IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| EDDIE OGLETREE, and individual, | ) | |
| GERAL STEPHENS, an individual, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CV: 3:07-cv-867-WKW |
| v. | ) | |
| | ) | |
| CITY OF AUBURN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| CWH RESEARCH, INC., | ) | |
| | ) | |

## CWH, INC.'S MOTION FOR SUMMARY JUDGMENT

CWH, Inc. ("CWH") moves the Court for judgment in its favor on all claims brought against CWH by the City of Auburn pursuant to Rule 56. Based on the pleadings on file and the depositions of Eddie Ogletree, Gerald Stephens, Steven Reeves, Lee Lamar, Larry Langley, and William Howard James, all of which are attached hereto as Exhibits A through E, respectively, there are no genuine issues of material fact and CWH is entitled to judgment as a matter of law.

/s/ William K. Hancock
William K. Hancock


Attorney for CWH Research, Inc.


OF COUNSEL:


753651-1

ADAMS & REESE LLP
2100 3rd Avenue North, Suite 1100
Birmingham, AL  35203
Telephone:  (205) 250-5000
Facsimile:  (205) 250-5034

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2008, I electronically filed same using the CMEF system which will electronically notify all attorneys of record.

Richard F. Horsley
King, Horsley & Lyons, LLC
1 Metroplex, Suite 280
Birmingham, AL 35209

Randall Morgan
Hill Hill Carter
P.O. Box 116
Montgomery, AL 36101-0116

/s/ William K. Hancock
OF COUNSEL

753651-1

# DEPOSITION OF GERALD STEPHENS

## May 30, 2008

## Pages 1 through 251

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


EDDIE OGLETREE, an individual,
GERALD STEPHENS, an
individual,

        Plaintiffs,

Vs.                                CIVIL ACTION NO.
                                   3:07-CV-867-WKW

CITY OF AUBURN, a municipality
in The State of Alabama, LARRY
LANGLEY, and individual, LEE LAMAR,
an individual, BILL HAM, JR., an
individual, STEVEN A. REEVES, an
individual, BILL JAMES, an
individual, CHARLES M. DUGGAN, an
individual, and CORTEZ LAWRENCE,
an individual,

        Defendants.

        * * * * * * * * * * * *

        DEPOSITION OF GERALD STEPHENS, taken pursuant

to stipulation and agreement before Pamela A. Wilbanks,

Certified Court Reporter, ACCR# 391, Registered

Professional Reporter and Commissioner for the State of

Alabama at Large, in the Law Offices of Hill, Hill,

Carter, Franco, Cole & Black, 425 South Perry Street,

Montgomery, Alabama, on Friday, May 30, 2008, commencing

### Page 2

1          APPEARANCES
2    FOR THE PLAINTIFFS:
3    Mr. Richard F. Horsley
     KING, HORSLEY & LYONS
4    Attorneys at Law
     1 Metroplex Drive
5    Suite 280
     Birmingham, AL 35209
6
     FOR THE DEFENDANTS:
7
     Mr. Randall Morgan
8    HILL, HILL, CARTER, FRANCO, COLE & BLACK
     Attorneys at Law
9    425 South Perry Street
     Montgomery, Alabama
10
     FOR CWH:
11
     Mr. William K. Hancock
12   ADAMS & REESE
     Attorneys at Law
13   Suite 1100
     2100 Third Avenue North
14   Birmingham, AL 35203
15   ALSO PRESENT:
16   Mr. Eddie Ogletree
     Mr. Steven Reeves
17   Mr. Lee Lamar
18
          * * * * * * * * * * * *
19
         EXAMINATION INDEX
20
     BY MR. MORGAN . . . . . . . . . . . .  5
21   BY MR. HORSLEY . . . . . . . . . . .  237
     BY MR. MORGAN . . . . . . . . . . . .  242
22
23        * * * * * * * * * * * *

### Page 3

1          DEFENDANTS' EXHIBIT INDEX
2    1   Copy of posting for the position of        78
         Battalion Chief
3
     2   Copy of memo sent by e-mail dated 2/17/06   78
4        to all personnel from Mr. Lamar concerning
         the Battalion Chiefs Assessment
5
     3   Copy of memo sent by e-mail dated 2/23/06   80
6        to all career personnel from Chief Langley
         concerning the Battalion Chiefs Assessment
7
     4   Sign-in sheet for the Battalion Chief       83
8        Assessment Orientation dated 2/28/06
9    5   Copy of Auburn Fire Division Orientation    87
         Manual
10
     6   Copy of 3/3/06 letter to the Battalion      100
11       Chief candidates from Mr. Lamar
12   7   Auburn Fire Division Battalion Chief        100
         Reading List Check-out Sheet, 3/3/06
13
     8   Auburn Fire Division Battalion Chief        100
14       Reading List Check-out Sheet, 3/3/06
15   9   Mr. Stephens' application for the           104
         promotion to Battalion Chief
16
     10  Copy of 4/4/05 letter to Mr. Stephens from  125
17       Steve Reeves
18   11  Copy of 4/14/06 letter to Mr. Stephens from 127
         Stephanie King
19
     12  Copy of 4/21/06 letter to Mr. Chief Lamar   128
20       from Mr. Clanton, Mr. Hodge, Mr. Ogletree
         and Mr. Stephens
21
     13  Copy of the Charge of Discrimination        188
22
23

### Page 4

1              STIPULATION
2         It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of GERALD STEPHENS is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Pamela A. Wilbanks,
7    Registered Professional Reporter and Commissioner for
8    the State of Alabama at Large, without the formality of
9    a commission, that objections to questions other than
10   objections as to the form of the question need not be
11   made at this time but may be reserved for a ruling at
12   such time as the said deposition may be offered in
13   evidence or used for any other purpose by either party
14   provided for by the Statute.
15        It is further stipulated and agreed by and
16   between counsel representing the parties in this case
17   that the filing of said deposition is hereby waived and
18   may be introduced at the trial of this case or used in
19   any other manner by either party hereto provided for by
20   the Statute regardless of the waiving of the filing of
21   the same.
22        It is further stipulated and agreed by and
23   between the parties hereto and the witness that the

### Page 5

1    signature of the witness to this deposition is hereby
2    waived.
3
4         * * * * * * * * * * * * *
5
6           GERALD STEPHENS
7    The witness, after having first been duly sworn
8    to speak the truth, the whole truth and nothing but the
9    truth testified as follows:
10
             EXAMINATION
11
     BY MR. MORGAN:
12
     Q.  State your name, please.
13
     A.  My name is Gerald Stephens.
14
     Q.  And Mr. Stephens, where do you live?
15
     A.  I live in Auburn, Alabama.
16
     Q.  What is your address?
17
     A.  My address is 828 Cahaba Drive, Auburn, Alabama
18       36830.
19
     Q.  And who do you live with there?
20
     A.  I live with my wife and my son.
21
     Q.  What is your wife's name?
22
     A.  My wife name is Richetta, R-I-C-H-E-T-T-A.
23
     Q.  And your son's name?

Deposition of Gerald Stephens                          May 30, 2008

| Page 6 |
|---|
| 1   Q.  Richetta, where does she work? |
| 2   A.  Richetta works with Media General, which is a |
| 3       company that oversees the Opelika-Auburn News of |
| 4       Opelika. |
| 5   Q.  And how old is your son Jameson? |
| 6   A.  My son Jameson is four years old. |
| 7   Q.  Do you have any ex-wives? |
| 8   A.  No, sir, I don't. |
| 9   Q.  Got any other children? |
| 10  A.  Yes, sir, I do. |
| 11  Q.  And their names and ages? |
| 12  A.  I have one daughter.  She's 17 years old.  Her |
| 13      name is Tarnesha, T-A-R-N-E-S-H-A. |
| 14  Q.  And where does she live? |
| 15  A.  She also lives in Auburn. |
| 16  Q.  Does she attend high school there? |
| 17  A.  Yes, sir, she does. |
| 18  Q.  Which high school? |
| 19  A.  Auburn High School. |
| 20  Q.  Who is her mother? |
| 21  A.  Her mother name is Tasha Smith. |
| 22  Q.  Where does Tasha live? |
| 23  A.  She also lives in Auburn. |

| Page 8 |
|---|
| 1   Q.  Let me just send an interrogatory. |
| 2       Are your parents still living? |
| 3   A.  My mother is.  My father is deceased. |
| 4   Q.  Where does your mother work, if she does? |
| 5   A.  My mother is retired. |
| 6   Q.  From where? |
| 7   A.  She was in child care.  She worked in several |
| 8       different places.  The last place she worked was |
| 9       First Baptist Church. |
| 10  Q.  And what is her name? |
| 11  A.  Dorothy Stephens. |
| 12  Q.  And your father's name? |
| 13  A.  James. |
| 14  Q.  And where was his last employment? |
| 15  A.  Post Office of Auburn, Alabama.  U.S. Postal |
| 16      Service. |
| 17  Q.  Do you have any brothers? |
| 18  A.  I do. |
| 19  Q.  That live in Lee County? |
| 20  A.  Yes, sir. |
| 21  Q.  How many? |
| 22  A.  I have two brothers -- three brothers -- I'm |
| 23      sorry -- that live in Lee County. |

| Page 7 |
|---|
| 1   Q.  Where does she work? |
| 2   A.  Last I recall she works at Lambert Child Care of |
| 3       Auburn. |
| 4   Q.  This case is in federal court, and I guess |
| 5       probably the easiest thing would be to send some |
| 6       interrogatories.  But I'm going to ask you if |
| 7       you've got any relatives in any of these |
| 8       counties. |
| 9       Do you have any relatives by blood or |
| 10      marriage in Lee County? |
| 11  A.  Yes, sir, I do. |
| 12  Q.  How about Chambers County? |
| 13  A.  No, sir. |
| 14  Q.  Macon County? |
| 15  A.  No, sir. |
| 16  Q.  Randolph County? |
| 17  A.  No, sir. |
| 18  Q.  Russell County? |
| 19  A.  No, sir. |
| 20  Q.  Tallapoosa County? |
| 21  A.  No, sir. |
| 22  Q.  How many relatives do you have in Lee County? |
| 23  A.  Several. |

| Page 9 |
|---|
| 1   Q.  Just give me their names. |
| 2   A.  Terry Byrd.  B-Y-R-D, last name.  Russell Byrd |
| 3       and Clemmon Byrd. |
| 4   Q.  Where does Terry work? |
| 5   A.  He's disabled at this time.  He doesn't work |
| 6       anymore. |
| 7   Q.  Russell? |
| 8   A.  He's disabled as well. |
| 9   Q.  And Clemmon? |
| 10  A.  Clemmon is a police officer of the City of |
| 11      Auburn, police division. |
| 12  Q.  And are they married? |
| 13  A.  Clemmon is. |
| 14  Q.  What's his wife's name? |
| 15  A.  Allison. |
| 16  Q.  Where does she work? |
| 17  A.  I think she works with Mental Health of Lee |
| 18      County, if I'm not mistaken. |
| 19  Q.  What's her maiden name? |
| 20  A.  I'm not really sure about that, Mr. Morgan. |
| 21  Q.  Got any sisters? |
| 22  A.  I do. |
| 23  Q.  How many sisters? |

Page 10

1   A.  One sister.
2   Q.  And her name is ...
3   A.  Cassandra Stephens Pitts.
4   Q.  Where does she work?
5   A.  She works in Montgomery.
6   Q.  What does she do over here?
7   A.  She works with the IRS Department of the State.
8   Q.  And her husband's name, if she has one?
9   A.  She's divorced, but her ex-husband name is
10      Robert Pitts.
11  Q.  And where does he live and work?
12  A.  He works in Opelika.  He lives in Auburn.
13  Q.  What does he do in Opelika?
14  A.  He works at the UniRoyal Plant.
15  Q.  Are you a member or do you regularly attend a
16      church?
17  A.  Yes, sir, I do.
18  Q.  What is that church?
19  A.  My church home is Ebeneezer Baptist Church of
20      Auburn.
21  Q.  Do you attend another church?
22  A.  Mr. Morgan, I attend several churches in the
23      City of Auburn.  I attend my wife's church,

Page 11

1       which is St. Luke CME, also of Auburn.
2   Q.  Okay.
3   A.  I attend Auburn United Methodist Church, which
4       is also of Auburn.  And I also attend Greater
5       Peace Baptist Church, which is in Opelika,
6       Alabama.
7   Q.  But you are officially a member of Ebeneezer?
8   A.  Yes, sir.
9   Q.  And I assume you attend St. Luke's because your
10      wife goes there?
11  A.  Yes, sir.  Wife and son.
12  Q.  What about these other two:  Auburn United
13      Methodist and Greater Peace?
14  A.  Those are just neighboring churches in the
15      community that I'm affiliated with the people
16      that go there and the ministers.  So I attend
17      them on a regular basis.
18  Q.  Do you hold any position in any of these
19      churches?
20  A.  No, sir.
21  Q.  Deacon or anything like that?
22  A.  No, sir.
23  Q.  Are you a member of any clubs, civic, social --

Page 12

1   A.  I am a member -- I'm sorry.
2   Q.  -- political organizations in Lee County or any
3       of these other counties?
4   A.  I am a member of an organization by the name of
5       People of Action for Community Enrichment.  The
6       icon on that is PACE, and it is of Lee County.
7   Q.  What kind of group is that?  What do they do?
8   A.  It's a social communication where we implement
9       youth development and educational skills.  We
10      oversee our organization, which is a reading
11      club, to induce basically educational skills for
12      growing youth.
13  Q.  Is that a mixed race group?
14  A.  Yes, sir, it is.
15  Q.  Where is it located?  Does it have an address?
16  A.  We meet monthly in Opelika.  We don't have a
17      general area where we consider to be a part of.
18  Q.  Are there any other Auburn firefighters that are
19      members of that club?
20  A.  No, sir, not that I'm aware of.
21  Q.  Are you a member of the NAACP?
22  A.  No, sir.
23  Q.  Have we covered all your clubs, civic, political

Page 13

1       organizations?
2   A.  (Witness nods head positively.)
3   Q.  Any others?
4   A.  Not that I'm aware of at this time, sir.
5   Q.  Or any that you've been a member of, say, within
6       the last five years that you're no longer a
7       member of?
8   A.  I am a part of a Masonic organization, if that
9       would apply to it or whatever.
10  Q.  Okay.  Where is it located?
11  A.  Auburn.
12  Q.  What's the name of it?
13  A.  Milton W. Howze, H-O-W-Z-E.  Lodge Number 408.
14  Q.  And what does that organization do?
15  A.  Community involvement as far as -- Basically
16      what we do is just help out in the community,
17      help local businesses, fundraisers, anything
18      that pretty much enhances the community.
19  Q.  Have you, other than this lawsuit, been a
20      plaintiff, sued anyone else, other than this
21      lawsuit?
22  A.  No, sir, not that I can recall.
23  Q.  Have you ever been sued by anybody?

| | Page 14 |
|---|---|
| 1 | A. No, sir. |
| 2 | Q. Ever been in bankruptcy? |
| 3 | A. No, sir. |
| 4 | Q. Have you ever had any judgments against you for |
| 5 | anything? |
| 6 | A. In reference to -- Just in particular? |
| 7 | Q. Anything. Loans, collections -- |
| 8 | A. No, sir. |
| 9 | Q. -- cases? Anything? |
| 10 | A. No, sir. |
| 11 | Q. Have you ever been arrested? |
| 12 | A. In my early years, yes, sir. |
| 13 | Q. What for? |
| 14 | A. I had a driving violation, 16 years old. |
| 15 | Q. Like a speeding ticket? |
| 16 | A. DUI. |
| 17 | Q. Anything else? |
| 18 | A. Other than speeding tickets. From that point |
| 19 | on, no, sir. |
| 20 | Q. And any convictions? Were you convicted of the |
| 21 | DUI? |
| 22 | A. Yes, sir, I was. |
| 23 | Q. Any other convictions other than that? |

| | Page 15 |
|---|---|
| 1 | A. No, sir. |
| 2 | Q. Tell me about your educational background. |
| 3 | You're a high school graduate? |
| 4 | A. Yes, sir. |
| 5 | Q. Where did you graduate from? |
| 6 | A. Auburn High School. |
| 7 | Q. What year? |
| 8 | A. 1990. |
| 9 | Q. Have you attended college or junior colleges? |
| 10 | A. Yes, sir. |
| 11 | Q. Where have you been? |
| 12 | A. Auburn University. |
| 13 | Q. What year did you start? |
| 14 | A. 1990. |
| 15 | Q. And did you complete it? |
| 16 | A. No, sir. 1992. I did two years at Auburn |
| 17 | University. |
| 18 | Q. What was your course of study? |
| 19 | A. Business. |
| 20 | Q. And what was the reason why you did not complete |
| 21 | it? |
| 22 | A. I had a child at the time, and I needed to work. |
| 23 | Q. Did you have any academic problems? |

| | Page 16 |
|---|---|
| 1 | A. No, sir. |
| 2 | Q. Any other formal education? |
| 3 | A. Yes, sir. I attended several junior colleges: |
| 4 | Southern Union, Chattahoochee Valley State |
| 5 | Community College, Shelton State Community |
| 6 | College, Alabama State Fire College. |
| 7 | Q. Is that at Shelton State or is that separate? |
| 8 | A. Yes, sir. That's through Shelton State in |
| 9 | Tuscaloosa. |
| 10 | Q. In terms of Southern Union, did you receive a |
| 11 | diploma, certificate or anything from that or |
| 12 | were you attending courses related to your fire |
| 13 | work? |
| 14 | A. Courses related to my fire work. |
| 15 | Q. And how about Chattahoochee Valley? Same thing? |
| 16 | A. Courses related to my fire work. |
| 17 | Q. Shelton State? |
| 18 | A. Yes, sir. Courses related to my fire work. |
| 19 | Q. And the Alabama Fire College, is that something |
| 20 | that all firefighters attend or do you have to |
| 21 | be selected to attend the Alabama Fire College? |
| 22 | How does that work at Auburn? |
| 23 | A. As far as I've been working there, it was an |

| | Page 17 |
|---|---|
| 1 | opportunity for firefighters to go and to better |
| 2 | enhance themselves as far as the fire |
| 3 | professional field and career. |
| 4 | Q. Do you have to attend the Alabama Fire College |
| 5 | as an employee of Auburn Fire Department? |
| 6 | A. Yes, sir, I do. |
| 7 | Q. So all firefighters, once they are hired and |
| 8 | become, I guess, non-probationary, they have to |
| 9 | attend the fire college? |
| 10 | A. Yes, sir. In order to be employed with the |
| 11 | Auburn Fire Division, to my understanding you |
| 12 | must undergo several weeks of training which |
| 13 | comes from the State Fire College through |
| 14 | certifications and all that. |
| 15 | Q. Now, are there state-required minimum standards |
| 16 | for firefighters before you can be hired? |
| 17 | A. Before? |
| 18 | Q. Yes. Or as part of your hiring process. |
| 19 | A. Not before, no. And I'm only speaking from my |
| 20 | experience. When I was hired I underwent |
| 21 | educational and physical training through the |
| 22 | State Fire College at that point. It was not |
| 23 | prior to. |

**Page 18**

1  Q. Okay. In order to be certified in the state of
2     Alabama as a firefighter, do you have to
3     complete certain things?
4  A. Yes, sir.
5  Q. And what do those include?
6  A. I had to complete Firefighter I certification.
7  Q. And where did you do that?
8  A. The training was conducted in Lee County at the
9     Opelika training grounds through my employer.
10  Q. Are you a veteran?
11  A. No, sir.
12  Q. No time in the military?
13  A. No, sir.
14  Q. When were you first employed with the City of
15     Auburn?
16  A. I was first employed in 1991.
17  Q. Now, were you a student firefighter?
18  A. Yes, sir, I was.
19  Q. And tell me what you had to do to be a student
20     firefighter.
21  A. Of course, I had to submit an application. And
22     once selected I had to undergo several weeks of
23     training, what they consider to be a rookie

**Page 19**

1     school.
2  Q. Who would be your supervisor when you were a
3     student firefighter?
4  A. My immediate supervisor was a team leader.
5  Q. Do you remember who?
6  A. If I'm thinking correctly, my first team leader
7     was by the name of Ronald Blankenship.
8  Q. And how long did you remain a student
9     firefighter?
10  A. Three years.
11  Q. That would have been up till about '94?
12  A. Yes, sir.
13  Q. And then you became a ...
14  A. Career firefighter, yes, sir.
15  Q. If you left Auburn in -- the university in '92,
16     how did you remain a student firefighter up
17     through '94?
18  A. I went to Auburn University for two years, and
19     then after that I started taking courses through
20     the junior colleges.
21  Q. Academic courses or fire-related courses?
22  A. Both.
23  Q. What junior colleges did you take academic

**Page 20**

1     courses in?
2  A. Southern Union and Chattahoochee Valley.
3  Q. Did you receive a certificate or diploma or
4     complete the coursework academically at either
5     Southern Union or Chattahoochee?
6  A. I have my grades and records to show that I
7     attended those, but certification-wise, not
8     during that period of time.
9  Q. What I'm asking is -- Usually, I guess, if you
10     go two years, you get some sort of certificate
11     at the end: I've completed this course of study
12     at a junior college. Did you ever achieve that
13     from either Southern Union or Chattahoochee?
14  A. No, sir.
15  Q. But that allowed you to stay on as a student
16     firefighter?
17  A. Yes, sir.
18  Q. What did you do to become a regular firefighter?
19  A. I submitted an application.
20  Q. And I assume you were hired?
21  A. Yes, sir.
22  Q. According to my notes, I've got that you were
23     hired January 17, 1994. Is that about right?

**Page 21**

1  A. That was my first day on shift. I was
2     actually -- According to my state retirement
3     records and all that, I officially started
4     January 1st.
5  Q. Of '94?
6  A. Yes, sir.
7  Q. Speaking of retirement, do you get time credited
8     on your retirement for the period when you were
9     a student firefighter?
10  A. I didn't ever get any, no, sir.
11  Q. Do they do that now?
12  A. Yes, sir.
13  Q. So did they go back and pick up your three
14     years?
15  A. Well, I was given an opportunity to do that, but
16     I didn't.
17  Q. You would have had to have pay in, I guess?
18  A. Yes, sir.
19  Q. We talked about training, going to the Alabama
20     Fire College and the Firefighter I training you
21     received in Lee County. Did you have to undergo
22     any additional training to be a career
23     firefighter from what you had already received

Page 22

1    as a student firefighter?
2    A.  Yes, sir.  I underwent a lot of training that
3         was basically voluntary that I chose to pursue
4         on my own.
5    Q.  Let me back up.
6         As a requirement -- I assume when you were
7         hired as a student firefighter, you had to have
8         fire training just like anybody else.
9    A.  Yes, sir.
10   Q.  Did you have to have any additional required
11        training when you made the transition from
12        student to career?
13   A.  Yes, sir.  I had to -- Within a year I had to
14        pass a course or certification of Firefighter
15        II.  And I can't remember how many years later,
16        but I was required to pass an apparatus operator
17        certification.
18   Q.  And I assume you did all that without any
19        problem?
20   A.  Yes, sir.  No problems.
21   Q.  Other than the fire department or fire division
22        with City of Auburn, have you had -- between
23        high school and becoming a career -- what I call

Page 23

1    a career firefighter in '94, did you have any
2         other employments?
3    A.  Yes, sir.
4    Q.  Where else were you employed?
5    A.  I had several.  I worked with Lamar Lawn Care,
6         and that's of Auburn.  I worked at JJ Raceway,
7         which is a convenience store/gas station, and
8         that's of Auburn.  I worked at Wal-Mart
9         Supercenter, and that was in Opelika, Alabama.
10        I'm trying to think.  Two years ago I started my
11        own business as a lawn care and landscaping
12        service business, and I've been doing that for
13        two years.  I think I touched them all.  I
14        think.
15   Q.  Now, I'm aware of two EEOC charges which you
16        filed.
17   A.  Yes, sir.
18   Q.  The one about the battalion chief and promotion,
19        and then one several years earlier that I think
20        had to do with the Horace Clanton assignment.
21        Have you filed any other EEOC charges other
22        than those two?  Not just the City of Auburn but
23        anybody.  Any other, other than those two EEOC

Page 24

1    charges?
2    A.  No, sir, I haven't.  Other than the two you've
3         spoken of.
4    Q.  And in the grievances, I'm aware that you filed
5         a grievance after the battalion chief promotion
6         procedure.  Have you filed any other grievances
7         with the City of Auburn?
8    A.  I have initiated grievances, but I've never
9         completed them.  Well, I didn't complete those
10        that were initiated.  After going through the
11        procedures that are in place with the City, it
12        was handled through the process.
13   Q.  Let me get a list of those.  The battalion
14        chief -- The grievance related to the battalion
15        chief promotion, you completed that process?
16   A.  Yes, sir.
17   Q.  What grievances have you filed that you
18        didn't -- Let me back up.  I want to be clear.
19        That's the only grievance procedure that
20        you've completed.
21   A.  It was two grievance procedures I completed.
22        One was in 2005 where I went -- where I
23        underwent all the procedures of the City and

Page 25

1    actually had a hearing.  And that was in 2005
2         where I was pretty much on my -- alone on that
3         grievance and pursued all procedures in
4         reference to.
5    Q.  What was the 2005 one about?
6    A.  That one was about -- That was when Mr. Horace
7         Clanton was assigned as acting battalion chief
8         in the presence of our official battalion chief
9         who had health issues at the time.
10   Q.  You actually had a hearing on it?
11   A.  Yes, sir.
12   Q.  Who was the hearing officer?
13   A.  The city Judge, Judge Joe Bailey.
14   Q.  Just briefly, what was the outcome of his --
15   A.  That I can recall, basically they stated that
16        they didn't find anything in reference to me
17        having a grievance or any grounds in reference
18        to my complaint that I was applying on the City.
19   Q.  Were you the only person involved in that
20        grievance?
21   A.  Yes, sir.
22   Q.  And is that the same incident or scenario that
23        led to the EEOC charge?

6623b598-899c-485a-b995-fb9fd663a9ce

| Page 26 |
|---|
| 1   A.  The first one. |
| 2   Q.  Yes, sir. |
| 3   A.  Yes, sir. |
| 4   Q.  And did you receive a right to sue letter on |
| 5       that first EEOC charge involving Mr. Clanton? |
| 6   A.  From the attorney firm that I had at that time, |
| 7       yes, I did receive one. |
| 8   Q.  You had a law firm representing you at that |
| 9       time? |
| 10  A.  I had a law firm I was consulting with, yes. |
| 11  Q.  Who were they? |
| 12  A.  Brooks Law Firm of Birmingham, Alabama. |
| 13  Q.  But my understanding is you did not file a |
| 14      lawsuit as a result of that EEOC complaint; is |
| 15      that true? |
| 16  A.  No, sir. |
| 17  Q.  No, sir, you -- |
| 18  A.  No, I didn't. |
| 19  Q.  It's true you did not file a complaint? |
| 20  A.  I filed a complaint and went all the way through |
| 21      the hearing and to the point where I got the |
| 22      right to sue letter, but after -- |
| 23         MR. HORSLEY:  He's talking about a |

| Page 27 |
|---|
| 1        lawsuit. |
| 2   Q.  You didn't file a lawsuit as a result of that? |
| 3   A.  No, sir. |
| 4   Q.  So you didn't file a lawsuit as a result of |
| 5       either that EEOC charge or grievance? |
| 6   A.  No, sir. |
| 7   Q.  Tell me what other grievances that you filed |
| 8       with the City that you didn't complete the |
| 9       process. |
| 10  A.  Past and present? |
| 11  Q.  Yeah.  All of them. |
| 12  A.  All of them.  Okay. |
| 13  Q.  Well, let me back up.  I want all of them, but |
| 14      if you have any present ones that are still |
| 15      pending, I'm going to put them in a different |
| 16      category. |
| 17  A.  Okay. |
| 18  Q.  Do you have any grievances that are still |
| 19      pending? |
| 20  A.  No, sir. |
| 21  Q.  So all -- |
| 22  A.  Present day, no, sir. |
| 23  Q.  So all the grievances that you're about to tell |

| Page 28 |
|---|
| 1       me about you filed but did not complete the |
| 2       process? |
| 3   A.  I didn't go through the whole process where a |
| 4       hearing was involved. |
| 5   Q.  Okay.  Tell me about those grievances.  And if |
| 6       you can, start at your earliest one that you can |
| 7       remember. |
| 8   A.  If I'm thinking correctly, the first one I ever |
| 9       filed was in 2001, and that was filed on my |
| 10      immediate supervisor, Melvin Dean Garrett. |
| 11  Q.  Just tell me what was the nature of the |
| 12      grievance. |
| 13  A.  Basically I was being labeled as a problem from |
| 14      my immediate supervisor and coworkers, and I |
| 15      thought I was being treated unfairly.  So I |
| 16      underwent the grievance procedures of the City. |
| 17  Q.  And how was that resolved? |
| 18  A.  Basically it was resolved when we got to the |
| 19      acting fire chief at the time, Mr. Larry |
| 20      Langley. |
| 21  Q.  And how did Mr. Langley resolve it? |
| 22  A.  Basically the problem was confronted at hand, |
| 23      and to make a long story short, we left the room |

| Page 29 |
|---|
| 1       with an understanding that the problem wouldn't |
| 2       happen again. |
| 3   Q.  And did that work out to your satisfaction? |
| 4   A.  For a little bit of time it did, yes, sir. |
| 5   Q.  What was there about being labeled a problem |
| 6       that you considered being unfair treatment? |
| 7   A.  Well, there was a lot of things going on on |
| 8       shift whereas it was presented to me that people |
| 9       had problems working for me, working with me, |
| 10      or, better yet, just saying overall that I |
| 11      wanted things done my way, of that nature, |
| 12      whereas I was doing basically what I was told or |
| 13      advised to do through my immediate supervisor, |
| 14      who was Captain Garrett at the time. |
| 15  Q.  Now, you were a lieutenant then? |
| 16  A.  Yes, sir. |
| 17  Q.  And you would have reported to Captain Garrett? |
| 18  A.  Yes, sir.  That's my immediate supervisor. |
| 19  Q.  What location was this? |
| 20  A.  This happened at Station 1. |
| 21  Q.  And I want to be clear.  Would the captain have |
| 22      been the highest ranking officer at Station 1 at |
| 23      that time? |

Page 30

1   A.   Captain Garrett was the shift commander for that
2        shift.  And if I'm thinking correctly, that
3        was -- I want to say it was A shift, but
4        don't -- I don't actually recall the actual
5        shift.  But he was the shift commander.
6   Q.   And would y'all have both been on the same shift
7        at the same time?
8   A.   Yes, sir.  Same station.
9   Q.   When is the next grievance that you recall?
10  A.   The next one was on -- was when I changed
11       shifts.  I went through a shift change and
12       received another immediate supervisor by the
13       name of Danny Leverette.
14  Q.   Just generally what was the nature of that
15       complaint?
16  A.   It was basically a problem from the previous
17       grievance I filed where it carried over, and the
18       same things pretty much started happening again.
19  Q.   You were labeled a problem?
20  A.   Yes, sir.
21  Q.   How was that resolved?
22  A.   Same procedures.  Underwent the procedures and
23       got to Mr. Langley's office again, and I

Page 31

1        requested that it stop.  And we left his office
2        with the understanding that it would.
3   Q.   And did it work out?
4   A.   For a little -- short period of time, yes.
5   Q.   And when is your next grievance?
6   A.   I'm trying to get them in order here.  I
7        initiated a grievance -- I don't recall the
8        date.  I initiated a grievance in reference to
9        my evaluation.  And basically that was about the
10       fact that my evaluation was due at a certain
11       time, and it wasn't according to the rules in
12       place.
13  Q.   Wasn't timely completed?
14  A.   No, sir, it wasn't timely.
15  Q.   And who was the person that was supposed to
16       evaluate you?
17  A.   I don't recall that, Mr. Morgan.  I'm sorry.
18  Q.   How was that --
19  A.   I received my evaluation.  It was late but I
20       received it.
21  Q.   Did you have to go any further than just
22       initiating a grievance?  Did you meet with Larry
23       Langley or --

Page 32

1   A.   No, sir.  I pretty much presented it to my
2        immediate supervisor.  What he did, I don't
3        know, but I received my evaluation immediately.
4   Q.   Any other grievances you filed?
5   A.   I've had to do that twice.  I had to file a
6        grievance twice on that, evaluation purposes.
7   Q.   Okay.
8   A.   For the same reasons.
9   Q.   And I assume it was the same result on each one
10       of them?
11  A.   Yes, sir.
12  Q.   You talked to your superior officer, and the
13       next thing is you get your evaluation?
14  A.   Yes, sir.
15  Q.   Any other grievances?
16  A.   If I'm thinking correctly, the next one was when
17       I was assigned to Station 5.  I'm sorry.  I'm
18       sorry.  Back up.
19            I started a grievance about an incident that
20       happened on the fire scene over a fire call that
21       involved Mr. Larry Langley.  And my immediate
22       supervisor at that time was the late Jimmy
23       Brown, who is deceased at this time.

Page 33

1   Q.   What rank was Langley at the time?
2   A.   Langley was acting fire chief.
3   Q.   Just briefly tell me what happened.
4   A.   Basically what happened on that incident was we
5        was on an actual working structure fire, fire
6        call, that day.  Captain Brown at the time was
7        not working.  The acting supervisor was Dennis
8        Carlisles.  And during the process of working
9        that structure fire, Mr. Langley arrived on the
10       scene.  And from what I saw, he was in the way.
11       He didn't have on his proper equipment, and we
12       was trying to work.  And basically I asked him
13       to remove himself from what we considered to be
14       the hot zone of the fire scene.  And the remark
15       he gave me back was something I probably
16       shouldn't say.
17  Q.   You can say it.  We've probably all heard
18       something similar.
19  A.   Well, to the best of my knowledge, he told me,
20       I'm the damn fire chief; I do what I want to do;
21       you just get to work.  Not in those exact
22       words.
23            So at that point I asked -- I went to the

## Page 34

1    immediate supervisor, Mr. Carlisles, and asked
2    him could he remove him from the fire scene so
3    we could do our work. And the response
4    Mr. Carlisles gave me at that time was, I told
5    him, and he basically told me he was the fire
6    chief and he do what he want to do.
7        So we worked through that and put the fire
8    out. And after the fire when we returned to the
9    station, it was a called meeting for the
10   personnel on shift who actually fought the
11   fire. And in this meeting, again Mr. Langley
12   became very irate with me in front of everybody
13   who was present. And at that point I considered
14   things to be totally out of hand so I sat down,
15   and I just didn't say anything else until
16   everybody left. And when everybody did leave,
17   to make a long story short, I told him that I
18   would not accept that type of behavior and I
19   just wasn't going to tolerate it.
20       So therefore I wrote a letter to my
21   immediate supervisor, who -- when he came back
22   to work. Explained it to him, what happened.
23   And his response basically was, this is

## Page 35

1    something that always happens at the fire scene;
2    you should be used to this by now; deal with
3    it. And being that I got that response, I
4    decided not to do anything at that point but to
5    just have that documented and in my presence.
6    Q. Any other grievances?
7    A. I think the next one was when I was assigned to
8    Station 5, the new station that was recently
9    built or the last station that was recently
10   built, the fire station that was built in
11   Auburn.
12   Q. Tell me about that one.
13   A. This particular grievance involved an incident
14   where a young man was -- I'm trying to think of
15   a good word. He was violated and he chose to
16   pursue it.
17   Q. Who is this?
18   A. His name was Paden Payton.
19   Q. Pagan?
20   A. Paden Payton.
21   Q. P-A-D-E-N?
22   A. Payton Paden. I'm sorry. P-A-Y-T-O-N
23   P-A-D-E-N.

## Page 36

1    Q. How was he violated?
2    A. It was one of those situations where you're new
3       on the shift, and this is our way of initiating
4       you in sort of speaking, something that happens
5       or has happened at the fire station. But this
6       particular time when it happened, he felt
7       violated and he came to me.
8    Q. Can you tell me what it was that was done to him
9       or that he relayed to you?
10   A. From what I was told and from what I observed
11      when it was presented to me, he was severely wet
12      down with water and covered with food product,
13      duck-taped, et cetera, et cetera, to the point
14      where -- He told me in the beginning it was
15      against his will. Like I say, Mr. Morgan, I
16      didn't see it. It was brought to me after the
17      fact. And when I asked him what did he want me
18      to do about it in reference to, he said he
19      wanted me to do something. So the only thing I
20      knew to do was to follow the procedures that
21      were in place for the City.
22   Q. Is he a white male?
23   A. He is a white male.

## Page 37

1    Q. Did you file a grievance on his behalf or did he
2       file his own grievance?
3    A. Well, that's leading to -- everything that was
4       done was through me as his immediate
5       supervisor. I guess I should just tell you all
6       in detail leading to the point where I did what
7       I did. Would that be okay?
8    Q. Sure.
9    A. I presented in writing what I was told by him
10      and my guys on my shift to my immediate
11      supervisor. From that point I think it went to
12      the Public Safety Department, whereas the deputy
13      fire chief, acting fire chief, training chief,
14      all those superior officers got involved to
15      investigate. And to make a long story short, I
16      convinced Mr. Paden to the point that we can try
17      to resolve this in-house if we possibly can. Of
18      course, he can do anything he want. That was
19      his choice. But as his immediate supervisor and
20      on the behalf of the division, I was trying to
21      resolve this in-house and in a progressive
22      manner as much as possible. And it was.
23          Mr. Paden's request was to remain under my

Page 38

1    immediate supervision until he regained his
2    confidence. And he did stay with me; that is,
3    until I was told to report to another station.
4    And when I was told to report to another
5    station, I didn't understand why. And, of
6    course, when I told Payton that I was advised to
7    move to another station, he resigned. And his
8    reason for resigning was that he asked to remain
9    under my immediate supervision until he regained
10    his confidence. Being that they were moving me
11    and I wasn't there to be over him, he didn't
12    feel confident anymore to even work there and he
13    resigned.
14    Q.   What station was that?
15    A.   Station 5.
16    Q.   Is that something that's called hazing?
17    A.   Yes, sir, that's exactly what it is.
18    Q.   Did he participate in any hazing himself?
19    A.   According to the investigation from what I was
20        told, they say he did. According to Mr. Paden,
21        he say he didn't.
22    Q.   Have you ever participated in any hazing?
23    A.   No, sir.

Page 39

1    Q.   Not even as a young firefighter?
2    A.   No, sir.
3    Q.   What's your next grievance that you started but
4        didn't complete?
5    A.   Well, I think the last grievance I started and
6        didn't complete was in reference to the incident
7        with Mr. Paden whereas I questioned why I was
8        being moved from Station 5. And it was with
9        Mr. Lamar, who at the time was the deputy chief.
10    Q.   You went from 5 to where?
11    A.   I went from 5 to Station 4.
12    Q.   And did you file a grievance and it went up
13        to --
14    A.   I initiated a grievance, and it stopped at
15        Mr. Lamar.
16    Q.   And how was it resolved?
17    A.   Basically it was decided between him and my
18        immediate supervisor, who was Matthew Jordan.
19        What happened was that when I initiated a
20        grievance, the response was that Chief Jordan
21        was going administratively working Monday
22        through Friday and that a new shift commander
23        was stepping in by the name of Joey Darby. And,

Page 40

1    of course, that took place, but I was still
2    given an opportunity to move back to Station 5
3    by Mr. Lamar. And after conversing with my
4    immediate supervisor -- present immediate
5    supervisor, Mr. Darby, Chief Darby, and through
6    agreement with him as my immediate supervisor, I
7    chose to remain at Station 4 and just work
8    things out from that point.
9    Q.   Which station was Jordan the shift commander, 4
10        or 5?
11    A.   Chief Jordan was working administrative duties
12        as a battalion chief. He was working in the
13        public safety building. He was working Monday
14        through Friday schedule. He was not assigned --
15        Prior to him becoming shift commander, he was
16        not assigned to a station.
17    Q.   Here's why I'm confused. You were at Station 5
18        and transferred to Station 4.
19    A.   Yes, sir.
20    Q.   Did you have any problems with the shift
21        commander at Station 5?
22    A.   No, sir.
23    Q.   Did you want to leave Station 5?

Page 41

1    A.   No, sir.
2    Q.   When you arrived at Station 4, did you have any
3        problems with the shift commander?
4    A.   No, sir.
5    Q.   You just didn't want to go from 5 to 4?
6    A.   Basically I was asked to go to Station 5 when it
7        opened by Mr. Langley. And I had put in a
8        request to go to Station 5 when it was being
9        built that I explained to my immediate
10        supervisor. So my problem was here I am being
11        requested to go and asking to go, and a month
12        and a half later or right at almost two months
13        I'm being asked to leave. And I wanted to know
14        why.
15    Q.   And did you ask somebody why?
16    A.   I asked Chief Jordan why.
17    Q.   What did he say?
18    A.   The response he gave me was: You're closer to
19        home and you don't have to travel so far to get
20        to work. And my response to him was: For 14
21        years I've never been late for work regardless
22        of where the station was and how far I had to
23        travel.

Page 42

1   Q.  But now that you're at -- Are you still at 4?
2   A.  I'm still at 4.
3   Q.  And once you got to 4 and you filed your
4       grievance, they gave you an opportunity to go
5       back to 5 and you elected to stay at 4?
6   A.  Yes, sir.  After speaking with my present
7       supervisor.
8   Q.  Is there some significance in Darby becoming the
9       shift commander --
10  A.  That was not my call.  That was somebody else's.
11  Q.  I mean is there some significance in him being
12      shift commander that influenced you to stay at
13      4?
14  A.  Yes, sir.
15  Q.  And what was that?
16  A.  Basically Chief Darby was coming on fresh.  He
17      hadn't made this decision with me.  And after
18      talking with him and letting him know what I
19      thought about the move in general, we just came
20      to a conclusion where we worked it out where I
21      would stay at 4 and the other guy would remain
22      at 5 who actually replaced me when I left.
23  Q.  And do you agree with me that it is up to the

Page 43

1       chief or his administrative assistant to
2       determine where firefighters be assigned?
3   A.  It's not my decision, Mr. Morgan.  As far as I
4       know, it is everyone above me -- that's
5       battalion chief and up -- who make those
6       decisions.
7   Q.  And do you agree with me they are the ones that
8       should make those decisions?
9   A.  They are in position to make those decisions so
10      therefore, I guess, it's their duty to make
11      those decisions when the time come.
12  Q.  Now, you applied for promotion to lieutenant in
13      '96?
14  A.  Yes, sir.
15  Q.  And you were promoted?
16  A.  Yes, sir.
17  Q.  What was the procedure for lieutenant?
18  A.  At that time?
19  Q.  Yes, sir.
20  A.  At that time I underwent an assessment center.
21  Q.  Explain that to me.
22  A.  An assessment center consists of a panel of
23      assessors, non-affiliated with Auburn Fire

Page 44

1       Division or the City of Auburn in general.
2       Basically what you have is a panel of officers,
3       lieutenant or higher, who would sit through a
4       scenario or different scenarios throughout the
5       entire procedures.  I think the procedures at
6       that time lasted a week.  And basically what I
7       had to do was undergo these scenarios to the
8       point where they would take the information
9       received and grade me appropriately or
10      accordingly.  Didn't take a written test.  Had
11      to be eligible to apply for the position
12      basically was the only requirement.  And at that
13      time, I was eligible to apply; therefore, I did.
14  Q.  Do you remember what the eligibility
15      requirements were?
16  A.  No, sir, I don't recall.  But at the time I know
17      I had several certifications:  Firefighter I and
18      II, Instructor I and II, Fire Officer 1 and II,
19      hazmat technician, apparatus operator, pumper
20      certification.  Fire Inspector I, I think I had.
21  Q.  What I was asking actually is:  Were there any
22      time in grade requirements?  Did you have to be
23      a permanent firefighter?

Page 45

1   A.  I was never -- Well, you had to be a career
2       firefighter to apply.
3   Q.  Okay.
4   A.  But I was not given any pertinent time in
5       reference to applying for this position.
6   Q.  So if I became a career firefighter on April
7       1st, I could have taken the promotion procedure
8       for lieutenant on April 5?
9   A.  One thing I was told is that I couldn't apply if
10      I was on probation.
11  Q.  Okay.
12  A.  And I wasn't on probation when I applied.  Let
13      me confirm that.
14  Q.  How long is your probationary period?
15  A.  My probationary period when I became career --
16      well, when I became a student was one year.  My
17      probationary period when I became a career
18      firefighter was one year, and my probationary
19      period when I became a lieutenant was one year.
20  Q.  So you had to at least have one year of service
21      as a career firefighter to apply for lieutenant
22      when you applied?
23  A.  In reference to me, yes, sir.

Deposition of Gerald Stephens                          May 30, 2008

Page 46

1    Q.  What were the ranks in the fire department in
2         '96 when you applied for lieutenant?
3    A.  Okay.  Chain of command in '96 was student
4         firefighter, career firefighter, team leader,
5         lieutenant, captain, deputy chief and fire
6         chief.  And that's from -- leads to your
7         superior.
8    Q.  And what was your understanding as to the
9         evolution of team leaders?  What were they to do
10        as you understood it and what did they do?
11   A.  Team leaders supervise student firefighters.
12        They were created contingent to the student
13        firefighter program whereas fire lieutenants was
14        part of the career ladder itself.  Student
15        firefighters and team leaders was a temporary
16        full-time position whereas lieutenant and up
17        were career positions:  salaries, benefits, the
18        whole nine.
19   Q.  And where did you get that understanding?
20   A.  I got it in writing from the requirements.  The
21        understanding, whatever, came through the City
22        of Auburn rules and regulations, et cetera.
23   Q.  Team leader would be a career firefighter?

Page 47

1    A.  A team leader would be a career -- The way it
2         worked was you had to be a career firefighter to
3         apply for team leader.  You couldn't apply for a
4         team leader position that I'm aware of as a
5         student firefighter.  You couldn't do it.
6    Q.  Student firefighters can't do anything but be
7         student firefighters.
8    A.  That's it.
9              MR. HORSLEY:  We're still talking
10             1996, right?
11   A.  Yes.
12   Q.  Yes.  I'm just trying to --
13   A.  Yes, sir.
14   Q.  -- get the promotion procedures as we go
15        forward.
16   A.  Understand, Mr. Morgan, I've never been a team
17        leader.
18   Q.  I understand.
19   A.  But from what I understand, you become career.
20        And if the position became available, these guys
21        applied, or the career firefighters who was
22        eligible or wanted to apply applied.
23   Q.  Are you familiar with the promotion process that

Page 48

1    was used for team leaders?
2    A.  All I can tell you, Mr. Morgan, was it was a
3         structured interview.
4    Q.  Did you ever participate in the structured
5         interview?
6    A.  I never went through a structured interview for
7         a team leader, but I have on occasion sat in as
8         an interview board.
9    Q.  You were on the interview board.  How many
10        interview boards did you have -- were you on?
11   A.  Several, Mr. Morgan.  Estimated four times, I
12        guess.  It was several times.
13   Q.  In your opinion has the role of a team leader
14        changed from what you just described in '96 up
15        until, what year was it, '06, I guess, that they
16        became lieutenants?
17   A.  Yes, sir.
18   Q.  Did the role of team leaders change during that
19        period of time?
20   A.  For the record, Mr. Morgan, I was the last
21        lieutenant promoted in the Auburn Fire
22        Division.  Anything after my promotion was team
23        leaders.

Page 49

1    Q.  How many lieutenants were there when you were
2         promoted?
3    A.  Three, maybe four.
4    Q.  You were the last lieutenant?
5    A.  I was the last lieutenant to be promoted in the
6         Auburn Fire Division through an assessment
7         center.
8    Q.  So then the team leaders that came after you,
9         did they assume the responsibilities of a
10        lieutenant?
11   A.  Through the powers that be, they were allowed to
12        conduct themselves on my level or on a level of
13        a fire lieutenant.
14   Q.  So their role, at least in your viewpoint,
15        expanded from just being supervisors for student
16        firefighters to assuming the responsibilities of
17        a lieutenant?
18   A.  They was assuming the responsibilities for
19        career firefighters.
20   Q.  Say the last year that there were team
21        leaders -- '04, '05, whatever year that may
22        be -- in your opinion was there any difference
23        in what you as a lieutenant did as opposed to

13  (Pages 46 to 49)

Page 50

1    what a team leader did?
2    A. No, sir. Basically from 1996 and up, they were
3       acting as station officers, which that's what I
4       am. I'm a station officer. I just had a
5       different title as they. And I underwent a
6       different procedure as far as being promoted.
7       Other than that they stepped in as a station
8       officer and conducted themselves as a station
9       officer to their ability.
10   Q. Once you were promoted to lieutenant, I assume
11      you had a new assignment at that point.
12   A. As far as responsibilities, duties, stations and
13      all that?
14   Q. Yes.
15   A. Yes, sir. I had a very wide range of
16      responsibilities and duties as a station
17      officer, fire lieutenant.
18   Q. Did you apply for any more promotions between
19      lieutenant in '96 and the battalion chief
20      promotion in '06?
21   A. Yes, sir.
22   Q. What other promotions did you apply for?
23   A. I applied for training chief -- the training

Page 51

1    officer position. Excuse me. I applied for the
2    deputy fire chief position.
3    Q. When was the last captain's promotion?
4    A. If I'm not mistaken, the last one was when I was
5       promoted. When they did an assessment center
6       for me in '96, it was an assessment center for
7       lieutenants and captains.
8    Q. So you never applied and went through an
9       assessment center for the position of captain;
10      is that correct?
11   A. No, sir.
12   Q. No, sir, it's not correct or --
13   A. I didn't apply for the captain --
14   Q. What I said is correct? You never applied and
15      went through an assessment center for captain,
16      true?
17   A. No, sir.
18      MR. HORSLEY: That is true?
19   Q. Wait a minute.
20   A. That is true. A captain position never came
21      available during my era.
22   Q. So you did the lieutenant assessment in '96 at
23      the same time they did the captain

Page 52

1    assessment?
2    A. Yes, sir.
3    Q. What procedure was used for training officer?
4    A. I underwent what I consider to be a structured
5       interview.
6    Q. Let me back up on the captain's assessment
7       center.
8       Other than the assessment center, do you
9       know of any other requirements at that time for
10      the captain's promotion?
11   A. I'm not aware of that, sir.
12   Q. Did you pay any attention one way or the other
13      what the captains had to do or were you just
14      interested in being a lieutenant at that time?
15   A. I just -- It was totally separate. If you
16      applied for lieutenant, you went to the
17      lieutenant. If you applied for captain, you
18      went to captain.
19   Q. The training officer was a structured interview,
20      and when was that promotion procedure?
21   A. I don't recall the actual year or date.
22   Q. Has it been, say, within the last five years?
23   A. Yes, sir, it was within the last five.

Page 53

1    Q. And who was promoted?
2    A. A gentleman by the name of Terry Walker.
3    Q. Is he still the training officer?
4    A. No, sir. He's retired.
5    Q. Who took his place?
6    A. A gentleman by the name of John Lankford.
7    Q. Did you apply for training officer when
8       Lankford --
9    A. No, sir, I did not.
10   Q. So you applied for training officer one time,
11      and that was when Terry Walker received it?
12   A. Yes, sir.
13   Q. And that was a structured interview?
14   A. Pretty much, sir, yes.
15   Q. And you sat on, you told me, the structured
16      interview panels for team leaders?
17   A. Yes, sir.
18   Q. Was that a similar-type interview? I'm sure the
19      questions were different, but people from
20      in-house, firefighters and others --
21   A. The difference between team leaders and the
22      training officer was the team leader wasn't
23      intense like the training officer was. The team

Deposition of Gerald Stephens                                    May 30, 2008

|                                                    |                                                    |
|----------------------------------------------------|----------------------------------------------------|
| **Page 54**                                        | **Page 56**                                        |

### Page 54

1  leader basically was a panel of questions that
2  was presented to the candidate. When I went
3  through training officer, I went through seven
4  different scenarios. I had to make, I think it
5  was, a three-minute presentation. I had to go
6  through what they call, I think it was, an
7  in-basket situation where you prioritize your
8  responsibilities for the day. It's all on
9  paper. And then you undergo an actual interview
10 where you sit down and they ask you questions,
11 you know. Basically that was it.
12 Q.  Do you remember who was on your panel or the
13     panel?
14 A.  Dean Garrett, Danny Leverette, Lee Lamar, Larry
15     Langley. I can't remember who else.
16 Q.  So these were all fire division people?
17 A.  Yes. They was city employees, whether it was
18     human resources down through the fire division.
19 Q.  And Terry Walker, did you think that he was a
20     good hire?
21 A.  At the present time, Mr. Morgan, I didn't know
22     anything about Terry Walker so I can't say if he
23     was good or bad. I don't know.

### Page 56

1  officer, and deputy fire chief --
2  A.  Yes.
3  Q.  -- before the battalion chief?
4  A.  Yes, sir.
5  Q.  And then you sat on some of the interview panels
6      with the team leader position?
7  A.  Yes, sir.
8        MR. MORGAN:  Can we take a quick
9        break?
10       MR. HORSLEY:  Yeah.
11       (Brief recess was taken.)
12 Q.  (Continuing by Mr. Morgan)  Did you have any
13     involvement or input into the last team leader
14     promotion procedure where a written test was
15     used?
16 A.  No, sir.
17 Q.  Did you know anything about the requirements for
18     that last team leader promotion procedure?
19 A.  No, sir. The only thing I knew, Mr. Morgan, was
20     basically information that was presented the day
21     of that was going to be questioned to the
22     candidates. That's all I know. And I was asked
23     to be on the board.

### Page 55

1  Q.  And when did you apply for the deputy fire chief
2      position?
3  A.  Again, I don't actually remember the year and
4      date, but it was within the five years.
5  Q.  And who was promoted to that position?
6  A.  Lee Lamar. Mr. Lee Lamar.
7  Q.  What was the procedure used at that time?
8  A.  Basically I submitted an application, and I went
9      to a structured interview at City Hall.
10 Q.  And the panel, was it all firefighters or fire
11     division or were there other people on the
12     panel?
13 A.  It was other people on the panel outside of the
14     fire division, yes.
15 Q.  So you had an application and a structured
16     interview?
17 A.  Yes, sir.
18 Q.  Any other component of that promotion procedure?
19 A.  No, sir.
20 Q.  And Mr. Lamar was promoted?
21 A.  Yes, sir.
22 Q.  Have we covered all the promotions that you've
23     actually applied for -- lieutenant, training

### Page 57

1  Q.  And so you were on the structured interview
2      board or panel for the last team leader
3      promotion?
4  A.  I don't know if it was the last one, but I do
5      know I've sat in on several.
6  Q.  Did you ever hear any complaints or comments
7      about a written test being a component of the
8      team leader promotion procedure?
9  A.  I don't recall a written test ever being a
10     component of the promotion procedure for a team
11     leader.
12 Q.  And then at some point there was a petition
13     presented to the City for team leaders to become
14     lieutenants.
15 A.  Yes, sir.
16 Q.  You're familiar with that?
17 A.  Yes, sir.
18 Q.  And you did not join in that petition?
19 A.  I wasn't given the opportunity to join,
20     Mr. Morgan.
21 Q.  How did that come about?
22 A.  The first I heard or seen anything in reference
23     to a petition for team leaders and the title

Deposition of Gerald Stephens                    May 30, 2008

Page 58

1    change was December of 2005.
2    Q.  And what did you see or hear at that time?
3    A.  Basically me and two other of my insubordinates
4        (sic) were called to a meeting in the public
5        safety building.  And basically this meeting was
6        in reference to whether we was for or opposed to
7        the title change from team leader to
8        lieutenants.
9    Q.  Who were the other two?
10   A.  Mr. Christopher Turner and Mr. Walter Allen.
11   Q.  Is it your testimony that's the first time that
12       you learned the City was considering or had been
13       petitioned to change from team leader to
14       lieutenant?
15   A.  From my understanding, Mr. Morgan, is basically
16       this all rendered from when the captains had a
17       title change to battalion chiefs.  So therefore
18       the team leaders took it upon themselves to
19       pursue a title change as well.  I had heard
20       rumors, but I didn't have any definite, you
21       know, idea or information in reference to they
22       were doing that until that day.
23   Q.  But you had heard rumors that the team leaders

Page 59

1        were making an effort to change it to
2        lieutenant?
3    A.  In the fire house, Mr. Morgan, you hear all kind
4        of rumors.  I just don't believe them until I
5        see them.
6    Q.  So the first actual confirmation that you had
7        that that was under consideration was when you,
8        Chris Turner, and Walter Allen were called to a
9        meeting in December of '05?
10   A.  Yes, sir.
11   Q.  And who was that meeting with?
12   A.  It was my immediate supervisor, Dean Garrett,
13       Mr. Steve Reeves, Mr. Bill James, Mr. Lamar,
14       and, of course, Mr. Turner, and Mr. Allen.  I
15       think that's everybody.
16   Q.  And what was the discussion?
17   A.  Basically the discussion was -- the floor was
18       pretty much open to the point in reference to
19       what we thought about it.  And me, myself, I
20       requested to see everything in reference to, the
21       proposal and the reason why we were there and
22       all.  And I was presented with the paperwork
23       that included thirteen signatures of team

Page 60

1        leaders.  All the team leaders in the
2        department, their signature was on this
3        paperwork.  And it was provided to me by the --
4        I guess the public safety director, Mr. James,
5        gave the okay for me to receive that, and it was
6        given to me by Mr. Reeves.
7    Q.  You received it at that meeting?
8    A.  Yes, sir.
9    Q.  Let me back up a minute.
10       Were you the last lieutenant when this
11       meeting was called?
12   A.  In 1996 I was the last lieutenant to be
13       promoted.
14   Q.  I understand that, but were you the last actual
15       lieutenant rank --
16   A.  Yes, sir.
17   Q.  -- in December of '05?
18   A.  The only one, yes, sir.
19   Q.  Now, were Chris Turner and Walter Allen the only
20       two career firefighters that were not team
21       leaders?
22   A.  I'm not sure about that, Mr. Morgan.  All I know
23       is they were career firefighters.

Page 61

1    Q.  And Chris Turner is a black male?
2    A.  Yes, sir.
3    Q.  And Walter Allen is a white male?
4    A.  Yes, sir.
5    Q.  So you received the paperwork which showed that
6        all thirteen of the team leaders --
7        Which included Eddie Ogletree, true?
8    A.  Yes, sir.
9    Q.  -- had petitioned for team leaders to become
10       lieutenants?
11   A.  Yes, sir.  And understand, Mr. Morgan, that was
12       the first time I had seen actual paperwork in
13       reference to a petition being presented for team
14       leaders getting a title change.  That was the
15       first time.  And I confirmed that in the
16       meeting.  I was like, this is the first time
17       I've seen this; can I take time to read it.  And
18       I read it, and I asked for copies of it.
19   Q.  Do you know why you and Chris and Walter Allen
20       were called to that meeting?
21   A.  No, sir.  I don't know the actual reason, but I
22       know I did speak with Mr. Langley with my
23       immediate supervisor present prior to that

6623b598-899c-485a-b995-fb9fd663a9ce

Page 62

1    meeting. Mr. Langley.
2    Q.  Was he in this meeting?
3    A.  Yes, sir, he was.  If I'm thinking correctly, he
4        was.
5    Q.  So Langley, Lamar, James, Reeves, and Garrett
6        were in the meeting with you two?
7    A.  Yes, sir.
8    Q.  But then you said you spoke to Mr. Langley.  Did
9        you speak to him outside of this meeting?
10   A.  I had to sign a form.  I had to sign a form
11       saying I was in favor of or against the title
12       change.  And at that time, I submitted some
13       paperwork to Mr. Langley.
14   Q.  Let me back up.  I'm a little confused.
15       The form that you received whether you were
16       in favor or not in favor, did you receive that
17       before this meeting with these other people?
18   A.  I received it from Mr. Langley in his office
19       before that meeting.
20   Q.  That same day or a different day?
21   A.  I don't think it was the same day, no, sir.
22   Q.  So you had had an opportunity, then, before that
23       to put in whether or not you thought it was a

Page 63

1    good idea or bad idea?
2    A.  Yes, sir.  I had a choice to make in reference
3        to -- I was asked to fill out that paperwork and
4        enclose it in an envelope to be submitted to
5        human resources.
6    Q.  And did you do that?
7    A.  Yes, sir.
8    Q.  And that was all done before this meeting that
9        you're telling me about?
10   A.  Yes, sir.  Now, understand, now, this paperwork
11       I was given to sign off on was different from
12       the paper I received at the meeting.
13   Q.  Well, how was it different?
14   A.  Well, basically the letter I received from
15       Mr. Langley in the presence of Chief Garrett at
16       the time was saying was I for or against.
17   Q.  Right.  A vote.
18   A.  When I actually got in the meeting, I was, like,
19       can somebody provide me with some information in
20       reference to what's going on because this is new
21       to me, and I want to know, you know, what does
22       it involve.  And that's when I received the
23       paperwork stating everything that had been done

Page 64

1    to include the thirteen signatures.
2    Q.  So when Mr. Langley handed you this form where
3        you could vote "yes" or "no" on the name change,
4        you didn't understand what was going on?
5    A.  No, sir, I didn't.  Directly speaking, no, I
6        didn't know.
7    Q.  And Mr. Langley didn't explain it to you?
8    A.  He explained it to me, but, I mean, it's one of
9        those situations where I don't believe
10       everything I hear regardless of who it comes
11       from until I see it.  But I know the paperwork
12       that I saw and I signed, which was not in favor
13       of the title change.  And my main reason for
14       that, Mr. Morgan, was because I didn't know
15       nothing about it.  I was never given an
16       opportunity to -- in the beginning to sign with
17       the other thirteen signatures to say I was for
18       or against.
19   Q.  Well, looking back now, if you had been given
20       the information, would your vote have been
21       different?
22           MR. HORSLEY:  Object to the form.  You
23       can answer.

Page 65

1    A.  No, sir.  I still would have been against it.
2    Q.  But when Mr. Langley handed you this sheet of
3        paper, the form which you could vote, he didn't
4        explain to you why or that the City had been
5        petitioned by the team leaders?  He didn't
6        explain any of that to you?
7    A.  I don't recall exactly what he said,
8        Mr. Morgan.  But, like I said earlier, he gave
9        me the paper.  I read it.  I presented to him my
10       paperwork I had.  And he said no, and so I
11       marked the appropriate place indicating that I
12       was not in favor of it.  I folded the letter up
13       and put it in an envelope, sealed it, and gave
14       it to Mr. Langley.
15   Q.  What paperwork did you give Mr. Langley?
16   A.  I typed a letter myself on my behalf, the only
17       lieutenant in the division, and presented it to
18       him basically asking for -- in complainance
19       (sic) to whatever the team leaders were doing.
20   Q.  Now, do you still have copies of that paperwork?
21   A.  Yes, sir, I do.
22   Q.  Well, I'm not trying to get into any privileged
23       conversations, but do you know if that paperwork

Page 66

1   was produced as part of your disclosures?
2            MR. MORGAN:  I can get with you later
3            on that.
4   A.  Mr. Horsley has it.  He has a copy of it.
5   Q.  Let me backtrack one minute.
6       When you applied for lieutenant, they had a
7   captain's promotion at the same time?
8   A.  Yes, sir.
9   Q.  Was there any time in grade requirements for the
10  captain promotion or could anybody apply for the
11  captain promotion?
12  A.  Again, sir, I don't know if there was any -- if
13  any of that applied.  I'm not sure.
14  Q.  You don't know whether or not you had to be a
15  lieutenant to apply for captain or whether just
16  a firefighter could apply for captain?
17  A.  The way it's supposed to work is that you follow
18  the chain of command as far as promotions.
19  Q.  So you gave Chief Langley -- I guess he was
20  chief at that time -- some paperwork dealing
21  with your complaints about team leaders?
22  A.  I presented to him a form that I had typed, and
23  I asked him to, you know, sign it, him and Chief

Page 67

1       Garrett both to sign it, if he was in agreement
2       of it.  And he told me no, and he would not
3       sign.  So did Chief Garrett, which Chief Garrett
4       was acting as a witness.
5   Q.  What was your paperwork, just the gist of it?
6   A.  Basically it was just, you know, from -- I guess
7       it was drawn upon and presented to him based
8       upon what I had heard.  And being that I was
9       called to his office to sign this form in
10      reference to, then therefore I presented to him
11      what I would like to have if this is the case.
12  Q.  And what is it that you would like to have?
13  A.  I wanted a title change.
14  Q.  So you knew then even before you went to see
15      Chief Langley that there were discussions about
16      a title change?
17  A.  I had heard rumors about a title change.  When I
18      was called to his office, of course, Chief
19      Garrett was with me.  That's when it was
20      confirmed through me that, yes, there was
21      something going on with the title change.
22  Q.  And did you take Garrett with you?
23  A.  Yes, sir.

Page 68

1   Q.  And so you wanted your own title changed?
2   A.  Yes, sir.  Just like everybody else, I wanted
3       one.
4   Q.  And what title change did you want?
5   A.  I wanted captain.
6   Q.  Well, now, at that time were there still captain
7       positions or had the captains been renamed
8       battalion chiefs?
9   A.  The captains had been renamed battalion chiefs.
10  Q.  So if the team leaders became lieutenants, you
11      wanted a title change from lieutenant to
12      captain?
13  A.  Yes, sir.
14  Q.  So then you and Chris Turner and Walter Allen
15      meet with these people that you've told me
16      about: Dean, Steve, Lee, and Larry.  What did
17      y'all talk about in that meeting?
18  A.  Basically what was presented at the meeting was
19      basically what has been going on as far as the
20      paperwork that had been submitted, those who was
21      in favor of, the review of whatever rules and
22      regulations that was in place involving the
23      division and the -- fire division and the City,

Page 69

1       and basically where they were and what they was
2       going to do or what they was, you know, planning
3       to do.
4   Q.  What was it they were planning to do?
5   A.  They was planning to go forward with the title
6       change from team leaders to lieutenants.
7   Q.  And what was your response or reaction?
8   A.  Well, I tried to remain as calm and professional
9       as I possibly could.  Nevertheless, things got a
10      little out of order with Mr. Turner and
11      Mr. Allen.  So at that point I kind of thought
12      things was out of hand.  So therefore I just
13      renamed calm until I could actually speak on my
14      behalf in reference to what I thought.
15  Q.  And how did it get out of hand with Turner and
16      Allen?
17  A.  Apparently their reaction to it was their
18      reaction.  They reacted to it.  They got up.
19      They seemed to get a little irate about it and
20      all that and -- Something I would have never
21      done.
22  Q.  Do you remember any specific comments that
23      Turner or Allen made?

Deposition of Gerald Stephens                           May 30, 2008

|  | Page 70 |
|---|---|
| 1 | A. I recall a comment made by Turner when he was |
| 2 | asking for a title change as well. |
| 3 | Q. What did he want to be? |
| 4 | A. I don't know. I don't know what he wanted to |
| 5 | be, being he was a firefighter. I don't know. |
| 6 | Q. Do you remember him making the statement that he |
| 7 | didn't have any opposition to team leaders being |
| 8 | lieutenants as long as he became a lieutenant? |
| 9 | A. I don't recall that, Mr. Morgan. I'm sorry. |
| 10 | Q. Did you eventually make some verbal response to |
| 11 | what you had heard? |
| 12 | A. Yes, sir, I did. |
| 13 | Q. And what did you say? |
| 14 | A. Basically what I did, Mr. Morgan, is when |
| 15 | everything calmed down to a certain point, I |
| 16 | asked to speak to Mr. James in private. He |
| 17 | accepted my request. |
| 18 | Q. What did y'all talk about? |
| 19 | A. Basically I told Mr. James -- I thanked him for |
| 20 | calling me in and letting me know what was |
| 21 | officially going on and working with me to bring |
| 22 | me up to par. But at the same time, I told |
| 23 | Mr. James that there was a problem at the Auburn |

|  | Page 71 |
|---|---|
| 1 | Fire Division and he needed to look into it. |
| 2 | Q. What was that problem? |
| 3 | A. Basically there was some things taking place |
| 4 | down there that I deemed unfair, that I deemed |
| 5 | inconsistent, that basically needed some |
| 6 | attention, needed to be looked into and |
| 7 | corrected before it got any worse. |
| 8 | Q. And tell me what they are. |
| 9 | A. Well, I mean -- |
| 10 | Q. Did you give him some specifics or -- |
| 11 | A. No, sir. I didn't tell him anything specific |
| 12 | because at that time I thought -- it was several |
| 13 | things going on, and that's just me thinking |
| 14 | that. I'm speaking for myself. |
| 15 | Q. Well, did you tell Bill James what things were |
| 16 | going on that you thought were unfair or |
| 17 | inconsistent or needed attention? |
| 18 | A. I was not specific with that, Mr. Morgan. |
| 19 | Q. And what was Mr. James' response to your saying |
| 20 | that things were unfair or inconsistent? |
| 21 | A. Mr. James was very, very considerate. He was |
| 22 | very polite and very professional, and he say he |
| 23 | want everything to be right for everybody, not |

|  | Page 72 |
|---|---|
| 1 | in those words. But, again, I specifically |
| 2 | directed to him that there was a problem at the |
| 3 | Auburn Fire Division and he needed to look into |
| 4 | it. |
| 5 | Q. Anything else that you recall saying to |
| 6 | Mr. James in y'all's private meeting? |
| 7 | A. No, sir. It was just very brief and very to the |
| 8 | point. |
| 9 | Q. Anything else you recall saying in the meeting |
| 10 | with everyone other than asking to speak |
| 11 | privately with Mr. James? |
| 12 | A. I can't think of nothing else at this time, |
| 13 | Mr. Morgan. |
| 14 | Q. Turner and Allen, you testified they became |
| 15 | irate and I think in your opinion probably acted |
| 16 | unprofessional? |
| 17 | A. Yes, sir. |
| 18 | Q. Did they leave before you asked to speak to Bill |
| 19 | James or did -- |
| 20 | A. I don't know exactly when they left, but at that |
| 21 | point when everything appeared to have calmed |
| 22 | down, I asked to speak to Mr. James in private. |
| 23 | And, you know, as far as how they departed and |

|  | Page 73 |
|---|---|
| 1 | how they left, I really don't know. |
| 2 | Q. Did you come back into the main meeting or did |
| 3 | you leave -- |
| 4 | A. No, sir, I didn't leave. Me and Mr. James did |
| 5 | not leave. Everybody else left, and me and |
| 6 | Mr. James stayed. |
| 7 | Q. So they were gone and just the two of y'all? |
| 8 | A. Yes, sir. |
| 9 | Q. And then the name change was eventually approved |
| 10 | from team leader to lieutenant? |
| 11 | A. Yes, sir, it was approved. |
| 12 | Q. Are there any people or team leaders who in your |
| 13 | opinion are not qualified to serve as |
| 14 | lieutenants? |
| 15 | A. I'm not in that position to say if they are |
| 16 | qualified or not, Mr. Morgan. All I know is |
| 17 | they applied and they were promoted. |
| 18 | Q. Now, let's backtrack a minute. |
| 19 | A. Yes, sir. |
| 20 | Q. My understanding is, I guess from your testimony |
| 21 | so I want to be clear on this, there had earlier |
| 22 | been a name change from captain to battalion |
| 23 | chief. |

Deposition of Gerald Stephens                                    May 30, 2008

Page 74

1    A.  That's when it all started, yes, sir.
2    Q.  When did that occur?
3    A.  I'm not sure on the date, Mr. Morgan, but I know
4        it happened -- I think it happened within the
5        past five years.  But, understand, that's when
6        the whole title change thing came about.  You
7        had all the captains made a proposal to the city
8        manager at the time.  And to make a long story
9        short, it happened.  So from that point, it just
10       went on.
11   Q.  Did you have any conversations with anybody that
12       would have been involved in that process?  And
13       I'm assuming that's going to be the city
14       manager, from what you've testified, the
15       captains, deputy chief, and chief.  Did you have
16       any conversations with any of those people about
17       the name change from captain to battalion chief?
18   A.  No, sir.
19   Q.  Did you have any conversations with any of these
20       people that you've sued in this lawsuit:  Larry
21       Langley, Lee Lamar, Bill Ham, Jr., Steven
22       Reeves, Bill James, Charles Duggan, and Cortez
23       Lawrence?  Did you have any conversations with

Page 75

1        any of them --
2    A.  No, sir.
3    Q.  -- about the name change from --
4    A.  Other than the meeting that I had with Mr. Allen
5        and Mr. Turner, that's the only time I conversed
6        with Mr. Reeves.  That was in reference to team
7        leader to a lieutenant.  But nothing about -- I
8        didn't have no dealings, didn't know how they
9        was doing it or what they were doing in
10       reference to captain to battalion chief.
11   Q.  Was Cortez Lawrence still employed with the City
12       when the name change occurred?
13   A.  To my knowledge, no.
14   Q.  He left --
15   A.  Years ago.
16   Q.  -- years ago, didn't he?
17   A.  Yes, sir.
18   Q.  Do you know why he's been sued?
19   A.  I have no idea.
20           MR. HORSLEY:  Off the record.
21           (Brief off-the-record discussion.)
22   Q.  How was it announced, official announcement,
23       that from this day forward captains will now be

Page 76

1        battalion chiefs?  How would that be announced?
2    A.  If I'm thinking correctly, Mr. Morgan, it came
3        from a memorandum or a letter directed to the
4        division.  And, of course, when it occurred,
5        word of mouth.
6    Q.  And at that point captains were then referred to
7        as battalion chiefs?
8    A.  Yes, sir.
9    Q.  Did you make any formal complaint either through
10       the grievance procedure or EEOC protesting the
11       change from captain to battalion chief?
12   A.  No, sir.
13   Q.  Did you make any verbal complaints to Langley or
14       Lamar or Ham or Reeves or Bill James or Charles
15       Duggan?
16   A.  No, sir.
17   Q.  And from your observations, did the battalion
18       chiefs continue to operate similar to what the
19       captains had done before?
20   A.  Basically the only thing that changed was the
21       title.  The responsibilities and all that went
22       hand in hand.
23   Q.  When did you learn there would be a promotion

Page 77

1        procedure or process to battalion chief?
2    A.  I received it through a memorandum or a letter
3        directed to the division.
4    Q.  And did you receive it the same day or within a
5        day or two of the memorandum being published?
6    A.  Basically, if I'm thinking correctly, it was
7        posted.  I think it was done in two places:  At
8        the stations and through e-mail -- City e-mail.
9    Q.  The City has an e-mail?  They send out things on
10       e-mail?
11   A.  Yes, sir.
12   Q.  As an employee do you receive those e-mails on
13       duty or can you receive them off duty?
14   A.  The information -- I don't know what procedures
15       they use to send the information, but they send
16       them as far as I know randomly.  It could come
17       on a day when I'm at work.  It could come on a
18       day when I'm off work.
19   Q.  Do you have a home computer?
20   A.  Yes, sir, I do.
21   Q.  Can you check the City of Auburn Web site --
22   A.  Yes, sir.
23   Q.  -- for these e-mails from home?

6623b598-899c-485a-b995-fb9fd663a9ce

Deposition of Gerald Stephens                          May 30, 2008

Page 78

1   A.  Yes, sir.
2       (Defendant's Exhibits 1 and 2 marked
3       for identification.)
4   Q.  Let me show you what I'm marking as Defendant's
5       Exhibit Number 1.  Let me show you 1 and 2.
6       Does Defendant's Exhibit Number 1 appear to be
7       the posting for the position of battalion chief?
8   A.  It appears to be, yes, sir.
9   Q.  Is that what would have been posted in, you
10      said, two places:  the stations and -- Where was
11      the other place it would have been posted?
12  A.  E-mail.
13      Exhibit 1 was posted at the station.
14  Q.  And I think it's dated February 16.
15  A.  Yes, sir.  2006.
16  Q.  And would it be fair to say that you would have
17      observed that either February 16 or within a day
18      or two of that day?
19  A.  Within that week, yes, sir, I would have
20      observed it.
21  Q.  And in addition to it being posted at stations,
22      that job notice is also sent out by e-mail?
23  A.  Well, you haven't gotten to Exhibit 2 yet, but

Page 79

1       this one here, I think I saw it on e-mail.
2   Q.  I'm going to get to Number 2.
3   A.  But this one I saw in the station only.
4   Q.  Is Number 1 also sent by e-mail?
5   A.  I haven't seen nothing like this sent on e-mail.
6   Q.  But it's posted in the station?
7   A.  Yes, sir.
8   Q.  All right.  And then Defendant's Exhibit Number
9       2 is the one that you received by e-mail?
10  A.  If I'm thinking correctly, sir, I did get a copy
11      of this on e-mail.
12  Q.  And that's the memorandum I think you were
13      testifying about earlier?
14  A.  Yes, sir.
15  Q.  And it says you must be a current
16      non-probationary lieutenant.  It talks about an
17      orientation session, and it says a written exam
18      will be a component of the assessment process.
19      Reading materials have been obtained.
20      That's all in the e-mail that was sent on
21      Exhibit 2, true?
22  A.  Yes, sir.
23  Q.  When you received that e-mail, did you register

Page 80

1       any objection at that time to -- Let me back up.
2       I assume you would have received that
3       e-mail -- Is that memo also posted or is it just
4       sent by e-mail?
5   A.  I recall seeing one on the board just like this
6       one around the station, but it could easily be
7       somebody got a copy of the e-mail and put it up
8       there. I don't know.
9   Q.  Is it fair to say you would have received that
10      e-mail or observed that memo either February 17
11      or within a day or two thereafter?
12  A.  Give or take within a week, yes, sir.
13  Q.  And did you make any complaints at that time to
14      anybody about the written exam being a component
15      of the assessment process?
16  A.  No, sir.
17      (Defendant's Exhibit 3 marked for
18      identification.)
19  Q.  And let me show you what's going to be marked as
20      Defendant's Exhibit Number 3, which is another
21      memo dated February 23, which discovered that
22      non-probationary firefighters and probationary
23      lieutenants were eligible and reaffirmed when

Page 81

1       the orientation was going to be.  And that's
2       dated February 23.  I assume that you either saw
3       or received that --
4   A.  Yes, sir, I did.
5   Q.  -- February 23rd or within a day or two of that?
6   A.  Yes, sir.
7   Q.  Did you register any complaint for
8       non-probationary firefighters or probationary
9       lieutenants being eligible to apply for the
10      battalion chief vacancy?
11  A.  When I read this, I was kind of puzzled due to
12      the fact that why are probationary employees
13      allowed to apply for this position, you know.  I
14      was somewhat familiar of the first memo.  But
15      when I received this one, it really puzzled me.
16      But, no, sir, I did not make a complaint.  I
17      didn't say nothing.  I just followed the
18      procedures in place.
19  Q.  You didn't have any conversations with anyone
20      about there being a written test component nor
21      probationary -- non-probationary firefighters
22      and probationary lieutenants being eligible.  Is
23      that a fair statement?

6623b598-899c-485a-b995-fb9fd663a9ce

Deposition of Gerald Stephens                           May 30, 2008

---

Page 82

1    A.  Yes, sir, that's a fair statement.
2    Q.  And, now, I understand that at least in this
3        lawsuit you've made some complaint about there
4        being no non-probationary firefighters and
5        probationary lieutenants being eligible.  Were
6        any non-probationary firefighters promoted to
7        battalion chief as a result of this process?
8    A.  As a result of this process, no, sir.
9    Q.  Were any probationary lieutenants promoted to
10       battalion chief as a result of this process?
11   A.  The only thing I can recall, Mr. Morgan, is I
12       recall an incident where a probationary
13       firefighter was promoted to team leader, and I
14       also recall an incident where a firefighter was
15       promoted to captain and then eventually promoted
16       to acting fire chief.
17   Q.  Well, my question is:  In terms of the
18       complaints about the battalion chief promotion
19       procedure in 2006, isn't it true that no
20       non-probationary firefighters were promoted to
21       battalion chief in 2006?
22   A.  Yes, sir.
23   Q.  And were any probationary lieutenants promoted

---

Page 83

1        to battalion chief?
2    A.  No, sir.
3            (Defendant's Exhibit 4 marked for
4            identification.)
5    Q.  Let me show you what I'm going to mark as
6        Defendant's Exhibit Number 4.  Do you recognize
7        that as the sign-in sheet for the battalion
8        chief assessment orientation, which was February
9        28, 2006?
10   A.  Yes, sir.  This is the sheet.
11   Q.  And is that your signature?
12   A.  Yes, sir, that's my signature.
13   Q.  And you attended that orientation?
14   A.  Yes, sir, I did.
15   Q.  How long was that orientation?
16   A.  If I'm thinking correctly, it was two to three
17       hours.
18   Q.  Who conducted the orientation?
19   A.  It was several people there -- a couple of
20       people there, Mr. Morgan.  You had two
21       representatives from human resources:
22       Ms. Stephanie King, Mr. Reeves.  You had a
23       representative from the company who I guess

---

Page 84

1        provided the test for the division, CWH, I
2        suppose.  He was there.  Chief Lamar was there,
3        and I think vaguely Larry Langley was there.
4    Q.  You're not as certain on him, but you think he
5        was?
6    A.  I think I recall seeing him there for a short
7        period of time.  Mr. Lamar pretty much handled
8        everything.
9    Q.  Any other non-applicants you recall being there
10       other than Stephanie King, Steve, the
11       representative from CWH, Lee Lamar, or Larry
12       Langley?
13   A.  No, sir, I don't recall anybody else.
14   Q.  The representative from CWH, was that a male or
15       female?
16   A.  It was a white male.
17   Q.  Look on that list and tell me who on that list
18       was a non-probationary firefighter.
19   A.  According to this list, nobody on here that I'm
20       aware of was a non-probationary firefighter.
21   Q.  Well, was everyone on that list a team leader
22       with the exception of Chris Turner?
23   A.  Chris Turner was a career firefighter.

---

Page 85

1    Q.  And he was not a team leader or a lieutenant?
2    A.  No, sir.
3    Q.  Is he the only one on that list?
4    A.  Yes, sir.
5            MR. HORSLEY:  When you say team
6            leader, you're referring to team
7            leaders that have now been changed
8            to lieutenant?
9            MR. MORGAN:  Right.
10   Q.  My point is:  The only person on the list who
11       was not a lieutenant via assessment center or
12       team leader was Chris Turner, true?
13   A.  I'm not sure about Carson.  He may have been.
14       He may have not.  I'm not really sure.  But I
15       know Chris Turner was a firefighter.
16   Q.  And he's a black male?
17   A.  Yes, sir.
18   Q.  And the record will show this.  I'm not --
19   A.  Yes, sir.  I understand.
20   Q.  This isn't any test that you're going to pass or
21       fail, but do you recognize the names of anybody
22       else on the list other than Chris Turner that
23       was a career firefighter that was not a team

---

|  | Page 86 |
|---|---|
| 1 | leader or hadn't been either a team leader or |
| 2 | lieutenant? You said possibly Clay Carson? |
| 3 | A. Yes, sir. I think Carson was a firefighter and |
| 4 | recently became a lieutenant, but I'm not clear |
| 5 | on him. For the record, I know Chris Turner was |
| 6 | a firefighter. |
| 7 | Q. There's no question Chris Turner was? |
| 8 | A. No question. |
| 9 | Q. And who on the list would have been a |
| 10 | probationary lieutenant -- |
| 11 | A. No one. |
| 12 | Q. -- at the time? |
| 13 | A. If it was anybody, it was Carson. |
| 14 | Q. And did Clay Carson score -- he's a white male, |
| 15 | is he not? |
| 16 | A. Yes, sir. |
| 17 | Q. Did he score high enough on the written test to |
| 18 | go to the assessment portion of the battalion |
| 19 | chief -- |
| 20 | A. That I recall, Clay Carson did not take the |
| 21 | test. |
| 22 | Q. Did not take the test. Okay. |
| 23 | A. He wasn't there when I took it. |

|  | Page 87 |
|---|---|
| 1 | Q. So we can take him out of the equation. |
| 2 | A. If you choose to, yes, sir. |
| 3 | Q. So the only career non-probationary firefighter |
| 4 | who took the battalion chief written test who |
| 5 | was not a lieutenant was Chris Turner, a black |
| 6 | male? |
| 7 | A. I know Chris Turner took the test. |
| 8 | Q. Did you keep notes of the orientation session? |
| 9 | A. I don't recall taking any notes. We were |
| 10 | provided study material in reference to the test |
| 11 | at some particular time or another. But, no, |
| 12 | sir, I don't recall any notes I took during |
| 13 | orientation. |
| 14 | (Defendant's Exhibit 5 marked for |
| 15 | identification.) |
| 16 | Q. I'm going to mark this as Number 5. Did you |
| 17 | receive this document at the orientation? |
| 18 | A. It looks familiar, Mr. Morgan. Yes, sir. |
| 19 | Q. And that is an Auburn Fire Division Orientation |
| 20 | Manual. That's the title of it, true? |
| 21 | A. Yes, sir. |
| 22 | Q. And you did receive that at the orientation |
| 23 | session? |

|  | Page 88 |
|---|---|
| 1 | A. I think so. |
| 2 | Q. And did the people that you've testified were |
| 3 | there -- Stephanie King, Steve Reeves, Lee and |
| 4 | the WCA's representative -- did they go over |
| 5 | that document with you? |
| 6 | A. A lot of things was discussed that day, |
| 7 | Mr. Morgan. I can't specifically remember what |
| 8 | was went over and what was discussed. But it |
| 9 | was a lot of information involved, and |
| 10 | everything that I think was presented was |
| 11 | touched upon as far as orientation, yes, sir. |
| 12 | Q. The bottom line is: It was explained to the |
| 13 | applicants the testing process? |
| 14 | A. Yes, sir. It was told to us basically how it |
| 15 | would be implemented and worked and I guess |
| 16 | scored and applied to whatever was going on. |
| 17 | Q. And the percentages as to people taking the |
| 18 | written test, who would be eligible to proceed |
| 19 | on to the assessment program part of it? |
| 20 | A. Basically the understanding I had when I was |
| 21 | there was if you passed the written test, you |
| 22 | proceed. |
| 23 | Q. If you didn't pass the written test -- |

|  | Page 89 |
|---|---|
| 1 | A. If you didn't pass, you didn't proceed. |
| 2 | Q. You talked about a reading material or study |
| 3 | material list. Did you receive a list -- I know |
| 4 | you got some books. I'm going to get to that in |
| 5 | a minute. Was there an actual list that was |
| 6 | given out or was the list discussed or was it in |
| 7 | that manual? |
| 8 | A. The only thing I remember was that I was |
| 9 | notified to come to the public safety building |
| 10 | to Mr. Lamar's office and receive your study |
| 11 | material. |
| 12 | Q. But you were made aware in the orientation |
| 13 | session that study materials would be provided? |
| 14 | A. Yes, sir. |
| 15 | Q. The person from CWH, do you recall anything that |
| 16 | he said about the test, how the test was |
| 17 | devised, the purpose of the test? |
| 18 | A. I don't recall that, sir. |
| 19 | Q. Did you make any complaint at the orientation |
| 20 | session, which I think was February 28, 2006 -- |
| 21 | did you make any complaint at the orientation |
| 22 | session about a written test? |
| 23 | A. No, sir. |

Page 90

1   Q.  The people that were conducting the orientation,
2       did they ask people -- the participants if they
3       wanted to -- needed to ask questions or
4       anything?
5   A.  That I recall, I think it was a time available
6       for questioning throughout the whole --
7       throughout the hours we were there, but I can't
8       recall any specifics at this time.  I know I
9       can't.
10  Q.  Did you ask any questions?
11  A.  No, sir, I didn't.
12  Q.  Did Mr. Ogletree ask any questions?
13  A.  I'm not aware of that, sir, if he did or not.
14  Q.  How about Chris Turner?
15  A.  I'm not aware of that either, sir.
16  Q.  Did anybody complain about a written test being
17      part of the promotion procedure at the
18      orientation?
19  A.  I'm not aware of anybody complaining,
20      Mr. Morgan.
21  Q.  And I know this was, what, two years ago and a
22      three-hour session, but just as best you can
23      remember, tell me what you recall Stephanie

Page 91

1       King's role being at that session.
2   A.  The first person I saw when I came to
3       orientation that I guess had something to do
4       with presenting the material was Ms. King.  She
5       was actually setting up the projectile and all
6       that in the room I guess preparing everything
7       for presentation.
8   Q.  Did you have any conversation with Stephanie?
9   A.  Other than hello; how are you doing; good to see
10      you, no, sir.
11  Q.  Do you remember anything that she said or
12      contributed to the orientation session other
13      than setting up the equipment?
14  A.  From what I experienced and saw, it looked as if
15      Ms. King or Mr. Reeves was working together to
16      do whatever they had to do as far as human
17      resources.  But vaguely do I recall Ms. King
18      saying anything in reference to.  She was
19      present with Mr. Reeves.
20  Q.  What about Steve Reeves?  What do you recall his
21      role being?
22  A.  Mr. Reeves made a brief presentation in
23      reference to welcoming everybody in so many

Page 92

1       words, and then he turned things over to the
2       representative from CWH.
3   Q.  Do you recall Steve Reeves explaining any of the
4       testing procedures or what would be -- which the
5       applicants would go through?
6   A.  I don't remember, sir.  I'm sorry.  I don't
7       recall that.
8   Q.  Do you remember Steve Reeves saying anything
9       about how the procedure was developed?
10  A.  I don't remember, sir.  I'm sorry.
11  Q.  Do you remember Steve Reeves saying anything
12      about how it was determined that there would be
13      a written test and then you would go from the
14      written test if you passed to the remainder of
15      it, the assessment part?  Do you remember any of
16      that from Mr. Reeves?
17  A.  The only person I recall saying that or
18      explaining in detail how it would work was the
19      representative for CWH.  But I don't recall -- I
20      can't remember if he did or not -- did say that,
21      Mr. Morgan.  I don't remember.
22  Q.  "He" being Steve Reeves?
23  A.  Yes.

Page 93

1   Q.  What about Larry Langley?  What was his role or
2       what did he contribute to the --
3   A.  That I remember, Mr. Langley walked in the room
4       before we even got started and left, and I never
5       saw him again.
6   Q.  And Lee Lamar, what do you recall his input or
7       participation being?
8   A.  Mr. Lamar was there, that I recall, for the
9       entire time of the orientation.  And I vaguely
10      remember him having some input, if he was
11      questioned about it, in reference to the
12      division itself and all that.  That's basically
13      all I remember on that.
14  Q.  Do you remember Lee saying anything specifically
15      about how the test was developed?
16  A.  No, sir.
17  Q.  Do you remember Lee saying anything specifically
18      about how the components were derived and
19      processed, came about?
20  A.  I don't remember that, sir.
21  Q.  Tell me what you recall the CWH representative
22      saying about the test.
23  A.  Basically he was saying that the questions was

Page 94

1   drawn from whatever procedures they have, and
2   they had been representing several cities or
3   municipalities around the nation, you know.
4   Just told us a little bit about the company
5   within itself, and he started going over the
6   material. I think he had a slide presentation,
7   and we just gradually worked through the whole
8   orientation process of that evening.
9   Q. What do you recall the slide presentation being
10  about?
11  A. I think it was in reference to the study
12  material we had, the things to study or
13  something of that nature. But I can't
14  specifically remember what it was pertaining to.
15  Q. Do you remember if the CWH representative
16  explained to the participants that questions
17  would be drawn from these study materials?
18  A. It's a great chance he could have said that, but
19  I just don't remember at this time, Mr. Morgan.
20  I'm sorry.
21  Q. What was your understanding as to the purpose of
22  the study materials?
23  A. My understanding of the study material was it

Page 95

1   was given because -- supposedly it was in
2   reference to the test that was being given.
3   That's the understanding I had.
4   Q. The study materials would help you on the test?
5   A. Supposedly help us on the test.
6   Q. Now, anything else specific that you recall from
7   the CWH representative?
8   A. No, sir, I don't. I don't recall anything.
9   Q. Did the representative from CWH go over any
10  sample questions with you and the other
11  participants at that orientation?
12  A. I don't remember Mr. Morgan. We went over so
13  much within those hours, I just don't remember.
14  Q. What was your understanding from the orientation
15  session and what you were being told as to how
16  the questions were developed? What was your
17  understanding as to why the questions that you
18  were going to be asked were going to be those
19  questions?
20  A. I don't have any idea on how they drew up their
21  questions. I don't have a clue.
22  Q. The reading materials that were discussed, did
23  they all relate to fire duties?

Page 96

1   A. They were actually -- If I remember correctly,
2   they were essentials of some sort in the field
3   of firefighting.
4   Q. Were any of them related more to supervision
5   than firefighting, or were they all -- as you
6   heard it, did they all appear to be related to
7   what you would be doing as an officer?
8          MR. HORSLEY: The study materials?
9          MR. MORGAN: Yeah.
10  A. From what I looked at and what was presented to
11  me, Mr. Morgan, the material was of an advanced
12  level. And what I consider to be an advanced
13  level is a management position within the fire
14  division.
15  Q. And the battalion chief is an advanced level, is
16  it not?
17  A. Yes, sir.
18  Q. That's what --
19  A. Superior, advanced, you know. Yes, sir.
20  Q. That's the next rank below the deputy chief?
21  A. Yes, sir. In the Auburn Fire Division.
22  Q. Well, the discussion from the CWH representative
23  as to the test and what would be included and

Page 97

1   what was expected, did it appear to be related
2   to what a person would do as a supervisory
3   officer in the Auburn Fire Department?
4   A. Now, that was a question. I mean, we have ways
5   we do things in Auburn, and people have ways
6   they do things in Montgomery. But the
7   essentials itself I guess was the appropriate or
8   the common way or the popular way, however they
9   put it, that they think something should
10  happen. I mean, it didn't directly apply to the
11  way we do things in Auburn, but it was
12  officially essential in reference to, you know,
13  advanced positions of that nature.
14  Q. The discussion in your opinion was that these
15  were essential functions of that rank, but it
16  may not be the way we do it in Auburn?
17  A. Yes, sir.
18  Q. And did you register any complaint with the WCH
19  representative about those type questions being
20  asked on the test?
21  A. No, sir.
22  Q. Did anybody?
23  A. I'm not aware of that, sir. If somebody did,

6623b598-899c-485a-b995-fb9fd663a9ce

Page 98

1    I'm not aware of it.
2    Q.  Do you know what input into the written test any
3       officers with the City of Auburn Fire Division
4       had?
5    A.  There were rumors that the battalion chiefs at
6       the time played a role in some part of it, but I
7       don't know. I'm not aware if they did. I'm not
8       aware what part they played.
9    Q.  Let's assume that the battalion chiefs at Auburn
10      played a role in the written test that was
11      developed for the position of battalion chief.
12      Would you agree with me that that would be a
13      good thing?
14          MR. HORSLEY: Object to the form. You
15          can answer if you know how.
16    A.  I think just like with team leaders,
17       lieutenants, the whole nine, I think battalion
18       chiefs should play a role in the overall
19       promotionary procedure. Now, the test, I'm not
20       sure about that.
21    Q.  Not sure about what, whether they did or not?
22    A.  I'm not sure if they played a role in the
23       questions that was on the test. I'm not sure of

Page 99

1       that.
2    Q.  And I understand that you've testified to that.
3       My question is: Assume they did. Would you
4       agree with me that battalion chiefs playing a
5       role in helping develop the written test, if
6       that occurred, would be a good thing?
7          MR. HORSLEY: Object to the form. You
8          can answer.
9    A.  That would be a good resource, yes, sir.
10    Q.  Was there anything that the representative from
11      CWH said at the orientation session that day
12      that would be included on the test, whether it
13      was a written test or the assessment part of it,
14      that you thought didn't have anything to do with
15      fire work?
16    A.  I don't recall anything, Mr. Morgan. I mean, he
17      was presenting information that was available
18      that I guess was being directed to the
19      candidates, which was me and all the others that
20      was present.
21    Q.  Are you aware of any orientation sessions other
22      than this one?
23    A.  This is the only one I can recall.

Page 100

1    Q.  Do you know of any special meetings or
2      orientation sessions that white applicants had
3      with these people that were there, including the
4      CWH representative, that you were not a part of?
5    A.  To my knowledge, no, sir, I don't know anything
6      about that.
7    Q.  As far as you know, everybody attended the same
8      orientation session. You have no evidence
9      otherwise?
10    A.  No evidence otherwise.
11    Q.  And as far as you know, that was the only
12      orientation session that was given, true?
13    A.  That's all I know, yes, sir.
14          MR. HORSLEY: Is this a decent time
15          for a break?
16          MR. MORGAN: Yeah.
17          (Lunch recess.)
18          (Defendant's Exhibits 6, 7 and 8
19          marked for identification.)
20    Q.  (Continuing by Mr. Morgan) Let me show you what
21      I'm marking as three exhibits, 6, 7, and 8. Do
22      you recall receiving Exhibit 6, which is a memo,
23      letter, to the candidates outlining the dates

Page 101

1      and guidelines for the exam? Do you recall
2      receiving that?
3    A.  Yes, sir, I do.
4    Q.  Would you have received that on or about March
5      3, 2006?
6    A.  Yes, sir, on or about.
7    Q.  And the next two exhibits, 7 and 8, both of them
8      say they are the battalion chief reading list
9      check-out sheet, and they have your signature on
10      both of these. Signature on one and initials --
11      yeah -- Signatures and initials on both.
12    A.  Yes, sir.
13    Q.  And those are both dated March 3, 2006, true?
14    A.  Yes, sir, they are.
15    Q.  When you signed these 7 and 8, would you have
16      received -- by that time would you already have
17      received Defendant's Exhibit Number 6, which is
18      the letter outlining the dates and guidelines?
19    A.  Yes, sir.
20    Q.  Now, the one that I guess that's Exhibit 7 has
21      your signature, and then it has some initials
22      and then it has a number, number 14. I guess
23      that's a book number that you received?

Deposition of Gerald Stephens                          May 30, 2008

|  | Page 102 |
|---|---|

1   A.  I don't remember specifically what it applies
2       to.  But, yes, it has the number 14.
3   Q.  And to the left of that are initials.  Do you
4       know whose initials those are?
5   A.  On Exhibit Number 7 or which one are we on right
6       now?
7   Q.  Yeah.  Look to the right of where you signed.
8   A.  Right here?
9   Q.  Yeah.  In fact, let's look -- look at your
10      signature.  It's got Gerald Stephens, 3/7/06, at
11      something.
12  A.  Yes, sir.  On the day I signed this form, it was
13      March 7, 2006 at 0850 hours, at 8:50 a.m., that
14      morning.
15  Q.  You signed it on March 7 rather than March 6?
16  A.  Yes, sir.
17  Q.  I'm sorry.  March 3.
18      Why did you sign it on March 7?
19  A.  It had to be when I was on duty that day.  That
20      would be the only reason.
21  Q.  And then continuing on, it's got, looks like,
22      ZZZ.  It looks like numbers to me.  Are those
23      your initials?

|  | Page 103 |
|---|---|

1   A.  No, sir.  Those are not mine.
2   Q.  And how about the number 14?  Is that your
3       handwriting or is that someone else's
4       handwriting?
5   A.  That's somebody else's handwriting.
6   Q.  But that's your signature?
7   A.  Yes, sir.
8   Q.  And Defendant's Exhibit Number 8, books, it's
9       got the number of books, number 14.  Is that
10      your signature?
11  A.  Yes, sir.  Those are my initials.
12  Q.  And is the number 14 yours as well or did
13      somebody else write that in?
14  A.  Somebody else wrote 14.
15  Q.  And do you remember if you signed Defendant's
16      Exhibit 8 on March 3rd or did you sign it on
17      March 7th?
18  A.  I'm going to guess and say I signed it on the
19      7th.
20  Q.  The same day would be your best guess?
21  A.  Yes, sir.
22  Q.  Do you remember what you received as book number
23      14?

|  | Page 104 |
|---|---|

1   A.  I received a couple of books when I would
2       receive my material.  I can't remember which
3       ones they were and the titles of them, but I do
4       recall them being some sort of essential or
5       another in reference to firefighting.
6   Q.  Essential?
7   A.  Yes, sir.
8          (Defendant's Exhibit 9 marked for
9           identification.)
10  Q.  Let me show you what I'm going to mark as
11      Defendant's Exhibit Number 9.  I apologize.  Is
12      that your application for the promotion to
13      battalion chief?
14  A.  Yes, sir.  That's it.
15  Q.  And what day did you fill that out or sign it?
16  A.  I signed it on February 20, 2006, on a Monday.
17  Q.  Now, between the orientation session, which was
18      February 28 of '06, and your signing for the
19      books on March 7, 2006, do you recall anything
20      during that period of time that occurred in
21      relation to the battalion chief promotion?
22  A.  I don't recall anything, Mr. Morgan.
23  Q.  Did you discuss with any of the people who had

|  | Page 105 |
|---|---|

1       been involved in the orientation -- Lee, Steve,
2       Stephanie, the CWH representative, or Chief
3       Langley -- did you have any discussions with
4       them up until the time you received your books
5       on March 7?  Anything about the procedure or the
6       test or any conversations with any of those
7       people?
8   A.  No, sir, I don't recall.
9   Q.  How about the folks that you've sued in this
10      case -- other people that you've sued:  Bill
11      Ham, Bill James, Charles Duggan?  Did you have
12      any conversations with any of them --
13  A.  No, sir.
14  Q.  -- up until March 7 about the test or how it
15      would be administered?  Anything to do with the
16      test?
17  A.  No, sir.
18  Q.  Do you recall where you were when you received
19      the -- signed the form and received the books?
20  A.  As I stated, Mr. Morgan, I think I was on duty
21      that day.
22  Q.  Did somebody bring you the books and the form?
23  A.  No, sir.  I had to go to the public safety

Page 106

1    office to Chief Lamar's office.
2    Q.  And was Chief Lamar there?
3    A.  Yes, sir.
4    Q.  Did you have any conversations with him when you
5         signed about the test or books?
6    A.  No, sir.
7    Q.  Just said I'm here and signed it?
8    A.  Yes, sir.
9    Q.  So you had the letter from, I guess, Lee Lamar
10        telling you that the written test was going to
11        be on a certain day.  I think it was April 10 or
12        whatever is in the letter.
13   A.  Yes, sir.
14   Q.  And you had the books that you had received from
15        the City, and you had your orientation booklet.
16        Y'all got to keep these orientation booklets,
17        didn't you, Defendant's Exhibit 5?
18   A.  I don't think we got to keep these.  I'm not
19        real sure on that.
20   Q.  But you are sure you got to keep the books or at
21        least --
22   A.  Oh, yes.  Most definitely, sir.
23   Q.  Is there anything of any significance that

Page 107

1         occurred in relation to the promotion procedure
2         from the time you received your books on March 7
3         up until the time you start taking the written
4         test, which I think is April 10?
5    A.  Can you repeat the first part?  It slipped my
6         mind.  I'm sorry.
7    Q.  You received the books on March 7 at Deputy --
8         at that time -- Lee Lamar's office, and I think
9         the test began April 10.  Anything of any
10        significance between that time period that
11        relates to the promotion procedure?  Did
12        anything occur during that time period?
13   A.  Not that I can recall, sir.
14   Q.  Did you have any conversations with Lee or Larry
15        Langley or Steve Reeves or Stephanie up until
16        you start taking the written test on April 10?
17   A.  No, sir.
18   Q.  Other than what may have occurred at the
19        orientation?
20   A.  No, sir.
21   Q.  And you never had any conversations up to that
22        time with the mayor or Charles Duggan or Steve
23        Reeves?

Page 108

1    A.  No, sir.
2    Q.  The mayor, Bill James, and Charles Duggan, you
3         didn't have any conversations with them up to
4         April 10 about the test in any fashion, true?
5    A.  No, sir.  True.
6    Q.  Tell me what you did to study and prepare for
7         the test.
8    A.  Being the time I had to study all that
9         material -- First of all, I reviewed all the
10        material that was available.  And I took it upon
11        myself to just study areas where I thought to be
12        important.  Like I say, we didn't have that much
13        time or I don't think we had enough time to
14        actually study all the material that was
15        available.  So I took it upon myself to apply
16        myself to areas where I thought I needed to
17        study and work on to prepare or be ready for
18        this test.  And that was just the way I was
19        thinking about it, Mr. Morgan.
20   Q.  Did you have study groups?  Firefighters get
21        together and have study groups?
22   A.  I did not.
23   Q.  You did not?

Page 109

1    A.  No, sir.
2    Q.  How many study books did you have?
3    A.  I can't remember the exact number, but three to
4         four books.
5    Q.  Did you have to turn those back in?
6    A.  Yes, sir.
7    Q.  Did you make any complaint to anybody before you
8         sat down for the written test that you didn't
9         have enough time to study?
10   A.  Anybody as in ...
11   Q.  Lee Lamar.
12   A.  The one person that I did talk about in the
13        study time and all that, he's in this room
14        now and that's Mr. Ogletree.
15   Q.  You had those conversations with Mr. Ogletree?
16   A.  Yes, sir.  I told him just what I thought about
17        the time span and the material that was
18        available to study, and I told him what I
19        thought about it.
20   Q.  Well, I'm going to get to that.  Let me go
21        through my little list.
22        You didn't have any conversations with Larry
23        Langley complaining about the time you had to

---

Page 110

1  study, did you?
2  A.  Larry Langley, no.
3  Q.  No conversations with Lee Lamar about the period
4     of time for study, did you?
5  A.  Mr. Lamar, no.
6  Q.  No conversations with Bill Ham about the period
7     of time you had to study?
8  A.  Mayor Ham, no.
9  Q.  No conversation with Steve Reeves about the
10    period of time you had to study?
11 A.  Mr. Reeves, no.
12 Q.  No conversations with Bill James about the
13    period of time you had to study?
14 A.  Mr. James, no.
15 Q.  No conversations with Charles Duggan about the
16    time you had to -- period of time you had to
17    study?
18 A.  Charles Duggan, no.
19 Q.  And none with Stephanie king?
20 A.  Ms. King, no.
21 Q.  And none with any representative of CWH?
22 A.  No representatives, no.
23 Q.  And so you and I will be together on this, I'm

---

Page 111

1     not asking you questions about Cortez Lawrence
2     because I'm understanding from your answers he
3     didn't have anything to do with this. Is that a
4     fair statement?
5  A.  To my knowledge he don't. I don't know nothing
6     about that.
7  Q.  What conversations did you have with Eddie
8     Ogletree about the time span?
9  A.  Basically I notified him and just asked him, you
10    know, basically his opinion on the material that
11    was presented and the time we had on it. And I
12    just basically told him that I don't see where I
13    think I would be able to cover all this, you
14    know, in the time we had available. It was a
15    lot of material. It was a lot to read. Plus,
16    you know, the other information that I chose to
17    pursue and study that I thought would be liable
18    (sic) for the test, I studied that as well,
19    stuff like SOP books, personnel policies, City
20    personnel policies -- I'm sorry -- in
21    conjunction with the material that was given for
22    the actual test.
23 Q.  So in addition to the books that you were told

---

Page 112

1     were the recommended reading for the test, you
2     studied the fire department SOPs and you studied
3     the personnel policies?
4  A.  Yes, sir.
5  Q.  Now, did anybody recommend or suggest that you
6     study the SOPs for the battalion chief test?
7  A.  Nobody recommended it to me, sir.
8  Q.  Did anybody recommend or suggest that you study
9     the personnel policies for this battalion chief
10    test?
11 A.  No, sir. Nobody recommended it to me.
12 Q.  Any other sources that you studied or reviewed
13    for the battalion chief test, now, that weren't
14    on the recommended reading list, the books you
15    were given by the City, other than the SOPs and
16    personnel policies?
17 A.  No, sir. Those are the only outside two
18    resources I studied in conjunction with what was
19    given to me.
20 Q.  And other than the fact that you received your
21    reading material on March 7 rather than March 3,
22    did any of the other firefighters or candidates
23    for this promotion have any additional period of

---

Page 113

1     time to study than you did?
2  A.  I'm not aware of that, sir.
3  Q.  As far as we can tell from the documentation
4     that I've presented to you today, everybody
5     would have received the reading material on or
6     about March 3; is that true?
7  A.  Yes, sir, on or about.
8  Q.  So the length of time would have been the same
9     for black applicants, white applicants,
10    lieutenant applicants, team leader lieutenant
11    applicants, firefighter applicants? Everybody
12    would have had the same time period. Is that a
13    fair statement?
14 A.  Give or take one or two days depending on how
15    the shift ran. Yes, sir, that's a true
16    statement.
17 Q.  You make a reference in your complaint to test
18    aids. What did you consider to be the test aids
19    for the battalion chief promotion process?
20 A.  Could you be a little bit more specific about
21    this?
22 Q.  I'll show you what I'm talking about.
23 A.  Okay.

Page 114

1    Q. Paragraph 18. You have on here -- I've
2       highlighted it. Caucasian applicants for the
3       position were given preferential treatment
4       regarding the application process, test aids,
5       and test grades.
6          Do you see that in your complaint?
7    A. Yes, sir.
8    Q. What are the test aids that you're referring
9       to? What did you consider to be the test aids
10      for this promotion?
11   A. I can't recall that, Mr. Morgan.
12   Q. Well, let me ask this. You testified about an
13      orientation.
14   A. Yes, sir.
15   Q. And you testified about receiving the books.
16   A. Yes, sir.
17   Q. Do you have knowledge of any white applicants
18      for this position with battalion chief that
19      received anything else that would help them on
20      this test other than attending the orientation
21      and reviewing the books that everyone was
22      given? Anything else that you know of that
23      white applicants received that you didn't

Page 115

1       receive?
2    A. I'm not aware, Mr. Morgan. I haven't been
3       introduced with that.
4    Q. Do you know any white applicant who was given
5       preferential treatment in the application
6       process?
7    A. I don't recall that, Mr. Morgan. It don't ring
8       a bell.
9    Q. Do you know any white applicant who was given
10      preferential treatment in terms of test aids?
11   A. Never presented to me, Mr. Morgan. I'm not
12      aware of that.
13   Q. I assume that you continued your regular shift
14      work -- shift hours during the process when you
15      were studying for the battalion chief promotion
16      procedure.
17   A. Yes, sir.
18   Q. Did you take any time off to study?
19   A. That I recall, none, sir. If it was any, it
20      would have been how our Kelly days fall or
21      something like that. But I don't recall taking
22      off any significant shift during that process.
23   Q. Did you apply for any or request any leave time

Page 116

1       that you were denied during that period of time?
2    A. I don't recall anything of that nature, sir.
3    Q. Did you have your lawn service going on at that
4       time?
5    A. No, sir.
6    Q. When did you say you started the lawn service?
7    A. May of 2006.
8    Q. Did you do any preparatory work for that?
9    A. Basically I waited until everything was over
10      with the battalion chief promotion before I even
11      thought about starting a business. So no, sir,
12      I didn't do anything.
13   Q. How is that business set up? Is it a d/b/a or a
14      corporation?
15   A. D/b/a.
16   Q. And who does your books?
17   A. My wife. She has accounting resources
18      knowledge, stuff like that.
19   Q. And do you have -- I guess for tax purposes you
20      keep your records on purchasing equipment --
21   A. Yes, sir.
22   Q. -- advertising, if you do any advertising --
23   A. Yes, sir.

Page 117

1    Q. -- and all that?
2    A. Yes, sir.
3    Q. So if I needed to request that information, you
4       would have that from the beginning of the time
5       when you started your business?
6    A. Yes, sir.
7    Q. Is that a fair statement?
8    A. Yes, sir.
9    Q. I always get confused with firefighters and
10      their shifts. In March of '06, where were you
11      assigned?
12   A. I was on A shift. Chief Brown was my immediate
13      supervisor.
14   Q. What station?
15   A. Station 3, if I remember correctly.
16   Q. And what are the hours or days that A shift
17      works in a week?
18   A. Well, each shift works a 24-hour shift. So we
19      work from 0700 to 07 the following morning for a
20      total of 24. Then we're off for 48 hours
21      whereas overall we work one day and be off two
22      days.
23   Q. And you maintained that same shift during the

6623b598-899c-485a-b995-fb9fd663a9ce

Page 118

1   time that you would have been preparing for the
2   test?
3   A.  Yes, sir.
4   Q.  Work one day and off two days?
5   A.  Yes, sir.
6   Q.  Anything that you did to prepare for the test
7       other than review the SOPs, personnel policies,
8       and those portions of the study books which you
9       thought were going to be important?  Anything
10      else that you did in preparation for the test?
11  A.  That's about all I did, sir.
12  Q.  Did you read completely any of the study aid
13      books?
14  A.  Like I said earlier, Mr. Morgan, I reviewed the
15      material that was given to me.  In the areas
16      where I felt strong on, I didn't spend as much
17      time as on the areas that I felt weak on.  So it
18      was give and take throughout the study guides --
19      study information.
20  Q.  So is it fair to say, then, the answer to my
21      question is:  You didn't read the whole book.
22      You read the parts you thought were going to
23      help you with your strengths taking the test?

Page 119

1   A.  Yes, sir.  I concentrated heavily on the area
2       where I thought I was weak in.
3   Q.  What day of the week was the test given?  Do you
4       recall?
5   A.  No.  I don't recall what day it was, sir.
6   Q.  And didn't we decide, or at least I decided, it
7       was April 10?
8   A.  Yes, sir.  April 10.
9   Q.  And do you remember what time it started?
10  A.  It was stated that it started at 8:30, but I
11      don't know if it started on time, a little bit
12      before or a little bit after.  I'm not sure on
13      that.  I don't recall.
14  Q.  Was there a sign-in sheet?
15  A.  Yes, sir, I do recall a sign-in sheet.
16  Q.  And would you -- I say you.  I mean all the
17      applicants.  Were you given a booklet to take?
18      How was the written test?  What was the written
19      test?
20  A.  If I'm remembering correctly, through the whole
21      process we came in and signed in.  And, of
22      course, all the tables and chairs were set up
23      and spaced evenly from each candidate.  And

Page 120

1   sometime or another a booklet was presented -- a
2   sealed booklet -- that we had to open at the
3   time we started the actual test.
4   Q.  How did you identify -- Did you write in the
5       test booklet or was there a separate answer
6       sheet?
7   A.  I don't recall exactly what it was, but I think
8       we wrote in the test booklet.  But I don't
9       recall.  I just can't remember.
10  Q.  Did you put your name on your test booklet or a
11      number?  How was that to identify --
12  A.  There was a number, and somewhere you did have
13      to put your name.
14  Q.  And how long was the test?
15  A.  We was allowed so many hours to take the test.
16      If I'm thinking correctly, it was three hours.
17      And it took me approximately two, two hours and
18      fifteen minutes, two hours and a half to take
19      it.  I wasn't the last person in the room when I
20      left.  I'll put it like that.  So I didn't take
21      up the whole three hours.
22  Q.  Who was present to monitor or proctor the test?
23      Who was there to hand it out and make sure --

Page 121

1   A.  I think I recall Mr. Lamar being there.  I
2       vaguely saw Mr. Langley there.  I can't remember
3       who else may have been there, Mr. Morgan.  I'm
4       sorry.
5   Q.  Do you remember if Steve Reeves was there?
6   A.  I don't remember.
7   Q.  How about Stephanie?
8   A.  I don't remember.
9   Q.  Do you remember any representative from CWH?
10  A.  I don't recall anybody from CWH.
11  Q.  From the time of the orientation on February 28
12      up until the time you start taking the test on
13      April 10, did you have any further conversations
14      or participate in any further discussions with
15      anybody from CWH about the test?
16  A.  No.
17  Q.  During this three-hour test, were you allowed to
18      take breaks if you needed to?
19  A.  I don't remember.  All I do remember is I didn't
20      take one.  I didn't take a break.
21  Q.  How many questions were there?
22  A.  I don't remember, sir.
23  Q.  Was it a multiple choice, fill-in-the-blank?

Deposition of Gerald Stephens                    May 30, 2008

Page 122

1    How were the questions and answers?
2    A.  If I remember correctly, it was multiple
3       choice.
4    Q.  Were they divided up into any divisions or areas
5       such as supervision, fire scene, or was it just
6       a straight series of questions?
7    A.  That I recall, it was a straight series of
8       questions.
9    Q.  And did the questions appear to be related to
10      fire work?
11   A.  They appeared to be related to the field of fire
12      profession, yes.
13   Q.  Were there questions on there that appeared to
14      be related to supervisory roles?
15   A.  I recall there being some questions, yes, sir.
16   Q.  Did you think that the questions related to what
17      a battalion chief would do in the city of
18      Auburn?
19          MR. HORSLEY:  Object to the form.  You
20          can answer.
21   A.  I don't think -- I think several of the
22      questions on that test had nothing to do with
23      Auburn and the way we do things at Auburn.  To

Page 123

1       me those questions were something in reference
2       to a larger municipality bigger than us.
3    Q.  Do you remember the specific questions?
4    A.  No, sir, I don't.
5    Q.  How many questions were there like that that you
6       thought related to a larger municipality?
7    A.  It was the majority of the questions of the
8       test.  I don't recall the exact number or how
9       many apply to that, but I know it was several
10      questions on there that I just didn't think
11      pertained to the way we do things in Auburn, to
12      the rules we go by, regulations.
13   Q.  What exactly is your familiarity with the
14      responsibilities and duties of the battalion
15      chief?
16   A.  Being that I filled the role in the absence of a
17      battalion chief, I'm very familiar with the
18      things they do.
19   Q.  What does a battalion chief do differently from
20      what a lieutenant does?
21   A.  Basically in a nutshell, the battalion chief is
22      responsible for the entire shift and also
23      responsible for the operations of the City in

Page 124

1       reference to life, safety, and fire protection
2       during that shift.
3    Q.  Did you make any complaints to anyone during the
4       testing process --
5    A.  No, sir, I did not.
6    Q.  -- that you didn't think the test was related to
7       what went on at Auburn?
8    A.  No, sir, I did not.
9    Q.  After the test was completed, usually folks talk
10      about the test, what they thought about it.  Do
11      you remember anybody making any comments in any
12      kind of meetings like that that they thought the
13      test did not address what a battalion chief did
14      at the City of Auburn?
15   A.  Nobody spoke to me about anything of the test
16      afterwards, Mr. Morgan, and nor did I speak to
17      anybody about it.
18   Q.  How did you think you had done on the test?
19   A.  I didn't know what to think to be honest with
20      you, Mr. Morgan.
21   Q.  Although you can't remember specific questions,
22      was there some general area of the test that you
23      thought didn't relate to what went on at Auburn

Page 125

1       that you could give me some examples so I could
2       kind of understand what you're talking about?
3    A.  I can't remember specifically, Mr. Morgan.  If I
4       had to guess, it had to be something on the
5       guidelines of --
6          MR. HORSLEY:  Don't guess.  Just tell
7          him what you remember.
8    A.  I don't remember.  I just don't remember.
9    Q.  Who was the first person to finish the test?  Do
10      you remember?
11   A.  If I recall, it was Christopher Turner.
12      Mr. Turner.
13   Q.  And there were still people in there when you
14      completed it?
15   A.  Yes, sir, there was still people in there.
16          (Defendant's Exhibit 10 marked for
17          identification.)
18   Q.  Let me show you what I'm marking as Defendant's
19      Exhibit 10.  This is a letter to you dated April
20      4, a feedback letter, feedback report.  Do you
21      remember receiving that?
22   A.  Yes, sir.
23   Q.  Did you make a request for this report or did

6623b598-899c-485a-b995-fb9fd663a9ce

Deposition of Gerald Stephens                    May 30, 2008

|  | Page 126 |
|---|---|
| 1 | this report just come to you without you having |
| 2 | requested it? |
| 3 | A.  If I recall I requested this. |
| 4 | Q.  Did you do that in writing or -- |
| 5 | A.  I did it in writing. |
| 6 | Q.  What did the -- I may have it, but I can't find |
| 7 |     it. |
| 8 |         In what way did you request it, just that |
| 9 |     you would like an opportunity to look at it |
| 10 |     or -- |
| 11 | A.  That I recall, this was done during the |
| 12 |     grievance procedure that we initiated, me and |
| 13 |     three other guys.  Three other guys initiated a |
| 14 |     grievance after the results of the test, if I'm |
| 15 |     thinking correctly. |
| 16 |         MR. HORSLEY:  Off the record. |
| 17 |         (Brief off-the-record discussion.) |
| 18 |         MR. HORSLEY:  For the record, this |
| 19 |             letter is dated April 4, 2005, |
| 20 |             which would appear to be before |
| 21 |             the test was given. |
| 22 |         MR. MORGAN:  Let me take one second. |
| 23 |         (Brief recess.) |

|  | Page 127 |
|---|---|
| 1 |         (Defendant's Exhibit 11 marked for |
| 2 |             identification.) |
| 3 | Q.  (Continuing by Mr. Morgan) I have a letter, |
| 4 |     which I will show you, Defendant's Exhibit |
| 5 |     Number 11, and it is an official notification |
| 6 |     that you didn't make 70 or whatever the magic |
| 7 |     number was on the written test.  And then I've |
| 8 |     given you Defendant's Exhibit Number 10, which |
| 9 |     is the feedback report.  Okay? |
| 10 | A.  Yes, sir. |
| 11 | Q.  And I didn't pick up on it, but as Richard |
| 12 |     pointed out, the year is incorrect on the Number |
| 13 |     10.  It should be 2006. |
| 14 | A.  Yes, sir. |
| 15 | Q.  My question to you is -- |
| 16 |         MR. HORSLEY:  Just for the record, the |
| 17 |             date is wrong, too, because it |
| 18 |             predates the test. |
| 19 |         MR. MORGAN:  What is the date? |
| 20 |         MR. HORSLEY:  April 4. |
| 21 |         MR. MORGAN:  The whole date is wrong? |
| 22 |         MR. HORSLEY:  The whole thing -- |
| 23 |         THE WITNESS:  Everything is improper. |

|  | Page 128 |
|---|---|
| 1 | Q.  Which did you receive first, 10 or 11? |
| 2 | A.  I received 11 first.  I did. |
| 3 | Q.  And that's dated April -- |
| 4 | A.  14th, 2006. |
| 5 | Q.  And that's the one telling you that you did |
| 6 |     not -- Let me show you one other document. |
| 7 |         (Defendant's Exhibit 12 marked for |
| 8 |             identification.) |
| 9 | Q.  Now, that is a document which appears to be the |
| 10 |     grievance complaining about the test, true? |
| 11 | A.  Yes, sir. |
| 12 | Q.  And it's dated April 21, 2006? |
| 13 | A.  Yes, sir. |
| 14 | Q.  Using that as a frame of reference, did you |
| 15 |     receive the report -- feedback report before or |
| 16 |     after you filed the grievance? |
| 17 | A.  Now, for starters, Exhibit 11, that's the first |
| 18 |     thing I received after the test. |
| 19 | Q.  And let me ask you this.  Did that come to you |
| 20 |     in the mail or was it hand-delivered? |
| 21 | A.  I recall it coming in the mail, Mr. Morgan. |
| 22 | Q.  All right. |
| 23 | A.  And as far as this feedback, the only thing that |

|  | Page 129 |
|---|---|
| 1 |     I have received, Mr. Morgan, as far as feedback |
| 2 |     is when I requested it.  That's the only thing I |
| 3 |     can recall me receiving, any feedback, because |
| 4 |     nothing was made to me directly, but people |
| 5 |     complained about the test, one person in |
| 6 |     particular, whereas some questions were thrown |
| 7 |     out during the testing period. |
| 8 | Q.  Who is the one -- |
| 9 | A.  Joey Darby. |
| 10 |         And through the rumor mill, I understand |
| 11 |     that's how he managed to make the cut to go |
| 12 |     through the remaining of the promotion |
| 13 |     procedures. |
| 14 | Q.  Because questions were thrown out? |
| 15 | A.  That was deemed -- That shouldn't have been |
| 16 |     there of some sort.  It was presented to |
| 17 |     whomever was in power to make that decision. |
| 18 |     And I do recall Joey Darby being one of those to |
| 19 |     pursue that. |
| 20 | Q.  Do you recall there being any others? |
| 21 | A.  I don't.  I don't recall anyone else. |
| 22 | Q.  Well, I'm not saying this is true, but assume |
| 23 |     what you said is true, that questions were |

6623b598-899c-485a-b995-fb9fd663a9ce

Deposition of Gerald Stephens                    May 30, 2008

Page 130

1    thrown out for Joey Darby. Would those
2    questions have been thrown out for everybody or
3    just for Joey Darby?
4    A.  The whole process.
5    Q.  That question for everybody was thrown out?
6    A.  It was removed, null and void, pointblank.
7    Q.  So if you missed those same questions that Joey
8        Darby missed and that question was thrown out,
9        then that helped your score?
10   A.  Apparently so. It did.
11   Q.  Do you recall if you requested that feedback in
12       writing or just asked somebody verbally to send
13       the feedback report?
14   A.  As I stated earlier, Mr. Morgan, it was done in
15       writing. And right here on Exhibit 12, it will
16       show where we asked that four written exams be
17       reviewed. And what I received was this
18       feedback.
19   Q.  So you're thinking that your written request for
20       that was in Exhibit 12, the grievance thing?
21   A.  Yes, sir.
22   Q.  So when that grievance is filed -- My
23       understanding is Exhibit 12 is the first step in

Page 131

1    the grievance procedure.
2    A.  It appears that this is, yes, sir.
3    Q.  You, of course, had been informed that you did
4        not pass by that time?
5    A.  Yes, sir. The first thing I received was my
6        letter of response saying what I made on the
7        test. That's the first thing I received.
8    Q.  And is it your testimony that when you filed
9        that grievance that you had heard rumors that
10       Joey Darby had test questions thrown out?
11   A.  Well, Joey Darby didn't have them thrown out.
12       He questioned those -- I guess he pursued those
13       questions because we was -- they mentioned
14       somewhere -- I'm trying to remember -- if a
15       question was on the test that didn't appear to
16       be in reference to -- I can't remember how they
17       worded it, but I know there was some questions
18       on that test challenged.
19   Q.  Well, did you challenge any test -- any --
20   A.  Any questions? No, sir, I didn't.
21   Q.  But from what I understand your testimony to be,
22       the rumor was that Joey Darby challenged some
23       questions?

Page 132

1    A.  Yes, sir. If I'm thinking correctly, yes, sir.
2    Q.  And the rumor was that some of the questions
3        that Joey Darby challenged were thrown out. Is
4        that what the rumor was?
5    A.  Yes, sir, if I'm thinking correctly.
6    Q.  And you don't know whether or not the questions
7        he challenged affected your grade or not. Is
8        that a fair statement?
9    A.  I don't know which questions it was that he
10       challenged, and therefore I don't know if it
11       will help me or hurt me or whatever.
12   Q.  Is it your understanding that the feedback
13       report was only prepared or presented to the
14       four people who signed the grievance as opposed
15       to everyone who took the test receiving a
16       feedback report?
17   A.  Like I said earlier, Mr. Morgan, I didn't
18       receive -- the first thing I received was the
19       letter that I received showing my score. After
20       that me and the other guys filed a grievance,
21       and then after that I received the feedback
22       report based on the request that I made.
23   Q.  That's what my question is. Is it your

Page 133

1    understanding that you received the feedback
2    report because you requested it when you filed
3    for the grievance?
4    A.  Yes.
5    Q.  Do you have an understanding as to whether, for
6        instance, Rodney Hartsfield received a feedback
7        report? Do you know one way or the other
8        whether he did?
9    A.  I don't know if he did or not, sir.
10   Q.  The only thing you can say that you think is
11       that because you complained and requested it,
12       you received it, and you don't know whether
13       other people received it as a matter of course
14       or not?
15   A.  Just like right here on Exhibit 10, this was
16       addressed to me, and I know what I asked for.
17   Q.  Have you ever discussed it with Joey Darby about
18       test questions being thrown out or what he
19       objected to or anything?
20   A.  No, sir, I didn't.
21   Q.  Have you heard of any other applicants that
22       complained about the test questions other than
23       Joey Darby?

|  | Page 134 |
|---|---|

1　A.　Like I say, it was just word of mouth, rumor
2　　　mill, and I'm not sure on that. I don't recall.
3　Q.　The only name you recall is Joey Darby?
4　A.　That's the only name I recall hearing in
5　　　reference to.
6　Q.　What's the date of the letter that told you you
7　　　didn't -- April 14?
8　A.　Uh-huh (positive response).
9　Q.　And the grievance was filed April 21.
10　　　In between receiving the letter, Defendant's
11　　　Exhibit Number 11, telling you that you were
12　　　not -- hadn't made high enough on the written
13　　　and filing this grievance, Defendant's Exhibit
14　　　12 on April 21, did you have any conversations
15　　　with Lee Lamar or Larry Langley about the test?
16　A.　I didn't, sir.
17　Q.　Did you have any conversations with Steve Reeves
18　　　or Bill James?
19　A.　No, sir, I did not.
20　Q.　Have any conversations with the mayor or the
21　　　city manager about it?
22　A.　No, sir, I did not.
23　Q.　How about WCH? Did you have any conversations

|  | Page 135 |
|---|---|

1　　　with CWH?
2　A.　No, sir, I did not.
3　Q.　And then you and three others filed a grievance
4　　　to Lee Lamar, and you asked that four written
5　　　exams be reviewed. I assume that's the four of
6　　　you, your written exams?
7　A.　Yes, sir.
8　Q.　Now, Horace Clanton is a white male?
9　A.　Yes, sir.
10　Q.　And Robbie Hodge is a white male?
11　A.　Yes, sir.
12　Q.　Eddie Ogletree is a black male?
13　A.　Yes, sir.
14　Q.　And Gerald Stephens is a black male?
15　A.　Yes, sir.
16　Q.　And the four of y'all filed this grievance
17　　　together?
18　A.　We initiated that grievance together.
19　Q.　And when you actually had the hearing, though,
20　　　how many of you went forward with the hearing?
21　A.　It was three of us.
22　Q.　Who did not go forward?
23　A.　Robbie Hodge.

|  | Page 136 |
|---|---|

1　Q.　In this letter y'all say about exercising your
2　　　rights for a grievance on a promotion procedure,
3　　　which includes the following: The written exam.
4　　　　What was your complaint about the written
5　　　exam at that point?
6　A.　In reference to this grievance as a group,
7　　　everybody had their specific complaint. And the
8　　　only thing I can tell you about that is the last
9　　　one, inconsistency of past promotional
10　　　procedures. That was my main complaint.
11　Q.　So did you have a complaint yourself about the
12　　　written exam as part of this grievance
13　　　procedure?
14　　　　MR. HORSLEY: What was that question
15　　　　again? I'm sorry.
16　　　　MR. MORGAN: He said --
17　Q.　As I understand what you said, the four of y'all
18　　　may have each had your own separate complaints,
19　　　true?
20　A.　Pretty much so, yes, sir.
21　Q.　The one that you were most complaining about was
22　　　the inconsistency of past promotional
23　　　procedures?

|  | Page 137 |
|---|---|

1　A.　Yes, sir.
2　Q.　My question is: As part of the grievance
3　　　procedure, was one of your complaints or did you
4　　　have a complaint about the written exam?
5　A.　The thing about inconsistency of past
6　　　promotional procedures, it involves the written
7　　　exam because for the simple fact there have
8　　　never been one. That's my main thing. That's
9　　　part of my inconsistency, because when I took --
10　　　if I can explain --
11　　　　MR. HORSLEY: Yeah.
12　A.　When I took my promotional assessment in '96,
13　　　there was no written test. Anything after that
14　　　that I recall within a ten-year time span, there
15　　　was no written test.
16　Q.　Let me ask the question this way. I'm going to
17　　　get to the inconsistency and let you explain
18　　　that in detail, but I want to go through these
19　　　other three.
20　　　　What I'm hearing you say -- you tell me if
21　　　I'm wrong -- is that your complaint about the
22　　　written exam is that it was a requirement.
23　A.　Basically the written exam was part of the

Page 138

1    procedure, yes.
2    Q.  You didn't make any specific complaints about
3        the exam per se but just the fact that it was
4        now a part of the promotion procedure?
5    A.  Yes, sir.
6    Q.  And did you have as part of your complaint the
7        no time in grade policy?  Was that something
8        that concerned you?
9    A.  Not directly, sir.
10   Q.  And then the -- I don't even understand this
11       one -- no accumulative point system, was that
12       one of your concerns?
13   A.  That was a minor concern because --
14   Q.  What is that?
15   A.  Basically accumulative points is something
16       that's implemented into the overall assessment
17       whereas if --
18   Q.  Back up.
19   A.  Let's say, for example, if you had four years of
20       service, you get two points for that.  If you
21       had a degree, you get eight points for that, you
22       know.  To the point -- The point I'm trying to
23       get at is:  At the end of the testing, all your

Page 139

1    points are added up, and that's how you get a
2    result, like I got on my result from when I was
3    promoted stating how I ranked and here was my
4    score.
5    Q.  So you thought there should be some accumulative
6        point system into the system, either seniority
7        or education or something?
8    A.  Yes, sir.  I think it should have been one --
9        some type of point system, yes, sir.  Whether
10       there was or not, I don't know, because I didn't
11       make it past the written test portion for
12       battalion chief.
13   Q.  Well, tell me how you would have fashioned the
14       test for battalion chief.
15           MR. HORSLEY:  Object to the form.  You
16               can answer.
17   A.  I'm not an expert on test making, Mr. Morgan, so
18       I can't really say what I would do and what I
19       would do would be the correct thing to do.  But
20       I just -- I just -- I'm not an expert in that
21       field.  I just don't know.
22   Q.  And then your number four complaint -- I think
23       this is the one that you said most concerned

Page 140

1    you -- was the inconsistency of past promotional
2    procedures.
3    A.  Yes, sir.
4    Q.  Elaborate and tell me exactly what it is that
5        concerned you about that one.
6    A.  The thing that concerned me was that, of course,
7        I went through an assessment center.  Some
8        people promoted and, whether it was lieutenant
9        or team leader, went through structured
10       interviews.  Some people was appointed.  And
11       some people were just, in my terms, vaguely
12       given a job.
13   Q.  Just what, now?
14   A.  Vaguely given the job and told them that you are
15       in this position.  And when I say that, the job
16       position wasn't posted.
17   Q.  So --
18   A.  So that's what I mean by inconsistency.
19   Q.  I guess what I'm understanding you to say -- and
20       once again, you correct me -- is that people had
21       achieved a rank in different ways.
22   A.  Yes, sir.
23   Q.  Who was appointed as opposed to going through

Page 141

1    the structured interview with the team leader or
2    the assessment as lieutenant?  Who was appointed
3    to a position that sat for the battalion chief
4    promotion?
5    A.  I do recall Rodney Hartsfield, who is a
6        battalion chief now, being promoted when he was
7        on probation as a career firefighter.  I don't
8        have any specifics on the date or nothing like
9        that.
10   Q.  Promoted to what?
11   A.  He was promoted to a team leader.
12   Q.  While he was a probationary career firefighter?
13   A.  Yes.
14   Q.  Well, I don't know either.  I mean, the
15       documents will say whatever they say, but was
16       there always -- other than Rodney Hartsfield's
17       promotion, was there always a requirement for
18       promotion to team leader that you had to be a
19       non-probationary career firefighter?
20   A.  Like I say, Mr. Morgan, I was not a team leader,
21       but I know there was requirements for me when I
22       applied for lieutenant.
23   Q.  So you don't know whether or not the

Page 142

1    non-probationary versus probationary was ever a
2    requirement for team leader?
3    A.  Well, I mean, it was practiced, but whether or
4        not it was a direct requirement, I can't tell
5        you. Like I say, I was never a team leader.
6    Q.  And then the last category was people who were
7        vaguely given the jobs that were not posted.
8        Who sat for the battalion chief position that
9        was vaguely given a job that was not posted?
10   A.  Well, nobody sat for the position of battalion
11       chief. Basically he had something to do with
12       presenting in the -- the testing orientation or
13       whatever. And what I'm speaking about in
14       particular is that when they first implemented
15       back the training officer position, it was never
16       posted. I never saw anything in reference to.
17       And the first time I heard about it was when my
18       immediate supervisor told me, who is the late
19       Jimmy Brown. He told me that the person who had
20       stepped in and started acting as the training
21       officer was the training officer.
22   Q.  Lee Lamar?
23   A.  Yes, sir.

Page 143

1    Q.  Anybody else who you think in the fire
2        department received a promotion where they were
3        vaguely given a job that was not posted other
4        than Lee Lamar?
5    A.  Well, vaguely given a job, I don't know, but I
6        recall another incidence where a promotion took
7        place. They went from firefighter to captain
8        whereas they skipped other rank.
9    Q.  And that's Larry Langley?
10   A.  And that's Larry Langley.
11   Q.  Once again, do you know whether or not on that
12       promotion there was a requirement for a time in
13       grade or that you had to be a lieutenant?
14   A.  The only thing I know is what I applied for,
15       Mr. Morgan, and that was lieutenant.
16   Q.  And that would have been the captain promotion
17       that occurred in 1996, true?
18   A.  No, sir. It was in -- In 1996 I think
19       Mr. Langley was on his way to being acting fire
20       chief.
21   Q.  So Langley was promoted to captain even before
22       '96?
23   A.  Yes, sir.

Page 144

1    Q.  Do you remember what year he was promoted to
2        captain?
3    A.  I don't remember off the top of my head,
4        Mr. Morgan.
5    Q.  But your best recollection is it was sometime
6        before '96?
7    A.  It was before '96.
8    Q.  All right. Now, you're going to have to help me
9        here. You've taken your written test. You've
10       told me about the procedure, what went on during
11       that written test. And then I guess a couple of
12       days later -- within a week I guess -- you get
13       notice that you didn't score high enough to
14       proceed. And then by April 21 you filed your
15       grievance along with these other firefighters.
16       I guess they were all lieutenants at that point.
17   A.  Yes, sir. We were all lieutenants.
18   Q.  And then you go through the grievance
19       procedure. I've seen the paperwork where you go
20       up -- the four of you go up the steps on the
21       grievance procedure.
22   A.  Yes, sir.
23   Q.  Is there anything else going on at that time in

Page 145

1        terms of complaints about the test,
2        conversations with people, anything that's not
3        documented in the grievance procedures?
4    A.  I don't recall of anything. I will say that I
5        did converse with the guys that was on the
6        grievance. Once we came together and decided to
7        file a grievance, we discussed a lot of things.
8        And it was with those guys that are on that
9        paper right there.
10   Q.  What do you recall Horace Clanton's specific
11       complaints being about the test or the
12       procedure?
13   A.  Can I see that?
14   Q.  Yeah, sure.
15   A.  I can't remember, Mr. Morgan. I'm sorry. The
16       only thing that I can consider to be my direct
17       complaint was the inconsistency part in
18       compliance (sic) with everything else. I mean,
19       it was all of us conversing together. And we
20       had our concerns, and all of it came together
21       and we presented this together.
22   Q.  I just want to be sure I have this documented.
23       Do you remember -- what was the other -- Not

Page 146

1   Eddie, but who was the other one?
2   A. Mr. Robert Hodge.
3   Q. Do you remember any specific complaints that he
4      had?
5   A. No, sir, I don't. I don't recall.
6   Q. Do you remember any specific complaints that
7      Eddie Ogletree had?
8   A. Of the three that's available, no, sir. I don't
9      recall.
10  Q. I think this is Exhibit 10, the feedback
11     report. When is your recollection that you
12     received that, after you filed the grievance?
13  A. Like I say, the only time I recall receiving
14     this that is addressed to me is when I pretty
15     much asked for a review. In reference to
16     everybody else, I don't know. I'm just speaking
17     as far as what I received that was addressed to
18     me, because I think of the three of us -- of the
19     four of us who did it, each one was addressed to
20     each individual, I think. But I'm not clear on
21     it. It's been so far along. But I can vouch
22     for this one that's addressed to me.
23  Q. Look at the second page of this document, and

Page 147

1      it's got down there reading source.
2   A. Okay.
3   Q. It's got four books -- I assume they are
4      books -- listed: IFSTA Chief Officer, Effective
5      Supervisory Practices, Fire Officers' Handbook
6      of Tactics, and Structural Firefighting.
7         Do you see those?
8   A. Yes, sir.
9   Q. Are those the four books that the City furnished
10     you to review to prepare for the battalion chief
11     exam?
12  A. I think they are, sir.
13  Q. And look at the next page on that. It says:
14     Scoring Changes Based on Item Analysis. Do you
15     see that?
16  A. Yes, sir.
17  Q. And it's got -- The first sentence says: At the
18     time of the written test, all candidates were
19     given the opportunity to appeal any item on the
20     test they felt was inaccurate and unfair.
21        And my understanding is that you did not
22     appeal any of the test questions, true?
23  A. No, sir, I didn't appeal any.

Page 148

1   Q. And then the second paragraph says: There were
2      a total of seven items appealed, and the scoring
3      key was adjusted for two of these items.
4         Did you ever ask anyone at the City what
5      that referred to or what that meant?
6   A. I didn't, sir. No.
7   Q. And so I can be clear, the rumor is that if test
8      grades or scores had not been changed -- Let me
9      start over.
10        The rumor is if test question answers had
11     not been changed that Joey Darby would not have
12     scored high enough to have proceeded to the
13     assessment part?
14  A. Yes, sir.
15  Q. But you don't know how that change affected your
16     individual score, do you?
17  A. Not directly, sir, no.
18  Q. Tell me just generally what went on during the
19     grievance appeal process.
20  A. Basically what happened was after -- I was
21     notified after the time I received the letter
22     stating what I made on the test and I couldn't
23     proceed. I was contacted by Mr. Clanton. He

Page 149

1      asked me what I thought, and I told him that I'm
2      concerned enough to file a grievance; what about
3      you. And he say he felt the same way, and he
4      had talked to Mr. Hodge and Mr. Ogletree.
5         So we met and we initiated the first letter
6      based upon the conversations we had and based on
7      everything that we presented on this first
8      letter. And we decided to present it to --
9      Being that we was a station officer and middle
10     management, we decided to present it to
11     Mr. Lamar, who was deputy chief, because we each
12     worked on -- well, some of us worked on
13     different shifts. If I'm not mistaken, me and
14     Mr. Clanton was on the same shift, and Eddie
15     and -- Mr. Hodge and Mr. Ogletree was on the
16     same shift. So we had different supervisor --
17     immediate supervisors. So we addressed it to
18     Mr. Lamar.
19  Q. And I guess from there it goes to --
20  A. Yes, sir. Just procedures that go through the
21     chain of command.
22  Q. And eventually you have a hearing?
23  A. Yes, sir. When we reach the city manager, it's

6623b598-899c-485a-b995-fb9fd663a9ce

Deposition of Gerald Stephens                    May 30, 2008

---

Page 150

1  his decision to grant us a hearing of his
2  choice, you know, as far as the hearing
3  officer.  And it's set up, and that's when we go
4  into the hearing procedure part of the
5  grievance.
6  Q.  And that was before Judge Bailey came in?
7  A.  No.  That was when Judge Bailey came.  He was
8      the hearing officer.
9  Q.  He was the hearing officer.  That's what I
10     asked.  Okay.
11         And Hodge decided not to go forward with the
12     hearing?
13 A.  Yes, sir.  During the process of when we
14     addressed Chief Lamar and, if I'm remember
15     correctly, when addressed -- when we was
16     preparing to address Mr. James, public safety
17     director, he told myself and Mr. Clanton that he
18     did not want to pursue any further.  And, of
19     course, we respected that and told him we
20     appreciated what he had done.  And Mr. Clanton
21     and myself and Mr. Ogletree, we're still
22     proceeding.
23 Q.  Clanton, is that the officer that had been the

Page 151

1      subject of your earlier EEOC complaint --
2  A.  Yes, sir.
3  Q.  -- that he took a temporary position as
4      something?
5  A.  Yes, sir.  He was appointed as acting A shift
6      officer in place of the late Chief Brown.
7      That's when he had undergone -- initially found
8      out and undergone his health issues at the time
9      and was not capable of work.  So our shift was
10     without an immediate supervisor when this
11     happened, but I was the acting.  I was filling
12     that role prior to him being appointed because I
13     was the one who broke the news to every other
14     officer on the shift, the situation with Chief
15     Brown.
16 Q.  But my question is:  That's the person you were
17     complaining about that got to be the temporary,
18     I guess, captain or battalion chief and you
19     thought it should have been you?
20 A.  Yes, sir.  That was my main complaint to
21     Mr. Langley who made the appointment:  Why
22     Mr. Clanton when I wasn't given an opportunity.
23 Q.  Did you have an attorney representing you at the

Page 152

1      hearing?
2  A.  No, sir.  Well, let's back up.  Which one, the
3      one in 2005 or 2006?
4  Q.  The one dealing with the battalion chief.
5  A.  Me, Mr. Ogletree, and Mr. Clanton?  No, sir, we
6      didn't have a lawyer at that time.
7  Q.  Was there an attorney on the other side for the
8      City or was it just --
9  A.  No, sir.  We just came into the hearing as we
10     were.
11 Q.  Who was the City's spokesperson?
12 A.  The City spokesperson?
13 Q.  Who was the one that defended the City's
14     position?
15 A.  Basically Judge Bailey.  I mean, that's who we
16     talked to.
17 Q.  Lee Lamar wasn't there?
18 A.  Mr. Lamar was there and Mr. Reeves was there,
19     but, you know, we -- our conversation pretty
20     much was through Mr. Bailey.
21 Q.  Well, I understand that.  Was there somebody
22     from the City who then had a conversation with
23     Mr. Bailey as to what the City's position was?

Page 153

1  A.  I guess there was between those other people
2      that were present, yes, sir.
3  Q.  Anybody you remember being there besides Lee and
4      Steve Reeves?
5  A.  I can't remember if Mr. Langley was there or
6      not, but I do know Mr. Lamar and Mr. Reeves was
7      there.
8  Q.  And Judge Bailey --
9  A.  And Judge Bailey, of course.  He was the hearing
10     officer.
11 Q.  He ruled against y'all?
12 A.  Yes, sir.
13 Q.  Did you have any witnesses or was it just the
14     three of you?
15 A.  It was just us three.
16 Q.  Do you know Rodney Hartsfield?
17 A.  I do.
18 Q.  Have you ever worked with him?
19 A.  I do.
20 Q.  Is he --
21 A.  I have.
22 Q.  Is he a good officer?
23 A.  I can't say if he's good or not, but the times I

6623b598-899c-485a-b995-fb9fd663a9ce

Page 154

1  worked with Rodney Hartsfield, he was an
2  insubordinate (sic) to me. I mean, he worked
3  under my leadership.
4  Q. He wasn't insubordinate. He was subordinate.
5  A. He was subordinate, yes, sir. He was either a
6  student firefighter, career firefighter, or a
7  team leader. As far as him being a battalion
8  chief, I don't recall working for him ever since
9  he's been in that position. I may have worked
10  overtime a couple of hours till they can get
11  somebody at shift change, but not a 24-hour
12  shift. No, sir.
13  Q. Do you have an opinion as to whether or not he
14  is qualified or not qualified to be a battalion
15  chief?
16      MR. HORSLEY: Object to the form. You
17      can answer.
18  A. I don't have an opinion on that, Mr. Morgan.
19  Q. And Joe Lovvorn, have you worked with him?
20  A. Yes, sir. Same as I have with Rodney
21  Hartsfield.
22  Q. Was he a good, competent officer when you worked
23  with him?

Page 155

1  A. I mean --
2  Q. Have any complaints about him?
3  A. I never worked under his leadership as a
4  battalion chief. It was always the same
5  description as was for Rodney Hartsfield.
6  Q. Do you have any opinion as to whether he is or
7  is not qualified to be a battalion chief?
8      MR. HORSLEY: Object to the form.
9  A. I don't have an opinion, sir.
10  Q. And Matt Jordan --
11  A. Yes, sir.
12      MR. HORSLEY: Same objection.
13  Q. Have you ever worked for Matt Jordan?
14      MR. HORSLEY: I'm sorry. I thought he
15      was asking the same question.
16  A. I have worked for Chief Jordan. He was -- When
17  he was promoted, he was my -- he was put on my
18  shift, or our shift, as my immediate supervisor.
19  Q. And do you have an opinion on whether or not he
20  is or is not qualified to be a battalion chief?
21      MR. HORSLEY: Object to the form. You
22      can answer.
23  A. I don't have an opinion whether he's qualified

Page 156

1  or not, but I do know I had some problems with
2  him in reference to the grievance that I
3  initiated. And that goes back to when I was at
4  Station 5.
5  Q. You told me about that grievance?
6  A. Yes, sir.
7  Q. I don't know that he's one of the people that
8  y'all referred to, but I think Joey Darby has
9  been promoted to battalion chief as well now.
10  A. Joey Darby was promoted to battalion chief to
11  replace Chief Brown when he retired.
12  Q. Do you have an opinion of whether or not Joey
13  Darby is qualified or not qualified to be a
14  battalion chief?
15      MR. HORSLEY: Object to the form. You
16      can answer.
17  A. I don't have an opinion on that, sir.
18  Q. Do you have an opinion on whether or not you are
19  more qualified than Rodney Hartsfield to be a
20  battalion chief?
21      MR. HORSLEY: Object to the form. You
22      can answer.
23  A. I do have an opinion on that.

Page 157

1  Q. What is that opinion?
2  A. Considering that I was an officer when he
3  started working there, I taught him in rookie
4  school, and, I mean, I trained him through the
5  training procedures that took place or
6  whatever. All these guys who are battalion
7  chiefs now, they came in after me.
8  Q. I want to be sure I get all your answers so
9  let's kind of take our time on this.
10  A. Yes, sir.
11  Q. What I'm understanding you to say about Rodney
12  Hartsfield as to why you think you're more
13  qualified is that you were an officer when he
14  was hired and you participated in his training,
15  right?
16  A. (Witness nods head positively.)
17  Q. Any other reasons why you think you're more
18  qualified than Rodney Hartsfield?
19      MR. HORSLEY: Object to the form.
20  A. More years of experience level. I have more
21  years of experience. Spent more time on the
22  job. Has played a significant role or did play
23  a significant role in the growth of the

Deposition of Gerald Stephens                           May 30, 2008

---

Page 158

1    department, you know, during the era when they
2    was actually coming in and being hired. I just
3    think I have more experience than any of those
4    guys at the Auburn Fire Division.
5         And one other thing: I mentioned it later
6    on. During their absence, you know, I filled
7    that position. And I filled that position
8    before they even became, you know, battalion
9    chiefs. I filled the position in the absence of
10   a battalion chief.
11   Q.   If a battalion chief --
12   A.   And I still do it.
13   Q.   -- is not there, you as a lieutenant, step up --
14   A.   Yes, sir.
15   Q.   -- to that position?
16   A.   Yes, sir. Based upon seniority.
17           MR. HORSLEY:  And you said you had
18               done that before the battalion
19               chief promotion?
20           THE WITNESS:  Before and after.
21   Q.   You're talking about with other people who were
22   battalion chiefs?
23   A.   Yes, sir. I've filled in several times for

---

Page 159

1    Chief Brown.
2    Q.   Do you know whether or not Rodney Hartsfield
3    ever filled in --
4    A.   I don't know. Me and him was not on the same
5    shift.
6    Q.   Do you know whether or not as a team leader
7    Rodney Hartsfield had stepped up and filled in
8    as a lieutenant?
9    A.   I'm not sure on that, Mr. Morgan.
10   Q.   Have we covered everything about Rodney
11   Hartsfield as to why you think you're more
12   qualified?
13   A.   I think we touched the basis of it, sir, the
14   most important part.
15   Q.   And Joe Lovvorn, do you think you're more
16   qualified than Joe Lovvorn to be a battalion
17   chief?
18           MR. HORSLEY:  Object to the form.
19   Q.   What are the reasons?
20   A.   Pretty much the same reasons that I mentioned
21   with Rodney Hartsfield.
22   Q.   Been there longer?
23   A.   Yes, sir.

---

Page 160

1    Q.   And Matt Jordan. Do you think you're more
2    qualified than Matt Jordan?
3           MR. HORSLEY:  Object to the form.
4    Q.   What are the reasons?
5    A.   Same reasons. Understand, Mr. Morgan, all these
6    guys came in right along the same era, one or
7    two years, give or take. And when they came in,
8    I was a officer already.
9    Q.   And then Joey Darby. You think you're more
10   qualified than Joey Darby --
11   A.   Yes, sir.
12   Q.   -- to be a battalion chief?
13           MR. HORSLEY:  Object to the form.
14   A.   Yes, sir.
15   Q.   Same reasons?
16   A.   Yes, sir.
17   Q.   Any different reasons for any of them other than
18   what you've already expressed?
19   A.   Not at this time, sir.
20   Q.   There's a reference in this lawsuit -- Well, let
21   me get to that.
22           MR. MORGAN:  Let's take a quick break.
23           (Brief recess.)

---

Page 161

1    Q.   (Continuing by Mr. Morgan)  Look at these four
2    books that were the reading source.
3    Specifically I'm going to ask you about all of
4    them, but specifically the supervisory --
5    Effective Supervisory Practices. Hadn't you
6    read that book earlier in some of your training
7    courses for some of the certifications that you
8    had received along the way in your career?
9    A.   Yes, sir. I recall having a lot to do
10   resourcefully with this particular text, yes,
11   sir.
12   Q.   How about the other three texts on there? Had
13   you read or been exposed to any of them before
14   the battalion chief promotion procedure?
15   A.   If it was any other, it had to be Structural
16   Firefighting. That's throughout your whole
17   career pretty much.
18   Q.   So a lot of this -- at least the material in
19   those two books would not have been new material
20   to you but really have been a review of stuff
21   that you had learned along the way?
22   A.   Yes, sir. I can agree with that.
23   Q.   Let me ask some specifics about your complaint.

---

41 (Pages 158 to 161)

Deposition of Gerald Stephens                    May 30, 2008

|  | Page 162 |
|---|---|
| 1 | In Count I -- |
| 2 | (Brief pause.) |
| 3 | Q. Look at paragraph 15, if you would, first |
| 4 | sentence. It says: Prior to February 2007, |
| 5 | only nine probationary lieutenants were allowed |
| 6 | to apply for the position of battalion chief. |
| 7 | Actually, isn't it true that there actually |
| 8 | had never been a promotion for battalion chief |
| 9 | before this? Isn't that true? |
| 10 | A. No. |
| 11 | MR. HORSLEY: And, for the record, |
| 12 | that date is wrong too. It should |
| 13 | be 2006. I'm sorry about that. |
| 14 | That was my fault. |
| 15 | A. The first incident involving battalion chiefs |
| 16 | was a change from captain to battalion chief. |
| 17 | That was the title change coordinated and worked |
| 18 | through the person in position to make that |
| 19 | decision. |
| 20 | Q. So this is actually the first promotion to |
| 21 | battalion chief? |
| 22 | A. Yes, sir. |
| 23 | Q. The prior promotion had been to captain in '96? |

|  | Page 163 |
|---|---|
| 1 | A. Yes, sir. |
| 2 | Q. And I think you testified, but I want to be |
| 3 | clear. You don't remember whether or not |
| 4 | non-probationary people were allowed to apply |
| 5 | for captain in '96 because you weren't concerned |
| 6 | with that. You were concerned with your own |
| 7 | promotion procedure. |
| 8 | A. Yes, sir. For the record, there were two people |
| 9 | applying for captain in '96 when I was applying |
| 10 | for lieutenant, and it was Mr. Lamar and |
| 11 | Mr. Johnny Lawrence. Those were the two |
| 12 | candidates for captains in 1996. |
| 13 | Q. And were either of them promoted? |
| 14 | A. Chief Lawrence -- Mr. Lawrence was promoted to |
| 15 | captain. |
| 16 | Q. Had he been a lieutenant? |
| 17 | A. He was a team leader. |
| 18 | Q. So then prior to February 2006, this is not |
| 19 | correct. Only non-probationary -- Unless you're |
| 20 | counting team leaders as being lieutenants in |
| 21 | '96. As a team leader, he was allowed to apply |
| 22 | for promotion to captain? |
| 23 | A. Yes, sir, he was. |

|  | Page 164 |
|---|---|
| 1 | Q. And was promoted? |
| 2 | A. Yes, sir. |
| 3 | Q. And then you've got in February of '06, the City |
| 4 | changed its policy to allow non-probationary and |
| 5 | probationary firefighters to apply for battalion |
| 6 | chief. |
| 7 | And I think cutting through all that, what |
| 8 | we've established is the only person who was not |
| 9 | a team leader, lieutenant, or lieutenant (sic) |
| 10 | who sat for the written test for battalion chief |
| 11 | was Chris Turner, a black male? |
| 12 | A. Chris Turner. Give or take Clay Carson. |
| 13 | Q. And I think you said he didn't take the test. |
| 14 | A. No, sir, he did not. |
| 15 | Q. The only one that took the test was Chris? |
| 16 | A. Yes, sir. Mr. Turner. |
| 17 | Q. Black male. All right. |
| 18 | Look at number 16, the next page. It says: |
| 19 | During the time the City changed the policy to |
| 20 | require applicants for battalion chief to pass a |
| 21 | written test. |
| 22 | Obviously there was a written test. What's |
| 23 | the problem with the written test? |

|  | Page 165 |
|---|---|
| 1 | MR. HORSLEY: Object to the form. Go |
| 2 | ahead. |
| 3 | A. My problem with that is that there have never |
| 4 | been a written test, Mr. Morgan. It was |
| 5 | always -- It was either assessment center or a |
| 6 | structured interview. And regardless which one |
| 7 | it was, there was not a written test for a |
| 8 | promotion to that rank. |
| 9 | Q. Well, say that's true. Say that's true. Why |
| 10 | does that make it wrong to change the procedure |
| 11 | to include a written test? |
| 12 | MR. HORSLEY: Object to the form. |
| 13 | Q. I know you don't like the fact that you didn't |
| 14 | do well on the written test. But aside from |
| 15 | that, looking at the big picture, what's wrong |
| 16 | with the City including a written test as part |
| 17 | of the promotion procedure? |
| 18 | MR. HORSLEY: Object to the form. Go |
| 19 | ahead. |
| 20 | A. I'm not in the position to say whether it's |
| 21 | right or wrong with the City implementing |
| 22 | anything. I can only speak from the point that |
| 23 | through my 17 years of being there or up to the |

42 (Pages 162 to 165)

Deposition of Gerald Stephens                              May 30, 2008

| Page 166 | Page 168 |
|---|---|

**Page 166**

1  point where I became an officer and on up until
2  the time of this first battalion chief
3  promotion, there was never a written test. What
4  is right or wrong for the City to do, I'm not at
5  any liberty or at any power to justify that.
6  Q. And that makes me want to back up a minute.
7      You took the assessment center or
8  participated in that for lieutenant.
9  A. Yes, sir.
10 Q. You sat on what you've called structured
11 interviews for team leader.
12 A. Yes, sir.
13 Q. What's the difference between the two? What was
14 different as an assessment as opposed to the
15 structured interview?
16 A. I consider assessment center very thorough where
17 it covers all broadness of the position. I
18 mean, from exercises in reference to medical
19 calls, pumping, driving, having good
20 conversational skills with the public, in
21 general. That's an assessment center. A
22 structured interview for a team leader, you come
23 in a room and you sit down and okay, we have a

**Page 168**

1  says: Coincidentally the policy changes
2  occurred when two African-American lieutenants
3  and one entry-level African-American
4  firefighter --
5      I assume that's Chris Turner.
6  A. Yes.
7  Q. -- became eligible for the position.
8      What's coincidental about that?
9          MR. HORSLEY: Object to the form. You
10         can answer.
11 A. Coincidentally, you know, we applied for the
12 positions. We became eligible and we applied.
13 And all of a sudden, you know, things changed.
14 Things changed to the point where, you know, we
15 had to take a test. Why not stick to the way
16 we've been doing things?
17 Q. Do you have any evidence that that change
18 occurred to exclude African-Americans from being
19 promoted to battalion chief?
20         MR. HORSLEY: Object to the form.
21 A. I don't know if it was applied or not, sir. I
22 don't know. But I know this. It just
23 coincidentally happened that way to the point

**Page 167**

1  series of questions we want to ask you. Please
2  respond to the best of your ability. Let us
3  know when you're done, and that's it.
4  Q. Does assessment center involve more than just
5  questions and answers?
6  A. It could, depending on what type of promotion it
7  is. The ones where I conducted myself as an
8  assessor in a neighboring department, yes, it
9  did. But in Auburn all the scenarios in 1996
10 was inside a building, and it was just different
11 scenarios dealing with different broad areas
12 that you're going to be exposed to as an
13 officer.
14 Q. The assessment center that you participated in
15 for lieutenant, was that a question-and-answer
16 system?
17 A. A portion of it was, yes, sir.
18 Q. Was there more than just questions and answers?
19 A. Yes, sir. We had role plays. We had an
20 in-basket scenario. We had scenarios where we
21 were actually videotaped. I can't remember if
22 we did an interview or not. I'm not sure.
23 Q. Look at the second sentence of paragraph 16. It

**Page 169**

1  where it hasn't happened in the past.
2  Q. And the last sentence of that paragraph says:
3  Seniority within the division was discarded as a
4  criteria for promotion to the battalion chief
5  position.
6      Do you recall one way or the other whether
7  or not in '96 for the last captain's promotion
8  seniority was a requirement?
9  A. I don't know if it was a requirement, but it was
10 heavily considered.
11 Q. And that's based on what?
12 A. Based on time in grade, based on the number of
13 years of experience, on the years you was --
14 Q. My question is: Why do you say that was a
15 requirement for captain in '96? Do you recall
16 seniority being a requirement for captain?
17 A. I don't recall that. I don't know, sir.
18 Q. Look at paragraph 17. It says you were denied
19 promotion to battalion chief in April 2006 and a
20 temporary assignment in January of 2005.
21     The 2005, is that the one where you filed
22 the grievance and the EEOC charge dealing with
23 Horace Clanton?

Deposition of Gerald Stephens                           May 30, 2008

| Page 170 |
|---|
| 1   A.  Yes, sir. |
| 2   Q.  And if I recall, no lawsuit was filed as a |
| 3       result of that? |
| 4   A.  No, sir. |
| 5   Q.  And then you said the denial of the promotion |
| 6       was racially based. |
| 7       What facts do you have that you're not being |
| 8       promoted to battalion chief was because of -- |
| 9       was racially based? |
| 10      MR. HORSLEY:  Object to the form. |
| 11  A.  I can't think of no other reason why. I mean, |
| 12      I've done everything that the Auburn Fire |
| 13      Division asked me to do up until this point. I |
| 14      was actually running the position prior to him |
| 15      making that decision, and it had been practiced |
| 16      and exercised prior to this incident that the |
| 17      available lieutenants fill these positions. |
| 18      Prior to the opportunity coming to me, |
| 19      Mr. Langley's brother, who was a lieutenant of |
| 20      the department, every time they needed a |
| 21      position to take place, he was given the |
| 22      opportunity.  And he had more seniority than |
| 23      me.  And basically at one point, Mr. Langley |

| Page 171 |
|---|
| 1       told me -- Mr. Larry Langley told me that he has |
| 2       more seniority than you; he's a lieutenant.  So |
| 3       I'm just following suit. |
| 4   Q.  Wait.  Now, he was a lieutenant? |
| 5   A.  Terry Langley was a lieutenant.  Terry Langley |
| 6       is Larry Langley's brother. |
| 7   Q.  And what positions was he given that you weren't |
| 8       given? |
| 9   A.  In the absence of a captain or battalion chief, |
| 10      he would fill that role and it was based on |
| 11      seniority. |
| 12  Q.  I thought you testified that you had also filled |
| 13      that role as captain or battalion chief. |
| 14  A.  When he left I did.  When he retired in February |
| 15      of 2004, I was the only lieutenant left, and I |
| 16      started filling those positions when asked to do |
| 17      so.  Lieutenant Langley, Terry Langley, would do |
| 18      it consecutively.  He would get the assignment, |
| 19      and it would be his until told to do something |
| 20      else.  I would do it randomly when guys take off |
| 21      and -- When they take off, I'll step in. |
| 22  Q.  Well, assume all that is true.  Why is it that |
| 23      you say -- How do you consider that to be |

| Page 172 |
|---|
| 1       evidence of racial discrimination in your not |
| 2       being promoted to battalion chief? |
| 3   A.  What other reason would it be?  I mean, I've |
| 4       done -- I'm qualified.  I'm certified.  I'm |
| 5       capable of doing the job.  They make me do it |
| 6       anyway.  So what other reason would it not be? |
| 7       That's the conclusion I was led to, and that's |
| 8       what I think. |
| 9   Q.  Well, do you have any specific what you would |
| 10      consider evidence other than that's what you |
| 11      think? |
| 12      MR. HORSLEY:  Object to the form.  You |
| 13      can answer. |
| 14  A.  Well, the only evidence I have, Mr. Morgan, is |
| 15      the day that the announcement was made and |
| 16      Mr. Clanton was asked to act as the A shift |
| 17      shift commander. |
| 18  Q.  That was back in '05? |
| 19  A.  Yes, sir. |
| 20  Q.  Well, let's talk about February of '06 when you |
| 21      applied for battalion chief and then you didn't |
| 22      score high enough on the written test.  What |
| 23      evidence do you have that you were denied |

| Page 173 |
|---|
| 1       promotion on that occasion because of your race? |
| 2       MR. HORSLEY:  Object to the form.  You |
| 3       can answer. |
| 4   A.  I don't recall anything at this time, |
| 5       Mr. Morgan. |
| 6   Q.  Look at paragraph 18.  I think we've been |
| 7       through this.  You're not aware of any Caucasian |
| 8       applicants for battalion chief in February of |
| 9       '06 that were given preferential treatment in |
| 10      the application process, test aids, or test |
| 11      grades, correct? |
| 12  A.  Yes, sir. |
| 13  Q.  And in paragraph 19, it said:  The City |
| 14      continues to violate a federal court order |
| 15      requiring them to alter hiring and promotion |
| 16      practices. |
| 17      First of all, you were hired in '94 as a |
| 18      black male, true? |
| 19  A.  Yes, sir. |
| 20  Q.  And you had been hired earlier than that, I |
| 21      guess, in '91 as a student firefighter? |
| 22  A.  Yes, sir. |
| 23  Q.  What federal court order are you referring to |

6623b598-899c-485a-b995-fb9fd663a9ce

Page 174

1    and how is the City of Auburn violating it as it
2    relates to promotion practices?
3    A.  When I was hired in 1994, I was informed -- my
4    immediate supervisor when I went career was Dean
5    Garrett.  No.  My shift commander was Dean
6    Garrett.  My immediate supervisor was a black
7    male by the name of Jessie Strickland.  And at
8    the time, I didn't know anything about previous
9    lawsuits or whatever.  But it was at that time
10   when they informed me that I was hired because I
11   was black, and that was in the previous lawsuit.
12   Q.  Who told you that?
13   A.  This came from the officers when I went on shift
14   as a career --
15   Q.  Jessie Strickland?
16   A.  It was Dean Garrett and Jessie Strickland
17   present.
18   Q.  Told you you were hired because you were black?
19   A.  Yeah.  Basically in a nutshell, that's what it
20   was.  And it was all contingent upon the lawsuit
21   that they had where they was made to hire three
22   African-Americans, three blacks.
23   Q.  You don't believe that, do you?

Page 175

1    A.  Oh, most definitely.  I think I was hired
2    because I was the man for the job.  It has
3    nothing to do with color.
4    Q.  That's right.
5        Well, the court order that you're referring
6    to is one that occurred before you were hired as
7    a student firefighter as you understand it?
8    A.  I guess it was, Mr. Morgan.  I don't -- well --
9    Q.  Have you ever read the court order?
10   A.  No, sir.  I don't know nothing about it.
11   Q.  Well, is it fair to say that you really don't
12   know -- can't give me any examples about how is
13   it you claim that the City is violating the
14   court order as to promotion policies?
15       MR. HORSLEY:  Object to the form.  You
16       can answer.
17   A.  All I know is that from previous lawsuits, there
18   were stipulations set, guidelines set.  And the
19   City was to follow it in reference to the Auburn
20   Fire Division.
21   Q.  And you got that understanding from Dean Garrett
22   and Jessie Strickland?
23   A.  That's the first confirmation I got from it when

Page 176

1    I became career.
2    Q.  Was from those two people?
3    A.  They were my immediate and shift supervisor.
4    Q.  And they are the same two people that told you
5    you were hired because you were black?
6    A.  They pretty much told me.
7    Q.  And you don't believe that?
8    A.  No, sir.
9    Q.  Look at Count II, Retaliation.  I think it's
10   page 6.  You've got here that the Plaintiffs
11   have engaged in statutorily protected
12   expressions, such as filing EEOC -- well, Equal
13   Opportunity charges and grievances against the
14   City.
15       What do consider to be statutorily protected
16   expressions?
17       MR. HORSLEY:  Object to the form.
18   A.  I guess -- Well, I don't want to guess about
19   it.  I want to be direct with it.
20       MR. HORSLEY:  If you don't know, don't
21       try and answer.
22   A.  I don't know, Mr. Morgan.
23   Q.  Let me ask you, then.  Do you claim in this

Page 177

1    lawsuit that you were denied promotion to
2    battalion chief in retaliation for having filed
3    an earlier EEOC charge and grievances against
4    the City?
5    A.  To my understanding, the reason why I didn't get
6    the opportunity to pursue the battalion chief
7    position is because I didn't pass the written
8    test.  I don't understand to this day why it was
9    implemented as part as when in the past it never
10   has happened.
11   Q.  You don't have any evidence that the reason you
12   weren't promoted is in retaliation for having
13   filed an EEOC charge or grievance, do you?
14       THE WITNESS:  Can I talk to my
15       attorney for a minute?
16       MR. HORSLEY:  All I can tell you is if
17       you don't know the answer to the
18       question, that needs to be your
19       answer.
20   A.  I don't know the answer to that question,
21   Mr. Morgan.
22   Q.  Your understanding is you didn't get promoted
23   because you didn't score high enough on the

Page 178

1    written test, true?
2         MR. HORSLEY: Object to the form.
3         THE WITNESS: Can I answer?
4         MR. HORSLEY: You can answer.
5    A. True.
6    Q. And as far as you know, the same written test
7       was given to everyone, blacks and whites?
8    A. As far as I know, sir, everyone that was present
9       got the same test.
10   Q. And you don't have any evidence or suspect that
11      the City sat around with anybody and said, hey,
12      let's make this test so that Gerald Stephens
13      can't pass it because we're mad at him for
14      filing an EEOC charge? You don't have any
15      evidence to that effect, do you?
16        MR. HORSLEY: Object to the form.
17        THE WITNESS: Can I answer?
18        MR. HORSLEY: Yeah.
19   A. No, sir, I don't have any evidence of that.
20   Q. In paragraph 31, you make reference to protected
21      expressions. Do you see that?
22   A. Yes.
23   Q. Do you include anything in protected expressions

Page 179

1    other than what you refer to in paragraph 30
2    being the EEOC charge and the grievances? Is
3    there anything else that you consider to be
4    protected expressions, if you consider them to
5    be, other than the EEOC charge and the
6    grievances, if you know one way or the other?
7    A. I don't know one way or the other, sir.
8    Q. Look at Count III. And the first question is --
9       In paragraph 34 in quotes, is the phrase
10      "built-in headwind for minority groups and
11      unrelated to measuring job capability".
12         What is a built-in headwind? What do you
13      understand that to be?
14        MR. HORSLEY: Object to the form. He
15        didn't draft the complaint.
16        MR. MORGAN: I understand.
17   A. I don't know, sir, at this point.
18   Q. Outside of this lawsuit and excluding any
19      conversations with your attorney, have you ever
20      heard of the phrase "built-in headwind" before?
21   A. I don't recall ever hearing anything of that
22      nature, sir.
23   Q. What is your understanding as to your claim that

Page 180

1    the promotion practice had a disparate impact?
2    In your terms, what does that mean?
3         MR. HORSLEY: Object to the form. You
4         can answer.
5    A. All I know, Mr. Morgan, is that as an employee
6       of the Auburn Fire Division being hired in 1994,
7       there have only been one person hired with the
8       division, African-American, as a career
9       firefighter, and that was a guy by the name of
10      Roderick Torbert.
11   Q. Who?
12   A. Roderick Torbert. And other than myself being
13      promoted in 1996, the only other person I know
14      that was promoted is Mr. Ogletree. Since then
15      no African-Americans have been promoted or
16      hired, and I know that there are
17      African-Americans out there who have applied and
18      who are qualified for those positions. I don't
19      know them directly. I don't know their
20      specifically, but I know some who have applied
21      for a promotion and for career firefighter
22      positions, and it's never happened.
23   Q. Let me kind of break that down because I want to

Page 181

1    be clear on it.
2         Is your complaint about a disparate impact
3    related to the hiring or non-hiring of blacks,
4    or is it related to the promotion or
5    non-promotion of blacks?
6         MR. HORSLEY: Object to the form.
7    A. Both. I'm concerned about both of those issues,
8       Mr. Morgan.
9    Q. So you think that the City's hiring practices
10      have a disparate impact on blacks?
11   A. Yes, sir.
12   Q. Tell me what you mean by a disparate impact on
13      blacks.
14        MR. HORSLEY: Object to the form. Go
15        ahead.
16   A. They haven't hired any, Mr. Morgan, or promoted
17      any, since 1996.
18   Q. And what do you mean by a disparate impact
19      against blacks on promotions?
20        MR. HORSLEY: Same objection. Go
21        ahead.
22   A. They haven't promoted any.
23   Q. In your opinion, just the fact that none have

Deposition of Gerald Stephens                          May 30, 2008

| Page 182 |
|---|

1    been hired is evidence of the disparate impact?
2    A.  They have not hired or promoted qualified
3         African-Americans since 1996.
4    Q.  And that's the basis of your disparate impact
5         claim?
6    A.  Yes.
7    Q.  How did you rate Chris Turner on the team leader
8         interviews?
9    A.  I never sat on the interview with -- on the
10        board of an interview for Chris Turner.  I've
11        never sat --
12   Q.  For team leader you never sat on one that he
13        applied for?
14   A.  No, sir, I never did.
15   Q.  Was it your experience that the team leader
16        interviews that -- panels that you sat on always
17        included at least one and usually two blacks?
18   A.  One if not two, yes, sir.
19   Q.  Well, let's focus in on the promotion to
20        battalion chief which you applied for and did
21        not receive.  What is there about that procedure
22        to battalion chief that you think had a
23        disparate impact on blacks?

| Page 183 |
|---|

1         MR. HORSLEY:  Object to the form.  You
2         can answer.
3    A.  When the four captains received their battalion
4         chief rank, it was done by a title change.  No
5         test.  No procedures.  No structured interview.
6         No assessment center.  I mean, nothing was set
7         in stone other than a title change until after
8         the fact when they decided to go this route
9         right here.
10   Q.  This route meaning the test?
11   A.  The test -- The written test and the cutoff
12        score and everything else that went along with
13        it that I didn't experience.
14   Q.  Well, let's go back to the four captains.
15   A.  Okay.
16   Q.  Did anything occur in terms of their employment
17        other than they were renamed battalion chief
18        from captain?
19   A.  No, sir.
20   Q.  Did their duties and responsibilities remain the
21        same?
22   A.  The only thing I say had something to do with
23        that is the actual growth of the city.  I mean,

| Page 184 |
|---|

1    the city is steadily growing.  Responsibilities
2    are steadily increasing.  Our job
3    responsibilities are, you know, growing more
4    than they have been in the past.  And I guess --
5    Well, I won't guess about it.
6         Just the growth of the city, and they
7    thought maybe they needed a title change for
8    some reason or another, and they pursued it.
9    Q.  Do you claim that the title change alone from
10        captain to battalion chief -- do you make a
11        claim that that had some sort of racial
12        discrimination or racially discriminatory effect
13        toward blacks, changing the name from captain to
14        battalion chief?
15        MR. HORSLEY:  Object to the form.
16   A.  I don't know what the reason was, Mr. Morgan.  I
17        don't know the reason for pursuing it, the
18        reason for wanting to change it.  I don't have a
19        clue.
20   Q.  My question is:  Do you consider that to be
21        somehow racially discriminatory, to change the
22        title from captain to battalion chief?
23        MR. HORSLEY:  Object to the form.  I

| Page 185 |
|---|

1         think he's already answered the
2         question.
3    A.  No, sir, I don't.
4    Q.  Now, in terms of the actual battalion chief
5         promotion procedure that you were involved in,
6         what is there about it that you think had a
7         disparate impact on blacks?
8         MR. HORSLEY:  Object to the form.  You
9         can answer.
10   A.  Can you ask me that again, please, sir?
11   Q.  In terms of the battalion chief promotion
12        process in which you participated, what is it
13        about it that you think had a disparate impact
14        on blacks?
15        MR. HORSLEY:  Object to the form.
16   A.  The written test.
17   Q.  What is there about the written test that you
18        think had a disparate impact?
19        MR. HORSLEY:  Same objection.  Go
20        ahead.
21   A.  As stated before, Mr. Morgan, on previous
22        incidents, the written test has never been an
23        option in the promotion -- a written test with a

Deposition of Gerald Stephens                    May 30, 2008

Page 186

1    cutoff score has never been part of the
2    promotion procedure within the division.
3    Q.  And I don't want to keep on with this, but I
4    want to be clear.  Is it your position that just
5    by giving a written test that the effect of that
6    was to have a disparate impact on blacks?
7         MR. HORSLEY:  Object to the form.  You
8    can answer.
9    A.  I don't recall that at this time, Mr. Morgan.
10   Q.  What I probably should have done is ask this
11   question first.
12        What does disparate impact mean to you?
13   What do the terms "disparate impact" mean to
14   you?
15   A.  Basically it means to me that -- Let me see if I
16   can come up with a specific --
17        MR. HORSLEY:  That's a legal question.
18   A.  No, sir.
19        MR. HORSLEY:  It's a legal term, and I
20        don't want you answering questions
21        like that.
22   A.  No, sir.  I don't have any comment at this time.
23   Q.  I'm not asking a legal definition.  I'm just

Page 187

1    asking what do you think it means.
2         MR. HORSLEY:  I don't want you trying
3         to think up an answer.
4         MR. MORGAN:  No.  Don't sit here and
5         just answer it.
6    Q.  Do you know what disparate impact means one way
7    or the other?
8    A.  No, sir.  I don't have any comment at this time.
9    Q.  Before they became battalion chiefs, were those
10   people that held that position captains or were
11   they shift commanders?
12   A.  The title that I understand is shift
13   commander/captain or shift commander/battalion
14   chief.  Captains or battalion chief are
15   commanders like lieutenants are station
16   officers.
17   Q.  So captains had become shift commanders which
18   had become battalion chiefs?
19   A.  Captains are shift commanders and the title was
20   changed to battalion chief.
21   Q.  All of which was just, as you understand it, a
22   name change?
23   A.  Title change.

Page 188

1    Q.  In the big picture, what do the battalion chiefs
2    do?
3    A.  They are shift commanders.  They oversee all
4    operations per shift, including the firefighters
5    that work under them in reference to the safety
6    of the city, the whole -- Everything in
7    reference to.
8    Q.  And there are four of them?
9    A.  Yes, sir, it is.
10   Q.  And does each one have a different area of
11   responsibility?
12   A.  Each one of them carry out the same
13   responsibilities.  The responsibilities apply to
14   each battalion chief, other than the one who is
15   assigned to administrative duties.
16        (Defendant's Exhibit 13 marked for
17        identification.)
18   Q.  Let me show you Defendant's Exhibit 13 and ask
19   you if you recognize this as the charge of
20   discrimination when you submitted to the EEOC.
21        Is that your charge of discrimination?
22   A.  Yes, sir.
23        (Off-the-record discussion followed by

Page 189

1    a brief recess.)
2    Q.  (Continuing by Mr. Morgan)  Let me ask you about
3    some of these folks on the witness list and
4    specifically what they know about your case.
5         William Thompkins, who is he and what does
6    he know about your case?
7    A.  William Thompkins used to be employed with the
8    student firefighter program.  Of course, he's a
9    black male.  And Mr. Thompkins was terminated on
10   a first offense of an incident that occurred
11   between him and another temporary full-time
12   employee, who is a PSO, Public Safety Officer.
13   Why he was terminated on a first offense, I
14   don't know, but he shouldn't have never been
15   terminated.
16   Q.  And he's a black male?
17   A.  Yes, sir, he is.
18   Q.  When was he terminated?
19   A.  I don't remember, Mr. Morgan.
20   Q.  Well, does he know anything about you not being
21   promoted to battalion chief?
22   A.  I don't know exactly what he knows, but he could
23   have been told something of that nature.  I

6623b598-899c-485a-b995-fb9fd663a9ce

| Page 190 | Page 192 |

**Page 190**

1    don't know for sure.

2  Q.  Was he still employed with the City when you

3    applied for battalion chief?

4  A.  I don't recall he was, sir.

5  Q.  Have you had any conversations with him about

6    race discrimination?

7  A.  I haven't seen Thompkins in a long time.

8  Q.  Anything else that you have him listed for other

9    than the fact that he was terminated on a first

10    offense and you don't think he should have been

11    terminated on a first offense?

12  A.  No, sir.

13  Q.  And do you know what that offense was?

14  A.  I really don't know. I don't know why they

15    decided to do that.

16  Q.  Was he a firefighter?

17  A.  He was a student firefighter.

18  Q.  Well, let me ask you this. I'm not being

19    disrespectful, but what business would it be of

20    yours as to why he was terminated?

21  A.  Because I've seen other things happen with other

22    student firefighters who were white, and they

23    had multiple times to correct the problem, do

**Page 191**

1    better, whatever. There were times when they've

2    done things that, yes, they should have been

3    fired on the first offense because it involved

4    the police department. Police were notified.

5    They were involved. They committed an act that

6    I deem to be very serious. And if I was their

7    immediate supervisor, I would have recommended

8    that they be terminated.

9  Q.  And can you give me names of any of them?

10  A.  Michael Garrett Thee; a young man by the name of

11    Hale -- last name Hale, H-A-L-E; a young man by

12    the name of Graham -- last name Graham,

13    G-R-A-H-A-M. That's just a few that come off

14    the top of my head.

15  Q.  Who is Jeremy Patterson?

16  A.  He also is a black male, student firefighter

17    program, or was.

18  Q.  And was he there when you applied for promotion

19    to battalion chief?

20  A.  No, sir, he wasn't.

21  Q.  To your knowledge does he know anything about

22    your case?

23  A.  I have talked to Mr. Patterson.

**Page 192**

1  Q.  And what has he told you?

2  A.  Basically he understand who the battalion chiefs

3    were who were promoted, and he asked me on

4    occasions how did that happen and what took

5    place.

6  Q.  Well, does he have any evidence or give you any

7    information or facts that you were not promoted

8    because of your race?

9  A.  I don't recall that. I don't know.

10  Q.  Did he voluntarily leave the student firefighter

11    program?

12  A.  He graduated from Auburn University and obtained

13    another job, and -- I think he resigned and took

14    on a new job and left the program.

15  Q.  So he stayed in the program. What is the up

16    side to being in the student firefighter

17    program? They pay for your college education?

18  A.  They do --

19  Q.  Room and board?

20  A.  They provide them a place to live. They have

21    tuition reimbursement. Now they allow them to

22    pay into the retirement program.

23  Q.  And then you have Chris Turner. What does Chris

**Page 193**

1    Turner know about your complaint?

2  A.  Chris Turner, of course, him and I went through

3    recruiting school together in '91 and have

4    pretty much worked our entire career together,

5    you know, per shift assignments.

6  Q.  Well, do you know of any specific information he

7    has about you not being promoted?

8  A.  Well, Chris Turner I think has been overlooked

9    several times on promotion himself; therefore,

10    he's witnessed other incidents to occur. What

11    his reasons are, I don't recall. But as I

12    stated, Chris Turner and I have pretty much

13    worked our career together.

14  Q.  I guess I'm pronouncing this right. Marzella

15    Ogletree?

16      MR. OGLETREE: That's my wife.

17  Q.  His wife. Do you know her?

18  A.  I've seen her before, but I don't know her, no,

19    sir.

20  Q.  And then your wife. What does your wife know

21    about your complaints or your lawsuit?

22  A.  Basically what I've told her and shared with her

23    from what I received from my attorney.

Deposition of Gerald Stephens                    May 30, 2008

Page 194

1   Q.  She doesn't have any firsthand knowledge of what
2       goes on at the fire department, does she?
3   A.  She don't work there, no, sir.
4   Q.  Then you have Adelner Franklin Thomas, district
5       director, EEOC.  What does -- I guess that's a
6       male.  What does he know or she know?
7   A.  I don't have -- I don't know of anything of
8       that, Mr. Morgan.
9   Q.  You've got Doug Watkins, former city manager.
10  A.  Yes, sir.
11  Q.  What does he know about your battalion chief
12      promotion?
13  A.  I don't know if he knows anything, Mr. Morgan,
14      but --
15  Q.  He wasn't there at that time, was he?
16  A.  He was the one who implemented and helped
17      implement the title change promotion, whatever
18      you want to call it, from captain to battalion
19      chief.
20  Q.  Do you know specifically what he did in that
21      regard?
22  A.  I don't know specifically what he did.
23  Q.  Do you know of anything else that he's done in

Page 195

1       terms of the battalion chief position other than
2       his involvement in the title and name change?
3   A.  I don't know of anything.
4   Q.  And he was not present when you were -- went
5       through the process?
6   A.  No, sir.
7   Q.  And you've got Horace Clanton.  He's one of
8       those that signed the grievance with you?
9   A.  Yes, sir.
10  Q.  In terms of racial discrimination, do you know
11      of any information or knowledge that Mr. Clanton
12      has about you and racial discrimination?
13  A.  I don't know of anything, sir.
14  Q.  Rodney Hartsfield?
15  A.  I don't know of anything.
16  Q.  And he was promoted to battalion chief.
17          And then you've got Michael -- Matthew
18      Jordan.  Do you know of anything he knows about
19      you being racially discriminated against?
20  A.  I don't know if he knows anything, sir.
21  Q.  Joseph Lovvorn, do you know anything he knows
22      about your case, this lawsuit?
23  A.  No, sir, I don't know if he knows anything.

Page 196

1   Q.  Jason Brown, who is Jason Brown?
2   A.  Jason Brown is a station officer, one of those
3       that -- one of the thirteen signatures on the
4       paperwork that allowed them to -- allowed them
5       the title change or promotion, whatever you want
6       to call it, to lieutenant.
7   Q.  Is he a white male?
8   A.  He is a white male.
9   Q.  What, if anything, does he know about your
10      complaints in this lawsuit?
11  A.  I don't know if he knows anything, Mr. Morgan.
12  Q.  Did he sit for the promotion to battalion chief?
13  A.  He did, sir.
14  Q.  Did he make it to the top five?
15  A.  I don't know, sir, if he did or not.
16  Q.  Was he promoted to battalion chief?
17  A.  No, sir, he was not.
18  Q.  And then you've got Paden Payton.  Is he the one
19      you told me about earlier with the hazing
20      incident?
21  A.  Yes, sir.
22  Q.  And when did he leave the City?
23  A.  I can't remember the date right off, sir, but it

Page 197

1       was within the last two years.
2   Q.  Was he still employed with the City when you
3       went through the promotion procedure process for
4       battalion chief?
5   A.  Yes, sir, he was.
6   Q.  Has he told you any information or knowledge he
7       has about your lawsuit or your claims of racial
8       discrimination?
9   A.  No, sir.
10  Q.  Then you've got the Auburn city council
11      members.  Have you discussed your case with any
12      members of the Auburn city council?
13  A.  No, sir.
14  Q.  Do you know anything that the Auburn city
15      council members know about your claim of racial
16      discrimination?
17  A.  No, sir.
18  Q.  Joey Darby, do you know anything he knows about
19      your case or why he's listed as a witness?
20  A.  I don't know anything that he knows.
21  Q.  Then you have Terry Walker.  Who is Terry
22      Walker?
23  A.  He is the former training officer -- training

6623b598-899c-485a-b995-fb9fd663a9ce

|  | Page 198 |
|---|---|

1    chief who recently retired.
2    Q.  Do you know anything that he knows about your
3        case?
4    A.  No, sir.
5    Q.  Do you know why he's listed as a witness?
6    A.  Don't have a clue.
7    Q.  Ronnie Blankenship, who is he?
8    A.  He was my first actual supervisor when I became
9        a student.  And to make a long story short, he
10       was the fire chief up until '96-'97 --
11       1996-1997.  He went from team leader to fire
12       chief, and then from fire chief he went on and
13       retired and went elsewhere.
14   Q.  He left the City in '96 or '97?
15   A.  Yes, sir.
16   Q.  Do you know anything that he knows about your
17       claims of racial discrimination?
18   A.  I don't know if -- I don't know what he knows,
19       Mr. Morgan.
20   Q.  But he hasn't been employed with the City since
21       '97 thereabouts?
22   A.  '96-'97, within that range.
23   Q.  And Stephanie King, you've told me your

|  | Page 199 |
|---|---|

1    observations of her involvement in this
2    process.  Anything that she knows or any other
3    reason she would be listed as a witness other
4    than her role in the assessment -- I mean, the
5    orientation process?
6    A.  No, sir.  I don't know of anything.
7    Q.  Have you ever had any conversations with her and
8        complained about racial discrimination?
9    A.  No, sir.
10   Q.  Ever complained about the test to her?
11   A.  No, sir.
12   Q.  And you've got Joe Bailey, and I know you said
13       he was the hearing officer.
14   A.  Yes, sir.
15   Q.  To your knowledge does he know anything else
16       other than what he heard as the hearing officer?
17   A.  I don't know what else he have heard or knows or
18       anything, Mr. Morgan.
19   Q.  Have you ever discussed your case with him?
20   A.  No, sir.
21   Q.  Michael Thee.  Who is Michael Thee?
22   A.  Mr. Thee is a student firefighter of the Auburn
23       Fire Division.

|  | Page 200 |
|---|---|

1    Q.  And is he still a firefighter?
2    A.  Yes, sir.
3    Q.  Still a student firefighter?
4    A.  Yes, sir.  To my knowledge he is.
5    Q.  What, if anything, does he know about your case?
6    A.  I don't know if he knows anything, Mr. Morgan.
7    Q.  Has he received any favorable treatment in your
8        opinion?
9    A.  I think he has.
10   Q.  What kind of favorable --
11   A.  Being that he was involved in the incident at
12       work, which according to the rules and the
13       personnel procedures of the City, what he did
14       was considered a major offense and he should
15       have been dismissed.
16   Q.  What was that major offense?
17   A.  He went in and changed documents, provided false
18       documents in a calendar that belonged to me
19       while I was on duty because he was running late
20       and had been late for work several consecutive
21       times and knew he was in trouble.  And he knew
22       what was going to happen to you if it continued
23       because I made sure I let him know each time

|  | Page 201 |
|---|---|

1    that it occurred what was going to happen.
2    Q.  And did you report that, that he changed
3        documents?
4    A.  I documented and reported to my immediate
5        supervisor, and it did go up the chain.
6    Q.  What happened to him?
7    A.  If I'm thinking correctly, he received a
8        suspension for, I think it was, four shifts but
9        was allowed to return back to work, and he still
10       works there.
11   Q.  Has he applied for any promotions?
12   A.  I don't know if he applied for any promotions or
13       not, Mr. Morgan.
14   Q.  Then you've got Casey McCloud -- McLeod?
15   A.  McLeod.
16   Q.  Who is that?
17   A.  Casey McLeod also was a student firefighter, but
18       presently he is now a fire career firefighter.
19   Q.  White male?
20   A.  White male.
21   Q.  And does he know anything about your case?
22   A.  I don't know if he knows anything or not,
23       Mr. Morgan.

Deposition of Gerald Stephens                    May 30, 2008

---

Page 202

1  Q. Have you discussed it with him?
2  A. No, sir, I have not.
3  Q. Did he apply for any promotions?
4  A. I don't know if he have or not, sir.
5  Q. Any problems that you're aware of with him?
6  A. Presently, no, sir.
7  Q. Well, in the past?
8  A. Well, there have been some incidents where he
9     also was late for work, an incident where he had
10    an unexcused absence that pretty much was said
11    or told to me through my immediate supervisor at
12    the time, which was Johnny Lawrence, that we're
13    not going to worry about this; it never happened
14    as far as I'm concerned.
15 Q. Did you complain to anybody about that above
16    your supervisor?
17 A. I complained to Chief Lawrence directly and told
18    him that I didn't think it was right.
19 Q. To Chief Lawrence?
20 A. Yes, sir. Johnny Lawrence. That was my
21    immediate supervisor at the time.
22 Q. Did you complain to anybody above your immediate
23    supervisor?

---

Page 203

1  A. Well, I talked to Mr. Langley about it, too.
2     Larry Langley.
3  Q. And what did he say?
4  A. I also talked to -- Well, let me back up.
5     Johnny Lawrence was filling in for my supervisor
6     at the time who was Danny Leverette. So I spoke
7     to Johnny Lawrence and I talked to Danny
8     Leverette and I also talked to Larry Langley.
9  Q. But you're not aware of anything he knows about
10    you not being promoted?
11 A. I don't know if he knows anything.
12 Q. How about Dean Garrett? Does he know anything
13    about you not being promoted?
14 A. I don't know if he knows anything or not, sir.
15 Q. Was he still with the City when you applied for
16    the battalion chief?
17 A. I think he had retired.
18 Q. Have you ever discussed with him any complaints
19    you have about racial discrimination?
20 A. No, sir.
21 Q. Amy Weaver, it says she's -- I don't know what
22    it says she is, but she takes care of the
23    Auburn-Opelika News. Have you ever talked to an

---

Page 204

1     Amy Weaver?
2  A. No, sir.
3  Q. Do you know who she is?
4  A. No, sir.
5  Q. Lindsey Field, do you know who that is?
6  A. No, sir.
7  Q. Clinton Hammond, do you know who he is?
8  A. Yes, sir.
9  Q. Does he know anything about your claims of
10    racial discrimination?
11 A. Mr. Hammond is deceased. I don't know what he
12    knew when he was living.
13 Q. Do you remember what year he died?
14 A. I don't remember the exact year, but -- Maybe
15    eight, nine years ago maybe.
16 Q. Jimmy Lee Brown, who is that?
17 A. He was the battalion chief of the Auburn Fire
18    Division, the one who had the health issues
19    that --
20 Q. Hammock?
21 A. No.
22 Q. Horace Clanton?
23 A. Horace Clanton, yes, sir, was assigned to fill

---

Page 205

1     his position in his absence.
2  Q. Was Mr. Brown still a battalion chief when you
3     applied for the promotion to battalion chief?
4  A. Was he? I don't recall if he was or not,
5     Mr. Morgan. It was right during the time -- I
6     think he was maybe on sick leave or something of
7     that nature. Let me see. Yes, sir, he was
8     still employed there.
9  Q. Have you had any conversations with him about
10    racial discrimination or your claims?
11 A. No, sir.
12 Q. Who is Wendall Willis?
13 A. He was a guy that I used to work with years
14    ago. He was a career firefighter. He doesn't
15    work there anymore. It's been a long time since
16    he worked there.
17 Q. Do you know anything that he knows about your
18    case?
19 A. No, sir.
20 Q. Have you talked to him about it?
21 A. No, sir.
22 Q. James Lyle?
23 A. Yes, I know him.

---

52 (Pages 202 to 205)

Deposition of Gerald Stephens                        May 30, 2008

|  | Page 206 |
|---|---|
| 1 | Q. Who is he? |
| 2 | A. Also a career firefighter years ago. |
| 3 | Q. Has he been gone a long time? |
| 4 | A. Yes, sir. |
| 5 | Q. Have you discussed your lawsuit with him? |
| 6 | A. No, sir. |
| 7 | Q. Have you talked to him about it or seen him |
| 8 | recently? |
| 9 | A. No, sir. |
| 10 | Q. Tommy James? |
| 11 | A. Yes, sir, I know him. |
| 12 | Q. Who is Tommy James? |
| 13 | A. Tommy James is a retired team leader from the |
| 14 | Auburn Fire Division. |
| 15 | Q. Was he retired when you applied for the |
| 16 | battalion chief? |
| 17 | A. Yes, sir. |
| 18 | Q. Do you know anything that he knows about your |
| 19 | case? |
| 20 | A. No, sir. |
| 21 | Q. Have you discussed your case with him? |
| 22 | A. No, sir. |
| 23 | Q. Kenneth Lee Smith? |

|  | Page 207 |
|---|---|
| 1 | A. Used to be a lieutenant in the fire division but |
| 2 | was demoted to firefighter approximately a |
| 3 | couple of months before he actually retired. |
| 4 | Q. How long has he been retired? |
| 5 | A. Over ten years. |
| 6 | Q. White male? |
| 7 | A. White male. |
| 8 | Q. Do you know anything he knows about your case? |
| 9 | A. No, sir. |
| 10 | Q. Have you discussed your case with him? |
| 11 | A. No, sir. |
| 12 | Q. Ron Jones? |
| 13 | A. Ronnie Jones? |
| 14 | Q. Yeah. |
| 15 | A. Ronald Jones? He is a retired shift commander, |
| 16 | captain, at the time. |
| 17 | Q. Was he still with the City when you applied for |
| 18 | battalion chief? |
| 19 | A. No, sir. |
| 20 | Q. Do you know anything he knows about your case? |
| 21 | A. I don't know if he knows anything, sir. |
| 22 | Q. Have you discussed it with him? |
| 23 | A. No, sir. |

|  | Page 208 |
|---|---|
| 1 | Q. Dexter Card. Do you know Dexter Card? |
| 2 | A. Lieutenant Dexter Card, yes, sir. |
| 3 | Q. Does he know anything about your case? |
| 4 | A. I don't know what he knows, sir. |
| 5 | Q. Have you discussed your lawsuit with him? |
| 6 | A. No, sir. |
| 7 | Q. And he wasn't there when you took the test? |
| 8 | A. No, sir. |
| 9 | Q. William Felton? |
| 10 | A. Yes, sir. Retired lieutenant. |
| 11 | Q. Has he been gone a long time? |
| 12 | A. Yes, sir. |
| 13 | Q. Have you discussed your lawsuit with him? |
| 14 | A. No, sir. |
| 15 | Q. Thomas Scott? |
| 16 | A. Yes, sir. Retired -- Well, actually, he was |
| 17 | terminated. Terminated career firefighter. |
| 18 | Q. What did he do? |
| 19 | A. I have no idea. Happened years ago. |
| 20 | Q. Have you discussed your case with him? |
| 21 | A. I haven't seen him, no, sir. |
| 22 | Q. Steve Heart, who is he? H-E-A-R-T, Steve |
| 23 | Heart? Name doesn't sound familiar? |

|  | Page 209 |
|---|---|
| 1 | A. Don't ring a bell with me. |
| 2 | Q. Larry Stanley, does that name sound familiar? |
| 3 | A. Don't ring a bell with me, sir. |
| 4 | Q. Gary Jones? |
| 5 | A. Yes, sir, I know him. |
| 6 | Q. Who is that? |
| 7 | A. Gary Jones is actually the brother to Ronnie |
| 8 | Jones. Never had an opportunity to work with |
| 9 | him. Haven't seen him. |
| 10 | Q. Does he know anything about your case? |
| 11 | A. I don't know if he knows anything or not. |
| 12 | Q. Have you discussed it with him? |
| 13 | A. No, sir. |
| 14 | Q. Was he gone when you took the promotion? |
| 15 | A. Yes, sir. |
| 16 | Q. Jan Dempsey? |
| 17 | A. Former mayor of the City of Auburn. |
| 18 | Q. Have you discussed your complaints with her? |
| 19 | A. No, sir. |
| 20 | Q. Have you discussed this lawsuit with her? |
| 21 | A. No, sir. |
| 22 | Q. Ron Tahita, do you know who he is? |
| 23 | A. That names sound familiar, but I don't know who |

6623b598-899c-485a-b995-fb9fd663a9ce

Deposition of Gerald Stephens                    May 30, 2008

Page 210

1    he is.
2    Q. Do you know who Ellis Mitchell is?
3    A. Yes, sir, I do.
4    Q. Had any conversation with Ellis Mitchell about
5      this lawsuit?
6    A. No, sir.
7    Q. There were a number of documents that were
8      disclosed, and I'm not going to go through all
9      of them, but let me ask this. Toward the end of
10     these documents are a lot of paperwork dealing
11     with various employees, it looks like, with the
12     fire department: Michael Thee, Harvard
13     Graham --
14        What does this paperwork have to do with
15     your lawsuit?
16   A. Basically those papers are progressive
17     disciplinary procedures that were implemented on
18     them for improperly doing something in reference
19     to the Auburn Fire Division. Could vary from
20     being late for work or doing something they
21     don't supposed to do.
22   Q. And Dave Bradley?
23   A. Yes, sir. I recall him being late for work one

Page 211

1      time.
2    Q. Walter Peacock?
3    A. Uh-huh (positive response).
4    Q. Katie Hartsill?
5    A. Hartsill.
6    Q. Casey McLeod.
7        Other than being paperwork on people that
8      looks like most of them were late, does it have
9      some significance to your not being promoted to
10     battalion chief?
11   A. No. Those are just documentation as an officer
12     that I must do when these people don't comply to
13     the rules of the division.
14   Q. Just documentation showing that you disciplined
15     people when you thought they needed to be
16     disciplined?
17   A. According to the personnel policies of the City
18     of Auburn, whenever they violate any of their
19     rules, it is my job to document and submit it to
20     the immediate supervisor for any other action to
21     be taken, if necessary. All I can do is make a
22     request in reference to what I think should
23     happen.

Page 212

1    Q. Scott Chinowith?
2    A. Yes, sir.
3    Q. Other than documenting that these people didn't
4      do something that you thought they should do --
5      Cusak, Dennis Ballard, Kanaxi Sufom (phonetic),
6      Austin Bales -- do they have any bearing on you
7      not being promoted?
8    A. No, sir. But when we talked about
9      Mr. Thompkins --
10   Q. About who?
11   A. William Thompkins. You remember you mentioned
12     that name to me at the beginning? What I think
13     should have happened to Thompkins is basically
14     what happened to all these other guys you just
15     looked through, if anything. I mean, he didn't
16     do anything directly or violated any rules or
17     regulations within the personnel policies. And
18     what happened to all those people you just saw
19     should have happened to him. I think he should
20     have never been terminated.
21   Q. Before I get to my main question, let me be
22     clear. Those documents don't have anything to
23     do with you not being promoted, though, true?

Page 213

1    A. No, sir.
2    Q. No, sir meaning I'm correct?
3    A. You're correct.
4    Q. And whatever happened to Mr. Thompkins you don't
5      know for an actual fact, do you?
6    A. I didn't make that decision. I don't know.
7    Q. But whatever happened to Mr. Thompkins, he
8      didn't file a lawsuit, did he?
9    A. Not that I'm aware. I don't know if he filed
10     one or not, sir.
11   Q. But you're not familiar or know what he actually
12     did or didn't do, do you?
13   A. I don't know what he did, sir.
14   Q. Now, let me ask you about the folks I represent
15     and what it is that you think these people have
16     done to constitutes racial discrimination and
17     why you have sued them.
18        The first one is Larry Langley.
19        MR. HORSLEY: I'm going to do a
20          blanket objection to all these
21          questions because I think they ask
22          for legal conclusions. But go
23          ahead and answer them.

6623b598-899c-485a-b995-fb9fd663a9ce

Page 214

1    A.  Larry Langley -- Ask your question.
2    Q.  What is it that Larry Langley has done that you
3        think is racially discriminatory or retaliation
4        and caused you to sue him in this lawsuit?
5    A.  Mr. Langley have not allowed me to -- Let me
6        back up.
7             I feel like -- I think Mr. Langley has been
8        unfair to me as a fire lieutenant and the
9        responsibilities I have and the position I
10       should fill as a fire lieutenant in the absence
11       of or in reference to whatever the job may be.
12       I don't think he's been honest with me about
13       several things throughout my career.  I think
14       he's been misleading to a point where when
15       things do occur, I'm not aware of it.  I have to
16       go through -- go through my immediate supervisor
17       asking questions in reference to find out what's
18       going on.  Overall I just think he's been very
19       unfair to me as specifications of my rank, which
20       is fire lieutenant.
21   Q.  Is there anything that you claim that Larry
22       Langley did that prevented you from being
23       promoted to battalion chief?

Page 215

1    A.  Yes, sir.
2    Q.  What?
3    A.  Larry Langley sent me a memo -- I'm sorry.  He
4        didn't send me a memo.  He responded to an
5        e-mail I sent to him in reference to the posting
6        of the training officer position that Lee Lamar
7        filled.  And in his memo, he stated that, if I
8        can remember correctly, somehow or another he
9        lost it in his computer and that it was posted
10       and it was posted for some period of time and it
11       was for team leaders only.  And at the time I
12       was a lieutenant.
13   Q.  And that was for training officer?
14   A.  That was for training officer.
15   Q.  Is there anything that Larry Langley did that
16       you think prevented you from being promoted to
17       battalion chief because of your race?
18   A.  I also recall an incident.  If I'm thinking
19       correctly, it was during the time I filed my
20       grievance in 2005.  Mr. Langley came to my house
21       and delivered a letter from Mr. James, which I
22       had addressed to him.  And during that
23       deliverance, we conversed, and he told me in a

Page 216

1    nutshell that if I underwent or continued my
2    grievance that a red flag would be up against my
3    name and people of the City would think that I'm
4    not willing to comply with what they are doing
5    and that basically I would have a hard time, you
6    know, progressing working there whatsoever.
7    Q.  Well, assume all that is true.  Is there
8        anything that you know of that he did that kept
9        you from being promoted to battalion chief in
10       February or March or April of '06?
11   A.  I think he had something to do with allowing
12       non-probationary personnel to be eligible to
13       apply for that position, therefore making it
14       more challenging for me to possibly attempt to
15       obtain that position.
16   Q.  Well, first of all, in terms of that test, it
17       didn't matter how many people applied.  I mean,
18       you were graded on what you made, right?
19            MR. HORSLEY:  Object to the form.
20   Q.  True?  It didn't matter if a thousand people
21       applied.  You had to make 70?
22   A.  That was the rule.
23   Q.  So it didn't matter how many folks were in that

Page 217

1    room.  You either were going to make 70 or not
2    make 70, right?
3    A.  Right.
4    Q.  And the best I can tell, the only person who
5        took that test that was a non-probationary
6        career officer was Chris Turner, another black
7        male.  Are you complaining that Chris Turner
8        should not have been allowed to take that test?
9    A.  I can't say -- I don't -- I'm not in a position
10       to say what he can or can't take.  But Chris
11       Turner was allowed to take the test.
12   Q.  And he didn't make it, did he?
13   A.  No, sir, he did not.
14   Q.  And that didn't influence your grade one bit,
15       did it?
16   A.  Not that I'm aware of, it didn't.
17   Q.  So can you agree with me that whether or not
18       Larry Langley did or didn't allow
19       non-probationary permanent employees to take the
20       test doesn't affect your score one bit?
21   A.  I'm not aware if it did or not, sir.
22   Q.  So you can't think of any reason or anything
23       that Larry Langley did to keep you from being

Page 218

1  promoted to battalion chief in April of '06, can
2  you?
3  A.  I can't recall anything at this time, sir.
4  Q.  And what is it that Mr. Langley said or did that
5  you think was not honest or misleading?
6  A.  Basically when he said that the training officer
7  position was posted.
8  Q.  And what is it that you think he did or didn't
9  do that was unfair to your position as a fire
10  lieutenant?
11  A.  In the absence of a shift commander, captain, or
12  battalion chief, I wasn't given the opportunity
13  to fill those positions.
14  Q.  Is that the Horace Clanton deal?
15  A.  That's part of it, yes, sir.
16  Q.  What else besides Horace Clanton?
17  A.  There were several other times when things
18  got -- things came about whereas when I applied
19  for it, he wanted to -- he did whatever he
20  deemed necessary to -- that made me think he was
21  trying to prevent me from being a part of it.
22  Q.  Did any of those incidences occur after you
23  complained about Horace Clanton?

Page 219

1  A.  No, sir.
2  Q.  And what about Lee Lamar?  What is it that Lee
3  Lamar did in your opinion that kept you from
4  being promoted because of your race or in
5  retaliation?
6  A.  I don't recall.  I'm not aware of anything at
7  this time, sir.
8  Q.  And Bill Ham, Jr., what is it that he did that
9  kept you from being promoted because of your
10  race or in retaliation?
11  A.  I'm not aware of anything at this time, sir.
12  Q.  Have you ever spoken to Bill Ham, Jr. about any
13  of this?
14  A.  No, sir.
15  Q.  And what is it that Steve Reeves did to keep you
16  from being promoted because of your race or in
17  retaliation?
18  A.  I don't know what role he could have played in
19  any of this, but being he works in the human
20  resource department, he had to play some role in
21  it.  He was present during all the orientation
22  and the testing procedures.
23  Q.  Anything else other than the fact that he's in

Page 220

1  HR?
2  A.  I'm not aware of anything, sir.
3  Q.  And you're not aware of any specifics that he
4  did, are you?
5  A.  No, sir.
6  Q.  And then Bill James, what is it that you say
7  Bill James did to keep you from being promoted
8  because of your race or in retaliation?
9  A.  Other than the point of me speaking with him
10  directly telling him there was a problem at the
11  Auburn Fire Division, I'm not aware of what he
12  knows or done or -- I don't know.
13  Q.  And my understanding is that when you spoke with
14  him privately, you never said, hey, I'm being
15  discriminated against in promotions because of
16  my race, did you?
17  A.  I don't recall making that statement, sir.
18  Q.  And your conference with him was before you took
19  the battalion chief test, wasn't it?
20  A.  Yes, sir.  It was before they actually
21  implemented the title change or the promotion
22  for team leader to lieutenant.
23  Q.  And Charles M. Duggan, the city manager, have

Page 221

1  you ever spoken to the city manager about any
2  complaints you have about race discrimination or
3  retaliation?
4  A.  No, sir.
5  Q.  Do you know of anything that Charles M. Duggan
6  did to keep you from being promoted because of
7  your race or in retaliation?
8  A.  No, sir, I'm not aware of anything he knows.
9  Q.  And then you've sued the City of Auburn.  What
10  is it you say the City of Auburn did to keep you
11  from being promoted because of your race or in
12  retaliation?
13  A.  Being that the City of Auburn is responsible for
14  everything that has taken place throughout the
15  history of the department, why no blacks or
16  African-Americans have been hired or promoted
17  since me or since Mr. Ogletree, I don't
18  understand that.  I'm very concerned about
19  that.  What's the reason for it?  I just don't
20  understand it.
21  Q.  Which occurred first?  Were you promoted to
22  lieutenant before or after Mr. Ogletree became a
23  team leader?

Deposition of Gerald Stephens                    May 30, 2008

---

**Page 222**

1   A.  Approximately one month before he became a team
2       leader.
3   Q.  You were promoted to lieutenant?
4   A.  Yes, sir.
5   Q.  And he would have gone through the structured
6       interview that you've talked about to become a
7       team leader as far as you know?
8   A.  As far as I know, he went through a structured
9       interview. How was it? Was it identical to
10      previous times? I don't know.
11  Q.  Any other reason that you've sued the City of
12      Auburn other than you just don't understand
13      about the hiring and the promotion?
14          MR. HORSLEY: Object to the form. You
15              can answer.
16  A.  I'm not aware of anything at this time.
17  Q.  Let me ask you about your damages, how you claim
18      you've been damaged. Do you know what I'm
19      talking about?
20  A.  Yes, sir.
21  Q.  I assume we can just get through this quick. I
22      assume that one way you claim you've been
23      damaged is the difference in salary that you

---

**Page 223**

1       would have received as a battalion chief
2       compared to what you're making now.
3   A.  Yes, sir.
4   Q.  I assume that --
5   A.  To the conclusion of my retirement, whenever I
6       retire.
7   Q.  The difference in salary and ever how that
8       impacts retirement benefits and whatever?
9   A.  Yes, sir.
10  Q.  Then you've got a claim in here for emotional --
11      I thought you did. I thought I had written in
12      here emotional distress.
13          (Brief off-the-record discussion.)
14  Q.  Are you claiming emotional distress or mental
15      anguish?
16  A.  Yes, sir.
17  Q.  Have you seen any professional mental health
18      counselors, doctors, psychiatrists, or
19      psychologists for any mental anguish or
20      emotional distress which you claim as a result
21      of not being promoted?
22  A.  No, sir.
23  Q.  Had you ever seen a mental health specialist --

---

**Page 224**

1   A.  No, sir.
2   Q.  -- before this or a psychiatrist or a
3       psychologist?
4   A.  No, sir.
5   Q.  What is your claim for mental anguish and
6       emotional distress? What is it that you claim?
7   A.  I've been -- For years, Mr. Morgan, I've been
8       labeled as a problem by my immediate
9       supervisors, and basically it has traveled from
10      one shift to another to one shift commander to
11      another to eventually up the chain to the point
12      where when it actually got to the point of a
13      hearing, it was pretty much all over the
14      division, which, you know, challenged my skill
15      as a leader amongst my men, just my overall
16      character as a firefighter, officer, an
17      employee, the whole nine, and being that it has
18      been challenging at times for me to successfully
19      and progressively manage my people and to
20      conduct myself safely and to do my job in a
21      manner in which I'm supposed to do it. I always
22      felt like I was being watched. Any mistakes I
23      make or anything that may happen that falls

---

**Page 225**

1       under my responsibility, you know, I actually
2       think if it happens that it will be held against
3       me severely.
4   Q.  And how long have you had those feelings?
5   A.  Ever since I was promoted to lieutenant in
6       1996. Back then a lot of people didn't think I
7       deserved it. They thought I was promoted
8       because I was black. They thought things that I
9       never thought people that I trust and work with
10      in the profession that I do would actually
11      think. I applied for the position, I was
12      eligible for the position, and I got the
13      position, not because of my skin color but
14      because I thought I was the best person for the
15      job.
16  Q.  Well, do you claim you suffered any additional
17      mental anguish or emotional distress as a result
18      of not being promoted to the battalion chief or
19      is it just something that's been going on since
20      '96?
21  A.  That's adding to the problem overall. I mean,
22      here I am the only lieutenant in the fire
23      division, and then here comes title changes

---

57 (Pages 222 to 225)

6623b598-899c-485a-b995-fb9fd663a9ce

Page 226

1    which pretty much put people on the level that
2    I'm on. Now I've got to -- Where I had no one
3    to compete with, now I've got to compete with
4    thirteen other people for a position that I
5    didn't even have to compete with anyone with.
6    Why couldn't I have been appointed like some of
7    these other people that have been appointed
8    through the years? Why couldn't I have
9    undergone a structured interview? Why I got to
10   go take a test and make a cutoff score to be
11   eligible for a position when at that particular
12   time or at a particular time, I was the only
13   fire lieutenant in the whole fire division? So
14   that concerns me severely.
15   Q. Well, how does this mental anguish or emotional
16   distress manifest itself? How does it affect
17   you? Are you not able to do your job?
18   A. Doing my job is very challenging. Rarely do I
19   sleep at night when I'm on shift because I don't
20   know what could happen. I've got people that
21   live in the stations. I've got people that have
22   access to the stations. I'm just at a point now
23   where there's not too many people I trust at the

Page 227

1    Auburn Fire Division.
2    Q. And is that because of this battalion chief
3    promotion?
4    A. Because of everything that I've dealt with,
5    Mr. Morgan, to include the battalion chief
6    promotion.
7    Q. But you haven't seen any professionals?
8    A. No, sir, I have not seen any professionals.
9    Q. Do they have some counseling program that's
10   available to the employees of the City of
11   Auburn?
12   A. I'm quite sure they have some type of program,
13   yes.
14   Q. Have you done anything in that regard?
15   A. No, sir, I have not done anything yet.
16   Q. And I know you've told me this, and I
17   apologize. I'm really not trying to belabor
18   this. Who is it that you say was appointed, Lee
19   Lamar? Who was appointed to a position?
20   A. Apparently Lee Lamar was because I don't recall
21   him going through an interview. I don't recall
22   the position being posted. The deputy chief
23   position, which he got, it was a structured

Page 228

1    interview. But according to the paperwork or
2    the information that was forwarded to me, he was
3    appointed as deputy chief.
4    Q. Well, did he have a structured interview as
5    part of -- to be deputy chief?
6    A. Yes, sir. There was a structured interview that
7    I also attended.
8    Q. And you applied for that position?
9    A. Yes, sir.
10   Q. So you know there was some process by which he
11   was selected?
12   A. For the deputy chief, it was.
13   Q. But you're saying for training officer?
14   A. Training officer ...
15   Q. And how long ago was that?
16   A. I don't remember the date. 2003 or 2004, one of
17   those.
18   Q. Anybody else that you claim was appointed other
19   than Lee Lamar, training officer?
20   A. Terry Walker, he was appointed.
21   Q. And what was he appointed to?
22   A. Training chief. Training officer.
23   Q. Do you want to be training officer? Would you

Page 229

1    have given up your position as lieutenant to
2    be --
3    A. I applied for the position, but today I can't --
4    I can't say what I would do without talking with
5    my attorney and discussing it further.
6    Q. When did you apply for the position of training
7    officer?
8    A. I don't remember the date, Mr. Morgan.
9    Q. Who got it?
10   A. Terry Walker got it.
11   Q. So when Terry Walker was appointed, there was a
12   process in which you participated?
13   A. Yes, sir.
14   Q. And he was selected?
15   A. And understand, Mr. Morgan, there was no test.
16   There was no written test. When John Lankford
17   got the training officer position, there was no
18   test.
19   Q. Are you complaining there should have been a
20   test or shouldn't have been a test?
21   A. I was made to take a test for battalion chief.
22   Q. Well, so was everybody else that was promoted in
23   April of '06, weren't they?

Deposition of Gerald Stephens                    May 30, 2008

---

### Page 230

1  A. But nobody between --
2  Q. Didn't everybody that applied for battalion
3     chief in February and March of '06 have to take
4     a written test?
5  A. Yes, sir.
6  Q. So Terry Walker and Lee Lamar. Anybody else you
7     claim was appointed?
8  A. John Lankford.
9  Q. And what was he appointed to?
10 A. Training officer.
11 Q. Was that before or after Lee Lamar?
12 A. That was after Lee Lamar.
13 Q. Did you apply before then?
14 A. No, sir.
15 Q. Did anybody apply for it then?
16 A. I'm not aware of who applied for it.
17 Q. Lee Lamar, John Lankford, and Terry Walker.
18    Anyone else that was appointed?
19 A. I look -- Overall I look at the title changes as
20    a promotion.
21 Q. The title changes?
22 A. Yes, sir. From captain to battalion chief, from
23    team leader to lieutenants, I look at that as a

### Page 231

1     promotion.
2  Q. You think that's a promotion?
3  A. Yes, sir.
4  Q. But you know that's not true?
5     MR. HORSLEY: Object to the form.
6  A. Well, the thing is that when -- captains,
7     prior to them going to battalion chief, they
8     had, I think it was, two bugles as far as their
9     brass. They went to three. Team leaders had
10    collar insignia, and they went to bugles. I
11    wear bugles, and I know what I had to do to get
12    my bugles.
13 Q. So you're saying Eddie Ogletree should not be a
14    lieutenant?
15    MR. HORSLEY: Object to the form.
16 A. I'm not saying --
17 Q. I'm asking you. Are you saying Eddie Ogletree
18    should not be a lieutenant?
19    MR. HORSLEY: Object to the form.
20 Q. It's a simple question.
21    MR. HORSLEY: You can answer.
22 A. As far as I'm concerned, Eddie Ogletree and all
23    other thirteen people who signed that paper

### Page 232

1     should be team leaders.
2  Q. Should not be a lieutenant?
3  A. No, sir.
4  Q. And should not have been eligible to apply for
5     battalion chief?
6     MR. HORSLEY: Object to the form.
7  A. No, sir.
8  Q. I mean, that's your position? They should not
9     have been eligible to apply for battalion chief;
10    is that true?
11    MR. HORSLEY: Object to the form. You
12    can answer.
13 A. Yes, that's true.
14 Q. I want to try to get a grasp on this mental
15    anguish, emotional distress. I know you haven't
16    seen any professionals. Specifically as to not
17    being promoted to battalion chief, how has that
18    affected you?
19 A. Can you be more specific on that question,
20    please, sir?
21 Q. I wish I could. I mean, do you not want to go
22    to work? You can't sleep? What is it?
23 A. I'm very displeased at work, very.

### Page 233

1  Q. But you've not discussed -- How about your
2     family doctor? Did you discuss it with your
3     family doctor?
4  A. No, sir.
5  Q. Who is your family doctor?
6  A. Dr. Kevin L. Jackson. That's my medical doctor.
7  Q. And where is he located?
8  A. Auburn, Alabama.
9  Q. You've got a loss wage claim based on the
10    difference in the positions. You have a claim
11    for mental anguish and emotional distress. Any
12    other way you claim you've been damaged by not
13    being promoted to battalion chief because of
14    your race or in retaliation?
15 A. Directly speaking, the opportunity to advance.
16    I've always had a goal to be somewhere within
17    the Auburn --
18    MR. HORSLEY: He's just asking you if
19    there's any other category of
20    damages that you're claiming other
21    than wages and mental anguish and
22    emotional distress. That's what
23    he's asking.

6623b598-899c-485a-b995-fb9fd663a9ce

Deposition of Gerald Stephens                    May 30, 2008

---

Page 234

1    A.  I can't think of nothing else at this time, sir.
2    Q.  Loss wages and emotional distress.
3        And then this opportunity to advance, what
4        do you mean by that?
5    A.  Career advancement, move up, be promoted.
6    Q.  Can't move up because you didn't get that
7        promotion.  Okay.
8        Any other damages you claim?  I want -- I'm
9        not -- I want to know anything that you claim as
10       a damage.  I've got your wages, I've got your
11       emotional distress, and I've got your
12       opportunity to advance.  Are there any other
13       damages that you claim in this lawsuit?
14              MR. HORSLEY:  You're not asking
15                  punitives obviously?
16              MR. MORGAN:  I'm not talking about
17                  punitives.
18   A.  I think that pretty much touches bases.
19   Q.  I am going to ask you this one question about
20       punitives.
21       Do you claim that any of these people that
22       you've sued -- Larry Langley, Lee Lamar, Bill
23       Ham, Steven Reeves, Bill James, Charles

---

Page 235

1        Duggan -- do you think they deliberately and
2        intentionally kept you from being promoted?
3              MR. HORSLEY:  Object to the form.
4    A.  I don't have any comment about that right this
5        time, Mr. Morgan.
6              MR. MORGAN:  Give me two minutes, and
7                  I may be through.
8              (Brief recess was taken.)
9    Q.  (Continuing by Mr. Morgan)  Mr. Stephens, are
10       you familiar with the City's educational
11       assistance plan -- do you know what that is --
12       or program?
13   A.  I'm somewhat familiar with it.  It's been a long
14       time since I seen that, sir.
15   Q.  Have you taken advantage of that opportunity to
16       complete your college education or school?
17   A.  I have.  In my career I have taken advantage of
18       it.
19   Q.  Tell me what you've done in terms of educational
20       assistance.
21   A.  I have taken classes -- Everything pretty much
22       in my latter years I took was in reference to my
23       career with the Auburn Fire Division.  And I

---

Page 236

1        took an EMT course.  I can't remember when it
2        was, but it was right during the time when the
3        local colleges and junior colleges were
4        implementing the change from quarterly to
5        semesters.  Took the EMT course.  Made the
6        grade.  Submitted all the paperwork.  Told my
7        immediate supervisors in reference to tuition
8        reimbursement and all that.  Met all
9        requirements but never was reimbursed.
10       During those times when I took those -- that
11       course -- it was approximately nine weeks or a
12       quarter long -- I had to get people to work for
13       me.  I think somewhere in the education program
14       of the City, it states they allow you to take
15       time off to take these courses as long as you
16       make them up.  I work a 24-hour shift.  I work a
17       little bit different than other people in the
18       City; therefore, I couldn't necessarily do
19       that.  But I was allowed to swap or get people
20       to cover for me so I could attend these courses
21       or whatever courses that I decided to take.
22              MR. MORGAN:  That's all I've got,
23                  Richard.

---

Page 237

1              MR. HORSLEY:  I've got a few.
2                  EXAMINATION
3    BY MR. HORSLEY:
4    Q.  Gerald, either in layman's terms or in legal
5        terms, do you truly understand the meaning of
6        the term "disparate impact"?
7    A.  No, sir.
8    Q.  You got a lot of questions about disparate
9        impact and what you're claiming in the lawsuit
10       as it relates to disparate impact.  My question
11       is:  Do you have an understanding as to what you
12       are ultimately claiming in this lawsuit,
13       claiming happened to you?
14   A.  Yes, sir, I kind of understand.
15   Q.  What are you claiming happened to you in this
16       lawsuit?
17   A.  I'm claiming that basically because I'm a black
18       man employed with the City, I was discriminated
19       against.
20   Q.  Are you claiming that with regard to the 2006
21       battalion chief promotion?
22   A.  Yes, sir.  That's a part of it.
23   Q.  You were also asked a lot of questions about

---

6623b598-899c-485a-b995-fb9fd663a9ce

Deposition of Gerald Stephens                    May 30, 2008

Page 238

1  evidence, and I think evidence is probably a
2  legal term also. Can you give us examples of
3  how you were denied that promotion or
4  discriminated against because of your race by
5  the City of Auburn?
6        MR. MORGAN: Object to the form.
7  Q. You can answer.
8  A. There was a lot of implementations that took
9     place during the time when I was eligible for
10    several positions, and it was something that was
11    not practiced through those years. They gave a
12    test, which, you know, for whatever reason they
13    he gave it, they did it.
14 Q. The test we've talked about for the battalion
15    chief promotion?
16 A. Yes.
17 Q. What else?
18 A. They made temporary assignments, and I think
19    they never considered me for those assignments.
20    They haven't promoted any blacks of the ones
21    that was available that works there.
22 Q. What are your thoughts about the seniority and
23    experience level of the people that were

Page 239

1  promoted in front of you as it relates to racial
2  discrimination?
3        MR. MORGAN: Object to the form.
4  Q. Go ahead.
5  A. I think I was more qualified than these guys
6     were. I had more seniority. I was more
7     experienced. I just directly speaking think I
8     was more qualified.
9  Q. Why do you think -- Again, from a layman's
10    standpoint, why do you believe the City
11    implemented the test for this promotion?
12       MR. MORGAN: Object to the form.
13 Q. You can answer.
14 A. Basically because I'm black and I was applying
15    for the position.
16 Q. Were other blacks applying for the position
17    also?
18 A. Other blacks were applying for the position as
19    well.
20 Q. Y'all spoke some about damages, and Randall
21    asked you questions about mental anguish and
22    emotional distress related to the denial of the
23    promotion. Again, what is the reason you are

Page 240

1  ultimately claiming you were denied that
2  promotion?
3        MR. MORGAN: Object to the form.
4  A. Basically because I'm black.
5  Q. How does that affect you from an emotional
6     standpoint?
7        MR. MORGAN: Object to the form.
8  A. Can I answer?
9  Q. Yes, you can answer.
10 A. Being judged because I'm a black man, that
11    really bothers me a whole lot because I have
12    applied myself. I've done everything that I can
13    possibly do or everything they've asked me to do
14    to obtain this position and have held it -- any
15    position that I've applied and received and held
16    it as long as of today. There are just things
17    that happened to me that I think didn't happen
18    to other people; therefore, it leads me to think
19    that, along with other things that take place.
20 Q. How does that make you feel?
21       MR. MORGAN: Object to the form.
22 A. It basically just makes me feel like, you know,
23    people don't trust me or whatever the case may

Page 241

1  be and that they are going to give me a hard
2  time at work and just make it very challenging
3  for me when I'm working there.
4  Q. He asked you about the individual defendants and
5     what evidence you have that they had acted
6     deliberately and intentionally. Who do you
7     understand made the decisions to implement a
8     test for the battalion chief promotion?
9        MR. MORGAN: Object to the form.
10 Q. Go ahead.
11 A. All the persons that are named on the
12    paperwork. Now, I think they played a major
13    role of some part or another in reference to
14    what took place.
15 Q. Who made the decisions to make the title changes
16    from team leader to lieutenant?
17 A. As far as I'm concerned, those names that was
18    mentioned on the paperwork.
19 Q. As far as you know, who made the decision to
20    make the title change from captain to battalion
21    chief?
22 A. As far as I'm concerned, those people again
23    whose name is on the paperwork.

6623b598-899c-485a-b995-fb9fd663a9ce

Page 242

1    MR. HORSLEY: That's all I have.
2         EXAMINATION
3   BY MR. MORGAN:
4   Q.  Mr. Stephens, was there anything on the test you
5       took, the booklet, that you turned in to be
6       graded that identified you as a black male?
7   A.  Identified me as a black male?
8   Q.  Anything that would tell the person that was
9       grading that paper, hey, this is a black male.
10  A.  I'm not aware if anything was.
11  Q.  You didn't put Gerald Stephens, black male, did
12      you?
13  A.  No, sir.
14  Q.  You didn't put Gerald Stephens,
15      African-American, did you?
16  A.  No, sir.
17  Q.  You just put your name or your -- ever what that
18      identification --
19  A.  Yes, sir.
20  Q.  So whoever graded your paper didn't know what
21      your race was, did they?
22  A.  I'm not aware if they knew anything or not,
23      Mr. Morgan.

Page 243

1   Q.  This temporary assignment, I want to be clear
2       because I thought we had been through all this.
3       The last temporary assignment about which you
4       complained you didn't get was the one involving
5       Horace Clanton that you filed an EEOC charge
6       about, wasn't it?
7   A.  Yes, sir.
8   Q.  And your thoughts on seniority and experience,
9       that's why you think you're more qualified than
10      the people who became battalion chiefs, true?
11  A.  Yes, sir.  To include time on the job, time in
12      grade, all that.
13  Q.  Seniority.
14  A.  Yes, sir.
15  Q.  So you think promotions should be based on
16      seniority?
17  A.  Yes, sir.
18  Q.  Not qualifications, not who can do the best job,
19      simply I've been sitting in this job for the
20      longest of anybody else; therefore, I need to be
21      promoted?
22       MR. HORSLEY:  Object to the form.
23       That's not --

Page 244

1   Q.  Is that your position?
2        MR. HORSLEY:  Mischaracterization of
3        testimony.
4   A.  I think seniority is a main part in the job I do
5       and the job that the other firefighters do,
6       which leads to the length of time on the job,
7       knowing the job, being experienced doing the
8       job.  I don't think it should be based upon
9       whether you pass or fail a test.
10  Q.  You don't?  You don't think --
11  A.  A written test.  No, sir, I don't.
12  Q.  You don't want a test that's designed to test
13      your qualifications, your skill, knowledge of
14      the job is more important than just having been
15      on the payroll longer than somebody else?
16       MR. HORSLEY:  Object to the form.
17  Q.  That's your testimony?
18       MR. HORSLEY:  Object to the form.
19       That's not his testimony.
20  A.  I don't necessarily look at it as being on the
21      payroll, Mr. Morgan.  I look at it as basically
22      being on the job, learning the job, doing the
23      job, training those who, you know, just may turn

Page 245

1       around and be your supervisors one day, you
2       know.  It takes time to be in that position
3       that -- you know, what was being tested for, and
4       I don't think a cutoff score of no nature should
5       be involved.  That's just what I think.
6   Q.  So you think that it's just strictly seniority
7       is all that --
8        MR. HORSLEY:  Object to the form.
9        That's not what he said.
10       MR. MORGAN:  That's exactly what he's
11       saying.
12       MR. HORSLEY:  That's exactly not what
13       he's saying.  He just said --
14       MR. MORGAN:  Well, I'm going to ask
15       him this.
16  Q.  Do you think strictly seniority is what you
17      should go by?
18  A.  No, sir.
19  Q.  Then what other qualifications are there?
20  A.  Seniority, experience, time on the job.
21  Q.  Experience.  How do you define experience?
22  A.  How long you've been working there.
23  Q.  Seniority?

Deposition of Gerald Stephens                    May 30, 2008

Page 246

1   A.  Yes.  It falls under that category, yes, sir.
2   Q.  Time in the grade.  Time on the job.  That's
3       seniority?
4   A.  Knowledge of the job, yes, sir.  Training.
5   Q.  Back up.
6       Knowledge of the job?
7   A.  Yes, sir.
8   Q.  How do you test knowledge of the job?
9   A.  I'm not in a position to justify how they go
10      about testing that.
11  Q.  Do you agree that before someone should be
12      promoted that you should test their knowledge of
13      the job?
14          MR. HORSLEY:  Object to the form.  Go
15          ahead.
16  Q.  Shouldn't you test --
17  A.  I agree that testing procedures should be
18      consistent whether a written test is involved or
19      not.
20  Q.  That's not my question.  My question is:  Before
21      a person is promoted, should knowledge of the
22      job be tested?
23          MR. HORSLEY:  Object to the form.

Page 247

1   A.  I don't have any comments at this time.
2   Q.  You don't have a comment on whether or not you
3       ought to test somebody's knowledge of the job?
4   A.  Well, you know, apparently not.
5   Q.  But you do have a comment that based on
6       seniority you ought to be promoted?
7   A.  Yes, sir.
8   Q.  Would you have been promoted to lieutenant if
9       the City had used seniority as the guide stick
10      back in 1996?  Did you have the most seniority
11      of anybody that applied to be a lieutenant or
12      was eligible to be a lieutenant in 1996?
13  A.  Not in 1996.
14  Q.  You wouldn't have been promoted.
15  A.  Not in 1996.
16  Q.  And do you have -- I don't care if you want to
17      call it, evidence, hearsay, knowledge --
18      anything that you say that supports your
19      contention that the City implemented a written
20      test to discriminate against black applicants on
21      the basis of their race?  Anything?  Anybody
22      ever said anything, any hearsay, anything you've
23      seen, any documents, anything that would support

Page 248

1       that contention?
2           MR. HORSLEY:  Asked and answered, but
3           go ahead and answer it again.
4   A.  Over a time span of ten years, I have not seen a
5       black man or woman or African-American hired or
6       promoted.
7   Q.  Under any procedure?  Under any procedure?  Is
8       that your testimony?
9   A.  Under any procedure what?
10  Q.  Whether it was a written test or not written
11      test?
12  A.  No, I haven't.
13  Q.  Well, then, what is there?  What facts, what
14      evidence, hearsay, anything, would make you say
15      the City implemented a written test to
16      discriminate against you on the basis of your
17      race?
18          MR. HORSLEY:  Asked and answered.  Go
19          ahead.
20  A.  Basically nobody never been hired or promoted.
21      That's it.
22  Q.  That's it?
23  A.  Yes, sir.

Page 249

1       MR. MORGAN:  That's it.
2       (Deposition concluded at
3       approximately 4:00 p.m.)
4       * * * * * * * * * * *
5       FURTHER DEPONENT SAITH NOT
6       * * * * * * * * * * * *
7
8       REPORTER'S CERTIFICATE
9   STATE OF ALABAMA:
10  MONTGOMERY COUNTY:
11      I, Pamela A. Wilbanks, CCR, Registered
12  Professional Reporter, and Commissioner for the State
13  of Alabama at Large, do hereby certify that I reported
14  the deposition of:
15      GERALD STEPHENS
16  who was first duly sworn by me to speak the truth, the
17  whole truth and nothing but the truth, in the matter
18  of:
19      EDDIE OGLETREE, an individual,
20      GERALD STEPHENS, an
21      individual,
22      Plaintiffs,
23      Vs.

Page 250

1      In The State of Alabama, LARRY
2      LANGLEY, and individual, LEE LAMAR,
3      an individual, BILL HAM, JR., an
4      individual, STEVEN A. REEVES, an
5      individual, BILL JAMES, an
6      individual, CHARLES M. DUGGAN, an
7      individual, and CORTEZ LAWRENCE,
8      an individual,
9      Defendants.
10     In The U.S. District Court
11     For the Middle District of Alabama
12     Eastern Division
13     3:07-CV-867-WKW
14 on Friday, May 30, 2008.
15     The foregoing 249 computer printed pages
16 contain a true and correct transcript of the
17 examination of said witness by counsel for the parties
18 set out herein.  The reading and signing of same is
19 hereby waived.
20     I further certify that I am neither of kin nor
21 of counsel to the parties to said cause nor in any
22 manner interested in the results thereof.
23     This 13th day of June 2008.

Page 251

1
2
3
4
5
6
7
8
       Pamela A. Wilbanks, ACCR #334
9      Expiration Date:  9-30-2008
       Registered Professional Reporter
10     and Commissioner for the State
       of Alabama at Large
11
12
13
14
15
16
17
18
19
20
21
22
23

# DEPOSITION OF LARRY M. LANGLEY

## July 30, 2008

## Pages 1 through 31

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

EDDIE OGLETREE, an individual,
GERALD STEPHENS, an
individual,

        Plaintiffs,

Vs.                                CIVIL ACTION NO.
                                   3:07-CV-867-WKW

CITY OF AUBURN, a municipality
in the State of Alabama, LARRY
LANGLEY, an individual, LEE LAMAR,
an individual, BILL HAM, JR., an
individual, STEVEN A. REEVES, an
individual, BILL JAMES, an
individual, CHARLES M. DUGGAN, an
individual, and CORTEZ LAWRENCE,
an individual,

        Defendants.

* * * * * * * * * *

DEPOSITION OF LARRY M. LANGLEY, taken pursuant

to stipulation and agreement before Pamela A. Wilbanks,

Certified Court Reporter, ACCR# 391, Registered

Professional Reporter and Commissioner for the State of

Alabama at Large, in the Conference Room of Auburn City

Hall, 144 Tichenor Avenue, Auburn, Alabama, on

Wednesday, July 30, 2008, commencing at approximately

2:20 p.m.

ad6b29b7-788e-44e3-8c4e-df1f4d188462

## Page 2

1        APPEARANCES
2   FOR THE PLAINTIFF:
3   Mr. Richard F. Horsley
    KING, HORSLEY & LYONS
4   Attorneys at Law
    1 Metroplex Drive
5   Suite 280
    Birmingham, AL 35209
6
7   FOR THE DEFENDANT:

    Mr. Randall Morgan
8   HILL, HILL, CARTER, FRANCO, COLE & BLACK
    Attorneys at Law
9   425 South Perry Street
    Montgomery, Alabama
10
    ALSO PRESENT:
11
    Mr. D'Arcy Wernette
12  Mr. Steven Reeves
    Mr. Bill James
13  Mr. Lee Lamar
    Mr. Eddie Ogletree
14  Mr. Gerald Stephens
15
            * * * * * * * * * * * *
16
        EXAMINATION INDEX
17
    BY MR. HORSLEY . . . . . . . . . . .   4
18  BY MR. MORGAN . . . . . . . . . . . .  27
19      * * * * * * * * * * * * *
        PLAINTIFFS' EXHIBIT INDEX
20
    17  5/4/06 grievance letter to Mr. Langley from   21
21      Mr. Clanton, Mr. Hodge, Mr. Ogletree and
        Mr. Stephens
22
    18  Mr. Langley's letter to Mr. Stephens in   21
23      response to PX-17

## Page 3

1           STIPULATION

2       It is hereby stipulated and agreed by and

3   between counsel representing the parties that the

4   deposition of LARRY M. LANGLEY is taken pursuant to the

5   Alabama Rules of Civil Procedure and that said

6   deposition may be taken before Pamela A. Wilbanks,

7   Registered Professional Reporter and Commissioner for

8   the State of Alabama at Large, without the formality of

9   a commission, that objections to questions other than

10  objections as to the form of the question need not be

11  made at this time but may be reserved for a ruling at

12  such time as the said deposition may be offered in

13  evidence or used for any other purpose by either party

14  provided for by the Statute.

15      It is further stipulated and agreed by and

16  between counsel representing the parties in this case

17  that the filing of said deposition is hereby waived and

18  may be introduced at the trial of this case or used in

19  any other manner by either party hereto provided for by

20  the Statute regardless of the waiving of the filing of

21  the same.

22      It is further stipulated and agreed by and

23  between the parties hereto and the witness that the

## Page 4

1   signature of the witness to this deposition is hereby

2   not waived.

3           * * * * * * * * * * * *

4           LARRY M. LANGLEY

5       The witness, after having first been duly

6   sworn to speak the truth, the whole truth and nothing

7   but the truth testified as follows:

8           EXAMINATION

9   BY MR. HORSLEY:

10  Q.  Please tell us your full name.

11  A.  Larry Michael Langley.

12  Q.  My name is Richard Horsley.  The same thing.

13      I'm going to ask you questions.  And if you

14      don't understand, tell me to repeat.  I'm going

15      to assume you understood and gave the answer you

16      intended to give once you answer.  Okay?

17  A.  Okay.

18  Q.  Where do you currently reside?

19  A.  81 Lee Road 374, Valley, Alabama 36854.

20  Q.  And you're retired from the Auburn Fire

21      Department; is that correct?

22  A.  Right.

23  Q.  When did you retire?

## Page 5

1   A.  November 30, 2007.

2   Q.  2007?

3   A.  Uh-huh (positive response).

4           MR. MORGAN:  Yes.  You need to make

5           an audible answer.

6   Q.  Yeah.  I'm sorry.

7           MR. MORGAN:  You need to say "yes" or

8           "no".  Don't say "uh-huh".

9   Q.  Say "yes" or "no" rather than "uh-huh" or

10      "huh-uh" because she can't take that down.

11      So you retired in November 2007?

12  A.  Yes.

13  Q.  And what was the reason for your retirement?

14  A.  I had 30 years in with the City.

15  Q.  Just ready to retire?

16  A.  Ready to retire.

17  Q.  How long were you the fire chief for the City of

18      Auburn?

19  A.  Acting chief and deputy of public safety

20      director a little over ten years.

21  Q.  Deputy public safety director, tell me what that

22      is.

23  A.  Our public safety director -- in I think it was

**Page 6**

1    '02 or '03 -- changed our title from police
2    chief and fire chief and the building code
3    official and communications director to deputy
4    public safety director over police operations or
5    fire operations. It was just a name change.
6  Q. So if I call it fire chief, it's the same thing?
7  A. Same thing.
8  Q. You were the fire chief for about ten years?
9  A. Yeah.
10 Q. And what job did you hold immediately before you
11    became the fire chief?
12 A. I was a battalion chief or shift commander.
13 Q. What year were you promoted to fire chief?
14 A. July of '97.
15 Q. And before that you were a shift commander, and
16    then are you saying that position was changed to
17    battalion chief?
18 A. Later in 2005 -- '04. Whenever we're talking
19    about, it was changed. I just said battalion
20    chief because it's --
21 Q. But you were already the chief at the time that
22    it was changed to battalion chief?
23 A. Right.

**Page 7**

1  Q. So before you were chief, you actually were a
2    shift commander?
3  A. Yeah.
4  Q. And for how long were you a shift commander?
5  A. About a year and a half.
6  Q. What process did you go through to be promoted
7    to chief from shift commander?
8  A. I didn't go through a process. The current
9    chief resigned and went to Phenix City.
10 Q. What was his name?
11 A. Ronnie Blankenship. And I was asked by the
12    current public safety director at that time if I
13    would run the fire department until, you know,
14    they went through a process. And they never
15    went through a process. I just kept the job the
16    whole time.
17 Q. You weren't required to interview, correct?
18 A. No.
19 Q. You weren't required to take any test, correct?
20 A. No.
21 Q. You weren't required to go through an assessment
22    center, correct?
23 A. No.

**Page 8**

1  Q. We've talked a little bit today about the job
2    classification or changes from shift commander
3    to battalion chief and from team leader to
4    lieutenant. I'm assuming as a fire chief,
5    you're familiar with the insignia that the
6    firemen wear on their uniforms; is that correct?
7  A. Right.
8  Q. What's the difference between the insignia that
9    a shift commander and a battalion chief wore?
10 A. The shift commander at that time -- Well, we was
11    captain/shift commanders, and it was two bars.
12    That's standard in the industry, two bars. Two
13    bugles.
14 Q. And then when --
15 A. And then when the name changed to battalion
16    chief, the recognized insignia for that is the
17    three bugles.
18 Q. Would three bugles as opposed to two bugles not
19    signify a promotion in rank within the
20    department?
21        MR. MORGAN: Object to the form.
22 A. Not in this department, no.
23 Q. Are you saying that it would in some

**Page 9**

1    departments, but --
2  A. Some departments may. But if they had the
3    captain position still open and then the
4    assistant chief, battalion chiefs, you would
5    have different insignias on the collar for that.
6  Q. What did you wear as a chief?
7  A. Five bugles.
8  Q. Did anybody in the department have more than
9    five bugles?
10 A. No.
11 Q. Would that signify that you were the highest
12    level employee at the fire department --
13 A. Right.
14 Q. -- the fact that you had five bugles?
15 A. Right.
16 Q. And a lieutenant has how many bugles?
17 A. One bugle.
18 Q. And when the team leaders -- Well, what did a
19    team leader have when that position existed?
20 A. The team leaders wore a gold collar brass. I
21    think it had AFD wrote on it.
22 Q. They had no bugles, correct?
23 A. They had no bugles.

|                                    Page 10 |
| --- |

1    Q.  And when they were reclassified as lieutenants,
2         they would then wear insignia with one bugle?
3    A.  Right.
4    Q.  And you said earlier, I think, battalion chief
5         has three bugles; is that correct?
6    A.  Correct.
7    Q.  Would battalion chief be the second highest
8         level employee within the fire division?
9    A.  Deputy chief.
10   Q.  I'm sorry.
11        What does a deputy chief wear?
12   A.  Four bugles.
13   Q.  So it goes lieutenant, one bugle; battalion
14        chief -- Wait a minute.  Who has two bugles?
15   A.  Captains.
16   Q.  And then battalion chief, three bugles?
17   A.  Right.
18   Q.  Deputy chief, four bugles; and -- is that
19        correct?
20   A.  Correct.
21   Q.  And chief, five bugles, correct?
22   A.  Correct.
23   Q.  And is it your testimony that the number of

|                                    Page 11 |
| --- |

1         bugles on the insignia does not indicate rank
2         within the department?
3              MR. MORGAN:  Object to the form.
4    A.  In certain departments it does.
5    Q.  But in the Auburn Fire Department, it does not?
6    A.  We don't have -- The captain position they
7         recognized as a battalion chief so they went to
8         three bugles.
9    Q.  But wouldn't you agree with me that the higher
10        ranking employee you are, the more bugles you
11        get on your insignia within the Auburn
12        Department?
13   A.  The way we structure it now, yes.
14   Q.  The way you structure it now, yes?
15   A.  Uh-huh (positive response).
16   Q.  What about the way it was structured in 2006?
17   A.  The way we were structured then, the team leader
18        had the AFD.  And we had two lieutenants, and
19        one retired and that left Gerald.
20   Q.  But you'll agree with me in 2006, the higher
21        rank that you achieved would give you more
22        bugles, is that correct, on your insignia; is
23        that correct?

|                                    Page 12 |
| --- |

1              MR. MORGAN:  Object to the form.
2    A.  The higher the name would recognize the -- The
3         name of the position recognized the amount of
4         bugles.
5    Q.  And the more bugles on an insignia would signify
6         the higher position, correct?
7              MR. MORGAN:  Object to the form.
8    A.  With the deputy chief having four and the fire
9         chief having five, yes.
10   Q.  Right.  That's logical, correct?
11             MR. MORGAN:  Object to the form.
12   A.  Uh-huh (positive response).
13   Q.  Now, you said you served for a year and a half
14        as the shift commander?
15   A.  Right.
16   Q.  And what job did you hold before shift
17        commander?
18   A.  Staff captain, rotating shift commander.
19   Q.  Staff captain, is that the same thing as a
20        captain or -- Well, what's the difference in a
21        staff captain?
22   A.  I worked eight to five in administration.  And
23        when one of the -- The rotating part, when one

|                                    Page 13 |
| --- |

1         of the shift commanders at that time would take
2         off, I would work in their position on their
3         shift.
4    Q.  So going from that to shift commander was a
5         promotion for you, correct?
6    A.  Huh-uh (negative response).  I didn't -- It was
7         just a name change.  It was no change in pay or
8         nothing.
9    Q.  And how did you get that position?
10   A.  The staff captain?
11   Q.  No.  You're saying you were a staff captain and
12        a rotating shift commander?
13   A.  I filled in for the rotating shift commanders
14        when they was on vacation or out sick.
15   Q.  And then you were changed to full-time shift
16        commander, correct?
17   A.  When one of the shift commanders retired, I
18        moved to that position.
19   Q.  But in order to do that, you didn't have to take
20        a test, correct?
21   A.  No.
22   Q.  You didn't have to go through an assessment
23        center?

Page 14

1  A. No. It was just a lateral move.
2  Q. You didn't have to do an interview, correct?
3  A. No.
4  Q. Did the bugles on your insignia change when you
5     moved to shift commander?
6  A. No. I still had two.
7  Q. How long were you the rotating shift commander
8     and staff captain?
9  A. I was promoted to staff captain in '94 --
10    January of '94.
11 Q. From what position?
12 A. Firefighter.
13 Q. And what process did you go through to get
14    promoted --
15 A. I went through an assessment center.
16 Q. You went through an assessment center.
17    Do you remember what company administered
18    the assessment center?
19 A. Kathleen Robinson administered that one.
20 Q. And do you remember the components of that
21    assessment center?
22 A. We had a hot seat, a role play, an in-basket, and
23    something else. I don't remember what it was.

Page 15

1  Q. Did you have to take a written test with a
2     cutoff score?
3  A. No.
4  Q. And how many people received that promotion
5     along with you?
6  A. Myself and Jimmy Brown.
7  Q. Jimmy Brown?
8  A. Me and him was promoted at the same time.
9  Q. Is he a white guy or black guy?
10 A. He was a white guy.
11 Q. Is he still with the department?
12 A. He's deceased.
13 Q. You heard me talking earlier about the
14    assessment center. Is it your understanding --
15    The assessment center that you went through did
16    not include a test with a cutoff score, correct?
17 A. Correct.
18 Q. And there was no test with a cutoff score that
19    was a prerequisite to your assessment center; is
20    that correct?
21 A. That's correct.
22 Q. And then before firefighter, that was your first
23    job with the City of Auburn?

Page 16

1  A. No. I worked for Ampex Corporation.
2  Q. But that was your first job with the City of
3     Auburn was --
4  A. Right.
5  Q. -- firefighter?
6     You heard me ask questions earlier, I
7     assume, about the meetings that were held prior
8     to the 2006 battalion chief promotion between
9     you and Lee Lamar and Mr. Reeves and Mr. James.
10    Do you specifically recall those meetings and
11    what was discussed in those meetings?
12 A. Somewhat of them. I wasn't in all of them.
13    Sometimes I was out of town when they had a
14    meeting.
15 Q. Do you recall any discussions in those meetings
16    about implementing a test with a cutoff score as
17    a prerequisite for that job?
18 A. Yes.
19 Q. Whose decision was it?
20 A. I don't remember. I don't really remember how
21    that come about. The only thing I know is
22    during the conversations and everything between
23    all of us, it come up.

Page 17

1  Q. You can't testify about who with the City had
2     the idea or made the decision to have a test
3     with a cutoff score; is that correct?
4  A. No.
5  Q. Do you recall if that decision was made before
6     the City contracted with CWH?
7  A. No. It was made along with CWH.
8  Q. Do you recall whether or not Lee Lamar was the
9     individual that suggested the number of 70 as
10    the test score cutoff?
11 A. Don't -- I can't testify to that, no.
12 Q. Does that seem familiar to you that he did or --
13 A. Well, 70 was discussed because it's a state
14    standard for the fire college and National Fire
15    Academy, and I remember the 70 score being
16    discussed.
17 Q. Was there any discussion about using a test
18    without a cutoff score and just using it as a
19    part of the whole process?
20 A. I really don't remember if it was or not.
21 Q. Looking back on it, do you have any opinions
22    about whether or not that would have been a
23    better idea?

Page 18

1       MR. MORGAN: Object to the form of
2       that question.
3   A.  No. I think the process went good.
4   Q.  As a fire chief, did you feel like the people
5       that should be promoted to battalion chief
6       should have had significant experience with the
7       Auburn Fire Department?
8       MR. MORGAN: Object to the form.
9   A.  Again, it's what you're talking about on
10      experience. Knowledge and stuff of fire
11      techniques, fire tactics -- I think they should
12      have had the knowledge. But experience, I don't
13      know exactly what you mean by that.
14  Q.  Well, knowledge, then. Do you feel like that
15      the people that are promoted to battalion chief,
16      that it was more important that they have the
17      knowledge about firefighting or whether or not
18      they could pass the test?
19      MR. MORGAN: Object to the form of
20      the question.
21  A.  If they had the knowledge of firefighting, they
22      should have passed the test.
23  Q.  Did you review the test yourself?

Page 19

1   A.  No. The only thing that I reviewed was -- CWH
2       brought in a pack of questions. It was 150 or
3       175 questions and about 60 situational judgment
4       questions. And there was about nine or ten of
5       us -- the battalion chiefs, HRM, Bill James,
6       Deputy Chief Lamar, and myself -- and we
7       reviewed the questions and turned back to CWH
8       what we thought was consistent with the way the
9       City of Auburn operated. Did I see the final
10      test? No.
11  Q.  You've never taken that test, correct?
12  A.  No.
13  Q.  Did you participate in any way in the decision
14      to allow probationary lieutenants,
15      nonprobationary and probationary firefighters to
16      apply for the battalion chief position in 2006?
17  A.  Participate? What --
18  Q.  Were you a part of that decision?
19  A.  Yes. We recognized that by the City policies
20      that they was eligible to apply for it.
21  Q.  Had those people I just identified ever been
22      allowed to apply for battalion chief promotions
23      before?

Page 20

1   A.  Which people?
2   Q.  Probationary lieutenants --
3   A.  Yes.
4   Q.  -- non and probationary firefighters before
5       2006?
6   A.  Before 2006, yes.
7   Q.  When were they allowed?
8   A.  They was allowed to on team leader promotions,
9       on just about every promotion we done. If they
10      was still on probation, they could apply.
11  Q.  I guess what I'm asking, though, is: Was there
12      ever a captain or a battalion chief promotion
13      before 2006 where probationary lieutenants and
14      probationary and nonprobationary firefighters
15      were allowed to apply?
16  A.  The last captain/lieutenant promotion we done
17      was in 1996, and I was a shift commander at that
18      time.
19  Q.  Is it true that in -- February 1 of 2006 when
20      the team leaders were reclassified as
21      lieutenants that Lieutenant Stephens was
22      actually the only lieutenant in the department
23      at that time?

Page 21

1   A.  Yes. Yes.
2   Q.  Do you recall any discontent or dissatisfaction
3       among white team leaders that lieutenant
4       Stephens was the only lieutenant in the
5       department?
6   A.  No.
7       (Plaintiff's Exhibits 17 & 18 marked
8       for identification.)
9   Q.  I'll show you what I've marked as Plaintiff's
10      Exhibits 17 and 18. It's the same letters we
11      looked at before. Have you ever seen that
12      before? Have you seen that before?
13  A.  Yes.
14  Q.  In response to that, is Exhibit 18 what you
15      sent?
16  A.  Yes.
17  Q.  And in the third paragraph it says: Under our
18      current city policies and job -- and, again,
19      this letter is dated -- well, it's not dated.
20      Yeah, it is. May 8 of 2006.
21      In the third paragraph it says: Under our
22      current City policies and job descriptions,
23      there is no time in grade policy and no

Page 22

1    cumulative point system. Because of our current
2    advancement criteria, any nonprobationary
3    employee may participate in the assessment. The
4    fire division is currently reviewing a Career
5    Development Plan that addresses these criteria.
6        So when you wrote this letter, the City of
7    Auburn was then reviewing a Career Development
8    Plan that addressed the criteria of time in
9    grade and a cumulative point system, correct?
10        MR. MORGAN: Object to the form.
11   A. Yes. We was working on one.
12   Q. And that would be a Career Development Plan
13       meaning that people could be promoted within the
14       department based on time in grade and a
15       cumulative point system; is that correct?
16        MR. MORGAN: Object to the form.
17   A. Yes.
18   Q. Why was the City reviewing that?
19        MR. MORGAN: Object to the form.
20   A. We didn't have a current Career Development Plan
21       that was really in place, and we was trying to
22       develop one to set out guidelines for the
23       firefighters where a career firefighter hired in

Page 23

1    would know what he had to do to advance.
2    Q. For that Career Development Plan, you would
3       consider a cumulative point system and time in
4       grade as requirements to promote, correct?
5        MR. MORGAN: Object to the form.
6    A. Before?
7    Q. No. As a part of this Career Development Plan
8       that y'all were looking into, you would consider
9       time in grade and a cumulative point system for
10       promotions; is that correct?
11        MR. MORGAN: Object to the form.
12   A. Yes. Once we got it there. But it wasn't in
13       place at that time.
14   Q. Right. Well, has it ever gotten in place?
15   A. It hadn't been put in place when I retired in
16       November.
17   Q. Do you agree that those are important criteria
18       for promotions, time in grade and a cumulative
19       point system?
20        MR. MORGAN: Object to the form.
21   A. Some of it, yes.
22   Q. Would those criteria have benefited Mr. Ogletree
23       and Mr. Stephens in your opinion in their

Page 24

1    application for battalion chief?
2        MR. MORGAN: Object to the form.
3    A. That's according to what points was assigned to
4       it. We never had got down to that point.
5    Q. Just because I don't know, what would be an
6       example of things considered in a cumulative
7       point system? How would you accumulate points?
8    A. The amount of certifications you might have or
9       college degrees, time in grade and stuff like
10       that.
11   Q. What does time in grade mean?
12   A. How long you've worked in that, you know, grade,
13       that position.
14        MR. HORSLEY: Let's take a minute.
15        (Brief recess.)
16   Q. (Continuing by Mr. Horsley) Are you familiar
17       with Plaintiff's Exhibit 3, which is the 1991
18       settlement order that we've talked about today?
19   A. I'm familiar with it. I haven't looked at it in
20       over eight or nine -- It's been a long time
21       since I looked it.
22   Q. Eight or nine years?
23   A. No.

Page 25

1    Q. I thought you said --
2    A. Eight or nine months, ever how long it's been
3       since I left, or it might have been longer than
4       that.
5    Q. Do you know whether or not during the battalion
6       chief promotions in 2006 that the City of Auburn
7       was required to comply with that order?
8        MR. MORGAN: Object to the form.
9        Also calls for a legal opinion.
10   A. Repeat that.
11   Q. Yeah. During the battalion chief promotions in
12       2006, do you know if the City of Auburn Fire
13       Department was required to comply with that
14       order?
15   A. By the process we was going through, I thought
16       we was complying with that form.
17   Q. But the question was: Did you think y'all were
18       required to comply with it?
19        MR. MORGAN: Object to the form.
20   A. Was we required? I never questioned it because
21       the process I thought we was doing was meeting
22       this criteria.
23   Q. Did you review that order before y'all

**Page 26**

1  implemented the process for the battalion chief
2  promotion that you recall?
3  A. I don't remember if I did or not.
4  Q. But you've heard earlier discussions about
5     whether or not the order was still in force in
6     2006. Did you know one way or the other whether
7     or not that order was still in force?
8  A. Really I don't know.
9  Q. Am I correct in saying that the
10    reclassification -- that the City did not
11    consult this order before you reclassified the
12    team leaders to lieutenants in February of '06,
13    correct?
14         MR. MORGAN: Object to the form.
15 A. February?
16 Q. When the team leaders were reclassified to
17    lieutenants in February of 1 of 2006, do you
18    recall whether or not the City consulted this
19    order to see if that was proper or not?
20         MR. MORGAN: Object to the form.
21 A. Yes. Steve Reeves and the city attorney, you
22    know, they read it, and that's when they come
23    back with their judgment that we could make a

**Page 27**

1  name change.
2  Q. Do you recall whether or not the City consulted
3     this order before the captain was reclassified
4     or renamed as battalion chief?
5         MR. MORGAN: Object to the form.
6  A. That I don't know. That was handled by the city
7     manager, David Watkins, at that time.
8  Q. Do you know whether or not the Plaintiff's
9     Exhibit 3 was consulted by the City before it
10    reclassified the shift commander position to
11    battalion chief?
12         MR. MORGAN: Object to the form.
13 A. Again, that was done by -- that decision was
14    made by the city manager, David Watkins. I
15    don't know if he did or not.
16         MR. HORSLEY: That's all. Thank you.
17         MR. MORGAN: I've got one or two
18         questions.
19         EXAMINATION
20 BY MR. MORGAN:
21 Q. The lieutenant/team leader reclassification, at
22    that time you testified lieutenant had a bar and
23    the team leaders had what, something --

**Page 28**

1  A. AFD insignia on the collar.
2  Q. Did they do the same job?
3  A. The job description was identical.
4  Q. Did they get the same pay?
5  A. Same pay.
6  Q. Was the lieutenant over a team leader?
7  A. No.
8  Q. Was that a promotion from team leader to
9     lieutenant?
10 A. No. It was a name change only.
11 Q. You were asked about people being eligible to
12    apply for the battalion chief promotion and the
13    City opening it up for everybody.
14 A. Right.
15 Q. When you applied for captain in 1993 --
16 A. Yes.
17 Q. -- you were what rank?
18 A. Firefighter.
19 Q. Even though you were not a lieutenant, you were
20    eligible to have applied for captain?
21 A. Right.
22 Q. And Eddie Ogletree as a firefighter in 1993
23    could have applied for captain as well, couldn't

**Page 29**

1  he?
2  A. Right.
3         MR. MORGAN: No further questions.
4         MR. HORSLEY: Thank you.
5         (Deposition concluded at
6         approximately 2:40 p.m.)
7         * * * * * * * * * * * *
8  FURTHER DEPONENT SAITH NOT
9  * * * * * * * * * * * *
10
11         REPORTER'S CERTIFICATE
   STATE OF ALABAMA:
12
   MONTGOMERY COUNTY:
13
       I, Pamela A. Wilbanks, CCR, Registered
14
   Professional Reporter, and Commissioner for the State
15
   of Alabama at Large, do hereby certify that I reported
16
   the deposition of:
17
       LARRY M. LANGLEY
18
   who was first duly sworn by me to speak the truth, the
19
   whole truth and nothing but the truth, in the matter
20
   of:
21
       EDDIE OGLETREE, an individual,
22
       GERALD STEPHENS, an
23



Page 30

1   Plaintiffs,
2   Vs.
3   CITY OF AUBURN, a municipality
4   in the State of Alabama, LARRY
5   LANGLEY, an individual, LEE LAMAR,
6   an individual, BILL HAM, JR., an
7   individual, STEVEN A. REEVES, an
8   individual, BILL JAMES, an
9   individual, CHARLES M. DUGGAN, an
10  individual, and CORTEZ LAWRENCE,
11  an individual,
12  Defendants.
13      In The U.S. District Court
14      For the Middle District of Alabama
15      Eastern Division
16      3:07-CV-867-WKW
17  on Wednesday, July 30, 2008.
18      The foregoing 29 computer printed pages
19  contain a true and correct transcript of the
20  examination of said witness by counsel for the parties
21  set out herein.  The reading and signing of same is
22  hereby not waived.
23      I further certify that I am neither of kin nor

Page 31

1   of counsel to the parties to said cause nor in any
2   manner interested in the results thereof.
3       This 5th day of August 2008.

11      Pamela A. Wilbanks, ACCR #334
12      Expiration Date: 9-30-2008
        Registered Professional Reporter
13      and Commissioner for the State
        of Alabama at Large

# DEPOSITION OF STEVEN A. REEVES

## July 30, 2008

## Pages 1 through 130

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


EDDIE OGLETREE, an individual,
GERALD STEPHENS, an
individual,

      Plaintiffs,

Vs.                                        CIVIL ACTION NO.
                                           3:07-CV-867-WKW

CITY OF AUBURN, a municipality
in the State of Alabama, LARRY
LANGLEY, an individual, LEE LAMAR,
an individual, BILL HAM, JR., an
individual, STEVEN A. REEVES, an
individual, BILL JAMES, an
individual, CHARLES M. DUGGAN, an
individual, and CORTEZ LAWRENCE,
an individual,

      Defendants

        * * * * * * * * * * *


      DEPOSITION OF STEVEN A. REEVES, taken pursuant

to stipulation and agreement before Pamela A. Wilbanks,

Certified Court Reporter, ACCR# 391, Registered

Professional Reporter and Commissioner for the State of

Alabama at Large, in the Conference Room of Auburn City

Hall, 144 Tichenor, Auburn, Alabama, on Wednesday, July

30, 2008, commencing at approximately 9:15 a.m.

## Page 2

```
 1
 2              APPEARANCES
 3
 4   FOR THE PLAINTIFF:
 5   Mr. Richard F. Horsley
     KING, HORSLEY & LYONS
 6   Attorneys at Law
     1 Metroplex Drive
 7   Suite 280
     Birmingham, AL 35209
 8
     FOR THE DEFENDANT:
 9
     Mr. Randall Morgan
10   HILL, HILL, CARTER, FRANCO, COLE & BLACK
     Attorneys at Law
11   425 South Perry Street
     Montgomery, Alabama
12
     FOR CWH:
13
     Mr. William K. Hancock
14   ADAMS & REESE
     Attorneys at Law
15   Suite 1100
     2100 Third Avenue North
16   Birmingham, AL 35203
17   ALSO PRESENT:
18   Mr. D'Arcy Wernette
     Mr. Bill James
19   Mr. Larry Langley
     Mr. Lee Lamar
20   Mr. Eddie Ogletree
     Mr. Gerald Stephens
21
22
23
```

## Page 3

```
 1
 2          EXAMINATION INDEX
 3   BY MR. HORSLEY . . . . . . . . . . . . 5
     BY MR. HANCOCK . . . . . . . . . . . . 115
     BY MR. HORSLEY . . . . . . . . . . . . 123
 4
 5       * * * * * * * * * * * * *
 6
        PLAINTIFFS' EXHIBIT INDEX
 7   1   Letter of agreement between the City of    14
         Auburn and CWH Research, Inc.
 8   2   Copy of Orientation Manual        18
 9   3   Order Approving Settlement Agreement       32
10   4   4/4/96 letter to Gerald Stephens from    36
         Ronnie Blankenship concerning his promotion
11       to lieutenant
12   5   Series of e-mails          65
13   6   City of Auburn Pay Table Beginning October   110
         1, 2005
14
15   7   Proposed Modification of the Fire      58
         Lieutenant Promotional Process signed by
16       Chris Turner
17   8   Proposed Modification of the Fire      58
         Lieutenant Promotional Process signed by
         Gerald Stephens
18
19   9   City of Auburn Personnel Policies      78
20   10  Notice of Right to Sue letter to Mr.    111
         Ogletree and determination
21   11  Notice of Right to Sue letter to Mr.    111
         Stephens and determination
22
     12  Defendant Steven Reeves' Responses to    113
23       Plaintiffs' First Set of Interrogatories
```

## Page 4

```
 1              STIPULATION
 2       It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of STEVEN A. REEVES is taken pursuant to the
 5   Alabama Rules of Civil Procedure and that said
 6   deposition may be taken before Pamela A. Wilbanks,
 7   Registered Professional Reporter and Commissioner for
 8   the State of Alabama at Large, without the formality of
 9   a commission, that objections to questions other than
10   objections as to the form of the question need not be
11   made at this time but may be reserved for a ruling at
12   such time as the said deposition may be offered in
13   evidence or used for any other purpose by either party
14   provided for by the Statute.
15       It is further stipulated and agreed by and
16   between counsel representing the parties in this case
17   that the filing of said deposition is hereby waived and
18   may be introduced at the trial of this case or used in
19   any other manner by either party hereto provided for by
20   the Statute regardless of the waiving of the filing of
21   the same.
22       It is further stipulated and agreed by and
23   between the parties hereto and the witness that the
```

## Page 5

```
 1   signature of the witness to this deposition is hereby
 2   not waived.
 3           * * * * * * * * * * * *
 4           STEVEN A. REEVES
 5       The witness, after having first been duly sworn
 6   to speak the truth, the whole truth and nothing but the
 7   truth testified as follows:
 8           EXAMINATION
 9   BY MR. HORSLEY:
10   Q.  Please tell us your full name.
11   A.  Steven Anderson Reeves.
12   Q.  Mr. Reeves, my name is Richard Horsley.  We've
13       met a couple of times before.  I'm going to ask
14       you some questions today related to the lawsuit
15       that's been filed by Mr. Ogletree and
16       Mr. Stephens.
17       If you don't understand what I'm asking you,
18       please ask me to repeat the question or rephrase
19       it so that you understand it.  Once you answer a
20       question, I'm going to assume that you
21       understood it and that you're giving the answer
22       you intended to give.  Okay?
23   A.  Okay.
```

---

**Page 6**

1  Q. Where do you currently reside?
2  A. 1071 Terrace Acres Drive, Auburn.
3  Q. And where are you currently employed?
4  A. City of Auburn.
5  Q. In what capacity?
6  A. I'm the human resources director.
7  Q. And how long have you been the human resources
8     director with the City of Auburn?
9  A. Since 1994 -- 1993.
10 Q. 1993?
11 A. Yes, sir.
12 Q. Before '93 where were you employed?
13 A. City of Auburn.
14 Q. In what capacity?
15 A. Risk manager.
16 Q. Risk manager?
17    How long did you hold that job?
18 A. Six years.
19 Q. And before that where were you employed?
20 A. Auburn University.
21 Q. And in what capacity?
22 A. Faculty member.
23 Q. What type of faculty member?

**Page 7**

1  A. I was a research associate.
2  Q. How long did you hold that job?
3  A. About nine months.
4  Q. Before that where were you employed?
5  A. Auburn University.
6  Q. In what capacity?
7  A. Graduate student.
8  Q. Before that you were a student --
9  A. Yes.
10 Q. -- at Auburn?
11    So the jobs you have held since you
12    graduated from Auburn University would be with
13    Auburn University and with the City of Auburn
14    and that's it, correct?
15 A. Correct.
16 Q. Do you have relatives -- I'm assuming you do
17    have relatives that live in Lee County.
18 A. I do.
19 Q. Is it a lot or is it just a few?
20 A. A few.
21 Q. Can you tell me who they are?
22 A. Starting with immediate family, my wife Jane,
23    two children.

**Page 8**

1  Q. They are not over 18 years of age, are they?
2  A. One is 18.
3  Q. What is his or her name?
4  A. Danielle.
5  Q. Who else?
6  A. Sister-in-law, Susan McChesney. Sister-in-law,
7     Ann May.
8  Q. What are their husbands' names?
9  A. Susan is not married and Ann is widowed.
10 Q. Who else?
11 A. Do you want Ann's children?
12 Q. Not unless they are over 18.
13 A. Okay. Rem May. Remmington May.
14 Q. Is that it?
15 A. I think so.
16 Q. Do you have any relatives in Russell, Chambers,
17    Montgomery, Lowndes, or Macon County?
18 A. No.
19 Q. Other than that I'm not going -- I'm going to
20    try to get straight into the issues in this case
21    because we don't have a lot of time. We're
22    going to take four depositions today so I'm
23    going to jump straight into the issues.

**Page 9**

1     Tell me generally what your job duties are
2     as the human resources director for the City of
3     Auburn.
4  A. Generally I coordinate compensation and
5     benefits, employee relations, risk management
6     and safety, employee training and development.
7  Q. Do you participate in any way in the promotion
8     practices of the City of Auburn?
9  A. Yes.
10 Q. In what capacity?
11 A. I serve as a resource. I will do research as
12    necessary.
13 Q. Do you actually participate in decision-making
14    with regard to promotions with City of Auburn
15    employees?
16 A. Only within my department.
17 Q. You don't participate in the decisions to
18    promote or not promote City of Auburn
19    firefighters; is that correct?
20 A. I have not.
21 Q. You have not ever?
22 A. I have not.
23 Q. Are you in charge of implementing policies and

| Page 10 | Page 12 |
|---|---|
| 1     procedures with regard to the promotional | 1   A.   Ultimately, yes. |
| 2     practices of the City of Auburn? | 2   Q.   When you say ultimately, I'm assuming that there |
| 3   A.   Yes. | 3     are other individuals that would have also been |
| 4   Q.   Is anybody else in charge of that or is that | 4     involved in the promotion of firefighters within |
| 5     your sole -- or are you the only person that is, | 5     the City of Auburn Fire Division; is that |
| 6     in fact, in charge of that? | 6     correct? |
| 7   A.   Each department head is charged with complying | 7   A.   Correct. |
| 8     with the personnel policies as they pertain to | 8   Q.   And, again, concentrating on the time from |
| 9     promotions. | 9     February of '06 through June of '06, who at the |
| 10   Q.   But you as the human resources director are in | 10     City of Auburn Fire Division would have been in |
| 11     charge of enforcing the promotional policies and | 11     the decision-making process to promote |
| 12     procedures throughout the City of Auburn. Is | 12     firefighters? |
| 13     that a fair statement? | 13   A.   Bill James. |
| 14        MR. MORGAN: Object to the form. | 14   Q.   And he is the public safety director; is that |
| 15   A.   No. | 15     correct? |
| 16   Q.   So it's just within your department; is that | 16   A.   That's correct. |
| 17     correct? | 17   Q.   Still? |
| 18   A.   I make recommendations regarding promotions | 18   A.   Still. |
| 19     within my department. | 19   Q.   Who else? |
| 20   Q.   Let's say from February until June of 2006, who | 20   A.   Lee Lamar. |
| 21     would have been in charge of promotions at the | 21   Q.   What's Mr. Lamar's position? |
| 22     City of Auburn Fire Division? | 22   A.   Currently he's the fire chief. |
| 23   A.   The city manager. | 23   Q.   In May of '06, what was his position with the |

| Page 11 | Page 13 |
|---|---|
| 1   Q.   And what was his name? What is his name? | 1     City of Auburn? |
| 2   A.   Can you give me the dates again? | 2   A.   Deputy fire chief. |
| 3   Q.   Yeah. From February of '06 until June of '06. | 3   Q.   Who was the fire chief at that time? |
| 4   A.   Well, from February 10 or February 11, '06 -- I | 4   A.   Larry Langley. |
| 5     think I've got this date right. From February | 5   Q.   Bill James, Lee Lamar. Who else would have been |
| 6     11, '06, it would have been the current city | 6     involved in the decision to promote firefighters |
| 7     manager. | 7     at the City of Auburn? |
| 8   Q.   Who is ... | 8   A.   I believe that's all. |
| 9   A.   Charles M. Duggan, Jr. | 9   Q.   That's it? |
| 10        MR. HORSLEY: Off the record for a | 10     And I may be wrong about this, but would |
| 11        minute. | 11     Bill James and Larry Langley recommend |
| 12        (Brief off-the-record discussion.) | 12     firefighters for promotion and then Charles |
| 13   Q.   Charles Duggan was the city manager from | 13     Duggan would have the ultimate say in whether or |
| 14     February 11 of '06 until when? | 14     not those people were actually promoted? |
| 15   A.   He's currently the city manager. | 15   A.   Correct. |
| 16   Q.   So he would have been the city manager in May of | 16   Q.   Do you know back in May of 2006 whether or not |
| 17     '06, correct? | 17     Mr. Duggan had to approve every promotion or, if |
| 18   A.   Correct. | 18     there was a dispute about a promotion, he would |
| 19   Q.   And you just testified that he was -- he would | 19     have the ultimate say? |
| 20     have been the person in charge of promotions at | 20   A.   He has to approve. |
| 21     the City of Auburn Fire Division; is that | 21   Q.   He has to approve every promotion; is that |
| 22     correct? | 22     correct? |
| 23        MR. MORGAN: Object to the form. | 23   A.   Every promotion, yes. |

Page 14

1  Q.  Tell me what, if any, participation you had in
2      the battalion chief promotion that occurred in
3      May of 2006.
4  A.  I helped identify the firm that would guide us
5      through that process. I helped put together a
6      contract to employ that firm. I participated in
7      the discussions about the process. I helped
8      facilitate the interactions between the firm and
9      the City.
10          (Plaintiff's Exhibit 1 marked for
11          identification.)
12 Q.  What I'm going to mark as Plaintiff's Exhibit
13     Number 1 is a letter of agreement that appears
14     to be between the City of Auburn and the CWH
15     Research, Inc. Is that the agreement or the
16     contract that you spoke about just a moment ago
17     between the research company and the City of
18     Auburn?
19 A.  This appears to be the agreement.
20 Q.  And how did you go about finding this company?
21 A.  This company was recommended to me by a lady
22     named Kathleen Robinson.
23 Q.  Who is she?

Page 15

1  A.  Kathleen Robinson was the individual who
2      formerly did promotion processes for the ranks
3      of lieutenant and captain for the City of
4      Auburn.
5  Q.  What was your understanding of what this company
6      was supposed to do with regard to the battalion
7      chief promotion in May of 2006?
8  A.  They were to develop a job-related neutral
9      selection process for us to use to make
10     promotions to the rank of battalion chief.
11 Q.  Had the City of Auburn ever done any contract
12     work with this firm before?
13 A.  No.
14 Q.  You're not testifying that this company, CWH, is
15     an outside assessment center, are you?
16 A.  I ...
17 Q.  Do you know what an assessment center is?
18 A.  I know what an assessment center is.
19 Q.  This company is not an assessment center, are
20     they?
21          MR. MORGAN:  Object to the form.
22 A.  An assessment center is not a brick-and-mortar
23     structure.

Page 16

1  Q.  Right.
2      Well, are you familiar with the 1991
3      settlement order in the McCormick case?
4          MR. MORGAN:  Object to the form. In
5          the what case?
6          MR. HORSLEY:  I got the name wrong.
7          Hammock case.
8          MR. MORGAN:  Object to the form.
9  A.  Yes.
10 Q.  You're familiar with the order approving a
11     settlement agreement that requires an assessment
12     center for certain promotions within the Auburn
13     City Fire Division?
14 A.  I am.
15 Q.  Is it your testimony that Plaintiff's Exhibit
16     Number 1 qualifies as an assessment center
17     pursuant to that order?
18 A.  No.
19 Q.  Is it your testimony that this company -- that
20     the hiring of this company qualifies as an
21     assessment center pursuant to the order in the
22     Hammock case?
23          MR. MORGAN:  Object to the form.

Page 17

1  A.  No.
2  Q.  Is it true that this company, CWH, was hired to
3      administer a written test that anyone applying
4      for the battalion chief promotion had to take?
5      Is that correct?
6  A.  They developed a neutral job-related process for
7      us to use in making a promotion decision.
8  Q.  Other than administering the written test that
9      was taken by all the battalion chief applicants,
10     what else did they do to participate in the
11     battalion chief promotion process?
12 A.  They recommended and developed a series of
13     exercises to help determine who was the best
14     candidate for the promotion.
15 Q.  Was that provided to the City in some written
16     form?
17 A.  The exercises?
18 Q.  Yes, sir.
19 A.  Yes.
20 Q.  Do you know if the City of Auburn still has that
21     document that details the exercises?
22 A.  In one form, yes.
23 Q.  What do you mean in one form?

Page 18

1   A.  Well, the orientation manual is one form.
2   Q.  What other form do y'all have it in writing?
3   A.  There was a report -- Well, I think the
4       Candidate Feedback Reports provided some
5       information about it.  There was a final report
6       about the overall process that provided details
7       about it.
8   Q.  Is the orientation manual that you just
9       testified about -- Is Plaintiff's Exhibit Number
10      2 a copy of that orientation manual?
11          (Plaintiff's Exhibit 2 marked for
12              identification.)
13  A.  It appears to be at least part of it.
14  Q.  Part of it?  What else --
15  A.  I can't tell.
16  Q.  Your testimony is Plaintiff's Exhibit 2 is part
17      of the orientation manual submitted by CWH; is
18      that correct?
19  A.  It appears to be.
20  Q.  Does the City of Auburn to your knowledge still
21      have the actual test that was administered to
22      the battalion chief applicants?
23  A.  We don't.

Page 19

1   Q.  What happened to that test?
2   A.  The test was returned to CWH.
3   Q.  You said earlier that you spoke with an
4       individual about hiring CWH.  Tell me what
5       happened that participated your seeing the need
6       to hire a company such as CWH to get involved in
7       the battalion chief promotion.
8   A.  The settlement agreement in 1991 called for a
9       process utilizing outside assessors and a
10      consultant.  Kathleen Robinson was the person
11      that did that for us.  She retired.
12  Q.  Robinson?
13  A.  Yes.
14  Q.  And she's the one who you consulted with in
15      hiring CWH, correct?
16  A.  I asked her if she was available to do this
17      work, and she said she was retiring and
18      recommended CWH to me.
19  Q.  Had the City of Auburn to your knowledge used a
20      company like CWH to perform some type of written
21      test or assessment center prior to the battalion
22      chief promotion in May of 2006?
23  A.  Like CWH?

Page 20

1   Q.  Well, let me rephrase the question.
2       Had the City of Auburn used an outside
3       assessment center for any promotion within the
4       fire division since the 1991 settlement order?
5   A.  Yes.
6   Q.  And what promotions did it use an assessment
7       center for?
8   A.  I believe there was a 1994 captains promotion
9       and a 1996 lieutenant and captains promotion.
10  Q.  If you can, describe the assessment center that
11      was used for those two promotions.
12  A.  To my knowledge it involved a conglomeration of
13      exercises -- job-related exercises.
14  Q.  And it was formulated by whom?
15  A.  Kathleen Robinson.
16  Q.  And I guess what I'm asking you to do for my
17      education is define what you believe an outside
18      assessment center to be.
19  A.  An assessment center -- An outside assessment
20      center would consist of a conglomeration of
21      devices used -- job-related devices used to
22      determine who the best candidates were for a
23      promotion.

Page 21

1   Q.  And by outside assessment center, does that mean
2       someone or some company has to implement those
3       processes that is not employed or has any
4       connection with the City of Auburn?
5   A.  I think that's a fair statement.
6   Q.  And you said Kathleen Robinson was in
7       charge of that for the City of Auburn for a
8       period of time, correct?
9   A.  Correct.
10  Q.  Was she employed by the City of Auburn?
11  A.  No.  She was contracted by the City of Auburn.
12  Q.  What was Kathleen Robinson's job to your
13      knowledge?
14  A.  Professionally?
15  Q.  Yeah.
16  A.  I recall she was involved in testing services at
17      either Cobb County or DeKalb County in the
18      Atlanta metro area.
19  Q.  So she lives in the Atlanta metro area or did
20      live in the Atlanta Metro ...
21  A.  I assume that's where she lived.
22  Q.  Do you know who actually made the decision to
23      hire Kathleen Robinson to implement the outside

| Page 22 | Page 24 |
|---|---|
| 1  assessment center? | 1  together and decided that there needed to be an |
| 2  A. The lawyers involved in the original litigation. | 2  outside assessment center for this promotion, |
| 3  Q. The original Clinton Hammock litigation? | 3  and you contacted Kathleen Robinson?  She had |
| 4  A. Correct. | 4  retired and told you you needed to contact CWH? |
| 5  Q. Do you know if she still lives in the Atlanta | 5  Is that the chronology of how it occurred? |
| 6  metro area? | 6  A. Yes. |
| 7  A. I don't know. | 7  Q. And then the individuals I just named, along |
| 8  Q. Does she have a company name to your knowledge? | 8  with you, got with CWH, and that group made the |
| 9  A. I don't know. | 9  decision that a test with a cutoff score was |
| 10  Q. You don't know if there's some -- if she's | 10  going to be given; is that correct? |
| 11  incorporated under some other name? | 11  A. That's correct. |
| 12  A. I haven't had any further contact with her. | 12  Q. Were you personally involved in meetings with |
| 13  Q. It's your testimony that she developed the | 13  CWH, Langley, Lamar, the safety director where |
| 14  outside assessment center for the 1994 captains | 14  y'all discussed with CWH that a test needed to |
| 15  promotion and the 1996 lieutenant promotion; is | 15  be given with a cutoff score? |
| 16  that correct? | 16  A. Yes. |
| 17  A. That's my understanding. | 17  Q. Is it your testimony that the City of Auburn had |
| 18  Q. Is it also your understanding that pursuant to | 18  not made that decision before it contracted with |
| 19  either of those promotions or pursuant to | 19  CWH about the test or the cutoff score? |
| 20  neither of those promotions there was a written | 20  A. Could you repeat the question? |
| 21  test given to the applicants with a cutoff | 21  Q. Yeah. |
| 22  score; is that correct? | 22  Did you, the public safety director, Lamar, |
| 23  A. I don't recall there was a written test. | 23  and Langley make the decision that there needed |

| Page 23 | Page 25 |
|---|---|
| 1  Q. You don't recall if there was a written test? | 1  to be a test with a cutoff score given prior to |
| 2  A. Right. | 2  the time y'all contracted with CWH? |
| 3  Q. Are you saying there may have been and you don't | 3  A. No. |
| 4  recall? | 4  Q. Do you recall the individual's name that y'all |
| 5  A. I don't -- I was not directly involved in that | 5  were dealing with at CWH? |
| 6  process. | 6  A. Primarily Michael Blair. |
| 7  Q. With regard to the battalion chief promotion in | 7  Q. Do you independently recall as you sit here |
| 8  May of 2006, who at the City of Auburn decided | 8  today meetings with those individuals and |
| 9  that there was going to be a written test with a | 9  Mr. Blair where the decision was made that a |
| 10  cutoff score as a factor in the promotion? | 10  test was going to be given for the battalion |
| 11  A. It was a collective decision made by me, the | 11  chief promotion with a cutoff score? |
| 12  public safety director, the deputy fire chief, | 12  A. Yes. |
| 13  and CWH. | 13  Q. Do you recall who actually first recommended |
| 14  Q. And at that time the deputy fire chief was Lee | 14  that that test be given? |
| 15  Lamar? | 15  A. The CWH process incorporates a testing option. |
| 16  A. Correct.  And the fire chief. | 16  Through our discussions it was determined that |
| 17  Q. Who was Langley? | 17  giving a test was a good way to evaluate the |
| 18  A. Right. | 18  subject matter expertise of the candidates in |
| 19  And CWH. | 19  the area of fire prevention. |
| 20  Q. And CWH. | 20  Q. Did Mr. Blair, the CWH representative, recommend |
| 21  So for the battalion chief promotion, is it | 21  that a test be given or did he say that that was |
| 22  your testimony that you, the public safety | 22  a necessary part of CWH's involvement in this |
| 23  director, the deputy fire chief, the chief got | 23  process? |

Page 26

1           MR. HANCOCK: Object to the form.
2    A.  As I said, the CWH process incorporated an
3        option to have a test.
4    Q.  It wasn't a requirement; it was an option; is
5        that correct?
6    A.  It was an option, correct.
7    Q.  And was it at the City's discretion -- Was it at
8        the City's discretion to give or not give the
9        test with a cutoff score?
10   A.  Yes.
11          MR. MORGAN: Object to the form.
12   Q.  It was?
13       Do you recall whether or not Lee Lamar
14       suggested that a cutoff score of 70 is something
15       that he would prefer during those meetings?
16   A.  Our discussions included the use of a cutoff
17       score of 70 percent.
18   Q.  Do you recall specifically who suggested the
19       cutoff score of 70?
20   A.  Who first voiced that, I don't know.
21   Q.  You don't recall if it was Lee Lamar?
22   A.  I know Lee Lamar stated that 70 percent was the
23       common cutoff score used in the fire service.

Page 27

1        If people went to the fire college and they took
2        a test, there was a 70 percent cutoff. I
3        understand at the National Fire Academy, some of
4        the courses there have a 70 percent cutoff. Our
5        practice in other testing procedures in the City
6        of Auburn had been to use a 70 percent cutoff.
7        We saw it as something consistent and also in
8        keeping with tradition in the fire service.
9    Q.  Am I correct in saying that the City of Auburn
10       representatives during these meetings were the
11       individuals who suggested the 70 cutoff score
12       rather than the CWH representative?
13          MR. MORGAN: Object to the form.
14   A.  I don't know if CWH said you can use a cutoff
15       score or if we said we want to use a cutoff
16       score. It was --
17   Q.  You don't recall?
18   A.  No, I don't.
19   Q.  Are you aware that CWH pursuant to administering
20       this test required that there be a cutoff score?
21   A.  No. I think that was our choice.
22   Q.  That was your choice? The City of Auburn's
23       choice?

Page 28

1    A.  It was our, as you stated, discretion.
2    Q.  During those meetings about the test, am I
3        correct that the City of Auburn made the
4        decision to implement that test as the first
5        factor in the battalion chief promotion with a
6        cutoff score, meaning that if you did not meet
7        the cutoff score, you could not progress further
8        in the battalion chief promotion process?
9    A.  Would you repeat the question?
10   Q.  Yeah.
11       Is it true that the -- Isn't it true that
12       the City of Auburn made the decision that the
13       test with a cutoff score was the initial factor
14       in whether an applicant proceeded through the
15       rest of the process?
16   A.  Again, this was a decision made collectively in
17       consultation with CWH. Had the City said we
18       don't want to use a cutoff score, I don't think
19       CWH would have argued with us.
20   Q.  CWH didn't care one way or the other whether or
21       not the City used a cutoff score or whether the
22       test was a deciding factor if someone got to
23       progress through the process, did they?

Page 29

1           MR. MORGAN: Object to the form.
2    A.  I'm not sure I'd go that far.
3    Q.  Well, CWH was hired as a consulting firm to
4        administer a test; is that correct?
5    A.  They were designed to --
6           MR. MORGAN: Object to the form.
7    A.  -- hired to design and provide consulting
8        services to the City so that we had a fair
9        promotional process.
10   Q.  And if the City had decided that the test would
11       be administered by CWH and that there would not
12       be a cutoff score and that the test would simply
13       be part of a cumulative process for the
14       battalion chief promotion, CWH to your knowledge
15       wouldn't have objected to that; is that correct?
16          MR. MORGAN: Object to the form.
17   A.  I think they would have allowed us to do that.
18   Q.  They would have allowed you to do that?
19   A.  (Witness nods head positively.)
20   Q.  You've got to answer out loud.
21       They would have allowed you to do that,
22       correct?
23   A.  Yes.

Page 30

1  Q. My point is: The City of Auburn had the
2     discretion as to how the test and the cutoff
3     score would be implemented into the promotional
4     process. Is that a fair statement?
5  A. Yes.
6  Q. CWH didn't make that decision, did they?
7        MR. MORGAN: He's answered that about
8        five times.
9  Q. CWH didn't make that decision, did they?
10        MR. MORGAN: Object to the form.
11  A. It was a collective decision, but ultimately it
12     was the City's discretion to --
13  Q. Well, if the City had the ultimate discretion,
14     then CWH didn't have any discretion to decide
15     how that test would play a part in the
16     promotional process, did they?
17        MR. MORGAN: Object to the form.
18  A. We certainly listened carefully to their advice.
19  Q. They could make recommendations but they could
20     not make decisions; is that correct?
21  A. Correct.
22  Q. Do you recall -- I may have asked this
23     question. I simply can't remember.

Page 31

1     Do you recall if CWH recommended that the
2     test be the deciding factor -- the test with a
3     cutoff score be the deciding factor as to
4     whether or not an applicant proceeded through
5     the battalion chief promotional process?
6  A. Again, this was a collective decision made in
7     discussion with CWH.
8  Q. And if CWH is going to say that Lee Lamar
9     suggested the 70 cutoff score, you don't have
10     anything to dispute that, do you?
11  A. No.
12  Q. Tell me why you and the public safety director
13     and Lee Lamar and Langley decided that CWH
14     needed to be hired in order to conduct the
15     outside assessment center if the City of Auburn
16     at that time in May of 2006 -- Well, the test
17     was given before then. Let's just say between
18     February and May of 2006. Let me start over.
19     Why did you and the public safety director,
20     Lee Lamar, and Langley decide during that time
21     period from February through May of 2006 that an
22     outside assessment center needed to take place
23     pursuant to the battalion chief promotion if the

Page 32

1     City was under the impression that the 1991
2     order had expired?
3        MR. MORGAN: Object to the form.
4  Q. When I speak of the 1991 order -- Let's go ahead
5     and mark it and we'll talk about it in detail in
6     a little while.
7     But you're familiar with the Clinton Hammock
8     order approving the settlement agreement,
9     correct?
10  A. I am.
11        (Plaintiff's Exhibit 3 marked for
12        identification.)
13  Q. And that's the document that required the City
14     of Auburn to conduct an outside assessment
15     center back then for any captain promotion or
16     any lieutenant promotion, correct?
17  A. Correct.
18  Q. Tell me, then, if the City believed that that
19     order had either expired or that the court no
20     longer had jurisdiction over the City of
21     Auburn's promotional practices, why did you and
22     these other gentlemen feel that an assessment
23     center was necessary for this promotion?

Page 33

1        MR. MORGAN: Object to the form.
2  A. I think -- I won't speculate. We had
3     considered the -- if the order approving
4     settlement was still in effect with counsel
5     narrowly construed to the issue of the matter of
6     reclassifying team leaders to lieutenant. We
7     came to a point where we needed to make a
8     promotion to fill some vacant positions at the
9     battalion chief level. We felt that the best
10     course of action -- since we had not gone
11     through a process as we had with the team leader
12     to lieutenant reclassification, the best course
13     of action was to follow what was stipulated in
14     the assessment center or -- I'm sorry -- in the
15     settlement agreement from 1991.
16  Q. Have you read the order approving settlement
17     agreement marked as Plaintiff's Exhibit 3?
18  A. I have.
19  Q. Have you read it in preparation for this
20     deposition?
21  A. I have.
22  Q. Do you know of anywhere in that order where it
23     states that a written test with a cutoff score

Page 34

1 is required to be a part of the assessment
2 center?
3 A. It does not specifically say that.
4 Q. Again, I'm not sure I followed you when you were
5 talking about the lieutenant or the team leader
6 reclassification to lieutenant. I think you
7 said that during that process --
8 Well, tell me what you said. I don't want
9 to mischaracterize your testimony. Tell me
10 again why an assessment center -- why the court
11 order was not followed pursuant to the team
12 leader to lieutenant reclassification.
13     MR. MORGAN: Object to the form.
14 Q. You'll agree with me that the order approving
15 settlement agreement was not complied with
16 pursuant to the February 1, 2006
17 reclassification of team leaders to lieutenants;
18 is that correct?
19     MR. MORGAN: Object to the form.
20 Q. Will you agree with me on that?
21 A. I would agree that we did some research with
22 legal counsel, and it was determined that the
23 settlement agreement was no longer in force.

Page 35

1 And at that point, based on a petition from team
2 leaders, based on the interest of stimulating
3 morale in the department, based on
4 considerations of the cost of conducting
5 assessment centers, we determined that changing
6 the job title of equal -- of a position that
7 had -- that was equal to lieutenant was an
8 appropriate thing to do.
9 Q. So are you testifying that a firefighter or a
10 City of Auburn Fire Division employee that
11 moved -- prior to February 1 of 2006, before
12 that time, a firefighter that moved from team
13 leader to lieutenant was not considered to be a
14 promotion?
15 A. It was not a promotion.
16 Q. It was not a promotion?
17 A. No.
18 Q. Is that correct?
19 A. Correct.
20 Q. When Lieutenant Stevens went from team leader to
21 lieutenant in 1996, was that not a promotion?
22     MR. MORGAN: Object to the form.
23 A. No.

Page 36

1 Q. It was not?
2     You've already testified that during that
3 process, an outside assessment center was used,
4 correct?
5 A. It was.
6     (Plaintiff's Exhibit 4 marked for
7     identification.)
8 Q. I'll show what you I've marked as Plaintiff's
9 Exhibit Number 4.
10     MR. MORGAN: Was he a team leader?
11     MR. HORSLEY: Well, hold on.
12 Q. When was the team leader position started at the
13 City of Auburn Fire Division?
14 A. I think it was started sometime in 1989 or 1990.
15 Q. In 1996 when Gerald Stephens was promoted to
16 lieutenant --
17     I'm going to show you what's marked as
18 Plaintiff's Exhibit Number 4. Have you ever
19 seen that letter?
20 A. I've seen a copy of this.
21 Q. Is it your understanding that he was promoted
22 from the team leader position or from the
23 firefighter position to lieutenant?

Page 37

1 A. I understand he was a firefighter.
2 Q. Why did he not have to be promoted to team
3 leader before being promoted to lieutenant back
4 in 1996?
5     MR. MORGAN: Object to the form.
6 A. I'm sorry. Repeat the question.
7 Q. Yes.
8     Why was he not required to be promoted to
9 team leader before being promoted to lieutenant
10 back in 1996?
11 A. To my knowledge he didn't apply for team leader.
12 Q. Well, my question is: You're saying that team
13 leader and lieutenant were the exact same
14 position before February 1 of 2006, correct?
15 A. Correct.
16 Q. Then why do they have different names?
17 A. One was -- One evolved out of the court-ordered
18 settlement and one evolved out of traditional
19 rank structure in the fire service.
20 Q. Which one evolved out of the court-ordered
21 settlement?
22 A. Team leader.
23 Q. And is there a pay differential between -- Was

| Page 38 | Page 40 |
|---|---|
| 1  there a pay differential between the job of team | 1  in the Auburn Fire Division to your knowledge? |
| 2  leader and lieutenant before February 1 of 2006? | 2  A. Gerald Stephens. |
| 3  A. No. | 3  Q. He's the only one, correct? |
| 4  Q. None? | 4  A. Yes. |
| 5  A. None. | 5  Q. He's an Afro-American, correct? |
| 6  Q. All team leaders and all lieutenants made the | 6  A. He is. |
| 7  exact same wage. Is that your testimony? | 7  Q. Are you aware -- How long had he been the only |
| 8  A. Yes. They were paid in the same pay grade. | 8  lieutenant in the Auburn Fire Division to your |
| 9  Q. What about bars? Do firemen at the City of | 9  knowledge? |
| 10  Auburn have pins that they wear that have a | 10  A. I don't know. |
| 11  certain number of bars on them? | 11  Q. And he was appointed or promoted to lieutenant |
| 12  A. I'm aware that there's some insignia that they | 12  back in 1996, correct? |
| 13  wear. | 13  A. Correct. |
| 14  Q. Is the insignia that the team leaders wore | 14  Q. Did you ever hear or have you heard of |
| 15  before February 1 of '06 the same as the | 15  dissatisfaction among the team leaders at that |
| 16  lieutenants wore prior to that time? | 16  time prior to February 1 of '06 that Gerald |
| 17  A. I don't know. | 17  Stephens was the only lieutenant in the |
| 18  Q. You don't know? | 18  department? |
| 19  A. (Witness nods head negatively.) | 19  A. Can you repeat the question? |
| 20  Q. Do you know why all these team leaders wanted to | 20  Q. Yeah. |
| 21  be reclassified as lieutenants if the job was | 21  Did you ever hear or have you ever heard of |
| 22  the same and they were making the same money? | 22  dissatisfaction or discontent among the team |
| 23  A. I think they stipulated that in their petition. | 23  leaders at that time prior to February 1 of '06 |

| Page 39 | Page 41 |
|---|---|
| 1  Q. What do you recall that stipulation to be? | 1  that Gerald Stephens was the only lieutenant in |
| 2  A. I believe they said that team leader is not a | 2  the Auburn Fire Division? |
| 3  recognized title in the fire service. When they | 3  A. Not that I recall. |
| 4  went to other training, they had to explain what | 4  Q. Have you ever heard of that? |
| 5  a team leader was. When they went to other -- | 5  A. Not that I recall. |
| 6  to assist other fire agencies, they had to | 6  Q. Is it your testimony that Gerald Stephens was |
| 7  explain what their training was. They preferred | 7  not a higher ranking employee of the City of |
| 8  to be called lieutenants because that was a | 8  Auburn Fire Division prior to February 1 of '06 |
| 9  recognized, more traditional job title for a | 9  than the team leaders? |
| 10  company officer in the fire service. | 10  A. I'm sorry. Would you repeat that? |
| 11  Q. So from their standpoint -- you would agree with | 11  Q. Is it your testimony that Gerald Stephens was |
| 12  me from a convenience standpoint, it was an | 12  not a higher ranking Auburn Fire Division |
| 13  actual promotion from team leader to lieutenant? | 13  employee prior to February 1 of '06 than were |
| 14  A. I'm sorry? | 14  the team leaders? |
| 15  Q. From a convenience to the team leaders, it was a | 15  A. That is my testimony. |
| 16  promotion to go from team leader to lieutenant; | 16  MR. MORGAN: Object to the form. |
| 17  is that correct? | 17  Q. He was not a higher ranking employee? |
| 18  MR. MORGAN: Object to the form. | 18  A. He was not. |
| 19  A. No. | 19  Q. I don't want to get into privileged information |
| 20  Q. And you don't know if the insignia had more bars | 20  between you and attorneys. You said that you |
| 21  as a lieutenant than a team leader? | 21  consulted with legal counsel prior to the time |
| 22  A. I don't. | 22  that you reclassified the team leaders to |
| 23  Q. In February 1 of 2006, who were the lieutenants | 23  lieutenants and decided that the court order had |

67b44512-a3f5-4882-b948-707cd78b9621

Page 42

1    expired or that it was no longer in force; is
2    that correct?
3  A.  Correct.
4  Q.  Who was your legal counsel at that time?
5  A.  The city attorney.
6  Q.  And was that Arnold Umbach?
7  A.  It is.
8  Q.  Anyone else that you or the City consulted with
9    in reaching the conclusion that the 1991 order
10    had expired or was no longer in force?
11  A.  Not directly.  I don't know if Arnold had --
12  Q.  Yeah.  What I'm saying is: The City came to
13    that conclusion based on discussions with legal
14    counsel, Arnold Umbach, and that's the only way
15    the City came to that conclusion.  Is that a
16    correct statement?
17  A.  That's correct.
18  Q.  And, again, I don't want to know what Arnold
19    Umbach told you or anyone else, but do you have
20    knowledge as to why Arnold Umbach told the City
21    that the 1991 settlement agreement was no longer
22    in force?
23  A.  I do know what he told me.

Page 43

1        MR. HORSLEY:  Can I ask him that?
2        MR. MORGAN:  Yeah.
3  Q.  What did he tell you?
4  A.  He told us that -- he told me that --
5        MR. MORGAN:  Let me say this.
6        We're --
7        MR. HORSLEY:  You're not waiving any
8        privilege.  You're not waiving any
9        privilege.
10        MR. MORGAN:  Okay.
11  A.  He told me that in the absence of a specific
12    termination date, all contracts have -- they
13    come to an end based on changing conditions,
14    changing situations, that he had learned that
15    the court did not retain jurisdiction of this
16    settlement and that basically this was a
17    contractual matter between the City and the
18    plaintiffs.
19  Q.  Did he tell you when the court no longer
20    retained jurisdiction over this?
21  A.  A point in time?
22  Q.  Yeah.
23  A.  No.

Page 44

1  Q.  Was it your understanding that after the court
2    signed off on the order that they essentially
3    lost jurisdiction over what was contained within
4    the order?  Is that your understanding?
5        MR. MORGAN:  Object to the form.
6  A.  That's the information I received.
7  Q.  So the order was essentially ineffective the day
8    after it was signed?  Is that your testimony?
9        MR. MORGAN:  Object to the form.
10  A.  No.
11  Q.  Well, what was your understanding of when that
12    order became ineffective or when the court lost
13    jurisdiction over the contents of that order?
14        MR. MORGAN:  Object to the form.
15  A.  It's not something I really contemplated until
16    you just asked me this question.
17  Q.  You don't know -- don't have any knowledge over
18    a time -- a date and time when the court lost
19    jurisdiction over the 1991 order?  Is that your
20    testimony?
21        MR. MORGAN:  Object to the form.
22  A.  Based on what I was told by the city attorney,
23    presumably they did not retain jurisdiction

Page 45

1    after the settlement.
2  Q.  And that was my question a moment ago.  Your
3    belief today and upon discussing it with Arnold
4    Umbach was that essentially the United States
5    District Court for the Middle District of
6    Alabama Eastern Division lost jurisdiction over
7    the order that it entered in 1991 essentially
8    the day after it signed the order; is that
9    correct?
10        MR. MORGAN:  Object to the form.
11  Q.  I think that's what you said.
12  A.  Not being a lawyer, that's the way it appears.
13        MR. MORGAN:  Are you at a stopping
14        point?
15        MR. HORSLEY:  Yeah.  We can take a
16        break.  That's fine.
17        (Brief recess.)
18  Q.  (Continuing by Mr. Horsley)  I want to go back
19    for a moment to the distinction between the team
20    leader and lieutenant position prior to February
21    1 of 2006.  That's when that change became
22    effective, correct, when all the team leaders
23    became lieutenants?

Deposition of Steven A. Reeves                              July 30, 2008

|  | Page 46 |
|---|---|
| 1 | A. February 1. |
| 2 | Q. February 1 of 2006? |
| 3 | A. That's correct. |
| 4 | Q. Isn't it true that prior to that time, the team |
| 5 | leader position was a temporary position? It |
| 6 | was a full-time job but a temporary position; is |
| 7 | that correct? |
| 8 | A. My recollection is that it started as a |
| 9 | temporary position and at some point since 1989 |
| 10 | it became an assignment that didn't go away. |
| 11 | Q. And weren't the team leaders in some respects |
| 12 | required to oversee the student firefighters? |
| 13 | A. They did oversee student firefighters. |
| 14 | Q. Was that a part of their job duties? |
| 15 | A. A part of their job duties was to provide |
| 16 | front-line supervision -- first-line supervision |
| 17 | over fire suppression personnel. |
| 18 | Q. Student firefighters? |
| 19 | A. Student firefighters included, yeah. |
| 20 | Q. Was that also a job task of the lieutenants |
| 21 | prior to February 1 of 2006? |
| 22 | A. I believe lieutenants did oversee student |
| 23 | firefighters. I don't -- That's my belief. |

|  | Page 47 |
|---|---|
| 1 | Q. But wasn't the team leader position specifically |
| 2 | created in order to oversee the student |
| 3 | firefighters? |
| 4 | A. I believe it was. |
| 5 | Q. Was the lieutenant position ever specifically |
| 6 | created in order to oversee student |
| 7 | firefighters? |
| 8 | A. The lieutenant position existed prior to the |
| 9 | creation of student firefighters. |
| 10 | Q. It has never been the primary job task of a |
| 11 | lieutenant to oversee student firefighters; is |
| 12 | that correct? |
| 13 | MR. MORGAN: Object to the form. |
| 14 | A. Would you repeat that? |
| 15 | Q. It has never been a primary job duty of a |
| 16 | lieutenant with the Auburn Fire Division to |
| 17 | oversee the student firefighters; is that |
| 18 | correct? |
| 19 | MR. MORGAN: Object to the form. |
| 20 | A. I can't agree with that. |
| 21 | Q. You cannot agree with that? |
| 22 | A. No. |
| 23 | Q. Will you agree with me that the primary task of |

|  | Page 48 |
|---|---|
| 1 | a team leader was to oversee the student |
| 2 | firefighters? |
| 3 | A. At one time. |
| 4 | Q. When? |
| 5 | A. The late '80s, early '90s. |
| 6 | Q. So it's your testimony that in 2005, the team |
| 7 | leaders were no longer required to oversee the |
| 8 | student firefighters? |
| 9 | A. I think they oversaw student firefighters and |
| 10 | also career firefighters. |
| 11 | Q. And it's your testimony that their job duties |
| 12 | directly related to student firefighters were |
| 13 | exactly the same as the lieutenants' job duties |
| 14 | related to student firefighters; is that |
| 15 | correct? |
| 16 | A. The job descriptions were identical. |
| 17 | Q. With respect to student firefighters? |
| 18 | A. With respect to supervising personnel. |
| 19 | Q. Is your testimony that with respect to the |
| 20 | supervision of student firefighters, the job |
| 21 | duties of team leader and lieutenant were |
| 22 | exactly the same prior to February 1 of '06? |
| 23 | MR. MORGAN: Object to the form. |

|  | Page 49 |
|---|---|
| 1 | A. That's my belief. |
| 2 | Q. The City decided through discussions with its |
| 3 | attorney that the outside assessment center was |
| 4 | no longer required because the 1991 court order |
| 5 | was no longer effective with regard to the team |
| 6 | leader reclassification to lieutenants in |
| 7 | February 1 of '06. We've established that. |
| 8 | MR. MORGAN: Object to the form. |
| 9 | Q. And it sounds to me like you were concerned |
| 10 | about that or the City was concerned about that |
| 11 | and actually consulted with its attorney before |
| 12 | it made that decision to reclassify team leaders |
| 13 | to lieutenants. Is that a fair statement? |
| 14 | A. Correct. |
| 15 | Q. Why, then, were the battalion chief promotions |
| 16 | at the end of 2005 performed without an outside |
| 17 | assessment center? |
| 18 | MR. MORGAN: Do what? |
| 19 | A. They were. |
| 20 | Q. The battalion chief promotions in 2005 were? |
| 21 | MR. MORGAN: Object to the form. |
| 22 | A. There wasn't a battalion chief promotion in |
| 23 | 2005. |

13 (Pages 46 to 49)

Page 50

1  Q.  When was the last battalion chief promotion
2      before May of '06?
3  A.  1996. But back then it was called captain or
4      shift commander.
5  Q.  Were Dean Garrett, Johnny Lawrence, Jimmy Brown,
6      and Danny Leverette not promoted to battalion
7      chief in 2004 or 2005 to your knowledge?
8  A.  They were not.
9  Q.  What is your understanding of their job status
10     in 2004 and '05?
11 A.  At some point during that period of time, their
12     job title changed.
13 Q.  From captain to battalion chief?
14 A.  From shift commander to battalion chief.
15 Q.  And it's your testimony that's not a promotion?
16 A.  That's correct.
17 Q.  Are you testifying that it's similar to or just
18     like the reclassification of team leaders to
19     lieutenants, that shift commanders became
20     battalion chiefs?
21 A.  Their job title was changed.
22 Q.  All shift commanders' job titles were changed to
23     battalion chiefs?

Page 51

1  A.  Correct.
2  Q.  And when did that happen?
3  A.  I think it was in 2004.
4  Q.  Why did that occur?
5  A.  The captains/shift commanders had been asking
6      that their job titles be changed to battalion
7      chief for quite some time. They met with the
8      former city manager and requested that their job
9      titles be changed. I understand that it was a
10     desire that they had because it was a job title
11     more in keeping with the fire service, that when
12     they went to training or conferences, they
13     wanted to introduce themselves as battalion
14     chief. They made their petition to the city
15     manager, and he agreed to change their job
16     title. There was no change in job description.
17     There was no change in compensation whatsoever.
18 Q.  Were those individuals that I just named all
19     white men?
20 A.  Yes.
21 Q.  And, again, that change was made at their
22     request, for lack of a better word, convenience
23     to them; is that correct?

Page 52

1      MR. MORGAN:  Object to the form.
2  A.  I don't know about convenience, but to satisfy
3      what they wanted to be called.
4  Q.  But it's your testimony that was not a
5      promotion?
6  A.  It was not.
7  Q.  Again, the insignia -- are you familiar with the
8      insignia that the shift commanders wore back
9      then?
10 A.  Not until just recently.
11 Q.  Was that insignia the same as what a battalion
12     chief wore?
13     MR. MORGAN:  Which one?
14     MR. HORSLEY:  The shift commander.
15 A.  I have heard there was a change in the jewelry
16     that they put on their collars.
17 Q.  Once they became battalion chiefs, they wore a
18     different insignia; is that correct? Once the
19     shift commanders became battalion chiefs, the
20     individuals we just named; is that correct?
21 A.  I heard something about there was a bugle added
22     to their collar.
23 Q.  Do you know whether or not the insignia that the

Page 53

1      shift commanders wore included two bars and the
2      ones that the battalion chiefs wore included
3      three bars?
4  A.  I don't know that.
5  Q.  You don't know?
6  A.  (Witness nods head negatively.)
7  Q.  Do you have any reason to dispute that if that's
8      what --
9      MR. MORGAN:  Object to the form.
10 A.  It is what it is.
11 Q.  But you don't know?
12 A.  I don't know.
13 Q.  Once again, the reclassification or retitlement
14     of -- the reclassification of the shift
15     commanders to battalion chiefs was done without
16     an outside assessment center, correct?
17     MR. MORGAN:  Object to the form.
18 A.  Correct.
19 Q.  There were no tests given to those individuals,
20     correct?
21 A.  There was no promotion.
22 Q.  I understand. That's not my question.
23 A.  There was no test.

Page 54

1  Q. There were no tests given to those individuals,
2     correct?
3  A. Correct.
4        MR. MORGAN: Wait a minute. There was
5           a test when they were promoted to
6           captain or shift commander so
7           object to the form of that.
8        MR. HORSLEY: I was asking about the
9           reclassification. He said it was
10          not a promotion. I was asking
11          about the reclassification from
12          shift commander to battalion
13          chief.
14       MR. MORGAN: When they were renamed
15          from shift commander to battalion
16          chief, was there a promotion given
17          to rename them? Is that the
18          question?
19       MR. HORSLEY: No. My question is:
20          Was there a test given?
21       MR. MORGAN: When they are renamed?
22       MR. HORSLEY: Whatever we're calling
23          it. When they are reclassified.

Page 55

1  Q. When they became battalion chiefs, they did not
2     have to take a test, correct?
3        MR. MORGAN: Object to the form.
4  A. When their job title was changed from shift
5     commander to battalion chief, there was not a
6     test given.
7  Q. They were not required to undergo an outside
8     assessment center pursuant to that change,
9     correct?
10 A. It was not necessary.
11 Q. When did the position of captain change to the
12    position of battalion chief?
13 A. The position of captain changed to shift
14    commander.
15 Q. When was that?
16 A. Mid-'90s. I don't know.
17 Q. Why was that change made?
18 A. I don't know that either.
19 Q. You don't have any information about why the
20    position of captain was changed to shift
21    commander?
22 A. I don't.
23 Q. The order that we've been --

Page 56

1  A. Let me clarify that.
2  Q. Okay.
3  A. You asked do I have any information?
4  Q. Uh-huh (positive response).
5  A. I don't recall what -- who made that decision;
6     why it was done.
7  Q. You'll agree with me that that change from
8     captain to shift commander occurred subsequent
9     to Plaintiff's Exhibit 3, which is the Hammock
10    order approving the settlement agreement,
11    correct?
12 A. Correct.
13 Q. Are you aware that that order specifically --
14    whether it was effective or not effective, that
15    order specifically requires that any promotion
16    to captain requires an outside assessment
17    center? You're aware of that, right?
18       MR. MORGAN: Object to the form.
19 A. Yes.
20 Q. So it's your testimony that for some reason
21    subsequent to this order, the position of
22    captain was renamed shift commander, correct?
23 A. Correct.

Page 57

1  Q. And you don't know why; is that correct?
2  A. Right.
3  Q. It's also your testimony that subsequent to this
4     order marked as Exhibit 3 that there was a
5     reclassification in 2004 or '05 from shift
6     commander to shift commander -- excuse me -- from
7     captain to shift commander and that the captain
8     position no longer existed, correct?
9        MR. MORGAN: Object to the form.
10 A. What date did you say?
11 Q. I think we established it was either -- I think
12    you said '04. It was in 2004.
13 A. I said in '04. I believe in '04 the job title
14    changed from shift commander to battalion chief.
15 Q. When did it change from -- I'm sorry. That's my
16    fault. It was in the mid-'90s that it changed
17    from captain to shift commander?
18 A. I think so.
19 Q. Subsequent to the 1991 order, correct?
20 A. Correct.
21 Q. Subsequent to that order which specifically
22    addresses the outside assessment for captain
23    promotions, the captain position was essentially

Page 58

1    eliminated by the department, correct?
2         MR. MORGAN: Object to the form.
3    A. No.
4    Q. The title of captain was eliminated by the
5    department, correct?
6         MR. MORGAN: Object to the form.
7    A. Correct.
8    Q. You agree with that, the title of captain was
9    eliminated subsequent to the order?
10   A. It was changed to shift commander.
11        (Plaintiff's Exhibits 7 & 8 marked for
12        identification.)
13   Q. I'll show you what I've marked as Plaintiff's
14   Exhibits 5 and 6.
15        MR. MORGAN: Richard, we've gone on
16        about this, but the change in name
17        from team leader to lieutenant is
18        not an issue in this case, and I
19        don't know why we're spending so
20        much time on it. I mean, that's
21        not a claim in this lawsuit.
22        MR. HORSLEY: I think I'm entitled to
23        ask questions about the history of

Page 59

1    the department and the changes
2    they've made and the motivations
3    behind them.
4    Q. Have you ever seen Plaintiff's Exhibits 5 and 6?
5         (Off-the-record discussion.)
6         MR. HORSLEY: I'm marking these as 7
7         and 8. Seven is the Proposed
8         Modification of Fire Lieutenant
9         Promotional process signed by
10        Christopher Turner, and 8 is the
11        same thing signed by Gerald
12        Stephens.
13   Q. Have you seen those two documents?
14   A. I have.
15   Q. And do you recall who made the decision to issue
16   these documents to the City of Auburn
17   firefighters?
18   A. Ultimately it would have been the city manager.
19   Q. Who was ...
20   A. David Watkins.
21   Q. And you'll agree with me that in both of these
22   documents -- both of these documents are
23   addressing the reclassification of team leaders

Page 60

1    to lieutenants; is that correct?
2    A. That's correct.
3    Q. Do you know why these memos or documents were
4    given to Gerald Stephens and Christopher Turner?
5    A. They were given to all affected members of the
6    fire division. They were given to them because
7    we wanted their input. We wanted to offer full
8    disclosure. And because the city attorney said
9    this essentially was a contractual matter
10   between the plaintiffs and the City, we felt
11   this was a good way to go about getting the
12   input regarding their preference as to this
13   particular matter.
14   Q. The preference to the particular matter of
15   reclassifying team leaders to lieutenants?
16   A. Changing their job title from team leader to
17   lieutenant, reclassifying, yes.
18   Q. And Eddie Ogletree would have been one of those
19   individuals, correct?
20   A. Eddie Ogletree was a team leader who supported
21   that decision.
22   Q. Well, he signed the document agreeing to it,
23   correct?

Page 61

1         MR. MORGAN: Object to the form.
2    Q. Do you have --
3         MR. MORGAN: We have that. We have
4         the one that he signed. The
5         second he claimed he didn't sign,
6         yeah, we've got it.
7    A. He stated: I agree with the proposal.
8    Q. And did you witness Mr. Ogletree sign that
9    document?
10   A. No.
11   Q. Do you know if the first page was attached to it
12   when he signed it?
13   A. No.
14   Q. Even though you had certain members of the fire
15   department that disagreed with the
16   reclassification, the City did it anyway,
17   correct?
18   A. After we met with those individuals to
19   understand their concerns.
20   Q. And in both 7 and 8, it states that the
21   court-approved assessment center process
22   submitted for fire lieutenant will be considered
23   to have expired, correct?

Deposition of Steven A. Reeves                    July 30, 2008

Page 62

1   A.  Correct.
2   Q.  That's in paragraph 1 at the bottom of the first
3       page; is that correct?
4   A.  That's correct.
5   Q.  If it was your position and the City's position
6       at that time that, number one, the settlement
7       order was no longer in effect and that this was
8       not a promotion -- it was simply a
9       reclassification -- why are you addressing the
10      outside assessment center required by the order
11      in these two documents?
12          MR. MORGAN:  Object to the form.
13  Q.  I mean, if it's not an issue because it's not a
14      promotion and the order is not in force anyway,
15      why do you have to send out this document for
16      people to sign that specifically addresses the
17      assessment center and the fact that you consider
18      it to have expired?
19          MR. MORGAN:  Object to the form.
20  A.  Because --
21          MR. MORGAN:  The document speaks for
22          itself.
23  Q.  Go ahead.

Page 63

1   A.  Because the city attorney said this was
2       essentially a contractual matter between the
3       plaintiffs and the City, and we were trying to
4       provide full disclosure as to what the
5       implications of this proposal meant before we
6       moved forward.
7   Q.  But your earlier testimony made it very clear
8       this was not a promotion, correct?
9   A.  Correct.
10  Q.  Then why are you required to send out documents
11      asking for the approval when this is not a
12      promotion?  It's simply a reclassification.
13          MR. MORGAN:  Object to the form.
14          Asked and answered.
15  Q.  Is there a reason why you felt you needed to
16      send out these documents if this was not a
17      promotion?
18  A.  We were concerned that if we didn't take this
19      step, potentially understand their preferences, then it
20      would potentially invalidate moving them from
21      team leader to lieutenant.
22  Q.  And even though some people disagreed with it,
23      y'all went ahead and reclassified them, correct?

Page 64

1   A.  After we met with them to understand what their
2       concerns were.
3   Q.  If February 1 of 2006 the City had decided the
4       order was no longer in effect and outside
5       assessment centers were not required, why was an
6       outside assessment center used or why was it
7       allegedly used for the battalion chief promotion
8       in May of 2006?
9           MR. MORGAN:  Object to the form.
10  A.  In regard to the --
11  Q.  Well, let me ask you this.  Is it your position
12      that an outside assessment center that complies
13      with the court order of 1991 was, in fact,
14      utilized for the 2006 battalion chief promotion?
15          MR. MORGAN:  Object to the form.
16  A.  Yes.
17  Q.  Why did the City feel it necessary to use the
18      outside assessment center for the battalion
19      chief promotion in 2006 if it was the City's
20      position that the order was no longer in effect?
21          MR. MORGAN:  Object to the form.
22  A.  As I've indicated previously, this matter
23      regarding the team leaders being changed in job

Page 65

1       title to lieutenant was very narrowly focused on
2       in regard to the settlement agreement.  We did
3       not address the issue of assessment center
4       processes or the process for promotion to
5       battalion chief or captain or shift commander,
6       whatever you want to call it, in this effort or
7       in this initiative presented to us by the team
8       leaders.
9   Q.  Are you familiar with somebody named Stephanie
10      King?
11  A.  I am.
12  Q.  Who is she?
13  A.  She is our senior HR generalist.
14  Q.  Still?
15  A.  She is.
16          (Plaintiff's Exhibit 5 marked for
17          identification.)
18  Q.  Let me show you what I've marked as Plaintiff's
19      Exhibit 5.  This has just been provided to me
20      today.  It's a series of e-mails, some of which
21      you sent, some of which you received, some
22      Mr. Lamar sent, received.  Take a look at those,
23      and I'm going to ask you a couple of questions

| Page 66 |
|---|
| 1   about them. |
| 2        MR. MORGAN: Where did you get this |
| 3   document? |
| 4        MR. HORSLEY: From Will Hancock. |
| 5        MR. HANCOCK: That's what I sent you, |
| 6        Randall. Those are the e-mails |
| 7        you requested I think after |
| 8        Mr. Turner's deposition. I sent |
| 9        them the following week. |
| 10  Q.  Have you seen that exhibit before? |
| 11  A.  I have. |
| 12  Q.  The only question I'm going to ask you is: Does |
| 13       it appear to be an accurate reflection of |
| 14       e-mails that were sent between the City of |
| 15       Auburn employees and CWH representatives about |
| 16       the battalion chief promotion test and |
| 17       assessment center? |
| 18        MR. MORGAN: Object to the form. |
| 19  A.  No. |
| 20  Q.  It does not? How is it not e-mails sent -- |
| 21  A.  Well, chronologically I'm puzzled by how I got |
| 22       this e-mail at 1:51. I responded at 2:55. Lee |
| 23       Lamar responded at 2:07. I don't understand how |

| Page 67 |
|---|
| 1        that happens, how he responded after me or -- |
| 2        before me, but it chronologically appears that |
| 3        he responded after me. |
| 4   Q.  So you say there's a contradiction in two of the |
| 5        times when e-mails were apparently sent; is that |
| 6        correct? |
| 7   A.  I don't understand why that is. There's a |
| 8        question in my mind about that. |
| 9   Q.  Do you agree with me that these e-mails were |
| 10       sent? Have you seen these e-mails? |
| 11  A.  I believe -- Well, I saw them after Mr. Hancock |
| 12       provided them. |
| 13  Q.  Do you dispute that these e-mails exist? |
| 14  A.  No. |
| 15  Q.  Do you agree that the e-mails that have your |
| 16       name on them as being sent by you were sent by |
| 17       you? |
| 18  A.  Yes. |
| 19  Q.  Did you receive the e-mails that indicate that |
| 20       you received them on this document? |
| 21  A.  I believe I did. |
| 22  Q.  Do you believe that Lee Lamar sent the e-mails |
| 23       that his name is on? |

| Page 68 |
|---|
| 1   A.  This document would suggest that. |
| 2   Q.  The battalion chief promotion that we're talking |
| 3        about and that actually occurred in May of 2006, |
| 4        that was a promotion, correct, from -- for |
| 5        anyone that applied for it; is that correct? |
| 6   A.  Correct. |
| 7   Q.  Or for anyone who actually received the job, |
| 8        that was a promotion, correct? |
| 9   A.  Correct. |
| 10  Q.  It was a promotion in rank and pay; is that |
| 11       correct? |
| 12  A.  Correct. |
| 13  Q.  And you'll agree with me that Mr. Stephens and |
| 14       Mr. Ogletree and Mr. Turner did not receive that |
| 15       promotion, correct? |
| 16  A.  Correct. |
| 17  Q.  And you'll agree with me that those are each |
| 18       Afro-Americans, correct? |
| 19  A.  Correct. |
| 20  Q.  And you'll agree with me those are the only |
| 21       Afro-Americans that applied for the battalion |
| 22       chief promotion at that time, correct? |
| 23  A.  Correct. |

| Page 69 |
|---|
| 1   Q.  You'll agree with me that the only people who |
| 2        did receive that promotion were white men, |
| 3        correct? |
| 4   A.  Correct. |
| 5   Q.  You'll agree with me that the only people who |
| 6        made it past the testing phase of that promotion |
| 7        were white men, correct? |
| 8        MR. MORGAN: Object to the form. |
| 9   A.  Correct. |
| 10  Q.  The testing phase meaning the test that was |
| 11       taken with the 70 cutoff score, correct? |
| 12  A.  The written test. |
| 13  Q.  Yes. The only people that made it past that |
| 14       point were white, correct? |
| 15  A.  Correct. |
| 16  Q.  Are you familiar with Mr. Stephens' and |
| 17       Mr. Ogletree's job history with the City of |
| 18       Auburn? |
| 19  A.  Yes. |
| 20  Q.  You're familiar with the jobs they've held and |
| 21       their work performance. Is that a fair |
| 22       statement? |
| 23  A.  Yes. |

67b44512-a3f5-4882-b948-707cd78b9621

Page 70

1  Q.  Other than their not passing the written test,
2      are you aware of anything about their employment
3      history with the City of Auburn that would have
4      kept them from being promoted to battalion
5      chief?
6          MR. MORGAN: Object to the form.
7  A.  They had the same opportunity that everyone else
8      did.
9  Q.  Right. My question though, is: There's not
10     something that you're aware of that would have
11     precluded them from that promotion but for not
12     passing that test; is that correct?
13         MR. MORGAN: Object to the form. Go
14         ahead.
15  A.  Correct. They were eligible, just like everyone
16     else.
17  Q.  But for not passing that test, is it your
18     testimony that they were qualified to receive
19     that promotion?
20         MR. MORGAN: Object to the form.
21  A.  That is not my testimony.
22  Q.  Based on their time in grade, based upon their
23     seniority, based upon your knowledge of their

Page 71

1     work ethic and yearly evaluations, do you have
2     an opinion one way or the other about whether
3     they were qualified to be battalion chiefs?
4         MR. MORGAN: Object to the form.
5  A.  First, time in grade and seniority were not
6     considered.
7  Q.  Why is that?
8  A.  How do you consider that?
9  Q.  I don't know.
10  A.  Exactly.
11  Q.  I mean, I guess you consider it by how long
12     somebody has been there and how long they've
13     been in a certain position. You're saying that
14     was not a qualification obviously for the
15     battalion chief job? Is that what you're
16     saying?
17  A.  Correct.
18  Q.  My question, though, was: Other than them not
19     passing the test, based upon their work history
20     with the City of Auburn, were they qualified for
21     that promotion?
22         MR. MORGAN: Object to the form.
23         Asked and answered.

Page 72

1  A.  They were eligible.
2  Q.  They were not disqualified for that promotion?
3  A.  Correct.
4  Q.  Who ultimately received those promotions to
5     battalion chief? I'll try to help you. I think
6     it was Joe Lovvorn, Rod Hartsfield, Matt Jordan,
7     and Joey Darby.
8  A.  That's correct.
9  Q.  Is that correct?
10  A.  Yes.
11  Q.  Those were all white males, correct?
12  A.  Correct.
13  Q.  Would you disagree with me that at the time of
14     his promotion to battalion chief, Joe Lovvorn
15     had been with the Auburn Fire Division for
16     approximately five to six years?
17  A.  I don't know exactly.
18  Q.  Do you have any reason to disagree with that?
19         MR. MORGAN: Well, the record speaks
20         for itself.
21  Q.  Do you have any reason to disagree with that?
22         MR. MORGAN: Object to the form.
23  A.  Does that include his time as a student

Page 73

1     firefighter?
2  Q.  No.
3  A.  I think --
4  Q.  He's been full-time employed with the City of
5     Auburn five to six years to your knowledge?
6  A.  As a regular firefighter?
7  Q.  Yes.
8  A.  I don't have any reason to disbelieve that
9     that's true.
10         MR. MORGAN: Object to the form on
11         that question.
12  Q.  Do you believe that Rod Hartsfield had been with
13     the Auburn Fire Department for approximately
14     seven years at the time he was promoted to
15     battalion chief?
16         MR. MORGAN: Object to the form.
17  A.  As a regular employee?
18  Q.  Yes, sir.
19  A.  I have no reason to disbelieve that's not true.
20  Q.  Matt Jordan, five to six years with the Auburn
21     Fire Division; is that --
22         MR. MORGAN: Object to the form.
23  A.  Same stipulation.

Deposition of Steven A. Reeves                          July 30, 2008

---

Page 74

1  Q. And the same question with Joey Darby.
2        MR. MORGAN: Object to the form.
3  A. Same stipulation.
4  Q. Do you agree with me that Mr. Stephens and
5     Mr. Ogletree both had more years of service with
6     the Auburn Fire Department than any of the
7     individuals that were promoted to battalion
8     chief?
9  A. I believe that's true.
10 Q. Do you agree with me that both Mr. Stephens and
11    Mr. Ogletree had more experience with the Auburn
12    Fire Department than did the individuals that
13    received the battalion chief promotion?
14       MR. MORGAN: Object to the form.
15 A. They had worked -- To the extent that they had
16    been employed longer, ostensibly they had worked
17    more shifts than these others.
18 Q. So they had more experience?
19       MR. MORGAN: Object to the form.
20 Q. Is that correct?
21       MR. MORGAN: What do you mean by
22       experience?
23       MR. HORSLEY: Experience as Auburn

---

Page 75

1        firefighters working for the
2        Auburn Fire Department.
3        MR. MORGAN: Are you talking about
4        seniority?
5        MR. HORSLEY: No. Seniority is just a
6        number of years. I'm talking
7        about experience going out and
8        working for the City of Auburn.
9  Q. Did they have more experience than the people
10    that were promoted to battalion chief?
11       MR. MORGAN: Object to the form.
12 A. They had more experience as employees of the
13    City of Auburn to the extent that they had been
14    employed longer.
15 Q. What jobs with the City of Auburn did the
16    individuals that were promoted to battalion
17    chief hold immediately before they were
18    promoted?
19 A. I think they were all lieutenants.
20 Q. Lieutenants?
21 A. (Witness nods head positively.)
22 Q. Were they in the group that was reclassified
23    from team leaders to lieutenants, the ones that

---

Page 76

1  were promoted?
2        MR. MORGAN: Promoted to battalion
3        chief?
4        MR. HORSLEY: Yes.
5  A. They were in that group.
6  Q. Each of the individuals that were promoted to
7     battalion chief in May of '06 were in the same
8     group of individuals that were reclassified from
9     team leader to lieutenant in February 1 of '06,
10    correct?
11 A. Correct.
12 Q. So how long had they been lieutenants at the
13    time that they were promoted to battalion
14    chiefs?
15 A. They had held the job title of lieutenant from
16    February 1, 2006.
17 Q. So --
18 A. They had been company officers, as I understand
19    that term in the fire service, for significantly
20    longer than that.
21 Q. So they had been lieutenants for four months
22    approximately; is that correct?
23 A. Correct.

---

Page 77

1  Q. Since they had not been lieutenants for twelve
2     months, would they have not been probationary
3     lieutenants at the time that they were promoted
4     to battalion chiefs?
5  A. No.
6  Q. They were not?
7  A. They were not probationary.
8  Q. Why not?
9  A. Because we made a title change from team leader
10    to lieutenant. They had already satisfied any
11    probationary requirements.
12 Q. So it's your testimony that even though they had
13    only been lieutenants for approximately four
14    months, they were nonprobationary lieutenants
15    and entitled to be promoted to battalion chiefs,
16    correct?
17 A. Correct. For the sake of argument, even if they
18    had been probationary, they would have been
19    eligible.
20 Q. Doesn't that conflict with the City of Auburn
21    personnel policies?
22 A. Not that I'm aware of.
23 Q. Are you familiar with those policies?

---

67b44512-a3f5-4882-b948-707cd78b9621

Page 78

1    A. I am.
2    Q. You are? Are you familiar with Section 2.07 of
3       the City of Auburn personnel policies from
4       1999? I've marked the whole document as
5       Plaintiff's Exhibit Number 9.
6          (Plaintiff's Exhibit 9 marked for
7           identification.)
8          MR. MORGAN: Is that what was in
9           effect in 2006?
10         MR. HORSLEY: I don't know.
11   Q. Was it?
12   A. No.
13   Q. What was in effect?
14   A. The personnel policies of 2005 as amended.
15   Q. Okay. Look at Section 2.07 of that section and
16      read it, if you will.
17   A. In the document, the City of Auburn personnel
18      policies of 1999 labeled such, Section 2.07,
19      probation, states: The probationary period --
20         Did you want me to read this out loud?
21   Q. No. Just read it to yourself, and I'm going to
22      ask you a question about it.
23   A. (Witness complies.)

Page 79

1    Q. Was that section still in effect with the
2       amended personnel policies of '05 to your
3       knowledge?
4    A. To my knowledge it was.
5    Q. Does that section not require that a fire
6       department employee be employed at a certain job
7       for twelve months before being entitled to a
8       promotion?
9    A. When an employee --
10         MR. MORGAN: Object to the form. Go
11          ahead.
12   A. When an employee is promoted -- When an employee
13      is hired or promoted into a new job, they serve
14      a probationary period.
15   Q. Of twelve months?
16   A. Of twelve months.
17   Q. And they can't be promoted while they are in
18      that probationary period, is that correct,
19      according to the city personnel policies?
20   A. No, that is not correct.
21   Q. That's not correct?
22   A. No.
23   Q. 2.7 does not say that?

Page 80

1    A. 2.07?
2    Q. Yes, sir.
3    A. It does not say you can't be promoted during the
4       probationary period.
5          MR. MORGAN: I didn't see it either.
6           Show it.
7    Q. I'm sorry. Section 2.09 regarding promotions
8       refers back to Section 2.07. Does that section
9       not say an employee is not entitled to a
10      promotion until he has served a twelve-month
11      probationary period?
12         MR. MORGAN: Object to the form.
13   A. No.
14   Q. It refers to a step increase in pay, correct?
15   A. Correct.
16   Q. Does it not state that an increase in pay
17      requires an employee to serve a probationary
18      period of twelve months?
19         MR. MORGAN: Object to the form.
20   A. A step increase -- I'm sorry. Repeat the
21      question.
22   Q. Does that not mean -- Section 2.09 which refers
23      back to 2.07, does that not mean an employee has

Page 81

1       to serve a twelve-month probationary period
2       before he can receive a step increase in pay?
3    A. In that job, correct.
4    Q. So it's your testimony that there's no
5       requirement through the City of Auburn personnel
6       policies that an employee serve a twelve-month
7       probationary period before they can be promoted?
8    A. If a firefighter wanted to apply for a higher
9       level job within the organization during their
10      probationary period as a firefighter, they could
11      certainly do so. And if selected they would be
12      promoted to that position.
13   Q. And it's your testimony that would not
14      contradict or conflict in any way with the
15      personnel policies marked as Plaintiff's Exhibit
16      9; is that correct?
17   A. It would not.
18   Q. I think I asked this earlier, but I forgot what
19      your answer was. Is it your testimony that the
20      individuals that were promoted to battalion
21      chief in May of '06 were, in fact, probationary
22      lieutenants?
23         MR. MORGAN: Object to the form.

Page 82

1    A.  That was not my testimony.
2        MR. HORSELY:  That's why I asked it
3            again because I couldn't remember
4            what his answer was.
5    Q.  What was your testimony?
6    A.  My testimony was that they were not
7        probationary.  They had received -- I'm sorry.
8        Repeat which question --
9    Q.  Yeah.  Were they non --
10   A.  Which job?
11   Q.  Is it your testimony that those individuals that
12       received the battalion chief promotion were
13       probationary or nonprobationary lieutenants at
14       the time of the promotion to battalion chief?
15   A.  They were nonprobationary lieutenants when they
16       were promoted.
17   Q.  And, again, they had only been lieutenants for
18       approximately four months, correct?
19           MR. MORGAN:  Object to the form.
20   A.  They had held the job title of lieutenant for --
21       since February 1, 2006.
22   Q.  Are you familiar with how many Afro-Americans
23       or -- Let's say minorities.

Page 83

1        Are you familiar with how many minorities
2        the City of Auburn Fire Department has hired
3        since the year 2004?
4    A.  Off the top of my head, no.
5    Q.  Are you aware that they've hired any?
6    A.  I believe that they have hired student
7        firefighters that were minorities.
8    Q.  Student firefighters?
9    A.  Yes.
10   Q.  Are you aware of any full-time firemen that the
11       City has hired since 2000, minority firemen?
12   A.  Not to my knowledge.
13   Q.  And, again, I may be taxing your memory -- and
14       it's fine if you don't know the answer to this
15       question -- but since 1991, since the order was
16       entered, are you aware of how many minorities
17       the City of Auburn has hired as full-time
18       firemen?
19   A.  As regular --
20   Q.  Yes, sir.
21   A.  -- firemen?
22       No.
23   Q.  You don't know?

Page 84

1    A.  No.
2    Q.  Do you have any knowledge or information that it
3        would be more than two?
4            MR. MORGAN:  Object to the form.
5    A.  I don't know if there have been more than two
6        regular minority firefighters hired since 2000
7        or ...
8    Q.  Since 1991.
9    A.  1991.  Sorry.
10   Q.  Do you know if there's been more than four
11       minority firefighters hired since 1991?
12           MR. MORGAN:  Object to the form.
13   A.  No.
14   Q.  And how many minority firefighters are employed
15       with the City right now?  Let's say regular
16       firefighters first, full-time firemen.
17   A.  Three.
18   Q.  And that's Chris Turner, Gerald Stephens, and
19       Eddie Ogletree, correct?
20   A.  Correct.
21   Q.  And how many student firefighters are there,
22       minority student firefighters?
23   A.  Right now?

Page 85

1    Q.  Uh-huh (positive response).
2            MR. MORGAN:  How many?
3            MR. HORSLEY:  He said "right now".  He
4                hasn't answered yet.
5    A.  I think it's one or two.
6    Q.  Did Chief Langley or Lamar, either one of those
7        gentlemen, ever make the statement to you that
8        the City of Auburn needed to hire more minority
9        firefighters?
10   A.  Yes.
11   Q.  Let's start with Langley first.  When has he
12       made that statement to you?
13   A.  I can't tell you a specific time, but it's been
14       a matter of concern for quite a while that we
15       have not been able to attract and hire
16       minorities into the fire division.
17   Q.  And Lamar has said that to you as well?
18   A.  Yes.
19   Q.  It's your position that the City wants to hire
20       more minorities, but there's been no interest
21       from minorities to be firefighters with the City
22       of Auburn?
23   A.  That's not my testimony.

Page 86

1   Q.  What is your testimony?
2   A.  We have not -- For one reason or another, either
3       through not getting applications or not being
4       ranked as number one in the selection process or
5       for people -- Well, I've already said lack of
6       applications.
7           It's for those two reasons we've not been
8       able to develop a strong minority presence in
9       the fire division.
10  Q.  Are you familiar with two student firefighters
11      by the name of Jeremy Patterson and William
12      Thompkins?
13  A.  I know them.  I know their names.  I don't know
14      them.
15  Q.  Did they apply for full-time employment with the
16      City of Auburn Fire Department?
17  A.  I don't think they did.
18  Q.  So you don't know one way or the other whether
19      or not they applied with the City of Auburn for
20      full-time employment?
21  A.  One of them did not.
22  Q.  Which one?
23  A.  I want to say it was Thompkins.

Page 87

1           And what was the other?
2   Q.  Jeremy Patterson.
3   A.  I don't think Jeremy Patterson applied.
4   Q.  But Thompkins did?
5   A.  I don't recall that he did.
6   Q.  If he did, you'll agree with me he was not
7       hired, correct?
8           MR. MORGAN:  Object to the form.
9   A.  Correct.
10  Q.  Leading up to the battalion chief promotion in
11      May of 2006 when you and Langley and Lamar and
12      the public safety director were discussing that
13      promotion, do you recall any discussion about
14      whether or not the test would make it more
15      difficult for minorities to be promoted to
16      battalion chief?
17  A.  No.
18  Q.  That was not discussed, is that correct, at
19      least when you were present?
20  A.  Not that I recall.
21  Q.  Do you recall any discussion among those
22      individuals and you about whether or not the
23      test would make it more difficult for the older

Page 88

1       members of the fire department to be promoted to
2       battalion chief?
3   A.  I think there was some discussion that the way
4       the test was structured, which incorporated
5       situational judgment questions, that that would
6       help employees that had been with the
7       organization longer to exercise that knowledge
8       that they had gained based on experience and
9       familiarity with the policies, that that would
10      give -- that that would help them in the testing
11      process.
12  Q.  So your testimony is that y'all had some
13      discussions about how the test would actually
14      help the older members of the fire department;
15      is that correct?
16  A.  Actually, I think that was something that CWH
17      told us.
18  Q.  Well, my question was:  Do you recall any
19      discussions between you and those gentlemen
20      about whether or not the test requirement would
21      make it more difficult for the older members of
22      the department to receive that promotion?
23          MR. MORGAN:  Object to the form.

Page 89

1   A.  No.
2   Q.  You don't recall?
3   A.  No.
4   Q.  Do you recall the education levels of the four
5       individuals that received the battalion chief
6       promotion?
7   A.  I think I do.
8   Q.  Can you tell me?
9   A.  I think they've all got college degrees.
10  Q.  Are you aware of whether Mr. Ogletree and
11      Mr. Stephens had college degrees at the time
12      they applied for battalion chief promotion?
13  A.  I don't think that they had completed their
14      college education.
15  Q.  Had they been out of school -- formal school for
16      a much longer period than the individuals that
17      were promoted to battalion chief to your
18      knowledge?
19  A.  To my knowledge, yes.
20  Q.  Do you agree with me that someone who is closer
21      to being out of school than further away from
22      being out of school might be a better test
23      taker?

| Page 90 | Page 92 |
|---|---|

**Page 90**

1    MR. MORGAN: Object to the form.
2  Q. Standard test taker?
3    MR. MORGAN: Object to the form.
4  A. That would seem plausible.
5  Q. Will you agree with me that the individuals who
6    had been out of school for a lesser period of
7    time than the older individuals had an advantage
8    in taking the cutoff test for the battalion
9    chief promotion?
10    MR. MORGAN: Object to the form.
11  A. No.
12  Q. You would not agree with that?
13  A. No.
14  Q. Would you agree with me that someone with a
15    college education would have an advantage over
16    someone without a college education in taking
17    the cutoff score test for battalion chief
18    promotion?
19    MR. MORGAN: Object to the form.
20  A. Not based on a cutoff score.
21  Q. Well, just the test, then.
22  A. I think that they would --
23    MR. MORGAN: Object to the form.

**Page 91**

1  A. -- it's logical that somebody that has more
2    formal education is going to do better on a
3    test. And all of our employees have abundant
4    opportunities to pursue education through the
5    tuition reimbursement program, in particular,
6    through courses that we send them to for
7    training.
8    MR. MORGAN: Can we take another quick
9      break?
10    MR. HORSLEY: Yeah.
11    (Brief recess.)
12  Q. (Continuing by Mr. Horsley) We've talked about
13    the order of approving settlement agreement,
14    Plaintiff's Exhibit 3, and you've read it. Will
15    you agree with me that at least for a period of
16    time, however long that was, the City did use
17    this settlement agreement pursuant to its
18    policies and procedures with regard to hiring
19    minorities?
20    MR. MORGAN: Object to the form.
21  Q. Is that correct?
22  A. Yes. To any hiring.
23  Q. To any hiring.

**Page 92**

1    So this document was something that the City
2    had and looked at and used, correct?
3    MR. MORGAN: Object to the form.
4  A. For the promotions --
5    MR. MORGAN: Is there a special
6      provision in there on hiring?
7    MR. HORSLEY: He said it.
8  A. In regard to the promotion processes for
9    lieutenant and captain.
10    MR. MORGAN: Object to the form.
11  Q. Will you agree with me that the promotional
12    process for battalion chief in May of '06
13    consisted of the following: It consisted of a
14    cutoff test and then the exercises that were
15    implemented by CWH, and that was essentially it;
16    is that correct?
17    MR. MORGAN: Why do we keep using May
18      of '06? Didn't they take this
19      written test in April?
20  Q. Didn't the promotion occur in May? If I've used
21    May incorrectly, I stand corrected.
22  A. I don't remember the exact date.
23  Q. We're talking about the battalion chief

**Page 93**

1    promotion in '06. Okay?
2  A. Okay.
3  Q. The process, you'll agree with me, did not
4    include the consideration of seniority, correct?
5  A. Correct.
6  Q. It didn't include the consideration of time in
7    grade, correct?
8  A. Correct.
9  Q. It didn't include the consideration of work
10    experience, correct?
11    MR. MORGAN: Object to the form.
12  A. Not directly.
13  Q. It included essentially a cutoff test that was
14    the first thing you had to do in order to be
15    considered to be promoted to battalion chief,
16    correct?
17    MR. MORGAN: Object to the form.
18  A. It utilized a job-related test with a cutoff
19    score to advance further in the process.
20  Q. And you'll agree with me that that was the first
21    step in the process. And if you did not pass
22    that test, you were not allowed to progress in
23    the process regardless of seniority, regardless

67b44512-a3f5-4882-b948-707cd78b9621

Page 94

1    of work experience, regardless of time in grade,
2    correct?
3         MR. MORGAN: Object to the form.
4    Q.  Is that correct?
5         MR. MORGAN: Object to the form.
6    A.  It is correct.
7    Q.  That process -- Who developed that process to
8         your knowledge?
9    A.  The overall process?
10   Q.  Uh-huh (positive response). The process y'all
11        used for that specific promotion.
12   A.  That process was developed by CWH in
13        consultation with the City of Auburn, the
14        employees that you've listed there.
15   Q.  Do you know if that process itself, the entire
16        process, for the promotion has ever been
17        scientifically validated to not have a disparate
18        or negative impact on Afro-Americans?
19        MR. MORGAN: Object to the form.
20   A.  That particular process could not --
21        MR. MORGAN: Go ahead. I object to
22        the form. You go ahead.
23   A.  That particular process could not have been

Page 95

1    scientifically validated because it had not been
2    done. However, it used the EEOC uniform
3    guidelines and other professional standards of
4    test development such that there was assurance
5    that it had content -- that it was content
6    validated.
7    Q.  You're talking about the test itself.
8    A.  I'm talking about the test itself.
9    Q.  We're not exactly on the same page. I'm talking
10        about the entire process for the promotion of
11        battalion chief. The test was a component of
12        that. You'll agree with me, correct?
13   A.  Correct.
14   Q.  And the test may have been scientifically
15        validated by CWH, correct?
16   A.  Correct.
17   Q.  What I'm asking you is: Did the City of Auburn
18        take the entire process with the test as a
19        component of that process and have it
20        scientifically validated not to have a disparate
21        impact on Afro-Americans?
22        MR. MORGAN: Object to the form.
23   A.  Let me try to answer that in this way. CWH

Page 96

1    represents in their literature that their
2    process results in valid job-related
3    selections. That particular process could not
4    have been after the fact -- Well, any analysis
5    of it in terms of adverse impact would occur
6    after the fact so it could not have been done
7    before the fact. But following professional
8    standards of test development and CWH's
9    representation that the exercises are a neutral
10   job-related method of making selections, I would
11   say that it was scientifically validated.
12   Q.  Just so we're clear, you understand what I'm
13        saying when I say disparate impact; is that
14        correct?
15   A.  I do.
16   Q.  But you've already testified that the City made
17        the ultimate decision about having the test as
18        the first factor of the process and the cutoff
19        score, correct?
20        MR. MORGAN: Wait a minute. Here's
21        the problem. You've asked him the
22        question about the entire process,
23        and then when he answered it, you

Page 97

1    corrected him and asked him, no,
2    you're looking at the entire
3    process. He's now answered the
4    question about the entire process,
5    but now you're going back as if
6    somehow the written test is
7    supposed to be treated differently
8    in terms of the validation.
9         MR. HORSLEY: Randall, just let me ask
10        my question. I didn't tell you to
11        ask you my guys questions in a
12        certain way.
13        MR. MORGAN: I know that, but, I
14        mean --
15        MR. HORSELY: Come on.
16        MR. MORGAN: Object to the form.
17   Q.  My question is: Didn't you already testify that
18        the City made the decision about the cutoff
19        score on the test and that the test would be the
20        first step in the process and that you could not
21        go past the first step if you failed the test?
22        Did the City make that decision?
23        MR. MORGAN: Object to the form.

Deposition of Steven A. Reeves                              July 30, 2008

Page 98

1    A. Yes.
2    Q. So my question is: Has it been scientifically
3       validated by the City that that process does not
4       have a disparate impact on Afro-Americans, that
5       the test be given first, if you don't meet the
6       cutoff, you don't progress and then nothing else
7       is considered?
8          MR. MORGAN: Object to the form.
9    A. We were relying on our consultant to advise us
10      in that regard.
11   Q. And who was that?
12   A. CWH.
13   Q. Is it your testimony that CWH informed you that
14      if the test were done first without a cutoff
15      score, you could not progress past the test if
16      you failed, that had been scientifically
17      validated not to have a disparate impact on
18      Afro-Americans?
19         MR. MORGAN: Object to the form.
20   Q. Your testimony is that's what CWH told the City
21      of Auburn?
22         MR. MORGAN: Object to the form.
23   A. I'm sorry. Repeat the question.

Page 99

1    Q. I think you just testified that your consultant
2       CWH advised the City of Auburn that if you
3       conducted the test as the first factor in the
4       process with a cutoff score and that you could
5       not progress past the test if you failed it had
6       been scientifically validated to not have a
7       disparate impact on black applicants?
8          MR. MORGAN: Object to the form.
9    Q. Did they tell you that?
10         MR. MORGAN: Object to the form.
11   A. They told us that the process that they use
12      using subject matter experts to develop the
13      written test was a neutral job-related,
14      content-validated approach recognized in
15      professional standards as the appropriate way to
16      develop a test which is neutral.
17   Q. But they didn't tell you that using the test as
18      the first factor with a cutoff score was neutral
19      or did not have a disparate impact on
20      Afro-Americans, did they?
21         MR. MORGAN: Object to the form.
22   A. They did not tell us that the test would have
23      adverse impact.

Page 100

1    Q. Would not -- What I'm asking you is: Did they
2       tell you the test would not have -- the whole
3       process of using the test first with a cutoff
4       score would not have an adverse or a disparate
5       impact on Afro-Americans? Did they tell you
6       that?
7          MR. MORGAN: Object to the form.
8    A. They did not tell us that it would have adverse
9       impact.
10   Q. You're not hearing my question. Did they tell
11      you it would not have an adverse impact?
12         MR. MORGAN: Object to the form.
13   A. I guess you're using a double negative in here.
14   Q. Well, let me repeat it just so we're clear.
15         Did CWH advise the City that if you used the
16      test as the first factor in the promotional
17      process with a cutoff score beyond which you
18      could not go if you failed, that that process
19      would not have a disparate impact on
20      Afro-American applicants?
21         MR. MORGAN: Object to the form.
22   A. They did not tell us that using the test as a
23      cutoff would not have adverse impact because it

Page 101

1       was designed as a neutral test.
2    Q. That's all my question was, and you just
3       answered it. They did not tell you that,
4       correct?
5          MR. MORGAN: Object to the form.
6    Q. You answered yes.
7    A. Why would they?
8    Q. And you'll agree with me that the promotional
9       process that the City of Auburn used with the
10      test as a component of that process caused the
11      only black applicants not to receive the
12      promotion, correct?
13         MR. MORGAN: Object to the form.
14   A. They and four others. Four whites did not
15      advance beyond that level.
16   Q. And how many white applicants were there for
17      that battalion chief promotion to your
18      knowledge?
19   A. Nine.
20   Q. Nine?
21   A. No. I'm sorry. There were nine that sat for
22      it. I think there were eleven that applied.
23   Q. Is it your testimony that four white applicants

                          26 (Pages 98 to 101)

Deposition of Steven A. Reeves                    July 30, 2008

Page 102

1     did not pass the test?
2   A.  That is my testimony.
3   Q.  And seven white applicants passed the test; is
4     that correct?
5   A.  Five.
6   Q.  Five passed the test?
7   A.  (Witness nods head positively.)
8   Q.  So there were nine white applicants total. I
9     thought you said eleven.
10  A.  There were eleven white applicants. There were
11    two white applicants that opted out before the
12    test.
13  Q.  Okay. So nine whites took the test. Four of
14    them failed it, correct?
15  A.  Correct.
16  Q.  And you'll agree with me that three
17    Afro-Americans took the test and failed it,
18    correct?
19  A.  Correct.
20  Q.  The only three applicants for battalion chief --
21    The only three Afro-American battalion chief
22    applicants did not make it through the process
23    that the City developed for the battalion chief

Page 103

1     promotion, correct?
2        MR. MORGAN:  Object to the form. The
3          City didn't develop it. Object to
4          the form. I'm sorry.
5   A.  They did not make it through the test.
6   Q.  They didn't make it through the process,
7     correct?
8   A.  Correct.
9   Q.  Are you aware that the only black firemen hired
10    by the City of Auburn Fire Department since 1991
11    are Chris Turner, Gerald Stephens, Kevin Harper,
12    and Rod Torbert?
13       MR. MORGAN:  Object to the form.
14  A.  I'm aware that two of them were: Chris and
15    Gerald.
16  Q.  Do you have any information at your disposal
17    that would indicate more Afro-Americans than
18    those I just named have been hired by the fire
19    department?
20  A.  Probably.
21  Q.  You do?
22  A.  Yeah.
23  Q.  Can you tell me who they are or are you saying

Page 104

1     you could get that information?
2   A.  I'm sure we've got that information.
3   Q.  And you believe that more have been hired by the
4     City of Auburn Fire Department?
5   A.  Including in the student firefighter program,
6     yes.
7   Q.  But not including the student firefighter
8     program.
9   A.  I don't know about those last two.
10  Q.  Do you know how many white firemen have been
11    hired by the City of Auburn since 1991?
12  A.  No.
13  Q.  Do you have an estimate?
14  A.  Regular or student?
15  Q.  Regular.
16  A.  This is a very rough estimate. Probably 20.
17  Q.  Could the City provide records to us of that
18    number?
19  A.  We can try.
20       MR. MORGAN:  Well, let me -- you can
21          submit a request and we can
22          respond to it.
23  Q.  You said a rough estimate would be 20, correct?

Page 105

1   A.  A very rough estimate.
2   Q.  Could be more? Could be less?
3   A.  Yes.
4   Q.  You're referring to the student firefighters,
5     and I guess your indication is there have been a
6     number of Afro-Americans hired into the student
7     firefighter program, correct?
8   A.  Correct.
9   Q.  Are you aware of one Afro-American student
10    firefighter that's been hired by the City of
11    Auburn as a full-time firefighter since 1991?
12       MR. MORGAN:  Object to the form.
13  A.  I think one.
14  Q.  Who?
15  A.  If I'm not mistaken, Gerald was a student
16    firefighter.
17  Q.  Gerald Stephens?
18  A.  Yes.
19  Q.  Other than Mr. Stephens, who has been hired to
20    your knowledge out of the student firefighter
21    program?
22  A.  I couldn't say.
23  Q.  What does the student firefighter program do in

27  (Pages 102 to 105)

**Page 106**

1  order to attract minority applicants in the City
2  of Auburn?
3  A. Thank you for asking that question.
4  Q. Uh-huh (positive response).
5  A. The City of Auburn is very aggressive in its
6  recruitment process. We cast a very wide net
7  such that anybody that wants to know of a job
8  with the City of Auburn can easily find out
9  about that. Specifically in terms of recruiting
10  minorities to the student firefighter program,
11  we recruit through the State Employment Office,
12  through the City's Web site, through four or
13  five traditionally black colleges, through a
14  dozen or so black churches, through -- At one
15  time we sent literature to every high school in
16  the state informing them about the student
17  program. More recently we've sent literature --
18  contacted every high school within a 50 to 60
19  mile range. We have participated in career days
20  at those high schools. Much of this has been an
21  effort to reach out to minorities and let them
22  know of our programs so that we can get them
23  into the student program. And ultimately

**Page 107**

1  because our student program does act as a feeder
2  into our career program because of the education
3  and the experience that the student firefighters
4  have, they become -- they are very competitive
5  with outside applicants for career firefighter
6  positions and so we try to get them into the
7  student program so they'll be successful when
8  they apply for the career positions. So we cast
9  a very wide net, and we've been very aggressive
10  with that.
11  Q. And, again, other than Gerald Stephens, you're
12  not aware of any student fire -- minority
13  student firefighter hired full-time by the City
14  of Auburn since 1990, correct?
15  A. That's correct.
16  Q. Do you know who drafted Plaintiff's Exhibits 7
17  and 8, who authored those exhibits?
18  A. Yes.
19  Q. Who?
20  A. Me. It was also reviewed by -- After I drafted
21  them, it was reviewed by the city attorney, and
22  I suspect that public safety employees were also
23  involved in that review. But I drafted it.

**Page 108**

1  Q. Do you agree with me that if the battalion chief
2  test with a cutoff score had not been used --
3  specifically with a cutoff score had not been
4  used as a part of the battalion chief promotion
5  that Gerald Stephens and Eddie Ogletree would
6  have had a better opportunity to receive the
7  battalion chief promotion?
8  MR. MORGAN: Object to the form.
9  A. I don't know that.
10  Q. Are you aware or have you been told by any chief
11  or any other employee with the City of Auburn
12  that there were other factors in that
13  promotional process that they thought would have
14  hindered Mr. Ogletree or Mr. Stephens pursuant
15  to that promotion?
16  MR. MORGAN: Object to the form.
17  A. No.
18  Q. And just so I'm clear -- and I'm going to take a
19  little break, and I may be through -- your
20  position and the City of Auburn's position back
21  in February of '06 and until today is that the
22  1991 order in the Hammock case is no longer in
23  effect and was not in effect back in 2006,

**Page 109**

1  correct?
2  MR. MORGAN: Object to the form. Go
3  ahead.
4  A. I would say that's true in regard to utilization
5  of the selection procedure for lieutenant.
6  Q. What about captain?
7  MR. MORGAN: Object to the form.
8  Q. Let me ask you this. Isn't it true that the
9  title change from captain to shift commander --
10  Is that right?
11  A. Yes.
12  Q. -- relieved the City of any requirements
13  pursuant to this order with regard to the
14  captain promotion?
15  MR. MORGAN: Object to the form.
16  A. I don't think the City looked at it that way.
17  Q. Well --
18  A. I think the City saw that as just a title
19  change, and they were still abiding by this
20  agreement.
21  Q. Still abiding by this agreement when? At what
22  time?
23  A. When shift commander became a job title used in

| Page 110 | Page 112 |
|---|---|
| 1 the fire division. | 1 the form. |
| 2 Q. And that was in the early to mid-'90s, correct? | 2 MR. HORSLEY: This is how I have the |
| 3 A. Somewhere in there. | 3 documents in my file. I may be |
| 4 MR. HORSLEY: Let's take a little | 4 wrong. |
| 5 break. | 5 MR. MORGAN: All right. I'm going to |
| 6 (Brief recess.) | 6 object to the form. |
| 7 MR. HORSLEY: On the record we need to | 7 MR. HORSLEY: That's fine. |
| 8 state we are missing Exhibit 6. | 8 Q. Have you seen all these documents previously? |
| 9 There was no document marked as | 9 A. I think so. |
| 10 Exhibit 6. | 10 Q. My question is: Before the determinations were |
| 11 Q. I'm going to get you to identify several | 11 sent to the City of Auburn, did you participate |
| 12 things. | 12 in the City of Auburn's response to the EEOC |
| 13 (Brief off-the-record discussion.) | 13 claims made by Stephens and Ogletree? |
| 14 MR. HORSLEY: I will mark what I'm | 14 A. I did. |
| 15 about to offer as Exhibit 6. | 15 Q. And did you do that with Mr. Umbach? |
| 16 (Plaintiff's Exhibit 6 marked for | 16 A. I did. |
| 17 identification.) | 17 Q. Did anybody else with the City to your knowledge |
| 18 Q. This is a document that was produced to us in | 18 participate in the City's response to those |
| 19 the initial disclosures in this case. Can you | 19 charges? |
| 20 simply identify that for me? | 20 A. Yeah. I believe others at this table |
| 21 (Brief off-the-record discussion.) | 21 participated in that and others that are not at |
| 22 Q. Can you identify it for me? | 22 this table, including CWH. |
| 23 A. This is entitled City of Auburn Pay Table | 23 Q. Who actually drafted the responses? |

| Page 111 | Page 113 |
|---|---|
| 1 Beginning October 1, 2005. | 1 A. I think it was -- it came out of our city |
| 2 Q. And -- | 2 attorney's office. I don't know who drafted it. |
| 3 A. And at the bottom it says: Pay table FY 2006. | 3 Q. Around Umbach? |
| 4 Q. Is that -- What does that mean? | 4 A. It came from his office. |
| 5 A. That means that that was the pay table for the | 5 (Plaintiff's Exhibit 12 marked for |
| 6 classified employees of the City of Auburn in | 6 identification.) |
| 7 effect for fiscal year 2006, which began October | 7 Q. What I have marked as 12 are your response to |
| 8 1, 2005. | 8 our interrogatories. |
| 9 (Plaintiff's Exhibits 10 & 11 marked | 9 MR. HORSELY: And, Randall, you may |
| 10 for identification.) | 10 have sent them to me and I haven't |
| 11 Q. Let me show you what I've marked as Plaintiff's | 11 seen them in my mass of |
| 12 Exhibits 10 and 11, which are Notice of Right to | 12 documents. But I don't think I |
| 13 Sue letters and determinations issued by the | 13 have a signed copy yet. |
| 14 U.S. Equal Employment Opportunity Commission | 14 MR. MORGAN: Okay. I'll check on |
| 15 which I believe were both sent to the City of | 15 that. |
| 16 Auburn. And I'll just ask you if you've ever | 16 MR. HORSLEY: If you've already sent |
| 17 seen both of those documents. | 17 them, just tell me and I'll try to |
| 18 MR. MORGAN: I see what they are, but | 18 find them. But I assume nothing |
| 19 are you representing that the | 19 has changed. |
| 20 determination went with the right | 20 Q. Can you identify Plaintiff's Exhibit 12? |
| 21 to sue letter? | 21 (Brief off-the-record discussion.) |
| 22 MR. HORSLEY: I believe it did. | 22 A. You asked me to identify this document: Stephen |
| 23 MR. MORGAN: I'm going to object to | 23 A. Reeves' Responses to Plaintiff's First Set of |

Page 114

1    Interrogatories.
2    Q.  Is that an accurate copy of your responses to my
3        interrogatories as best you can tell?
4    A.  As best I can tell.
5    Q.  Have you ever read those before today?
6    A.  I think I did.
7    Q.  Do you recall signing them and getting your
8        signature notarized?  It's not on that document,
9        but do you know if you've done that yet?
10   A.  I don't recall notary -- What I do recall is
11       that the City developed responses.  That's what
12       stands out in my mind more so than this
13       document.
14   Q.  But those are your individual responses.  At
15       some point you're going to have to sign
16       responses, and what I'm trying to get at is:
17       Are those going to be the responses that you
18       sign or is there going to be something that's
19       changed or different before you sign them or do
20       you know?
21   A.  I don't know, but I have no reason to believe
22       that I would make any changes.
23   Q.  As far as you know, these are your responses to

Page 115

1    the interrogatories that -- these are going to
2    be your sworn responses to my interrogatories?
3    A.  As far as I know.
4    Q.  Are you aware that Lieutenant Stephens requested
5        of Langley to have his lieutenant's title
6        changed to that of captain at some point?
7    A.  I'm not aware of that.
8    Q.  So you're not aware that that request was
9        denied?
10   A.  I've never heard that.
11          MR. HORSLEY:  That's all I have.
12          Thank you.
13          MR. HANCOCK:  I've got just a couple
14          of questions.  I'll go ahead and
15          knock them out.
16          EXAMINATION
17   BY MR. HANCOCK:
18   Q.  Mr. Reeves, the City of Auburn does not contend
19       that CWH's batching test had a disparate impact
20       on test takers, does it?
21   A.  Not being a statistician, I don't think you can
22       establish disparate impact with such a small
23       population.

Page 116

1    Q.  I'm not asking about the statistical
2        significance of the pool of test takers.  I'm
3        asking whether Auburn takes the position that
4        the test itself had a disparate impact on those
5        who took the test.
6    A.  We take the position that it didn't.
7    Q.  Do you recall that CWH recommended that no
8        cutoff score be applied, that the City not use a
9        cutoff score of any number?
10   A.  I don't recall -- There was a lot of discussion
11       about cutoff score.  In fact, in the literature
12       from CWH, it says some tests use a cutoff
13       score.  We discussed that quite extensively with
14       CWH.  We partnered with them through this
15       process, and there was a lot of back-and-forth
16       discussion.  And ultimately the decision was we
17       would use a cutoff score as part of the
18       process -- the overall process.
19   Q.  I understand that was the City's ultimate
20       decision.  My question is:  Do you recall that
21       CWH recommended that a cutoff score not be
22       used?  Let me ask it maybe a different way.
23          Do you recall that CWH recommended that all

Page 117

1    applicants be allowed to proceed through the
2    assessment center notwithstanding their test
3    score?
4    A.  At one time they actually recommended that only
5        the top twelve finishers go through.
6    Q.  That ultimately was not the City's decision,
7        though, right?
8    A.  No.  Ultimately the City's decision was that
9        anybody that passed the 70 percent threshold
10       would move forward in the process.
11   Q.  And it was the City's decision not to allow
12       those who didn't score 70 or higher on the test
13       to proceed to the assessment center; is that
14       correct?
15   A.  As I've said before, that was the decision made
16       collectively with CWH as our consultant.
17   Q.  CWH was the consultant, but it had no decisional
18       authority in the decision, did it?
19          MR. MORGAN:  Object to the form.
20   A.  Ultimately, if you want to say who had the final
21       authority on a cutoff score, it would have been
22       the City of Auburn.
23   Q.  CWH couldn't make any decision at all.  All it

Page 118

1  could do is offer advice; is that correct?
2          MR. MORGAN: Object to the form.
3  A.  Correct.
4  Q.  If CWH were to take the position that it
5      recommended that all applicants be allowed to
6      proceed to the assessment center regardless of
7      score and that the test score be but one
8      component of the ultimate decision, would you
9      dispute that contention?
10         MR. MORGAN: Object to the form.
11 A.  Yes.
12 Q.  Why?
13 A.  Part of the discussion included CWH, Michael
14     Blair, expressing the opinion that somebody that
15     did poorly on the test would find the assessment
16     center process demoralizing or humiliating.
17 Q.  I'm not sure that answers my question, though.
18 A.  Would you ask the question again, please?
19         MR. HANCOCK: Would you read it back
20             to him, please?
21         (The immediately preceding question
22             was read back by the court
23             reporter.)

Page 119

1  A.  I can only say that there was a lot of
2      back-and-forth discussion, and I don't know if
3      they actually said that we should not have a
4      cutoff score and that everyone should
5      participate.
6  Q.  So Auburn's position is that there was
7      discussion back and forth, but it couldn't
8      dispute the assertion by CWH that CWH
9      recommended that all applicants be allowed to
10     proceed through the assessment center
11     notwithstanding their test score?
12         MR. MORGAN: Object to the form of the
13             question.
14 A.  My position is that we partnered with CWH to
15     guide us through a process, and we listened very
16     carefully to their recommendations.  There was a
17     lot of discussion about whether or not to use a
18     cutoff score.  And ultimately, in conjunction
19     with CWH, a cutoff score was determined.
20     Whether or not CWH advised us flat-out not to
21     use a cutoff score, I don't recall that.
22 Q.  You don't recall one way or the other?
23 A.  I don't recall that they flat-out said don't use

Page 120

1  a cutoff score.
2  Q.  Do you remember them urging the City not to use
3      a cutoff score?
4          MR. MORGAN: Object to the form.
5  Q.  Pardon me.  Do you recall that CWH recommended
6      that Auburn not use a cutoff score?
7  A.  I don't recall that.  Again, there was a lot of
8      conversation back and forth, and we talked about
9      letting the score stand as it was and being a
10     part of the final score as it was -- ultimately
11     the test was a part of the final score at the
12     end of the process or to -- or not to have a
13     cutoff score.  I just -- There was a lot of
14     discussion about that, and ultimately we decided
15     that in the tradition of the fire service and in
16     being consistent with other testing processes
17     that the City had done that the cutoff score was
18     an appropriate thing for us to use on the
19     written test.
20 Q.  It was Lee Lamar who first suggested a 70 cutoff
21     score, wasn't it?
22 A.  I can't say he was the first one to say that.
23     Again, that's something in the CWH literature.

Page 121

1  Q.  Well, CWH never recommended that the City use a
2      cutoff score of 70, did it?
3  A.  Actually, in the assessment -- in the exercises
4      portion of the whole process, they did.
5  Q.  I'm talking about the test.
6  A.  I don't know that they said one way or the
7      other.  I mean, I couldn't say that they said 70
8      percent.
9  Q.  Is it Auburn's position that CWH ever recommend
10     that a cutoff score be used with regard to the
11     test -- the written test?
12         MR. MORGAN: Object to the form.
13 A.  They told us that some clients use a cutoff
14     score and some clients don't.  I'm sorry I'm not
15     answering the question.
16 Q.  Right.  Because in point of fact, CWH never
17     recommended that the City of Auburn use a cutoff
18     score.
19         MR. MORGAN: Object to the form.
20             Asked and answered.
21 A.  I don't think they -- Through those discussions
22     they didn't say it was wrong to do so.
23 Q.  But they never said it was right and appropriate

Deposition of Steven A. Reeves                    July 30, 2008

<table>
<tr><td>

**Page 122**

1  to. They said some clients use a cutoff and
2  others don't?
3      MR. MORGAN: Object to the form.
4  A. And what would we take from that?
5  Q. Well, ultimately it was the City of Auburn and
6  not CWH that decided to use a cutoff score; is
7  that correct?
8  A. Yes.
9  Q. And it was the City of Auburn and not CWH that
10 decided that the cutoff score would be 70; is
11 that correct?
12     MR. MORGAN: Object to the form.
13 A. Yes.
14 Q. And it's the City's position that the
15 utilization of the written test with a cutoff
16 score of 70 did not have an adverse impact on
17 applicants or test takers; is that correct?
18 A. Correct.
19     MR. HANCOCK: I don't have anything
20     else.
21     MR. HORSLEY: One other question.
22         EXAMINATION
23 BY MR. HORSLEY:

</td><td>

**Page 124**

1  A. That's my recollection.
2  Q. And who to your knowledge applied for that
3  promotion?
4  A. I don't remember. I think I want to say David
5  Hines was the one that was promoted from that
6  process, but I don't remember who all applied
7  for it.
8  Q. Do you recall what African-Americans, if any,
9  applied for that promotion?
10 A. I think Chris Turner applied for that.
11 Q. Did he take the test?
12 A. I think he did.
13 Q. Did he pass it?
14 A. He did not.
15 Q. What was the cutoff score on that test?
16 A. I recall that it was 70 percent.
17 Q. Who decided to have a test with a cutoff score
18 of 70 on that occasion?
19 A. I don't know. Maybe I should say I don't
20 recall.
21 Q. Was the battalion chief promotion the first time
22 that the City had ever implemented a test with a
23 cutoff score for any position -- for promotion

</td></tr>
<tr><td>

**Page 123**

1  Q. The battalion chief promotion in 2006 was the
2  first time the City had ever implemented a test
3  with a cutoff score for a promotion; is that
4  correct?
5      MR. MORGAN: Object to the form.
6  A. Not correct.
7  Q. When was it done before?
8  A. It was used for team leader in 2005.
9  Q. Team leader in 2005.
10     And who was the company that implemented or
11 did the test?
12 A. We utilized a test that was developed by the
13 International Public Management Association.
14 Q. And that was for promotions to team leader?
15 A. To company officer, parenthesis, lieutenant, or
16 maybe it's the other way around. It's the
17 company officer level position.
18 Q. And that was in 2005?
19 A. That's correct.
20 Q. And it's your testimony that the City used a
21 test with a cutoff score as their first factor
22 in that promotional process; if you didn't meet
23 the cutoff score, you did not go forward?

</td><td>

**Page 125**

1  to any position above team leader?
2      MR. MORGAN: Object to the form.
3  A. Are you asking if we had ever used a test with a
4  cutoff score for the battalion level job?
5  Q. Yes.
6  A. No.
7  Q. Okay.
8  A. Not to my knowledge.
9  Q. Is it Chief Lamar now?
10 A. Yes.
11 Q. Was Chief Lamar required to take a test with a
12 cutoff score in order to be promoted to chief?
13 A. No.
14 Q. Was that a position that people could apply for?
15 A. The city manager made an appointment to the
16 unclassified service. The fire chief, the
17 police chief, the department heads are in the
18 unclassified service. They are not covered by
19 the personnel policies of the City of Auburn.
20 They serve strictly at the will of the city
21 manager. He was appointed to that position.
22 Q. What about -- What was his job before he was
23 deputy chief?

</td></tr>
</table>

67b44512-a3f5-4882-b948-707cd78b9621

## Page 126

1  A.  Before he was deputy chief, he was team leader.

2  Q.  He was a team leader?

3  A.  I'm sorry.  He was the training officer.

4  Q.  Training officer.  And he was promoted from

5      training officer to deputy chief; is that

6      correct?

7  A.  Correct.

8  Q.  Did that promotion require an assessment center?

9  A.  No, not that I recall.

10 Q.  Was he required to take any type of test?

11 A.  I think there were interviews.

12 Q.  Do you recall who else interviewed for that

13     position?

14 A.  I don't.

15 Q.  Will you agree with me that Chief Lamar was

16     promoted to chief based on experience and

17     seniority?

18        MR. MORGAN:  Object to the form.

19 A.  No.

20 Q.  You would not?

21 A.  No.

22 Q.  What were the circumstances of that promotion?

23        MR. MORGAN:  Object to the form.

## Page 127

1  A.  It wasn't my decision.

2  Q.  Do you know why he was promoted to that

3      position?

4  A.  I assume because he was doing a good job as

5      acting chief.

6  Q.  His experience and his job history with the City

7      of Auburn allowed for him to get that

8      promotion.  Would you agree with that?

9         MR. MORGAN:  Object to the form.

10        He's asked and answered.

11 A.  The skill set -- From an HR perspective, the

12     skill set that Lee Lamar brought to the table

13     combined with education and his experience as a

14     fire officer enabled him to succeed as the

15     acting chief.  And I would presume -- I'm not

16     speaking for my city manager, but I'm assuming

17     my city manager took that into consideration

18     when he made the appointment.

19        MR. HORSLEY:  That's all.  Thank

20        you.

21     (Deposition concluded at

22     approximately 12:30 p.m.)

23        * * * * * * * * * * * *

## Page 128

1  FURTHER DEPONENT SAITH NOT
   * * * * * * * * * * * * *

2

3  REPORTER'S CERTIFICATE

   STATE OF ALABAMA:

4

   MONTGOMERY COUNTY:

5

6      I, Pamela A. Wilbanks, CCR, Registered

7  Professional Reporter, and Commissioner for the State

8  of Alabama at Large, do hereby certify that I reported

9  the deposition of:

10        STEVEN A. REEVES

11 who was first duly sworn by me to speak the truth, the

12 whole truth and nothing but the truth, in the matter

13 of:

14     EDDIE OGLETREE, an individual,

15     GERALD STEPHENS, an

16     individual,

       Plaintiffs,

17

       Vs.

18

19     CITY OF AUBURN, a municipality

20 in the State of Alabama, LARRY

21 LANGLEY, and individual, LEE LAMAR,

22 an individual, BILL HAM, JR., an

23

## Page 129

1  individual, BILL JAMES, an

2  individual, CHARLES M. DUGGAN, an

3  individual, and CORTEZ LAWRENCE,

4  an individual,

5     Defendants.

6  In The U.S. District Court

7  For the Middle District of Alabama

8  Eastern Division

9  3:07-CV-867-WKW

10 on Wednesday, July 30, 2008.

11     The foregoing 128 computer printed pages

12 contain a true and correct transcript of the

13 examination of said witness by counsel for the parties

14 set out herein.  The reading and signing of same is

15 hereby not waived.

16     I further certify that I am neither of kin nor

17 of counsel to the parties to said cause nor in any

18 manner interested in the results thereof.

19     This 5th day of August 2008.

20

21

22

23

Deposition of Steven A. Reeves                    July 30, 2008

Page 130

1
2
3
4
5
            _____
            Pamela A. Wilbanks, ACCR #334
6           Expiration Date:  9-30-2008
            Registered Professional Reporter
7           and Commissioner for the State
            of Alabama at Large
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

I, Steven A. Reeves, hereby certify that I have read the foregoing transcript of my deposition given on Wednesday, July 30, 2008, and it is a true and correct transcript of the testimony given by me at the time and place stated with the corrections, if any, and the reasons therefor noted on a separate sheet of paper and attached hereto.


            _____
            Steven A. Reeves


     SWORN TO AND SUBSCRIBED before me this _____
day of _____, 20__.

            _____
            NOTARY PUBLIC


8/5/08
Mr. Steven A. Reeves
1071 Terrace Acres Drive
Auburn, AL  36830
IN RE:  OGLETREE AND STEPHENS VS. CITY OF AUBURN, ETC.
Dear Mr. Reeves:
Enclosed is a condensed copy of the transcript of your deposition taken on Wednesday, July 30, 2008.  Please read the transcript and make any corrections on the correction sheet provided specifying the page and line number of each correction.

You will find the original signature page attached to the front of the transcript.  Even if there are no corrections, please sign the original signature page and have your signature notarized.

Please return the signature page and correction sheet within thirty days.  The list of corrections will be attached to the original deposition and all parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

Pamela A. Wilbanks, CCR, ACCR#391, RPR

cc:  Mr. Richard Horsley
     Mr. Randall Morgan
     Mr. William Hancock

67b44512-a3f5-4882-b948-707cd78b9621

# DEPOSITION OF WILLIAM HOWARD JAMES

## July 30, 2008

## Pages 1 through 39

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

EDDIE OGLETREE, an individual,
GERALD STEPHENS, an
individual,

        Plaintiffs,

Vs.                                    CIVIL ACTION NO.
                                       3:07-CV-867-WKW

CITY OF AUBURN, a municipality
in the State of Alabama, LARRY
LANGLEY, an individual, LEE LAMAR,
an individual, BILL HAM, JR., an
individual, STEVEN A. REEVES, an
individual, BILL JAMES, an
individual, CHARLES M. DUGGAN, an
individual, and CORTEZ LAWRENCE,
an individual,

        Defendants.

* * * * * * * * * *

DEPOSITION OF WILLIAM HOWARD JAMES, taken

pursuant to stipulation and agreement before Pamela A.

Wilbanks, Certified Court Reporter, ACCR# 391,

Registered Professional Reporter and Commissioner for

the State of Alabama at Large, in the Conference Room

of Auburn City Hall, 144 Tichenor Avenue, Auburn,

Alabama, on Wednesday, July 30, 2008, commencing at

approximately 1:20 p.m.

| Page 2 | Page 4 |
|---|---|

**Page 2**

```
 1
 2        APPEARANCES
 3
 4   FOR THE PLAINTIFF:
 5   Mr. Richard F. Horsley
     KING, HORSLEY & LYONS
 6   Attorneys at Law
     1 Metroplex Drive
 7   Suite 280
     Birmingham, AL 35209
 8
     FOR THE DEFENDANT:
 9
     Mr. Randall Morgan
10   HILL, HILL, CARTER, FRANCO, COLE & BLACK
     Attorneys at Law
11   425 South Perry Street
     Montgomery, Alabama
12
     ALSO PRESENT:
13
     Mr. D'Arcy Wernette
14   Mr. Steven Reeves
     Mr. Larry Langley
15   Mr. Lee Lamar
     Mr. Eddie Ogletree
16   Mr. Gerald Stephens
17
         * * * * * * * * * * * *
18
         EXAMINATION INDEX
19
     BY MR. HORSLEY . . . . . . . . . . .   4
20
         * * * * * * * * * * * *
21
22
23
```

**Page 4**

```
 1   signature of the witness to this deposition is hereby
 2   not waived.
 3            * * * * * * * * * * * *
 4           WILLIAM HOWARD JAMES
 5        The witness, after having first been duly
 6   sworn to speak the truth, the whole truth and nothing
 7   but the truth testified as follows:
 8           EXAMINATION
 9   BY MR. HORSLEY:
10   Q.  Please tell us your full name.
11   A.  William Howard James.
12   Q.  And do you go by Bill James?
13   A.  Yes.
14   Q.  My name is Richard Horsley.  I'm going to ask
15       you some questions.  Just like with Mr. Reeves,
16       if you don't understand something or want me to
17       rephrase it, just tell me and I will do so.
18       Once you answer a question, I'm going to assume
19       you understood it and are giving the answer you
20       intended to give.  Okay?
21   A.  Okay.
22   Q.  Where do you currently reside?
23   A.  8371 Lee Road 188, Waverly.
```

| Page 3 | Page 5 |
|---|---|

**Page 3**

```
 1           STIPULATION
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of WILLIAM HOWARD JAMES is taken pursuant to
 5   the Alabama Rules of Civil Procedure and that said
 6   deposition may be taken before Pamela A. Wilbanks,
 7   Registered Professional Reporter and Commissioner for
 8   the State of Alabama at Large, without the formality of
 9   a commission, that objections to questions other than
10   objections as to the form of the question need not be
11   made at this time but may be reserved for a ruling at
12   such time as the said deposition may be offered in
13   evidence or used for any other purpose by either party
14   provided for by the Statute.
15        It is further stipulated and agreed by and
16   between counsel representing the parties in this case
17   that the filing of said deposition is hereby waived and
18   may be introduced at the trial of this case or used in
19   any other manner by either party hereto provided for by
20   the Statute regardless of the waiving of the filing of
21   the same.
22        It is further stipulated and agreed by and
23
```

**Page 5**

```
 1   Q.  What's the ZIP Code out there?
 2   A.  36879.
 3   Q.  Where are you currently employed?
 4   A.  City of Auburn.
 5   Q.  In what capacity with the City?
 6   A.  Public safety director.
 7   Q.  How long have you held that job?
 8   A.  October of 2004.
 9   Q.  Generally tell me what you do as a public safety
10       director for the City of Auburn.
11   A.  Provide administrative direction for the
12       divisions in public safety, budgets, contract,
13       personnel.
14   Q.  What was your job immediately before that?
15   A.  I was a building official with the City of
16       Auburn.
17   Q.  The building official?
18   A.  Uh-huh (positive response).
19   Q.  How long did you hold that job?
20   A.  Fifteen years, sixteen years.
21   Q.  Where were you immediately before that?
22   A.  I worked with the economic development
23       department for a year --
```

Page 6

1   Q. City of Auburn?
2   A. -- with the City of Auburn prior to that.
3   Q. Before that where were you employed?
4   A. I worked for Castle and Algernon Blair, a
5       contracting company out of Montgomery.
6   Q. What kind of contracting?
7   A. They did building contracting.
8   Q. Do you recall where you worked before that?
9   A. Self-employed in Tennessee.
10  Q. What did you do in Tennessee?
11  A. Built a few houses.
12  Q. Did you have a company name or ...
13  A. Worked with my brother-in-law.
14  Q. Was there a name of the company?
15  A. Blue Ridge Construction or Blue -- Blue Ridge
16      maybe.
17  Q. Do you have relatives that reside in Lee County?
18  A. Yes.
19  Q. Can you tell me who they are, or if it's a lot
20      of them --
21  A. I've got in-laws and three brothers and sisters
22      and such.
23  Q. Just provide a list of your -- what I want -- I

Page 7

1       don't want to spend a bunch of time going
2       through them, but what I need to know is
3       relatives in Lee County, Macon County, Lowndes
4       County, Russell County, Montgomery County. I
5       think that's it.
6   A. Okay.
7   Q. Macon. Did I say Macon?
8       Randall knows which counties they are.
9   A. Okay.
10  Q. You said that your job -- one of the elements of
11      your job was dealing with personnel; is that
12      correct?
13  A. Yes, sir.
14  Q. What aspects of personnel decisions are you
15      involved in?
16  A. Review personnel actions, whether it be
17      performance appraisals, corrective actions,
18      things of that nature.
19  Q. Did you participate in any way in the battalion
20      chief promotions back in 2006?
21  A. I did.
22  Q. What participation did you have in those
23      promotions?

Page 8

1   A. I was -- participated with the others that have
2       been mentioned here today discussing what we
3       were going to do for the promotion process.
4   Q. And I think you were a part of the group that
5       Mr. Reeves named that decided how that promotion
6       would take place; is that correct?
7   A. Yes. I had input, yes.
8   Q. And do you agree with him that that group of
9       people decided to hire CWH to conduct the cutoff
10      test?
11  A. Yes. Well, to hire CWH, yes.
12  Q. And the people that he named, were those the
13      people that you remember being involved in that
14      decision?
15  A. In the hiring of the company?
16  Q. Yes.
17  A. Yes.
18  Q. He also spoke about decisions or meetings that
19      were had after CWH was hired. What I want to
20      know is: Do you recall being in those meetings
21      when discussions were held with CWH about the
22      cutoff test and the assessment center?
23          MR. MORGAN: Object to the form.

Page 9

1   A. Yes.
2   Q. Is your memory that the City of Auburn was
3       attempting to comply with the 1991 court order
4       that we've talked about earlier during that
5       promotion or was that not a consideration?
6   A. I don't recall that personally being a
7       consideration.
8   Q. You don't recall specifically the order being
9       something the City felt like it had to comply
10      with pursuant to those promotions?
11          MR. MORGAN: Object to the form.
12  A. Right.
13  Q. Is that right?
14  A. Yes.
15  Q. And are you familiar with that order? Have you
16      read it?
17  A. Not recently, but I have read it.
18  Q. Can you tell me why the City did not believe at
19      that time that it was -- that it had to comply
20      with the 1991 order?
21          MR. MORGAN: Object to the form.
22  A. I'm not sure I understand the question. In
23      reference to what?

## Page 10

1  Q.  You said you didn't feel like the 1991 order was
2      a consideration in y'all's decision-making
3      process for the battalion chief promotion in
4      2006.
5          MR. MORGAN: Object to the form.
6  Q.  Is that correct?
7  A.  Whether we had to do an assessment center?
8  Q.  Whether you had to comply with the order.
9          MR. MORGAN: Object to the form.
10 A.  I guess -- I'm sorry. I don't understand.
11 Q.  Let me ask it again.
12     When y'all were talking about the promotion
13     to battalion chief and decided how that
14     promotion was going to take place, when y'all
15     were having these meetings, before and when you
16     joined up with CWH, what I want to know is: Is
17     it your memory that the City felt as though it
18     was obligated to comply with the 1991 order
19     pursuant to those promotions?
20         MR. MORGAN: Object to the form.
21 A.  Whether it was obligated to follow that?
22 Q.  Uh-huh (positive response).
23 A.  No.

## Page 11

1  Q.  The City did not believe it was, correct?
2          MR. MORGAN: Object to the form.
3  A.  That we had to comply with the order?
4  Q.  The City did not believe it had to comply with
5      the order?
6          MR. MORGAN: Object to the form.
7  A.  No, I don't want to say that. No.
8  Q.  We're not connecting.
9      Are you saying that it's your memory the
10     City did not believe it had to comply with the
11     1991 order pursuant to the 2006 battalion chief
12     promotions?
13         MR. MORGAN: Object to the form.
14 A.  I'm sorry.
15 Q.  That's okay.
16     Did you or did you not have to comply with
17     the order?
18         MR. MORGAN: I'm going to object to
19         the form.
20 A.  I don't think that was the only reason we went
21     to an assessment center was because the order
22     said that you had to use an assessment center
23     for a promotional process.

## Page 12

1  Q.  You're saying y'all weren't doing an assessment
2      center because the order said you had to do it?
3          MR. MORGAN: Object to the form.
4  A.  Not in my understanding.
5  Q.  Again, was it your understanding that the City
6      had to comply with the 1991 order for the
7      battalion chief promotion in 2006?
8          MR. MORGAN: Object to the form.
9  A.  I'm not sure what the position was from the
10     City's standpoint of whether we had to comply
11     with the '91 order.
12 Q.  You don't know one way or the other; is that
13     correct?
14 A.  Yes. I don't have that knowledge.
15 Q.  Did you ever have any meetings about the 1991
16     order and whether or not it was still in force
17     with the city attorney, Arnold Umbach?
18 A.  No. I don't recall having any meetings with
19     Attorney Umbach.
20 Q.  Do you recall the 1991 order being the subject
21     of any discussions that y'all had when you were
22     deciding about the battalion chief promotion
23     maybe from Steve Reeves?

## Page 13

1  A.  There may have been some discussion about there
2      is this order and it has -- I believe in
3      captains -- assessment centers. There may have
4      been some discussions on that, yes.
5  Q.  From your standpoint am I correct in saying that
6      the City did not attempt to comply with the 1991
7      order pursuant to the battalion chief promotions
8      in 2006?
9          MR. MORGAN: Object to the form.
10 A.  I wouldn't say we attempted to comply, no.
11 Q.  You wouldn't say you -- Say that again. I
12     wasn't sure what your answer was, if you don't
13     mind.
14     Did the City attempt to comply with the
15     1991 order for the 2006 battalion chief
16     promotions?
17         MR. MORGAN: Object to the form.
18 A.  Yeah. Yes, we attempted to comply with it.
19 Q.  You did? And how did you do that?
20 A.  If you assume that we had to do an assessment
21     center for this promotion, then I guess we
22     complied with the order.
23 Q.  In Section 12 of the order, which we've marked

Page 14

1  as Plaintiff's Exhibit 3 -- I'll show it to
2  you -- if you would read the section for me,
3  Section 12. I've highlighted it. I apologize
4  for that.
5  A.  (Witness complies.)
6  Q.  Section 12, which is the section that deals with
7      the assessment center and promotions, did you
8      see anywhere in that section any reference to a
9      test with a cutoff score?
10          MR. MORGAN:  Object to the form.
11  A.  No, sir.
12  Q.  Is it your understanding that this order
13      requires an assessment center or an assessment
14      center that has a test with a cutoff score?
15          MR. MORGAN:  Object to the form.
16  A.  Well, I think I have an understanding of what an
17      assessment center is.
18  Q.  Okay.
19  A.  And --
20  Q.  You'll agree with me that Section 12 does not --
21          MR. MORGAN:  Let him answer the
22              question.
23  Q.  I'm sorry.

Page 15

1  A.  I think I have an understanding of what an
2      assessment center is, and there are various
3      components in an assessment center.
4  Q.  You'll agree with me that this document does not
5      reference in any way a cutoff score either as a
6      prerequisite or as a component of the assessment
7      center that's been approved by this court; is
8      that correct?
9          MR. MORGAN:  Object to the form.
10  A.  That's right.
11  Q.  In fact, an assessment center and a test with a
12      cutoff score or any tests are two separate
13      entities; is that correct?
14          MR. MORGAN:  Object to the form.
15  A.  I don't know that I would agree with that.
16  Q.  You would not agree with that?
17      What we've marked earlier as Plaintiff's
18      Exhibit 2, which is the Auburn Fire Division
19      Orientation Manual, Promotional Written Test and
20      Assessment Center Process, have you seen this
21      document?
22  A.  Yes.
23  Q.  Have you looked at it and read it and understand

Page 16

1  it?
2  A.  I remember looking at this document back when we
3      started the process.
4  Q.  Will you agree with me that as described in that
5      document, the test and the assessment center are
6      two completely separate things?
7          MR. MORGAN:  Object to the form.
8  A.  I would have to read back through here and see
9      how it's spelled out in this document here.
10  Q.  There's a section on page 9 that describes an
11      assessment center.
12  A.  Okay.
13  Q.  And if you don't mind, I'll read it into the
14      record and ask if that's what you understand an
15      assessment center to be.
16      An assessment center is an integrated
17  system of simulations designed to elicit
18  behavior similar to that required for success in
19  a target job. More simply, it is a series of
20  activities that are similar to those performed
21  in a given job. Each activity mirrors a
22  different aspect of the job. Performance in
23  these activities is observed by assessors who

Page 17

1  are trained to be fair and objective. The panel
2  of objective assessors will be selected from
3  departments similar to yours based upon their
4  expertise and knowledge regarding the target
5  job. The assessors will observe you performing
6  a series of exercises in order to evaluate
7  several job performance dimensions deemed
8  important to performing successfully on the
9  job. Assessors compare candidates' performance
10  to predetermined performance guidelines to
11  ascertain who will perform effectively on the
12  job.
13      Is that consistent with your understanding
14  of what an assessment center is?
15          MR. MORGAN:  Object to the form.
16  A.  I would say no.
17  Q.  That's not consistent with your understanding?
18  A.  Not my personal understanding of an assessment
19      center, no.
20  Q.  How is your personal understanding different
21      than what I just read to you?
22  A.  I think it included those components right
23      there, but also a part of that would be an

Page 18

1   examination.
2   Q. You understand that the examination is part of
3       the assessment center; is that correct?
4   A. Yes.
5   Q. And where did you gain that information?
6   A. That's just my personal belief. I don't know
7       that I've read or -- I can't point to a specific
8       document that says this is why I believe that.
9       I just believe that an assessment center would
10      be evaluating a wide ...
11  Q. If you assume that what I just read you is
12      correct and that that is a correct description
13      of an assessment center, you would agree with me
14      that a written test is not a part of it,
15      correct?
16          MR. MORGAN: Object to the form.
17  A. Based on that definition.
18  Q. Based on that definition your answer is "yes"?
19          MR. MORGAN: Object to the form.
20  A. Yes.
21  Q. And, in fact, the test with the cutoff score
22      that was given to the battalion chief applicants
23      in 2006 was a prerequisite before you could

Page 19

1   actually go to the assessment center; is that
2   correct?
3          MR. MORGAN: Object to the form.
4   A. Yes. You had to pass the test before you went
5       to the next step in the process, yes.
6   Q. According to the document that y'all used for
7       the assessment center, the assessment center as
8       I just read to you which was implemented by the
9       City of Auburn doesn't include a test, does it?
10          MR. MORGAN: Object to the form of
11          that question.
12  Q. What I just read to you --
13  A. Out of that definition, it did not say anything
14      about a test.
15          MR. MORGAN: Object to the form.
16  Q. Well, this is the company y'all were using to do
17      the assessment center, correct?
18  A. Right.
19  Q. Is there any reason why you would disagree with
20      the company y'all had hired to do the assessment
21      center?
22  A. No. But the test was a part of the process.
23  Q. The test was a prerequisite --

Page 20

1   A. The assessment process.
2   Q. You'll agree with me if you didn't pass the
3       test, you didn't go to the assessment center,
4       did you?
5          MR. MORGAN: Object to the form.
6          Asked --
7   A. You didn't move further along the process, that
8       is correct.
9   Q. The document speaks for itself, and I'll submit
10      that the document clearly shows the test and the
11      assessment center are two separate entities.
12      Okay?
13          MR. MORGAN: If that's a question, I
14          object to the form.
15  Q. Was the assessment -- I think you testified
16      earlier that in doing an assessment center or
17      attempting to do an assessment center for the
18      battalion chief promotion in 2006 that you felt
19      like the City was trying to comply with the 1991
20      court order; is that correct?
21  A. Yes.
22  Q. Do you know whether or not the 2006 assessment
23      center used for the battalion chief promotion

Page 21

1   had been approved by the United States District
2   Court for the Middle District of Alabama Eastern
3   Division?
4   A. I have no knowledge of that.
5   Q. You don't know one way or the other?
6   A. Right. Correct.
7   Q. Will you agree with me that in the paragraph we
8       just read in Section 12 it says that the City at
9       that time submitted to the court an assessment
10      center which shall be approved by the court? Do
11      you agree with that?
12          MR. MORGAN: Object to the form.
13  A. That's what it says. I wasn't here at that
14      time.
15  Q. And you don't know one way or the other if this
16      assessment center for the 2006 BC promotion was
17      approved by the court or not, correct?
18  A. No, sir.
19  Q. Are you familiar with Kathleen Robinson?
20  A. No, I'm not.
21  Q. Will you agree with me, Mr. James, that if, in
22      fact, the City required a cutoff test before you
23      could go to the assessment center that that

---

Page 22

1    would violate the 1991 order that we just read?
2              MR. MORGAN: Object to the form.
3    A. Would I agree that it would violate it?
4    Q. That it would violate it.
5              MR. MORGAN: First of all, that's a
6              legal question. But if you've got
7              an opinion --
8    A. My opinion is no.
9    Q. In your opinion it would not violate the order?
10   A. Correct.
11   Q. And why is that your opinion?
12             MR. MORGAN: Object to the form.
13   A. Because it doesn't say anything about not having
14      a test.
15   Q. Your testimony is that because the order doesn't
16      mention a test, then it doesn't violate the --
17      giving a test doesn't violate the order?
18             MR. MORGAN: Object to the form.
19   A. Correct. Based on my -- what my opinion is of
20      an assessment center.
21   Q. Did you hear testimony earlier from Mr. Reeves
22      about the number of black firefighters hired --
23      firemen hired since the 1991 order?

---

Page 23

1    A. Yes, sir.
2    Q. And you've been there all that time, maybe not
3      in the same position --
4    A. Correct.
5    Q. -- but did you hear when I said that -- when I
6      named four black firefighters that were hired
7      since that time?
8    A. I heard you mention that, yes.
9    Q. Do you know of any other black firemen that were
10     hired since that time by the City of Auburn Fire
11     Department?
12   A. No, sir.
13   Q. You heard Mr. Reeves give a rough estimate that
14     20 white people had been hired or white firemen
15     had been hired since 1991. Do you agree with
16     that estimate?
17   A. To be honest, I couldn't say if that was ten
18     over or ten -- I don't know. I don't have a
19     feel for whether that's even close.
20            (Plaintiff's Exhibit 13 marked for
21             identification.)
22   Q. I'll show you what I've marked as Plaintiff's
23     Exhibit 13. These are unsigned answers to

---

Page 24

1    interrogatories that I submitted to the City and
2    your attorney. I'm going to show them to you
3    and just ask if you've ever seen them before.
4              MR. MORGAN: Richard, I have the
5              signed responses. And I will send
6              those to you, and I will show him
7              his signed responses --
8    MR. HORSLEY: Okay.
9    MR. MORGAN: -- if that's okay.
10   MR. HORSLEY: That's fine.
11   MR. MORGAN: We can make a copy of it
12             if you want to.
13   MR. HORSLEY: It doesn't matter. As
14             long as they are the same, it
15             doesn't matter.
16   MR. MORGAN: I don't think we made
17             any changes.
18   MR. HORSLEY: If you'll send me the
19             signed copies, I don't care if
20             those are not attached to the
21             deposition.
22   MR. MORGAN: The unsigned responses I
23             sent you have not been changed. I

---

Page 25

1    have the signed ones, and I'll
2    send them to you.
3    MR. HORSLEY: So for the record, the
4             interrogatory responses we're
5             attaching as exhibits to this
6             deposition are exactly the same as
7             the interrogatory responses that
8             have been signed under oath by
9             each individual --
10   MR. MORGAN: That's my understanding.
11   Q. Do you recall signing your answers to
12     interrogatories?
13   A. Yes, sir.
14   Q. And this is an accurate copy of your answers; is
15     that correct?
16   A. Yes, sir.
17   Q. And these answers are correct and answers given
18     to the best of your knowledge, correct?
19   A. Yes, sir.
20            (Plaintiff's Exhibit 14 marked for
21             identification.)
22   Q. I'll show you what I've marked -- Let me do this
23     first. Just so I can go ahead and get these

---

Page 26

1    attached, these are the City of Auburn's
2    responses to my interrogatories marked as
3    Plaintiff's Exhibit 14. Have you seen those?
4           MR. MORGAN: I'll make the same
5           representation to you.
6           MR. HORSLEY: Who is going to sign or
7           who signed those?
8           MR. MORGAN: I don't know who signed
9           for the City.
10          (Off-the-record discussion.)
11          MR. MORGAN: The city manager, yeah.
12          MR. HORSLEY: Who is that?
13          MR. MORGAN: Charles Duggan.
14          MR. HORSLEY: So Plaintiff's Exhibit
15          14 is the City's responses, and
16          those were signed without change
17          by Charles Duggan, the city
18          manager, correct?
19          (Plaintiff's Exhibit 15 marked for
20          identification.)
21   Q.  What I've marked as Plaintiff's Exhibit 15 is a
22       letter sent to you back on May 12, 2006 from
23       Horace Clanton, Eddie Ogletree, and Gerald

Page 27

1        Stephens, and I'll ask you if you've ever seen
2        that document.
3    A.  Yes, sir.
4    Q.  You have seen this?
5    A.  Yes.
6    Q.  You received it?
7            Had you had any discussions with
8        Mr. Ogletree or Mr. Stephens about this
9        grievance before they sent you this letter?
10   A.  I don't recall having any discussions, no.
11   Q.  As a result of this letter, do you recall having
12       a meeting with Mr. Stephens and Mr. Ogletree?
13   A.  No, I don't recall having a meeting.
14   Q.  Have you ever had a face-to-face meeting with
15       these gentlemen specifically related to their
16       complaints in Plaintiff's Exhibit 15?
17   A.  Not that I recall.
18          (Plaintiff's Exhibit 16 marked for
19          identification.)
20   Q.  What I'll mark as Plaintiff's Exhibit 16 is a
21       letter that I believe you sent to Lieutenant
22       Stephens. If you could, identify that for me.
23   A.  Yes, I recall this.

Page 28

1    Q.  Was that letter sent to Lieutenant Stephens in
2        response to Plaintiff's Exhibit 15?
3    A.  Let me see it again.
4           (Brief off-the-record discussion.)
5    A.  Yeah. It appears to be what I would have
6        responded to.
7    Q.  Did you send the exact same letter to your
8        knowledge to Eddie Ogletree?
9    A.  Yeah. My recollection I would have, yes.
10   Q.  In your second to last sentence in the second
11       paragraph, you state that an accumulative system
12       is being evaluated in the overall scope of the
13       promotional process. They hope to have this
14       completed by the end of this fiscal year.
15          What did you mean by those two sentences?
16   A.  A Career Development Plan that the fire division
17       is working on.
18   Q.  Did you mean by that that the Auburn Fire
19       Department was looking into an accumulative
20       system for promotions?
21   A.  Yes.
22   Q.  Meaning --
23   A.  As part of the Career Development Plan for each

Page 29

1        rank.
2    Q.  I'm sorry. What?
3    A.  Promotion for each rank, for each position.
4    Q.  And what specifically do you mean when you say
5        accumulative?
6    A.  Well, the Career Development Plan, as I
7        understand it, each position would have certain
8        requirements in that position, certain
9        certifications, educational requirements. And
10       then to go to the next -- or be eligible for a
11       promotion to a higher rank, that you would meet
12       those qualifications.
13   Q.  Does a cutoff test also -- is that also included
14       in those qualifications?
15   A.  The document I recall does not mention a cutoff
16       test.
17   Q.  So were you saying in this letter that the City
18       was looking into promoting people based on
19       something different than tests with cutoff
20       scores?
21          MR. MORGAN: Object to the form.
22   A.  Well, as I recall this, it was the Career
23       Development Plan, CDP, that the fire division

Page 30

1    was working on.
2    Q.  Do you recall during the meetings with CHW -- if
3        I say that wrong -- CWH -- do you recall who
4        during those meetings was promoting a score of
5        70 as being the cutoff score?
6    A.  I don't recall any specific person promoting
7        that other than it was discussed among everybody
8        that was in the room about a cutoff score.
9    Q.  And you can't testify if anyone with the City of
10       Auburn was the first person to suggest that
11       there be a 70 cutoff score?
12   A.  I couldn't identify a person, no.
13   Q.  Are you familiar through your job with the City
14       of Auburn with the work history of Mr. Stephens
15       and Mr. Ogletree?  It's okay if you're not.  I'm
16       just asking.
17   A.  Detailed parts of it, not specifically, other
18       than I did -- since my position as the director
19       looking at performance appraisals.
20   Q.  To your knowledge did they have satisfactory
21       performance appraisals?
22   A.  As I recall they do, yes.
23   Q.  Are you aware of anything in their work history

Page 31

1    with the City of Auburn that would have
2    disqualified them for the promotion to battalion
3    chief?
4        MR. MORGAN:  Object to the form.
5    A.  No.
6    Q.  You talked about the promotional process a
7        moment ago, and you'll agree with me that the
8        test with a cutoff score was a component of the
9        process to be promoted to battalion chief in
10       2006; is that correct?
11   A.  Correct.
12   Q.  And what other components of that process
13       existed to your knowledge for the promotion?
14   A.  They had the thing they called the hot seat.
15       They had a situational scenario.  It seems there
16       was another component, but I can't remember what
17       it was.  It seems like there were three
18       components.
19   Q.  Is it your understanding that an applicant's
20       performance in the situational part of the
21       process, that their performance was largely
22       based on their experience as firefighters?
23       MR. MORGAN:  Object to the form.

Page 32

1    A.  To be honest I don't know that I could answer
2        that.  I'm not sure.  I'm not a firefighter so
3        I'm not sure.
4    Q.  You'll agree with me that all three
5        African-Americans that applied for battalion
6        chief failed to make it past the first step of
7        the requirements; is that correct?
8    A.  That's true.
9    Q.  And that being -- the first step was a test with
10       a cutoff score of 70, correct?
11   A.  That's true.
12   Q.  Will you also agree with me that the three
13       African-Americans that failed to make it past
14       the first step of the promotion process had been
15       with the City of Auburn Fire Department for more
16       years than the four individuals that were
17       actually promoted to battalion chief?
18   A.  To my recollection I'd say that's correct.
19   Q.  Would you agree that since they had been there a
20       number of years more than the individuals who
21       were actually promoted to battalion chief that
22       they had more actual on-the-job experience than
23       those individuals?

Page 33

1        MR. MORGAN:  Object to the form.
2    A.  I could agree that they had been a firefighter
3        longer.  I'm not sure how you define experience.
4    Q.  I'm not going to offer this exhibit during your
5        deposition, but have you seen the two memos that
6        were sent out back to back in advance of the
7        promotion where one said that only
8        nonprobationary lieutenants could apply and then
9        several days later a second one that said
10       everybody can apply:  nonprobationary,
11       probationary, and probationary, nonprobationary
12       firefighters could apply also?  Did you see
13       those two memos?
14   A.  Yes.
15   Q.  Were you involved in the decision to allow
16       nonprobationary lieutenants and probationary and
17       nonprobationary --
18       Were you involved in the decision to allow
19       probationary lieutenants and nonprobationary and
20       probationary firefighters to apply for the
21       battalion chief position?
22   A.  Yes.  I made -- Yes.
23   Q.  Was that a group decision or did you make that

Page 34

1  decision yourself?
2  A.  I did not see anything in our policy or job
3      description that would have excluded the
4      individuals other than lieutenants, and I made
5      that point and then the second memo was sent
6      out.
7  Q.  So you saw the first memo.  And for some reason
8      that triggered you to go --
9  A.  No.  Actually, the first memo went out as I
10     recall.  And then, if I'm not mistaken, I
11     believe we got an application from Mr. Turner.
12     When I got that or when I heard that, I looked
13     and did not find anything that would preclude
14     him from applying for the job.
15 Q.  So it's your testimony that as a result of
16     his -- Mr. Turner's application, you went and
17     looked at the policies and determined that there
18     was nothing that would preclude him from
19     applying for the battalion chief position,
20     correct?
21 A.  As I recall, yes.
22 Q.  And so based upon that, you decided to allow
23     probationary lieutenants, probationary and

Page 35

1  nonprobationary firefighters all to apply for
2  that position; is that correct?
3  A.  Yes, sir.
4  Q.  Is it your position that the lieutenants who had
5      been reclassified in February of '06 were
6      probationary or nonprobationary lieutenants at
7      the time of the battalion chief promotion?
8  A.  Non.
9  Q.  Why is that?
10 A.  Because they weren't promoted.
11 Q.  Mr. Reeves wasn't real familiar with the
12     insignia that different ranking firemen wear.
13     Are you familiar with those insignia?
14 A.  I am not.
15 Q.  Do you recall a meeting with Lieutenant Stephens
16     sometime in 2005 which would have been before
17     the reclassification of team leaders to
18     lieutenant?
19 A.  A meeting before that?
20 Q.  Uh-huh (positive response).
21 A.  I don't recall that we had a meeting before
22     that.
23 Q.  You don't recall the meeting you had with

Page 36

1  Mr. Stephens where he told you that there was a
2  problem --
3  A.  I believe we may have met after that meeting --
4      at some point after that meeting.
5  Q.  At some point after the reclassification?
6  A.  No.  After a meeting that we had with the three
7      individuals that did not agree with the
8      reclassification.
9  Q.  You're saying you and Mr. Stephens had a meeting
10     after that meeting?
11 A.  As I recall it was after that meeting.
12 Q.  Can you tell us approximately when this meeting
13     occurred?
14 A.  It may have been the same day.  It could have
15     been the next day.  I think it was shortly after
16     that.
17 Q.  Tell me what you recall was said during that
18     meeting.  It's just you and Mr. Stephens?
19 A.  I believe we went to my office.  To be quite
20     honest, I don't recall any details about the
21     meeting.  I don't recall anything -- I can only
22     assume that there wasn't anything earth
23     shattering, but I don't recall what we said or

Page 37

1  what he said.
2  Q.  It's your testimony you don't recall
3      specifically what was said during that meeting?
4  A.  No.  I recall -- I believe we met in my office,
5      but I don't recall any specifics about it, no.
6      MR. HORSLEY:  Let's take a few
7      minutes.
8      (Brief recess.)
9      (Deposition concluded at
10     approximately 2:10 p.m.)
11     * * * * * * * * * * * *
12 FURTHER DEPONENT SAITH NOT
13     * * * * * * * * * * * *
14
15 REPORTER'S CERTIFICATE

STATE OF ALABAMA:

MONTGOMERY COUNTY:

17     I, Pamela A. Wilbanks, CCR, Registered
18 Professional Reporter, and Commissioner for the State
19 of Alabama at Large, do hereby certify that I reported
20 the deposition of:
21     WILLIAM HOWARD JAMES
22 who was first duly sworn by me to speak the truth, the
23

Page 38



1    of:

2         EDDIE OGLETREE, an individual,

3         GERALD STEPHENS, an

4         individual,

5         Plaintiffs,

6         Vs.

7         CITY OF AUBURN, a municipality

8         in the State of Alabama, LARRY

9         LANGLEY, an individual, LEE LAMAR,

10        an individual, BILL HAM, JR., an

11        individual, STEVEN A. REEVES, an

12        individual, BILL JAMES, an

13        individual, CHARLES M. DUGGAN, an

14        individual, and CORTEZ LAWRENCE,

15        an individual,

16        Defendants.

17        In The U.S. District Court

18        For the Middle District of Alabama

19        Eastern Division

20        3:07-CV-867-WKW

21   on Wednesday, July 30, 2008.

22        The foregoing 37 computer printed pages

23   contain a true and correct transcript of the

Page 39

1    examination of said witness by counsel for the parties

2    set out herein.  The reading and signing of same is

3    hereby not waived.

4         I further certify that I am neither of kin nor

5    of counsel to the parties to said cause nor in any

6    manner interested in the results thereof.

7         This 5th day of August 2008.

8

9

10

11

12

13

14

15

        _____

        Pamela A. Wilbanks, ACCR #334

16      Expiration Date:  9-30-2008

        Registered Professional Reporter

17      and Commissioner for the State

        of Alabama at Large

18

19

20

21

22

23



**AlaFile E-Notice**

01-CV-2007-901537.00

Judge: G. WILLIAM NOBLE

To:  ROWE STEPHEN A
     steve.rowe@arlaw.com

---

# NOTICE OF COURT ACTION

---

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

ADVANCED MACHINE AUTOMATION, INC. v. GREIF, INC
01-CV-2007-901537.00

A court action was entered in the above case on 8/5/2008 2:22:49 PM

**C001 ADVANCED MACHINE AUTOMATION,**
**MOTION TO CONTINUE**

[Attorney: VEAL WILLIAM C]

| | |
|---|---|
| Disposition: | GRANTED |
| Judge: | GWN |
| Notice Date: | 8/5/2008 2:22:49 PM |

**ANNE-MARIE ADAMS**
**CIRCUIT COURT CLERK**
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
BIRMINGHAM, AL 35203

205-325-5355
anne-marie.adams@alacourt.gov

ELECTRONICALLY FILED
8/5/2008 2:22 PM
CV-2007-901537.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

ADVANCED MACHINE  )
AUTOMATION, INC.,   )
         )
  **Plaintiff,**    )
         )
v.         ) <u>**CASE NO. CV 07-901537-GWN**</u>
         )
GREIF, INC., et al.,   )
         )
  **Defendant.**   )

## <u>ORDER</u>

The Plaintiff's Motion to Continue is GRANTED. This cause is hereby continued from its present setting of October 6, 2008 and is hereby reset for trial on **January 5, 2009 at 9:00 a.m.**

DONE and ORDERED this <u>5th</u> day of <u>August</u>, 2008.

        /s/ G. William Noble
        G. WILLIAM NOBLE
        CIRCUIT JUDGE

GWN/pc
cc: All parties