**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **EDDIE OGLETREE, an individual,** | * | |
| **GERALD STEPHENS, an individual,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **vs.** | * | **CASE NO.: 3:07-cv-867-WKW** |
| | * | |
| **CITY OF AUBURN, et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants in the above-styled cause, and pursuant to *Federal Rule of Civil Procedure* 56, move this Court to grant summary judgment in favor of Defendants in that there is no genuine issue of material fact to be submitted to a jury and judgment should be entered in their favor as a matter of law as to all Plaintiffs' claims.  In support of this motion, Defendants rely upon the following:

1.    All pleadings filed in this matter.

2.    Exhibits A through P, attached hereto and specifically.[1]

        Exhibit A - Deposition of Eddie Ogletree

        Exhibit B - Deposition of Gerald Stephens

        Exhibit C - Affidavit of Bill Ham, jR.

        Exhibit D - Affidavit of Charles M. Duggan. Jr.

        Exhibit E - Deposition of Steven A. Reeves

        Exhibit F - Affidavit of Steven A. Reeves

        Exhibit G - Deposition of William (Bill) Howard James

---

[1] Although specific page/line or paragraph cites are made to all factual statements made in the memorandum brief, Defendants rely on the depositions and affidavits referenced in their entirety and reserve the right to further cite to the depositions or affidavits relied upon, if necessary, when replying to any response Plaintiffs might file to this motion.

Exhibit H - Deposition of Larry M. Langley

Exhibit I - Deposition of Lee Y. Lamar, Jr.

Exhibit J - 1991 Order Approving Settlement Agreement

Exhibit K - Affidavit of Lee Y. Lamar, Jr.

Exhibit L - Letter Agreement between the City of Auburn and CWH Research, Inc.

Exhibit M - February 2006 Position Announcement

Exhibit N - February 17, 2006 Memo of Battalion Chief Promotions

Exhibit O - February 23, 2006 Memo regarding Eligible Applicants

Exhibit P - The Grievance; and

3.      Memorandum Brief, submitted contemporaneously herewith.

WHEREFORE PREMISES CONSIDERED, the Defendants, request summary judgment be granted in their favor and all Plaintiffs' claims dismissed as a matter of law.

Respectfully submitted this the 11th day of August 2008.

                                        /S/ *Randall Morgan*
                                        Randall Morgan [8350-R70R]
                                        Elizabeth Brannen Carter [3272-C-38-E]
                                        HILL, HILL, CARTER, FRANCO,
                                            COLE & BLACK, P.C.
                                        425 South Perry Street
                                        Montgomery, Alabama 36101-0116
                                        (334) 834-7600
                                        (334) 263-5969 facsimile
                                        Rmorgan@hillhillcarter.com
                                        Counsel for Defendant

OF COUNSEL:

HILL, HILL, CARTER, FRANCO
    COLE & BLACK, P.C.
Post Office Box 116
Montgomery, Alabama  36101-0116
(334) 834-7600
(334) 263-5969

## CERTIFICATE OF SERVICE

I Hereby Certify that I have this date served a true and correct copy of the foregoing *Motion for Summary Judgment on Behalf of Defendants* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, using the CM/ECF system which will send notification of such filing to: Richard F. Horsley, Esquire (rfhala@cs.com)  this the 11th day of August 2008.


/S/ *Randall Morgan*
Of Counsel

# EXHIBIT "A"

COPY

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    EASTERN DIVISION

4

5    EDDIE OGLETREE, an individual,
     GERALD STEPHENS, an
6    individual,

7         Plaintiffs,

8    Vs.                              CIVIL ACTION NO.
                                      3:07-CV-867-WKW
9
     CITY OF AUBURN, a municipality
10   in the State of Alabama, LARRY
     LANGLEY, and individual, LEE LAMAR,
11   an individual, BILL HAM, JR., an
     individual, STEVEN A. REEVES, an
12   individual, BILL JAMES, an
     individual, CHARLES M. DUGGAN, an
13   individual, and CORTEZ LAWRENCE,
     an individual,

14        Defendants.

15             * * * * * * * * * * * *

16

17   **DEPOSITION OF EDDIE OGLETREE**, taken pursuant to

     stipulation and agreement before Pamela A. Wilbanks,
18
     Certified Court Reporter, ACCR# 391, Registered
19
     Professional Reporter and Commissioner for the State of
20
     Alabama at Large, in the Law Offices of Hill, Hill,
21
     Carter, Franco, Cole & Black, 425 South Perry Street,
22
     Montgomery, Alabama, on Friday, June 6, 2008, commencing
23
     at approximately 9:00 a.m.

10

```
1    Q.    State your name, please.

2    A.    Eddie Ogletree.

3    Q.    And, Mr. Ogletree, you're employed as a

4          lieutenant with the City of Auburn Fire

5          Department?

6    A.    Yes.  As of February 1st, 2006 when they changed

7          the title from team leader.

8    Q.    And before that you were a team leader?

9    A.    Yes.

10   Q.    And when did you become a team leader?

11   A.    June 1st of 1996, I believe, somewhere around

12         there.

13   Q.    And what procedure did you go through to be

14         eligible to be a team leader in 1996?

15   A.    They called it -- I guess it was like a

16         structured interview.

17   Q.    Is that the first time that you had applied for

18         team leader in '96?

19   A.    I had applied one time before, but they took the

20         job off the board.  And I had applied for a

21         lieutenant's position about a year or two before

22         that, and they cancelled the job.

23   Q.    You applied for lieutenant before '96?
```

12

```
 1        average.

 2   Q.   Do you remember who got promoted that time?

 3   A.   I couldn't recall.  I couldn't recall.  It's

 4        been several guys.  I do know that one of them

 5        might have been Hartsfield, which is a battalion

 6        chief now.  I believe he might have been one of

 7        them that got promoted.  I think it might have

 8        been him.

 9   Q.   Rodney Hartsfield?

10   A.   Yes.

11   Q.   Is he a good officer?

12   A.   Rodney?

13   Q.   Yeah.

14   A.   He's no better than I would be or -- He's a good

15        officer, but all officers there are pretty good.

16   Q.   Did you participate in petitioning the City to

17        change the rank from team leader to lieutenant?

18   A.   Yes.

19             Can I elaborate?

20   Q.   Yeah.

21   A.   When they came around to me --

22   Q.   Now, who is "they"?

23   A.   Joey Darby.  I was approached by Joey Darby
```

17

1          about taking orders from Lieutenant Stephens

2          because he's black?

3     A.   No one.

4     Q.   Their complaint was they thought their rank as a

5          team leader was equal to his rank as a

6          lieutenant, true?

7     A.   Yes, that's true.

8     Q.   Did you feel like your rank as a team leader was

9          equal to the lieutenant rank?

10    A.   No.

11    Q.   Well, since the promotion or the change from

12         team leader to lieutenant did not go through the

13         court --

14             You know that, don't you?

15    A.   Yes.  I know it because it come back too quick.

16    Q.   Did you refuse to accept that rank change since

17         it didn't go through the court?

18    A.   I didn't refuse.  I just took -- They gave me

19         the bars, and I just put them on and kept doing

20         the same thing I've been doing.

21    Q.   Did you complain to anybody or make any comment

22         to anybody when you became a lieutenant that you

23         thought it needed to go through the court?

18

1   A.   I talked to Lieutenant Stephens.

2   Q.   Anybody else?

3   A.   No.

4   Q.   Steve Reeves or any of these people that you've

5        sued?

6   A.   No.

7   Q.   Did you say anything to them about -- complain

8        about being changed from a team leader to a

9        lieutenant?

10  A.   No.

11           Can I say something else on that?

12  Q.   Say whatever you want.

13  A.   I been there long enough to know that

14       complaining don't do no good.  When somebody

15       make a decision, you know -- If I'm going to do

16       something, I'm going to do it formally.  That's

17       why we're here now.  But complaining, you just

18       make your day bad.

19               MR. MORGAN:  Well, I'm going to move

20                   to exclude that.

21  Q.   Well, who brought you the petition that you

22       signed, Joey Darby?

23  A.   Joey Darby.

19

```
1    Q.    And did you tell Mr. Darby that you were only

2          signing it because it was going through the

3          court?

4    A.    Yes.  They say they was going to petition the

5          court, and I say I'll sign it.

6    Q.    Did you tell them you wouldn't sign it if they

7          weren't going to petition the court?

8    A.    No.  That was my understanding when it came to

9          me, that it was going to the court system.

10   Q.    Is it your position in this lawsuit that you

11         should not be a lieutenant?

12               MR. HORSLEY:  Object to the form.

13   A.    No.  Because other people that got promoted over

14         the years were doing less.

15   Q.    I'm not asking about other people.  I'm asking

16         about Eddie Ogletree.

17   A.    No.

18   Q.    Is it your position because they didn't petition

19         the court that you should not be a lieutenant?

20   A.    No.

21   Q.    Your position is you should be a lieutenant?

22   A.    Yes.

23   Q.    Is it your position that because you were a team
```

20

```
 1          leader and the change to lieutenant did not go

 2          to the court that you should not be eligible for

 3          promotion to battalion chief?

 4   A.     No.  Because team leaders were eligible for

 5          promotion.

 6   Q.     Well, do you have any problem with team leaders

 7          being eligible for promotion to battalion chief?

 8   A.     No.

 9   Q.     You don't have any complaint about that, do you?

10   A.     No, I didn't have a complaint about that.

11   Q.     Do you have a complaint about people who had not

12          yet achieved the rank of team leader being

13          eligible to apply for the battalion chief

14          promotion?

15   A.     Yes, I do.

16   Q.     What's your problem with that?

17   A.     When I came there, it was five years before you

18          could even put in for anything above -- You

19          could be a firefighter from your first five

20          years.

21   Q.     You came in 1984?

22   A.     Yes.

23   Q.     So you had to wait five years for a promotion?
```

22

```
 1    A.    Uh-huh (positive response).

 2                 MR. HORSLEY:  You need to say yes, not

 3                      uh-huh (positive response).

 4    A.    Yes.

 5    Q.    Before I get to that, what firefighters who were

 6          not team leaders or lieutenants sat for the exam

 7          on the battalion chief promotion?

 8    A.    Chris Turner was a firefighter.

 9                 MR. HORSLEY:  In 2006?  Was that your

10                      question?

11    Q.    Isn't that the one you're complaining about, the

12          battalion chief promotion in 2006?

13    A.    Yes.

14    Q.    You're not complaining about any other

15          promotions, are you?

16    A.    Other than when they changed the title.  I told

17          you I didn't agree --

18    Q.    You don't want to be a lieutenant?  You want the

19          City to make you a team leader again?

20    A.    Other than when they changed the title and it

21          didn't go to the courts.

22                 MR. HORSLEY:  Object to the form.

23                      It's argumentative.
```

23

1    Q.    And that's team leader to lieutenant.  You
2          consider that a promotion?
3    A.    Yes.
4    Q.    And you don't want -- you think that's unfair to
5          you to make you a lieutenant?
6                    MR. HORSLEY:   Object to the form.
7    A.    And the battalion chief promotions of 2005 --
8          2004.
9    Q.    Did you apply for those?
10   A.    No.  Didn't nobody get a chance to apply.
11   Q.    Is that when the captains became battalion
12         chiefs?
13   A.    Yes.  Battalion chief was a promotion.
14   Q.    Did you file an EEOC claim over that in 2004?
15   A.    No, I didn't file a EEOC claim.
16   Q.    Did you file a lawsuit over that?
17   A.    No, I didn't.
18   Q.    So Chris Turner is the only person who was not
19         ranked at least -- who was not ranked as a
20         lieutenant?
21   A.    Yes.
22   Q.    So you think he should not have been allowed to
23         sit for the battalion chief promotion?

24

1   A.   I think so, but ...

2   Q.   Now, how did his sitting for battalion chief

3        adversely affect your promotion possibilities?

4   A.   I didn't have a problem with him sitting per

5        se.  I'm talking about all the people that was

6        in there that had less time than I had.

7   Q.   Well, that's everybody that was there, wasn't

8        it?

9   A.   That's the way they've been promoting.

10   Q.   I mean, everybody that sat for the exam had less

11        time --

12   A.   Except for two other guys.

13   Q.   All right.  Who had been there longer than you?

14   A.   Horace Clanton and Robbie Hodge.

15   Q.   And he's white?

16   A.   Both of them are white.

17   Q.   So your position is those two whites should have

18        been promoted to battalion chief?

19               MR. HORSLEY:  Object to the form.

20   A.   No.  I said I have a problem with who sat

21        there.  That doesn't have nothing to do with

22        being promoted, who just you was competing

23        against.

27

```
 1    Q.   So how would you have fashioned the exam for

 2         battalion chief?  What would you have made the

 3         requirements be?

 4              MR. HORSLEY:  Object to the form.

 5    A.   Just like --

 6    Q.   We can establish first:  You're not a testing

 7         expert, are you?

 8    A.   No, I'm not.

 9    Q.   You don't purport yourself --

10    A.   Don't purport.

11    Q.   Well, given that, what would you have made the

12         requirements to be?

13              MR. HORSLEY:  Object to the form.

14    A.   No cutoff score.  More hands-on type

15         activities.  Seniority, time in grade.

16    Q.   Is there --

17    A.   We didn't get any points for any of that.  We

18         got cut off.  That's where my problem is.

19    Q.   Is there a difference in seniority and time in

20         grade?

21    A.   Yes.  Because you have some people that have

22         been -- Like Lieutenant Stephens there, he's the

23         longest ranking lieutenant in the fire
```

29

1           was different throughout the City.

2    Q.    Were your responsibilities and duties any --

3    A.    Did --

4    Q.    Let me finish my question.

5                -- any different from Gerald Stephens after

6           2000?

7    A.    Yes.

8    Q.    What were the differences?

9    A.    I was supervising more students than I was

10          career.  I wasn't supervising any career until

11          here probably the last three or four years when

12          they put a full-time man regular out at my

13          station.

14   Q.    When did you start supervising a career?

15   A.    Probably about 2004 or '5, somewhere around

16          there.

17   Q.    Well, at that point was there any difference in

18          what you were doing from Lieutenant Stephens?

19   A.    No.

20   Q.    The entire time that you were a team leader that

21          he was a lieutenant, was there any difference in

22          what the two of y'all did?

23   A.    Yes.

30

1     Q.    What was the differences?

2     A.    He could supervise regular full-time

3           firefighters and I couldn't.

4     Q.    That's the only difference?

5     A.    Yes, that's the difference.

6     Q.    Well, do you have any problem -- feel any

7           deficiency in supervising full-time regular --

8     A.    No.

9     Q.    I mean, are they any more difficult or less

10          difficult to supervisor than student

11          firefighters?

12     A.    No.

13     Q.    Supervision at that rank is supervision, isn't

14          it?

15     A.    Yes.

16     Q.    I mean, do student firefighters do less or more

17          than the regular firefighters?

18     A.    They probably present more of a challenge than a

19          regular firefighter.

20     Q.    So if you can supervisor a student firefighter,

21          you can probably supervise a regular

22          firefighter, can't you?

23     A.    Yes.

31

| | | |
|---|---|---|
| 1 | Q. | Have you ever filed an EEOC charge against the |
| 2 | | City? |
| 3 | A. | No.  This is my first one. |
| 4 | Q. | Had you filed a grievance against the City? |
| 5 | A. | No.  This is my first one. |
| 6 | Q. | Where do you currently live? |
| 7 | A. | At 106 Pioneer Drive, LaGrange, Georgia 30240. |
| 8 | Q. | And who do you live there with? |
| 9 | A. | My wife. |
| 10 | Q. | And what is her name? |
| 11 | A. | Marzilla.  That's M-A-R-Z-I-L-L-A. |
| 12 | Q. | And is that your only wife? |
| 13 | A. | Yes. |
| 14 | Q. | Don't have any ex's? |
| 15 | A. | No. |
| 16 | Q. | Do you have any relatives by blood or marriage |
| 17 | | that live in Lee County? |
| 18 | A. | Yes. |
| 19 | Q. | Who are they? |
| 20 | A. | My mother. |
| 21 | Q. | And what's her name? |
| 22 | A. | Emma, E-M-M-A, Ogletree. |
| 23 | Q. | And where does Emma live? |

41

1    A.    No.

2    Q.    What did you do before you joined the Auburn

3          Fire Department?

4    A.    I worked with Allen McCord.  He used to work at

5          the fire department.  He retired now.  I

6          attended school.  I attended Southern Union a

7          couple of years, and I attended the University

8          of North Alabama a couple of semesters.  And I

9          came down to Auburn and attended there for about

10         a year.

11   Q.    You went to Southern --

12   A.    Southern Union.

13   Q.    Where is it located?

14   A.    It was in Wadley, Alabama.  Still in Wadley,

15         Alabama.  They got a campus in Opelika now.

16   Q.    But you went to the Whatley campus?

17   A.    Uh-huh (positive response).

18   Q.    Yes?

19              MR. HORSLEY:  It's Wadley,

20              W-A-D-L-E-Y.

21   Q.    And then you went where in north Alabama?

22   A.    University of North Alabama.

23   Q.    Did you graduate from there?

42

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | What was your course of study? |
| 3 | A. | Sociology and psychology. |
| 4 | Q. | How long did you go? |
| 5 | A. | I got about three years in.  I came back to |
| 6 | | Auburn and did a year.  So I got about three, |
| 7 | | three-and-a-half years in. |
| 8 | Q. | So you were a senior? |
| 9 | A. | Yeah.  I was close to being a senior. |
| 10 | Q. | Where did you graduate from high school? |
| 11 | A. | Loachapoka. |
| 12 | Q. | What year? |
| 13 | A. | 1977. |
| 14 | Q. | And then you say you attended Auburn University? |
| 15 | A. | I attended Southern Union first.  Yeah, I |
| 16 | | attended Auburn University. |
| 17 | Q. | When you came back from north Alabama, where did |
| 18 | | you go? |
| 19 | A. | Auburn University. |
| 20 | Q. | How long were you at Auburn? |
| 21 | A. | A year. |
| 22 | Q. | What years were you there? |
| 23 | A. | '80, '81, I believe. |

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

43

1    Q.    Did you get a degree?

2    A.    No.

3    Q.    What was your course of study at Auburn?

4    A.    Same:  Social and psychology.

5    Q.    How close were you to graduating?

6    A.    I probably got about 60 to 80 hours to go.

7    Q.    Six to eight?

8    A.    Sixty to eighty.  No, not six to eight.

9    Q.    You applied for -- You said you were promoted to

10         team leader in June of '96?

11   A.    Yes.

12   Q.    From June of '96 up until, what, February of

13         '06, did you apply for a promotion to any other

14         ranks in the Auburn Fire Department?

15   A.    No.

16   Q.    I think before you were promoted to team leader,

17         Gerald Stephens had been promoted to lieutenant;

18         is that correct?

19   A.    Yes.  He was promoted in May -- April of '96,

20         and I was promoted in June of '96.

21   Q.    Did you apply for the promotion to lieutenant?

22   A.    No, I did not.

23   Q.    Why not?

48

| | | |
|---|---|---|
| 1 | A. | He didn't sit for any.  They just come got him |
| 2 | | and made him captain. |
| 3 | Q. | Before the February of '06 battalion chief exam, |
| 4 | | there were no other captain exams that you |
| 5 | | remember other than the one that was sometime |
| 6 | | around '96? |
| 7 | A. | Yes. |
| 8 | Q. | Is that correct what I said? |
| 9 | A. | That's correct. |
| 10 | Q. | And then there was a long period of time when |
| 11 | | there was no lieutenant exams given? |
| 12 | A. | Yes.  They just started -- They didn't promote |
| 13 | | any more lieutenants after '96.  Gerald was the |
| 14 | | last one.  It was two left.  It was Gerald and |
| 15 | | Andrew Terry Langley.  He was there.  He was |
| 16 | | ahead of Gerald.  He was a senior lieutenant at |
| 17 | | the time, and he retired and then Gerald became |
| 18 | | a senior lieutenant. |
| 19 | Q. | Well -- |
| 20 | A. | They started promoting team leaders. |
| 21 | Q. | And is it your testimony that the last |
| 22 | | lieutenant exam, the one that Gerald sat for, |
| 23 | | that there was both a seniority and a time in |

54

```
1          because they were battalion chiefs, and they

2          didn't take the test.  And I had been seeing too

3          much of this over the years.  I'm not a

4          complainer, but when something is wrong, it's

5          wrong.

6     Q.   You've seen too much of what over the years?

7     A.   Discrepancies in promotional procedures.  People

8          getting jobs that are not even being posted.

9          People go in and sit and interview and get a

10         job.

11    Q.   What promotions have there been when it wasn't

12         posted?

13    A.   Training chief in 2005.  That's when Lieutenant

14         Stephens filed that grievance.

15    Q.   Did you file a grievance?

16    A.   No.

17    Q.   Any other promotions that weren't, in your

18         opinion, posted?

19    A.   The battalion chief for Chief Garrett -- Chief

20         Leverette.

21    Q.   When the captains became battalion chiefs?

22    A.   It's a promotion to me.

23    Q.   Well, did you consider the team leader to
```

55

| | | |
|---|---|---|
| 1 | | lieutenant to be a promotion? |
| 2 | A. | Yes, I did. |
| 3 | Q. | Was that posted? |
| 4 | A. | No.  It was petitioned, but it wasn't posted. |
| 5 | Q. | Who is Jeremy Patterson and William Thompkins? |
| 6 | | You said they were -- |
| 7 | A. | They were in the student program.  They had been |
| 8 | | the only two African-Americans besides one more, |
| 9 | | and his name was Owny (phonetic), and he had |
| 10 | | disciplinary problems.  I think he had gotten |
| 11 | | into some trouble so he got fired. |
| 12 | Q. | When was Jeremy Patterson there? |
| 13 | A. | I want to say between 2003 and 2006 I believe |
| 14 | | they were there, both of them. |
| 15 | Q. | And when was William Thompkins there? |
| 16 | A. | About the same time. |
| 17 | Q. | And why wasn't Patterson hired? |
| 18 | A. | I have no idea.  I wasn't privy to that |
| 19 | | information.  I knew he did apply for a job. |
| 20 | Q. | Did he talk to you about why he wasn't hired? |
| 21 | A. | He thought it was because he was black. |
| 22 | Q. | Did he file a complaint or lawsuit or anything? |
| 23 | A. | No.  He went on and got his engineering degree |

58

| | | |
|---|---|---|
| 1 | | Gerald's deposition.  That's the posted notice, |
| 2 | | and it was posted, I think, February 16, 2006. |
| 3 | | Did you see that when it went up? |
| 4 | A. | Yes, I did. |
| 5 | Q. | Did you see it about February 16? |
| 6 | A. | Somewhere around there. |
| 7 | Q. | Within a day or two? |
| 8 | A. | Uh-huh (positive response). |
| 9 | Q. | Yes? |
| 10 | A. | Yes, sir. |
| 11 | Q. | So you knew at that time there would be a |
| 12 | | promotion procedure? |
| 13 | A. | Yes. |
| 14 | Q. | And Gerald said something about e-mails.  Do you |
| 15 | | get e-mails? |
| 16 | A. | Yes.  We can read the City -- That's how we |
| 17 | | communicate. |
| 18 | Q. | So did this come out -- this Number 1, did this |
| 19 | | come out on an e-mail? |
| 20 | A. | I don't know if it came out on e-mail.  It |
| 21 | | probably did, but I got mine from the chief. |
| 22 | Q. | The chief handed you one? |
| 23 | A. | Yeah, I got it. |

59

1   Q.   Which chief?

2   A.   Chief Langley.

3   Q.   Did you have any conversation with him when he

4        gave it to you?

5   A.   I might have -- I probably spoke to him.  I know

6        I spoke to him about the test I just said, you

7        know, because they was talking about giving a

8        test then because Chief Garrett had talked to me

9        about they were going over questions, and that

10       was my immediate supervisor.

11  Q.   So even before you got Defendant's Exhibit

12       Number 1, the notice, you had talked to Chief

13       Garrett --

14  A.   And he had said they had been working on a test

15       for battalion chief.

16  Q.   Did you ask him what was the test about or how

17       was it or what was he --

18  A.   He just said they threw out some questions.

19       They looked at some questions and determined

20       some questions that were good for the test and

21       all that.  And he made the statement to me that

22       he didn't think it was fair to us older guys

23       because it give the younger guys fresh out of

60

1           college a better chance.

2   Q.   Dean Garrett told you that he did not think it

3           was fair to the older guys?

4   A.   Yeah.  He said he discussed this with Chief

5           Langley.

6   Q.   Well, what was there about it that he didn't

7           think was fair?

8   A.   Just the fact that they were testing us on that

9           type of material for the job, I guess.  That's

10          what I took it to mean.  And that you had guys

11          that were working on their master's degrees

12          where I hadn't picked up a book and studied like

13          that for years, that they probably were going to

14          have an advantage going in where I had to pick

15          up a book and start studying from that point of

16          getting the books and material and going

17          forward.

18   Q.   Well, he didn't say he didn't think it was going

19          to be fair to blacks.  He said he didn't think

20          it was going to be fair to the older guys?

21   A.   He said he didn't think it would be fair to the

22          older guys.

23   Q.   Who else was taking it that would be considered

61

1          an older guy?

2    A.    I guess he was talking about myself, Horace

3          Clanton, Robbie Hodge, Gerald Stephens.

4    Q.    And Clanton and Hodge are white males?

5    A.    Yes.

6    Q.    Any other conversations you had with Dean

7          Garrett about the test other --

8    A.    I was concerned that he had seen some of the

9          questions.  I didn't say it to him, but I was

10         like, I thought they were going to order the

11         test from somebody.

12   Q.    Well, do you know for a fact whether he saw

13         questions that were actually --

14   A.    That was him telling me.  I can't verify that.

15   Q.    And you didn't tell him you were concerned that

16         he saw the questions?

17   A.    I didn't say it to him.  No, I didn't.

18   Q.    What else did y'all actually discuss other than

19         you said he told you he had looked at some of

20         the questions, and he didn't think it was going

21         to be fair to the older guys?

22   A.    That was about it.

23   Q.    And then Chief Langley gives you Defendant's

62

```
1              Exhibit Number 1?

2    A.    Yes.

3    Q.    And did you have any conversation with him about

4          the procedure at that point?

5    A.    No, I didn't.

6    Q.    I assume you received this memo, Defendant's

7          Exhibit Number 2, which is dated February 17

8          that tells you who can be eligible and that a

9          written exam will be part of the assessment

10         process.  Did you receive that?

11   A.    Yes.

12   Q.    And was that e-mailed to you or posted?

13   A.    I think I got mine e-mailed.

14   Q.    Does it come e-mail to your house?

15   A.    Everybody got e-mail, and they just click -- all

16         the officers, and they just click on the

17         computer.

18   Q.    So you would have probably received that

19         February 17 --

20   A.    Yeah.  If I was on duty.

21   Q.    If you weren't on duty, the next time --

22   A.    The next day, yeah.

23   Q.    At that point did you make any complaints to
```

63

1      anybody about the written test?

2  A.   No.  It was about 30 days later when I went to

3       pick up my books, 30-something days later.  I

4       just mentioned it to Chief Lamar there that -- I

5       said, a test, you know.  It just kind of like --

6       You know, it bothered me.

7  Q.   Well, I'm going to get to that.  But as a result

8       of this February 17, 2006 Defendant's Exhibit

9       Number 2, did you make any complaints to anybody

10      about having to take a written test?

11 A.   No.  We talked -- It was two or three of us

12      talked among ourselves, the other older guys:

13      Horace Clanton, Robbie Hodge.

14 Q.   And y'all didn't want to take a written test?

15 A.   We just didn't think it was right.

16 Q.   Y'all probably wanted it to be seniority, didn't

17      you?

18 A.   Not just necessarily seniority, but if you're

19      going to give a written test, let it count for a

20      certain percentage and let you move on to the

21      next phase.  My particular thing is that cutoff

22      score that the City imposed.

23 Q.   Do you think it's too high or too low?

64

```
 1    A.    That's the first time they ever gave a test with
 2          a cutoff score.
 3    Q.    How do you know the City imposed that?
 4    A.    I got paperwork that says it imposed it.
 5    Q.    What do you think the cutoff score should have
 6          been?
 7                MR. HORSLEY:   Object to the form.
 8    A.    I have no idea.  That's something they had to
 9          have experts determine.
10    Q.    Well, do you know whether or not the City had
11          any expert to determine the cutoff score?
12    A.    Thirty days.
13    Q.    What?
14    A.    No.  I don't believe they did.
15    Q.    Why don't you believe that?
16    A.    Because it plainly states in our grievance
17          hearing that the City chose to impose a 70,
18          which is the cutoff score.
19    Q.    Do you know Mr. Hancock here down at the end of
20          the table?
21    A.    Yes, I do.
22    Q.    Have you had any conversations with Mr. Hancock
23          about the cutoff score?
```

65

| | | |
|---|---|---|
| 1 | A. | No, I haven't. |
| 2 | Q. | Have you had any conversations with Mr. Hancock |
| 3 | | about who came up with the 70 percent figure? |
| 4 | A. | No. |
| 5 | Q. | Have you had any conversations with him about |
| 6 | | who imposed the cutoff? |
| 7 | A. | No. |
| 8 | Q. | Let me show you Defendant's Exhibit Number 3, |
| 9 | | which is a memo dated February 23, 2006 that |
| 10 | | opened it up to others that were not |
| 11 | | non-probationary lieutenants. |
| 12 | A. | Yes.  That's about the time. |
| 13 | Q. | And you would have received that on or about |
| 14 | | February 23, 2006? |
| 15 | A. | Yes. |
| 16 | Q. | And did you make any complaints to anybody about |
| 17 | | that? |
| 18 | A. | No.  It kind of struck me that -- Probationary |
| 19 | | lieutenants, that kind of struck me, because the |
| 20 | | City policy states that probationary employees |
| 21 | | in the fire department can't be eligible for a |
| 22 | | promotion within a year. |
| 23 | Q. | Back up. |

66

1          The City policy says what?

2    A.   That -- In the fire and the police department,

3         that if you work for them and you go from one

4         rank to the next, you can't be eligible for a

5         promotion until after you complete that -- you

6         have to do a year in that promotion step to be

7         able to apply for the next promotion.  Now, the

8         fire department policy I guess states another

9         thing, but the City policy states what I just

10        told you.

11   Q.   So according to the City policy, in order to

12        apply for promotion, as you understand it, to

13        battalion chief, you would have had to have been

14        in what position for a year?

15   A.   Lieutenant's position for a year.

16   Q.   Were you in the lieutenant's position for a

17        year?

18   A.   No.  That's why I was satisfied with the team

19        leader.  I was eligible as team leader.

20   Q.   Well, was there anybody -- a team leader or

21        lieutenant that had not been there for a year?

22   A.   All of us had been there for a year, but we went

23        from team leader to lieutenant.

67

 1    Q.    That's my question.  Are you saying only people

 2          who had been lieutenants for a year should have

 3          been eligible for battalion chief?

 4    A.    It's not me saying it.  That's City policy.

 5    Q.    And you agree with the City policy is what

 6          you're saying?

 7                      MR. HORSLEY:  Object to the form.

 8    A.    I work for the City.  I just work --

 9    Q.    Here's where I'm confused.  Are you saying you

10          should or should have not been eligible?

11    A.    If those guys were eligible, I should have been.

12    Q.    I'm not asking about those guys.

13    A.    Yeah, I was eligible.

14    Q.    Why were you eligible?

15    A.    I wasn't eligible according to the City policy.

16    Q.    You were not?

17    A.    But I was eligible according to this memo from

18          Chief Langley.

19    Q.    All right.  You were not eligible to apply for

20          battalion chief per City policy?

21    A.    Yeah.

22    Q.    And why is that, because you had not been a

23          lieutenant for a year?

68

```
 1    A.    City policy states if you work for the fire
 2          department or police department and you go from
 3          one position to the next that you can't be
 4          eligible for a promotion to within a year's
 5          period.
 6    Q.    So, then, the only two people that would have
 7          been eligible for promotion to battalion chief
 8          would have been Gerald Stephens and Chris
 9          Turner?  Is that your position?
10    A.    Yes.
11                    MR. HORSLEY:  Is this a decent time
12                 for a break?
13                    MR. MORGAN:  Sure.
14                 (Brief recess.)
15    Q.    (Continuing by Mr. Morgan)  Let me show you
16          Defendant's Exhibit Number 4, which I think is
17          the sign-in sheet for the orientation.  Did you
18          attend the orientation?
19    A.    Yes, I did.
20    Q.    Who was present?
21    A.    It was all of these guys except -- I think just
22          about everybody was present that signed off on
23          here.
```

69

```
 1              MR. HANCOCK:  Randall, let me
 2                  interrupt.  The exhibits you're
 3                  referring to, are those the
 4                  exhibits to Mr. Stephens'
 5                  deposition?
 6              MR. MORGAN:  They are.
 7              MR. HANCOCK:  Are you going to attach
 8                  those to this or do you want to
 9                  have one set?
10              MR. MORGAN:  My intention was to just
11                  keep the same numbers going.
12              MR. HANCOCK:  I just --
13              MR. MORGAN:  I don't see any need to
14                  renumber and put extra exhibits in
15                  there.
16              MR. HANCOCK:  Okay.
17              MR. HORSLEY:  I agree.
18     Q.   Who was there --
19     A.   Dennis might have not been there, because he
20          didn't take the test.
21     Q.   Who was there to explain what was going on or
22          what was going to happen?
23     A.   I don't remember the guy's name, but he got up
```

70

```
 1              on stage.  And I believe Mr. Reeves was there
 2              and Chief Lamar was there.
 3      Q.      The guy that got up on stage --
 4      A.      He was a representative from CWH.
 5                      (Off-the-record discussion.)
 6      Q.      How long did the orientation session last?
 7      A.      I want to say about an hour.  You could give or
 8              take.
 9      Q.      And what do you remember Steve Reeves saying?
10      A.      I believe he just passed out some things for us,
11              and they got our signature.  Took up our
12              signature.  And the guy from CWH kind of took
13              the show and started explaining the different
14              parts of the test and thing.
15      Q.      And then what do you remember Lee Lamar saying
16              or doing?
17      A.      I can't remember if he did anything or said
18              anything.
19      Q.      And the guy from CWH I guess explained the
20              assessment process?
21      A.      Yeah, that's what he did.
22      Q.      And did he explain the written test?
23      A.      Yes.  He went through some parts of it and how
```

71

```
 1        it worked, you know.  That's all I remember him

 2        doing.

 3   Q.   Did he tell you there would be a cutoff score?

 4   A.   Not to my knowledge.

 5   Q.   When did you learn there would be a cutoff

 6        score?

 7   A.   I think Mr. Lamar told me that it would be --

 8        you would have to make a 70.  I'm not sure when

 9        it was.

10   Q.   Was it before or after this orientation?

11   A.   I don't know if it was before or after.  I can't

12        really recall.

13   Q.   Well, did the guy that was from CWH --

14             I assume you don't remember his name?

15   A.   No, I don't.

16   Q.   -- did he indicate to you that certain people

17        would not be allowed to go to the second part of

18        the procedure?

19   A.   Not to my knowledge.

20   Q.   What do you remember him telling you about the

21        written test?

22   A.   He just explained the different components and

23        how they go about making the test.  He told us
```

73

1            that not everybody would get to go to the

2            assessment part?

3    A.    I didn't know when I learned of the 70.  I can't

4            say --

5    Q.    It could have been before or it could have been

6            after?

7    A.    That's right.

8    Q.    You certainly knew it by the time you took the

9            test?

10   A.    Yeah, I knew it by the time I took it.

11   Q.    Defendant's Exhibit Number 5, it says Auburn

12          Fire Division Orientation Manual, Promotional

13          Written Test, and Assessment Center.

14            I assume you were given that at the

15          orientation session?

16   A.    Yes.

17   Q.    And who handed that out?

18   A.    I couldn't say who handed it out, but I do have

19          it.

20   Q.    And did the person from CWH go over this with

21          you?

22   A.    Yeah.  He went over -- this is what -- He went

23          over brief parts of it.  He just touched on each

75

```
 1    Q.    -- 2006.
 2    A.    Like I said, I mentioned -- the only thing I
 3          mentioned was I was concerned about it to
 4          Mr. Lamar the day I signed for those books.
 5    Q.    And that's going to be after this actually,
 6          March 3.
 7    A.    Okay.  It was after.
 8    Q.    But the day when you had -- when there was the
 9          orientation and you had the guy that was there
10          that was explaining the test and the assessment
11          center, Steve and Lee Lamar, you didn't make any
12          objection --
13    A.    No.
14    Q.    -- at that point about any of the process, did
15          you?
16    A.    No.
17    Q.    Now, here is a document dated -- Defendant's
18          Exhibit 6 dated March 3, 2006.  I assume you
19          remember receiving that document.
20    A.    Yes.
21    Q.    Is that another one that came out via e-mail?
22    A.    It probably did, but I know I got a copy of
23          this.  I can't say if it came --
```

76

1   Q.   On or about March 3, 2006?

2   A.   Yes.

3   Q.   And in here it clearly states that -- I say it

4        does.  Does this tell you about a cutoff score?

5   A.   Yeah.  Minimum score of 70 must be achieved.  So

6        if I got this, I learned about it around about

7        this time.

8   Q.   You don't remember if you knew about it before,

9        but you knew about it for certain by March 3,

10       2006?

11  A.   Yeah, thereabouts.  Because if I wasn't on duty,

12       I didn't get it that day but the next day.

13  Q.   So within --

14  A.   One or two days either way.

15  Q.   So we know for certain you knew about it by

16       then?

17  A.   Yes, sir.

18  Q.   And whether you knew about it before, you just

19       can't remember?

20  A.   I don't know.

21  Q.   When you received this March 3 memo from Lee

22       Lamar, did you complain to anybody at that time

23       about the cutoff score?

77

```
 1    A.    If he gave it to me, that's the day I spoke to
 2          him.  That would be around about the day I spoke
 3          to him about I was concerned about taking the
 4          test with the score -- the cutoff score.
 5    Q.    Let's see.  This is March 3, 2006 when you
 6          picked up your stuff.  This is Defendant's
 7          Exhibit 7.  And then Defendant's Exhibit 8 I
 8          think is where you actually signed on March 3,
 9          2006 that that's when you got your stuff.
10    A.    That would have been the day I spoke with him
11          (indicating).
12    Q.    What did you say to Mr. --
13    A.    I just kind of said, a test; I don't know.  He
14          said, well, you're a smart guy; you'll pass it.
15          And I said, well, I just don't know.  And I just
16          kind of walked out and left with the books.
17    Q.    Did you say anything more definitive to him
18          than, a test; I don't know?
19    A.    I didn't say anything other than that.  He just
20          kind of acknowledged it, and I kind of
21          acknowledged it and turned around and walked
22          out.
23    Q.    So the only thing you said to him was, a test; I
```

78

1    don't know?

2  A.    Yeah.

3  Q.    That's when you signed that you received the

4        book, and that's the day that Lee would have

5        handed you that piece of paper telling you about

6        the test?

7  A.    Yes.

8  Q.    And you said, a test; I don't know?

9  A.    Yes.

10                (Defendant's Exhibit 14 marked for

11                    identification.)

12  Q.    Let me show you Defendant's Exhibit 14.  Is this

13        your application for the battalion chief

14        promotion?

15  A.    Yes.

16  Q.    I think the test was given April 10 of 2006.

17  A.    Somewhere thereabouts.

18  Q.    Tell me what you did to study for the test.

19        What did you do?

20  A.    I believe it was three or four different books.

21        I went through and read the chapters, and I

22        really put some time in.  I studied.  My wife

23        was kind of worried about me I was studying so

79

1    hard at the dining room table.  You know, I seen

2    a lot of material, went over a lot of material.

3    And as I was studying, I was like, you know, a

4    lot of this stuff is for -- to me, it seemed

5    like it was for bigger departments.  And it

6    really strayed away from what we really do

7    actually day-to-day operations with all the --

8  Q.  Wait.  When you were studying, you were doing

9    what, now?

10 A.  I said I did a lot of reading, and my wife got a

11   little worried about it because I was trying to

12   study so hard and make sure I did as well as I

13   could on the test.

14 Q.  But you thought something was getting away?

15 A.  The material that we was reading, chief officers

16   and stuff, a lot of that to me seemed like it

17   was for maybe a department the size of

18   Montgomery where it had district chiefs.  You

19   know, you had a bigger rank structure.

20 Q.  Well, are these the books that you had that the

21   City gave you:  IFSTA Chief Officer?

22 A.  Yes.

23 Q.  You read that book?

80

```
 1    A.    Yeah.  I read chapters.  I didn't read all of
 2          it.  I read most of it.
 3    Q.    You didn't read it all, but you read most of it?
 4    A.    Yes.
 5    Q.    And you decided that that book didn't apply to
 6          the City of Auburn?
 7    A.    I didn't decide.  I said --
 8                  MR. HORSLEY:  Object to the form.
 9    A.    I didn't decide.  I just said to myself that
10          some of this stuff looked like it was a bit much
11          for the department a size of Auburn.  That
12          didn't stop me from trying to read and
13          comprehend it.
14    Q.    What was there in the IFSTA Chief Officer book
15          that you thought was a bit much for the City of
16          Auburn?
17    A.    A lot of that was pertaining to more of a
18          district chief.
19    Q.    What's the difference in a district chief and a
20          battalion chief?
21    A.    A district chief runs an entire quadrant of a
22          city.
23    Q.    And what does a battalion chief do?
```

81

```
 1    A.    Battalion chief just oversees about three to

 2          four stations.  We don't have but five stations,

 3          and that's what he does.  But, you know, it was

 4          a lot more responsibility.

 5    Q.    For who?

 6    A.    A district chief has a lot more responsibility.

 7    Q.    So you thought the IFSTA Chief Officer referred

 8          more to a larger city and district chiefs?

 9    A.    Yeah, I did.  I'm not a expert, but that's what

10          I thought.

11    Q.    Did you complain to anybody about that before

12          the written test?

13    A.    No.  I just read.  I just studied my material.

14    Q.    And did you read the Effective Supervisory

15          Practices?

16    A.    Yes.

17    Q.    Now, had you had that book before?

18    A.    Yes.

19    Q.    Where all had you had that before?

20    A.    That was a class that the City puts on and

21          requires the employees to go to that's in

22          supervisory positions.

23    Q.    You had already had that?
```

82

1    A.    Yes.

2    Q.    And then that was another book that you were

3          given to review?

4    A.    Yes.

5    Q.    Because questions were going to come from it on

6          this test?

7    A.    Yes.

8    Q.    Was there anything about that book that you

9          didn't think applied to the battalion chief

10         promotion?

11   A.    No.  That was kind of good.

12   Q.    And did you read that whole book or just parts

13         of it?

14   A.    Parts of it because I took that class, and I was

15         pretty familiar with it.

16   Q.    And then you had the Fire Officers Handbook of

17         Tactics?

18   A.    Yeah.

19   Q.    Did you read that book?

20   A.    Yes.  I read some parts of it.

21   Q.    Had you been exposed to that book before?

22   A.    No.  Not that book per se but some tactics and

23         firefighting books.

83

| | | |
|---|---|---|
| 1 | Q. | And you read parts of it? |
| 2 | A. | Yes. |
| 3 | Q. | How did you decide what parts you were going to |
| 4 | | read? |
| 5 | A. | I just -- You know, everybody got strong and |
| 6 | | weak areas in stuff they do, and I looked at |
| 7 | | things that I wasn't quite sure of.  Some things |
| 8 | | I knew.  Some things I wasn't quite sure of, and |
| 9 | | I read those.  I spent a little more time -- |
| 10 | | when I say -- I spent more time on some things |
| 11 | | than others. |
| 12 | Q. | So if you thought you knew it, you didn't spend |
| 13 | | as much time on it? |
| 14 | A. | Yes. |
| 15 | Q. | And you had had some exposure, maybe not to this |
| 16 | | book, but to the tactics books? |
| 17 | A. | Yes. |
| 18 | Q. | As you reviewed this Fire Officers' Handbook of |
| 19 | | Tactics, was there anything in this book you |
| 20 | | didn't think applied to the City of Auburn? |
| 21 | A. | No. |
| 22 | Q. | You thought that book was applicable to what |
| 23 | | went on at Auburn? |

84

1    A.    Yes.   Because you got -- any different structure

2          fire going to be different.   So that was more

3          telling you about attacks and plans.

4    Q.    And that's pretty uniform?

5    A.    Pretty uniform.

6    Q.    And then the fourth book was Structural

7          Firefighting?

8    A.    Yeah.   That's another one that's pretty true to

9          form too.

10   Q.    That's a uniform book?

11   A.    Yeah.

12   Q.    Were you exposed to that book before at the City

13         of Auburn?

14   A.    Not -- I've took some classes -- You know, you

15         got a little building construction and stuff and

16         components of different classes I took over the

17         years.   It was made up of that.

18   Q.    And you thought that book was applicable to what

19         went on at the City of Auburn?

20   A.    Yeah.

21   Q.    Did you form any study groups with anybody?

22   A.    No.   I just studied at home.

23   Q.    Did you study anything other than the -- I

85

1          assume that's the four books that were given to

2          you by the City for this?

3    A.    Yes.

4    Q.    Did you study anything other than those four

5          books in preparation for the exam?

6    A.    No, I did not.

7    Q.    Because you understood the questions were going

8          to come from those books?

9    A.    Yes.  That's what I understood.

10   Q.    Y'all were told that in the orientation, were

11         you not?

12   A.    I don't remember him saying it just like you

13         said it, but we just assumed that those books

14         were going to cover the test.

15   Q.    So you reviewed those books, read some of them.

16         You studied at home.  Anything else you did in

17         preparation for the test?

18   A.    No.  Other than all the years of going to the

19         fire college and going to the National Fire

20         Academy for advanced training.  Other than

21         that ...

22   Q.    Your experience?

23   A.    Yes.

86

1   Q.   You said you went to the fire college and where

2        else?

3   A.   I went -- Yeah, the fire college.  I went to the

4        National Fire Academy at Emmitsburg, Maryland.

5   Q.   How many times have you been to the fire

6        college?

7   A.   Several.  I've been up there about three or four

8        times, but a lot of classes now are taught in

9        the field so we don't really have to go up

10       there.  But they are certified through the fire

11       college so we get a lot of that in regional

12       training.

13  Q.   Do they give tests when you complete those

14       courses at the fire college?

15  A.   Yes.  After a week or two weeks of going over.

16  Q.   You get a written test?

17  A.   Yes.

18  Q.   Does the written test have a passing score?

19  A.   Yes.

20  Q.   And what's the passing score on those written

21       tests?

22  A.   It's a 70.

23  Q.   And how about at the National Fire Academy in

89

```
 1    A.   I couldn't say.

 2    Q.   Were you the second one to finish?

 3    A.   No.

 4    Q.   And when you completed the test that day with

 5         the human resources people there, did you make

 6         any complaints to anybody at that time about the

 7         written test?

 8    A.   Not to anybody that was in authority.  Some of

 9         the guys talked when we left about we thought it

10         was vague.

11    Q.   But nobody -- you didn't complain to any of the

12         people that you've sued --

13    A.   No.

14    Q.   -- in this lawsuit --

15    A.   No.

16    Q.   -- or anybody with human resources?

17    A.   No.

18    Q.   Did you ever complain to anybody that you've

19         sued or with human resources before you learned

20         you had not passed the test?

21    A.   No.

22    Q.   Did anybody that you talked to think they had

23         done well?
```

95

```
 1        doing.

 2    Q.  Who all thought it was vague?

 3    A.  The same older officers I talked to.

 4    Q.  The older officers?

 5    A.  Yeah.  Lieutenant Clanton, Lieutenant Hodge, we

 6        spoke about it.

 7    Q.  Clanton, Hodge, and you.  Y'all thought it was

 8        vague?

 9    A.  Yes.

10    Q.  Did you challenge any of the test questions?

11    A.  I think Joey did.  Chief Darby did that.  I

12        think he was the one that -- I know some

13        questions were being challenged, and later on I

14        come to find out I believe he was the one doing

15        it.

16    Q.  Did you challenge any questions?

17    A.  No, I did not.

18    Q.  Before filing the grievance, did you ever

19        complain to anybody that you've sued in this

20        lawsuit --

21    A.  Yes.

22    Q.  -- about the written test --

23    A.  Yes.
```

96

| 1 | Q. | -- being unfair? |
| 2 | A. | Yes. |
| 3 | Q. | And to whom did you complain? |
| 4 | A. | The day I was talking to Chief Langley and Chief |
| 5 |    | Lamar walked in, and I told him to come on in |
| 6 |    | too.  I don't know if he was paying me much |
| 7 |    | attention, but I was complaining to chief that |
| 8 |    | day. |
| 9 | Q. | What day? |
| 10 | A. | It was after we took the test.  It was about a |
| 11 |    | couple of days after we took the test.  And |
| 12 |    | I just told them I didn't think the process was |
| 13 |    | fair. |
| 14 | Q. | Well, did you tell them what was unfair about |
| 15 |    | the process? |
| 16 | A. | Yes.  People that got promoted to battalion |
| 17 |    | chief before me and didn't take a test. |
| 18 | Q. | Well, did you ever tell anybody you thought it |
| 19 |    | discriminated against you because you were |
| 20 |    | black? |
| 21 | A. | Yes, I did.  All the black guys, we didn't have |
| 22 |    | a chance to be promoted.  Obviously it |
| 23 |    | discriminated against us because we was black. |

108

```
1          over the candidate feedback, was that somebody

2          from the City or was that somebody from WCH

3          there?

4     A.   I believe it was the City official.

5     Q.   Did you file your grievance before or after

6          that?

7     A.   I can't recall.  It might have been filed

8          before, but I can't say.

9     Q.   Let me show you Defendant's Exhibit 17.

10                   (Defendant's Exhibit 17 marked for

11                        identification.)

12    Q.   Is that the grievance that you filed?

13    A.   Yes.

14    Q.   When were you supposed to challenge the

15         questions?

16    A.   I think you had maybe -- After the test, I

17         believe.  I can't say exactly the time frame.

18    Q.   How did you learn you could challenge questions?

19    A.   I think that was went over in orientation.  It

20         might have been went over in orientation.

21    Q.   And your recollection is you had some time

22         period after the test to challenge questions?

23    A.   Maybe a couple of days.
```

109

| | | |
|---|---|---|
| 1 | Q. | But a day or two or some period? |
| 2 | A. | Yes.  That's my recollection, now.  Somebody |
| 3 | | else might remember something different. |
| 4 | Q. | And that was something discussed, I guess, by |
| 5 | | the CWH person in orientation? |
| 6 | A. | Yeah. |
| 7 | Q. | And is it your understanding that Joey Darby is |
| 8 | | the only one that challenged any questions? |
| 9 | A. | Yes, that's my understanding.  I don't know if |
| 10 | | anybody else did or didn't, but it's my |
| 11 | | understanding that he -- |
| 12 | Q. | We know you did not. |
| 13 | A. | No, I did not. |
| 14 | Q. | And these older firefighters that were making |
| 15 | | complaints about the test being vague, they |
| 16 | | didn't challenge any questions? |
| 17 | A. | No, they did not.  Not to my knowledge they |
| 18 | | didn't. |
| 19 | Q. | We can agree, I guess, that Defendant's Exhibit |
| 20 | | 17 does not make any reference to your race as a |
| 21 | | factor, does it? |
| 22 | A. | No, it doesn't.  Not the first letter. |
| 23 | Q. | But you say there's another letter in the |

114

```
 1    Q.    How many years of service do you think you
 2          should have had before you could be considered?
 3                MR. HORSLEY:   Object to the form.
 4    A.    At least ten to fifteen.
 5    Q.    And then no accumulative point system, I'm not
 6          clear on that one.  Tell me what that one is.
 7    A.    Say somebody took the test and made a 69 on it,
 8          and they move to the next phase of testing, of
 9          an in-basket or they done a great job on
10          doing -- say it was something that Chief Lamar
11          wants us to do, an assignment, and we did that
12          so we made -- Say he made a 75 on that where
13          somebody on the test might have made a 71 and
14          then didn't do so good on that.  You took all
15          those scores when you got to the end of the
16          thing and add it up and come out with a average
17          and then made your promotions.
18    Q.    That's basically the same thing about the
19          written test, not having a cutoff score, isn't
20          it?
21    A.    Basically.
22    Q.    You think you should have --
23    A.    You accumulate points.  You get points for not
```

115

```
 1          getting wrote up, coming to work on time,

 2          wearing your uniform with pride.  We do

 3          merit-based raises.  We get merit-based raises.

 4          And if I'm supervising a career firefighter and

 5          I don't fill his evaluation out just like my

 6          chief want me to -- It's very important that we

 7          do that and keep a track of his performance.

 8          Now, you got -- you ought to be able -- if

 9          that's so important, you ought to be able to

10          incorporate that into your promotional

11          procedures also.

12     Q.   You're saying the promotional procedures should

13          have included more than the test --

14     A.   Exactly.

15     Q.   -- and the assessment center?

16     A.   Exactly.

17     Q.   What else should have been -- Let me finish.

18               What else should have been involved in the

19          promotional procedure besides the written test

20          and the assessment center?

21                    MR. HORSLEY:  Object to the form.

22     A.   Your yearly appraisals, the years that you've

23          been there.  That's about it.
```

118

1        into consideration.  Let's look at it that way.

2    Q.  Here's the reason I asked that.  Earlier you

3        said that you should look at the performance

4        appraisal to determine who should be able to

5        take --

6    A.  I made a mistake.

7    Q.  Are you backing off that?

8    A.  I'm backing off that.  But have all of it add up

9        to something and don't cut nobody.  Just don't

10       cut nothing.  Just get a score.  That way you

11       could do it this way.  If that person didn't

12       wear his uniform, he could see why maybe he

13       didn't get -- he could go through the process,

14       but he could see where he fell 5 points short

15       for not wearing his uniform.  He'll be more

16       motivated to the next time to keep his shirttail

17       tucked in, wear his collar brass the right way,

18       make sure the truck gets checked off, because,

19       let's face it.  We live in a world where you can

20       only do so much talking to people when you're a

21       supervisor.

22   Q.  Would you count that equal with the written test

23       of the assessment center, the performance

119

1          appraisal?

2                  MR. HORSLEY:  Object to the form.

3    A.   I can't make a statement because I'm not a

4          expert.  I just thought it should be included in

5          my opinion.

6    Q.   You think the seniority --

7    A.   Yes, I think it should be included.  I ain't say

8          give them a hundred points.  I say give them

9          some points.  A lot of departments do, for being

10         on the job, for being there and being -- You can

11         look at the appraisal and look at how long

12         they've been on the job and say, well, if this

13         person is doing this at this level, then you can

14         score -- give them a numerical score on it.

15    Q.   So a person who may have better performance

16         appraisals and score higher on a written test

17         and do better on an assessment center should be

18         penalized because they haven't been hired before

19         somebody else?

20                 MR. HORSLEY:  Object to the form.

21                 That's not what he said.

22    A.   No, that's not what I'm saying.

23    Q.   Tell me what you're saying.  I want to be sure I

122

1    A.    Every one I seen is good.

2    Q.    And what battalion chiefs are there there don't

3         know how to get around the city?

4    A.    I'm saying that's not a big priority now, and a

5         lot of people come up through the ranks and

6         really don't know their streets and numbers.

7         When I came I had to learn that and go before

8         people and show them that I knew that in order

9         to move to the next step.

10    Q.    Well, what battalion chiefs don't know their

11         streets and numbers?

12    A.    Most of them.  I would say every one of them.

13         They are learning them.  They are getting

14         on-the-job training, but that wasn't required of

15         them when they first came in like it was

16         required of me.

17    Q.    You mean when they were first hired?

18    A.    I know it wasn't.  They didn't enforce it like

19         they did against me.  They would have put it in

20         my appraisal and fired me.

21    Q.    Well, is it your testimony that the people that

22         were promoted to battalion chief don't know

23         their streets and numbers?  Is that what you're

123

```
 1            testifying to?

 2       A.   They don't know them like the people -- their

 3            predecessors had to know them.  I'll put it that

 4            way.

 5       Q.   And specifically which -- All battalion chiefs?

 6       A.   Yes.

 7       Q.   None of the battalion chiefs know their streets

 8            and numbers?

 9                      MR. HORSLEY:  Object to the form.

10                      That's not what he said.

11       Q.   Like you would have?

12       A.   Like their predecessors were required to.

13       Q.   How did they test the predecessors to see if

14            they knew them?

15       A.   Now we have people moving so fast that you

16            didn't get -- We moved fast because that's the

17            way they done got the system set up.  But you

18            used to you come in -- You're 19 fresh coming in

19            now from college, 19, student firefighter, and

20            driving the front end pumper, that's a lot of

21            responsibility.  Driving a truck in to lay a

22            line to a house fire and you're 19 years old

23            with a $300,000 piece of apparatus at your
```

124

1    control, that's unheard of in most places.

2    Q.    Are you saying those people aren't competent to

3          do it?

4    A.    That's a lot of responsibility.  You need time

5          to learn.

6    Q.    Didn't y'all's fire rating just increase?

7    A.    I have no way of knowing.  That's Chief Lamar.

8    Q.    And I'm not trying to argue with you.  I want to

9          be sure I understand what you're saying.

10          A student firefighter in your opinion is not

11         qualified to operate a piece of apparatus?  Is

12         that what you're saying?

13              MR. HORSLEY:  That's not what he

14                   said.

15   A.    I'm not a expert.  Let me sum it up this way.

16         The standards I were hired under are lacking

17         now.  That's what I am saying.

18   Q.    And how are they lacking?

19              MR. HORSLEY:  Object to the form.

20                   Asked and answered.

21   A.    That's all I can say.  Standards --

22   Q.    Well, you've told me about the streets and

23         numbers.  How else are they lacking?

125

A.    I could sit here all day and go through things

that are different now about what happens down

there.  The training, it's good, but people are

not -- you've got people that are just sliding

through the cracks.  They are looking forward to

being promoted instead of learning one job

before they can get -- before they can move to

the next because they done took away all the

standards, all the policies.

When I came in -- And this is exactly what

I'm saying.  When I came in, I was told learn

your streets and numbers, your hydrant

locations, and you've got a certain time to

learn them and the hydrant locations, and then

we're going to teach you how to tilt the back of

the ladder truck and we're going to teach you

how to drive a pumper, and you won't be eligible

for a promotion to lieutenant for at least five

years.

Now they come in, and they entertain the

thought of a promotion as soon as they come off

probation, or some will sneak in on probation.

They let them come in on probation to sit in to

126

```
1          get promoted.  That's what I'm saying right

2          there in a nutshell.

3     Q.   Is it your opinion that the procedures and

4          promotion policies and hiring policies under

5          Ellis Mitchell are better and more fair than

6          they are today?

7               MR. HORSLEY:  Object to the form.

8     A.   In my opinion -- Like I say, I'm not a expert.

9          I know he had his problems, but -- Yes, he had

10         some problems, some serious problems, because he

11         told me what he told me when he hired me.  But

12         at least when he hired me and told me that, I

13         could accept the fact he was trying to do

14         something about it.

15    Q.   So you think his hiring and promotion procedures

16         are better than what they are now?

17              MR. HORSLEY:  Object to the form.

18    A.   I think he required more of you.

19    Q.   He required more of you?

20    A.   Yeah.  Than just --

21    Q.   Who was promoted from probationary status?

22    A.   Rodney Hartsfield.

23    Q.   He was --
```

127

1   A.   Team leader.  He promoted from firefighter to

2        team leader.

3   Q.   And he was still --

4   A.   On probation per City policy.

5   Q.   Where is that City policy that says you have to

6        have one year in grade?

7   A.   Firemen and policeman -- It's in the City

8        personnel policies book.

9   Q.   Do you have that City personnel book that has

10       that in there?

11  A.   I don't have it handy.

12  Q.   But there's a City policy in the personnel book

13       that says police and fire have to be in a

14       position one year before they can --

15  A.   Yes.  I just read it last week.  I went online

16       and read it last week.

17  Q.   I think the last thing on -- what's that letter

18       number -- Defendant's Exhibit 17, inconsistency

19       of past promotional procedures, what's your

20       complaint?  Was that one of your complaints?

21  A.   Yes.

22  Q.   What was your complaint?

23  A.   Just what I got through spelling out.  If Chief

128

1      Lamar can get promoted one way, Chief Lankford

2      can get promoted another way, Fire Chief Langley

3      got promoted from firefighter to captain by

4      somebody coming and getting him and telling him

5      he captain and then he moves to the chief

6      position and never took a written test, it's

7      definitely discriminatory when you require that

8      of me.

9  Q.  Well, it would be -- would it be discriminatory

10     if you required it of anybody, black or white?

11              MR. HORSLEY:  Object to the form.

12  A.  I've got to worry about me right now.

13  Q.  I'm asking you.  Is it any less discriminatory

14     toward you as a black than it would be as a

15     white?

16              MR. HORSLEY:  Object to the form.

17  A.  Well, it's excluding us blacks.  I'll put it --

18  Q.  Well, does it exclude the other whites?

19  A.  Other whites are being promoted at a record

20     rate.

21  Q.  Mr. Ogletree, does it exclude people who don't

22     get promoted like Horace Clanton?  Is he

23     discriminated against?

129

1          MR. HORSLEY:  Object to the form.

2     A.   I have no idea.

3     Q.   You don't know if he's discriminated against?

4     A.   I have no idea.  That would be something he

5          would have to tell you.  I know how I feel.

6     Q.   So the procedure only discriminates against

7          blacks, not against whites that don't get

8          promoted.  That's your testimony?

9          MR. HORSLEY:  Object to the form.

10    A.   That's my testimony.

11    Q.   You asked that the four written exams be

12         reviewed.  Information was received that

13         questions were excluded.  Is that the challenges

14         that were made by Joey Darby?

15    A.   Yes.  I guess that's what that were referring

16         to.

17    Q.   And very concerned which questions were removed

18         and verify that everyone participated in the

19         exam was equally graded.

20         Do you have any --

21    A.   I have no way of knowing.

22    Q.   -- evidence or testimony or hearsay or opinions

23         now that anybody was not graded fairly?

130

1    A.    I have no way of knowing that.  We don't even

2          know what questions were threw out.  We have no

3          way -- We know it helped Joey, but we don't know

4          did somebody get all seven right and they still

5          were thrown out and they didn't get credit for

6          it.  We have no way of knowing.

7    Q.    You don't know whether it helped you or not?

8    A.    That's right

9                    MR. HANCOCK:  Are we close to a

10                       break?

11                   MR. MORGAN:  Sure.

12                   (Brief recess.)

13   Q.    (Continuing by Mr. Morgan)  Mr. Ogletree, do you

14         recall sometime in the late 1980s that there was

15         a lawsuit against the City dealing with the

16         Auburn Fire Department and Ellis Mitchell as its

17         fire chief?

18   A.    Yes.

19   Q.    After that lawsuit was settled, did the City

20         ever give any streets and numbers exam?

21   A.    They didn't never really give an exam.  They

22         just called you in and sat you down, and you

23         would answer to your supervisor really.  It

131

1      wasn't nothing that was like what they are

2      giving you today and say you've got a 70. They

3      just made sure you knew it. I didn't take it as

4      being an exam. They just kind of called you in

5      and gave you a map and said fill it in. Or you

6      sat there before somebody, and they would ask

7      you Cox Street, and then you would have to give

8      all streets and the numbers on them.

9  Q.  Since the settlement of that lawsuit against the

10     City and Ellis Mitchell, have applicants for

11     promotion ever been given any points for

12     seniority?

13  A.  Not to my -- I wouldn't have privy to that

14     information.

15  Q.  Well --

16  A.  I wouldn't know. Not to my knowledge. I should

17     say that.

18  Q.  Well, did you receive any points for seniority

19     the time that you competed for team leader? Did

20     anybody get seniority points on that occasion?

21  A.  The only thing I could say, everybody in there

22     had been there at least four or five years and

23     had -- the people that went out were with me and

136

1   A.   No, he did not.

2   Q.   Is there anything different about Mr. Clanton's

3        position on the promotion process and the way he

4        was treated than your position and the way you

5        were treated?

6   A.   There's one big difference.  Mr. Clanton is not

7        black.

8   Q.   That's the only difference, isn't it?

9   A.   Yes.

10  Q.   Sir?

11  A.   That's it.

12  Q.   Were you privy to a conversation where

13       Mr. Clanton was told he did not have a suit

14       because he was not black?

15  A.   I don't know if I was privy to that or not.  I

16       don't remember anything like that.

17  Q.   I'm going to ask you about these guys that were

18       promoted, and I want you to tell me -- I'm going

19       to ask you about Rodney Hartsfield.  Is it your

20       opinion that Mr. Hartsfield is or is not

21       qualified to be a battalion chief?

22            MR. HORSLEY:  Object to the form.

23  A.   I can't make that -- I'm not a expert.  All I

134

1      have.

2  Q.  And then I think we've covered the initial thing

3      of the grievance procedure.  Y'all proceeded on

4      through the grievance procedure?

5  A.  Yes, sir.

6  Q.  And actually had a hearing?

7  A.  Yes.

8  Q.  But your testimony was at some point along at

9      that process, y'all brought up about the race.

10  A.  It was the last letter addressed to Mr. Charlie

11      Duggan.

12  Q.  By the way, do you know what section of the

13      personnel rules that is that says you've got to

14      be time in grade?

15  A.  No, it doesn't -- I didn't see anything.  I said

16      it's about probation.  That's in the promotions

17      part of it.

18  Q.  Do you know what section of the personnel --

19  A.  It will be a section that says promotions, and

20      it will be under it.

21  Q.  And it says you have to be --

22  A.  If you're a firefighter or a police officer, you

23      have to be on probation for one year before

135

1          being eligible to move to the next rank.

2    Q.    And I assume you have a copy of the letter that

3          you can make available that went to Charles

4          Duggan --

5    A.    Yes.

6    Q.    -- about the race?

7              Who showed up for the hearing?  Who was

8          still on board as complaining about the

9          procedure?

10   A.    Myself, Lieutenant Stephens, and Lieutenant

11         Horace Clanton.

12   Q.    And y'all had a hearing in the -- before Judge

13         Bailey?

14   A.    Before Judge Bailey, yes, sir.

15   Q.    And what happened after the hearing?

16   A.    Well, basically Judge Bailey sided with the

17         City.  They sent us about -- It was about maybe

18         two weeks later they sent us a packet where they

19         reaffirmed the decision not to promote us.

20         Later we got a letter from Mr. Duggan

21         reaffirming Judge Bailey's decision not to

22         promote us.

23   Q.    And Mr. Clanton did not file a lawsuit?

137

```
 1          know is I am qualified and experienced and have

 2          more qualifications and more experience than

 3          Chief Hartsfield.

 4     Q.   Tell me how your qualifications are better and

 5          how your experience is better than Chief

 6          Hartsfield.

 7     A.   I feel this way:  If they could give Chief

 8          Garrett, Chief Lawrence, and Chief Leverette

 9          those promotions based on -- obviously it was

10          based on their experience -- they could have

11          promoted me based on my experience and

12          qualifications.

13     Q.   My question, though, is as to Mr. Hartsfield.

14          What is it about you that makes you more

15          qualified than Mr. Hartsfield?

16                    MR. HORSLEY:  Object to the form.

17     A.   My years of service.

18     Q.   Anything else?

19     A.   No.

20     Q.   I'm sorry?

21     A.   No.

22     Q.   What is there about your experience that makes

23          you more qualified than Mr. Hartsfield?
```

138

1    A.    This goes to the core of it.

2    Q.    Goes to what?

3    A.    This goes to the core of all of it with that.

4          Firefighting is not like going out here and

5          learning something, you know, across the street

6          at the bank or something -- learning how to be a

7          teller.  Any different structure you pull up on,

8          it could be different.  It could seem like it's

9          burning in the front room when it might be

10         burning on the bottom floor.  And until you see

11         enough of that -- You gain more understanding

12         with the more that you see, and that's why your

13         years of service is so important.

14   Q.    So, once again, going back, your experience --

15         you're more experienced than Mr. Hartsfield

16         because of your years of service?

17   A.    That's right.

18   Q.    Anything else?

19   A.    That's it.

20   Q.    What about, is it, Joe --

21   A.    Joe Lovvorn.  Same answer.

22   Q.    Same answer as to why you think you're better

23         qualified to be a battalion chief is because of

139

```
 1        your years in service?

 2   A.   Yes, sir.

 3   Q.   Same answer?

 4   A.   Same answer.

 5   Q.   And as for Matt Jordan --

 6   A.   Same answer.

 7   Q.   -- same answer?  You think you're better

 8        qualified to be a battalion chief because of

 9        your years in service?

10   A.   Yes, sir.

11   Q.   And Joey Darby?

12   A.   Same answer.

13   Q.   You think you're more qualified to be a

14        battalion chief because of your years in service

15        than Mr. Darby?

16   A.   Yes, sir.

17   Q.   I'm going to run through some of these witnesses

18        that y'all have listed, and I'm going to try to

19        do this quickly.  These are people that you and

20        your attorney disclosed as having some

21        information about your case, and two of them are

22        William Thompkins and Jeremy Patterson.

23   A.   Yes, sir.
```

141

```
 1            hire some blacks, and I think that have some

 2            relevance to ...

 3     Q.     To your knowledge they know nothing about your

 4            case?

 5     A.     Exactly, to my knowledge.

 6     Q.     But they were not hired, and they are black?

 7     A.     That's right.

 8     Q.     And Chris Turner.  What is it that Chris

 9            Turner -- what do you think he knows about all

10            this?

11     A.     Only thing I can say is Chris has been subjected

12            to tests every time he gets ready to be

13            promoted, and he's not being promoted.

14     Q.     Test.  Now, has he ever had a written test

15            before?

16     A.     Yes.

17     Q.     Was that for the last team leader?

18     A.     I don't know.  I just know he was sitting there

19            with the battalion chiefs.

20     Q.     Oh, he took the battalion chiefs with y'all?

21     A.     Yes, sir.

22     Q.     But you don't think he should have been able to

23            take the battalion chiefs, do you?
```

142

1          MR. HORSLEY:  Object to the form.

2    A.   I know that by City policy, he was the only one

3         other than Gerald Stephens qualified to be -- By

4         the policy of non-probationary employees, they

5         were the only two qualified to be sitting in

6         there if we went by the City policy.

7    Q.   But he was not a lieutenant?

8    A.   No.  And I don't think he should have been in

9         there.

10   Q.   You don't think he should have ever taken the

11        test, do you?

12   A.   That's right.

13          MR. HORSLEY:  Object to the form.

14   Q.   Marzilla Ogletree, that's your wife?

15   A.   Yes.

16   Q.   What does she know about this case or do you

17        know anything that she would have -- any

18        information she would have about this?

19   A.   Probably worried about me.

20   Q.   Delner Franklin Thomas with the EEOC, do you

21        know who he is?

22   A.   No, I don't.

23   Q.   Douglas Watson, the former City manager, do you

159

1          captain had at least 15 years' experience or

2          more.  So whether they put it in writing or not,

3          it was given weight.

4     Q.   So before they became a captain or battalion

5          chief, they had at least 15 years' experience?

6     A.   Yeah.  The guys I worked for had at least 15

7          years' experience.

8     Q.   Let's go back to my question on the promotion

9          procedure.  Do you know of any promotion

10         procedure --

11    A.   No.

12    Q.   -- since the settlement of the Clinton Hammock

13         lawsuit in which credit was given for seniority?

14    A.   Chief Lawrence, Chief Garrett, Chief Brown, and

15         Chief Leverette.

16    Q.   And that's the name change?

17    A.   That's a promotion to me.

18    Q.   Did their duties change any?

19    A.   No.  When somebody tell me they are the chief

20         and I work for them, it changed.

21    Q.   Well, you worked for him when he was a captain.

22    A.   Yeah.  And he come down and made sure I knew he

23         was the chief.

160

```
1    Q.    Whether he called himself the chief or captain,

2          did your relationship change any?

3    A.    Not my relationship, no.

4    Q.    Did his duties change any?

5    A.    I have no idea.

6    Q.    Well, did you know -- you told me before you

7          knew what a battalion chief did and you knew

8          what a captain did.  Did the duties change

9          between a captain and --

10   A.    Not to my knowledge.

11   Q.    Did he get any more pay?

12   A.    I wouldn't have that information.

13   Q.    And you didn't make any complaint with anybody

14         when the name change occurred, did you?

15   A.    No, I did not.

16   Q.    Let's see.  Then you've got 25.  The denial of

17         your promotion to battalion chief was racially

18         based.

19             Tell me why you claim that you were not

20         promoted based on your race.

21                     MR. HORSLEY:  As much as its been

22                        answered numerous times, I object

23                        to the form.  But go ahead.
```

161

1    A.    All I know is three African-Americans were

2          eligible to be hired -- promoted to battalion

3          chief, and all the promotions went to four white

4          guys -- four Caucasian males.

5    Q.    Is that the only basis, evidence, hearsay,

6          documents?  Anything else that you have that

7          supports your allegation that you were denied

8          promotion because of your race?

9                     MR. HORSLEY:  Same objection.  You can

10                         answer.

11   A.    No.

12   Q.    Just that you and two other blacks were not

13         promoted and four whites were?

14                    MR. HORSLEY:  Same objection.

15   Q.    True?

16   A.    Exactly.

17   Q.    In number 26 you say that Caucasian or white

18         applicants for battalion chief were given

19         preferential treatment regarding the application

20         process, test aids, and test grades.

21         What Caucasians were given preferential

22         treatment?

23   A.    All I know is Chief Garrett told me he had seen

162

the questions.  And if he had seen some of the

questions, I don't know what happened.  I don't

know what -- I can't say what happened.  I

don't -- But I just know somebody -- he say he

had seen those questions.

Q.    Well, so what?  He wasn't an applicant, was he?

A.    I have --

              MR. HORSLEY:  Object.

Q.    Was he an applicant for battalion chief?

A.    No, he was not.

Q.    This specifically says that Caucasian applicants

      were given preferential treatment regarding

      application process, test aids, and test

      grades.

          What Caucasian applicants were given

      preferential treatment?

A.    I have no idea.

Q.    Can you name a single one?

A.    No, I cannot.

Q.    Do you know of any?

A.    No, I don't.

Q.    Do you know any white applicants that received

      preferential treatment in the application

163

1   process?

2 A. No, I don't.  I don't know.

3 Q. What do you mean by application process?

4     MR. HORSLEY:  Object to the form.  He

5        didn't write it.

6     MR. MORGAN:  Well, I understand, but

7        it's my only chance to ask him.  I

8        understand.  I'm sorry.

9 Q. What do you mean by application process?

10     MR. HORSLEY:  Object to the form.

11 A. I didn't write it.  I have no idea.

12 Q. Do you know of any white applicant that received

13   more test aids than you did from the City or

14   any --

15 A. I wouldn't be privy to that.  If it happened, I

16   wouldn't be privy to that.

17 Q. The answer to my question is:  You don't know of

18   any, do you?

19 A. I don't.

20 Q. Do you know of any white applicants that were

21   given preferential treatment on their test

22   grades?

23 A. Obviously Chief Garrett and them were.  They

164

```
 1          didn't take a test.

 2     Q.   That's not the question now, Mr. Ogletree.

 3          Let's stay focused on the battalion chief

 4          promotion that was given in April of 2006.

 5     A.   I was talking about the other one.  I don't

 6          know.

 7     Q.   Do you know of any white applicants that got

 8          preference on their test grades?

 9     A.   I don't know.

10     Q.   Look at number 27.  You make a reference to the

11          City violating and continuing to violate a

12          federal court order requiring them to alter

13          hiring and promotion policies and procedures to

14          provide equitable treatment to

15          African-Americans.

16              What court order are you referring to?

17                  MR. HORSLEY:  Object to the form.

18     A.   I don't know.

19     Q.   Well, what is it that you say the City is doing

20          wrong that they violate a federal court order?

21                  MR. HORSLEY:  Object to the form.

22     Q.   Do you know?

23     A.   I'd say giving the test to weed out
```

165

```
 1              African-American applicants.  They are running
 2              the student firefighter program and not getting
 3              any African-Americans to apply and therefore be
 4              hired full-time.
 5       Q.     I'm sorry.  I missed the first one.  Something
 6              about test.
 7       A.     Yeah.  They decided to change the policies and
 8              give a test and weed out African-American
 9              applicants from being promoted.
10       Q.     And then they do the student firefighter
11              program, and blacks don't get hired, or
12              African-Americans?
13       A.     Exactly.
14       Q.     Do you know what advertising the City does for
15              the student firefighter program?
16       A.     I know some of it.  I know they recently tried
17              to improve on some of it, I guess, when they
18              started going around to more schools.  But they
19              had quit going anywhere for a long time.
20       Q.     When did they quit going anywhere?
21       A.     Because I went and talked to some -- to a church
22              at one time about twelve years ago and -- talked
23              to an African-American church and talked to some
```

169

1    think about it.  I was in there and I gave him a

2    score, and I scored him pretty well.  That's all

3    I was concerned with.

4  Q.  Now, you've got a complaint in here for

5    retaliation.  It says you engaged in

6    statutorily-protected expressions such as EEOC

7    charges and grievances.

8        My understanding is you had never filed an

9    EEOC charge or grievance before this.

10 A.  No.

11 Q.  Is there any other statutorily-protected

12   expressions that you think you engaged in that

13   resulted in you being denied a promotion?

14       MR. HORSLEY:  Object to the form.

15 A.  I didn't engage in it directly, but I think I

16   suffered for that 1996 lawsuit of Lieutenant

17   Strickland, Lieutenant Card, and Lieutenant Bill

18   Felton, and Chris Turner.

19 Q.  How do you suffer for that?

20 A.  I think that they just made up their mind they

21   didn't want any blacks working there anymore,

22   that if they get rid of us, they'll be fine, and

23   that they wasn't going to promote us, and they

170

1       wasn't going to hire anymore to make sure no

2       more ever worked there if they could get away

3       with it.

4   Q.  But you didn't participate in that lawsuit?

5   A.  No.  I didn't participate in it, but I'm just as

6       black as they were.

7   Q.  Did they ask you to participate in it?

8   A.  No.  I make my own mind up.  This is serious

9       business.

10  Q.  But in terms of you actually participating in

11      any statutorily-protected expression, you can't

12      name any of that, can you?

13              MR. HORSLEY:  Object to the form.

14  A.  No, sir.

15  Q.  And then we have here that the employment

16      practices of the City -- of the defendants --

17      I'm going get to the defendants in a minute.

18          What does this mean to you, built-in

19      headwind?

20              MR. HORSLEY:  Object to the form.

21  A.  It means something that's put there that really

22      don't carry any weight, but it stops a

23      particular group from advancing.  That's exactly

1         what it means to me.

2  Q.  And I know you didn't draft this, but I just

3         want you to explain to me what you understand

4         your suit is about the disparate impact.

5                MR. HORSLEY:  Object to the form.

6  A.  I didn't write it.

7  Q.  I understand.

8  A.  But in layman terms, the way they select people

9         through the student firefighter program.  Like I

10        said, the last black person that was hired was

11        twelve years ago.  The way they promote is --

12        There's three of us down there.  Chris has been

13        there 20-something years and still making

14        firefighters pay, but he can do the job and

15        everybody is confident in his abilities to do

16        his job.  Everybody got weaknesses.

17          I can't get promoted.  I've been there

18        working on 25 years now, and they come up with

19        different rules and sets.  And I know it's

20        affecting us.  I can't worry about who else it's

21        affecting.  It's affecting us three

22        African-Americans that work there and the

23        ones -- the potential of keeping ones from ever

172

1    working there.

2    Q.    Have you had any conversations with Larry

3          Langley about this promotion procedure or race

4          discrimination?

5    A.    Two things he said to me was he know he need to

6          hire some blacks.

7    Q.    Now, what year did he say that?

8    A.    He said that right before we had that battalion

9          chiefs exam in 2005.  He mentioned that to me.

10   Q.    Anything else he said --

11   A.    After the test I had talked with him about I

12         didn't think it was fair the way they did the

13         procedure.

14   Q.    And what did he say?

15   A.    I didn't have nothing to do with it.  That's

16         exactly what he said:  I didn't have nothing to

17         do with it.

18   Q.    Any other conversations you've had with him

19         about this lawsuit or your complaints --

20   A.    No, sir.

21   Q.    -- for promotion, hiring, race discrimination or

22         anything?

23   A.    No, sir.

173

| | | |
|---|---|---|
| 1 | Q. | Any conversations you've had with Lee Lamar |
| 2 | | about your complaints, this lawsuit, promotion, |
| 3 | | hiring, race discrimination? |
| 4 | A. | Other than when I made that little gesture about |
| 5 | | my reservations about the test. |
| 6 | Q. | The ones you already told me about? |
| 7 | A. | Yes. |
| 8 | Q. | Anything else you talked to Lee about? |
| 9 | A. | No, sir. |
| 10 | Q. | Any conversations you had with Mayor Ham about |
| 11 | | your complaints, promotions, hiring, race |
| 12 | | discrimination? |
| 13 | A. | No, sir. |
| 14 | Q. | This lawsuit? |
| 15 | A. | No, sir. |
| 16 | Q. | Have you ever spoken to Mayor Ham about |
| 17 | | anything? |
| 18 | A. | No, sir. |
| 19 | Q. | Steve Reeves.  Any conversations you've had with |
| 20 | | Steve Reeves about the procedure, the test, race |
| 21 | | discrimination, hiring, promotion, complaints, |
| 22 | | this lawsuit? |
| 23 | A. | No, sir, I haven't spoken to Mr. Reeves. |

174

| | | |
|---|---|---|
| 1 | Q. | Bill James.  Any conversations you've had with |
| 2 | | him about this lawsuit, your complaints, race |
| 3 | | discrimination, promotion, hiring, procedures, |
| 4 | | tests? |
| 5 | A. | No, sir. |
| 6 | Q. | Any conversations with Bill James? |
| 7 | A. | No, sir. |
| 8 | Q. | Charles Duggan.  Any conversations with Charles |
| 9 | | Duggan -- |
| 10 | A. | Other than that correspondence, that letter that |
| 11 | | we sent. |
| 12 | Q. | Written correspondence? |
| 13 | A. | Yes. |
| 14 | Q. | Any verbal communication? |
| 15 | A. | (Witness nods head negatively.) |
| 16 | Q. | Ever spoken to him about anything? |
| 17 | A. | Other than just -- |
| 18 | Q. | Hey, how are you? |
| 19 | A. | Yeah. |
| 20 | Q. | You never talked to Charles Duggan about your |
| 21 | | complaints, this lawsuit, policies, procedures, |
| 22 | | hiring, promotion, race discrimination or |
| 23 | | anything? |

175

```
 1    A.    No.  No, sir.  He just took over that job
 2          probably a year and a half ago.
 3    Q.    Did you ever have any with his predecessor,
 4          David Watkins?
 5    A.    No, sir.
 6    Q.    Did you ever have any with Doug Watkins?
 7    A.    No, sir.
 8    Q.    Did you ever have any conversation with Cortez
 9          Lawrence complaining about race discrimination
10          or promotions or hiring?
11    A.    No, sir.
12    Q.    If you would, just summarize for me what your
13          complaints are, why you filed this lawsuit.
14                MR. HORSLEY:  Object to the form.
15    A.    I got the way the City conducts its policy and
16          procedures as far as using that test and that
17          that disparate impact claim, because you can
18          look around at the numbers and you can tell it's
19          having an impact.
20    Q.    And I guess the gist of all that is that you're
21          complaining that you've been denied a promotion
22          because of your race?
23    A.    Yes, sir.
```

176

1    Q.    As a result of --

2    A.    Of the policy of giving that test with that

3          cutoff score.

4    Q.    And the disparate impact?

5    A.    Yes.

6    Q.    Tell me what you understand, if anything, that

7          Larry Langley had to do with the two things that

8          you just told me about.

9    A.    He didn't hire -- He was telling me he know he

10         need to hire some blacks.  And he was a

11         decision-maker so I figured if he was telling

12         me, he could go out and make something

13         happened.  And he upheld the fact to give us

14         this promotional procedure.

15   Q.    Anything else you think Larry Langley did to

16         discriminate against you on the basis of your

17         race?

18   A.    No.  Those two.

19   Q.    What do you think Lee Lamar did to discriminate

20         against you on the basis of your race?

21   A.    He was part of the decision-making process to do

22         it this way, to promote this way.

23   Q.    The procedure that was in place?

177

1   A.   Exactly.

2   Q.   Written test and the assessment center?

3   A.   Exactly.

4   Q.   Anything specifically you know that Lee did?

5   A.   No.

6   Q.   What is it that Mayor Ham did that you think --

7   A.   His decision --

8   Q.   Let me get my question out.

9        What is it that Mayor Ham did in your

10       opinion that discriminated against you on the

11       basis of your race?

12  A.   I'm sorry about cutting you off.

13       He's a decision-maker, and he upheld that

14       decision when we filed the grievance.

15  Q.   Upheld the grievance?

16  A.   Upheld the decision not to promote us after we

17       filed a grievance.  I guess he in the chain.

18  Q.   Well, do you know of anything in particular he

19       did in regard to the test or the promotion

20       procedure?

21  A.   No, not anything particular.

22  Q.   Other than being mayor, do you know of any

23       involvement he had in this?

178

| | | |
|---|---|---|
| 1 | A. | No, sir. |
| 2 | Q. | And Steve Reeves.  What is it that you think |
| 3 | | Steve Reeves has done to discriminate against |
| 4 | | you on the basis of race? |
| 5 | A. | He upheld the decision.  He was part of the |
| 6 | | chain that made the decision to promote this |
| 7 | | way. |
| 8 | Q. | To implement the procedure you're complaining |
| 9 | | about? |
| 10 | A. | Yes, sir. |
| 11 | Q. | Anything else that Steve Reeves did? |
| 12 | A. | Not that I can think of. |
| 13 | Q. | I don't want to keep beating this up.  Let's say |
| 14 | | that's true.  Let's say Steve Reeves had some |
| 15 | | input.  Do you say he did that knowing it was |
| 16 | | going to affect blacks? |
| 17 | | MR. HORSLEY:  Object to the form. |
| 18 | A. | I have no idea.  I know it did affect blacks.  I |
| 19 | | can't say what they were thinking before. |
| 20 | Q. | I understand that, but you sued him claiming he |
| 21 | | racially discriminated against you -- |
| 22 | A. | That's the way it end up. |
| 23 | Q. | Other than approving the policy, if he did, |

179

1      other than whatever input he had in the

2      promotion procedure, you say he intentionally

3      did that to discriminate against you on the

4      basis of your race?

5                  MR. HORSLEY:  Object to the form.

6   A.  I can't say he intentionally did anything.

7   Q.  Well, let's go through it, and I'll get that

8      question next.

9          Bill James.  What do you say Bill James did

10      to discriminate against you on the basis of your

11      race?

12  A.  He upheld the decision to promote this way --

13      use the procedure to promote.

14  Q.  And Charles Duggan, what do you say --

15  A.  He had the final say, and he upheld the decision

16      not to promote us.

17  Q.  Let's say you're correct, that all these six

18      folks -- Langley, Lamar, Ham, Reeves, James, and

19      Duggan -- all had a hand in agreeing to the

20      procedure that was being used.  Do you have any

21      evidence, any facts, any hearsay, any documents,

22      anything that would lend weight to a claim that

23      those people did it with the purpose of racially

180

1    discriminating against you and Lieutenant

2    Stephens?

3              MR. HORSLEY:  Object to the form.

4    A.   Everything I have, sir, my lawyer has, documents

5         and otherwise.  So I wouldn't -- I'm not a legal

6         mind.  That's why we hired him.

7    Q.   But do you know of anything?

8    A.   No, I don't.

9    Q.   Do you know of any reason that Larry Langley

10        would discriminate against you on the basis of

11        your race?

12   A.   I don't have any evidence, and I don't know

13        anything.

14   Q.   In summary, is it fair to say that you don't

15        have any evidence that any of these individuals

16        discriminated against you?  Your complaint is

17        that the procedure was in place, and you didn't

18        get promoted as a result of the procedure in

19        place?

20             MR. HORSLEY:  Object to the form.

21   A.   Yes, sir.

22   Q.   You don't know of anything that Lee did or Steve

23        did or Bill Ham or James or anybody did to keep

181

1        you from being promoted because of your race?

2                    MR. HORSLEY:  Object to the form.

3    A.   I don't have -- No, sir.

4                    MR. MORGAN:  I've got one little

5                         area.  If we can take about a

6                         five-minute break, I may be about

7                         through.

8                    MR. HORSLEY:  Okay.

9                    (Brief recess.)

10   Q.   (Continuing by Mr. Morgan) Tell me what damages

11        you claim in this lawsuit.  How do you claim

12        you've been damaged and what do you seek for

13        relief?

14                    MR. HORSLEY:  Object to the form.

15   A.   I think it's punitive.

16   Q.   Punitive?

17   A.   I think it's punitive damages on there.

18   Q.   Well --

19   A.   And compensatory.

20   Q.   Tell me what compensatory damages you claim

21        you've been denied or that you're entitled to.

22                    MR. HORSLEY:  Object to the form.

23   A.   That's the raise that go along with being

1            MR. HORSLEY:  Object to the form.

2    A.   No.

3    Q.   I think we've been through this before.  You

4         don't know of anything they did to intentionally

5         discriminate against you because of your race?

6    A.   No.  That's right.  I don't know.

7    Q.   Have we covered all your damages?

8    A.   I think that's it.

9            MR. MORGAN:  That's it.

10                      **EXAMINATION**

11   BY MR. HANCOCK:

12   Q.   Mr. Ogletree, I want to make sure I fully

13        understand your disparate impact claim.  My

14        understanding is you're not claiming that the

15        test -- the CWH test itself had a negative

16        impact on black employees at the Auburn Fire

17        Department, are you?

18   A.   Not the test itself.

19   Q.   It's the policy that utilizes the test as part

20        of it, but it was the policy that didn't take

21        into consideration years of service, that didn't

22        allow all applicants to go through all phases of

23        the process, including the practical side, the

186

1          assessment, the in-basket and that sort of

2          thing, and result in a total score of looking at

3          all components of the process; is that correct?

4     A.   Yes, sir.

5                    MR. HANCOCK:  No further questions.

6                    MR. MORGAN:  Is that it?

7                    MR. HANCOCK:  Richard, do you mind if

8               I ask Mr. Stephens those same

9               questions?

10                   MR. HORSLEY:  That's fine.

11                   (Off-the-record discussion.)

12              **EXAMINATION CONTINUING OF MR. OGLETREE**

13   **BY MR. MORGAN:**

14    Q.   You don't have a complaint about the test and

15         the way it was graded or the way the scores came

16         out.  You just complained that you weren't

17         allowed to go through the whole process?

18                   MR. HORSLEY:  Object to the form.

19    A.   Yes, sir.

20                   MR. HORSLEY:  I'm objecting to the

21              form because he has already

22              testified about problems that he

23              did have with the test itself and

187

```
 1                          that's --
 2    Q.    Well, you thought -- do you think the test
 3          fairly tested what a battalion chief did at the
 4          City of Auburn, the written test?
 5                    MR. HORSLEY:  Object to the form.
 6    A.    I answered it -- I told -- It's back in my
 7          testimony that I didn't think some components of
 8          it we used at the City of Auburn.
 9                    MR. MORGAN:  Okay.
10                          EXAMINATION
11    BY MR. HANCOCK:
12    Q.    But you're not claiming in this lawsuit that the
13          vagueness of the test is what caused the adverse
14          impact.  It's the City's policy of not taking
15          into consideration other factors and allowing
16          the applicants to go through the entire process?
17                    MR. MORGAN:  Object to the form of
18                          that question.
19                    MR. HANCOCK:  I'm just asking what his
20                          claim is in this lawsuit.
21    A.    Yes, sir.
22                          EXAMINATION
23    BY MR. MORGAN:
```

188

1    Q.    So just to be clear, your only complaint with

2          the test; that is, whether it tested stuff you

3          were supposed to do, disparate impact -- your

4          only complaint with the test is the 70 cutoff

5          score; otherwise, you're happy with the test?

6               MR. HORSLEY:  Object to the form.

7    A.    Yes, sir.

8          **ADDITIONAL EXAMINATION OF MR. STEPHENS**

9    **BY MR. HANCOCK:**

10   Q.    Mr. Stephens, you've heard the questions that

11         Mr. Morgan and I have asked Mr. Ogletree.  Do

12         you agree -- Is your testimony and your position

13         in this lawsuit and the claims you bring the

14         same that Mr. Ogletree has just testified to?

15   A.    Yes, sir --

16              MR. MORGAN:  Object to the form.

17   A.    -- it is the same.

18   Q.    You don't have a complaint about the test

19         itself; it's the City's policy of not using

20         additional factors in the ultimate decision as

21         to who would be promoted to battalion chief; is

22         that correct?

23              MR. MORGAN:  Object to the form.

189

1    A.    Yes, sir.

2                  MR. HANCOCK:  Nothing else.

3                          **EXAMINATION**

4  BY MR. MORGAN:

5    Q.    Just to be clear, you do not make any claim in

6          this lawsuit that the test itself, the written

7          test, has a disparate impact; is that true?

8                  MR. HORSLEY:  Object to the form.

9                          That's a legal question.

10   Q.    Well, do you claim or don't claim that the

11         written test has a disparate impact?

12                 MR. HORSLEY:  Object to the form.

13   Q.    Do you know one way or the other?

14   A.    I don't know one way or the other, Mr. Morgan.

15   Q.    Do you claim in this lawsuit -- Wait a minute.

16         Let me rephrase.

17             Do you agree that the test -- the written

18         test is job related and tests those factors that

19         are important for a battalion chief with the

20         City of Auburn Fire Department?

21                 MR. HORSLEY:  Object to the form.  You

22                         can answer.

23   A.    Again, Mr. Morgan, I'm not a expert.  Your

# EXHIBIT "B"

COPY

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3                EASTERN DIVISION

4

5    EDDIE OGLETREE, an individual,
     GERALD STEPHENS, an
6    individual,

7            Plaintiffs,

8    Vs.                              CIVIL ACTION NO.
                                      3:07-CV-867-WKW
9
     CITY OF AUBURN, a municipality
10   in The State of Alabama, LARRY
     LANGLEY, and individual, LEE LAMAR,
11   an individual, BILL HAM, JR., an
     individual, STEVEN A. REEVES, an
12   individual, BILL JAMES, an
     individual, CHARLES M. DUGGAN, an
13   individual, and CORTEZ LAWRENCE,
     an individual,

14
             Defendants.

15
             * * * * * * * * * * * *
16
        **DEPOSITION OF GERALD STEPHENS**, taken pursuant
17
     to stipulation and agreement before Pamela A. Wilbanks,
18
     Certified Court Reporter, ACCR# 391, Registered
19
     Professional Reporter and Commissioner for the State of
20
     Alabama at Large, in the Law Offices of Hill, Hill,
21
     Carter, Franco, Cole & Black, 425 South Perry Street,
22
     Montgomery, Alabama, on Friday, May 30, 2008, commencing
23
     at approximately 10:00 a.m.

15

1    A.    No, sir.

2    Q.    Tell me about your educational background.

3          You're a high school graduate?

4    A.    Yes, sir.

5    Q.    Where did you graduate from?

6    A.    Auburn High School.

7    Q.    What year?

8    A.    1990.

9    Q.    Have you attended college or junior colleges?

10   A.    Yes, sir.

11   Q.    Where have you been?

12   A.    Auburn University.

13   Q.    What year did you start?

14   A.    1990.

15   Q.    And did you complete it?

16   A.    No, sir.  1992.  I did two years at Auburn

17         University.

18   Q.    What was your course of study?

19   A.    Business.

20   Q.    And what was the reason why you did not complete

21         it?

22   A.    I had a child at the time, and I needed to work.

23   Q.    Did you have any academic problems?

16

```
 1    A.    No, sir.

 2    Q.    Any other formal education?

 3    A.    Yes, sir.  I attended several junior colleges:

 4          Southern Union, Chattahoochee Valley State

 5          Community College, Shelton State Community

 6          College, Alabama State Fire College.

 7    Q.    Is that at Shelton State or is that separate?

 8    A.    Yes, sir.  That's through Shelton State in

 9          Tuscaloosa.

10    Q.    In terms of Southern Union, did you receive a

11          diploma, certificate or anything from that or

12          were you attending courses related to your fire

13          work?

14    A.    Courses related to my fire work.

15    Q.    And how about Chattahoochee Valley?  Same thing?

16    A.    Courses related to my fire work.

17    Q.    Shelton State?

18    A.    Yes, sir.  Courses related to my fire work.

19    Q.    And the Alabama Fire College, is that something

20          that all firefighters attend or do you have to

21          be selected to attend the Alabama Fire College?

22          How does that work at Auburn?

23    A.    As far as I've been working there, it was an
```

17

1      opportunity for firefighters to go and to better

2      enhance themselves as far as the fire

3      professional field and career.

4    Q.   Do you have to attend the Alabama Fire College

5         as an employee of Auburn Fire Department?

6    A.   Yes, sir, I do.

7    Q.   So all firefighters, once they are hired and

8         become, I guess, non-probationary, they have to

9         attend the fire college?

10   A.   Yes, sir.  In order to be employed with the

11        Auburn Fire Division, to my understanding you

12        must undergo several weeks of training which

13        comes from the State Fire College through

14        certifications and all that.

15   Q.   Now, are there state-required minimum standards

16        for firefighters before you can be hired?

17   A.   Before?

18   Q.   Yes.  Or as part of your hiring process.

19   A.   Not before, no.  And I'm only speaking from my

20        experience.  When I was hired I underwent

21        educational and physical training through the

22        State Fire College at that point.  It was not

23        prior to.

18

| | | |
|---|---|---|
| 1 | Q. | Okay.  In order to be certified in the state of |
| 2 | | Alabama as a firefighter, do you have to |
| 3 | | complete certain things? |
| 4 | A. | Yes, sir. |
| 5 | Q. | And what do those include? |
| 6 | A. | I had to complete Firefighter I certification. |
| 7 | Q. | And where did you do that? |
| 8 | A. | The training was conducted in Lee County at the |
| 9 | | Opelika training grounds through my employer. |
| 10 | Q. | Are you a veteran? |
| 11 | A. | No, sir. |
| 12 | Q. | No time in the military? |
| 13 | A. | No, sir. |
| 14 | Q. | When were you first employed with the City of |
| 15 | | Auburn? |
| 16 | A. | I was first employed in 1991. |
| 17 | Q. | Now, were you a student firefighter? |
| 18 | A. | Yes, sir, I was. |
| 19 | Q. | And tell me what you had to do to be a student |
| 20 | | firefighter. |
| 21 | A. | Of course, I had to submit an application.  And |
| 22 | | once selected I had to undergo several weeks of |
| 23 | | training, what they consider to be a rookie |

22

1          as a student firefighter?

2     A.   Yes, sir.  I underwent a lot of training that

3          was basically voluntary that I chose to pursue

4          on my own.

5     Q.   Let me back up.

6               As a requirement -- I assume when you were

7          hired as a student firefighter, you had to have

8          fire training just like anybody else.

9     A.   Yes, sir.

10    Q.   Did you have to have any additional required

11         training when you made the transition from

12         student to career?

13    A.   Yes, sir.  I had to -- Within a year I had to

14         pass a course or certification of Firefighter

15         II.  And I can't remember how many years later,

16         but I was required to pass an apparatus operator

17         certification.

18    Q.   And I assume you did all that without any

19         problem?

20    A.   Yes, sir.  No problems.

21    Q.   Other than the fire department or fire division

22         with City of Auburn, have you had -- between

23         high school and becoming a career -- what I call

23

```
1        a career firefighter in '94, did you have any
2        other employments?
3   A.   Yes, sir.
4   Q.   Where else were you employed?
5   A.   I had several.  I worked with Lamar Lawn Care,
6        and that's of Auburn.  I worked at JJ Raceway,
7        which is a convenience store/gas station, and
8        that's of Auburn.  I worked at Wal-Mart
9        Supercenter, and that was in Opelika, Alabama.
10       I'm trying to think.  Two years ago I started my
11       own business as a lawn care and landscaping
12       service business, and I've been doing that for
13       two years.  I think I touched them all.  I
14       think.
15  Q.   Now, I'm aware of two EEOC charges which you
16       filed.
17  A.   Yes, sir.
18  Q.   The one about the battalion chief and promotion,
19       and then one several years earlier that I think
20       had to do with the Horace Clanton assignment.
21            Have you filed any other EEOC charges other
22       than those two?  Not just the City of Auburn but
23       anybody.  Any other, other than those two EEOC
```

24

```
 1          charges?
 2     A.   No, sir, I haven't.  Other than the two you've
 3          spoken of.
 4     Q.   And in the grievances, I'm aware that you filed
 5          a grievance after the battalion chief promotion
 6          procedure.  Have you filed any other grievances
 7          with the City of Auburn?
 8     A.   I have initiated grievances, but I've never
 9          completed them.  Well, I didn't complete those
10          that were initiated.  After going through the
11          procedures that are in place with the City, it
12          was handled through the process.
13     Q.   Let me get a list of those.  The battalion
14          chief -- The grievance related to the battalion
15          chief promotion, you completed that process?
16     A.   Yes, sir.
17     Q.   What grievances have you filed that you
18          didn't -- Let me back up.  I want to be clear.
19               That's the only grievance procedure that
20          you've completed?
21     A.   It was two grievance procedures I completed.
22          One was in 2005 where I went -- where I
23          underwent all the procedures of the City and
```

25

1      actually had a hearing.  And that was in 2005

2      where I was pretty much on my -- alone on that

3      grievance and pursued all procedures in

4      reference to.

5  Q.  What was the 2005 one about?

6  A.  That one was about -- That was when Mr. Horace

7      Clanton was assigned as acting battalion chief

8      in the presence of our official battalion chief

9      who had health issues at the time.

10 Q.  You actually had a hearing on it?

11 A.  Yes, sir.

12 Q.  Who was the hearing officer?

13 A.  The city Judge, Judge Joe Bailey.

14 Q.  Just briefly, what was the outcome of his --

15 A.  That I can recall, basically they stated that

16     they didn't find anything in reference to me

17     having a grievance or any grounds in reference

18     to my complaint that I was applying on the City.

19 Q.  Were you the only person involved in that

20     grievance?

21 A.  Yes, sir.

22 Q.  And is that the same incident or scenario that

23     led to the EEOC charge?

26

```
 1    A.    The first one.

 2    Q.    Yes, sir.

 3    A.    Yes, sir.

 4    Q.    And did you receive a right to sue letter on

 5          that first EEOC charge involving Mr. Clanton?

 6    A.    From the attorney firm that I had at that time,

 7          yes, I did receive one.

 8    Q.    You had a law firm representing you at that

 9          time?

10    A.    I had a law firm I was consulting with, yes.

11    Q.    Who were they?

12    A.    Brooks Law Firm of Birmingham, Alabama.

13    Q.    But my understanding is you did not file a

14          lawsuit as a result of that EEOC complaint; is

15          that true?

16    A.    No, sir.

17    Q.    No, sir, you --

18    A.    No, I didn't.

19    Q.    It's true you did not file a complaint?

20    A.    I filed a complaint and went all the way through

21          the hearing and to the point where I got the

22          right to sue letter, but after --

23               MR. HORSLEY:  He's talking about a
```

27

```
 1                        lawsuit.

 2    Q.    You didn't file a lawsuit as a result of that?

 3    A.    No, sir.

 4    Q.    So you didn't file a lawsuit as a result of

 5          either that EEOC charge or grievance?

 6    A.    No, sir.

 7    Q.    Tell me what other grievances that you filed

 8          with the City that you didn't complete the

 9          process.

10    A.    Past and present?

11    Q.    Yeah.  All of them.

12    A.    All of them.  Okay.

13    Q.    Well, let me back up.  I want all of them, but

14          if you have any present ones that are still

15          pending, I'm going to put them in a different

16          category.

17    A.    Okay.

18    Q.    Do you have any grievances that are still

19          pending?

20    A.    No, sir.

21    Q.    So all --

22    A.    Present day, no, sir.

23    Q.    So all the grievances that you're about to tell
```

43

1           chief or his administrative assistant to

2           determine where firefighters should be assigned?

3      A.   It's not my decision, Mr. Morgan.  As far as I

4           know, it is everyone above me -- that's

5           battalion chief and up -- who make those

6           decisions.

7      Q.   And do you agree with me they are the ones that

8           should make those decisions?

9      A.   They are in position to make those decisions so

10          therefore, I guess, it's their duty to make

11          those decisions when the time come.

12     Q.   Now, you applied for promotion to lieutenant in

13          '96?

14     A.   Yes, sir.

15     Q.   And you were promoted?

16     A.   Yes, sir.

17     Q.   What was the procedure for lieutenant?

18     A.   At that time?

19     Q.   Yes, sir.

20     A.   At that time I underwent an assessment center.

21     Q.   Explain that to me.

22     A.   An assessment center consists of a panel of

23          assessors, non-affiliated with Auburn Fire

44

1      Division or the City of Auburn in general.

2      Basically what you have is a panel of officers,

3      lieutenant or higher, who would sit through a

4      scenario or different scenarios throughout the

5      entire procedures.  I think the procedures at

6      that time lasted a week.  And basically what I

7      had to do was undergo these scenarios to the

8      point where they would take the information

9      received and grade me appropriately or

10     accordingly.  Didn't take a written test.  Had

11     to be eligible to apply for the position

12     basically was the only requirement.  And at that

13     time, I was eligible to apply; therefore, I did.

14  Q.  Do you remember what the eligibility

15     requirements were?

16  A.  No, sir, I don't recall.  But at the time I know

17     I had several certifications:  Firefighter I and

18     II, Instructor I and II, Fire Officer 1 and II,

19     hazmat technician, apparatus operator, pumper

20     certification.  Fire Inspector I, I think I had.

21  Q.  What I was asking actually is:  Were there any

22     time in grade requirements?  Did you have to be

23     a permanent firefighter?

46

Q.  What were the ranks in the fire department in
    '96 when you applied for lieutenant?

A.  Okay.  Chain of command in '96 was student
    firefighter, career firefighter, team leader,
    lieutenant, captain, deputy chief and fire
    chief.  And that's from -- leads to your
    superior.

Q.  And what was your understanding as to the
    evolution of team leaders?  What were they to do
    as you understood it and what did they do?

A.  Team leaders supervise student firefighters.
    They were created contingent to the student
    firefighter program whereas fire lieutenants was
    part of the career ladder itself.  Student
    firefighters and team leaders was a temporary
    full-time position whereas lieutenant and up
    were career positions:  salaries, benefits, the
    whole nine.

Q.  And where did you get that understanding?

A.  I got it in writing from the requirements.  The
    understanding, whatever, came through the City
    of Auburn rules and regulations, et cetera.

Q.  Team leader would be a career firefighter?

48

1    was used for team leaders?

2  A.   All I can tell you, Mr. Morgan, was it was a

3       structured interview.

4  Q.   Did you ever participate in the structured

5       interview?

6  A.   I never went through a structured interview for

7       a team leader, but I have on occasion sat in as

8       an interview board.

9  Q.   You were on the interview board.  How many

10      interview boards did you have -- were you on?

11 A.   Several, Mr. Morgan.  Estimated four times, I

12      guess.  It was several times.

13 Q.   In your opinion has the role of a team leader

14      changed from what you just described in '96 up

15      until, what year was it, '06, I guess, that they

16      became lieutenants?

17 A.   Yes, sir.

18 Q.   Did the role of team leaders change during that

19      period of time?

20 A.   For the record, Mr. Morgan, I was the last

21      lieutenant promoted in the Auburn Fire

22      Division.  Anything after my promotion was team

23      leaders.

49

```
 1    Q.    How many lieutenants were there when you were
 2          promoted?
 3    A.    Three, maybe four.
 4    Q.    You were the last lieutenant?
 5    A.    I was the last lieutenant to be promoted in the
 6          Auburn Fire Division through an assessment
 7          center.
 8    Q.    So then the team leaders that came after you,
 9          did they assume the responsibilities of a
10          lieutenant?
11    A.    Through the powers that be, they were allowed to
12          conduct themselves on my level or on a level of
13          a fire lieutenant.
14    Q.    So their role, at least in your viewpoint,
15          expanded from just being supervisors for student
16          firefighters to assuming the responsibilities of
17          a lieutenant?
18    A.    They was assuming the responsibilities for
19          career firefighters.
20    Q.    Say the last year that there were team
21          leaders -- '04, '05, whatever year that may
22          be -- in your opinion was there any difference
23          in what you as a lieutenant did as opposed to
```

50

```
 1         what a team leader did?

 2    A.   No, sir.  Basically from 1996 and up, they were

 3         acting as station officers, which that's what I

 4         am.  I'm a station officer.  I just had a

 5         different title as they.  And I underwent a

 6         different procedure as far as being promoted.

 7         Other than that they stepped in as a station

 8         officer and conducted themselves as a station

 9         officer to their ability.

10    Q.   Once you were promoted to lieutenant, I assume

11         you had a new assignment at that point.

12    A.   As far as responsibilities, duties, stations and

13         all that?

14    Q.   Yes.

15    A.   Yes, sir.  I had a very wide range of

16         responsibilities and duties as a station

17         officer, fire lieutenant.

18    Q.   Did you apply for any more promotions between

19         lieutenant in '96 and the battalion chief

20         promotion in '06?

21    A.   Yes, sir.

22    Q.   What other promotions did you apply for?

23    A.   I applied for training chief -- the training
```

51

1      officer position.  Excuse me.  I applied for the

2      deputy fire chief position.

3  Q.  When was the last captain's promotion?

4  A.  If I'm not mistaken, the last one was when I was

5      promoted.  When they did an assessment center

6      for me in '96, it was an assessment center for

7      lieutenants and captains.

8  Q.  So you never applied and went through an

9      assessment center for the position of captain;

10     is that correct?

11  A.  No, sir.

12  Q.  No, sir, it's not correct or --

13  A.  I didn't apply for the captain --

14  Q.  What I said is correct?  You never applied and

15      went through an assessment center for captain,

16      true?

17  A.  No, sir.

18              MR. HORSLEY:  That is true?

19  Q.  Wait a minute.

20  A.  That is true.  A captain position never came

21      available during my era.

22  Q.  So you did the lieutenant assessment in '96 at

23      the same time that they did the captain

52

1    assessment?

2   A.   Yes, sir.

3   Q.   What procedure was used for training officer?

4   A.   I underwent what I consider to be a structured

5        interview.

6   Q.   Let me back up on the captain's assessment

7        center.

8             Other than the assessment center, do you

9        know of any other requirements at that time for

10        the captain's promotion?

11  A.   I'm not aware of that, sir.

12  Q.   Did you pay any attention one way or the other

13        what the captains had to do or were you just

14        interested in being a lieutenant at that time?

15  A.   I just -- It was totally separate. If you

16        applied for lieutenant, you went to the

17        lieutenant. If you applied for captain, you

18        went to captain.

19  Q.   The training officer was a structured interview,

20        and when was that promotion procedure?

21  A.   I don't recall the actual year or date.

22  Q.   Has it been, say, within the last five years?

23  A.   Yes, sir, it was within the last five.

53

```
 1    Q.   And who was promoted?

 2    A.   A gentleman by the name of Terry Walker.

 3    Q.   Is he still the training officer?

 4    A.   No, sir.  He's retired.

 5    Q.   Who took his place?

 6    A.   A gentleman by the name of John Lankford.

 7    Q.   Did you apply for training officer when

 8         Lankford --

 9    A.   No, sir, I did not.

10    Q.   So you applied for training officer one time,

11         and that was when Terry Walker received it?

12    A.   Yes, sir.

13    Q.   And that was a structured interview?

14    A.   Pretty much, sir, yes.

15    Q.   And you sat on, you told me, the structured

16         interview panels for team leaders?

17    A.   Yes, sir.

18    Q.   Was that a similar-type interview?  I'm sure the

19         questions were different, but people from

20         in-house, firefighters and others --

21    A.   The difference between team leaders and the

22         training officer was the team leader wasn't

23         intense like the training officer was.  The team
```

54

1        leader basically was a panel of questions that

2        was presented to the candidate.  When I went

3        through training officer, I went through seven

4        different scenarios.  I had to make, I think it

5        was, a three-minute presentation.  I had to go

6        through what they call, I think it was, an

7        in-basket situation where you prioritize your

8        responsibilities for the day.  It's all on

9        paper.  And then you undergo an actual interview

10       where you sit down and they ask you questions,

11       you know.  Basically that was it.

12   Q.  Do you remember who was on your panel or the

13       panel?

14   A.  Dean Garrett, Danny Leverette, Lee Lamar, Larry

15       Langley.  I can't remember who else.

16   Q.  So these were all fire division people?

17   A.  Yes.  They was city employees, whether it was

18       human resources down through the fire division.

19   Q.  And Terry Walker, did you think that he was a

20       good hire?

21   A.  At the present time, Mr. Morgan, I didn't know

22       anything about Terry Walker so I can't say if he

23       was good or bad.  I don't know.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

55

```
 1    Q.   And when did you apply for the deputy fire chief
 2         position?
 3    A.   Again, I don't actually remember the year and
 4         date, but it was within the five years.
 5    Q.   And who was promoted to that position?
 6    A.   Lee Lamar.  Mr. Lee Lamar.
 7    Q.   What was the procedure used at that time?
 8    A.   Basically I submitted an application, and I went
 9         to a structured interview at City Hall.
10    Q.   And the panel, was it all firefighters or fire
11         division or were there other people on the
12         panel?
13    A.   It was other people on the panel outside of the
14         fire division, yes.
15    Q.   So you had an application and a structured
16         interview?
17    A.   Yes, sir.
18    Q.   Any other component of that promotion procedure?
19    A.   No, sir.
20    Q.   And Mr. Lamar was promoted?
21    A.   Yes, sir.
22    Q.   Have we covered all the promotions that you've
23         actually applied for -- lieutenant, training
```

57

| | | |
|---|---|---|
| 1 | Q. | And so you were on the structured interview |
| 2 | | board or panel for the last team leader |
| 3 | | promotion? |
| 4 | A. | I don't know if it was the last one, but I do |
| 5 | | know I've sat in on several. |
| 6 | Q. | Did you ever hear any complaints or comments |
| 7 | | about a written test being a component of the |
| 8 | | team leader promotion procedure? |
| 9 | A. | I don't recall a written test ever being a |
| 10 | | component of the promotion procedure for a team |
| 11 | | leader. |
| 12 | Q. | And then at some point there was a petition |
| 13 | | presented to the City for team leaders to become |
| 14 | | lieutenants. |
| 15 | A. | Yes, sir. |
| 16 | Q. | You're familiar with that? |
| 17 | A. | Yes, sir. |
| 18 | Q. | And you did not join in that petition? |
| 19 | A. | I wasn't given the opportunity to join, |
| 20 | | Mr. Morgan. |
| 21 | Q. | How did that come about? |
| 22 | A. | The first I heard or seen anything in reference |
| 23 | | to a petition for team leaders and the title |

64

1           to include the thirteen signatures.

2    Q.    So when Mr. Langley handed you this form where

3          you could vote "yes" or "no" on the name change,

4          you didn't understand what was going on?

5    A.    No, sir, I didn't.  Directly speaking, no, I

6          didn't know.

7    Q.    And Mr. Langley didn't explain it to you?

8    A.    He explained it to me, but, I mean, it's one of

9          those situations where I don't believe

10         everything I hear regardless of who it comes

11         from until I see it.  But I know the paperwork

12         that I saw and I signed, which was not in favor

13         of the title change.  And my main reason for

14         that, Mr. Morgan, was because I didn't know

15         nothing about it.  I was never given an

16         opportunity to -- in the beginning to sign with

17         the other thirteen signatures to say I was for

18         or against.

19   Q.    Well, looking back now, if you had been given

20         the information, would your vote have been

21         different?

22                   MR. HORSLEY:  Object to the form.  You

23              can answer.

65

1   A.   No, sir.  I still would have been against it.

2   Q.   But when Mr. Langley handed you this sheet of

3        paper, the form which you could vote, he didn't

4        explain to you why or that the City had been

5        petitioned by the team leaders?  He didn't

6        explain any of that to you?

7   A.   I don't recall exactly what he said,

8        Mr. Morgan.  But, like I said earlier, he gave

9        me the paper.  I read it.  I presented to him my

10       paperwork I had.  And he said no, and so I

11       marked the appropriate place indicating that I

12       was not in favor of it.  I folded the letter up

13       and put it in an envelope, sealed it, and gave

14       it to Mr. Langley.

15  Q.   What paperwork did you give Mr. Langley?

16  A.   I typed a letter myself on my behalf, the only

17       lieutenant in the division, and presented it to

18       him basically asking for -- in complainance

19       (sic) to whatever the team leaders were doing.

20  Q.   Now, do you still have copies of that paperwork?

21  A.   Yes, sir, I do.

22  Q.   Well, I'm not trying to get into any privileged

23       conversations, but do you know if that paperwork

67

```
1          Garrett both to sign it, if he was in agreement
2          of it.  And he told me no, and he would not
3          sign.  So did Chief Garrett, which Chief Garrett
4          was acting as a witness.
5     Q.   What was your paperwork, just the gist of it?
6     A.   Basically it was just, you know, from -- I guess
7          it was drawn upon and presented to him based
8          upon what I had heard.  And being that I was
9          called to his office to sign this form in
10         reference to, then therefore I presented to him
11         what I would like to have if this is the case.
12    Q.   And what is it that you would like to have?
13    A.   I wanted a title change.
14    Q.   So you knew then even before you went to see
15         Chief Langley that there were discussions about
16         a title change?
17    A.   I had heard rumors about a title change.  When I
18         was called to his office, of course, Chief
19         Garrett was with me.  That's when it was
20         confirmed through me that, yes, there was
21         something going on with the title change.
22    Q.   And did you take Garrett with you?
23    A.   Yes, sir.
```

76

```
 1         battalion chiefs?  How would that be announced?
 2    A.   If I'm thinking correctly, Mr. Morgan, it came
 3         from a memorandum or a letter directed to the
 4         division.  And, of course, when it occurred,
 5         word of mouth.
 6    Q.   And at that point captains were then referred to
 7         as battalion chiefs?
 8    A.   Yes, sir.
 9    Q.   Did you make any formal complaint either through
10         the grievance procedure or EEOC protesting the
11         change from captain to battalion chief?
12    A.   No, sir.
13    Q.   Did you make any verbal complaints to Langley or
14         Lamar or Ham or Reeves or Bill James or Charles
15         Duggan?
16    A.   No, sir.
17    Q.   And from your observations, did the battalion
18         chiefs continue to operate similar to what the
19         captains had done before?
20    A.   Basically the only thing that changed was the
21         title.  The responsibilities and all that went
22         hand in hand.
23    Q.   When did you learn there would be a promotion
```

77

1    procedure or process to battalion chief?

2  A.  I received it through a memorandum or a letter

3    directed to the division.

4  Q.  And did you receive it the same day or within a

5    day or two of the memorandum being published?

6  A.  Basically, if I'm thinking correctly, it was

7    posted.  I think it was done in two places:  At

8    the stations and through e-mail -- City e-mail.

9  Q.  The City has an e-mail?  They send out things on

10    e-mail?

11  A.  Yes, sir.

12  Q.  As an employee do you receive those e-mails on

13    duty or can you receive them off duty?

14  A.  The information -- I don't know what procedures

15    they use to send the information, but they send

16    them as far as I know randomly.  It could come

17    on a day when I'm at work.  It could come on a

18    day when I'm off work.

19  Q.  Do you have a home computer?

20  A.  Yes, sir, I do.

21  Q.  Can you check the City of Auburn Web site --

22  A.  Yes, sir.

23  Q.  -- for these e-mails from home?

79

```
 1           this one here, I think I saw it on e-mail.

 2     Q.    I'm going to get to Number 2.

 3     A.    But this one I saw in the station only.

 4     Q.    Is Number 1 also sent by e-mail?

 5     A.    I haven't seen nothing like this sent on e-mail.

 6     Q.    But it's posted in the station?

 7     A.    Yes, sir.

 8     Q.    All right.  And then Defendant's Exhibit Number

 9           2 is the one that you received by e-mail?

10     A.    If I'm thinking correctly, sir, I did get a copy

11           of this on e-mail.

12     Q.    And that's the memorandum I think you were

13           testifying about earlier?

14     A.    Yes, sir.

15     Q.    And it says you must be a current

16           non-probationary lieutenant.  It talks about an

17           orientation session, and it says a written exam

18           will be a component of the assessment process.

19           Reading materials have been obtained.

20                That's all in the e-mail that was sent on

21           Exhibit 2, true?

22     A.    Yes, sir.

23     Q.    When you received that e-mail, did you register
```

80

```
 1         any objection at that time to -- Let me back up.
 2              I assume you would have received that
 3         e-mail -- Is that memo also posted or is it just
 4         sent by e-mail?
 5    A.   I recall seeing one on the board just like this
 6         one around the station, but it could easily be
 7         somebody got a copy of the e-mail and put it up
 8         there.  I don't know.
 9    Q.   Is it fair to say you would have received that
10         e-mail or observed that memo either February 17
11         or within a day or two thereafter?
12    A.   Give or take within a week, yes, sir.
13    Q.   And did you make any complaints at that time to
14         anybody about the written exam being a component
15         of the assessment process?
16    A.   No, sir.
17                   (Defendant's Exhibit 3 marked for
18                       identification.)
19    Q.   And let me show you what's going to be marked as
20         Defendant's Exhibit Number 3, which is another
21         memo dated February 23, which discovered that
22         non-probationary firefighters and probationary
23         lieutenants were eligible and reaffirmed when
```

81

```
 1          the orientation was going to be.  And that's

 2          dated February 23.  I assume that you either saw

 3          or received that --

 4    A.    Yes, sir, I did.

 5    Q.    -- February 23rd or within a day or two of that?

 6    A.    Yes, sir.

 7    Q.    Did you register any complaint for

 8          non-probationary firefighters or probationary

 9          lieutenants being eligible to apply for the

10          battalion chief vacancy?

11    A.    When I read this, I was kind of puzzled due to

12          the fact that why are probationary employees

13          allowed to apply for this position, you know.  I

14          was somewhat familiar of the first memo.  But

15          when I received this one, it really puzzled me.

16          But, no, sir, I did not make a complaint.  I

17          didn't say nothing.  I just followed the

18          procedures in place.

19    Q.    You didn't have any conversations with anyone

20          about there being a written test component nor

21          probationary -- non-probationary firefighters

22          and probationary lieutenants being eligible.  Is

23          that a fair statement?
```

82

```
 1    A.   Yes, sir, that's a fair statement.

 2    Q.   And, now, I understand that at least in this

 3         lawsuit you've made some complaint about there

 4         being no non-probationary firefighters and

 5         probationary lieutenants being eligible.  Were

 6         any non-probationary firefighters promoted to

 7         battalion chief as a result of this process?

 8    A.   As a result of this process, no, sir.

 9    Q.   Were any probationary lieutenants promoted to

10         battalion chief as a result of this process?

11    A.   The only thing I can recall, Mr. Morgan, is I

12         recall an incident where a probationary

13         firefighter was promoted to team leader, and I

14         also recall an incident where a firefighter was

15         promoted to captain and then eventually promoted

16         to acting fire chief.

17    Q.   Well, my question is:  In terms of the

18         complaints about the battalion chief promotion

19         procedure in 2006, isn't it true that no

20         non-probationary firefighters were promoted to

21         battalion chief in 2006?

22    A.   Yes, sir.

23    Q.   And were any probationary lieutenants promoted
```

83

1        to battalion chief?

2    A.   No, sir.

3                    (Defendant's Exhibit 4 marked for

4                     identification.)

5    Q.   Let me show you what I'm going to mark as

6         Defendant's Exhibit Number 4.  Do you recognize

7         that as the sign-in sheet for the battalion

8         chief assessment orientation, which was February

9         28, 2006?

10   A.   Yes, sir.  This is the sheet.

11   Q.   And is that your signature?

12   A.   Yes, sir, that's my signature.

13   Q.   And you attended that orientation?

14   A.   Yes, sir, I did.

15   Q.   How long was that orientation?

16   A.   If I'm thinking correctly, it was two to three

17        hours.

18   Q.   Who conducted the orientation?

19   A.   It was several people there -- a couple of

20        people there, Mr. Morgan.  You had two

21        representatives from human resources:

22        Ms. Stephanie King, Mr. Reeves.  You had a

23        representative from the company who I guess

87

| | | |
|---|---|---|
| 1 | Q. | So we can take him out of the equation. |
| 2 | A. | If you choose to, yes, sir. |
| 3 | Q. | So the only career non-probationary firefighter |
| 4 | | who took the battalion chief written test who |
| 5 | | was not a lieutenant was Chris Turner, a black |
| 6 | | male? |
| 7 | A. | I know Chris Turner took the test. |
| 8 | Q. | Did you keep notes of the orientation session? |
| 9 | A. | I don't recall taking any notes.  We were |
| 10 | | provided study material in reference to the test |
| 11 | | at some particular time or another.  But, no, |
| 12 | | sir, I don't recall any notes I took during |
| 13 | | orientation. |
| 14 | | (Defendant's Exhibit 5 marked for |
| 15 | | identification.) |
| 16 | Q. | I'm going to mark this as Number 5.  Did you |
| 17 | | receive this document at the orientation? |
| 18 | A. | It looks familiar, Mr. Morgan.  Yes, sir. |
| 19 | Q. | And that is an Auburn Fire Division Orientation |
| 20 | | Manual.  That's the title of it, true? |
| 21 | A. | Yes, sir. |
| 22 | Q. | And you did receive that at the orientation |
| 23 | | session? |

88

```
 1   A.   I think so.

 2   Q.   And did the people that you've testified were

 3        there -- Stephanie King, Steve Reeves, Lee and

 4        the WCA's representative -- did they go over

 5        that document with you?

 6   A.   A lot of things was discussed that day,

 7        Mr. Morgan.  I can't specifically remember what

 8        was went over and what was discussed.  But it

 9        was a lot of information involved, and

10        everything that I think was presented was

11        touched upon as far as orientation, yes, sir.

12   Q.   The bottom line is:  It was explained to the

13        applicants the testing process?

14   A.   Yes, sir.  It was told to us basically how it

15        would be implemented and worked and I guess

16        scored and applied to whatever was going on.

17   Q.   And the percentages as to people taking the

18        written test, who would be eligible to proceed

19        on to the assessment program part of it?

20   A.   Basically the understanding I had when I was

21        there was if you passed the written test, you

22        proceed.

23   Q.   If you didn't pass the written test --
```

89

1    A.    If you didn't pass, you didn't proceed.

2    Q.    You talked about a reading material or study

3          material list.  Did you receive a list -- I know

4          you got some books.  I'm going to get to that in

5          a minute.  Was there an actual list that was

6          given out or was the list discussed or was it in

7          that manual?

8    A.    The only thing I remember was that I was

9          notified to come to the public safety building

10         to Mr. Lamar's office and receive your study

11         material.

12   Q.    But you were made aware in the orientation

13         session that study materials would be provided?

14   A.    Yes, sir.

15   Q.    The person from CWH, do you recall anything that

16         he said about the test, how the test was

17         devised, the purpose of the test?

18   A.    I don't recall that, sir.

19   Q.    Did you make any complaint at the orientation

20         session, which I think was February 28, 2006 --

21         did you make any complaint at the orientation

22         session about a written test?

23   A.    No, sir.

93

| | | |
|---|---|---|
| 1 | Q. | What about Larry Langley?  What was his role or |
| 2 | | what did he contribute to the -- |
| 3 | A. | That I remember, Mr. Langley walked in the room |
| 4 | | before we even got started and left, and I never |
| 5 | | saw him again. |
| 6 | Q. | And Lee Lamar, what do you recall his input or |
| 7 | | participation being? |
| 8 | A. | Mr. Lamar was there, that I recall, for the |
| 9 | | entire time of the orientation.  And I vaguely |
| 10 | | remember him having some input, if he was |
| 11 | | questioned about it, in reference to the |
| 12 | | division itself and all that.  That's basically |
| 13 | | all I remember on that. |
| 14 | Q. | Do you remember Lee saying anything specifically |
| 15 | | about how the test was developed? |
| 16 | A. | No, sir. |
| 17 | Q. | Do you remember Lee saying anything specifically |
| 18 | | about how the components were derived and |
| 19 | | processed, came about? |
| 20 | A. | I don't remember that, sir. |
| 21 | Q. | Tell me what you recall the CWH representative |
| 22 | | saying about the test. |
| 23 | A. | Basically he was saying that the questions was |

94

1        drawn from whatever procedures they have, and

2        they had been representing several cities or

3        municipalities around the nation, you know.

4        Just told us a little bit about the company

5        within itself, and he started going over the

6        material.  I think he had a slide presentation,

7        and we just gradually worked through the whole

8        orientation process of that evening.

9   Q.   What do you recall the slide presentation being

10       about?

11  A.   I think it was in reference to the study

12       material we had, the things to study or

13       something of that nature.  But I can't

14       specifically remember what it was pertaining to.

15  Q.   Do you remember if the CWH representative

16       explained to the participants that questions

17       would be drawn from these study materials?

18  A.   It's a great chance he could have said that, but

19       I just don't remember at this time, Mr. Morgan.

20       I'm sorry.

21  Q.   What was your understanding as to the purpose of

22       the study materials?

23  A.   My understanding of the study material was it

96

```
 1    A.    They were actually -- If I remember correctly,

 2          they were essentials of some sort in the field

 3          of firefighting.

 4    Q.    Were any of them related more to supervision

 5          than firefighting, or were they all -- as you

 6          heard it, did they all appear to be related to

 7          what you would be doing as an officer?

 8                    MR. HORSLEY:  The study materials?

 9                    MR. MORGAN:  Yeah.

10    A.    From what I looked at and what was presented to

11          me, Mr. Morgan, the material was of an advanced

12          level.  And what I consider to be an advanced

13          level is a management position within the fire

14          division.

15    Q.    And the battalion chief is an advanced level, is

16          it not?

17    A.    Yes, sir.

18    Q.    That's what --

19    A.    Superior, advanced, you know.  Yes, sir.

20    Q.    That's the next rank below the deputy chief?

21    A.    Yes, sir.  In the Auburn Fire Division.

22    Q.    Well, the discussion from the CWH representative

23          as to the test and what would be included and
```

97

1        what was expected, did it appear to be related

2        to what a person would do as a supervisory

3        officer in the Auburn Fire Department?

4    A.   Now, that was a question.  I mean, we have ways

5        we do things in Auburn, and people have ways

6        they do things in Montgomery.  But the

7        essentials itself I guess was the appropriate or

8        the common way or the popular way, however they

9        put it, that they think something should

10       happen.  I mean, it didn't directly apply to the

11       way we do things in Auburn, but it was

12       officially essential in reference to, you know,

13       advanced positions of that nature.

14   Q.   The discussion in your opinion was that these

15       were essential functions of that rank, but it

16       may not be the way we do it in Auburn?

17   A.   Yes, sir.

18   Q.   And did you register any complaint with the WCH

19       representative about those type questions being

20       asked on the test?

21   A.   No, sir.

22   Q.   Did anybody?

23   A.   I'm not aware of that, sir.  If somebody did,

98

1       I'm not aware of it.

2  Q.   Do you know what input into the written test any

3      officers with the City of Auburn Fire Division

4      had?

5  A.   There were rumors that the battalion chiefs at

6      the time played a role in some part of it, but I

7      don't know.  I'm not aware if they did.  I'm not

8      aware what part they played.

9  Q.   Let's assume that the battalion chiefs at Auburn

10     played a role in the written test that was

11     developed for the position of battalion chief.

12     Would you agree with me that that would be a

13     good thing?

14            MR. HORSLEY:  Object to the form.  You

15               can answer if you know how.

16  A.   I think just like with team leaders,

17     lieutenants, the whole nine, I think battalion

18     chiefs should play a role in the overall

19     promotionary procedure.  Now, the test, I'm not

20     sure about that.

21  Q.   Not sure about what, whether they did or not?

22  A.   I'm not sure if they played a role in the

23     questions that was on the test.  I'm not sure of

99

1          that.

2    Q.    And I understand that you've testified to that.

3          My question is:  Assume they did.  Would you

4          agree with me that battalion chiefs playing a

5          role in helping develop the written test, if

6          that occurred, would be a good thing?

7                        MR. HORSLEY:  Object to the form.  You

8                        can answer.

9    A.    That would be a good resource, yes, sir.

10   Q.    Was there anything that the representative from

11         CWH said at the orientation session that day

12         that would be included on the test, whether it

13         was a written test or the assessment part of it,

14         that you thought didn't have anything to do with

15         fire work?

16   A.    I don't recall anything, Mr. Morgan.  I mean, he

17         was presenting information that was available

18         that I guess was being directed to the

19         candidates, which was me and all the others that

20         was present.

21   Q.    Are you aware of any orientation sessions other

22         than this one?

23   A.    This is the only one I can recall.

100

1    Q.   Do you know of any special meetings or

2          orientation sessions that white applicants had

3          with these people that were there, including the

4          CWH representative, that you were not a part of?

5    A.   To my knowledge, no, sir, I don't know anything

6          about that.

7    Q.   As far as you know, everybody attended the same

8          orientation session.  You have no evidence

9          otherwise?

10   A.   No evidence otherwise.

11   Q.   And as far as you know, that was the only

12         orientation session that was given, true?

13   A.   That's all I know, yes, sir.

14                 MR. HORSLEY:  Is this a decent time

15                    for a break?

16                 MR. MORGAN:  Yeah.

17                 (Lunch recess.)

18                 (Defendant's Exhibits 6, 7 and 8

19                    marked for identification.)

20   Q.   (Continuing by Mr. Morgan)  Let me show you what

21         I'm marking as three exhibits, 6, 7, and 8.  Do

22         you recall receiving Exhibit 6, which is a memo,

23         letter, to the candidates outlining the dates

103

```
 1    A.    No, sir.  Those are not mine.

 2    Q.    And how about the number 14?  Is that your

 3          handwriting or is that someone else's

 4          handwriting?

 5    A.    That's somebody else's handwriting.

 6    Q.    But that's your signature?

 7    A.    Yes, sir.

 8    Q.    And Defendant's Exhibit Number 8, books, it's

 9          got the number of books, number 14.  Is that

10          your signature?

11    A.    Yes, sir.  Those are my initials.

12    Q.    And is the number 14 yours as well or did

13          somebody else write that in?

14    A.    Somebody else wrote 14.

15    Q.    And do you remember if you signed Defendant's

16          Exhibit 8 on March 3rd or did you sign it on

17          March 7th?

18    A.    I'm going to guess and say I signed it on the

19          7th.

20    Q.    The same day would be your best guess?

21    A.    Yes, sir.

22    Q.    Do you remember what you received as book number

23          14?
```

104

1   A.   I received a couple of books when I would

2        receive my material.  I can't remember which

3        ones they were and the titles of them, but I do

4        recall them being some sort of essential or

5        another in reference to firefighting.

6   Q.   Essential?

7   A.   Yes, sir.

8             (Defendant's Exhibit 9 marked for

9                 identification.)

10  Q.   Let me show you what I'm going to mark as

11       Defendant's Exhibit Number 9.  I apologize.  Is

12       that your application for the promotion to

13       battalion chief?

14  A.   Yes, sir.  That's it.

15  Q.   And what day did you fill that out or sign it?

16  A.   I signed it on February 20, 2006, on a Monday.

17  Q.   Now, between the orientation session, which was

18       February 28 of '06, and your signing for the

19       books on March 7, 2006, do you recall anything

20       during that period of time that occurred in

21       relation to the battalion chief promotion?

22  A.   I don't recall anything, Mr. Morgan.

23  Q.   Did you discuss with any of the people who had

107

1       occurred in relation to the promotion procedure

2       from the time you received your books on March 7

3       up until the time you start taking the written

4       test, which I think is April 10?

5  A.  Can you repeat the first part?  It slipped my

6       mind.  I'm sorry.

7  Q.  You received the books on March 7 at Deputy --

8       at that time -- Lee Lamar's office, and I think

9       the test began April 10.  Anything of any

10       significance between that time period that

11       relates to the promotion procedure?  Did

12       anything occur during that time period?

13  A.  Not that I can recall, sir.

14  Q.  Did you have any conversations with Lee or Larry

15       Langley or Steve Reeves or Stephanie up until

16       you start taking the written test on April 10?

17  A.  No, sir.

18  Q.  Other than what may have occurred at the

19       orientation?

20  A.  No, sir.

21  Q.  And you never had any conversations up to that

22       time with the mayor or Charles Duggan or Steve

23       Reeves?

108

1    A.    No, sir.

2    Q.    The mayor, Bill James, and Charles Duggan, you

3          didn't have any conversations with them up to

4          April 10 about the test in any fashion, true?

5    A.    No, sir.  True.

6    Q.    Tell me what you did to study and prepare for

7          the test.

8    A.    Being the time I had to study all that

9          material -- First of all, I reviewed all the

10         material that was available.  And I took it upon

11         myself to just study areas where I thought to be

12         important.  Like I say, we didn't have that much

13         time or I don't think we had enough time to

14         actually study all the material that was

15         available.  So I took it upon myself to apply

16         myself to areas where I thought I needed to

17         study and work on to prepare or be ready for

18         this test.  And that was just the way I was

19         thinking about it, Mr. Morgan.

20   Q.    Did you have study groups?  Firefighters get

21         together and have study groups?

22   A.    I did not.

23   Q.    You did not?

109

1    A.    No, sir.

2    Q.    How many study books did you have?

3    A.    I can't remember the exact number, but three to

4          four books.

5    Q.    Did you have to turn those back in?

6    A.    Yes, sir.

7    Q.    Did you make any complaint to anybody before you

8          sat down for the written test that you didn't

9          have enough time to study?

10   A.    Anybody as in ...

11   Q.    Lee Lamar.

12   A.    The one person that I did talk about in the

13         study time and all that, he's in this room

14         now and that's Mr. Ogletree.

15   Q.    You had those conversations with Mr. Ogletree?

16   A.    Yes, sir.  I told him just what I thought about

17         the time span and the material that was

18         available to study, and I told him what I

19         thought about it.

20   Q.    Well, I'm going to get to that.  Let me go

21         through my little list.

22              You didn't have any conversations with Larry

23         Langley complaining about the time you had to

110

1       study, did you?

2    A.    Larry Langley, no.

3    Q.    No conversations with Lee Lamar about the period

4          of time for study, did you?

5    A.    Mr. Lamar, no.

6    Q.    No conversations with Bill Ham about the period

7          of time you had to study?

8    A.    Mayor Ham, no.

9    Q.    No conversation with Steve Reeves about the

10          period of time you had to study?

11    A.    Mr. Reeves, no.

12    Q.    No conversations with Bill James about the

13          period of time you had to study?

14    A.    Mr. James, no.

15    Q.    No conversations with Charles Duggan about the

16          time you had to -- period of time you had to

17          study?

18    A.    Charles Duggan, no.

19    Q.    And none with Stephanie king?

20    A.    Ms. King, no.

21    Q.    And none with any representative of CWH?

22    A.    No representatives, no.

23    Q.    And so you and I will be together on this, I'm

111

1        not asking you questions about Cortez Lawrence

2        because I'm understanding from your answers he

3        didn't have anything to do with this.  Is that a

4        fair statement?

5  A.   To my knowledge he don't.  I don't know nothing

6        about that.

7  Q.   What conversations did you have with Eddie

8        Ogletree about the time span?

9  A.   Basically I notified him and just asked him, you

10       know, basically his opinion on the material that

11       was presented and the time we had on it.  And I

12       just basically told him that I don't see where I

13       think I would be able to cover all this, you

14       know, in the time we had available.  It was a

15       lot of material.  It was a lot to read.  Plus,

16       you know, the other information that I chose to

17       pursue and study that I thought would be liable

18       (sic) for the test, I studied that as well,

19       stuff like SOP books, personnel policies, City

20       personnel policies -- I'm sorry -- in

21       conjunction with the material that was given for

22       the actual test.

23  Q.   So in addition to the books that you were told

112

1    were the recommended reading for the test, you

2    studied the fire department SOPs and you studied

3    the personnel policies?

4    A.    Yes, sir.

5    Q.    Now, did anybody recommend or suggest that you

6    study the SOPs for the battalion chief test?

7    A.    Nobody recommended it to me, sir.

8    Q.    Did anybody recommend or suggest that you study

9    the personnel policies for this battalion chief

10    test?

11    A.    No, sir.  Nobody recommended it to me.

12    Q.    Any other sources that you studied or reviewed

13    for the battalion chief test, now, that weren't

14    on the recommended reading list, the books you

15    were given by the City, other than the SOPs and

16    personnel policies?

17    A.    No, sir.  Those are the only outside two

18    resources I studied in conjunction with what was

19    given to me.

20    Q.    And other than the fact that you received your

21    reading material on March 7 rather than March 3,

22    did any of the other firefighters or candidates

23    for this promotion have any additional period of

113

1        time to study than you did?

2    A.  I'm not aware of that, sir.

3    Q.  As far as we can tell from the documentation

4        that I've presented to you today, everybody

5        would have received the reading material on or

6        about March 3; is that true?

7    A.  Yes, sir, on or about.

8    Q.  So the length of time would have been the same

9        for black applicants, white applicants,

10       lieutenant applicants, team leader lieutenant

11       applicants, firefighter applicants?  Everybody

12       would have had the same time period.  Is that a

13       fair statement?

14   A.  Give or take one or two days depending on how

15       the shift ran.  Yes, sir, that's a true

16       statement.

17   Q.  You make a reference in your complaint to test

18       aids.  What did you consider to be the test aids

19       for the battalion chief promotion process?

20   A.  Could you be a little bit more specific about

21       this?

22   Q.  I'll show you what I'm talking about.

23   A.  Okay.

114

| | | |
|---|---|---|
| 1 | Q. | Paragraph 18.  You have on here -- I've |
| 2 | | highlighted it.  Caucasian applicants for the |
| 3 | | position were given preferential treatment |
| 4 | | regarding the application process, test aids, |
| 5 | | and test grades. |
| 6 | | Do you see that in your complaint? |
| 7 | A. | Yes, sir. |
| 8 | Q. | What are the test aids that you're referring |
| 9 | | to?  What did you consider to be the test aids |
| 10 | | for this promotion? |
| 11 | A. | I can't recall that, Mr. Morgan. |
| 12 | Q. | Well, let me ask this.  You testified about an |
| 13 | | orientation. |
| 14 | A. | Yes, sir. |
| 15 | Q. | And you testified about receiving the books. |
| 16 | A. | Yes, sir. |
| 17 | Q. | Do you have knowledge of any white applicants |
| 18 | | for this position with battalion chief that |
| 19 | | received anything else that would help them on |
| 20 | | this test other than attending the orientation |
| 21 | | and reviewing the books that everyone was |
| 22 | | given?  Anything else that you know of that |
| 23 | | white applicants received that you didn't |

115

1      receive?

2   A.   I'm not aware, Mr. Morgan.  I haven't been

3      introduced with that.

4   Q.   Do you know any white applicant who was given

5      preferential treatment in the application

6      process?

7   A.   I don't recall that, Mr. Morgan.  It don't ring

8      a bell.

9   Q.   Do you know any white applicant who was given

10     preferential treatment in terms of test aids?

11  A.   Never presented to me, Mr. Morgan.  I'm not

12     aware of that.

13  Q.   I assume that you continued your regular shift

14     work -- shift hours during the process when you

15     were studying for the battalion chief promotion

16     procedure.

17  A.   Yes, sir.

18  Q.   Did you take any time off to study?

19  A.   That I recall, none, sir.  If it was any, it

20     would have been how our Kelly days fall or

21     something like that.  But I don't recall taking

22     off any significant shift during that process.

23  Q.   Did you apply for any or request any leave time

118

| | | |
|---|---|---|
| 1 | | time that you would have been preparing for the |
| 2 | | test? |
| 3 | A. | Yes, sir. |
| 4 | Q. | Work one day and off two days? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Anything that you did to prepare for the test |
| 7 | | other than review the SOPs, personnel policies, |
| 8 | | and those portions of the study books which you |
| 9 | | thought were going to be important?  Anything |
| 10 | | else that you did in preparation for the test? |
| 11 | A. | That's about all I did, sir. |
| 12 | Q. | Did you read completely any of the study aid |
| 13 | | books? |
| 14 | A. | Like I said earlier, Mr. Morgan, I reviewed the |
| 15 | | material that was given to me.  In the areas |
| 16 | | where I felt strong on, I didn't spend as much |
| 17 | | time as on the areas that I felt weak on.  So it |
| 18 | | was give and take throughout the study guides -- |
| 19 | | study information. |
| 20 | Q. | So is it fair to say, then, the answer to my |
| 21 | | question is:  You didn't read the whole book. |
| 22 | | You read the parts you thought were going to |
| 23 | | help you with your strengths taking the test? |

119

A.    Yes, sir.  I concentrated heavily on the area
      where I thought I was weak in.

Q.    What day of the week was the test given?  Do you
      recall?

A.    No.  I don't recall what day it was, sir.

Q.    And didn't we decide, or at least I decided, it
      was April 10?

A.    Yes, sir.  April 10.

Q.    And do you remember what time it started?

A.    It was stated that it started at 8:30, but I
      don't know if it started on time, a little bit
      before or a little bit after.  I'm not sure on
      that.  I don't recall.

Q.    Was there a sign-in sheet?

A.    Yes, sir, I do recall a sign-in sheet.

Q.    And would you -- I say you.  I mean all the
      applicants.  Were you given a booklet to take?
      How was the written test?  What was the written
      test?

A.    If I'm remembering correctly, through the whole
      process we came in and signed in.  And, of
      course, all the tables and chairs were set up
      and spaced evenly from each candidate.  And

122

1          How were the questions and answers?

2     A.   If I remember correctly, it was multiple

3          choice.

4     Q.   Were they divided up into any divisions or areas

5          such as supervision, fire scene, or was it just

6          a straight series of questions?

7     A.   That I recall, it was a straight series of

8          questions.

9     Q.   And did the questions appear to be related to

10         fire work?

11    A.   They appeared to be related to the field of fire

12         profession, yes.

13    Q.   Were there questions on there that appeared to

14         be related to supervisory roles?

15    A.   I recall there being some questions, yes, sir.

16    Q.   Did you think that the questions related to what

17         a battalion chief would do in the city of

18         Auburn?

19              MR. HORSLEY:  Object to the form.  You

20                   can answer.

21    A.   I don't think -- I think several of the

22         questions on that test had nothing to do with

23         Auburn and the way we do things at Auburn.  To

123

```
 1           me those questions were something in reference

 2           to a larger municipality bigger than us.

 3    Q.     Do you remember the specific questions?

 4    A.     No, sir, I don't.

 5    Q.     How many questions were there like that that you

 6           thought related to a larger municipality?

 7    A.     It was the majority of the questions of the

 8           test.  I don't recall the exact number or how

 9           many apply to that, but I know it was several

10           questions on there that I just didn't think

11           pertained to the way we do things in Auburn, to

12           the rules we go by, regulations.

13    Q.     What exactly is your familiarity with the

14           responsibilities and duties of the battalion

15           chief?

16    A.     Being that I filled the role in the absence of a

17           battalion chief, I'm very familiar with the

18           things they do.

19    Q.     What does a battalion chief do differently from

20           what a lieutenant does?

21    A.     Basically in a nutshell, the battalion chief is

22           responsible for the entire shift and also

23           responsible for the operations of the City in
```

131

1          the grievance procedure.

2     A.    It appears that this is, yes, sir.

3     Q.    You, of course, had been informed that you did

4          not pass by that time?

5     A.    Yes, sir.  The first thing I received was my

6          letter of response saying what I made on the

7          test.  That's the first thing I received.

8     Q.    And is it your testimony that when you filed

9          that grievance that you had heard rumors that

10          Joey Darby had test questions thrown out?

11    A.    Well, Joey Darby didn't have them thrown out.

12          He questioned those -- I guess he pursued those

13          questions because we was -- they mentioned

14          somewhere -- I'm trying to remember -- if a

15          question was on the test that didn't appear to

16          be in reference to -- I can't remember how they

17          worded it, but I know there was some questions

18          on that test challenged.

19    Q.    Well, did you challenge any test -- any --

20    A.    Any questions?  No, sir, I didn't.

21    Q.    But from what I understand your testimony to be,

22          the rumor was that Joey Darby challenged some

23          questions?

135

```
 1          with CWH?

 2     A.   No, sir, I did not.

 3     Q.   And then you and three others filed a grievance

 4          to Lee Lamar, and you asked that four written

 5          exams be reviewed.  I assume that's the four of

 6          you, your written exams?

 7     A.   Yes, sir.

 8     Q.   Now, Horace Clanton is a white male?

 9     A.   Yes, sir.

10     Q.   And Robbie Hodge is a white male?

11     A.   Yes, sir.

12     Q.   Eddie Ogletree is a black male?

13     A.   Yes, sir.

14     Q.   And Gerald Stephens is a black male?

15     A.   Yes, sir.

16     Q.   And the four of y'all filed this grievance

17          together?

18     A.   We initiated that grievance together.

19     Q.   And when you actually had the hearing, though,

20          how many of you went forward with the hearing?

21     A.   It was three of us.

22     Q.   Who did not go forward?

23     A.   Robbie Hodge.
```

136

1   Q.   In this letter y'all say about exercising your

2        rights for a grievance on a promotion procedure,

3        which includes the following:  The written exam.

4             What was your complaint about the written

5        exam at that point?

6   A.   In reference to this grievance as a group,

7        everybody had their specific complaint.  And the

8        only thing I can tell you about that is the last

9        one, inconsistency of past promotional

10       procedures.  That was my main complaint.

11  Q.   So did you have a complaint yourself about the

12       written exam as part of this grievance

13       procedure?

14            MR. HORSLEY:  What was that question

15                 again?  I'm sorry.

16            MR. MORGAN:  He said --

17  Q.   As I understand what you said, the four of y'all

18       may have each had your own separate complaints,

19       true?

20  A.   Pretty much so, yes, sir.

21  Q.   The one that you were most complaining about was

22       the inconsistency of past promotional

23       procedures?

137

```
 1    A.    Yes, sir.

 2    Q.    My question is:  As part of the grievance

 3          procedure, was one of your complaints or did you

 4          have a complaint about the written exam?

 5    A.    The thing about inconsistency of past

 6          promotional procedures, it involves the written

 7          exam because for the simple fact there have

 8          never been one.  That's my main thing.  That's

 9          part of my inconsistency, because when I took --

10          if I can explain --

11                MR. HORSLEY:  Yeah.

12    A.    When I took my promotional assessment in '96,

13          there was no written test.  Anything after that

14          that I recall within a ten-year time span, there

15          was no written test.

16    Q.    Let me ask the question this way.  I'm going to

17          get to the inconsistency and let you explain

18          that in detail, but I want to go through these

19          other three.

20                What I'm hearing you say -- you tell me if

21          I'm wrong -- is that your complaint about the

22          written exam is that it was a requirement.

23    A.    Basically the written exam was part of the
```

138

1          procedure, yes.

2    Q.    You didn't make any specific complaints about

3          the exam per se but just the fact that it was

4          now a part of the promotion procedure?

5    A.    Yes, sir.

6    Q.    And did you have as part of your complaint the

7          no time in grade policy?  Was that something

8          that concerned you?

9    A.    Not directly, sir.

10   Q.    And then the -- I don't even understand this

11         one -- no accumulative point system, was that

12         one of your concerns?

13   A.    That was a minor concern because --

14   Q.    What is that?

15   A.    Basically accumulative points is something

16         that's implemented into the overall assessment

17         whereas if --

18   Q.    Back up.

19   A.    Let's say, for example, if you had four years of

20         service, you get two points for that.  If you

21         had a degree, you get eight points for that, you

22         know.  To the point -- The point I'm trying to

23         get at is:  At the end of the testing, all your

139

```
 1         points are added up, and that's how you get a

 2         result, like I got on my result from when I was

 3         promoted stating how I ranked and here was my

 4         score.

 5    Q.   So you thought there should be some accumulative

 6         point system into the system, either seniority

 7         or education or something?

 8    A.   Yes, sir.  I think it should have been one --

 9         some type of point system, yes, sir.  Whether

10         there was or not, I don't know, because I didn't

11         make it past the written test portion for

12         battalion chief.

13    Q.   Well, tell me how you would have fashioned the

14         test for battalion chief.

15                   MR. HORSLEY:  Object to the form.  You

16                   can answer.

17    A.   I'm not an expert on test making, Mr. Morgan, so

18         I can't really say what I would do and what I

19         would do would be the correct thing to do.  But

20         I just -- I just -- I'm not an expert in that

21         field.  I just don't know.

22    Q.   And then your number four complaint -- I think

23         this is the one that you said most concerned
```

140

1    you -- was the inconsistency of past promotional

2    procedures.

3  A.  Yes, sir.

4  Q.  Elaborate and tell me exactly what it is that

5    concerned you about that one.

6  A.  The thing that concerned me was that, of course,

7    I went through an assessment center.  Some

8    people promoted and, whether it was lieutenant

9    or team leader, went through structured

10    interviews.  Some people was appointed.  And

11    some people were just, in my terms, vaguely

12    given a job.

13  Q.  Just what, now?

14  A.  Vaguely given the job and told them that you are

15    in this position.  And when I say that, the job

16    position wasn't posted.

17  Q.  So --

18  A.  So that's what I mean by inconsistency.

19  Q.  I guess what I'm understanding you to say -- and

20    once again, you correct me -- is that people had

21    achieved a rank in different ways.

22  A.  Yes, sir.

23  Q.  Who was appointed as opposed to going through

141

```
1          the structured interview with the team leader or
2          the assessment as lieutenant?  Who was appointed
3          to a position that sat for the battalion chief
4          promotion?
5     A.   I do recall Rodney Hartsfield, who is a
6          battalion chief now, being promoted when he was
7          on probation as a career firefighter.  I don't
8          have any specifics on the date or nothing like
9          that.
10    Q.   Promoted to what?
11    A.   He was promoted to a team leader.
12    Q.   While he was a probationary career firefighter?
13    A.   Yes.
14    Q.   Well, I don't know either.  I mean, the
15         documents will say whatever they say, but was
16         there always -- other than Rodney Hartsfield's
17         promotion, was there always a requirement for
18         promotion to team leader that you had to be a
19         non-probationary career firefighter?
20    A.   Like I say, Mr. Morgan, I was not a team leader,
21         but I know there was requirements for me when I
22         applied for lieutenant.
23    Q.   So you don't know whether or not the
```

1       non-probationary versus probationary was ever a

2       requirement for team leader?

3  A.  Well, I mean, it was practiced, but whether or

4       not it was a direct requirement, I can't tell

5       you.  Like I say, I was never a team leader.

6  Q.  And then the last category was people who were

7       vaguely given the jobs that were not posted.

8       Who sat for the battalion chief position that

9       was vaguely given a job that was not posted?

10  A.  Well, nobody sat for the position of battalion

11       chief.  Basically he had something to do with

12       presenting in the -- the testing orientation or

13       whatever.  And what I'm speaking about in

14       particular is that when they first implemented

15       back the training officer position, it was never

16       posted.  I never saw anything in reference to.

17       And the first time I heard about it was when my

18       immediate supervisor told me, who is the late

19       Jimmy Brown.  He told me that the person who had

20       stepped in and started acting as the training

21       officer was the training officer.

22  Q.  Lee Lamar?

23  A.  Yes, sir.

143

1    Q.    Anybody else who you think in the fire

2          department received a promotion where they were

3          vaguely given a job that was not posted other

4          than Lee Lamar?

5    A.    Well, vaguely given a job, I don't know, but I

6          recall another incidence where a promotion took

7          place.  They went from firefighter to captain

8          whereas they skipped other rank.

9    Q.    And that's Larry Langley?

10   A.    And that's Larry Langley.

11   Q.    Once again, do you know whether or not on that

12         promotion there was a requirement for a time in

13         grade or that you had to be a lieutenant?

14   A.    The only thing I know is what I applied for,

15         Mr. Morgan, and that was lieutenant.

16   Q.    And that would have been the captain promotion

17         that occurred in 1996, true?

18   A.    No, sir.  It was in -- In 1996 I think

19         Mr. Langley was on his way to being acting fire

20         chief.

21   Q.    So Langley was promoted to captain even before

22         '96?

23   A.    Yes, sir.

144

```
 1    Q.    Do you remember what year he was promoted to
 2          captain?
 3    A.    I don't remember off the top of my head,
 4          Mr. Morgan.
 5    Q.    But your best recollection is it was sometime
 6          before '96?
 7    A.    It was before '96.
 8    Q.    All right.  Now, you're going to have to help me
 9          here.  You've taken your written test.  You've
10          told me about the procedure, what went on during
11          that written test.  And then I guess a couple of
12          days later -- within a week I guess -- you get
13          notice that you didn't score high enough to
14          proceed.  And then by April 21 you filed your
15          grievance along with these other firefighters.
16          I guess they were all lieutenants at that point.
17    A.    Yes, sir.  We were all lieutenants.
18    Q.    And then you go through the grievance
19          procedure.  I've seen the paperwork where you go
20          up -- the four of you go up the steps on the
21          grievance procedure.
22    A.    Yes, sir.
23    Q.    Is there anything else going on at that time in
```

153

| | | |
|---|---|---|
| 1 | A. | I guess there was between those other people |
| 2 | | that were present, yes, sir. |
| 3 | Q. | Anybody you remember being there besides Lee and |
| 4 | | Steve Reeves? |
| 5 | A. | I can't remember if Mr. Langley was there or |
| 6 | | not, but I do know Mr. Lamar and Mr. Reeves was |
| 7 | | there. |
| 8 | Q. | And Judge Bailey -- |
| 9 | A. | And Judge Bailey, of course.  He was the hearing |
| 10 | | officer. |
| 11 | Q. | He ruled against y'all? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Did you have any witnesses or was it just the |
| 14 | | three of you? |
| 15 | A. | It was just us three. |
| 16 | Q. | Do you know Rodney Hartsfield? |
| 17 | A. | I do. |
| 18 | Q. | Have you ever worked with him? |
| 19 | A. | I do. |
| 20 | Q. | Is he -- |
| 21 | A. | I have. |
| 22 | Q. | Is he a good officer? |
| 23 | A. | I can't say if he's good or not, but the times I |

154

1        worked with Rodney Hartsfield, he was an

2        insubordinate (sic) to me.  I mean, he worked

3        under my leadership.

4    Q.  He wasn't insubordinate.  He was subordinate.

5    A.  He was subordinate, yes, sir.  He was either a

6        student firefighter, career firefighter, or a

7        team leader.  As far as him being a battalion

8        chief, I don't recall working for him ever since

9        he's been in that position.  I may have worked

10       overtime a couple of hours till they can get

11       somebody in at shift change, but not a 24-hour

12       shift.  No, sir.

13   Q.  Do you have an opinion as to whether or not he

14       is qualified or not qualified to be a battalion

15       chief?

16                MR. HORSLEY:  Object to the form.  You

17                can answer.

18   A.  I don't have an opinion on that, Mr. Morgan.

19   Q.  And Joe Lovvorn, have you worked with him?

20   A.  Yes, sir.  Same as I have with Rodney

21       Hartsfield.

22   Q.  Was he a good, competent officer when you worked

23       with him?

155

1   A.   I mean --

2   Q.   Have any complaints about him?

3   A.   I never worked under his leadership as a

4        battalion chief.  It was always the same

5        description as was for Rodney Hartsfield.

6   Q.   Do you have any opinion as to whether he is or

7        is not qualified to be a battalion chief?

8             MR. HORSLEY:  Object to the form.

9   A.   I don't have an opinion, sir.

10  Q.   And Matt Jordan --

11  A.   Yes, sir.

12            MR. HORSLEY:  Same objection.

13  Q.   Have you ever worked for Matt Jordan?

14            MR. HORSLEY:  I'm sorry.  I thought he

15                 was asking the same question.

16  A.   I have worked for Chief Jordan.  He was -- When

17       he was promoted, he was my -- he was put on my

18       shift, or our shift, as my immediate supervisor.

19  Q.   And do you have an opinion on whether or not he

20       is or is not qualified to be a battalion chief?

21            MR. HORSLEY:  Object to the form.  You

22                 can answer.

23  A.   I don't have an opinion whether he's qualified

157

| | | |
|---|---|---|
| 1 | Q. | What is that opinion? |
| 2 | A. | Considering that I was an officer when he |
| 3 | | started working there, I taught him in rookie |
| 4 | | school, and, I mean, I trained him through the |
| 5 | | training procedures that took place or |
| 6 | | whatever.  All these guys who are battalion |
| 7 | | chiefs now, they came in after me. |
| 8 | Q. | I want to be sure I get all your answers so |
| 9 | | let's kind of take our time on this. |
| 10 | A. | Yes, sir. |
| 11 | Q. | What I'm understanding you to say about Rodney |
| 12 | | Hartsfield as to why you think you're more |
| 13 | | qualified is that you were an officer when he |
| 14 | | was hired and you participated in his training, |
| 15 | | right? |
| 16 | A. | (Witness nods head positively.) |
| 17 | Q. | Any other reasons why you think you're more |
| 18 | | qualified than Rodney Hartsfield? |
| 19 | | MR. HORSLEY:  Object to the form. |
| 20 | A. | More years of experience level.  I have more |
| 21 | | years of experience.  Spent more time on the |
| 22 | | job.  Has played a significant role or did play |
| 23 | | a significant role in the growth of the |

158

1    department, you know, during the era when they

2    was actually coming in and being hired.  I just

3    think I have more experience than any of those

4    guys at the Auburn Fire Division.

5         And one other thing:  I mentioned it later

6    on.  During their absence, you know, I filled

7    that position.  And I filled that position

8    before they even became, you know, battalion

9    chiefs.  I filled the position in the absence of

10   a battalion chief.

11   Q.   If a battalion chief --

12   A.   And I still do it.

13   Q.   -- is not there, you as a lieutenant, step up --

14   A.   Yes, sir.

15   Q.   -- to that position?

16   A.   Yes, sir.  Based upon seniority.

17              MR. HORSLEY:  And you said you had

18                   done that before the battalion

19                   chief promotion?

20              THE WITNESS:  Before and after.

21   Q.   You're talking about with other people who were

22   battalion chiefs?

23   A.   Yes, sir.  I've filled in several times for

159

1          Chief Brown.

2    Q.    Do you know whether or not Rodney Hartsfield

3          ever filled in --

4    A.    I don't know.  Me and him was not on the same

5          shift.

6    Q.    Do you know whether or not as a team leader

7          Rodney Hartsfield had stepped up and filled in

8          as a lieutenant?

9    A.    I'm not sure on that, Mr. Morgan.

10   Q.    Have we covered everything about Rodney

11         Hartsfield as to why you think you're more

12         qualified?

13   A.    I think we touched the basis of it, sir, the

14         most important part.

15   Q.    And Joe Lovvorn, do you think you're more

16         qualified than Joe Lovvorn to be a battalion

17         chief?

18              MR. HORSLEY:  Object to the form.

19   Q.    What are the reasons?

20   A.    Pretty much the same reasons that I mentioned

21         with Rodney Hartsfield.

22   Q.    Been there longer?

23   A.    Yes, sir.

160

| | | |
|---|---|---|
| 1 | Q. | And Matt Jordan.  Do you think you're more |
| 2 | | qualified than Matt Jordan? |
| 3 | | MR. HORSLEY:  Object to the form. |
| 4 | Q. | What are the reasons? |
| 5 | A. | Same reasons.  Understand, Mr. Morgan, all these |
| 6 | | guys came in right along the same era, one or |
| 7 | | two years, give or take.  And when they came in, |
| 8 | | I was a officer already. |
| 9 | Q. | And then Joey Darby.  You think you're more |
| 10 | | qualified than Joey Darby -- |
| 11 | A. | Yes, sir. |
| 12 | Q. | -- to be a battalion chief? |
| 13 | | MR. HORSLEY:  Object to the form. |
| 14 | A. | Yes, sir. |
| 15 | Q. | Same reasons? |
| 16 | A. | Yes, sir. |
| 17 | Q. | Any different reasons for any of them other than |
| 18 | | what you've already expressed? |
| 19 | A. | Not at this time, sir. |
| 20 | Q. | There's a reference in this lawsuit -- Well, let |
| 21 | | me get to that. |
| 22 | | MR. MORGAN:  Let's take a quick break. |
| 23 | | (Brief recess.) |

165

1          MR. HORSLEY:  Object to the form.  Go

2                ahead.

3    A.   My problem with that is that there have never

4         been a written test, Mr. Morgan.  It was

5         always -- It was either assessment center or a

6         structured interview.  And regardless which one

7         it was, there was not a written test for a

8         promotion to that rank.

9    Q.   Well, say that's true.  Say that's true.  Why

10        does that make it wrong to change the procedure

11        to include a written test?

12         MR. HORSLEY:  Object to the form.

13   Q.   I know you don't like the fact that you didn't

14        do well on the written test.  But aside from

15        that, looking at the big picture, what's wrong

16        with the City including a written test as part

17        of the promotion procedure?

18         MR. HORSLEY:  Object to the form.  Go

19               ahead.

20   A.   I'm not in the position to say whether it's

21        right or wrong with the City implementing

22        anything.  I can only speak from the point that

23        through my 17 years of being there or up to the

166

1      point where I became an officer and on up until

2      the time of this first battalion chief

3      promotion, there was never a written test.  What

4      is right or wrong for the City to do, I'm not at

5      any liberty or at any power to justify that.

6   Q.  And that makes me want to back up a minute.

7         You took the assessment center or

8      participated in that for lieutenant.

9   A.  Yes, sir.

10  Q.  You sat on what you've called structured

11     interviews for team leader.

12  A.  Yes, sir.

13  Q.  What's the difference between the two?  What was

14     different as an assessment as opposed to the

15     structured interview?

16  A.  I consider assessment center very thorough where

17     it covers all broadness of the position.  I

18     mean, from exercises in reference to medical

19     calls, pumping, driving, having good

20     conversational skills with the public, in

21     general.  That's an assessment center.  A

22     structured interview for a team leader, you come

23     in a room and you sit down and okay, we have a

168

```
 1        says:  Coincidentally the policy changes

 2        occurred when two African-American lieutenants

 3        and one entry-level African-American

 4        firefighter --

 5             I assume that's Chris Turner.

 6   A.   Yes.

 7   Q.   -- became eligible for the position.

 8             What's coincidental about that?

 9                  MR. HORSLEY:  Object to the form.  You

10                       can answer.

11   A.   Coincidentally, you know, we applied for the

12        positions.  We became eligible and we applied.

13        And all of a sudden, you know, things changed.

14        Things changed to the point where, you know, we

15        had to take a test.  Why not stick to the way

16        we've been doing things?

17   Q.   Do you have any evidence that that change

18        occurred to exclude African-Americans from being

19        promoted to battalion chief?

20                  MR. HORSLEY:  Object to the form.

21   A.   I don't know if it was applied or not, sir.  I

22        don't know.  But I know this.  It just

23        coincidentally happened that way to the point
```

169

1     where it hasn't happened in the past.

2  Q.  And the last sentence of that paragraph says:

3     Seniority within the division was discarded as a

4     criteria for promotion to the battalion chief

5     position.

6        Do you recall one way or the other whether

7     or not in '96 for the last captain's promotion

8     seniority was a requirement?

9  A.  I don't know if it was a requirement, but it was

10     heavily considered.

11  Q.  And that's based on what?

12  A.  Based on time in grade, based on the number of

13     years of experience, on the years you was --

14  Q.  My question is:  Why do you say that was a

15     requirement for captain in '96?  Do you recall

16     seniority being a requirement for captain?

17  A.  I don't recall that.  I don't know, sir.

18  Q.  Look at paragraph 17.  It says you were denied

19     promotion to battalion chief in April 2006 and a

20     temporary assignment in January of 2005.

21        The 2005, is that the one where you filed

22     the grievance and the EEOC charge dealing with

23     Horace Clanton?

170

1    A.    Yes, sir.

2    Q.    And if I recall, no lawsuit was filed as a

3          result of that?

4    A.    No, sir.

5    Q.    And then you said the denial of the promotion

6          was racially based.

7                What facts do you have that you're not being

8          promoted to battalion chief was because of --

9          was racially based?

10               MR. HORSLEY:  Object to the form.

11   A.    I can't think of no other reason why.  I mean,

12         I've done everything that the Auburn Fire

13         Division asked me to do up until this point.  I

14         was actually running the position prior to him

15         making that decision, and it had been practiced

16         and exercised prior to this incident that the

17         available lieutenants fill these positions.

18               Prior to the opportunity coming to me,

19         Mr. Langley's brother, who was a lieutenant of

20         the department, every time they needed a

21         position to take place, he was given the

22         opportunity.  And he had more seniority than

23         me.  And basically at one point, Mr. Langley

173

1        promotion on that occasion because of your race?

2                MR. HORSLEY:  Object to the form.  You

3                     can answer.

4   A.   I don't recall anything at this time,

5        Mr. Morgan.

6   Q.   Look at paragraph 18.  I think we've been

7        through this.  You're not aware of any Caucasian

8        applicants for battalion chief in February of

9        '06 that were given preferential treatment in

10       the application process, test aids, or test

11       grades, correct?

12  A.   Yes, sir.

13  Q.   And in paragraph 19, it said:  The City

14       continues to violate a federal court order

15       requiring them to alter hiring and promotion

16       practices.

17            First of all, you were hired in '94 as a

18       black male, true?

19  A.   Yes, sir.

20  Q.   And you had been hired earlier than that, I

21       guess, in '91 as a student firefighter?

22  A.   Yes, sir.

23  Q.   What federal court order are you referring to

176

1          I became career.

2     Q.   Was from those two people?

3     A.   They were my immediate and shift supervisor.

4     Q.   And they are the same two people that told you

5          you were hired because you were black?

6     A.   They pretty much told me.

7     Q.   And you don't believe that?

8     A.   No, sir.

9     Q.   Look at Count II, Retaliation.  I think it's

10         page 6.  You've got here that the Plaintiffs

11         have engaged in statutorily protected

12         expressions, such as filing EEOC -- well, Equal

13         Opportunity charges and grievances against the

14         City.

15              What do consider to be statutorily protected

16         expressions?

17              MR. HORSLEY:  Object to the form.

18    A.   I guess -- Well, I don't want to guess about

19         it.  I want to be direct with it.

20              MR. HORSLEY:  If you don't know, don't

21              try and answer.

22    A.   I don't know, Mr. Morgan.

23    Q.   Let me ask you, then.  Do you claim in this

177

1    lawsuit that you were denied promotion to

2    battalion chief in retaliation for having filed

3    an earlier EEOC charge and grievances against

4    the City?

5    A.    To my understanding, the reason why I didn't get

6          the opportunity to pursue the battalion chief

7          position is because I didn't pass the written

8          test.  I don't understand to this day why it was

9          implemented as part as when in the past it never

10         has happened.

11   Q.    You don't have any evidence that the reason you

12         weren't promoted is in retaliation for having

13         filed an EEOC charge or grievance, do you?

14                     THE WITNESS:  Can I talk to my

15                        attorney for a minute?

16                     MR. HORSLEY:  All I can tell you is if

17                        you don't know the answer to the

18                        question, that needs to be your

19                        answer.

20   A.    I don't know the answer to that question,

21         Mr. Morgan.

22   Q.    Your understanding is you didn't get promoted

23         because you didn't score high enough on the

178

1    written test, true?

2                    MR. HORSLEY:  Object to the form.

3                    THE WITNESS:  Can I answer?

4                    MR. HORSLEY:  You can answer.

5    A.    True.

6    Q.    And as far as you know, the same written test

7          was given to everyone, blacks and whites?

8    A.    As far as I know, sir, everyone that was present

9          got the same test.

10   Q.    And you don't have any evidence or suspect that

11         the City sat around with anybody and said, hey,

12         let's make this test so that Gerald Stephens

13         can't pass it because we're mad at him for

14         filing an EEOC charge?  You don't have any

15         evidence to that effect, do you?

16                   MR. HORSLEY:  Object to the form.

17                   THE WITNESS:  Can I answer?

18                   MR. HORSLEY:  Yeah.

19   A.    No, sir, I don't have any evidence of that.

20   Q.    In paragraph 31, you make reference to protected

21         expressions.  Do you see that?

22   A.    Yes.

23   Q.    Do you include anything in protected expressions

179

1        other than what you refer to in paragraph 30

2        being the EEOC charge and the grievances?  Is

3        there anything else that you consider to be

4        protected expressions, if you consider them to

5        be, other than the EEOC charge and the

6        grievances, if you know one way or the other?

7  A.    I don't know one way or the other, sir.

8  Q.    Look at Count III.  And the first question is --

9        In paragraph 34 in quotes, is the phrase

10       "built-in headwind for minority groups and

11       unrelated to measuring job capability".

12           What is a built-in headwind?  What do you

13       understand that to be?

14              MR. HORSLEY:  Object to the form.  He

15                 didn't draft the complaint.

16              MR. MORGAN:  I understand.

17  A.    I don't know, sir, at this point.

18  Q.    Outside of this lawsuit and excluding any

19        conversations with your attorney, have you ever

20        heard of the phrase "built-in headwind" before?

21  A.    I don't recall ever hearing anything of that

22        nature, sir.

23  Q.    What is your understanding as to your claim that

180

1          the promotion practice had a disparate impact?

2          In your terms, what does that mean?

3                    MR. HORSLEY:  Object to the form.  You

4                    can answer.

5    A.    All I know, Mr. Morgan, is that as an employee

6          of the Auburn Fire Division being hired in 1994,

7          there have only been one person hired with the

8          division, African-American, as a career

9          firefighter, and that was a guy by the name of

10         Roderick Torbert.

11   Q.    Who?

12   A.    Roderick Torbert.  And other than myself being

13         promoted in 1996, the only other person I know

14         that was promoted is Mr. Ogletree.  Since then

15         no African-Americans have been promoted or

16         hired, and I know that there are

17         African-Americans out there who have applied and

18         who are qualified for those positions.  I don't

19         know them directly.  I don't know them

20         specifically, but I know some who have applied

21         for a promotion and for career firefighter

22         positions, and it's never happened.

23   Q.    Let me kind of break that down because I want to

181

1           be clear on it.

2                  Is your complaint about a disparate impact

3           related to the hiring or non-hiring of blacks,

4           or is it related to the promotion or

5           non-promotion of blacks?

6                  MR. HORSLEY:  Object to the form.

7      A.   Both.  I'm concerned about both of those issues,

8           Mr. Morgan.

9      Q.   So you think that the City's hiring practices

10          have a disparate impact on blacks?

11     A.   Yes, sir.

12     Q.   Tell me what you mean by a disparate impact on

13          blacks.

14                 MR. HORSLEY:  Object to the form.  Go

15                  ahead.

16     A.   They haven't hired any, Mr. Morgan, or promoted

17          any, since 1996.

18     Q.   And what do you mean by a disparate impact

19          against blacks on promotions?

20                 MR. HORSLEY:  Same objection.  Go

21                  ahead.

22     A.   They haven't promoted any.

23     Q.   In your opinion, just the fact that none have

1          been hired is evidence of the disparate impact?

2    A.    They have not hired or promoted qualified

3          African-Americans since 1996.

4    Q.    And that's the basis of your disparate impact

5          claim?

6    A.    Yes.

7    Q.    How did you rate Chris Turner on the team leader

8          interviews?

9    A.    I never sat on the interview with -- on the

10         board of an interview for Chris Turner.  I've

11         never sat --

12   Q.    For team leader you never sat on one that he

13         applied for?

14   A.    No, sir, I never did.

15   Q.    Was it your experience that the team leader

16         interviews that -- panels that you sat on always

17         included at least one and usually two blacks?

18   A.    One if not two, yes, sir.

19   Q.    Well, let's focus in on the promotion to

20         battalion chief which you applied for and did

21         not receive.  What is there about that procedure

22         to battalion chief that you think had a

23         disparate impact on blacks?

185

1           think he's already answered the

2           question.

3   A.   No, sir, I don't.

4   Q.   Now, in terms of the actual battalion chief

5        promotion procedure that you were involved in,

6        what is there about it that you think had a

7        disparate impact on blacks?

8                MR. HORSLEY:  Object to the form.  You

9                can answer.

10  A.   Can you ask me that again, please, sir?

11  Q.   In terms of the battalion chief promotion

12       process in which you participated, what is it

13       about it that you think had a disparate impact

14       on blacks?

15               MR. HORSLEY:  Object to the form.

16  A.   The written test.

17  Q.   What is there about the written test that you

18       think had a disparate impact?

19               MR. HORSLEY:  Same objection.  Go

20               ahead.

21  A.   As stated before, Mr. Morgan, on previous

22       incidents, the written test has never been an

23       option in the promotion -- a written test with a

186

```
 1          cutoff score has never been part of the

 2          promotion procedure within the division.

 3     Q.   And I don't want to keep on with this, but I

 4          want to be clear.  Is it your position that just

 5          by giving a written test that the effect of that

 6          was to have a disparate impact on blacks?

 7                    MR. HORSLEY:  Object to the form.  You

 8               can answer.

 9     A.   I don't recall that at this time, Mr. Morgan.

10     Q.   What I probably should have done is ask this

11          question first.

12               What does disparate impact mean to you?

13          What do the terms "disparate impact" mean to

14          you?

15     A.   Basically it means to me that -- Let me see if I

16          can come up with a specific --

17                    MR. HORSLEY:  That's a legal question.

18     A.   No, sir.

19                    MR. HORSLEY:  It's a legal term, and I

20               don't want you answering questions

21               like that.

22     A.   No, sir.  I don't have any comment at this time.

23     Q.   I'm not asking a legal definition.  I'm just
```

187

1       asking what do you think it means.

2              MR. HORSLEY:  I don't want you trying

3                 to think up an answer.

4              MR. MORGAN:  No.  Don't sit here and

5                 just answer it.

6  Q.   Do you know what disparate impact means one way

7      or the other?

8  A.   No, sir.  I don't have any comment at this time.

9  Q.   Before they became battalion chiefs, were those

10     people that held that position captains or were

11     they shift commanders?

12  A.   The title that I understand is shift

13     commander/captain or shift commander/battalion

14     chief.  Captains or battalion chief are

15     commanders like lieutenants are station

16     officers.

17  Q.   So captains had become shift commanders which

18     had become battalion chiefs?

19  A.   Captains are shift commanders and the title was

20     changed to battalion chief.

21  Q.   All of which was just, as you understand it, a

22     name change?

23  A.   Title change.

188

Q.   In the big picture, what do the battalion chiefs
     do?

A.   They are shift commanders.  They oversee all
     operations per shift, including the firefighters
     that work under them in reference to the safety
     of the city, the whole -- Everything in
     reference to.

Q.   And there are four of them?

A.   Yes, sir, it is.

Q.   And does each one have a different area of
     responsibility?

A.   Each one of them carry out the same
     responsibilities.  The responsibilities apply to
     each battalion chief, other than the one who is
     assigned to administrative duties.

              (Defendant's Exhibit 13 marked for
                  identification.)

Q.   Let me show you Defendant's Exhibit 13 and ask
     you if you recognize this as the charge of
     discrimination when you submitted to the EEOC.

     Is that your charge of discrimination?

A.   Yes, sir.

              (Off-the-record discussion followed by

219

1   A.   No, sir.

2   Q.   And what about Lee Lamar?  What is it that Lee

3       Lamar did in your opinion that kept you from

4       being promoted because of your race or in

5       retaliation?

6   A.   I don't recall.  I'm not aware of anything at

7       this time, sir.

8   Q.   And Bill Ham, Jr., what is it that he did that

9       kept you from being promoted because of your

10      race or in retaliation?

11  A.   I'm not aware of anything at this time, sir.

12  Q.   Have you ever spoken to Bill Ham, Jr. about any

13      of this?

14  A.   No, sir.

15  Q.   And what is it that Steve Reeves did to keep you

16      from being promoted because of your race or in

17      retaliation?

18  A.   I don't know what role he could have played in

19      any of this, but being he works in the human

20      resource department, he had to play some role in

21      it.  He was present during all the orientation

22      and the testing procedures.

23  Q.   Anything else other than the fact that he's in

220

1        HR?

2    A.    I'm not aware of anything, sir.

3    Q.    And you're not aware of any specifics that he

4          did, are you?

5    A.    No, sir.

6    Q.    And then Bill James, what is it that you say

7          Bill James did to keep you from being promoted

8          because of your race or in retaliation?

9    A.    Other than the point of me speaking with him

10         directly telling him there was a problem at the

11         Auburn Fire Division, I'm not aware of what he

12         knows or done or -- I don't know.

13   Q.    And my understanding is that when you spoke with

14         him privately, you never said, hey, I'm being

15         discriminated against in promotions because of

16         my race, did you?

17   A.    I don't recall making that statement, sir.

18   Q.    And your conference with him was before you took

19         the battalion chief test, wasn't it?

20   A.    Yes, sir.  It was before they actually

21         implemented the title change or the promotion

22         for team leader to lieutenant.

23   Q.    And Charles M. Duggan, the city manager, have

221

1        you ever spoken to the city manager about any
2        complaints you have about race discrimination or
3        retaliation?
4    A.  No, sir.
5    Q.  Do you know of anything that Charles M. Duggan
6        did to keep you from being promoted because of
7        your race or in retaliation?
8    A.  No, sir, I'm not aware of anything he knows.
9    Q.  And then you've sued the City of Auburn.  What
10       is it you say the City of Auburn did to keep you
11       from being promoted because of your race or in
12       retaliation?
13   A.  Being that the City of Auburn is responsible for
14       everything that has taken place throughout the
15       history of the department, why no blacks or
16       African-Americans have been hired or promoted
17       since me or since Mr. Ogletree, I don't
18       understand that.  I'm very concerned about
19       that.  What's the reason for it?  I just don't
20       understand it.
21   Q.  Which occurred first?  Were you promoted to
22       lieutenant before or after Mr. Ogletree became a
23       team leader?

239

1    promoted in front of you as it relates to racial

2    discrimination?

3                    MR. MORGAN:  Object to the form.

4    Q.  Go ahead.

5    A.  I think I was more qualified than these guys

6        were.  I had more seniority.  I was more

7        experienced.  I just directly speaking think I

8        was more qualified.

9    Q.  Why do you think -- Again, from a layman's

10       standpoint, why do you believe the City

11       implemented the test for this promotion?

12                   MR. MORGAN:  Object to the form.

13   Q.  You can answer.

14   A.  Basically because I'm black and I was applying

15       for the position.

16   Q.  Were other blacks applying for the position

17       also?

18   A.  Other blacks were applying for the position as

19       well.

20   Q.  Y'all spoke some about damages, and Randall

21       asked you questions about mental anguish and

22       emotional distress related to the denial of the

23       promotion.  Again, what is the reason you are

242

1              MR. HORSLEY:  That's all I have.

2                        **EXAMINATION**

3  BY MR. MORGAN:

4    Q.    Mr. Stephens, was there anything on the test you

5          took, the booklet, that you turned in to be

6          graded that identified you as a black male?

7    A.    Identified me as a black male?

8    Q.    Anything that would tell the person that was

9          grading that paper, hey, this is a black male.

10   A.    I'm not aware if anything was.

11   Q.    You didn't put Gerald Stephens, black male, did

12         you?

13   A.    No, sir.

14   Q.    You didn't put Gerald Stephens,

15         African-American, did you?

16   A.    No, sir.

17   Q.    You just put your name or your -- ever what that

18         identification --

19   A.    Yes, sir.

20   Q.    So whoever graded your paper didn't know what

21         your race was, did they?

22   A.    I'm not aware if they knew anything or not,

23         Mr. Morgan.

246

```
 1   A.   Yes.  It falls under that category, yes, sir.

 2   Q.   Time in the grade.  Time on the job.  That's

 3        seniority?

 4   A.   Knowledge of the job, yes, sir.  Training.

 5   Q.   Back up.

 6             Knowledge of the job?

 7   A.   Yes, sir.

 8   Q.   How do you test knowledge of the job?

 9   A.   I'm not in a position to justify how they go

10        about testing that.

11   Q.   Do you agree that before someone should be

12        promoted that you should test their knowledge of

13        the job?

14             MR. HORSLEY:  Object to the form.  Go

15                 ahead.

16   Q.   Shouldn't you test --

17   A.   I agree that testing procedures should be

18        consistent whether a written test is involved or

19        not.

20   Q.   That's not my question.  My question is:  Before

21        a person is promoted, should knowledge of the

22        job be tested?

23             MR. HORSLEY:  Object to the form.
```

247

```
 1    A.    I don't have any comments at this time.
 2    Q.    You don't have a comment on whether or not you
 3          ought to test somebody's knowledge of the job?
 4    A.    Well, you know, apparently not.
 5    Q.    But you do have a comment that based on
 6          seniority you ought to be promoted?
 7    A.    Yes, sir.
 8    Q.    Would you have been promoted to lieutenant if
 9          the City had used seniority as the guide stick
10          back in 1996?  Did you have the most seniority
11          of anybody that applied to be a lieutenant or
12          was eligible to be a lieutenant in 1996?
13    A.    Not in 1996.
14    Q.    You wouldn't have been promoted.
15    A.    Not in 1996.
16    Q.    And do you have -- I don't care if you want to
17          call it, evidence, hearsay, knowledge --
18          anything that you say that supports your
19          contention that the City implemented a written
20          test to discriminate against black applicants on
21          the basis of their race?  Anything?  Anybody
22          ever said anything, any hearsay, anything you've
23          seen, any documents, anything that would support
```

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

EDDIE OGLETREE, an individual,                *
GERALD STEPHENS, an individual,               *
                                              *
        Plaintiffs,                           *
                                              *
vs.                                           *        CASE NO.: 3:07-cv-867-WKW
                                              *
CITY OF AUBURN, et al.,                       *
                                              *
        Defendants.                           *

## AFFIDAVIT OF BILL HAM, JR.

Before me, the undersigned authority in and for said county and state personally appeared Bill Ham, Jr. who being known to me and being first duly sworn, deposes and says under oath as follows:

1.    My name is Bill Ham, Jr.. I am an adult over the age of nineteen and I have personal knowledge of the following matter

2.    I have served as the Mayor of the City of Auburn since 1998.

3.    As the Mayor, my responsibilities are set out in Section 11-43a-16 of the Code of Alabama. It states: "The mayor shall preside at the meetings of the council and shall be recognized as the head of the municipal government for all ceremonial purposes and by the governor for purpose of military law, but shall have no other administrative duties."

4.    I do not have the authority to hire, fire, or promote employees.

5.    I was not involved in the Battalion Chief promotions in 2006 other than to vote, as a member of the City Council, to approve a contract with CWH Management Solutions to develop and administer a promotion process. Under State Law, this contract had to come before the City Council due to the amount of the contract.

6.    I was not aware of the individuals who applied for the position or the race of those individuals.

7.    I played no part in determining what promotional process would be used to make those promotions.

Further affiant saith not.

Dated this the 11th of August 2008.

_Bill Ham_ _____

Bill Ham, Jr.

STATE OF ALABAMA        )

COUNTY OF LEE           )

Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **Bill Ham, Jr.** who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

_Earline R. Cobb_ _____
NOTARY PUBLIC

(SEAL)

My Commission Expires: EARLINE S. COBB, NOTARY PUBLIC
STATE OF ALABAMA, LEE COUNTY
MY COMMISSION EXPIRES MAY 23, 2010

# EXHIBIT "D"

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **EDDIE OGLETREE, an individual,** | * |
| **GERALD STEPHENS, an individual,** | * |
| | * |
| **Plaintiffs,** | * |
| | * |
| **vs.** | * **CASE NO.: 3:07-cv-867-WKW** |
| | * |
| **CITY OF AUBURN, et al.,** | * |
| | * |
| **Defendants.** | * |

## AFFIDAVIT OF CHARLES M. DUGGAN, JR.

Before me, the undersigned authority in and for said county and state personally appeared Charles M. Duggan, Jr., who being known to me and being first duly sworn, deposes and says under oath as follows:

1.  My name is Charles M. Duggan, Jr., . I am an adult over the age of nineteen and I have personal knowledge of the following matter

2.  I have been employed with City of Auburn as the City Manager since February 2006.

3.  As City Manager, I have the obligation to hire and fire for the City and approve all other personnel actions.

4.  When the Battalion Chief promotions were made in 2006, I approved the recommendations made to me as a result of the promotional process.

5.  I was not involved in any way with developing the promotional process, determining who was eligible to apply for the position or how the promotional process would be implemented.

6.  In February 2006 to May 2006, I was unaware of any settlement agreement that related to certain promotional processes.

7.    In February 2006 to May 2006 I did not know Mr. Ogletree or Mr. Stephens and did not know their race. I was unaware that they applied for the Battalion Chief position nor was I aware of anything that occurred during that promotional process.

8.    I was told there was a valid, job related, and neutral outside assessment center process utilized for the Battalion Chief promotions and in reliance on that process hired the individuals with the highest scores from that process. I am aware that the City went to great time and expense to ensure that a fair and objective promotion process was followed.


Further affiant saith not.

Dated this the _11th_ of August 2008.


_Charles M. Duggan, Jr._
Charles M. Duggan, Jr.




STATE OF ALABAMA        )

COUNTY OF LEE           )

Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **Charles Duggan** who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

_Earline S. Cobb_
NOTARY PUBLIC

(SEAL)                          My Commission Expires: EARLINE S. COBB, NOTARY PUBLIC
                                                        STATE OF ALABAMA, LEE COUNTY
                                                        MY COMMISSION EXPIRES MAY 23, 2010

# EXHIBIT "E"



COPY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


EDDIE OGLETREE, an individual,
GERALD STEPHENS, an
individual,

      Plaintiffs,

Vs.                                    CIVIL ACTION NO.
                                       3:07-CV-867-WKW

CITY OF AUBURN, a municipality
in the State of Alabama, LARRY
LANGLEY, an individual, LEE LAMAR,
an individual, BILL HAM, JR., an
individual, STEVEN A. REEVES, an
individual, BILL JAMES, an
individual, CHARLES M. DUGGAN, an
individual, and CORTEZ LAWRENCE,
an individual,

      Defendants

        * * * * * * * * * *


     **DEPOSITION OF STEVEN A. REEVES**, taken pursuant

to stipulation and agreement before Pamela A. Wilbanks,

Certified Court Reporter, ACCR# 391, Registered

Professional Reporter and Commissioner for the State of

Alabama at Large, in the Conference Room of Auburn City

Hall, 144 Tichenor, Auburn, Alabama, on Wednesday, July

30, 2008, commencing at approximately 9:15 a.m.

1    Q.    Where do you currently reside?

2    A.    1071 Terrace Acres Drive, Auburn.

3    Q.    And where are you currently employed?

4    A.    City of Auburn.

5    Q.    In what capacity?

6    A.    I'm the human resources director.

7    Q.    And how long have you been the human resources

8          director with the City of Auburn?

9    A.    Since 1994 -- 1993.

10   Q.    1993?

11   A.    Yes, sir.

12   Q.    Before '93 where were you employed?

13   A.    City of Auburn.

14   Q.    In what capacity?

15   A.    Risk manager.

16   Q.    Risk manager?

17          How long did you hold that job?

18   A.    Six years.

19   Q.    And before that where were you employed?

20   A.    Auburn University.

21   Q.    And in what capacity?

22   A.    Faculty member.

23   Q.    What type of faculty member?

1          Tell me generally what your job duties are

2     as the human resources director for the City of

3     Auburn.

4     A.   Generally I coordinate compensation and

5          benefits, employee relations, risk management

6          and safety, employee training and development.

7     Q.   Do you participate in any way in the promotion

8          practices of the City of Auburn?

9     A.   Yes.

10    Q.   In what capacity?

11    A.   I serve as a resource.  I will do research as

12         necessary.

13    Q.   Do you actually participate in decision-making

14         with regard to promotions with City of Auburn

15         employees?

16    A.   Only within my department.

17    Q.   You don't participate in the decisions to

18         promote or not promote City of Auburn

19         firefighters; is that correct?

20    A.   I have not.

21    Q.   You have not ever?

22    A.   I have not.

23    Q.   Are you in charge of implementing policies and

1             procedures with regard to the promotional

2             practices of the City of Auburn?

3  A.     Yes.

4  Q.     Is anybody else in charge of that or is that

5             your sole -- or are you the only person that is,

6             in fact, in charge of that?

7  A.     Each department head is charged with complying

8             with the personnel policies as they pertain to

9             promotions.

10 Q.     But you as the human resources director are in

11            charge of enforcing the promotional policies and

12            procedures throughout the City of Auburn.  Is

13            that a fair statement?

14                   MR. MORGAN:  Object to the form.

15 A.     No.

16 Q.     So it's just within your department; is that

17            correct?

18 A.     I make recommendations regarding promotions

19            within my department.

20 Q.     Let's say from February until June of 2006, who

21            would have been in charge of promotions at the

22            City of Auburn Fire Division?

23 A.     The city manager.

12

1   A.   Ultimately, yes.

2   Q.   When you say ultimately, I'm assuming that there

3        are other individuals that would have also been

4        involved in the promotion of firefighters within

5        the City of Auburn Fire Division; is that

6        correct?

7   A.   Correct.

8   Q.   And, again, concentrating on the time from

9        February of '06 through June of '06, who at the

10       City of Auburn Fire Division would have been in

11       the decision-making process to promote

12       firefighters?

13  A.   Bill James.

14  Q.   And he is the public safety director; is that

15       correct?

16  A.   That's correct.

17  Q.   Still?

18  A.   Still.

19  Q.   Who else?

20  A.   Lee Lamar.

21  Q.   What's Mr. Lamar's position?

22  A.   Currently he's the fire chief.

23  Q.   In May of '06, what was his position with the

13

1          City of Auburn?

2    A.    Deputy fire chief.

3    Q.    Who was the fire chief at that time?

4    A.    Larry Langley.

5    Q.    Bill James, Lee Lamar.  Who else would have been
6          involved in the decision to promote firefighters
7          at the City of Auburn?

8    A.    I believe that's all.

9    Q.    That's it?

10         And I may be wrong about this, but would
11         Bill James and Larry Langley recommend
12         firefighters for promotion and then Charles
13         Duggan would have the ultimate say in whether or
14         not those people were actually promoted?

15   A.    Correct.

16   Q.    Do you know back in May of 2006 whether or not
17         Mr. Duggan had to approve every promotion or, if
18         there was a dispute about a promotion, he would
19         have the ultimate say?

20   A.    He has to approve.

21   Q.    He has to approve every promotion; is that
22         correct?

23   A.    Every promotion, yes.

14

Q.    Tell me what, if any, participation you had in
      the battalion chief promotion that occurred in
      May of 2006.

A.    I helped identify the firm that would guide us
      through that process.  I helped put together a
      contract to employ that firm.  I participated in
      the discussions about the process.  I helped
      facilitate the interactions between the firm and
      the City.

                (Plaintiff's Exhibit 1 marked for
                     identification.)

Q.    What I'm going to mark as Plaintiff's Exhibit
      Number 1 is a letter of agreement that appears
      to be between the City of Auburn and the CWH
      Research, Inc.  Is that the agreement or the
      contract that you spoke about just a moment ago
      between the research company and the City of
      Auburn?

A.    This appears to be the agreement.

Q.    And how did you go about finding this company?

A.    This company was recommended to me by a lady
      named Kathleen Robinson.

Q.    Who is she?

16

1   Q.   Right.

2          Well, are you familiar with the 1991

3      settlement order in the McCormick case?

4                   MR. MORGAN:  Object to the form.   In

5                   the what case?

6                   MR. HORSLEY:  I got the name wrong.

7                   Hammock case.

8                   MR. MORGAN:  Object to the form.

9   A.   Yes.

10  Q.   You're familiar with the order approving a

11      settlement agreement that requires an assessment

12      center for certain promotions within the Auburn

13      City Fire Division?

14  A.   I am.

15  Q.   Is it your testimony that Plaintiff's Exhibit

16      Number 1 qualifies as an assessment center

17      pursuant to that order?

18  A.   No.

19  Q.   Is it your testimony that this company -- that

20      the hiring of this company qualifies as an

21      assessment center pursuant to the order in the

22      Hammock case?

23                   MR. MORGAN:  Object to the form.

1   A.   No.

2   Q.   Is it true that this company, CWH, was hired to

3        administer a written test that anyone applying

4        for the battalion chief promotion had to take?

5        Is that correct?

6   A.   They developed a neutral job-related process for

7        us to use in making a promotion decision.

8   Q.   Other than administering the written test that

9        was taken by all the battalion chief applicants,

10       what else did they do to participate in the

11       battalion chief promotion process?

12  A.   They recommended and developed a series of

13       exercises to help determine who was the best

14       candidate for the promotion.

15  Q.   Was that provided to the City in some written

16       form?

17  A.   The exercises?

18  Q.   Yes, sir.

19  A.   Yes.

20  Q.   Do you know if the City of Auburn still has that

21       document that details the exercises?

22  A.   In one form, yes.

23  Q.   What do you mean in one form?

1   Q.   What happened to that test?

2   A.   The test was returned to CWH.

3   Q.   You said earlier that you spoke with an

4        individual about hiring CWH.  Tell me what

5        happened that participated your seeing the need

6        to hire a company such as CWH to get involved in

7        the battalion chief promotion.

8   A.   The settlement agreement in 1991 called for a

9        process utilizing outside assessors and a

10       consultant.  Kathleen Robinson was the person

11       that did that for us.  She retired.

12  Q.   Robinson?

13  A.   Yes.

14  Q.   And she's the one who you consulted with in

15       hiring CWH, correct?

16  A.   I asked her if she was available to do this

17       work, and she said she was retiring and

18       recommended CWH to me.

19  Q.   Had the City of Auburn to your knowledge used a

20       company like CWH to perform some type of written

21       test or assessment center prior to the battalion

22       chief promotion in May of 2006?

23  A.   Like CWH?

1  Q.  Well, let me rephrase the question.

2      Had the City of Auburn used an outside

3      assessment center for any promotion within the

4      fire division since the 1991 settlement order?

5  A.  Yes.

6  Q.  And what promotions did it use an assessment

7      center for?

8  A.  I believe there was a 1994 captains promotion

9      and a 1996 lieutenant and captains promotion.

10  Q.  If you can, describe the assessment center that

11      was used for those two promotions.

12  A.  To my knowledge it involved a conglomeration of

13      exercises -- job-related exercises.

14  Q.  And it was formulated by whom?

15  A.  Kathleen Robinson.

16  Q.  And I guess what I'm asking you to do for my

17      education is define what you believe an outside

18      assessment center to be.

19  A.  An assessment center -- An outside assessment

20      center would consist of a conglomeration of

21      devices used -- job-related devices used to

22      determine who the best candidates were for a

23      promotion.

1   Q.   And by outside assessment center, does that mean

2        someone or some company has to implement those

3        processes that is not employed or has any

4        connection with the City of Auburn?

5   A.   I think that's a fair statement.

6   Q.   And you said that Kathleen Robinson was in

7        charge of that for the City of Auburn for a

8        period of time, correct?

9   A.   Correct.

10  Q.   Was she employed by the City of Auburn?

11  A.   No.  She was contracted by the City of Auburn.

12  Q.   What was Kathleen Robinson's job to your

13       knowledge?

14  A.   Professionally?

15  Q.   Yeah.

16  A.   I recall she was involved in testing services at

17       either Cobb County or DeKalb County in the

18       Atlanta metro area.

19  Q.   So she lives in the Atlanta metro area or did

20       live in the Atlanta Metro ...

21  A.   I assume that's where she lived.

22  Q.   Do you know who actually made the decision to

23       hire Kathleen Robinson to implement the outside

1       assessment center?

2   A.  The lawyers involved in the original litigation.

3   Q.  The original Clinton Hammock litigation?

4   A.  Correct.

5   Q.  Do you know if she still lives in the Atlanta

6       metro area?

7   A.  I don't know.

8   Q.  Does she have a company name to your knowledge?

9   A.  I don't know.

10  Q.  You don't know if there's some -- if she's

11      incorporated under some other name?

12  A.  I haven't had any further contact with her.

13  Q.  It's your testimony that she developed the

14      outside assessment center for the 1994 captains

15      promotion and the 1996 lieutenant promotion; is

16      that correct?

17  A.  That's my understanding.

18  Q.  Is it also your understanding that pursuant to

19      either of those promotions or pursuant to

20      neither of those promotions there was a written

21      test given to the applicants with a cutoff

22      score; is that correct?

23  A.  I don't recall there was a written test.

23

1    Q.    You don't recall if there was a written test?

2    A.    Right.

3    Q.    Are you saying there may have been and you don't

4          recall?

5    A.    I don't -- I was not directly involved in that

6          process.

7    Q.    With regard to the battalion chief promotion in

8          May of 2006, who at the City of Auburn decided

9          that there was going to be a written test with a

10         cutoff score as a factor in the promotion?

11   A.    It was a collective decision made by me, the

12         public safety director, the deputy fire chief,

13         and CWH.

14   Q.    And at that time the deputy fire chief was Lee

15         Lamar?

16   A.    Correct.  And the fire chief.

17   Q.    Who was Langley?

18   A.    Right.

19         And CWH.

20   Q.    And CWH.

21         So for the battalion chief promotion, is it

22         your testimony that you, the public safety

23         director, the deputy fire chief, the chief got

1    together and decided that there needed to be an

2    outside assessment center for this promotion,

3    and you contacted Kathleen Robinson?  She had

4    retired and told you you needed to contact CWH?

5    Is that the chronology of how it occurred?

6  A.  Yes.

7  Q.  And then the individuals I just named, along

8    with you, got with CWH, and that group made the

9    decision that a test with a cutoff score was

10    going to be given; is that correct?

11  A.  That's correct.

12  Q.  Were you personally involved in meetings with

13    CWH, Langley, Lamar, the safety director where

14    y'all discussed with CWH that a test needed to

15    be given with a cutoff score?

16  A.  Yes.

17  Q.  Is it your testimony that the City of Auburn had

18    not made that decision before it contracted with

19    CWH about the test or the cutoff score?

20  A.  Could you repeat the question?

21  Q.  Yeah.

22    Did you, the public safety director, Lamar,

23    and Langley make the decision that there needed

1      to be a test with a cutoff score given prior to

2      the time y'all contracted with CWH?

3  A.  No.

4  Q.  Do you recall the individual's name that y'all

5      were dealing with at CWH?

6  A.  Primarily Michael Blair.

7  Q.  Do you independently recall as you sit here

8      today meetings with those individuals and

9      Mr. Blair where the decision was made that a

10     test was going to be given for the battalion

11     chief promotion with a cutoff score?

12 A.  Yes.

13 Q.  Do you recall who actually first recommended

14     that that test be given?

15 A.  The CWH process incorporates a testing option.

16     Through our discussions it was determined that

17     giving a test was a good way to evaluate the

18     subject matter expertise of the candidates in

19     the area of fire prevention.

20 Q.  Did Mr. Blair, the CWH representative, recommend

21     that a test be given or did he say that that was

22     a necessary part of CWH's involvement in this

23     process?

26

1                MR. HANCOCK:  Object to the form.

2   A.   As I said, the CWH process incorporated an

3       option to have a test.

4   Q.   It wasn't a requirement; it was an option; is

5       that correct?

6   A.   It was an option, correct.

7   Q.   And was it at the City's discretion -- Was it at

8       the City's discretion to give or not give the

9       test with a cutoff score?

10  A.   Yes.

11              MR. MORGAN:  Object to the form.

12  Q.   It was?

13       Do you recall whether or not Lee Lamar

14       suggested that a cutoff score of 70 is something

15       that he would prefer during those meetings?

16  A.   Our discussions included the use of a cutoff

17       score of 70 percent.

18  Q.   Do you recall specifically who suggested the

19       cutoff score of 70?

20  A.   Who first voiced that, I don't know.

21  Q.   You don't recall if it was Lee Lamar?

22  A.   I know Lee Lamar stated that 70 percent was the

23       common cutoff score used in the fire service.

28

1   A.   It was our, as you stated, discretion.

2   Q.   During those meetings about the test, am I

3        correct that the City of Auburn made the

4        decision to implement that test as the first

5        factor in the battalion chief promotion with a

6        cutoff score, meaning that if you did not meet

7        the cutoff score, you could not progress further

8        in the battalion chief promotion process?

9   A.   Would you repeat the question?

10  Q.   Yeah.

11       Is it true that the -- Isn't it true that

12       the City of Auburn made the decision that the

13       test with a cutoff score was the initial factor

14       in whether an applicant proceeded through the

15       rest of the process?

16  A.   Again, this was a decision made collectively in

17       consultation with CWH.  Had the City said we

18       don't want to use a cutoff score, I don't think

19       CWH would have argued with us.

20  Q.   CWH didn't care one way or the other whether or

21       not the City used a cutoff score or whether the

22       test was a deciding factor if someone got to

23       progress through the process, did they?

1              MR. MORGAN:  Object to the form.

2   A.   I'm not sure I'd go that far.

3   Q.   Well, CWH was hired as a consulting firm to

4        administer a test; is that correct?

5   A.   They were designed to --

6              MR. MORGAN:  Object to the form.

7   A.   -- hired to design and provide consulting

8        services to the City so that we had a fair

9        promotional process.

10  Q.   And if the City had decided that the test would

11       be administered by CWH and that there would not

12       be a cutoff score and that the test would simply

13       be part of a cumulative process for the

14       battalion chief promotion, CWH to your knowledge

15       wouldn't have objected to that; is that correct?

16             MR. MORGAN:  Object to the form.

17  A.   I think they would have allowed us to do that.

18  Q.   They would have allowed you to do that?

19  A.   (Witness nods head positively.)

20  Q.   You've got to answer out loud.

21            They would have allowed you to do that,

22       correct?

23  A.   Yes.

32

1    City was under the impression that the 1991

2    order had expired?

3                  MR. MORGAN:  Object to the form.

4    Q.   When I speak of the 1991 order -- Let's go ahead

5         and mark it and we'll talk about it in detail in

6         a little while.

7              But you're familiar with the Clinton Hammock

8         order approving the settlement agreement,

9         correct?

10   A.   I am.

11                  (Plaintiff's Exhibit 3 marked for

12                     identification.)

13   Q.   And that's the document that required the City

14        of Auburn to conduct an outside assessment

15        center back then for any captain promotion or

16        any lieutenant promotion, correct?

17   A.   Correct.

18   Q.   Tell me, then, if the City believed that that

19        order had either expired or that the court no

20        longer had jurisdiction over the City of

21        Auburn's promotional practices, why did you and

22        these other gentlemen feel that an assessment

23        center was necessary for this promotion?

1               MR. MORGAN:  Object to the form.

2    A.   I think -- I won't speculate.  We had

3         considered the -- if the order approving

4         settlement was still in effect with counsel

5         narrowly construed to the issue of the matter of

6         reclassifying team leaders to lieutenant.  We

7         came to a point where we needed to make a

8         promotion to fill some vacant positions at the

9         battalion chief level.  We felt that the best

10        course of action -- since we had not gone

11        through a process as we had with the team leader

12        to lieutenant reclassification, the best course

13        of action was to follow what was stipulated in

14        the assessment center or -- I'm sorry -- in the

15        settlement agreement from 1991.

16   Q.   Have you read the order approving settlement

17        agreement marked as Plaintiff's Exhibit 3?

18   A.   I have.

19   Q.   Have you read it in preparation for this

20        deposition?

21   A.   I have.

22   Q.   Do you know of anywhere in that order where it

23        states that a written test with a cutoff score

1        is required to be a part of the assessment

2        center?

3    A.  It does not specifically say that.

4    Q.  Again, I'm not sure I followed you when you were

5        talking about the lieutenant or the team leader

6        reclassification to lieutenant.  I think you

7        said that during that process --

8            Well, tell me what you said.  I don't want

9        to mischaracterize your testimony.  Tell me

10       again why an assessment center -- why the court

11       order was not followed pursuant to the team

12       leader to lieutenant reclassification.

13               MR. MORGAN:  Object to the form.

14   Q.  You'll agree with me that the order approving

15       settlement agreement was not complied with

16       pursuant to the February 1, 2006

17       reclassification of team leaders to lieutenants;

18       is that correct?

19               MR. MORGAN:  Object to the form.

20   Q.  Will you agree with me on that?

21   A.  I would agree that we did some research with

22       legal counsel, and it was determined that the

23       settlement agreement was no longer in force.

1      And at that point, based on a petition from team

2      leaders, based on the interest of stimulating

3      morale in the department, based on

4      considerations of the cost of conducting

5      assessment centers, we determined that changing

6      the job title of equal -- of a position that

7      had -- that was equal to lieutenant was an

8      appropriate thing to do.

9   Q.  So are you testifying that a firefighter or a

10     City of Auburn Fire Division employee that

11     moved -- prior to February 1 of 2006, before

12     that time, a firefighter that moved from team

13     leader to lieutenant was not considered to be a

14     promotion?

15  A.  It was not a promotion.

16  Q.  It was not a promotion?

17  A.  No.

18  Q.  Is that correct?

19  A.  Correct.

20  Q.  When Lieutenant Stevens went from team leader to

21     lieutenant in 1996, was that not a promotion?

22              MR. MORGAN:  Object to the form.

23  A.  No.

1  work ethic and yearly evaluations, do you have

2  an opinion one way or the other about whether

3  they were qualified to be battalion chiefs?

4         MR. MORGAN:  Object to the form.

5  A.  First, time in grade and seniority were not

6  considered.

7  Q.  Why is that?

8  A.  How do you consider that?

9  Q.  I don't know.

10 A.  Exactly.

11 Q.  I mean, I guess you consider it by how long

12 somebody has been there and how long they've

13 been in a certain position.  You're saying that

14 was not a qualification obviously for the

15 battalion chief job?  Is that what you're

16 saying?

17 A.  Correct.

18 Q.  My question, though, was:  Other than them not

19 passing the test, based upon their work history

20 with the City of Auburn, were they qualified for

21 that promotion?

22        MR. MORGAN:  Object to the form.

23            Asked and answered.

76

1     were promoted?

2              MR. MORGAN:  Promoted to battalion

3                chief?

4              MR. HORSLEY:  Yes.

5    A.   They were in that group.

6    Q.   Each of the individuals that were promoted to

7       battalion chief in May of '06 were in the same

8       group of individuals that were reclassified from

9       team leader to lieutenant in February 1 of '06,

10      correct?

11   A.   Correct.

12   Q.   So how long had they been lieutenants at the

13      time that they were promoted to battalion

14      chiefs?

15   A.   They had held the job title of lieutenant from

16      February 1, 2006.

17   Q.   So --

18   A.   They had been company officers, as I understand

19      that term in the fire service, for significantly

20      longer than that.

21   Q.   So they had been lieutenants for four months

22      approximately; is that correct?

23   A.   Correct.

77

1    Q.   Since they had not been lieutenants for twelve

2          months, would they have not been probationary

3          lieutenants at the time that they were promoted

4          to battalion chiefs?

5    A.   No.

6    Q.   They were not?

7    A.   They were not probationary.

8    Q.   Why not?

9    A.   Because we made a title change from team leader

10         to lieutenant.  They had already satisfied any

11         probationary requirements.

12    Q.   So it's your testimony that even though they had

13         only been lieutenants for approximately four

14         months, they were nonprobationary lieutenants

15         and entitled to be promoted to battalion chiefs,

16         correct?

17    A.   Correct.  For the sake of argument, even if they

18         had been probationary, they would have been

19         eligible.

20    Q.   Doesn't that conflict with the City of Auburn

21         personnel policies?

22    A.   Not that I'm aware of.

23    Q.   Are you familiar with those policies?

79

1    Q.    Was that section still in effect with the

2           amended personnel policies of '05 to your

3           knowledge?

4    A.    To my knowledge it was.

5    Q.    Does that section not require that a fire

6           department employee be employed at a certain job

7           for twelve months before being entitled to a

8           promotion?

9    A.    When an employee --

10                MR. MORGAN:  Object to the form.  Go

11                   ahead.

12    A.    When an employee is promoted -- When an employee

13           is hired or promoted into a new job, they serve

14           a probationary period.

15    Q.    Of twelve months?

16    A.    Of twelve months.

17    Q.    And they can't be promoted while they are in

18           that probationary period, is that correct,

19           according to the city personnel policies?

20    A.    No, that is not correct.

21    Q.    That's not correct?

22    A.    No.

23    Q.    2.7 does not say that?

80

1   A.    2.07?

2   Q.    Yes, sir.

3   A.    It does not say you can't be promoted during the

4         probationary period.

5                      MR. MORGAN:  I didn't see it either.

6                      Show it.

7   Q.    I'm sorry.  Section 2.09 regarding promotions

8         refers back to Section 2.07.  Does that section

9         not say an employee is not entitled to a

10        promotion until he has served a twelve-month

11        probationary period?

12                     MR. MORGAN:  Object to the form.

13  A.    No.

14  Q.    It refers to a step increase in pay, correct?

15  A.    Correct.

16  Q.    Does it not state that an increase in pay

17        requires an employee to serve a probationary

18        period of twelve months?

19                     MR. MORGAN:  Object to the form.

20  A.    A step increase -- I'm sorry.  Repeat the

21        question.

22  Q.    Does that not mean -- Section 2.09 which refers

23        back to 2.07, does that not mean an employee has

1      to serve a twelve-month probationary period

2      before he can receive a step increase in pay?

3  A.  In that job, correct.

4  Q.  So it's your testimony that there's no

5      requirement through the City of Auburn personnel

6      policies that an employee serve a twelve-month

7      probationary period before they can be promoted?

8  A.  If a firefighter wanted to apply for a higher

9      level job within the organization during their

10     probationary period as a firefighter, they could

11     certainly do so.  And if selected they would be

12     promoted to that position.

13 Q.  And it's your testimony that would not

14     contradict or conflict in any way with the

15     personnel policies marked as Plaintiff's Exhibit

16     9; is that correct?

17 A.  It would not.

18 Q.  I think I asked this earlier, but I forgot what

19     your answer was.  Is it your testimony that the

20     individuals that were promoted to battalion

21     chief in May of '06 were, in fact, probationary

22     lieutenants?

23              MR. MORGAN:  Object to the form.

1          And what was the other?

2    Q.    Jeremy Patterson.

3    A.    I don't think Jeremy Patterson applied.

4    Q.    But Thompkins did?

5    A.    I don't recall that he did.

6    Q.    If he did, you'll agree with me he was not

7          hired, correct?

8                    MR. MORGAN:   Object to the form.

9    A.    Correct.

10   Q.    Leading up to the battalion chief promotion in

11         May of 2006 when you and Langley and Lamar and

12         the public safety director were discussing that

13         promotion, do you recall any discussion about

14         whether or not the test would make it more

15         difficult for minorities to be promoted to

16         battalion chief?

17   A.    No.

18   Q.    That was not discussed, is that correct, at

19         least when you were present?

20   A.    Not that I recall.

21   Q.    Do you recall any discussion among those

22         individuals and you about whether or not the

23         test would make it more difficult for the older

88

1    members of the fire department to be promoted to

2    battalion chief?

3    A.    I think there was some discussion that the way

4          the test was structured, which incorporated

5          situational judgment questions, that that would

6          help employees that had been with the

7          organization longer to exercise that knowledge

8          that they had gained based on experience and

9          familiarity with the policies, that that would

10         give -- that that would help them in the testing

11         process.

12   Q.    So your testimony is that y'all had some

13         discussions about how the test would actually

14         help the older members of the fire department;

15         is that correct?

16   A.    Actually, I think that was something that CWH

17         told us.

18   Q.    Well, my question was:  Do you recall any

19         discussions between you and those gentlemen

20         about whether or not the test requirement would

21         make it more difficult for the older members of

22         the department to receive that promotion?

                 MR. MORGAN:  Object to the form.

23

1   promotion in '06.  Okay?

2 A. Okay.

3 Q. The process, you'll agree with me, did not

4   include the consideration of seniority, correct?

5 A. Correct.

6 Q. It didn't include the consideration of time in

7   grade, correct?

8 A. Correct.

9 Q. It didn't include the consideration of work

10   experience, correct?

11     MR. MORGAN:  Object to the form.

12 A. Not directly.

13 Q. It included essentially a cutoff test that was

14   the first thing you had to do in order to be

15   considered to be promoted to battalion chief,

16   correct?

17     MR. MORGAN:  Object to the form.

18 A. It utilized a job-related test with a cutoff

19   score to advance further in the process.

20 Q. And you'll agree with me that that was the first

21   step in the process.  And if you did not pass

22   that test, you were not allowed to progress in

23   the process regardless of seniority, regardless

94

1    of work experience, regardless of time in grade,

2    correct?

3                    MR. MORGAN:  Object to the form.

4    Q.   Is that correct?

5                    MR. MORGAN:  Object to the form.

6    A.   It is correct.

7    Q.   That process -- Who developed that process to

8    your knowledge?

9    A.   The overall process?

10   Q.   Uh-huh (positive response).  The process y'all

11   used for that specific promotion.

12   A.   That process was developed by CWH in

13   consultation with the City of Auburn, the

14   employees that you've listed there.

15   Q.   Do you know if that process itself, the entire

16   process, for the promotion has ever been

17   scientifically validated to not have a disparate

18   or negative impact on Afro-Americans?

19                   MR. MORGAN:  Object to the form.

20   A.   That particular process could not --

21                   MR. MORGAN:  Go ahead.  I object to

22                   the form.  You go ahead.

23   A.   That particular process could not have been

1    scientifically validated because it had not been

2    done.  However, it used the EEOC uniform

3    guidelines and other professional standards of

4    test development such that there was assurance

5    that it had content -- that it was content

6    validated.

7    Q.   You're talking about the test itself.

8    A.   I'm talking about the test itself.

9    Q.   We're not exactly on the same page.  I'm talking

10       about the entire process for the promotion of

11       battalion chief.  The test was a component of

12       that.  You'll agree with me, correct?

13   A.   Correct.

14   Q.   And the test may have been scientifically

15       validated by CWH, correct?

16   A.   Correct.

17   Q.   What I'm asking you is:  Did the City of Auburn

18       take the entire process with the test as a

19       component of that process and have it

20       scientifically validated not to have a disparate

21       impact on Afro-Americans?

22            MR. MORGAN:  Object to the form.

23   A.   Let me try to answer that in this way.  CWH

99

Q.   I think you just testified that your consultant
     CWH advised the City of Auburn that if you
     conducted the test as the first factor in the
     process with a cutoff score and that you could
     not progress past the test if you failed it had
     been scientifically validated to not have a
     disparate impact on black applicants?

               MR. MORGAN:  Object to the form.

Q.   Did they tell you that?

               MR. MORGAN:  Object to the form.

A.   They told us that the process that they use
     using subject matter experts to develop the
     written test was a neutral job-related,
     content-validated approach recognized in
     professional standards as the appropriate way to
     develop a test which is neutral.

Q.   But they didn't tell you that using the test as
     the first factor with a cutoff score was neutral
     or did not have a disparate impact on
     Afro-Americans, did they?

               MR. MORGAN:  Object to the form.

A.   They did not tell us that the test would have
     adverse impact.

1       did not pass the test?

2    A.   That is my testimony.

3    Q.   And seven white applicants passed the test; is

4        that correct?

5    A.   Five.

6    Q.   Five passed the test?

7    A.   (Witness nods head positively.)

8    Q.   So there were nine white applicants total.   I

9        thought you said eleven.

10   A.   There were eleven white applicants.   There were

11       two white applicants that opted out before the

12       test.

13   Q.   Okay.   So nine whites took the test.   Four of

14       them failed it, correct?

15   A.   Correct.

16   Q.   And you'll agree with me that three

17       Afro-Americans took the test and failed it,

18       correct?

19   A.   Correct.

20   Q.   The only three applicants for battalion chief --

21       The only three Afro-American battalion chief

22       applicants did not make it through the process

23       that the City developed for the battalion chief

106

1    order to attract minority applicants in the City

2    of Auburn?

3  A.  Thank you for asking that question.

4  Q.  Uh-huh (positive response).

5  A.  The City of Auburn is very aggressive in its

6    recruitment process.  We cast a very wide net

7    such that anybody that wants to know of a job

8    with the City of Auburn can easily find out

9    about that.  Specifically in terms of recruiting

10   minorities to the student firefighter program,

11   we recruit through the State Employment Office,

12   through the City's Web site, through four or

13   five traditionally black colleges, through a

14   dozen or so black churches, through -- At one

15   time we sent literature to every high school in

16   the state informing them about the student

17   program.  More recently we've sent literature --

18   contacted every high school within a 50 to 60

19   mile range.  We have participated in career days

20   at those high schools.  Much of this has been an

21   effort to reach out to minorities and let them

22   know of our programs so that we can get them

23   into the student program.  And ultimately

1    because our student program does act as a feeder

2    into our career program because of the education

3    and the experience that the student firefighters

4    have, they become -- they are very competitive

5    with outside applicants for career firefighter

6    positions and so we try to get them into the

7    student program so they'll be successful when

8    they apply for the career positions.  So we cast

9    a very wide net, and we've been very aggressive

10   with that.

11   Q.   And, again, other than Gerald Stephens, you're

12        not aware of any student fire -- minority

13        student firefighter hired full-time by the City

14        of Auburn since 1990, correct?

15   A.   That's correct.

16   Q.   Do you know who drafted Plaintiff's Exhibits 7

17        and 8, who authored those exhibits?

18   A.   Yes.

19   Q.   Who?

20   A.   Me.  It was also reviewed by -- After I drafted

21        them, it was reviewed by the city attorney, and

22        I suspect that public safety employees were also

23        involved in that review.  But I drafted it.

1    Q.   Do you agree with me that if the battalion chief
2         test with a cutoff score had not been used --
3         specifically with a cutoff score had not been
4         used as a part of the battalion chief promotion
5         that Gerald Stephens and Eddie Ogletree would
6         have had a better opportunity to receive the
7         battalion chief promotion?
8              MR. MORGAN:  Object to the form.
9    A.   I don't know that.
10   Q.   Are you aware or have you been told by any chief
11        or any other employee with the City of Auburn
12        that there were other factors in that
13        promotional process that they thought would have
14        hindered Mr. Ogletree or Mr. Stephens pursuant
15        to that promotion?
16             MR. MORGAN:  Object to the form.
17   A.   No.
18   Q.   And just so I'm clear -- and I'm going to take a
19        little break, and I may be through -- your
20        position and the City of Auburn's position back
21        in February of '06 and until today is that the
22        1991 order in the Hammock case is no longer in
23        effect and was not in effect back in 2006,

118

1    could do is offer advice; is that correct?

2                 MR. MORGAN:  Object to the form.

3    A.    Correct.

4    Q.    If CWH were to take the position that it

5    recommended that all applicants be allowed to

6    proceed to the assessment center regardless of

7    score and that the test score be but one

8    component of the ultimate decision, would you

9    dispute that contention?

10                MR. MORGAN:  Object to the form.

11   A.    Yes.

12   Q.    Why?

13   A.    Part of the discussion included CWH, Michael

14   Blair, expressing the opinion that somebody that

15   did poorly on the test would find the assessment

16   center process demoralizing or humiliating.

17   Q.    I'm not sure that answers my question, though.

18   A.    Would you ask the question again, please?

19                MR. HANCOCK:  Would you read it back

20                     to him, please?

21                     (The immediately preceding question

22                     was read back by the court

23                     reporter.)

1  A.    I can only say that there was a lot of

2        back-and-forth discussion, and I don't know if

3        they actually said that we should not have a

4        cutoff score and that everyone should

5        participate.

6  Q.    So Auburn's position is that there was

7        discussion back and forth, but it couldn't

8        dispute the assertion by CWH that CWH

9        recommended that all applicants be allowed to

10        proceed through the assessment center

11        notwithstanding their test score?

12                MR. MORGAN:  Object to the form of the

13              question.

14  A.    My position is that we partnered with CWH to

15        guide us through a process, and we listened very

16        carefully to their recommendations.  There was a

17        lot of discussion about whether or not to use a

18        cutoff score.  And ultimately, in conjunction

19        with CWH, a cutoff score was determined.

20        Whether or not CWH advised us flat-out not to

21        use a cutoff score, I don't recall that.

22  Q.    You don't recall one way or the other?

23  A.    I don't recall that they flat-out said don't use

1    a cutoff score.

2  Q.   Do you remember them urging the City not to use

3    a cutoff score?

4             MR. MORGAN:  Object to the form.

5  Q.   Pardon me.  Do you recall that CWH recommended

6    that Auburn not use a cutoff score?

7  A.   I don't recall that.  Again, there was a lot of

8    conversation back and forth, and we talked about

9    letting the score stand as it was and being a

10    part of the final score as it was -- ultimately

11    the test was a part of the final score at the

12    end of the process or to -- or not to have a

13    cutoff score.  I just -- There was a lot of

14    discussion about that, and ultimately we decided

15    that in the tradition of the fire service and in

16    being consistent with other testing processes

17    that the City had done that the cutoff score was

18    an appropriate thing for us to use on the

19    written test.

20  Q.   It was Lee Lamar who first suggested a 70 cutoff

21    score, wasn't it?

22  A.   I can't say he was the first one to say that.

23    Again, that's something in the CWH literature.

1   Q.   Well, CWH never recommended that the City use a

2        cutoff score of 70, did it?

3   A.   Actually, in the assessment -- in the exercises

4        portion of the whole process, they did.

5   Q.   I'm talking about the test.

6   A.   I don't know that they said one way or the

7        other.  I mean, I couldn't say that they said 70

8        percent.

9   Q.   Is it Auburn's position that CWH ever recommend

10       that a cutoff score be used with regard to the

11       test -- the written test?

12              MR. MORGAN:  Object to the form.

13  A.   They told us that some clients use a cutoff

14       score and some clients don't.  I'm sorry I'm not

15       answering the question.

16  Q.   Right.  Because in point of fact, CWH never

17       recommended that the City of Auburn use a cutoff

18       score.

19              MR. MORGAN:  Object to the form.

20              Asked and answered.

21  A.   I don't think they -- Through those discussions

22       they didn't say it was wrong to do so.

23  Q.   But they never said it was right and appropriate

1    Q.    The battalion chief promotion in 2006 was the

2          first time the City had ever implemented a test

3          with a cutoff score for a promotion; is that

4          correct?

5                   MR. MORGAN:  Object to the form.

6    A.    Not correct.

7    Q.    When was it done before?

8    A.    It was used for team leader in 2005.

9    Q.    Team leader in 2005.

10          And who was the company that implemented or

11          did the test?

12    A.    We utilized a test that was developed by the

13          International Public Management Association.

14    Q.    And that was for promotions to team leader?

15    A.    To company officer, parenthesis, lieutenant, or

16          maybe it's the other way around.  It's the

17          company officer level position.

18    Q.    And that was in 2005?

19    A.    That's correct.

20    Q.    And it's your testimony that the City used a

21          test with a cutoff score as their first factor

22          in that promotional process; if you didn't meet

23          the cutoff score, you did not go forward?

# EXHIBIT "F"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

EDDIE OGLETREE, an individual,        *
GERALD STEPHENS, an individual,    *
                                        *
     Plaintiffs,                 *
                                        *
vs.                                 *     CASE NO.: 3:07-cv-867-WKW
                                        *
CITY OF AUBURN, et al.,          *
                                        *
     Defendants.               *

## AFFIDAVIT OF STEVEN A. REEVES

Before me, the undersigned authority in and for said county and state personally appeared Steven A. Reeves who being known to me and being first duly sworn, deposes and says under oath as follows:

1.    My name is Steven A. Reeves. I am an adult over the age of nineteen and I have personal knowledge of the following information.

2.    I am employed with the City of Auburn and have been the Human Resources Director since 1993.

3.    As part of my job responsibilities, I took part in a decision regarding the promotional process to be used to promote four individuals to Fire Division Battalion Chief in 2006.

4.    Public Safety Director Bill James, Fire Division Chief Larry Langley, Deputy Chief Lee Lamar and I determined that an outside assessment center process was needed. I had contacted Kathleen Robinson, the consultant that the parties agreed to use to conduct assessment center promotional processes in the 1991 settlement, but she was retiring. Ms. Robinson recommended CWH Management Solutions to me.

5.    CWH Management Solutions is a nationally recognized firm with notable clients. We were impressed when we learned that its entry level fire fighter test was recommended by

the U.S. Department of Justice due to its low adverse impact and excellent validity, that it was endorsed by the International Association of Fire Chiefs, and that it had earned the highest professional award in the field of industrial/organizational psychology. We were also impressed by the methodology CWH proposed to develop and administer a valid, job-related, neutral selection process.    After we made the decision to engage CWH, I worked with that firm to create and execute a contract.  An agreement was reached and CWH was retained for the purpose of developing a valid, job-related and neutral promotional process for the 2006 City of Auburn Battalion Chief promotion.

6.    James, Langley, Lamar and I met with CWH representatives and collectively determined that there would be a written test utilized as part of the assessment center and that any applicant not scoring a 70 or above on the written test could not proceed in the promotional process for Battalion Chief.

7.    I am aware that there is some question about who made the decision to have a written test as a component of the assessment center and to use a cut off score.  Among the services provided by CWH was the option to use a written test as a component of the assessment center.  We decided to use a written test as part of the process because we felt it was important that candidates demonstrate their level of subject matter expertise to help identify the most qualified candidates for promotion, and because the assessment of subject matter knowledge through written testing is common in the fire service.  For these reasons, the Fire Division had used written tests in other promotional processes, as well.

8.    We collectively determined to implement a cut off score of 70 in order for an applicant to move forward in the promotional process because this is the cut off score commonly used in the fire service, including the Alabama Fire College and the National Fire Academy, it was consistent with the cut off score the City has used in past selection processes, and because we felt it was important to ensure that those who were promoted to this critical life

and community safety position know well the body of knowledge necessary to do the job of Battalion Chief.

9.      I am aware that the Plaintiffs have also called into question the fact that seniority was not a criteria considered during this promotion.  The Fire Division had not given points for seniority in past promotional processes and CWH had expressed some caution in regard to awarding points for seniority and/or education.  However, even if points had been awarded for seniority and/or education as part of the overall promotion process, it would not have had an impact on the outcome of the test for the plaintiffs and four white applicants who also did not pass the test.

10.     In mid-February 2006, a vacancy announcement was posted to invite applications for Battalion Chief.  At the end of February 2006, an in-depth three-hour candidate orientation meeting was held to introduce the candidates to the CWH representatives and to explain the entire promotion process and how the various components would be developed and validated.  During this meeting, in which applicant attendance was mandatory, it was announced that a written test would be administered as part of the promotional process and that a 70 percent cut off score would be utilized.  Each candidate was given a detailed orientation manual reviewing, among other aspects, the types of questions that would be on the test and how to prepare for the test.  To help candidates review and prepare for the test, four job-related text books were identified and on or about March 3, 2006, at least six weeks before the test, each candidate was given a copy of each book. All of the technical job knowledge questions were developed by CWH and came from these four books.   In consultation with subject matter experts, CWH also developed situational judgment questions that were consistent with the Fire Division's standard operating procedures and required the application of knowledge and skills to specific, job-related situations appropriate to the Fire Division and the rank of Battalion Chief.

11.     After the Battalion Chief positions were announced, Chris Turner, a black male, applied for the job.  Because he was a Fire Fighter and not a Lieutenant, the Public Safety

Director investigated whether anyone within the Fire Division was eligible to apply for the position. Because the City's Personnel Policies and the Battalion Chief job description did not preclude a Fire Fighter from applying, because past promotion processes for Battalion Chief (aka Captain and Shift Commander at various times) had allowed non-probationary Fire Fighters and probationary and non-probationary Lieutenants to seek promotion to Battalion Chief, and because the Fire Division's career development plan was out-of-date and being revised at that time, it was determined that non-probationary Fire Fighters were eligible for the job as were probationary and non-probationary Lieutenants. The documentation we released on this matter to the Fire Division employees is attached hereto as Exhibit "1".

12.    There were initially fifteen applicants but three individuals, all white males, never took the written test because they decided not to pursue the promotion.

13.    Twelve applicants took the written exam: nine white employees and three black employees. Five individuals scored a 70 or above and continued in the promotional process of job-related exercises. Four of the white applicants and all three black applicants failed to score a 70. We were very surprised and disappointed by the low number of applicants that passed the test. Four individuals were promoted to Battalion Chief at the end of that process.

14.    The application process was the same for each candidate. Identical test aid materials were distributed to each applicant. The written test was graded by CWH. There were no differences in the promotional process for any applicant.

15.    All four individuals receiving the promotion had ten or more years of fire fighter experience and college degrees.

16.    CWH responded in writing when the EEOC made the determination that the written test had an adverse impact on black applicants. A CWH expert, Chris Hornick, President of the company, opined that the process did not create a disparate impact for black applicants and that an applicant pool of twelve individuals did not establish statistical significance such that an illegal disparate impact could be presented. That communication from

CWH is attached hereto as Exhibit "2" and incorporated as set out in full herein. Hornick stated: "CWH would like to emphasize that no statistical analysis of adverse impact can be performed with a sample of 12 candidates, including only 3 minority candidates." Hornick's correspondence provides a detailed analysis of why seven individuals failed and confirms that no disparate impact of black applicants could be indicated. Hornick points to educational experience, time lapse since formal education (and therefore test taking), allowed study time before the test, and CWH being new to the City, as factors that caused the fail rate - - all unrelated to race.

17.    When there was a need for a temporary working out of class assignment to fill in for an absent Battalion Chief in January 2005, it was determined that Horace Clanton, a white male, would fill the position because the assignment duration was too short and to allow each eligible officer to rotate into the assignment would prove to be operationally disruptive. As such, we simply chose Horace Clanton because he had seniority by several years at the company officer level. Under the circumstances, it was the fairest way to address the temporary need. Working out of class is a temporary assignment and is not considered a promotion.

18.    In November 2004, Shift Commanders asked the former City Manager to change their job title to Battalion Chief, and he granted their request. There were no changes made to the job description or the rate of pay. Changing the job title was not a promotion.

Further affiant saith not.

Dated this the 7th of August 2008.

_Steven A. Reeves_
Steven A. Reeves

STATE OF ALABAMA          )

COUNTY OF LEE             )

Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **Steve Reeves** who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

_Kimberly M. Coleman_
NOTARY PUBLIC

(SEAL)

My Commission Expires: _5-16-2012_

# Memo

To: All Career Personnel

From: Chief Larry Langley



Date: February 23, 2006

Ref: Battalion Chief Assessment

On February 17, 2006 a memo was sent to all personnel on the Battalion Chiefs vacancy explaining that only non-probationary Lieutenants were eligible to apply for the position. After reviewing the current job descriptions and minimum qualifications, it was discovered that non-probationary Firefighters and the probationary Lieutenant are eligible to apply for the Battalion Chiefs Vacancy. I know this is short notice but any of the eligible applicants mention above if interested need to apply by February 28, 2006 at 3:00 PM. Orientation is on February 28, at 6:00 PM in the large conference at the Public Safety Building. This session will include an explanation of the process and practical information to assist candidates.



Ogletree-¶ Disclosures

00050



To:    Glenn Todd
From:  Chris W. Hornick, Ph.D., President, CWH Research, Inc.
Date:  3/5/07
Re:    EEOC Case–Stephens, Ogletree v. Auburn


Dear Mr. Todd,

This letter is a response to the EEOC correspondence dated February 27, 2007 regarding the EEOC
Cases of Stephens and Ogletree v. Auburn. CWH offers the following evidence, explanation and
analysis to adamantly and vigorously reject the preliminary conclusion of the EEOC that the
selection process discriminates on the basis of race.

*The EEOC correspondence stated that "...the validation study determined that the written test
adversely impacted Black applicants."*

1.  The CWH written summary report stated that the written test demonstrated adverse impact
    against Blacks because no Blacks passed the test at the pre-determined cut score of 70%.. CWH
    is committed to the elimination of disparate impact based on race and gender in testing
    processes. Because of this, we provide detailed information in our reports regarding the results
    of the testing process. In our discussion of the written test results, we provided information to
    the client regarding ways to evaluate the testing process. While it was a concern that no Black
    candidates passed the test, the information provided about the adverse impact in the written test
    must be interpreted in a correct and appropriate context.
2.  CWH would like to emphasize that **no** statistical analysis of adverse impact can be performed
    with a sample of 12 candidates, including only 3 minority candidates. Thus, there is **no** evidence
    of statistically significant or meaningful adverse impact. There is **no** evidence that the testing
    process itself discriminated illegally or inappropriately against Blacks or any group of
    candidates. However, further qualitative analysis of the process may shed light on other
    potential factors related to the performance of Blacks **and** the low scoring Whites in the testing
    process.
3.  The CWH report (p. 8 and 9) examined differences in performance of Whites and Blacks on the
    written test. Although there were differences in the mean score and pass rates of Whites and
    Blacks, these differences cannot be evaluated in terms of statistical differences due to the very
    small sample sizes. Thus it is essentially impossible to draw meaningful statistical conclusions,
    based on a sample of 12. CWH noted that Blacks did not perform as well as a group as Whites
    on the test. However, CWH did not intend to suggest that the testing process discriminated
    unfairly, inappropriately, or illegally. In fact, there are many other factors that should be
    considered in putting the results in context:
    a.  One Black candidate with the lowest written test score was only at the rank of Firefighter
        at the time of testing, and may not have had the minimum necessary experience and
        training as an officer to compete for Battalion Chief. All other candidates were at the
        rank of Lieutenant. The City of Auburn allowing participation by firefighters in the
        testing process serves to increase potential diversity and provide learning opportunities

EXHIBIT

2



for these individuals. In our professional opinion, in most departments nationally, individuals at the firefighter rank would most likely fail a Battalion Chief test, as these ranks are extremely different in terms of duties, experience, and responsibility. Thus, this candidate could reasonably be excluded from any adverse impact considerations or analysis.

b. The tenure (time since date of hire) of candidates is a possible factor in test performance. In fact, the average tenure of candidates who passed the test was 8 years. The average tenure of candidates who failed the test was 16 years. It is highly probable that this difference in tenure had much more relevance in the testing process than race.

c. The education levels and recency of formal education of candidates was most likely another significant factor in test performance. As indicated above, candidates who passed the test have been hired more recently, and may have higher levels of education and more recent experience in the educational system, including more recent test taking experience.

d. Research in the field of I/O psychology supports the above observations that tenure and time since formal education impact test performance. Research studies exist in the professional literature that suggest that older, more tenured workers perform more poorly as a group on standardized tests (such as reading comprehension or other cognitive ability tests) than younger workers.

4. As CWH noted in the report (p.9), the majority of candidates performed poorly on the written test. Only 5 out of 12 passed the test at the pre-determined passing score of 70, while 7 out of 12 failed the test. This is an overall pass rate of less than half (42%). In fact, it is highly probable that the poor performance of candidates (White and Black) on the written test had to do with factors unrelated to the testing process itself. CWH noted several variables in our report that could have caused lower than expected test scores on the test:

a. 10 years since the last Battalion Chief test in the Auburn Fire Division meant that many candidates may not have been familiar with or comfortable with the testing process in general and the test reading material in particular.

b. Using CWH Research as a consultant for the first time meant that candidates were not familiar with the CWH process and our written tests.

c. The preparation time frame permitted only a 6 week study period. Departments nationally usually allow 90 days to 6 months study time for this type of test.

5. In addition, tenure and education appear to have a strong correlation with test performance, as discussed above.

6. In this small sample of candidates, more Whites (4) failed the test than Blacks (3). Thus, no conclusion may be drawn that the test had a more negative impact on Blacks than Whites. In fact, the above noted factors would have the same potential impact on all candidates.

7. Little or no meaning can be placed on an evaluation of this small sample. The 4/5ths rule **cannot** be met in this situation unless all minority candidates (all 3 Black candidates) were to have passed the test. For example, with a sample size of only 3 Black candidates, the only possible pass ratios for Black candidates are 0% ( 0 Black candidates pass), 33% (1 Black candidate passes), 67% (2 Black candidates pass) and 100% (all 3 Black candidates pass). Even if a different cut score had been established prior to the test administration, such as 60%, only 2 out of 3 Black candidates would have passed (pass ratio of 67%) and 8 out of 9 White candidates would have passed (pass rate of 89%). This would still result in an adverse impact ratio of 75%,



slightly below the 80% guideline. Thus, there is no possible cut score that would not result in some adverse impact because of the exceptionally small sample sizes.

8.  The EEOC guideline regarding the 4/5[th] ratio and other professionally accepted methods of evaluating adverse impact were never intended to be used to evaluate small samples where the performance of 1 or 2 candidates could dramatically affect the test results and the evaluation of the process as a whole.

*The EEOC correspondence stated: "No evidence has been submitted to indicate that Auburn sought to employ any alternative selection criteria, despite its knowledge of the racial impact of the test."*

The testing process developed by CWH exceeded all national professional guidelines and standards recommended by the American Psychological Association (APA) and the Society of Industrial-Organizational Psychology (SIOP). CWH is a national leader in creating testing processes that maintain high validity and increase diversity. CWH has won the highest lifetime award from SIOP (the M. Scott Myers Award in 1999) for its entry level testing processes, and CWH has pioneered the use of Situational Judgment tests that emphasize experience over "book-learning." In fact, the testing process also incorporated many Best Practices methods recommended by the EEOC and the Department of Labor to reduce adverse impact, such as use of a compensatory model. In addition, the testing process had the following features:

1.  The written test measured job related knowledge, skills, and abilities and was **validated** in accordance with professional standards to demonstrate content validity.
2.  It used a compensatory model to measure more skills and abilities earlier in the process. A traditional model used by most departments nationally includes only a technical job knowledge test based on reading material as an initial hurdle in the promotional process. The CWH test for Auburn incorporated a Situational Judgment component with a Technical Job Knowledge component. Research in I/O Psychology and CWH data from other departments demonstrate that using a Situational Judgment test greatly minimizes differences in performance based on race. This was also the case with the written test in question, with the result that the differences in scores between Blacks and Whites was substantially smaller on the Situational Judgment items than on the Technical Job Knowledge items.
3.  CWH maintains a database of test results nationally and can demonstrate very positive results with minimum or substantially lower adverse impact from clients where sample sizes include significant numbers of minorities.
4.  Therefore, the City had actually investigated options, and selected CWH based on a track record of successfully providing tests with no or very low adverse impact based on race or gender.
5.  Finally, knowledge of the actual test results occurred after the test administration. There was no expectation of a racial impact in the test prior to the test administration. The results cited by the EEOC from the report were only available after the written test had been administered, using a predetermined passing score of 70%. Thus, it is inappropriate to state that the City did not seek alternative testing procedures with less adverse impact prior to the test administration.

9085 E. Mineral Circle Suite 350,    Englewood, CO 80112    VOICE: 303-617-3433    FAX: 303-617-3433
FILENAME \p P:\2006 Projects\Auburn Fire\Auburn letter re ai.doc



In conclusion, the City of Auburn took responsible measures to ensure a fair, valid testing process that would provide equal opportunity for all test takers. Many factors potentially contributed to lower test performance by both Blacks and Whites on the written test. There is not sufficient evidence to conclude that the test unfairly or illegally discriminated against the small sample of Blacks on the basis of their race.

Sincerely,


Chris W. Hornick, Ph.D.
President

# EXHIBIT "G"

COPY

1

1      IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              EASTERN DIVISION

4   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
5   individual,

6          Plaintiffs,

                                    CIVIL ACTION NO.
7   Vs.                             3:07-CV-867-WKW

8
    CITY OF AUBURN, a municipality
9   in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
10  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
11  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
12  individual, and CORTEZ LAWRENCE,
    an individual,
13
          Defendants.
14
              * * * * * * * * * *
15

16      **DEPOSITION OF WILLIAM HOWARD JAMES**, taken

17  pursuant to stipulation and agreement before Pamela A.

18  Wilbanks, Certified Court Reporter, ACCR# 391,

19  Registered Professional Reporter and Commissioner for

20  the State of Alabama at Large, in the Conference Room

21  of Auburn City Hall, 144 Tichenor Avenue, Auburn,

22  Alabama, on Wednesday, July 30, 2008, commencing at

23  approximately 1:20 p.m.

5

1   Q.   What's the ZIP Code out there?

2   A.   36879.

3   Q.   Where are you currently employed?

4   A.   City of Auburn.

5   Q.   In what capacity with the City?

6   A.   Public safety director.

7   Q.   How long have you held that job?

8   A.   October of 2004.

9   Q.   Generally tell me what you do as a public safety

10       director for the City of Auburn.

11  A.   Provide administrative direction for the

12       divisions in public safety, budgets, contract,

13       personnel.

14  Q.   What was your job immediately before that?

15  A.   I was a building official with the City of

16       Auburn.

17  Q.   The building official?

18  A.   Uh-huh (positive response).

19  Q.   How long did you hold that job?

20  A.   Fifteen years, sixteen years.

21  Q.   Where were you immediately before that?

22  A.   I worked with the economic development

23       department for a year --

12

1    Q.    You're saying y'all weren't doing an assessment

2          center because the order said you had to do it?

3                  MR. MORGAN:   Object to the form.

4    A.    Not in my understanding.

5    Q.    Again, was it your understanding that the City

6          had to comply with the 1991 order for the

7          battalion chief promotion in 2006?

8                  MR. MORGAN:   Object to the form.

9    A.    I'm not sure what the position was from the

10         City's standpoint of whether we had to comply

11         with the '91 order.

12   Q.    You don't know one way or the other; is that

13         correct?

14   A.    Yes.  I don't have that knowledge.

15   Q.    Did you ever have any meetings about the 1991

16         order and whether or not it was still in force

17         with the city attorney, Arnold Umbach?

18   A.    No.  I don't recall having any meetings with

19         Attorney Umbach.

20   Q.    Do you recall the 1991 order being the subject

21         of any discussions that y'all had when you were

22         deciding about the battalion chief promotion

23         maybe from Steve Reeves?

22

1     would violate the 1991 order that we just read?

2                 MR. MORGAN:  Object to the form.

3     A.  Would I agree that it would violate it?

4     Q.  That it would violate it.

5                 MR. MORGAN:  First of all, that's a

6                     legal question.  But if you've got

7                     an opinion --

8     A.  My opinion is no.

9     Q.  In your opinion it would not violate the order?

10    A.  Correct.

11    Q.  And why is that your opinion?

12                MR. MORGAN:  Object to the form.

13    A.  Because it doesn't say anything about not having

14        a test.

15    Q.  Your testimony is that because the order doesn't

16        mention a test, then it doesn't violate the --

17        giving a test doesn't violate the order?

18                MR. MORGAN:  Object to the form.

19    A.  Correct.  Based on my -- what my opinion is of

20        an assessment center.

21    Q.  Did you hear testimony earlier from Mr. Reeves

22        about the number of black firefighters hired --

23        firemen hired since the 1991 order?

30

1    was working on.

2    Q.    Do you recall during the meetings with CHW -- if

3          I say that wrong -- CWH -- do you recall who

4          during those meetings was promoting a score of

5          70 as being the cutoff score?

6    A.    I don't recall any specific person promoting

7          that other than it was discussed among everybody

8          that was in the room about a cutoff score.

9    Q.    And you can't testify if anyone with the City of

10         Auburn was the first person to suggest that

11         there be a 70 cutoff score?

12   A.    I couldn't identify a person, no.

13   Q.    Are you familiar through your job with the City

14         of Auburn with the work history of Mr. Stephens

15         and Mr. Ogletree?  It's okay if you're not.  I'm

16         just asking.

17   A.    Detailed parts of it, not specifically, other

18         than I did -- since my position as the director

19         looking at performance appraisals.

20   Q.    To your knowledge did they have satisfactory

21         performance appraisals?

22   A.    As I recall they do, yes.

23   Q.    Are you aware of anything in their work history

33

1              MR. MORGAN:  Object to the form.

2    A.   I could agree that they had been a firefighter

3         longer.  I'm not sure how you define experience.

4    Q.   I'm not going to offer this exhibit during your

5         deposition, but have you seen the two memos that

6         were sent out back to back in advance of the

7         promotion where one said that only

8         nonprobationary lieutenants could apply and then

9         several days later a second one that said

10        everybody can apply:  nonprobationary,

11        probationary, and probationary, nonprobationary

12        firefighters could apply also?  Did you see

13        those two memos?

14   A.   Yes.

15   Q.   Were you involved in the decision to allow

16        nonprobationary lieutenants and probationary and

17        nonprobationary --

18             Were you involved in the decision to allow

19        probationary lieutenants and nonprobationary and

20        probationary firefighters to apply for the

21        battalion chief position?

22   A.   Yes.  I made -- Yes.

23   Q.   Was that a group decision or did you make that

34

1      decision yourself?

2  A.   I did not see anything in our policy or job

3      description that would have excluded the

4      individuals other than lieutenants, and I made

5      that point and then the second memo was sent

6      out.

7  Q.   So you saw the first memo.  And for some reason

8      that triggered you to go --

9  A.   No.  Actually, the first memo went out as I

10     recall.  And then, if I'm not mistaken, I

11     believe we got an application from Mr. Turner.

12     When I got that or when I heard that, I looked

13     and did not find anything that would preclude

14     him from applying for the job.

15 Q.   So it's your testimony that as a result of

16     his -- Mr. Turner's application, you went and

17     looked at the policies and determined that there

18     was nothing that would preclude him from

19     applying for the battalion chief position,

20     correct?

21 A.   As I recall, yes.

22 Q.   And so based upon that, you decided to allow

23     probationary lieutenants, probationary and

# EXHIBIT "H"

COPY

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    EASTERN DIVISION

4    EDDIE OGLETREE, an individual,
     GERALD STEPHENS, an
5    individual,

6         Plaintiffs,

7    Vs.                              CIVIL ACTION NO.
                                      3:07-CV-867-WKW
8
     CITY OF AUBURN, a municipality
9    in the State of Alabama, LARRY
     LANGLEY, an individual, LEE LAMAR,
10   an individual, BILL HAM, JR., an
     individual, STEVEN A. REEVES, an
11   individual, BILL JAMES, an
     individual, CHARLES M. DUGGAN, an
12   individual, and CORTEZ LAWRENCE,
     an individual,
13
          Defendants.
14
              * * * * * * * * * *
15

16        DEPOSITION OF LARRY M. LANGLEY, taken pursuant

17   to stipulation and agreement before Pamela A. Wilbanks,

18   Certified Court Reporter, ACCR# 391, Registered

19   Professional Reporter and Commissioner for the State of

20   Alabama at Large, in the Conference Room of Auburn City

21   Hall, 144 Tichenor Avenue, Auburn, Alabama, on

22   Wednesday, July 30, 2008, commencing at approximately

23   2:20 p.m.

4

1  signature of the witness to this deposition is hereby

2  not waived.

3                    * * * * * * * * * * * *

4                        LARRY M. LANGLEY

5          The witness, after having first been duly

6  sworn to speak the truth, the whole truth and nothing

7  but the truth testified as follows:

8                          EXAMINATION

9  BY MR. HORSLEY:

10     Q.   Please tell us your full name.

11     A.   Larry Michael Langley.

12     Q.   My name is Richard Horsley.  The same thing.

13          I'm going to ask you questions.  And if you

14          don't understand, tell me to repeat.  I'm going

15          to assume you understood and gave the answer you

16          intended to give once you answer.  Okay?

17     A.   Okay.

18     Q.   Where do you currently reside?

19     A.   81 Lee Road 374, Valley, Alabama 36854.

20     Q.   And you're retired from the Auburn Fire

21          Department; is that correct?

22     A.   Right.

23     Q.   When did you retire?

5

```
1    A.    November 30, 2007.

2    Q.    2007?

3    A.    Uh-huh (positive response).

4                MR. MORGAN:  Yes.  You need to make

5                      an audible answer.

6    Q.    Yeah.  I'm sorry.

7                MR. MORGAN:  You need to say "yes" or

8                      "no".  Don't say "uh-huh".

9    Q.    Say "yes" or "no" rather than "uh-huh" or

10         "huh-uh" because she can't take that down.

11              So you retired in November 2007?

12   A.    Yes.

13   Q.    And what was the reason for your retirement?

14   A.    I had 30 years in with the City.

15   Q.    Just ready to retire?

16   A.    Ready to retire.

17   Q.    How long were you the fire chief for the City of

18         Auburn?

19   A.    Acting chief and deputy of public safety

20         director a little over ten years.

21   Q.    Deputy public safety director, tell me what that

22         is.

23   A.    Our public safety director -- in I think it was
```

6

1  '02 or '03 -- changed our title from police

2  chief and fire chief and the building code

3  official and communications director to deputy

4  public safety director over police operations or

5  fire operations.  It was just a name change.

6  Q.  So if I call it fire chief, it's the same thing?

7  A.  Same thing.

8  Q.  You were the fire chief for about ten years?

9  A.  Yeah.

10 Q.  And what job did you hold immediately before you

11     became the fire chief?

12 A.  I was a battalion chief or shift commander.

13 Q.  What year were you promoted to fire chief?

14 A.  July of '97.

15 Q.  And before that you were a shift commander, and

16     then are you saying that position was changed to

17     battalion chief?

18 A.  Later in 2005 -- '04.  Whenever we're talking

19     about, it was changed.  I just said battalion

20     chief because it's --

21 Q.  But you were already the chief at the time that

22     it was changed to battalion chief?

23 A.  Right.

1  Q.  You can't testify about who with the City had

2      the idea or made the decision to have a test

3      with a cutoff score; is that correct?

4  A.  No.

5  Q.  Do you recall if that decision was made before

6      the City contracted with CWH?

7  A.  No.  It was made along with CWH.

8  Q.  Do you recall whether or not Lee Lamar was the

9      individual that suggested the number of 70 as

10     the test score cutoff?

11 A.  Don't -- I can't testify to that, no.

12 Q.  Does that seem familiar to you that he did or --

13 A.  Well, 70 was discussed because it's a state

14     standard to the fire college and National Fire

15     Academy, and I remember the 70 score being

16     discussed.

17 Q.  Was there any discussion about using a test

18     without a cutoff score and just using it as a

19     part of the whole process?

20 A.  I really don't remember if it was or not.

21 Q.  Looking back on it, do you have any opinions

22     about whether or not that would have been a

23     better idea?

18

1              MR. MORGAN:  Object to the form of

2                  that question.

3    A.   No.  I think the process went good.

4    Q.   As a fire chief, did you feel like the people

5         that should be promoted to battalion chief

6         should have had significant experience with the

7         Auburn Fire Department?

8              MR. MORGAN:  Object to the form.

9    A.   Again, it's what you're talking about on

10        experience.  Knowledge and stuff of fire

11        techniques, fire tactics -- I think they should

12        have had the knowledge.  But experience, I don't

13        know exactly what you mean by that.

14   Q.   Well, knowledge, then.  Do you feel like that

15        the people that are promoted to battalion chief,

16        that it was more important that they have the

17        knowledge about firefighting or whether or not

18        they could pass the test?

19             MR. MORGAN:  Object to the form of

20                 the question.

21   A.   If they had the knowledge of firefighting, they

22        should have passed the test.

23   Q.   Did you review the test yourself?

19

1   A.   No.  The only thing that I reviewed was -- CWH

2          brought in a pack of questions.  It was 150 or

3          175 questions and about 60 situational judgment

4          questions.  And there was about nine or ten of

5          us -- the battalion chiefs, HRM, Bill James,

6          Deputy Chief Lamar, and myself -- and we

7          reviewed the questions and turned back to CWH

8          what we thought was consistent with the way the

9          City of Auburn operated.  Did I see the final

10         test?  No.

11   Q.   You've never taken that test, correct?

12   A.   No.

13   Q.   Did you participate in any way in the decision

14         to allow probationary lieutenants,

15         nonprobationary and probationary firefighters to

16         apply for the battalion chief position in 2006?

17   A.   Participate?  What --

18   Q.   Were you a part of that decision?

19   A.   Yes.  We recognized that by the City policies

20         that they was eligible to apply for it.

21   Q.   Had those people I just identified ever been

22         allowed to apply for battalion chief promotions

23         before?

1   A.   Which people?

2   Q.   Probationary lieutenants --

3   A.   Yes.

4   Q.   -- non and probationary firefighters before

5        2006?

6   A.   Before 2006, yes.

7   Q.   When were they allowed?

8   A.   They was allowed to on team leader promotions,

9        on just about every promotion we done.  If they

10       was still on probation, they could apply.

11  Q.   I guess what I'm asking, though, is:  Was there

12       ever a captain or a battalion chief promotion

13       before 2006 where probationary lieutenants and

14       probationary and nonprobationary firefighters

15       were allowed to apply?

16  A.   The last captain/lieutenant promotion we done

17       was in 1996, and I was a shift commander at that

18       time.

19  Q.   Is it true that in -- February 1 of 2006 when

20       the team leaders were reclassified as

21       lieutenants that Lieutenant Stephens was

22       actually the only lieutenant in the department

23       at that time?

21

1   A.   Yes.  Yes.

2   Q.   Do you recall any discontent or dissatisfaction

3        among white team leaders that lieutenant

4        Stephens was the only lieutenant in the

5        department?

6   A.   No.

7                    (Plaintiff's Exhibits 17 & 18 marked

8                         for identification.)

9   Q.   I'll show you what I've marked as Plaintiff's

10       Exhibits 17 and 18.  It's the same letters we

11       looked at before.  Have you ever seen that

12       before?  Have you seen that before?

13  A.   Yes.

14  Q.   In response to that, is Exhibit 18 what you

15       sent?

16  A.   Yes.

17  Q.   And in the third paragraph it says:  Under our

18       current city policies and job -- and, again,

19       this letter is dated -- well, it's not dated.

20       Yeah, it is.  May 8 of 2006.

21          In the third paragraph it says:  Under our

22       current City policies and job descriptions,

23       there is no time in grade policy and no

1    cumulative point system.  Because of our current

2    advancement criteria, any nonprobationary

3    employee may participate in the assessment.  The

4    fire division is currently reviewing a Career

5    Development Plan that addresses these criteria.

6         So when you wrote this letter, the City of

7    Auburn was then reviewing a Career Development

8    Plan that addressed the criteria of time in

9    grade and a cumulative point system, correct?

10        MR. MORGAN:  Object to the form.

11   A.   Yes.  We was working on one.

12   Q.   And that would be a Career Development Plan

13   meaning that people could be promoted within the

14   department based on time in grade and a

15   cumulative point system; is that correct?

16        MR. MORGAN:  Object to the form.

17   A.   Yes.

18   Q.   Why was the City reviewing that?

19        MR. MORGAN:  Object to the form.

20   A.   We didn't have a current Career Development Plan

21   that was really in place, and we was trying to

22   develop one to set out guidelines for the

23   firefighters where a career firefighter hired in

1  would know what he had to do to advance.

2  Q.  For that Career Development Plan, you would

3  consider a cumulative point system and time in

4  grade as requirements to promote, correct?

5  MR. MORGAN:  Object to the form.

6  A.  Before?

7  Q.  No.  As a part of this Career Development Plan

8  that y'all were looking into, you would consider

9  time in grade and a cumulative point system for

10  promotions; is that correct?

11  MR. MORGAN:  Object to the form.

12  A.  Yes.  Once we got it there.  But it wasn't in

13  place at that time.

14  Q.  Right.  Well, has it ever gotten in place?

15  A.  It hadn't been put in place when I retired in

16  November.

17  Q.  Do you agree that those are important criteria

18  for promotions, time in grade and a cumulative

19  point system?

20  MR. MORGAN:  Object to the form.

21  A.  Some of it, yes.

22  Q.  Would those criteria have benefited Mr. Ogletree

23  and Mr. Stephens in your opinion in their

24

1    application for battalion chief?

2                MR. MORGAN:  Object to the form.

3    A.    That's according to what points was assigned to

4          it.  We never had got down to that point.

5    Q.    Just because I don't know, what would be an

6          example of things considered in a cumulative

7          point system?  How would you accumulate points?

8    A.    The amount of certifications you might have or

9          college degrees, time in grade and stuff like

10         that.

11   Q.    What does time in grade mean?

12   A.    How long you've worked in that, you know, grade,

13         that position.

14                MR. HORSLEY:  Let's take a minute.

15                (Brief recess.)

16   Q.    (Continuing by Mr. Horsley)  Are you familiar

17         with Plaintiff's Exhibit 3, which is the 1991

18         settlement order that we've talked about today?

19   A.    I'm familiar with it.  I haven't looked at it in

20         over eight or nine -- It's been a long time

21         since I looked it.

22   Q.    Eight or nine years?

23   A.    No.

25

1    Q.    I thought you said --

2    A.    Eight or nine months, ever how long it's been

3         since I left, or it might have been longer than

4         that.

5    Q.    Do you know whether or not during the battalion

6         chief promotions in 2006 that the City of Auburn

7         was required to comply with that order?

8                  MR. MORGAN:  Object to the form.

9                  Also calls for a legal opinion.

10   A.    Repeat that.

11   Q.    Yeah.  During the battalion chief promotions in

12         2006, do you know if the City of Auburn Fire

13         Department was required to comply with that

14         order?

15   A.    By the process we was going through, I thought

16         we was complying with that form.

17   Q.    But the question was:  Did you think y'all were

18         required to comply with it?

19                  MR. MORGAN:  Object to the form.

20   A.    Was we required?  I never questioned it because

21         the process I thought we was doing was meeting

22         this criteria.

23   Q.    Did you review that order before y'all

28

1  A.  AFD insignia on the collar.

2  Q.  Did they do the same job?

3  A.  The job description was identical.

4  Q.  Did they get the same pay?

5  A.  Same pay.

6  Q.  Was the lieutenant over a team leader?

7  A.  No.

8  Q.  Was that a promotion from team leader to

9     lieutenant?

10 A.  No.  It was a name change only.

11 Q.  You were asked about people being eligible to

12    apply for the battalion chief promotion and the

13    City opening it up for everybody.

14 A.  Right.

15 Q.  When you applied for captain in 1993 --

16 A.  Yes.

17 Q.  -- you were what rank?

18 A.  Firefighter.

19 Q.  Even though you were not a lieutenant, you were

20    eligible to have applied for captain?

21 A.  Right.

22 Q.  And Eddie Ogletree as a firefighter in 1993

23    could have applied for captain as well, couldn't

# EXHIBIT "I"

COPY

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3           EASTERN DIVISION

4   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
5   individual,

6           Plaintiffs,
                            CIVIL ACTION NO.
7   Vs.                     3:07-CV-867-WKW

8
    CITY OF AUBURN, a municipality
9   in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
10  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
11  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
12  individual, and CORTEZ LAWRENCE,
    an individual,
13
            Defendants.
14          * * * * * * * * * * *

15

16      **DEPOSITION OF LEE Y. LAMAR, JR.**, taken pursuant

17  to stipulation and agreement before Pamela A. Wilbanks,

18  Certified Court Reporter, ACCR# 391, Registered

19  Professional Reporter and Commissioner for the State of

20  Alabama at Large, in the Conference Room of Auburn City

21  Hall, 144 Tichenor Avenue, Auburn, Alabama, on

22  Wednesday, July 30, 2008, commencing at approximately

23  2:50 p.m.

1    questions just like everybody else.  If you want

2    me to rephrase it or repeat it, tell me.

3    Otherwise I'll assume you understood and gave

4    the answer you intended to give.  Okay?

5  A.    Yes, sir.

6  Q.    Where do you currently reside?

7  A.    566 Lee Road 93, Waverly, Alabama 36879.

8  Q.    And where are you currently employed?

9  A.    City of Auburn.

10  Q.    And you're the City of Auburn fire chief; is

11    that correct?

12  A.    Deputy public safety director fire operations or

13    fire chief.

14  Q.    And that means fire chief?

15  A.    Yes, sir.

16  Q.    If I call you fire chief, we'll assume -- that

17    means all those titles you just gave us.

18    And how long have you been the fire chief?

19  A.    I was named acting December 1, 2007 and then was

20    made permanent July 1, 2008.

21  Q.    And what were you on December 1 of '07?

22  A.    Acting.

23  Q.    And then you became permanent?

1   A.   Yes, sir.

2   Q.   What process did you go through to go from

3        acting fire chief to permanent fire chief?

4   A.   No specific process.  Mr. James and I discussed

5        it, and then I was -- had an appointment with

6        Charles Duggan, the city manager.  We discussed

7        it, and then he offered the position to me.

8   Q.   Was that a promotion?

9   A.   Yes, sir.  From deputy chief.

10  Q.   And you didn't have to take a test, correct?

11  A.   No, sir.  Not for that.

12  Q.   Other than your meeting with Mr. Duggan, did you

13       have to give any interviews?

14  A.   I had to prepare some papers.  They requested

15       some papers be written.

16  Q.   Did you have to go to an assessment center?

17  A.   No, sir.

18  Q.   What job did you -- That's when you went from

19       acting to permanent?

20  A.   Yes, sir.

21  Q.   Before you were acting fire chief, what was your

22       position?

23  A.   Deputy fire chief.

10

1   Q.   It wasn't just people -- It wasn't just

2        civilians.  Okay.

3            Do you have any information today about

4        Gerald Stephens' interviews for that job?

5   A.   No, sir.  That would be privileged.

6   Q.   Was the job of deputy chief actually a posted

7        job position?

8   A.   Yes, sir.

9   Q.   Who ultimately made the decision to promote you

10       to deputy chief?

11   A.   If -- I don't know for sure.  I would imagine if

12       it's like many things, a recommendation by the

13       board was sent to the city manager, and he would

14       have made the appointment.

15   Q.   And was anybody else promoted to deputy chief at

16       the same time?

17   A.   No, sir.

18   Q.   There's only one deputy chief --

19   A.   There's only --

20   Q.   -- in that department?

21   A.   -- one vacancy.  Sorry.

22   Q.   And before deputy chief, what was your position?

23   A.   Training officer for the division.

11

1    Q.    Training officer?

2    A.    Yes.

3    Q.    And that's different than training chief?

4    A.    The actual job title is training officer on the

5          job description.

6    Q.    So is there such a thing as training chief?

7    A.    People refer to it as that because it's at the

8          same level as the battalion.

9    Q.    So when I said training chief a minute ago, that

10         would be the same thing as training officer; is

11         that correct?

12   A.    Yes, sir.

13   Q.    And how long were you a training officer?

14   A.    I believe it was -- March of 2001 would have

15         been when I moved over from the line to that

16         position.

17   Q.    What do you mean the line?

18   A.    In fire service you have line and staff.  Line

19         personnel are those who work shift and respond

20         to calls directly on a daily basis.  Staff are

21         those who work in administration.  And I moved

22         off the line to take that position.

23   Q.    What was your job title before you became

1      training chief?

2  A.   Team leader.

3  Q.   And what process did you go through to be
4      promoted from team leader to training officer?

5  A.   I believe it was posted. I stated that I was
6      interested in it, and I don't think anybody else
7      did because there was no pay incentive. And it
8      was just an opportunity to move over and try to
9      work with training. I think I was the only
10     person who applied at that time.

11  Q.  Is it your testimony under oath that that job
12     was posted for people within the department to
13     apply for, correct?

14  A.  To the best of my recollection.

15  Q.  And did you have to take a test to get that
16     promotion?

17  A.  No.

18        MR. MORGAN: Object to the form as a
19          promotion.

20  Q.  Did you have to undergo an assessment for that
21     promotion?

22        MR. MORGAN: Object to the form of
23          the question.

1    A.    No.

2    Q.    Did you have to interview for that?

3              MR. MORGAN:  Object to the form.

4    A.    No.

5    Q.    All you did was put your name and you were

6          selected -- put in your name and you were

7          selected, correct?

8    A.    Yes, sir.  It was not a promotion.

9    Q.    Was there a certain reason why you wanted it, if

10         it was not a promotion, but nobody else wanted

11         it?

12   A.    I had worked for quite a while with training new

13         recruits and was very interested in it.  And my

14         wife and I discussed it as an opportunity to

15         improve my skills.  And so we viewed it -- Even

16         though I would not be working part-time anywhere

17         because I would be coming off line, it was an

18         opportunity that I needed to take and see if I

19         could make it work and try to develop my skills.

20   Q.    And then before that you said you were a team

21         leader, correct?

22   A.    Yes, sir.

23   Q.    And how long were you a team leader?

16

1       school at Auburn University and was working

2       part-time at Tyson's Grocery.  I worked on the

3       family farm some in Macon County and any other

4       odd jobs at the time.

5  Q.   Just so it's clear on the record, what was your

6       position with the fire department from February

7       2006 through May of 2006?

8  A.   Would have been the deputy chief.

9  Q.   Did you participate in the decision-making

10      process concerning the battalion chief

11      promotion?

12  A.   Yes, sir.  Collectively there were a group of us

13      who made decisions on that.

14  Q.   Why did there need to be a battalion chief

15      promotion in 2006?

16  A.   We had several battalion chiefs who were

17      retiring and several more who had the time in

18      service to retire so we wanted to go ahead and

19      get that accomplished.

20  Q.   During the initial meetings about that promotion

21      before CWH was hired, do you recall discussions

22      that y'all had as a group about what the process

23      would entail for the promotion of battalion

1      chief?

2  A.   I think there were probably some general

3      discussions about what we should include.

4  Q.   What do you remember about those discussions?

5  A.   That what we were looking for or what components

6      of an assessment center would best measure the

7      candidates in the process.  We may have

8      discussed role plays or in-baskets or written

9      exams or hot seat exercises, tactical exercise,

10     any number of things.

11  Q.  Was it a concern of yours that the City of

12     Auburn Fire Department comply with the 1991

13     settlement order marked as Plaintiff's Exhibit 3

14     pursuant to the battalion chief promotion in

15     2006?

16          MR. MORGAN:  Object to the form.

17  A.   Not greatly, sir, no.

18  Q.  It was not a concern of the City's, correct?

19  A.   Not a concern of mine.

20          MR. MORGAN:  Object to the form.

21  Q.  Not a concern of yours that you comply with the

22     order, correct?

23  A.   What we viewed -- That was a decision that would

18

1    have been made above my grade at the time.  My

2    concern was that we identify the best way to

3    find a candidate -- the best candidates.

4  Q.   And the order itself was not a concern of yours

5    personally?

6  A.   Not mine personally, no, sir.

7  Q.   And in these meetings and in deciding how y'all

8    were going to make the battalion chief

9    promotions, did you ever sit down and read that

10   order and say, okay, well, we've got to comply

11   with this part and this part?

12 A.   I don't believe I did, no, sir.

13 Q.   Did you know at the time whether or not the City

14   of Auburn was required to comply with that order

15   for the battalion chief promotion in 2006?

16            MR. MORGAN:  Object to the form.

17 A.   I did not know, no, sir.

18 Q.   You did not know?

19 A.   No.

20 Q.   Whose decision was it to use an assessment

21   center as a part of this promotion process to

22   battalion chief?

23 A.   I think that goes back to the collective

1    discussions that we had, that that would be one

2    of the best methodologies to determine who was

3    the most highly qualified candidates.

4    Q.    Is that something that's commonly done in fire

5    departments to your knowledge, that in order to

6    determine promotions, outside assessments are

7    done?

8    A.    Assessment centers --

9    Q.    Assessment centers.

10   A.    -- or assessment processes are becoming more and

11   more common in fire service organizations.  It's

12   an expensive process, but it's -- typically what

13   they find is that the best candidates rise to

14   the top because you're measuring against

15   multiple different areas and multiple criteria.

16   Q.    And you understand that you can conduct an

17   assessment center or pay somebody to conduct an

18   assessment center without having a written test

19   as a component of the process, correct?

20   A.    A written test does not have to be a component,

21   but it can be.

22   Q.    It doesn't have to be, though.

23   A.    Doesn't have to be.

1   Q.   If a written test is to be a component of a
2        promotional process, it is not required that
3        there be a cutoff score; is that correct?
4   A.   That's left up to the individual agency is
5        typically what's done I would think, if they
6        want to impose one or not.
7   Q.   Well, who imposed a cutoff score for the written
8        test that we've been talking about today for the
9        battalion chief promotion in 2006?
10  A.   Again, the group that's been discussed several
11       times today:  Steve Reeves, Bill James, Larry
12       Langley, myself, and CWH's personnel when they
13       arrived at that part.  We all discussed it, and
14       that was the option.
15  Q.   That was the option --
16  A.   That was the option that was chosen.
17  Q.   But you'll agree with me that the City of Auburn
18       Fire Department had ultimate discretion as to
19       whether or not there would be, number one, a
20       test, correct?
21                   MR. MORGAN:  Object to the form.
22  A.   Yes, sir.
23  Q.   And number two, y'all had ultimate discretion as

21

1  to whether or not that test would contain a

2  cutoff score, correct?

3  MR. MORGAN:  Object to the form.

4  A.  Yes, sir.  As advised by CWH, our consultant.

5  Q.  But y'all have the ultimate decision-making

6  power?

7  MR. MORGAN:  Object to the form.

8  A.  Yes, sir.

9  Q.  And you heard Mr. Hancock's questions earlier

10  today to Mr. Reeves, I guess, where he suggested

11  that CWH attempted to persuade or encourage the

12  City of Auburn not to use a cutoff score.  Did

13  you hear those questions?

14  A.  I heard those questions.

15  Q.  Do you recall that?

16  A.  No, sir.

17  Q.  Can you testify one way or the other about what

18  you remember CWH advising you and the City of

19  Auburn about a cutoff score?

20  A.  What I recall was that if you chose to use one

21  that it needed to be that way throughout the

22  assessment on all components.

23  Q.  That cutoff scores would be used on every

22

1    component?

2  A.   Yes, sir.

3  Q.   Did the City of Auburn use cutoff scores on all

4       components of the battalion chief promotion

5       process in 2006?

6  A.   Yes, sir.  I believe so.

7  Q.   And if CWH says that it encouraged you and the

8       City of Auburn not to use a cutoff score, you're

9       testifying that's incorrect?

10           MR. MORGAN:  Object to the form.

11 A.   Can you repeat that?

12 Q.   Yeah.

13        If CWH is going to say in this case that

14      they tried to encourage you and the City of

15      Auburn not to use a cutoff score for that test,

16      you're going to testify that that's incorrect;

17      is that correct?

18           MR. MORGAN:  Object to the form.

19 A.   I'm not trying to be difficult.  It's that when

20      you through that last "that's correct" --

21 Q.   Forget that last correct.  Let me ask it a

22      different way.

23        Are you going to testify that CWH did not

1    recommend to you and the City of Auburn that you

2    not use a cutoff score?

3              MR. MORGAN:  Object to the form.

4    A.   I don't recall them specifically saying that,

5    no, sir.

6    Q.   You don't recall?  Is that your testimony?

7    A.   Yes, sir.

8              MR. MORGAN:  Wait.  Object to the

9                   form of that question.

10   Q.   Let's ask it again.

11        You don't recall whether CWH encouraged you

12   and the City not to use a cutoff score?

13             MR. MORGAN:  Object to the form.

14   A.   No, they did not encourage us not to use it.  I

15   don't recall that they did.

16   Q.   And that's my question.  You don't recall or

17   they did not do it?

18   A.   I don't recall that they did -- that they did

19   not encourage us to use a cutoff.

20   Q.   You don't --

21             MR. MORGAN:  His question -- You're

22                  asking if they do not recall, and

23                  what he's saying is I don't recall

24

1        them doing that.

2            MR. HORSLEY:  And that's why I want

3                to be clear about it.

4            MR. MORGAN:  He doesn't recall is

5                what you're asking him.

6            MR. HORSLEY:  Exactly.  But I'm

7                making sure --

8    Q.    You're not saying that it didn't happen.  You're

9    saying you don't recall whether it happened or

10   not?

11            MR. MORGAN:  Object to the form.  Go

12                ahead.

13   Q.    We're going to get it straight before we move

14   on.

15        I'm going to ask you two questions.  The

16   first one:  Do you remember whether CWH

17   attempted to encourage the City of Auburn not to

18   use a cutoff score?

19            MR. MORGAN:  Object to the form.

20   A.    I do not remember them encouraging us not to use

21   a cutoff.

22   Q.    And the second question is:  The answer you just

23   gave me is, I don't remember; is that correct?

1          MR. MORGAN:  Object to the form.

2    A.   That's correct.

3    Q.   Was it you, in fact, that suggested the cutoff

4         score of 70 to other members of the group with

5         the City of Auburn and CWH?

6    A.   I may have, yes, sir.

7    Q.   And why did you suggest 70 as a cutoff score, if

8         you did?

9    A.   As we were having the discussion with CWH and

10        the rest of the group, it was agreed that that

11        was a state certification standard, that you

12        could not obtain a certification without scoring

13        a minimum of 70 on an exam, that that was a

14        standard in the three to five classes that the

15        National Fire Academy has tests in.  That was

16        also an educational standard, that anything

17        below a 70 was not a transferable grade -- i.e,

18        a "D" in most schools -- and therefore would not

19        meet an educational standard as well.

20             So those three items were the argument-- my

21        side of an argument -- not argument but

22        discussion points -- in that saying that if you

23        could not obtain a 70, you really hadn't

26

1   achieved anything.

2   Q.   So --

3   A.   That was transferable.

4   Q.   So it sounds to me like you did suggest 70 as

5        the cutoff score.

6   A.   I'm sure in the discussion with everybody else,

7        yeah, we -- Again, I may have suggested it, but

8        I had thought about it.

9   Q.   Was it your perception that the people at CWH

10       didn't know all that stuff you just told me

11       about the 70 cutoff score?

12  A.   No, sir.  I believe they knew.

13  Q.   Were they suggesting a different cutoff score?

14  A.   Not that I recall.

15  Q.   Was there some reason why you were having to

16       explain all the reasons why 70 should be a

17       cutoff score to the people at CWH that you feel

18       like already knew all the things you were

19       telling them?

20  A.   Well, I think it was part of the discussion as a

21       group:  What would be your -- What would be your

22       points to make that decision on.

23  Q.   I think you've already testified to this, but

27

1    it's your testimony that you decided in

2    conjunction with the other members of the group

3    with the City of Auburn along with CWH that a

4    test that included a cutoff score should be used

5    in advance of the assessment center, correct?

6              MR. MORGAN:  Object to the form.

7    A.   Yes, sir.

8    Q.   You couldn't get to the assessment center

9    without passing the test, correct?

10             MR. MORGAN:  Object to the form.

11   Q.   Is that correct?

12   A.   That's correct.

13   Q.   I guess you heard my questions to Chief Langley

14   a minute ago or maybe -- I don't remember who it

15   was.  But you'll agree with me that the test and

16   the assessment center are two separate entities;

17   is that correct?

18             MR. MORGAN:  Object to the form.

19   A.   No, sir, I don't agree with you.

20   Q.   You don't agree with that.

21        So you disagree with -- I'm not going to

22   read it again.  You disagree with the definition

23   of assessment center provided by CWH in the

1        Auburn Fire Division Orientation Manual?

2                MR. MORGAN:  Object to the form.

3    A.   May I read it, sir?

4    Q.   Sure.  It's under, What Is an Assessment Center.

5    A.   I agree with portions of this, but I don't agree

6         with the entire definition they are using.

7    Q.   So you disagree with the entire definition of

8         assessment center provided by CWH, which is the

9         company y'all contracted with in order to

10        conduct the assessment center; is that correct?

11               MR. MORGAN:  Object to the form.

12   A.   Not with the entire definition, no, sir.

13   Q.   So it's your testimony that a test -- that this

14        test for the battalion chief was part of an

15        assessment center?  Is that what you're saying?

16   A.   Yes, sir.

17   Q.   Isn't the point of an assessment center that

18        somebody neutral --

19               (Brief interruption.)

20   Q.   Isn't the main objective behind an outside

21        assessment center that the assessment center is

22        conducted by someone neutral that has no

23        connection with the fire department?

1           MR. HORSLEY:  Object to the leading.

2  A.   I don't remember CWH ever telling us not to use

3     a cutoff.

4  Q.   Now, let me show you Plaintiff's Exhibit 19, the

5     concern of CWH about some candidates not being

6     prepared for battalion chief based on experience

7     and rank.

8         Did that concern come up after the

9     eligibility was opened up to everybody?

10  A.   I believe so, yes, sir.

11         MR. HORSLEY:  Object to the form.

12  Q.   That concern had to do with firefighters being

13     eligible to apply for battalion chief?

14  A.   Yes, sir.

15  Q.   Were any of the people who were promoted to

16     battalion chief firefighter -- rank of

17     firefighter?

18  A.   No, sir.

19  Q.   And Lovvorn, Jordan, Hartsfield, and Darby, had

20     they all been student firefighters?

21  A.   Yes, sir.

22  Q.   Are student firefighters certified to be

23     firefighters?

40

1   A.    Yes, sir.

2   Q.    But that time doesn't count towards their

3         seniority once they become career firefighters?

4                     MR. HORSLEY:  Object to the form.

5   Q.    Does it or does it not?

6   A.    We haven't counted it towards -- We don't count

7         seniority typically for any reason.  We don't

8         use it for promotions or anything.

9   Q.    But as a student firefighter, those people are

10        certified and do they do everything that a

11        career firefighter does?

12                    MR. MORGAN:  Object to the form.

13  A.    For the most part, yes, sir.

14  Q.    How long has Lovvorn been a certified

15        firefighter working with the City of Auburn

16        either as a student firefighter or a career

17        firefighter?

18  A.    Probably ten or more years.

19  Q.    And how about Jordan?

20                    MR. HORSLEY:  Objection.

21  A.    Twelve years.

22  Q.    How about Hartsfield?

23                    MR. HORSLEY:  Object to the form.

41

1   A.   Approximately ten years.

2   Q.   And how about Darby?

3   A.   Thirteen to fourteen years.  Twelve to fourteen

4        years.  I'm sorry.

5   Q.   In your opinion were they in any way lacking in

6        experience or job knowledge to be a battalion

7        chief?

8                  MR. HORSLEY:  Object to the form.

9   A.   No, sir.  They showed themselves to be the best

10       candidates.

11                 MR. MORGAN:  That's all I've got.

12                 MR. HORSLEY:  I forgot to mark

13                    Langley's answers to

14                    interrogatories and Lamar's.

15       (Plaintiff's Exhibits 22 & 23 marked

16                    for identification.)

17                 MR. HORSLEY:  What I have marked as

18                    22 are Chief Langley's answers to

19                    interrogatories.  And these are

20                    going to remain the same once --

21                    or the signed copy is going to be

22                    the same as Exhibit 22, correct,

23                    Randall?

# EXHIBIT "J"



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

FEB 1 5 1991

THOMAS ... C. ... CLERK

CLINTON W. HAMMOCK, et al.,          )
                                     )
            Plaintiffs,              )
                                     )
                                     )
                                     )         CV-87-680-E
vs.                                  )
                                     )
                                     )
THE CITY OF AUBURN, et al.,          )
                                     )
            Defendants.              )

## ORDER APPROVING SETTLEMENT AGREEMENT

On this the 1st day of February, 1991, at 9:00 A.M., the day and date set for the Fairness Hearing on the proposed Settlement Agreement in the above case, the parties appeared in Open Court. Several written objections to the Settlement Agreement had been filed, which the Court considered. The attorneys for the parties, namely Arnold W. Umbach, Jr., attorney for the City of Auburn; Hon. Stephen R. Glassroth, attorney for the past and present white firefighters, Hon. Deborah H. Biggers, attorney for the past, present and future black firefighters, and Hon. Dudley Perry, Jr., attorney for the white future firefighters, appeared in Court and represented to this Court that the proposed Settlement Agreement represented a compromise by all parties and all attorneys recommended the Settlement Agreement to the Court on behalf of their clients. The Court gave an opportunity to all class members present to express any opinions which they might have regarding the

EOD  2-15-91

PLAINTIFF'S EXHIBIT




proposed Settlement Agreement and no member of the class spoke. The Court is therefore of the opinion that the proposed Settlement Agreement should be approved and it is

ORDERED, as follows:

1. That the Settlement Agreement dated November, 1990, submitted to this Court is hereby approved and all parties are hereby directed to implement the terms and conditions of said Notice of Proposed Class Settlement.

2. That the matters involving the attorneys' fee for Perry & Perry is reserved for future decision by this Court.

3. That a copy of this Order be mailed postage prepaid or hand-delivered by the Clerk of this Court to the following:

Arnold W. Umbach, Jr.
Walker, Hill, Adams,
    Umbach, Meadows & Walton
Attorneys for the City of Auburn
P. O. Box 2069
Opelika, AL  36803-2069

Hon. Stephen R. Glassroth
P. O. Box 910
Montgomery, AL 36102

Hon. Deborah H. Biggers
P. O. Box 1258
Tuskegee, AL  36083

Hon. Dudley Perry, Jr.
111 Washington Avenue
Montgomery, AL  36104

ENTERED this __15th__ day of February, 1991.

ROBERT E. VARNER, District Judge

**EXHIBIT    A**

FILE[

NOV 14 1990

THOMAS C. C[VER]

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CLINTON W. HAMMOCK, et al.,    )
                               )
            Plaintiffs,        )
                               )
vs.                            )    CV-87-680-E
                               )
THE CITY OF AUBURN, et al.,    )
                               )
            Defendants.        )

NOTICE OF PROPOSED CLASS SETTLEMENT

TO:  Former, Present, and Future Employees of
     the City of Auburn Fire Department who
     are members of the Plaintiff Class in
     Civil Action No. 87-V-680-E

     A lawsuit pending in this Court, Civil Action No.
87-V-680-E involving a claim by Clinton W. Hammock and others
against the City of Auburn, Jan M. Dempsey, Mayor of the City of
Auburn; Tejeda, Personnel Manager for the City of Auburn; the
City Council of the City of Auburn, Robert Gastaldo, Samuel
Harris, Mary Fortenberry, Sam Teague, Lamar Sellers, Frances W.
Hale, W. G. "Trey" Johnston, and Bill Ham, Jr., was settled
pursuant to a Notice of Proposed Class Settlement, which, if you
are a member of the class, you should have received on or about
August 22, 1988. Since the settlement of this class action
suit, several issues have been brought before this Court
concerning the enforcement of the provisions of the settlement
decree. Currently pending before this Court are Objections of

███████████████    ███████████████ ██

EXHIBIT C

1

EXHIBIT    A   ▓



Dexter Card and William Felton To Proposed Settlement of Class Action, Objections of Members of Subclass of Past, Present, and Future Black Firemen, and Response of the Class Consisting of Present and Future Auburn Firefighters to the Order to Show Cause of February 16, 1990, all filed by class counsel.

The purpose of this notice is to advise you of the status of proposed settlement of all issues involved.

Subject to the approval of the Court the Plaintiffs and the Defendants have agreed on a settlement of the issues. The terms of agreement are in the Memorandum of Understanding which states:

## MEMORANDUM OF UNDERSTANDING

1. **STUDENT FIREFIGHTERS.** Within thirty days the City will issue a statement restating in substance those matters set forth in the plan submitted on February 3, 1989, (the Plan) to the U. S. District Court in this case and indicating, among other things, the following:

A. That the Student Firefighters are not Regular Firefighters. "Regular Firefighters" includes all permanent full-time Firefighters except Student Firefighters.

B. The Student Firefighters and their leaders are all under the direct supervision and control of the Fire Chief and the officers of the fire department. Student Firefighters have



[] 006



no control or authority over any Regular Firefighters at any time.

C.  The Student Firefighters do not automatically become Regular Firefighters but may, of course, apply for the position of a Regular Firefighter in the event such position becomes available.  The Student Firefighters are not eligible for any promotions within the fire department except for the promotion to student positions within the Student Firefighters section.

D.  The Student Firefighters may be used as deemed appropriate by the City.  When the Career Firefighters arrive, the Senior Career Fire Officer or his designee shall assume command immediately upon their arrival.  All Student Firefighters and Career Firefighters shall work together to carry out the directions and instructions of the Senior Career Fire Officer or his designee.  In the event that a third firestation is built by the City, the City may make a determination to use Student Firefighters to man the third firestation.

E.  No parties challenge the selection process of student team leaders.  In addition all parties agree that the City's obligation to hire black Firefighters does not apply to Student Firefighters and the City may hire Student Firefighters without regards to said Order but may not, of course, discriminate in its hiring practices based upon race.

EXHIBIT    A

 

2.   KENNETH RIDLEY AND THOMAS SCOTT.  Within thirty
days from the approval of this settlement, the City shall pay
both Mr. Ridley and Mr. Scott from November 17, 1988, until the
date of their re-hiring by the City of Auburn.  Said sum shall
be treated as compensation with the appropriate withholding and
deductions.  In addition, if the City has not reinstated Mr.
Ridley and Mr. Scott at their previous seniority level,
including their prior grade and step, with the same accumulated
vacation days and sick leave days as of the date of their last
employment with the City prior to 1989, the City shall do so
within 30 days of the approval of this settlement and shall
issue a written statement to be placed in their personnel file,
stating that the seniority, vacation days and sick leave has
been so reinstated.

3.   CAFETERIA PLAN.  Within thirty days, the City will
obtain from the Administrator of the City's Cafeteria Plan a
statement indicating all reserves, including cash reserves and
other reserves, available to any Firefighter, and a complete
accounting of the disposition or transfer of any such cash
reserves.  Further, the City will joint with Plaintiffs to
assist the Firefighter in obtaining all benefits to which they
are entitled under the Cafeteria Plan, and under all insurance
policies within such Cafeteria plan, and under all insurance
policies within such cafeteria plan to which the Plaintiffs have

**EXHIBIT    A    1**





made payments, and to be sure that the Cafeteria Plan has been administered in accordance with applicable regulations.

4. **BILL PELTON.** In addition to the above matters pertaining to the City's Cafeteria Plan, within thirty days, the City will furnish to Mr. Pelton a statement of his plan and determine whether inappropriate deductions have been made from his paycheck and whether certain benefits are due. If it is determined that benefits are due to him or that inappropriate deductions have been made the City will cooperate to require the insurance company to fulfill its obligations.

5. **CAREER PLAN.** Within thirty days from the approval of this settlement, the City will modify the Career Plan currently submitted to the Court in this matter so that all deadlines set forth therein are extended for one year past the previous deadlines set forth in said Career Plan. In addition, no Firefighters shall be required to sit for nor pass the Firefighter II examination given by the State of Alabama. All Firefighters must, however, complete all training for the Firefighter II certification as given by the City of Auburn and pass all practical tests and examinations given by the City, whether written or oral which relate to said training. So long as each Firefighter is making a good faith effort to successfully complete the tests and examinations, each Firefighter shall be allowed the opportunity to take such tests and examinations as many times as may reasonably be required in

# EXHIBIT     A

5



order to pass. All Firefighters, even those who do not pass the State Firefighter II certification, will be required to take additional training as required by the Career Plan, with said training to include but not be limited to Fire Apparatus Operator training. The exemption to the requirement for the Firefighter II certification shall apply to Chris Turner referred to in Paragraph 11 below, but shall not apply to any Fire Officer, present or future, nor to any Firefighter hired after the date of this Agreement. In addition, all Firefighters understand and acknowledge that the failure to obtain the Firefighter II certification probably will affect future raises, promotions and job tasks.

City shall have the right to delete courses and requirements from the Career Plan if in the judgment of the City such requirements are no longer needed or required. City shall also have the right to amend the Career Plan to reflect future state or federal requirements and change in the mission of the Fire Division.

All other matters set forth in said Career Plan shall be approved by all parties and can immediately be implemented by the City.

The City shall amend the job descriptions in the Career Development Plan if necessary, so that said job descriptions correctly reflect the actual job tasks performed by each position with the Fire Division of the Department of Public

EXHIBIT    A

800☒    09/10/2015 00:46 FAX

 
Safety of the City and are consistent with the current job
descriptions for each position in the Fire Division of the
Department of Public Safety of the City.

Upon approval of this Settlement Agreement by the Court and
the Class, the Career Plan will be amended to be consistent with
the changes set forth herein.

6.. PHYSICAL FITNESS PLAN. The City shall modify the
Physical Fitness Plan currently submitted to the Court so that
by adopting Section 2-3.1 of the Physical Fitness Plan required
by the National Fire Protection Association, NFPA 1001
Firefighter Professional Qualifications, 1987 Edition, so that
the criterion reference norms set forth in the Physical Fitness
Plan shall be as follows:

## CRITERION REFERENCE NORMS

| Field Test | Males | Females |
|---|---|---|
| Percent Body Fat | max 19%-25% age related | max 23%-29% age related |
| Sit ups | min 30 | min 30 |
| Sit and Reach | min 23 cm | min 23 cm |
| Step test | Good level based on age (See Table B.4) | Good level based on age (See Table B.5) |

# EXHIBIT    A

7

 
Each Firefighter shall complete one of the following:

| | Males | | Females | |
|---|---|---|---|---|
| 1 1/2 mile run | under 30 | 13:00 min | under 30 | 13:00 min |
| | 30-39 | 13:00 min | 30-39 | 13:00 min |
| | 40-49 | 14:00 min | 40-49 | 14:00 min |
| | over 50 | 14:30 min | over 50 | 14:30 min |
| Walk 3 miles | 38 min | | 38 min | |
| Bicycle 4 miles | 12 min | | 12 min | |
| Swim 500 yards | 8 min 20 seconds | | 8 min 20 seconds | |
| Run in Place 75 steps per minute | 15 min | | 15 min | |
| Run on a motorized horizontal treadmill 10 miles per hour | 6 min | | 6 min | |

The Physical Fitness Plan currently submitted to this Court with the above modifications shall be approved and the City may immediately implement said Plan.

EXHIBIT A

8


7. WELDON AND FORTNER. The City will in good faith attempt to convince the Retirement Systems of the State of Alabama to accept its contributions on behalf of Mr. Weldon and Mr. Fortner in accordance with the previous order of this Court. It is the understanding of the parties that such attempt, if necessary, will include litigation on behalf of Mr. Weldon and Mr. Fortner. The City shall proceed in good faith to promptly obtain such ruling.

8. SICK LEAVE. The City represents that it has included in the Sick Leave Plan submitted to the Court in this matter a statement indicating that co-employees will not check on other employees regarding sick leave. If requested, the City will issue a further statement to this affect.

9. WALTER ALLEN. Within thirty days, the City will grant Mr. Allen two vacation days in exchange for two sick leave days.

10. MINIMUM PERMANENT FIREFIGHTER STAFFING. For a period of seven years from October 1, 1990, the City shall maintain 33 permanent Firefighters which 33 permanent Firefighters shall include the Fire Chief, Deputy Chiefs, Captains, Lieutenants, Student Team Leaders and Firefighters. In addition, the City agrees to maintain within said minimum number of 33 Permanent Firefighters, six Captains and six Lieutenants. The City may, in its sole discretion and with the consent of the Fire Officer, use the Fire Officers (Lieutenants

EXHIBIT A

9



and Captains) as student team leaders without having to replace the Fire Officers. This commitment by the City shall expire on October 1, 1997.

11. BLACK FIREFIGHTERS. Upon the execution of this Agreement, the City agrees to hire Chris Turner as a Probational Firefighter for a period of one year, and if Chris Turner completes all of the requirements for a Permanent Firefighter, which shall include the 240 hours of training required by the State of Alabama, passing the required physical examination by Dr. Jimmy Mathews and satisfactorily complying with all of the rules and regulations of the Fire Division during the one-year period, he may become a Permanent Firefighter within the one-year period. In such event the City shall retain Chris Turner as a Permanent Firefighter, subject to the rules and regulations of the Fire Division of the Public Safety Department of the City including all provisions of the Career Plan. Mr. Turner shall <u>not</u> be required to sit for nor pass the Firefighter II examination given by the State of Alabama. He must, however, complete all training for the Firefighter II certification as given by the City of Auburn and pass all practical tests and examinations given by the City, whether written or oral, which relate to said training. If Mr. Turner does not complete all of the requirements to become a Permanent Firefighter within the one-year period, the City shall not be obligated to retain him. In addition, the City agrees that the next two Regular

EXHIBIT    A

10


Firefighters hired by the City shall be black Firefighters.
These Firefighters shall be hired when the City next hires
Regular Firefighters.

12.  **ASSESSMENT CENTER.**  The City has submitted to this
Court an Assessment Center which shall be approved by the Court
and implemented by the City for use in the promotion of
Lieutenants and Captains with the Fire Division.
Notwithstanding any language to the contrary contained in the
City of Auburn Assessment Center Candidate Orientation Manual,
all promotions subject to Assessment Center involvement shall be
made by promoting the candidate rated Number 1 by the Assessment
Center for each such promotion.

13.  **BILL FELTON AND JESSIE STRICKLAND.**  Immediately
upon the execution of this Agreement, the City shall promote
Bill Felton and Jessie Strickland to Lieutenant and shall pay to
Bill Felton and Jessie Strickland within thirty days thereof,
back pay at Grade 34, Step 10 from March 1, 1990, until the date
of promotion by the City.  The City shall not be required to
promote any other individual to the rank of Lieutenant, whether
~~or not any individual has applied for the position of Lieutenant~~
prior to the date of this Agreement.

14.  **DAY.**  The day will be defined as follows:  For
Firefighters on a 56-hour work week, 10.6 hours per month will
be earned for all employees hired after February 3, 1989.  For
full-time Firefighters who work a 56-hour week and were hired

EXHIBIT    A    11

014                                                    09/10/2015 03:48 FAX

Case 3:07-cv-00867-WKW-WC   Document 76-11   Filed 08/11/2008   Page 15 of 18

Case 3:07-cv-00867-WKW-WC   Document 1-8   Filed 10/01/2007   Page 14 of 17
Case 3:07-cv-00?   -MEF-WC   Document 1-2   Filed 0?  ?/2007   Page 14 of 17

prior to February 3, 1989, annual leave shall be earned based on
one 24-hour shift per month. For all personnel of the Fire
Division not on the 56-hour week, adjustments will be made
accordingly.

15. RETALIATION PROHIBITED. The City shall not
retaliate against any member of the class.

16. ENTIRE AGREEMENT. This Settlement Agreement
expresses the entire agreement between the parties hereto,
whether oral or written, and incorporates herein all other
matters agreed upon by the parties in the settlement of this
lawsuit.

### General

1. The City shall be provided Full and Final Releases from
all individuals adverse to the City in Clinton W. Hammock, et
al. vs. City of Auburn, Civil Action No. CV-87-V-680,
specifically releasing the City and all individuals it so
chooses of any and all liability or obligations of any kind in
connection with the events which are the basis of said lawsuit.
This lawsuit shall then be dismissed with prejudice and the
Plaintiffs shall bear their own costs.

2. ATTORNEY'S FEES. The matter involving any attorney
fees due to Perry & Perry is reserved by the Court for final
decision after hearing evidence thereon. The City shall pay to



EXHIBIT A

12



Deborah Hill Biggers the sum of $15,000.00 and shall pay to the
law firm of Kendrick and Glassroth the sum of $10,000.00.

## SETTLEMENT HEARING

The Court will hold a hearing in the United States District
Courthouse in Montgomery, Alabama, on  February 1, 1991  , at
 9:00   A.M., to determine whether, as recommended by both
class counsel, it should approve the proposed settlement.

Objections to the proposed settlement by class members will
L. considered by the Court but only if such objections are filed
in writing with the Court on or before  January 15, 1991  .
Attendance at the hearing is not necessary; however, class
members wishing to be heard orally in opposition to the proposed
settlement should indicate in their written objection their
intention to appear at the hearing.

Class members who support the proposed settlement do not
need to appear at the hearing or take any other action to
indicate their approval

## FURTHER PROCEEDINGS

If the settlement is approved by the Court, the entire
Memorandum of Understanding will be put into effect and the
entire amount of damages, including fees, costs and expenses,

# EXHIBIT A

13



will be paid to the Clerk of this Court, who will make
distribution in accord with the terms of the Memorandum of
Understanding.

If settlement is not approved, the motions and other
matters will be prepared for judicial resolution of the claims
and defenses concerning this Courts prior order and the other
matters.

<u>ADDITIONAL INFORMATION</u>

Any questions you have about the matters in this notice
should not be directed to the Court, but may be directed by
telephone or letter to:

    Deborah Hill Biggers
    113 East Northside
    Tuskegee, AL  36083

    Stephen R. Glassroth
    Kendrick and Glassroth
    505 South Perry Street
    P. O. Box 910
    Montgomery, AL  36101-0910

or

    Robert T. Meadows, III or
    Arnold W. Umbach, Jr.
    Attorneys for the Defendant, the City of
    Auburn, Mayor Jan Dempsey, Douglas Watson,
    Ron Tejeda, and the Members of the City
    Council of the City of Auburn
    Walker, Hill, Adams, Umbach & Meadows
    P. O. Box 2069
    Opelika, AL  36803-2069
    Telephone:  (205) 745-6466

EXHIBIT  A

14

Case 3:07-cv-00867-WKW-WC     Document 76-11     Filed 08/11/2008     Page 18 of 18

Case 3:07-cv-00867-WKW-WC     Document 1-8     Filed 10/01/2007     Page 17 of 17
Case 3:07-cv-001     MEF-WC     Document 1-2     Filed 02   7/2007     Page 17 of 17

You may, of course, seek the advice and guidance of your
own attorney if you desire.  The pleadings and other records in
this litigation, including a complete copy of the proposed
settlement agreement, may be examined and copied at any time
during regular office hours at the office of the Clerk, Federal
Courthouse, Montgomery, Alabama.

## REMINDER AS TO TIME LIMITS

If you wish to object to the proposed settlement, file your
written objections with the Clerk of the Court on or before
January 15, 1991            .  Include any request to be heard
orally at the hearing.

DATED:  February 14, 1990

Thomas C. Caver
THOMAS C. CAVER, Clerk
United States District Court for
the Middle District of Alabama
P. O. Box 711
Montgomery, AL  36101

EXHIBIT     A

15

# EXHIBIT "K"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

EDDIE OGLETREE, an individual,
GERALD STEPHENS, an individual,

      Plaintiffs,

vs.

CITY OF AUBURN, et al.,

      Defendants.

CASE NO.: 3:07-cv-867-WKW

## AFFIDAVIT OF LEE LAMAR

Before me, the undersigned authority in and for said county and state personally appeared Lee Lamar who being known to me and being first duly sworn, deposes and says under oath as follows:

1.    My name is Lee Lamar. I am an adult over the age of nineteen and I have personal knowledge of the following matter.

2.    I was first employed with the City of Auburn in January 1980 and after four years, I went part-time. In November 1985, I resumed full-time employment.

3.    I was named acting Fire Chief in December 2007 and was given the permanent position July 2008.

4.    Before becoming Fire Chief, I was the Deputy Fire Chief and before that position, I was the Training Officer for the division. I obtained the Training Officer position in 2001. There was a posting for anyone who was interested in the job and to the best of my knowledge I was the only person who applied. This was a lateral move from Team Leader on shift. There was no increase in pay or rank until the job was reclassified by Condrey and Associates in 2004. It was not a promotion in 2001. Gerald Stephens applied for this job in June 2005, after I was already in the Deputy Chief position.

5.    Since 1991 assessment centers have been used for certain promotions –
Captains and Lieutenants. In 1989 a student firefighter program was developed that resulted in
some career fire fighters being promoted to Team Leaders as opposed to Lieutenants. The
position was the same in pay and had similar job duties. Over time the job descriptions became
identical and have been so for more than five (5) years.

6.    In November 2004, the Captains petitioned the City to retitle the position
Battalion Chiefs. The change was made. It was in not a promotion. There was no change in
rank, pay or job descriptions. No one complained about the decision or challenged it at the
time. It was just a title change. Prior to the petition, the last promotions to Captain occurred in
1996 (when the last Lieutenant promotions were made). The next promotion for this position
occurred in February 2006 when there was a posting for Battalion Chief positions. At that time,
an assessment center was utilized to make the promotions. An outside consulting firm (CWH)
assisted the City in implementing the assessment center.

7.    The Team Leaders petitioned the City to change their titles to Lieutenants
because there was no difference in the two positions in regards to pay and job description.
Because the Team Leaders had undergone a promotional process similar to Lieutenants in
reaching the position and because the Team Leaders wanted the change and because there
was no difference in the positions, the title change was made. 27 of 30 affected Fire Division
employees voted for the name change. The change became effective on February 1, 2006

8.    When the assessment center was conducted for Battalion Chief promotions in
2006, there was a written test component. It was explained to the applicants during orientation
and through the written study and instructional materials distributed for test preparation that any
test taker could challenge a question on the exam before leaving the testing center. Joe Darby
challenged five questions before he left the testing center when he turned his test in. As a result
of that challenge, CWH determined that three of the questions would stand and that in relation
to the other two questions, all test takers would be scored as if getting the answers to those two

questions correct. The challenge and response thereto affected all test takers equally. While I am personally aware of how this matter was handled, it was CWH personnel that handled the challenges and CWH made the decision of how it would be resolved.

9.      When it was determined that nonprobationary firefighters and probationary and nonprobationary Lieutenants could apply for the position of Battalion Chief, no one complained about those individuals being eligible for the position. Nothing in the City's personnel policies prohibited these individuals from applying for the position and allowing such was consistent with past practices of the fire division.

10.     Nothing in the City personnel policies require that an employee hold a specific rank before applying for a higher level position. For example, an individual does not have to be a Lieutenant to become a Captain. As such, Chris Turner was allowed to apply for Battalion Chief in 2006. Such was consistent with past practices.

Further affiant saith not.

Dated this the 11th of August 2008.

_____
Lee Lamar

STATE OF ALABAMA       )

COUNTY OF LEE       )

     Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared Lee Lamar who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

_____
NOTARY PUBLIC

(SEAL)                         My Commission Expires._____

Candace C. Curenton
Notary Public
Lee County, Alabama State at Large

My commission expires:
July 25, 2011

# EXHIBIT "L"



December 21, 2005

Mr. Steven Reeves
City of Auburn Human Resources
HR Director
144 Tichenor Avenue
Auburn, AL 36830

Dear Steve:

Enclosed please find two signed originals of the contract between The City of Auburn, Alabama and CWH Research, Inc. Please sign both agreements, retain one original for your file and return the other original to me for our file.

Sincerely,

Michael D. Blair
Manager of Consulting Services
CWH Research, Inc.



## LETTER OF AGREEMENT

THIS AGREEMENT is made this 21st day of December, 2005 between the City of Auburn, Alabama (hereinafter called "the Client") and CWH Research, Inc., (hereinafter called "CWH") a Colorado Corporation, whose business address is 9085 E. Mineral Circle, Suite 350, Englewood, CO 80112. 

1) The Contract. This document is a complete agreement.

2) Definitions. When used in this Agreement, the following words and phrases shall have the indicated meanings:

   a) candidate - an individual who appears at the testing site and begins the written test.

   b) written test - a written measuring instrument and accompanying answer sheets, which may or may not be combined with other instruments into a single battery.

   c) qualified administrator – an individual who has had previous experience in written test administration, has been apprised of the confidential nature of the tests, the importance of fair and impartial testing, and the importance of maintaining strict test security. Further, this individual shall have read the CWH general instructions for written test administrations, and shall have been approved by CWH.

   d) written test session - the period from commencement of the first test in a CWH promotional test battery to the last test in that battery, occurring on the testing date (s) agreed upon by CWH and client.

   e) assessment center - exercises or simulations designed to measure candidates' knowledge, skills, and abilities, as well as the scoring of those candidates' performance on each of the exercises and simulations.

   f) assessor - an individual who has been trained in the use of assessment centers and the evaluation of candidates' performances in assessment centers. Further, the assessor or assessors shall have been apprised of the confidential nature of the assessment center exercises, the importance of fair and impartial evaluations, and the importance of maintaining strict security over all elements of the assessment center.

   g) assessment center test session - the period from commencement of the first set of assessment center exercises to the last exercise and final evaluation of candidates, occurring on the testing date (s) agreed upon by CWH and the Client.

   h) oral board – series of structured interview questions designed to measure candidates' knowledge, skills, and abilities, as well as the scoring of those candidates' performance on each of the questions.

   i) oral board test session – the period from commencement of the first oral board question to the last question and final evaluation of candidates, occurring on the testing date (s) agreed upon by CWH and the Client.

3) Services to be Performed by CWH. CWH is an independent contractor and is not an agent, servant, employee or partner of the Client, and nothing contained herein shall be deemed or construed by the parties hereto or by any third party as creating a relationship of principal and agent or partnership or joint venture between the parties. CWH shall perform services for the Client in the categories listed below (collectively, the "Services"). These categories, and some, but not necessarily all, of the major services to be performed for the **Fire Battalion Chief** position as follows:

   a) Job Analysis Review
      (1) Job analysis review includes conducting interviews to develop test instruments and to provide a content valid process.

# CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO  80112
303-617-3433

b)  Written Test Development
   (1)  Developing and validating a semi-customized written exam composed of 70 to 80 traditional job
        knowledge written items and 20 to 30 situational judgment items.  Includes recommendations as to the
        format of the questions and answers, the number of questions to be included and the study sources.
        Includes up to 30 custom test items designed specifically for the client.
   (2)  Provide master copy of the exam, the delivery of the exam and answer sheets, scoring of the exam, and
        handling appeals.

c)  Test Scoring
   (1)  Score tests.
   (2)  Conduct relevant statistical analysis.
   (3)  Consult with the Client regarding the format and structure of the final eligibility lists.
   (4)  Provide results in written format within two weeks after completion of the exams.
   (5)  Handle test challenges or concerns.

d)  Assessment Center
   (1)  Develop one set of exercises for each position, selecting three of the following for each position:  In-
        basket, Oral Resume, Oral Presentation, Written Exercise, Role-Play or Emergency / Tactical
        Scenario.
   (2)  Provide candidate orientations, conduct rater training, conduct training for Client staff as required or
        needed.
   (3)  Provide assessor training.
   (4)  Administer process to up to 12 candidates (one day of testing).
   (5)  Score.

e)  Feedback
   (1)  Provide written feedback letters to candidates.
   (2)  Provide process summary to Client.

f)  Validity.  CWH shall conduct a content validation process for the test(s).  This validation will meet and
    adhere to the following standards and guidelines:

   (1)  Federal EEOC Uniform Guidelines on Employment Selection Procedures.
   (2)  Principals for the Validation and use of Personnel Selection Procedures.
   (3)  Standards and Ethical Considerations for Assessment Center Operations.
   (4)  Standards for Education and Psychological Tests.

# CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

4) <u>Payment for Services</u>. In consideration of the Services of CWH, the Client shall pay CWH the total sum shown below for services. Travel expenses will be billed at additional cost.

Breakdown for services is as follows:

| Service | Cost |
|---|---|
| Job Analysis Review | Included |
| Semi-Customized Written Test | |
|     Technical Job Knowledge Component | $2,500.00 |
|     Situational Judgment Component | $4,500.00 |
| Assessment Center | $10,000.00 |
| | |
| TOTAL (excluding options and expenses) | $17,000.00 |
| | |
| | |
| OPTIONS: | |
| Written Feedback Letters ($125 per candidate – assumes 10 candidates) | $1,250.00 |
| Additional days of assessment center administration | $800 per day |
| "Hot Seat" exercise | Not included |
| CWH obtaining assessors | Not included |
| | |

Payment to be made as follows (excludes options and expenses):

| | |
|---|---|
| 25% upon initiation of contract | $4,250.00 |
| 25% upon completion of SME test development meeting | $4,250.00 |
| 25% upon completion of written test | $4,250.00 |
| 25% upon completion of assessment center | $4,250.00 |

Options will be billed with the final invoice following completion of the assessment center.

All travel and additional expenses will be billed at cost as incurred or at the below standard rates. These expenses will include the following categories and rates:

| | |
|---|---|
| Airfare | Economy class, with first class upgrades paid for by CWH mileage points. Cost varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Hotel charges | Mid priced hotel, such as Marriot, Hilton, etc. We use government rates and discounts when possible. Cost varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Per Diem | $45 per day, or $15 per meal. |
| Mileage to/from airport and to/from client site | $0.42 cents per mile, plus applicable tolls. |
| Rental car | Mid size car. Varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Shipping | US Postal service or FED EX is generally used, depending upon requirements. 2 day shipping is generally used, unless overnight is required. |

# CWH Research, Inc.
9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

This price includes the complete and satisfactory performance of the Services specified in this Agreement. Optional components may be selected by client for additional charges noted.

If any additional work is required beyond what this contract states, Dr. Hornick will provide his assistance at the rate of $250 per hour. Any additional work provided by other personnel in CWH will be charged at the rate of $175 per hour for Managing Consultants, $125 per hour for Consultants, and $50 per hour for clerical.

Expert Testimony. CWH shall provide expert testimony concerning any aspect of its work related to this contract and/or the resultant defense of all related products. This testimony and any necessary preparation will be performed at the hourly rate mentioned above, plus any travel or other related expenses which are incurred.

5) Client Responsibilities. In addition to paying CWH for services according to the preceding paragraph, the Client shall have the following responsibilities:

   a) The Client shall provide for the written test and assessment center appropriate testing site(s) and materials, including rooms and furniture conducive to the taking of tests. In addition, all necessary supplies needed by candidates, assessors, and proctors during the written test and assessment center shall also be provided by Client.

   b) The Client shall make arrangements for qualified written test and assessment center administrators and proctors. The qualified administrators must be approved by CWH.

   c) The Client shall make all notifications to those people who are eligible to take the test. These notifications include, by way of explanation, but not by way of limitation: testing dates, testing times, and testing places. Further, Client shall make all reasonable attempts to provide for notifications, testing opportunities, and similar concerns to all candidates in a fair and impartial manner.

   d) The Client shall supply sufficient numbers of assessors and role players to conduct the assessment centers, based on criteria established by CWH. Should these assessors or role players require payment for their time or expenses, the Client agrees to assume full responsibility for these costs.

   e) CWH will retain the copyrights to all materials developed in the performance of this contract. CWH will, however, grant the Client a non-exclusive, royalty free license to use the selection procedures that will be developed for the duration of this contract. Client shall not reveal the contents of the tests to anyone without the written consent of CWH. The Client assumes full responsibility and liability for any violation of this provision by its employees and/or agents to the extent such employees and/or agents were acting within the scope of their employment and or agency.

   f) Client shall return all testing materials provided by CWH, to CWH.

6) Provisions of the Contract. The following provisions are made a part of this contract:

   a) Non-Discrimination. CWH certifies and represents that, during the performance of this Contract, Contractor and any other parties with whom it may subcontract shall adhere to equal opportunity employment practices to assure that applicants and employees are treated equally and are not discriminated against because of their race, religious creed, color, national origin, ancestry, handicap, sex or age. Contractor further certifies that it will not maintain any segregated facilities.

   b) Applicable Law. Parties to this contract shall conform with all existing and applicable city ordinances, resolutions, state laws, federal laws, and all existing and applicable rules and regulations. This contract should be construed in accordance with the laws of the State of Alabama. If a dispute arises involving this agreement, and the parties are not able to amicably resolve such dispute, then the parties agree that all claims shall be brought in a Court of Competent jurisdiction located in Alabama.

12/21/2005

# CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

c) <u>Interest of the Client</u>. No elected official or any officer or employee of the Client shall have a financial interest, direct or indirect, in this contract.

d) <u>Interest of CWH</u>. CWH covenants that they presently have no interest and shall not acquire any interest, direct or indirect, which would conflict with the performance of services required to be performed under this contract; they further covenant that in the performance of this contract, no person having any such conflict of interest shall be employed.

e) <u>Maintenance of Records</u>. All appropriate records related to the aforementioned projects will be maintained by CWH for the required statute of limitations.

f) <u>Modification</u>. This contract contains the entire Agreement of the parties. No representations were made or relied upon by either party other than those that are expressly set forth herein. No agent, employee or other representative of either party is empowered to alter any of the terms hereof unless mutually consented to in writing and signed by an authorized officer of the respective parties.

g) <u>Assignment</u>. CWH may not assign its rights under this Agreement without the express prior written consent of the Client, and such successor in interest may not assign its rights under this Agreement without the express prior written consent of the Client. The Client has the right to continue with the assignee or cancel the Agreement with a pro-rata refund.

h) <u>Termination: The Client may terminate this Agreement upon 30 days written notice without cause.</u> Upon delivery of said notice to CWH, CWH shall cease performing any work pursuant to this agreement and shall be entitled to retain that portion of the fee for services performed through and including the 30 days notice period prior to termination.

i) <u>Insurance</u>: CWH will be required to provide certificates of insurance showing that it carries, or has in force, automobile liability insurance, general liability insurance, professional liability insurance and workers' compensation insurance. Limits of liability for automobile liability insurance shall be, at a minimum, $1,000,000.00 combined single limit. Limits of liability for general liability insurance shall be, at a minimum, $1,000,000.00 per occurrence, $1,000,000.00 personal and advertising injury, $1,000,000.00 general aggregate and $1,000,000.00 products/completed operations aggregate. General liability insurance will include coverage for contractually assumed liability. Limits of liability for professional liability shall be, at a minimum, $1,000,000.00 per occurrence or claim and $3,000,000.00 aggregate. If professional liability coverage is on a claims-made basis, CWH will maintain coverage in force for a period of two (2) years following completion of the work specified in the agreement. Workers' compensation insurance shall provide statutory workers' compensation coverage and employers' liability coverage with limits of, at a minimum, $500,000.00 each accident, $500,000.00 disease- each employee and $500,000.00 accident, $500,000.00 disease – policy limit.

The certificate of insurance shall provide the Client with thirty (30) days written notice of cancellation of any of the coverages named in said certificate.

The Client will be named as additional insured under the CWH's general liability insurance and automobile insurance policies.

CWH shall require certificates of insurance from subcontractors. Subcontractors will carry limits of insurance equal to or greater than those carried by the CWH. These certificates shall evidence waivers of subrogation in favor of CWH and the Client and shall be made available to the Client upon request.

j) <u>Indemnification</u>. Each party shall generally be responsible for its own acts and will be responsible for all damages, costs, fees, and expenses, including attorney's fees and costs, which arise out of the performance of

12/21/2005

# CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

this agreement and which are due to that party's own negligence, carelessness, unskillfulness, and other unlawful conduct and/or the negligence, carelessness or unskillfulness or other unlawful conduct of its respective officers, agents and/or employees acting in their official capacities. Provided; however, Client shall defend, indemnify and hold CWH, its officers, agents and employees free and harmless from and against any claims, demands, actions, damages, expenses, fees, liabilities and/or attorney's fees arising out of, by virtue of or associated with the negligence, tortuous acts or other unlawful conduct of Client or its respective agents, officers and employees in the performance of this agreement. Provided however, that Client does not waive its defense of sovereign immunity or any other immunity or privilege afforded by law; nor does client waive official immunity available to any officer, employee, or agent acting by or on behalf of Client. In addition, CWH shall defend, indemnify, and hold Client, its officials, representatives, agents, servants and employees free and harmless from and against any claims, demands or actions brought by third parties which are related in any way or are associated with the negligence, tortuous acts or other unlawful conduct of CWH or its respective agents, officers and employees in the performance of this agreement.

## AUTHORIZED REPRESENTATIVE

In further consideration of the mutual covenants herein contained, the parties hereto expressly agree that for purposes of notice, including legal service of process, during the term of this contract and for the period of any applicable statute of limitations thereafter, the following named individuals shall be the authorized representatives of the parties:

(i)    CLIENT:

Steven A. Reeves

Human Resources Director

130 Tichenor Avenue

Auburn, AL 36830

By:

Name:    David F. Watkins

Title:    City Manager

(ii)    CWH Research, Inc.
Kathryn A. Fox, M.A.
9085 E. Mineral Circle
Suite 350
Englewood, Colorado 80112

Kathryn A. Fox, Vice-President

EXECUTED this 21st day of December, 2005.

# EXHIBIT "M"



# City of Auburn

Home of Auburn University



## "In-House Only"

**PAGE ONE OF ONE**

**CURRENT JOB VACANCIES**
As of February 16, 2006

# FEBRUARY 2006 ANNOUNCEMENT

## HUMAN RESOURCES DEPARTMENT

Applicants have the responsibility of being familiar with the job specifications and/or job requirements. Applications will only be accepted for current vacancies. For updated job opportunities, call the City of Auburn Job Line at (334) 501-7250.

Employees may apply directly to the Human Resources Department.

**POSITION:**                                                    **CLOSING DATE:**

**Battalion Chief (Fire Division)**                          February 28, 2006
A one year hiring list will be established.
Regular/Full-time
Grade 20 - Monthly Salary Per City Policy

The class specification for this position is posted for your review at the Human Resources Department. The City of Auburn is an equal opportunity employer. We provide equal opportunity and equal treatment without regard to race, religion, sex, national origin, citizenship, age or disability. Minorities and women are encouraged to apply. Accommodation considered. The City of Auburn is a smoke-free environment.

*Stephanie L. King*

Human Resources Generalist



# EXHIBIT "N"

**Auburn Fire Division**

# Memo

**To:** All personnel

**From:** D.C. Lamar

**Date:** February 17, 2006

**Re:** Battalion Chiefs Assessment

---

The battalion chief's vacancy has been posted. To be eligible an applicant must be a current non-probationary Lieutenant. Applicants must fill out a City of Auburn application and submit a short one to three page resume. An orientation session is scheduled for 6:00 PM February 28, 2006 at the Public Safety Building large conference room. Candidates must attend the orientation session. Dates for the assessment will be announced at that time. The session will include an explanation of the process and practical information to assist the candidates in preparation. A one year hiring list will be established.

A written exam will be a component of the assessment process. The reading materials have been obtained and will be issued as soon as all applications are received.

All eligible personnel are encouraged to apply and good luck in the process.



DEFENDANT'S EXHIBIT

1

# EXHIBIT "O"

# Memo

To: All Career Personnel



From: Chief Larry Langley

Date: February 23, 2006

Ref: Battalion Chief Assessment

On February 17, 2006 a memo was sent to all personnel on the Battalion Chiefs vacancy explaining that only non-probationary Lieutenants were eligible to apply for the position. After reviewing the current job descriptions and minimum qualifications, it was discovered that non-probationary Firefighters and the probationary Lieutenant are eligible to apply for the Battalion Chiefs Vacancy. I know this is short notice but any of the eligible applicants mention above if interested need to apply by February 28, 2006 at 3:00 PM. Orientation is on February 28, at 6:00 PM in the large conference at the Public Safety Building. This session will include an explanation of the process and practical information to assist candidates.

# EXHIBIT "P"



# City of Auburn
#### Home of Auburn University

Friday April 21, 2006

Lee Lamar, Jr.
City of Auburn, Deputy Fire Chief
161 North Ross Street
Auburn, Alabama 36830



Dear Chief Lamar,

This letter is addressed to you in reference to the April 2006 promotional process for Battalion Chief, which started April 10. According to the City of Auburn Personnel Policies we are exercising our rights to file grievance on the promotional process. This is to include, but not limited to, the following:

-the written exam
-no time in grade policy
-no accumulative point system
-inconsistency of past promotional procedures.

We asked that four written exams be reviewed. Information was received that questions were excluded from the overall exam after testing. We are very concerned which questions were removed and to verify that everyone participating in the exam were equally graded. Understand there are other concerns that may arise from further discussions pertaining to this grievance. In closing we look forward to your immediate response.

Company Officers,

Horace Clanton        Robbie Hodge        Eddie Ogletree        Gerald Stephens