**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EDDIE OGLETREE, an individual,** | * | |
| **GERALD STEPHENS, an individual,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **vs.** | * | **CASE NO.: 3:07-cv-867-WKW** |
| | * | |
| **CITY OF AUBURN, et al.,** | * | |
| | * | |
| **Defendants.** | * | |

---

**DEFENDANTS' MEMORANDUM BRIEF**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

---

Randall Morgan, Esquire
Elizabeth Brannen Carter, Esquire
Hill, Hill, Carter, Franco, Cole & Black, P.C.
425 South Perry Street
Post Office Box 116 (36101-0116)
Montgomery, Alabama 36104
(334) 834-7600 phone
(334) 832-7419 facsimile
RMorgan@HillHillCarter.com

## **TABLE OF CONTENTS**

I.    Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Summary of Undisputed Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.    Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            a.    Eddie Ogletree. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            b.    Gerald Stephens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Background Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.    Battalion Chief Promotions Prior to 2006. . . . . . . . . . . . . . . . . . . 4

        2.    Battalion Chief Promotions 2006. . . . . . . . . . . . . . . . . . . . . . . . . 6

            a.    Development of the Assessment Center. . . . . . . . . . . . . . . . . 6

            b.    Position Postings and Applications. . . . . . . . . . . . . . . . . . . . 10

            c.    Post Application Process. . . . . . . . . . . . . . . . . . . . . . . . . . 11

            d.    Grievance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.    Plaintiffs' Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.    Title Changes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            a.    Captain to Battalion Chief in 2004. . . . . . . . . . . . . . . . . . . . 15

            b.    Team Leader to Lieutenant in 2006. . . . . . . . . . . . . . . . . . . . 15

        2.    Battalion Chief Promotion 2006. . . . . . . . . . . . . . . . . . . . . . . . . 15

            a.    Intentional Race Discrimination. . . . . . . . . . . . . . . . . . . . . . 16

                (1)    Comparative Qualifications. . . . . . . . . . . . . . . . . . . 16

                (2)    Preferential Treatment to White Applicants. . . . . . . . . . 17

                (3)    The Written Test. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

(4)    Inconsistency with Past Practices. . . . . . . . . . . . . . . . . 20

(5)    Seniority and Time In Grade. . . . . . . . . . . . . . . . . . . . . 22

b.    Disparate Impact.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

c.    Retaliation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

d.    Claims Against Individuals. . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

III.    Argument and Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A.    Standards Governing Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . 27

B.    Statute of Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C.    §1983 - Individual Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1.    Qualified Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

2.    Individual Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

D.    §1983 - The City of Auburn    35

E.    Title VII - The City of Auburn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1.    Intentional Race Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . 38

a.    No Prima Facie Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

b.    Defendants had a legitimate non-discriminatory reasons. . . . . . 41

2.    Other Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

3.    Disparate Impact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

a.    No Prima Facie Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

b.    The Written Test was a business necessity. . . . . . . . . . . . . . . 50

F.    Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

IV.    Conclusions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                                                                          <u>**Page**</u>

*Abel v. Dubberly,*
    210 F.3d 1334 (11th Cor. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Barrow v. Georgia Pacific Corp.,*
    2005 WL 1926420 (11th Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Brewer v. Alabama,*
    111 F.Supp.2d 1197 (M.D. Ala. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Butler v. Alabama Dept. Of Transportation,*
    *512 F.Supp.2d 1209 (M.D. ala. 2007).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *52*

*Carlin v. Communication, Inc. v. Southern Bell Tel. & Tel.,*
    802 F.2d 1352. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Carter v. Three Springs Residential Treatment,*
    *132 F.3d 635 (11th Cir. 1998).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *39*

*City of Canton v. Harris,*
    *489 U.S. 378, 109 S.Ct. 1197, L.Ed.2d 412 (1989).* . . . . . . . . . . . . . . . . . . . . . . . *36*

*Clover v. Total System Services, Inc.,*
    *176 F.3d 1346 (11th Cir. 1999).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *51*

*Combs v. Plantation Patterns,*
    *106 F.3d 1519 (11th Cir. 1997).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *52*

*Connecticut v. Teal*,
    *457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982).* . . . . . . . . . . . . . . . . . . . . . *46*

*Courson v. McMillan,*
    *939 F.2d 1479 (11th Cir. 1991).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *31, 32*

*Cox v. Administrator U.S. Steel and Carnagie Pension Fund*,
    *17 F.3d 1400 (11th Cir. 1994).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*Cross v. State of Alabama,*
    *49 F.3d 1490 (11th Cir. 1995).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *36*

*Delaware State Coll. V. Ricks,*
    449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). . . . . . . . . . . . . . . . . . . . . . . 30

*DePew v. City of St. Marys,*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
787 F.2d 1496 (11th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Edwards v. Wallace Community College,*
49 F.3d 1517 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc.*
220 F.3d 1263 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Farred v. Hicks,*
915 F.2d 1530 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Fitzpatrick v. City of Atlanta,*
2 F.3d 1112, (11th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Gaddis v. Russell Corporation,*
242 F.Supp.2d 1123 (M.D. Ala. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *40, 53*

*Garner v. Runyon,* 769 F.Supp. 357 (N.D. Ala. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 47,48

*Geer v. Marco Wearinghouse,*
179 F.Supp.2d 1332 (M.D. Ala. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Goldsmith v. City of Atmore,*
*996 F.2d 1155 (11th Cir. 1993).*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Gorman v. Roberts,*
909 F.Supp 1493 (M.D. Ala. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Green v. School Bd. Of Hillsborough County,*
25 F.3d 974 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Hamilton v. Montgomery County Board of Education,*
122 F.Supp.2d 1273 (M.D. Ala. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Harper v. Blockbuster Entertainment Corp.,*
139 F.3d 1385 (11th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Hartley v. Parnell,*
193 F.3d 1263 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Hill v. Dekalb Regional Youth Detention Center,*
40 F.3d 1176 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *31, 32*

*Hope v. Pelzer,*
536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2000_). . . . . . . . . . . . . . . . . . . . . . 31

iv

*Howell v. Evans,*
    922 F.2d 712 (11ᵗʰ Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Jackson v. State of Alabama Tenure Comm'n,*
    405 F.3d 1276 (11ᵗʰ Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Jones v. Bessemer Carraway Med. Ctr.,*
    151 F.3d 1321 (11ᵗʰ Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Jones v. Reuit & Mauldin,*
    876 F.2d 1480, 1483084 (11ᵗʰ Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Jordan v. City of Montgomery,*
    2007 WL 2903010 * (M.D. Ala.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *28*

*Keel v. United States Department of Air,*
    256 F.Supp.2d 1269 (M.D. Ala. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *53*

*Kennedy v. Kelly Temporary Services, Inc.,*
    95 F.Supp.2d 1288 (M.D. Ala. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Lassiter v. Alabama A & M University Board of Trustees,*
    28 F.3d 1146 (11ᵗʰ Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Lee v. State of Florida, Dept. Of Children of Family Services,*
    135 Fed.Appx. 202 (11ᵗʰ Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Lett v. Reliable Ruskin*,
    2006 WL 2056582 (M.D. Ala. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Lincoln v. Board of Regents*,
    697 F.2d 928 (11ᵗʰ Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Mangum v. West*,
    2000 WL 206618 (S.D. ala.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Mann v. Olsten Certified Healthcare Corp.,*
    40 F.Supp.2d 1307 (M.D. ala. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *29*

*Martinez v. City of Opa-Locka,*
    971 F.2d 708 (11ᵗʰ Cir 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Mayfield v. Patterson Pump Co.,*
    101 F.3d 1371 (11ᵗʰ Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792, S.Ct. 1817, 36 L.Ed.2d 668 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . *39*

*Meeks v. Computer Assoc. International,*

15 F.3d 1013 (11th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Mercantile v. Bank & Trust v. Fidelity & Deposit Co.,
    750 F.2d 838 (11th Cir. 1985. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Monell v. New York City Department of Social Services,
    436 U.S. 658, S.Ct. 2018, 56 L.Ed.2d 611 (1978). . . . . . . . . . . . . . . . . . . . . . 36,37

Montgomery v. City of Birmingham,
    2000 U.S. Dist. LEXIS 11491 (N.D. Ala). . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Nash v. Consolidated City of Jacksonville,
    895 F.Supp. 1536 (M.D. Fla. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

National R.R. Passenger Corp. v. Morgan,
    536, U.S.  101 S.Ct. 2061, 153 L.Ed.2d 106 (2002). . . . . . . . . . . . . . . . . . . . . 28,29

Nelson v. Prison Health Services, Inc.  991 F.Supp. 1452 (M.D. Fla. 1997). . . . . . . . . . . . . . 30
Nix v. Radio/Rahall Communications,
    738 F.2d 1181 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Oklahoma City v. Tuttle,
    471 U.S. 8089, 105 S.Ct. 2427, L.Ed.2d 791 (1985). . . . . . . . . . . . . . . . . . . . . . 34

Oladeinde v. City of Birmingham, 965 F.2d 1481 (11th Cir. 1992). . . . . . . . . . . . . . . . . . . 32

Parratt v. Taylor,
    451 U.S. 527, 101 S.Ct. 1908, 69 L.Ed.2d (1981.. . . . . . . . . . . . . . . . . . . . . . . . . 35

Pembaur v. City of Cincinnati,
    475 U.S., 106 S.Ct. 1292, 89 L.Ed. 452 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 37

Perryman v. Johnson Products Co.,
    698 F.2d 1138 (11th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Raney v. Vinson Guard Serv.,
    120 F.3d 1192 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Rich v. Vinson Guard Serv.,
    120 F.3d 1192 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Rich v. Dollar,
    841 F.2d 1558 (11th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Rivas v. Freeman,
    940 F.2d 1491 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Schoenfeld v. Babbitt,
    168 F.3d 1257 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Sim v. Montgomery County Commission,*
    873 F.Supp. 585 (M.D. Ala. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Stallworth v. Shuler,*
    777 F.2d 1431 (11th Cor. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Texas Dept. Of Community Affairs v. Burdine,*
    450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). . . . . . . . . . . . . . . . . . . . . . . 39

*Thomas v. Alabama Council on Human Relations,*
    248 F.Supp.2d 1105 (M.D. Ala. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,29,30

*Thomas v. Bed Bath & Beyond,*
    508 F.Supp.2d 1264 (N.D. Ga.2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Thomas Ex Rel. v. Roberts,*
    261 F.3d 1160 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Turnes v. Amsouth Bank, N.A.,*
    36 F.3d 1057 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Walker v. Nations Bank of Florida, N.A.,*
    53 F.3d 1548 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Wascura v. City of South Miami,*
    257 F.3d 1238 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Watson v. Fort Worth Bank & Trust,*
    487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). . . . . . . . . . . . . . . . . 46,47,49

*Williams Ala. Indus. Dev. Training,*
    146 F.Supp.2d 1214 (M.D. Ala. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Zatler v. Wainwright,*
    802 F.2d 397 (11th Cor. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## Federal Statutes

*Federal Rules of Civil Procedure Rule 56.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *28*
42 U.S.C. §1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,30,34-38,44,47
42 U.S.C. §2000e-5(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **EDDIE OGLETREE, an individual,** | * | |
| **GERALD STEPHENS, an individual,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **vs.** | * | **CASE NO.: 3:07-cv-867-WKW** |
| | * | |
| **CITY OF AUBURN, et al.,** | * | |
| | * | |
| **Defendants.** | * | |

<u>**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT ON BEHALF OF DEFENDANTS**</u>

COME NOW Defendants in the above-styled cause and file this memorandum brief and evidentiary material in support of their motion for summary judgment.

*I.*
<u>*STATEMENT OF THE CASE*</u>

This is a race discrimination and retaliation case. Plaintiffs Eddie Ogletree and Gerald Stephens brought this action against the City of Auburn (hereinafter "the City"), Larry Langley, Lee Lamar, Bill Ham, Jr., Steven A. Reeves, Bill James, Charles M. Duggan and Cortez Lawrence in their individual capacities, claiming violations of Title VII and the Equal Employment Act pursuant to §1983.

Plaintiffs allege causes of action pursuant to 42 U.S.C. §1983 and Title VII relating to their failure to obtain a promotion in 2006 to Battalion Chief. On June 27, 2008, Cortez Lawrence was dismissed as a Defendant to this action. Plaintiffs filed a Second and Third Amended Complaint leaving a claim for intentional race discrimination, retaliation and disparate impact.

The City filed a Third Party Complaint against CWH Research, Inc. for indemnification if race discrimination was found against the City.

*II.*
*SUMMARY OF UNDISPUTED FACTS*[1]

**A.    The Parties**

    **1.    Plaintiffs**

The Plaintiffs are African-American employees of the Auburn City Fire Division. Both complain that they were not promoted to Battalion Chiefs in 2006 because of their race and retaliation.

        **a.    Eddie Ogletree**

Ogletree joined the Fire Division in 1984.  (See Exhibit "A" Deposition of Eddie Ogletree p. 20 at lines 21-22).  Ogletree attended college but did not graduate.  (Ogletree Depo. p. 41 at line 2 to p. 42 at line 9).  After undergoing a structured interview process, he became a Team Leader in June 1996. (Ogletree Depo. p. 10 at lines 10-16).   Ogletree participated in a petition of the team leaders requesting the City to change the job title of "Team Leader" to "Lieutenant" in early 2006. (Ogletree Depo. p. 12 at lines 16-18).   In 2006, Ogletree applied for the Battalion Chief promotion that is the basis of this lawsuit. Between June 1996 when Ogletree was promoted to Team Leader and 2006 when he applied for the Battalion Chief promotion, he did not apply for a promotion. (Ogletree Depo. p. 43 at lines 9-15).

        **b.    Gerald Stephens**

Stephens was first employed with the City of Auburn in 1991 as a student fire fighter.  (See Exhibit "B" Deposition of Gerald Stephens p. 18 at lines 14-18).  Stephens attended college at several institutions but did not receive a degree.  (Stephens Depo. p. 15 at line 9 to p. 16 at line 18).  Stephens explained that after being hired as a fire fighter and completing a probationary

---

[1] For purposes of clarity this statement of material and undisputed facts includes factual allegations of Plaintiffs, which may not be relevant or actual facts.  Rather, this is a statement of "facts" for purposes of summary judgment.  See *Cox v. Administrator, U.S. Steel and Carnagie Pension Fund*, 17 F.3d 1400 (11th Cir. 1994).  This statement may also contain statements of the absence of critically needed facts, for purposes of clarifying the issues.

period, an employee had to attend the Alabama Fire College. (Stephens Depo. p. 17 at lines 4-19). In order to become a certified fire fighter, an individual must obtain Fire Fighter I certification. (Stephens Depo. p. 18 at lines 1-6). Stephens had to pass a Fire Fighter II course when he made the transition from a student fire fighter to a career fire fighter and then later had to pass an Apparatus Operator certification. (Stephens Depo. p. 22 at lines 10-20). He had no problem with these requirements. (Id.). Through an assessment center process, Stephens was promoted to Lieutenant in 1996. (Stephens Depo. p. 43 at line 12 to p. 44 at line 13). He later went through the structured interview process for a training officer position and the Deputy Fire Chief position, but did not receive the positions. (Stephens Depo. p. 52 at line 3 to p. 55 at line 21).[2]  Stephens also complains that he was not given a temporary position to Battalion Chief in January 2005, which resulted in his filing an EEOC charge at the time; however, he did not file a lawsuit thereafter. (Stephens Depo. p. 169 at line 18 to p. 170 at line 4).

### 2.    Defendants

The City of Auburn is a municipality organized under the laws of the State of Alabama.

Bill Ham has been the Mayor of the City since 1998. (See Exhibit "C" Affidavit of Bill Ham, Jr. at ¶2). Ham has no hiring, promoting or firing authority for the City. (Ham Aff. at ¶4). He played no part in the promotional process in question here. (Ham Aff. at ¶5).

Charlie Duggan became acting City Manager in February 2006. (See Exhibit "D" Affidavit of Charles Duggan at ¶2). Duggan has the authority to hire and fire for the City. (Duggan Aff. at ¶3). Other than approving the hiring recommendations, Duggan played no part in the promotional process here. (Duggan Aff. at ¶4).[3]

---

[2]  The training officer position and the Deputy Fire Chief position are not a subject of this litigation.

[3]  After the fact, Duggan received notice of Plaintiffs' grievance.

Steve Reeves has been the Human Resources Director for the City since 1993 and prior thereto was the City's Risk Manager for approximately six years.  (See Exhibit "E" Deposition of Steve Reeves p. 6 at lines 3-18; see also Exhibit "F" Affidavit of Steve Reeves at ¶2).  His job duties require coordinating compensation and benefits, employee relations, risk management and safety, employee training and development.  (Reeves Depo. p. 9 at lines 1-6).  He also serves in a resource capacity for the promotional processes with the City.  (Reeves Depo. p. 9 at line 7 to p. 10 at line 3).

William James is the Public Safety Director for the City and has held that position since October 2004.  (See Exhibit "G" Deposition of William James p. 5 at lines 3-8).  He provides administrative direction for the divisions of Public Safety, Budgets, Contracts and Personnel. (James Depo. p. 5 at lines 9-13).

Larry Langley served as the Fire Chief for the City from 1997 until he retired on November 3, 2007.  (See Exhibit "H" Deposition of Larry Langley p. 4 at line 20 to p. 5 at line 2, p. 6 at lines 13-14¶).

Lee Lamar is currently the City's Fire Chief.  (See Exhibit "I" Deposition of Lee Lamar p. 5 at lines 8-15).  He was previously the Deputy Fire Chief.  In December 2007, he was named the acting Fire Chief and in July 2008, he was made the permanent Fire Chief.  (Lamar Depo. p. 5 at line 16 to p. 6 at line 1).

### B.    Background Facts

#### 1.    Battalion Chief Promotions Prior to 2006

The City settled a race discrimination lawsuit regarding promotional practices in 1991.  The settlement resulted in a Court Order wherein the City was to use an outside assessment center for promotions to Lieutenant or Captain.  (See Exhibit "J" 1991 Order Approving Settlement Agreement hereinafter referred to as "the 1991 Order").

In 1996, there were promotions to both Captain and Lieutenant. (Stephens Depo. p. 51 at line 14 to p. 52 at line 2). Stephens was promoted to a Lieutenant at that time. (Stephens Depo. p. 43 at lines 12-16). At the time, there were student fire fighters, career fire fighters, Team Leaders, Lieutenants, Captains, a Deputy Chief and a Fire Chief. (Stephens Depo. p. 46 at lines 1-7). After the promotions in 1996, any career fire fighter being promoted was promoted to Team Leader, not Lieutenant, therefore, Stephens was the last Lieutenant to be promoted. (Stephens Depo. p. 48 at line 20 to p. 49 at line 7). However, in early 2006, the Team Leaders petitioned the City to be retitled "Lieutenants". (See Exhibit "K" Affidavit of Lee Lamar at ¶7; Stephens Depo. p. 57 at lines 12-15). Insomuch as there was no difference in rank, pay or job responsibilities, the City agreed to the title change. (Id.). Langley agreed that the title change from "Team Leader" to "Lieutenant" was in no way a promotion. (Langley Depo. p. 28 at lines 2-10). Stephens was against the retitling, but Ogletree signed the petition requesting the change.[4] (Stephens Depo. p. 64 at line 19 to p. 65 at line 1). Twenty-seven of thirty Fire Division employees voted for the name change. (Lamar Aff. at ¶7).

Prior thereto, in November 2004, the Captains had petitioned the City Manager to have a title change to "Battalion Chiefs" and the change was made. (Lamar Aff. at ¶6; Reeves Aff. at ¶18; Reeves Depo. p. 57 at lines 11-14). This also was not a promotion of any kind. (Id.). It was simply a title change. (Id.). No one complained about or otherwise challenged the decision. (Id.).

Thereafter in 2006, there was a need for Battalion Chiefs and a notice was posted for the openings. (Lamar Depo. p. 16 at lines 14-19). Lamar explained that there were several Battalion Chiefs who were retiring or who were close to retiring and therefore there was a need to make promotions to that position. (Id.). This was the first promotion process for the position since 1996.

---

[4] Ogletree apparently believes signing the petition somehow hurts the posture of his current lawsuit, because he now takes the position that it was wrong to make the change and insinuates that he was misled when he did it. Nevertheless, Ogletree believes he should be a Lieutenant. (Ogletree Depo. p. 19 at lines 18-22).

For the time period February 2006 through June 2006, Human Resources Director Steve Reeves, Public Safety Director Bill James, Fire Chief Larry Langley, and Deputy Fire Chief Lee Lamar (sometimes referred to herein as "the Promotion Group") were involved in the promotion of fire fighters within the Fire Division. (Reeves Depo. p. 12 at line to p. 13 at line 15; Reeves Aff. at ¶4). The City Manager at the time, Charles Duggan, would make final approvals of the promotions. (Reeves Depo. p. 13 at lines 16-23).

### 2.    Battalion Chief Promotions In 2006

In 2006, there were promotions to Battalion Chief. (Reeves Depo. p. 14 at lines 1-9; Reeves Aff. at ¶3). An assessment center was used to make the promotions. (Reeves Aff. at ¶¶5, 8). There was no consideration for seniority or time in grade. (Reeves Depo. p. 71 at lines 5-17, p. 93 at lines 3-8).

### a.    Development of the Assessment Center

Lamar explained that when the discussions started about the 2006 Battalion Chief promotional process, the Promotional Group was looking for components of an assessment center that would best measure the candidates in the process such as role plays, in baskets, written exams, hot seat exercises, tactical exercises or any number of other aspects. (Lamar Depo. p. 17 at lines 4-10). The decision to use an assessment center to Battalion Chief was through collective discussion about the best methodology to determine who was the most highly qualified candidate. (Lamar Depo. p. 18 at line 20 to p. 19 at line 3; see also Reeves Depo. p. 23 at line 12 to p. 24 at line 6).

The City had previously used an outside assessment center for the 1994 Captain promotion and the 1996 Lieutenant and Captain promotions. (Reeves Depo. p. 20 at lines 1-9). Reeves described an outside assessment center as a conglomeration of job related devices used to determine who the best candidates were for a promotion. (Reeves Depo. p. 20 at lines 16-23).

Reeves also explained that an outside assessment center meant that some individual or company not employed or affiliated with the City had to implement the processes for the promotion. (Reeves Depo. p. 21 at lines 1-5). Lawyers involved in prior litigation that resulted in the 1991 order made the decision to hire Kathleen Robinson as a consultant to establish the outside assessment centers for the prior promotions in 1994 and 1996. (Reeves Depo. p. 21 at line 22 to p. 22 at line 4, p. 22 at lines 13-17). Therefore, Reeves contacted Kathleen Robinson for the 2006 Battalion Chief promotions. (Reeves Aff. at ¶4). Because she was retiring, Robinson recommended the City use CWH Management Solutions ("CWH") as an outside consulting firm to develop the assessment center. (Reeves Aff. at ¶4).

CWH is a nationally recognized firm with notable clients. (Reeves Aff. at ¶5). The Promotion Group was impressed that CWH's "entry level fire fighter test was recommended by the U.S. Department of Justice due to its low adverse impact and excellent validity, that it was endorsed by the International Association of Fire Chiefs and that it had the highest professional award in the field of industrial/organizational psychology." (Id.). The Promotion Group also liked the methodology CWH proposed to develop and administer a valid, job-related, neutral selection process. (Id.).

Reeves worked with CWH to create and execute a contract for CWH to develop a valid, job-related, neutral process for the Battalion Chief promotions. (Id.; Reeves Depo. p. 14 at lines 1-9, p. 17 at lines 2-7; see also Exhibit "L" Letter Agreement between City of Auburn and CWH Research, Inc.). CWH was to design and provide consulting services to the City to ensure a fair promotional process. (Reeves Depo. p. 29 at lines 3-9).

After executing the contract, the Promotion Group worked with CWH to determine the appropriate assessment center. (Reeves Aff. at ¶8). The CWH assessment center process incorporated a written test option. (Reeves Depo. p. 23 at line 21 to p. 24 at line 16, p. 25 at line 13 to p. 26 at line 10, p. 28 at lines 2-19, p. 93 at line 13 to p. 94 at line 6; Reeves Aff. at ¶8). CWH

-7-

and the Promotion Group collectively determined that the assessment center for the Battalion Chief promotion would include a written test and determined there would be a cut-off score; the applicants would not move forward in the process unless they scored at least a 70 on the test. (Id.; Lamar Depo. p. 20 at line 17 to p. 21 at line 14; Langley Depo. p. 17 at lines 1-7; James Depo. p. 30 at lines 2-8). The City felt it was "important that candidates demonstrate their level of subject matter expertise to help identify the most qualified candidates for promotion, and because the assessment of subject matter knowledge through written testing is common in fire service." (Reeves Aff. at ¶7). The cut-off score of 70 was used because it was commonly used in the fire service, including Alabama Fire College and the National Fire Academy, it was consistent with past City practices and because it was important to ensure that individuals promoted possessed the critical knowledge for the job. (Reeves Aff. at ¶8). The Fire Division for the City had previously used written tests with a cut-off score for the promotional process. (Reeves Aff. at ¶7; Reeves Depo. p. 123 at lines 1-6).

In 2006, when Reeves, Langley, Lamar and James were discussing the upcoming Battalion Chief promotion, there was no a conversation about whether the test would make it more difficult for minorities to be promoted. (Reeves Depo. p. 87 at lines 10-20). Rather, there was some discussion that based on the way the test was structured, and the incorporation of situational judgment questions, employees who had been with the City longer would have an advantage in the test because of their experience and familiarity with policies. (Reeves Depo. p. 87 at line 21 to p. 88 at line 11). Reeves said that CWH shared this opinion with the Promotional Group. (Reeves Depo. p. 88 at lines 12-17).

There is some question about who wanted the cut-off score and whether CWH agreed with the cut-off score. Lamar confirms that he does not recall that CWH discouraged use of the cut-off score. (Lamar Depo. p. 23 at lines 10-15, p. 24 at lines 13-21). Lamar explained that it could have been him that initially suggested a cut-off score of 70. (Lamar Depo. p. 25 at lines 7-15). He

testified that he would have done so based on the fact that a person could not obtain a certification without scoring a minimum of 70 on an exam and that a score of 70 was the standard in the three to five classes that the National Fire Academy implemented testing for. (Lamar Depo. p. 25 at lines 7-15). Langley confirmed that 70 was a standard cut-off score at the Fire College and National Fire Academy. (Langley Depo. p. 17 at lines 12-16). Lamar further explained that a cut-off score of 70 was an educational standard. (Lamar Depo. p. 25 at lines 7-19). Regardless, Lamar confirmed that the cut-off score was discussed among the entire group before the final decision was made. (Lamar Depo. p. 26 at line 15 to p. 27 at line 7). He further confirmed that the written test was simply a part of the assessment center. (Lamar Depo. p. 28 at lines 13-16).

The assessment center process used EEOC uniform guidelines and other professional standards of test development such that there was assurance that it had content validation. (Reeves Depo. p. 94 at line 23 to p. 95 at line 6). The test had been scientifically validated by CWH. (Reeves Depo. p. 95 at lines 14-16). CWH represented to the City that the process that they used with subject matter experts to develop the written test was a neutral, job-related, content-validated approach recognized in professional standards as the appropriate way to develop the test. (Reeves Depo. p. 99 at lines 1-16).

Although neither Ogletree nor Stephens could speak to this issue, there is a claim that the promotional process did not comply with the 1991 Order. (See Third Amended Complaint at ¶19). However, James confirms that the City was complying with the 1991 Order by implementing the assessment center for Battalion Chiefs and that the Order was not violated. (James Depo. p. 12 at line 5 to p. 22 at line 8). James confirmed that the process that was used for Battalion Chief was in fact an assessment center as referenced in the 1991 Order. (Id.). Reeves and Langley agree. (Langley Depo. p. 17 at line 21 to p. 25 at line 16; Reeves Depo. p. 16 at lines 2-14, p. 19 at lines 4-11). The Promotional Group determined that the best course of action was to use an outside

assessment center as referenced in the 1991 settlement agreement.  (Reeves Depo. p. 32 at line 18 to p. 33 at line 15; p. 34 at line 14 to p. 35 at line 8).

**b.    Position Postings and Applications**

In mid-February 2006, there was a vacancy announcement to invite applicants to apply for Battalion Chief positions.  (Reeves Aff. at ¶10; see also Exhibit "M" February 16, 2006 Position Announcement).  Ogletree and Stephens then received the February 17, 2006 notice announcing the promotional process for Battalion Chiefs.  (Ogletree Depo. p. 58 at lines 1-23; Stephens Depo. p. 76 at line to p. 77 at line 8; see also Exhibit "N" February 17, 2006 Memo of Battalion Chief Promotions).  Both would have received the notice within a week of February 17, 2006.  (Stephens Depo. p. 78 at lines 16-20).  The February 17, 2006 notice also explained that the assessment center process would have a written exam component and that there would be reading materials provided for the exam.  (Stephens Depo. p. 79 at lines 15-22; Ogletree Depo. p. 62 at lines 6-11; February 17, 2006 Memo).  Neither Stephens nor Ogletree made a complaint about the written exam component of the assessment process at that time.  (Stephens Depo. p. 80 at lines 9-16; Ogletree Depo. p. 63 at lines 7-11).  However, Ogletree claims that, at the time, the older guys did not want to take a written exam and also claims that Chief Garrett thought the test would be unfair to older guys because the younger guys who were fresh out of college had an advantage. (Ogletree Depo. p. 59 at line 11 to p. 61 at line 5, p. 63 at lines 11-15).

After the Battalion Chief positions were announced, Chris Turner, a black male fire fighter, applied for the job.  (Reeves Aff. at ¶11; Langley Depo. p. 19 at lines 13-20; James p. 33 at lines 15-22, p. 34 at lines 2-6).  As a result, James investigated whether anyone with the Fire Division would be eligible to apply for the position of Battalion Chief.  (Id.).  James determined that Turner would not be excluded (Id.).  It was determined that based on the personnel policies, the Battalion Chief description and past promotion procedures for Captains and Shift Commanders, all non-

probationary fire fighters and probationary and non-probationary Lieutenants would be allowed to apply for the job of Battalion Chief. (Id.). Notice was sent out clarifying who could apply for the job. (See Exhibit "O" February 23, 2006 Memo Regarding Eligible Applicants).    At that time, no one complained about who was eligible to apply for the job. (Lamar Aff. at ¶9). Ogletree and Stephens both received a February 23, 2006 memo that disclosed that non-probationary fire fighters and probationary and non-probationary Lieutenants would be eligible to apply for the position. (Ogletree Depo. p. 65 at lines 8-15; Stephens Depo. p. 80 at line 19 to p. 81 at line 6). Neither made any complaint to anyone about who was eligible to apply at that time. (Ogletree Depo. p. 24 at lines 2-23, p. 65 at lines 16-18; Stephens Depo. p. 81 at line 7 to p. 82 at line 1).[5]

      c.      **Post-Application Process**

      Reeves explained the post-application process as follows:

> At the end of February 2006, an in-depth three-hour candidate orientation meeting was held to introduce the candidates to the CWH representatives and to explain the entire promotion process and how the various components would be developed and validated. During this meeting, in which applicant attendance was mandatory, it was announced that a written test would be administered as part of the promotional process and that a 70 percent cut off score would be utilized. Each candidate was given a detailed orientation manual reviewing, among other aspects, the types of questions that would be on the test and how to prepare for the test. To help candidates review and prepare for the test, four job-related text books were identified and on or about March 3, 2006, at least six weeks before the test, each candidate was given a copy of each book. All of the technical job knowledge questions were developed by CWH and came from these four books.

(Reeves Aff. at ¶10).

---

[5]  Both Plaintiffs now complain that the promotion process should not have been opened to fire fighters and what they classify as "probationary Lieutenants", although Stephens admits that no probationary Lieutenant was promoted. (Ogletree Depo. p. 65 at lines 16-18; Stephens Depo. p. 82 at line 17 to p. 83 at line 2). It should be noted that opening the process to fighters caused the inclusion of one additional applicant, Turner, who is black.

-11-

Both Ogletree and Stephens attended the mandatory orientation at which individuals from CWH explained the different components of the test and how the assessment process would be implemented and scored.  (Ogletree Depo. p. 68 at line 15 to p. 71 at line 2; Stephens Depo. p. 87 at line 16 to p. 88 at line 1, p. 89 at lines 12-14, p. 103 at line 9 to p. 104 at line 7).  Stephens confirms that he understood at the orientation that any applicant would have to make a certain score to proceed through the promotional process.  (Stephens Depo. p. 88 at line 12 to p. 89 at line 1).  While Ogletree is unsure about when he gained this knowledge, he confirms that by the time he took the test, he knew that he had to make a certain cut-off score to continue through the process.  (Ogletree Depo. p. 71 at lines 5-12, p. 73 at lines 8-10, p. 75 at line 17 to p. 76 at line 7).  Stephens testified that there was a slide presentation at the orientation and that the CWH individuals walked through the entire process with the group.  (Stephens Depo. p. 93 at line 21 to p. 94 at line 14).  Stephens did not complain about the written test at the orientation.  (Stephens Depo. p. 89 at lines 19-23).  At some point, Ogletree said he talked to Lamar about his concerns with the test but Lamar said "you are a smart guy and you will pass it."  (Ogletree Depo. p. 76 at line 21 to p. 77 at line 16).

Ogletree and Stephens received the study materials to prepare for the test.  (Ogletree Depo. p. 73 at lines 11-16; Stephens Depo. p. 96 at line 10 to p. 97 at line 17).  Both Stephens and Ogletree thought that some of the materials were for bigger fire departments, and although related to management level fire jobs, covered materials different than the way things were done in Auburn.  (Ogletree Depo. p. 79 at line 14 to p. 81 at line 13; Stephens Depo. p. 96 at line 10 to p. 97 at line 17).  Neither Stephens or Ogletree made a complaint of any nature to anyone about the study materials or what Stephens believed to be a lack of study time.  (Stephens Depo. p. 97 at lines 18-21, p. 107 at line 7 to p. 108 at line 5, p. 109 at line 7 to p. 110 at line 22).  Ogletree studied parts of the different study books, but nothing else.  (Ogletree Depo. p. 79 at line 14 to p. 85 at line 6).  In preparation for the exam, Stephens also studied some parts of the books and

studied the SOP's and City policies, even though no one recommended this additional materials. (Stephens Depo. p. 111 at line 23 to p. 112 at line 19, p. 118 at line 6 to p. 119 at line 2).

The written test was given on April 10, 2006. (Ogletree Depo. p. 78 at line 16). There were initially fifteen applicants, but only twelve applicants moved forward with the process. (Reeves Aff. at ¶¶12, 13). Applicants were given three hours to take the test. It was explained in orientation that a test taker could challenge a question on the exam before leaving the testing center. (Lamar Aff. at ¶8). In fact, before he left the testing center, applicant Joe Darby challenged five question when he turned in his test. (Id.). CWH determined three of the questions would stand and in regards to the other two, all test takers would be scored as if they answered the questions correctly. (Id.). Although both Ogletree and Stephens knew they could challenge any question from the exam, neither did so. (Stephens Depo. p. 131 at lines 19-20; Ogletree Depo. p. 108 at lines 18-20, p. 109 at lines 12-13). Ogletree said he discussed with some of the guys that they thought the test was vague, but he made no complaints to anyone of authority about the test. (Ogletree Depo. p. 89 at lines 4-17). Stephens had no conversations with Langley, Reeves, Duggan, Ham or James between the time he went to the orientation and the time he took the test. (Stephens Depo. p. 107 at line 7 to p. 108 at line 5). Ogletree complained to Langley and Lamar that he thought the test was unfair a couple of days after it was over. (Ogletree Depo. p. 95 at line 18 to p. 96 at line 17). He indicates no conversation about the test being discriminatory in any manner.

Five individuals completed the assessment center and four were promoted. (Reeves Aff. at ¶¶13-15). All four individuals receiving the promotion to Battalion Chief have been a certified fire fighter working with the City for ten or more years. (Lamar Depo. p. 40 at line 14 to p. 41 at line 4). Lamar clarified that the individuals receiving the job were in no way lacking of experience or the job knowledge to be a Battalion Chief. (Lamar Depo. p. 41 at lines 4-9). No fire fighter received the promotion. (Lamar Depo. p. 39 at lines 15-18).

-13-

#### d.    Grievance

Ogletree, Stephens, Horace Clanton and Robbie Hodge jointly filed a written grievance asking for their exams to be reviewed; they also jointly complained about who was allowed to take the exam, the cut-off score on the written exam, the lack of a cumulative point system and what they perceived to be inconsistency with the process and past practices.  (Ogletree Depo. p. 108 at lines 9-13; Stephens Depo. p. 135 at lines 3-18; see also Exhibit "P" The Grievance).  Clanton and Hodge are white.  (Stephens Depo. p. 135 at lines 3-18).  The grievance did not reference race as a factor in their complaints.  (Ogletree Depo. p. 109 at lines 19-22).  When Ogletree was asked the difference between his complaint and Clanton's complaint on the promotional process, he said the only difference was that Clanton was not black.  (Ogletree Depo. p. 136 at lines 2-11).  The grievance resulted in a hearing before Judge Joe Bailey and it was ultimately decided that the promotional decision would stand.  (Ogletree Depo. p. 134 at line 2 to p. 135 at line 22).[6]

### C.    Plaintiffs' Claims[7]

Plaintiffs claim that they were discriminated against based on their race and retaliated against when they were not promoted to Battalion Chiefs in 2006.  Plaintiffs also claim that the promotional process for 2006 Battalion Chiefs created a disparate impact on black fire fighters.

Ogletree said his complaint regarded: the 2006 Battalion Chief promotions, the title change from "Team Leader" to "Lieutenant" and the Battalion Chief promotions in 2004 or 2005.  (Ogletree Depo. p. 22 at line 11 to p. 23 at line 8).[8]

---

[6]  Hodge did not move forward with the grievance process when it came time for the hearing. (Stephens Depo. p. at lines 19-23).

[7]  Defendants maintain that Plaintiffs' only viable claim is regarding the 2006 Battalion Chief promotion.  The Third Amended Complaint and appropriate statute of limitations dictate such.  However, in a good faith attempt to put any and all contentions in proper context, all of the facts and positions Plaintiffs raised during their depositions are presented herein.

[8]  First, Ogletree petitioned the City for the title change and experienced a benefit therefrom. Moreover, there is no evidence that the title change from "Captain" to "Battalion Chief" was a promotion. Ogletree simply calls it such here.

1.    **Title Changes**

a.    **Captain to Battalion Chief in 2004**

Plaintiffs believe that when the Captains (also know as "Shift Commanders") were retitled "Battalion Chiefs," it was a promotion and that such was unfair because there was no promotional process.  (Ogletree Depo. p. 54 at lines 6-22; Stephens Depo. p. 73 at line 20 to p. 74 at line 10). Plaintiffs are simply calling the name change a promotion here  - - they acknowledge that there were no job duty changes nor did their relationships change with their supervisors who were called "Captains" and then called "Battalion Chiefs."  (Ogletree Depo. p. 159 at line 12 to p. 160 at line 10; Stephens Depo. p. 67 at lines 2-22).  Neither Plaintiff filed a grievance or made any complaint at the time that "Captain" titles were changed to "Battalion Chiefs" in November 2004.  (Ogletree Depo. p. 54 at lines 11-16, p. 60 at lines 13-15; Stephens Depo. p. 67 at lines 2-22).  In fact, Ogletree agreed that until the 2006 promotion in question here, there were no Captain or Battalion Chief promotions since 1996.  (Ogletree Depo. p. 48 at lines 3-9).[9]  Stephens clarifies that he did not find that action to be racially discriminatory and concedes it was just a name change. (Stephens Depo. p. 182 at line 19 to p. 185 at line 3, p. 187 at lines 9-3).

b.    **Team Leader to Lieutenant in 2006**

Plaintiffs claim that Team Leaders should not have been retitled "Lieutenants" because it was a promotion without a promotional process. First, Ogletree went from being titled a "Team Leader" to a "Lieutenant." Ogletree agreed that the Team Leaders felt they were equal in rank to a Lieutenant.  (Ogletree Depo. p. 17 at lines 4-7).  Ogletree conceded that when he became a Lieutenant, his job stayed the same.  (Ogletree Depo. p. 18 at lines 7-10).  Ogletree admits there was not any difference in what he was doing as a Team Leader than what Stephens was doing as

---

[9] Ogletree also acknowledged that the same thing happened to him, to his benefit, when his title was changed from "Team Leader" to "Lieutenant" in 2005 and discussed below in detail.  (Ogletree Depo. p. 54 at line 23 to p. 55 at line 4).

a Lieutenant, other than saying he supervised more student fire fighters; however he admits that the supervision was no different.  (Ogletree Depo. p. 29 at line 8 to p. 30 at line 23).   When asked if there was a difference in what a Lieutenant and Team Leader did, Stephens said: "No, sir. Basically from 1996 and up, they were acting as station officers, which that is what I am.  I am a station officer."  (Stephens Depo. p. 49 at line 20 to p. 50 at line 9).

It seems that the current challenge regarding the title change has to do with who was allowed to apply for Battalion Chief; the four individuals receiving the promotion to Battalion Chief were in the group of Team Leaders who experienced the title change to "Lieutenant" in February 2006.   (Reeves Depo. p. 33 at line 1 to p. 35 at line 23, p. 38 at lines 6-8, p. 38 at line 20 to p. 39 at line 10, p. 41 at line 19 to p. 42 at line 3, p. 41 at lines 12-17, p. 45 at line 18 to p. 46 at line 3, p. 48 at lines 11-16, p. 76 at line 6 to p. 77 at line 5).   However, because this was only a title change and not a promotion, those individuals (including Ogletree) were not considered probationary employees at the time of the Battalion Chief promotion in 2006.  (Id.).  Reeves explained that because this was simply a title change, the individuals had satisfied any probationary requirements.  (Reeves Depo. p. 77 at lines 7-11).  However, Reeves further explains that even if the individuals were probationary, they still would have been eligible for the promotion.  (Reeves Depo. p. 77 at lines 12-19, p. 79 at lines 17-22, p. 80 at line 7 to p. 81 at line 17).

### 2.    Battalion Chief Promotion 2006

#### a.    Intentional Race Discrimination

##### (1)    Comparative Qualifications

Plaintiffs claim they are more qualified than the four successful applicants.[10]  Ogletree said the only thing that made him more qualified was his years of experience.  (Ogletree Depo. p. 136 at line 17 to p. 139 at line 16).  Ogletree said he had more "experience" because he has more

---

[10]   The four successful applicants were Rodney Hartsfield, Joe Lovvorn, Matt Jordan and Joe Darby.

years of service. (Ogletree Depo. p. 138 at lines 3-19).   Stephens agrees. (Stephens Depo. p. 153 at line 16 to p. 155 at line 23). Stephens also said that he felt more qualified because he filled in for the Battalion Chief before, but he offers no evidence that this was also not true for the individuals who were awarded the job. (Stephens Depo. p. 157 at line 17 to p. 160 at line 19). Stephens does not have an opinion about whether the four individuals who became Battalion Chiefs in 2006 were qualified and offers no evidence of comparative qualifications other than his seniority. (Stephens Depo. p. 153 at line 16 to p. 155 at line 2, p. 157 at line 17 to p. 160 at line 19).

Ogletree was asked to provide any evidence that he had that he was not promoted to Battalion Chief because of his race. He answered only that all four of the promotions went to white males, but that he had no other basis, evidence, hearsay or documents to support his claim. (Ogletree Depo. p. 160 at line 16 to p. 161 at line 16). Stephens was asked what evidence he had that he was not promoted in February 2006 because of his race and he said, "I don't recall anything at this time." (Stephens Depo. p. 122 at line 20 to p. 123 at line 4).

### (2)    Preferential Treatment to White Applicants

In the Complaint, there is a claim that  white applicants were given preferential treatment for the application process, test aides and test grades and Ogletree says his evidence of such was that Chief Garrett told him that Garrett had seen some of the questions. (Ogletree Depo. p. 161 at line 17 to p. 162 at line 10; Stephens Depo. p. 173 at lines 6-12). Chief Garrett was not an applicant. (Id.). Stephens heard rumors that the Battalion Chiefs played a role in developing some of the questions, but admitted that if that were true, they should have been a good resource. (Stephens Depo. p. 98 at line 2 to p. 99 at line 9).   There is no evidence that if these individuals were consulted about test questions, this information was shared with any particular applicants.

-17-

Ogletree testified as follows:

Q:    What Caucasian applicants were given preferential treatment?

A:    I have no idea.

Q:    Can you name a single one?

A:    No I cannot.

Q:    Do you know of any?

A:    No, I don't.

Q:    Do you know of any white applicants that received preferential treatment in the application process?

A:    No, I don't.  I don't know.

                    *    *    *

Q:    Do you know of any white applicant that received more test aides than you did from the City or any -

A:    I wouldn't be privy to that.  If it happened, I wouldn't be privy to that.

Q:    The answer to my question is: You don't know of any, do you?

A:    I don't.

                    *    *    *

Q:    Do you know of any white applicants that got preference on their test grades?

A:    I don't know.

(Ogletree Depo. p. 162 at line 15 to p. 164 at line 6).  Moreover, Ogletree has no information that the applicants were not equally graded on the written exam.  (Ogletree Depo. p. 129 at line 17 to p. 130 at line 8).  Similarly, Stephens has no information or knowledge about the claim of preferential treatment to white applicants.  (Stephens Depo. p. 114 at line 1 to p. 115 at line 12). Stephens knows of no special meetings or orientation sessions where only white applicants were

allowed to attend.  (Stephens Depo. p. 99 at line 21 to p. 100 at line 13).  Stephens concedes that all applicants - - black and white - -had the same amount of study time.  (Stephens Depo. p. 113 at lines 3-16).

### (3)    The Written Test

Plaintiffs complain about the written test being a component of the assessment center. Stephens testified that he believed the test was implemented because he and other black individuals were applying for the job.  (Stephens Depo. p. 239 at lines 9-19).  Stephens admitted that nothing on his test booklet identified him as a black male.  (Stephens Depo. p. 242 at lines 4-16).

Stephens says he is not complaining about the written test *per se* but complaining about the fact that a written test was a part of the promotional process at all.  (Stephens Depo. p. 136 at line 1 to p. 140 at line 22).  Stephens also concedes that he does not know how he would fashion the test because he is not a testing expert.  (Id.).   Further, he agrees that knowledge of the job should be part of the promotional process.  (Stephens Depo. p. 246 at lines 2-10).

Ogletree claims that implementing a testing cut-off score was not proper and had not been done in the past.  (Ogletree Depo. p. 27 at lines 11-15).  He said that the City should have left that decision to the experts.  (Ogletree Depo. p. 64 at lines 5-9). In making this complaint, Ogletree acknowledges that when he went to the Fire Academy and that he had to take exams and make a score of 70.  (Ogletree Depo. p. 86 at lines 3-22).  Regardless, Ogletree believes that the test was given to weed out black applicants.  (Ogletree Depo. p. 164 at line 10 to p. 165 at line 9).

Lamar explains that assessment processes are becoming more and more common in fire service organizations and that a written test can be a component of that process.  (Lamar Depo. p. 19 at lines 4-21).  Lamar recalls that through discussions with CWH, it was advised that if there

were cut-off scores used on one part of the assessment, it should be used on all components. (Lamar Depo. p. 21 at line 17 to p. 22 at line 2).

Reeves testified that Michael Blair, the CWH point person that the City worked with, expressed his opinion that somebody that did poorly on the test would find the remaining assessment center process demoralizing or humiliating.  (Reeves Depo. p. 118 at lines 13-16).  In short, CWH said some clients used a cut-off score, some clients did not and in the end they did not advise that it was wrong to do so.  (Reeves Depo. p. 121 at lines 9-22).  Reeves explained that there was a lot of back and forth about whether to use a cut-off score, that the decision was made collectively with CWH and that ultimately the City decided that it was keeping in tradition of fire service and consistent with other testing processes the City had done in the past.  (Reeves Depo. p. 119 at line 14 to p. 120 at line 19).

### (4)    Inconsistency with Past Practices

Stephens explained that the grievance was a collective process and that his main issue in the grievance (and presumably now) was that he felt the Battalion Chief promotion process was inconsistent with what had occurred in the past.  (Stephens Depo. p. 136 at line 1 to p. 140 at line 22).   He has no evidence that any change in the promotional process was designed to exclude black applicants.  (Stephens Depo. p. 168 at line 17 to p. 169 at line 1).

Stephens then gave two examples of what he considered inconsistency in past practices: (1) Lamar getting the position of Training Officer without the job being posted, and (2) Langley being made a Captain when he was a fire fighter immediately before.  (Stephens Depo. p. 141 at line 3 to p. 143 at line 10).

As it relates to Lamar becoming the Training Officer, Lamar explains that before he  was the Deputy Chief, he was the Training Officer for the Division.  (Lamar Depo. p. 10 at lines 22-23). He received the position of Training Officer in March 2001.  (Lamar Depo. p. 11 at lines 9-16).  This

job change took him from working on the line to an administrative position. (Lamar Depo. p. 11 at lines 17-22). Lamar recalls that the job was posted and he was the only one to show interest in the position. (Lamar Depo. p. 12 at lines 3-17). Lamar said he was the only person to apply for the job. (Lamar Depo. p. 12 at lines 9-10). Stephens did not apply for the job in 1991. (Lamar Aff. at ¶4) Even though it was not a promotion, he wanted it because he thought it was an opportunity to improve his skills. (Lamar Depo. p. 12 at lines 15-17, p. 13 at lines 5-19).

As it relates to Langley, Stephens has no information that an individual had to be a Lieutenant before applying for the Captain position. (Stephens Depo. p. 143 at lines 11-17). In fact, such is not the case. The personnel policies do not require that an individual applying for "Captain" (or "Battalion Chief") to hold the position of "Lieutenant". (Reeves Aff. at ¶11).[11] Langley's promotion to Captain occurred some time before 1996. (Stephens Depo. p. 143 at line 18 to p. 144 at line 7).

When Stephens was asked why it was wrong for the City to change its promotional procedures to include a written test, assuming it was true they had not done so before, he said:

> "I'm not in the position to say whether it is right or wrong that the City implemented anything. I can only speak from the standpoint that through my 17 years of being there or up to the point where I became an officer and on up until the time of this first Battalion Chief promotion, there was never a written test. What is right or wrong for the City to do, I'm not at liberty or at any power to justify."

(Stephens Depo. p. 165 at line 13 to p. 166 at line 5).

Like Stephens, Ogletree believes there is inconsistencies in past promotional practices, but could not explain how any changes affected him more than it did everybody else subjected to the change; he said only, "I've got to worry about me right now." (Ogletree Depo. p. 127 at lines 17-21, p. 122 at line 2 to p. 126 at line 18, p. 128 at lines 9-12). Ogletree was never clear on this point,

---

[11] As such, Turner, a black fire fighter was allowed to apply for the same position (Captain also known as Battalion Chief) in 2006.

and even maintained that he should have been required to be a Lieutenant for a year to be eligible for the position of Battalion Chief. (Ogletree Depo. p. 66 at line 1 to p. 67 at line 21). Based on that assertion, Ogletree said that only Stephens and Chris Turner should have been eligible for the job. (Ogletree Depo. p. 68 at lines 6-10).[12] Later, Ogletree maintained that Turner should not be allowed to apply for Battalion Chief because he was only a fire fighter. (Ogletree Depo. p. 141 at line 8 to p. 142 at line 12).

### (5)    Seniority and Time In Grade

Stephens feels there should have been a process wherein there were points given for years of service, etc. (Stephens Depo. p 136 at line 1 to p. 140 at line 22, p. 243 at lines 15-17). Ogletree also believes that years in service and time in grade should have been part of the aspects of an assessment center. (Ogletree Depo. p. 114 at line 5 to p. 115 at line 23). He does not know how seniority should have been counted. (Ogletree Depo. p. 118 at line 22 to p. 119 at line 5). Ogletree acknowledges that since the late 1980's, there have been no points given during a promotional process for seniority. (Ogletree Depo. p. 130 at line 13 to p. 131 at line 17).

Reeves clarifies that the Fire Division for the City has not given points for seniority in past promotional processes and that, in fact, CWH expressed some caution in regard to rewarding points for seniority and/or education. (Reeves Aff. at ¶11). Reeves further points out that even if points had been awarded for education and seniority, it would not have changed the outcome for the individuals who failed to pass the test. (Id.).

Interestingly, Stephens concedes that if seniority had been in the criteria in 1996, he would not have received a promotion to Lieutenant. (Stephens Depo. p. 247 at lines 8-15).

---

[12] This argument is presumably based on the notion that individuals whose title changed from "Team Leader" to "Lieutenant" in early 2006 were in some type of probationary period as Lieutenants. As previously explained, the title change was not considered a promotion, and therefore, the individuals were not considered to have been in a probationary period. Regardless, Reeves explains that being a probationary Lieutenant would not have prevented individuals from being eligible for the position.

### b.    Disparate Impact

Plaintiffs claim that the promotional process had a disparate impact on black applicants. (Stephens Depo. p. 185 at lines 11-16).[13]  Both Plaintiffs explained that it was not the test itself, but the fact that one was used or that there was a cut-off score.  (Ogletree Depo. p. 185 at line 12 to p. 188 at line 7).[14]

When asked to explain his disparate impact claim, Stephens simply said that the claim was based on the fact that the City had not promoted black employees since 1996.  (Stephens Depo. p. 179 at line 23 to p. 182 at line 6).  When asked about his disparate impact claim, Ogletree said that he knows the promotional procedures are affecting the black employees and he cannot worry about how promotional procedures are affecting others.  (Ogletree Depo. p. 171 at line 2 to p. 172 at line 1).

As is explained by CWH President Chris Hornick  in Exhibit "2" of Reeves' Affidavit, there is no way to determine an adverse impact based on the small number of applicants and information in this case.  Exhibit "2" to Reeves' Affidavit is incorporated herein as if set out in full.

CWH did not tell the City that the test would have an adverse impact.  (Reeves Depo. p. 99 at lines 17-23).

The City has been very aggressive in its recruitment processes in its attempt to attract black fire fighters.  (Reeves Depo. p. 106 at line 5 to p. 107 at line 10).

---

[13]  Stephens admits that he is not sure what "disparate impact" means.  (Stephens Depo. p. 187 at lines 6-8).

[14]  Ogletree does not know if the test caused the disparate impact one way or the other.  (Ogletree Depo. p. 188 at line 18 to p. 189 at line 14).

c.      Retaliation

Ogletree has never filed an EEOC charge until the present one.  (Ogletree Depo. p. 31 at lines 1-5).   When asked about his retaliation charge and the fact that he had never engaged in statutorily protected expressions such as an EEOC charge or a grievance, Ogletree said he did not engage in it directly but thinks he has suffered as a result of the 1996 lawsuit by other black fire fighters.  (Ogletree Depo. p. 169 at lines 18).  He said he did not participate in the lawsuit, but that he is "just as black as they are."  (Ogletree Depo. p. 170 at lines 4-6).  He then clarifies that he cannot articulate any statutorily protected expression that he has made.  (Ogletree Depo. p. 170 at lines 10-14).

Stephens has filed two EEOC charges against the City: the present one and one regarding an assignment that Horace Clanton received in January 2005.  (Stephens Depo. p. 23 at line 15 to p. 24 at line 3; Reeves Aff. at ¶17).  In both instances, Stephens filed a grievance with the City which resulted in a hearing.  (Stephens Depo. p. 24 at line 4 to p. 25 at line 4).   The first grievance was in 2005 when Horace Clanton was assigned as Acting Battalion Chief because the official Battalion Chief had health issues.  (Stephens Depo. p. 25 at lines 5-11).  That grievance also resulted in an EEOC charge.  (Stephens Depo. p. 25 at line 22 to p. 26 at line 3).  Stephens did not file any type of lawsuit as a result of the 2005 EEOC charge.  (Stephens Depo. p. 26 at line 4 to p. 27 at line 6).[15]  Now Stephens says it was race discrimination.  Reeves explains that there was a need for a temporary working out of class assignment to fill in for an absent Battalion Chief in January 2005.  (Reeves Aff. at ¶17).  It was determined that Horace Clanton would fill the position because the assignment duration was too short to allow a rotation of officers which would result in operational disruption. (Reeves Aff. at ¶17).  Therefore, the Fire Division simply placed the

---

[15] Stephens also had grievances that he initiated, but did not carry through during his tenure with the Fire Division.  (Stephens Depo. p. 27 at lines 7-20). There is no evidence such was a protected activity.

person with more seniority at company officer level. (Id.). This was not a promotion. (Id.). Reeves says it was the fairest way to address a temporary need under the circumstances. (Id.).

Stephens was unable to provide any evidence or information that he was not promoted to Battalion Chief in retaliation for a prior statutorily protected expression. (Stephens Depo. p. 176 at line 9 to p. 178 at line 5, p. 178 at lines 10-19). In fact, Stephens said he understood that he did not get promoted because he did not score high enough on a written test. (Stephens Depo. p. 176 at line 9 to p. 178 at line 5, p. 178 at lines 10-19). Stephens confirmed that as far as he knew everyone present got the same test. (Stephens Depo. p. 178 at lines 6-9). Stephens was unable to point to anything other than his EEOC charge or grievances that would have been considered protected expression. (Stephens Depo. p. 178 at line 20 to p. 179 at line 17).

### d.    Claims Against Individuals

Ogletree had no conversations with Lamar about race discrimination and promotional practices other than saying he had reservations about the test before it occurred. (Ogletree Depo. p. 172 at lines 2-23, p. 173 at lines 1-9). He has never had conversations with Mayor Ham about anything. (Ogletree Depo. p. 173 at lines 10-18). He has also not had any conversations about race discrimination, hiring, promotion or the lawsuit with Steve Reeves. (Ogletree Depo. p. 173 at lines 19-23). Ogletree has also not talked to Bill James about the issue. (Ogletree Depo. p. 174 at lines 1-7). Other than his correspondence to Charles Duggan, Ogletree has not talked to Duggan about his complaint, hiring procedures or race discrimination. (Ogletree Depo. p. 174 at line 8 to p. 175 at line 1). Ogletree said he sued Langley and Lamar because they were part of the decision-making process in regards to the promotional process. (Ogletree Depo. p. 176 at line 6 to p. 177 at line 5). He sued Mayor Ham because Ham upheld the decision to not promote him after he filed a grievance. (Ogletree Depo. p. 177 at lines 6-17). However, he knows of no involvement the Mayor had in the promotional process. (Ogletree Depo. p. 177 at line 18 to p. 178

at line 1).  Ogletree said he sued Steve Reeves because of his involvement in determining what

the promotional process would be.  (Ogletree Depo. p. 178 at lines 2-10).  When asked specifically

about Reeves and whether Ogletree claimed that Reeves acted knowing it would affect black

applicants, Ogletree said "I have no idea.  I know it did affect blacks.  I can't say what they were

thinking before."  (Ogletree Depo. p. 178 at lines 13-19).  Ogletree further testified as follows:

> Q:    Other than approving the policy, if he did, other than
>       whatever input he had in the promotion procedure, you say
>       he intentionally did that to discriminate against you on the
>       basis of your race?
>
> [Objection]
>
> A:    I can't say he intentionally did anything.

(Ogletree Depo. p. 178 at line 23 to p. 179 at line 6)

Ogletree said he sued Bill James because of his decision to use the promotional procedure

used.  (Ogletree Depo. p. 179 at lines 9-13).  In regards to why he sued Charles Duggan, Ogletree

said "he had the final say, and he upheld the decision not to promote us."  (Ogletree Depo. p. 179

at lines 14-16).   In regards to why any of the six individuals were sued for intentional race

discrimination, Ogletree testified as follows:

> Q:    Let's say you're correct, that all these six folks - - Langley,
>       Lamar, Ham, Reeves, James and Duggan - - all had a hand
>       in agreeing to the procedure that was being used.  Do you
>       have any evidence, any facts, any hearsay, any documents,
>       anything that would lend weight to a claim that those people
>       did it with the purpose of racially discriminating against you
>       and Lieutenant Stephens?
>
> [Objection]
>
> A:    Everything I have, sir, my lawyer has, documents and
>       otherwise.  So I would - - I'm not a legal mind.  That's why
>       we hired him.
>
> Q:    But do you know of anything?
>
> A:    No, I don't.

Q:    Do you know of any reason that Larry Langley would discriminate against you on the basis of your race?

A:    I don't have any evidence, and I don't know anything.

Q:    In summary, is it fair to say that you don't have any evidence that any of these individuals discriminated against you? Your complaint is that the procedure was in place, and you didn't get promoted as a result of the procedure in place?

[Objection]

A    Yes, sir.

Q:    You don't know of anything that we did or Steve did or Bill Ham or James or anybody did to keep you from being promoted because of your race?

[Objection]

A:    I don't have - - no sir.

(Ogletree Depo. p. 179 at line 17 to p. 181 at line 3)

Stephens has no information that Lamar, Ham, Reeves, James, Duggan or Langley did anything to effectuate race discrimination or retaliation against him in regards to the 2006 Battalion Chief promotions.  (Stephens Depo. p. 219 at line 2 to p. 221 at line 8).  He never spoke to any of these individuals nor did he complain that he believed he was being discriminated against.  (Id.).

### III.
### ARGUMENT AND CONCLUSIONS OF LAW

**A.    Standards Governing Summary Judgment**

"Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and [the defendants] are entitled to a judgment as a matter of law." *Carlin Communication, Inc. v. Southern Bell Tel. & Tel.,* 802 F.2d 1352, 1356 (11th Cir 1986) (citing

-27-

*Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985); Fed.R.Civ.P. Rule 56.

On the outset, Ogletree's claims should be dismissed as a matter of law because he claims to have not been eligible for the promotion which makes the basis of this suit.  (Ogletree Depo. p. 66 at line 1 to p. 67 at line 21).  As such, he cannot create a *prima facie* case of intentional or impact discrimination and cannot maintain a retaliation claim.  Ogletree's claims should all be dismissed as a matter of law.

### B.    Statute of Limitations

With the exception of the 2006 Battalion Chief promotion, Plaintiff's claims pursuant to Title VII in regard to any promotion are due to be dismissed as a matter of law based on Title VII's 180-day statute of limitations.

Title VII dictates that a charge of discrimination must be presented to the EEOC within 180 days of the alleged unlawful action.  42 U.S.C. §2000e-5(e)(1).  Thus, if the plaintiff fails to bring a timely charge with the EEOC, he is procedurally barred from pursuing a Title VII claim based on the untimely conduct.  *Jordan v. City of Montgomery*, 2007 WL 2903010 *3 (M.D.Ala.)(citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002)).

> In cases involving discrete retaliatory or discriminatory acts such as termination of employment, failure to promote, denial of transfer, or refusal to hire, a discrete retaliatory or discriminatory act occurs on the day that it happens. *Morgan,* [supra], 122 S.Ct. at 2070, 2073. "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Id. at 2073.   Consequently, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 2072.  Each such act starts a new clock for filing charges.  Id.

*Thomas v. Alabama Council on Human Relations, Inc.*, 248 F.Supp.2d 1105, 1115 (M.D.Ala. 2003).

Therefore, any act that occurred more than 180 days prior to September 5, 2006 (or March 9, 2006) is time barred by Title VII's statute of limitations. 42 U.S.C. §2000e-5(e)(1);  See also *Morgan*, supra, 536 U.S. at 113. Accordingly, the City is entitled to summary judgment as to any allegation related to any promotion or other action that occurred before March 9, 2006.

Moreover any §1983 lawsuit must be filed no more than two years after the discrete act. See *Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483-84 (11th Cir. 1989)(holding that the statute of limitations for a §1983 claim is two years).

Plaintiffs' attempt to argue about past promotional practices (or title changes they wrongfully claim were promotions) not only fail on the merits but are time barred.  This naked allegation is insufficient to overcome the statute of limitations problem addressed more fully below.  See *Kennedy v. Kelly Temporary Services, Inc.*, 95 F.Supp.2d 1288, 1294-95 (M.D. Ala. 2000); *Mann v. Olsten Certified Healthcare Corp.*, 49 F.Supp.2d 1307 (M.D. Ala. 1999). Plaintiffs were aware of all actions taken when such occurred.  As *Thomas* discusses, the limitation period is an integral part of the statutory scheme and should not be disregarded even out of sympathy for the plaintiff. *Thomas*, supra, 248 F.Supp.2d at 1115.  There is no question that any claims regarding promotion practices, other than the 2006 Battalion Chief, are time-barred pursuant to Title VII and §1983 because the last promotions were in 1996.  Even if the title change from "Captain" to "Battalion Chief" could be considered a promotion (which will be addressed more fully below), the title change occurred in November 2004 and therefore occurred more than two years before the filing of this lawsuit - - September 28, 2007.  (Reeves Aff. at ¶17).  Similarly, even if the temporary assignment of Horace Clanton to "Battalion Chief" in January 2005 could be considered a promotion, it also occurred more than two years before the filing of this lawsuit.  (Reeves. Aff. at ¶18).  Any potential claim made regarding Lamar being named Training Officer in 1991 is also time-barred.

-29-

In short, the only claims arguably at issue here is whether there was intentional discrimination in not promoting Plaintiffs to Battalion Chiefs in 2006.  Any other attempted claim is time barred and due to be dismissed as a matter of law.

That said, even as to the 2006 Battalion Chief claims, Plaintiffs raise issues here regarding who was allowed to apply for the job and whether the assessment center process was proper and/or whether there should have been a written test with a cut-off score.    To that extent, those decisions were adverse employment actions, "[t]he 180-days begins to run when the challenged employment decision is made and the employment receives notice of it."  *Thomas v. Alabama Council on Human Relations, Inc.,* 248 F.Supp.2d 1105, 1115 (M.D. Ala. 2003) (citing *Delaware State Coll. v. Ricks,* 449 U.S. 250, 256-57, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) and *Brewer v. Alabama*, 111 F.Supp.2d 1197, 1204 (M.D. Ala. 2000).  Plaintiffs concede that all information regarding these three complaints were learned during the month of February 2006.   Plaintiffs did not file their EEOC Charges until September 5, 2006.  As such, all Title VII claims are due to be dismissed as a matter of law insomuch as Plaintiffs' learned of the acts that they challenged here more than 180 days before they filed their EEOC Charges.

C.    §1983 - Individual Defendants

1.    Qualified Immunity

Plaintiffs assert that the individual Defendants discriminated against them in their individual capacities in violation of the Fourteenth Amendment and bring a §1983 claim against each for said violation. The individual Defendants are due to be granted qualified immunity.

Qualified immunity is a question of law to be determined by the court prior to trial.  *Nelson v. Prison Health Services, Inc.*, 991 F.Supp. 1452, 1460-61 (M.D. Fla. 1997) (citing *Howell v. Evans,* 922 F.2d 712 (11th Cir.), vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991),

overruled on other grounds.  The Eleventh Circuit Court of Appeals has explained the court's consideration of qualified immunity as follows:

> Unless a government agent's act is so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. (citations omitted). Because qualified immunity shields government actors in all but the exceptional cases, courts should think long and hard before stripping defendants of immunity.

*Lassiter v. Alabama A&M University*, 28 F.3d 1146, 1149 (11th Cir. 1994).

"Qualified immunity *usually* protects government actors in their individual capacities from civil claims against them, provided that their challenged discretionary conduct does not violate clearly established federal law." *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1184-85 (11th Cir. 1994)(Italics in original), overruled in part by *Hope v. Pelzer*, 536 U.S. 730, 739 n.9, 122 S.Ct. 2508, 153 L.Ed.2d 666 (200). "'Objective legal reasonableness is the touchstone' by which the conduct of a governmental actor must be measured to determine if qualified immunity is applicable." *Hill*, supra, 40 F.3d at 1185.  Under the Supreme Court's opinion in *Harlow v. Fitzgerald*, 457 U.S. 800, 815-19, 102 S.Ct. 2727, 2738-39, 73 L.Ed.2d 396 (1982), "[t]he official's action must be evaluated against clearly established law, consisting of statutory or constitutional rights that a reasonable person should have known." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991). In *Courson*, the court described the reviewing court's analysis of a claim of qualified immunity as follows:

> [T]his circuit [has] derived a two-part analysis for applying the objective-reasonableness test to a qualified immunity defense:
>
> 1.    The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."
>
> 2.    Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part.  This burden is met

> by proof demonstrating that the defendant public official's action
> "violated clearly established law."

Id. at 1487; see also *Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988).

A governmental official proves he acted within in his discretionary authority "by showing objective circumstances which would compel the conclusion that the challenged actions occurred in the performance of the official's duties and within the scope of his authority." *Courson*, supra, 939 F.2d at 1487; *Hill*, supra, 40 F.3d at 1195 n.17.

In the present case, the actions taken by the individual Defendants were in the performance of their duties and within the scope of their discretionary authority. Plaintiffs do not make any allegation to the contrary.

As previously stated, once the individual Defendants demonstrate that they were acting within their discretionary authority, the burden shifts to Plaintiff to prove that those defendants did not act in good faith. *Rich*, supra, 841 F.2d at 1563-64. In determining whether Plaintiffs have met their burden of proof, this Court must conduct a two-part analysis.

> First, the reviewing court must decide whether the applicable law
> was clearly established when the governmental action in question
> occurred. (citations omitted). "Clearly established," is defined, with
> reference to the right that the official is alleged to have violated, as
> meaning that "[t]he contours of the right must be sufficiently clear
> that a reasonable official would have understood that what he is
> doing violates that right." (citations omitted). Second, the court must
> determine whether there is a genuine issue of fact concerning the
> government official's conduct being in violation of clearly established
> law.

*Courson*, supra, 939 F.2d at 1487-88. In addition, the *Rich* court recognized

> two situations where qualified immunity is afforded to government
> officials: (1) when the law that they allegedly violated *is not clearly
> established* . . . (citations omitted), and (2) when the law is *clearly
> established* and the court decides that the defendant's conduct did
> not violate any right afforded to the plaintiff under clearly established
> law.

*Courson*, supra, 939 F.2d at 1488 n.14 (Emphasis in original).

In order to defeat the individual Defendants' claim for qualified immunity, Plaintiffs must prove to this Court that the law at the time of the acts as alleged by Plaintiffs was clearly established. In order to show that the law was clearly established, "the right must be so specific that 'in light of pre-existing law the unlawfulness must be apparent.'" *Gorman v. Roberts*, 909 F.Supp. 1493, 1504 (M.D.Ala. 1995). Plaintiffs must rely upon materially similar cases in determining whether the law applicable to the facts of the present case was clearly established. Id. Thus, it is incumbent upon Plaintiffs to come forward with cases which hold that using an objective assessment center as a promotional device violated a federally protected right (*i.e.*, discrimination on the basis of race). Plaintiffs cannot rely on "general conclusory allegations or broad legal truisms." Id.

Defendants admit that Plaintiffs have a constitutional right to be free of race discrimination in the selection process of any job with the City. However, there does not appear to be a case that has held that the actions here, considering all relevant circumstances, constitutes discrimination on the basis of race. That is, Plaintiffs do not provide a single material fact that the individual Defendants even considered race during this promotional process. It is undisputed that an independent company was used for the assessment center. Rather, Plaintiffs make the more general allegation that the system itself discriminates against them because of race. Assuming for the sake of argument that Plaintiffs could establish such a claim, it is undisputed that the individual Defendants would not have been on the required notice that their conduct (participation or responsibility in process) violated the Plaintiffs' constitutional right. That is, reasonable officials would not have known that what they were doing was wrong.

Moreover, Plaintiffs have not met their burden of establishing that the actions complained of were discriminatory, therefore there is no evidence of bad faith to be submitted to a jury. There is no evidence of intent. Plaintiffs have absolutely no evidence that the individual Defendants took any action or inaction that would be a constitutional violation (here, race discrimination). "Without

-33-

a constitutional violation, there can be no violation of a clearly established constitutional right."
*Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992). Accordingly, the individual
Defendants are entitled to qualified immunity as to each and every claim asserted pursuant to
§1983 in Plaintiff's Complaint.

> ## 2.    Individual Liability

Even if the individual Defendants should not be afforded qualified immunity, the §1983
claims against them are still due to be dismissed because there is no admissible evidence that
creates a question of fact that the individual Defendants intentionally discriminated against
Plaintiffs.  Plaintiffs have no evidence of such action or animus, but rather admit that they believe
something was wrong because no black applicant was promoted.   Such is not evidence of
intentional race discrimination  - - a requirement to maintain §1983 liability.

Mayor Ham was in no way involved in the process of how the promotions would be
determined and had no authority to promote the individuals.  (Ham Aff. at ¶¶4-5; see also Ogletree
Depo. p. 177 at line 18 to p. 178 at line 1). City Manager Duggan also did not participate in the
decision of how the assessment center would work. (Duggan Aff. at ¶5).  Duggan simply made the
ultimate decision based on the individuals who scored the highest in the assessment center.
(Duggan Aff. at ¶7).   Reeves, James, Langley and Lamar worked collectively with an outside
assessment center to determine what the assessment center process would be.  (Reeves Aff. at
¶¶3, 5, 6).  The Promotion Group followed EEOC guidelines, national standards and common
practices in the industry and there is absolutely no evidence that any of these individuals made any
independent decision about the promotional process that was related in any way to race.  (Reeves
Aff. at ¶¶5, 7-8).   There is simply no evidence that the individual Defendants acted with
discriminatory intent in regards to the 2006 Battalion Chief promotional process.   There is no
evidence any actions they took regarding the overall process in any way effectuated intentional

race discrimination against the Plaintiffs. Plaintiffs admit such. All individual Defendants are due to be dismissed as matter of law. (Ogletree Depo. p. 66 at line 1 to p. 67 at line 21, p. 178 at line 23 to p. 179 at line 6, p. 179 at line 17 to p. 181 at line 3; Stephens Depo. p. 219 at line 2 to p. 221 at line 8).

The same analysis applies to any retaliation claim that Plaintiffs attempt to make pursuant to §1983 against the individual Defendants.[16] There is no evidence of intentional discriminatory acts against any of the individual Defendants outside of their collective participation with an outside assessment group to develop a promotional process. The process was validated, standardized and implemented to each applicant identically. (Reeves Aff. at ¶¶5-7). Plaintiffs admit such. (Ogletree Depo. p. 162 at line 15 to p. 167 at line 6; Stephens Depo. p. 114 at line 1 to p. 115 at line 12). Again, Plaintiffs rely on the single fact that no black applicant passed the written test. To the extent such evidence is relevant to a disparate impact claim, it is certainly not relevant to individual liability pursuant to §1983 wherein evidence of intent is required.

As such, qualified immunity should be afforded to the individual Defendants and summary judgment should otherwise be granted as to Plaintiffs' §1983 claims as a matter of law. See *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)(holding that the supervisor's alleged improper conduct must have created a custom or policy of deliberate indifference to constitutional rights) (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)(citing *Zatler v. Wainwright*, 802 F.2d 397 (11th Cir. 1986)).

**D.    §1983 - The City of Auburn**

Section 1983 provides a remedy for deprivations of federally protected rights caused by persons acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912-12, 68 L.Ed.2d 420 (1981), overruled on other grounds. Liability under §1983 is personal in

---

[16] Actually, Plaintiffs cannot maintain a retaliation claim pursuant to §1983 based on the Fourteenth Amendment. See *Palisano v. City of Clearwater*, 219 F.Supp.2d 1249 (M.D. Fla. 2002).

nature, requiring intentional discrimination and cannot be imposed vicariously. See *Cross v. State of Alabama*, 49 F.3d 1490, 1507-08 (11th Cir. 1995).

Section 1983 provides, in relevant part, that "every person who subjects or causes to be subjected any citizen of the United States....to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party in an action at law, suit in equity or other proper proceedings to redress." Local governmental bodies such as municipalities are "persons" within the meaning of §1983. See *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978). "Local governments are directly liable under § 1983 . . . for constitutional deprivations resulting from (1) an unconstitutional act taken pursuant to an officially promulgated policy, decision, regulation or ordinance; or (2) governmental custom, even though not authorized by written law." *Martinez v. City of Opa-Locka*, 971 F.2d 708, 714 (11th Cir. 1992). However, a local governmental body such as the City, cannot be found liable under §1983 on a *respondent superior* theory. *Oklahoma City v. Tuttle*, 471 U.S. 808, 817-18, 105 S.Ct. 2427, 2433, 85 L.Ed. 2d 791 (1985). The City cannot be liable for the acts of its employees unless Plaintiffs establish a constitutional violation caused by Defendants pursuant to an official policy or custom of the City. *City of Canton v. Harris*, 489 U.S. 378, 389-92, 109 S.Ct. 1197, 1205-1206, 103 L.Ed.2d 412 (1989). Plaintiffs must prove that an official policy or custom of the City was the moving force behind the alleged constitutional deprivation. *Farred v. Hicks*, 915 F.2d 1530, 1532-33 (11th Cir. 1990). Otherwise, Plaintiffs must prove that a decision was made by an official who possesses "final authority to establish municipal policy with respect to the actions ordered." *Hamilton v. Montgomery County Board of Education*, 122 F.Supp.2d 1273, 1289 (M.D. Ala. 2000). The Eleventh Circuit has held that a §1983 liability cannot be established based on a subordinate official's decision if the final policy-making body had the right to exercise its own discretion. *Scala v. City of Winter Park,* 116 F.3d 1396, 1399 (11th Cir. 1997). Additionally, where the City has adopted a policy, any alleged deviation from the policy by

-36-

an employee or employees of the City does not represent policy of the City.  *Thomas v. Roberts,* 261 F.3d 1160, 1173 (11th Cir. 2001), vacated on other grounds, 536 U.S. 953 (2002).  Under Alabama law, there is no individual named in this lawsuit that had final authority to establish municipal policy and therefore §1983 liability cannot be found against the City on this ground.   As such, Plaintiffs must prove official policy that is discriminatory or prove a long standing widespread custom that is discriminatory.  They cannot do so here.

An analysis of §1983 liability must begin with a determination of whether Plaintiffs were deprived of any right protected by the Constitution.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477, 106 S.Ct. 1292, 89 L.Ed.2d 452, 461 (1986)(quoting *Monell*, supra, 436 U.S. at 691) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.").

In the instant case, there is no evidence that Plaintiffs were deprived of their rights pursuant to the Fourteenth Amendment.  Based upon the arguments presented below in the discussion of Plaintiffs' Title VII claims wherein it is clear that there is an absence of the deprivation of a constitutional right, Plaintiffs' §1983 claims must necessarily fail.

Moreover, Plaintiffs cannot point to an official policy or custom of the City authorizing discrimination against black employees on the basis of race.  The United States Supreme Court recognized in *Monell* that local governmental entities may be sued for constitutional deprivations pursuant "to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels."  *Monell*, supra, 436 U.S. at 690-91. However, the Eleventh Circuit has held that random acts or isolated events are insufficient to establish custom.  See *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986).

Therefore, Plaintiffs must show that their alleged constitutional injuries "resulted from a 'permanent and well settled' practice" in order to rely on allegations of official custom. Id.  As is set out in Defendants' arguments concerning Plaintiffs' Title VII claims, there is no evidence of an

official custom of the City to discriminate against Plaintiffs on the basis of race.  See Edwards v. Wallace Community College, 49 F.3d 1517, 1520 (11th Cir. 1995)(holding that plaintiffs §1983 claim and Title VII claims for disparate treatment and hostile environment must fail because, among other problems with the case, the Plaintiff failed to present evidence of "practices" of discrimination).  On the contrary, it is undisputed that Plaintiffs have been promoted in the past and have experienced the same promotional processes as all other employees of the Fire Division.  Therefore, even if Plaintiffs had any evidence of discrimination, such would be random and isolated, barring §1983 liability for the City.

In short, Plaintiffs cannot show by competent evidence that they suffered a constitutional violation on the basis of race or that an alleged constitutional violation occurred pursuant to the City's official policy or custom.  Accordingly, Plaintiffs' §1983 claims must fail and the Defendants are entitled to summary judgment as a matter of law.

To the extent the factual evidence in this case relates to Plaintiffs' §1983 claims against the City, the Title VII discussions below would apply because the legal elements necessary to establish a claim under Title VII and § 1983 are the same.  See Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985); Lincoln v. Board of Regents, 697 F.2d 928, 935 (11th Cir. 1983).

### E.    Title VII - The City of Auburn

Plaintiffs bring a claim of failure to promote against the City pursuant to Title VII claiming that they were not promoted to Battalion Chief because of their race.[17]  Plaintiffs' claim are due to be dismissed as a matter of law.

### 1.    Intentional Race Discrimination

---

[17]  To the extent that Plaintiffs attempt to make a separate claim as it relates to title changes for certain positions, this Court has previously ruled that Plaintiffs cannot maintain said claims. Regardless, Plaintiffs did not suffer an adverse employment action.

In *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1375 (11th Cir. 1996), the court reviewed the now-familiar rules and principles of law governing employment discrimination cases. Title VII prohibits discrimination on the basis of race, color, religion, sex or national origin in a variety of employment practices. See *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995). In an employment discrimination case, the plaintiff bears the ultimate burden of proving that the defendant intentionally discriminated against him. See *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981); *Green v. School Bd. of Hillsborough County*, 25 F.3d 974, 978 (11th Cir. 1994).

Determining whether evidence presented by the Plaintiff is "direct" or "circumstantial" bears specifically on allocation of burdens of proof in a summary judgment analysis. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998).

In the present case, Plaintiff's claims are based on alleged indirect circumstantial evidence; namely, that they was more qualified than white firefighters who were promoted to Battalion Chief or simply that but for their race, they would have been promoted. Therefore, the *McDonnell Douglas* standard should be followed in this case.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L Ed.2d 668 (1973), the Supreme Court created a framework of the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination. See *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184, reh'g denied, 747 F.2d 710 (11th Cir. 1984) (noting that the *McDonnell Douglas* framework is a valuable tool for analyzing disparate treatment cases.) To prove discriminatory treatment through circumstantial evidence, the plaintiff must first make out a *prima facie* case. If a *prima facie* case is not established, summary judgment is due to be granted. If a *prima facie* case is established, the burden shifts to the defendant to produce legitimate, non-discriminatory reasons for the alleged adverse employment action. When legitimate, nondiscriminatory reasons are proffered, the burden then shifts back to the plaintiff to establish that

those reasons are pretextual. *McDonnell Douglas,* supra, 411 U.S. at 802-04. If the plaintiff fails to produce evidence sufficient to permit a reasonable factfinder to disbelieve the defendant's proffered nondiscriminatory reasons, summary judgment should be granted. *Tidwell v. Carter Products,* 135 F.3d 1422, 1428 (11th Cir. 1998).

To make a *prima facie* case of failure to promote, Plaintiffs must establish, by a preponderance of the evidence, that (1) he belongs to a protected class; (2) is qualified for the job; (3) was rejected for the job; and (4) an individual outside of the protected class received the job. See *Gaddis v. Russell Corporation*, 242 F.Supp.2d 1123, 1135 (M.D. Ala. 2003); *Williams v. Ala. Indus. Dev. Training*, 146 F.Supp.2d 1214, 1219 (M.D. Ala. 2001). Plaintiffs must create an inference of discrimination in order to establish a *prima facie* case. See *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 (11th Cir. 1998) (no *prima facie* case because "one still cannot infer it is more likely than not that [plaintiff's] termination was based on an illegal discriminatory criterion.")

### a.    No *prima facie* case

It is somewhat unclear based on precedential case authority what Plaintiffs must establish about their qualifications or discriminatory intent in order to establish a *prima facie* case in a failure to promote case. Defendants assert that allowing Plaintiffs to establish a *prima facie* case with only a showing of base qualifications and nothing more, especially in a case such as this, would be contrary to the spirit of the precedential law taken as a whole. Defendants agree with the Eleventh Circuit's holding that "[w]hether a *prima facie* case has been established is a fact specific inquiry: Would an ordinary person reasonably infer discrimination if the facts presented remained unrebutted?" *Walker*, supra, 53 F.3d at 1556 n. 12. To that end, it is critical to point out that Plaintiffs have no evidence that would infer that race was a motivating factor in the Defendants' decision to not promote them. Rather, it is undisputed that there was an assessment center which

utilized a written exam given to all applicants. It is undisputed that the exam was identical for each applicant and was graded the same for each applicant by an outside assessment center. (Reeves Aff. at ¶14). Plaintiffs failed to make a 70 on the test. There was no specific decision to not promote them. On the contrary, they were not qualified to move through the remaining components of the assessment center based on the predetermined requirements applicable to all candidates.

As such, Plaintiffs failed to establish a *prima facie* case of race discrimination and their cases should be dismissed as a matter of law.

### b.    Defendants had a legitimate, non-discriminatory reason

Even if there was a *prima facie* case, Defendants have established legitimate, non-discriminatory reasons for not promoting Plaintiffs - - they failed to score a 70 on the written exam. Moreover, to the extent there is an argument about why the assessment center was developed, Defendants have explained in detail the reason for using an assessment center, the reason for hiring CWH and the detailed process of working with CWH to develop a fair and neutral job-assessment center. (Reeves Aff. at ¶¶4-5, 7-9).

Plaintiffs must show the proffered reason was not the true reason for the employment decision. *Jackson v. State of Alabama Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). Plaintiffs attempt to establish pretext by arguing that this promotional process was different than ones in the past but this argument too fails for several reasons: (1) it is simply untrue that the assessment center was different than processes in the past - - tests had been given as part of promotional processes before; (2) if there was a change in the promotional process, there is no information or evidence that it was done for the sake of race discrimination; and (3) the procedure that was used was developed with an outside consulting firm and was consistent with what was occurring in the fire service industry. The exam was job-related and content validated.

Plaintiffs asserting that they were more qualified because of seniority is irrelevant because it is undisputed that seniority was not a criteria in the promotional process. (Reeves Aff. at ¶9). On the contrary, seniority had not been considered in the promotional process for some time. (Reeves Aff. at ¶9). Moreover, to the extent that Plaintiffs argue that seniority should have been part of the process, the claim fails for two reasons: (1) Plaintiffs cannot dictate to their employer what hiring process to use even if that process is flawed and, (2) even if the system is flawed, there is no evidence that such flaw was related to race. If seniority had been considered in 1996, Stephens would not have been promoted to Lieutenant. (Stephens Depo. p. 247 at lines 8-15). Moreover, it is insufficient for Plaintiffs to disagree with how Defendants decided what the assessment center would be. That is, it does not matter that Plaintiffs think seniority or time in grade should have been part of the process. That was not their decision to make. *Abel v. Dubberly,* 210 F.3d 1334, 1339 n.5 (11th Cir. 2000) (holding the reasonableness of an employer's policies are not a consideration in analyzing an employee's claim for disparate treatment); see also *Barrow v. Georgia Pacific Corp.*, 2005 WL 1926420 at *3 (11th Cir.)(holding that plaintiff's claim failed when he presented only his own unsubstantiated opinion that he was more qualified than successful candidate).

Plaintiffs blanket claims that they are black and therefore there must be discrimination also fails. Plaintiffs carry the ultimate burden of at least linking, in some way, that their race caused them to receive some type of unfavorable treatment that hurt them in the promotional process. They cannot do so based on the undisputed facts of this case. It is not sufficient to claim that the other people are white. *Geer v. Marco Warehousing,* 179 F.Supp.2d 1332, 1341 (M.D. Ala. 2001) (holding that employer's decision to upgrade to acknowledging what area should not be determined as sex discrimination under Title VII merely because the employee in the other area was a member of a protected class). Ogletree's inability to explain why the process hurt him differently than it did the white applicants who did not proceed in the assessment center demonstrates this point well.

Regardless of the criticisms of the process, there is no link to race. As such, any claim of intentional race discrimination as it relates to the promotional process must be dismissed as a matter of law.

To the extent Plaintiffs argue that the City violated the 1991 Order because there was a written test, such argument also fails. First, Defendants make clear that a written test option was part of the assessment center offered by CWH - - not a separate matter. Plaintiffs do not offer any evidence, expert or otherwise, that this is not the case. Logic dictates that CWH would not provide a written test option if such was not at least sometimes used in an assessment center. The 1991 Order certainly does not dictate what the assessment must be. Rather, it is a means of implementing objectivity for job selection. No one can argue with the fact that a written test is objective. Second, even if it the written test is considered a separate part, the 1991 Order certainly does not disallow this objective measure of job knowledge. Plaintiffs concede the benefit of it and ultimately argue only that there should not have been a cut-off. Again, this was not their decision to make. Further, there is no indication that the 1991 Order was violated and certainly no evidence that the 1991 Order was intentionally violated based on the undisputed evidence regarding the development of the assessment center. Written tests had been administered before for promotional processes. (Reeves Aff. at ¶7). No one challenged such before now. The City acted in no way with discriminatory intent with regards to how they developed this promotional process. It was applied equally to each applicant. As previously noted, four of the nine white applicants also failed the test. Plaintiffs would have to provide evidence that the Promotion Group knew that the written test would have a negative impact on black applicants. There is no such evidence. There is also no evidence of race discrimination when considering the 1991 Order.

Further, any argument by Plaintiffs that the decision of who was eligible to apply was discriminatory is completely unfounded. On the contrary, the decision resulted in another black employee being eligible to apply.

-43-

Moreover, any claim that white applicants were more favorably treated was completely negated by the Plaintiffs' testimony.

"All that matters is that the employer advance an explanation for its actions that is not discriminatory in nature." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir. 1999). "[I]t is not the role of federal courts to second-guess the hiring decisions of business entities." Id. (citing *Nix*, supra, 738 F.2d at 1187.

"Once the defendant carries the burden of production, the plaintiff must prove through presentation of a preponderance of the evidence that the employer had a discriminatory intent." *Walker,* supra, 53 F.3d at 1556 (citing *Burdine*, supra, 450 U.S. at 256). Plaintiff has the burden of proving intentional discrimination. There is no such evidence in this matter and there is absolutely no evidence of pretext.

Because Defendant need only produce, not prove, the non-discriminatory reason, the burden is "exceedingly light." *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1142 (11th Cir. 1983); *Turnes v. Amsouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir. 1994). There is no evidence to contradict the legitimate, non-discriminatory reasons that have been proffered by the Defendants. Because there is a complete void of any evidence indicating pretext, Plaintiffs' claim for race discrimination is due to be dismissed as a matter of law.

## 2.    Other Claims

Plaintiffs attempt to draw into question past employment actions to substantiate a claim of intentional race discrimination - - the notion that white employees are treated more favorably. Defendants rely on the statement of facts as set out herein and argue that even if the statute of limitations did not bar these claims, said claims would fail because (1) Plaintiffs did not suffer an adverse employment action when titles were changed, (2) Plaintiffs did not apply for some jobs complained of, and (3) Plaintiffs (or other black employees) benefitted from decisions regarding

who could apply for jobs and when title changes occurred - - Ogletree became a Lieutenant and Turner was allowed to apply for the Battalion Chief position. To that end, regardless of whether one agrees with how certain employment decisions have been made, there is no connection to these decisions and an intent to discriminate based on race.

In paragraph 19 of the Complaint, Plaintiffs state that Defendants have discriminated against black employees in hiring and promotional practices. To be clear, Plaintiffs do not have standing to bring suit regarding hiring practices; they were both hired by the City.

To the extent Stephens brings a race claim based on Clanton receiving a temporary appointment to Battalion Chief in 2005 (and assuming the claim was not time barred), the claim fails because insomuch as there was not a promotion, there was no adverse employment action such that a *prima facie* case can be established. Even so, Stephens cannot present evidence regarding the legitimate non-discriminatory reason articulated by Reeves as to why Clanton was allowed to take the assignment. (Reeves Aff. at ¶17).

In short, there is no viable claim pending before the court other than the 2006 Battalion Chief claim.

### 3. Disparate Impact

An disparate impact discrimination claim was explained as follows by the Eleventh Circuit in the *Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000):

> [D]isparate impact theory prohibits *neutral* employment practices which, while nondiscriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (explaining that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation"); see also *In re Employment,* 198 F.3d at 1311; *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1117 (11th Cir. 1993). The doctrine seeks the removal of employment obstacles, not required by business necessity, which create "'built-in

headwinds'" and freeze out protected groups from job opportunities and advancement. *Griffin v. Carlin,* 755 F.2d 1516, 1524 (11th Cir. 1985) (quoting *Griggs*, 401 U.S. at 431-32, 91 S.Ct. 849). As the district court correctly identified, "[t]he premise of disparate impact theory is that some employment practices, adopted without deliberately discriminatory motive, may be the functional equivalent of intentional discrimination" *Joe's Stone Crab*, 969 F.Supp. at 735. In essence, disparate impact theory is a doctrinal surrogate for eliminating unprovable acts of intentional discrimination hidden innocuously behind facially-neutral policies or practices.

The disparate impact framework under Title VII by now is well-settled. "Since *Griggs*, Congress has codified the appropriate burdens of proof in a disparate impact case in 42. U.S.C. §2000e-2(k) (1994), and a settled jurisprudence has arisen to implement the methodology'" *In re Employment,* 198 F.3d at 1311. As correctly identified by the district court, a plaintiff in a sex discrimination suit must establish three elements: *first,* that there is a significant statistical disparity between the proportion of women in the available labor pool and the proportion of women hired; *second,* that there is a specific, facially-neutral, employment practice which is the alleged cause of the disparity; and *finally,* and most critically in this case, that a causal nexus exists between the specific employment practice identified and the statistical disparity shown. *Joe's Stone Crab,* 969 F.Supp. at 735. See generally *MacPherson v. University of Montevallo,* 922 F.2d 766, 771 (11th Cir. 1991) (citing *Wards Cove Packing Co., v. Atonio,* 490 U.S. 642, 655-56, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-95, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 (1988).

*Joe's Stone Crab*, supra, 220 F.3d at 1274 (Emphasis in original).

The *Joe's Stone Crab* court explained that the first hurdle a plaintiff must establish in creating a *prima facie* case is "that [a] facially-neutral employment practice ha[s] a significantly discriminatory impact." (Id.)(quoting *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982)). "[T]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that *the practice in question* has *caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group." Id. at 1275 (citing *Watson,* supra, 487 U.S. at 994). The Plaintiffs must point to a specific employment practice that caused the disparate impact. Id.

-46-

If a *prima facie* case of disparate impact is established, Defendants must present evidence that the challenged employment practice serves a legitimate, non-discriminatory business objective. Id. (citing *Fitzpatrick,* supra, 2 F.3d at 1117).  If this burden is met, Plaintiffs may still establish a case of disparate impact if they can prove the business objective could have been equally met through alternative, non-discriminatory means.  Id.

**(a)      No Prima Facie Case**

Plaintiffs here cannot establish a *prima facie* case because they cannot point to a specific practice that caused a statistically significant discriminatory impact.  In determining statistical significance, "[t]he mere absence of minority employees in [ ] [particular] positions does not suffice to prove a *prime facie* case of discrimination ..." Id. (quoting *Carter v. Ball,* 33 F.3d 450, 456 (4th Cir. 1994)(citing *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 484 (9th Cir. 1983)).

Statistics of a work force imbalance are not sufficient.  Such evidence is inconsistent with Title VII because the statute "explicitly rejects the notion that employers must adopt numerical hiring quotas or 'grant preferential treatment ... on account of an imbalance ...'" *Joe's Stone Crab,* supra, 220 F.3d at 1276.  Employers do not possess an affirmative duty to correct work force imbalances that are not attributable to their conduct.  Id. (citing *Watson,* supra, 487 U.S. at 993).

In the present case, the presumable employment practice that is neutral on its face was the written test component of the assessment center - - or, at least, that there was a cut-off score to proceed after taking the written component of the assessment center.  Assuming for the purposes of summary judgment only that the Plaintiffs establish this evidence, the next two elements of the *prima facie* case cannot be maintained.  An applicant pool of only twelve individuals cannot establish statistical significance.  See *Garner v. Runyon,* 769 F.Supp. 357, 362 (N.D. Ala. 1991) (holding that looking at statistics involving 30 black applicants out of 126 total applicants for 22 jobs, was "scant statistical evidence within a very small universe" that was "not of the kind and

-47-

degree to demonstrate statistically that practice actually caused the exclusion of black applicants," and held such "may explain why plaintiff offered no affidavit or sworn deposition of a labor economist or statistician, because no reputable expert could state an opinion of disparate impact on such evidence"). Seven of the twelve applicants here failed the test. Four of the individuals who failed were white and three were black. (Reeves Aff. at ¶13). The mere fact that all three black applicants failed does not logically dictate that there was a statistically significant impact on black applicants. There were simply not enough test takers to draw this conclusion. As explained by the CWH expert, "no statistical analysis of adverse impact can be performed with a sample of 12 candidates, including only 3 minority candidates." (Exhibit "2" of Reeves Aff.). Rather, the CWH expert explains that through further analysis there are a number of factors that explain the results of the test and that none of this information points to illegal discrimination. Id. Again, the CWH expert emphasizes that the sample size was simply too small to make it possible to draw meaningful statistical conclusions. Id. A review of pertinent case law supports this opinion.

The case of *Nash v. Consolidated City of Jacksonville,* 895 F.Supp. 1536 (M.D. Fla. 1995) is instructive here. In that case, plaintiff applied for a promotion to Fire Combat Captain or Captain, the rank immediately above that of Lieutenant. Id. at 1538. The hiring process required the taking of a written exam and if the applicant scored a 70 or above, seniority credit and veteran preference points were added to the test score to come up with the final score. Id. Plaintiff challenged the testing aspect of the promotional process when only two African-Americans out of ninety-four applicants took the exam. Id. at 1539. Both made a 70 or above but were not one of the thirty applicants that were promoted from the eligibility list once the total score was calculated. Id. While recognizing that there was no set mathematical threshold to be established to show significant disparate impact, the *Nash* court held that the numbers were too unpredictable to say there had been an adverse impact. Id. at 1542. The court held:

> A statistical pool of only two African-American test takers is too shallow for the court to dive into with a disparate impact analysis.

Id. at 1543.

The Supreme Court noted that, "small or incomplete data sets and inadequate statistical technique" is an appropriate challenge to a disparate impact case. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 996-97, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); See also *Sims v. Montgomery County Commission,* 873 F.Supp. 585, 602 (M.D. Ala. 1994)("a sample size may be too small to support a determination of whether there is adverse impact").

Plaintiffs also critically fail to establish a causal connection between the three black applicants failing to score a 70 or above on the test and the conclusion that a black applicant could not be promoted. First, there is no evidence to be presented by Plaintiffs that the objective job related test was implemented identically for all applicants. There is no evidence or indication that the test would be more difficult, challenging or burdensome to a black individual than it would a white individual. On the contrary, Plaintiffs here seem to argue that the test was more difficult because they were older and more far removed from college classes and testing environments than others. Assuming such is the case, and even if one determined that such was unfair, that conclusion says nothing of whether the test is more difficult for a black applicant. Moreover, it is important to remain mindful that Plaintiffs do not challenge the test itself so much as they challenge the fact that there was a cut-off score to proceed through the assessment center. That is to say, Plaintiffs argue that the test score should have been but one element of a multi-faceted process that was judged together. However, Plaintiffs cannot establish here that if, in fact, there had not been a cut-off score, they would have ultimately been two of the four successful candidates. As such, Plaintiffs failed to meet the causal relation burden necessary to establish a *prima facie* case.

Accordingly, Plaintiffs' disparate impact claim should be dismissed as a matter of law because they cannot establish a *prima facie* case.

-49-

**(b)    The written test was a business necessity**

Plaintiffs admit that the written test examined job knowledge.  Although testifying that the test was vague or that the test asked some questions that were related to issues different than how procedures were done in the Auburn Fire Department, they admitted that the test also examined relevant job knowledge and was related to a management or administrative job in the Fire Division. It cannot fairly be argued that testing job knowledge for an administrative position is not a business necessity.  There is no legal precedent which would have dictated to the City that they could not implement a job neutral, job knowledge objective test in its promotional processes for a management or an administrative position within the Fire Department.  Reeves explained:

> [w]e decided to use a written test as part of the process because we felt it was important that candidates demonstrate their level of subject matter expertise to help identify the most qualified candidates for promotion, and because the assessment of subject matter knowledge through written testing is common in the fire service.

(Reeves Aff. at ¶7).

Accordingly, even if Plaintiffs could establish a *prima facie* case, they cannot present evidence that the business necessity of measuring an applicant's job knowledge for a particular administrative position could be equally accomplished in a manner other than implementing the written test.  Plaintiffs' opinion that seniority, time in grade or hands on demonstration should be the significant considerations is not the relevant criteria.  Seniority, time in grade or how an individual handles an actual fire or emergency experience, does not necessarily address all business necessity issues in relation to an individual competing for an administrative job in the Fire Department.  Unlike many disparate impact cases, the employment criteria here is not subjective. Again, this was a written objective test created by an outside consulting firm who were experts in the field.  (Reeves Aff. at ¶5, 7, 10).  The written test graded all applicants equally based on their knowledge of the job.  Plaintiffs' attempt to establish that it was not CWH but the City who

-50-

determined to have a cut-off score is irrelevant for this analysis.  It is undisputed that CWH had a written test option and that they developed a test and implemented same as part of the assessment center as experts in the field.  Plaintiffs admit that it is not their place to say whether the test was appropriate or relevant.  Rather, because the Plaintiffs were not successful at scoring a 70 or above on the exam, they wish to challenge the wisdom of objectively measuring job knowledge as oppose to weight given seniority, time in grade or hands on exercises. There is no dictate that an employer must give any weight and certainly not greater weight to seniority over job qualifications or job knowledge. See e.g. *Thomas v. Bed Bath & Beyond*, 508 F.Supp.2d 1264, 1281 (N.D.Ga. 2007); see also *Lett v. Reliable Ruskin*, 2006 WL 2056582 *15 (M.D.Ala. 2006)(approving employer's policy that it would not hire a more senior employee over a more qualified one).

Because Plaintiffs cannot establish a *prima facie* case or in the alternative cannot present an equal alternative to the assessment center that was utilized for the Battalion Chief promotions in 2006, any disparate impact claim fails as a matter of law.

The Eleventh Circuit, citing the Supreme Court's *Griggs* case, has stated:

> Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications ... What is required ... is the removal of artificial, arbitrary, and unnecessary barriers ...

*Lee v. State of Florida, Dept. of Children and Family Services,* 135 Fed.Appx. 202, 206 (11th Cir. 2005) (citing *Griggs,* supra, 401 U.S. at 429).

**F.    Retaliation**

The law plainly states that it is an unlawful employment practice to discriminate against an individual if "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing ..." § 704(a) of Title VII; see also *Clover v. Total System Services, Inc.,*176 F.3d 1346, 1350 (11th Cir.1999).  To establish a claim of retaliation, the plaintiff must establish that (1) he was engaged in a statutorily protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action

-51-

and the protected activity.  See *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1388 (11th Cir. 1998); see also *Montgomery v. City of Birmingham*, 2000 WL 1608620 *7 (N.D. Ala.), (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)).   The employee must prove intent.  The real issue in this case is whether that "causal connection" can be established. See *Raney v. Vinson Guard Serv.,* 120 F.3d 1192, 1197 (11th Cir. 1997); *Mangum v. West*, 2000 WL 206618 *3 (S.D. Ala).  The Eleventh Circuit has stated that the plaintiff must prove that the "protected activity and the negative employment action are not completely unrelated."  *Meeks v. Computer Assoc. International,* 15 F.3d 1013, 1021 (11th Cir. 1994)(quoting *E.E.O.C. v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993).

If an employee establishes a *prima facie* case of retaliation, the employer carries the burden of offering a non-retaliatory reason for its acts.  See *Burdine,* supra, 450 U.S. at 255-56.  If the employer offers a legitimate reason for its employment action, the burden shifts back to the plaintiff to demonstrate that the explanation was a pretext and that the employer took adverse action because of his protected activities.  Id. at 256; *Mangum*, supra*, 2000 WL 206618 *3; *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997).

There is no question in this case that Plaintiffs cannot maintain a claim of retaliation for the protected activity.  Ogletree has never engaged in protected activity and therefore cannot maintain a retaliation claim.  *Butler v. Alabama Dept. of Transportation*, 512 F.Supp.2d 1209, 1226 (M.D. Ala. 2007).

Stephens filed an EEOC charge in early 2005 when there was a temporary assignment to Battalion Chief for a white employee.  However, he offers no information or evidence that anything that occurred with him thereafter was connected or related to that EEOC charge.  In fact, it is undisputed that Stephens went through the exact same promotional process as everyone else and there was no subjectivity such that an individual could exercise retaliation in the decision of who would be promoted.  Stephens certainly offers no evidence that the promotional process of an

-52-

assessment center was devised to intentionally weed him out of the process because of his prior EEOC charge. In fact, when asked about it, he says he was not promoted because he did not score a 70 on the exam. (Stephens Depo. p. 176 at line 9 to p. 178 at line 5, p. 178 at lines 10-19). Moreover, there was a significant lapse in time between Stephens prior EEOC charge and the 2006 promotions. Although not completely determinative, such a significant amount of time between the events in question creates a tremendous burden on Plaintiff here that he cannot overcome. See *Wascura v. City of South Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001); *Keel v. United States Department of Air*, 256 F.Supp.2d 1269, 1289 (M.D. Ala. 2003)(citing *Gaddis v. Russell Corp.*, 242 F.Supp.2d 1123, 1145-47 (M.D. Ala. 2003)(holding that Plaintiff failed to establish evidence of causal connection where a lapse of six months existed between the protected activity and the adverse employment action)). Stephens can present no evidence to connect the prior protected activities and his failure to be promoted.

There is no evidence otherwise that the subject events have anything to do with the other. In fact, Plaintiffs have no evidence that retaliation effected the decision to not promote him.

Even if Plaintiffs presented "causal connection" evidence, the legitimate, non-retaliatory reasons proffered by Defendants regarding Plaintiffs' failure to be promoted are undisputed. Plaintiffs participated in the assessment center process like all other candidates and scored below at 70 on the written exam. Plaintiffs' retaliation claim is due to be dismissed as a matter of law.

### IV.
### CONCLUSION

***Wherefore premises considered***, Defendants request that summary judgment be granted in their favor and all Plaintiff's claims dismissed as a matter of law.

Respectfully submitted this the 11th day of August 2008.

/S/ Elizabeth Brannen Carter
Randall Morgan [8350-R70R]

-53-

Elizabeth Brannen Carter [3272-C-38-E]
HILL, HILL, CARTER, FRANCO,
  COLE & BLACK, P.C.
425 South Perry Street
Montgomery, Alabama 36101-0116
(334) 834-7600
(334) 263-5969 facsimile
Rmorgan@hillhillcarter.com
ECarter@hillhillcarter.com
Counsel for Defendant


## CERTIFICATE OF SERVICE

I Hereby Certify that I have this date served a true and correct copy of the foregoing *Memorandum Brief in Support of Motion for Summary Judgment on Behalf of Defendants* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, using the CM/ECF system which will send notification of such filing to: Richard F. Horsley, Esquire (rfhala@cs.com)  this the 11[h] day of August 2008.


/S/ Elizabeth Brannen Carter
Of Counsel