# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

FEB 15 1991

THOMAS ... COVER, CLERK
BY _____

CLINTON W. HAMMOCK, et al.,       )
                                  )
            Plaintiffs,           )
                                  )
                                  )
                                  )
vs.                               )          CV-87-680-E
                                  )
                                  )
THE CITY OF AUBURN, et al.,       )
                                  )
            Defendants.           )

PLAINTIFF'S
EXHIBIT
3

## ORDER APPROVING SETTLEMENT AGREEMENT

On this the 1st day of February, 1991, at 9:00 A.M., the day
and date set for the Fairness Hearing on the proposed Settlement
Agreement in the above case, the parties appeared in Open Court.
Several written objections to the Settlement Agreemnt had been
filed, which the Court considered.  The attorneys for the parties,
namely Arnold W. Umbach, Jr., attorney for the City of Auburn; Hon.
Stephen R. Glassroth, attorney for the past and present white
firefighters, Hon. Deborah H. Biggers, attorney for the past,
present and future black firefighters, and Hon. Dudley Perry, Jr.,
attorney for the white future firefighters, appeared in Court and
represented to this Court that the proposed Settlement Agreement
represented a compromise by all parties and all attorneys
recommended the Settlement Agreement to the Court on behalf of
their clients.  The Court gave an opportunity to all class members
present to express any opinions which they might have regarding the

EOD 2-15-91

proposed Settlement Agreement and no member of the class spoke. The Court is therefore of the opinion that the proposed Settlement Agreement should be approved and it is

ORDERED, as follows:

1. That the Settlement Agreement dated November, 1990, submitted to this Court is hereby approved and all parties are hereby directed to implement the terms and conditions of said Notice of Proposed Class Settlement.

2. That the matters involving the attorneys' fee for Perry & Perry is reserved for future decision by this Court.

3. That a copy of this Order be mailed postage prepaid or hand-delivered by the Clerk of this Court to the following:

Arnold W. Umbach, Jr.
Walker, Hill, Adams,
    Umbach, Meadows & Walton
Attorneys for the City of Auburn
P. O. Box 2069
Opelika, AL  36803-2069

Hon. Stephen R. Glassroth
P. O. Box 910
Montgomery, AL 36102

Hon. Deborah H. Biggers
P. O. Box 1258
Tuskegee, AL  36083

Hon. Dudley Perry, Jr.
111 Washington Avenue
Montgomery, AL  36104

ENTERED this ___15th___ day of February, 1991.

ROBERT E. VARNER, District Judge

-2-

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NOV 14 1990

THOMAS C. CAVER

CLINTON W. HAMMOCK, et al.,      )
                                 )
          Plaintiffs,            )
                                 )
vs.                              )      CV-87-680-E
                                 )
THE CITY OF AUBURN, et al.,      )
                                 )
          Defendants.            )

## NOTICE OF PROPOSED CLASS SETTLEMENT

TO: Former, Present, and Future Employees of
the City of Auburn Fire Department who
are members of the Plaintiff Class in
Civil Action No. 87-V-680-E

A lawsuit pending in this Court, Civil Action No.
87-V-680-E involving a claim by Clinton W. Hammock and others
against the City of Auburn, Jan M. Dempsey, Mayor of the City of
Auburn; Tejeda, Personnel Manager for the City of Auburn; the
City Council of the City of Auburn, Robert Gastaldo, Samuel
Harris, Mary Fortenberry, Sam Teague, Lamar Sellers, Frances W.
Hale, W. G. "Trey" Johnston, and Bill Ham, Jr., was settled
pursuant to a Notice of Proposed Class Settlement, which, if you
are a member of the class, you should have received on or about
August 22, 1988. Since the settlement of this class action
suit, several issues have been brought before this Court
concerning the enforcement of the provisions of the settlement
decree. Currently pending before this Court are Objections of

EXHIBIT C

Dexter Card and William Felton To Proposed Settlement of Class
Action, Objections of Members of Subclass of Past, Present, and
Future Black Firemen, and Response of the Class Consisting of
Present and Future Auburn Firefighters to the Order to Show
Cause of February 16, 1990, all filed by class counsel.

The purpose of this notice is to advise you of the status
of proposed settlement of all issues involved.

Subject to the approval of the Court the Plaintiffs and the
Defendants have agreed on a settlement of the issues.  The terms
of agreement are in the Memorandum of Understanding which
states:

## MEMORANDUM OF UNDERSTANDING

1.  STUDENT FIREFIGHTERS.  Within thirty days the City
will issue a statement restating in substance those matters set
forth in the plan submitted on February 3, 1989, (the Plan) to
the U. S. District Court in this case and indicating, among
other things, the following:

A.  That the Student Firefighters are not Regular
Firefighters.  "Regular Firefighters" includes all permanent
full-time Firefighters except Student Firefighters.

B.  The Student Firefighters and their leaders are all
under the direct supervision and control of the Fire Chief and
the officers of the fire department.  Student Firefighters have

no control or authority over any Regular Firefighters at any time.

C.  The Student Firefighters do not automatically become Regular Firefighters but may, of course, apply for the position of a Regular Firefighter in the event such position becomes available.  The Student Firefighters are not eligible for any promotions within the fire department except for the promotion to student positions within the Student Firefighters section.

D.  The Student Firefighters may be used as deemed appropriate by the City.  When the Career Firefighters arrive, the Senior Career Fire Officer or his designee shall assume command immediately upon their arrival.  All Student Firefighters and Career Firefighters shall work together to carry out the directions and instructions of the Senior Career Fire Officer or his designee.  In the event that a third firestation is built by the City, the City may make a determination to use Student Firefighters to man the third firestation.

E.  No parties challenge the selection process of student team leaders.  In addition all parties agree that the City's obligation to hire black Firefighters does not apply to Student Firefighters and the City may hire Student Firefighters without regards to said Order but may not, of course, discriminate in its hiring practices based upon race.

2.   KENNETH RIDLEY AND THOMAS SCOTT.  Within thirty days from the approval of this settlement, the City shall pay both Mr. Ridley and Mr. Scott from November 17, 1988, until the date of their re-hiring by the City of Auburn.  Said sum shall be treated as compensation with the appropriate withholding and deductions.  In addition, if the City has not reinstated Mr. Ridley and Mr. Scott at their previous seniority level, including their prior grade and step, with the same accumulated vacation days and sick leave days as of the date of their last employment with the City prior to 1989, the City shall do so within 30 days of the approval of this settlement and shall issue a written statement to be placed in their personnel file, stating that the seniority, vacation days and sick leave has been so reinstated.

3.  CAFETERIA PLAN.  Within thirty days, the City will obtain from the Administrator of the City's Cafeteria Plan a statement indicating all reserves, including cash reserves and other reserves, available to any Firefighter, and a complete accounting of the disposition or transfer of any such cash reserves.  Further, the City will joint with Plaintiffs to assist the Firefighter in obtaining all benefits to which they are entitled under the Cafeteria Plan, and under all insurance policies within such Cafeteria plan, and under all insurance policies within such cafeteria plan to which the Plaintiffs have

made payments, and to be sure that the Cafeteria Plan has been administered in accordance with applicable regulations.

4. **BILL PELTON.** In addition to the above matters pertaining to the City's Cafeteria Plan, within thirty days, the City will furnish to Mr. Felton a statement of his plan and determine whether inappropriate deductions have been made from his paycheck and whether certain benefits are due. If it is determined that benefits are due to him or that inappropriate deductions have been made the City will cooperate to require the insurance company to fulfill its obligations.

5. **CAREER PLAN.** Within thirty days from the approval of this settlement, the City will modify the Career Plan currently submitted to the Court in this matter so that all deadlines set forth therein are extended for one year past the previous deadlines set forth in said Career Plan. In addition, no Firefighters shall be required to sit for nor pass the Firefighter II examination given by the State of Alabama. All Firefighters must, however, complete all training for the Firefighter II certification as given by the City of Auburn and pass all practical tests and examinations given by the City, whether written or oral which relate to said training. So long as each Firefighter is making a good faith effort to successfully complete the tests and examinations, each Firefighter shall be allowed the opportunity to take such tests and examinations as many times as may reasonably be required in

order to pass. All Firefighters, even those who do not pass the State Firefighter II certification, will be required to take additional training as required by the Career Plan, with said training to include but not be limited to Fire Apparatus Operator training. The exemption to the requirement for the Firefighter II certification shall apply to Chris Turner referred to in Paragraph 11 below, but shall not apply to any Fire Officer, present or future, nor to any Firefighter hired after the date of this Agreement. In addition, all Firefighters understand and acknowledge that the failure to obtain the Firefighter II certification probably will affect future raises, promotions and job tasks.

City shall have the right to delete courses and requirements from the Career Plan if in the judgment of the City such requirements are no longer needed or required. City shall also have the right to amend the Career Plan to reflect future state or federal requirements and change in the mission of the Fire Division.

- All other matters set forth in said Career Plan shall be approved by all parties and can immediately be implemented by the City.

The City shall amend the job descriptions in the Career Development Plan if necessary, so that said job descriptions correctly reflect the actual job tasks performed by each position with the Fire Division of the Department of Public

Safety of the City and are consistent with the current job
descriptions for each position in the Fire Division of the
Department of Public Safety of the City.

Upon approval of this Settlement Agreement by the Court and
the Class, the Career Plan will be amended to be consistent with
the changes set forth herein.

6.   PHYSICAL FITNESS PLAN.  The City shall modify the
Physical Fitness Plan currently submitted to the Court so that
by adopting Section 2-3.1 of the Physical Fitness Plan required
by the National Fire Protection Association, NFPA 1001
Firefighter Professional Qualifications, 1987 Edition, so that
the criterion reference norms set forth in the Physical Fitness
Plan shall be as follows:

### CRITERION REFERENCE NORMS

| Field Test | Males | Females |
|---|---|---|
| Percent Body Fat | max 19%-25% age related | max 23%-29% age related |
| Sit ups | min 30 | min 30 |
| Sit and Reach | min 23 cm | min 23 cm |
| Step test | Good level based on age (See Table B.4) | Good level based on age (See Table B.5) |

7

Each Firefighter shall complete one of the following:

|  | Males | Females |
|---|---|---|
| 1 1/2 mile run | under 30  13:00 min<br>30-39   13:00 min<br>40-49   14:00 min<br>over 50  14:30 min | under 30  13:00 min<br>30-39   13:00 min<br>40-49   14:00 min<br>over 50  14:30 min |
| Walk 3 miles | 38 min | 38 min |
| Bicycle 4 miles | 12 min | 12 min |
| Swim 500 yards | 8 min 20 seconds | 8 min 20 seconds |
| Run in Place<br>75 steps per<br>minute | 15 min | 15 min |
| Run on a<br>motorized hori-<br>zontal tread-<br>mill 10 miles<br>per hour | 6 min | 6 min |

The Physical Fitness Plan currently submitted to this Court with the above modifications shall be approved and the City may immediately implement said Plan.

8

7.   **WELDON AND FORTNER.**  The City will in good faith
attempt to convince the Retirement Systems of the State of
Alabama to accept its contributions on behalf of Mr. Weldon and
Mr. Fortner in accordance with the previous order of this Court.
It is the understanding of the parties that such attempt, if
necessary, will include litigation on behalf of Mr. Weldon and
Mr. Fortner.  The City shall proceed in good faith to promptly
obtain such ruling.

8.   **SICK LEAVE.**  The City represents that it has
included in the Sick Leave Plan submitted to the Court in this
matter a statement indicating that co-employees will not check
on other employees regarding sick leave.  If requested, the City
will issue a further statement to this affect.

9.   **WALTER ALLEN.**  Within thirty days, the City will
grant Mr. Allen two vacation days in exchange for two sick leave
days.

10.   **MINIMUM PERMANENT FIREFIGHTER STAFFING.**  For a
period of seven years from October 1, 1990, the City shall
maintain 33 permanent Firefighters which 33 permanent
Firefighters shall include the Fire Chief, Deputy Chiefs,
Captains, Lieutenants, Student Team Leaders and Firefighters.
In addition, the City agrees to maintain within said minimum
number of 33 Permanent Firefighters, six Captains and six
Lieutenants.  The City may, in its sole discretion and with the
consent of the Fire Officer, use the Fire Officers (Lieutenants

and Captains) as student team leaders without having to replace the Fire Officers.  This commitment by the City shall expire on October 1, 1997.

11.  BLACK FIREFIGHTERS.  Upon the execution of this Agreement, the City agrees to hire Chris Turner as a Probational Firefighter for a period of one year, and if Chris Turner completes all of the requirements for a Permanent Firefighter, which shall include the 240 hours of training required by the State of Alabama, passing the required physical examination by Dr. Jimmy Mathews and satisfactorily complying with all of the rules and regulations of the Fire Division during the one-year period, he may become a Permanent Firefighter within the one-year period.  In such event the City shall retain Chris Turner as a Permanent Firefighter, subject to the rules and regulations of the Fire Division of the Public Safety Department of the City including all provisions of the Career Plan.  Mr. Turner shall _not_ be required to sit for nor pass the Firefighter II examination given by the State of Alabama.  He must, however, complete all training for the Firefighter II certification as given by the City of Auburn and pass all practical tests and examinations given by the City, whether written or oral, which relate to said training.  If Mr. Turner does not complete all of the requirements to become a Permanent Firefighter within the one-year period, the City shall not be obligated to retain him. In addition, the City agrees that the next two Regular

Firefighters hired by the City shall be black Firefighters. These Firefighters shall be hired when the City next hires Regular Firefighters.

12.   ASSESSMENT CENTER.  The City has submitted to this Court an Assessment Center which shall be approved by the Court and implemented by the City for use in the promotion of Lieutenants and Captains with the Fire Division. Notwithstanding any language to the contrary contained in the City of Auburn Assessment Center Candidate Orientation Manual, all promotions subject to Assessment Center involvement shall be made by promoting the candidate rated Number 1 by the Assessment Center for each such promotion.

13.   BILL FELTON AND JESSIE STRICKLAND.  Immediately upon the execution of this Agreement, the City shall promote Bill Felton and Jessie Strickland to Lieutenant and shall pay to Bill Felton and Jessie Strickland within thirty days thereof, back pay at Grade 34, Step 10 from March 1, 1990, until the date of promotion by the City.  The City shall not be required to promote any other individual to the rank of Lieutenant, whether or not any individual has applied for the position of Lieutenant prior to the date of this Agreement.

14.   DAY.  The day will be defined as follows:  For Firefighters on a 56-hour work week, 10.6 hours per month will be earned for all employees hired after February 3, 1989.  For full-time Firefighters who work a 56-hour week and were hired

prior to February 3, 1989, annual leave shall be earned based on one 24-hour shift per month. For all personnel of the Fire Division not on the 56-hour week, adjustments will be made accordingly.

15. RETALIATION PROHIBITED. The City shall not retaliate against any member of the class.

16. ENTIRE AGREEMENT. This Settlement Agreement expresses the entire agreement between the parties hereto, whether oral or written, and incorporates herein all other matters agreed upon by the parties in the settlement of this lawsuit.

## General

1. The City shall be provided Full and Final Releases from all individuals adverse to the City in Clinton W. Hammock, et al. vs. City of Auburn, Civil Action No. CV-87-V-680, specifically releasing the City and all individuals it so chooses of any and all liability or obligations of any kind in connection with the events which are the basis of said lawsuit. This lawsuit shall then be dismissed with prejudice and the Plaintiffs shall bear their own costs.

2. ATTORNEY'S FEES. The matter involving any attorney fees due to Perry & Perry is reserved by the Court for final decision after hearing evidence thereon. The City shall pay to

Deborah Hill Biggers the sum of $15,000.00 and shall pay to the law firm of Kendrick and Glassroth the sum of $10,000.00.

## SETTLEMENT HEARING

The Court will hold a hearing in the United States District Courthouse in Montgomery, Alabama, on __February 1, 1991__, at __9:00__ A.M., to determine whether, as recommended by both class counsel, it should approve the proposed settlement.

Objections to the proposed settlement by class members will be considered by the Court but only if such objections are filed in writing with the Court on or before __January 15, 1991__. Attendance at the hearing is not necessary; however, class members wishing to be heard orally in opposition to the proposed settlement should indicate in their written objection their intention to appear at the hearing.

Class members who support the proposed settlement do not need to appear at the hearing or take any other action to indicate their approval

## FURTHER PROCEEDINGS

If the settlement is approved by the Court, the entire Memorandum of Understanding will be put into effect and the entire amount of damages, including fees, costs and expenses,

will be paid to the Clerk of this Court, who will make

distribution in accord with the terms of the Memorandum of

Understanding.

If settlement is not approved, the motions and other

matters will be prepared for judicial resolution of the claims

and defenses concerning this Courts prior order and the other

matters.

## ADDITIONAL INFORMATION

Any questions you have about the matters in this notice

should not be directed to the Court, but may be directed by

telephone or letter to:

Deborah Hill Biggers
113 East Northside
Tuskegee, AL  36083

Stephen R. Glassroth
Kendrick and Glassroth
505 South Perry Street
P. O. Box 910
Montgomery, AL  36101-0910

or

Robert T. Meadows, III or
Arnold W. Umbach, Jr.
Attorneys for the Defendant, the City of
Auburn, Mayor Jan Dempsey, Douglas Watson,
Ron Tejeda, and the Members of the City
Council of the City of Auburn
Walker, Hill, Adams, Umbach & Meadows
P. O. Box 2069
Opelika, AL  36803-2069
Telephone:  (205) 745-6466

You may, of course, seek the advice and guidance of your own attorney if you desire. The pleadings and other records in this litigation, including a complete copy of the proposed settlement agreement, may be examined and copied at any time during regular office hours at the office of the Clerk, Federal Courthouse, Montgomery, Alabama.

## REMINDER AS TO TIME LIMITS

If you wish to object to the proposed settlement, file your written objections with the Clerk of the Court on or before January 15, 1991        . Include any request to be heard orally at the hearing.

DATED: February 14, 1990

*Thomas C. Caver*

THOMAS C. CAVER, Clerk
United States District Court for
   the Middle District of Alabama
P. O. Box 711
Montgomery, AL  36101

# EXHIBIT B

PLAINTIFF'S
EXHIBIT

1

PENGAD 800-631-6989

RESOLUTION NO.  05-288

BE IT RESOLVED by the City Council of the City of Auburn, Alabama, that the City Manager is authorized to execute the attached contract with CWH Research, Inc. for the development and administration of a promotion selection process for the position of Fire Battalion Chief.

ADOPTED AND APPROVED by the City Council of the City of Auburn, Alabama, this 20th  day of December, 2005.

_____
Mayor

ATTEST:

_____
City Manager



EXHIBIT

tabbies    A



## LETTER OF AGREEMENT

THIS AGREEMENT is made this 21st day of December, 2005 between the City of Auburn, Alabama (hereinafter called "the Client") and CWH Research, Inc., (hereinafter called "CWH") a Colorado Corporation, whose business address is 9085 E. Mineral Circle, Suite 350, Englewood, CO 80112.

1) The Contract. This document is a complete agreement.

2) Definitions. When used in this Agreement, the following words and phrases shall have the indicated meanings:

   a) candidate - an individual who appears at the testing site and begins the written test.

   b) written test - a written measuring instrument and accompanying answer sheets, which may or may not be combined with other instruments into a single battery.

   c) qualified administrator – an individual who has had previous experience in written test administration, has been apprised of the confidential nature of the tests, the importance of fair and impartial testing, and the importance of maintaining strict test security. Further, this individual shall have read the CWH general instructions for written test administrations, and shall have been approved by CWH.

   d) written test session - the period from commencement of the first test in a CWH promotional test battery to the last test in that battery, occurring on the testing date (s) agreed upon by CWH and client.

   e) assessment center - exercises or simulations designed to measure candidates' knowledge, skills, and abilities, as well as the scoring of those candidates' performance on each of the exercises and simulations.

   f) assessor - an individual who has been trained in the use of assessment centers and the evaluation of candidates' performances in assessment centers. Further, the assessor or assessors shall have been apprised of the confidential nature of the assessment center exercises, the importance of fair and impartial evaluations, and the importance of maintaining strict security over all elements of the assessment center.

   g) assessment center test session - the period from commencement of the first set of assessment center exercises to the last exercise and final evaluation of candidates, occurring on the testing date (s) agreed upon by CWH and the Client.

   h) oral board – series of structured interview questions designed to measure candidates' knowledge, skills, and abilities, as well as the scoring of those candidates' performance on each of the questions.

   i) oral board test session – the period from commencement of the first oral board question to the last question and final evaluation of candidates, occurring on the testing date (s) agreed upon by CWH and the Client.

3) Services to be Performed by CWH. CWH is an independent contractor and is not an agent, servant, employee or partner of the Client, and nothing contained herein shall be deemed or construed by the parties hereto or by any third party as creating a relationship of principal and agent or partnership or joint venture between the parties. CWH shall perform services for the Client in the categories listed below (collectively, the "Services"). These categories, and some, but not necessarily all, of the major services to be performed for the Fire Battalion Chief position as follows:

   a) Job Analysis Review
      (1) Job analysis review includes conducting interviews to develop test instruments and to provide a content valid process.

## CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

b) Written Test Development
   (1) Developing and validating a semi-customized written exam composed of 70 to 80 traditional job knowledge written items and 20 to 30 situational judgment items. Includes recommendations as to the format of the questions and answers, the number of questions to be included and the study sources. Includes up to 30 custom test items designed specifically for the client.
   (2) Provide master copy of the exam, the delivery of the exam and answer sheets, scoring of the exam, and handling appeals.

c) Test Scoring
   (1) Score tests.
   (2) Conduct relevant statistical analysis.
   (3) Consult with the Client regarding the format and structure of the final eligibility lists.
   (4) Provide results in written format within two weeks after completion of the exams.
   (5) Handle test challenges or concerns.

d) Assessment Center
   (1) Develop one set of exercises for each position, selecting three of the following for each position: In-basket, Oral Resume, Oral Presentation, Written Exercise, Role-Play or Emergency / Tactical Scenario.
   (2) Provide candidate orientations, conduct rater training, conduct training for Client staff as required or needed.
   (3) Provide assessor training.
   (4) Administer process to up to 12 candidates (one day of testing).
   (5) Score.

e) Feedback
   (1) Provide written feedback letters to candidates.
   (2) Provide process summary to Client.

f) Validity. CWH shall conduct a content validation process for the test(s). This validation will meet and adhere to the following standards and guidelines:

   (1) Federal EEOC Uniform Guidelines on Employment Selection Procedures.
   (2) Principals for the Validation and use of Personnel Selection Procedures.
   (3) Standards and Ethical Considerations for Assessment Center Operations.
   (4) Standards for Education and Psychological Tests.

## CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

4) <u>Payment for Services</u>. In consideration of the Services of CWH, the Client shall pay CWH the total sum shown below for services. Travel expenses will be billed at additional cost.

Breakdown for services is as follows:

| Service | Cost |
|---|---|
| Job Analysis Review | Included |
| Semi-Customized Written Test | |
| Technical Job Knowledge Component | $2,500.00 |
| Situational Judgment Component | $4,500.00 |
| Assessment Center | $10,000.00 |
| | |
| TOTAL (excluding options and expenses) | $17,000.00 |
| | |
| | |
| OPTIONS: | |
| Written Feedback Letters ($125 per candidate -- assumes 10 candidates) | $1,250.00 |
| Additional days of assessment center administration | $800 per day |
| "Hot Seat" exercise | Not included |
| CWH obtaining assessors | Not included |

Payment to be made as follows (excludes options and expenses):

| | |
|---|---|
| 25% upon initiation of contract | $4,250.00 |
| 25% upon completion of SME test development meeting | $4,250.00 |
| 25% upon completion of written test | $4,250.00 |
| 25% upon completion of assessment center | $4,250.00 |

Options will be billed with the final invoice following completion of the assessment center.

All travel and additional expenses will be billed at cost as incurred or at the below standard rates. These expenses will include the following categories and rates:

| | |
|---|---|
| Airfare | Economy class, with first class upgrades paid for by CWH mileage points. Cost varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Hotel charges | Mid priced hotel, such as Marriot, Hilton, etc. We use government rates and discounts when possible. Cost varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Per Diem | $45 per day, or $15 per meal. |
| Mileage to/from airport and to/from client site | $0.42 cents per mile, plus applicable tolls. |
| Rental car | Mid size car. Varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Shipping | US Postal service or FED EX is generally used, depending upon requirements. 2 day shipping is generally used, unless overnight is required. |

## CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

This price includes the complete and satisfactory performance of the Services specified in this Agreement. Optional components may be selected by client for additional charges noted.

If any additional work is required beyond what this contract states, Dr. Hornick will provide his assistance at the rate of $250 per hour. Any additional work provided by other personnel in CWH will be charged at the rate of $175 per hour for Managing Consultants, $125 per hour for Consultants, and $50 per hour for clerical.

Expert Testimony. CWH shall provide expert testimony concerning any aspect of its work related to this contract and/or the resultant defense of all related products. This testimony and any necessary preparation will be performed at the hourly rate mentioned above, plus any travel or other related expenses which are incurred.

5) Client Responsibilities. In addition to paying CWH for services according to the preceding paragraph, the Client shall have the following responsibilities:

   a) The Client shall provide for the written test and assessment center appropriate testing site(s) and materials, including rooms and furniture conducive to the taking of tests. In addition, all necessary supplies needed by candidates, assessors, and proctors during the written test and assessment center shall also be provided by Client.

   b) The Client shall make arrangements for qualified written test and assessment center administrators and proctors. The qualified administrators must be approved by CWH.

   c) The Client shall make all notifications to those people who are eligible to take the test. These notifications include, by way of explanation, but not by way of limitation: testing dates, testing times, and testing places. Further, Client shall make all reasonable attempts to provide for notifications, testing opportunities, and similar concerns to all candidates in a fair and impartial manner.

   d) The Client shall supply sufficient numbers of assessors and role players to conduct the assessment centers, based on criteria established by CWH. Should these assessors or role players require payment for their time or expenses, the Client agrees to assume full responsibility for these costs.

   e) CWH will retain the copyrights to all materials developed in the performance of this contract. CWH will, however, grant the Client a non-exclusive, royalty free license to use the selection procedures that will be developed for the duration of this contract. Client shall not reveal the contents of the tests to anyone without the written consent of CWH. The Client assumes full responsibility and liability for any violation of this provision by its employees and/or agents to the extent such employees and/or agents were acting within the scope of their employment and or agency.

   f) Client shall return all testing materials provided by CWH, to CWH.

6) Provisions of the Contract. The following provisions are made a part of this contract:

   a) Non-Discrimination. CWH certifies and represents that, during the performance of this Contract, Contractor and any other parties with whom it may subcontract shall adhere to equal opportunity employment practices to assure that applicants and employees are treated equally and are not discriminated against because of their race, religious creed, color, national origin, ancestry, handicap, sex or age. Contractor further certifies that it will not maintain any segregated facilities.

   b) Applicable Law. Parties to this contract shall conform with all existing and applicable city ordinances, resolutions, state laws, federal laws, and all existing and applicable rules and regulations. This contract should be construed in accordance with the laws of the State of Alabama. If a dispute arises involving this agreement, and the parties are not able to amicably resolve such dispute; then the parties agree that all claims shall be brought in a Court of Competent jurisdiction located in Alabama.

12/21/2005                                                                          Page 4 of 7

**CWH Research, Inc.**

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112

303-617-3433

c) Interest of the Client. No elected official or any officer or employee of the Client shall have a financial interest, direct or indirect, in this contract.

d) Interest of CWH. CWH covenants that they presently have no interest and shall not acquire any interest, direct or indirect, which would conflict with the performance of services required to be performed under this contract; they further covenant that in the performance of this contract, no person having any such conflict of interest shall be employed.

e) Maintenance of Records. All appropriate records related to the aforementioned projects will be maintained by CWH for the required statute of limitations.

f) Modification. This contract contains the entire Agreement of the parties. No representations were made or relied upon by either party other than those that are expressly set forth herein. No agent, employee or other representative of either party is empowered to alter any of the terms hereof unless mutually consented to in writing and signed by an authorized officer of the respective parties.

g) Assignment. CWH may not assign its rights under this Agreement without the express prior written consent of the Client, and such successor in interest may not assign its rights under this Agreement without the express prior written consent of the Client. The Client has the right to continue with the assignee or cancel the Agreement with a pro-rata refund.

h) Termination. The Client may terminate this Agreement upon 30 days written notice without cause. Upon delivery of said notice to CWH, CWH shall cease performing any work pursuant to this agreement and shall be entitled to retain that portion of the fee for services performed through and including the 30 days notice period prior to termination.

i) Insurance. CWH will be required to provide certificates of insurance showing that it carries, or has in force, automobile liability insurance, general liability insurance, professional liability insurance and workers' compensation insurance. Limits of liability for automobile liability insurance shall be, at a minimum, $1,000,000.00 combined single limit. Limits of liability for general liability insurance shall be, at a minimum, $1,000,000.00 per occurrence, $1,000,000.00 personal and advertising injury, $1,000,000.00 general aggregate and $1,000,000.00 products/completed operations aggregate. General liability insurance will include coverage for contractually assumed liability. Limits of liability for professional liability shall be, at a minimum, $1,000,000.00 per occurrence or claim and $3,000,000.00 aggregate. If professional liability coverage is on a claims-made basis, CWH will maintain coverage in force for a period of two (2) years following completion of the work specified in the agreement. Workers' compensation insurance shall provide statutory workers' compensation coverage and employers' liability coverage with limits of, at a minimum, $500,000.00 each accident, $500,000.00 disease- each employee and $500,000.00 accident, $500,000.00 disease – policy limit.

The certificate of insurance shall provide the Client with thirty (30) days written notice of cancellation of any of the coverages named in said certificate.

The Client will be named as additional insured under the CWH's general liability insurance and automobile insurance policies.

CWH shall require certificates of insurance from subcontractors. Subcontractors will carry limits of insurance equal to or greater than those carried by the CWH. These certificates shall evidence waivers of subrogation in favor of CWH and the Client and shall be made available to the Client upon request.

j) Indemnification. Each party shall generally be responsible for its own acts and will be responsible for all damages, costs, fees, and expenses, including attorney's fees and costs, which arise out of the performance of

## CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

this agreement and which are due to that party's own negligence, carelessness, unskillfulness, and other unlawful conduct and/or the negligence, carelessness or unskillfulness or other unlawful conduct of its respective officers, agents and/or employees acting in their official capacities. Provided; however, Client shall defend, indemnify and hold CWH, its officers, agents and employees free and harmless from and against any claims, demands, actions, damages, expenses, fees, liabilities and/or attorney's fees arising out of, by virtue of or associated with the negligence, tortuous acts or other unlawful conduct of Client or its respective agents, officers and employees in the performance of this agreement. Provided however, that Client does not waive its defense of sovereign immunity or any other immunity or privilege afforded by law; nor does client waive official immunity available to any officer, employee, or agent acting by or on behalf of Client. In addition, CWH shall defend, indemnify, and hold Client, its officials, representatives, agents, servants and employees free and harmless from and against any claims, demands or actions brought by third parties which are related in any way or are associated with the negligence, tortuous acts or other unlawful conduct of CWH or its respective agents, officers and employees in the performance of this agreement.

### AUTHORIZED REPRESENTATIVE

In further consideration of the mutual covenants herein contained, the parties hereto expressly agree that for purposes of notice, including legal service of process, during the term of this contract and for the period of any applicable statute of limitations thereafter, the following named individuals shall be the authorized representatives of the parties:

(i)    CLIENT:

     Steven A. Reeves

     Human Resources Director

     130 Tichenor Avenue

     Auburn, AL 36830

By:

Name:    David F. Watkins

Title:    City Manager

(ii)    CWH Research, Inc.
     Kathryn A. Fox, M.A.
     9085 E. Mineral Circle
     Suite 350
     Englewood, Colorado 80112

Kathryn A. Fox, Vice-President

EXECUTED this 21st day of December, 2005.

# EXHIBIT C


PLAINTIFF'S
EXHIBIT
2
PENGAD 800-631-8989

# Auburn Fire Division
# Orientation Manual

# Promotional Written Test &
# Assessment Center
# Process



CWH

Copyright © 2004 by CWH Research, Inc.
No part of this manual may be reproduced without prior written consent.
ALL RIGHTS RESERVED



# Contents

Orientation Manual Overview     1

    INTRODUCTION     1

Written Test     2

    EXAM DEVELOPMENT PROCESS     2

    THE TEST     2

    GENERAL STEPS IN PREPARING FOR THE TEST     4

    HOW TO REVIEW THE READING MATERIAL     5

    HOW TO CONTROL TEST ANXIETY     6

    STRATEGIES FOR TAKING THE TEST     7

The Assessment Center Process     9

    WHAT IS AN ASSESSMENT CENTER?     9

    WHY USE AN ASSESSMENT CENTER?     9

    HOW ARE THE EXERCISES DEVELOPED?     9

    OVERVIEW OF TYPICAL ASSESSMENT CENTER EXERCISES     10

    CONDUCTING THE ASSESSMENT CENTER PROCESS     11

    SAMPLE SCHEDULE     12

    HOW TO PREPARE FOR THE ASSESSMENT CENTER PROCESS     12

    PREPARING FOR SPECIFIC ASSESSMENT CENTER EXERCISES     14

    CANDIDATE EVALUATION     18

    SCORING AND FEEDBACK     19



# Orientation Manual Overview

*This section gives you a brief explanation of the manual so that you can easily find the information that will be most helpful to you.*

## Introduction

The goal of this manual is to introduce you to the promotional process that will be used for the positions in your Department. Exposure to this material will give you, the candidate, an idea of what to expect and how to prepare for the promotional process. This manual will assist you during your preparation for the written examination and depending on how well you score on the exam, your advancement to the assessment center.

Each of the sections in the manual is briefly described below.

### Written Test

This section of the orientation manual contains information to answer the following questions that are commonly asked about written examinations.

- What general steps should I take to prepare for the test?
- How should I review the reading material?
- How can I control test anxiety?
- What strategies should I use when actually taking the test?
- What is the test development process?
- What kinds of questions will be on the test?

### Assessment Center

In this chapter, you will find answers to the following questions:

- What is an assessment center?
- Why are assessment centers used?
- How are assessment center exercises developed?
- What are the typical assessment center exercises?
- How is the assessment center process conducted?
- How should I prepare for an assessment center?
- How will the assessment center be scored?
- What feedback will I receive on my performance?
- How will I be evaluated during the assessment center?

### Supplementary Materials

In the supplementary materials, you will find examples of typical written test items and assessment center exercises. These example items and exercises will give you an idea of what to expect in this promotional process.

Copyright © 2004 by CWH Research, Inc.



**The stem can be of three types:**

- Background information followed by a direct question. One of the options will answer the question.

- A partial statement that ends with a colon ( : ). One of the options will complete the sentence.

- Fill-in the blanks. The statement should provide a clue to what the missing word or phrase is. One of the options will fit into the blank.

**The answers:**

- All of the options, correct and incorrect are taken directly from the source material.

- Some questions may appear to have more than one correct answer. However, there is one option that is best. If you believe that there is more than one right answer, choose the option that you believe is the most correct.

### Situational Judgment Items

Situational Judgment items are not drawn directly from the Official Reading List materials. However, the correct responses to the items will be consistent with the department's standard operating procedures. The Situational Judgment questions require the application of knowledge and skills to specific job-related situations appropriate to your department and the rank for which you are testing. These items measure practical application of technical job knowledge, supervisory and management skills, and "people skills" in realistic contexts. There will typically be 20 to 40 Situational Judgment questions on a test.

Each Situational Judgment question presents a complex scenario with 5 possible answer choices. You must read all of the answer choices, and then identify the answer choice that best represents what you would do in the situation described. These questions describe situations related to an incident, event, or subject and ask what you would do to effectively solve the problem or handle the situation. These questions measure a variety of skills, including problem solving, decision making, interpersonal skills, technical and tactical knowledge, as well as many other relevant skills. For these types of questions, there may be more than one correct answer or way to deal with the situation. Each of us is different, and we solve problems and deal with situations differently. However, in a written test format, it is important for you to choose the one response that comes closest to how you would respond, even if it is not exactly what you would do or think.

Try to place yourself in each situation, or remember a situation you have been in that was similar to the one described. If you do not totally agree with the answer choices that are provided, try to pick the answer that is the closest to how you would respond. You may feel that more than one of the answer choices is correct. In some cases, there may actually be more than one correct answer. However, you must choose the one answer that best represents your style and approach to solving the problem or handling the situation and that is a correct response in the department. If there is more than one correct answer, you will receive full credit for the question as long as you choose one of the correct answers, regardless of which one you choose.

Copyright © 2004 by CWH Research, Inc.



When you know that other people are relying on your input in the group, you will be less likely to skip or procrastinate your own study sessions, and you will make sure you are prepared when the group meets. Each person in the group should contribute information and ideas equally. Meeting with other people who are going through the same process will help lend some support, and will motivate you to study.

### Develop Excellent Reading Skills

One of the important test preparations you can do is to assess and improve your reading skills. If you are not accustomed to reading, you will be at a disadvantage when you have to read for 2 to 3 hours at one time during the test. In addition, effective reading skills are a requirement for studying the textbooks. Get into a habit of reading at least 30 minutes every day. You can read newspapers, magazines, books, or any material that is interesting to you.

### Practice Taking Tests

Taking a test is a skill. Some studies have found that many people do not perform well on tests because the test-taking experience is unnatural, unfamiliar, or intimidating. You should practice taking tests under "test-like" conditions. You can use the questions in a study guide or questions that you and your peers have developed. The test can be taken in any environment that has library type qualities.

### Take Care of Yourself

Allow yourself to have some fun. Do not study in all your spare time. When you give yourself a break you will be much fresher when you decide to tackle the studying again. Give yourself at least one day off before the examination to avoid being exhausted or stressed the day of the exam. Most importantly, get a good night's sleep the night before the exam, and arrive early so you are not feeling rushed and anxious before the exam begins.

# How to Review the Reading Material

Because multiple texts and other sources have been assigned to the reading list, it is unlikely that you will have the opportunity to read the material more than once. Although you should be familiar with the material on the reading list from your studies and use of this material, a few helpful hints will help you study the material more effectively for the examination.

### Obtain an Overview of the Material

1) Look at each reading source to see how it is organized and how many pages of reading are required for each manual. Be sure to note on the reading lists if some sources have chapters that have been excluded from the reading requirements.

2) Before you begin reading, skim the chapter for chapter objectives, headings, subheadings, and review questions to get an idea of the content of the chapter.

### Taking Notes from a Textbook or Internal Manuals

First, read the entire chapter or section, then go back and take notes. Decide what the main and sub ideas of the section are and then paraphrase the ideas and important points. Putting the information into your own words will help you process and remember it

Copyright © 2004 by CWH Research, Inc.



- **Second, start controlling your physical nervousness by learning to relax.** If you feel yourself getting nervous, sit back comfortably in your chair, close your eyes, and take a few deep breathes. Imagine yourself doing well on the exam. Remember, a few minutes spent relaxing yourself, so that you can answer the questions intelligently, is not a waste of time. This is especially true when you recognize that spending 30 minutes aimlessly reading and guessing the answers to questions could be a disaster.

- **Third, avoid talking to people before the exam begins.** It is easy to allow yourself to become "worked up" on your own. If the people you talk to are anxious, you are likely to become anxious. You do not need help from anyone else!

- **Fourth, do not be hard on yourself.** If you think it will be a difficult exam, chances are you are not alone in that thought. You are not expected to know the answer to every question on the test. Everyone makes mistakes, so think positive, and try to do your best.

# Strategies for Taking the Test

The type of written test you will be taking is multiple-choice. The multiple-choice format of test items consists of the item stem (an introductory question or incomplete statement) and several alternative responses. The responses are suggested answers to the questions or completions of a statement.

On this type of test, you will be asked to identify a single answer from a number of alternatives. The steps you should follow to do well on this type of test are as follows:

## General Strategy

- **Arrive on time and ready to begin the exam.**

- **Choose a good seat, get comfortable, and relax.**

- **Before you even look at the questions read the directions to make sure you understand how you are to answer the questions.** Do not hesitate to ask the administrator for clarification if you are unsure of what you are to do.

- **Look the test over before you begin answering any questions** in order to familiarize yourself with the entire test. Note how many pages there are on the test. If you accidentally skip an entire page of questions, your chances of promotion will be significantly reduced.

- **The time limits for this test are very liberal.** For a 100-question test, you have approximately 1 ½ minutes to answer each question. Keep track of the time and remember to allow some time at the end to go back and check your answers and to make sure you have answered all the questions. Use all of your time. You will not get extra credit for leaving early, and you may just remember something when you relax after you think you have finished the exam.

- **Skip the very difficult questions and come back to them after you have answered all others.** When you skip a question, be sure to skip to the corresponding number on the answer sheet. It is very easy to get off by one, so check yourself often.

- **If you cannot answer a question immediately,** translate the question into your own words. Read each option carefully. Use a strategy such as the process of elimination.



# The Assessment Center Process

*This section of the manual will provide you with an opportunity to learn how to do your very best in the assessment center exercises. You will learn how an assessment center promotional process is typically run, and what the results of this process are, for both a candidate and the department. You will also learn how to prepare for the assessment center exercises, with emphasis on preparations for the specific exercises that you will see in the assessment center process for your department. Examples of exercises are provided in the supplementary materials to this manual to prepare you for what to expect.*

## What is an Assessment Center?

An assessment center is an integrated system of simulations designed to elicit behavior similar to that required for success in a target job. More simply, it is a series of activities that are similar to those performed in a given job. Each activity mirrors a different aspect of the job. Performance in these activities is observed by assessors who are trained to be fair and objective. The panel of objective assessors will be selected from departments similar to yours, based upon their expertise and knowledge regarding the target job. The assessors will observe you perform in a series of exercises, in order to evaluate several job performance dimensions deemed important to performing successfully on the job. Assessors compare candidates' performance to predetermined performance guidelines to ascertain who will perform effectively in the job.

## Why Use an Assessment Center?

It is always difficult to measure human behavior. Any type of testing process is imperfect. However, Assessment Centers are known to be a valid predictor of success on the job, and the results are reliable. Your evaluation will not be based on how you look or who you know. It will be based on what you know and what you can do.

For practical reasons, your Department cannot promote everyone who is eligible for promotion, and then see how they perform before making a final selection. The next best approach is to give you a chance to try activities that closely resemble the target job. In this way, an Assessment Center Process is like a try-out for a sports team. For example, a basketball coach who wants the best performers has potential players try out for the team. He does not assume that all tall individuals will make good players. The coach is trying to predict performance under actual game conditions by seeing how people do in a try-out situation. In a similar manner, the department is predicting future job performance by seeing how well you perform in a situation that closely parallels activities on the job. These activities are called simulations, or exercises, and are the major ingredients of the Assessment Center Process. In most of these exercises, you will actually be doing the task, not just telling someone what you would do. It is a real opportunity to demonstrate your abilities.

## How are the Exercises Developed?

In order to develop the exercises in which you will be participating, the job analysis was reviewed and updated to determine what knowledge, skills and abilities a candidate must possess in order to perform successfully. Job analysis is a generic term for the process of critically examining job components in order to provide a functional description of a job.

Copyright © 2004 by CWH Research, Inc.



### Oral Presentation

In this exercise, candidates are asked to prepare and present an Oral Presentation to the assessors. Like all assessment center exercises, the topic is adjusted to the targeted rank. An Oral Presentation for a candidate who would be expected to conduct training, for example, might include the presentation of an actual class. Various Oral Presentation topics and formats may be used. Some additional examples include: a presentation of facts before a legal board of inquiry, followed by questioning from an aggressive defense attorney, making a prepared statement at a press conference, presenting a budget request.

### Oral Resume

In this exercise, you will be expected to prepare a brief presentation concerning your career history and objectives. You are encouraged to graphically display this information, as well as present it orally to the assessors.

### Role-Play

The Role-Play exercise allows the assessors opportunities to evaluate candidates in realistic interactions with others. The situation for the Role-Play might be related to any aspect of the job for the rank. For example, a candidate might be required to handle a dispute between an old-fashioned officer and a young naïve officer. Alternatively, you might be required to explain a controversial policy or decision, with which you personally disagree. You will have some advance preparation time, which will be shown in your schedule.

### Structured Interview

During this exercise, you will be asked to respond to several questions. The topics of the questions may cover a wide range of knowledge. For instance, one question may ask you to describe your background and how it has prepared you for the position. Another question might ask you to decide how you would react in a certain difficult situation. You will be given the questions to review before the actual interview.

### Written Exercise

There are few professions where writing is trained or emphasized. However, there are very few professions in which writing is not important. What if a superior asked you to submit a report in a short amount of time? Could you turn in a well-written, professional document? The Written Exercise may be on any topic that is relevant for the rank in your Department. Candidates are asked to write a paper, memo, or other correspondence on a related topic, such as how to increase cooperation between the fire and police departments. The writing exercise is one that is easily practiced. You can write on topics of issue in your department and have others evaluate it for both writing ability and content.

## Conducting the Assessment Center Process

The sample schedule shown below will give you some idea of what a typical schedule would be like for the process. When you arrive, you will receive a packet of information about the process, and you will have time to become familiar with the contents of the packet and your individual schedule. All of the candidates will have exactly the same amount of time for preparation and presentation. However, due to the constraints of scheduling many candidates and assessors, candidates may be on-site for different lengths of time. You should be prepared to be on-site for as long as a normal 8-hour shift. The length of breaks between exercises may also vary, and you may have significant down time.

Copyright © 2004 by CWH Research, Inc.



anecdotes are probably the best to use. However, you should be certain that the anecdotes do not detract from the exercise itself (i.e., don't make fun of the exercise, the process, the other candidates or the assessors). (2) If the opportunity arises to take a stance on a relatively controversial issue (one that is job related), and if you can defend that stance, do so.

## Be Prepared to State your Assumptions

On almost every exercise, the candidate will have to make certain assumptions. It is best to inform the assessors of such assumptions. For example, suppose you were asked to teach a training class as your Oral Presentation exercise. You might choose to inform the assessors that if you were really to teach such a class, you would give a pre-test to evaluate the level of the class as well as a post-test to see how much was learned, and how well you did as an instructor. Alternatively, perhaps, you might tell the assessors that normally, you would use a variety of audio-visual equipment, and give some examples of how you might indeed use them. Another example would be before going into the details of how you prioritized your In-Basket items, you might briefly tell the assessors about the assumptions you made regarding the organization you represent. You might say that the department you just became the head of is in dire need of training, and that you would begin instituting such plans immediately.

## Be Natural, but Realize that You Are Being Evaluated

If you have weaknesses, but tried to overcome them by "faking", you will never know whether you failed because of your faking, or because of genuine weaknesses. If you have weaknesses (and we all do), the assessment center process is an excellent tool to reveal them, receive a critical analysis of them, and to practice overcoming them before the next assessment center.

## When Possible, Take an Overall View of the Situation

For example, if the items in the In-Basket appear to indicate that there are some serious problems in the department, you can tell the assessors that before explaining how you handled the items.

## Pay Close Attention to Time Limits

You are responsible for managing your own time during the exercises. A digital watch with a stopwatch feature works well for this. Any watch will work, as long as you understand when the exercise is to finish. Then be sure to periodically check to see how much time you have left. You can speed up or slow down depending on the time left.

## Present the Breadth of Your Knowledge and Appropriate Details

Let the assessors know the scope of what you know about a topic, then go into detail as time allows. Present as many details as necessary to fully explain the reasons for your actions and decisions. However, do not present everything you know about one topic, and run out of time to explain other topics. Do not refer to topics or use buzzwords unless you can readily discuss these in more detail. Do not get caught by the questions HOW or WHY.

## Materials and Supplies

There is no advance preparation for the assessment center beyond taking the recommendations in this manual. You are not allowed to bring any written materials or pads of paper with you to the assessment center. All preparation will be done in the preparation room. We will provide paper, pens, flip charts, dictionaries, and all other materials that are needed. You may take your preparation materials from the preparation



- There is a tendency among many assessment center participants, especially those who have never been through one, to defer decisions because they do not have enough information. Obviously, there may be some situations where a definitive decision cannot be made due to lack of sufficient information. However, we recommend that you think through the situation and determine what could happen in the situation. You should present "if/then" situations to the assessors. In other words, "if such and such were the case, I would . . ." "However, if such and such happened, then I would . . ." The assessors will be looking for you to think through each situation, rather than to defer situations.

- State your assumptions. Remember that the assessors are not mind readers. If you make an assumption that affects how you handle certain items in your In-Basket, be certain to tell the assessors what those assumptions are.

## Emergency Scenario

- This assessment center exercise will test your knowledge and skills in a variety of areas, including technical job knowledge, tactical skills, and effectiveness under stress.

- One of the most common mistakes candidates make is to not use their time wisely. Time can go by very quickly in a fast-paced Emergency Scenario exercise. A clock will be provided in each exercise to help you gauge your time. Pace your self and slow down enough that you can present your ideas in a clear, precise, and understandable manner.

- To prepare, you might consider some Emergency Scenarios you have encountered in the past. Think through the steps and strategies that were effective as well as those that were not.

- Know your SOP's and other Department policies. When they are relevant and appropriate, mention them in your presentation to the assessors. The assessors are trained to look for your knowledge and application of policies and procedures.

- Review the information for each scenario that is provided to you in the preparation room. Review any pertinent details such as time of day, weather conditions, and location of the scenario. Think through the impact that this information will have on your strategy for handling the emergency.

## Oral Presentation

- Practice, practice, practice!

- Make a mental checklist of the key issues facing your department today. For example, is your department focusing on enhancing community relations, initiating a new prevention program, or facing major budget cutbacks? Knowing the current events and issues in your department will allow you to make a presentation that is thorough, relevant, and consistent with department goals, challenges, and initiatives.

- Find a willing family member or friend that will listen to you speak and then give you feedback. This is a great way to practice speaking and often is a good way to find out what you do well and what you need to improve.

- There are several good books and other resources available on enhancing your presentation skills. Go to your local library or bookstore to find one of these books and brush up on your presentation skills!

## Oral Resume

- In this exercise, you will have the opportunity to explain why you are the candidate for the position. This is your opportunity to "brag" a little and explain to the assessors why you think you would be the best choice.

- Your presentation skills must be polished for this type of an exercise! You may have all the experience and knowledge in the world, but if you cannot get your point across in a clear and understandable manner, it will not matter.

Copyright © 2004 by CWH Research, Inc.



- You will be given the questions prior to meeting with the assessors. During this time, think through each question thoroughly. You will typically have 20 minutes to answer all the questions, which is an average of 5 minutes per question.

- Think about if/then scenarios. Consider how the Department is affected by the issue. Consider how the actions you would take in the situation would affect the Department, the public, your co-workers, anyone else. In other words, move away from your own personal stake in the issue and look at the big picture.

## Written Exercise

- There are few professions where writing is trained or emphasized. However, there are very few professions in which writing is not important. What if the Chief asked you to submit a report in a short amount of time? Could you turn in a well-written, professional document? The typical writing samples obtained from most job simulations are horrible. This is particularly unfortunate because the writing exercise is one that is easily practiced.

- Simply pick a topic, give yourself an hour to write on it, and have a colleague critique it.

- As a matter of fact, you will find that most of what we have for advice is basic information which we all learned in the 5th grade.

- Outline your paper. Most people are not good enough at writing to create an outline in their heads. We encourage you to write down at least a broad outline to structure your paper. On the other hand, do not be so detailed with your outline that you run out of time in writing your actual exercise. While they will be looking at your notes, the assessors will primarily be scoring your finished product.

- Stick to the problem at hand. Do not ramble! Review your work. It is absolutely amazing how many papers come back with poor spelling, incorrect grammar, bad punctuation, and other mistakes that could have easily been caught with a review. If you know you will be pressed for time, make the decision to say less, but to review your work, rather than saying more and not going over the final product. In addition, do not worry about scratching out poor grammar or spelling. It is much better to have scratch marks and a well-written document than no scratch marks and errors or poor writing. There will be a dictionary and a thesaurus available to you. Please take the time to use them!

- Consider your audience. A formal report to your Chief is different from a letter to a disgruntled citizen. Think about to whom you are writing and the appropriate tone to take with that individual.

- In terms of preparing for the subject of the Written Exercise, be prepared to discuss the current issues within the Department. Typically, you will have about an hour for this exercise.

Copyright © 2004 by CWH Research, Inc.



| 4. LEADERSHIP SKILLS (LEA) |
|---|

There are many different styles of effective leadership, all of which share some common characteristics. An effective leader understands and embraces the organization's values, goals, and direction, and is able to instill these within subordinates. In addition, an effective leader has command presence and is respected. Included in the dimension of leadership skills are supervisory skills. Supervisory skills reflect the ability to interact with others, often in difficult situations, without incurring hostility, resistance, or resentment, while at the same time reaching personal or organizational objectives. Leadership and supervisory skills involve the ability to work cooperatively and effectively with diverse groups of people, both within an organization and out, identifying conflicts, and working toward resolution of those conflicts, along with assigning work, delegating, and giving orders so that appropriate resources are utilized and tasks are accomplished in an effective manner. This dimension involves the ability to help subordinates define personal goals, the ability to motivate subordinates, the ability to foster a learning environment, the ability to handle emergency incidents, decision-making, and decisiveness, as well as an understanding of the job role. Characteristics of this dimension include flexibility and adaptability, compassion, fairness, and objectivity. Components found within this dimension would include: leadership skills, and supervisory skills.

| 5. TACTICAL SKILLS (TAC) |
|---|

This dimension reflects the extent to which the candidate demonstrates a clear understanding of the important aspects of managing an emergency scene or high-risk incident. It also includes knowledge of firefighting tactics, incident command, equipment, and firefighter safety.

| 6. ORAL COMMUNICATION AND PRESENTATION SKILLS (ORP) |
|---|

The ability to organize one's thoughts, to be persuasive and articulate, and to effectively communicate is essential in most jobs. It is also important to present information in a clear and logical manner. This dimension includes the ability to actively listen to and understand information being relayed as well as present information in a manner that is appropriate for the given audience.

| 7. WRITING SKILLS (WRI) |
|---|

The ability to write well is essential to performing well. This dimension includes good grammar, punctuation, spelling, and sentence structure. In addition, it includes the ability to be logically organized and concise, yet persuasive in writing reports, memos, and other required correspondence and documentation.

# Scoring and Feedback

In the assessment center process, each candidate is evaluated on a variety of job performance dimensions utilizing 100-point, behaviorally-anchored rating scales. For a complete list of the dimensions that are measured, refer to the list above. The ratings are statistically combined to produce a combined total score across exercises, as well as scores reflecting your performance in each exercise. The combined total scores determine how well you scored on the Assessment Center. The results are then utilized for selection according to policy set forth by the rules of the department.

If your department chooses, you will receive a total score and a breakdown of your scores by exercise. You may also receive a more detailed feedback report. This will summarize comments from the assessors regarding some of your specific strengths and weaknesses.

## End of Orientation Manual
## GOOD LUCK!!!

Copyright © 2004 by CWH Research, Inc.



# Supplementary Materials
## to the
## Orientation Manual
## -GENERAL-

| Topic | Page |
|---|---|
| Additional Resources | 2 |
| Sample Confidentiality Agreement | 4 |

Copyright © 2004 by CWH Research, Inc.



# Communication and Interpersonal Skills

- *Fire Up Your Communication Skills: Get People to Listen, Understand, and Give You What You Want!*, by Captain Bob Smith, Code 3 Publishers, 1997.

- *People Skills*, by Robert Bolton, 1986.

# Interviewing Skills

- *Best Answers to the 201 Most Frequently Asked Interview Questions*, by Matthew J. Deluca, McGraw-Hill, 1996.

- *The Complete Job Interview Handbook*, by John Marcus, Harper Perennial Library, 1994.

# Presentation Skills

- *Basic Presentation Skills*, by Gary Kroehnert, McGraw-Hill, 1999.

- *Effective Presentation Skills (A Fifty Minute Series Book)*, by Steve Mandel and Michael Crisp, Crisp Publication, 1993.

- *Effective Presentation Skills: A Practical Guide for Better Speaking*, by Steve Mandel, Crisp Publications, 2000.

# Test-Taking Skills

- *Taking the Anxiety Out of Taking Tests: A Step-by-Step Guide*, by Susan Johnson, New Harbinger Publications, 1997

- *Test-Taking Strategies*, by Judi Kesselman-Turkel and Franklyn Peterson, NTC/Contemporary Publishing, 1981.



# Supplementary Materials
# to the
# Orientation Manual
## -FIRE SERVICES WRITTEN TEST-

| Topic | Page |
|---|---|
| Example Hydraulics Items | 2 |
| Example Technical Job Knowledge Items | 3 |
| Example Supervisory / Leadership Items | 4 |
| Example Situational Judgment Items | 5 |



# Example Technical Job Knowledge Items

## Sample Question 1

An often overlooked but very important part of any apparatus inspection and maintenance program is the cleanliness of the vehicle and equipment. However, overcleaning of the apparatus can have negative effects. What is one negative effect of overcleaning?

    A. Overcleaning can drive grit and debris into the finish.
    B. Overcleaning removes the wax or similar polishes from the exterior of the apparatus.
    C. Overcleaning removes the lubrication from chassis and aerial device components.
    D. Overcleaning corrodes the steel components of the apparatus body and chassis.

## Sample Question 2

While conducting an inspection of the outside of an apparatus, general problems are readily apparent by simply looking at the vehicle. What vehicle problems can be found through a <u>visual</u> inspection?

    A. Leaking fluids such as water, coolant, oil, or brake fluid.
    B. Malfunctioning fuel or oil pressure gauges.
    C. Cracking or damage to a hoseline.
    D. Missing or broken rescue winches.

## Sample Question 3

Several tasks must be accomplished when laying a hoseline. Which of the following tasks would be the <u>first</u> step in laying any hoseline?

    A. Remove a small amount of supply hose from the hose bed.
    B. Gather the appropriate tools that will be needed.
    C. Wrap the end of the hose around a stationary object.
    D. Make sure the proper adapters are present at each end.



# Example Situational Judgment Items

## Sample Question 1

One of the newer firefighters on your shift is very respectful and courteous when he talks to you, and you have not had any trouble with him. However, you have heard him make offhand negative comments about others. Recently, another individual told you that this firefighter complains about you and makes negative comments about you when you are not around. How would you handle this situation?

    A. Be more cautious around this firefighter until you know whether or not you can trust him.

    B. Ignore what you have heard; you cannot do anything about what someone says when you are not there.

    C. Tell others in the station to help you keep a record of what the firefighter says so you can discuss it with him.

    D. Tell all the firefighters as a group that if they have a problem with you or your decisions, you want them to discuss it with you.

    E. Explain to the firefighter the behavior you and others have noticed, and how this is causing a negative perception of him that he needs to change.

## Sample Question 2

During your shift, your station is scheduled for training involving multi-company drills. One of your firefighters, Skinner, has just called in sick. When he returns, he has an excuse note from a doctor. You have noticed that the last three times training has been scheduled, Skinner was absent. How would you handle the situation?

    A. Write up firefighter Skinner for abuse of sick leave.

    B. Order firefighter Skinner to make up training on his day off.

    C. Alert the Battalion Chief to schedule Skinner to make up training with another unit on an announced day.

    D. Advise firefighter Skinner that a pattern of absence is very noticeable and that his attendance in training will be monitored.

    E. Suggest to the Battalion Chief that a fit for duty test via Risk Management may be warranted.



# Supplementary Materials
# to the
# Orientation Manual
## -FIRE SERVICES ASSESSMENT CENTER-

| Topic | Page |
|---|---|
| Example In-Basket | 2 |
| Example Hot Seat Emergency Scenario | 8 |
| Example Static Emergency Scenario | 10 |
| Example Oral Presentation | 12 |
| Example Oral Resume | 13 |
| Example Role-Play | 14 |
| Example Structured Interview | 15 |
| Example Written Exercise | 16 |
| Assessment Center Self Assessment | 17 |



<u>M E M O R A N D U M</u>

TO:        Lieutenant Candidate

FROM:      Jones

DATE:      March 1, 1999

SUBJECT:   Injury

I just thought you should know that on a call we had a few days ago, I think Al strained his back.  He probably did not say anything because he does not want anyone to think he might be out of shape.  I think it happened when he lifted the stretcher of that very large man that had the heart attack last week.  He says that he is all right, but I can see that he is in a lot of pain.

Copyright © 2004 by CWH Research, Inc.



February 27, 1999

Fire Chief Lansing
Fictitious Fire Department
2100 E. 58th Street
Fictitious, AL 48901

Dear Chief Lansing:

I am writing to let you know that I have been having a problem working with one of your firefighters. I have been called in to work with the company at Station #1 on several occasions, and every time I show up to do my job as a reserve, I get a lot of grief from Firefighter Bolin. He is always saying that I am in the way and that I do not know what I am doing. Yesterday, he even told me to just get away from him and let him do his job.

I have trained very hard to be a reserve and I intend on joining your department someday. I do not think I deserve to be treated this way when I go out on a call. It does not look good in front of the other firefighters and the citizens are probably wondering what is going on. I would appreciate it if you would talk to Bolin, so I do not have to put up with this the next time I am called out to assist the department at an emergency scene.

Sincerely,

George Henry
Reserve Firefighter

Copyright © 2004 by CWH Research, Inc.



ITEM – D

M E M O R A N D U M

TO:          Lieutenant Candidate

FROM:        EMS/Hazmat Coordinator

DATE:        March 1, 1999

SUBJECT:     Employee Conduct


I got a call yesterday from a supervisor at Minos Ambulance Service.  He called to tell me that an ambulance had been sent out from their service to assist your company at an accident scene on two separate occasions in the last month.  On both occasions, he received complaints from one of his female drivers that a Firefighter Bolin had made rude, sexist comments to her at the accident scene.  He was really upset about this.  I do not have to tell you how the Chief would feel about this.  The department does not tolerate this kind of behavior. Since Bolin is in your company, I want you to investigate these incidents, and report back to me as soon as possible with the results.



# Hot Seat Emergency Scenario Exercise
# Incident Fact Sheet

**Location:**       7200 Fire Exercise Example Road

**Date:**           Thursday, September 7

**Time:**           09:00 a.m.

**Temperature:**    60° Fahrenheit

**Wind:**           None

**Occupancy:**      Apartment Complex

**Structure:**      Three (3) story, ordinary construction

**Water Supply:**   Two hydrants, one 100' east, one 250' west of structure.

## Initial Dispatch:

At approximately 09:00 a.m., Thursday September 7, Dispatch received a call from an individual who stated that he lives in the Fire Exercise Subdivision. He heard the alarm in the apartment next door and upon investigation found smoke coming from the second floor windows. He was unable to get anyone to the door. With this information, the following units were dispatched:

Engine 1      One (1) **YOU**, one (1) Engineer, and two (2) Firefighters
Engine 2      One (1) Acting Lieutenant, one (1) Engineer, and two (2) Firefighters
Engine 3      One (1) Lieutenant, one (1) Acting Engineer, and one (1) Firefighter
Ladder 1      One (1) Acting Captain, one (1) Engineer, and one (1) Firefighter
Rescue 2      One (1) Lieutenant, One Engineer, and one (1) Firefighter
Battalion 1   One (1) Battalion Chief

## Other Information:

Ladder 1 and Battalion 1 are responding from City Hall and will be delayed.



# Static Emergency Scenario Exercise
# Incident Fact Sheet

## VEHICLES AND STREETS

| | |
|---|---|
| **BLUE SEMI-TRUCK** | Truck loaded with vegetables and other produce |
| **RED AUTOMOBILE** | Small hatchback |
| **PURPLE AUTOMOBILE** | Full-size 4 X 4 pickup truck |
| **ROAD DESCRIPTION** | Incident is at the intersection of 1st Avenue and Main Street<br>Main Street is a major arterial street<br>1st Avenue is a minor side street |
| **TEMPERATURE** | 57 Degrees Fahrenheit |
| **WIND** | Calm |
| **EXPOSURES** | Convenience Store located at SW corner<br>Traffic |
| **WATER SUPPLY** | Two hydrants |

## EMERGENCY CONDITIONS

- Time: 1630, Friday

- Hatchback is leaking gasoline and engine oil. Approximately 15 gallons is on the ground.

- No fire is showing.

- Passenger of red car is trapped and unconscious, leg is crushed by the engine block. Driver of red car was thrown clear and is lying unconscious on the road. Passenger and driver of purple pickup have minor cuts and scrapes; passenger hit his head on the windshield. Driver of blue semi-truck is uninjured.

- Traffic is still slowly moving west on Main Street. All other directions have stopped.

- No other emergency personnel have arrived on the scene.

Copyright © 2004 by CWH Research, Inc.



# Example Oral Resume

This exercise requires you to present your qualifications for the job of Lieutenant. You will have **15 minutes** to make an Oral Presentation to the assessors, which should emphasize your preparation and qualifications for this position. After you finish your presentation, the assessors will ask you questions regarding the information that you present.

You will have **30 minutes** to prepare and organize your presentation. During your preparation period, you will be provided with poster paper, index cards, and magic markers, as well as scratch paper. A flipchart will be available in the presentation room. You may utilize this material in any way you wish to aid you in your presentation. In preparing your self-presentation, you should keep in mind that you will be presenting to a small group of people. Also, you should remember that the assessors will be making their initial impressions of your qualifications for Lieutenant, so make your presentation as job-related as possible. Finally, in addition to telling the assessors *what* you have done, you should be prepared to discuss *how* what you have done has helped prepare you for the position of Lieutenant. You will have **15 minutes** to present your Oral Resume to the assessors. After your presentation, the assessors may ask you questions for **5 minutes**.

Copyright © 2004 by CWH Research, Inc.



# Example Structured Interview

During this exercise, you will be asked to answer a set of questions that assesses your knowledge, skills and abilities. You will be required to organize your thoughts and orally present them clearly and concisely. Subject Matter Experts within your department have been extensively involved in the development of the questions. Each question gives you an opportunity to speak about a subject that is important in assessing your potential. The questions address topics and situations that are most important to your department at this time.

You will have **15 minutes** to review the questions before you begin the Structured Interview. You may take notes during this time and refer to them during the interview. Once the exercise begins, you will have **15 minutes** to answer all the questions. The exercise will begin when you enter the room. The assessors will read each question to you and wait for you to complete each answer. It is your responsibility to allocate your time accordingly for each answer. Remember to include the time that it takes for the assessors to ask each question when estimating your time. After the 15 minutes, the assessors will ask you questions for **5 minutes** to clarify any questions they may have about your answers.

*Question:*

You are a new Lieutenant in your department. You are speaking to a group of citizens at a community center about safety practices. During the question and answer session, an individual stands up and starts yelling at you because he has complained several times about a lack of responsiveness in your department and has never received a response. How would you respond?



# Assessment Center Self Assessment

The following questions address aspects of the performance dimensions that are used to assess assessment center candidates.  How would you rate yourself on each of the following on a scale of 1 to 10 (10 being the highest)?

**Organizational and Technical Skills – _____**
1. If your actions were ever questioned, would you be able to reference the appropriate departmental policy and procedure to defend your actions?
2. Do you know the goals and vision of your Department?

**Management and Practical Skills – _____**
1. Do you ever find that things didn't turn out as you had expected and you are put in a bind because you weren't prepared?
2. When you are at an emergency scene, are you able to make quick decisions when others lives are in danger?
3. Do you think it is always appropriate to react in the same way when you are approached with a complicated situation?

**Interpersonal Skills – _____**
1. If a member of the public approached you and questioned your actions, would you find yourself explaining the reason for your actions or getting defensive that an outside observer is questioning your decisions?
2. Are you as eager to help the community and provide them a service (i.e. open houses, educational training) as you are to fight fires?
3. Do you have any problems working with anyone in your Department?

**Leadership Skills – _____**
1. Have you ever been in a situation where you were in charge and no one seemed to be paying any attention to you?
2. When you need to delegate a task, would you pass it on to someone who is very good at the task or to someone who needs to improve their skills related to the task at hand?
3. When you are caught in the middle of an argument or conflict, are you able to work with all of those involved to resolve the conflict or do you allow it to eventually work itself out?
4. When you are working with others, do you tend to go along with what they are doing or do you take more of a role in developing goals and a plan to accomplish those goals?

**Oral Communication and Presentation Skills – _____**
1. Does anyone ever have to ask you if you were listening to what they were saying?
2. Do people often ask you to repeat yourself or not seem to understand what you are talking about?
3. Are you comfortable speaking in front of others (i.e. giving a presentation or conducting training)?

# EXHIBIT D



**Auburn Fire Division**

# Memo

**To:** All personnel

**From:** D.C. Lamar

**Date:** February 17, 2006

**Re:** Battalion Chiefs Assessment

---

The battalion chief's vacancy has been posted. To be eligible an applicant must be a current non-probationary Lieutenant. Applicants must fill out a City of Auburn application and submit a short one to three page resume. An orientation session is scheduled for 6:00 PM February 28, 2006 at the Public Safety Building large conference room. Candidates must attend the orientation session. Dates for the assessment will be announced at that time. The session will include an explanation of the process and practical information to assist the candidates in preparation. A one year hiring list will be established.

A written exam will be a component of the assessment process. The reading materials have been obtained and will be issued as soon as all applications are received.

All eligible personnel are encouraged to apply and good luck in the process.



DEFENDANT'S EXHIBIT
2

1

# EXHIBIT E

# Memo

To: All Career Personnel



From: Chief Larry Langley

Date: February 23, 2006

Ref: Battalion Chief Assessment

On February 17, 2006 a memo was sent to all personnel on the Battalion Chiefs vacancy explaining that only non-probationary Lieutenants were eligible to apply for the position. After reviewing the current job descriptions and minimum qualifications, it was discovered that non-probationary Firefighters and the probationary Lieutenant are eligible to apply for the Battalion Chiefs Vacancy. I know this is short notice but any of the eligible applicants mention above if interested need to apply by February 28, 2006 at 3:00 PM. Orientation is on February 28, at 6:00 PM in the large conference at the Public Safety Building. This session will include an explanation of the process and practical information to assist candidates.

# EXHIBIT F



**DEPARTMENT OF PUBLIC SAFETY**

**FIRE DIVISION**

**RONNIE BLANKENSHIP, FIRE CHIEF**

# City of Auburn



HOME OF AUBURN UNIVERSITY

**April 4, 1996**



PLAINTIFF'S
EXHIBIT
4

**Dear Gerald:**

**Congratulations!** You were ranked first in the Lieutenant assessment center. Your overall score of 20.26 put you tops on the Lieutenant's list. I am proud to be able to promote you to the rank of Lieutenant based on your knowledge and ability. I hope this is just one rung of many on your career ladder in the fire service.

Your leadership is needed on a shift other than the one you are currently working. Your promotion will be effective April 7. You will need to report for duty on that date to start your new role in the fire service.

Again, I congratulate you for your achievement in the Auburn Fire Division. I look forward to working with you in your leadership role. With your personality and ingenuity, I expect many good things from you.

Sincerely,

Ronnie Blankenship
Fire Chief

**359 EAST MAGNOLIA · AUBURN, ALABAMA 36830**
**(205) 821-1110 · FAX NUMBER: (205) 887-4996**

Ogletree-II Disclosures

00297

# EXHIBIT G

candidates would complete the entire process. A minimum score must be attained to make the final list. The question we had was would we use multiple cut scores or single cut scores.
lee


Lee Y. Lamar Jr.

Deputy Chief/ Operations

Auburn Fire Division

161 North Ross Street

Auburn, AL 36830

334-501-3162

llamar@auburnalabama.org

---

From: Steve Reeves
Sent: Wednesday, February 15, 2006 2:55 PM
To: Stephanie L. King; Lee Y. Lamar, Jr.; Larry Langley; Bill James
Subject: FW: scheduling questions


Did we agree that we would allow everyone to participate in each element but that a minimum cut off score had to be achieved on the test in order be selected?  If so, can we have the test on the same day?


Steve


---

From: Erin Hardin [mailto:ehardin@cwhms.com]
Sent: Wednesday, February 15, 2006 1:51 PM
To: Steve Reeves
Subject: scheduling questions


Hi Steve,


Did you find out whether it would work to give the written test on the assessment center training day and run all candidates through the assessment center?  Or, will we have to do the written test earlier to screen the candidates for the assessment center?


Hope things are going well there,


Erin Hardin

Consultant

p.4

**Erin Hardin**

**From:**                    Lee Y. Lamar, Jr.
**To:**                      Erin Hardin
**Subject:**                 RE: scheduling questions


In previous in-house it was a minimum 70 to keep going. Sounds great. lee


Lee Y. Lamar Jr.

Deputy Chief/ Operations

Auburn Fire Division

161 North Ross Street

Auburn, AL 36830

334-501-3162

llamar@auburnalabama.org


------
**From:** Erin Hardin [mailto:ehardin@cwhms.com]
**Sent:** Wednesday, February 15, 2006 3:20 PM
**To:** Lee Y. Lamar, Jr.; Steve Reeves; Stephanie L. King; Bill James; Larry Langley
**Cc:** mblair@cwhms.com
**Subject:** RE: scheduling questions


Then we will just plan on doing the written test on the assessment center training day.  I had recalled that there was a question of whether it was mandated somewhere that the test be used as an eligibility hurdle for the assessment center.  Once you review the exercises, you all can discuss cut scores with Michael.  Thanks!


Erin Hardin

Consultant

ehardin@cwhms.com


-----Original Message-----
**From:** Lee Y. Lamar, Jr. [mailto:llamar@auburnalabama.org]
**Sent:** Wednesday, February 15, 2006 2:07 PM
**To:** Steve Reeves; Stephanie L. King; Erin Hardin; Bill James; Larry Langley
**Subject:** RE: scheduling questions


The way I recall: we agreed to test first day of the assessment week and that all

1

P.3

161 North Ross Street

Auburn, AL 36830

334-501-3162

llamar@auburnalabama.org

---

From: Steve Reeves
Sent: Wednesday, February 15, 2006 2:55 PM
To: Stephanie L. King; Lee Y. Lamar, Jr.; Larry Langley; Bill James
Subject: FW: scheduling questions

Did we agree that we would allow everyone to participate in each element but that a
minimum cut off score had to be achieved on the test in order be selected?  If so, can we
have the test on the same day?

Steve

---

From: Erin Hardin [mailto:ehardin@cwhms.com]
Sent: Wednesday, February 15, 2006 1:51 PM
To: Steve Reeves
Subject: scheduling questions

Hi Steve,

Did you find out whether it would work to give the written test on the assessment center
training day and run all candidates through the assessment center?  Or, will we have to do
the written test earlier to screen the candidates for the assessment center?

Hope things are going well there,

Erin Hardin

Consultant

9085 E. Mineral Circle, Suite 350

Englewood, CO  80112

(303) 617-3433 (Voice)

(303) 617-3436 (Fax)

ehardin@cwhms.com

2

2/15/06 emails

**Erin Hardin**

| | |
|---|---|
| From: | Steve Reeves |
| To: | Erin Hardin |
| Cc: | Bill James |
| Subject: | RE: scheduling questions |

It's been wild here (our CM has been asked to resign and that was going on while you were here and has continued to be an issue I have been dealing with). I remember that I was going to talk to the attorney. It slipped my mind. I will do that now and get back with you.

From: Erin Hardin [mailto:ehardin@cwhms.com]
Sent: Wednesday, February 15, 2006 3:20 PM
To: Lee Y. Lamar, Jr.; Steve Reeves; Stephanie L. King; Bill James; Larry Langley
Cc: mblair@cwhms.com
Subject: RE: scheduling questions

Then we will just plan on doing the written test on the assessment center training day. I had recalled that there was a question of whether it was mandated somewhere that the test be used as an eligibility hurdle for the assessment center. Once you review the exercises, you all can discuss cut scores with Michael. Thanks!



Erin Hardin

Consultant

ehardin@cwhms.com



PLAINTIFF'S EXHIBIT
5
PENGAD 800-631-6989

-----Original Message-----
From: Lee Y. Lamar, Jr. [mailto:llamar@auburnalabama.org]
Sent: Wednesday, February 15, 2006 2:07 PM
To: Steve Reeves; Stephanie L. King; Erin Hardin; Bill James; Larry Langley
Subject: RE: scheduling questions

The way I recall: we agreed to test first day of the assessment week and that all candidates would complete the entire process. A minimum score must be attained to make the final list. The question we had was would we use multiple cut scores or single cut scores. lee

Lee Y. Lamar Jr.

Deputy Chief/ Operations

Auburn Fire Division

1

P.1

# EXHIBIT H





# City of Auburn

— Home of Auburn University —

## Proposed Modification of the Fire Lieutenant Promotional Process and Reclassification of Team Leaders to Fire Lieutenants

### Background Information

The settlement order dated February 15, 1991, regarding *Clinton W. Hammock, et al. vs. The City of Auburn, et al, CV-87-680-E* stipulates that the City of Auburn will utilize the assessment center promotion process submitted to the Federal Court for the jobs of Fire Lieutenant and Fire Captain. The plaintiffs and defendants to this suit agreed to this stipulation nearly 14 years ago. Since that time, many changes have occurred in the structure and staffing of the Fire Division in response to City growth and service needs.

On February 28, 2005, the Team Leaders of the City of Auburn Public Safety Department—Fire Division requested Deputy Public Safety Director for Fire Operations Larry Langley to "petition the Court, on our behalf, to: (1) amend the portion of the settlement agreement pertaining to the Lieutenant promotional process and to (2) permit the City to reclassify the current Team Leaders to the class of Fire Lieutenant." A copy of the Team Leaders' petition is attached to this memo and shown as Exhibit A. While the promotional process utilized for Team Leaders was a very similar process to that approved by the Court for the job of Lieutenant, it was not identical; notably, it did not use outside assessors for the exercises, and the exercises were developed by the City, not a consultant. The job descriptions of Team Leader and Fire Lieutenant are virtually identical. In considering the request from the Team Leaders, the City of Auburn has learned that the Court does not retain jurisdiction over the settlement agreement.

### Proposed Changes

In response to the petition from the Fire Division Team Leaders, the City of Auburn proposes that:

1.  The Court approved assessment center process submitted for Fire Lieutenant will be considered to have expired. The City of Auburn will not be bound to the requirement of using an outside consultant or outside assessors to develop and administer an assessment center process for promotion to the job of Fire Lieutenant. The City of Auburn will, however, use neutral, job-related selection tests, exercises and information in making promotion decisions to the job of Fire Lieutenant consistent with the requirements of the City of Auburn Personnel Policies; and

2.  All employees currently holding the title of Team Leader will be reclassified to Fire Lieutenant.

The City seeks the input of those employees who are affected by the requests contained in the petition from the Team Leaders. Therefore, you are asked to respond to this proposal. Please provide the information requested below and return the signed original to Human Resources Director Steve Reeves in the attached envelope by December 31, 2005.

<u>Acknowledgement and Response</u>

I acknowledge that I have read the foregoing information and proposal regarding the expiration of the Court approved Fire Lieutenant assessment center process and reclassifying those employees holding the job of Team Leader to Fire Lieutenant. I hereby (please initial the response you select):

_____ agree with the proposal.

_____ do not agree with the proposal.

Name (please print)

Signature

Job Title _Fire - Lieutenant_

Date _Thursday 12/23/05 @ 1500 hrs_

# EXHIBIT I







# City of Auburn

Home of Auburn University

## Proposed Modification of the Fire Lieutenant Promotional Process and Reclassification of Team Leaders to Fire Lieutenants

### Background Information

The settlement order dated February 15, 1991, regarding *Clinton W. Hammock, et al. vs. The City of Auburn, et al, CV-87-680-E* stipulates that the City of Auburn will utilize the assessment center promotion process submitted to the Federal Court for the jobs of Fire Lieutenant and Fire Captain. The plaintiffs and defendants to this suit agreed to this stipulation nearly 14 years ago. Since that time, many changes have occurred in the structure and staffing of the Fire Division in response to City growth and service needs.

On February 28, 2005, the Team Leaders of the City of Auburn Public Safety Department—Fire Division requested Deputy Public Safety Director for Fire Operations Larry Langley to "petition the Court, on our behalf, to: (1) amend the portion of the settlement agreement pertaining to the Lieutenant promotional process and to (2) permit the City to reclassify the current Team Leaders to the class of Fire Lieutenant." A copy of the Team Leaders' petition is attached to this memo and shown as Exhibit A. While the promotional process utilized for Team Leaders was a very similar process to that approved by the Court for the job of Lieutenant, it was not identical; notably, it did not use outside assessors for the exercises, and the exercises were developed by the City, not a consultant. The job descriptions of Team Leader and Fire Lieutenant are virtually identical. In considering the request from the Team Leaders, the City of Auburn has learned that the Court does not retain jurisdiction over the settlement agreement.

### Proposed Changes

In response to the petition from the Fire Division Team Leaders, the City of Auburn proposes that:

1. The Court approved assessment center process submitted for Fire Lieutenant will be considered to have expired. The City of Auburn will not be bound to the requirement of using an outside consultant or outside assessors to develop and administer an assessment center process for promotion to the job of Fire Lieutenant. The City of Auburn will, however, use neutral, job-related selection tests, exercises and information in making promotion decisions to the job of Fire Lieutenant consistent with the requirements of the City of Auburn Personnel Policies; and

2. All employees currently holding the title of Team Leader will be reclassified to Fire Lieutenant.

The City seeks the input of those employees who are affected by the requests contained in the petition from the Team Leaders. Therefore, you are asked to respond to this proposal. Please provide the information requested below and return the signed original to Human Resources Director Steve Reeves in the attached envelope by December 31, 2005.

<u>Acknowledgement and Response</u>

I acknowledge that I have read the foregoing information and proposal regarding the expiration of the Court approved Fire Lieutenant assessment center process and reclassifying those employees holding the job of Team Leader to Fire Lieutenant. I hereby (please initial the response you select):

_____ agree with the proposal.

___✗___ do not agree with the proposal.

Christopher E. Turner          Fire Fighter
Name (please print)            Job Title

Christopher E. Turner          12/29/05
Signature                      Date

# EXHIBIT J



Updated Policies
Received 5/20/0
@ 1500hrs.

## City of Auburn

— Home of Auburn University —

# MEMORANDUM

PLAINTIFF'S
EXHIBIT
a
PENGAD 800-631-6989

**To:**        City Employees

**From:**      David Watkins, City Manager *DFW*

**Subject:**   Personnel Policies

**Date:**      May 19, 2005

Following careful review by the department heads, the City Attorney, and me, the City Council adopted the updated Personnel Policies at its meeting on May 17, 2005. As before, these Policies serve to promote the fair and equitable treatment of employees based upon merit principles, to describe employee benefits and rights, to outline rules and regulations regarding performance and conduct, to comply with numerous laws, and to guide many administrative decisions that must be made to deliver quality, cost effective services to our citizens through the City's workforce.

The new Personnel Policies are being printed and when they are distributed they will be available for your review in your department's administrative office. However, I want to mention to you several of the important changes.

<u>Section 3.02</u> (Holidays).  For law enforcement officers, communication officers and water treatment plant operators, the observed holiday will be the actual holiday unless otherwise specified by the City Manager.

<u>Section 3.03 and 4.04</u> (Annual Leave and Sick Leave).  In order to take advantage of the annual and sick leave tracking and valuation capabilities that the new payroll software offers and to promote proportionality in leave benefits received, many of the text changes in Sections 3.03 and 3.04 implement hours as the basis for leave accrual and do so in proportion to the number of hours an employee would normally work in a year.  For most employees, this has no impact other than allowing employees to accrue and use leave in hours instead of days.  However, current employees who are accruing a work day that is greater than 8 hours (police officers, firefighters, communications officers, and water treatment plant operators) have been grandfathered into the previous system, including how leave is cashed-out upon separation, unless they elect to switch over to accruing leave in hours within 90 days of the adoption of these policies. For these employees, more information will follow regarding this one time election. All employees who are currently accruing an

**2.05**     <u>Hiring Lists.</u>  When approved by the City Manager, and when notification is first given through vacancy announcements or other means approved by the City Manager prior to any selection screening activity, a list of qualified applicants may be created from which future vacancies may be filled for a period not to exceed one year from the date the position vacancy is filled, unless otherwise approved by the City Manager.  A copy of each hiring list shall be maintained in the HRM Department.  Generally, hiring lists may be appropriate when the screening process for a particular job is time consuming and expensive due to extensive testing, background investigation, and the probability that other position vacancies for the same job will occur within one year.

Notwithstanding the above, if a new vacancy occurs in a position for which the application process was closed within the previous 30 days, a department head may rely on the previously developed applicant pool to fill the new vacancy.

**2.06**     <u>Hiring of Family.</u>  Two or more members of a family shall not be employed by the City if such employment will result in one supervising a member of his/her family, or where one member of a family occupies a position which has influence over another's employment, promotion, salary administration and other related management or personnel considerations.     A family shall include parents, parents-in-law, grandparents, husbands, wives, brothers, sisters, children (including legally adopted children), aunts, uncles, brothers-in-law and sisters-in-law, children-in-law, nieces, nephews, and grandchildren.

This policy does not include employees in this situation working for the City as of the date of the adoption of these Policies.  Exceptions to this section may be made only by the City Manager in writing.

**2.07**     <u>Probation.</u>  The probationary period is the part of the examination process which is used to observe the employee's work, to secure the most effective adjustment of the employee to his or her new position, and to reject an employee who does not meet required work standards.  The probationary period for all regular appointments shall be for a minimum period of six months, except for police officers and firefighters, who shall serve a twelve month probationary period.  However, some jobs may require longer probationary periods based on the amount of time required to learn a job, to receive required certifications, or upon the inability to evaluate significant aspects of a job due to work cycle factors.

With the prior approval of the City Manager, a department head may extend the required probationary period up to six months if necessary for the employee to meet standards required in the job, to allow more time to

are not eligible for a probationary increase, and their base pay rate will not change as a result of the transfer or completion of the probationary period, unless such probationary period is one year.    During the probationary period, the employee's performance will be evaluated in accordance with Section IX, Employee Performance Appraisal.    If a transferred employee's performance is documented to be inadequate, he/she may be removed from his or her new position and may be eligible to be returned to his/her prior position or to an equivalent position, if available.    However, the City reserves the right to separate such an employee in the City's discretion.

2.09    Promotion. A promotion is an assignment of an employee from one position to another which has a higher maximum rate of pay, rank, and responsibility. Promotion in every case must involve a definite increase in duties and responsibilities and shall not be made merely for the purpose of effecting an increase in compensation.    Refer to Section 11.06 regarding rates of pay for promoted employees.

An employee who receives a promotion shall serve a probationary period consistent with Section 2.07, and shall be eligible for a step increase in pay upon completion of probation, unless such pay increase would exceed the maximum of the pay grade.

2.10    Demotion.    A demotion is an assignment of an employee from one position to another which has a lower maximum rate of pay, rank, and responsibility. An employee may be demoted for any of the following non-disciplinary reasons:

    A. Because his or her position is being abolished and he or she would otherwise be laid off;
    B. Because there is a lack of work;
    C. Because there is a lack of funds;
    D. Because the employee does not possess the necessary qualifications (i.e. loss or suspension of a driver's license) to render satisfactory service in the position he/she holds;
    E. Because the employee voluntarily requests such a demotion and it is available;
    F. When an employee, due to a disability, becomes unable to perform the essential functions of his or her present job with, or without, a reasonable accommodation;
    G. For any other reason deemed to be in the best interest of the City as determined by the City Manager.

# EXHIBIT K

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement reverse before completing this form

ENTER CHARGE NUMBER
[ X ] EEOC

| | |
|---|---|
| (State or local Agency, if any) | and EEOC |

| NAME (Indicate Mr., Ms., or Mrs.) | | HOME TELEPHONE NO. (Include Area Code) |
|---|---|---|
| Eddie Ogletree | | (334) 332-5766 |

| STREET ADDRESS | CITY, STATE AND ZIP | COUNTY |
|---|---|---|
| 106 Pioneer Drive | La Grange, Georgia 30240 | Troup |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NO. (Include Area Code) |
|---|---|---|
| The City of Auburn | Over 15 | (334) 501-7260 |

| STREET ADDRESS | CITY, STATE AND ZIP | COUNTY |
|---|---|---|
| 144 Tichenor Avenue, Ste. 1 | Auburn, Alabama  36830 | Lee |

| NAME | | TELEPHONE NO. (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es):

☒ Race  ☐ Color  ☐ Sex  ☐ Religion  ☐ National Origin

☐ Retaliation  ☐ Age  ☐ Disability  ☐ Other

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)
7/27/2006

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s):

SEE EXHIBIT A

| | |
|---|---|
| [X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements) |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>Date 9/5/06    Charging Party *(Signature)* | SIGNATURE OF COMPLAINANT  *Eddie Ogletree*<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) Sept 5 2006 |

SEP 1 1 2006

Notary Public, Troup County, Georgia
My Commission Expires April 7, 2010

## EXHIBIT A

Lieutenant Eddie Ogletree is an African American and has served the City of Auburn Fire Department for more than (22) twenty two years. On or about February 2006, Lieutenant Ogletree applied for a promotion from Lieutenant to the position of a Battalion Chief (Captain). Prior to February 2006, only non probationary Lieutenants were allowed to apply for the position of Battalion Chief. However, in February 2006, the respondent City of Auburn changed its policies to allow any fire fighter, including entry level fire fighters, to apply for the Battalion Chief position. Also, during this same period, the City of Auburn Fire Department changed its policies to require applicants for Battalion Chief to pass a written test. Coincidentally, these policy changes occurred at a time when two African American Lieutenants and one entry level African American Firefighter became eligible for the position of Battalion Chief. Seniority within the department was discarded as a criteria for promotion to the Battalion Chief position.

Lieutenant Ogletree was denied the promotion to Battalion Chief in April 2006. The denial of the promotion was racially based. At the time of Lieutenant Ogletree's application, there were three Battalion Chief positions available, and each position was filled by a Caucasian team leader (Lieutenant). Each of the applicants that were awarded the Battalion Chief position have less seniority and experience than Lieutenant Ogletree.

Caucasian applicants for the Battalion Chief position were given preferential treatment regarding the application process, test aids and test grades.

The policy changes and preferential treatment towards Caucasian applicants combined to cause the denial of Lieutenant Ogletree's application for promotion to Battalion Chief in April 2006. Moreover, the City of Auburn has violated, and continues to this day to violate Federal Court Orders requiring them to alter hiring and promotion policies and procedures in order to provide equitable treatment to African Americans. Despite these Federal Court Orders, the City of Auburn has intentionally changed its policies and procedures to exclude African Americans from the hiring and promotion practice.

Lieutenant Ogletree filed a grievance against the City of Auburn and followed the grievance administrative process to its completion. In July 2006, the City of Auburn affirmed its decision not to promote Lieutenant Ogletree to the position of Battalion Chief.

RECEIVED

SEP 1 1 2006

# EXHIBIT L

## CHARGE DISCRIMINATION

| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form | ENTER CHARGE NUMBER [X] EEOC 920-2006-04928 |
|---|---|

| (State or local Agency, if any) | and EEOC |
|---|---|

| NAME (Indicate Mr., Ms., or Mrs.)  Gerald Stephens | HOME TELEPHONE NO. (Include Area Code) (334) 502-2946 |
|---|---|

| STREET ADDRESS 828 Cahaba Drive | CITY, STATE AND ZIP Auburn, Alabama 36830 | COUNTY Lee |
|---|---|---|

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)**

| NAME  The City of Auburn | NO. OF EMPLOYEES/MEMBERS Over 15 | TELEPHONE NO. (Include Area Code) (334) 501-7260 |
|---|---|---|

| STREET ADDRESS 144 Tichenor Avenue, Ste. 1 | CITY, STATE AND ZIP Auburn, Alabama 36830 | COUNTY Lee |
|---|---|---|

| NAME | TELEPHONE NO. (Include Area Code) |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP | COUNTY |
|---|---|---|

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es): ☒Race  ☐Color  ☐Sex  ☐Religion  ☐National Origin  ☐Retaliation  ☐Age  ☐Disability  ☐Other | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year) 7/27/2006 |
|---|---|

**THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)**

SEE EXHIBIT A

RECEIVED SEP 1 1 2006

EEOC BIRMINGHAM DISTRICT

| [X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements)  I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.  September 5, 2006  Date          Charging Party (Signature) | SIGNATURE OF COMPLAINANT  _HD Stephens_  March 23, 2009  SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE 9/5/06 (Day, month, and year)   Penelope D. McCoy |

DEFENDANT'S EXHIBIT 13

## EXHIBIT A

Lieutenant Gerald Stephens is an African American. On or about February 2006, Lieutenant Stephens applied for a promotion from Lieutenant to the position of a Battalion Chief (Captain). Prior to February 2006, only non probationary Lieutenants were allowed to apply for the position of Battalion Chief. However, in February 2006, the respondent City of Auburn changed its policies to allow any fire fighter, including entry level fire fighters, to apply for the Battalion Chief position. Also, during this same period, the City of Auburn Fire Department changed its policies to require applicants for Battalion Chief to pass a written test. Coincidentally, these policy changes occurred at a time when two African American Lieutenants and one entry level African American Firefighter became eligible for the position of Battalion Chief. Seniority within the department was discarded as a criteria for promotion to the Battalion Chief position.

Lieutenant Stephens was denied the promotion to Battalion Chief in April 2006. The denial of the promotion was racially based. At the time of Lieutenant Stephens' application, there were three Battalion Chief positions available, and each position was filled by a Caucasian team leader (Lieutenant). Each of the applicants that were awarded the Battalion Chief position have less seniority and experience than Lieutenant Stephens.

Caucasian applicants for the Battalion Chief position were given preferential treatment regarding the application process, test aids and test grades.

The policy changes and preferential treatment towards Caucasian applicants combined to cause the denial of Lieutenant Stephens' application for promotion to Battalion Chief in April 2006. Moreover, the City of Auburn has violated, and continues to this day to violate Federal Court Orders requiring them to alter hiring and promotion policies and procedures in order to provide equitable treatment to African Americans. Despite these Federal Court Orders, the City of Auburn has intentionally changed its policies and procedures to exclude African Americans from the hiring and promotion practice.

Lieutenant Stephens filed a grievance against the City of Auburn and followed the grievance administrative process to its completion. In July 2006, the City of Auburn affirmed its decision not to promote Lieutenant Stephens to the position of Battalion Chief.

# EXHIBIT M



U.S. Department ( Justice

Civil Rights Division

Employment Litigation Section - PHB
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
www.usdoj.gov/crt/emp/emphome.html

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

WJK:WBF:mdw
DJ 170-1-0

JUL 1 8 2007

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Eddie Ogletree
c/o Richard F. Horsley, Esq.
1 Metroplex Drive, Suite 280
Birmingham, AL 35209



Re: Eddie Ogletree v. City of Auburn,
EEOC No. 420-2006-04927

Dear Mr. Ogletree:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and conciliation on that charge has failed, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate court within 90 days of your receipt of this Notice.

    We are returning the EEOC files pertaining to your case to the Birmingham District Office of the EEOC, located at the following address: Equal Employment Opportunity Commission, 1130 22nd Street, South, Birmingham, AL 35205.

    This notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your charges are meritorious.

                                    Sincerely,

                                    Wan J. Kim
                                    Assistant Attorney General
                                    Civil Rights Division

                    By:    William B. Fenton

                                    William B. Fenton
                                    Deputy Chief
                                    Employment Litigation Section

cc: Arnold W. Umbach, Esq.
    City of Auburn

    EEOC District Office



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Charge Number:    420 2006 04927

Eddie Ogletree
106 Pioneer Drive
LaGrange, Georgia 30240                          Charging Party

City of Auburn
144 Tichenor Avenue, Suite 1
Auburn, Alabama 36830                            Respondent

## DETERMINATION

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. (Title VII). Timeliness and all other requirements for coverage have been met.

Charging Party alleges he was not promoted because of his race, Black, in violation of Title VII.

Evidence substantiates that Respondent used tests which discriminated against Black applicants as a class in its promotions to Battalion Chief. Evidence indicates that Charging Party and other Black candidates were disqualified for promotion by use of this test. Evidence further indicates all resulting promotions to Battalion Chief were of White applicants.

I have determined that the evidence obtained during the investigation establishes reasonable cause to believe a violation of the statute occurred as alleged.

Upon finding there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. Please complete the enclosed Invitation to Conciliate and return it to the Commission at the above address no later than April 16, 2007. You may fax your response directly to (205) 212-2105 to the attention of J.W. Furman. Failure to respond by April 16, 2007, will indicate that you are not interested in conciliating this matter and the Commission will determine that efforts to conciliate this charge as required by Title VII, Section 706(b), have been unsuccessful.

Letter of Determination
Charge Number 420 2006 04927
Page 2

If the Respondent declines to participate in conciliation discussions or when, for any other reason, a conciliation agreement acceptable to the Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

On Behalf of the Commission:

_____4/3/07_____

Date

Delner Franklin-Thomas
District Director

Encl:    Invitation to Conciliate

cc:    Richard F. Horsley
       Goozee, King & Horsley
       1 Metroplex Drive, Suite 280
       Birmingham, Alabama 35209

       Arnold W. Umbach, Jr.
       Adams, Umbach, Davidson & White
       122 Tichenor Avenue
       Auburn, Alabama 36830

# EXHIBIT N



U.S. Department of Justice

Civil Rights Division

_____

Employment Litigation Section - PHB
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
www.usdoj.gov/crt/emp/emphome.html

### NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

WJK:WBF:mdw
DJ 170-1-0

JUL 18 2007

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Gerald Stephens
c/o Richard F. Horsley, Esq.
1 Metroplex Drive, Suite 280
Birmingham, AL 35209

PLAINTIFF'S
EXHIBIT
11

Re: Gerald Stephens v. City of Auburn,
EEOC No. 420-2006-04928

Dear Mr. Stephens:

Because you filed the above charge with the Equal Employment Opportunity Commission, and conciliation on that charge has failed, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate court within 90 days of your receipt of this Notice.

We are returning the EEOC files pertaining to your case to the Birmingham District Office of the EEOC, located at the following address: Equal Employment Opportunity Commission, 1130 22nd Street, South, Birmingham, AL 35205.

This notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your charges are meritorious.

Sincerely,

Wan J. Kim
Assistant Attorney General
Civil Rights Division

By:    William B. Fenton
       Deputy Chief
       Employment Litigation Section

cc: Arnold W. Umbach, Esq.
    City of Auburn

    EEOC District Office



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Charge Number:    420 2006 04928

Gerald Stephens
828 Cahaba Drive
Auburn, Alabama 36830                    Charging Party

City of Auburn
144 Tichenor Avenue, Suite 1
Auburn, Alabama 36830                    Respondent

DETERMINATION

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. (Title VII). Timeliness and all other requirements for coverage have been met.

Charging Party alleges he was not promoted because of his race, Black, in violation of Title VII.

Evidence substantiates that Respondent used tests which discriminated against Black applicants as a class in its promotions to Battalion Chief. Evidence indicates that Charging Party and other Black candidates were disqualified for promotion by use of this test. Evidence further indicates all resulting promotions to Battalion Chief were of White applicants.

I have determined that the evidence obtained during the investigation establishes reasonable cause to believe a violation of the statute occurred as alleged.

Upon finding there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. Please complete the enclosed Invitation to Conciliate and return it to the Commission at the above address no later than April 16, 2007. You may fax your response directly to (205) 212-2105 to the attention of Glenn Todd. Failure to respond by April 16, 2007, will indicate that you are not interested in conciliating this matter and the Commission will determine that efforts to conciliate this charge as required by Title VII, Section 706(b), have been unsuccessful.

Letter of Determination
Charge Number 420 2006 04928
Page 2

If the Respondent declines to participate in conciliation discussions or when, for any other reason, a conciliation agreement acceptable to the Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

On Behalf of the Commission:

_4/3/07_
Date

_Delner Franklin-Thomas_
Delner Franklin-Thomas
District Director

Encl:    Invitation to Conciliate

cc:    Richard F. Horsley
       Goozee, King & Horsley
       1 Metroplex Drive, Suite 280
       Birmingham, Alabama 35209

       Arnold W. Umbach, Jr.
       Adams, Umbach, Davidson & White
       122 Tichenor Avenue
       Auburn, Alabama 36830

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| EDDIE OGLETREE, an individual; | ) | |
| GERALD STEPHENS, an individual; | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO: |
| | ) | 3:07-cv-867-WKW |
| CITY OF AUBURN, a municipality in The | ) | |
| State of Alabama; LARRY LANGLEY, an | ) | |
| Individual; LEE LAMAR, an individual; | ) | |
| BILL HAM, Jr., an individual; STEVEN | ) | |
| A. REEVES, an individual; BILL JAMES, | ) | |
| an individual; CHARLES M. DUGGAN, | ) | |
| an individual; and CORTEZ LAWRENCE, | ) | |
| an individual; | ) | |
| | ) | |
| Defendants, | ) | |

PLAINTIFF'S
EXHIBIT
1 G

## DEFENDANT CITY OF AUBURN'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

COMES NOW, Defendant City of Auburn and herewith responds to Plaintiffs' Interrogatories as follows:

### GENERAL OBJECTIONS

Defendant objects to each of Plaintiff's discovery requests to the extent that each is overly broad, vague, unduly burdensome, seeks information not designed nor reasonably calculated to the discovery of relevant evidence; and, purport to request information protected by the attorney/client privilege or the work-product doctrine or seeks information taken and/or prepared in anticipation of litigation, or privileged, not subject to discovery or which otherwise are impermissible subjects of discovery under the rules of civil procedure.

1

Defendant further objects to each discovery request to the extent each seeks documents or things which constitute confidential, proprietary information, or to which Defendant has a duty or obligation of confidentiality with respect to persons or entities not parties to this litigation. This objection is made specifically, but without limitation, with respect to any request which entails disclosure of the identities or other confidential information of persons not parties to this litigation, whose privacy rights would be violated by such disclosure.

## SPECIFIC RESPONSES

1.    Provide the name, address and job title of the individual responding.

Response: The Defendant objects to this Interrogatory as privileged, not subject to discovery and seek information not designed nor reasonably calculated to lead to the discovery of relevant evidence. Without waiving said objection, these are the responses of the City.

2.    Describe in detail any and all promotions for which the Plaintiffs have applied within the last (10) years, including the job title for which they sought promotion and the date of their applications.

Response: Stephens applied for promotion to Fire Training Officer May 26, 2005. Both Plaintiffs applied for the Battalion Chief position February 21, 2006.

3.    For each promotion listed in the previous Interrogatory, please state whether the Plaintiffs received those promotions.

Response: Plaintiffs were not promoted.

2

4.    Provide names, last known addresses and telephone numbers of any and all witnesses, of whom this Defendant is aware having knowledge of the events made the subject of this lawsuit.

Response: The Defendant objects to this Interrogatory because it is vague, overly broad, unduly burdensome and seeks confidential information about individuals who may not be parties to this lawsuit. Without waiving said objections, see Initial Disclosures, which may be supplemented from time to time. Defendant will also submit a Witness List in accord with Court's scheduling order.

5.    Provide the names, last known addresses and telephone numbers of any and all witnesses from whom this Defendant has obtained statements which in any way concern the events made the subject of this lawsuit.

Response: This Defendant objects on the grounds of privilege, taken and/or prepared in anticipation of litigation, protected by the attorney-client privilege, work product and not subject to discovery.

6.    Did the Plaintiffs apply for promotion to Battalion Chief? Is so, please state the Plaintiffs' current job titles and state whether or not the Plaintiffs applied for promotions to Battalion Chief positions in 2006, including the dates of their applications, and the dates that any final decisions were made with regard to their applications.

Response: Yes; Fire Lieutenant; Plaintiffs applied on February 21, 2006.

7.    Provide the names, addresses, and telephone numbers of any and all individuals who received Battalion Chief promotions during the year 2005 and 2006, including for each the pre-promotion job title and length of time of employment with the City of Auburn Fire Department.

3

Response:    Joseph Lovvorn, Matthew Jordan and Rodney Hartsfield were promoted to Battalion Chief in May 2006.  Each employee had previously been a Fire Lieutenant.  Joseph Lovvorn, was a Student Firefighter from January 12, 1995 to August 31, 1999.  Lovvorn was hired as a regular full-time employee in the Fire Division on September 1, 1999.  Matthew Jordan was a Student Firefighter from June 12, 1995 to August 1, 1997.  Jordan was hired as a regular full-time employee in the Fire Division on August 1, 1997.  Rodney Hartsfield was a Student Firefighter from June 10, 1996 to May 31, 1999.  Hartsfield was hired as a regular full-time employee of the Fire Division on June 1, 1999.

8.      If Plaintiffs were denied Battalion Chief promotions in 2006, please state in great detail all reasons why the Plaintiffs were denied those promotions.

Response:  The Defendant objects as overly broad, to the form and to the extent it implies Plaintiffs were qualified to be promoted to Battalion Chief; but without waiving said objections while Plaintiffs were eligible to participate in the Battalion Chief assessment process they failed to score high enough on the written test to proceed in the process.

9.      Please state the Plaintiffs' wages currently, in February 2006 and August 2005.

Response:  Eddie Ogletree: current:  $4,630.71 (Grade 18, Step11); February, 2006:  $4,237.75 (Grade 18, Step 10); August, 2005:  $4,114.21 (Grade 18, Step 10).  Gerald Stephens:  current $4,495.83 (Grade 18, Step 10); February, 2006: $4,114.32 (Grade 18, Step 9); August, 2005 $3,994.50 (Grade 18, Step 9).

4

10.    Provide the names, last known addresses and telephone numbers of any African Americans who have been employed by the City of Auburn Fire Division, including job title, within the last (10) ten years.

Response: The Defendant objects to this Interrogatory as overly broad, unduly burdensome, requests privileged confidential and non-discoverable information about current or former employees and is not designed nor reasonably calculated to lead to the discovery of relevant evidence.  Without waiving said objections, African Americans employed and available for regular duty by the City of Auburn Fire Division within the last (10) years are: Team Leader, now Lieutenant Eddie Ogletree, Lieutenant Gerald Stephens, Fire Fighter Christopher Turner. Jeremy Patterson, William Thompkins, Arkelle Matthews and Jon Oni were Student Fire Fighters.

11.    Provide the names, last known addresses and telephone numbers of any and all African Americans employed by the City of Auburn Fire Division in February 2006, including with each their job titles.

Response: The Defendant objects to this Interrogatory as it requests confidential, privileged and non-discoverable information about current or former employees and is not designed nor reasonably calculated to lead to the discovery of relevant evidence. Without waiving said objections, African Americans employed by the City of Auburn Fire Division in February 2006 and their job titles:  Eddie Ogletree – Fire Lieutenant; Gerald Stephens – Fire Lieutenant; Christopher Turner – Firefighter; and Jon Oni- Student Fire Fighter.

12:    State in detail the written requirements for the Battalion Chief job that were in effect in February 2006.

Response: See attached job description.

13.    State in detail the time and exact reasons why passing a written test became a requirement for the Battalion Chief position.

Response:  The Defendant objects to the form of this Interrogatory, objects as vague, ambiguous and overly broad; without waiving said objections a written test was required for the Battalion Chief position so applicants could demonstrate their basic knowledge about the various facets of the fire service.

14.    For any tests referenced in the previous Interrogatory response, please state the name of those test and the name of the company that administered and graded those tests.

Response: The Defendant objects to the form of this Interrogatory, objects as vague, ambiguous and overly broad.  Without waiving said objections, the test was named Battalion Chief, the test was administered by the City of Auburn and CWH Research, Inc.; and graded by CWH Research, Inc.

15.    State whether or not any of these Defendants have instituted legal action against any company responsible for administering and grading the test required for the Battalion Chief promotion and/or whether any of these Defendants are currently considering litigation against these companies.

Response: Yes.

16.    If litigation has begun pursuant to the company's referenced in the previous Interrogatory, please state in detail the legal basis upon which those claims are asserted.

Response: See City's Third Party Complaint attached to its Motion to File Third Party Complaint.

17.     Please state in detail the requirements of the Battalion Chief job prior to February 2006 and how if at all those requirements changed in 2006.

Response: See attached job description.

18.     Provide the test scores of all applicants for the February 2006 Battalion Chief promotion, including the name and race of the individual.

Response:   Defendant objects on the grounds of privilege, confidentiality, not subject to discovery and proprietary; but, without waiving said objections, will be made available at a mutually agreeable time and place pursuant to a confidentiality agreement acceptable to the City.

19.     State in detail any and all disciplinary action, written, verbal or otherwise taken against the Plaintiffs by these Defendants within the last (10) ten years, and stating the reasons for such disciplinary action.

Response: The Defendant objects to this request as overly broad and seeks information not designed nor reasonably calculated to lead to the discovery of relevant evidence.  However, without waiving said objections, based on information and belief, Ogletree has no disciplinary actions in his file. Stephens has one on July 27, 1997 for negligence for not putting equipment back on the truck. A nozzle fell off and a car ran over it causing damage.

20.     Provide the names, last known addresses and telephone numbers of any and all witnesses this Defendant intends to call at the trial of this case.

7

Response: The Defendant will submit a Witness List in accord with the Court's scheduling order.

21.    Provide the names, addresses and telephone numbers of any and all expert witnesses this Defendant has consulted with and/or whom this Defendant intends to call at the trial of this case.

Response: The Defendant objects to responding as to experts, if any, with whom it has consulted as privileged, not subject to discovery, work-product and beyond the bounds of discovery.  As for any expert this Defendant intends to use at trial, it will comply with the Court's scheduling order.

22.    Provide any video or audio tape in the possession of the Defendant which this Defendant contends to depict the Plaintiffs.

Response: The Defendant objects to this Interrogatory as vague, overly broad, and ambiguous, not limited in time, place, or event, privileged, not subject to discovery, and not designed nor reasonably calculated to lead to the discovery of relevant evidence.

23.    Provide the case style, including number and court system, for any lawsuits filed against the City of Auburn Fire Department or the City of Auburn alleging claims of racial discrimination within the last (5) years.

Response:    The Defendant objects to this request as overly broad, unduly burdensome, not designed or reasonably calculated to lead to the discovery of relevant evidence, and equally available to Plaintiffs.


**[SIGNATURES ON FOLLOWING PAGES]**


8

CITY OF AUBURN

By: _____

As its: _____

STATE OF ALABAMA

COUNTY OF _____

    Personally appeared before me, _____, who acknowledged that he/she in capacity as _____ of said City of Auburn executed the foregoing instrument based on information and belief unless specifically indicated, these responses are not based upon the personal knowledge of the undersigned who is the representative designated with full authority as and for the act of same after being informed of the contents thereof.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of my office on this ____day of April, 2008.


_____

NOTARY PUBLIC

My Commission Expires:_____

9

Objections signed for Defendant by its undersigned attorney.

/S/ *Randall Morgan*
Randall Morgan [8350-R70R]
Elizabeth Brannen Carter [3272-C-38-E]
**HILL, HILL, CARTER, FRANCO,**
   **COLE & BLACK, P.C.**
425 South Perry Street
Montgomery, Alabama 36101-0116
(334) 834-7600
(334) 263-5969 facsimile
Rmorgan@hillhillcarter.com
Counsel for Defendant

## CERTIFICATE OF SERVICE

I Hereby Certify that I have this date served a true and correct copy of the foregoing VIA E-Mail and U.S. Mail to: Richard F. Horsley, Esquire (rfhala@cs.com) this the 4th day of April 2008.

/S/ *Randall Morgan*
Of Counsel

# EXHIBIT P



# City of Auburn

### Home of Auburn University

Friday May 12, 2006

William James
City of Auburn, Public Safety Director
161 North Ross Street
Auburn, Alabama 36830

Dear Director James,

On April 21, 2006 a grievance was filed in reference to the promotional process for Battalion Chief, which started Monday April 10, 2006. According to the division chain of command the grievance was addressed first to the Deputy Fire Chief and second, the Deputy Director of Fire Operations. A written response was given on Friday April 28, 2006 and Monday May 8, 2006 to all participants of the formal grievance. Due to the unsatisfactory response from the Deputy Fire Chief and the Deputy Director of Fire Operations we chose to address the same concerns to you. Our concerns are listed below, but not limited to, the following:

-the written exam
-no time in grade policy
-no accumulative point system
-inconsistency of past promotional procedures.

PLAINTIFF'S
EXHIBIT
15
PENGAD 800-631-6989

Previously, we have asked that certain written exams be reviewed. Thus far we have received Candidate Feedback Reports, which does not fully explain the information we have requested. We are very concerned which questions were removed and to verify that everyone participating in the exam were equally graded. Understand there are other concerns that may arise from further discussions pertaining to this grievance. In closing we look forward to your immediate response.

Company Officers,

Horace Clanton          Eddie Ogletree          Gerald Stephens

**EXHIBIT Q**



PLAINTIFF'S
EXHIBIT
| ⌐

# City of Auburn

### Home of Auburn University

April 28, 2006

Lt. Horace Clanton
359 East Magnolia Avenue
Auburn, AL 36830

Dear Lieutenant Clanton:

I have received your letter requesting a review of the recent Battalion Chief's assessment and written exam. Specifically you have raised four questions for review and I will try to answer what I can. Item one is the review of the written exam. The exams were reviewed by CWH staff for accuracy of grading and to resolve any challenged questions. The City of Auburn has requested CWH provide a written review to the candidate of their exams. This may take a several days to obtain. Included in this review letter will be information about the number of questions answered correctly and incorrectly, what category they are in (knowledge or situational judgment), and a section on questions that were reviewed and how they were resolved. Again this material is being provided to you and may take some time before it is available.

The second and third items are similar in nature and it should be noted that no time-in-grade or cumulative point system exists within the fire division at this time. The only policy in this area states that probationary career employees may not assess for higher positions. A concern CWH had was that some of the candidates would not be prepared for the job of Battalion Chief based on their experience and rank. However, because our current advancement criteria permitted anyone to apply, anyone not a probationary employee was allowed to participate. In the near future, we will be reviewing the criteria required in order for an employee to participate in a future promotional process. As you know, the career development plan currently being developed addresses those criteria.

The fourth item I would ask you to elaborate on and state what you believe to be inconsistent about the promotional practices. I am unsure what you wish to discuss and would like to know more before I respond.

I would also suggest that you wait until the report from CWH is received and you have chance to review it. If you wish to file a grievance after receiving that information, you will have seven days of receipt of the report to file. Please let me know how I can help in this matter and I will be happy to assist you with any questions or requests for information.

Sincerely,

Lee Y. Lamar Jr.
Deputy Fire Chief

# EXHIBIT R



# City of Auburn

Home of Auburn University

April 14, 2006



DEFENDANT'S
EXHIBIT
76

Eddie Ogletree
106 Pioneer Dr.
La Grange, GA 30240

Eddie:

On Monday, April 10, 2006, you sat for the Battalion Chief written test. As you are aware, a score of 70 or above on the written test was necessary to advance to the assessment center portion of the promotion process. We regret to inform you that CWH has returned the test scores and your score is 63.81. Because you did not pass the written test, you are ineligible to participate in the assessment center.

We appreciate your interest in promotional opportunities with the City of Auburn and hope that you continue to seek them in the future. If you should have any questions, feel free to contact me at (334) 501-7245.

Sincerely,

*Stephanie L. King*

Stephanie L. King
Senior Human Resources Generalist

Ogletree-¶ Disclosures

00001



# City of Auburn

### ——— Home of Auburn University ———

April 14, 2006

Gerald Stephens
828 Cahaba Dr.
Auburn, AL 36830

Gerald:

On Monday, April 10, 2006, you sat for the Battalion Chief written test.  As you are aware, a score of 70 or above on the written test was necessary to advance to the assessment center portion of the promotion process. We regret to inform you that CWH has returned the test scores and your score is 60.95.  Because you did not pass the written test, you are ineligible to participate in the assessment center.

We appreciate your interest in promotional opportunities with the City of Auburn and hope that you continue to seek them in the future.   If you should have any questions, feel free to contact me at (334) 501-7245.

Sincerely,



Stephanie L. King
Senior Human Resources Generalist

Ogletree-¶ Disclosures

00024

# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

EDDIE OGLETREE, an individual;    )
GERALD STEPHENS, an individual    )
                                  )
        Plaintiff,                )
                                  )
vs.                               )        CIVIL ACTION NO:
                                  )        3:07-cv-867-WKW
CITY OF AUBURN, et al.            )
                                  )
                                  )
        Defendants,               )

## AFFIDAVIT OF GERALD STEPHENS

My name is Gerald Stephens, and I am an adult and competent to testify. I have personal knowledge of the matters contained within this Affidavit.

I am one of the Plaintiffs in the above styled cause of action.

I submitted a grievance to the City of Auburn Fire Department in 2005. The grievance surrounded what I believed to be unfair and discriminatory promotional practices by the City of Auburn Fire Department. The attached Exhibit contains the actual grievance and the City's initial responses to that grievance. The Exhibit also contains a follow up response from me.

After submitting this grievance, then Chief Larry Langley called me and came to my home in order to deliver a written response to my grievance. While at my home, Chief Langley specifically told me that if I continued with this discrimination grievance there would be a "red flag" next to my name with the City of Auburn. I interpreted this to mean that the City would use my grievance against me concerning promotional opportunities in the future.

The matters contained in this Affidavit are true and correct to the best of my knowledge.

Page 1 of 2

_Gerald Stephens_
Gerald Stephens

**SWORN** to and **SUBSCRIBED** before me on this 2nd day of September, 2008.

State of Alabama
County of Lee

_Rachel B. Treston_
**NOTARY PUBLIC**

My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: May 6, 2012
BONDED THRU NOTARY PUBLIC UNDERWRITER

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: May 6, 2012
BONDED THRU NOTARY PUBLIC UNDERWRITER

Page 2 of 2



# City of Auburn

— Home of Auburn University —

Fire Lieutenant Gerald D. Stephens
Auburn Fire Division
359 East Magnolia Avenue
Auburn, Alabama 36830

Mr. Larry Langley
Deputy Public Safety Director of Fire Operations
Tuesday January 18, 2005

Dear Sir,

The purpose of this letter is threefold. First and foremost, I am aware of the importance to follow the chain of command within the Auburn Fire Division. I have followed the proper chain of command and requested the assigned shift commander, Team Leader Horace Clanton, to deliver this letter to you. However, I think it is of great interest that I share my intentions with you at this time. Second, I would like to speak to you about previous events, presently, two in particular. One involves the Auburn Fire Division temporary assignment of Shift Commander/Battalion Chief for A-Shift. The other involves the promotional position of the Auburn Fire Division Training Officer. Thirdly, as a City of Auburn employee I have decided to engage in Grievance Procedures in accordance to the City of Auburn Personnel Policies (1999, Section VIII).

The grievance being pursued is the result to interpretation of alleged discrimination and unfair treatment of specifications and distinguishing features of the class Fire Lieutenant. Also being pursued is interpretation of alleged discrimination and unfair treatment with notification and eligibility of position vacancy for the division position of training officer (Personnel Policies-Recruitment and Selection-Section II).

Upon request, I would like to make an appointment with you to discuss the events mentioned. If possible, for confirmation purposes, I request to be contacted 48 hours before the scheduled appointment explaining what time to be present. Also I request the appointment to take place in the small or medium conference room of the City of Auburn Public Safety Building. Upon doing so I will make the necessary provision to meet with you at the scheduled time. I appreciate your attention and patience with this matter. I look forward to your written response.

Thank You,

Gerald D. Stephens

16



# City of Auburn
— Home of Auburn University —

To:   Gerald Stephens

From: Larry Langley
        Deputy Public Safety Director of Fire Operations

Date:  January 19, 2005

Re: Grievance

I received your letter dated January 18, 2005, in which you asked about the position of Training Officer and the alleged discrimination and unfair treatment of specifications and distinguishing features of the class Fire Lieutenant.

As you know, the City conducted a classification and compensation study using Condrey and Associates, a consulting firm in these studies. Condrey and Associates recommended that the job of Training Officer be assigned to pay grade 20, and that was where the job has been placed. Because this was a reclassification of position, (Section 11.06 paragraph 4 page 45 of the City of Auburn Personnel Policies) it was not handled as a promotion.

The Training Officer position was a lateral move from Team Leader to Training Officer several years ago with no pay grade change or increase in pay. With the creation of this position we were able to promote another Team Leader to fill the vacant opening. With the reclassification of this position it adds another slot in the rank structure and in the future this would be a promotion.

As you are well aware Battalion Chief Brown has come down with an unexpected illness and had to have surgery for cancer and Battalion Chief Leverette has had surgery on his ankle leaving the Fire Division without a Battalion Chief on A- Shift and Battalion Chief Lawrence filling in on C- Shift until the return of Battalion Chief Leverette. Battalion Chief Garrett and Lawrence has been filling on A- Shift during the Christmas and New Year Holidays so it would not interfere with anyone's scheduled time off during holidays. Now that the holidays are over and still unsure when Chief Brown are Chief Leverette will be able to return to work a decision was made by upper management and myself to move the Senior Officer to Temporary Battalion Chief to cover A-Shift until the return of Chief Leverette or Chief Brown. Horace Clanton was promoted to Team Leader on

17

January 5, 1993 making him the Senior Officer in the division not including the Battalion Chiefs.

The Job Description for Team Leader and Lieutenant (effective date: June 1, 2004) has no distinguishing features or specifications separating the two classes. The positions are equal in rank requiring the same job duties. The decision was based on seniority of the senior officers. You were promoted to Lieutenant on April 7, 1996 making Team Leader Clanton the Senior Officer by three years therefore there was no discrimination towards the class of Fire Lieutenant.

You have requested a meeting in the Public Safety to discuss the events as mentioned. If you feel you still want to meet to discuss the grievance I will schedule a time for the meeting.

18

# City of Auburn

Home of Auburn University

Gerald D. Stephens
Auburn Fire Division Fire Lieutenant
359 East Magnolia Drive
Auburn, Alabama 36830

Mr. Larry Langley
Deputy Public Safety Director of Fire Operations
Wednesday January 26, 2005

Dear Sir,

I received the letter of response dated January 19, 2005. Upon delivery I thanked the assigned shift commander, Team Leader Clanton, and I appreciate the prompt response by way of the Division's chain of command.

In response to the letter received, I am aware of the consulting firm Condrey and Associates and the classification study conducted by the City of Auburn. In reference to the reclassification of the Training Officer position (Section 11.06, 4. / City of Auburn Personnel Polices) I have the following questions:

1. Although the Training Officer position was not handled as a promotion, as stated in your letter of response, what is a reclassification that involves a pay grade change from 18 to 20 within the Auburn Fire Division?
2. Was there a Job-Position Classification Plan for Training Officer (Section 10, page 38, City of Auburn Personnel Policies) other than the recommendation given by Condrey and Associates?
3. Prior to the assignment of the Training Officer position where was the posting of the current job vacancy (Section 2.01) and what was the closing date?
4. Was the Training Officer position available for current city employees ("In-House Only") and/or open to the public via the Alabama State Employment Service?
5. Relating to current city employees, what position/title was eligible for the Training Officer position within the Auburn Fire Division (Section 2.02)?
6. Relating to the job status of Training Officer, was it a Regular/Full-Time, Temporary/Full-Time, Temporary/Part-Time (etc.) position?
7. What was the Date of Announcement for the Training Officer position?

Also in the letter of response it stated that the Training Officer position was a lateral move from Team Leader several years ago with no pay grade change or increase in pay. Another Team Leader was promoted to fill the vacant opening with the creation of training officer and this added another slot in the rank structure. This leads to further questions. Was the Fire Lieutenant position included or involved in the lateral move to Training Officer?

I am very aware of the health issues the Division is experiencing with two Shift Commanders/Battalion Chiefs assigned to "A" and "C". Presently, I am aware that one Battalion Chief has been assigned to fill the Shift Commander position on "C" shift. I am also aware that two Battalion Chiefs rotated Shift Commander duties and responsibilities on "A" Shift, starting December 15, 2004 and ending January 13, 2005. As scheduled and assigned, the two Battalion Chiefs worked 24-hour shifts on weekends and 15-hour shifts on weekdays. Each hour worked was documented and forwarded as overtime pay status.

*19*

Gerald D. Stephens / Continued Grievance / January 26, 2005

If I may ask, Mr. Langley, what is a senior officer in the Auburn Fire Division? Presently, what is the division rank structure and what slot is Fire Lieutenant located? As we know, the Division's Team Leader position was created as a temporary assignment, filled by regular firefighters and contingent on the continuation of the Student Firefighter Program. In 1996 three firefighters of the Auburn Fire Division applied and competed for the Fire Lieutenant position by way of an outside departmental assessment center. As we are well aware I was one of the three. In this case, Mr. Langley, what was the Division's Fire Lieutenant position created as? Please explain any, if not all, previous promotional competitive/testing procedures for the Team Leader position since June 20, 1997. One other question, Mr. Langley, pertains to the upper management who assisted with selecting the senior officer to cover "A" Shift at the Auburn Fire Division. Would you please provide the position/title of the involved management and the number of participants in the selection?

In closing, I did request a meeting to discuss the events mentioned in my first grievance letter. If you recall upon three past interpretations, when I filed and initiated the procedures and presented to you my written grievance, you scheduled a meeting(s) to discuss matters at hand and never sent a response letter. For the record I have never received a response letter pertaining to past grievances filed, that is until now. So, at the present time, I think a meeting with you is not mandatory. But, due to my discomfort and continued dissatisfaction, I consider the grievance, filed January 18, 2005, still active. I also request that future discussions, between you and I, be conducted formally in a written response. Again, I appreciate the attention and prompt response.


Thank you,

Lieutenant Gerald D. Stephens

2



# City of Auburn
— Home of Auburn University —

To:   Gerald Stephens

From: Larry Langley
       Deputy Public Safety Director of Fire Operations

Date: February 1, 2005

Ref: Grievance

I received your letter dated January 26, 2005 in reference to the reclassification of the Training Officer position and the Senior Officer in the Auburn Fire Division.

As Stated in my letter to you on January 19, 2005 the City conducted a classification and compensation study using Condrey and Associates, a consulting firm in these studies. The City implemented the results of the study in March of 2004 with most employees getting a pay increase and some jobs were reclassified to a different pay grade. The appeals process for anyone wanting to appeal the results of a job classification ended in August 2004. Your grievance on the Training Officer reclassification should have been done during that time period. Since the seven-day period for a grievance to be file has past, your grievance will not go forward on the Training Officer reclassification.

In response to your question of what is a senior officer in the Auburn Fire Division. The senior officer is the officer with the most time in grade in this position. The Team Leader and Fire Lieutenant are equal in rank and perform the same job duties. As stated in the previous letter dated January 19, 2005 Horace Clanton was the senior person in this class and moved to the temporary assignment of Battalion Chief. The decision was made by me and Bill James (Public Safety Director), after consulting with Steve Reeves (Human Resource Director).

This is the second response to your grievance in the last 12 calendars days. Your second letter should have been sent to the Public Safety Director Bill James in accordance with the City of Auburn Personnel Policies. If you wish to appeal this matter to Public Safety Director Bill James you have seven days from the date of receipt of this letter to do so.

21

# EXHIBIT T

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

EDDIE OGLETREE, an individual;     )
GERALD STEPHENS, an individual     )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )
                                   )          CIVIL ACTION NO:
CITY OF AUBURN, et al.             )          3:07-cv-867-WKW
                                   )
                                   )
        Defendants,                )
                                   )

## AFFIDAVIT OF EDDIE OGLETREE

My name is Eddie Ogletree, and I am an adult and competent to testify. I have personal knowledge of the matters contained within this Affidavit.

I am one of the (2) two Plaintiffs in the above styled cause of action. The document attached hereto as Exhibit A is my City of Auburn Performance Appraisal Form dated July 10, 2007. This represents my performance appraisal for the time period beginning July 1, 2006 and ending July 1, 2007. This is my yearly appraisal for 2007. On page 5 of the Appraisal I was scored pursuant to my performance of the duties of Battalion Chief in the absence of a Battalion Chief. I received a score of (7) seven which meets the job requirements "with distinction". In the comment section of my appraisal, it states that in the absence of the Battalion Chief, Lieutenant Ogletree often fills in as the Shift Commander where he is responsible for commanding the entire shift. Lieutenant Ogletree is (1) one of the (2) two Lieutenants currently on B-Shift with the knowledge and experience to perform the duties of the Battalion Chief, in his/her absence. He used his years of knowledge and experience to resolve all emergency scenes

Page 1 of 2

in an exemplary manner. He also handles all non emergency shift duties in an exceptional

fashion; and proves time and again why he is a superior supervisor, and someone who can be

trusted to safely supervise the entire shift.

Exhibit A is a true and accurate copy of the Performance Appraisal I received in 2007.

The matters contained in this Affidavit are true and correct to the best of my knowledge.

**Eddie Ogletree**

**SWORN** to and **SUBSCRIBED** before me on this 29 th day of August , 2008.

NOTARY PUBLIC

My Commission Expires Nov. 6, 2011

EUNICE SHEALY
NOTARY
GEORGIA
NOV. 6, 2011
PUBLIC
TROUP COUNTY

# City of Auburn - Performance Appraisal Form

JOB TITLE: Lieutenant                                              FD/3

DEPARTMENT: Public Safety, Fire Division

FLSA Designation: Non-exempt

PAY GRADE: 18

EFFECTIVE DATE: June 1, 2004

JOB SUMMARY: This position is responsible for supervising the activities of personnel assigned to a fire station and involved in fire suppression and rescue work.

## Date

Date:        7/10/2007

Rating Period     From:      7/1/2006        To:        7/1/2007

## Identification

Name:          Eddie Ogletree

Rater Name:    Rodney Hartsfield

Rater Title:   Battalion Chief

Department:    Public Safety / Fire Division

## Total Score

Sum of domain score =  5.85

## Signatures

This report is based on my observation and knowledge of both the employee and the job.

_Rodney Hatfull_                                    _7/16/07_
Supervisor                                          Date

_ZZZ_                                               _7/13/07_
Reviewer  (NH)                                      Date

My signature indicates that I have reviewed this appraisal.  It does not mean that I agree with the results.

_Eddie Ogltree_                                     _7/16/07_
Employee  (N)                                       Date

COPY

## Rating Scale Key

| 1 | 2 | 3 | 4 | 5 | 6 | 7 8 9 | NA |
|---|---|---|---|---|---|---|---|
| Falls to meet...........Almost meets Job Requirements | | | Barely meets...............Fully meets Job Requirements | | | Meets with distinction........Exceeds Job Requirements | Not Applicable |

Any score below or above 4-5-6 requires explanation/justification in the "comments" section.

## Domain One: Performs Fire and Rescue Duties ( 25%)

1) Effectively responds to and coordinates the activities of the firefighting and rescue personnel and equipment at fire and emergency scenes.

Score: **6**

Comments:

　　　Lieutenant Ogletree responds to 911 calls in a professional and timely manner.

2) Effectively commands fire scenes until relieved by a senior officer:  assesses emergency situations; determines suppression methods; determines the need for additional personnel and equipment; preserves evidence of arson; ensures the security of a structure prior to leaving the scene.

Score: **7**

Comments:

　　　Lieutenant Ogletree uses his years of knowledge and experience to assess and mitigate any emergency scene. Lieutenant Ogletree remains calm and professional on all emergency calls, and he effectively follows the command structure. He performs and supervises on scene details such as fire suppression, ventilation, and search and rescue in a timely and professional manner. He is efficient, tactically sound, and provides leadership to his crew with little supervision from the Battalion Chief. One such example of this performance occurred on April 14, 2007 when a strong thunderstorm passed through Auburn. The Fire Department had multiple emergency calls, occurring simultaneously making it impossible for the Battalion Chief to respond to every call. Lieutenant Ogletree mitigated many of these emergency calls without assistance from the Battalion Chief, and did so in an exemplary fashion. Lieutenant Ogletree supervised scenes during this storm, and numerous other emergency scenes throughout the evaluation cycle, in an exceptional manner.

3) Develops effective pre-fire plans for use in emergency situations..

Score: **6**

Comments:

Lieutenant Ogletree performs pre-fire plans in a professional manner. While conducting pre-fire plans, he uses the opportunity to better familiarize himself and his crew with structures within the city. He always completes assigned pre-fire plans in a timely manner.

4) Effectively performs and supervises first responder duties as necessary.

Score: **5**

Comments:

Lieutenant Ogletree uses his knowledge to administer first aid when necessary and to know when someone needs more extensive care.

5) Effectively responds to automatic fire alarms.

Score: **6**

Comments:

Lieutenant Ogletree uses his years of experience to respond to all calls, emergency or non-emergency, in a professional and timely manner.

6) Effectively tests equipment and apparatus as required.

Score: **6**

Comments:

Lieutenant Ogletree consistently maintains accountability of the apparatus and equipment he is responsible for.

Total Points    36    divided by number of rated items    6    =    6.00    X 25 % =    1.50

## Domain Two: Performs Supervisory Duties (45%)

1) Effectively oversees daily station operations.

Score: **6**

Comments:

Lieutenant Ogletree continuously ensures that daily and shift assignments are completed in an incomparable manner. Lieutenant Ogletree's station continuously looks good, all paper work is accomplished, and he does a great job maintaining accountability of all things he is responsible for.

2) Effectively supervises personnel in the maintenance of equipment and the station.

Score: **6**

Comments:

Lieutenant Ogletree ensures all apparatus and equipment he is responsible for is maintained in a high state of readiness for firefighting operations.

3) Effectively directs training activities of assigned personnel.

Score: **7**

Comments:

Lieutenant Ogletree uses his vast level of knowledge and experience to organize and conduct training for all B-shift personnel. He consistently uses this knowledge and years of experience to increase other personnel's knowledge of firefighting tactics. Lieutenant Ogletree has been assigned, along with another senior Lieutenant, as B-shifts training officer. He assist in creating a shift training schedule, ensures daily training is conducted for his personnel and the entire shift, and uses his level of knowledge and experience to provide a superior level of training for all B-shift personnel.

4) Effectively supervises, counsels, disciplines, and evaluates the performance of assigned fire officers.

Score: **5**

Comments:

Lieutenant Ogletree counsels, disciplines, and evaluates his crew in accordance with the standards of the organization.

5) Accurately inspects fire station, equipment, supplies, and personnel.

Score: **6**

Comments:

Lieutenant Ogletree maintains a high level of appearance for the station, apparatus, and his crew.

6) Prepares and maintains accurate reports on all shift activities.

Score: **5**

Comments:

Lieutenant Ogletree ensures all information for records and reports are entered into the computer.

Total Points    35    divided by number of rated items    6    = 5.83   X 45 % =   2.63

## Domain Three: Related Duties (30%)

1) Attends training seminars, conventions, and meetings.

Score: **5**

Comments:

Lieutenant Ogletree has attended on-shift courses, and has also received Introduction to Technical Rescue and Fire Officer II certifications from the Alabama Fire College during this evaluation cycle.

2) Effectively presents fire safety education classes to local school and community groups; conducts fire drills.

Score: **5**

Comments:

Lieutenant Ogletree assists the citizens of the City of Auburn in being aware of fire safety. He conducts fire drills at local schools and participates with the smoke trailer and truck displays at public functions.

3) Effectively performs the duties of the Battalion Chief in his/her absence.

Score: **7**

Comments:

In the absence of the Battalion Chief, LT Ogletree often fills in as the Shift Commander where he is responsible for commanding the entire shift. Lieutenant Ogletree is one of two Lieutenants currently on B-shift with the knowledge and experience to perform the duties of the Battalion Chief, in his/her absence. He uses his years of knowledge and experience to resolve all emergency scenes in an exemplary manner. He also handles all non-emergency shift duties in an exceptional fashion; and proves time and again why he is a superior supervisor, and someone who can be trusted to safely supervise the entire shift.

4) Performs other related duties as assigned.
Score: **6**

Comments:

Lieutenant Ogletree continuously performs any duty assigned to him with professionalism and devotion. He is always willing to assist in any work needing done.

Total Points  23    divided by number of rated items    4    =   5.75   X 30 % =   1.72

## Performance Discussion and Summary

1)Does the employee report for and remain at work as required?
⦿ **Yes**
◯ **No**

If no, please explain:

2)Does the employee follow instructions and observe work rules and personnel policies?
⦿ **Yes**
◯ **No**
If no, please explain:

3)Does the employee interact effectively with co-workers on the job?
⦿ **Yes**
◯ **No**
If no, please explain:

4)Does the employee perform the job in compliance with safety practices appropriate to the assigned work environment?

◉ **Yes**

○ **No**

If no, please explain:

5)Does the employee exhibit proper respect for and use of City property?

◉ **Yes**

○ **No**

If no, please explain:

6)Does the employee have the knowledge, skills, abilities, and other qualifications needed for successful job performance?

◉ **Yes**

○ **No**

If no, please explain:

7)Describe any specific actions employee needs to take to improve performance.

Lieutenant Ogletree needs to continue his career development by taking advantage of all schools and training that will allow him to keep up with firefighting and supervisory tactics. It is recommended that he continues with the Alabama Fire Officer courses by taking Fire Officer III. He should also continue on with the Alabama Instructor courses by taking Instructor III. Lieutenant Ogletree should also take advantage of any tactical, leadership, and management classes offered at the Alabama Fire College and the National Fire Academy. Lieutenant Ogletree must keep up with the ever-expanding growth of the City of Auburn by maintaining and increasing his knowledge on streets and numbers, business familiarization, and hydrant locations.

8)Summarize the employee's overall job performance.

Lieutenant Ogletree is an outstanding employee for the City of Auburn. He is dedicated and takes pride in the fire service. He is always willing to help citizens, fellow employees, or who ever may need assistance. He is a mentor and leader to his firefighters and peers, and always presents himself as a professional. Lieutenant Ogletree is a hard worker, an excellent supervisor, and a real asset to the City of Auburn.

# EXHIBIT U

STATE OF ALABAMA )
            COUNTY       )

My name is Chris Turner and I am over the age of nineteen years, of sound mind, and have firsthand knowledge of the facts set forth.

I have been employed with the City of Auburn from 1987 to present. I was hired originally in 1987, part time. I was refused full-time by Ellis Mitchell. I was a party to the Hammock v. The City of Auburn, 1987 CV 680 E lawsuit and it was through the lawsuit that I was hired full-time.

I have endured numerous instances of negative comments related to my race and job status, specifically, I was told by Chief Langley in about 2002 that I would have trouble getting promoted because I had filed an EEOC charge in or about 2002. In 2005, I had to a take Lieutenant's exam, which was a cut-off test. I did not make the cut-off. Four white fire fighters made the cut-off–but only one position was open in August. Instead of retesting for the next Lieutenant position, the City appointed from the four to the next open Lieutenant spot until all four whites were promoted to Lieutenant. I was not given a opportunity to apply for these positions. I was not assessed, as stated in para 12 of the 1991 Settlement Agreement, a copy of which attached. I complained to Chief Langley that they did not go through the assessment center in this promotion like stated in the 1991 Settlement Agreement. He said that he had nothing to do with it, *this time*, go see Stephanie King, Assistant Human Resource Director. She said, go see Larry Langley. I went back and he said, that this was a new process that they were starting. He said that it wasn't fair and he knew it wasn't fair.

All of the Team Leaders were promoted in February of 2006 to Lieutenant. There are no more Team Leaders. The Captains were appointed to Battalion Chief in 2005. There are no more Captains.

The student fire fighter program, from where the City of Auburn draws its fire fighters, is all white. There are approximately 70 to 80 student firefighters. They all attend college. They will compete for promotions to Battalion Chief and Lieutenant, with no time in grade. However, they have college experience which includes recent testing experience.

_____         8/24/08
AFFIANT                                               Date

SUBSCRIBED AND SWORN TO Sandra J. Hall
ON THIS THE 24th DAY OF August, 2008

_____
Sandra J. Hall
NOTARY Public

NOTARY PUBLIC - STATE AT LARGE
MY COMMISSION EXPIRES: 02-19-2012

# EXHIBIT V

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| EDDIE OGLETREE, an individual; | ) | |
| GERALD STEPHENS, an individual | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO:** |
| | ) | **3:07-cv-867-WKW** |
| CITY OF AUBURN, et al. | ) | |
| | ) | |
| | ) | |
| **Defendants,** | ) | |

## AFFIDAVIT OF HORACE CLANTON

My name is Horace Clanton. I am an adult, of sound mind and competent to testify. I have personal knowledge of the matters contained within this Affidavit and they are true and accurate to the best of my knowledge.

I am a Firefighter with the Auburn Fire Department. I am a white male. For many years, I have worked along side Eddie Ogletree and Gerald Stephens. Both of these men have the experience and knowledge to qualify for the Battalion Chief job which they applied for in 2006. Both of these men have served in that capacity on a fill in basis and have performed that job adequately and competently.

Prior to the 2006 Battalion Chief promotion, I was told on numerous occasions by now Fire Chief Lee Lamar and others at the City of Auburn that the Fire Department was developing a career development plan and that a firefighter would have to have at least 12 years of career firefighting experience in order to be eligible for the job of Battalion Chief. However, when the City of Auburn actually conducted the Battalion Chief promotion, they allowed Firefighters with far less than 12 years of career firefighting experience to apply. If the City of Auburn had

followed its proposed career development plan, only 6 applicants were actually eligible for the Battalion Chief promotion. Gerald Stephens and Eddie Ogletree both black males, would have been eligible for that promotion. Therefore, 2 of the 6 eligible Battalion Chief applicants would have been African Americans if the City had followed its proposed career development plan.

In 2005, a Battalion Chief was undergoing cancer treatment, and I was asked to fill in as a substitute Battalion Chief. Larry Langley was the Fire Chief at that time. Chief Langley asked me to make sure to be at work every day so that Gerald Stephens would not be in charge. He stated that other firefighters would not want to work for Gerald Stephens.

These matters are true and accurate to the best of my knowledge.

**Horace Clanton**

**SWORN** to and **SUBSCRIBED** before me on this 2nd day of _____ 2008.

**NOTARY PUBLIC**

My Commission Expires: 6/09.

# EXHIBIT W

STATE OF ALABAMA )
        COUNTY        )

My name is  William Felton  and I am over the age of nineteen years, of sound mind, and have firsthand knowledge of the facts set forth.

I was employed with the City of Auburn from 1974 to 1999.  I was an original party to the Hammock v. The City of Auburn,        87 CV 680 E  lawsuit. I sued because I was being denied a promotion to Lieutenant.  Prior to 1987, I had been with the fire department for 13 years as a permanent firefighter.  Prior to 1987, the City of Auburn used a "test" to make the Lieutenant promotions, along with evaluations, longevity, and streets and numbers.  I never applied because I was black and Thomas Scott, Dexter Card and Jessie Strickand, all black had applied and did not get the promotion.  The rumor at the fire stations was that the promotion process was fixed, and that is why I filed suit.  As part of the settlement, I was promoted to Lieutenant. In order to keep the promotion, I had to fulfil the Lieutenant requirements within a certain time frame, which I did.

The lawsuit was settled and the promotion process changed to an assessment center where all Captains and Lieutenants had to be done through an assessment center.  But, this stopped in 1996, after a black was promoted through the assessment center (Gerald Stephens) to Lieutenant.

I was a Lieutenant in 1993 (through the lawsuit) when a Captain position came open.  The City of Auburn would not allow me and Dexter Card and Jessie Strickand take the Captain assessment, through the assessment center.   I was told by then Firechief Blankenship that we could not take the assessment because we were not qualified.  However, Larry Langley (white)  took the assessment for Captain and was promoted, even though he was a regular firefighter--he jumped the Lieutenant's position, meaning, he jumped over me, Dexter Card and Jessie Strickand.   Steve Reeves was the Human Resource Director at that time.  So, even though Langley was allowed to bypass the Lieutenant position, we, the black Lieutenants were denied the opportunity to even apply.

Ronald Blankenship regularly used the N-word.  Larry Langley referred to us black fire fighters as N-word.  He said it regularly.  Lee LeMar also used the N-word, regularly.  All of them became Fire Chief.

From 1988 to 1997, the only new Lieutenants were myself, Thomas Scott, Dexter Card and Jessie Strickand and Gerald Stephens (who was promoted because of the 1996 lawsuit against the city).

In 1988 they started the Team Leader position.  They did the job of Lieutenant. There were about 10 -12 Lieutenants back then.  When they retired, or quit or were terminated, they were replaced by Team Leaders, who were white, except for Eddie Ogletree.

When I was there, there were no black officers higher than Lieutenant, out of at least, 80 firefighters. The number of black firefighters was never over 10%.

Chief Ellis Mitchell told me on numerous occasions, until he retired in 1987, that because I was black I would have probably have trouble because whites had said to him that they didn't want to "house" in the dormitory with a black man. I was called N-word by my fellow fire fighters regularly.


_____          08-25-08
AFFIANT                                        Date

SUBSCRIBED AND SWORN TO _Sandra J. Hall_
ON THIS THE 25th DAY OF _August_ ,2008
_Sandra J. Hall_
NOTARY PUBLIC - STATE AT LARGE
MY COMMISSION EXPIRES: 02-19-2012

# EXHIBIT X

City of Auburn

*Wednesday May 24, 2006*

Charles M. Duggan Jr.
Acting-City Manager, City of Auburn
144 Tichenor Avenue
Auburn, Alabama 36830

Mr. Duggan,

On Friday April 21, 2006 a grievance was filed in reference to the promotional process for Battalion Chief with the Auburn Fire Division. According to the division chain of command the grievance was addressed, first-to the Deputy Fire Chief, second-the Deputy Director of Fire Operations and, third-to the Public Safety Director. A written response was given on Friday April 28, 2006, Monday May 8, 2006 and Wednesday May 17, 2006 to each participants of the formal grievance. Due to each response received from the described supervisor we now chose to address the same concerns to you. Our concerns are listed below, but not limited to, the following:

-the written exam
-no time in grade policy
-no accumulative point system
-inconsistency of past promotional procedures.

Thus far, we have asked that the Battalion Chief promotional exams be reviewed. We have received *Candidate Feedback Reports*, which we think do not fully explain the information we have requested about the written portion of the exam. It has been stated that *no time in grade or cumulative point system exist within the fire division. There is no time in grade policy and no cumulative point system. The Deputy Fire Chief and Deputy Public Safety Director for Fire Operations are working on a career ladder that would implement minimum requirements to test for and hold a particular rank in the Fire Division.*

As for consistency in promotional procedures it has been *asked that we elaborate on and state what we believe to be inconsistent about the promotional practices.* It has been stated that *the last promotion of "Shift Commander" which has been changed to "Battalion Chief" was in 1996-an assessment center was used with outside assessors for*

1

*Wednesday May 24, 2006*

*promotion to the position.* It was further stated that *two Shift Commander/Battalion Chief assessments have been conducted in the last ten years–a contracted professional company, known in the fire service, conducted a comprehension evaluation process that test each candidate on many of the daily requirements of the Battalion Chief Position.*

Due to each response received another concern has surfaced. If considerable time is taken to research and/or investigate previous, as well as, past hiring and promotional strategies for Auburn Fire Division (*rank structures: Career Firefighter, Team Leader/Lieutenant, Captain/Battalion Chief, Training Officer, Deputy Chief*) it will show the inconsistency we are stating in this grievance. No eligible African American firefighters have been promoted and none hired on the career level since April 7, 1996. A probationary career *Firefighter* was once promoted to a *Company Officer* position and probationary *Team Leaders/Lieutenants* were eligible to apply for upper management positions *upon discovering that they meet current job descriptions and minimum qualifications. Senior Shift Officers have assumed duties of Shift Commander/Battalion Chief,* on a consecutive role, *at the discretion of the Deputy Director of Fire Operations* within the Auburn Fire Division.

In a nutshell, we request a review of our grievance by you. Understand, other concerns have arisen from further discussions pertaining to this grievance and more may arise. In closing we look forward to your ethical and progressive response.

Company Officers,

Horace Clanton        Eddie Ogletree        Gerald Stephens

2

# EXHIBIT Y

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| CHRIS E. TURNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| CITY OF AUBURN, a municipality of | ) |
| The State of Alabama; LARRY LANGLEY, | ) |
| an individual; LEE LAMAR, an individual; | ) |
| BILL HAM, Jr., an individual; STEVEN A. | ) |
| REEVES, an individual; BILL JAMES, an | ) |
| Individual; DAVID WATKINS, an individual; | ) |
| CHARLES M. DUGGAN, an individual; | ) |
| and CORTEZ LAWRENCE, an individual; | ) |
| | ) |
| Defendants. | ) |

CIVIL ACTION NO: 3:07 cv 162-MEF

JURY TRIAL DEMANDED

## COMPLAINT

### I.    JURISDICTION

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1331, 1343;  42

U.S.C. 1983, as amended;  28 U.S.C. 2201 and 2202, and 42 U.S.C. 2000(e), et seq., Title VII of

the Civil Rights Act of 1964, as amended, and the Fourteenth Amendment of the United States

Constitution.

### II.    PARTIES

2.    Plaintiff, Chris E. Turner, is a citizen of the United States and a permanent resident

1

of the State of Alabama.

3.    Defendant, the City of Auburn, Alabama, is a municipality and governmental entity located in Lee County, Alabama.    Plaintiff has been a full-time employee of Defendant City of Auburn since 1991 as a Firefighter, and presently is employed as a Firefighter-Station Officer and continues to be employed there in this capacity.    Plaintiff began his employment on a full-time basis pursuant to the a 1991 Settlement Agreement, entered pursuant to Order entered in that certain action styled "Hammock  v. The City of Auburn, Alabama, et al.", CV-87-690-E (hereinafter the "1991 Settlement Agreement and the "Hammock Case", respectively), wherein the City of Auburn hired Plaintiff as a full-time Firefighter, pursuant to ¶ 11 of the Order (hereinafter the "1991 Order").  A copy of the 1991 Settlement Agreement is attached hereto and made a part hereof as Exhibit "A".

4.    Defendant City of Auburn is an employer within the meaning of 28 U.S.C. 2000, et seq..    All Defendants are citizens of the United States and permanent residents of the State of Alabama.

5.    Defendant, Larry Langley (hereinafter "Langley"), has been the Chief of the City of Auburn Fire Department since 1997 and has had input and authority as a decision-maker with regard to the facts set forth herein.

6.    Defendant, Lee Lamar (hereinafter "Lamar"), has been the Deputy Chief of the City of Auburn Fire Department since approximately 2003 and has had input and authority as a decision-maker with regard to the facts set forth herein.

7.    Defendant, Steven A. Reeves (hereinafter "Reeves") has been the Human Resource Director of the City of Auburn Fire Department since some time in the 1980's and has had input and

authority as a decision-maker with regard to the facts set forth herein.

8.     Defendant, Bill Ham, Jr. (hereinafter "Ham"), has been the Mayor of the City of Auburn since approximately 2000 and has had input and authority as a decision-maker with regard to the facts set forth herein.

9.     Defendant, Bill James (hereinafter "James"), has been the Public Safety Director of the City of Auburn since approximately 2001 and has had input and authority as a decision-maker with regard to the facts set forth herein.   Defendant Cortez Lawrence (hereinafter "Lawrence") is, and at all times pertinent hereto was,  the Deputy Public Safety Director of the City of Auburn.

10.     Defendants, David Watkins and Charles M. Duggan (hereinafter "Watkins" and "Duggan", respectively), were the City Managers of the City of Auburn at the time of the promotions identified and described herein and has had input and authority with regard to those promotions.

## III.     STATEMENT OF PLAINTIFF'S CLAIMS:

11.     Plaintiff brings the claims set forth herein pursuant to the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States under § 1983 and Title VII of the Civil Rights Act of 1964.   Plaintiff filed two claims with the EEOC within the one-hundred and eighty day period and has received a Right to Sue Letter for each claim.  This action is commenced within    the    required    ninety    day    filing    period.    Copies    of    the Right to Sue Letters are attached hereto and made a part hereof as Exhibits "B" and C".  This action is commenced within two years of the actions complained of.

## COUNT ONE

### RACE DISCRIMINATION IN PROMOTION:  August 23, 2005

12.     On to-wit, February 15, 1991, in the 1991 Order, this Court ordered the Defendant City of Auburn to hire Plaintiff as a full-time Firefighter.  When he was hired, he was a probationary Firefighter for one year.  Plaintiff passed all of the requirements and became a Firefighter I.   He remained a firefighter I for approximately seven years, and then was promoted to Firefighter II, with no pay increase.

13.     Once a probationary Firefighter becomes a permanent Firefighter I, as Plaintiff did, he or she becomes eligible to apply for a Team Leader position.  Plaintiff applied for the Team Leader position each time it became open once he became eligible, which was in 1992, up to the present date.   Plaintiff was never promoted to Team Leader.  Plaintiff is a black male, age 41.  During this time period, the City promoted 21 Whites and one Black to the position of Team Leader.  Plaintiff applied for all of these promotions/positions and received none.

14.     Specifically, on August 23, 2005, Plaintiff applied for the Team Leader position and did not receive the promotion.   The position was given to a white Firefighter.

15.     On August 23, 2005, one opening for a Team Leader Position became available at Fire Station #1.  The position was awarded to Jason Rawls, a white male, within one to two weeks of that date.

4

16.     Additionally, three other white Firefighters were put on a waiting list. From this waiting list, all three white males received promotions to the Team Leader position which became available at various stations. These promotions were parceled out within a few weeks after August 23rd.   None of the promotions were awarded to Blacks.   Plaintiff was not awarded any of the positions.

17.     Plaintiff was qualified to be a Team Leader because he was a permanent Firefighter II with over a decade of experience and expertise and had met all other Departmental requirements for the position.

18.     Plaintiff has held the positions of Firefighter II, Fire-Officer I, Fire-Instructor, and is certified to command fires until the senior officer arrives on a scene,  pursuant to his Incident Command System Certification.    Furthermore, Plaintiff has certificates in Apparatus Operator/Pumper, Apparatus Operator/Aerial, Hazardous Materials Incident Commander, Building Construction For Fire Suppression Forces Principles wood and ordinary construction, EMT-Basic, Alabama Forestry Commission (brush fire training), National Wildland/Urban Firefighter Safety Certification, ISI safety, Commercial Drivers Licensing Program, Firefighter Safety and Survival, Emergency Vehicles Operations Course and defensive driving training, as well as thirty-two (32) hours of secondary education in fire-fighting courses.

19.     Plaintiff has been a Station Officer for approximately ten (10) to fifteen (15) years. In 1995, Plaintiff began assuming supervisory responsibilities, as assigned,  of all the fire stations. The job of the Station Officer is to manage a station when the Lieutenant is absent. In this position, the Station Officer must interact effectively with team members, senior officers and the public. He

has to instruct, plan, lead, communicate, be safe, manage and supervise. Plaintiff has ten to fifteen years of experience in this position.

20.    Plaintiff was qualified to be a Team Leader on August 23, 2005. Although qualified, he was denied the promotion and the position was kept open and eventually given to white firefighters.

21.    The promotees from the August 23, 2005 position were as follows:  David Hines, Jason Rawl, James Gilbert and Clay Carson – all white males.

22.    The 1991 Settlement Agreement specifically provided that promotions to Team Leader did not have to be determined through an outside assessment center, such as was required for filling Lieutenants' and Captains' positions, for the reason that the Team Leader "position" is not a classification as such, but is in fact an additional responsibility of a permanent Firefighter, as set forth more specifically herein below. The position does provide pay and grade as that of Lieutenant.

23.    Thus, the City of Auburn employs the term "Team Leader" to promote white Firefighters to a grade *equal* to that of Lieutenant (Team Leaders were not Lieutenants). Team Leader determinations are made by in various ways,  either by appointment from the Fire Chief, inside assessment by the Fire Chief, the Public Safety Director, other Team Leaders, including some former Captains, and sometimes, even by city administrators or merely by informing the permanent Firefighter of a promotion to Lieutenant pay grade (a raise of approximately three hundred dollars a month. These appointees, as stated above, were called Team Leaders, even though the term Team Leader is not an official classification.

24.    Until August 23, 2005, all promotions to Team Leader were handled in the manner set

6

forth above.

25.    Prior to August of 2005, Plaintiff was "passed over" for promotion by Defendants approximately twenty times.    In or about 1994, Plaintiff became eligible for the position of Team Leader.  He never received a promotion.  Normally, Plaintiff was told that the reason he didn't get the job was because he interviewed poorly.    Plaintiff was interviewed many times, often by the same persons,  yet continued to be passed over,  and was always given the same reason – that he "interviewed poorly".  During this period of time, white Firefighters, with less experience, training and communication skills, continued to be promoted over Plaintiff.

26.    Plaintiff's formal evaluations demonstrate that he possesses the requisite knowledge, skills, abilities, and other qualifications needed for successful job performance as a Team Leader. He even performs in his current job, from time to time, the duties of Team Leader and also the higher position of Lieutenant.  By way of example (and consistent with Plaintiff's customary evaluations) is Plaintiff's performance appraisal for March 7, 2006, attached hereto and made a part hereof as Exhibit "D".

27.    In 2002, Plaintiff filed a charge with the Equal Employment Opportunity Commission (hereinafter the "EEOC") arising out of the failure of the City of Auburn to promote him to Team Leader.    Plaintiff was offered the job of Team Leader during settlement negotiations through EEOC.  However, the settlement was never finalized and Plaintiff filed a lawsuit against the City.

28.    Following dismissal of the above lawsuit, the first Team Leader position to become available was August 23, 2005.

29. However, the August 24, 2005 position was not filled following customary procedures utilized in the past.

30.     Following dismissal of the lawsuit, Defendant City of Auburn, in order to continue passing over Plaintiff for promotion, implemented a "written test" for the *first* time for the Team Leader position. The test was racially discriminatory and designed to keep Plaintiff from getting the job. It was an unlawful "cut-off" test, divided into several parts, the first of which was a written test with no questions related to requirements for the Team Leader position. Failure to pass the written test "cut off" the applicant from the remainder of the examinations.

31.     Specific pertinent features of the written portion of the test are as follows:

(1) the written test was designed for application to promotion to Lieutenant, not for the Team Leader position. Team Leaders are not Lieutenants, nor do they have the same duties. The 1991 Settlement Agreement clearly designates the distinctions between Team Leader and Lieutenant.

(2)     The written test was applicable to Lieutenant positions only and had no application to the Team Leader position.

(3)     The application process was composed of five parts, as follows:  (1) the written test, as hereinbefore described;  (2) various scenarios;  (3) writing skills; (4) fire tactics and (5) oral examination. As noted above, the written portion of the test, administered first, functioned as a "cut-off test", precluding the applicant from proceeding further if failed. The written exam was entitled "Examination 702 -- Lieutenant's Exam". The written exam was graded by designated personnel of the City of Auburn and the tests results were

shredded. Plaintiff was not allowed to see his test.

32.    Plaintiff was advised that he failed the written examination and he was not allowed to proceed to the remaining parts of the application process, none of which carried the cut-off characteristics of the "written exam." Furthermore, all portions except the written test were "graded" by the City of Auburn with no objective measurement or standard as to passage or failure. There also was no physical requirement in the testing process, which is a provision of the 1991 Settlement Agreement. Defendant City of Auburn, however, used the physical fitness test in 2006 to deny Bobby Felton, an African-American, a position as a Firefighter with the City of Auburn.

33.    Defendant City of Auburn has not hired a black permanent Firefighter since approximately 1996 and has only promoted two black Firefighters since 1996, manifesting a pattern and practice of avoidance in hiring Blacks. Every African-American promoted since 1974 has been the result of a lawsuit or a pending lawsuit.

34.    No Firefighter has been hired since 1989 from the general public. All Firefighter positions have been filled through a program called the Student Program. Ninety-nine plus percent of the Firefighters employed through the Student Program are white. Students in the program are trained by Team Leaders.

35.    As of this date, Whites are predominant in the Fire Department, in violation of the 1991 Settlement Agreement which states, in ¶ E, that the City may hire student firefighters without regard to the 1991 Order but may not discriminate in its hiring practices based upon race.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays for the following relief:

A.    Granting Plaintiff an order requiring Defendant to make Plaintiff whole by granting to him the appropriate declaratory relief, compensatory and punitive damages;

B.    Entering a permanent injunction enjoining individual Defendants and Defendant, City of Auburn, its agents, successors, employees, attorneys and those acting in concert therewith from continuing to violate 42 U.S.C. 2000(e); and

C.    Awarding to Plaintiff such other, further or additional relief as justice may require.

## COUNT TWO

### RACE DISCRIMINATION IN PROMOTION: February 1, 2006

36.    In 1989 Defendant City of Auburn instituted and created a position called the Team Leader Position. This team leader position was designed (allegedly) to supply leaders to supervise new Firefighters drawn from the student population of Auburn University. These students were a part of the newly -- and simultaneously -- created program with the Team Leader Position, and were designated the "college student firefighting teams" or members of the Student Firefighter Program. The Team Leader position was created during the pendency of the lawsuit which resulted in the 1991 Settlement Agreement and became a part of that Settlement Agreement.

36.    As previously stated, Plaintiff became proficient in the requirements for the Team Leader Position in 1994 but never received a promotion, including as part of the August 23, 2005 promotions.

37.    The Team Leader position is, and has always been, a Grade 34 position, which is the same grade and pay for a Lieutenant. However, as stated in a letter to this Court from Defendant

10

Langley, filed January 17, 1990, a copy of which is attached hereto and made a part hereof as Exhibit

"E", the Student Team Leaders have no authority or supervisory power over permanent Firefighters.

These positions were allegedly created to supervise the student firefighters, provided in the 1991

Settlement Agreement. The Team Leaders did not wear Lieutenant's bars but wore a team leader

badge.

       38.     Because of these distinctions, the Team Leader Position was not included in the

Court's February 15, 1991 Order, as a position that required an outside assessment, as did the

Lieutenant and Captain positions (see Order, ¶ 12). A Team Leader promotion came from within,

including the promotions of August 23, 2005.

       39.     The Student Firefighter Program, as stated above, is composed of students from

Auburn University, who attend school and work as Firefighters part-time, according to a court

document filed in the Hammock case, a copy of which is attached hereto and made a part hereof as

Exhibit "F". According to this document, the Team Leaders were created solely to supervise these

student firefighters.

       40.     On February 1, 2006, thirteen Team Leaders were "re-classified" (promoted) to the

Lieutenant position from "within", meaning there was no outside assessment, in violation of ¶ 12 of

the 1991 Order. These re-classifications or promotions were made by Defendant Langley and the

other individual defendants on the stated basis that the 1991 Settlement Agreement had expired.

The 1991 Settlement Agreement has not expired.    Plaintiff objected directly to Chief Langley

about these promotions and he was called into the office at the public safety building and had a

meeting with Defendant James, the Public Safety Director of the City;  Defendant Reeves, the

Human Resource Director of the City; Defendant Langley, the Fire Chief of the City, and others. In that meeting, Plaintiff was told that the 1991 Settlement Agreement had expired and that they were going to petition the court to allow them to change all of the team leaders to lieutenants. Witnesses at this meeting included Walter Allen, Gerald Stevens and Dean Garrett, employees of the Fire Department. No petition was ever filed.

41.     There is no "official" Team Leader position according to the National Fire Protection Association, a national organization for the enhancement for firefighter skills. The Team Leader position was a creation of these Defendants for the purpose of avoiding the 1991 Settlement Agreement by actually using it as a subterfuge to promote Whites to the Lieutenant grade.

42.     Of the thirteen (13) Team Leaders promoted, eight came from the Student Firefighter Program and accordingly all had less seniority than plaintiff. All of the promotees from the Student Firefighter program were White. Of the thirteen (13) promotions, twelve (12) were white and one was African-American (Eddie Ogletree) and he did not come from the Student Program.

43.     Of the thirteen (13) Team Leaders promoted to Lieutenant, only four had been required to take the August 23, 2005 written test. The other nine had been appointed to Team Leader pursuant to the application process described in ¶ (E) of the 1991 Settlement Agreement.

44.     Pursuant to a court document filed January 17, 1990, Chief Langley has been aware since at least January 17, 1990, that the Team Leader Position was a subterfuge to promote to Lieutenants in violation of the 1991 Settlement Agreement. See Exhibit "E" hereto. According to Defendant Langley, in his letter written to Judge Varner "...I also disagree with the way team leader(s) was [sic] made lieutenant, that wasn't the understanding I had when they started the Student

12

Program".

45.     Plaintiff was qualified to be promoted to the position of Lieutenant. He was by-passed for the Lieutenant's position and white Firefighters were promoted to the position of Lieutenant, without the requirement of an outside assessment. Plaintiff should have been promoted to Team Leader and then upgraded as everyone else.     Defendant City of Auburn's admission that outside assessment centers were not used in connection with Team Leader positions is stated in Defendant Langley's deposition taken in the Hammock Case.     The pertinent excerpt of that deposition transcript is attached hereto and made a part hereof as Exhibit "F".   Plaintiff alleges that the Team Leader position was created to allow Defendant City of Auburn to avoid the court-ordered outside assessment process in promotions to Lieutenant and Captain positions.

46.     Until the 1991 Settlement Agreement, there were 10 - 15 Lieutenants and they were all white. Under the 1991 Settlement Agreement, the defendants were ordered to promote three African-Americans to Lieutenant. After that, no more Lieutenants were promoted. At the time of the February, 2006 promotion, as heretofore described, there remained only one Lieutenant (Gerald Stevens), as all the other lieutenants retired or quit. After February, 2006 thirteen (13) white Firefighters were appointed Lieutenant and one Black was appointed.   See Memorandum titled "Title Change of Company Officer Position", dated January 28, 2006, from Defendant Langley to "All Personnel" which authorizes changing the title of Team Leader to Lieutenant, in violation of the 1991 Settlement Agreement, attached hereto and made a part hereof as Exhibit "G".

        **WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays for the following relief:

        A.     Entry of an order requiring Defendants to make Plaintiff whole by granting

13

appropriate declaratory relief, compensatory and punitive damages;

B.    Entering a permanent injunction enjoining Defendants, its agents, successors, employees, attorneys and those acting in concert therewith from continuing to violate 42 U.S.C. 2000(e);

C.    Awarding to Plaintiff such other, further and additional relief as justice may require.


## COUNT THREE

## RACE DISCRIMINATION: BATTALION FIRE CHIEF PROMOTION: MAY, 2006

47.    In January, 2005 the City appointed four white captains to the newly created position of Battalion Fire Chief, without any outside assessment, interview or other formal process.    No Blacks were promoted.  There has never been a black captain or a black battalion fire chief or any black above the rank of lieutenant, manifesting a pattern and practice to avoid promoting Blacks. Furthermore, the 1991 Settlement Agreement calls for an outside assessment for the promotion to Lieutenant or Captain.  The position of Battalion Fire Chief did not exist in 1991.  Thus, the City of Auburn, though the battalion position is not mentioned in the 1991 Settlement Agreement, is a rank above Captain, and therefore, under the 1991 Settlement Agreement, should have been awarded by an outside assessment, which it was not.


48. When another Battalion Fire Chief job became available in May, 2006, Plaintiff applied for the position.  Instead of awarding the position in the same manner as the first battalion position, Defendant City of Auburn returned to the same testing procedures used in the August 23rd promotion

14

and again Plaintiff failed to make the cut-off and therefore was not allowed to take the rest of the examination.    Two other African-Americans also applied and they also were cut off and the three positions went to Whites.

49.    Although a cut-off score was used to eliminate Plaintiff and other Blacks form the positions to which Whites were promoted,  the other applicants were not required to comply with the Physical Fitness Plan, as ordered by the Court pursuant to  the 1991 Settlement Agreement, which would have eliminated all of them.

**WHEREFORE, PREMISES  CONSIDERED,** Plaintiff prays for the following relief:

A.    Entry of an order requiring Defendants to make Plaintiff whole by granting appropriate declaratory relief, compensatory and punitive damages;

B.    Entering a permanent injunction enjoining Defendants, its agents, successors, employees, attorneys and those acting in concert therewith from continuing to violate  42 U.S.C. 2000(e);

C.    Awarding to Plaintiff such other, further and additional relief as justice may require.

**COUNT FOUR**

**RETALIATION**

50.    Plaintiff reaffirms each and every allegation set forth above, the same as if stated herein.

51.    Plaintiff alleges that he was a plaintiff in the Hammock Case, which incorporated the 1991 Settlement Agreement.    It was through that settlement that Plaintiff was hired.  Plaintiff

became a probationary Firefighter for one year. He passed his probation and became a permanent Firefighter in March of 1992. In 1994 he became eligible for promotion to Team Leader. Since that time, to the present, he has been passed over at least twenty times, as heretofore stated.

52.    Plaintiff alleges that he filed an EEOC complaint alleging race discrimination in 2003 and was offered the position of Team Leader during the process of the EEOC investigation and negotiations. However, Plaintiff turned down the offer and filed an action for race discrimination, which was dismissed for reasons heretofore stated.

53.    Plaintiff alleges that he has engaged in statutorily protected expression(s); he suffered adverse employment action(s), which adverse action(s) was causally related to the protected expressions.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays for the following relief:

A.    Entry of an order requiring Defendants to make Plaintiff whole by granting appropriate declaratory relief, compensatory and punitive damages;

B.    Entering a permanent injunction enjoining Defendants, its agents, successors, employees, attorneys and those acting in concert therewith from continuing to violate 42 U.S.C. 2000(e);

C.    Awarding to Plaintiff such other, further and additional relief as justice may require.

## COUNT FIVE

### DISPARATE IMPACT

54.    Plaintiff reaffirms each and every allegation set forth above as if set forth herein.

16

55.    Plaintiff alleges that the above employment practices, as administered by the defendants, have a substantial adverse impact on a protected group, namely, African-Americans.

56.    Plaintiff alleges that the practices are discriminatory in operation, though the Defendants will maintain that they are fair in form.    Plaintiff alleges that the employment procedure(s) and/ or testing mechanisms operate as a "built-in headwind" for minority groups and are unrelated to measuring job capability.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff requests the following relief:

A. Entering an order requiring Defendants to make Plaintiff whole by granting appropriate declaratory relief, compensatory and punitive damages; and·

B. Entering  a permanent injunction enjoining Defendant City of Auburn, its agents, successors, employees, attorneys and those acting in concert therewith from continuing to violate 42 U.S.C. 2000(e).

C. Awarding to Plaintiff such other, further and additional relief as justice may require.

**PLAINTIFF REQUESTS A TRIAL BY JURY**

**RESPECTFULLY SUBMITTED** on this the 23rd day of February, 2007.

                                JEFFREY W. BENNITT
                                ASB N51J (BEN 004)

Of Counsel:

Jeff Bennitt & Associates, LLC
P.O. Box 383063
Birmingham, Al   35238-3063
Suite 3A 4898 Valleydale Rd., Birmingham, Al 35242

17

(205) 408-7240
fax: (205) 408-9236
e-mail: Bennittlaw@aol.com

PLAINTIFF'S ADDRESS:

c/ Jeff Bennitt & Associates

**WANDA D. DEVEREAUX**
**ASB 7244-v45w   (DEV 001)**

Of Counsel:

Devereaux & Associates, LLC
2800 Zelda Road, Suite 200-2
Montgomery, AL  36106
(334) 396-5006
fax (334) 396-3774
e-mail:  wdd@devxllc.com

**ATTORNEYS FOR PLAINTIFF**

By _____
    **WANDA D. DEVEREAUX**

Defendants to be served by Process Server.

18

# EXHIBIT Z

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

EDDIE OGLETREE, and individual,    )
GERAL STEPHENS, an individual,     )
                                   )
        Plaintiffs,                )
                                   )        CV: 3:07-cv-867-WKW
v.                                 )
                                   )
CITY OF AUBURN, et al.,            )
                                   )
        Defendants.                )
                                   )
CWH RESEARCH, INC.,                )
                                   )
        Third-Party Defendant      )

## DECLARATION OF CHRIS HORNICK

My name is Chris Hornick, and I am President of CWH, Inc. I make this declaration based on personal knowledge.

In December of 2005, CWH entered into a Letter of Agreement with the City of Auburn, Alabama to provide certain services with regard to the City of Auburn's selection of Fire Battalion Chiefs. Attached hereto as Exhibit 1 is a copy of that Letter of Agreement. Pursuant to that Letter of Agreement, CWH agreed to provide, among other services, written test services and services related to a separate assessment center designed to measure a candidate's knowledge, skills, and abilities. The City of Auburn elected against CWH's advice to impose a test score cutoff of 70 as a pre-condition to advancing to the assessment center. CWH recommended that

758090-1

the City allow all applicants to proceed to the assessment center regardless of test score. CWH had no authority to impose a cutoff or to make any decision relating to the City of Auburn's selection of Fire Battalion Chiefs.

I make this declaration under penalty of perjury this 2nd day of September, 2008.

Chris W. Hornick

758090-1

## CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

this agreement and which are due to that party's own negligence, carelessness, unskillfulness, and other unlawful conduct and/or the negligence, carelessness or unskillfulness or other unlawful conduct of its respective officers, agents and/or employees acting in their official capacities. Provided; however, Client shall defend, indemnify and hold CWH, its officers, agents and employees free and harmless from and against any claims, demands, actions, damages, expenses, fees, liabilities and/or attorney's fees arising out of, by virtue of or associated with the negligence, tortuous acts or other unlawful conduct of Client or its respective agents, officers and employees in the performance of this agreement. Provided however, that Client does not waive its defense of sovereign immunity or any other immunity or privilege afforded by law; nor does client waive official immunity available to any officer, employee, or agent acting by or on behalf of Client. In addition, CWH shall defend, indemnify, and hold Client, its officials, representatives, agents, servants and employees free and harmless from and against any claims, demands or actions brought by third parties which are related in any way or are associated with the negligence, tortuous acts or other unlawful conduct of CWH or its respective agents, officers and employees in the performance of this agreement.

### AUTHORIZED REPRESENTATIVE

In further consideration of the mutual covenants herein contained, the parties hereto expressly agree that for purposes of notice, including legal service of process, during the term of this contract and for the period of any applicable statute of limitations thereafter, the following named individuals shall be the authorized representatives of the parties:

(i)     CLIENT:

    Steven A. Reeves

    Human Resources Director

    130 Tichenor Avenue

    Auburn, AL 36830

By:

Name:     David F. Watkins

Title:     City Manager

(ii)     CWH Research, Inc.
    Kathryn A. Fox, M.A.
    9085 E. Mineral Circle
    Suite 350
    Englewood, Colorado 80112

Kathryn A. Fox, Vice-President

EXECUTED this 21st day of December, 2005.

12/21/2005                                                                 Page 6 of 7

## CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

c)  <u>Interest of the Client</u>.  No elected official or any officer or employee of the Client shall have a financial interest, direct or indirect, in this contract.

d)  <u>Interest of CWH</u>.  CWH covenants that they presently have no interest and shall not acquire any interest, direct or indirect, which would conflict with the performance of services required to be performed under this contract; they further covenant that in the performance of this contract, no person having any such conflict of interest shall be employed.

e)  <u>Maintenance of Records</u>.  All appropriate records related to the aforementioned projects will be maintained by CWH for the required statute of limitations.

f)  <u>Modification</u>.  This contract contains the entire Agreement of the parties.  No representations were made or relied upon by either party other than those that are expressly set forth herein.  No agent, employee or other representative of either party is empowered to alter any of the terms hereof unless mutually consented to in writing and signed by an authorized officer of the respective parties.

g)  <u>Assignment</u>.  CWH may not assign its rights under this Agreement without the express prior written consent of the Client, and such successor in interest may not assign its rights under this Agreement without the express prior written consent of the Client.  The Client has the right to continue with the assignee or cancel the Agreement with a pro-rata refund.

h)  <u>Termination: The Client may terminate this Agreement upon 30 days written notice without cause.</u>  Upon delivery of said notice to CWH, CWH shall cease performing any work pursuant to this agreement and shall be entitled to retain that portion of the fee for services performed through and including the 30 days notice period prior to termination.

i)  <u>Insurance</u>:  CWH will be required to provide certificates of insurance showing that it carries, or has in force, automobile liability insurance, general liability insurance, professional liability insurance and workers' compensation insurance.  Limits of liability for automobile liability insurance shall be, at a minimum, $1,000,000.00 combined single limit.  Limits of liability for general liability insurance shall be, at a minimum, $1,000,000.00 per occurrence, $1,000,000.00 personal and advertising injury, $1,000,000.00 general aggregate and $1,000,000.00 products/completed operations aggregate.  General liability insurance will include coverage for contractually assumed liability.  Limits of liability for professional liability shall be, at a minimum, $1,000,000.00 per occurrence or claim and $3,000,000.00 aggregate.  If professional liability coverage is on a claims-made basis, CWH will maintain coverage in force for a period of two (2) years following completion of the work specified in the agreement.  Workers' compensation insurance shall provide statutory workers' compensation coverage and employers' liability coverage with limits of, at a minimum, $500,000.00 each accident, $500,000.00 disease- each employee and $500,000.00 accident, $500,000.00 disease – policy limit.

The certificate of insurance shall provide the Client with thirty (30) days written notice of cancellation of any of the coverages named in said certificate.

The Client will be named as additional insured under the CWH's general liability insurance and automobile insurance policies.

CWH shall require certificates of insurance from subcontractors.  Subcontractors will carry limits of insurance equal to or greater than those carried by the CWH.  These certificates shall evidence waivers of subrogation in favor of CWH and the Client and shall be made available to the Client upon request.

j)  <u>Indemnification</u>.  Each party shall generally be responsible for its own acts and will be responsible for all damages, costs, fees, and expenses, including attorney's fees and costs, which arise out of the performance of

12/21/2005

## CWH Research, Inc.
9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

This price includes the complete and satisfactory performance of the Services specified in this Agreement. Optional components may be selected by client for additional charges noted.

If any additional work is required beyond what this contract states, Dr. Hornick will provide his assistance at the rate of $250 per hour. Any additional work provided by other personnel in CWH will be charged at the rate of $175 per hour for Managing Consultants, $125 per hour for Consultants, and $50 per hour for clerical.

Expert Testimony. CWH shall provide expert testimony concerning any aspect of its work related to this contract and/or the resultant defense of all related products. This testimony and any necessary preparation will be performed at the hourly rate mentioned above, plus any travel or other related expenses which are incurred.

5) Client Responsibilities. In addition to paying CWH for services according to the preceding paragraph, the Client shall have the following responsibilities:

   a) The Client shall provide for the written test and assessment center appropriate testing site(s) and materials, including rooms and furniture conducive to the taking of tests. In addition, all necessary supplies needed by candidates, assessors, and proctors during the written test and assessment center shall also be provided by Client.

   b) The Client shall make arrangements for qualified written test and assessment center administrators and proctors. The qualified administrators must be approved by CWH.

   c) The Client shall make all notifications to those people who are eligible to take the test. These notifications include, by way of explanation, but not by way of limitation: testing dates, testing times, and testing places. Further, Client shall make all reasonable attempts to provide for notifications, testing opportunities, and similar concerns to all candidates in a fair and impartial manner.

   d) The Client shall supply sufficient numbers of assessors and role players to conduct the assessment centers, based on criteria established by CWH. Should these assessors or role players require payment for their time or expenses, the Client agrees to assume full responsibility for these costs.

   e) CWH will retain the copyrights to all materials developed in the performance of this contract. CWH will, however, grant the Client a non-exclusive, royalty free license to use the selection procedures that will be developed for the duration of this contract. Client shall not reveal the contents of the tests to anyone without the written consent of CWH. The Client assumes full responsibility and liability for any violation of this provision by its employees and/or agents to the extent such employees and/or agents were acting within the scope of their employment and or agency.

   f) Client shall return all testing materials provided by CWH, to CWH.

6) Provisions of the Contract. The following provisions are made a part of this contract:

   a) Non-Discrimination. CWH certifies and represents that, during the performance of this Contract, Contractor and any other parties with whom it may subcontract shall adhere to equal opportunity employment practices to assure that applicants and employees are treated equally and are not discriminated against because of their race, religious creed, color, national origin, ancestry, handicap, sex or age. Contractor further certifies that it will not maintain any segregated facilities.

   b) Applicable Law. Parties to this contract shall conform with all existing and applicable city ordinances, resolutions, state laws, federal laws, and all existing and applicable rules and regulations. This contract should be construed in accordance with the laws of the State of Alabama. If a dispute arises involving this agreement, and the parties are not able to amicably resolve such dispute, then the parties agree that all claims shall be brought in a Court of Competent jurisdiction located in Alabama.

12/21/2005

## CWH Research, Inc.
9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

4) **Payment for Services.** In consideration of the Services of CWH, the Client shall pay CWH the total sum shown below for services. Travel expenses will be billed at additional cost.

Breakdown for services is as follows:

| Service | Cost |
|---|---|
| Job Analysis Review | Included |
| Semi-Customized Written Test | |
|     Technical Job Knowledge Component | $2,500.00 |
|     Situational Judgment Component | $4,500.00 |
| Assessment Center | $10,000.00 |
| | |
| TOTAL (excluding options and expenses) | $17,000.00 |
| | |
| | |
| OPTIONS: | |
| Written Feedback Letters ($125 per candidate – assumes 10 candidates) | $1,250.00 |
| Additional days of assessment center administration | $800 per day |
| "Hot Seat" exercise | Not included |
| CWH obtaining assessors | Not included |
| | |

Payment to be made as follows (excludes options and expenses):

| | |
|---|---|
| 25% upon initiation of contract | $4,250.00 |
| 25% upon completion of SME test development meeting | $4,250.00 |
| 25% upon completion of written test | $4,250.00 |
| 25% upon completion of assessment center | $4,250.00 |

Options will be billed with the final invoice following completion of the assessment center.

All travel and additional expenses will be billed at cost as incurred or at the below standard rates. These expenses will include the following categories and rates:

| | |
|---|---|
| Airfare | Economy class, with first class upgrades paid for by CWH mileage points. Cost varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Hotel charges | Mid priced hotel, such as Marriot, Hilton, etc. We use government rates and discounts when possible. Cost varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Per Diem | $45 per day, or $15 per meal. |
| Mileage to/from airport and to/from client site | $0.42 cents per mile, plus applicable tolls. |
| Rental car | Mid size car. Varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Shipping | US Postal service or FED EX is generally used, depending upon requirements. 2 day shipping is generally used, unless overnight is required. |

12/21/2005

**CWH Research, Inc.**
9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

b) Written Test Development
   (1) Developing and validating a semi-customized written exam composed of 70 to 80 traditional job knowledge written items and 20 to 30 situational judgment items. Includes recommendations as to the format of the questions and answers, the number of questions to be included and the study sources. Includes up to 30 custom test items designed specifically for the client.
   (2) Provide master copy of the exam, the delivery of the exam and answer sheets, scoring of the exam, and handling appeals.

c) Test Scoring
   (1) Score tests.
   (2) Conduct relevant statistical analysis.
   (3) Consult with the Client regarding the format and structure of the final eligibility lists.
   (4) Provide results in written format within two weeks after completion of the exams.
   (5) Handle test challenges or concerns.

d) Assessment Center
   (1) Develop one set of exercises for each position, selecting three of the following for each position: In-basket, Oral Resume, Oral Presentation, Written Exercise, Role-Play or Emergency / Tactical Scenario.
   (2) Provide candidate orientations, conduct rater training, conduct training for Client staff as required or needed.
   (3) Provide assessor training.
   (4) Administer process to up to 12 candidates (one day of testing).
   (5) Score.

e) Feedback
   (1) Provide written feedback letters to candidates.
   (2) Provide process summary to Client.

f) Validity. CWH shall conduct a content validation process for the test(s). This validation will meet and adhere to the following standards and guidelines:

   (1) Federal EEOC Uniform Guidelines on Employment Selection Procedures.
   (2) Principals for the Validation and use of Personnel Selection Procedures.
   (3) Standards and Ethical Considerations for Assessment Center Operations.
   (4) Standards for Education and Psychological Tests.

**CWH**

LETTER OF AGREEMENT

THIS AGREEMENT is made this 21st day of December, 2005 between the City of Auburn, Alabama (hereinafter called "the Client") and CWH Research, Inc., (hereinafter called "CWH") a Colorado Corporation, whose business address is 9085 E. Mineral Circle, Suite 350, Englewood, CO 80112.

1) The Contract. This document is a complete agreement.

2) Definitions. When used in this Agreement, the following words and phrases shall have the indicated meanings:

   a) candidate - an individual who appears at the testing site and begins the written test.

   b) written test - a written measuring instrument and accompanying answer sheets, which may or may not be combined with other instruments into a single battery.

   c) qualified administrator – an individual who has had previous experience in written test administration, has been apprised of the confidential nature of the tests, the importance of fair and impartial testing, and the importance of maintaining strict test security. Further, this individual shall have read the CWH general instructions for written test administrations, and shall have been approved by CWH.

   d) written test session – the period from commencement of the first test in a CWH promotional test battery to the last test in that battery, occurring on the testing date (s) agreed upon by CWH and client.

   e) assessment center - exercises or simulations designed to measure candidates' knowledge, skills, and abilities, as well as the scoring of those candidates' performance on each of the exercises and simulations.

   f) assessor - an individual who has been trained in the use of assessment centers and the evaluation of candidates' performances in assessment centers. Further, the assessor or assessors shall have been apprised of the confidential nature of the assessment center exercises, the importance of fair and impartial evaluations, and the importance of maintaining strict security over all elements of the assessment center.

   g) assessment center test session – the period from commencement of the first set of assessment center exercises to the last exercise and final evaluation of candidates, occurring on the testing date (s) agreed upon by CWH and the Client.

   h) oral board – series of structured interview questions designed to measure candidates' knowledge, skills, and abilities, as well as the scoring of those candidates' performance on each of the questions.

   i) oral board test session – the period from commencement of the first oral board question to the last question and evaluation of candidates, occurring on the testing date (s) agreed upon by CWH and the Client.

3) Services to be Performed by CWH. CWH is an independent contractor and is not an agent, servant, employee or partner of the Client, and nothing contained herein shall be deemed or construed by the parties hereto or by any third party as creating a relationship of principal and agent or partnership or joint venture between the parties. CWH shall perform services for the Client in the categories listed below (collectively, the "Services"). These categories, and some, but not necessarily all, of the major services to be performed for the Fire Battalion Chief position as follows:

   a) Job Analysis Review
      (1) Job analysis review includes conducting interviews to develop test instruments and to provide a content valid process.

PLAINTIFF'S
EXHIBIT
1

PENGAD 800-631-6989

RESOLUTION NO. __05-288__

BE IT RESOLVED by the City Council of the City of Auburn, Alabama, that the City Manager is authorized to execute the attached contract with CWH Research, Inc. for the development and administration of a promotion selection process for the position of Fire Battalion Chief.

ADOPTED AND APPROVED by the City Council of the City of Auburn, Alabama, this 20th day of December, 2005.

_____
Mayor

ATTEST:

_____
City Manager

EXHIBIT
A

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **EDDIE OGLETREE, an individual;** | ) | |
| **GERALD STEPHENS, an individual** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO:** |
| | ) | **3:07-cv-867-WKW** |
| **CITY OF AUBURN**, a municipality in The | ) | |
| State of Alabama; **LARRY LANGLEY**, an | ) | **JURY TRIAL DEMANDED** |
| individual; **LEE LAMAR**, an individual; | ) | |
| **BILL HAM, Jr.**, an individual; **STEVEN** | ) | |
| **A.REEVES**, an individual; **BILL JAMES**, | ) | |
| an individual; **CHARLES M. DUGGAN**, | ) | |
| an individual; and **CORTEZ LAWRENCE**, | ) | |
| an individual; | ) | |
| | ) | |
| **Defendants,** | ) | |

**PLAINTIFFS' RESPONSE TO THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**COME NOW** the Plaintiffs, through counsel, and respond to the Defendants' Motion for

Summary Judgment and state that, pursuant to FRCP 56, there are genuine issues of material fact

for submission to a jury, and judgment as a matter of law is improper.  In support of this

response, the Plaintiffs submit their response Brief contemporaneously with the following

submissions of evidence:

1.      All Pleadings to date;

2.      Ex A-1991 Hammock Order;

3.      Ex B-CWH Research Inc. Letter of Agreement;

4.      Ex C-CWH Research Inc. Auburn Fire Division Orientation Manual;

5.      Ex D-Battalion Chief Memo dated February 17, 2006;

6.      Ex E- Battalion Chief Memo dated February 23, 2006;

7.      Ex F- Gerald Stephens Lieutenant Promotion Letter;

8.      Ex G- CWH Research Inc./City of Auburn E-mails;

9.      Ex H-Modification of Lieutenant Promotional Process signed by Gerald Stephens;

10.     Ex I-Modification of Lieutenant Promotional Process signed by Chris Turner;

11.     Ex J-City of Auburn Personnel Policies § 2.07 and § 2.09;

12.     Ex K-Eddie Ogletree EEOC Charge of Discrimination;

13.     Ex L-Gerald Stephens EEOC Charge of Discrimination;

14.     Ex M- EEOC Determination regarding Eddie Ogletree;

15.     Ex N-EEOC Determination regarding Gerald Stephens;

16.     Ex O-City of Auburn Interrogatory responses;

17.     Ex P-Grievance Letter dated May 12, 2006;

18.     Ex Q-Lee Lamar Letter dated April 28, 2006;

19.     Ex R-April 14, 2006 Letters to Ogletree and Stephens regarding the denial of the

        Battalion Chief Promotion;

20.     Ex S-Affidavit of Gerald Stephens with attachments;

21.     Ex T-Affidavit of Eddie Ogletree with attachments;

22.     Ex U-Affidavit of Christopher Turner;

23.     Ex V-Affidavit of Horace Clanton;

24.     Ex W-Affidavit of William Felton;

25.     Ex X-Grievance Letter dated May 24, 2006;

26.     Ex Y-Christopher Turner lawsuit;

27.     Ex Z-Affidavit of CWH Research Inc.;

28.     Ex AA-Larry Langley Letter;

29.     Deposition Testimony of Eddie Ogletree;

30.     Deposition Testimony of Gerald Stephens;

31.     Deposition Testimony of Stephen Reeves;

32.     Deposition Testimony of Lee Lamar;

33.     Deposition Testimony of Larry Langley;

34.     Deposition Testimony of William James;

**WHEREFORE**, Plaintiffs respectfully request the denial of the Defendants Motion for

Summary Judgment.


                                        **/s/ Richard F. Horsley**
                                        **Richard F. Horsley (HOR023)**
                                        **Attorney for Plaintiffs:**
                                        **Gerald Stephens & Eddie Ogletree**

**OF COUNSEL:**
**KING, HORSLEY & LYONS, LLC**
**1 Metroplex, Suite 280**
**Birmingham, Alabama 35209**
**Telephone: (205) 871-1310**
**Facsimile:  (205) 871-1370**
**E-mail:  rfhala@cs.com**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using electronic filing which will send notification of such filing on this the 2nd day of September, 2008.


/s/ Richard F. Horsley
Richard F. Horsley


**Randall Morgan, Esquire**
**Hill, Hill, Carter, Franco, Cole & Black PC**
**425 South Perry Street**
**Montgomery, Alabama 36104**
**Telephone: (334) 834-7600**
**Facsimile: (334) 262-4389**
**E-mail: morgan@hillhillcarter.com**

# EXHIBIT AA

To: Judge Robert Varner

I object to the Settlement Dudley Perry has agree to in the Dudley Perry Action at the meeting. It was uncall for. Mr. Perry said he would settle this case hisself & we had no say so in the matter. Mr. Perry has told us we would be Grandfather concerning schooling & Physial fittnes, but the agreement he had was not like that. Mr. Perry has done nothing to stop the harrasment from city Officals. We were not allow to set in on negotiactions, but Alan Ledbetter was allow to set in on his. I disagree with the promoton of Jessie Stricklan & Bill Felton to Lieutenant. & Alson disagree with the way Team leader was made Lieutnant, That was not the understanding I had when they started the Student Program. I have had no say in the concering this Prospal & Therefore I must object to the Prospal.

Your Respectly
Larry Langley

RECEIVED
JAN 17 1990
THOMAS C. CAVER, CLERK
U.S. DISTRIC COURT
MIDDLE DISTRICT OF AL

FILED
JAN 1 7 1990
CLERK
U.S. DIST. COURT
MIDDLE DIST. OF AL
DEPUTY CLERK, BY CO

# DEPOSITION TESTIMONY OF
# EDDIE OGLETREE

# DEPOSITION OF EDDIE OGLETREE

## June 6, 2008

## Pages 1 through 192

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                  EASTERN DIVISION
4
5   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
6   individual,
7        Plaintiffs,
8   Vs.               CIVIL ACTION NO.
                      3:07-CV-867-WKW
9
    CITY OF AUBURN, a municipality
10  in the State of Alabama, LARRY
    LANGLEY, and individual, LEE LAMAR,
11  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
12  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
13  individual, and CORTEZ LAWRENCE,
    an individual,
14
         Defendants.
15
            * * * * * * * * * * *
16
       DEPOSITION OF EDDIE OGLETREE, taken pursuant to
17
    stipulation and agreement before Pamela A. Wilbanks,
18
    Certified Court Reporter, ACCR# 391, Registered
19
    Professional Reporter and Commissioner for the State of
20
    Alabama at Large, in the Law Offices of Hill, Hill,
21
    Carter, Franco, Cole & Black, 425 South Perry Street,
22
    Montgomery, Alabama, on Friday, June 6, 2008, commencing
23
```

Page 2

```
1              APPEARANCES
2   FOR THE PLAINTIFFS:
3   Mr. Richard F. Horsley
    KING, HORSLEY & LYONS
4   Attorneys at Law
    1 Metroplex Drive
5   Suite 280
    Birmingham, AL 35209
6
    FOR THE DEFENDANTS:
7
    Mr. Randall Morgan
8   HILL, HILL, CARTER, FRANCO, COLE & BLACK
    Attorneys at Law
9   425 South Perry Street
    Montgomery, Alabama
10
    FOR CWH:
11
    Mr. William K. Hancock
12  ADAMS & REESE
    Attorneys at Law
13  Suite 1100
    2100 Third Avenue North
14  Birmingham, AL 35203
15  ALSO PRESENT:
16  Mr. Steven Reeves
    Mr. Lee Lamar
17  Mr. Gerald Stephens
18
            * * * * * * * * * * *
19          EXAMINATION INDEX
20  BY MR. MORGAN . . . . . . . . . . .   4
    BY MR. HANCOCK . . . . . . . . . .  185
21  BY MR. MORGAN . . . . . . . . . . . 186
    BY MR. HANCOCK . . . . . . . . . .  187
22  BY MR. MORGAN . . . . . . . . . . . 188
23
```

Page 3

```
1     EXAMINATION INDEX OF MR. STEPHENS
2   BY MR. HANCOCK . . . . . . . . . . . 188
    BY MR. MORGAN . . . . . . . . . . .  189
3
4           DEFENDANT'S EXHIBIT INDEX
5   14  City of Auburn Employment Application    78
6   15  4/4/05 letter to Mr. Ogletree from Steve  103
        Reeves concerning the Candidate Feedback
7       Report
8   16  4/14/06 letter to Mr. Ogletree from       103
        Stephanie King
9
10  17  4/21/06 letter to Chief Lamar from Clanton,  108
        Hodge, Ogletree and Stephens
11
12
13
14              STIPULATION
15      It is hereby stipulated and agreed by and
16  between counsel representing the parties that the
17  deposition of EDDIE OGLETREE is taken pursuant to
18  Federal Rules of Civil Procedure and that said
19  deposition may be taken before Pamela A. Wilbanks,
20  Registered Professional Reporter and Commissioner for
21  the State of Alabama at Large, without the formality of
22  a commission, that objections to questions other than
23  objections as to the form of the question need not be
```

Page 4

```
1   such time as the said deposition may be offered in
2   evidence or used for any other purpose by either party
3   provided for by the Statute.
4       It is further stipulated and agreed by and
5   between counsel representing the parties in this case
6   that the filing of said deposition is hereby waived and
7   may be introduced at the trial of this case or used in
8   any other manner by either party hereto provided for by
9   the Statute regardless of the waiving of the filing of
10  the same.
11      It is further stipulated and agreed by and
12  between the parties hereto and the witness that the
13  signature of the witness to this deposition is hereby
14  waived.
15
16          * * * * * * * * * * * *
17              EDDIE OGLETREE
18      The witness, after having first been duly sworn
19  to speak the truth, the whole truth and nothing but the
20  truth testified as follows:
21              EXAMINATION
22  BY MR. MORGAN:
23      Q.  State your name, please.
```

Page 5

1   A.  Eddie Ogletree.
2          MR. HANCOCK:  Before we get started, I
3       think we've got a stipulation from
4       the plaintiffs that I'd like to
5       put on the record.
6          MR. HORSLEY:  The plaintiffs in this
7       case will stipulate that at this
8       point in the litigation, we do not
9       have a claim and are not claiming
10      that the test in and of itself at
11      issue is a discriminatory test.
12      We are not waiving the right to
13      claim that in the future, but at
14      this point in the litigation we
15      have not even seen the test so I
16      don't think that we can claim that
17      statistically the test is a
18      discriminatory test at this point
19      since we have not even seen it.
20      But we are not waiving the right
21      to claim that in the future of
22      this litigation.
23         MR. HANCOCK:  As I understand it, the

Page 6

1       disparate impact claim that you're
2       bringing in the City's --
3          MR. HORSLEY:  The disparate impact
4       claim that we have made in the
5       case and that we made from the
6       outset is that the City's
7       implementation of a test has a
8       disparate impact on the
9       plaintiffs, not that the test in
10      and of itself is a discriminatory
11      test and causes -- or that the
12      test in and of itself is a
13      disparate impact test.
14         MR. HANCOCK:  And the policy -- the
15      City's policy with regard to who
16      is allowed to take the test; is
17      that correct?
18         MR. HORSLEY:  Correct.
19         MR. MORGAN:  Wait a minute.  Both of
20      y'all are stipulating to a lot.
21         Are you dropping your
22      disparate impact claim?
23         MR. HORSLEY:  No, we are not.

Page 7

1          Absolutely not.
2          MR. MORGAN:  What is the disparate
3       impact claim if you're not
4       claiming it's the results from the
5       test?
6          MR. HORSLEY:  It is the results of the
7       test.
8          MR. MORGAN:  You're claiming --
9          MR. HORSLEY:  I'm not dropping any
10      claim.  We never made a claim in
11      this lawsuit against this company;
12      y'all did.
13         MR. MORGAN:  Well, I know that.  But
14      you claim that the written test --
15      and if I'm wrong, correct me --
16      that the written test, that the
17      procedure had a disparate impact
18      on blacks.
19         MR. HORSLEY:  Yes, we're claiming
20      that.
21         MR. HANCOCK:  As I read the complaint,
22      it's not the test.  It's the
23      procedure of who takes the test.

Page 8

1          It's the policy of utilizing a
2       test.
3          MR. HORSLEY:  It's the policy of
4       implementing the test in order to
5       give people this promotion.
6          That's what we've been claiming
7       all long.
8          MR. HANCOCK:  But not the test
9       itself?
10         MR. HORSLEY:  We don't have any
11      evidence at this point in the
12      litigation --
13         MR. MORGAN:  Wait a minute.  Are you
14      saying the test does not have a
15      disparate impact?
16         MR. HORSLEY:  No, I'm not saying
17      that.
18         MR. HANCOCK:  He's saying he doesn't
19      know.
20         MR. MORGAN:  Huh?
21         MR. HORSLEY:  No.  We're saying it
22      does have a disparate impact.
23         MR. MORGAN:  The written test?

Page 9

1    MR. HORSLEY:  The fact that the City
2    made these people take the test.
3    MR. MORGAN:  I can see the claim where
4    you say the written test shouldn't
5    have been required.  I don't have
6    any problem with that.
7    MR. HORSLEY:  Right.
8    MR. MORGAN:  I understand that.  But
9    then you have a disparate impact
10    claim.  Are you --
11    MR. HORSLEY:  Let's go off the record.
12    (Brief off-the-record discussion.)
13    MR. HORSLEY:  After a meeting with
14    Randall and Will about the
15    previous stipulation for today's
16    deposition, we are not going to
17    stipulate to anything on the
18    record pursuant to the disparate
19    impact claim which we stated
20    earlier.  So for today there's no
21    stipulation on the record about
22    the disparate impact claim or the
23    test.

Page 10

1    Q.  State your name, please.
2    A.  Eddie Ogletree.
3    Q.  And, Mr. Ogletree, you're employed as a
4    lieutenant with the City of Auburn Fire
5    Department?
6    A.  Yes.  As of February 1st, 2006 when they changed
7    the title from team leader.
8    Q.  And before that you were a team leader?
9    A.  Yes.
10    Q.  And when did you become a team leader?
11    A.  June 1st of 1996, I believe, somewhere around
12    there.
13    Q.  And what procedure did you go through to be
14    eligible to be a team leader in 1996?
15    A.  They called it -- I guess it was like a
16    structured interview.
17    Q.  Is that the first time that you had applied for
18    team leader in '96?
19    A.  I had applied one time before, but they took the
20    job off the board.  And I had applied for a
21    lieutenant's position about a year or two before
22    that, and they cancelled the job.
23    Q.  You applied for lieutenant before '96?

Page 11

1    A.  Yes.
2    Q.  And that was also cancelled?
3    A.  Uh-huh (positive response).
4    Q.  So you never went through --
5    A.  Never went through any process.
6    Q.  Do you remember what the process would have been
7    for lieutenant in '94?
8    A.  It would have been -- More or less it would have
9    been a structured interview type of thing.
10    Q.  Did you sit on any of the structured interviews
11    or assessment --
12    A.  I did.
13    Q.  Which ones did you sit on?
14    A.  I probably have sat on about four to five from a
15    period of, like, the year of '97 or '98 till
16    about maybe 2001, somewhere along in there.
17    Q.  Would that have been for team leader?
18    A.  That would have been for team leader.
19    Q.  And did Chris Turner apply for team leader
20    during those --
21    A.  I believe he did one time.
22    Q.  Do you remember how you graded him?
23    A.  He was above average.  I graded him above

Page 12

1    average.
2    Q.  Do you remember who got promoted that time?
3    A.  I couldn't recall.  I couldn't recall.  It's
4    been several guys.  I do know that one of them
5    might have been Hartsfield, which is a battalion
6    chief now.  I believe he might have been one of
7    them that got promoted.  I think it might have
8    been him.
9    Q.  Rodney Hartsfield?
10    A.  Yes.
11    Q.  Is he a good officer?
12    A.  Rodney?
13    Q.  Yeah.
14    A.  He's no better than I would be or -- He's a good
15    officer, but all officers there are pretty good.
16    Q.  Did you participate in petitioning the City to
17    change the rank from team leader to lieutenant?
18    A.  Yes.
19        Can I elaborate?
20    Q.  Yeah.
21    A.  When they came around to me --
22    Q.  Now, who is "they"?
23    A.  Joey Darby.  I was approached by Joey Darby

Page 13

1   first about it before I seen any paperwork. And
2   he had said that they was going -- they was
3   thinking about petitioning to change the team
4   leader title to lieutenant and say he had
5   chalked to chief about it, which would have been
6   Chief Langley at the time. And he approached me
7   again, and he showed me the paperwork. And when
8   I read through the paperwork, it was my
9   understanding that they was going to petition
10  the court, and that's the only reason I signed,
11  because I figured if they go back through the
12  court system, then everything would be legal and
13  it would take enough time where everybody would
14  be satisfied, because I was approached by then
15  by Chief Garrett, and he had already said that
16  they know that certain people were going to
17  complain about it. Just because -- I signed
18  that paper, but I didn't think -- I thought it
19  was going to court.
20  Q.  Well, what about Chief Garrett knew that certain
21      people were going to complain? Who --
22  A.  Chief Garrett had stated that Chris Turner and
23      Lieutenant Stephens and Walter Allen -- the

Page 14

1   chief already knew they weren't going to agree
2   with it.
3   Q.  Well, did that influence your decision to sign
4       it, the fact that they weren't going to agree
5       with it?
6   A.  The one thing on there that I signed for was to
7       court. They stated they were going to petition
8       the court, because, you know -- Another thing
9       about that: Those guys that were pushing that
10      petition, they had a real problem with answering
11      to Lieutenant Stephens over there. And my only
12      conclusions with that was because Lieutenant
13      Stephens was black, and he was the highest
14      ranking officer in the fire department at that
15      time. And they had a real problem when he was
16      giving them orders. I have heard them complain,
17      go over his head, say they think they was equal
18      rank to him. And the policy plainly states that
19      team leaders had no say-so over regular
20      firefighters or officers.
21  Q.  Who are the officers that complained about
22      Lieutenant Stephens -- taking orders from
23      Lieutenant Stephens?

Page 15

1   A.  Joey Darby.
2   Q.  Okay.
3   A.  Matt Joy.
4   Q.  Matt who?
5   A.  Matt Joy.
6   Q.  J-O-Y?
7   A.  J-O-R-D-A-N.
8   Q.  Jordan. Okay.
9   A.  I know they complained directly.
10  Q.  Complained directly to who?
11  A.  Chief Garrett.
12  Q.  What other team leaders did you hear complain
13      about taking orders from Lieutenant Stephens?
14  A.  I just -- I knew it was a problem. Most all --
15      It's probably about eight to nine of them.
16  Q.  Give me their names.
17  A.  Jason Brown. Let's see who else it would be.
18      Clay Carson, John Benefield, Joe Lovvorn, I
19      remember those guys directly.
20  Q.  Who did they complain to about --
21  A.  Their immediate supervisor, because at the time
22      they were giving Lieutenant Stephens a hard
23      time.

Page 16

1   Q.  These six people were giving Lieutenant Stephens
2       a hard time?
3   A.  They just didn't think that their rank and his
4       rank -- They thought their rank and his rank was
5       the same.
6   Q.  I want to be clear on what their complaint was.
7       If they thought the rank was the same, that's
8       one thing. But what you said was that they were
9       complaining because Lieutenant Stephens was
10      black. Now, did you hear any of these people
11      say, I don't want to take orders from Lieutenant
12      Stephens because he's black?
13  A.  No, I didn't hear them say it.
14  Q.  Did you hear anybody say --
15  A.  But --
16  Q.  -- anything like that?
17          MR. HORSLEY: Just answer his
18          question.
19  Q.  Wait a minute.
20          Did you hear anybody say anything like that,
21      that I don't want to take orders from Lieutenant
22      Stephens because he's black? Who do you accuse
23      of those people that you named of complaining

Page 17

1    about taking orders from Lieutenant Stephens
2    because he's black?
3  A.  No one.
4  Q.  Their complaint was they thought their rank as a
5    team leader was equal to his rank as a
6    lieutenant, true?
7  A.  Yes, that's true.
8  Q.  Did you feel like your rank as a team leader was
9    equal to the lieutenant rank?
10  A.  No.
11  Q.  Well, since the promotion or the change from
12    team leader to lieutenant did not go through the
13    court --
14      You know that, don't you?
15  A.  Yes. I know it because it come back too quick.
16  Q.  Did you refuse to accept that rank change since
17    it didn't go through the court?
18  A.  I didn't refuse. I just took -- They gave me
19    the bars, and I just put them on and kept doing
20    the same thing I've been doing.
21  Q.  Did you complain to anybody or make any comment
22    to anybody when you became a lieutenant that you
23    thought it needed to go through the court?

Page 18

1  A.  I talked to Lieutenant Stephens.
2  Q.  Anybody else?
3  A.  No.
4  Q.  Steve Reeves or any of these people that you've
5    sued?
6  A.  No.
7  Q.  Did you say anything to them about -- complain
8    about being changed from a team leader to a
9    lieutenant?
10  A.  No.
11      Can I say something else on that?
12  Q.  Say whatever you want.
13  A.  I been there long enough to know that
14    complaining don't do no good. When somebody
15    make a decision, you know -- If I'm going to do
16    something, I'm going to do it formally. That's
17    why we're here now. But complaining, you just
18    make your day bad.
19      MR. MORGAN: Well, I'm going to move
20      to exclude that.
21  Q.  Well, who brought you the petition that you
22    signed, Joey Darby?
23  A.  Joey Darby.

Page 19

1  Q.  And did you tell Mr. Darby that you were only
2    signing it because it was going through the
3    court?
4  A.  Yes. They say they was going to petition the
5    court, and I say I'll sign it.
6  Q.  Did you tell them you wouldn't sign it if they
7    weren't going to petition the court?
8  A.  No. That was my understanding when it came to
9    me, that it was going to the court system.
10  Q.  Is it your position in this lawsuit that you
11    should not be a lieutenant?
12      MR. HORSLEY: Object to the form.
13  A.  No. Because other people that got promoted over
14    the years were doing less.
15  Q.  I'm not asking about other people. I'm asking
16    about Eddie Ogletree.
17  A.  No.
18  Q.  Is it your position because they didn't petition
19    the court that you should not be a lieutenant?
20  A.  No.
21  Q.  Your position is you should be a lieutenant?
22  A.  Yes.
23  Q.  Is it your position that because you were a team

Page 20

1    leader and the change to lieutenant did not go
2    to the court that you should not be eligible for
3    promotion to battalion chief?
4  A.  No. Because team leaders were eligible for
5    promotion.
6  Q.  Well, do you have any problem with team leaders
7    being eligible for promotion to battalion chief?
8  A.  No.
9  Q.  You don't have any complaint about that, do you?
10  A.  No, I didn't have a complaint about that.
11  Q.  Do you have a complaint about people who had not
12    yet achieved the rank of team leader being
13    eligible to apply for the battalion chief
14    promotion?
15  A.  Yes, I do.
16  Q.  What's your problem with that?
17  A.  When I came there, it was five years before you
18    could even put in for anything above -- You
19    could be a firefighter from your first five
20    years.
21  Q.  You came in 1984?
22  A.  Yes.
23  Q.  So you had to wait five years for a promotion?

Deposition of Eddie Ogletree

June 6, 2008

Page 21

1   A.   Exactly.  You had certain things you had to
2        learn, basic things you had to learn for those
3        first five years:  streets and numbers, your
4        hydrant flow, learn how to do pumping on the
5        truck and -- before you even got -- You was on
6        the ladder truck, but you learned that first.
7        Then you learned to run a front run pumper.  So
8        by the time you learn all that, you didn't have
9        time to just come in the door and apply yourself
10       to be something else because they held you to
11       it.
12  Q.   Well, who just came in the door and was eligible
13       to apply for battalion chief?
14  A.   We had several firefighters -- We had
15       firefighters in there, and we had several guys
16       that had been promoted within the first two
17       years of being a regular firefighter.
18  Q.   Were they team leaders?
19  A.   Yes.
20  Q.   And we've already established you don't have any
21       complaint about --
22  A.   I've got a complaint about time in service.
23  Q.   Seniority?

Page 22

1   A.   Uh-huh (positive response).
2        MR. HORSLEY:  You need to say yes, not
3        uh-huh (positive response).
4   A.   Yes.
5   Q.   Before I get to that, what firefighters who were
6        not team leaders or lieutenants sat for the exam
7        on the battalion chief promotion?
8   A.   Chris Turner was a firefighter.
9        MR. HORSLEY:  In 2006?  Was that your
10       question?
11  Q.   Isn't that the one you're complaining about, the
12       battalion chief promotion in 2006?
13  A.   Yes.
14  Q.   You're not complaining about any other
15       promotions, are you?
16  A.   Other than when they changed the title.  I told
17       you I didn't agree --
18  Q.   You don't want to be a lieutenant?  You want the
19       City to make you a team leader again?
20  A.   Other than when they changed the title and it
21       didn't go to the courts.
22       MR. HORSLEY:  Object to the form.
23       It's argumentative.

Page 23

1   Q.   And that's team leader to lieutenant.  You
2        consider that a promotion?
3   A.   Yes.
4   Q.   And you don't want -- you think that's unfair to
5        you to make you a lieutenant?
6        MR. HORSLEY:  Object to the form.
7   A.   And the battalion chief promotions of 2005 --
8        2004.
9   Q.   Did you apply for those?
10  A.   No.  Didn't nobody get a chance to apply.
11  Q.   Is that when the captains became battalion
12       chiefs?
13  A.   Yes.  Battalion chief was a promotion.
14  Q.   Did you file an EEOC claim over that in 2004?
15  A.   No, I didn't file a EEOC claim.
16  Q.   Did you file a lawsuit over that?
17  A.   No, I didn't.
18  Q.   So Chris Turner is the only person who was not
19       ranked at least -- who was not ranked as a
20       lieutenant?
21  A.   Yes.
22  Q.   So you think he should not have been allowed to
23       sit for the battalion chief promotion?

Page 24

1   A.   I think so, but ...
2   Q.   Now, how did his sitting for battalion chief
3        adversely affect your promotion possibilities?
4   A.   I didn't have a problem with him sitting per
5        se.  I'm talking about all the people that was
6        in there that had less time than I had.
7   Q.   Well, that's everybody that was there, wasn't
8        it?
9   A.   That's the way they've been promoting.
10  Q.   I mean, everybody that sat for the exam had less
11       time --
12  A.   Except for two other guys.
13  Q.   All right.  Who had been there longer than you?
14  A.   Horace Clanton and Robbie Hodge.
15  Q.   And he's white?
16  A.   Both of them are white.
17  Q.   So your position is those two whites should have
18       been promoted to battalion chief?
19       MR. HORSLEY:  Object to the form.
20  A.   No.  I said I have a problem with who sat
21       there.  That doesn't have nothing to do with
22       being promoted, who just you was competing
23       against.

Page 25

1　Q.　Let's go back to my other question about Chris
2　　　Turner.
3　　　　　Did Chris Turner sitting for the battalion
4　　　chief exam adversely affect your chances to be
5　　　promoted?
6　A.　No.
7　Q.　And Chris Turner is a black male?
8　A.　Yes.
9　Q.　And you're a black male?
10　A.　Yes.
11　Q.　And Gerald Stephens is a black male?
12　A.　Yes.
13　Q.　Well, who that sat for the exam do you think
14　　　didn't have enough seniority to sit for it?
15　A.　Joe Lovvorn, Rod Hartsfield, Matt Jordan, Clay
16　　　Carson, Jason Brown. Let me see who else was in
17　　　there. There's probably one or two -- probably
18　　　one or two more. I can't remember exactly
19　　　everybody.
20　Q.　Let me show you the list because I want to make
21　　　sure I get all of them. Here's the ones that
22　　　were in the orientation. Who else do you think
23　　　didn't have enough time to sit?

Page 26

1　A.　John Lankford. And that's it. Well, Jason
2　　　didn't take it.
3　Q.　Who didn't take it?
4　A.　Jason Rawls (phonetic), he didn't take it.
5　Q.　Joe Lovvorn, Rodney Hartsfield, Matt Jordan,
6　　　Clay Carson, Jason Brown, and John Lankford --
7　A.　Yes.
8　Q.　-- you think didn't have enough time in grade to
9　　　take the exam?
10　A.　Yes.
11　Q.　How long had Joe Lovvorn been with the fire
12　　　department at that time?
13　A.　Well, they count student time now, but probably
14　　　about five or six years.
15　Q.　And how about Rodney Hartsfield? How long had
16　　　he been there?
17　A.　Probably about seven.
18　Q.　And Matt Jordan? How long --
19　A.　Probably about five or six. That's not exact,
20　　　but that's counting that date of hire probably,
21　　　not their student firefighter date of hire.
22　Q.　So this is a regular firefighter --
23　A.　Yeah, regular firefighter.

Page 27

1　Q.　So how would you have fashioned the exam for
2　　　battalion chief? What would you have made the
3　　　requirements be?
4　　　　　MR. HORSLEY: Object to the form.
5　A.　Just like --
6　Q.　We can establish first: You're not a testing
7　　　expert, are you?
8　A.　No, I'm not.
9　Q.　You don't purport yourself --
10　A.　Don't purport.
11　Q.　Well, given that, what would you have made the
12　　　requirements to be?
13　　　　　MR. HORSLEY: Object to the form.
14　A.　No cutoff score. More hands-on type
15　　　activities. Seniority, time in grade.
16　Q.　Is there --
17　A.　We didn't get any points for any of that. We
18　　　got cut off. That's where my problem is.
19　Q.　Is there a difference in seniority and time in
20　　　grade?
21　A.　Yes. Because you have some people that have
22　　　been -- Like Lieutenant Stephens there, he's the
23　　　longest ranking lieutenant in the fire

Page 28

1　　　department. He doesn't have as much time in
2　　　grade as I have, but he's the highest -- longest
3　　　ranking lieutenant. So he's been in a
4　　　lieutenant position now for twelve years.
5　　　　　THE WITNESS: Right?
6　　　　　(No response.)
7　Q.　Well, which do you consider that to be,
8　　　seniority or time in grade?
9　A.　Time in grade.
10　Q.　And seniority is just how long you've been with
11　　　the department?
12　A.　Yes.
13　Q.　Well, from, say, 2000 on, were there any
14　　　differences in what you did as a team leader
15　　　than what Gerald Stephens did as a lieutenant?
16　A.　2000? I couldn't really say because -- I'm
17　　　trying to think about the manpower and who I was
18　　　really supervising at the time. For me I was
19　　　doing what I was -- I was at Station 3, and I
20　　　rarely had a full-time man, which it state the
21　　　team leader can't supervisor a regular full-time
22　　　firefighter. I always just about had student
23　　　firefighters at my station. There was some that

Page 29

1  was different throughout the City.
2  Q.  Were your responsibilities and duties any --
3  A.  Did --
4  Q.  Let me finish my question.
5      -- any different from Gerald Stephens after
6  2000?
7  A.  Yes.
8  Q.  What were the differences?
9  A.  I was supervising more students than I was
10  career.  I wasn't supervising any career until
11  here probably the last three or four years when
12  they put a full-time man regular out at my
13  station.
14  Q.  When did you start supervising a career?
15  A.  Probably about 2004 or '5, somewhere around
16  there.
17  Q.  Well, at that point was there any difference in
18  what you were doing from Lieutenant Stephens?
19  A.  No.
20  Q.  The entire time that you were a team leader that
21  he was a lieutenant, was there any difference in
22  what the two of y'all did?
23  A.  Yes.

Page 30

1  Q.  What was the differences?
2  A.  He could supervise regular full-time
3  firefighters and I couldn't.
4  Q.  That's the only difference?
5  A.  Yes, that's the difference.
6  Q.  Well, do you have any problem -- feel any
7  deficiency in supervising full-time regular --
8  A.  No.
9  Q.  I mean, are they any more difficult or less
10  difficult to supervisor than student
11  firefighters?
12  A.  No.
13  Q.  Supervision at that rank is supervision, isn't
14  it?
15  A.  Yes.
16  Q.  I mean, do student firefighters do less or more
17  than the regular firefighters?
18  A.  They probably present more of a challenge than a
19  regular firefighter.
20  Q.  So if you can supervisor a student firefighter,
21  you can probably supervise a regular
22  firefighter, can't you?
23  A.  Yes.

Page 31

1  Q.  Have you ever filed an EEOC charge against the
2  City?
3  A.  No.  This is my first one.
4  Q.  Had you filed a grievance against the City?
5  A.  No.  This is my first one.
6  Q.  Where do you currently live?
7  A.  At 106 Pioneer Drive, LaGrange, Georgia 30240.
8  Q.  And who do you live there with?
9  A.  My wife.
10  Q.  And what is her name?
11  A.  Marzilla.  That's M-A-R-Z-I-L-L-A.
12  Q.  And is that your only wife?
13  A.  Yes.
14  Q.  Don't have any ex's?
15  A.  No.
16  Q.  Do you have any relatives by blood or marriage
17  that live in Lee County?
18  A.  Yes.
19  Q.  Who are they?
20  A.  My mother.
21  Q.  And what's her name?
22  A.  Emma, E-M-M-A, Ogletree.
23  Q.  And where does Emma live?

Page 32

1  A.  She stays out in Loachapoka.
2  Q.  Is she employed?
3  A.  She retired.
4  Q.  Where did she retire from?
5  A.  University.  Auburn University.
6  Q.  What did she do at Auburn?
7  A.  She was housekeeping.  She worked in
8  housekeeping.
9  Q.  Any other relatives in Lee County?
10  A.  Yes.
11  Q.  All right.
12  A.  Catherine Calloway.
13  Q.  Who is she?
14  A.  My sister.
15  Q.  Where does she live?
16  A.  In Loachapoka.
17  Q.  Who is she married to?
18  A.  Earnest Calloway.
19  Q.  What's her employment?
20  A.  She does home care.
21  Q.  And what's his employment?
22  A.  He's retired.
23  Q.  From where?

Page 33

1   A.   Southern Stone.
2   Q.   Do they have any children over the age of, say,
3        18, that live in Lee County or --
4   A.   A daughter.
5   Q.   What's her daughter's name?
6   A.   Earnestine.
7   Q.   Calloway?
8   A.   Yes.
9   Q.   And how old is she?
10  A.   About 34 or 35, somewhere along there.
11  Q.   And where does she live?
12  A.   She stays in Loachapoka also.
13  Q.   Where is she employed?
14  A.   She works at Wal-Mart in Tallassee, Alabama.
15  Q.   Any other relatives in Lee County?
16  A.   Yes.  Marjorie Dowdell.
17  Q.   Who is she?
18  A.   My sister.
19  Q.   Where does she live?
20  A.   In Loachapoka.
21  Q.   Who is she married to?
22  A.   Arthur Dowdell.
23  Q.   What does Marjorie do?

Page 34

1   A.   She works for Loachapoka High School.
2   Q.   What does Arthur do?
3   A.   He cooks at the athletic Sewell Hall for
4        athletes at Auburn University.
5   Q.   Do they have any children over 18?
6   A.   Yes.
7   Q.   What are their names?
8   A.   Arthur Dowdell, Jr.
9   Q.   How old is he?
10  A.   He's about 37.
11  Q.   And what does he do?
12  A.   He works at Bruno's, I think, down here in
13       Montgomery.
14  Q.   Any other children they have over 18?
15  A.   Yes.  Kim.  Well, she doesn't live -- you can
16       strike her.  She's out in Colorado.
17       Faye.
18  Q.   Where does she live?
19  A.   She stays in Loachapoka.
20  Q.   How old is he?
21  A.   She's probably 20.
22  Q.   What does she do?
23  A.   She goes to Southern Union.

Page 35

1   Q.   Any other relatives in Lee County?
2   A.   Not in Lee.  Well, yeah.  I've got some first
3        cousins.
4   Q.   I'll send an interrogatory on that.
5        Do you have any relatives in Chambers
6        County?
7   A.   By marriage.
8   Q.   Who are they?  Is that where your wife is from?
9   A.   Yes.
10  Q.   What is her maiden name?
11  A.   Barrow, B-A-R-R-O-W.
12  Q.   Are her parents still alive?
13  A.   Yes.
14  Q.   Do they live in Chambers County?
15  A.   Yes.
16  Q.   Has she got brothers and sisters in Chambers
17       County?
18  A.   Yes.
19  Q.   What are her parents' names?
20  A.   Walter and Velma Barrow.
21  Q.   Are they employed?
22  A.   Retired.
23  Q.   Walter, what did he retire from?

Page 36

1   A.   He had his own business.  He runs an auto
2        mechanic shop.
3   Q.   And Velma?
4   A.   Yeah.  She retired from Piggly Wiggly.
5   Q.   Has your wife got brothers and sisters in
6        Chambers County?
7   A.   Yeah.
8   Q.   How many?
9   A.   She got two brothers and one sister.
10  Q.   Just give me the brothers' names?
11  A.   Walter, Jr. and Keith.
12  Q.   And then the sister?
13  A.   Velma.
14  Q.   What's her last name?
15  A.   I'm trying to think of her husband's name.
16       Canada, C-A-N-A-D-A.
17  Q.   Have you got any relatives in Macon County?
18  A.   Yes, sir.  A brother.
19  Q.   What's his name?
20  A.   Alfred.
21  Q.   Ogletree?
22  A.   Yes.
23  Q.   And where is he employed?

Page 37

| | |
|---|---|
| 1 | A. Rubber Plant, Mitchell. |
| 2 | Q. Is he married? |
| 3 | A. Yes. |
| 4 | Q. And what's her name? |
| 5 | A. Gail. |
| 6 | Q. What's her maiden name? |
| 7 | A. Kendall. |
| 8 | Q. Where is she employed? |
| 9 | A. She works for a guy that runs a private |
| 10 | company. I don't know exactly what she does. |
| 11 | Q. Do they have any children over the age of 18 |
| 12 | that live -- |
| 13 | A. Yes. |
| 14 | Q. How many? |
| 15 | A. One. |
| 16 | Q. What's his or her name? |
| 17 | A. Her name. Let me see what her name -- Ashley. |
| 18 | Q. How old is Ashley? |
| 19 | A. She's 19, I believe. |
| 20 | Q. And she goes to school? |
| 21 | A. Yes. She will be going to West Georgia College |
| 22 | in the fall. She just finished up in Pensacola. |
| 23 | Q. Do you have any relatives by blood or marriage |

Page 38

| | |
|---|---|
| 1 | in Randolph County? |
| 2 | A. No. |
| 3 | Q. Do you have any relatives by blood or marriage |
| 4 | in Russell County? |
| 5 | A. No. |
| 6 | Q. Do you have any relatives by blood or marriage |
| 7 | in Tallapoosa County? |
| 8 | A. No. |
| 9 | Q. Are you a member or have you been a member of a |
| 10 | church or any civic, social, political clubs, |
| 11 | organizations in Lee County? |
| 12 | A. Yes. I belong to a fraternity, but I'm |
| 13 | inactive. |
| 14 | Q. What fraternity? |
| 15 | A. Phi Beta Sigma. |
| 16 | Q. Is that a social fraternity? |
| 17 | A. Uh-huh (positive response). |
| 18 | Q. Yes? |
| 19 | A. Yes. |
| 20 | Q. Have you ever lived in Lee County? |
| 21 | A. Yes. |
| 22 | Q. When did you live there? |
| 23 | A. Probably -- It's been about 20 years. |

Page 39

| | |
|---|---|
| 1 | Q. Have you been in Georgia for 20 years? |
| 2 | A. No. I've been -- Yeah, close to it. Close to |
| 3 | it. |
| 4 | Q. Were you a member or did you attend a church |
| 5 | when you were in Lee County? |
| 6 | A. Cluster (phonetic). I still got a church down |
| 7 | in Cluster, a Baptist church. |
| 8 | Q. Are you a member of a church or any clubs or |
| 9 | civic organizations in any of the following |
| 10 | counties: Chambers? |
| 11 | A. No. |
| 12 | Q. Macon? |
| 13 | A. No. |
| 14 | Q. Randolph? |
| 15 | A. No. |
| 16 | Q. Russell? |
| 17 | A. No. |
| 18 | Q. Tallapoosa? |
| 19 | A. No. |
| 20 | Q. Other than this lawsuit, have you been a |
| 21 | plaintiff in any other lawsuits? |
| 22 | A. No. |
| 23 | Q. Have you ever been sued for anything? |

Page 40

| | |
|---|---|
| 1 | A. No. |
| 2 | Q. Have you ever given a deposition before? |
| 3 | A. No. Never given a deposition. |
| 4 | Q. Have you ever been arrested for anything? |
| 5 | A. Yes. I missed a court date. |
| 6 | Q. When was that? |
| 7 | A. It was about 25 years ago. |
| 8 | Q. Have you ever been convicted of anything? |
| 9 | A. No. |
| 10 | Q. Have you ever made any other discrimination |
| 11 | claims against anybody? |
| 12 | A. No. |
| 13 | Q. You've been with the City since 1984? |
| 14 | A. Yes. |
| 15 | Q. And you've been a regular firefighter the whole |
| 16 | time? |
| 17 | A. Yes. When I was hired, they didn't have the |
| 18 | student program. |
| 19 | Q. You never were -- |
| 20 | What did you do before that? What year were |
| 21 | you born? |
| 22 | A. 1959. |
| 23 | Q. Are you a veteran? |

Page 41

1  A.  No.
2  Q.  What did you do before you joined the Auburn
3      Fire Department?
4  A.  I worked with Allen McCord.  He used to work at
5      the fire department.  He retired now.  I
6      attended school.  I attended Southern Union a
7      couple of years, and I attended the University
8      of North Alabama a couple of semesters.  And I
9      came down to Auburn and attended there for about
10     a year.
11 Q.  You went to Southern --
12 A.  Southern Union.
13 Q.  Where is it located?
14 A.  It was in Wadley, Alabama.  Still in Wadley,
15     Alabama.  They got a campus in Opelika now.
16 Q.  But you went to the Whatley campus?
17 A.  Uh-huh (positive response).
18 Q.  Yes?
19         MR. HORSLEY:  It's Wadley,
20     W-A-D-L-E-Y.
21 Q.  And then you went where in north Alabama?
22 A.  University of North Alabama.
23 Q.  Did you graduate from there?

Page 42

1  A.  No.
2  Q.  What was your course of study?
3  A.  Sociology and psychology.
4  Q.  How long did you go?
5  A.  I got about three years in.  I came back to
6      Auburn and did a year.  So I got about three,
7      three-and-a-half years in.
8  Q.  So you were a senior?
9  A.  Yeah.  I was close to being a senior.
10 Q.  Where did you graduate from high school?
11 A.  Loachapoka.
12 Q.  What year?
13 A.  1977.
14 Q.  And then you say you attended Auburn University?
15 A.  I attended Southern Union first.  Yeah, I
16     attended Auburn University.
17 Q.  When you came back from north Alabama, where did
18     you go?
19 A.  Auburn University.
20 Q.  How long were you at Auburn?
21 A.  A year.
22 Q.  What years were you there?
23 A.  '80, '81, I believe.

Page 43

1  Q.  Did you get a degree?
2  A.  No.
3  Q.  What was your course of study at Auburn?
4  A.  Same:  Social and psychology.
5  Q.  How close were you to graduating?
6  A.  I probably got about 60 to 80 hours to go.
7  Q.  Six to eight?
8  A.  Sixty to eighty.  No, not six to eight.
9  Q.  You applied for -- You said you were promoted to
10     team leader in June of '96?
11 A.  Yes.
12 Q.  From June of '96 up until, what, February of
13     '06, did you apply for a promotion to any other
14     ranks in the Auburn Fire Department?
15 A.  No.
16 Q.  I think before you were promoted to team leader,
17     Gerald Stephens had been promoted to lieutenant;
18     is that correct?
19 A.  Yes.  He was promoted in May -- April of '96,
20     and I was promoted in June of '96.
21 Q.  Did you apply for the promotion to lieutenant?
22 A.  No, I did not.
23 Q.  Why not?

Page 44

1  A.  I had -- I think at the time I had already put
2      in for the team leader.  But they had -- they
3      did the lieutenants assessment before they
4      did ...
5  Q.  But you would have been eligible to have applied
6      for lieutenant?
7  A.  Yes, I would have.
8  Q.  And then I think sometime -- I'm not sure what
9      year -- sometime around '96 there was a captains
10     promotion.
11 A.  Yes.  I don't know if it was '96.  It was
12     somewhere around there because it was -- the
13     other four black guys that were working there at
14     the time, they were involved in litigation
15     against the City.  And they promoted Gerald and
16     they promoted me right after that settlement.
17 Q.  Who were the other four?
18 A.  There was Lieutenant Jessie Strickland,
19     Lieutenant Bill Felton, Lieutenant Dexter Card,
20     and Chris Turner -- Firefighter Chris Turner.
21     And they were involved in litigation about the
22     captains promotion.
23 Q.  About the captains promotion?

Page 45

1   A.  Yes.
2   Q.  Do you remember what that litigation was about?
3   A.  Basically the same thing:  About blacks being
4       looked over for promotion.
5   Q.  And do you know how that litigation resolved?
6   A.  It was settled with them.
7   Q.  With them what?
8   A.  I don't know exact settlement.  All I know is
9       Jessie and Bill and Dexter went home, and they
10      settled it with them.
11  Q.  Have you talked to Jessie Strickland about the
12      terms of the settlement or anything that he
13      received in the settlement?
14  A.  Not about the terms.
15  Q.  Did he tell you anything he received in the
16      settlement?
17  A.  No.
18  Q.  How about Bill Felton?
19  A.  No.
20  Q.  Did you talk to him about the terms of the
21      settlement?
22  A.  No.  I haven't even talked to him period.
23  Q.  Did he tell you anything he may have received in

Page 46

1       the settlement?
2   A.  No.
3   Q.  How about Dexter Card?  Did you talk to him
4       about the settlement?
5   A.  No.  Haven't talked or seen him since he left.
6   Q.  You don't know what he may have received as part
7       of the settlement?
8   A.  No.
9   Q.  And Chris Turner, did you talk to him as
10      part of -- what his part --
11  A.  No.  He hadn't told us.
12  Q.  Do you know anything he may have received with
13      any settlement with the City?
14  A.  No.
15  Q.  Well, whenever the captains -- last captains
16      promotion was, sometime around '96, did you sit
17      for that promotion?
18  A.  No, I didn't.
19  Q.  Well --
20  A.  I wouldn't have been able to sit for that
21      promotion because at that time, unless you was
22      the right person, I guess -- Chief Langley went
23      from firefighter to captain, but it used to be

Page 47

1       you had to hold one rank before you could move
2       up to the next rank and the next rank.
3   Q.  Well --
4   A.  They would have laughed me out of there.
5   Q.  Why would they have laughed you out?
6   A.  They wouldn't have let me sit for it because I
7       was a firefighter.  I hadn't been promoted to
8       anything yet.
9   Q.  Well, was the last captains promotion open for
10      firefighters to sit?
11  A.  No.
12  Q.  You had to be a lieutenant?
13  A.  Yes.
14  Q.  When was the promotion to captain that you're
15      talking about Captain Langley, when he went from
16      firefighter?  Was it before the last one?
17  A.  Yes, it was before the last one.
18  Q.  Well, was that part of a settlement --
19  A.  No.
20  Q.  -- that anybody could sit for it?
21  A.  I don't know how it happened, but it happened.
22  Q.  Well, did you sit for the one that Langley sat
23      for?

Page 48

1   A.  He didn't sit for any.  They just come got him
2       and made him captain.
3   Q.  Before the February of '06 battalion chief exam,
4       there were no other captain exams that you
5       remember other than the one that was sometime
6       around '96?
7   A.  Yes.
8   Q.  Is that correct what I said?
9   A.  That's correct.
10  Q.  And then there was a long period of time when
11      there was no lieutenant exams given?
12  A.  Yes.  They just started -- They didn't promote
13      any more lieutenants after '96.  Gerald was the
14      last one.  It was two left.  It was Gerald and
15      Andrew Terry Langley.  He was there.  He was
16      ahead of Gerald.  He was a senior lieutenant at
17      the time, and he retired and then Gerald became
18      a senior lieutenant.
19  Q.  Well --
20  A.  They started promoting team leaders.
21  Q.  And is it your testimony that the last
22      lieutenant exam, the one that Gerald sat for,
23      that there was both a seniority and a time in

Page 49

1    grade requirement?
2    A.  I'm going to elaborate on that.  When that
3        litigation was going on -- I'm not saying Gerald
4        is not qualified, but he was black first.
5        That's why they promoted him, because they had
6        been exposed about how they were treating us
7        down there and how they were promoting us.  I'm
8        talking about minorities, African-Americans.
9        And then they went right on -- In the complaint
10       they complained about it not being any black
11       team leaders.  They went right on and promoted
12       me after they promoted Gerald, and we have --
13       and they hadn't promoted a minority since -- an
14       African-American since then.
15   Q.  Well, are you saying you were promoted to team
16       leader because you were black?
17   A.  I didn't say I wasn't qualified, but yes.
18   Q.  And Gerald was promoted to lieutenant because he
19       was black?
20   A.  Yes.
21   Q.  Well, has there ever been another
22       African-American or black who sat for team
23       leader other than Chris Turner?

Page 50

1    A.  No.  There's no -- It's never been over seven or
2        eight that worked there at one time, and it's
3        not been over three worked there in the last --
4        full-time firefighters where they could have sat
5        for anything in the last twelve years.  Chief
6        Langley had made it known to me that he was
7        intending to hire some minorities.  He said, I
8        know I need to hire some blacks; I know I need
9        to hire some blacks.  When the opportunity
10       presented itself with two qualified guys --
11       that's Jeremy Patterson and William Thompkins --
12       he didn't hire them.  And they were from the
13       student program.
14   Q.  Okay.  I'm going to get to those in a minute,
15       but let me ask you this, Mr. Ogletree.
16       Since the court order that you've told me
17       about with Dexter and Jessie and Bill, has any
18       test or any promotion procedure at the fire
19       department required seniority or time in grade
20       since the settlement of those claims that they
21       made?
22   A.  Let me see.  I guess that battalion chief
23       promotion did because I guess that's how they

Page 51

1    got it:  Dean Garrett, Johnny Lawrence, Danny
2    Leverette, and the late Jimmy Brown, because --
3    All I know is Chief Garrett was my boss, and he
4    went up the hill one day with two bars on and he
5    came back with three and said, call me chief
6    now.  And to me that's a promotion, because they
7    take the same thing and turn around and tried to
8    test me for it when they gave it to them.
9    Q.  And that was when?
10   A.  That was in 2005, I believe.  Yeah, about 2004
11       or 2005.  I'm not sure on that date.
12   Q.  And when that occurred, there were no more
13       captains, were there?
14   A.  No.
15   Q.  And I think I've asked you this, but just for
16       the record, you didn't file an EEOC claim or
17       lawsuit over that?
18   A.  No.  That's kind of part of this.
19   Q.  Well, what is that part of this?
20   A.  Because of the inconsistency.  Test today,
21       interview tomorrow, somebody get gave a
22       promotion the next day.
23   Q.  Somebody what?

Page 52

1    A.  Get gave a promotion the next week.  And
2        coincidentally ain't nothing happened for
3        African-Americans down there.  And I know I'm
4        qualified, and I do my job.
5    Q.  Well, is there anybody that you know that sat
6        for the battalion chief promotion in '06 that
7        didn't think he was qualified?
8            MR. HORSLEY:  Object to the form.
9    A.  Yeah, I can't say.  I can't ...
10   Q.  Is there anybody that sat for that promotion in
11       February of '06 that didn't think he did his
12       job?
13           MR. HORSLEY:  Object to the form.
14   A.  I don't know that either.
15   Q.  Do you agree with me that there has to be some
16       procedure in place to decide who gets promoted?
17   A.  That's the key word:  Some procedure.
18   Q.  You agree with me, right?
19   A.  Some procedure, yes.
20   Q.  And do you agree with me that that procedure is
21       a responsibility of the City of Auburn?
22   A.  I don't know if I would agree with that.
23   Q.  Who should make the decision as to the

Page 53

1    procedure?
2    A.  Probably I would think that the men should have
3        a lot of input because we do the jobs every day.
4    Q.  So the folks that are -- the firefighters --
5    A.  Yes.
6    Q.  -- should decide what the procedure is for
7        promotion?
8    A.  Collectively, and send some up and -- I know
9        they would have the final say, but they should
10       have more input than they do.
11   Q.  Do you know of any fire department where the men
12       have the say-so as to who gets promoted?
13   A.  I can't answer that.
14   Q.  Well --
15   A.  I do know one thing, though:  The way they
16       tested us was unfair and discriminatory.
17   Q.  Because you didn't --
18   A.  No.  I talked to Mr. Lamar about it before.  I
19       was concerned about the test before he gave it,
20       if he recall, and he say don't worry about it;
21       you'll pass.  Chief Garrett had said they had
22       went through it and seen some of the questions
23       and had helped with the test.  I was concerned

Page 54

1        because they were battalion chiefs, and they
2        didn't take the test.  And I had been seeing too
3        much of this over the years.  I'm not a
4        complainer, but when something is wrong, it's
5        wrong.
6    Q.  You've seen too much of what over the years?
7    A.  Discrepancies in promotional procedures.  People
8        getting jobs that are not even being posted.
9        People go in and sit and interview and get a
10       job.
11   Q.  What promotions have there been when it wasn't
12       posted?
13   A.  Training chief in 2005.  That's when Lieutenant
14       Stephens filed that grievance.
15   Q.  Did you file a grievance?
16   A.  No.
17   Q.  Any other promotions that weren't, in your
18       opinion, posted?
19   A.  The battalion chief for Chief Garrett -- Chief
20       Leverette.
21   Q.  When the captains became battalion chiefs?
22   A.  It's a promotion to me.
23   Q.  Well, did you consider the team leader to

Page 55

1        lieutenant to be a promotion?
2    A.  Yes, I did.
3    Q.  Was that posted?
4    A.  No.  It was petitioned, but it wasn't posted.
5    Q.  Who is Jeremy Patterson and William Thompkins?
6        You said they were --
7    A.  They were in the student program.  They had been
8        the only two African-Americans besides one there,
9        and his name was Owny (phonetic), and he had
10       disciplinary problems.  I think he had gotten
11       into some trouble so he got fired.
12   Q.  When was Jeremy Patterson there?
13   A.  I want to say between 2003 and 2006 I believe
14       they were there, both of them.
15   Q.  And when was William Thompkins there?
16   A.  About the same time.
17   Q.  And why wasn't Patterson hired?
18   A.  I have no idea.  I wasn't privy to that
19       information.  I knew he did apply for a job.
20   Q.  Did he talk to you about why he wasn't hired?
21   A.  He thought it was because he was black.
22   Q.  Did he file a complaint or lawsuit or anything?
23   A.  No.  He went on and got his engineering degree

Page 56

1        and is working now.  William Thompkins thought
2        the same thing.
3    Q.  Thought he was black?
4    A.  Because he was black.  These guys were under my
5        immediate supervision for one time.  They
6        confided a lot in me, you know.
7    Q.  Have there been any white student firefighters
8        that weren't hired?
9    A.  I'm not concerned about that.  I --
10   Q.  I'm asking you that because it's really easy to
11       say I didn't get hired because I'm black.  You
12       can't say -- You tell me:  Are there any white
13       firefighter students that didn't get hired?
14   A.  Yes.
15   Q.  Did they not get hired because they were white?
16           MR. HORSLEY:  Object to the form.
17   A.  I don't know, but I know the ratio of the hiring
18       to minorities to the white students is
19       overwhelming.  It's about 95, 96 to one.
20   Q.  But you got hired?
21   A.  And I was told that I'm hiring you because
22       you're black.
23   Q.  Who told you that?

Page 57

1  A.  Chief Ellis Mitchell.  Before the federal
2      government tells me to hire some more blacks,
3      I'm hiring you.  He was proactive about the
4      situation.
5  Q.  Have you talked to Thompkins or Patterson --
6  A.  I haven't talked to Patterson.  I communicate
7      with Thompkins.  All of us are frat brothers --
8      fraternity brothers, but I just talk to him
9      about his job.  He calls me from time to time.
10 Q.  Where is he working now?
11 A.  He's in the Atlanta area.
12 Q.  Have you talked to Chief Langley about why
13     either one wasn't hired?
14 A.  No.  Chief Langley -- The only thing Chief
15     Langley used to tell me was I know I need to
16     hire some blacks, and I didn't have much
17     conversation.
18 Q.  When did you first learn about the battalion
19     chief promotion?
20 A.  They sent a letter out.  You have it, the same
21     letter you showed Gerald.
22 Q.  First of all, I'm going to show you what was
23     marked as Defendant's Exhibit Number 1 to

Page 58

1      Gerald's deposition.  That's the posted notice,
2      and it was posted, I think, February 16, 2006.
3          Did you see that when it went up?
4  A.  Yes, I did.
5  Q.  Did you see it about February 16?
6  A.  Somewhere around there.
7  Q.  Within a day or two?
8  A.  Uh-huh (positive response).
9  Q.  Yes?
10 A.  Yes, sir.
11 Q.  So you knew at that time there would be a
12     promotion procedure?
13 A.  Yes.
14 Q.  And Gerald said something about e-mails.  Do you
15     get e-mails?
16 A.  Yes.  We can read the City -- That's how we
17     communicate.
18 Q.  So did this come out -- this Number 1, did this
19     come out on an e-mail?
20 A.  I don't know if it came out on e-mail.  It
21     probably did, but I got mine from the chief.
22 Q.  The chief handed you one?
23 A.  Yeah, I got it.

Page 59

1  Q.  Which chief?
2  A.  Chief Langley.
3  Q.  Did you have any conversation with him when he
4      gave it to you?
5  A.  I might have -- I probably spoke to him.  I know
6      I spoke to him about the test I just said, you
7      know, because they was talking about giving a
8      test then because Chief Garrett had talked to me
9      about they were going over questions, and that
10     was my immediate supervisor.
11 Q.  So even before you got Defendant's Exhibit
12     Number 1, the notice, you had talked to Chief
13     Garrett --
14 A.  And he had said they had been working on a test
15     for battalion chief.
16 Q.  Did you ask him what was the test about or how
17     was it or what was he --
18 A.  He just said they threw out some questions.
19     They looked at some questions and determined
20     some questions that were good for the test and
21     all that.  And he made the statement to me that
22     he didn't think it was fair to us older guys
23     because it give the younger guys fresh out of

Page 60

1      college a better chance.
2  Q.  Dean Garrett told you that he did not think it
3      was fair to the older guys?
4  A.  Yeah.  He said he discussed this with Chief
5      Langley.
6  Q.  Well, what was there about it that he didn't
7      think was fair?
8  A.  Just the fact that they were testing us on that
9      type of material for the job, I guess.  That's
10     what I took it to mean.  And that you had guys
11     that were working on their master's degrees
12     where I hadn't picked up a book and studied like
13     that for years, that they probably were going to
14     have an advantage going in where I had to pick
15     up a book and start studying from that point of
16     getting the books and material and going
17     forward.
18 Q.  Well, he didn't say he didn't think it was going
19     to be fair to blacks.  He said he didn't think
20     it was going to be fair to the older guys?
21 A.  He said he didn't think it would be fair to the
22     older guys.
23 Q.  Who else was taking it that would be considered

Page 61

1    an older guy?
2    A. I guess he was talking about myself, Horace
3      Clanton, Robbie Hodge, Gerald Stephens.
4    Q. And Clanton and Hodge are white males?
5    A. Yes.
6    Q. Any other conversations you had with Dean
7      Garrett about the test other --
8    A. I was concerned that he had seen some of the
9      questions. I didn't say it to him, but I was
10     like, I thought they were going to order the
11     test from somebody.
12   Q. Well, do you know for a fact whether he saw
13     questions that were actually --
14   A. That was him telling me. I can't verify that.
15   Q. And you didn't tell him you were concerned that
16     he saw the questions?
17   A. I didn't say it to him. No, I didn't.
18   Q. What else did y'all actually discuss other than
19     you said he told you he had looked at some of
20     the questions, and he didn't think it was going
21     to be fair to the older guys?
22   A. That was about it.
23   Q. And then Chief Langley gives you Defendant's

Page 62

1      Exhibit Number 1?
2    A. Yes.
3    Q. And did you have any conversation with him about
4      the procedure at that point?
5    A. No, I didn't.
6    Q. I assume you received this memo, Defendant's
7      Exhibit Number 2, which is dated February 17
8      that tells you who can be eligible and that a
9      written exam will be part of the assessment
10     process. Did you receive that?
11   A. Yes.
12   Q. And was that e-mailed to you or posted?
13   A. I think I got mine e-mailed.
14   Q. Does it come e-mail to your house?
15   A. Everybody got e-mail, and they just click -- all
16     the officers, and they just click on the
17     computer.
18   Q. So you would have probably received that
19     February 17 --
20   A. Yeah. If I was on duty.
21   Q. If you weren't on duty, the next time --
22   A. The next day, yeah.
23   Q. At that point did you make any complaints to

Page 63

1      anybody about the written test?
2    A. No. It was about 30 days later when I went to
3      pick up my books, 30-something days later. I
4      just mentioned it to Chief Lamar there that -- I
5      said, a test, you know. It just kind of like --
6      You know, it bothered me.
7    Q. Well, I'm going to get to that. But as a result
8      of this February 17, 2006 Defendant's Exhibit
9      Number 2, did you make any complaints to anybody
10     about having to take a written test?
11   A. No. We talked -- It was two or three of us
12     talked among ourselves, the other older guys:
13     Horace Clanton, Robbie Hodge.
14   Q. And y'all didn't want to take a written test?
15   A. We just didn't think it was right.
16   Q. Y'all probably wanted it to be seniority, didn't
17     you?
18   A. Not just necessarily seniority, but if you're
19     going to give a written test, let it count for a
20     certain percentage and let you move on to the
21     next phase. My particular thing is that cutoff
22     score that the City imposed.
23   Q. Do you think it's too high or too low?

Page 64

1    A. That's the first time they ever gave a test with
2      a cutoff score.
3    Q. How do you know the City imposed that?
4    A. I got paperwork that says it imposed it.
5    Q. What do you think the cutoff score should have
6      been?
7          MR. HORSLEY: Object to the form.
8    A. I have no idea. That's something they had to
9      have experts determine.
10   Q. Well, do you know whether or not the City had
11     any expert to determine the cutoff score?
12   A. Thirty days.
13   Q. What?
14   A. No. I don't believe they did.
15   Q. Why don't you believe that?
16   A. Because it plainly states in our grievance
17     hearing that the City chose to impose a 70,
18     which is the cutoff score.
19   Q. Do you know Mr. Hancock here down at the end of
20     the table?
21   A. Yes, I do.
22   Q. Have you had any conversations with Mr. Hancock
23     about the cutoff score?

Page 65

1   A. No, I haven't.
2   Q. Have you had any conversations with Mr. Hancock
3       about who came up with the 70 percent figure?
4   A. No.
5   Q. Have you had any conversations with him about
6       who imposed the cutoff?
7   A. No.
8   Q. Let me show you Defendant's Exhibit Number 3,
9       which is a memo dated February 23, 2006 that
10      opened it up to others that were not
11      non-probationary lieutenants.
12  A. Yes. That's about the time.
13  Q. And you would have received that on or about
14      February 23, 2006?
15  A. Yes.
16  Q. And did you make any complaints to anybody about
17      that?
18  A. No. It kind of struck me that -- Probationary
19      lieutenants, that kind of struck me, because the
20      City policy states that probationary employees
21      in the fire department can't be eligible for a
22      promotion within a year.
23  Q. Back up.

Page 66

1       The City policy says what?
2   A. That -- In the fire and the police department,
3       that if you work for them and you go from one
4       rank to the next, you can't be eligible for a
5       promotion until after you complete that -- you
6       have to do a year in that promotion step to be
7       able to apply for the next promotion. Now, the
8       fire department policy I guess states another
9       thing, but the City policy states what I just
10      told you.
11  Q. So according to the City policy, in order to
12      apply for promotion, as you understand it, to
13      battalion chief, you would have had to have been
14      in what position for a year?
15  A. Lieutenant's position for a year.
16  Q. Were you in the lieutenant's position for a
17      year?
18  A. No. That's why I was satisfied with the team
19      leader. I was eligible as team leader.
20  Q. Well, was there anybody -- a team leader or
21      lieutenant that had not been there for a year?
22  A. All of us had been there for a year, but we went
23      from team leader to lieutenant.

Page 67

1   Q. That's my question. Are you saying only people
2       who had been lieutenants for a year should have
3       been eligible for battalion chief?
4   A. It's not me saying it. That's City policy.
5   Q. And you agree with the City policy is what
6       you're saying?
7          MR. HORSLEY: Object to the form.
8   A. I work for the City. I just work --
9   Q. Here's where I'm confused. Are you saying you
10      should or should have not been eligible?
11  A. If those guys were eligible, I should have been.
12  Q. I'm not asking about those guys.
13  A. Yeah, I was eligible.
14  Q. Why were you eligible?
15  A. I wasn't eligible according to the City policy.
16  Q. You were not?
17  A. But I was eligible according to this memo from
18      Chief Langley.
19  Q. All right. You were not eligible to apply for
20      battalion chief per City policy?
21  A. Yeah.
22  Q. And why is that, because you had not been a
23      lieutenant for a year?

Page 68

1   A. City policy states if you work for the fire
2       department or police department and you go from
3       one position to the next that you can't be
4       eligible for a promotion to within a year's
5       period.
6   Q. So, then, the only two people that would have
7       been eligible for promotion to battalion chief
8       would have been Gerald Stephens and Chris
9       Turner? Is that your position?
10  A. Yes.
11         MR. HORSLEY: Is this a decent time
12             for a break?
13         MR. MORGAN: Sure.
14         (Brief recess.)
15  Q. (Continuing by Mr. Morgan) Let me show you
16      Defendant's Exhibit Number 4, which I think is
17      the sign-in sheet for the orientation. Did you
18      attend the orientation?
19  A. Yes, I did.
20  Q. Who was present?
21  A. It was all of these guys except -- I think just
22      about everybody was present that signed off on
23      here.

Page 69

1    MR. HANCOCK: Randall, let me
2        interrupt. The exhibits you're
3        referring to, are those the
4        exhibits to Mr. Stephens'
5        deposition?
6    MR. MORGAN: They are.
7    MR. HANCOCK: Are you going to attach
8        those to this or do you want to
9        have one set?
10   MR. MORGAN: My intention was to just
11       keep the same numbers going.
12   MR. HANCOCK: I just --
13   MR. MORGAN: I don't see any need to
14       renumber and put extra exhibits in
15       there.
16   MR. HANCOCK: Okay.
17   MR. HORSLEY: I agree.
18   Q. Who was there --
19   A. Dennis might have not been there, because he
20       didn't take the test.
21   Q. Who was there to explain what was going on or
22       what was going to happen?
23   A. I don't remember the guy's name, but he got up

Page 70

1    on stage. And I believe Mr. Reeves was there
2    and Chief Lamar was there.
3    Q. The guy that got up on stage --
4    A. He was a representative from CWH.
5        (Off-the-record discussion.)
6    Q. How long did the orientation session last?
7    A. I want to say about an hour. You could give or
8        take.
9    Q. And what do you remember Steve Reeves saying?
10   A. I believe he just passed out some things for us,
11       and they got our signature. Took up our
12       signature. And the guy from CWH kind of took
13       the show and started explaining the different
14       parts of the test and thing.
15   Q. And then what do you remember Lee Lamar saying
16       or doing?
17   A. I can't remember if he did anything or said
18       anything.
19   Q. And the guy from CWH I guess explained the
20       assessment process?
21   A. Yeah, that's what he did.
22   Q. And did he explain the written test?
23   A. Yes. He went through some parts of it and how

Page 71

1    it worked, you know. That's all I remember him
2    doing.
3    Q. Did he tell you there would be a cutoff score?
4    A. Not to my knowledge.
5    Q. When did you learn there would be a cutoff
6        score?
7    A. I think Mr. Lamar told me that it would be --
8        you would have to make a 70. I'm not sure when
9        it was.
10   Q. Was it before or after this orientation?
11   A. I don't know if it was before or after. I can't
12       really recall.
13   Q. Well, did the guy that was from CWH --
14       I assume you don't remember his name?
15   A. No, I don't.
16   Q. -- did he indicate to you that certain people
17       would not be allowed to go to the second part of
18       the procedure?
19   A. Not to my knowledge.
20   Q. What do you remember him telling you about the
21       written test?
22   A. He just explained the different components and
23       how they go about making the test. He told us

Page 72

1    about the company. I kind of -- it kind of -- I
2    mentioned it to one of the guys when we left.
3    It looked like to me he was up there touting his
4    own successes more than really trying to fill us
5    in on anything.
6    Q. Well, did he tell you what procedure had been
7        used to come up with the written test?
8    A. He might have. I can't say if he did or didn't.
9    Q. And did he tell you what the next part of the
10       test was after the written part?
11   A. No, he didn't. Chief Lamar and them had said it
12       was the assessment part. I knew it was an
13       assessment part because everybody that's
14       there -- every guy promoted was familiar with
15       in-baskets because we did that in the structured
16       interviews. It was more like hands-on,
17       job-related stuff that you did every day.
18   Q. So let me be clear. Was it your understanding
19       that you would take a written test --
20   A. Yeah.
21   Q. -- and then --
22   A. Assessment.
23   Q. But your testimony is that you didn't understand

Page 73

1    that not everybody would get to go to the
2    assessment part?
3    A.  I didn't know when I learned of the 70. I can't
4        say --
5    Q.  It could have been before or it could have been
6        after?
7    A.  That's right.
8    Q.  You certainly knew it by the time you took the
9        test?
10   A.  Yeah, I knew it by the time I took it.
11   Q.  Defendant's Exhibit Number 5, it says Auburn
12       Fire Division Orientation Manual, Promotional
13       Written Test, and Assessment Center.
14           I assume you were given that at the
15       orientation session?
16   A.  Yes.
17   Q.  And who handed that out?
18   A.  I couldn't say who handed it out, but I do have
19       it.
20   Q.  And did the person from CWH go over this with
21       you?
22   A.  Yeah. He went over -- this is what -- He went
23       over brief parts of it. He just touched on each

Page 74

1    part of it.
2    Q.  Did he go over it page by page?
3    A.  I believe he had a slide show up there, and he
4        was punching it. And he was going to certain
5        topics and going through -- he touched on the
6        whole book.
7    Q.  For instance, I just happened to turn to
8        strategies for taking the test. Would he have a
9        slide up that would say strategies for taking
10       the test and have these things --
11   A.  He had some of them. I don't know -- I can't
12       recall exactly what he did show us, but I know
13       he gave me this packet because I have it. And
14       we went through, and he touched on different
15       topics.
16   Q.  And that book is something you were able to take
17       home with you?
18   A.  Yes.
19   Q.  Did you make any complaints that day to CWH,
20       Steve, or Lee Lamar about the procedure?
21   A.  Not the day of -- Talking about of orientation?
22   Q.  Yeah. March 3 --
23   A.  No, I didn't.

Page 75

1    Q.  -- 2006.
2    A.  Like I said, I mentioned -- the only thing I
3        mentioned was I was concerned about it to
4        Mr. Lamar the day I signed for those books.
5    Q.  And that's going to be after this actually,
6        March 3.
7    A.  Okay. It was after.
8    Q.  But the day when you had -- when there was the
9        orientation and you had the guy that was there
10       that was explaining the test and the assessment
11       center, Steve and Lee Lamar, you didn't make any
12       objection --
13   A.  No.
14   Q.  -- at that point about any of the process, did
15       you?
16   A.  No.
17   Q.  Now, here is a document dated -- Defendant's
18       Exhibit 6 dated March 3, 2006. I assume you
19       remember receiving that document.
20   A.  Yes.
21   Q.  Is that another one that came out via e-mail?
22   A.  It probably did, but I know I got a copy of
23       this. I can't say if it came --

Page 76

1    Q.  On or about March 3, 2006?
2    A.  Yes.
3    Q.  And in here it clearly states that -- I say it
4        does. Does this tell you about a cutoff score?
5    A.  Yeah. Minimum score of 70 must be achieved. So
6        if I got this, I learned about it around about
7        this time.
8    Q.  You don't remember if you knew about it before,
9        but you knew about it for certain by March 3,
10       2006?
11   A.  Yeah, thereabouts. Because if I wasn't on duty,
12       I didn't get it that day but the next day.
13   Q.  So within --
14   A.  One or two days either way.
15   Q.  So we know for certain you knew about it by
16       then?
17   A.  Yes, sir.
18   Q.  And whether you knew about it before, you just
19       can't remember?
20   A.  I don't know.
21   Q.  When you received this March 3 memo from Lee
22       Lamar, did you complain to anybody at that time
23       about the cutoff score?

Page 77

1    A.  If he gave it to me, that's the day I spoke to
2        him.  That would be around about the day I spoke
3        to him about I was concerned about taking the
4        test with the score -- the cutoff score.
5    Q.  Let's see.  This is March 3, 2006 when you
6        picked up your stuff.  This is Defendant's
7        Exhibit 7.  And then Defendant's Exhibit 8 I
8        think is where you actually signed on March 3,
9        2006 that that's when you got your stuff.
10   A.  That would have been the day I spoke with him
11       (indicating).
12   Q.  What did you say to Mr. --
13   A.  I just kind of said, a test; I don't know.  He
14       said, well, you're a smart guy; you'll pass it.
15       And I said, well, I just don't know.  And I just
16       kind of walked out and left with the books.
17   Q.  Did you say anything more definitive to him
18       than, a test; I don't know?
19   A.  I didn't say anything other than that.  He just
20       kind of acknowledged it, and I kind of
21       acknowledged it and turned around and walked
22       out.
23   Q.  So the only thing you said to him was, a test; I

Page 78

1        don't know?
2    A.  Yeah.
3    Q.  That's when you signed that you received the
4        book, and that's the day that Lee would have
5        handed you that piece of paper telling you about
6        the test?
7    A.  Yes.
8    Q.  And you said, a test; I don't know?
9    A.  Yes.
10            (Defendant's Exhibit 14 marked for
11            identification.)
12   Q.  Let me show you Defendant's Exhibit 14.  Is this
13       your application for the battalion chief
14       promotion?
15   A.  Yes.
16   Q.  I think the test was given April 10 of 2006.
17   A.  Somewhere thereabouts.
18   Q.  Tell me what you did to study for the test.
19       What did you do?
20   A.  I believe it was three or four different books.
21       I went through and read the chapters, and I
22       really put some time in.  I studied.  My wife
23       was kind of worried about me I was studying so

Page 79

1        hard at the dining room table.  You know, I seen
2        a lot of material, went over a lot of material.
3        And as I was studying, I was like, you know, a
4        lot of this stuff is for -- to me, it seemed
5        like it was for bigger departments.  And it
6        really strayed away from what we really do
7        actually day-to-day operations with all the --
8    Q.  Wait.  When you were studying, you were doing
9        what, now?
10   A.  I said I did a lot of reading, and my wife got a
11       little worried about it because I was trying to
12       study so hard and make sure I did as well as I
13       could on the test.
14   Q.  But you thought something was getting away?
15   A.  The material that we was reading, chief officers
16       and stuff, a lot of that to me seemed like it
17       was for maybe a department the size of
18       Montgomery where it had district chiefs.  You
19       know, you had a bigger rank structure.
20   Q.  Well, are these the books that you had that the
21       City gave you:  IFSTA Chief Officer?
22   A.  Yes.
23   Q.  You read that book?

Page 80

1    A.  Yeah.  I read chapters.  I didn't read all of
2        it.  I read most of it.
3    Q.  You didn't read it all, but you read most of it?
4    A.  Yes.
5    Q.  And you decided that that book didn't apply to
6        the City of Auburn?
7    A.  I didn't decide.  I said --
8            MR. HORSLEY:  Object to the form.
9    A.  I didn't decide.  I just said to myself that
10       some of this stuff looked like it was a bit much
11       for the department a size of Auburn.  That
12       didn't stop me from trying to read and
13       comprehend it.
14   Q.  What was there in the IFSTA Chief Officer book
15       that you thought was a bit much for the City of
16       Auburn?
17   A.  A lot of that was pertaining to more of a
18       district chief.
19   Q.  What's the difference in a district chief and a
20       battalion chief?
21   A.  A district chief runs an entire quadrant of a
22       city.
23   Q.  And what does a battalion chief do?

Page 81

1   A.  Battalion chief just oversees about three to
2       four stations.  We don't have but five stations,
3       and that's what he does.  But, you know, it was
4       a lot more responsibility.
5   Q.  For who?
6   A.  A district chief has a lot more responsibility.
7   Q.  So you thought the IFSTA Chief Officer referred
8       more to a larger city and district chiefs?
9   A.  Yeah, I did.  I'm not a expert, but that's what
10      I thought.
11  Q.  Did you complain to anybody about that before
12      the written test?
13  A.  No.  I just read.  I just studied my material.
14  Q.  And did you read the Effective Supervisory
15      Practices?
16  A.  Yes.
17  Q.  Now, had you had that book before?
18  A.  Yes.
19  Q.  Where all had you had that before?
20  A.  That was a class that the City puts on and
21      requires the employees to go to that's in
22      supervisory positions.
23  Q.  You had already had that?

Page 82

1   A.  Yes.
2   Q.  And then that was another book that you were
3       given to review?
4   A.  Yes.
5   Q.  Because questions were going to come from it on
6       this test?
7   A.  Yes.
8   Q.  Was there anything about that book that you
9       didn't think applied to the battalion chief
10      promotion?
11  A.  No.  That was kind of good.
12  Q.  And did you read that whole book or just parts
13      of it?
14  A.  Parts of it because I took that class, and I was
15      pretty familiar with it.
16  Q.  And then you had the Fire Officers Handbook of
17      Tactics?
18  A.  Yeah.
19  Q.  Did you read that book?
20  A.  Yes.  I read some parts of it.
21  Q.  Had you been exposed to that book before?
22  A.  No.  Not that book per se but some tactics and
23      firefighting books.

Page 83

1   Q.  And you read parts of it?
2   A.  Yes.
3   Q.  How did you decide what parts you were going to
4       read?
5   A.  I just -- You know, everybody got strong and
6       weak areas in stuff they do, and I looked at
7       things that I wasn't quite sure of.  Some things
8       I knew.  Some things I wasn't quite sure of, and
9       I read those.  I spent a little more time --
10      when I say -- I spent more time on some things
11      than others.
12  Q.  So if you thought you knew it, you didn't spend
13      as much time on it?
14  A.  Yes.
15  Q.  And you had had some exposure, maybe not to this
16      book, but to the tactics books?
17  A.  Yes.
18  Q.  As you reviewed this Fire Officers' Handbook of
19      Tactics, was there anything in this book you
20      didn't think applied to the City of Auburn?
21  A.  No.
22  Q.  You thought that book was applicable to what
23      went on at Auburn?

Page 84

1   A.  Yes.  Because you got -- any different structure
2       fire going to be different.  So that was more
3       telling you about attacks and plans.
4   Q.  And that's pretty uniform?
5   A.  Pretty uniform.
6   Q.  And then the fourth book was Structural
7       Firefighting?
8   A.  Yeah.  That's another one that's pretty true to
9       form too.
10  Q.  That's a uniform book?
11  A.  Yeah.
12  Q.  Were you exposed to that book before at the City
13      of Auburn?
14  A.  Not -- I've took some classes -- You know, you
15      got a little building construction and stuff and
16      components of different classes I took over the
17      years.  It was made up of that.
18  Q.  And you thought that book was applicable to what
19      went on at the City of Auburn?
20  A.  Yeah.
21  Q.  Did you form any study groups with anybody?
22  A.  No.  I just studied at home.
23  Q.  Did you study anything other than the -- I

Page 85

1  assume that's the four books that were given to
2  you by the City for this?
3  A.  Yes.
4  Q.  Did you study anything other than those four
5  books in preparation for the exam?
6  A.  No, I did not.
7  Q.  Because you understood the questions were going
8  to come from those books?
9  A.  Yes.  That's what I understood.
10  Q.  Y'all were told that in the orientation, were
11  you not?
12  A.  I don't remember him saying it just like you
13  said it, but we just assumed that those books
14  were going to cover the test.
15  Q.  So you reviewed those books, read some of them.
16  You studied at home.  Anything else you did in
17  preparation for the test?
18  A.  No.  Other than all the years of going to the
19  fire college and going to the National Fire
20  Academy for advanced training.  Other than
21  that ...
22  Q.  Your experience?
23  A.  Yes.

Page 86

1  Q.  You said you went to the fire college and where
2  else?
3  A.  I went -- Yeah, the fire college.  I went to the
4  National Fire Academy at Emmitsburg, Maryland.
5  Q.  How many times have you been to the fire
6  college?
7  A.  Several.  I've been up there about three or four
8  times, but a lot of classes now are taught in
9  the field so we don't really have to go up
10  there.  But they are certified through the fire
11  college so we get a lot of that in regional
12  training.
13  Q.  Do they give tests when you complete those
14  courses at the fire college?
15  A.  Yes.  After a week or two weeks of going over.
16  Q.  You get a written test?
17  A.  Yes.
18  Q.  Does the written test have a passing score?
19  A.  Yes.
20  Q.  And what's the passing score on those written
21  tests?
22  A.  It's a 70.
23  Q.  And how about at the National Fire Academy in

Page 87

1  Maryland?  Do they give written tests there?
2  A.  No.
3  Q.  Do they give you any kind of test?
4  A.  You have homework, and they go over with you --
5  they are more of making sure you learn it than
6  test your abilities after you come -- the
7  classes I took.  I don't know in the executive
8  fire officer classes what they do, but they give
9  you projects.
10  Q.  So they don't test what they've taught you?
11  A.  No.  I haven't took one up there.
12  Q.  Do you get any certification or anything from
13  them?
14  A.  Yes.
15  Q.  So then the test, I guess, is April 10 of 2006?
16  A.  Somewhere thereabouts.
17  Q.  Do you remember what time it started?
18  A.  I couldn't say.  I want to say about nine in the
19  morning.
20  Q.  And who was there to sort of be the proctor to
21  oversee the test, give it out?
22  A.  I want to say it was people from the human
23  resources department.  I don't know if it was

Page 88

1  Mr. Reeves -- I can't recall -- or Stephanie
2  King.  It was people from the human resource
3  department, though, that passed out ...
4  Q.  Was there anybody there from CWH?
5  A.  I can't recall.
6  Q.  Do you remember how long you had to take the
7  test?
8  A.  I believe it was three hours.
9  Q.  And this --
10  A.  I don't know for sure, but I believe it was
11  three hours.
12  Q.  And this was strictly a written test?
13  A.  Strictly a written test.
14  Q.  And you knew at that time you had to have a
15  70 --
16  A.  Yes.
17  Q.  -- to go forward?
18  A.  When we sat down there, we knew.
19  Q.  Do you remember how long it took you to take the
20  test?
21  A.  About two hours and thirty minutes, somewhere
22  thereabouts.
23  Q.  Who was the first one finished?

Page 89

1  A. I couldn't say.
2  Q. Were you the second one to finish?
3  A. No.
4  Q. And when you completed the test that day with
5     the human resources people there, did you make
6     any complaints to anybody at that time about the
7     written test?
8  A. Not to anybody that was in authority. Some of
9     the guys talked when we left about we thought it
10    was vague.
11 Q. But nobody -- you didn't complain to any of the
12    people that you've sued --
13 A. No.
14 Q. -- in this lawsuit --
15 A. No.
16 Q. -- or anybody with human resources?
17 A. No.
18 Q. Did you ever complain to anybody that you've
19    sued or with human resources before you learned
20    you had not passed the test?
21 A. No.
22 Q. Did anybody that you talked to think they had
23    done well?

Page 90

1  A. Like I said, everybody thought it was kind of
2     vague and not real poignant. If you answered
3     something right, sometime you might not knew
4     it. But it was different from the test that you
5     take at the fire college. It was just
6     different.
7  Q. Well, how was it different?
8  A. It was the same format, I mean, multiple choice,
9     but it was just different.
10 Q. Well, did you think the questions were related
11    to what a battalion chief would do in the Auburn
12    Fire Department?
13       MR. HORSLEY: Object to the form.
14 A. No.
15 Q. Well, did you know what a battalion chief did in
16    the Auburn Fire Department?
17 A. Yes.
18 Q. How did you know that?
19 A. I do it.
20 Q. You do the same thing as a battalion chief?
21 A. Yes. I was acting battalion chief a couple of
22    weeks ago for a week.
23 Q. Before this test did you know what a battalion

Page 91

1  chief did?
2  A. Yes, I did.
3  Q. And did you serve as an acting battalion chief
4     before this test?
5  A. Yes. When Chief Garrett was out, I would have
6     to go to headquarters and run the shift.
7  Q. Tell me what a battalion chief does
8  A. This is layman's terms -- layman terms.
9     Responsible for getting out all the
10    communications that day, making sure the
11    training gets done on shift, making sure that if
12    any trucks are down and something that we can
13    fix, that we get it took care of. They are in
14    charge of responding to all fires and
15    emergency-type situations and taking control of
16    the scene and dispersing their manpower and
17    other resources in the City we may need.
18    They're just really the overseer. They take
19    care of everything, you know.
20 Q. Do they have supervisory responsibilities?
21 A. Yes, they do. They are the top of the food
22    chain besides the administrative part.
23 Q. And you did not think that the questions on the

Page 92

1  test related to what a battalion chief did in
2  Auburn, Alabama?
3  A. It wasn't all of them. It was some of them.
4  Q. Well, what percent of the test did you think did
5     not relate to what you do in Auburn?
6       MR. HORSLEY: Object to the form.
7  A. Not expert, but about 35 to 40 percent.
8  Q. The 35 or 40 percent that you did not think
9     related to what a battalion chief did in the
10    City of Auburn, did those questions relate to
11    supervision of employees?
12      MR. HORSLEY: Object to the form.
13 A. I wouldn't say all of them.
14 Q. But some percent of those would relate to
15    supervision?
16 A. Yeah. Yes.
17 Q. Well, what kind of questions were there that you
18    didn't think related to what a battalion chief
19    did or to supervision? What were the other kind
20    of questions on there that you didn't think
21    related to one of those two subjects?
22      MR. HORSLEY: Object to the form.
23 A. Probably some of the structural firefighting

Page 93

1   questions, because we have very little -- we're
2   not Boston or New York. We have very little --
3   We have a few high-rise. We don't have those
4   type high-rise. We don't have those type of
5   warehouses, stuff like that. It was some on
6   there -- I don't remember exactly what questions
7   it were, but it was a lot of them on there.
8 Q. There were questions on there about high-rises
9   and warehouses?
10 A. It was just how you attack those, as I
11   remember. How you structurally fight fire on
12   those. It would be -- In other words, it would
13   be larger scale operations than we would be used
14   to.
15 Q. And you knew from your conversation with Dean
16   Garrett, I guess, that the battalion chiefs had
17   looked at some of the questions or areas to be
18   questioned?
19 A. That's what he told me.
20 Q. Any other areas of the test that you didn't
21   think applied to Auburn or supervision other
22   than the ones that related to high-rises or
23   warehouses?

Page 94

1      MR. HORSLEY: Object to the form.
2 A. No.
3 Q. And what was the problem with the warehouses?
4   Don't they have warehouses in Auburn?
5 A. Yeah. But I'm saying -- you're talking about
6   warehouses that cover two or three city blocks.
7   It seemed to be questions on there about -- we
8   didn't -- Some of those questions seemed to me
9   to call for more apparatus than we were ever
10   going to have or more manpower.
11 Q. Any other complaints you had about the written
12   test that day?
13 A. That day?
14 Q. I mean --
15 A. I just didn't think it was fair.
16 Q. But you didn't express that to anybody other --
17 A. Of authority. Nobody of authority.
18 Q. And all the people that talked about it said
19   they thought it was vague?
20 A. Yes.
21 Q. What did you mean by vague?
22 A. Just, you know -- It just didn't kind of fit
23   Auburn. It just didn't fit what we was used to

Page 95

1   doing.
2 Q. Who all thought it was vague?
3 A. The same older officers I talked to.
4 Q. The older officers?
5 A. Yeah. Lieutenant Clanton, Lieutenant Hodge, we
6   spoke about it.
7 Q. Clanton, Hodge, and you. Y'all thought it was
8   vague?
9 A. Yes.
10 Q. Did you challenge any of the test questions?
11 A. I think Joey did. Chief Darby did that. I
12   think he was the one that -- I know some
13   questions were being challenged, and later on I
14   come to find out I believe he was the one doing
15   it.
16 Q. Did you challenge any questions?
17 A. No, I did not.
18 Q. Before filing the grievance, did you ever
19   complain to anybody that you've sued in this
20   lawsuit --
21 A. Yes.
22 Q. -- about the written test --
23 A. Yes.

Page 96

1 Q. -- being unfair?
2 A. Yes.
3 Q. And to whom did you complain?
4 A. The day I was talking to Chief Langley and Chief
5   Lamar walked in, and I told him to come on in
6   too. I don't know if he was paying me much
7   attention, but I was complaining to chief that
8   day.
9 Q. What day?
10 A. It was after we took the test. It was about a
11   couple of days after we took the test. And
12   I just told them I didn't think the process was
13   fair.
14 Q. Well, did you tell them what was unfair about
15   the process?
16 A. Yes. People that got promoted to battalion
17   chief before me and didn't take a test.
18 Q. Well, did you ever tell anybody you thought it
19   discriminated against you because you were
20   black?
21 A. Yes, I did. All the black guys, we didn't have
22   a chance to be promoted. Obviously it
23   discriminated against us because we was black.

Deposition of Eddie Ogletree                                                          June 6, 2008

Page 97

1  Q. Did you explain --
2  A. Every time it comes time for -- at that
3      department for a black guy to move up on
4      experience and seniority, the rules change. You
5      can go back to when Lieutenant Felton and
6      Lieutenant Strickland had to file that lawsuit.
7      It was about the same thing: Being promoted
8      from lieutenant up to a higher rank.
9  Q. When is the first time that you complained to
10     any of the people that you've sued in this
11     lawsuit that you thought that test discriminated
12     against you because you were black?
13 A. I said it was unfair at the time.
14 Q. I know you said unfair. I mean specifically
15     complained that this test discriminates against
16     me because I'm black. When is the first time
17     you told anybody you sued that?
18         MR. HORSLEY: Your question was this
19         test discriminates against me, not
20         the whole promotional process?
21         MR. MORGAN: Anything. I don't care
22         what you call it.
23         MR. HORSLEY: Don't answer --

Page 98

1          MR. MORGAN: Well, I want to make
2          sure --
3          MR. HORSLEY: I don't want him to
4          answer anything.
5  Q. Anytime you complained about the test, the
6      procedure, or anything discriminating against
7      you because you were black.
8  A. We was talking about the process, and we talked
9      amongst ourselves before we filed the grievance
10     that -- Me and Lieutenant Stephens talked among
11     ourselves about the situation and from our
12     perspective. There were three blacks down
13     there. Every time -- I'm looking at four white
14     guys that just got promoted to battalion chief
15     and retired. Me and him looking at one another
16     like, now, you're a senior man; I'm a senior
17     man; the only thing we got in common is that and
18     we're black so it look like we just don't get a
19     shake; they are doing this on purpose.
20 Q. And did Horace Clanton and Robbie Hodge think
21     they were being discriminated against?
22         MR. HORSLEY: Object to the form.
23 A. I have no idea. I didn't talk to them about --

Page 99

1      They was worried more about the time in grade
2      policy and the inconsistencies.
3  Q. Weren't they senior men?
4  A. Yeah. They were more concerned about the
5      inconsistencies that we stated in the letter,
6      that some people can take a test to move up and
7      some people get gave their jobs, and some people
8      just walk up there one day and come back and
9      they are your boss.
10 Q. Well, did they think that they were -- that test
11     was unfair?
12         MR. HORSLEY: Object to the form.
13 A. I have no idea. You'll have to ask them that.
14 Q. Well, you did ask them, didn't you? Didn't
15     y'all meet and sign the letter together and go
16     through the procedure?
17 A. They didn't like the process no more than we did.
18 Q. Well, of the people that you've sued in this
19     lawsuit -- While I'm thinking about it, what's
20     the basis of Cortez Lawrence being sued? Did he
21     have anything to do with this battalion chief
22     promotion?
23 A. He didn't have anything to do with the battalion

Page 100

1      chief promotion.
2  Q. He wasn't there? Been gone for years, hadn't
3      he?
4  A. The only thing he got to do with this is they
5      are still using his policies and procedures,
6      which definitely discriminates against
7      African-Americans being hired at that fire
8      department.
9  Q. What policy and procedures --
10 A. Student firefighter program.
11 Q. You think -- The student firefighter program,
12     that's Cortez Lawrence's policy and procedure --
13 A. It's his program.
14 Q. -- program?
15     And you say it discriminates against blacks
16     being hired?
17 A. Yes.
18 Q. And that procedure has been in effect how long?
19 A. For about 13, 14 years.
20 Q. And you know Gerald Stephens went through that
21     procedure?
22 A. Yes. It's a couple of blacks have been -- two,
23     three, four. But if you look at the ratio and

Page 101

1      the numbers, it has a definite effect.
2  Q.  Well, is it not true that you never challenged
3      that procedure when it was first implemented?
4  A.  They had it in the lawsuit -- the old lawsuit.
5      It's in the old lawsuit.
6  Q.  Did you ever --
7  A.  I didn't challenge it.
8  Q.  Did you challenge it in the 1990s at all?  Did
9      you ever make a complaint or file a lawsuit
10     about the --
11 A.  No, I did not.
12 Q.  So the only thing with Cortez Lawrence is that
13     the City is still using his procedures or
14     policies on the student firefighter program?
15 A.  Yes.
16 Q.  And that's in hiring?
17 A.  Yes.
18 Q.  And he's been gone for at least, what, seven or
19     eight years?
20 A.  Yes.
21 Q.  He had nothing to do with the battalion chief?
22 A.  No, he did not.  Not to my knowledge.
23 Q.  So going back to my question:  When is the first

Page 102

1      time that you complained to somebody that you've
2      sued that you thought that this test or
3      procedure, the process, discriminated against
4      you on the basis of your race?
5  A.  I know we filed -- We didn't put -- state that
6      particularly in the first couple of letters, but
7      it was stated about blacks being promoted and
8      hired in the last letter that we sent out, I
9      think.  It should be in one of your --
10 Q.  The last letters --
11 A.  It's one of the letters in the grievance process
12     we sent back and forth, back and forth.  And it
13     was stated in the letter that if they would
14     carefully check in their records, no
15     African-American firefighter has been promoted
16     or hired in the past twelve years.
17 Q.  That's in one of the letters in the grievance
18     process?
19 A.  Yes, it is.  So it went to everybody.  It went
20     to the people that was our immediate
21     supervisors.
22 Q.  Let me show you what I marked as Defendant's
23     Exhibit 15, which is obviously an incorrect

Page 103

1      date.
2          (Defendant's Exhibit 15 marked for
3           identification.)
4  Q.  But did you receive that from --
5  A.  Yes, I did.
6  Q.  -- from somebody?
7  A.  I received one, but it wasn't April 4.  I don't
8      know --
9  Q.  Yeah.  It's a different date.
10 A.  It's a different date.
11 Q.  In fact, you probably received this one first.
12     Defendant's Exhibit 16, do you remember
13     receiving that, which is the -- telling you
14     about that you hadn't scored --
15 A.  Yes.
16 Q.  -- 70?
17         (Defendant's Exhibit 16 marked for
18          identification.)
19 Q.  And then you received 15 probably after this but
20     at some point, which is a candidate feedback
21     report regarding the written test.  And it says
22     if you have any questions, please contact me
23     directly.

Page 104

1      Did you contact Steve Reeves after you
2      received the candidate feedback report?
3  A.  If my memory serve me correct, we briefly went
4      over this with -- I'm trying -- I don't know if
5      it was Mr. Reeves -- and tried to explain some
6      of this to us.  But everybody left there was
7      like still -- we went in and didn't know
8      nothing, and we left and didn't know nothing.
9  Q.  Let's talk about that meeting.  Who was that --
10 A.  I know they tried to explain -- somebody tried
11     to explain this to us because -- when they were
12     sent back after the challenge.  I can't say it
13     was Mr. Reeves.  It might have been, since
14     that's part of his duties in his capacity of
15     HR.  But somebody did go over this with us.
16 Q.  Went over your candidate feedback?
17 A.  Yes.
18 Q.  Did they go over it just with you --
19 A.  No.
20 Q.  -- or with everybody?
21 A.  Yes.
22 Q.  Blacks and whites?
23 A.  Yes.

Page 105

1  Q.  And where was that meeting held?
2  A.  It had to be at the fire department.
3  Q.  And do you remember what was said at the
4      meeting?
5  A.  It was just explaining the breakdown, I guess,
6      of these.  I don't remember specifically what
7      was said.  Just the scoring breakdown.
8  Q.  Did you make any specific complaints at that
9      time about the written test?
10 A.  No, I did not.
11 Q.  And when did you learn that Joey Darby had
12     challenged some of the questions?
13 A.  Some people were complaining.  I can't call
14     their names.  I just remember they were
15     complaining, and somebody said Joey had
16     challenged.  And then we had a waiting period
17     till CWH figured out which ones they were going
18     to throw out.  And they came back and said they
19     threw out, I believe they said, seven.
20 Q.  CWH threw out seven questions?
21 A.  Yes.  We don't know if we got those seven right
22     or -- They were not going to count seven of
23     them.  And by virtue of those seven being

Page 106

1      throwed out, that put Joey had an even 70.
2  Q.  Put him at an even 70?
3  A.  Yes.
4  Q.  What had been his score before?
5  A.  I have no idea.  I know he didn't pass, but
6      that -- when they threw the questions out, that
7      put him at a even 70.
8  Q.  Who threw the questions out?
9  A.  Somebody from CWH.
10 Q.  Well, you're not saying CWH threw those
11     questions out --
12 A.  No, I haven't --
13 Q.  Let me finish my question.
14     You're not saying CWH threw those questions
15     out so that a white male could reach a passing
16     score, are you?
17 A.  I have no idea what CWH did.  I just know they
18     threw out seven questions that had been
19     complained about.
20 Q.  And did it increase your score as well?
21 A.  Not to my knowledge.
22 Q.  Did it decrease your score?
23 A.  Not to my knowledge.

Page 107

1  Q.  You don't know one way or the other?
2  A.  I don't know one way or the other.
3  Q.  How did y'all find out that it had increased
4      Joey's score?
5  A.  We know he hadn't passed.
6  Q.  Did he get one of these candidate feedback
7      letters that said he didn't pass?
8  A.  I hadn't talked to him, but everybody knew he
9      didn't pass so obviously he got a candidate
10     feedback letter.
11 Q.  And you knew he hadn't passed because everybody
12     knew?
13 A.  Yeah.  It wasn't just I knowed it.  People knew
14     it.
15 Q.  Did he ever say, hey, I didn't pass and I'm
16     challenging this question?
17 A.  No.  He was challenging the questions.
18 Q.  And CWH looked at the test questions and --
19 A.  And deemed them, I guess, unfit to be in there,
20     and they threw seven of them out.
21 Q.  How many questions were there all together?
22 A.  One hundred.
23 Q.  The meeting with Steve or somebody from HR to go

Page 108

1      over the candidate feedback, was that somebody
2      from the City or was that somebody from WCH
3      there?
4  A.  I believe it was the City official.
5  Q.  Did you file your grievance before or after
6      that?
7  A.  I can't recall.  It might have been filed
8      before, but I can't say.
9  Q.  Let me show you Defendant's Exhibit 17.
10         (Defendant's Exhibit 17 marked for
11         identification.)
12 Q.  Is that the grievance that you filed?
13 A.  Yes.
14 Q.  When were you supposed to challenge the
15     questions?
16 A.  I think you had maybe -- After the test, I
17     believe.  I can't say exactly the time frame.
18 Q.  How did you learn you could challenge questions?
19 A.  I think that was went over in orientation.  It
20     might have been went over in orientation.
21 Q.  And your recollection is you had some time
22     period after the test to challenge questions?
23 A.  Maybe a couple of days.

Page 109

1  Q.  But a day or two or some period?
2  A.  Yes.  That's my recollection, now.  Somebody
3      else might remember something different.
4  Q.  And that was something discussed, I guess, by
5      the CWH person in orientation?
6  A.  Yeah.
7  Q.  And is it your understanding that Joey Darby is
8      the only one that challenged any questions?
9  A.  Yes, that's my understanding.  I don't know if
10     anybody else did or didn't, but it's my
11     understanding that he --
12 Q.  We know you did not.
13 A.  No, I did not.
14 Q.  And these older firefighters that were making
15     complaints about the test being vague, they
16     didn't challenge any questions?
17 A.  No, they did not.  Not to my knowledge they
18     didn't.
19 Q.  We can agree, I guess, that Defendant's Exhibit
20     17 does not make any reference to your race as a
21     factor, does it?
22 A.  No, it doesn't.  Not the first letter.
23 Q.  But you say there's another letter in the

Page 110

1      grievance process that does make reference to --
2  A.  Yes.  It was on down the chain.  It was probably
3      the fourth or fifth letter.
4  Q.  Now, there are four specific complaints about
5      the test --
6  A.  Yes.
7  Q.  -- on this Defendant's Exhibit Number 17.  I'm
8      going to ask you which ones -- Look at the four
9      of them.  Were all four of those complaints that
10     you had or which ones were your complaints?
11         MR. HORSLEY:  Just for clarity, these
12             are not all four complaints about
13             the test.  These are complaints
14             about the whole procedure.
15 A.  Yes.  That's what I was going to say.  This is
16     more in line with the policies and procedures of
17     the Auburn Fire Department.  That written
18     exam -- When we say written exam, my thinking
19     was, why we have to take a written examine with
20     a cutoff score.  That was my concern when we met
21     to write this letter:  Why take a written exam
22     when people getting promoted and tested in other
23     ways down here and get promoted.

Page 111

1          No time in grade policy was a concern of
2      mine also because I had come there -- when they
3      hired me, you had to learn one job before you
4      came in and -- because you might have been a
5      little better in a book here and or book there,
6      you could just come in from being -- Some people
7      hadn't even been off probation got promoted, and
8      you have to show them how to get around the
9      street there.  But they are sitting in the
10     officer's seat.  They are lieutenants.  So I had
11     a concern about that.
12         No accumulative point system, that goes back
13     to the written exam.  You're grading a man on
14     one thing and one thing only.  You get that
15     cutoff score.  You don't -- And then you turn
16     around and he does the job, and nobody holler,
17     well, you didn't make 70; get out the Jeep.
18         Inconsistency on past promotional process,
19     if you think about everything I just said, that
20     sums that up because everybody that been
21     promoted down there has been promoted in a
22     different way in the last twelve years.
23 Q.  So I want to be clear on the written exam.  Did

Page 112

1      you have a complaint about the written exam or
2      just the fact that --
3  A.  The way it was administered.
4  Q.  What was it about the way it was administered?
5  A.  70 cutoff score.
6  Q.  You didn't think there should be a cutoff score?
7  A.  No.
8  Q.  If there hadn't been a cutoff score, would it
9      have been okay with you to use a written exam?
10 A.  Yes.  If it hadn't been a cutoff score.  I think
11     you should be tested on certain things, and then
12     if you're not that good at maybe a written exam,
13     you can go in and show, okay, I know this
14     hands-on.  You give me a hands-on exercise or
15     you give me a in-basket; you give me something
16     that I actually do when I'm out there doing it,
17     and you can see how well I do it.
18 Q.  So if there hadn't been a 70 cutoff score on
19     this exam, the use of this exam would have been
20     okay with you?
21 A.  As long as I got a chance to go forward in the
22     process.
23 Q.  Does that mean yes?

Page 113

1   A.  Yes.
2   Q.  And the no time in grade is that you didn't have
3       to be a --
4   A.  You could skip rank now.  You could jump -- go
5       from firefighter to being the chief, and then
6       you get up there with that power and say I got
7       to take a rank when I just watched you go from
8       firefighter to chief.
9   Q.  And is it --
10  A.  That goes down to inconsistency too.
11  Q.  Is it your testimony this is the first test
12      where there was no time in grade requirement?
13          MR. HORSLEY:  Test?
14  Q.  First procedure.
15  A.  For captain or battalion chief, yes.
16  Q.  So for captain or battalion chief, this is the
17      first promotion process where you didn't have a
18      time in grade requirement?
19  A.  Yes.  With eight years of service, you wouldn't
20      have even been considered.
21  Q.  With how many?
22  A.  Eight years of service, you wouldn't even be
23      considered fifteen years ago.

Page 114

1   Q.  How many years of service do you think you
2       should have had before you could be considered?
3          MR. HORSLEY:  Object to the form.
4   A.  At least ten to fifteen.
5   Q.  And then no accumulative point system, I'm not
6       clear on that one.  Tell me what that one is.
7   A.  Say somebody took the test and made a 69 on it,
8       and they move to the next phase of testing, of
9       an in-basket or they done a great job on
10      doing -- say it was something that Chief Lamar
11      wants us to do, an assignment, and we did that
12      so we made -- Say he made a 75 on that where
13      somebody on the test might have made a 71 and
14      then didn't do so good on that.  You took all
15      those scores when you got to the end of the
16      thing and add it up and come out with a average
17      and then made your promotions.
18  Q.  That's basically the same thing about the
19      written test, not having a cutoff score, isn't
20      it?
21  A.  Basically.
22  Q.  You think you should have --
23  A.  You accumulate points.  You get points for not

Page 115

1       getting wrote up, coming to work on time,
2       wearing your uniform with pride.  We do
3       merit-based raises.  We get merit-based raises.
4       And if I'm supervising a career firefighter and
5       I don't fill his evaluation out just like my
6       chief want me to -- It's very important that we
7       do that and keep a track of his performance.
8       Now, you got -- you ought to be able -- if
9       that's so important, you ought to be able to
10      incorporate that into your promotional
11      procedures also.
12  Q.  You're saying the promotional procedures should
13      have included more than the test --
14  A.  Exactly.
15  Q.  -- and the assessment center?
16  A.  Exactly.
17  Q.  What else should have been -- Let me finish.
18          What else should have been involved in the
19      promotional procedure besides the written test
20      and the assessment center?
21          MR. HORSLEY:  Object to the form.
22  A.  Your yearly appraisals, the years that you've
23      been there.  That's about it.

Page 116

1   Q.  So you should have a written test, you should
2       have the assessment center, but then you should
3       also --
4   A.  But some of this stuff should come before
5       there.  Like I said, your appraisals, if they
6       are so important, the way we have to fill them
7       out, they should be looked at before you be
8       allowed to put in for a promotion.
9   Q.  So what you would do to eliminate people rather
10      than a written test is looking at the yearly
11      appraisals?
12  A.  Yeah.  Because if he's not coming to work
13      wearing his uniform right, if I had to reprimand
14      him for being late and then all the sudden he's
15      eligible for battalion chief, obviously he got a
16      problem with coming to work on time, but yet and
17      still he's going to be battalion chief because
18      he can pass a test?
19  Q.  Are those written appraisals --
20  A.  Performance appraisals.
21  Q.  Is that where your supervising officer goes
22      through and fills out things and says this is
23      what Eddie -- he's a 3 on this or a 4 on that or

Page 117

1    a 5 on that?
2    A.   Yeah.  But you also -- that's how they move you
3         from -- get your raises.  You also get your
4         raises based on that.  You have to meet a
5         certain standard.
6    Q.   And you think that that should be used to
7         determine who is eligible for promotions?
8    A.   I didn't say the determining factor, but used.
9         That should have a little weight.
10   Q.   Should it eliminate people?  because you said
11        you ought to look at that first.
12             MR. HORSLEY:  Object to the form.
13   A.   I don't believe it should totally -- I don't
14        believe in elimination.  If you're -- Me, let me
15        speak for me personally.  To be discriminated
16        against -- I don't like that word "elimination"
17        because people can find ways to keep you out of
18        stuff.  There's smart people in this world.
19        They can find ways and don't make it look like
20        it, but you can discriminate against.  I'm
21        speaking for my side.  I've done experienced
22        it.  And so I don't believe in that word
23        "elimination".  But you should take all of it

Page 118

1         into consideration.  Let's look at it that way.
2    Q.   Here's the reason I asked that.  Earlier you
3         said that you should look at the performance
4         appraisal to determine who should be able to
5         take --
6    A.   I made a mistake.
7    Q.   Are you backing off that?
8    A.   I'm backing off that.  But have all of it add up
9         to something and don't cut nobody.  Just don't
10        cut nothing.  Just get a score.  That way you
11        could do it this way.  If that person didn't
12        wear his uniform, he could see why maybe he
13        didn't get -- he could go through the process,
14        but he could see where he fell 5 points short
15        for not wearing his uniform.  He'll be more
16        motivated to the next time to keep his shirttail
17        tucked in, wear his collar brass the right way,
18        make sure the truck gets checked off, because,
19        let's face it.  We live in a world where you can
20        only do so much talking to people when you're a
21        supervisor.
22   Q.   Would you count that equal with the written test
23        of the assessment center, the performance

Page 119

1    appraisal?
2             MR. HORSLEY:  Object to the form.
3    A.   I can't make a statement because I'm not a
4         expert.  I just thought it should be included in
5         my opinion.
6    Q.   You think the seniority --
7    A.   Yes, I think it should be included.  I ain't say
8         give them a hundred points.  I say give them
9         some points.  A lot of departments do, for being
10        on the job, for being there and being -- You can
11        look at the appraisal and look at how long
12        they've been on the job and say, well, if this
13        person is doing this at this level, then you can
14        score -- give them a numerical score on it.
15   Q.   So a person who may have better performance
16        appraisals and score higher on a written test
17        and do better on an assessment center should be
18        penalized because they haven't been hired before
19        somebody else?
20             MR. HORSLEY:  Object to the form.
21             That's not what he said.
22   A.   No, that's not what I'm saying.
23   Q.   Tell me what you're saying.  I want to be sure I

Page 120

1    understand.
2             MR. HORSLEY:  Object to the form.
3             He's answered the question, but go
4             ahead and answer it again.
5    Q.   I want to be sure I understand.  I didn't
6         understand.  Exactly what is it about the
7         seniority?  What --
8    A.   We have always got points when I was hired for
9         seniority.
10   Q.   And seniority means from your hiring date
11        forward?
12   A.   That's right.  From your hiring date forward.
13        You can be there -- But, see, when you came in
14        the door -- you don't even come in the door
15        pushing to be at the front of the line.  Now we
16        got a culture of where, I don't have to know
17        this.  You got people -- If I was driving a
18        truck for one of those guys right now, I would
19        have to show them how to get around town.
20   Q.   Who is one of those guys?
21   A.   Some of the battalion chiefs.
22   Q.   I'm going to get to that in just a minute.
23             You should get points under a procedure you

Page 121

1　would have for being hired longer than somebody
2　else?
3　A.  I think so.
4　Q.  Who among these battalion chiefs had poorer
5　yearly appraisals than you did?
6　A.  I have no way of knowing that.  That's personal
7　information.  I'm not -- When I say that, I'm
8　not accusing them of anything.  I'm saying I
9　think that's the way the promotional process
10　should have been.
11　Q.  Do you know whether or not any of the people
12　that were promoted had bad performance
13　appraisals?
14　A.  I know because of seniority and no time in grade
15　policy and inconsistent past promotional
16　procedures that that benefited those guys.
17　Q.  My question, though, is:  On the performance
18　appraisals that you think --
19　A.  No, I don't.
20　Q.  -- that you think should be a part of it, do you
21　know whether or not --
22　A.  I would have no way of knowing.
23　Q.  How are your performance appraisals?

Page 122

1　A.  Every one I seen is good.
2　Q.  And what battalion chiefs are there there don't
3　know how to get around the city?
4　A.  I'm saying that's not a big priority now, and a
5　lot of people come up through the ranks and
6　really don't know their streets and numbers.
7　When I came I had to learn that and go before
8　people and show them that I knew that in order
9　to move to the next step.
10　Q.  Well, what battalion chiefs don't know their
11　streets and numbers?
12　A.  Most of them.  I would say every one of them.
13　They are learning them.  They are getting
14　on-the-job training, but that wasn't required of
15　them when they first came in like it was
16　required of me.
17　Q.  You mean when they were first hired?
18　A.  I know it wasn't.  They didn't enforce it like
19　they did against me.  They would have put it in
20　my appraisal and fired me.
21　Q.  Well, is it your testimony that the people that
22　were promoted to battalion chief don't know
23　their streets and numbers?  Is that what you're

Page 123

1　testifying to?
2　A.  They don't know them like the people -- their
3　predecessors had to know them.  I'll put it that
4　way.
5　Q.  And specifically which -- All battalion chiefs?
6　A.  Yes.
7　Q.  None of the battalion chiefs know their streets
8　and numbers?
9　　　　MR. HORSLEY:  Object to the form.
10　　　　That's not what he said.
11　Q.  Like you would have?
12　A.  Like their predecessors were required to.
13　Q.  How did they test the predecessors to see if
14　they knew them?
15　A.  Now we have people moving so fast that you
16　didn't get -- We moved fast because that's the
17　way they done got the system set up.  But you
18　used to you come in -- You're 19 fresh coming in
19　now from college, 19, student firefighter, and
20　driving the front end pumper, that's a lot of
21　responsibility.  Driving a truck in to lay a
22　line to a house fire and you're 19 years old
23　with a $300,000 piece of apparatus at your

Page 124

1　control, that's unheard of in most places.
2　Q.  Are you saying those people aren't competent to
3　do it?
4　A.  That's a lot of responsibility.  You need time
5　to learn.
6　Q.  Didn't y'all's fire rating just increase?
7　A.  I have no way of knowing.  That's Chief Lamar.
8　Q.  And I'm not trying to argue with you.  I want to
9　be sure I understand what you're saying.
10　　　　A student firefighter in your opinion is not
11　qualified to operate a piece of apparatus?  Is
12　that what you're saying?
13　　　　MR. HORSLEY:  That's not what he
14　　　　said.
15　A.  I'm not an expert.  Let me sum it up this way.
16　The standards I were hired under are lacking
17　now.  That's what I am saying.
18　Q.  And how are they lacking?
19　　　　MR. HORSLEY:  Object to the form.
20　　　　Asked and answered.
21　A.  That's all I can say.  Standards --
22　Q.  Well, you've told me about the streets and
23　numbers.  How else are they lacking?

Page 125

1　A.  I could sit here all day and go through things
2　　　 that are different now about what happens down
3　　　 there. The training, it's good, but people are
4　　　 not -- you've got people that are just sliding
5　　　 through the cracks. They are looking forward to
6　　　 being promoted instead of learning one job
7　　　 before they can get -- before they can move to
8　　　 the next because they done took away all the
9　　　 standards, all the policies.
10　　　   When I came in -- And this is exactly what
11　　 I'm saying. When I came in, I was told learn
12　　 your streets and numbers, your hydrant
13　　 locations, and you've got a certain time to
14　　 learn them and the hydrant locations, and then
15　　 we're going to teach you how to tilt the back of
16　　 the ladder truck and we're going to teach you
17　　 how to drive a pumper, you won't be eligible
18　　 for a promotion to lieutenant for at least five
19　　 years.
20　　　   Now they come in, and they entertain the
21　　 thought of a promotion as soon as they come off
22　　 probation, or some will sneak in on probation.
23　　 They let them come in on probation to sit in to

Page 126

1　　　 get promoted. That's what I'm saying right
2　　　 there in a nutshell.
3　Q.  Is it your opinion that the procedures and
4　　　 promotion policies and hiring policies under
5　　　 Ellis Mitchell are better and more fair than
6　　　 they are today?
7　　　　   MR. HORSLEY: Object to the form.
8　A.  In my opinion -- Like I say, I'm not a expert.
9　　　 I know he had his problems, but -- Yes, he had
10　　 some problems, some serious problems, because he
11　　 told me what he told me when he hired me. But
12　　 at least when he hired me and told me that, I
13　　 could accept the fact he was trying to do
14　　 something about it.
15　Q.  So you think his hiring and promotion procedures
16　　 are better than what they are now?
17　　　　   MR. HORSLEY: Object to the form.
18　A.  I think he required more of you.
19　Q.  He required more of you?
20　A.  Yeah. Than just --
21　Q.  Who was promoted from probationary status?
22　A.  Rodney Hartsfield.
23　Q.  He was --

Page 127

1　A.  Team leader. He promoted from firefighter to
2　　　 team leader.
3　Q.  And he was still --
4　A.  On probation per City policy.
5　Q.  Where is that City policy that says you have to
6　　　 have one year in grade?
7　A.  Firemen and policeman -- It's in the City
8　　　 personnel policies book.
9　Q.  Do you have that City personnel book that has
10　　 that in there?
11　A.  I don't have it handy.
12　Q.  But there's a City policy in the personnel book
13　　 that says police and fire have to be in a
14　　 position one year before they can --
15　A.  Yes. I just read it last week. I went online
16　　 and read it last week.
17　Q.  I think the last thing on -- what's that letter
18　　 number -- Defendant's Exhibit 17, inconsistency
19　　 of past promotional procedures, what's your
20　　 complaint? Was that one of your complaints?
21　A.  Yes.
22　Q.  What was your complaint?
23　A.  Just what I got through spelling out. If Chief

Page 128

1　　　 Lamar can get promoted one way, Chief Lankford
2　　　 can get promoted another way, Fire Chief Langley
3　　　 got promoted from firefighter to captain by
4　　　 somebody coming and getting him and telling him
5　　　 he captain and then he moves to the chief
6　　　 position and never took a written test, it's
7　　　 definitely discriminatory when you require that
8　　　 of me.
9　Q.  Well, it would be -- would it be discriminatory
10　　 if you required it of anybody, black or white?
11　　　　   MR. HORSLEY: Object to the form.
12　A.  I've got to worry about me right now.
13　Q.  I'm asking you. Is it any less discriminatory
14　　 toward you as a black than it would be as a
15　　 white?
16　　　　   MR. HORSLEY: Object to the form.
17　A.  Well, it's excluding us blacks. I'll put it --
18　Q.  Well, does it exclude the other whites?
19　A.  Other whites are being promoted at a record
20　　 rate.
21　Q.  Mr. Ogletree, does it exclude people who don't
22　　 get promoted like Horace Clanton? Is he
23　　 discriminated against?

Page 129

1    MR. HORSLEY: Object to the form.
2    A. I have no idea.
3    Q. You don't know if he's discriminated against?
4    A. I have no idea. That would be something he
5       would have to tell you. I know how I feel.
6    Q. So the procedure only discriminates against
7       blacks, not against whites that don't get
8       promoted. That's your testimony?
9        MR. HORSLEY: Object to the form.
10   A. That's my testimony.
11   Q. You asked that the four written exams be
12      reviewed. Information was received that
13      questions were excluded. Is that the challenges
14      that were made by Joey Darby?
15   A. Yes. I guess that's what that were referring
16      to.
17   Q. And very concerned which questions were removed
18      and verify that everyone participated in the
19      exam was equally graded.
20      Do you have any --
21   A. I have no way of knowing.
22   Q. -- evidence or testimony or hearsay or opinions
23      now that anybody was not graded fairly?

Page 130

1    A. I have no way of knowing that. We don't even
2       know what questions were threw out. We have no
3       way -- We know it helped Joey, but we don't know
4       did somebody get all seven right and they still
5       were thrown out and they didn't get credit for
6       it. We have no way of knowing.
7    Q. You don't know whether it helped you or not?
8    A. That's right.
9        MR. HANCOCK: Are we close to a
10          break?
11       MR. MORGAN: Sure.
12       (Brief recess.)
13   Q. (Continuing by Mr. Morgan) Mr. Ogletree, do you
14      recall sometime in the late 1980s that there was
15      a lawsuit against the City dealing with the
16      Auburn Fire Department and Ellis Mitchell as its
17      fire chief?
18   A. Yes.
19   Q. After that lawsuit was settled, did the City
20      ever give any streets and numbers exam?
21   A. They didn't never really give an exam. They
22      just called you in and sat you down, and you
23      would answer to your supervisor really. It

Page 131

1    wasn't nothing that was like what they are
2    giving you today and say you've got a 70. They
3    just made sure you knew it. I didn't take it as
4    being an exam. They just kind of called you in
5    and gave you a map and said fill it in. Or you
6    sat there before somebody, and they would ask
7    you Cox Street, and you would have to give
8    all streets and the numbers on them.
9    Q. Since the settlement of that lawsuit against the
10      City and Ellis Mitchell, have applicants for
11      promotion ever been given any points for
12      seniority?
13   A. Not to my -- I wouldn't have privy to that
14      information.
15   Q. Well --
16   A. I wouldn't know. Not to my knowledge. I should
17      say that.
18   Q. Well, did you receive any points for seniority
19      the time that you competed for team leader? Did
20      anybody get seniority points on that occasion?
21   A. The only thing I could say, everybody in there
22      had been there at least four or five years and
23      had -- the people that went out were with me and

Page 132

1    we didn't get any points. It was more or less
2    just me talking to you, you talking to me, and
3    we -- Somebody is giving you a set of questions,
4    and you answer them and they would give you a
5    score between one and six.
6    Q. But nobody got seniority points?
7    A. Not to my knowledge.
8    Q. And going back to the petition from team leader
9       to lieutenant, I know you said you signed the
10      petition with the understanding that it would be
11      taken to the court.
12   A. Yes.
13   Q. Weren't you apprised later that the City
14      determined that the court did not retain
15      jurisdiction and that that name change could be
16      made without going back through the court?
17   A. I believe I seen something to that on the
18      letterhead, something to that effect. But in my
19      position and what I've seen over the years, I
20      don't take -- I take it to mean -- anything I
21      see dealing with the courts and the City of
22      Auburn, I take it to believe that they are
23      going -- They'll write anything down and give it

Page 133

1    to you just to keep you from asking any further
2    questions. That's what I believe.
3  Q.  Well, I'm not sure what that answer means, but
4    let me ask you this.
5        Didn't you get a letter or memorandum from
6    the City advising that the City determined that
7    they did not have to go back to the court, and
8    you signed a second thing agreeing to the name
9    change from team leader to lieutenant?
10  A.  No, I don't remember signing a second thing.
11  Q.  You only signed the petition?
12  A.  I know I signed the petition. I don't remember
13    signing anything else.
14  Q.  You don't remember signing a second thing after
15    you found that out?
16  A.  No, I don't remember that. I don't remember
17    having to sign anything else.
18  Q.  Well, if you had been presented with something
19    that said that the City had determined that they
20    could do it, in essence, without going back
21    through the court, would you have signed it?
22        MR. HORSLEY: Object to the form.
23  A.  With that language on there, I probably would

Page 134

1    have.
2  Q.  And then I think we've covered the initial thing
3    of the grievance procedure. Y'all proceeded on
4    through the grievance procedure?
5  A.  Yes, sir.
6  Q.  And actually had a hearing?
7  A.  Yes.
8  Q.  But your testimony was at some point along at
9    that process, y'all brought up about the race.
10  A.  It was the last letter addressed to Mr. Charlie
11    Duggan.
12  Q.  By the way, do you know what section of the
13    personnel rules that is that says you've got to
14    be time in grade?
15  A.  No, it doesn't -- I didn't see anything. I said
16    it's about probation. That's in the promotions
17    part of it.
18  Q.  Do you know what section of the personnel --
19  A.  It will be a section that says promotions, and
20    it will be under it.
21  Q.  And it says you have to be --
22  A.  If you're a firefighter or a police officer, you
23    have to be on probation for one year before

Page 135

1    being eligible to move to the next rank.
2  Q.  And I assume you have a copy of the letter that
3    you can make available that went to Charles
4    Duggan --
5  A.  Yes.
6  Q.  -- about the race?
7        Who showed up for the hearing? Who was
8    still on board as complaining about the
9    procedure?
10  A.  Myself, Lieutenant Stephens, and Lieutenant
11    Horace Clanton.
12  Q.  And y'all had a hearing in the -- before Judge
13    Bailey?
14  A.  Before Judge Bailey, yes, sir.
15  Q.  And what happened after the hearing?
16  A.  Well, basically Judge Bailey sided with the
17    City. They sent us about -- It was about maybe
18    two weeks later they sent us a packet where they
19    reaffirmed the decision not to promote us.
20    Later we got a letter from Mr. Duggan
21    reaffirming Judge Bailey's decision not to
22    promote us.
23  Q.  And Mr. Clanton did not file a lawsuit?

Page 136

1  A.  No, he did not.
2  Q.  Is there anything different about Mr. Clanton's
3    position on the promotion process and the way he
4    was treated than your position and the way you
5    were treated?
6  A.  There's one big difference. Mr. Clanton is not
7    black.
8  Q.  That's the only difference, isn't it?
9  A.  Yes.
10  Q.  Sir?
11  A.  That's it.
12  Q.  Were you privy to a conversation where
13    Mr. Clanton was told he did not have a suit
14    because he was not black?
15  A.  I don't know if I was privy to that or not. I
16    don't remember anything like that.
17  Q.  I'm going to ask you about these guys that were
18    promoted, and I want you to tell me -- I'm going
19    to ask you about Rodney Hartsfield. Is it your
20    opinion that Mr. Hartsfield is or is not
21    qualified to be a battalion chief?
22        MR. HORSLEY: Object to the form.
23  A.  I can't make that -- I'm not a expert. All I

Page 137

1    know is I am qualified and experienced and have
2    more qualifications and more experience than
3    Chief Hartsfield.
4  Q.  Tell me how your qualifications are better and
5    how your experience is better than Chief
6    Hartsfield.
7  A.  I feel this way: If they could give Chief
8    Garrett, Chief Lawrence, and Chief Leverette
9    those promotions based on -- obviously it was
10   based on their experience -- they could have
11   promoted me based on my experience and
12   qualifications.
13 Q.  My question, though, is as to Mr. Hartsfield.
14   What is it about you that makes you more
15   qualified than Mr. Hartsfield?
16      MR. HORSLEY:  Object to the form.
17 A.  My years of service.
18 Q.  Anything else?
19 A.  No.
20 Q.  I'm sorry?
21 A.  No.
22 Q.  What is there about your experience that makes
23   you more qualified than Mr. Hartsfield?

Page 138

1  A.  This goes to the core of it.
2  Q.  Goes to what?
3  A.  This goes to the core of all of it with that.
4    Firefighting is not like going out here and
5    learning something, you know, across the street
6    at the bank or something -- learning how to be a
7    teller.  Any different structure you pull up on,
8    it could be different.  It could seem like it's
9    burning in the front room when it might be
10   burning on the bottom floor.  And until you see
11   enough of that -- You gain more understanding
12   with the more that you see, and that's why your
13   years of service is so important.
14 Q.  So, once again, going back, your experience --
15   you're more experienced than Mr. Hartsfield
16   because of your years of service?
17 A.  That's right.
18 Q.  Anything else?
19 A.  That's it.
20 Q.  What about, is it, Joe --
21 A.  Joe Lovvorn.  Same answer.
22 Q.  Same answer as to why you think you're better
23   qualified to be a battalion chief is because of

Page 139

1    your years in service?
2  A.  Yes, sir.
3  Q.  Same answer?
4  A.  Same answer.
5  Q.  And as for Matt Jordan --
6  A.  Same answer.
7  Q.  -- same answer?  You think you're better
8    qualified to be a battalion chief because of
9    your years in service?
10 A.  Yes, sir.
11 Q.  And Joey Darby?
12 A.  Same answer.
13 Q.  You think you're more qualified to be a
14   battalion chief because of your years in service
15   than Mr. Darby?
16 A.  Yes, sir.
17 Q.  I'm going to run through some of these witnesses
18   that y'all have listed, and I'm going to try to
19   do this quickly.  These are people that you and
20   your attorney disclosed as having some
21   information about your case, and two of them are
22   William Thompkins and Jeremy Patterson.
23 A.  Yes, sir.

Page 140

1  Q.  First of all, what is it that they know about
2    your case; you're not being promoted to
3    battalion chief?
4  A.  Basically I don't think they know anything about
5    my case.  They just know that we didn't get
6    promoted.
7  Q.  Do you know why they were listed as possible
8    witnesses or have some information on this case?
9  A.  I think it's relevant how they were treated down
10   there when trying to get a job at Auburn Fire
11   Department.
12      MR. HORSLEY:  I'm going to object to
13        that because I've drafted the
14        letter --
15      MR. MORGAN:  I understand that.
16      MR. HORSLEY:  -- as to -- Every person
17        whose name appears anywhere is on
18        that list so he's not going to
19        have any idea why some of them are
20        on there.
21 A.  That's my opinion.  I think they are relevant
22   because the way they put in for jobs down there
23   when the chief was telling me he knew he need to

35 (Pages 137 to 140)

Page 141

1   hire some blacks, and I think that have some
2   relevance to ...
3   Q.  To your knowledge they know nothing about your
4       case?
5   A.  Exactly, to my knowledge.
6   Q.  But they were not hired, and they are black?
7   A.  That's right.
8   Q.  And Chris Turner.  What is it that Chris
9       Turner -- what do you think he knows about all
10      this?
11  A.  Only thing I can say is Chris has been subjected
12      to tests every time he gets ready to be
13      promoted, and he's not being promoted.
14  Q.  Test.  Now, has he ever had a written test
15      before?
16  A.  Yes.
17  Q.  Was that for the last team leader?
18  A.  I don't know.  I just know he was sitting there
19      with the battalion chiefs.
20  Q.  Oh, he took the battalion chiefs with y'all?
21  A.  Yes, sir.
22  Q.  But you don't think he should have been able to
23      take the battalion chiefs, do you?

Page 142

1       MR. HORSLEY:  Object to the form.
2   A.  I know that by City policy, he was the only one
3       other than Gerald Stephens qualified to be -- By
4       the policy of non-probationary employees, they
5       were the only two qualified to be sitting in
6       there if we went by the City policy.
7   Q.  But he was not a lieutenant?
8   A.  No.  And I don't think he should have been in
9       there.
10  Q.  You don't think he should have ever taken the
11      test, do you?
12  A.  That's right.
13      MR. HORSLEY:  Object to the form.
14  Q.  Marzilla Ogletree, that's your wife?
15  A.  Yes.
16  Q.  What does she know about this case or do you
17      know anything that she would have -- any
18      information she would have about this?
19  A.  Probably worried about me.
20  Q.  Delner Franklin Thomas with the EEOC, do you
21      know who he is?
22  A.  No, I don't.
23  Q.  Douglas Watson, the former City manager, do you

Page 143

1   know what he had to do with the battalion chief
2   situation?
3   A.  He wasn't there when -- The ones that got
4       promoted, it was Mr. Watkins that was there at
5       that time, when Chief Garrett and them were
6       promoted.
7   Q.  Do you know of any anything that Doug Watson has
8       to do with either changing captains to battalion
9       chief or the battalion chief procedure that you
10      took?
11  A.  Not that I know of.
12  Q.  And Horace Clanton, he was -- wasn't he one of
13      those that --
14  A.  He was on the grievance with us.
15  Q.  And Rodney Hartsfield was promoted?
16  A.  Promoted.
17  Q.  Anything else you know he might know about this
18      other than being promoted?
19  A.  No.
20  Q.  Does he know anything about your complaints?
21  A.  No.
22  Q.  Have you ever discussed them with him?
23  A.  No.  He's my immediate supervisor right now.  I

Page 144

1   don't ...
2   Q.  Do y'all have any problems with each other?
3   A.  No.  I get along with Rodney fine.
4   Q.  Is he a good supervisor?
5       MR. HORSLEY:  Object to the form.
6   A.  I don't have any problem with him.
7   Q.  Matthew Jordan, do you know anything he knows
8       specifically about your claims?
9   A.  No.  He was just promoted.
10  Q.  Joe Lovvorn, do you know anything he knows about
11      your claims?
12  A.  No.
13  Q.  Jason Brown, who is that?  The name sounds
14      familiar.
15  A.  He works on my shift with me.
16  Q.  Is he black or white?
17  A.  White.
18  Q.  Is there anything he knows about your promotion?
19  A.  No.
20  Q.  Have you discussed this lawsuit with him?
21  A.  No.
22  Q.  Has he ever told you he thought you should have
23      been promoted?

Page 145

1  A.  Yes.
2  Q.  What did he tell you?
3  A.  They thought seniority and people that been
4      there should have been promoted just like the
5      people that had been there before like Chief
6      Garrett and Chief Lawrence.
7  Q.  And how long has Jason Brown been there?
8  A.  Probably eight years -- eight or nine years.
9      Probably eight years.
10 Q.  Did he sit for the promotion to battalion chief?
11 A.  Yeah, I believe he did.  Yes, I believe he did.
12     I believe his name on that list.
13 Q.  Paden Payton, do you know him?
14 A.  No.  He worked there, but I don't know him.
15 Q.  Joey Darby?
16 A.  He's the guy who promoted that challenged --
17 Q.  That challenged the questions.
18     Terry Walker?
19 A.  Ex-training officer.
20 Q.  When did he leave?
21 A.  Last year sometime.  It might have been this
22     year, but he hadn't left over six months ago.
23 Q.  Did he have to go through a promotion to be a

Page 146

1      training officer?
2  A.  Yes, sir.  Interview.
3  Q.  Did you apply for training officer?
4  A.  No, I didn't.  But Lieutenant Stephens did.
5  Q.  But you did not?
6  A.  I did not.
7  Q.  Was he a good training officer?
8  A.  He was all right.
9  Q.  Anything you know about -- that he knows about
10     the battalion chief promotion that you know of
11     or your complaints in this lawsuit?
12 A.  He just spoke to me one day.  I don't know if he
13     would recall this.  He just spoke to me one day
14     and said he wouldn't have did it that way.
15 Q.  Not did what that way?
16 A.  The procedure -- the promotional procedure for
17     battalion chief.
18 Q.  Did he tell you how he would have done it?
19 A.  No.  He just said, I told them I wouldn't did it
20     that way.  I knew what he was talking about and
21     he knew I knew what he was talking about, and
22     that was it.
23 Q.  Ronnie Blankenship?

Page 147

1  A.  Ex-fire chief.
2  Q.  When did he leave?
3  A.  Was it 2000?  He been gone -- Chief was chief
4      for about twelve years, Chief Langley, so he
5      been gone 12 or 13 years.
6  Q.  Do you know what he knows about this case?
7  A.  I have no idea.
8  Q.  Do you know any information he has about any of
9      the promotion procedures or discrimination or
10     anything?
11 A.  He probably would have some information because
12     his name was named when Lieutenant Strickland
13     and Lieutenant Card and all them were filing
14     their lawsuit.
15 Q.  Stephanie King?
16 A.  Human resource specialist, generalist.
17 Q.  Do you remember anything she did in this
18     situation?
19 A.  She just came in and I think maybe spoke -- She
20     might have spoke to us.  I don't know.
21 Q.  Joe Bailey, he heard the grievance?
22 A.  He heard the grievance.
23 Q.  Anything else?

Page 148

1  A.  No.
2  Q.  Michael Thee, who is he?
3  A.  That's one of the student firefighters.
4  Q.  Is he still a student firefighter?
5  A.  Yes, he is.
6  Q.  And did he apply for battalion chief?
7  A.  No, he did not.
8  Q.  Anything else that -- Anything he would know
9      about your case?
10 A.  I haven't --
11 Q.  Have you discussed it with him?
12 A.  I have not.
13 Q.  Casey McLeod?
14 A.  Firefighter.
15 Q.  Black or white?
16 A.  White.
17 Q.  Have you discussed your case with him?
18 A.  No, I haven't.
19 Q.  Do you know anything he would know about the
20     promotion procedure?
21 A.  No.
22 Q.  Did he apply?
23 A.  No, he didn't.

Page 149

1  Q.  Dean Garrett?
2  A.  That's Chief Garrett I've been mentioning.
3  Q.  Have you had any conversations with him?  You
4      told me --
5  A.  Yeah.  I told you he mentioned that he had seen
6      the test questions.  He mentioned that he didn't
7      think it was fair to the older guys.  He
8      mentioned a couple of things to me.
9  Q.  What else did he mention besides that?
10 A.  That was about the gist of it.  I can't --
11 Q.  He had seen the test questions, and he --
12 A.  He say he helped with them, and they had threw
13     some of them out already and that he didn't --
14     that they had helped with forming the test.
15 Q.  And he didn't think it was fair to the older
16     guys?
17 A.  Yes.
18 Q.  Any other conversations you had with him?
19 A.  No.
20 Q.  Did you have any conversations with him after
21     you took the test about the test and what you
22     thought about it?
23 A.  I just mentioned to him I didn't think it was

Page 150

1      right and that we were going to file a
2      grievance.
3  Q.  What did he say?
4  A.  He didn't say nothing.  He had retired and he
5      came by so -- He didn't say anything.
6  Q.  Then you've got a couple of folks listed with
7      the Auburn News:  Amy Weaver and Lindsey Field.
8  A.  I have no idea --
9  Q.  Have you ever talked to them?
10 A.  No.
11 Q.  Jimmy Lee Brown?
12 A.  He's deceased.
13 Q.  What rank did he have when he was --
14 A.  Battalion chief.
15 Q.  Did he just die recently?
16 A.  Yes.  He died this year.
17 Q.  Have you ever had any conversation with him
18     about the test or discrimination?
19 A.  Yes, I did.  He mentioned to me -- He had
20     mentioned to me something about discrimination,
21     and he had mentioned that he didn't think -- he
22     didn't think they were treating us right.  He
23     mentioned that to me a couple of years ago.

Page 151

1  Q.  Now, who is "us"?
2  A.  African-Americans who worked there.
3  Q.  Anything else he said other than he didn't think
4      they were treating "us" fair?
5  A.  No.
6  Q.  What was the substance of the conversation y'all
7      were having?
8  A.  We just was talking.  Just -- He come out.  He
9      was my battalion chief at the time, and he just
10     say he just work here.  And I said, well, I just
11     work here too.  And he just mentioned that -- I
12     told him that I didn't think it was right how
13     they promote people and do things.  And he just
14     mentioned he didn't think he had been treated --
15     He especially mentioned how they were doing
16     Chris, by him not being promoted and they trying
17     to make him pass a test to be promoted when they
18     know he can do the job.
19 Q.  Well, did you ever specifically mention race or
20     was it just that you didn't like the way they --
21 A.  He reminded me I was a minority.  So, yeah, it
22     was race.
23 Q.  Do you know why they changed the procedure to

Page 152

1      require a written test for team leader?
2  A.  I have no idea.
3  Q.  You don't have any idea about that?
4  A.  I have no idea.
5  Q.  You didn't hear anything about Chris Turner's
6      last lawsuit and why they changed that
7      procedure?
8  A.  No, I did not.
9  Q.  Did you know they changed that procedure because
10     of him?
11 A.  No, I did not.  I didn't know anything about it.
12 Q.  And Wendall Willis?
13 A.  He used to work there.  He's retired.
14 Q.  How long has he been gone?
15 A.  Maybe over ten, eleven years I believe.
16 Q.  James -- Did you ever have any conversation with
17     Wendall Willis about promotions or race or
18     discrimination?
19 A.  No, I didn't.
20 Q.  James Lyle.
21 A.  He's another --
22 Q.  Been gone a long time?
23 A.  Yeah.

Page 153

1   Q.  Have you had any conversation with him about any
2       of this?
3   A.  No.
4   Q.  Tommy James?
5   A.  He's gone.  He's retired.
6   Q.  Have you had any conversation with him about
7       race —
8   A.  No.
9   Q.  — or promotions or anything?
10  A.  No.
11  Q.  Kenneth Lee Smith?
12  A.  No, I haven't had any conversation with him.  He
13      retired too.
14  Q.  How long has he been gone, a while?
15  A.  Yeah.  All them guys been gone a while.
16  Q.  You haven't had any discussion with him about
17      race discrimination or promotion —
18  A.  No.
19  Q.  Ron Jones?
20  A.  Ronnie Jones?
21  Q.  Who is he?
22  A.  He was a captain there.
23  Q.  Has he been gone a while?

Page 154

1   A.  Yeah.  About five years.
2   Q.  Did you have any conversation with him about
3       discrimination or the test or anything?
4   A.  No, I didn't.
5   Q.  Dexter Card, have you had any conversation with
6       him?
7   A.  No, I haven't.
8   Q.  I think you told me earlier you haven't —
9   A.  I haven't even seen him.
10  Q.  Since he left?
11  A.  Since he left.
12  Q.  How about William Felton?
13  A.  No.
14  Q.  No conversation with him?
15  A.  No.
16  Q.  Have you talked to him about this lawsuit or
17      anything?
18  A.  No.
19  Q.  Thomas Scott?  Have you discussed anything with
20      him about this case or does he know anything
21      about this case?
22  A.  No.
23  Q.  Steve Heart, who is he?

Page 155

1   A.  He was gone before I started working there.
2   Q.  Before you started working there?
3   A.  Yeah.
4   Q.  You haven't had any conversations with him, have
5       you?
6   A.  No.
7   Q.  Larry Stanley?
8   A.  Another one.  He was gone before I started
9       working there.
10  Q.  Have you had any conversations with him?
11  A.  No.
12  Q.  Gary Jones?
13  A.  No.  He's gone too.
14  Q.  Have you had any conversation with him?
15  A.  No.
16  Q.  Jan Dempsey?
17  A.  Ex-mayor, no.
18  Q.  Have you had any conversation with her about
19      anything to do with this discrimination or
20      hiring —
21  A.  I don't know if she was the mayor when they
22      filed that last lawsuit.  But, no, I haven't
23      talked to her anything about it.

Page 156

1   Q.  Ron Tahita?
2   A.  I think he was an OHR director.
3   Q.  And he's been gone a while, hasn't he?
4   A.  Yes.
5   Q.  Have you ever had any conversations with him —
6   A.  No.
7   Q.  — about race or promotions or anything?
8   A.  No.
9   Q.  And Ellis Mitchell?
10  A.  I mentioned him.  I haven't had any
11      conversations with him.
12  Q.  When did you mention him?
13  A.  I mentioned him earlier when you told me —
14  Q.  He's been gone from the City a long —
15  A.  He's been gone a long time.
16  Q.  Does he still live in the city?
17  A.  He lives in Loachapoka, I believe.
18  Q.  Have you had any conversation with him about
19      this lawsuit or your complaints or race
20      discrimination?
21  A.  No, I haven't.
22  Q.  Let me ask you about some of the allegations in
23      your complaint.  In paragraph 23 you complain

Page 157

1   that the test -- I think we've been over this --
2   the City allowed non-probationary and
3   probationary lieutenants, including entry-level
4   firefighters, to apply for battalion chief
5   promotion. That's one of your complaints?
6   A.  Yes.
7   Q.  And the only non-probationary non-lieutenant was
8   Chris Turner?
9   A.  Yes, sir.
10  Q.  Were there any probationary lieutenants that
11  were allowed to apply for the battalion chief
12  position?
13  A.  My position is that it was all of us guys that
14  had just got promoted from team leader to
15  lieutenant.
16  Q.  So that included you?
17  A.  That included me.
18  Q.  And number 24 is that you -- the City changed
19  its policy and required a written test.
20      And you complained about a written test
21  being -- Well, if I remember, you complained
22  about the cutoff score?
23  A.  The cutoff score.

Page 158

1   Q.  You're okay with the written test?
2   A.  I'm okay with some form of a written test, but
3   if that's all you're getting judged on, I'm not
4   okay with it.
5   Q.  And you say that coincidentally that policy
6   change occurred when two African-American
7   lieutenants and one entry-level --
8       What's coincidental about that?
9       MR. HORSLEY:  Object to the form.
10  A.  Well, all I know is before then, they were not
11  using a test with a cutoff score -- a written
12  test with a cutoff score.  And we seem to have a
13  bit of an edge at that particular time, and then
14  the policy changed when the three
15  African-Americans became -- well, two of them
16  were eligible.
17  Q.  And then you've got in there, of course, the
18  seniority was discarded.  I want to be clear on
19  this.  Can you name any promotional procedure
20  since the settlement of the Clinton Hammock
21  lawsuit in which seniority was given any credit?
22  A.  I'll put it this way.  Every battalion chief I
23  ever worked for had at least 15 years -- or

Page 159

1   captain had at least 15 years' experience or
2   more.  So whether they put it in writing or not,
3   it was given weight.
4   Q.  So before they became a captain or battalion
5   chief, they had at least 15 years' experience?
6   A.  Yeah.  The guys I worked for had at least 15
7   years' experience.
8   Q.  Let's go back to my question on the promotion
9   procedure.  Do you know of any promotion
10  procedure --
11  A.  No.
12  Q.  -- since the settlement of the Clinton Hammock
13  lawsuit in which credit was given for seniority?
14  A.  Chief Lawrence, Chief Garrett, Chief Brown, and
15  Chief Leverette.
16  Q.  And that's the name change?
17  A.  That's a promotion to me.
18  Q.  Did their duties change any?
19  A.  No.  When somebody tell me they are the chief
20  and I work for them, it changed.
21  Q.  Well, you worked for him when he was a captain.
22  A.  Yeah.  And he come down and made sure I knew he
23  was the chief.

Page 160

1   Q.  Whether he called himself the chief or captain,
2   did your relationship change any?
3   A.  Not my relationship, no.
4   Q.  Did his duties change any?
5   A.  I have no idea.
6   Q.  Well, did you know -- you told me before you
7   knew what a battalion chief did and you knew
8   what a captain did.  Did the duties change
9   between a captain and --
10  A.  Not to my knowledge.
11  Q.  Did he get any more pay?
12  A.  I wouldn't have that information.
13  Q.  And you didn't make any complaint with anybody
14  when the name change occurred, did you?
15  A.  No, I did not.
16  Q.  Let's see.  Then you've got 25.  The denial of
17  your promotion to battalion chief was racially
18  based.
19      Tell me why you claim that you were not
20  promoted based on your race.
21      MR. HORSLEY:  As much as its been
22  answered numerous times, I object
23  to the form.  But go ahead.

Page 161

1  A.  All I know is three African-Americans were
2      eligible to be hired -- promoted to battalion
3      chief, and all the promotions went to four white
4      guys -- four Caucasian males.
5  Q.  Is that the only basis, evidence, hearsay,
6      documents?  Anything else that you have that
7      supports your allegation that you were denied
8      promotion because of your race?
9          MR. HORSLEY:  Same objection.  You can
10             answer.
11 A.  No.
12 Q.  Just that you and two other blacks were not
13     promoted and four whites were?
14         MR. HORSLEY:  Same objection.
15 Q.  True?
16 A.  Exactly.
17 Q.  In number 26 you say that Caucasian or white
18     applicants for battalion chief were given
19     preferential treatment regarding the application
20     process, test aids, and test grades.
21         What Caucasians were given preferential
22     treatment?
23 A.  All I know is Chief Garrett told me he had seen

Page 162

1      the questions.  And if he had seen some of the
2      questions, I don't know what happened.  I don't
3      know what -- I can't say what happened.  I
4      don't -- But I just know somebody -- he say he
5      had seen those questions.
6  Q.  Well, so what?  He wasn't an applicant, was he?
7  A.  I have --
8          MR. HORSLEY:  Object.
9  Q.  Was he an applicant for battalion chief?
10 A.  No, he was not.
11 Q.  This specifically says that Caucasian applicants
12     were given preferential treatment regarding
13     application process, test aids, and test
14     grades.
15         What Caucasian applicants were given
16     preferential treatment?
17 A.  I have no idea.
18 Q.  Can you name a single one?
19 A.  No, I cannot.
20 Q.  Do you know of any?
21 A.  No, I don't.
22 Q.  Do you know any white applicants that received
23     preferential treatment in the application

Page 163

1      process?
2  A.  No, I don't.  I don't know.
3  Q.  What do you mean by application process?
4          MR. HORSLEY:  Object to the form.  He
5              didn't write it.
6          MR. MORGAN:  Well, I understand, but
7              it's my only chance to ask him.  I
8              understand.  I'm sorry.
9  Q.  What do you mean by application process?
10         MR. HORSLEY:  Object to the form.
11 A.  I didn't write it.  I have no idea.
12 Q.  Do you know of any white applicant that received
13     more test aids than you did from the City or
14     any --
15 A.  I wouldn't be privy to that.  If it happened, I
16     wouldn't be privy to that.
17 Q.  The answer to my question is:  You don't know of
18     any, do you?
19 A.  I don't.
20 Q.  Do you know of any white applicants that were
21     given preferential treatment on their test
22     grades?
23 A.  Obviously Chief Garrett and them were.  They

Page 164

1      didn't take a test.
2  Q.  That's not the question now, Mr. Ogletree.
3      Let's stay focused on the battalion chief
4      promotion that was given in April of 2006.
5  A.  I was talking about the other one.  I don't
6      know.
7  Q.  Do you know of any white applicants that got
8      preference on their test grades?
9  A.  I don't know.
10 Q.  Look at number 27.  You make a reference to the
11     City violating and continuing to violate a
12     federal court order requiring them to alter
13     hiring and promotion policies and procedures to
14     provide equitable treatment to
15     African-Americans.
16         What court order are you referring to?
17         MR. HORSLEY:  Object to the form.
18 A.  I don't know.
19 Q.  Well, what is it that you say the City is doing
20     wrong that they violate a federal court order?
21         MR. HORSLEY:  Object to the form.
22 Q.  Do you know?
23 A.  I'd say giving the test to weed out

Page 165

1 African-American applicants. They are running
2 the student firefighter program and not getting
3 any African-Americans to apply and therefore be
4 hired full-time.
5 Q. I'm sorry. I missed the first one. Something
6 about test.
7 A. Yeah. They decided to change the policies and
8 give a test and weed out African-American
9 applicants from being promoted.
10 Q. And then they do the student firefighter
11 program, and blacks don't get hired, or
12 African-Americans?
13 A. Exactly.
14 Q. Do you know what advertising the City does for
15 the student firefighter program?
16 A. I know some of it. I know they recently tried
17 to improve on some of it, I guess, when they
18 started going around to more schools. But they
19 had quit going anywhere for a long time.
20 Q. When did they quit going anywhere?
21 A. Because I went and talked to some -- to a church
22 at one time about twelve years ago and -- talked
23 to an African-American church and talked to some

Page 166

1 people trying to get some people to come in.
2 Q. At the request of the City?
3 A. At the request of -- It was at the request of my
4 training chief. I guess he had got orders from
5 somebody. I don't know who it was.
6 Q. And so you went to a black church and tried to
7 recruit people to apply for the student
8 firefighter program?
9 A. But they stopped. And I know they stopped --
10 Q. Let's go back to that.
11 A. Yes, I did.
12 Q. And how many people from that black church
13 applied?
14 A. I have no idea.
15 Q. Do you know of any?
16 A. All I know is we put on a seminar.
17 Q. And did they do that in other black churches?
18 A. That's the one I went to.
19 Q. You don't know what else they did?
20 A. I don't know what else they did.
21 Q. Why do you say you know they've quit that?
22 A. I just know they hadn't did it in a while.
23 Q. But you know they did it about twelve years ago?

Page 167

1 A. Yeah. Twelve or thirteen.
2 Q. Because you went out there?
3 A. Because I went out there, and I could speak for
4 that.
5 Q. You don't know how many folks that led to apply,
6 do you?
7 A. Exactly. I don't know. I wouldn't have
8 privilege to that information.
9 Q. Do you know if Gerald Stephens ever went to any
10 churches?
11 A. No, I don't.
12 Q. Do you know of anything else the City has done
13 in the last twelve or thirteen years to try to
14 get more applicants from the minority blacks?
15 A. No, I don't.
16 Q. How is the City violating, in your opinion, a
17 court order on promotion process?
18     MR. HORSLEY: Object to the form.
19 A. All I know is I got promoted in 1996, in June.
20 Lieutenant Stephens were promoted in April.
21 He's applied for several jobs and didn't get
22 them. I've applied for one. I was looking at
23 him struggle through the process, and I was,

Page 168

1 like, they still not going to promote us. And
2 then I looked back at Chris Turner, and he get
3 beat side the head every day when he goes in and
4 take those tests, whatever they give him in
5 there, and he has to supervise guys and they
6 come in and outrank him in a year. And that's
7 what I know. And we are the only three blacks
8 there. That's what I knew are those facts.
9 Q. And you sat on -- Are they structured interviews
10 for Chris Turner, for team leader?
11 A. I know the one I sat in on was a structured
12 interview.
13 Q. Do y'all get together and talk about the
14 applicants after that and make sure everybody is
15 consistent or talk about the grading?
16 A. They did. Sometime they would.
17 Q. Well, did you?
18 A. Yeah. I did that time.
19 Q. Well, did you think the people were unfair in
20 their evaluations of Chris Turner or the other
21 applicants when you did it?
22     MR. HORSLEY: Object to the form.
23 A. At that point I didn't think about it. I didn't

Deposition of Eddie Ogletree                                              June 6, 2008

Page 169

1    think about it. I was in there and I gave him a
2    score, and I scored him pretty well. That's all
3    I was concerned with.
4    Q.  Now, you've got a complaint in here for
5    retaliation. It says you engaged in
6    statutorily-protected expressions such as EEOC
7    charges and grievances.
8        My understanding is you had never filed an
9    EEOC charge or grievance before this.
10   A.  No.
11   Q.  Is there any other statutorily-protected
12   expressions that you think you engaged in that
13   resulted in you being denied a promotion?
14       MR. HORSLEY:  Object to the form.
15   A.  I didn't engage in it directly, but I think I
16   suffered for that 1996 lawsuit of Lieutenant
17   Strickland, Lieutenant Card, and Lieutenant Bill
18   Felton, and Chris Turner.
19   Q.  How do you suffer for that?
20   A.  I think that they just made up their mind they
21   didn't want any blacks working there anymore,
22   that if they get rid of us, they'll be fine, and
23   that they wasn't going to promote us, and they

Page 170

1    wasn't going to hire anymore to make sure no
2    more ever worked there if they could get away
3    with it.
4    Q.  But you didn't participate in that lawsuit?
5    A.  No. I didn't participate in it, but I'm just as
6    black as they were.
7    Q.  Did they ask you to participate in it?
8    A.  No. I make my own mind up. This is serious
9    business.
10   Q.  But in terms of you actually participating in
11   any statutorily-protected expression, you can't
12   name any of that, can you?
13       MR. HORSLEY:  Object to the form.
14   A.  No, sir.
15   Q.  And then we have here that the employment
16   practices of the City -- of the defendants --
17   I'm going get to the defendants in a minute.
18       What does this mean to you, built-in
19   headwind?
20       MR. HORSLEY:  Object to the form.
21   A.  It means something that's put there that really
22   don't carry any weight, but it stops a
23   particular group from advancing. That's exactly

Page 171

1    what it means to me.
2    Q.  And I know you didn't draft this, but I just
3    want you to explain to me what you understand
4    your suit is about the disparate impact.
5        MR. HORSLEY:  Object to the form.
6    A.  I didn't write it.
7    Q.  I understand.
8    A.  But in layman terms, the way they select people
9    through the student firefighter program. Like I
10   said, the last black person that was hired was
11   twelve years ago. The way they promote us --
12   There's three of us down there. Chris has been
13   there 20-something years and still making
14   firefighters pay, but he can do the job and
15   everybody is confident in his abilities to do
16   his job. Everybody got weaknesses.
17       I can't get promoted. I've been there
18   working on 25 years now, and they come up with
19   different rules and sets. And I know it's
20   affecting us. I can't worry about who else it's
21   affecting. It's affecting us three
22   African-Americans that work there and the
23   ones -- the potential of keeping ones from ever

Page 172

1    working there.
2    Q.  Have you had any conversations with Larry
3    Langley about this promotion procedure or race
4    discrimination?
5    A.  Two things he said to me was he know he need to
6    hire some blacks.
7    Q.  Now, what year did he say that?
8    A.  He said that right before we had that battalion
9    chiefs exam in 2005. He mentioned that to me.
10   Q.  Anything else he said --
11   A.  After the test I had talked with him about I
12   didn't think it was fair the way they did the
13   procedure.
14   Q.  And what did he say?
15   A.  I didn't have nothing to do with it. That's
16   exactly what he said: I didn't have nothing to
17   do with it.
18   Q.  Any other conversations you've had with him
19   about this lawsuit or your complaints --
20   A.  No, sir.
21   Q.  -- for promotion, hiring, race discrimination or
22   anything?
23   A.  No, sir.

Page 173

1  Q.  Any conversations you've had with Lee Lamar
2      about your complaints, this lawsuit, promotion,
3      hiring, race discrimination?
4  A.  Other than when I made that little gesture about
5      my reservations about the test.
6  Q.  The ones you already told me about?
7  A.  Yes.
8  Q.  Anything else you talked to Lee about?
9  A.  No, sir.
10 Q.  Any conversations you had with Mayor Ham about
11     your complaints, promotions, hiring, race
12     discrimination?
13 A.  No, sir.
14 Q.  This lawsuit?
15 A.  No, sir.
16 Q.  Have you ever spoken to Mayor Ham about
17     anything?
18 A.  No, sir.
19 Q.  Steve Reeves.  Any conversations you've had with
20     Steve Reeves about the procedure, the test, race
21     discrimination, hiring, promotion, complaints,
22     this lawsuit?
23 A.  No, sir, I haven't spoken to Mr. Reeves.

Page 174

1  Q.  Bill James.  Any conversations you've had with
2      him about this lawsuit, your complaints, race
3      discrimination, promotion, hiring, procedures,
4      tests?
5  A.  No, sir.
6  Q.  Any conversations with Bill James?
7  A.  No, sir.
8  Q.  Charles Duggan.  Any conversations with Charles
9      Duggan --
10 A.  Other than that correspondence, that letter that
11     we sent.
12 Q.  Written correspondence?
13 A.  Yes.
14 Q.  Any verbal communication?
15 A.  (Witness nods head negatively.)
16 Q.  Ever spoke to him about anything?
17 A.  Other than just --
18 Q.  Hey, how are you?
19 A.  Yeah.
20 Q.  You never talked to Charles Duggan about your
21     complaints, this lawsuit, policies, procedures,
22     hiring, promotion, race discrimination or
23     anything?

Page 175

1  A.  No.  No, sir.  He just took over that job
2      probably a year and a half ago.
3  Q.  Did you ever have any with his predecessor,
4      David Watkins?
5  A.  No, sir.
6  Q.  Did you ever have any with Doug Watkins?
7  A.  No, sir.
8  Q.  Did you ever have any conversation with Cortez
9      Lawrence complaining about race discrimination
10     or promotions or hiring?
11 A.  No, sir.
12 Q.  If you would, just summarize for me what your
13     complaints are, why you filed this lawsuit.
14         MR. HORSLEY:  Object to the form.
15 A.  I got the way the City conducts its policy and
16     procedures as far as using that test and that
17     that disparate impact claim, because you can
18     look around at the numbers and you can tell it's
19     having an impact.
20 Q.  And I guess the gist of all that is that you're
21     complaining that you've been denied a promotion
22     because of your race?
23 A.  Yes, sir.

Page 176

1  Q.  As a result of --
2  A.  Of the policy of giving that test with that
3      cutoff score.
4  Q.  And the disparate impact?
5  A.  Yes.
6  Q.  Tell me what you understand, if anything, that
7      Larry Langley had to do with the two things that
8      you just told me about.
9  A.  He didn't hire -- He was telling me he know he
10     need to hire some blacks.  And he was a
11     decision-maker so I figured if he was telling
12     me, he could go out and make something
13     happened.  And he upheld the fact to give us
14     this promotional procedure.
15 Q.  Anything else you think Larry Langley did to
16     discriminate against you on the basis of your
17     race?
18 A.  No.  Those two.
19 Q.  What do you think Lee Lamar did to discriminate
20     against you on the basis of your race?
21 A.  He was part of the decision-making process to do
22     it this way, to promote this way.
23 Q.  The procedure that was in place?

Deposition of Eddie Ogletree                                                                                          June 6, 2008

---

Page 177

1   A. Exactly.
2   Q. Written test and the assessment center?
3   A. Exactly.
4   Q. Anything specifically you know that Lee did?
5   A. No.
6   Q. What is it that Mayor Ham did that you think --
7   A. His decision --
8   Q. Let me get my question out.
9       What is it that Mayor Ham did in your
10      opinion that discriminated against you on the
11      basis of your race?
12  A. I'm sorry about cutting you off.
13      He's a decision-maker, and he upheld that
14      decision when we filed the grievance.
15  Q. Upheld the grievance?
16  A. Upheld the decision not to promote us after we
17      filed a grievance. I guess he in the chain.
18  Q. Well, do you know of anything in particular he
19      did in regard to the test or the promotion
20      procedure?
21  A. No, not anything particular.
22  Q. Other than being mayor, do you know of any
23      involvement he had in this?

---

Page 178

1   A. No, sir.
2   Q. And Steve Reeves. What is it that you think
3       Steve Reeves has done to discriminate against
4       you on the basis of race?
5   A. He upheld the decision. He was part of the
6       chain that made the decision to promote this
7       way.
8   Q. To implement the procedure you're complaining
9       about?
10  A. Yes, sir.
11  Q. Anything else that Steve Reeves did?
12  A. Not that I can think of.
13  Q. I don't want to keep beating this up. Let's say
14      that's true. Let's say Steve Reeves had some
15      input. Do you say he did that knowing it was
16      going to affect blacks?
17      MR. HORSLEY: Object to the form.
18  A. I have no idea. I know it did affect blacks. I
19      can't say what they were thinking before.
20  Q. I understand that, but you sued him claiming he
21      racially discriminated against you --
22  A. That's the way it end up.
23  Q. Other than approving the policy, if he did,

---

Page 179

1   other than whatever input he had in the
2   promotion procedure, you say he intentionally
3   did that to discriminate against you on the
4   basis of your race?
5       MR. HORSLEY: Object to the form.
6   A. I can't say he intentionally did anything.
7   Q. Well, let's go through it, and I'll get that
8       question next.
9       Bill James. What do you say Bill James did
10      to discriminate against you on the basis of your
11      race?
12  A. He upheld the decision to promote this way --
13      use the procedure to promote.
14  Q. And Charles Duggan, what do you say --
15  A. He had the final say, and he upheld the decision
16      not to promote us.
17  Q. Let's say you're correct, that all these six
18      folks -- Langley, Lamar, Ham, Reeves, James, and
19      Duggan -- all had a hand in agreeing to the
20      procedure that was being used. Do you have any
21      evidence, any facts, any hearsay, any documents,
22      anything that would lend weight to a claim that
23      those people did it with the purpose of racially

---

Page 180

1   discriminating against you and Lieutenant
2   Stephens?
3       MR. HORSLEY: Object to the form.
4   A. Everything I have, sir, my lawyer has, documents
5       and otherwise. So I wouldn't -- I'm not a legal
6       mind. That's why we hired him.
7   Q. But do you know of anything?
8   A. No, I don't.
9   Q. Do you know of any reason that Larry Langley
10      would discriminate against you on the basis of
11      your race?
12  A. I don't have any evidence, and I don't know
13      anything.
14  Q. In summary, is it fair to say that you don't
15      have any evidence that any of these individuals
16      discriminated against you? Your complaint is
17      that the procedure was in place, and you didn't
18      get promoted as a result of the procedure in
19      place?
20      MR. HORSLEY: Object to the form.
21  A. Yes, sir.
22  Q. You don't know of anything that Lee did or Steve
23      did or Bill Ham or James or anybody did to keep

---

Page 181

1    you from being promoted because of your race?
2            MR. HORSLEY: Object to the form.
3    A.  I don't have -- No, sir.
4            MR. MORGAN: I've got one little
5            area.  If we can take about a
6            five-minute break, I may be about
7            through.
8            MR. HORSLEY: Okay.
9            (Brief recess.)
10   Q.  (Continuing by Mr. Morgan) Tell me what damages
11       you claim in this lawsuit.  How do you claim
12       you've been damaged and what do you seek for
13       relief?
14           MR. HORSLEY: Object to the form.
15   A.  I think it's punitive.
16   Q.  Punitive?
17   A.  I think it's punitive damages on there.
18   Q.  Well --
19   A.  And compensatory.
20   Q.  Tell me what compensatory damages you claim
21       you've been denied or that you're entitled to.
22           MR. HORSLEY: Object to the form.
23   A.  That's the raise that go along with being

Page 182

1    promoted, the raise in your retirement benefits.
2    Q.  Any other money damages?
3    A.  I wouldn't know any right now when it comes to
4        that.  I know that's immediate right there.
5        That's immediate effect.
6    Q.  Do you make any claim for mental anguish or
7        emotional distress?
8    A.  Like I said before, my wife worry about me
9        because I'm usually a pretty happy-go-lucky
10       guy.  And it's been weighing on me a little bit.
11   Q.  What do you mean by weighing in on you?
12   A.  You know, I'm thinking about it all the time.
13       I'm bothering her, you know.  I don't take
14       lightly what's going on here and everything, and
15       it's just -- You know, to think that you done
16       put as many years as I have at a place and to be
17       denied a promotion, it just bothers you.  It
18       bothers you.
19   Q.  Well, have you been to see any doctors about
20       being bothered?
21   A.  No.  I got doctors I see, but not lately.
22   Q.  What doctors do you see?
23   A.  Well, I got a chronic stomach problem anyway,

Page 183

1    and so I ...
2    Q.  How long have you had that?
3    A.  Years.
4    Q.  Who do you see for that?
5    A.  Dr. Boyer.
6    Q.  Do you have what I call a family doctor or
7        primary care physician?
8    A.  Yes.
9    Q.  Who is that?
10   A.  I'm trying to call his name.  He got a foreign
11       name.  I missed my last appointment so -- I
12       can't think of his name right off, but I got a
13       family doctor I see.
14   Q.  Have you seen any psychiatrists or
15       psychologists --
16   A.  No, sir.
17   Q.  -- or mental health specialists for this
18       weighing on your mind?
19   A.  No, sir.
20   Q.  Received any medications or prescriptions for
21       sleeping or nerves or being anxious or anything?
22   A.  No, sir.  I take blood pressure medication,
23       but --

Page 184

1    Q.  You already did that before?
2    A.  Yes, sir.
3    Q.  Have you complained to Boyer or this
4        foreign-named doctor or any other doctor about
5        anxiety, nervousness, complaints about this
6        lawsuit or anything?
7    A.  No, sir.
8    Q.  Complaints about any of your employment with the
9        City or promotion?
10   A.  I just --
11   Q.  Any complaints or seen any medical providers,
12       psychological or anybody?
13   A.  No, I haven't complained to any.
14   Q.  Any other compensatory damages other than the
15       raise, increase in retirement benefits, and the
16       mental anguish and emotional distress?
17   A.  No.
18   Q.  And you said punitive damages.  Is there
19       anything that you know of that these six
20       individuals that you've sued -- let me just
21       rephrase it -- that any of these individuals
22       you've sued has done wrong that you think would
23       entitle you to punitive damages from them?

Page 185

1            MR. HORSLEY:  Object to the form.
2    A.  No.
3    Q.  I think we've been through this before.  You
4        don't know of anything they did to intentionally
5        discriminate against you because of your race?
6    A.  No.  That's right.  I don't know.
7    Q.  Have we covered all your damages?
8    A.  I think that's it.
9            MR. MORGAN:  That's it.
10           EXAMINATION
11   BY MR. HANCOCK:
12   Q.  Mr. Ogletree, I want to make sure I fully
13       understand your disparate impact claim.  My
14       understanding is you're not claiming that the
15       test -- the CWH test itself had a negative
16       impact on black employees at the Auburn Fire
17       Department, are you?
18   A.  Not the test itself.
19   Q.  It's the policy that utilizes the test as part
20       of it, but it was the policy that didn't take
21       into consideration years of service, that didn't
22       allow all applicants to go through all phases of
23       the process, including the practical side, the

Page 186

1        assessment, the in-basket and that sort of
2        thing, and result in a total score of looking at
3        all components of the process; is that correct?
4    A.  Yes, sir.
5            MR. HANCOCK:  No further questions.
6            MR. MORGAN:  Is that it?
7            MR. HANCOCK:  Richard, do you mind if
8        I ask Mr. Stephens those same
9        questions?
10           MR. HORSLEY:  That's fine.
11           (Off-the-record discussion.)
12           EXAMINATION CONTINUING OF MR. OGLETREE
13   BY MR. MORGAN:
14   Q.  You don't have a complaint about the test and
15       the way it was graded or the way the scores came
16       out.  You just complained that you weren't
17       allowed to go through the whole process?
18           MR. HORSLEY:  Object to the form.
19   A.  Yes, sir.
20           MR. HORSLEY:  I'm objecting to the
21       form because he has already
22       testified about problems that he
23       did have with the test itself and

Page 187

1        that's --
2    Q.  Well, you thought -- do you think the test
3        fairly tested what a battalion chief did at the
4        City of Auburn, the written test?
5            MR. HORSLEY:  Object to the form.
6    A.  I answered it -- I told -- It's back in my
7        testimony that I didn't think some components of
8        it we used at the City of Auburn.
9            MR. MORGAN:  Okay.
10           EXAMINATION
11   BY MR. HANCOCK:
12   Q.  But you're not claiming in this lawsuit that the
13       vagueness of the test is what caused the adverse
14       impact.  It's the City's policy of not taking
15       into consideration other factors and allowing
16       the applicants to go through the entire process?
17           MR. MORGAN:  Object to the form of
18       that question.
19           MR. HANCOCK:  I'm just asking what his
20       claim is in this lawsuit.
21   A.  Yes, sir.
22           EXAMINATION
23   BY MR. MORGAN:

Page 188

1    Q.  So just to be clear, your only complaint with
2        the test; that is, whether it tested stuff you
3        were supposed to do, disparate impact -- your
4        only complaint with the test is the 70 cutoff
5        score; otherwise, you're happy with the test?
6            MR. HORSLEY:  Object to the form.
7    A.  Yes, sir.
8        ADDITIONAL EXAMINATION OF MR. STEPHENS
9    BY MR. HANCOCK:
10   Q.  Mr. Stephens, you've heard the questions that
11       Mr. Morgan and I have asked Mr. Ogletree.  Do
12       you agree -- Is your testimony and your position
13       in this lawsuit and the claims you bring the
14       same that Mr. Ogletree has just testified to?
15   A.  Yes, sir --
16           MR. MORGAN:  Object to the form.
17   A.  -- it is the same.
18   Q.  You don't have a complaint about the test
19       itself; it's the City's policy of not using
20       additional factors in the ultimate decision as
21       to who would be promoted to battalion chief; is
22       that correct?
23           MR. MORGAN:  Object to the form.

Page 189

1   A.  Yes, sir.
2        MR. HANCOCK:  Nothing else.
3        EXAMINATION
4   BY MR. MORGAN:
5   Q.  Just to be clear, you do not make any claim in
6       this lawsuit that the test itself, the written
7       test, has a disparate impact; is that true?
8        MR. HORSLEY:  Object to the form.
9        That's a legal question.
10  Q.  Well, do you claim or don't claim that the
11      written test has a disparate impact?
12       MR. HORSLEY:  Object to the form.
13  Q.  Do you know one way or the other?
14  A.  I don't know one way or the other, Mr. Morgan.
15  Q.  Do you claim in this lawsuit -- Wait a minute.
16      Let me rephrase.
17       Do you agree that the test -- the written
18      test is job related and tests those factors that
19      are important for a battalion chief with the
20      City of Auburn Fire Department?
21       MR. HORSLEY:  Object to the form.  You
22       can answer.
23  A.  Again, Mr. Morgan, I'm not a expert.  Your

Page 190

1   question, related to the field of fire
2   profession, but I don't necessarily think it
3   applies to the way we do things in Auburn.
4        MR. MORGAN:  I don't have anything
5        else.
6        (Deposition concluded at approximately
7        1:05 p.m.)
8        * * * * * * * * * * * *
9        FURTHER DEPONENT SAITH NOT
10       * * * * * * * * * * * *
11
12       REPORTER'S CERTIFICATE
13  STATE OF ALABAMA:
    MONTGOMERY COUNTY:
14
15       I, Pamela A. Wilbanks, CCR, Registered
16  Professional Reporter, and Commissioner for the State of
    Alabama at Large, do hereby certify that I reported the
17  deposition of:
18       EDDIE OGLETREE
19  who was first duly sworn by me to speak the truth, the
20  whole truth and nothing but the truth, in the matter of:
21       EDDIE OGLETREE, an individual,
22       GERALD STEPHENS, an
23

Page 191

1        Plaintiffs,
2        Vs.
3        CITY OF AUBURN, a municipality
4        in the State of Alabama, LARRY
5        LANGLEY, and individual, LEE LAMAR,
6        an individual, BILL HAM, JR., an
7        individual, STEVEN A. REEVES, an
8        individual, BILL JAMES, an
9        individual, CHARLES M. DUGGAN, an
10       individual, and CORTEZ LAWRENCE,
11       an individual,
12       Defendants.
13   In The U.S. District Court
14   For the Middle District of Alabama
15   Eastern Division
16   3:07-CV-867-WKW
17  on Friday, June 6, 2008.
18       The foregoing 190 computer printed pages
19  contain a true and correct transcript of the examination
20  of said witness by counsel for the parties set out
21  herein.  The reading and signing of same is hereby
22  waived.
23       I further certify that I am neither of kin nor

Page 192

1   of counsel to the parties to said cause nor in any
2   manner interested in the results thereof.
3        This 17 day of June 2008.
4
5
6
7
8
9
10
11       _____
12       Pamela A. Wilbanks, ACCR #334
         Expiration Date:  9-30-2008
13       Registered Professional Reporter
         and Commissioner for the State
14       of Alabama at Large
15
16
17
18
19
20
21
22
23

# DEPOSITION TESTIMONY OF
# GERALD STEPHENS

# DEPOSITION OF GERALD STEPHENS

## May 30, 2008

## Pages 1 through 251

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                  EASTERN DIVISION
4
5    EDDIE OGLETREE, an individual,
     GERALD STEPHENS, an
6    individual,
7        Plaintiffs,
8    Vs.              CIVIL ACTION NO.
                      3:07-CV-867-WKW
9
     CITY OF AUBURN, a municipality
10   in The State of Alabama, LARRY
     LANGLEY, and individual, LEE LAMAR,
11   an individual, BILL HAM, JR., an
     individual, STEVEN A. REEVES, an
12   individual, BILL JAMES, an
     individual, CHARLES M. DUGGAN, an
13   individual, and CORTEZ LAWRENCE,
     an individual,
14
         Defendants.
15
         * * * * * * * * * * * * *
16
     DEPOSITION OF GERALD STEPHENS, taken pursuant
17
     to stipulation and agreement before Pamela A. Wilbanks,
18
     Certified Court Reporter, ACCR# 391, Registered
19
     Professional Reporter and Commissioner for the State of
20
     Alabama at Large, in the Law Offices of Hill, Hill,
21
     Carter, Franco, Cole & Black, 425 South Perry Street,
22
     Montgomery, Alabama, on Friday, May 30, 2008, commencing
23
```

**Page 2**

```
1              APPEARANCES
2    FOR THE PLAINTIFFS:
3    Mr. Richard F. Horsley
     KING, HORSLEY & LYONS
4    Attorneys at Law
     1 Metroplex Drive
5    Suite 280
     Birmingham, AL  35209
6
     FOR THE DEFENDANTS:
7
     Mr. Randall Morgan
8    HILL, HILL, CARTER, FRANCO, COLE & BLACK
     Attorneys at Law
9    425 South Perry Street
     Montgomery, Alabama
10
     FOR CWH:
11
     Mr. William K. Hancock
12   ADAMS & REESE
     Attorneys at Law
13   Suite 1100
     2100 Third Avenue North
14   Birmingham, AL  35203
15   ALSO PRESENT:
16   Mr. Eddie Ogletree
     Mr. Steven Reeves
17   Mr. Lee Lamar
18
         * * * * * * * * * * * * *
19
             EXAMINATION INDEX
20
     BY MR. MORGAN . . . . . . . . . . . 5
21   BY MR. HORSLEY . . . . . . . . . 237
     BY MR. MORGAN . . . . . . . . . 242
22
23       * * * * * * * * * * * * *
```

**Page 3**

```
1         DEFENDANTS' EXHIBIT INDEX
2    1  Copy of posting for the position of      78
        Battalion Chief
3
     2  Copy of memo sent by e-mail dated 2/17/06   78
4       to all personnel from Mr. Lamar concerning
        the Battalion Chiefs Assessment
5
     3  Copy of memo sent by e-mail dated 2/23/06   80
6       to all career personnel from Chief Langley
        concerning the Battalion Chiefs Assessment
7
     4  Sign-in sheet for the Battalion Chief       83
8       Assessment Orientation dated 2/28/06
9    5  Copy of Auburn Fire Division Orientation    87
        Manual
10
     6  Copy of 3/3/06 letter to the Battalion     100
11      Chief candidates from Mr. Lamar
12   7  Auburn Fire Division Battalion Chief       100
        Reading List Check-out Sheet, 3/3/06
13
     8  Auburn Fire Division Battalion Chief       100
14      Reading List Check-out Sheet, 3/3/06
15   9  Mr. Stephens' application for the          104
        promotion to Battalion Chief
16
     10 Copy of 4/4/05 letter to Mr. Stephens from 125
17      Steve Reeves
18   11 Copy of 4/14/06 letter to Mr. Stephens from 127
        Stephanie King
19
     12 Copy of 4/21/06 letter to Mr. Chief Lamar  128
20      from Mr. Clanton, Mr. Hodge, Mr. Ogletree
        and Mr. Stephens
21
22   13 Copy of the Charge of Discrimination       188
23
```

**Page 4**

```
1              STIPULATION
2         It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of GERALD STEPHENS is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Pamela A. Wilbanks,
7    Registered Professional Reporter and Commissioner for
8    the State of Alabama at Large, without the formality of
9    a commission, that objections to questions other than
10   objections as to the form of the question need not be
11   made at this time but may be reserved for a ruling at
12   such time as the said deposition may be offered in
13   evidence or used for any other purpose by either party
14   provided for by the Statute.
15        It is further stipulated and agreed by and
16   between counsel representing the parties in this case
17   that the filing of said deposition is hereby waived and
18   may be introduced at the trial of this case or used in
19   any other manner by either party hereto provided for by
20   the Statute regardless of the waiving of the filing of
21   the same.
22        It is further stipulated and agreed by and
23   between the parties hereto and the witness that the
```

Page 5

1  signature of the witness to this deposition is hereby
2  waived.
3
4  . . . . . . . . . . . . . .
5        GERALD STEPHENS
6        The witness, after having first been duly sworn
7  to speak the truth, the whole truth and nothing but the
8  truth testified as follows:
9            EXAMINATION
10 BY MR. MORGAN:
11   Q.  State your name, please.
12   A.  My name is Gerald Stephens.
13   Q.  And Mr. Stephens, where do you live?
14   A.  I live in Auburn, Alabama.
15   Q.  What is your address?
16   A.  My address is 828 Cahaba Drive, Auburn, Alabama
17      36830.
18   Q.  And who do you live with there?
19   A.  I live with my wife and my son.
20   Q.  What is your wife's name?
21   A.  My wife name is Richetta, R-I-C-H-E-T-T-A.
22   Q.  And your son's name?
23

Page 6

1   Q.  Richetta, where does she work?
2   A.  Richetta works with Media General, which is a
3      company that oversees the Opelika-Auburn News of
4      Opelika.
5   Q.  And how old is your son Jameson?
6   A.  My son Jameson is four years old.
7   Q.  Do you have any ex-wives?
8   A.  No, sir, I don't.
9   Q.  Got any other children?
10  A.  Yes, sir, I do.
11  Q.  And their names and ages?
12  A.  I have one daughter.  She's 17 years old.  Her
13      name is Tarnesha, T-A-R-N-E-S-H-A.
14  Q.  And where does she live?
15  A.  She also lives in Auburn.
16  Q.  Does she attend high school there?
17  A.  Yes, sir, she does.
18  Q.  Which high school?
19  A.  Auburn High School.
20  Q.  Who is her mother?
21  A.  Her mother name is Tasha Smith.
22  Q.  Where does Tasha live?
23  A.  She also lives in Auburn.

Page 7

1   Q.  Where does she work?
2   A.  Last I recall she works at Lambert Child Care of
3      Auburn.
4   Q.  This case is in federal court, and I guess
5      probably the easiest thing would be to send some
6      interrogatories.  But I'm going to ask you if
7      you've got any relatives in any of these
8      counties.
9          Do you have any relatives by blood or
10     marriage in Lee County?
11  A.  Yes, sir, I do.
12  Q.  How about Chambers County?
13  A.  No, sir.
14  Q.  Macon County?
15  A.  No, sir.
16  Q.  Randolph County?
17  A.  No, sir.
18  Q.  Russell County?
19  A.  No, sir.
20  Q.  Tallapoosa County?
21  A.  No, sir.
22  Q.  How many relatives do you have in Lee County?
23  A.  Several.

Page 8

1   Q.  Let me just send an interrogatory.
2          Are your parents still living?
3   A.  My mother is.  My father is deceased.
4   Q.  Where does your mother work, if she does?
5   A.  My mother is retired.
6   Q.  From where?
7   A.  She was in child care.  She worked in several
8      different places.  The last place she worked was
9      First Baptist Church.
10  Q.  And what is her name?
11  A.  Dorothy Stephens.
12  Q.  And your father's name?
13  A.  James.
14  Q.  And where was his last employment?
15  A.  Post Office of Auburn, Alabama.  U.S. Postal
16      Service.
17  Q.  Do you have any brothers?
18  A.  I do.
19  Q.  That live in Lee County?
20  A.  Yes, sir.
21  Q.  How many?
22  A.  I have two brothers -- three brothers -- I'm
23      sorry -- that live in Lee County.

Page 9

1    Q.  Just give me their names.
2    A.  Terry Byrd.  B-Y-R-D, last name.  Russell Byrd
3        and Clemmon Byrd.
4    Q.  Where does Terry work?
5    A.  He's disabled at this time.  He doesn't work
6        anymore.
7    Q.  Russell?
8    A.  He's disabled as well.
9    Q.  And Clemmon?
10   A.  Clemmon is a police officer of the City of
11       Auburn, police division.
12   Q.  And are they married?
13   A.  Clemmon is.
14   Q.  What's his wife's name?
15   A.  Allison.
16   Q.  Where does she work?
17   A.  I think she works with Mental Health of Lee
18       County, if I'm not mistaken.
19   Q.  What's her maiden name?
20   A.  I'm not really sure about that, Mr. Morgan.
21   Q.  Got any sisters?
22   A.  I do.
23   Q.  How many sisters?

Page 10

1    A.  One sister.
2    Q.  And her name is ...
3    A.  Cassandra Stephens Pitts.
4    Q.  Where does she work?
5    A.  She works in Montgomery.
6    Q.  What does she do over here?
7    A.  She works with the IRS Department of the State.
8    Q.  And her husband's name, if she has one?
9    A.  She's divorced, but her ex-husband name is
10       Robert Pitts.
11   Q.  And where does he live and work?
12   A.  He works in Opelika.  He lives in Auburn.
13   Q.  What does he do in Opelika?
14   A.  He works at the UniRoyal Plant.
15   Q.  Are you a member or do you regularly attend a
16       church?
17   A.  Yes, sir, I do.
18   Q.  What is that church?
19   A.  My church home is Ebeneezer Baptist Church of
20       Auburn.
21   Q.  Do you attend another church?
22   A.  Mr. Morgan, I attend several churches in the
23       City of Auburn.  I attend my wife's church,

Page 11

1        which is St. Luke CME, also of Auburn.
2    Q.  Okay.
3    A.  I attend Auburn United Methodist Church, which
4        is also of Auburn.  And I also attend Greater
5        Peace Baptist Church, which is in Opelika,
6        Alabama.
7    Q.  But you are officially a member of Ebeneezer?
8    A.  Yes, sir.
9    Q.  And I assume you attend St. Luke's because your
10       wife goes there?
11   A.  Yes, sir.  Wife and son.
12   Q.  What about these other two:  Auburn United
13       Methodist and Greater Peace?
14   A.  Those are just neighboring churches in the
15       community that I'm affiliated with the people
16       that go there and the ministers.  So I attend
17       them on a regular basis.
18   Q.  Do you hold any position in any of these
19       churches?
20   A.  No, sir.
21   Q.  Deacon or anything like that?
22   A.  No, sir.
23   Q.  Are you a member of any clubs, civic, social --

Page 12

1    A.  I am a member -- I'm sorry.
2    Q.  -- political organizations in Lee County or any
3        of these other counties?
4    A.  I am a member of an organization by the name of
5        People of Action for Community Enrichment.  The
6        icon on that is PACE, and it is of Lee County.
7    Q.  What kind of group is that?  What do they do?
8    A.  It's a social communication where we implement
9        youth development and educational skills.  We
10       oversee our organization, which is a reading
11       club, to induce basically educational skills for
12       growing youth.
13   Q.  Is that a mixed race group?
14   A.  Yes, sir, it is.
15   Q.  Where is it located?  Does it have an address?
16   A.  We meet monthly in Opelika.  We don't have a
17       general area where we consider to be a part of.
18   Q.  Are there any other Auburn firefighters that are
19       members of that club?
20   A.  No, sir, not that I'm aware of.
21   Q.  Are you a member of the NAACP?
22   A.  No, sir.
23   Q.  Have we covered all your clubs, civic, political

Page 13

1    organizations?
2    A.  (Witness nods head positively.)
3    Q.  Any others?
4    A.  Not that I'm aware of at this time, sir.
5    Q.  Or any that you've been a member of, say, within
6        the last five years that you're no longer a
7        member of?
8    A.  I am a part of a Masonic organization, if that
9        would apply to it or whatever.
10   Q.  Okay.  Where is it located?
11   A.  Auburn.
12   Q.  What's the name of it?
13   A.  Milton W. Howze, H-O-W-Z-E.  Lodge Number 408.
14   Q.  And what does that organization do?
15   A.  Community involvement as far as -- Basically
16       what we do is just help out in the community,
17       help local businesses, fundraisers, anything
18       that pretty much enhances the community.
19   Q.  Have you, other than this lawsuit, been a
20       plaintiff, sued anyone else, other than this
21       lawsuit?
22   A.  No, sir, not that I can recall.
23   Q.  Have you ever been sued by anybody?

Page 14

1    A.  No, sir.
2    Q.  Ever been in bankruptcy?
3    A.  No, sir.
4    Q.  Have you ever had any judgments against you for
5        anything?
6    A.  In reference to -- Just in particular?
7    Q.  Anything.  Loans, collections --
8    A.  No, sir.
9    Q.  -- cases?  Anything?
10   A.  No, sir.
11   Q.  Have you ever been arrested?
12   A.  In my early years, yes, sir.
13   Q.  What for?
14   A.  I had a driving violation, 16 years old.
15   Q.  Like a speeding ticket?
16   A.  DUI.
17   Q.  Anything else?
18   A.  Other than speeding tickets.  From that point
19       on, no, sir.
20   Q.  And any convictions?  Were you convicted of the
21       DUI?
22   A.  Yes, sir, I was.
23   Q.  Any other convictions other than that?

Page 15

1    A.  No, sir.
2    Q.  Tell me about your educational background.
3        You're a high school graduate?
4    A.  Yes, sir.
5    Q.  Where did you graduate from?
6    A.  Auburn High School.
7    Q.  What year?
8    A.  1990.
9    Q.  Have you attended college or junior colleges?
10   A.  Yes, sir.
11   Q.  Where have you been?
12   A.  Auburn University.
13   Q.  What year did you start?
14   A.  1990.
15   Q.  And did you complete it?
16   A.  No, sir.  1992.  I did two years at Auburn
17       University.
18   Q.  What was your course of study?
19   A.  Business.
20   Q.  And what was the reason why you did not complete
21       it?
22   A.  I had a child at the time, and I needed to work.
23   Q.  Did you have any academic problems?

Page 16

1    A.  No, sir.
2    Q.  Any other formal education?
3    A.  Yes, sir.  I attended several junior colleges:
4        Southern Union, Chattahoochee Valley State
5        Community College, Shelton State Community
6        College, Alabama State Fire College.
7    Q.  Is that at Shelton State or is that separate?
8    A.  Yes, sir.  That's through Shelton State in
9        Tuscaloosa.
10   Q.  In terms of Southern Union, did you receive a
11       diploma, certificate or anything from that or
12       were you attending courses related to your fire
13       work?
14   A.  Courses related to my fire work.
15   Q.  And how about Chattahoochee Valley?  Same thing?
16   A.  Courses related to my fire work.
17   Q.  Shelton State?
18   A.  Yes, sir.  Courses related to my fire work.
19   Q.  And the Alabama Fire College, is that something
20       that all firefighters attend or do you have to
21       be selected to attend the Alabama Fire College?
22       How does that work at Auburn?
23   A.  As far as I've been working there, it was an

Page 17

1   opportunity for firefighters to go and to better
2   enhance themselves as far as the fire
3   professional field and career.
4   Q.  Do you have to attend the Alabama Fire College
5       as an employee of Auburn Fire Department?
6   A.  Yes, sir, I do.
7   Q.  So all firefighters, once they are hired and
8       become, I guess, non-probationary, they have to
9       attend the fire college?
10  A.  Yes, sir.  In order to be employed with the
11      Auburn Fire Division, to my understanding you
12      must undergo several weeks of training which
13      comes from the State Fire College through
14      certifications and all that.
15  Q.  Now, are there state-required minimum standards
16      for firefighters before you can be hired?
17  A.  Before?
18  Q.  Yes.  Or as part of your hiring process.
19  A.  Not before, no.  And I'm only speaking from my
20      experience.  When I was hired I underwent
21      educational and physical training through the
22      State Fire College at that point.  It was not
23      prior to.

Page 18

1   Q.  Okay.  In order to be certified in the state of
2       Alabama as a firefighter, do you have to
3       complete certain things?
4   A.  Yes, sir.
5   Q.  And what do those include?
6   A.  I had to complete Firefighter I certification.
7   Q.  And where did you do that?
8   A.  The training was conducted in Lee County at the
9       Opelika training grounds through my employer.
10  Q.  Are you a veteran?
11  A.  No, sir.
12  Q.  No time in the military?
13  A.  No, sir.
14  Q.  When were you first employed with the City of
15      Auburn?
16  A.  I was first employed in 1991.
17  Q.  Now, were you a student firefighter?
18  A.  Yes, sir, I was.
19  Q.  And tell me what you had to do to be a student
20      firefighter.
21  A.  Of course, I had to submit an application.  And
22      once selected I had to undergo several weeks of
23      training, what they consider to be a rookie

Page 19

1   school.
2   Q.  Who would be your supervisor when you were a
3       student firefighter?
4   A.  My immediate supervisor was a team leader.
5   Q.  Do you remember who?
6   A.  If I'm thinking correctly, my first team leader
7       was by the name of Ronald Blankenship.
8   Q.  And how long did you remain a student
9       firefighter?
10  A.  Three years.
11  Q.  That would have been up till about '94?
12  A.  Yes, sir.
13  Q.  And then you became a ...
14  A.  Career firefighter, yes, sir.
15  Q.  If you left Auburn in -- the university in '92,
16      how did you remain a student firefighter up
17      through '94?
18  A.  I went to Auburn University for two years, and
19      then after that I started taking courses through
20      the junior colleges.
21  Q.  Academic courses or fire-related courses?
22  A.  Both.
23  Q.  What junior colleges did you take academic

Page 20

1   courses in?
2   A.  Southern Union and Chattahoochee Valley.
3   Q.  Did you receive a certificate or diploma or
4       complete the coursework academically at either
5       Southern Union or Chattahoochee?
6   A.  I have my grades and records to show that I
7       attended those, but certification-wise, not
8       during that period of time.
9   Q.  What I'm asking is -- Usually, I guess, if you
10      go two years, you get some sort of certificate
11      at the end:  I've completed this course of study
12      at a junior college.  Did you ever achieve that
13      from either Southern Union or Chattahoochee?
14  A.  No, sir.
15  Q.  But that allowed you to stay on as a student
16      firefighter?
17  A.  Yes, sir.
18  Q.  What did you do to become a regular firefighter?
19  A.  I submitted an application.
20  Q.  And I assume you were hired?
21  A.  Yes, sir.
22  Q.  According to my notes, I've got that you were
23      hired January 17, 1994.  Is that about right?

Page 21

1   A.  That was my first day on shift.  I was
2       actually -- According to my state retirement
3       records and all that, I officially started
4       January 1st.
5   Q.  Of '94?
6   A.  Yes, sir.
7   Q.  Speaking of retirement, do you get time credited
8       on your retirement for the period when you were
9       a student firefighter?
10  A.  I didn't ever get any, no, sir.
11  Q.  Do they do that now?
12  A.  Yes, sir.
13  Q.  So did they go back and pick up your three
14      years?
15  A.  Well, I was given an opportunity to do that, but
16      I didn't.
17  Q.  You would have had to have pay in, I guess?
18  A.  Yes, sir.
19  Q.  We talked about training, going to the Alabama
20      Fire College and the Firefighter I training you
21      received in Lee County.  Did you have to undergo
22      any additional training to be a career
23      firefighter from what you had already received

Page 22

1       as a student firefighter?
2   A.  Yes, sir.  I underwent a lot of training that
3       was basically voluntary that I chose to pursue
4       on my own.
5   Q.  Let me back up.
6           As a requirement -- I assume when you were
7       hired as a student firefighter, you had to have
8       fire training just like anybody else.
9   A.  Yes, sir.
10  Q.  Did you have to have any additional required
11      training when you made the transition from
12      student to career?
13  A.  Yes, sir.  I had to -- Within a year I had to
14      pass a course or certification of Firefighter
15      II.  And I can't remember how many years later,
16      but I was required to pass an apparatus operator
17      certification.
18  Q.  And I assume you did all that without any
19      problem?
20  A.  Yes, sir.  No problems.
21  Q.  Other than the fire department or fire division
22      with City of Auburn, have you had -- between
23      high school and becoming a career -- what I call

Page 23

1       a career firefighter in '94, did you have any
2       other employments?
3   A.  Yes, sir.
4   Q.  Where else were you employed?
5   A.  I had several.  I worked with Lamar Lawn Care,
6       and that's of Auburn.  I worked at JJ Raceway,
7       which is a convenience store/gas station, and
8       that's of Auburn.  I worked at Wal-Mart
9       Supercenter, and that was in Opelika, Alabama.
10      I'm trying to think.  Two years ago I started my
11      own business as a lawn care and landscaping
12      service business, and I've been doing that for
13      two years.  I think I touched them all.  I
14      think.
15  Q.  Now, I'm aware of two EEOC charges which you
16      filed.
17  A.  Yes, sir.
18  Q.  The one about the battalion chief and promotion,
19      and then one several years earlier that I think
20      had to do with the Horace Clanton assignment.
21          Have you filed any other EEOC charges other
22      than those two?  Not just the City of Auburn but
23      anybody.  Any other, other than those two EEOC

Page 24

1       charges?
2   A.  No, sir, I haven't.  Other than the two you've
3       spoken of.
4   Q.  And in the grievances, I'm aware that you filed
5       a grievance after the battalion chief promotion
6       procedure.  Have you filed any other grievances
7       with the City of Auburn?
8   A.  I have initiated grievances, but I've never
9       completed them.  Well, I didn't complete those
10      that were initiated.  After going through the
11      procedures that are in place with the City, it
12      was handled through the process.
13  Q.  Let me get a list of those.  The battalion
14      chief -- The grievance related to the battalion
15      chief promotion, you completed that process?
16  A.  Yes, sir.
17  Q.  What grievances have you filed that you
18      didn't -- Let me back up.  I want to be clear.
19          That's the only grievance procedure that
20      you've completed?
21  A.  It was two grievance procedures I completed.
22      One was in 2005 where I went -- where I
23      underwent all the procedures of the City and

Deposition of Gerald Stephens                                                    May 30, 2008

Page 25

1    actually had a hearing. And that was in 2005
2    where I was pretty much on my -- alone on that
3    grievance and pursued all procedures in
4    reference to.
5    Q.  What was the 2005 one about?
6    A.  That one was about -- That was when Mr. Horace
7       Clanton was assigned as acting battalion chief
8       in the presence of our official battalion chief
9       who had health issues at the time.
10   Q.  You actually had a hearing on it?
11   A.  Yes, sir.
12   Q.  Who was the hearing officer?
13   A.  The city Judge, Judge Joe Bailey.
14   Q.  Just briefly, what was the outcome of his --
15   A.  That I can recall, basically they stated that
16      they didn't find anything in reference to me
17      having a grievance or any grounds in reference
18      to my complaint that I was applying on the City.
19   Q.  Were you the only person involved in that
20      grievance?
21   A.  Yes, sir.
22   Q.  And is that the same incident or scenario that
23      led to the EEOC charge?

Page 26

1    A.  The first one.
2    Q.  Yes, sir.
3    A.  Yes, sir.
4    Q.  And did you receive a right to sue letter on
5       that first EEOC charge involving Mr. Clanton?
6    A.  From the attorney firm that I had at that time,
7       yes, I did receive one.
8    Q.  You had a law firm representing you at that
9       time?
10   A.  I had a law firm I was consulting with, yes.
11   Q.  Who were they?
12   A.  Brooks Law Firm of Birmingham, Alabama.
13   Q.  But my understanding is you did not file a
14      lawsuit as a result of that EEOC complaint; is
15      that true?
16   A.  No, sir.
17   Q.  No, sir, you --
18   A.  No, I didn't.
19   Q.  It's true you did not file a complaint?
20   A.  I filed a complaint and went all the way through
21      the hearing and to the point where I got the
22      right to sue letter, but after --
23           MR. HORSLEY:  He's talking about a

Page 27

1           lawsuit.
2    Q.  You didn't file a lawsuit as a result of that?
3    A.  No, sir.
4    Q.  So you didn't file a lawsuit as a result of
5       either that EEOC charge or grievance?
6    A.  No, sir.
7    Q.  Tell me what other grievances that you filed
8       with the City that you didn't complete the
9       process.
10   A.  Past and present?
11   Q.  Yeah. All of them.
12   A.  All of them. Okay.
13   Q.  Well, let me back up. I want all of them, but
14      if you have any present ones that are still
15      pending, I'm going to put them in a different
16      category.
17   A.  Okay.
18   Q.  Do you have any grievances that are still
19      pending?
20   A.  No, sir.
21   Q.  So all --
22   A.  Present day, no, sir.
23   Q.  So all the grievances that you're about to tell

Page 28

1    me about you filed but did not complete the
2    process?
3    A.  I didn't go through the whole process where a
4       hearing was involved.
5    Q.  Okay. Tell me about those grievances. And if
6       you can, start at your earliest one that you can
7       remember.
8    A.  If I'm thinking correctly, the first one I ever
9       filed was in 2001, and that was filed on my
10      immediate supervisor, Melvin Dean Garrett.
11   Q.  Just tell me what was the nature of the
12      grievance.
13   A.  Basically I was being labeled as a problem from
14      my immediate supervisor and coworkers, and I
15      thought I was being treated unfairly. So I
16      underwent the grievance procedures of the City.
17   Q.  And how was that resolved?
18   A.  Basically it was resolved when we got to the
19      acting fire chief at the time, Mr. Larry
20      Langley.
21   Q.  And how did Mr. Langley resolve it?
22   A.  Basically the problem was confronted at hand,
23      and to make a long story short, we left the room

Deposition of Gerald Stephens                                                                    May 30, 2008

Page 29

1   with an understanding that the problem wouldn't
2   happen again.
3   Q.  And did that work out to your satisfaction?
4   A.  For a little bit of time it did, yes, sir.
5   Q.  What was there about being labeled a problem
6       that you considered being unfair treatment?
7   A.  Well, there was a lot of things going on on
8       shift whereas it was presented to me that people
9       had problems working for me, working with me,
10      or, better yet, just saying overall that I
11      wanted things done my way, of that nature,
12      whereas I was doing basically what I was told or
13      advised to do through my immediate supervisor,
14      who was Captain Garrett at the time.
15  Q.  Now, you were a lieutenant then?
16  A.  Yes, sir.
17  Q.  And you would have reported to Captain Garrett?
18  A.  Yes, sir.  That's my immediate supervisor.
19  Q.  What location was this?
20  A.  This happened at Station 1.
21  Q.  And I want to be clear.  Would the captain have
22      been the highest ranking officer at Station 1 at
23      that time?

Page 30

1   A.  Captain Garrett was the shift commander for that
2       shift.  And if I'm thinking correctly, that
3       was -- I want to say it was A shift, but
4       don't -- I don't actually recall the actual
5       shift.  But he was the shift commander.
6   Q.  And would y'all have both been on the same shift
7       at the same time?
8   A.  Yes, sir.  Same station.
9   Q.  When is the next grievance that you recall?
10  A.  The next one was on -- was when I changed
11      shifts.  I went through a shift change and
12      received another immediate supervisor by the
13      name of Danny Leverette.
14  Q.  Just generally what was the nature of that
15      complaint?
16  A.  It was basically a problem from the previous
17      grievance I filed where it carried over, and the
18      same things pretty much started happening again.
19  Q.  You were labeled a problem?
20  A.  Yes, sir.
21  Q.  How was that resolved?
22  A.  Same procedures.  Underwent the procedures and
23      got to Mr. Langley's office again, and I

Page 31

1   requested that it stop.  And we left his office
2   with the understanding that it would.
3   Q.  And did it work out?
4   A.  For a little -- short period of time, yes.
5   Q.  And when is your next grievance?
6   A.  I'm trying to get them in order here.  I
7       initiated a grievance -- I don't recall the
8       date.  I initiated a grievance in reference to
9       my evaluation.  And basically that was about the
10      fact that my evaluation was due at a certain
11      time, and it wasn't according to the rules in
12      place.
13  Q.  Wasn't timely completed?
14  A.  No, sir, it wasn't timely.
15  Q.  And who was the person that was supposed to
16      evaluate you?
17  A.  I don't recall that, Mr. Morgan.  I'm sorry.
18  Q.  How was that --
19  A.  I received my evaluation.  It was late but I
20      received it.
21  Q.  Did you have to go any further than just
22      initiating a grievance?  Did you meet with Larry
23      Langley or --

Page 32

1   A.  No, sir.  I pretty much presented it to my
2       immediate supervisor.  What he did, I don't
3       know, but I received my evaluation immediately.
4   Q.  Any other grievances you filed?
5   A.  I've had to do that twice.  I had to file a
6       grievance twice on that, evaluation purposes.
7   Q.  Okay.
8   A.  For the same reasons.
9   Q.  And I assume it was the same result on each one
10      of them?
11  A.  Yes, sir.
12  Q.  You talked to your superior officer, and the
13      next thing is you get your evaluation?
14  A.  Yes, sir.
15  Q.  Any other grievances?
16  A.  If I'm thinking correctly, the next one was when
17      I was assigned to Station 5.  I'm sorry.  I'm
18      sorry.  Back up.
19          I started a grievance about an incident that
20      happened on the fire scene over a fire call that
21      involved Mr. Larry Langley.  And my immediate
22      supervisor at that time was the late Jimmy
23      Brown, who is deceased at this time.

Page 33

1    Q.   What rank was Langley at the time?
2    A.   Langley was acting fire chief.
3    Q.   Just briefly tell me what happened.
4    A.   Basically what happened on that incident was we
5         was on an actual working structure fire, fire
6         call, that day.  Captain Brown at the time was
7         not working.  The acting supervisor was Dennis
8         Carlisles.  And during the process of working
9         that structure fire, Mr. Langley arrived on the
10        scene.  And from what I saw, he was in the way.
11        He didn't have on his proper equipment, and we
12        was trying to work.  And basically I asked him
13        to remove himself from what we considered to be
14        the hot zone of the fire scene.  And the remark
15        he gave me back was something I probably
16        shouldn't say.
17   Q.   You can say it.  We've probably all heard
18        something similar.
19   A.   Well, to the best of my knowledge, he told me,
20        I'm the damn fire chief; I do what I want to do;
21        you just get to work.  Not in those exact
22        words.
23             So at that point I asked -- I went to the

Page 34

1         immediate supervisor, Mr. Carlisles, and asked
2         him could he remove him from the fire scene so
3         we could do our work.  And the response
4         Mr. Carlisles gave me at that time was, I told
5         him, and he basically told me he was the fire
6         chief and he do what he want to do.
7              So we worked through that and put the fire
8         out.  And after the fire when we returned to the
9         station, it was a called meeting for the
10        personnel on shift who actually fought the
11        fire.  And in this meeting, again Mr. Langley
12        became very irate with me in front of everybody
13        who was present.  And at that point I considered
14        things to be totally out of hand so I sat down,
15        and I just didn't say anything else until
16        everybody left.  And when everybody did leave,
17        to make a long story short, I told him that I
18        would not accept that type of behavior and I
19        just wasn't going to tolerate it.
20             So therefore I wrote a letter to my
21        immediate supervisor, who -- when he came back
22        to work.  Explained it to him, what happened.
23        And his response basically was, this is

Page 35

1         something that always happens at the fire scene;
2         you should be used to this by now; deal with
3         it.  And being that I got that response, I
4         decided not to do anything at that point but to
5         just have that documented and in my presence.
6    Q.   Any other grievances?
7    A.   I think the next one was when I was assigned to
8         Station 5, the new station that was recently
9         built or the last station that was recently
10        built, the fire station that was built in
11        Auburn.
12   Q.   Tell me about that one.
13   A.   This particular grievance involved an incident
14        where a young man was -- I'm trying to think of
15        a good word.  He was violated and he chose to
16        pursue it.
17   Q.   Who is this?
18   A.   His name was Paden Payton.
19   Q.   Pagan?
20   A.   Paden Payton.
21   Q.   P-A-D-E-N?
22   A.   Payton Paden.  I'm sorry.  P-A-Y-T-O-N
23        P-A-D-E-N.

Page 36

1    Q.   How was he violated?
2    A.   It was one of those situations where you're new
3         on the shift, and this is our way of initiating
4         you in sort of speaking, something that happens
5         or has happened at the fire station.  But this
6         particular time when it happened, he felt
7         violated and he came to me.
8    Q.   Can you tell me what it was that was done to him
9         or that he relayed to you?
10   A.   From what I was told and from what I observed
11        when it was presented to me, he was severely wet
12        down with water and covered with food product,
13        duck-taped, et cetera, et cetera, to the point
14        where -- He told me in the beginning it was
15        against his will.  Like I say, Mr. Morgan, I
16        didn't see it.  It was brought to me after the
17        fact.  And when I asked him what did he want me
18        to do about it in reference to, he said he
19        wanted me to do something.  So the only thing I
20        knew to do was to follow the procedures that
21        were in place for the City.
22   Q.   Is he a white male?
23   A.   He is a white male.

Page 37

1   Q.  Did you file a grievance on his behalf or did he
2       file his own grievance?
3   A.  Well, that's leading to -- everything that was
4       done was through me as his immediate
5       supervisor.  I guess I should just tell you all
6       in detail leading to the point where I did what
7       I did.  Would that be okay?
8   Q.  Sure.
9   A.  I presented in writing what I was told by him
10      and my guys on my shift to my immediate
11      supervisor.  From that point I think it went to
12      the Public Safety Department, whereas the deputy
13      fire chief, acting fire chief, training chief,
14      all those superior officers got involved to
15      investigate.  And to make a long story short, I
16      convinced Mr. Paden to the point that we can try
17      to resolve this in-house if we possibly can.  Of
18      course, he can do anything he want.  That was
19      his choice.  But as his immediate supervisor and
20      on the behalf of the division, I was trying to
21      resolve this in-house and in a progressive
22      manner as much as possible.  And it was.
23          Mr. Paden's request was to remain under my

Page 38

1       immediate supervision until he regained his
2       confidence.  And he did stay with me; that is,
3       until I was told to report to another station.
4       And when I was told to report to another
5       station, I didn't understand why.  And, of
6       course, when I told Payton that I was advised to
7       move to another station, he resigned.  And his
8       reason for resigning was that he asked to remain
9       under my immediate supervision until he regained
10      his confidence.  Being that they were moving me
11      and I wasn't there to be over him, he didn't
12      feel confident anymore to even work there and he
13      resigned.
14  Q.  What station was that?
15  A.  Station 5.
16  Q.  Is that something that's called hazing?
17  A.  Yes, sir, that's exactly what it is.
18  Q.  Did he participate in any hazing himself?
19  A.  According to the investigation from what I was
20      told, they say he did.  According to Mr. Paden,
21      he say he didn't.
22  Q.  Have you ever participated in any hazing?
23  A.  No, sir.

Page 39

1   Q.  Not even as a young firefighter?
2   A.  No, sir.
3   Q.  What's your next grievance that you started but
4       didn't complete?
5   A.  Well, I think the last grievance I started and
6       didn't complete was in reference to the incident
7       with Mr. Paden whereas I questioned why I was
8       being moved from Station 5.  And it was with
9       Mr. Lamar, who at the time was the deputy chief.
10  Q.  You went from 5 to where?
11  A.  I went from 5 to Station 4.
12  Q.  And did you file a grievance and it went up
13      to --
14  A.  I initiated a grievance, and it stopped at
15      Mr. Lamar.
16  Q.  And how was it resolved?
17  A.  Basically it was decided between him and my
18      immediate supervisor, who was Matthew Jordan.
19      What happened was that when I initiated a
20      grievance, the response was that Chief Jordan
21      was going administratively working Monday
22      through Friday and that a new shift commander
23      was stepping in by the name of Joey Darby.  And,

Page 40

1       of course, that took place, but I was still
2       given an opportunity to move back to Station 5
3       by Mr. Lamar.  And after conversing with my
4       immediate supervisor -- present immediate
5       supervisor, Mr. Darby, Chief Darby, and through
6       agreement with him as my immediate supervisor, I
7       chose to remain at Station 4 and just work
8       things out from that point.
9   Q.  Which station was Jordan the shift commander, 4
10      or 5?
11  A.  Chief Jordan was working administrative duties
12      as a battalion chief.  He was working in the
13      public safety building.  He was working Monday
14      through Friday schedule.  He was not assigned --
15      Prior to him becoming shift commander, he was
16      not assigned to a station.
17  Q.  Here's why I'm confused.  You were at Station 5
18      and transferred to Station 4.
19  A.  Yes, sir.
20  Q.  Did you have any problems with the shift
21      commander at Station 5?
22  A.  No, sir.
23  Q.  Did you want to leave Station 5?

Deposition of Gerald Stephens                                                                    May 30, 2008

Page 41

1   A.  No, sir.
2   Q.  When you arrived at Station 4, did you have any
3       problems with the shift commander?
4   A.  No, sir.
5   Q.  You just didn't want to go from 5 to 4?
6   A.  Basically I was asked to go to Station 5 when it
7       opened by Mr. Langley.  And I had put in a
8       request to go to Station 5 when it was being
9       built that I explained to my immediate
10      supervisor.  So my problem was here I am being
11      requested to go and asking to go, and a month
12      and a half later or right at almost two months
13      I'm being asked to leave.  And I wanted to know
14      why.
15   Q.  And did you ask somebody why?
16   A.  I asked Chief Jordan why.
17   Q.  What did he say?
18   A.  The response he gave me was:  You're closer to
19      home and you don't have to travel so far to get
20      to work.  And my response to him was:  For 14
21      years I've never been late for work regardless
22      of where the station was and how far I had to
23      travel.

Page 42

1   Q.  But now that you're at -- Are you still at 4?
2   A.  I'm still at 4.
3   Q.  And once you got to 4 and you filed your
4      grievance, they gave you an opportunity to go
5      back to 5 and you elected to stay at 4?
6   A.  Yes, sir.  After speaking with my present
7      supervisor.
8   Q.  Is there some significance in Darby becoming the
9      shift commander --
10   A.  That was not my call.  That was somebody else's.
11   Q.  I mean is there some significance in him being
12      shift commander that influenced you to stay at
13      4?
14   A.  Yes, sir.
15   Q.  And what was that?
16   A.  Basically Chief Darby was coming on fresh.  He
17      hadn't made this decision with me.  And after
18      talking with him and letting him know what I
19      thought about the move in general, we just came
20      to a conclusion where we worked it out where I
21      would stay at 4 and the other guy would remain
22      at 5 who actually replaced me when I left.
23   Q.  And do you agree with me that it is up to the

Page 43

1      chief or his administrative assistant to
2      determine where firefighters should be assigned?
3   A.  It's not my decision, Mr. Morgan.  As far as I
4      know, it is everyone above me -- that's
5      battalion chief and up -- who make those
6      decisions.
7   Q.  And do you agree with me they are the ones that
8      should make those decisions?
9   A.  They are in position to make those decisions so
10      therefore, I guess, it's their duty to make
11      those decisions when the time come.
12   Q.  Now, you applied for promotion to lieutenant in
13      '96?
14   A.  Yes, sir.
15   Q.  And you were promoted?
16   A.  Yes, sir.
17   Q.  What was the procedure for lieutenant?
18   A.  At that time?
19   Q.  Yes, sir.
20   A.  At that time I underwent an assessment center.
21   Q.  Explain that to me.
22   A.  An assessment center consists of a panel of
23      assessors, non-affiliated with Auburn Fire

Page 44

1      Division or the City of Auburn in general.
2      Basically what you have is a panel of officers,
3      lieutenant or higher, who would sit through a
4      scenario or different scenarios throughout the
5      entire procedures.  I think the procedures at
6      that time lasted a week.  And basically what I
7      had to do was undergo these scenarios to the
8      point where they would take the information
9      received and grade me appropriately or
10      accordingly.  Didn't take a written test.  Had
11      to be eligible to apply for the position
12      basically was the only requirement.  And at that
13      time, I was eligible to apply; therefore, I did.
14   Q.  Do you remember what the eligibility
15      requirements were?
16   A.  No, sir, I don't recall.  But at the time I know
17      I had several certifications:  Firefighter I and
18      II, Instructor I and II, Fire Officer I and II,
19      hazmat technician, apparatus operator, pumper
20      certification.  Fire Inspector I, I think I had.
21   Q.  What I was asking actually is:  Were there any
22      time in grade requirements?  Did you have to be
23      a permanent firefighter?

Page 45

1    A.  l was never -- Well, you had to be a career
2        firefighter to apply.
3    Q.  Okay.
4    A.  But I was not given any pertinent time in
5        reference to applying for this position.
6    Q.  So if I became a career firefighter on April
7        1st, I could have taken the promotion procedure
8        for lieutenant on April 5?
9    A.  One thing I was told is that I couldn't apply if
10       I was on probation.
11   Q.  Okay.
12   A.  And I wasn't on probation when I applied.  Let
13       me confirm that.
14   Q.  How long is your probationary period?
15   A.  My probationary period when I became career --
16       well, when I became a student was one year.  My
17       probationary period when I became a career
18       firefighter was one year, and my probationary
19       period when I became a lieutenant was one year.
20   Q.  So you had to at least have one year of service
21       as a career firefighter to apply for lieutenant
22       when you applied?
23   A.  In reference to me, yes, sir.

Page 46

1    Q.  What were the ranks in the fire department in
2        '96 when you applied for lieutenant?
3    A.  Okay.  Chain of command in '96 was student
4        firefighter, career firefighter, team leader,
5        lieutenant, captain, deputy chief and fire
6        chief.  And that's from -- leads to your
7        superior.
8    Q.  And what was your understanding as to the
9        evolution of team leaders?  What were they to do
10       as you understood it and what did they do?
11   A.  Team leaders supervise student firefighters.
12       They were created contingent to the student
13       firefighter program whereas fire lieutenants was
14       part of the career ladder itself.  Student
15       firefighters and team leaders was a temporary
16       full-time position whereas lieutenant and up
17       were career positions:  salaries, benefits, the
18       whole nine.
19   Q.  And where did you get that understanding?
20   A.  I got it in writing from the requirements.  The
21       understanding, whatever, came through the City
22       of Auburn rules and regulations, et cetera.
23   Q.  Team leader would be a career firefighter?

Page 47

1    A.  A team leader would be a career -- The way it
2        worked was you had to be a career firefighter to
3        apply for team leader.  You couldn't apply for a
4        team leader position that I'm aware of as a
5        student firefighter.  You couldn't do it.
6    Q.  Student firefighters can't do anything but be
7        student firefighters.
8    A.  That's it.
9            MR. HORSLEY:  We're still talking
10       1996, right?
11   A.  Yes.
12   Q.  Yes.  I'm just trying to --
13   A.  Yes, sir.
14   Q.  -- get the promotion procedures as we go
15       forward.
16   A.  Understand, Mr. Morgan, I've never been a team
17       leader.
18   Q.  I understand.
19   A.  But from what I understand, you become career.
20       And if the position became available, these guys
21       applied, or the career firefighters who was
22       eligible or wanted to apply applied.
23   Q.  Are you familiar with the promotion process that

Page 48

1        was used for team leaders?
2    A.  All I can tell you, Mr. Morgan, was it was a
3        structured interview.
4    Q.  Did you ever participate in the structured
5        interview?
6    A.  I never went through a structured interview for
7        a team leader, but I have on occasion sat in as
8        an interview board.
9    Q.  You were on the interview board.  How many
10       interview boards did you have -- were you on?
11   A.  Several, Mr. Morgan.  Estimated four times, I
12       guess.  It was several times.
13   Q.  In your opinion has the role of a team leader
14       changed from what you just described in '96 up
15       until, what year was it, '06, I guess, that they
16       became lieutenants?
17   A.  Yes, sir.
18   Q.  Did the role of team leaders change during that
19       period of time?
20   A.  For the record, Mr. Morgan, I was the last
21       lieutenant promoted in the Auburn Fire
22       Division.  Anything after my promotion was team
23       leaders.

Page 49

1  Q.  How many lieutenants were there when you were
2      promoted?
3  A.  Three, maybe four.
4  Q.  You were the last lieutenant?
5  A.  I was the last lieutenant to be promoted in the
6      Auburn Fire Division through an assessment
7      center.
8  Q.  So then the team leaders that came after you,
9      did you assume the responsibilities of a
10     lieutenant?
11 A.  Through the powers that be, they were allowed to
12     conduct themselves on my level or on a level of
13     a fire lieutenant.
14 Q.  So their role, at least in your viewpoint,
15     expanded from just being supervisors for student
16     firefighters to assuming the responsibilities of
17     a lieutenant?
18 A.  They was assuming the responsibilities for
19     career firefighters.
20 Q.  Say the last year that there were team
21     leaders -- '04, '05, whatever year that may
22     be -- in your opinion was there any difference
23     in what you as a lieutenant did as opposed to

Page 50

1      what a team leader did?
2  A.  No, sir.  Basically from 1996 and up, they were
3      acting as station officers, which that's what I
4      am.  I'm a station officer.  I just had a
5      different title as they.  And I underwent a
6      different procedure as far as being promoted.
7      Other than that they stepped in as a station
8      officer and conducted themselves as a station
9      officer to their ability.
10 Q.  Once you were promoted to lieutenant, I assume
11     you had a new assignment at that point.
12 A.  As far as responsibilities, duties, stations and
13     all that?
14 Q.  Yes.
15 A.  Yes, sir.  I had a very wide range of
16     responsibilities and duties as a station
17     officer, fire lieutenant.
18 Q.  Did you apply for any more promotions between
19     lieutenant in '96 and the battalion chief
20     promotion in '06?
21 A.  Yes, sir.
22 Q.  What other promotions did you apply for?
23 A.  I applied for training chief -- the training

Page 51

1      officer position.  Excuse me.  I applied for the
2      deputy fire chief position.
3  Q.  When was the last captain's promotion?
4  A.  If I'm not mistaken, the last one was when I was
5      promoted.  When they did an assessment center
6      for me in '96, it was an assessment center for
7      lieutenants and captains.
8  Q.  So you never applied and went through an
9      assessment center for the position of captain;
10     is that correct?
11 A.  No, sir.
12 Q.  No, sir, it's not correct or --
13 A.  I didn't apply for the captain --
14 Q.  What I said is correct?  You never applied and
15     went through an assessment center for captain,
16     true?
17 A.  No, sir.
18         MR. HORSLEY:  That is true?
19 Q.  Wait a minute.
20 A.  That is true.  A captain position never came
21     available during my era.
22 Q.  So you did the lieutenant assessment in '96 at
23     the same time that they did the captain

Page 52

1      assessment?
2  A.  Yes, sir.
3  Q.  What procedure was used for training officer?
4  A.  I underwent what I consider to be a structured
5      interview.
6  Q.  Let me back up on the captain's assessment
7      center.
8          Other than the assessment center, do you
9      know of any other requirements at that time for
10     the captain's promotion?
11 A.  I'm not aware of that, sir.
12 Q.  Did you pay any attention one way or the other
13     what the captains had to do or were you just
14     interested in being a lieutenant at that time?
15 A.  I just -- It was totally separate.  If you
16     applied for lieutenant, you went to the
17     lieutenant.  If you applied for captain, you
18     went to captain.
19 Q.  The training officer was a structured interview,
20     and when was that promotion procedure?
21 A.  I don't recall the actual year or date.
22 Q.  Has it been, say, within the last five years?
23 A.  Yes, sir, it was within the last five.

Page 53

1  Q.  And who was promoted?
2  A.  A gentleman by the name of Terry Walker.
3  Q.  Is he still the training officer?
4  A.  No, sir.  He's retired.
5  Q.  Who took his place?
6  A.  A gentleman by the name of John Lankford.
7  Q.  Did you apply for training officer when
8      Lankford --
9  A.  No, sir, I did not.
10 Q.  So you applied for training officer one time,
11     and that was when Terry Walker received it?
12 A.  Yes, sir.
13 Q.  And that was a structured interview?
14 A.  Pretty much, sir, yes.
15 Q.  And you sat on, you told me, the structured
16     interview panels for team leaders?
17 A.  Yes, sir.
18 Q.  Was that a similar-type interview?  I'm sure the
19     questions were different, but people from
20     in-house, firefighters and others --
21 A.  The difference between team leaders and the
22     training officer was the team leader wasn't
23     intense like the training officer was.  The team

Page 54

1      leader basically was a panel of questions that
2      was presented to the candidate.  When I went
3      through training officer, I went through seven
4      different scenarios.  I had to make, I think it
5      was, a three-minute presentation.  I had to go
6      through what they call, I think it was, an
7      in-basket situation where you prioritize your
8      responsibilities for the day.  It's all on
9      paper.  And then you undergo an actual interview
10     where you sit down and they ask you questions,
11     you know.  Basically that was it.
12 Q.  Do you remember who was on your panel or the
13     panel?
14 A.  Dean Garrett, Danny Leverette, Lee Lamar, Larry
15     Langley.  I can't remember who else.
16 Q.  So these were all fire division people?
17 A.  Yes.  They was city employees, whether it was
18     human resources down through the fire division.
19 Q.  And Terry Walker, did you think that he was a
20     good hire?
21 A.  At the present time, Mr. Morgan, I didn't know
22     anything about Terry Walker so I can't say if he
23     was good or bad.  I don't know.

Page 55

1  Q.  And when did you apply for the deputy fire chief
2      position?
3  A.  Again, I don't actually remember the year and
4      date, but it was within the five years.
5  Q.  And who was promoted to that position?
6  A.  Lee Lamar.  Mr. Lee Lamar.
7  Q.  What was the procedure used at that time?
8  A.  Basically I submitted an application, and I went
9      to a structured interview at City Hall.
10 Q.  And the panel, was it all firefighters or fire
11     division or were there other people on the
12     panel?
13 A.  It was other people on the panel outside of the
14     fire division, yes.
15 Q.  So you had an application and a structured
16     interview?
17 A.  Yes, sir.
18 Q.  Any other component of that promotion procedure?
19 A.  No, sir.
20 Q.  And Mr. Lamar was promoted?
21 A.  Yes, sir.
22 Q.  Have we covered all the promotions that you've
23     actually applied for -- lieutenant, training

Page 56

1      officer, and deputy fire chief --
2  A.  Yes.
3  Q.  -- before the battalion chief?
4  A.  Yes, sir.
5  Q.  And then you sat on some of the interview panels
6      with the team leader position?
7  A.  Yes, sir.
8            MR. MORGAN:  Can we take a quick
9            break?
10           MR. HORSLEY:  Yeah.
11           (Brief recess was taken.)
12 Q.  (Continuing by Mr. Morgan) Did you have any
13     involvement or input into the last team leader
14     promotion procedure where a written test was
15     used?
16 A.  No, sir.
17 Q.  Did you know anything about the requirements for
18     that last team leader promotion procedure?
19 A.  No, sir.  The only thing I knew, Mr. Morgan, was
20     basically information that was presented the day
21     of that was going to be questioned to the
22     candidates.  That's all I know.  And I was asked
23     to be on the board.

Page 57

1  Q.  And so you were on the structured interview
2      board or panel for the last team leader
3      promotion?
4  A.  I don't know if it was the last one, but I do
5      know I've sat in on several.
6  Q.  Did you ever hear any complaints or comments
7      about a written test being a component of the
8      team leader promotion procedure?
9  A.  I don't recall a written test ever being a
10     component of the promotion procedure for a team
11     leader.
12  Q.  And then at some point there was a petition
13     presented to the City for team leaders to become
14     lieutenants.
15  A.  Yes, sir.
16  Q.  You're familiar with that?
17  A.  Yes, sir.
18  Q.  And you did not join in that petition?
19  A.  I wasn't given the opportunity to join,
20     Mr. Morgan.
21  Q.  How did that come about?
22  A.  The first I heard or seen anything in reference
23     to a petition for team leaders and the title

Page 58

1     change was December of 2005.
2  Q.  And what did you see or hear at that time?
3  A.  Basically me and two other of my insubordinates
4     (sic) were called to a meeting in the public
5     safety building. And basically this meeting was
6     in reference to whether we was for or opposed to
7     the title change from team leader to
8     lieutenants.
9  Q.  Who were the other two?
10  A.  Mr. Christopher Turner and Mr. Walter Allen.
11  Q.  Is it your testimony that's the first time that
12     you learned the City was considering or had been
13     petitioned to change from team leader to
14     lieutenant?
15  A.  From my understanding, Mr. Morgan, is basically
16     this all rendered from when the captains had a
17     title change to battalion chiefs. So therefore
18     the team leaders took it upon themselves to
19     pursue a title change as well. I had heard
20     rumors, but I didn't have any definite, you
21     know, idea or information in reference to they
22     were doing that until that day.
23  Q.  But you had heard rumors that the team leaders

Page 59

1     were making an effort to change it to
2     lieutenant?
3  A.  In the fire house, Mr. Morgan, you hear all kind
4     of rumors. I just don't believe them until I
5     see them.
6  Q.  So the first actual confirmation that you had
7     that that was under consideration was when you,
8     Chris Turner, and Walter Allen were called to a
9     meeting in December of '05?
10  A.  Yes, sir.
11  Q.  And who was that meeting with?
12  A.  It was my immediate supervisor, Dean Garrett,
13     Mr. Steve Reeves, Mr. Bill James, Mr. Lamar,
14     and, of course, Mr. Turner, and Mr. Allen. I
15     think that's everybody.
16  Q.  And what was the discussion?
17  A.  Basically the discussion was -- the floor was
18     pretty much open to the point in reference to
19     what we thought about it. And me, myself, I
20     requested to see everything in reference to, the
21     proposal and the reason why we were there and
22     all. And I was presented with the paperwork
23     that included thirteen signatures of team

Page 60

1     leaders. All the team leaders in the
2     department, their signature was on this
3     paperwork. And it was provided to me by the --
4     I guess the public safety director, Mr. James,
5     gave the okay for me to receive that, and it was
6     given to me by Mr. Reeves.
7  Q.  You received it at that meeting?
8  A.  Yes, sir.
9  Q.  Let me back up a minute.
10       Were you the last lieutenant when this
11     meeting was called?
12  A.  In 1996 I was the last lieutenant to be
13     promoted.
14  Q.  I understand that, but were you the last actual
15     lieutenant rank --
16  A.  Yes, sir.
17  Q.  -- in December of '05?
18  A.  The only one, yes, sir.
19  Q.  Now, were Chris Turner and Walter Allen the only
20     two career firefighters that were not team
21     leaders?
22  A.  I'm not sure about that, Mr. Morgan. All I know
23     is they were career firefighters.

Page 61

1   Q.   And Chris Turner is a black male?
2   A.   Yes, sir.
3   Q.   And Walter Allen is a white male?
4   A.   Yes, sir.
5   Q.   So you received the paperwork which showed that
6        all thirteen of the team leaders --
7            Which included Eddie Ogletree, true?
8   A.   Yes, sir.
9   Q.   -- had petitioned for team leaders to become
10       lieutenants?
11  A.   Yes, sir.  And understand, Mr. Morgan, that was
12       the first time I had seen actual paperwork in
13       reference to a petition being presented for team
14       leaders getting a title change.  That was the
15       first time.  And I confirmed that in the
16       meeting.  I was like, this is the first time
17       I've seen this; can I take time to read it.  And
18       I read it, and I asked for copies of it.
19  Q.   Do you know why you and Chris and Walter Allen
20       were called to that meeting?
21  A.   No, sir.  I don't know the actual reason, but I
22       know I did speak with Mr. Langley with my
23       immediate supervisor present prior to that

Page 62

1        meeting.  Mr. Langley.
2   Q.   Was he in this meeting?
3   A.   Yes, sir, he was.  If I'm thinking correctly, he
4        was.
5   Q.   So Langley, Lamar, James, Reeves, and Garrett
6        were in the meeting with you two?
7   A.   Yes, sir.
8   Q.   But then you said you spoke to Mr. Langley.  Did
9        you speak to him outside of this meeting?
10  A.   I had to sign a form.  I had to sign a form
11       saying I was in favor of or against the title
12       change.  And at that time, I submitted some
13       paperwork to Mr. Langley.
14  Q.   Let me back up.  I'm a little confused.
15           The form that you received whether you were
16       in favor or not in favor, did you receive that
17       before this meeting with these other people?
18  A.   I received it from Mr. Langley in his office
19       before that meeting.
20  Q.   That same day or a different day?
21  A.   I don't think it was the same day, no, sir.
22  Q.   So you had had an opportunity, then, before that
23       to put in whether or not you thought it was a

Page 63

1        good idea or bad idea?
2   A.   Yes, sir.  I had a choice to make in reference
3        to -- I was asked to fill out that paperwork and
4        enclose it in an envelope to be submitted to
5        human resources.
6   Q.   And did you do that?
7   A.   Yes, sir.
8   Q.   And that was all done before this meeting that
9        you're telling me about?
10  A.   Yes, sir.  Now, understand, now, this paperwork
11       I was given to sign off on was different from
12       the paper I received at the meeting.
13  Q.   Well, how was it different?
14  A.   Well, basically the letter I received from
15       Mr. Langley in the presence of Chief Garrett at
16       the time was saying was I for or against.
17  Q.   Right.  A vote.
18  A.   When I actually got in the meeting, I was, like,
19       can somebody provide me with some information in
20       reference to what's going on because this is new
21       to me, and I want to know, you know, what does
22       it involve.  And that's when I received the
23       paperwork stating everything that had been done

Page 64

1        to include the thirteen signatures.
2   Q.   So when Mr. Langley handed you this form where
3        you could vote "yes" or "no" on the name change,
4        you didn't understand what was going on?
5   A.   No, sir, I didn't.  Directly speaking, no, I
6        didn't know.
7   Q.   And Mr. Langley didn't explain it to you?
8   A.   He explained it to me, but, I mean, it's one of
9        those situations where I don't believe
10       everything I hear regardless of who it comes
11       from until I see it.  But I know the paperwork
12       that I saw and I signed, which was not in favor
13       of the title change.  And my main reason for
14       that, Mr. Morgan, was because I didn't know
15       nothing about it.  I was never given an
16       opportunity to -- in the beginning to sign with
17       the other thirteen signatures to say I was for
18       or against.
19  Q.   Well, looking back now, if you had been given
20       the information, would your vote have been
21       different?
22           MR. HORSLEY:  Object to the form.  You
23       can answer.

16 (Pages 61 to 64)

Page 65

1    A.   No, sir.  I still would have been against it.
2    Q.   But when Mr. Langley handed you this sheet of
3         paper, the form which you could vote, he didn't
4         explain to you why or that the City had been
5         petitioned by the team leaders?  He didn't
6         explain any of that to you?
7    A.   I don't recall exactly what he said,
8         Mr. Morgan.  But, like I said earlier, he gave
9         me the paper.  I read it.  I presented to him my
10        paperwork I had.  And he said no, and so I
11        marked the appropriate place indicating that I
12        was not in favor of it.  I folded the letter up
13        and put it in an envelope, sealed it, and gave
14        it to Mr. Langley.
15   Q.   What paperwork did you give Mr. Langley?
16   A.   I typed a letter myself on my behalf, the only
17        lieutenant in the division, and presented it to
18        him basically asking for -- in complaiance
19        (sic) to whatever the team leaders were doing.
20   Q.   Now, do you still have copies of that paperwork?
21   A.   Yes, sir, I do.
22   Q.   Well, I'm not trying to get into any privileged
23        conversations, but do you know if that paperwork

Page 66

1         was produced as part of your disclosures?
2              MR. MORGAN:  I can get with you later
3         on that.
4    A.   Mr. Horsley has it.  He has a copy of it.
5    Q.   Let me backtrack one minute.
6              When you applied for lieutenant, they had a
7         captain's promotion at the same time?
8    A.   Yes, sir.
9    Q.   Was there any time in grade requirements for the
10        captain promotion or could anybody apply for the
11        captain promotion?
12   A.   Again, sir, I don't know if there was any -- if
13        any of that applied.  I'm not sure.
14   Q.   You don't know whether or not you had to be a
15        lieutenant to apply for captain or whether just
16        a firefighter could apply for captain?
17   A.   The way it's supposed to work is that you follow
18        the chain of command as far as promotions.
19   Q.   So you gave Chief Langley -- I guess he was
20        chief at that time -- some paperwork dealing
21        with your complaints about team leaders?
22   A.   I presented to him a form that I had typed, and
23        I asked him to, you know, sign it, him and Chief

Page 67

1         Garrett both to sign it, if he was in agreement
2         of it.  And he told me no, and he would not
3         sign.  So did Chief Garrett, which Chief Garrett
4         was acting as a witness.
5    Q.   What was your paperwork, just the gist of it?
6    A.   Basically it was just, you know, from -- I guess
7         it was drawn upon and presented to him based
8         upon what I had heard.  And being that I was
9         called to his office to sign this form in
10        reference to, then therefore I presented to him
11        what I would like to have if this is the case.
12   Q.   And what is it that you would like to have?
13   A.   I wanted a title change.
14   Q.   So you knew then even before you went to see
15        Chief Langley that there were discussions about
16        a title change?
17   A.   I had heard rumors about a title change.  When I
18        was called to his office, of course, Chief
19        Garrett was with me.  That's when it was
20        confirmed through me that, yes, there was
21        something going on with the title change.
22   Q.   And did you take Garrett with you?
23   A.   Yes, sir.

Page 68

1    Q.   And so you wanted your own title changed?
2    A.   Yes, sir.  Just like everybody else, I wanted
3         one.
4    Q.   And what title change did you want?
5    A.   I wanted captain.
6    Q.   Well, now, at that time were there still captain
7         positions or had the captains been renamed
8         battalion chiefs?
9    A.   The captains had been renamed battalion chiefs.
10   Q.   So if the team leaders became lieutenants, you
11        wanted a title change from lieutenant to
12        captain?
13   A.   Yes, sir.
14   Q.   So then you and Chris Turner and Walter Allen
15        meet with these people that you've told me
16        about:  Dean, Steve, Lee, and Larry.  What did
17        y'all talk about in that meeting?
18   A.   Basically what was presented at the meeting was
19        basically what has been going on as far as the
20        paperwork that had been submitted, those who was
21        in favor of, the review of whatever rules and
22        regulations that was in place involving the
23        division and the -- fire division and the City,

Page 69

1    and basically where they were and what they was
2    going to do or what they was, you know, planning
3    to do.
4    Q.  What was it they were planning to do?
5    A.  They was planning to go forward with the title
6        change from team leaders to lieutenants.
7    Q.  And what was your response or reaction?
8    A.  Well, I tried to remain as calm and professional
9        as I possibly could.  Nevertheless, things got a
10       little out of order with Mr. Turner and
11       Mr. Allen.  So at that point I kind of thought
12       things was out of hand.  So therefore I just
13       renamed calm until I could actually speak on my
14       behalf in reference to what I thought.
15   Q.  And how did it get out of hand with Turner and
16       Allen?
17   A.  Apparently their reaction to it was their
18       reaction.  They reacted to it.  They got up.
19       They seemed to get a little irate about it and
20       all that and -- Something I would have never
21       done.
22   Q.  Do you remember any specific comments that
23       Turner or Allen made?

Page 70

1    A.  I recall a comment made by Turner when he was
2        asking for a title change as well.
3    Q.  What did he want to be?
4    A.  I don't know.  I don't know what he wanted to
5        be, being he was a firefighter.  I don't know.
6    Q.  Do you remember him making the statement that he
7        didn't have any opposition to team leaders being
8        lieutenants as long as he became a lieutenant?
9    A.  I don't recall that, Mr. Morgan.  I'm sorry.
10   Q.  Did you eventually make some verbal response to
11       what you had heard?
12   A.  Yes, sir, I did.
13   Q.  And what did you say?
14   A.  Basically what I did, Mr. Morgan, is when
15       everything calmed down to a certain point, I
16       asked to speak to Mr. James in private.  He
17       accepted my request.
18   Q.  What did y'all talk about?
19   A.  Basically I told Mr. James — I thanked him for
20       calling me in and letting me know what was
21       officially going on and working with me to bring
22       me up to par.  But at the same time, I told
23       Mr. James that there was a problem at the Auburn

Page 71

1    Fire Division and he needed to look into it.
2    Q.  What was that problem?
3    A.  Basically there was some things taking place
4        down there that I deemed unfair, that I deemed
5        inconsistent, that basically needed some
6        attention, needed to be looked into and
7        corrected before it got any worse.
8    Q.  And tell me what they are.
9    A.  Well, I mean --
10   Q.  Did you give him some specifics or --
11   A.  No, sir.  I didn't tell him anything specific
12       because at that time I thought -- it was several
13       things going on, and that's just me thinking
14       that.  I'm speaking for myself.
15   Q.  Well, did you tell Bill James what things were
16       going on that you thought were unfair or
17       inconsistent or needed attention?
18   A.  I was not specific with that, Mr. Morgan.
19   Q.  And what was Mr. James' response to your saying
20       that things were unfair or inconsistent?
21   A.  Mr. James was very, very considerate.  He was
22       very polite and very professional, and he say he
23       want everything to be right for everybody, not

Page 72

1    in those words.  But, again, I specifically
2    directed to him that there was a problem at the
3    Auburn Fire Division and he needed to look into
4    it.
5    Q.  Anything else that you recall saying to
6        Mr. James in y'all's private meeting?
7    A.  No, sir.  It was just very brief and very to the
8        point.
9    Q.  Anything else you recall saying in the meeting
10       with everyone other than asking to speak to
11       privately with Mr. James?
12   A.  I can't think of nothing else at this time,
13       Mr. Morgan.
14   Q.  Turner and Allen, you testified they became
15       irate and I think in your opinion probably acted
16       unprofessional?
17   A.  Yes, sir.
18   Q.  Did they leave before you asked to speak to Bill
19       James or did --
20   A.  I don't know exactly when they left, but at that
21       point when everything appeared to have calmed
22       down, I asked to speak to Mr. James in private.
23       And, you know, as far as how they departed and

Page 73

1    how they left, I really don't know.
2    Q.   Did you come back into the main meeting or did
3        you leave —
4    A.   No, sir, I didn't leave.  Me and Mr. James did
5        not leave.  Everybody else left, and me and
6        Mr. James stayed.
7    Q.   So they were gone and just the two of y'all?
8    A.   Yes, sir.
9    Q.   And then the name change was eventually approved
10       from team leader to lieutenant?
11   A.   Yes, sir, it was approved.
12   Q.   Are there any people or team leaders who in your
13       opinion are not qualified to serve as
14       lieutenants?
15   A.   I'm not in that position to say if they are
16       qualified or not, Mr. Morgan.  All I know is
17       they applied and they were promoted.
18   Q.   Now, let's backtrack a minute.
19   A.   Yes, sir.
20   Q.   My understanding is, I guess from your testimony
21       so I want to be clear on this, there had earlier
22       been a name change from captain to battalion
23       chief.

Page 74

1    A.   That's when it all started, yes, sir.
2    Q.   When did that occur?
3    A.   I'm not sure on the date, Mr. Morgan, but I know
4        it happened — I think it happened within the
5        past five years.  But, understand, that's when
6        the whole title change thing came about.  You
7        had all the captains made a proposal to the city
8        manager at the time.  And to make a long story
9        short, it happened.  So from that point, it just
10       went on.
11   Q.   Did you have any conversations with anybody that
12       would have been involved in that process?  And
13       I'm assuming that's going to be the city
14       manager, from what you've testified, the
15       captains, deputy chief, and chief.  Did you have
16       any conversations with any of those people about
17       the name change from captain to battalion chief?
18   A.   No, sir.
19   Q.   Did you have any conversations with any of these
20       people that you've sued in this lawsuit:  Larry
21       Langley, Lee Lamar, Bill Ham, Jr., Steven
22       Reeves, Bill James, Charles Duggan, and Cortez
23       Lawrence?  Did you have any conversations with

Page 75

1        any of them —
2    A.   No, sir.
3    Q.   — about the name change from —
4    A.   Other than the meeting that I had with Mr. Allen
5        and Mr. Turner, that's the only time I conversed
6        with Mr. Reeves.  That was in reference to team
7        leader to a lieutenant.  But nothing about — I
8        didn't have no dealings, didn't know how they
9        was doing it or what they were doing in
10       reference to captain to battalion chief.
11   Q.   Was Cortez Lawrence still employed with the City
12       when the name change occurred?
13   A.   To my knowledge, no.
14   Q.   He left —
15   A.   Years ago.
16   Q.   — years ago, didn't he?
17   A.   Yes, sir.
18   Q.   Do you know why he's been sued?
19   A.   I have no idea.
20       MR. HORSLEY:  Off the record.
21       (Brief off-the-record discussion.)
22   Q.   How was it announced, official announcement,
23       that from this day forward captains will now be

Page 76

1        battalion chiefs?  How would that be announced?
2    A.   If I'm thinking correctly, Mr. Morgan, it came
3        from a memorandum or a letter directed to the
4        division.  And, of course, when it occurred,
5        word of mouth.
6    Q.   And at that point captains were then referred to
7        as battalion chiefs?
8    A.   Yes, sir.
9    Q.   Did you make any formal complaint either through
10       the grievance procedure or EEOC protesting the
11       change from captain to battalion chief?
12   A.   No, sir.
13   Q.   Did you make any verbal complaints to Langley or
14       Lamar or Ham or Reeves or Bill James or Charles
15       Duggan?
16   A.   No, sir.
17   Q.   And from your observations, did the battalion
18       chiefs continue to operate similar to what the
19       captains had done before?
20   A.   Basically the only thing that changed was the
21       title.  The responsibilities and all that went
22       hand in hand.
23   Q.   When did you learn there would be a promotion

Page 77

1  procedure or process to battalion chief?
2  A.  I received it through a memorandum or a letter
3      directed to the division.
4  Q.  And did you receive it the same day or within a
5      day or two of the memorandum being published?
6  A.  Basically, if I'm thinking correctly, it was
7      posted.  I think it was done in two places:  At
8      the stations and through e-mail -- City e-mail.
9  Q.  The City has an e-mail?  They send out things on
10     e-mail?
11 A.  Yes, sir.
12 Q.  As an employee do you receive those e-mails on
13     duty or can you receive them off duty?
14 A.  The information -- I don't know what procedures
15     they use to send the information, but they send
16     them as far as I know randomly.  It could come
17     on a day when I'm at work.  It could come on a
18     day when I'm off work.
19 Q.  Do you have a home computer?
20 A.  Yes, sir, I do.
21 Q.  Can you check the City of Auburn Web site --
22 A.  Yes, sir.
23 Q.  -- for these e-mails from home?

Page 78

1  A.  Yes, sir.
2         (Defendant's Exhibits 1 and 2 marked
3            for identification.)
4  Q.  Let me show you what I'm marking as Defendant's
5      Exhibit Number 1.  Let me show you 1 and 2.
6      Does Defendant's Exhibit Number 1 appear to be
7      the posting for the position of battalion chief?
8  A.  It appears to be, yes, sir.
9  Q.  Is that what would have been posted in, you
10     said, two places:  the stations and -- Where was
11     the other place it would have been posted?
12 A.  E-mail.
13        Exhibit 1 was posted at the station.
14 Q.  And I think it's dated February 16.
15 A.  Yes, sir.  2006.
16 Q.  And would it be fair to say that you would have
17     observed that either February 16 or within a day
18     or two of that day?
19 A.  Within that week, yes, sir, I would have
20     observed it.
21 Q.  And in addition to it being posted at stations,
22     that job notice is also sent out by e-mail?
23 A.  Well, you haven't gotten to Exhibit 2 yet, but

Page 79

1  this one here, I think I saw it on e-mail.
2  Q.  I'm going to get to Number 2.
3  A.  But this one I saw in the station only.
4  Q.  Is Number 1 also sent by e-mail?
5  A.  I haven't seen nothing like this sent on e-mail.
6  Q.  But it's posted in the station?
7  A.  Yes, sir.
8  Q.  All right.  And then Defendant's Exhibit Number
9      2 is the one that you received by e-mail?
10 A.  If I'm thinking correctly, sir, I did get a copy
11     of this on e-mail.
12 Q.  And that's the memorandum I think you were
13     testifying about earlier?
14 A.  Yes, sir.
15 Q.  And it says you must be a current
16     non-probationary lieutenant.  It talks about an
17     orientation session, and it says a written exam
18     will be a component of the assessment process.
19     Reading materials have been obtained.
20        That's all in the e-mail that was sent on
21     Exhibit 2, true?
22 A.  Yes, sir.
23 Q.  When you received that e-mail, did you register

Page 80

1  any objection at that time to -- Let me back up.
2      I assume you would have received that
3  e-mail -- Is that memo also posted or is it just
4  sent by e-mail?
5  A.  I recall seeing one on the board just like this
6      one around the station, but it could easily be
7      somebody got a copy of the e-mail and put it up
8      there.  I don't know.
9  Q.  Is it fair to say you would have received that
10     e-mail or observed that memo either February 17
11     or within a day or two thereafter?
12 A.  Give or take within a week, yes, sir.
13 Q.  And did you make any complaints at that time to
14     anybody about the written exam being a component
15     of the assessment process?
16 A.  No, sir.
17        (Defendant's Exhibit 3 marked for
18           identification.)
19 Q.  And let me show you what's going to be marked as
20     Defendant's Exhibit Number 3, which is another
21     memo dated February 23, which discovered that
22     non-probationary firefighters and probationary
23     lieutenants were eligible and reaffirmed when

Page 81

1  the orientation was going to be. And that's
2  dated February 23. I assume that you either saw
3  or received that --
4  A.  Yes, sir, I did.
5  Q.  -- February 23rd or within a day or two of that?
6  A.  Yes, sir.
7  Q.  Did you register any complaint for
8  non-probationary firefighters or probationary
9  lieutenants being eligible to apply for the
10  battalion chief vacancy?
11  A.  When I read this, I was kind of puzzled due to
12  the fact that why are probationary employees
13  allowed to apply for this position, you know. I
14  was somewhat familiar of the first memo. But
15  when I received this one, it really puzzled me.
16  But, no, sir, I did not make a complaint. I
17  didn't say nothing. I just followed the
18  procedures in place.
19  Q.  You didn't have any conversations with anyone
20  about there being a written test component nor
21  probationary -- non-probationary firefighters
22  and probationary lieutenants being eligible. Is
23  that a fair statement?

Page 82

1  A.  Yes, sir, that's a fair statement.
2  Q.  And, now, I understand that at least in this
3  lawsuit you've made some complaint about there
4  being no non-probationary firefighters and
5  probationary lieutenants being eligible. Were
6  any non-probationary firefighters promoted to
7  battalion chief as a result of this process?
8  A.  As a result of this process, no, sir.
9  Q.  Were any probationary lieutenants promoted to
10  battalion chief as a result of this process?
11  A.  The only thing I can recall, Mr. Morgan, is I
12  recall an incident where a probationary
13  firefighter was promoted to team leader, and I
14  also recall an incident where a firefighter was
15  promoted to captain and then eventually promoted
16  to acting fire chief.
17  Q.  Well, my question is: In terms of the
18  complaints about the battalion chief promotion
19  procedure in 2006, isn't it true that no
20  non-probationary firefighters were promoted to
21  battalion chief in 2006?
22  A.  Yes, sir.
23  Q.  And were any probationary lieutenants promoted

Page 83

1  to battalion chief?
2  A.  No, sir.
3          (Defendant's Exhibit 4 marked for
4          identification.)
5  Q.  Let me show you what I'm going to mark as
6  Defendant's Exhibit Number 4. Do you recognize
7  that as the sign-in sheet for the battalion
8  chief assessment orientation, which was February
9  28, 2006?
10  A.  Yes, sir. This is the sheet.
11  Q.  And is that your signature?
12  A.  Yes, sir, that's my signature.
13  Q.  And you attended that orientation?
14  A.  Yes, sir, I did.
15  Q.  How long was that orientation?
16  A.  If I'm thinking correctly, it was two to three
17  hours.
18  Q.  Who conducted the orientation?
19  A.  It was several people there -- a couple of
20  people there, Mr. Morgan. You had two
21  representatives from human resources:
22  Ms. Stephanie King, Mr. Reeves. You had a
23  representative from the company who I guess

Page 84

1  provided the test for the division, CWH, I
2  suppose. He was there. Chief Lamar was there,
3  and I think vaguely Larry Langley was there.
4  Q.  You're not as certain on him, but you think he
5  was?
6  A.  I think I recall seeing him there for a short
7  period of time. Mr. Lamar pretty much handled
8  everything.
9  Q.  Any other non-applicants you recall being there
10  other than Stephanie King, Steve, the
11  representative from CWH, Lee Lamar, or Larry
12  Langley?
13  A.  No, sir, I don't recall anybody else.
14  Q.  The representative from CWH, was that a male or
15  female?
16  A.  It was a white male.
17  Q.  Look on that list and tell me who on that list
18  was a non-probationary firefighter.
19  A.  According to this list, nobody on here that I'm
20  aware of was a non-probationary firefighter.
21  Q.  Well, was everyone on that list a team leader
22  with the exception of Chris Turner?
23  A.  Chris Turner was a career firefighter.

Deposition of Gerald Stephens                                                    May 30, 2008

Page 85

1   Q.   And he was not a team leader or a lieutenant?
2   A.   No, sir.
3   Q.   Is he the only one on that list?
4   A.   Yes, sir.
5             MR. HORSLEY:  When you say team
6             leader, you're referring to team
7             leaders that have now been changed
8             to lieutenant?
9             MR. MORGAN:  Right.
10  Q.   My point is:  The only person on the list who
11       was not a lieutenant via assessment center or
12       team leader was Chris Turner, true?
13  A.   I'm not sure about Carson.  He may have been.
14       He may have not.  I'm not really sure.  But I
15       know Chris Turner was a firefighter.
16  Q.   And he's a black male?
17  A.   Yes, sir.
18  Q.   And the record will show this.  I'm not --
19  A.   Yes, sir.  I understand.
20  Q.   This isn't any test that you're going to pass or
21       fail, but do you recognize the names of anybody
22       else on the list other than Chris Turner that
23       was a career firefighter that was not a team

Page 86

1        leader or hadn't been either a team leader or
2        lieutenant?  You said possibly Clay Carson?
3   A.   Yes, sir.  I think Carson was a firefighter and
4        recently became a lieutenant, but I'm not clear
5        on him.  For the record, I know Chris Turner was
6        a firefighter.
7   Q.   There's no question Chris Turner was?
8   A.   No question.
9   Q.   And who on the list would have been a
10       probationary lieutenant --
11  A.   No one.
12  Q.   -- at the time?
13  A.   If it was anybody, it was Carson.
14  Q.   And did Clay Carson score -- he's a white male,
15       is he not?
16  A.   Yes, sir.
17  Q.   Did he score high enough on the written test to
18       go to the assessment portion of the battalion
19       chief --
20  A.   That I recall, Clay Carson did not take the
21       test.
22  Q.   Did not take the test.  Okay.
23  A.   He wasn't there when I took it.

Page 87

1   Q.   So we can take him out of the equation.
2   A.   If you choose to, yes, sir.
3   Q.   So the only career non-probationary firefighter
4        who took the battalion chief written test who
5        was not a lieutenant was Chris Turner, a black
6        male?
7   A.   I know Chris Turner took the test.
8   Q.   Did you keep notes of the orientation session?
9   A.   I don't recall taking any notes.  We were
10       provided study material in reference to the test
11       at some particular time or another.  But, no,
12       sir, I don't recall any notes I took during
13       orientation.
14            (Defendant's Exhibit 5 marked for
15            identification.)
16  Q.   I'm going to mark this as Number 5.  Did you
17       receive this document at the orientation?
18  A.   It looks familiar, Mr. Morgan.  Yes, sir.
19  Q.   And that is an Auburn Fire Division Orientation
20       Manual.  That's the title of it, true?
21  A.   Yes, sir.
22  Q.   And you did receive that at the orientation
23       session?

Page 88

1   A.   I think so.
2   Q.   And did the people that you've testified were
3        there -- Stephanie King, Steve Reeves, Lee and
4        the WCA's representative -- did they go over
5        that document with you?
6   A.   A lot of things was discussed that day,
7        Mr. Morgan.  I can't specifically remember what
8        was went over and what was discussed.  But it
9        was a lot of information involved, and
10       everything that I think was presented was
11       touched upon as far as orientation, yes, sir.
12  Q.   The bottom line is:  It was explained to the
13       applicants the testing process?
14  A.   Yes, sir.  It was told to us basically how it
15       would be implemented and worked and I guess
16       scored and applied to whatever was going on.
17  Q.   And the percentages as to people taking the
18       written test, who would be eligible to proceed
19       on to the assessment program part of it?
20  A.   Basically the understanding I had when I was
21       there was if you passed the written test, you
22       proceed.
23  Q.   If you didn't pass the written test --

22 (Pages 85 to 88)

Page 89

1   A.  If you didn't pass, you didn't proceed.
2   Q.  You talked about a reading material or study
3       material list. Did you receive a list -- I know
4       you got some books. I'm going to get to that in
5       a minute. Was there an actual list that was
6       given out or was the list discussed or was it in
7       that manual?
8   A.  The only thing I remember was that I was
9       notified to come to the public safety building
10      to Mr. Lamar's office and receive your study
11      material.
12  Q.  But you were made aware in the orientation
13      session that study materials would be provided?
14  A.  Yes, sir.
15  Q.  The person from CWH, do you recall anything that
16      he said about the test, how the test was
17      devised, the purpose of the test?
18  A.  I don't recall that, sir.
19  Q.  Did you make any complaint at the orientation
20      session, which I think was February 28, 2006 --
21      did you make any complaint at the orientation
22      session about a written test?
23  A.  No, sir.

Page 90

1   Q.  The people that were conducting the orientation,
2       did they ask people -- the participants if they
3       wanted to -- needed to ask questions or
4       anything?
5   A.  That I recall, I think it was a time available
6       for questioning throughout the whole --
7       throughout the hours we were there, but I can't
8       recall any specifics at this time. I know I
9       can't.
10  Q.  Did you ask any questions?
11  A.  No, sir, I didn't.
12  Q.  Did Mr. Ogletree ask any questions?
13  A.  I'm not aware of that, sir, if he did or not.
14  Q.  How about Chris Turner?
15  A.  I'm not aware of that either, sir.
16  Q.  Did anybody complain about a written test being
17      part of the promotion procedure at the
18      orientation?
19  A.  I'm not aware of anybody complaining,
20      Mr. Morgan.
21  Q.  And I know this was, what, two years ago and a
22      three-hour session, but just as best you can
23      remember, tell me what you recall Stephanie

Page 91

1       King's role being at that session.
2   A.  The first person I saw when I came to
3       orientation that I guess had something to do
4       with presenting the material was Ms. King. She
5       was actually setting up the projectile and all
6       that in the room I guess preparing everything
7       for presentation.
8   Q.  Did you have any conversation with Stephanie?
9   A.  Other than hello; how are you doing; good to see
10      you, no, sir.
11  Q.  Do you remember anything that she said or
12      contributed to the orientation session other
13      than setting up the equipment?
14  A.  From what I experienced and saw, it looked as if
15      Ms. King or Mr. Reeves was working together to
16      do whatever they had to do as far as human
17      resources. But vaguely do I recall Ms. King
18      saying anything in reference to. She was
19      present with Mr. Reeves.
20  Q.  What about Steve Reeves? What do you recall his
21      role being?
22  A.  Mr. Reeves made a brief presentation in
23      reference to welcoming everybody in so many

Page 92

1       words, and then he turned things over to the
2       representative from CWH.
3   Q.  Do you recall Steve Reeves explaining any of the
4       testing procedures or what would be -- which the
5       applicants would go through?
6   A.  I don't remember, sir. I'm sorry. I don't
7       recall that.
8   Q.  Do you remember Steve Reeves saying anything
9       about how the procedure was developed?
10  A.  I don't remember, sir. I'm sorry.
11  Q.  Do you remember Steve Reeves saying anything
12      about how it was determined that there would be
13      a written test and then you would go from the
14      written test if you passed to the remainder of
15      it, the assessment part? Do you remember any of
16      that from Mr. Reeves?
17  A.  The only person I recall saying that or
18      explaining in detail how it would work was the
19      representative for CWH. But I don't recall -- I
20      can't remember if he did or not -- did say that,
21      Mr. Morgan. I don't remember.
22  Q.  "He" being Steve Reeves?
23  A.  Yes.

Deposition of Gerald Stephens                                    May 30, 2008

Page 93

1  Q.  What about Larry Langley?  What was his role or
2      what did he contribute to the --
3  A.  That I remember, Mr. Langley walked in the room
4      before we even got started and left, and I never
5      saw him again.
6  Q.  And Lee Lamar, what do you recall his input or
7      participation being?
8  A.  Mr. Lamar was there, that I recall, for the
9      entire time of the orientation.  And I vaguely
10     remember him having some input, if he was
11     questioned about it, in reference to the
12     division itself and all that.  That's basically
13     all I remember on that.
14  Q.  Do you remember Lee saying anything specifically
15     about how the test was developed?
16  A.  No, sir.
17  Q.  Do you remember Lee saying anything specifically
18     about how the components were derived and
19     processed, came about?
20  A.  I don't remember that, sir.
21  Q.  Tell me what you recall the CWH representative
22     saying about the test.
23  A.  Basically he was saying that the questions was

Page 94

1      drawn from whatever procedures they have, and
2      they had been representing several cities or
3      municipalities around the nation, you know.
4      Just told us a little bit about the company
5      within itself, and he started going over the
6      material.  I think he had a slide presentation,
7      and we just gradually worked through the whole
8      orientation process of that evening.
9   Q.  What do you recall the slide presentation being
10     about?
11  A.  I think it was in reference to the study
12     material we had, the things to study or
13     something of that nature.  But I can't
14     specifically remember what is was pertaining to.
15  Q.  Do you remember if the CWH representative
16     explained to the participants that questions
17     would be drawn from these study materials?
18  A.  It's a great chance he could have said that, but
19     I just don't remember at this time, Mr. Morgan.
20     I'm sorry.
21  Q.  What was your understanding as to the purpose of
22     the study materials?
23  A.  My understanding of the study material was it

Page 95

1      was given because -- supposedly it was in
2      reference to the test that was being given.
3      That's the understanding I had.
4   Q.  The study materials would help you on the test?
5   A.  Supposedly help us on the test.
6   Q.  Now, anything else specific that you recall from
7      the CWH representative?
8   A.  No, sir, I don't.  I don't recall anything.
9   Q.  Did the representative from CWH go over any
10     sample questions with you and the other
11     participants at that orientation?
12  A.  I don't remember Mr. Morgan.  We went over so
13     much within those hours, I just don't remember.
14  Q.  What was your understanding from the orientation
15     session and what you were being told as to how
16     the questions were developed?  What was your
17     understanding as to why the questions that you
18     were going to be asked were going to be those
19     questions?
20  A.  I don't have any idea on how they drew up their
21     questions.  I don't have a clue.
22  Q.  The reading materials that were discussed, did
23     they all relate to fire duties?

Page 96

1   A.  They were actually -- If I remember correctly,
2      they were essentials of some sort in the field
3      of firefighting.
4   Q.  Were any of them related more to supervision
5      than firefighting, or were they all -- as you
6      heard it, did they all appear to be related to
7      what you would be doing as an officer?
8          MR. HORSLEY:  The study materials?
9          MR. MORGAN:  Yeah.
10  A.  From what I looked at and what was presented to
11     me, Mr. Morgan, the material was of an advanced
12     level.  And what I consider to be an advanced
13     level is a management position within the fire
14     division.
15  Q.  And the battalion chief is an advanced level, is
16     it not?
17  A.  Yes, sir.
18  Q.  That's what --
19  A.  Superior, advanced, you know.  Yes, sir.
20  Q.  That's the next rank below the deputy chief?
21  A.  Yes, sir.  In the Auburn Fire Division.
22  Q.  Well, the discussion from the CWH representative
23     as to the test and what would be included and

Page 97

1   what was expected, did it appear to be related
2   to what a person would do as a supervisory
3   officer in the Auburn Fire Department?
4   A.  Now, that was a question.  I mean, we have ways
5   we do things in Auburn, and people have ways
6   they do things in Montgomery.  But the
7   essentials itself I guess was the appropriate or
8   the common way or the popular way, however they
9   put it, that they think something should
10  happen.  I mean, it didn't directly apply to the
11  way we do things in Auburn, but it was
12  officially essential in reference to, you know,
13  advanced positions of that nature.
14  Q.  The discussion in your opinion was that these
15  were essential functions of that rank, but it
16  may not be the way we do it in Auburn?
17  A.  Yes, sir.
18  Q.  And did you register any complaint with the WCH
19  representative about those type questions being
20  asked on the test?
21  A.  No, sir.
22  Q.  Did anybody?
23  A.  I'm not aware of that, sir.  If somebody did,

Page 98

1   I'm not aware of it.
2   Q.  Do you know what input into the written test any
3   officers with the City of Auburn Fire Division
4   had?
5   A.  There were rumors that the battalion chiefs at
6   the time played a role in some part of it, but I
7   don't know.  I'm not aware if they did.  I'm not
8   aware what part they played.
9   Q.  Let's assume that the battalion chiefs at Auburn
10  played a role in the written test that was
11  developed for the position of battalion chief.
12  Would you agree with me that that would be a
13  good thing?
14          MR. HORSLEY:  Object to the form.  You
15              can answer if you know how.
16  A.  I think just like with team leaders,
17  lieutenants, the whole nine, I think battalion
18  chiefs should play a role in the overall
19  promotionary procedure.  Now, the test, I'm not
20  sure about that.
21  Q.  Not sure about what, whether they did or not?
22  A.  I'm not sure if they played a role in the
23  questions that was on the test.  I'm not sure of

Page 99

1   that.
2   Q.  And I understand that you've testified to that.
3   My question is:  Assume they did.  Would you
4   agree with me that battalion chiefs playing a
5   role in helping develop the written test, if
6   that occurred, would be a good thing?
7          MR. HORSLEY:  Object to the form.  You
8              can answer.
9   A.  That would be a good resource, yes, sir.
10  Q.  Was there anything that the representative from
11  CWH said at the orientation session that day
12  that would be included on the test, whether it
13  was a written test or the assessment part of it,
14  that you thought didn't have anything to do with
15  fire work?
16  A.  I don't recall anything, Mr. Morgan.  I mean, he
17  was presenting information that was available
18  that I guess was being directed to the
19  candidates, which was me and all the others that
20  was present.
21  Q.  Are you aware of any orientation sessions other
22  than this one?
23  A.  This is the only one I can recall.

Page 100

1   Q.  Do you know of any special meetings or
2   orientation sessions that white applicants had
3   with these people that were there, including the
4   CWH representative, that you were not a part of?
5   A.  To my knowledge, no, sir, I don't know anything
6   about that.
7   Q.  As far as you know, everybody attended the same
8   orientation session.  You have no evidence
9   otherwise?
10  A.  No evidence otherwise.
11  Q.  And as far as you know, that was the only
12  orientation session that was given, true?
13  A.  That's all I know, yes, sir.
14          MR. HORSLEY:  Is this a decent time
15              for a break?
16          MR. MORGAN:  Yeah.
17          (Lunch recess.)
18          (Defendant's Exhibits 6, 7 and 8
19              marked for identification.)
20  Q.  (Continuing by Mr. Morgan)  Let me show you what
21  I'm marking as three exhibits, 6, 7, and 8.  Do
22  you recall receiving Exhibit 6, which is a memo,
23  letter, to the candidates outlining the dates

Page 101

1   and guidelines for the exam?  Do you recall
2   receiving that?
3   A.  Yes, sir, I do.
4   Q.  Would you have received that on or about March
5   3, 2006?
6   A.  Yes, sir, on or about.
7   Q.  And the next two exhibits, 7 and 8, both of them
8   say they are the battalion chief reading list
9   check-out sheet, and they have your signature on
10  both of these.  Signature on one and initials --
11  yeah -- Signatures and initials on both.
12  A.  Yes, sir.
13  Q.  And those are both dated March 3, 2006, true?
14  A.  Yes, sir, they are.
15  Q.  When you signed these 7 and 8, would you have
16  received -- by that time would you already have
17  received Defendant's Exhibit Number 6, which is
18  the letter outlining the dates and guidelines?
19  A.  Yes, sir.
20  Q.  Now, the one that I guess that's Exhibit 7 has
21  your signature, and then it has some initials
22  and then it has a number, number 14.  I guess
23  that's a book number that you received?

Page 102

1   A.  I don't remember specifically what it applies
2   to.  But, yes, it has the number 14.
3   Q.  And to the left of that are initials.  Do you
4   know whose initials those are?
5   A.  On Exhibit Number 7 or which one are we on right
6   now?
7   Q.  Yeah.  Look to the right of where you signed.
8   A.  Right here?
9   Q.  Yeah.  In fact, let's look -- look at your
10  signature.  It's got Gerald Stephens, 3/7/06, at
11  something.
12  A.  Yes, sir.  On the day I signed this form, it was
13  March 7, 2006 at 0850 hours, at 8:50 a.m., that
14  morning.
15  Q.  You signed it on March 7 rather than March 6?
16  A.  Yes, sir.
17  Q.  I'm sorry.  March 3.
18       Why did you sign it on March 7?
19  A.  It had to be when I was on duty that day.  That
20  would be the only reason.
21  Q.  And then continuing on, it's got, looks like,
22  ZZZ.  It looks like numbers to me.  Are those
23  your initials?

Page 103

1   A.  No, sir.  Those are not mine.
2   Q.  And how about the number 14?  Is that your
3   handwriting or is that someone else's
4   handwriting?
5   A.  That's somebody else's handwriting.
6   Q.  But that's your signature?
7   A.  Yes, sir.
8   Q.  And Defendant's Exhibit Number 8, books, it's
9   got the number of books, number 14.  Is that
10  your signature?
11  A.  Yes, sir.  Those are my initials.
12  Q.  And is the number 14 yours as well or did
13  somebody else write that in?
14  A.  Somebody else wrote 14.
15  Q.  And do you remember if you signed Defendant's
16  Exhibit 8 on March 3rd or did you sign it on
17  March 7th?
18  A.  I'm going to guess and say I signed it on the
19  7th.
20  Q.  The same day would be your best guess?
21  A.  Yes, sir.
22  Q.  Do you remember what you received as book number
23  14?

Page 104

1   A.  I received a couple of books when I would
2   receive my material.  I can't remember which
3   ones they were and the titles of them, but I do
4   recall them being some sort of essential or
5   another in reference to firefighting.
6   Q.  Essential?
7   A.  Yes, sir.
8       (Defendant's Exhibit 9 marked for
9       identification.)
10  Q.  Let me show you what I'm going to mark as
11  Defendant's Exhibit Number 9.  I apologize.  Is
12  that your application for the promotion to
13  battalion chief?
14  A.  Yes, sir.  That's it.
15  Q.  And what day did you fill that out or sign it?
16  A.  I signed it on February 20, 2006, on a Monday.
17  Q.  Now, between the orientation session, which was
18  February 28 of '06, and your signing for the
19  books on March 7, 2006, do you recall anything
20  during that period of time that occurred in
21  relation to the battalion chief promotion?
22  A.  I don't recall anything, Mr. Morgan.
23  Q.  Did you discuss with any of the people who had

Page 105

1    been involved in the orientation -- Lee, Steve,
2    Stephanie, the CWH representative, or Chief
3    Langley -- did you have any discussions with
4    them up until the time you received your books
5    on March 7?  Anything about the procedure or the
6    test or any conversations with any of those
7    people?
8  A.  No, sir, I don't recall.
9  Q.  How about the folks that you've sued in this
10    case -- other people that you've sued:  Bill
11    Ham, Bill James, Charles Duggan?  Did you have
12    any conversations with any of them --
13  A.  No, sir.
14  Q.  -- up until March 7 about the test or how it
15    would be administered?  Anything to do with the
16    test?
17  A.  No, sir.
18  Q.  Do you recall where you were when you received
19    the -- signed the form and received the books?
20  A.  As I stated, Mr. Morgan, I think I was on duty
21    that day.
22  Q.  Did somebody bring you the books and the form?
23  A.  No, sir.  I had to go to the public safety

Page 106

1    office to Chief Lamar's office.
2  Q.  And was Chief Lamar there?
3  A.  Yes, sir.
4  Q.  Did you have any conversations with him when you
5    signed about the test or books?
6  A.  No, sir.
7  Q.  Just said I'm here and signed it?
8  A.  Yes, sir.
9  Q.  So you had the letter from, I guess, Lee Lamar
10    telling you that the written test was going to
11    be on a certain day.  I think it was April 10 or
12    whatever is in the letter.
13  A.  Yes, sir.
14  Q.  And you had the books that you had received from
15    the City, and you had your orientation booklet.
16    Y'all got to keep these orientation booklets,
17    didn't you, Defendant's Exhibit 5?
18  A.  I don't think we got to keep these.  I'm not
19    real sure on that.
20  Q.  But you are sure you got to keep the books or at
21    least --
22  A.  Oh, yes.  Most definitely, sir.
23  Q.  Is there anything of any significance that

Page 107

1    occurred in relation to the promotion procedure
2    from the time you received your books on March 7
3    up until the time you start taking the written
4    test, which I think is April 10?
5  A.  Can you repeat the first part?  It slipped my
6    mind.  I'm sorry.
7  Q.  You received the books on March 7 at Deputy --
8    at that time -- Lee Lamar's office, and I think
9    the test began April 10.  Anything of any
10    significance between that time period that
11    relates to the promotion procedure?  Did
12    anything occur during that time period?
13  A.  Not that I can recall, sir.
14  Q.  Did you have any conversations with Lee or Larry
15    Langley or Steve Reeves or Stephanie up until
16    you start taking the written test on April 10?
17  A.  No, sir.
18  Q.  Other than what may have occurred at the
19    orientation?
20  A.  No, sir.
21  Q.  And you never had any conversations up to that
22    time with the mayor or Charles Duggan or Steve
23    Reeves?

Page 108

1  A.  No, sir.
2  Q.  The mayor, Bill James, and Charles Duggan, you
3    didn't have any conversations with them up to
4    April 10 about the test in any fashion, true?
5  A.  No, sir.  True.
6  Q.  Tell me what you did to study and prepare for
7    the test.
8  A.  Being the time I had to study all that
9    material -- First of all, I reviewed all the
10    material that was available.  And I took it upon
11    myself to just study areas where I thought to be
12    important.  Like I say, we didn't have that much
13    time or I don't think we had enough time to
14    actually study all the material that was
15    available.  So I took it upon myself to apply
16    myself to areas where I thought I needed to
17    study and work on to prepare or be ready for
18    this test.  And that was just the way I was
19    thinking about it, Mr. Morgan.
20  Q.  Did you have study groups?  Firefighters get
21    together and have study groups?
22  A.  I did not.
23  Q.  You did not?

Page 109

1   A.  No, sir.
2   Q.  How many study books did you have?
3   A.  I can't remember the exact number, but three to
4       four books.
5   Q.  Did you have to turn those back in?
6   A.  Yes, sir.
7   Q.  Did you make any complaint to anybody before you
8       sat down for the written test that you didn't
9       have enough time to study?
10  A.  Anybody as in ...
11  Q.  Lee Lamar.
12  A.  The one person that I did talk about in the
13      study time and all that, he's in this room
14      now and that's Mr. Ogletree.
15  Q.  You had those conversations with Mr. Ogletree?
16  A.  Yes, sir.  I told him just what I thought about
17      the time span and the material that was
18      available to study, and I told him what I
19      thought about it.
20  Q.  Well, I'm going to get to that.  Let me go
21      through my little list.
22      You didn't have any conversations with Larry
23      Langley complaining about the time you had to

Page 110

1       study, did you?
2   A.  Larry Langley, no.
3   Q.  No conversations with Lee Lamar about the period
4       of time for study, did you?
5   A.  Mr. Lamar, no.
6   Q.  No conversations with Bill Ham about the period
7       of time you had to study?
8   A.  Mayor Ham, no.
9   Q.  No conversation with Steve Reeves about the
10      period of time you had to study?
11  A.  Mr. Reeves, no.
12  Q.  No conversations with Bill James about the
13      period of time you had to study?
14  A.  Mr. James, no.
15  Q.  No conversations with Charles Duggan about the
16      time you had to -- period of time you had to
17      study?
18  A.  Charles Duggan, no.
19  Q.  And none with Stephanie king?
20  A.  Ms. King, no.
21  Q.  And none with any representative of CWH?
22  A.  No representatives, no.
23  Q.  And so you and I will be together on this, I'm

Page 111

1       not asking you questions about Cortez Lawrence
2       because I'm understanding from your answers he
3       didn't have anything to do with this.  Is that a
4       fair statement?
5   A.  To my knowledge he don't.  I don't know nothing
6       about that.
7   Q.  What conversations did you have with Eddie
8       Ogletree about the time span?
9   A.  Basically I notified him and just asked him, you
10      know, basically his opinion on the material that
11      was presented and the time we had on it.  And I
12      just basically told him that I don't see where I
13      think I would be able to cover all this, you
14      know, in the time we had available.  It was a
15      lot of material.  It was a lot to read.  Plus,
16      you know, the other information that I chose to
17      pursue and study that I thought would be liable
18      (sic) for the test, I studied that as well,
19      stuff like SOP books, personnel policies, City
20      personnel policies -- I'm sorry -- in
21      conjunction with the material that was given for
22      the actual test.
23  Q.  So in addition to the books that you were told

Page 112

1       were the recommended reading for the test, you
2       studied the fire department SOPs and you studied
3       the personnel policies?
4   A.  Yes, sir.
5   Q.  Now, did anybody recommend or suggest that you
6       study the SOPs for the battalion chief test?
7   A.  Nobody recommended it to me, sir.
8   Q.  Did anybody recommend or suggest that you study
9       the personnel policies for this battalion chief
10      test?
11  A.  No, sir.  Nobody recommended it to me.
12  Q.  Any other sources that you studied or reviewed
13      for the battalion chief test, now, that weren't
14      on the recommended reading list, the books you
15      were given by the City, other than the SOPs and
16      personnel policies?
17  A.  No, sir.  Those are the only outside two
18      resources I studied in conjunction with what was
19      given to me.
20  Q.  And other than the fact that you received your
21      reading material on March 7 rather than March 3,
22      did any of the other firefighters or candidates
23      for this promotion have any additional period of

Page 113

1    time to study than you did?
2    A.  I'm not aware of that, sir.
3    Q.  As far as we can tell from the documentation
4    that I've presented to you today, everybody
5    would have received the reading material on or
6    about March 3; is that true?
7    A.  Yes, sir, on or about.
8    Q.  So the length of time would have been the same
9    for black applicants, white applicants,
10    lieutenant applicants, team leader lieutenant
11    applicants, firefighter applicants?  Everybody
12    would have had the same time period.  Is that a
13    fair statement?
14    A.  Give or take one or two days depending on how
15    the shift ran.  Yes, sir, that's a true
16    statement.
17    Q.  You make a reference in your complaint to test
18    aids.  What did you consider to be the test aids
19    for the battalion chief promotion process?
20    A.  Could you be a little bit more specific about
21    this?
22    Q.  I'll show you what I'm talking about.
23    A.  Okay.

Page 114

1    Q.  Paragraph 18.  You have on here -- I've
2    highlighted it.  Caucasian applicants for the
3    position were given preferential treatment
4    regarding the application process, test aids,
5    and test grades.
6        Do you see that in your complaint?
7    A.  Yes, sir.
8    Q.  What are the test aids that you're referring
9    to?  What did you consider to be the test aids
10    for this promotion?
11    A.  I can't recall that, Mr. Morgan.
12    Q.  Well, let me ask this.  You testified about an
13    orientation.
14    A.  Yes, sir.
15    Q.  And you testified about receiving the books.
16    A.  Yes, sir.
17    Q.  Do you have knowledge of any white applicants
18    for this position with battalion chief that
19    received anything else that would help them on
20    this test other than attending the orientation
21    and reviewing the books that everyone was
22    given?  Anything else that you know of that
23    white applicants received that you didn't

Page 115

1    receive?
2    A.  I'm not aware, Mr. Morgan.  I haven't been
3    introduced with that.
4    Q.  Do you know any white applicant who was given
5    preferential treatment in the application
6    process?
7    A.  I don't recall that, Mr. Morgan.  It don't ring
8    a bell.
9    Q.  Do you know any white applicant who was given
10    preferential treatment in terms of test aids?
11    A.  Never presented to me, Mr. Morgan.  I'm not
12    aware of that.
13    Q.  I assume that you continued your regular shift
14    work -- shift hours during the process when you
15    were studying for the battalion chief promotion
16    procedure.
17    A.  Yes, sir.
18    Q.  Did you take any time off to study?
19    A.  That I recall, none, sir.  If it was any, it
20    would have been how our Kelly days fall or
21    something like that.  But I don't recall taking
22    off any significant shift during that process.
23    Q.  Did you apply for any or request any leave time

Page 116

1    that you were denied during that period of time?
2    A.  I don't recall anything of that nature, sir.
3    Q.  Did you have your lawn service going on at that
4    time?
5    A.  No, sir.
6    Q.  When did you say you started the lawn service?
7    A.  May of 2006.
8    Q.  Did you do any preparatory work for that?
9    A.  Basically I waited until everything was over
10    with the battalion chief promotion before I even
11    thought about starting a business.  So no, sir,
12    I didn't do anything.
13    Q.  How is that business set up?  Is it a d/b/a or a
14    corporation?
15    A.  D/b/a.
16    Q.  And who does your books?
17    A.  My wife.  She has accounting resources
18    knowledge, stuff like that.
19    Q.  And do you have -- I guess for tax purposes you
20    keep your records on purchasing equipment --
21    A.  Yes, sir.
22    Q.  -- advertising, if you do any advertising --
23    A.  Yes, sir.

Page 117

1   Q.  -- and all that?
2   A.  Yes, sir.
3   Q.  So if I needed to request that information, you
4       would have that from the beginning of the time
5       when you started your business?
6   A.  Yes, sir.
7   Q.  Is that a fair statement?
8   A.  Yes, sir.
9   Q.  I always get confused with firefighters and
10      their shifts.  In March of '06, where were you
11      assigned?
12  A.  I was on A shift.  Chief Brown was my immediate
13      supervisor.
14  Q.  What station?
15  A.  Station 3, if I remember correctly.
16  Q.  And what are the hours or days that A shift
17      works in a week?
18  A.  Well, each shift works a 24-hour shift.  So we
19      work from 0700 to 07 the following morning for a
20      total of 24.  Then we're off for 48 hours
21      whereas overall we work one day and be off two
22      days.
23  Q.  And you maintained that same shift during the

Page 118

1       time that you would have been preparing for the
2       test?
3   A.  Yes, sir.
4   Q.  Work one day and off two days?
5   A.  Yes, sir.
6   Q.  Anything that you did to prepare for the test
7       other than review the SOPs, personnel policies,
8       and those portions of the study books which you
9       thought were going to be important?  Anything
10      else that you did in preparation for the test?
11  A.  That's about all I did, sir.
12  Q.  Did you read completely any of the study aid
13      books?
14  A.  Like I said earlier, Mr. Morgan, I reviewed the
15      material that was given to me.  In the areas
16      where I felt strong on, I didn't spend as much
17      time as on the areas that I felt weak on.  So it
18      was give and take throughout the study guides --
19      study information.
20  Q.  So is it fair to say, then, the answer to my
21      question is:  You didn't read the whole book.
22      You read the parts you thought were going to
23      help you with your strengths taking the test?

Page 119

1   A.  Yes, sir.  I concentrated heavily on the area
2       where I thought I was weak in.
3   Q.  What day of the week was the test given?  Do you
4       recall?
5   A.  No.  I don't recall what day it was, sir.
6   Q.  And didn't we decide, or at least I decided, it
7       was April 10?
8   A.  Yes, sir.  April 10.
9   Q.  And do you remember what time it started?
10  A.  It was stated that it started at 8:30, but I
11      don't know if it started on time, a little bit
12      before or a little bit after.  I'm not sure on
13      that.  I don't recall.
14  Q.  Was there a sign-in sheet?
15  A.  Yes, sir, I do recall a sign-in sheet.
16  Q.  And would you -- I say you.  I mean all the
17      applicants.  Were you given a booklet to take?
18      How was the written test?  What was the written
19      test?
20  A.  If I'm remembering correctly, through the whole
21      process we came in and signed in.  And, of
22      course, all the tables and chairs were set up
23      and spaced evenly from each candidate.  And

Page 120

1       sometime or another a booklet was presented -- a
2       sealed booklet -- that we had to open at the
3       time we started the actual test.
4   Q.  How did you identify -- Did you write in the
5       test booklet or was there a separate answer
6       sheet?
7   A.  I don't recall exactly what it was, but I think
8       we wrote in the test booklet.  But I don't
9       recall.  I just can't remember.
10  Q.  Did you put your name on your test booklet or a
11      number?  How was that to identify --
12  A.  There was a number, and somewhere you did have
13      to put your name.
14  Q.  And how long was the test?
15  A.  We was allowed so many hours to take the test.
16      If I'm thinking correctly, it was three hours.
17      And it took me approximately two, two hours and
18      fifteen minutes, two hours and a half to take
19      it.  I wasn't the last person in the room when I
20      left.  I'll put it like that.  So I didn't take
21      up the whole three hours.
22  Q.  Who was present to monitor or proctor the test?
23      Who was there to hand it out and make sure --

Page 121

1   A.  I think I recall Mr. Lamar being there.  I
2       vaguely saw Mr. Langley there.  I can't remember
3       who else may have been there, Mr. Morgan.  I'm
4       sorry.
5   Q.  Do you remember if Steve Reeves was there?
6   A.  I don't remember.
7   Q.  How about Stephanie?
8   A.  I don't remember.
9   Q.  Do you remember any representative from CWH?
10  A.  I don't recall anybody from CWH.
11  Q.  From the time of the orientation on February 28
12      up until the time you start taking the test on
13      April 10, did you have any further conversations
14      or participate in any further discussions with
15      anybody from CWH about the test?
16  A.  No.
17  Q.  During this three-hour test, were you allowed to
18      take breaks if you needed to?
19  A.  I don't remember.  All I do remember is I didn't
20      take one.  I didn't take a break.
21  Q.  How many questions were there?
22  A.  I don't remember, sir.
23  Q.  Was it a multiple choice, fill-in-the-blank?

Page 122

1       How were the questions and answers?
2   A.  If I remember correctly, it was multiple
3       choice.
4   Q.  Were they divided up into any divisions or areas
5       such as supervision, fire scene, or was it just
6       a straight series of questions?
7   A.  That I recall, it was a straight series of
8       questions.
9   Q.  And did the questions appear to be related to
10      fire work?
11  A.  They appeared to be related to the field of fire
12      profession, yes.
13  Q.  Were there questions on there that appeared to
14      be related to supervisory roles?
15  A.  I recall there being some questions, yes, sir.
16  Q.  Did you think that the questions related to what
17      a battalion chief would do in the city of
18      Auburn?
19          MR. HORSLEY:  Object to the form.  You
20          can answer.
21  A.  I don't think -- I think several of the
22      questions on that test had nothing to do with
23      Auburn and the way we do things at Auburn.  To

Page 123

1       me those questions were something in reference
2       to a larger municipality bigger than us.
3   Q.  Do you remember the specific questions?
4   A.  No, sir, I don't.
5   Q.  How many questions were there like that that you
6       thought related to a larger municipality?
7   A.  It was the majority of the questions of the
8       test.  I don't recall the exact number or how
9       many apply to that, but I know it was several
10      questions on there that I just didn't think
11      pertained to the way we do things in Auburn, to
12      the rules we go by, regulations.
13  Q.  What exactly is your familiarity with the
14      responsibilities and duties of the battalion
15      chief?
16  A.  Being that I filled the role in the absence of a
17      battalion chief, I'm very familiar with the
18      things they do.
19  Q.  What does a battalion chief do differently from
20      what a lieutenant does?
21  A.  Basically in a nutshell, the battalion chief is
22      responsible for the entire shift and also
23      responsible for the operations of the City in

Page 124

1       reference to life, safety, and fire protection
2       during that shift.
3   Q.  Did you make any complaints to anyone during the
4       testing process --
5   A.  No, sir, I did not.
6   Q.  -- that you didn't think the test was related to
7       what went on at Auburn?
8   A.  No, sir, I did not.
9   Q.  After the test was completed, usually folks talk
10      about the test, what they thought about it.  Do
11      you remember anybody making any comments in any
12      kind of meetings like that that they thought the
13      test did not address what a battalion chief did
14      at the City of Auburn?
15  A.  Nobody spoke to me about anything of the test
16      afterwards, Mr. Morgan, and nor did I speak to
17      anybody about it.
18  Q.  How did you think you had done on the test?
19  A.  I didn't know what to think to be honest with
20      you, Mr. Morgan.
21  Q.  Although you can't remember specific questions,
22      was there some general area of the test that you
23      thought didn't relate to what went on at Auburn

Page 125

1   that you could give me some examples so I could
2   kind of understand what you're talking about?
3   A.   I can't remember specifically, Mr. Morgan.  If I
4        had to guess, it had to be something on the
5        guidelines of --
6            MR. HORSLEY:  Don't guess.  Just tell
7            him what you remember.
8   A.   I don't remember.  I just don't remember.
9   Q.   Who was the first person to finish the test?  Do
10       you remember?
11  A.   If I recall, it was Christopher Turner.
12       Mr. Turner.
13  Q.   And there were still people in there when you
14       completed it?
15  A.   Yes, sir, there was still people in there.
16           (Defendant's Exhibit 10 marked for
17            identification.)
18  Q.   Let me show you what I'm marking as Defendant's
19       Exhibit 10.  This is a letter to you dated April
20       4, a feedback letter, feedback report.  Do you
21       remember receiving that?
22  A.   Yes, sir.
23  Q.   Did you make a request for this report or did

Page 126

1   this report just come to you without you having
2   requested it?
3   A.   If I recall I requested this.
4   Q.   Did you do that in writing or --
5   A.   I did it in writing.
6   Q.   What did the -- I may have it, but I can't find
7        it.
8            In what way did you request it, just that
9        you would like an opportunity to look at it
10       or --
11  A.   That I recall, this was done during the
12       grievance procedure that we initiated, me and
13       three other guys.  Three other guys initiated a
14       grievance after the results of the test, if I'm
15       thinking correctly.
16           MR. HORSLEY:  Off the record.
17           (Brief off-the-record discussion.)
18           MR. HORSLEY:  For the record, this
19           letter is dated April 4, 2005,
20           which would appear to be before
21           the test was given.
22           MR. MORGAN:  Let me take one second.
23           (Brief recess.)

Page 127

1            (Defendant's Exhibit 11 marked for
2            identification.)
3   Q.   (Continuing by Mr. Morgan) I have a letter,
4        which I will show you, Defendant's Exhibit
5        Number 11, and it is an official notification
6        that you didn't make 70 or whatever the magic
7        number was on the written test.  And then I've
8        given you Defendant's Exhibit Number 10, which
9        is the feedback report.  Okay?
10  A.   Yes, sir.
11  Q.   And I didn't pick up on it, but as Richard
12       pointed out, the year is incorrect on the Number
13       10.  It should be 2006.
14  A.   Yes, sir.
15  Q.   My question to you is --
16           MR. HORSLEY:  Just for the record, the
17           date is wrong, too, because it
18           predates the test.
19           MR. MORGAN:  What is the date?
20           MR. HORSLEY:  April 4.
21           MR. MORGAN:  The whole date is wrong?
22           MR. HORSLEY:  The whole thing --
23           THE WITNESS:  Everything is improper.

Page 128

1   Q.   Which did you receive first, 10 or 11?
2   A.   I received 11 first.  I did.
3   Q.   And that's dated April --
4   A.   14th, 2006.
5   Q.   And that's the one telling you that you did
6        not -- Let me show you one other document.
7            (Defendant's Exhibit 12 marked for
8            identification.)
9   Q.   Now, that is a document which appears to be the
10       grievance complaining about the test, true?
11  A.   Yes, sir.
12  Q.   And it's dated April 21, 2006?
13  A.   Yes, sir.
14  Q.   Using that as a frame of reference, did you
15       receive the report -- feedback report before or
16       after you filed the grievance?
17  A.   Now, for starters, Exhibit 11, that's the first
18       thing I received after the test.
19  Q.   And let me ask you this.  Did that come to you
20       in the mail or was it hand-delivered?
21  A.   I recall it coming in the mail, Mr. Morgan.
22  Q.   All right.
23  A.   And as far as this feedback, the only thing that

Page 129

1  I have received, Mr. Morgan, as far as feedback
2  is when I requested it. That's the only thing I
3  can recall me receiving, any feedback, because
4  nothing was made to me directly, but people
5  complained about the test, one person in
6  particular, whereas some questions were thrown
7  out during the testing period.
8  Q.  Who is the one --
9  A.  Joey Darby.
10      And through the rumor mill, I understand
11  that's how he managed to make the cut to go
12  through the remaining of the promotion
13  procedures.
14  Q.  Because questions were thrown out?
15  A.  That was deemed -- That shouldn't have been
16  there of some sort. It was presented to
17  whomever was in power to make that decision.
18  And I do recall Joey Darby being one of those to
19  pursue that.
20  Q.  Do you recall there being any others?
21  A.  I don't. I don't recall anyone else.
22  Q.  Well, I'm not saying this is true, but assume
23  what you said is true, that questions were

Page 130

1  thrown out for Joey Darby. Would those
2  questions have been thrown out for everybody or
3  just for Joey Darby?
4  A.  The whole process.
5  Q.  That question for everybody was thrown out?
6  A.  It was removed, null and void, pointblank.
7  Q.  So if you missed those same questions that Joey
8  Darby missed and that question was thrown out,
9  then that helped your score?
10  A.  Apparently so. It did.
11  Q.  Do you recall if you requested that feedback in
12  writing or just asked somebody verbally to send
13  the feedback report?
14  A.  As I stated earlier, Mr. Morgan, it was done in
15  writing. And right here on Exhibit 12, it will
16  show where we asked that four written exams be
17  reviewed. And what I received was this
18  feedback.
19  Q.  So you're thinking that your written request for
20  that was in Exhibit 12, the grievance thing?
21  A.  Yes, sir.
22  Q.  So when that grievance is filed -- My
23  understanding is Exhibit 12 is the first step in

Page 131

1  the grievance procedure.
2  A.  It appears that this is, yes, sir.
3  Q.  You, of course, had been informed that you did
4  not pass by that time?
5  A.  Yes, sir. The first thing I received was my
6  letter of response saying what I made on the
7  test. That's the first thing I received.
8  Q.  And is it your testimony that when you filed
9  that grievance that you had heard rumors that
10  Joey Darby had test questions thrown out?
11  A.  Well, Joey Darby didn't have them thrown out.
12  He questioned those -- I guess he pursued those
13  questions because we was -- they mentioned
14  somewhere -- I'm trying to remember -- if a
15  question was on the test that didn't appear to
16  be in reference to -- I can't remember how they
17  worded it, but I know there was some questions
18  on that test challenged.
19  Q.  Well, did you challenge any test -- any --
20  A.  Any questions? No, sir, I didn't.
21  Q.  But from what I understand your testimony to be,
22  the rumor was that Joey Darby challenged some
23  questions?

Page 132

1  A.  Yes, sir. If I'm thinking correctly, yes, sir.
2  Q.  And the rumor was that some of the questions
3  that Joey Darby challenged were thrown out. Is
4  that what the rumor was?
5  A.  Yes, sir, if I'm thinking correctly.
6  Q.  And you don't know whether or not the questions
7  he challenged affected your grade or not. Is
8  that a fair statement?
9  A.  I don't know which questions it was that he
10  challenged, and therefore I don't know if it
11  will help me or hurt me or whatever.
12  Q.  Is it your understanding that the feedback
13  report was only prepared or presented to the
14  four people who signed the grievance as opposed
15  to everyone who took the test receiving a
16  feedback report?
17  A.  Like I said earlier, Mr. Morgan, I didn't
18  receive -- the first thing I received was the
19  letter that I received showing my score. After
20  that me and the other guys filed a grievance,
21  and then after that I received the feedback
22  report based on the request that I made.
23  Q.  That's what my question is. Is it your

Page 133

1  understanding that you received the feedback
2  report because you requested it when you filed
3  for the grievance?
4  A.  Yes.
5  Q.  Do you have an understanding as to whether, for
6  instance, Rodney Hartsfield received a feedback
7  report?  Do you know one way or the other
8  whether he did?
9  A.  I don't know if he did or not, sir.
10  Q.  The only thing you can say that you think is
11  that because you complained and requested it,
12  you received it, and you don't know whether
13  other people received it as a matter of course
14  or not?
15  A.  Just like right here on Exhibit 10, this was
16  addressed to me, and I know what I asked for.
17  Q.  Have you ever discussed it with Joey Darby about
18  test questions being thrown out or what he
19  objected to or anything?
20  A.  No, sir, I didn't.
21  Q.  Have you heard of any other applicants that
22  complained about the test questions other than
23  Joey Darby?

Page 134

1  A.  Like I say, it was just word of mouth, rumor
2  mill, and I'm not sure on that.  I don't recall.
3  Q.  The only name you recall is Joey Darby?
4  A.  That's the only name I recall hearing in
5  reference to.
6  Q.  What's the date of the letter that told you you
7  didn't -- April 14?
8  A.  Uh-huh (positive response).
9  Q.  And the grievance was filed April 21.
10  In between receiving the letter, Defendant's
11  Exhibit Number 11, telling you that you were
12  not -- hadn't made high enough on the written
13  and filing this grievance, Defendant's Exhibit
14  12 on April 21, did you have any conversations
15  with Lee Lamar or Larry Langley about the test?
16  A.  I didn't, sir.
17  Q.  Did you have any conversations with Steve Reeves
18  or Bill James?
19  A.  No, sir, I did not.
20  Q.  Have any conversations with the mayor or the
21  city manager about it?
22  A.  No, sir, I did not.
23  Q.  How about WCH?  Did you have any conversations

Page 135

1  with CWH?
2  A.  No, sir, I did not.
3  Q.  And then you and three others filed a grievance
4  to Lee Lamar, and you asked that four written
5  exams be reviewed.  I assume that's the four of
6  you, your written exams?
7  A.  Yes, sir.
8  Q.  Now, Horace Clanton is a white male?
9  A.  Yes, sir.
10  Q.  And Robbie Hodge is a white male?
11  A.  Yes, sir.
12  Q.  Eddie Ogletree is a black male?
13  A.  Yes, sir.
14  Q.  And Gerald Stephens is a black male?
15  A.  Yes, sir.
16  Q.  And the four of y'all filed this grievance
17  together?
18  A.  We initiated that grievance together.
19  Q.  And when you actually had the hearing, though,
20  how many of you went forward with the hearing?
21  A.  It was three of us.
22  Q.  Who did not go forward?
23  A.  Robbie Hodge.

Page 136

1  Q.  In this letter y'all say about exercising your
2  rights for a grievance on a promotion procedure,
3  which includes the following:  The written exam.
4  What was your complaint about the written
5  exam at that point?
6  A.  In reference to this grievance as a group,
7  everybody had their specific complaint.  And the
8  only thing I can tell you about that is the last
9  one, inconsistency of past promotional
10  procedures.  That was my main complaint.
11  Q.  So did you have a complaint yourself about the
12  written exam as part of this grievance
13  procedure?
14  MR. HORSLEY:  What was that question
15  again?  I'm sorry.
16  MR. MORGAN:  He said --
17  Q.  As I understand what you said, the four of y'all
18  may have each had your own separate complaints,
19  true?
20  A.  Pretty much so, yes, sir.
21  Q.  The one that you were most complaining about was
22  the inconsistency of past promotional
23  procedures?

Page 137

1  A.  Yes, sir.
2  Q.  My question is:  As part of the grievance
3     procedure, was one of your complaints or did you
4     have a complaint about the written exam?
5  A.  The thing about inconsistency of past
6     promotional procedures, it involves the written
7     exam because for the simple fact there have
8     never been one.  That's my main thing.  That's
9     part of my inconsistency, because when I took --
10    if I can explain --
11        MR. HORSLEY:  Yeah.
12  A.  When I took my promotional assessment in '96,
13    there was no written test.  Anything after that
14    that I recall within a ten-year time span, there
15    was no written test.
16  Q.  Let me ask the question this way.  I'm going to
17    get to the inconsistency and let you explain
18    that in detail, but I want to go through these
19    other three.
20       What I'm hearing you say -- you tell me if
21    I'm wrong -- is that your complaint about the
22    written exam is that it was a requirement.
23  A.  Basically the written exam was part of the

Page 138

1    procedure, yes.
2  Q.  You didn't make any specific complaints about
3    the exam per se but just the fact that it was
4    now a part of the promotion procedure?
5  A.  Yes, sir.
6  Q.  And did you have as part of your complaint the
7    no time in grade policy?  Was that something
8    that concerned you?
9  A.  Not directly, sir.
10  Q.  And then the -- I don't even understand this
11    one -- no accumulative point system, was that
12    one of your concerns?
13  A.  That was a minor concern because --
14  Q.  What is that?
15  A.  Basically accumulative points is something
16    that's implemented into the overall assessment
17    whereas if --
18  Q.  Back up.
19  A.  Let's say, for example, if you had four years of
20    service, you get two points for that.  If you
21    had a degree, you get eight points for that, you
22    know.  To the point -- The point I'm trying to
23    get at is:  At the end of the testing, all your

Page 139

1    points are added up, and that's how you get a
2    result, like I got on my result from when I was
3    promoted stating how I ranked and here was my
4    score.
5  Q.  So you thought there should be some accumulative
6    point system into the system, either seniority
7    or education or something?
8  A.  Yes, sir.  I think it should have been one --
9    some type of point system, yes, sir.  Whether
10    there was or not, I don't know, because I didn't
11    make it past the written test portion for
12    battalion chief.
13  Q.  Well, tell me how you would have fashioned the
14    test for battalion chief.
15       MR. HORSLEY:  Object to the form.  You
16     can answer.
17  A.  I'm not an expert on test making, Mr. Morgan, so
18    I can't really say what I would do and what I
19    would do would be the correct thing to do.  But
20    I just -- I just -- I'm not an expert in that
21    field.  I just don't know.
22  Q.  And then your number four complaint -- I think
23    this is the one that you said most concerned

Page 140

1    you -- was the inconsistency of past promotional
2    procedures.
3  A.  Yes, sir.
4  Q.  Elaborate and tell me exactly what it is that
5    concerned you about that one.
6  A.  The thing that concerned me was that, of course,
7    I went through an assessment center.  Some
8    people promoted and, whether it was lieutenant
9    or team leader, went through structured
10    interviews.  Some people were appointed.  And
11    some people were just, in my terms, vaguely
12    given a job.
13  Q.  Just what, now?
14  A.  Vaguely given the job and told them that you are
15    in this position.  And when I say that, the job
16    position wasn't posted.
17  Q.  So --
18  A.  So that's what I mean by inconsistency.
19  Q.  I guess what I'm understanding you to say -- and
20    once again, you correct me -- is that people had
21    achieved a rank in different ways.
22  A.  Yes, sir.
23  Q.  Who was appointed as opposed to going through

Page 141

1    the structured interview with the team leader or
2    the assessment or being appointed as lieutenant?  Who was appointed
3    to a position that sat for the battalion chief
4    promotion?
5    A.   I do recall Rodney Hartsfield, who is a
6    battalion chief now, being promoted when he was
7    on probation as a career firefighter.  I don't
8    have any specifics on the date or nothing like
9    that.
10   Q.   Promoted to what?
11   A.   He was promoted to a team leader.
12   Q.   While he was a probationary career firefighter?
13   A.   Yes.
14   Q.   Well, I don't know either.  I mean, the
15   documents will say whatever they say, but was
16   there always -- other than Rodney Hartsfield's
17   promotion, was there always a requirement for
18   promotion to team leader that you had to be a
19   non-probationary career firefighter?
20   A.   Like I say, Mr. Morgan, I was not a team leader,
21   but I know there was requirements for me when I
22   applied for lieutenant.
23   Q.   So you don't know whether or not the

Page 142

1    non-probationary versus probationary was ever a
2    requirement for team leader?
3    A.   Well, I mean, it was practiced, but whether or
4    not it was a direct requirement, I can't tell
5    you.  Like I say, I was never a team leader.
6    Q.   And then the last category was people who were
7    vaguely given the jobs that were not posted.
8    Who sat for the battalion chief position that
9    was vaguely given a job that was not posted?
10   A.   Well, nobody sat for the position of battalion
11   chief.  Basically he had something to do with
12   presenting in the -- the testing orientation or
13   whatever.  And what I'm speaking about in
14   particular is that when they first implemented
15   back the training officer position, it was never
16   posted.  I never saw anything in reference to.
17   And the first time I heard about it was when my
18   immediate supervisor told me, who is the late
19   Jimmy Brown.  He told me that the person who had
20   stepped in and started acting as the training
21   officer was the training officer.
22   Q.   Lee Lamar?
23   A.   Yes, sir.

Page 143

1    Q.   Anybody else who you think in the fire
2    department received a promotion where they were
3    vaguely given a job that was not posted other
4    than Lee Lamar?
5    A.   Well, vaguely given a job, I don't know, but I
6    recall another incidence where a promotion took
7    place.  They went from firefighter to captain
8    whereas they skipped other rank.
9    Q.   And that's Larry Langley?
10   A.   And that's Larry Langley.
11   Q.   Once again, do you know whether or not on that
12   promotion there was a requirement for a time in
13   grade or that you had to be a lieutenant?
14   A.   The only thing I know is what I applied for,
15   Mr. Morgan, and that was lieutenant.
16   Q.   And that would have been the captain promotion
17   that occurred in 1996, true?
18   A.   No, sir.  It was in -- In 1996 I think
19   Mr. Langley was on his way to being acting fire
20   chief.
21   Q.   So Langley was promoted to captain even before
22   '96?
23   A.   Yes, sir.

Page 144

1    Q.   Do you remember what year he was promoted to
2    captain?
3    A.   I don't remember off the top of my head,
4    Mr. Morgan.
5    Q.   But your best recollection is it was sometime
6    before '96?
7    A.   It was before '96.
8    Q.   All right.  Now, you're going to have to help me
9    here.  You've taken your written test.  You've
10   told me about the procedure, what went on during
11   that written test.  And then I guess a couple of
12   days later -- within a week I guess -- you get
13   notice that you didn't score high enough to
14   proceed.  And then by April 21 you filed your
15   grievance along with these other firefighters.
16   I guess they were all lieutenants at that point.
17   A.   Yes, sir.  We were all lieutenants.
18   Q.   And then you go through the grievance
19   procedure.  I've seen the paperwork where you go
20   up -- the four of you go up the steps on the
21   grievance procedure.
22   A.   Yes, sir.
23   Q.   Is there anything else going on at that time in

Page 145

1    terms of complaints about the test,
2    conversations with people, anything that's not
3    documented in the grievance procedures?
4    A.  I don't recall of anything.  I will say that I
5    did converse with the guys that was on the
6    grievance.  Once we came together and decided to
7    file a grievance, we discussed a lot of things.
8    And it was with those guys that are on that
9    paper right there.
10   Q.  What do you recall Horace Clanton's specific
11   complaints being about the test or the
12   procedure?
13   A.  Can I see that?
14   Q.  Yeah, sure.
15   A.  I can't remember, Mr. Morgan.  I'm sorry.  The
16   only thing that I can consider to be my direct
17   complaint was the inconsistency part in
18   compliance (sic) with everything else.  I mean,
19   it was all of us conversing together.  And we
20   had our concerns, and all of it came together
21   and we presented this together.
22   Q.  I just want to be sure I have this documented.
23   Do you remember -- what was the other -- Not

Page 146

1    Eddie, but who was the other one?
2    A.  Mr. Robert Hodge.
3    Q.  Do you remember any specific complaints that he
4    had?
5    A.  No, sir, I don't.  I don't recall.
6    Q.  Do you remember any specific complaints that
7    Eddie Ogletree had?
8    A.  Of the three that's available, no, sir.  I don't
9    recall.
10   Q.  I think this is Exhibit 10, the feedback
11   report.  When is your recollection that you
12   received that, after you filed the grievance?
13   A.  Like I say, the only time I recall receiving
14   this that is addressed to me is when I pretty
15   much asked for a review.  In reference to
16   everybody else, I don't know.  I'm just speaking
17   as far as what I received that was addressed to
18   me, because I think of the three of us -- of the
19   four of us who did it, each one was addressed to
20   each individual, I think.  But I'm not clear on
21   it.  It's been so far along.  But I can vouch
22   for this one that's addressed to me.
23   Q.  Look at the second page of this document, and

Page 147

1    it's got down there reading source.
2    A.  Okay.
3    Q.  It's got four books -- I assume they are
4    books -- listed:  IFSTA Chief Officer, Effective
5    Supervisory Practices, Fire Officers' Handbook
6    of Tactics, and Structural Firefighting.
7    Do you see those?
8    A.  Yes, sir.
9    Q.  Are those the four books that the City furnished
10   you to review to prepare for the battalion chief
11   exam?
12   A.  I think they are, sir.
13   Q.  And look at the next page on that.  It says:
14   Scoring Changes Based on Item Analysis.  Do you
15   see that?
16   A.  Yes, sir.
17   Q.  And it's got -- The first sentence says:  At the
18   time of the written test, all candidates were
19   given the opportunity to appeal any item on the
20   test they felt was inaccurate and unfair.
21   And my understanding is that you did not
22   appeal any of the test questions, true?
23   A.  No, sir, I didn't appeal any.

Page 148

1    Q.  And then the second paragraph says:  There were
2    a total of seven items appealed, and the scoring
3    key was adjusted for two of these items.
4    Did you ever ask anyone at the City what
5    that referred to or what that meant?
6    A.  I didn't, sir.  No.
7    Q.  And so I can be clear, the rumor is that if test
8    grades or scores had not been changed -- Let me
9    start over.
10   The rumor is if test question answers had
11   not been changed that Joey Darby would not have
12   scored high enough to have proceeded to the
13   assessment part?
14   A.  Yes, sir.
15   Q.  But you don't know how that change affected your
16   individual score, do you?
17   A.  Not directly, sir, no.
18   Q.  Tell me just generally what went on during the
19   grievance appeal process.
20   A.  Basically what happened was after -- I was
21   notified after the time I received the letter
22   stating what I made on the test and I couldn't
23   proceed.  I was contacted by Mr. Clanton.  He

Page 149

1    asked me what I thought, and I told him that I'm
2    concerned enough to file a grievance; what about
3    you. And he say he felt the same way, and he
4    had talked to Mr. Hodge and Mr. Ogletree.
5        So we met and we initiated the first letter
6    based upon the conversations we had and based on
7    everything that we presented on this first
8    letter. And we decided to present it to --
9    Being that we was a station officer and middle
10   management, we decided to present it to
11   Mr. Lamar, who was deputy chief, because we each
12   worked on -- well, some of us worked on
13   different shifts. If I'm not mistaken, me and
14   Mr. Clanton was on the same shift, and Eddie
15   and -- Mr. Hodge and Mr. Ogletree was on the
16   same shift. So we had different supervisor --
17   immediate supervisors. So we addressed it to
18   Mr. Lamar.
19   Q.  And I guess from there it goes to --
20   A.  Yes, sir. Just procedures that go through the
21   chain of command.
22   Q.  And eventually you have a hearing?
23   A.  Yes, sir. When we reach the city manager, it's

Page 150

1    his decision to grant us a hearing of his
2    choice, you know, as far as the hearing
3    officer. And it's set up, and that's when we go
4    into the hearing procedure part of the
5    grievance.
6    Q.  And that was before Judge Bailey came in?
7    A.  No. That was when Judge Bailey came. He was
8    the hearing officer.
9    Q.  He was the hearing officer. That's what I
10   asked. Okay.
11       And Hodge decided not to go forward with the
12   hearing?
13   A.  Yes, sir. During the process of when we
14   addressed Chief Lamar and, if I'm remember
15   correctly, when addressed -- when we was
16   preparing to address Mr. James, public safety
17   director, he told myself and Mr. Clanton that he
18   did not want to pursue any further. And, of
19   course, we respected that and told him we
20   appreciated what he had done. And Mr. Clanton
21   and myself and Mr. Ogletree, we're still
22   proceeding.
23   Q.  Clanton, is that the officer that had been the

Page 151

1    subject of your earlier EEOC complaint --
2    A.  Yes, sir.
3    Q.  -- that he took a temporary position as
4    something?
5    A.  Yes, sir. He was appointed as acting A shift
6    officer in place of the late Chief Brown.
7    That's when he had undergone -- initially found
8    out and undergone his health issues at the time
9    and was not capable of work. So our shift was
10   without an immediate supervisor when this
11   happened, but I was the acting. I was filling
12   that role prior to him being appointed because I
13   was the one who broke the news to every other
14   officer on the shift, the situation with Chief
15   Brown.
16   Q.  But my question is: That's the person you were
17   complaining about that got to be the temporary,
18   I guess, captain or battalion chief and you
19   thought it should have been you?
20   A.  Yes, sir. That was my main complaint to
21   Mr. Langley who made the appointment: Why
22   Mr. Clanton when I wasn't given an opportunity.
23   Q.  Did you have an attorney representing you at the

Page 152

1    hearing?
2    A.  No, sir. Well, let's back up. Which one, the
3    one in 2005 or 2006?
4    Q.  The one dealing with the battalion chief.
5    A.  Me, Mr. Ogletree, and Mr. Clanton? No, sir, we
6    didn't have a lawyer at that time.
7    Q.  Was there an attorney on the other side for the
8    City or was it just --
9    A.  No, sir. We just came into the hearing as we
10   were.
11   Q.  Who was the City's spokesperson?
12   A.  The City spokesperson?
13   Q.  Who was the one that defended the City's
14   position?
15   A.  Basically Judge Bailey. I mean, that's who we
16   talked to.
17   Q.  Lee Lamar wasn't there?
18   A.  Mr. Lamar was there and Mr. Reeves was there,
19   but, you know, we -- our conversation pretty
20   much was through Mr. Bailey.
21   Q.  Well, I understand that. Was there somebody
22   from the City who then had a conversation with
23   Mr. Bailey as to what the City's position was?

Page 153

1   A.  I guess there was between those other people
2       that were present, yes, sir.
3   Q.  Anybody you remember being there besides Lee and
4       Steve Reeves?
5   A.  I can't remember if Mr. Langley was there or
6       not, but I do know Mr. Lamar and Mr. Reeves was
7       there.
8   Q.  And Judge Bailey --
9   A.  And Judge Bailey, of course.  He was the hearing
10      officer.
11  Q.  He ruled against y'all?
12  A.  Yes, sir.
13  Q.  Did you have any witnesses or was it just the
14      three of you?
15  A.  It was just us three.
16  Q.  Do you know Rodney Hartsfield?
17  A.  I do.
18  Q.  Have you ever worked with him?
19  A.  I do.
20  Q.  Is he --
21  A.  I have.
22  Q.  Is he a good officer?
23  A.  I can't say if he's good or not, but the times I

Page 154

1       worked with Rodney Hartsfield, he was an
2       insubordinate (sic) to me.  I mean, he worked
3       under my leadership.
4   Q.  He wasn't insubordinate.  He was subordinate.
5   A.  He was subordinate, yes, sir.  He was either a
6       student firefighter, career firefighter, or a
7       team leader.  As far as him being a battalion
8       chief, I don't recall working for him ever since
9       he's been in that position.  I may have worked
10      overtime a couple of hours till they can get
11      somebody in at shift change, but not a 24-hour
12      shift.  No, sir.
13  Q.  Do you have an opinion as to whether or not he
14      is qualified or not qualified to be a battalion
15      chief?
16          MR. HORSLEY:  Object to the form.  You
17          can answer.
18  A.  I don't have an opinion on that, Mr. Morgan.
19  Q.  And Joe Lovvorn, have you worked with him?
20  A.  Yes, sir.  Same as I have with Rodney
21      Hartsfield.
22  Q.  Was he a good, competent officer when you worked
23      with him?

Page 155

1   A.  I mean --
2   Q.  Have any complaints about him?
3   A.  I never worked under his leadership as a
4       battalion chief.  It was always the same
5       description as was for Rodney Hartsfield.
6   Q.  Do you have any opinion as to whether he is or
7       is not qualified to be a battalion chief?
8          MR. HORSLEY:  Object to the form.
9   A.  I don't have an opinion, sir.
10  Q.  And Matt Jordan --
11  A.  Yes, sir.
12          MR. HORSLEY:  Same objection.
13  Q.  Have you ever worked for Matt Jordan?
14          MR. HORSLEY:  I'm sorry.  I thought he
15          was asking the same question.
16  A.  I have worked for Chief Jordan.  He was -- When
17      he was promoted, he was my -- he was put on my
18      shift, or our shift, as my immediate supervisor.
19  Q.  And do you have an opinion on whether or not he
20      is or is not qualified to be a battalion chief?
21          MR. HORSLEY:  Object to the form.  You
22          can answer.
23  A.  I don't have an opinion whether he's qualified

Page 156

1       or not, but I do know I had some problems with
2       him in reference to the grievance that I
3       initiated.  And that goes back to when I was at
4       Station 5.
5   Q.  You told me about that grievance?
6   A.  Yes, sir.
7   Q.  I don't know that he's one of the people that
8       y'all referred to, but I think Joey Darby has
9       been promoted to battalion chief as well now.
10  A.  Joey Darby was promoted to battalion chief to
11      replace Chief Brown when he retired.
12  Q.  Do you have an opinion of whether or not Joey
13      Darby is qualified or not qualified to be a
14      battalion chief?
15          MR. HORSLEY:  Object to the form.  You
16          can answer.
17  A.  I don't have an opinion on that, sir.
18  Q.  Do you have an opinion on whether or not you are
19      more qualified than Rodney Hartsfield to be a
20      battalion chief?
21          MR. HORSLEY:  Object to the form.  You
22          can answer.
23  A.  I do have an opinion on that.

Page 157

1   Q.   What is that opinion?
2   A.   Considering that I was an officer when he
3        started working there, I taught him in rookie
4        school, and, I mean, I trained him through the
5        training procedures that took place or
6        whatever. All these guys who are battalion
7        chiefs now, they came in after me.
8   Q.   I want to be sure I get all your answers so
9        let's kind of take our time on this.
10  A.   Yes, sir.
11  Q.   What I'm understanding you to say about Rodney
12       Hartsfield as to why you think you're more
13       qualified is that you were an officer when he
14       was hired and you participated in his training,
15       right?
16  A.   (Witness nods head positively.)
17  Q.   Any other reasons why you think you're more
18       qualified than Rodney Hartsfield?
19            MR. HORSLEY:  Object to the form.
20  A.   More years of experience level. I have more
21       years of experience. Spent more time on the
22       job. Has played a significant role or did play
23       a significant role in the growth of the

Page 158

1        department, you know, during the era when they
2        was actually coming in and being hired. I just
3        think I have more experience than any of those
4        guys at the Auburn Fire Division.
5             And one other thing: I mentioned it later
6        on. During their absence, you know, I filled
7        that position. And I filled that position
8        before they even became, you know, battalion
9        chiefs. I filled the position in the absence of
10       a battalion chief.
11  Q.   If a battalion chief —
12  A.   And I still do it.
13  Q.   — is not there, you as a lieutenant, step up —
14  A.   Yes, sir.
15  Q.   — to that position?
16  A.   Yes, sir. Based upon seniority.
17            MR. HORSLEY:  And you said you had
18            done that before the battalion
19            chief promotion?
20            THE WITNESS:  Before and after.
21  Q.   You're talking about with other people who were
22       battalion chiefs?
23  A.   Yes, sir. I've filled in several times for

Page 159

1        Chief Brown.
2   Q.   Do you know whether or not Rodney Hartsfield
3        ever filled in —
4   A.   I don't know. Me and him was not on the same
5        shift.
6   Q.   Do you know whether or not as a team leader
7        Rodney Hartsfield had stepped up and filled in
8        as a lieutenant?
9   A.   I'm not sure on that, Mr. Morgan.
10  Q.   Have we covered everything about Rodney
11       Hartsfield as to why you think you're more
12       qualified?
13  A.   I think we touched the basis of it, sir, the
14       most important part.
15  Q.   And Joe Lovvorn, do you think you're more
16       qualified than Joe Lovvorn to be a battalion
17       chief?
18            MR. HORSLEY:  Object to the form.
19  Q.   What are the reasons?
20  A.   Pretty much the same reasons that I mentioned
21       with Rodney Hartsfield.
22  Q.   Been there longer?
23  A.   Yes, sir.

Page 160

1   Q.   And Matt Jordan. Do you think you're more
2        qualified than Matt Jordan?
3             MR. HORSLEY:  Object to the form.
4   Q.   What are the reasons?
5   A.   Same reasons. Understand, Mr. Morgan, all these
6        guys came in right along the same era, one or
7        two years, give or take. And when they came in,
8        I was a officer already.
9   Q.   And then Joey Darby. You think you're more
10       qualified than Joey Darby —
11  A.   Yes, sir.
12  Q.   — to be a battalion chief?
13            MR. HORSLEY:  Object to the form.
14  A.   Yes, sir.
15  Q.   Same reasons?
16  A.   Yes, sir.
17  Q.   Any different reasons for any of them other than
18       what you've already expressed?
19  A.   Not at this time, sir.
20  Q.   There's a reference in this lawsuit — Well, let
21       me get to that.
22            MR. MORGAN:  Let's take a quick break.
23            (Brief recess.)

Page 161

1  Q.  (Continuing by Mr. Morgan)  Look at these four
2      books that were the reading source.
3      Specifically I'm going to ask you about all of
4      them, but specifically the supervisory --
5      Effective Supervisory Practices.  Hadn't you
6      read that book earlier in some of your training
7      courses for some of the certifications that you
8      had received along the way in your career?
9  A.  Yes, sir.  I recall having a lot to do
10     resourcefully with this particular text, yes,
11     sir.
12 Q.  How about the other three texts on there?  Had
13     you read or been exposed to any of them before
14     the battalion chief promotion procedure?
15 A.  If it was any other, it had to be Structural
16     Firefighting.  That's throughout your whole
17     career pretty much.
18 Q.  So a lot of this -- at least the material in
19     those two books would not have been new material
20     to you but really have been a review of stuff
21     that you had learned along the way?
22 A.  Yes, sir.  I can agree with that.
23 Q.  Let me ask some specifics about your complaint.

Page 162

1      In Count I --
2          (Brief pause.)
3  Q.  Look at paragraph 15, if you would, first
4      sentence.  It says:  Prior to February 2007,
5      only nine probationary lieutenants were allowed
6      to apply for the position of battalion chief.
7      Actually, isn't it true that there actually
8      had never been a promotion for battalion chief
9      before this?  Isn't that true?
10 A.  No.
11     MR. HORSLEY:  And, for the record,
12         that date is wrong too.  It should
13         be 2006.  I'm sorry about that.
14         That was my fault.
15 A.  The first incident involving battalion chiefs
16     was a change from captain to battalion chief.
17     That was the title change coordinated and worked
18     through the person in position to make that
19     decision.
20 Q.  So this is actually the first promotion to
21     battalion chief?
22 A.  Yes, sir.
23 Q.  The prior promotion had been to captain in '96?

Page 163

1  A.  Yes, sir.
2  Q.  And I think you testified, but I want to be
3      clear.  You don't remember whether or not
4      non-probationary people were allowed to apply
5      for captain in '96 because you weren't concerned
6      with that.  You were concerned with your own
7      promotion procedure.
8  A.  Yes, sir.  For the record, there were two people
9      applying for captain in '96 when I was applying
10     for lieutenant, and it was Mr. Lamar and
11     Mr. Johnny Lawrence.  Those were the two
12     candidates for captains in 1996.
13 Q.  And were either of them promoted?
14 A.  Chief Lawrence -- Mr. Lawrence was promoted to
15     captain.
16 Q.  Had he been a lieutenant?
17 A.  He was a team leader.
18 Q.  So then prior to February 2006, this is not
19     correct.  Only non-probationary -- Unless you're
20     counting team leaders as being lieutenants in
21     '96.  As a team leader, he was allowed to apply
22     for promotion to captain?
23 A.  Yes, sir, he was.

Page 164

1  Q.  And was promoted?
2  A.  Yes, sir.
3  Q.  And then you've got in February of '06, the City
4      changed its policy to allow non-probationary and
5      probationary firefighters to apply for battalion
6      chief.
7      And I think cutting through all that, what
8      we've established is the only person who was not
9      a team leader, lieutenant, or lieutenant (sic)
10     who sat for the written test for battalion chief
11     was Chris Turner, a black male?
12 A.  Chris Turner.  Give or take Clay Carson.
13 Q.  And I think you said he didn't take the test.
14 A.  No, sir, he did not.
15 Q.  The only one that took the test was Chris?
16 A.  Yes, sir.  Mr. Turner.
17 Q.  Black male.  All right.
18     Look at number 16, the next page.  It says:
19     During the time the City changed the policy to
20     require applicants for battalion chief to pass a
21     written test.
22     Obviously there was a written test.  What's
23     the problem with the written test?

Page 165

1         MR. HORSLEY: Object to the form. Go
2        ahead.
3  A.  My problem with that is that there have never
4     been a written test, Mr. Morgan. It was
5     always -- It was either assessment center or a
6     structured interview. And regardless which one
7     it was, there was not a written test for a
8     promotion to that rank.
9  Q.  Well, say that's true. Say that's true. Why
10    does that make it wrong to change the procedure
11    to include a written test?
12         MR. HORSLEY: Object to the form.
13  Q.  I know you don't like the fact that you didn't
14    do well on the written test. But aside from
15    that, looking at the big picture, what's wrong
16    with the City including a written test as part
17    of the promotion procedure?
18         MR. HORSLEY: Object to the form. Go
19    ahead.
20  A.  I'm not in the position to say whether it's
21    right or wrong with the City implementing
22    anything. I can only speak from the point that
23    through my 17 years of being there or up to the

Page 166

1    point where I became an officer and on up until
2    the time of this first battalion chief
3    promotion, there was never a written test. What
4    is right or wrong for the City to do, I'm not at
5    any liberty or at any power to justify that.
6  Q.  And that makes me want to back up a minute.
7    You took the assessment center or
8    participated in that for lieutenant.
9  A.  Yes, sir.
10  Q.  You sat on what you've called structured
11    interviews for team leader.
12  A.  Yes, sir.
13  Q.  What's the difference between the two? What was
14    different as an assessment as opposed to the
15    structured interview?
16  A.  I consider assessment center very thorough where
17    it covers all broadness of the position. I
18    mean, from exercises in reference to medical
19    calls, pumping, driving, having good
20    conversational skills with the public, in
21    general. That's an assessment center. A
22    structured interview for a team leader, you come
23    in a room and you sit down and okay, we have a

Page 167

1    series of questions we want to ask you. Please
2    respond to the best of your ability. Let us
3    know when you're done, and that's it.
4  Q.  Does assessment center involve more than just
5    questions and answers?
6  A.  It could, depending on what type of promotion it
7    is. The ones where I conducted myself as an
8    assessor in a neighboring department, yes, it
9    did. But in Auburn all the scenarios in 1996
10    was inside a building, and it was just different
11    scenarios dealing with different broad areas
12    that you're going to be exposed to as an
13    officer.
14  Q.  The assessment center that you participated in
15    for lieutenant, was that a question-and-answer
16    system?
17  A.  A portion of it was, yes, sir.
18  Q.  Was there more than just questions and answers?
19  A.  Yes, sir. We had role plays. We had an
20    in-basket scenario. We had scenarios where we
21    were actually videotaped. I can't remember if
22    we did an interview or not. I'm not sure.
23  Q.  Look at the second sentence of paragraph 16. It

Page 168

1    says: Coincidentally the policy changes
2    occurred when two African-American lieutenants
3    and one entry-level African-American
4    firefighter --
5        I assume that's Chris Turner.
6  A.  Yes.
7  Q.  -- became eligible for the position.
8        What's coincidental about that?
9        MR. HORSLEY: Object to the form. You
10    can answer.
11  A.  Coincidentally, you know, we applied for the
12    positions. We became eligible and we applied.
13    And all of a sudden, you know, things changed.
14    Things changed to the point where, you know, we
15    had to take a test. Why not stick to the way
16    we've been doing things?
17  Q.  Do you have any evidence that that change
18    occurred to exclude African-Americans from being
19    promoted to battalion chief?
20        MR. HORSLEY: Object to the form.
21  A.  I don't know if it was applied or not, sir. I
22    don't know. But I know this. It just
23    coincidentally happened that way to the point

Page 169

1   where it hasn't happened in the past.
2   Q.  And the last sentence of that paragraph says:
3       Seniority within the division was discarded as a
4       criteria for promotion to the battalion chief
5       position.
6          Do you recall one way or the other whether
7       or not in '96 for the last captain's promotion
8       seniority was a requirement?
9   A.  I don't know if it was a requirement, but it was
10      heavily considered.
11  Q.  And that's based on what?
12  A.  Based on time in grade, based on the number of
13      years of experience, on the years you was --
14  Q.  My question is:  Why do you say that was a
15      requirement for captain in '96?  Do you recall
16      seniority being a requirement for captain?
17  A.  I don't recall that.  I don't know, sir.
18  Q.  Look at paragraph 17.  It says you were denied
19      promotion to battalion chief in April 2006 and a
20      temporary assignment in January of 2005.
21         The 2005, is that the one where you filed
22      the grievance and the EEOC charge dealing with
23      Horace Clanton?

Page 170

1   A.  Yes, sir.
2   Q.  And if I recall, no lawsuit was filed as a
3       result of that?
4   A.  No, sir.
5   Q.  And then you said the denial of the promotion
6       was racially based.
7          What facts do you have that you're not being
8       promoted to battalion chief was because of --
9       was racially based?
10         MR. HORSLEY:  Object to the form.
11  A.  I can't think of no other reason why.  I mean,
12      I've done everything that the Auburn Fire
13      Division asked me to do up until this point.  I
14      was actually running the position prior to him
15      making that decision, and it had been practiced
16      and exercised prior to this incident that the
17      available lieutenants fill these positions.
18         Prior to the opportunity coming to me,
19      Mr. Langley's brother, who was a lieutenant of
20      the department, every time they needed a
21      position to take place, he was given the
22      opportunity.  And he had more seniority than
23      me.  And basically at one point, Mr. Langley

Page 171

1   told me -- Mr. Larry Langley told me that he has
2   more seniority than you; he's a lieutenant.  So
3   I'm just following suit.
4   Q.  Wait.  Now, he was a lieutenant?
5   A.  Terry Langley was a lieutenant.  Terry Langley
6       is Larry Langley's brother.
7   Q.  And what positions was he given that you weren't
8       given?
9   A.  In the absence of a captain or battalion chief,
10      he would fill that role and it was based on
11      seniority.
12  Q.  I thought you testified that you had also filled
13      that role as captain or battalion chief.
14  A.  When he left I did.  When he retired in February
15      of 2004, I was the only lieutenant left, and I
16      started filling those positions when asked to do
17      so.  Lieutenant Langley, Terry Langley, would do
18      it consecutively.  He would get the assignment,
19      and it would be his until told to do something
20      else.  I would do it randomly when guys take off
21      and -- When they take off, I'll step in.
22  Q.  Well, assume all that is true.  Why is it that
23      you say -- How do you consider that to be

Page 172

1   evidence of racial discrimination in your not
2   being promoted to battalion chief?
3   A.  What other reason would it be?  I mean, I've
4       done -- I'm qualified.  I'm certified.  I'm
5       capable of doing the job.  They make me do it
6       anyway.  So what other reason would it not be?
7       That's the conclusion I was led to, and that's
8       what I think.
9   Q.  Well, do you have any specific what you would
10      consider evidence other than that's what you
11      think?
12         MR. HORSLEY:  Object to the form.  You
13         can answer.
14  A.  Well, the only evidence I have, Mr. Morgan, is
15      the day that the announcement was made and
16      Mr. Clanton was asked to act as the A shift
17      shift commander.
18  Q.  That was back in '05?
19  A.  Yes, sir.
20  Q.  Well, let's talk about February of '06 when you
21      applied for battalion chief and then you didn't
22      score high enough on the written test.  What
23      evidence do you have that you were denied

Page 173

1    promotion on that occasion because of your race?
2        MR. HORSLEY: Object to the form. You
3    can answer.
4  A.  I don't recall anything at this time,
5    Mr. Morgan.
6  Q.  Look at paragraph 18. I think we've been
7    through this. You're not aware of any Caucasian
8    applicants for battalion chief in February of
9    '06 that were given preferential treatment in
10   the application process, test aids, or test
11   grades, correct?
12 A.  Yes, sir.
13 Q.  And in paragraph 19, it said: The City
14   continues to violate a federal court order
15   requiring them to alter hiring and promotion
16   practices.
17       First of all, you were hired in '94 as a
18   black male, true?
19 A.  Yes, sir.
20 Q.  And you had been hired earlier than that, I
21   guess, in '91 as a student firefighter?
22 A.  Yes, sir.
23 Q.  What federal court order are you referring to

Page 174

1    and how is the City of Auburn violating it as it
2    relates to promotion practices?
3  A.  When I was hired in 1994, I was informed -- my
4    immediate supervisor when I went career was Dean
5    Garrett. No. My shift commander was Dean
6    Garrett. My immediate supervisor was a black
7    male by the name of Jessie Strickland. And at
8    the time, I didn't know anything about previous
9    lawsuits or whatever. But it was at that time
10   when they informed me that I was hired because I
11   was black, and that was in the previous lawsuit.
12 Q.  Who told you that?
13 A.  This came from the officers when I went on shift
14   as a career --
15 Q.  Jessie Strickland?
16 A.  It was Dean Garrett and Jessie Strickland
17   present.
18 Q.  Told you you were hired because you were black?
19 A.  Yeah. Basically in a nutshell, that's what it
20   was. And it was all contingent upon the lawsuit
21   that they had where they was made to hire three
22   African-Americans, three blacks.
23 Q.  You don't believe that, do you?

Page 175

1  A.  Oh, most definitely. I think I was hired
2    because I was the man for the job. It has
3    nothing to do with color.
4  Q.  That's right.
5        Well, the court order that you're referring
6    to is one that occurred before you were hired as
7    a student firefighter as you understand it?
8  A.  I guess it was, Mr. Morgan. I don't -- well --
9  Q.  Have you ever read the court order?
10 A.  No, sir. I don't know nothing about it.
11 Q.  Well, is it fair to say that you really don't
12   know -- can't give me any examples about how is
13   it you claim that the City is violating the
14   court order as to promotion policies?
15       MR. HORSLEY: Object to the form. You
16       can answer.
17 A.  All I know is that from previous lawsuits, there
18   were stipulations set, guidelines set. And the
19   City was to follow it in reference to the Auburn
20   Fire Division.
21 Q.  And you got that understanding from Dean Garrett
22   and Jessie Strickland?
23 A.  That's the first confirmation I got from it when

Page 176

1    I became career.
2  Q.  Was from those two people?
3  A.  They were my immediate and shift supervisor.
4  Q.  And they are the same two people that told you
5    you were hired because you were black?
6  A.  They pretty much told me.
7  Q.  And you don't believe that?
8  A.  No, sir.
9  Q.  Look at Count II, Retaliation. I think it's
10   page 6. You've got here that the Plaintiffs
11   have engaged in statutorily protected
12   expressions, such as filing EEOC -- well, Equal
13   Opportunity charges and grievances against the
14   City.
15       What do consider to be statutorily protected
16   expressions?
17       MR. HORSLEY: Object to the form.
18 A.  I guess -- Well, I don't want to guess about
19   it. I want to be direct with it.
20       MR. HORSLEY: If you don't know, don't
21   try and answer.
22 A.  I don't know, Mr. Morgan.
23 Q.  Let me ask you, then. Do you claim in this

Page 177

1    lawsuit that you were denied promotion to
2    battalion chief in retaliation for having filed
3    an earlier EEOC charge and grievances against
4    the City?
5  A.  To my understanding, the reason why I didn't get
6    the opportunity to pursue the battalion chief
7    position is because I didn't pass the written
8    test.  I don't understand to this day why it was
9    implemented as part as when in the past it never
10   has happened.
11 Q.  You don't have any evidence that the reason you
12   weren't promoted is in retaliation for having
13   filed an EEOC charge or grievance, do you?
14        THE WITNESS:  Can I talk to my
15        attorney for a minute?
16        MR. HORSLEY:  All I can tell you is if
17        you don't know the answer to the
18        question, that needs to be your
19        answer.
20 A.  I don't know the answer to that question,
21   Mr. Morgan.
22 Q.  Your understanding is you didn't get promoted
23   because you didn't score high enough on the

Page 178

1    written test, true?
2        MR. HORSLEY:  Object to the form.
3        THE WITNESS:  Can I answer?
4        MR. HORSLEY:  You can answer.
5  A.  True.
6  Q.  And as far as you know, the same written test
7    was given to everyone, blacks and whites?
8  A.  As far as I know, sir, everyone that was present
9    got the same test.
10 Q.  And you don't have any evidence or suspect that
11   the City sat around with anybody and said, hey,
12   let's make this test so that Gerald Stephens
13   can't pass it because we're mad at him for
14   filing an EEOC charge?  You don't have any
15   evidence to that effect, do you?
16        MR. HORSLEY:  Object to the form.
17        THE WITNESS:  Can I answer?
18        MR. HORSLEY:  Yeah.
19 A.  No, sir, I don't have any evidence of that.
20 Q.  In paragraph 31, you make reference to protected
21   expressions.  Do you see that?
22 A.  Yes.
23 Q.  Do you include anything in protected expressions

Page 179

1    other than what you refer to in paragraph 30
2    being the EEOC charge and the grievances?  Is
3    there anything else that you consider to be
4    protected expressions, if you consider them to
5    be, other than the EEOC charge and the
6    grievances, if you know one way or the other?
7  A.  I don't know one way or the other, sir.
8  Q.  Look at Count III.  And the first question is --
9    In paragraph 34 in quotes, is the phrase
10   "built-in headwind for minority groups and
11   unrelated to measuring job capability".
12        What is a built-in headwind?  What do you
13   understand that to be?
14        MR. HORSLEY:  Object to the form.  He
15        didn't draft the complaint.
16        MR. MORGAN:  I understand.
17 A.  I don't know, sir, at this point.
18 Q.  Outside of this lawsuit and excluding any
19   conversations with your attorney, have you ever
20   heard of the phrase "built-in headwind" before?
21 A.  I don't recall ever hearing anything of that
22   nature, sir.
23 Q.  What is your understanding as to your claim that

Page 180

1    the promotion practice had a disparate impact?
2    In your terms, what does that mean?
3        MR. HORSLEY:  Object to the form.  You
4        can answer.
5  A.  All I know, Mr. Morgan, is that as an employee
6    of the Auburn Fire Division being hired in 1994,
7    there have only been one person hired with the
8    division, African-American, as a career
9    firefighter, and that was a guy by the name of
10   Roderick Torbert.
11 Q.  Who?
12 A.  Roderick Torbert.  And other than myself being
13   promoted in 1996, the only other person I know
14   that was promoted is Mr. Ogletree.  Since then
15   no African-Americans have been promoted or
16   hired, and I know that there are
17   African-Americans out there who have applied and
18   who are qualified for those positions.  I don't
19   know them directly.  I don't know them
20   specifically, but I know some who have applied
21   for a promotion and for career firefighter
22   positions, and it's never happened.
23 Q.  Let me kind of break that down because I want to

45 (Pages 177 to 180)

Page 181

1  be clear on it.
2  Is your complaint about a disparate impact
3  related to the hiring or non-hiring of blacks,
4  or is it related to the promotion or
5  non-promotion of blacks?
6  MR. HORSLEY: Object to the form.
7  A.  Both. I'm concerned about both of those issues,
8  Mr. Morgan.
9  Q.  So you think that the City's hiring practices
10  have a disparate impact on blacks?
11  A.  Yes, sir.
12  Q.  Tell me what you mean by a disparate impact on
13  blacks.
14  MR. HORSLEY: Object to the form. Go
15  ahead.
16  A.  They haven't hired any, Mr. Morgan, or promoted
17  any, since 1996.
18  Q.  And what do you mean by a disparate impact
19  against blacks on promotions?
20  MR. HORSLEY: Same objection. Go
21  ahead.
22  A.  They haven't promoted any.
23  Q.  In your opinion, just the fact that none have

Page 182

1  been hired is evidence of the disparate impact?
2  A.  They have not hired or promoted qualified
3  African-Americans since 1996.
4  Q.  And that's the basis of your disparate impact
5  claim?
6  A.  Yes.
7  Q.  How did you rate Chris Turner on the team leader
8  interviews?
9  A.  I never sat on the interview with -- on the
10  board of an interview for Chris Turner. I've
11  never sat --
12  Q.  For team leader you never sat on one that he
13  applied for?
14  A.  No, sir, I never did.
15  Q.  Was it your experience that the team leader
16  interviews that -- panels that you sat on always
17  included at least one and usually two blacks?
18  A.  One if not two, yes, sir.
19  Q.  Well, let's focus in on the promotion to
20  battalion chief which you applied for and did
21  not receive. What is there about that procedure
22  to battalion chief that you think had a
23  disparate impact on blacks?

Page 183

1  MR. HORSLEY: Object to the form. You
2  can answer.
3  A.  When the four captains received their battalion
4  chief rank, it was done by a title change. No
5  test. No procedures. No structured interview.
6  No assessment center. I mean, nothing was set
7  in stone other than a title change until after
8  the fact when they decided to go this route
9  right here.
10  Q.  This route meaning the test?
11  A.  The test -- The written test and the cutoff
12  score and everything else that went along with
13  it that I didn't experience.
14  Q.  Well, let's go back to the four captains.
15  A.  Okay.
16  Q.  Did anything occur in terms of their employment
17  other than they were renamed battalion chief
18  from captain?
19  A.  No, sir.
20  Q.  Did their duties and responsibilities remain the
21  same?
22  A.  The only thing I say had something to do with
23  that is the actual growth of the city. I mean,

Page 184

1  the city is steadily growing. Responsibilities
2  are steadily increasing. Our job
3  responsibilities are, you know, growing more
4  than they have been in the past. And I guess --
5  Well, I won't guess about it.
6  Just the growth of the city, and they
7  thought maybe they needed a title change for
8  some reason or another, and they pursued it.
9  Q.  Do you claim that the title change alone from
10  captain to battalion chief -- do you make a
11  claim that had some sort of racial
12  discrimination or racially discriminatory effect
13  toward blacks, changing the name from captain to
14  battalion chief?
15  MR. HORSLEY: Object to the form.
16  A.  I don't know what the reason was, Mr. Morgan. I
17  don't know the reason for pursuing it, the
18  reason for wanting to change it. I don't have a
19  clue.
20  Q.  My question is: Do you consider that to be
21  somehow racially discriminatory, to change the
22  title from captain to battalion chief?
23  MR. HORSLEY: Object to the form. I

Deposition of Gerald Stephens                                                                May 30, 2008

Page 185

1        think he's already answered the
2        question.
3    A.  No, sir, I don't.
4    Q.  Now, in terms of the actual battalion chief
5        promotion procedure that you were involved in,
6        what is there about it that you think had a
7        disparate impact on blacks?
8            MR. HORSLEY:  Object to the form.  You
9        can answer.
10   A.  Can you ask me that again, please, sir?
11   Q.  In terms of the battalion chief promotion
12       process in which you participated, what is it
13       about it that you think had a disparate impact
14       on blacks?
15           MR. HORSLEY:  Object to the form.
16   A.  The written test.
17   Q.  What was there about the written test that you
18       think had a disparate impact?
19           MR. HORSLEY:  Same objection.  Go
20       ahead.
21   A.  As stated before, Mr. Morgan, on previous
22       incidents, the written test has never been an
23       option in the promotion -- a written test with a

Page 186

1        cutoff score has never been part of the
2        promotion procedure within the division.
3    Q.  And I don't want to keep on with this, but I
4        want to be clear.  Is it your position that just
5        by giving a written test that the effect of that
6        was to have a disparate impact on blacks?
7            MR. HORSLEY:  Object to the form.  You
8        can answer.
9    A.  I don't recall that at this time, Mr. Morgan.
10   Q.  What I probably should have done is ask this
11       question first.
12           What does disparate impact mean to you?
13       What do the terms "disparate impact" mean to
14       you?
15   A.  Basically it means to me that -- Let me see if I
16       can come up with a specific --
17           MR. HORSLEY:  That's a legal question.
18   A.  No, sir.
19           MR. HORSLEY:  It's a legal term, and I
20       don't want you answering questions
21       like that.
22   A.  No, sir.  I don't have any comment at this time.
23   Q.  I'm not asking a legal definition.  I'm just

Page 187

1        asking what do you think it means.
2            MR. HORSLEY:  I don't want you trying
3        to think up an answer.
4            MR. MORGAN:  No.  Don't sit here and
5        just answer it.
6    Q.  Do you know what disparate impact means one way
7        or the other?
8    A.  No, sir.  I don't have any comment at this time.
9    Q.  Before they became battalion chiefs, were those
10       people that held that position captains or were
11       they shift commanders?
12   A.  The title that I understand is shift
13       commander/captain or shift commander/battalion
14       chief.  Captains or battalion chief are
15       commanders like lieutenants are station
16       officers.
17   Q.  So captains had become shift commanders which
18       had become battalion chiefs?
19   A.  Captains are shift commanders and the title was
20       changed to battalion chief.
21   Q.  All of which was just, as you understand it, a
22       name change?
23   A.  Title change.

Page 188

1    Q.  In the big picture, what do the battalion chiefs
2        do?
3    A.  They are shift commanders.  They oversee all
4        operations per shift, including the firefighters
5        that work under them in reference to the safety
6        of the city, the whole -- Everything in
7        reference to.
8    Q.  And there are four of them?
9    A.  Yes, sir, it is.
10   Q.  And does each one have a different area of
11       responsibility?
12   A.  Each one of them carry out the same
13       responsibilities.  The responsibilities apply to
14       each battalion chief, other than the one who is
15       assigned to administrative duties.
16           (Defendant's Exhibit 13 marked for
17       identification.)
18   Q.  Let me show you Defendant's Exhibit 13 and ask
19       you if you recognize this as the charge of
20       discrimination when you submitted to the EEOC.
21           Is that your charge of discrimination?
22   A.  Yes, sir.
23           (Off-the-record discussion followed by

Page 189

1          a brief recess.)
2     Q.   (Continuing by Mr. Morgan)  Let me ask you about
3          some of these folks on the witness list and
4          specifically what they know about your case.
5               William Thompkins, who is he and what does
6          he know about your case?
7     A.   William Thompkins used to be employed with the
8          student firefighter program.  Of course, he's a
9          black male.  And Mr. Thompkins was terminated on
10         a first offense of an incident that occurred
11         between him and another temporary full-time
12         employee, who is a PSO, Public Safety Officer.
13         Why he was terminated on a first offense, I
14         don't know, but he shouldn't have never been
15         terminated.
16    Q.   And he's a black male?
17    A.   Yes, sir, he is.
18    Q.   When was he terminated?
19    A.   I don't remember, Mr. Morgan.
20    Q.   Well, does he know anything about you not being
21         promoted to battalion chief?
22    A.   I don't know exactly what he knows, but he could
23         have been told something of that nature.  I

Page 190

1          don't know for sure.
2     Q.   Was he still employed with the City when you
3          applied for battalion chief?
4     A.   I don't recall he was, sir.
5     Q.   Have you had any conversations with him about
6          race discrimination?
7     A.   I haven't seen Thompkins in a long time.
8     Q.   Anything else that you have him listed for other
9          than the fact that he was terminated on a first
10         offense and you don't think he should have been
11         terminated on a first offense?
12    A.   No, sir.
13    Q.   And do you know what that offense was?
14    A.   I really don't know.  I don't know why they
15         decided to do that.
16    Q.   Was he a firefighter?
17    A.   He was a student firefighter.
18    Q.   Well, let me ask you this.  I'm not being
19         disrespectful, but what business would it be of
20         yours as to why he was terminated?
21    A.   Because I've seen other things happen with other
22         student firefighters who were white, and they
23         had multiple times to correct the problem, do

Page 191

1          better, whatever.  There were times when they've
2          done things that, yes, they should have been
3          fired on the first offense because it involved
4          the police department.  Police were notified.
5          They were involved.  They committed an act that
6          I deem to be very serious.  And if I was their
7          immediate supervisor, I would have recommended
8          that they be terminated.
9     Q.   And can you give me names of any of them?
10    A.   Michael Garrett Thee; a young man by the name of
11         Hale -- last name Hale, H-A-L-E; a young man by
12         the name of Graham -- last name Graham,
13         G-R-A-H-A-M.  That's just a few that come off
14         the top of my head.
15    Q.   Who is Jeremy Patterson?
16    A.   He also is a black male, student firefighter
17         program, or was.
18    Q.   And was he there when you applied for promotion
19         to battalion chief?
20    A.   No, sir, he wasn't.
21    Q.   To your knowledge does he know anything about
22         your case?
23    A.   I have talked to Mr. Patterson.

Page 192

1     Q.   And what has he told you?
2     A.   Basically he understand who the battalion chiefs
3          were who were promoted, and he asked me on
4          occasions how did that happen and what took
5          place.
6     Q.   Well, does he have any evidence or give you any
7          information or facts that you were not promoted
8          because of your race?
9     A.   I don't recall that.  I don't know.
10    Q.   Did he voluntarily leave the student firefighter
11         program?
12    A.   He graduated from Auburn University and obtained
13         another job, and -- I think he resigned and took
14         on a new job and left the program.
15    Q.   So he stayed in the program.  What is the up
16         side to being in the student firefighter
17         program?  They pay for your college education?
18    A.   They do --
19    Q.   Room and board?
20    A.   They provide them a place to live.  They have
21         tuition reimbursement.  Now they allow them to
22         pay into the retirement program.
23    Q.   And then you have Chris Turner.  What does Chris

48 (Pages 189 to 192)

Page 193

1    Turner know about your complaint?
2    A.  Chris Turner, of course, him and I went through
3        recruiting school together in '91 and have
4        pretty much worked our entire career together,
5        you know, per shift assignments.
6    Q.  Well, do you know of any specific information he
7        has about you not being promoted?
8    A.  Well, Chris Turner I think has been overlooked
9        several times on promotion himself; therefore,
10       he's witnessed other incidents to occur.  What
11       his reasons are, I don't recall.  But as I
12       stated, Chris Turner and I have pretty much
13       worked our career together.
14   Q.  I guess I'm pronouncing this right.  Marzella
15       Ogletree?
16            MR. OGLETREE:  That's my wife.
17   Q.  His wife.  Do you know her?
18   A.  I've seen her before, but I don't know her, no,
19       sir.
20   Q.  And then your wife.  What does your wife know
21       about your complaints or your lawsuit?
22   A.  Basically what I've told her and shared with her
23       from what I received from my attorney.

Page 194

1    Q.  She doesn't have any firsthand knowledge of what
2        goes on at the fire department, does she?
3    A.  She don't work there, no, sir.
4    Q.  Then you have Adelner Franklin Thomas, district
5        director, EEOC.  What does -- I guess that's a
6        male.  What does he know or she know?
7    A.  I don't have -- I don't know of anything of
8        that, Mr. Morgan.
9    Q.  You've got Doug Watkins, former city manager.
10   A.  Yes, sir.
11   Q.  What does he know about your battalion chief
12       promotion?
13   A.  I don't know if he knows anything, Mr. Morgan,
14       but --
15   Q.  He wasn't there at that time, was he?
16   A.  He was the one who implemented or helped
17       implement the title change promotion, whatever
18       you want to call it, from captain to battalion
19       chief.
20   Q.  Do you know specifically what he did in that
21       regard?
22   A.  I don't know specifically what he did.
23   Q.  Do you know of anything else that he's done in

Page 195

1        terms of the battalion chief position other than
2        his involvement in the title and name change?
3    A.  I don't know of anything.
4    Q.  And he was not present when you were -- went
5        through the process?
6    A.  No, sir.
7    Q.  And you've got Horace Clanton.  He's one of
8        those that signed the grievance with you?
9    A.  Yes, sir.
10   Q.  In terms of racial discrimination, do you know
11       of any information or knowledge that Mr. Clanton
12       has about you and racial discrimination?
13   A.  I don't know of anything, sir.
14   Q.  Rodney Hartsfield?
15   A.  I don't know of anything.
16   Q.  And he was promoted to battalion chief.
17            And then you got Michael -- Matthew
18       Jordan.  Do you know of anything he knows about
19       you being racially discriminated against?
20   A.  I don't know if he knows anything, sir.
21   Q.  Joseph Lovvorn, do you know anything he knows
22       about your case, this lawsuit?
23   A.  No, sir, I don't know if he knows anything.

Page 196

1    Q.  Jason Brown, who is Jason Brown?
2    A.  Jason Brown is a station officer, one of those
3        that -- one of the thirteen signatures on the
4        paperwork that allowed them to -- allowed them
5        the title change or promotion, whatever you want
6        to call it, to lieutenant.
7    Q.  Is he a white male?
8    A.  He is a white male.
9    Q.  What, if anything, does he know about your
10       complaints in this lawsuit?
11   A.  I don't know if he knows anything, Mr. Morgan.
12   Q.  Did he sit for the promotion to battalion chief?
13   A.  He did, sir.
14   Q.  Did he make it to the top five?
15   A.  I don't know, sir, if he did or not.
16   Q.  Was he promoted to battalion chief?
17   A.  No, sir, he was not.
18   Q.  And then you've got Paden Payton.  Is he the one
19       you told me about earlier with the hazing
20       incident?
21   A.  Yes, sir.
22   Q.  And when did he leave the City?
23   A.  I can't remember the date right off, sir, but it

Page 197

| 1 | was within the last two years. |
|---|---|
| 2 | Q.  Was he still employed with the City when you |
| 3 | went through the promotion procedure process for |
| 4 | battalion chief? |
| 5 | A.  Yes, sir, he was. |
| 6 | Q.  Has he told you any information or knowledge he |
| 7 | has about your lawsuit or your claims of racial |
| 8 | discrimination? |
| 9 | A.  No, sir. |
| 10 | Q.  Then you've got the Auburn city council |
| 11 | members.  Have you discussed your case with any |
| 12 | members of the Auburn city council? |
| 13 | A.  No, sir. |
| 14 | Q.  Do you know anything that the Auburn city |
| 15 | council members know about your claim of racial |
| 16 | discrimination? |
| 17 | A.  No, sir. |
| 18 | Q.  Joey Darby, do you know anything he knows about |
| 19 | your case or why he's listed as a witness? |
| 20 | A.  I don't know anything that he knows. |
| 21 | Q.  Then you have Terry Walker.  Who is Terry |
| 22 | Walker? |
| 23 | A.  He is the former training officer -- training |

Page 198

| 1 | chief who recently retired. |
|---|---|
| 2 | Q.  Do you know anything that he knows about your |
| 3 | case? |
| 4 | A.  No, sir. |
| 5 | Q.  Do you know why he's listed as a witness? |
| 6 | A.  Don't have a clue. |
| 7 | Q.  Ronnie Blankenship, who is he? |
| 8 | A.  He was my first actual supervisor when I became |
| 9 | a student.  And to make a long story short, he |
| 10 | was the fire chief up until '96-'97 -- |
| 11 | 1996-1997.  He went from team leader to fire |
| 12 | chief, and then from fire chief he went on and |
| 13 | retired and went elsewhere. |
| 14 | Q.  He left the City in '96 or '97? |
| 15 | A.  Yes, sir. |
| 16 | Q.  Do you know anything that he knows about your |
| 17 | claims of racial discrimination? |
| 18 | A.  I don't know if -- I don't know what he knows, |
| 19 | Mr. Morgan. |
| 20 | Q.  But he hasn't been employed with the City since |
| 21 | '97 thereabouts? |
| 22 | A.  '96-'97, within that range. |
| 23 | Q.  And Stephanie King, you've told me your |

Page 199

| 1 | observations of her involvement in this |
|---|---|
| 2 | process.  Anything that she knows or any other |
| 3 | reason she would be listed as a witness other |
| 4 | than her role in the assessment -- I mean, the |
| 5 | orientation process? |
| 6 | A.  No, sir.  I don't know of anything. |
| 7 | Q.  Have you ever had any conversations with her and |
| 8 | complained about racial discrimination? |
| 9 | A.  No, sir. |
| 10 | Q.  Ever complained about the test to her? |
| 11 | A.  No, sir. |
| 12 | Q.  And you've got Joe Bailey, and I know you said |
| 13 | he was the hearing officer. |
| 14 | A.  Yes, sir. |
| 15 | Q.  To your knowledge does he know anything else |
| 16 | other than what he heard as the hearing officer? |
| 17 | A.  I don't know what else he have heard or knows or |
| 18 | anything, Mr. Morgan. |
| 19 | Q.  Have you ever discussed your case with him? |
| 20 | A.  No, sir. |
| 21 | Q.  Michael Thee.  Who is Michael Thee? |
| 22 | A.  Mr. Thee is a student firefighter of the Auburn |
| 23 | Fire Division. |

Page 200

| 1 | Q.  And is he still a firefighter? |
|---|---|
| 2 | A.  Yes, sir. |
| 3 | Q.  Still a student firefighter? |
| 4 | A.  Yes, sir.  To my knowledge he is. |
| 5 | Q.  What, if anything, does he know about your case? |
| 6 | A.  I don't know if he knows anything, Mr. Morgan. |
| 7 | Q.  Has he received any favorable treatment in your |
| 8 | opinion? |
| 9 | A.  I think he has. |
| 10 | Q.  What kind of favorable -- |
| 11 | A.  Being that he was involved in the incident at |
| 12 | work, which according to the rules and the |
| 13 | personnel procedures of the City, what he did |
| 14 | was considered a major offense and he should |
| 15 | have been dismissed. |
| 16 | Q.  What was that major offense? |
| 17 | A.  He went in and changed documents, provided false |
| 18 | documents in a calendar that belonged to me |
| 19 | while I was on duty because he was running late |
| 20 | and had been late for work several consecutive |
| 21 | times and knew he was in trouble.  And he knew |
| 22 | what was going to happen to you if it continued |
| 23 | because I made sure I let him know each time |

Page 201

1    that it occurred what was going to happen.
2  Q.  And did you report that, that he changed
3    documents?
4  A.  I documented and reported to my immediate
5    supervisor, and it did go up the chain.
6  Q.  What happened to him?
7  A.  If I'm thinking correctly, he received a
8    suspension for, I think it was, four shifts but
9    was allowed to return back to work, and he still
10    works there.
11  Q.  Has he applied for any promotions?
12  A.  I don't know if he applied for any promotions or
13    not, Mr. Morgan.
14  Q.  Then you've got Casey McCloud -- McLeod?
15  A.  McLeod.
16  Q.  Who is that?
17  A.  Casey McLeod also was a student firefighter, but
18    presently he is now a fire career firefighter.
19  Q.  White male?
20  A.  White male.
21  Q.  And does he know anything about your case?
22  A.  I don't know if he knows anything or not,
23    Mr. Morgan.

Page 202

1  Q.  Have you discussed it with him?
2  A.  No, sir, I have not.
3  Q.  Did he apply for any promotions?
4  A.  I don't know if he have or not, sir.
5  Q.  Any problems that you're aware of with him?
6  A.  Presently, no, sir.
7  Q.  Well, in the past?
8  A.  Well, there have been some incidents where he
9    also was late for work, an incident where he had
10    an unexcused absence that pretty much was said
11    or told to me through my immediate supervisor at
12    the time, which was Johnny Lawrence, that we're
13    not going to worry about this; it never happened
14    as far as I'm concerned.
15  Q.  Did you complain to anybody about that above
16    your supervisor?
17  A.  I complained to Chief Lawrence directly and told
18    him that I didn't think it was right.
19  Q.  To Chief Lawrence?
20  A.  Yes, sir.  Johnny Lawrence.  That was my
21    immediate supervisor at the time.
22  Q.  Did you complain to anybody above your immediate
23    supervisor?

Page 203

1  A.  Well, I talked to Mr. Langley about it, too.
2    Larry Langley.
3  Q.  And what did he say?
4  A.  I also talked to -- Well, let me back up.
5    Johnny Lawrence was filling in for my supervisor
6    at the time who was Danny Leverette.  So I spoke
7    to Johnny Lawrence and I talked to Danny
8    Leverette and I also talked to Larry Langley.
9  Q.  But you're not aware of anything he knows about
10    you not being promoted?
11  A.  I don't know if he knows anything.
12  Q.  How about Dean Garrett?  Does he know anything
13    about you not being promoted?
14  A.  I don't know if he knows anything or not, sir.
15  Q.  Was he still with the City when you applied for
16    the battalion chief?
17  A.  I think he had retired.
18  Q.  Have you ever discussed with him any complaints
19    you have about racial discrimination?
20  A.  No, sir.
21  Q.  Amy Weaver, it says she's -- I don't know what
22    it says she is, but she takes care of the
23    Auburn-Opelika News.  Have you ever talked to an

Page 204

1    Amy Weaver?
2  A.  No, sir.
3  Q.  Do you know who she is?
4  A.  No, sir.
5  Q.  Lindsey Field, do you know who that is?
6  A.  No, sir.
7  Q.  Clinton Hammond, do you know who he is?
8  A.  Yes, sir.
9  Q.  Does he know anything about your claims of
10    racial discrimination?
11  A.  Mr. Hammond is deceased.  I don't know what he
12    knew when he was living.
13  Q.  Do you remember what year he died?
14  A.  I don't remember the exact year, but -- Maybe
15    eight, nine years ago maybe.
16  Q.  Jimmy Lee Brown, who is that?
17  A.  He was the battalion chief of the Auburn Fire
18    Division, the one who had the health issues
19    that --
20  Q.  Hammock?
21  A.  No.
22  Q.  Horace Clanton?
23  A.  Horace Clanton, yes, sir, was assigned to fill

Deposition of Gerald Stephens                                                              May 30, 2008

Page 205

1   his position in his absence.
2   Q.  Was Mr. Brown still a battalion chief when you
3       applied for the promotion to battalion chief?
4   A.  Was he?  I don't recall if he was or not,
5       Mr. Morgan.  It was right during the time -- I
6       think he was maybe on sick leave or something of
7       that nature.  Let me see.  Yes, sir, he was
8       still employed there.
9   Q.  Have you had any conversations with him about
10      racial discrimination or your claims?
11  A.  No, sir.
12  Q.  Who is Wendall Willis?
13  A.  He was a guy that I used to work with years
14      ago.  He was a career firefighter.  He doesn't
15      work there anymore.  It's been a long time since
16      he worked there.
17  Q.  Do you know anything that he knows about your
18      case?
19  A.  No, sir.
20  Q.  Have you talked to him about it?
21  A.  No, sir.
22  Q.  James Lyle?
23  A.  Yes, I know him.

Page 206

1   Q.  Who is he?
2   A.  Also a career firefighter years ago.
3   Q.  Has he gone a long time?
4   A.  Yes, sir.
5   Q.  Have you discussed your lawsuit with him?
6   A.  No, sir.
7   Q.  Have you talked to him about it or seen him
8       recently?
9   A.  No, sir.
10  Q.  Tommy James?
11  A.  Yes, sir, I know him.
12  Q.  Who is Tommy James?
13  A.  Tommy James is a retired team leader from the
14      Auburn Fire Division.
15  Q.  Was he retired when you applied for the
16      battalion chief?
17  A.  Yes, sir.
18  Q.  Do you know anything that he knows about your
19      case?
20  A.  No, sir.
21  Q.  Have you discussed your case with him?
22  A.  No, sir.
23  Q.  Kenneth Lee Smith?

Page 207

1   A.  Used to be a lieutenant in the fire division but
2       was demoted to firefighter approximately a
3       couple of months before he actually retired.
4   Q.  How long has he been retired?
5   A.  Over ten years.
6   Q.  White male?
7   A.  White male.
8   Q.  Do you know anything he knows about your case?
9   A.  No, sir.
10  Q.  Have you discussed your case with him?
11  A.  No, sir.
12  Q.  Ron Jones?
13  A.  Ronnie Jones?
14  Q.  Yeah.
15  A.  Ronald Jones?  He is a retired shift commander,
16      captain, at the time.
17  Q.  Was he still with the City when you applied for
18      battalion chief?
19  A.  No, sir.
20  Q.  Do you know anything he knows about your case?
21  A.  I don't know if he knows anything, sir.
22  Q.  Have you discussed it with him?
23  A.  No, sir.

Page 208

1   Q.  Dexter Card.  Do you know Dexter Card?
2   A.  Lieutenant Dexter Card, yes, sir.
3   Q.  Does he know anything about your case?
4   A.  I don't know what he knows, sir.
5   Q.  Have you discussed your lawsuit with him?
6   A.  No, sir.
7   Q.  And he wasn't there when you took the test?
8   A.  No, sir.
9   Q.  William Felton?
10  A.  Yes, sir.  Retired lieutenant.
11  Q.  Has he been gone a long time?
12  A.  Yes, sir.
13  Q.  Have you discussed your lawsuit with him?
14  A.  No, sir.
15  Q.  Thomas Scott?
16  A.  Yes, sir.  Retired -- Well, actually, he was
17      terminated.  Terminated career firefighter.
18  Q.  What did he do?
19  A.  I have no idea.  Happened years ago.
20  Q.  Have you discussed your case with him?
21  A.  I haven't seen him, no, sir.
22  Q.  Steve Heart, who is he?  H-E-A-R-T, Steve
23      Heart?  Name doesn't sound familiar?

Page 209

1    A.  Don't ring a bell with me.
2    Q.  Larry Stanley, does that name sound familiar?
3    A.  Don't ring a bell with me, sir.
4    Q.  Gary Jones?
5    A.  Yes, sir, I know him.
6    Q.  Who is that?
7    A.  Gary Jones is actually the brother to Ronnie
8        Jones.  Never had an opportunity to work with
9        him.  Haven't seen him.
10   Q.  Does he know anything about your case?
11   A.  I don't know if he knows anything or not.
12   Q.  Have you discussed it with him?
13   A.  No, sir.
14   Q.  Was he gone when you took the promotion?
15   A.  Yes, sir.
16   Q.  Jan Dempsey?
17   A.  Former mayor of the City of Auburn.
18   Q.  Have you discussed your complaints with her?
19   A.  No, sir.
20   Q.  Have you discussed this lawsuit with her?
21   A.  No, sir.
22   Q.  Ron Tahita, do you know who he is?
23   A.  That names sound familiar, but I don't know who

Page 210

1        he is.
2    Q.  Do you know who Ellis Mitchell is?
3    A.  Yes, sir, I do.
4    Q.  Had any conversation with Ellis Mitchell about
5        this lawsuit?
6    A.  No, sir.
7    Q.  There were a number of documents that were
8        disclosed, and I'm not going to go through all
9        of them, but let me ask this.  Toward the end of
10       these documents are a lot of paperwork dealing
11       with various employees, it looks like, with the
12       fire department:  Michael Thee, Harvard
13       Graham --
14           What does this paperwork have to do with
15       your lawsuit?
16   A.  Basically those papers are progressive
17       disciplinary procedures that were implemented on
18       them for improperly doing something in reference
19       to the Auburn Fire Division.  Could vary from
20       being late for work or doing something they
21       don't supposed to do.
22   Q.  And Dave Bradley?
23   A.  Yes, sir.  I recall him being late for work one

Page 211

1        time.
2    Q.  Walter Peacock?
3    A.  Uh-huh (positive response).
4    Q.  Katie Hartsill?
5    A.  Hartsill.
6    Q.  Casey McLeod.
7            Other than being paperwork on people that
8        looks like most of them were late, does it have
9        some significance to your not being promoted to
10       battalion chief?
11   A.  No.  Those are just documentation as an officer
12       that I must do when these people don't comply to
13       the rules of the division.
14   Q.  Just documentation showing that you disciplined
15       people when you thought they needed to be
16       disciplined?
17   A.  According to the personnel policies of the City
18       of Auburn, whenever they violate any of their
19       rules, it is my job to document and submit it to
20       the immediate supervisor for any other action to
21       be taken, if necessary.  All I can do is make a
22       request in reference to what I think should
23       happen.

Page 212

1    Q.  Scott Chinowith?
2    A.  Yes, sir.
3    Q.  Other than documenting that these people didn't
4        do something that you thought they should do --
5        Cusak, Dennis Ballard, Kanaxi Sufom (phonetic),
6        Austin Bales -- do they have any bearing on you
7        not being promoted?
8    A.  No, sir.  But when we talked about
9        Mr. Thompkins --
10   Q.  About who?
11   A.  William Thompkins.  You remember you mentioned
12       that name to me at the beginning?  What I think
13       should have happened to Thompkins is basically
14       what happened to all these other guys you just
15       looked through, if anything.  I mean, he didn't
16       do anything directly or violated any rules or
17       regulations within the personnel policies.  And
18       what happened to all those people just saw
19       should have happened to him.  I think he should
20       have never been terminated.
21   Q.  Before I get to my main question, let me be
22       clear.  Those documents don't have anything to
23       do with you not being promoted, though, true?

Page 213

1   A.  No, sir.
2   Q.  No, sir meaning I'm correct?
3   A.  You're correct.
4   Q.  And whatever happened to Mr. Thompkins you don't
5       know for an actual fact, do you?
6   A.  I didn't make that decision. I don't know.
7   Q.  But whatever happened to Mr. Thompkins, he
8       didn't file a lawsuit, did he?
9   A.  Not that I'm aware. I don't know if he filed
10      one or not, sir.
11  Q.  But you're not familiar or know what he actually
12      did or didn't do, do you?
13  A.  I don't know what he did, sir.
14  Q.  Now, let me ask you about the folks I represent
15      and what it is that you think these people have
16      done to constitutes racial discrimination and
17      why you have sued them.
18          The first one is Larry Langley.
19              MR. HORSLEY: I'm going to do a
20              blanket objection to all these
21              questions because I think they ask
22              for legal conclusions. But go
23              ahead and answer them.

Page 214

1   A.  Larry Langley -- Ask your question.
2   Q.  What is it that Larry Langley has done that you
3       think is racially discriminatory or retaliation
4       and caused you to sue him in this lawsuit?
5   A.  Mr. Langley have not allowed me to -- Let me
6       back up.
7           I feel like -- I think Mr. Langley has been
8       unfair to me as a fire lieutenant and the
9       responsibilities I have and the position I
10      should fill as a fire lieutenant in the absence
11      of or in reference to whatever the job may be.
12      I don't think he's been honest with me about
13      several things throughout my career. I think
14      he's been misleading to a point where when
15      things do occur, I'm not aware of it. I have to
16      go through -- go through my immediate supervisor
17      asking questions in reference to find out what's
18      going on. Overall I just think he's been very
19      unfair to me as specifications of my rank, which
20      is fire lieutenant.
21  Q.  Is there anything that you claim that Larry
22      Langley did that prevented you from being
23      promoted to battalion chief?

Page 215

1   A.  Yes, sir.
2   Q.  What?
3   A.  Larry Langley sent me a memo -- I'm sorry. He
4       didn't send me a memo. He responded to an
5       e-mail I sent to him in reference to the posting
6       of the training officer position that Lee Lamar
7       filled. And in his memo, he stated that, if I
8       can remember correctly, somehow or another he
9       lost it in his computer and that it was posted
10      and it was posted for some period of time and it
11      was for team leaders only. And at the time I
12      was a lieutenant.
13  Q.  And that was for training officer?
14  A.  That was for training officer.
15  Q.  Is there anything that Larry Langley did that
16      you think prevented you from being promoted to
17      battalion chief because of your race?
18  A.  I also recall an incident. If I'm thinking
19      correctly, it was during the time I filed my
20      grievance in 2005. Mr. Langley came to my house
21      and delivered a letter from Mr. James, which I
22      had addressed to him. And during that
23      deliverance, we conversed, and he told me in a

Page 216

1       nutshell that if I underwent or continued my
2       grievance that a red flag would be up against my
3       name and people of the City would think that I'm
4       not willing to comply with what they are doing
5       and that basically I would have a hard time, you
6       know, progressing working there whatsoever.
7   Q.  Well, assume all that is true. Is there
8       anything that you know of that he did that kept
9       you from being promoted to battalion chief in
10      February or March or April of '06?
11  A.  I think he had something to do with allowing
12      non-probationary personnel to be eligible to
13      apply for that position, therefore making it
14      more challenging for me to possibly attempt to
15      obtain that position.
16  Q.  Well, first of all, in terms of that test, it
17      didn't matter how many people applied. I mean,
18      you were graded on what you made, right?
19              MR. HORSLEY: Object to the form.
20  Q.  True? It didn't matter if a thousand people
21      applied. You had to make 70?
22  A.  That was the rule.
23  Q.  So it didn't matter how many folks were in that

Page 217

1   room. You either were going to make 70 or not
2   make 70, right?
3   A.  Right.
4   Q.  And the best I can tell, the only person who
5   took that test that was a non-probationary
6   career officer was Chris Turner, another black
7   male. Are you complaining that Chris Turner
8   should not have been allowed to take that test?
9   A.  I can't say -- I don't -- I'm not in a position
10  to say what he can or can't take. But Chris
11  Turner was allowed to take the test.
12  Q.  And he didn't make it, did he?
13  A.  No, sir, he did not.
14  Q.  And that didn't influence your grade one bit,
15  did it?
16  A.  Not that I'm aware of, it didn't.
17  Q.  So can you agree with me that whether or not
18  Larry Langley did or didn't allow
19  non-probationary permanent employees to take the
20  test doesn't affect your score one bit?
21  A.  I'm not aware if it did or not, sir.
22  Q.  So you can't think of any reason or anything
23  that Larry Langley did to keep you from being

Page 218

1   promoted to battalion chief in April of '06, can
2   you?
3   A.  I can't recall anything at this time, sir.
4   Q.  And what is it that Mr. Langley said or did that
5   you think was not honest or misleading?
6   A.  Basically when he said that the training officer
7   position was posted.
8   Q.  And what is it that you think he did or didn't
9   do that was unfair to your position as a fire
10  lieutenant?
11  A.  In the absence of a shift commander, captain, or
12  battalion chief, I wasn't given the opportunity
13  to fill those positions.
14  Q.  Is that the Horace Clanton deal?
15  A.  That's part of it, yes, sir.
16  Q.  What else besides Horace Clanton?
17  A.  There were several other times when things
18  got -- things came about whereas when I applied
19  for it, he wanted to -- he did whatever he
20  deemed necessary to -- that made me think he was
21  trying to prevent me from being a part of it.
22  Q.  Did any of those incidences occur after you
23  complained about Horace Clanton?

Page 219

1   A.  No, sir.
2   Q.  And what about Lee Lamar? What is it that Lee
3   Lamar did in your opinion that kept you from
4   being promoted because of your race or in
5   retaliation?
6   A.  I don't recall. I'm not aware of anything at
7   this time, sir.
8   Q.  And Bill Ham, Jr., what is it that he did that
9   kept you from being promoted because of your
10  race or in retaliation?
11  A.  I'm not aware of anything at this time, sir.
12  Q.  Have you ever spoken to Bill Ham, Jr. about any
13  of this?
14  A.  No, sir.
15  Q.  And what is it that Steve Reeves did to keep you
16  from being promoted because of your race or in
17  retaliation?
18  A.  I don't know what role he could have played in
19  any of this, but being he works in the human
20  resource department, he had to play some role in
21  it. He was present during all the orientation
22  and the testing procedures.
23  Q.  Anything else other than the fact that he's in

Page 220

1   HR?
2   A.  I'm not aware of anything, sir.
3   Q.  And you're not aware of any specifics that he
4   did, are you?
5   A.  No, sir.
6   Q.  And then Bill James, what is it that you say
7   Bill James did to keep you from being promoted
8   because of your race or in retaliation?
9   A.  Other than the point of me speaking with him
10  directly telling him there was a problem at the
11  Auburn Fire Division, I'm not aware of what he
12  knows or done or -- I don't know.
13  Q.  And my understanding is that when you spoke with
14  him privately, you never said, hey, I'm being
15  discriminated against in promotions because of
16  my race, did you?
17  A.  I don't recall making that statement, sir.
18  Q.  And your conference with him was before you took
19  the battalion chief test, wasn't it?
20  A.  Yes, sir. It was before they actually
21  implemented the title change or the promotion
22  for team leader to lieutenant.
23  Q.  And Charles M. Duggan, the city manager, have

Deposition of Gerald Stephens                                    May 30, 2008

Page 221

1   you ever spoken to the city manager about any
2   complaints you have about race discrimination or
3   retaliation?
4   A.  No, sir.
5   Q.  Do you know of anything that Charles M. Duggan
6       did to keep you from being promoted because of
7       your race or in retaliation?
8   A.  No, sir, I'm not aware of anything he knows.
9   Q.  And then you've sued the City of Auburn.  What
10      is it you say the City of Auburn did to keep you
11      from being promoted because of your race or in
12      retaliation?
13  A.  Being that the City of Auburn is responsible for
14      everything that has taken place throughout the
15      history of the department, why no blacks or
16      African-Americans have been hired or promoted
17      since me or since Mr. Ogletree, I don't
18      understand that.  I'm very concerned about
19      that.  What's the reason for it?  I just don't
20      understand it.
21  Q.  Which occurred first?  Were you promoted to
22      lieutenant before or after Mr. Ogletree became a
23      team leader?

Page 222

1   A.  Approximately one month before he became a team
2       leader.
3   Q.  You were promoted to lieutenant?
4   A.  Yes, sir.
5   Q.  And he would have gone through the structured
6       interview that you've talked about to become a
7       team leader as far as you know?
8   A.  As far as I know, he went through a structured
9       interview.  How was it?  Was it identical to
10      previous times?  I don't know.
11  Q.  Any other reason that you've sued the City of
12      Auburn other than you just don't understand
13      about the hiring and the promotion?
14          MR. HORSLEY:  Object to the form.  You
15      can answer.
16  A.  I'm not aware of anything at this time.
17  Q.  Let me ask you about your damages, how you claim
18      you've been damaged.  Do you know what I'm
19      talking about?
20  A.  Yes, sir.
21  Q.  I assume we can just get through this quick.  I
22      assume that one way you claim you've been
23      damaged is the difference in salary that you

Page 223

1   would have received as a battalion chief
2   compared to what you're making now.
3   A.  Yes, sir.
4   Q.  I assume that --
5   A.  To the conclusion of my retirement, whenever I
6       retire.
7   Q.  The difference in salary and ever how that
8       impacts retirement benefits and whatever?
9   A.  Yes, sir.
10  Q.  Then you've got a claim in here for emotional --
11      I thought you did.  I thought I had written in
12      here emotional distress.
13          (Brief off-the-record discussion.)
14  Q.  Are you claiming emotional distress or mental
15      anguish?
16  A.  Yes, sir.
17  Q.  Have you seen any professional mental health
18      counselors, doctors, psychiatrists, or
19      psychologists for any mental anguish or
20      emotional distress which you claim as a result
21      of not being promoted?
22  A.  No, sir.
23  Q.  Had you ever seen a mental health specialist --

Page 224

1   A.  No, sir.
2   Q.  -- before this or a psychiatrist or a
3       psychologist?
4   A.  No, sir.
5   Q.  What is your claim for mental anguish and
6       emotional distress?  What is it that you claim?
7   A.  I've been -- For years, Mr. Morgan, I've been
8       labeled as a problem by my immediate
9       supervisors, and basically it has traveled from
10      one shift to another to one shift commander to
11      another to eventually up the chain to the point
12      where when it actually got to the point of a
13      hearing, it was pretty much all over the
14      division, which, you know, challenged my skill
15      as a leader amongst my men, just my overall
16      character as a firefighter, officer, an
17      employee, the whole nine, and being that it has
18      been challenging at times for me to successfully
19      and progressively manage my people and to
20      conduct myself safely and to do my job in a
21      manner in which I'm supposed to do it.  I always
22      felt like I was being watched.  Any mistakes I
23      make or anything that may happen that falls

Page 225

1    under my responsibility, you know, I actually
2    think if it happens that it will be held against
3    me severely.
4    Q.  And how long have you had those feelings?
5    A.  Ever since I was promoted to lieutenant in
6    1996.  Back then a lot of people didn't think I
7    deserved it.  They thought I was promoted
8    because I was black.  They thought things that I
9    never thought people that I trust and work with
10   in the profession that I do would actually
11   think.  I applied for the position, I was
12   eligible for the position, and I got the
13   position, not because of my skin color but
14   because I thought I was the best person for the
15   job.
16   Q.  Well, do you claim you suffered any additional
17   mental anguish or emotional distress as a result
18   of not being promoted to the battalion chief or
19   is it just something that's been going on since
20   '96?
21   A.  That's adding to the problem overall.  I mean,
22   here I am the only lieutenant in the fire
23   division, and then here comes title changes

Page 226

1    which pretty much put people on the level that
2    I'm on.  Now I've got to -- Where I had no one
3    to compete with, now I've got to compete with
4    thirteen other people for a position that I
5    didn't even have to compete with anyone with.
6    Why couldn't I have been appointed like some of
7    these other people that have been appointed
8    through the years?  Why couldn't I have
9    undergone a structured interview?  Why I got to
10   go take a test and make a cutoff score to be
11   eligible for a position when at that particular
12   time or at a particular time, I was the only
13   fire lieutenant in the whole fire division?  So
14   that concerns me severely.
15   Q.  Well, how does this mental anguish or emotional
16   distress manifest itself?  How does it affect
17   you?  Are you not able to do your job?
18   A.  Doing my job is very challenging.  Rarely do I
19   sleep at night when I'm on shift because I don't
20   know what could happen.  I've got people that
21   live in the stations.  I've got people that have
22   access to the stations.  I'm just at a point now
23   where there's not too many people I trust at the

Page 227

1    Auburn Fire Division.
2    Q.  And is that because of this battalion chief
3    promotion?
4    A.  Because of everything that I've dealt with,
5    Mr. Morgan, to include the battalion chief
6    promotion.
7    Q.  But you haven't seen any professionals?
8    A.  No, sir, I have not seen any professionals.
9    Q.  Do they have some counseling program that's
10   available to the employees of the City of
11   Auburn?
12   A.  I'm quite sure they have some type of program,
13   yes.
14   Q.  Have you done anything in that regard?
15   A.  No, sir, I have not done anything yet.
16   Q.  And I know you've told me this, and I
17   apologize.  I'm really not trying to belabor
18   this.  Who is it that you say was appointed, Lee
19   Lamar?  Who was appointed to a position?
20   A.  Apparently Lee Lamar was because I don't recall
21   him going through an interview.  I don't recall
22   the position being posted.  The deputy chief
23   position, which he got, it was a structured

Page 228

1    interview.  But according to the paperwork or
2    the information that was forwarded to me, he was
3    appointed as deputy chief.
4    Q.  Well, did he have a structured interview as
5    part of -- to be deputy chief?
6    A.  Yes, sir.  There was a structured interview that
7    I also attended.
8    Q.  And you applied for that position?
9    A.  Yes, sir.
10   Q.  So you know there was some process by which he
11   was selected?
12   A.  For the deputy chief, it was.
13   Q.  But you're saying for training officer?
14   A.  Training officer ...
15   Q.  And how long ago was that?
16   A.  I don't remember the date.  2003 or 2004, one of
17   those.
18   Q.  Anybody else that you claim was appointed other
19   than Lee Lamar, training officer?
20   A.  Terry Walker, he was appointed.
21   Q.  And what was he appointed to?
22   A.  Training chief.  Training officer.
23   Q.  Do you want to be training officer?  Would you

Page 229

1  have given up your position as lieutenant to
2  be --
3  A.  I applied for the position, but today I can't --
4  I can't say what I would do without talking with
5  my attorney and discussing it further.
6  Q.  When did you apply for the position of training
7  officer?
8  A.  I don't remember the date, Mr. Morgan.
9  Q.  Who got it?
10  A.  Terry Walker got it.
11  Q.  So when Terry Walker was appointed, there was a
12  process in which you participated?
13  A.  Yes, sir.
14  Q.  And he was selected?
15  A.  And understand, Mr. Morgan, there was no test.
16  There was no written test.  When John Lankford
17  got the training officer position, there was no
18  test.
19  Q.  Are you complaining there should have been a
20  test or shouldn't have been a test?
21  A.  I was made to take a test for battalion chief.
22  Q.  Well, so was everybody else that was promoted in
23  April of '06, weren't they?

Page 230

1  A.  But nobody between --
2  Q.  Didn't everybody that applied for battalion
3  chief in February and March of '06 have to take
4  a written test?
5  A.  Yes, sir.
6  Q.  So Terry Walker and Lee Lamar.  Anybody else you
7  claim was appointed?
8  A.  John Lankford.
9  Q.  And what was he appointed to?
10  A.  Training officer.
11  Q.  Was that before or after Lee Lamar?
12  A.  That was after Lee Lamar.
13  Q.  Did you apply before then?
14  A.  No, sir.
15  Q.  Did anybody apply for it then?
16  A.  I'm not aware of who applied for it.
17  Q.  Lee Lamar, John Lankford, and Terry Walker.
18  Anyone else that was appointed?
19  A.  I look -- Overall I look at the title changes as
20  a promotion.
21  Q.  The title changes?
22  A.  Yes, sir.  From captain to battalion chief, from
23  team leader to lieutenants, I look at that as a

Page 231

1  promotion.
2  Q.  You think that's a promotion?
3  A.  Yes, sir.
4  Q.  But you know that's not true?
5       MR. HORSLEY:  Object to the form.
6  A.  Well, the thing is is that when -- captains,
7  prior to them going to battalion chief, they
8  had, I think it was, two bugles as far as their
9  brass.  They went to three.  Team leaders had
10  collar insignia, and they went to bugles.  I
11  wear bugles, and I know what I had to do to get
12  my bugles.
13  Q.  So you're saying Eddie Ogletree should not be a
14  lieutenant?
15       MR. HORSLEY:  Object to the form.
16  A.  I'm not saying --
17  Q.  I'm asking you.  Are you saying Eddie Ogletree
18  should not be a lieutenant?
19       MR. HORSLEY:  Object to the form.
20  Q.  It's a simple question.
21       MR. HORSLEY:  You can answer.
22  A.  As far as I'm concerned, Eddie Ogletree and all
23  other thirteen people who signed that paper

Page 232

1  should be team leaders.
2  Q.  Should not be a lieutenant?
3  A.  No, sir.
4  Q.  And should not have been eligible to apply for
5  battalion chief?
6       MR. HORSLEY:  Object to the form.
7  A.  No, sir.
8  Q.  I mean, that's your position?  They should not
9  have been eligible to apply for battalion chief;
10  is that true?
11       MR. HORSLEY:  Object to the form.  You
12  can answer.
13  A.  Yes, that's true.
14  Q.  I want to try to get a grasp on this mental
15  anguish, emotional distress.  I know you haven't
16  seen any professionals.  Specifically as to not
17  being promoted to battalion chief, how has that
18  affected you?
19  A.  Can you be more specific on that question,
20  please, sir?
21  Q.  I wish I could.  I mean, do you not want to go
22  to work?  You can't sleep?  What is it?
23  A.  I'm very displeased at work, very.

Page 233

1  Q.  But you've not discussed -- How about your
2      family doctor?  Did you discuss it with your
3      family doctor?
4  A.  No, sir.
5  Q.  Who is your family doctor?
6  A.  Dr. Kevin L. Jackson.  That's my medical doctor.
7  Q.  And where is he located?
8  A.  Auburn, Alabama.
9  Q.  You've got a loss wage claim based on the
10     difference in the positions.  You have a claim
11     for mental anguish and emotional distress.  Any
12     other way you claim you've been damaged by not
13     being promoted to battalion chief because of
14     your race or in retaliation?
15 A.  Directly speaking, the opportunity to advance.
16     I've always had a goal to be somewhere within
17     the Auburn --
18         MR. HORSLEY:  He's just asking you if
19             there's any other category of
20             damages that you're claiming other
21             than wages and mental anguish and
22             emotional distress.  That's what
23             he's asking.

Page 234

1  A.  I can't think of nothing else at this time, sir.
2  Q.  Loss wages and emotional distress.
3          And then this opportunity to advance, what
4      do you mean by that?
5  A.  Career advancement, move up, be promoted.
6  Q.  Can't move up because you didn't get that
7      promotion.  Okay.
8          Any other damages you claim?  I want -- I'm
9      not -- I want to know anything that you claim as
10     a damage.  I've got your wages, I've got your
11     emotional distress, and I've got your
12     opportunity to advance.  Are there any other
13     damages that you claim in this lawsuit?
14         MR. HORSLEY:  You're not asking
15             punitives obviously?
16         MR. MORGAN:  I'm not talking about
17             punitives.
18 A.  I think that pretty much touches bases.
19 Q.  I am going to ask you this one question about
20     punitives.
21         Do you claim that any of these people that
22     you've sued -- Larry Langley, Lee Lamar, Bill
23     Ham, Steven Reeves, Bill James, Charles

Page 235

1      Duggan -- do you think they deliberately and
2      intentionally kept you from being promoted?
3         MR. HORSLEY:  Object to the form.
4  A.  I don't have any comment about that right this
5      time, Mr. Morgan.
6         MR. MORGAN:  Give me two minutes, and
7             I may be through.
8         (Brief recess was taken.)
9  Q.  (Continuing by Mr. Morgan)  Mr. Stephens, are
10     you familiar with the City's educational
11     assistance plan -- do you know what that is --
12     or program?
13 A.  I'm somewhat familiar with it.  It's been a long
14     time since I seen that, sir.
15 Q.  Have you taken advantage of that opportunity to
16     complete your college education or school?
17 A.  I have.  In my career I have taken advantage of
18     it.
19 Q.  Tell me what you've done in terms of educational
20     assistance.
21 A.  I have taken classes -- Everything pretty much
22     in my latter years I took was in reference to my
23     career with the Auburn Fire Division.  And I

Page 236

1      took an EMT course.  I can't remember when it
2      was, but it was right during the time when the
3      local colleges and junior colleges were
4      implementing the change from quarterly to
5      semesters.  Took the EMT course.  Made the
6      grade.  Submitted all the paperwork.  Told my
7      immediate supervisors in reference to tuition
8      reimbursement and all that.  Met all
9      requirements but never was reimbursed.
10         During those times when I took those -- that
11     course -- it was approximately nine weeks or a
12     quarter long -- I had to get people to work for
13     me.  I think somewhere in the education program
14     of the City, it states they allow you to take
15     time off to take these courses as long as you
16     make them up.  I work a 24-hour shift.  I work a
17     little bit different than other people in the
18     City; therefore, I couldn't necessarily do
19     that.  But I was allowed to swap or get people
20     to cover for me so I could attend these courses
21     or whatever courses that I decided to take.
22         MR. MORGAN:  That's all I've got,
23             Richard.

Page 237

1    MR. HORSLEY: I've got a few.
2    EXAMINATION
3  BY MR. HORSLEY:
4  Q.  Gerald, either in layman's terms or in legal
5      terms, do you truly understand the meaning of
6      the term "disparate impact"?
7  A.  No, sir.
8  Q.  You got a lot of questions about disparate
9      impact and what you're claiming in the lawsuit
10     as it relates to disparate impact. My question
11     is: Do you have an understanding as to what you
12     are ultimately claiming in this lawsuit,
13     claiming happened to you?
14 A.  Yes, sir, I kind of understand.
15 Q.  What are you claiming happened to you in this
16     lawsuit?
17 A.  I'm claiming that basically because I'm a black
18     man employed with the City, I was discriminated
19     against.
20 Q.  Are you claiming that with regard to the 2006
21     battalion chief promotion?
22 A.  Yes, sir. That's a part of it.
23 Q.  You were also asked a lot of questions about

Page 238

1      evidence, and I think evidence is probably a
2      legal term also. Can you give us examples of
3      how you were denied that promotion or
4      discriminated against because of your race by
5      the City of Auburn?
6          MR. MORGAN: Object to the form.
7  Q.  You can answer.
8  A.  There was a lot of implementations that took
9      place during the time when I was eligible for
10     several positions, and it was something that was
11     not practiced through those years. They gave a
12     test, which, you know, for whatever reason they
13     he gave it, they did it.
14 Q.  The test we've talked about for the battalion
15     chief promotion?
16 A.  Yes.
17 Q.  What else?
18 A.  They made temporary assignments, and I think
19     they never considered me for those assignments.
20     They haven't promoted any blacks of the ones
21     that was available that works there.
22 Q.  What are your thoughts about the seniority and
23     experience level of the people that were

Page 239

1      promoted in front of you as it relates to racial
2      discrimination?
3          MR. MORGAN: Object to the form.
4  Q.  Go ahead.
5  A.  I think I was more qualified than these guys
6      were. I had more seniority. I was more
7      experienced. I just directly speaking think I
8      was more qualified.
9  Q.  Why do you think -- Again, from a layman's
10     standpoint, why do you believe the City
11     implemented the test for this promotion?
12         MR. MORGAN: Object to the form.
13 Q.  You can answer.
14 A.  Basically because I'm black and I was applying
15     for the position.
16 Q.  Were other blacks applying for the position
17     also?
18 A.  Other blacks were applying for the position as
19     well.
20 Q.  Y'all spoke some about damages, and Randall
21     asked you questions about mental anguish and
22     emotional distress related to the denial of the
23     promotion. Again, what is the reason you are

Page 240

1      ultimately claiming you were denied that
2      promotion?
3          MR. MORGAN: Object to the form.
4  A.  Basically because I'm black.
5  Q.  How does that affect you from an emotional
6      standpoint?
7          MR. MORGAN: Object to the form.
8  A.  Can I answer?
9  Q.  Yes, you can answer.
10 A.  Being judged because I'm a black man, that
11     really bothers me a whole lot because I have
12     applied myself. I've done everything that I can
13     possibly do or everything they've asked me to do
14     to obtain this position and have held it -- any
15     position that I've applied and received and held
16     it as long as of today. There are just things
17     that happened to me that I think didn't happen
18     to other people; therefore, it leads me to think
19     that, along with other things that take place.
20 Q.  How does that make you feel?
21         MR. MORGAN: Object to the form.
22 A.  It basically just makes me feel like, you know,
23     people don't trust me or whatever the case may

Page 241

1    be and that they are going to give me a hard
2    time at work and just make it very challenging
3    for me when I'm working there.
4  Q. He asked you about the individual defendants and
5    what evidence you have that they had acted
6    deliberately and intentionally. Who do you
7    understand made the decisions to implement a
8    test for the battalion chief promotion?
9         MR. MORGAN: Object to the form.
10 Q. Go ahead.
11 A. All the persons that are named on the
12   paperwork. Now, I think they played a major
13   role of some part or another in reference to
14   what took place.
15 Q. Who made the decisions to make the title changes
16   from team leader to lieutenant?
17 A. As far as I'm concerned, those names that was
18   mentioned on the paperwork.
19 Q. As far as you know, who made the decision to
20   make the title change from captain to battalion
21   chief?
22 A. As far as I'm concerned, those people again
23   whose name is on the paperwork.

Page 243

1  Q. This temporary assignment, I want to be clear
2    because I thought we had been through all this.
3    The last temporary assignment about which you
4    complained you didn't get was the one involving
5    Horace Clanton that you filed an EEOC charge
6    about, wasn't it?
7  A. Yes, sir.
8  Q. And your thoughts on seniority and experience,
9    that's why you think you're more qualified than
10   the people who became battalion chiefs, true?
11 A. Yes, sir. To include time on the job, time in
12   grade, all that.
13 Q. Seniority.
14 A. Yes, sir.
15 Q. So you think promotions should be based on
16   seniority?
17 A. Yes, sir.
18 Q. Not qualifications, not who can do the best job,
19   simply I've been sitting in this job for the
20   longest of anybody else; therefore, I need to be
21   promoted?
22        MR. HORSLEY: Object to the form.
23        That's not --

Page 242

1         MR. HORSLEY: That's all I have.
2              EXAMINATION
3  BY MR. MORGAN:
4  Q. Mr. Stephens, was there anything on the test you
5    took, the booklet, that you turned in to be
6    graded that identified you as a black male?
7  A. Identified me as a black male?
8  Q. Anything that would tell the person that was
9    grading that paper, hey, this is a black male.
10 A. I'm not aware if anything was.
11 Q. You didn't put Gerald Stephens, black male, did
12   you?
13 A. No, sir.
14 Q. You didn't put Gerald Stephens,
15   African-American, did you?
16 A. No, sir.
17 Q. You just put your name or your -- ever what that
18   identification --
19 A. Yes, sir.
20 Q. So whoever graded your paper didn't know what
21   your race was, did they?
22 A. I'm not aware if they knew anything or not,
23   Mr. Morgan.

Page 244

1  Q. Is that your position?
2         MR. HORSLEY: Mischaracterization of
3         testimony.
4  A. I think seniority is a main part in the job I do
5    and the job that the other firefighters do,
6    which leads to the length of time on the job,
7    knowing the job, being experienced doing the
8    job. I don't think it should be based upon
9    whether you pass or fail a test.
10 Q. You don't? You don't think --
11 A. A written test. No, sir, I don't.
12 Q. You don't think a test that's designed to test
13   your qualifications, your skill, knowledge of
14   the job is more important than just having been
15   on the payroll longer than somebody else?
16        MR. HORSLEY: Object to the form.
17 Q. That's your testimony?
18        MR. HORSLEY: Object to the form.
19        That's not his testimony.
20 A. I don't necessarily look at it as being on the
21   payroll, Mr. Morgan. I look at it as basically
22   being on the job, learning the job, doing the
23   job, training those who, you know, just may turn

Page 245

1    around and be your supervisors one day, you
2    know.  It takes time to be in that position
3    that -- you know, what was being tested for, and
4    I don't think a cutoff score of no nature should
5    be involved.  That's just what I think.
6  Q.  So you think that it's just strictly seniority
7    is all that --
8        MR. HORSLEY:  Object to the form.
9        That's not what he said.
10       MR. MORGAN:  That's exactly what he's
11       saying.
12       MR. HORSLEY:  That's exactly not what
13       he's saying.  He just said --
14       MR. MORGAN:  Well, I'm going to ask
15       him this.
16  Q.  Do you think strictly seniority is what you
17    should go by?
18  A.  No, sir.
19  Q.  Then what other qualifications are there?
20  A.  Seniority, experience, time on the job.
21  Q.  Experience.  How do you define experience?
22  A.  How long you've been working there.
23  Q.  Seniority?

Page 246

1  A.  Yes.  It falls under that category, yes, sir.
2  Q.  Time in the grade.  Time on the job.  That's
3    seniority?
4  A.  Knowledge of the job, yes, sir.  Training.
5  Q.  Back up.
6        Knowledge of the job?
7  A.  Yes, sir.
8  Q.  How do you test knowledge of the job?
9  A.  I'm not in a position to justify how they go
10    about testing that.
11  Q.  Do you agree that before someone should be
12    promoted that you should test their knowledge of
13    the job?
14        MR. HORSLEY:  Object to the form.  Go
15        ahead.
16  Q.  Shouldn't you test --
17  A.  I agree that testing procedures should be
18    consistent whether a written test is involved or
19    not.
20  Q.  That's not my question.  My question is:  Before
21    a person is promoted, should knowledge of the
22    job be tested?
23        MR. HORSLEY:  Object to the form.

Page 247

1  A.  I don't have any comments at this time.
2  Q.  You don't have a comment on whether or not you
3    ought to test somebody's knowledge of the job?
4  A.  Well, you know, apparently not.
5  Q.  But you do have a comment that based on
6    seniority you ought to be promoted?
7  A.  Yes, sir.
8  Q.  Would you have been promoted to lieutenant if
9    the City had used seniority as the guide stick
10    back in 1996?  Did you have the most seniority
11    of anybody that applied to be a lieutenant or
12    was eligible to be a lieutenant in 1996?
13  A.  Not in 1996.
14  Q.  You wouldn't have been promoted.
15  A.  Not in 1996.
16  Q.  And do you have -- I don't care if you want to
17    call it, evidence, hearsay, knowledge --
18    anything that you say that supports your
19    contention that the City implemented a written
20    test to discriminate against black applicants on
21    the basis of their race?  Anything?  Anybody
22    ever said anything, any hearsay, anything you've
23    seen, any documents, anything that would support

Page 248

1    that contention?
2        MR. HORSLEY:  Asked and answered, but
3        go ahead and answer it again.
4  A.  Over a time span of ten years, I have not seen a
5    black man or woman or African-American hired or
6    promoted.
7  Q.  Under any procedure?  Under any procedure?  Is
8    that your testimony?
9  A.  Under any procedure what?
10  Q.  Whether it was a written test or not written
11    test?
12  A.  No, I haven't.
13  Q.  Well, then, what is there?  What facts, what
14    evidence, hearsay, anything, would make you say
15    the City implemented a written test to
16    discriminate against you on the basis of your
17    race?
18        MR. HORSLEY:  Asked and answered.  Go
19        ahead.
20  A.  Basically nobody never been hired or promoted.
21    That's it.
22  Q.  That's it?
23  A.  Yes, sir.

Deposition of Gerald Stephens

Page 249

```
1      MR. MORGAN:  That's it.
2      (Deposition concluded at
3      approximately 4:00 p.m.)
4      * * * * * * * * * * * *
5      FURTHER DEPONENT SAITH NOT
6      * * * * * * * * * * * *
7
8      REPORTER'S CERTIFICATE
       STATE OF ALABAMA:
9
       MONTGOMERY COUNTY:
10
       I, Pamela A. Wilbanks, CCR, Registered
11
       Professional Reporter, and Commissioner for the State
12
       of Alabama at Large, do hereby certify that I reported
13
       the deposition of:
14
           GERALD STEPHENS
15
       who was first duly sworn by me to speak the truth, the
16
       whole truth and nothing but the truth, in the matter
17
       of:
18
           EDDIE OGLETREE, an individual,
19
           GERALD STEPHENS, an
20
       individual,
21
       Plaintiffs,
22
       Vs.
23
```

Page 251

```
1
2
3
4
5
6
7
8          Pamela A. Wilbanks, ACCR #334
9          Expiration Date:  9-30-2008
           Registered Professional Reporter
10         and Commissioner for the State
           of Alabama at Large
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 250

```
1          In The State of Alabama, LARRY
2      LANGLEY, and individual, LEE LAMAR,
3      an individual, BILL HAM, JR., an
4      individual, STEVEN A. REEVES, an
5      individual, BILL JAMES, an
6      individual, CHARLES M. DUGGAN, an
7      individual, and CORTEZ LAWRENCE,
8      an individual,
9      Defendants.
10     In The U.S. District Court
11     For the Middle District of Alabama
12     Eastern Division
13     3:07-CV-867-WKW
14  on Friday, May 30, 2008.
15     The foregoing 249 computer printed pages
16  contain a true and correct transcript of the
17  examination of said witness by counsel for the parties
18  set out herein.  The reading and signing of same is
19  hereby waived.
20     I further certify that I am neither of kin nor
21  of counsel to the parties to said cause nor in any
22  manner interested in the results thereof.
23     This 13th day of June 2008.
```

# DEPOSITION TESTIMONY OF
# STEPHEN REEVES

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3              EASTERN DIVISION

4

5   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
6   individual,

7          Plaintiffs,

8   Vs.                              CIVIL ACTION NO.
                                     3:07-CV-867-WKW
9

CITY OF AUBURN, a municipality
10  in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
11  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
12  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
13  individual, and CORTEZ LAWRENCE,
    an individual,
14
           Defendants
15
                   * * * * * * * * * * *
16

17          **DEPOSITION OF STEVEN A. REEVES**, taken pursuant

18  to stipulation and agreement before Pamela A. Wilbanks,

19  Certified Court Reporter, ACCR# 391, Registered

20  Professional Reporter and Commissioner for the State of

21  Alabama at Large, in the Conference Room of Auburn City

22  Hall, 144 Tichenor, Auburn, Alabama, on Wednesday, July

23  30, 2008, commencing at approximately 9:15 a.m.

2

1

2                                    **APPEARANCES**

3

4    **FOR THE PLAINTIFF:**

5    Mr. Richard F. Horsley
     KING, HORSLEY & LYONS
6    Attorneys at Law
     1 Metroplex Drive
7    Suite 280
     Birmingham, AL  35209
8
     **FOR THE DEFENDANT:**
9
     Mr. Randall Morgan
10   HILL, HILL, CARTER, FRANCO, COLE & BLACK
     Attorneys at Law
11   425 South Perry Street
     Montgomery, Alabama
12
     **FOR CWH:**
13
     Mr. William K. Hancock
14   ADAMS & REESE
     Attorneys at Law
15   Suite 1100
     2100 Third Avenue North
16   Birmingham, AL  35203

17   **ALSO PRESENT:**

18   Mr. D'Arcy Wernette
     Mr. Bill James
19   Mr. Larry Langley
     Mr. Lee Lamar
20   Mr. Eddie Ogletree
     Mr. Gerald Stephens
21

22

23

3

## EXAMINATION INDEX

BY MR. HORSLEY . . . . . . . . . . . . . 5
BY MR. HANCOCK . . . . . . . . . . . . 115
BY MR. HORSLEY . . . . . . . . . . . . 123

* * * * * * * * * * * *

## PLAINTIFFS' EXHIBIT INDEX

1   Letter of agreement between the City of
    Auburn and CWH Research, Inc.                    14

2   Copy of Orientation Manual
                                                     18

3   Order Approving Settlement Agreement
                                                     32

4   4/4/96 letter to Gerald Stephens from
    Ronnie Blankenship concerning his promotion      36
    to lieutenant

5   Series of e-mails
                                                     65

6   City of Auburn Pay Table Beginning October
    1, 2005                                          110

7   Proposed Modification of the Fire
    Lieutenant Promotional Process signed by         58
    Chris Turner

8   Proposed Modification of the Fire
    Lieutenant Promotional Process signed by         58
    Gerald Stephens

9   City of Auburn Personnel Policies
                                                     78

10  Notice of Right to Sue letter to Mr.
    Ogletree and determination                       111

11  Notice of Right to Sue letter to Mr.
    Stephens and determination                       111

12  Defendant Steven Reeves' Responses to
    Plaintiffs' First Set of Interrogatories         113

4

1

## STIPULATION

2    It is hereby stipulated and agreed by and

3  between counsel representing the parties that the

4  deposition of **STEVEN A. REEVES** is taken pursuant to the

5  Alabama Rules of Civil Procedure and that said

6  deposition may be taken before Pamela A. Wilbanks,

7  Registered Professional Reporter and Commissioner for

8  the State of Alabama at Large, without the formality of

9  a commission, that objections to questions other than

10  objections as to the form of the question need not be

11  made at this time but may be reserved for a ruling at

12  such time as the said deposition may be offered in

13  evidence or used for any other purpose by either party

14  provided for by the Statute.

15    It is further stipulated and agreed by and

16  between counsel representing the parties in this case

17  that the filing of said deposition is hereby waived and

18  may be introduced at the trial of this case or used in

19  any other manner by either party hereto provided for by

20  the Statute regardless of the waiving of the filing of

21  the same.

22    It is further stipulated and agreed by and

23  between the parties hereto and the witness that the

5

1    signature of the witness to this deposition is hereby

2    not waived.

3                    * * * * * * * * * * *

4                        STEVEN A. REEVES

5         The witness, after having first been duly sworn

6    to speak the truth, the whole truth and nothing but the

7    truth testified as follows:

8                        EXAMINATION

9    BY MR. HORSLEY:

10    Q.    Please tell us your full name.

11    A.    Steven Anderson Reeves.

12    Q.    Mr. Reeves, my name is Richard Horsley.  We've

13          met a couple of times before.  I'm going to ask

14          you some questions today related to the lawsuit

15          that's been filed by Mr. Ogletree and

16          Mr. Stephens.

17              If you don't understand what I'm asking you,

18          please ask me to repeat the question or rephrase

19          it so that you understand it.  Once you answer a

20          question, I'm going to assume that you

21          understood it and that you're giving the answer

22          you intended to give.  Okay?

23    A.    Okay.

6

```
 1    Q.    Where do you currently reside?

 2    A.    1071 Terrace Acres Drive, Auburn.

 3    Q.    And where are you currently employed?

 4    A.    City of Auburn.

 5    Q.    In what capacity?

 6    A.    I'm the human resources director.

 7    Q.    And how long have you been the human resources

 8          director with the City of Auburn?

 9    A.    Since 1994 -- 1993.

10    Q.    1993?

11    A.    Yes, sir.

12    Q.    Before '93 where were you employed?

13    A.    City of Auburn.

14    Q.    In what capacity?

15    A.    Risk manager.

16    Q.    Risk manager?

17              How long did you hold that job?

18    A.    Six years.

19    Q.    And before that where were you employed?

20    A.    Auburn University.

21    Q.    And in what capacity?

22    A.    Faculty member.

23    Q.    What type of faculty member?
```

7

1    A.    I was a research associate.

2    Q.    How long did you hold that job?

3    A.    About nine months.

4    Q.    Before that where were you employed?

5    A.    Auburn University.

6    Q.    In what capacity?

7    A.    Graduate student.

8    Q.    Before that you were a student --

9    A.    Yes.

10    Q.    -- at Auburn?

11          So the jobs you have held since you

12    graduated from Auburn University would be with

13    Auburn University and with the City of Auburn

14    and that's it, correct?

15    A.    Correct.

16    Q.    Do you have relatives -- I'm assuming you do

17    have relatives that live in Lee County.

18    A.    I do.

19    Q.    Is it a lot or is it just a few?

20    A.    A few.

21    Q.    Can you tell me who they are?

22    A.    Starting with immediate family, my wife Jane,

23    two children.

8

1  Q.  They are not over 18 years of age, are they?

2  A.  One is 18.

3  Q.  What is his or her name?

4  A.  Danielle.

5  Q.  Who else?

6  A.  Sister-in-law, Susan McChesney.  Sister-in-law,

7     Ann May.

8  Q.  What are their husbands' names?

9  A.  Susan is not married and Ann is widowed.

10  Q.  Who else?

11  A.  Do you want Ann's children?

12  Q.  Not unless they are over 18.

13  A.  Okay.  Rem May.  Remmington May.

14  Q.  Is that it?

15  A.  I think so.

16  Q.  Do you have any relatives in Russell, Chambers,

17     Montgomery, Lowndes, or Macon County?

18  A.  No.

19  Q.  Other than that I'm not going -- I'm going to

20     try to get straight into the issues in this case

21     because we don't have a lot of time.  We're

22     going to take four depositions today so I'm

23     going to jump straight into the issues.

9

1        Tell me generally what your job duties are

2    as the human resources director for the City of

3    Auburn.

4    A.   Generally I coordinate compensation and

5         benefits, employee relations, risk management

6         and safety, employee training and development.

7    Q.   Do you participate in any way in the promotion

8         practices of the City of Auburn?

9    A.   Yes.

10   Q.   In what capacity?

11   A.   I serve as a resource.  I will do research as

12        necessary.

13   Q.   Do you actually participate in decision-making

14        with regard to promotions with City of Auburn

15        employees?

16   A.   Only within my department.

17   Q.   You don't participate in the decisions to

18        promote or not promote City of Auburn

19        firefighters; is that correct?

20   A.   I have not.

21   Q.   You have not ever?

22   A.   I have not.

23   Q.   Are you in charge of implementing policies and

10

| | | |
|---|---|---|
| 1 | | procedures with regard to the promotional |
| 2 | | practices of the City of Auburn? |
| 3 | A. | Yes. |
| 4 | Q. | Is anybody else in charge of that or is that |
| 5 | | your sole -- or are you the only person that is, |
| 6 | | in fact, in charge of that? |
| 7 | A. | Each department head is charged with complying |
| 8 | | with the personnel policies as they pertain to |
| 9 | | promotions. |
| 10 | Q. | But you as the human resources director are in |
| 11 | | charge of enforcing the promotional policies and |
| 12 | | procedures throughout the City of Auburn.  Is |
| 13 | | that a fair statement? |
| 14 | | MR. MORGAN:  Object to the form. |
| 15 | A. | No. |
| 16 | Q. | So it's just within your department; is that |
| 17 | | correct? |
| 18 | A. | I make recommendations regarding promotions |
| 19 | | within my department. |
| 20 | Q. | Let's say from February until June of 2006, who |
| 21 | | would have been in charge of promotions at the |
| 22 | | City of Auburn Fire Division? |
| 23 | A. | The city manager. |

11

1   Q.   And what was his name?  What is his name?

2   A.   Can you give me the dates again?

3   Q.   Yeah.  From February of '06 until June of '06.

4   A.   Well, from February 10 or February 11, '06 -- I

5        think I've got this date right.  From February

6        11, '06, it would have been the current city

7        manager.

8   Q.   Who is ...

9   A.   Charles M. Duggan, Jr.

10                  MR. HORSLEY:  Off the record for a

11               minute.

12           (Brief off-the-record discussion.)

13   Q.   Charles Duggan was the city manager from

14        February 11 of '06 until when?

15   A.   He's currently the city manager.

16   Q.   So he would have been the city manager in May of

17        '06, correct?

18   A.   Correct.

19   Q.   And you just testified that he was -- he would

20        have been the person in charge of promotions at

21        the City of Auburn Fire Division; is that

22        correct?

23                  MR. MORGAN:  Object to the form.

12

```
1    A.    Ultimately, yes.

2    Q.    When you say ultimately, I'm assuming that there

3          are other individuals that would have also been

4          involved in the promotion of firefighters within

5          the City of Auburn Fire Division; is that

6          correct?

7    A.    Correct.

8    Q.    And, again, concentrating on the time from

9          February of '06 through June of '06, who at the

10         City of Auburn Fire Division would have been in

11         the decision-making process to promote

12         firefighters?

13   A.    Bill James.

14   Q.    And he is the public safety director; is that

15         correct?

16   A.    That's correct.

17   Q.    Still?

18   A.    Still.

19   Q.    Who else?

20   A.    Lee Lamar.

21   Q.    What's Mr. Lamar's position?

22   A.    Currently he's the fire chief.

23   Q.    In May of '06, what was his position with the
```

13

1          City of Auburn?

2   A.    Deputy fire chief.

3   Q.    Who was the fire chief at that time?

4   A.    Larry Langley.

5   Q.    Bill James, Lee Lamar.  Who else would have been

6          involved in the decision to promote firefighters

7          at the City of Auburn?

8   A.    I believe that's all.

9   Q.    That's it?

10         And I may be wrong about this, but would

11         Bill James and Larry Langley recommend

12         firefighters for promotion and then Charles

13         Duggan would have the ultimate say in whether or

14         not those people were actually promoted?

15  A.    Correct.

16  Q.    Do you know back in May of 2006 whether or not

17         Mr. Duggan had to approve every promotion or, if

18         there was a dispute about a promotion, he would

19         have the ultimate say?

20  A.    He has to approve.

21  Q.    He has to approve every promotion; is that

22         correct?

23  A.    Every promotion, yes.

14

1    Q.    Tell me what, if any, participation you had in

2          the battalion chief promotion that occurred in

3          May of 2006.

4    A.    I helped identify the firm that would guide us

5          through that process.  I helped put together a

6          contract to employ that firm.  I participated in

7          the discussions about the process.  I helped

8          facilitate the interactions between the firm and

9          the City.

10                    (Plaintiff's Exhibit 1 marked for

11                     identification.)

12   Q.    What I'm going to mark as Plaintiff's Exhibit

13         Number 1 is a letter of agreement that appears

14         to be between the City of Auburn and the CWH

15         Research, Inc.  Is that the agreement or the

16         contract that you spoke about just a moment ago

17         between the research company and the City of

18         Auburn?

19   A.    This appears to be the agreement.

20   Q.    And how did you go about finding this company?

21   A.    This company was recommended to me by a lady

22         named Kathleen Robinson.

23   Q.    Who is she?

15

1    A.    Kathleen Robinson was the individual who

2          formerly did promotion processes for the ranks

3          of lieutenant and captain for the City of

4          Auburn.

5    Q.    What was your understanding of what this company

6          was supposed to do with regard to the battalion

7          chief promotion in May of 2006?

8    A.    They were to develop a job-related neutral

9          selection process for us to use to make

10         promotions to the rank of battalion chief.

11    Q.    Had the City of Auburn ever done any contract

12         work with this firm before?

13    A.    No.

14    Q.    You're not testifying that this company, CWH, is

15         an outside assessment center, are you?

16    A.    I ...

17    Q.    Do you know what an assessment center is?

18    A.    I know what an assessment center is.

19    Q.    This company is not an assessment center, are

20         they?

21               MR. MORGAN:  Object to the form.

22    A.    An assessment center is not a brick-and-mortar

23         structure.

16

1    Q.    Right.

2          Well, are you familiar with the 1991

3    settlement order in the McCormick case?

4                    MR. MORGAN:  Object to the form.  In

5                    the what case?

6                    MR. HORSLEY:  I got the name wrong.

7                    Hammock case.

8                    MR. MORGAN:  Object to the form.

9    A.    Yes.

10   Q.    You're familiar with the order approving a

11   settlement agreement that requires an assessment

12   center for certain promotions within the Auburn

13   City Fire Division?

14   A.    I am.

15   Q.    Is it your testimony that Plaintiff's Exhibit

16   Number 1 qualifies as an assessment center

17   pursuant to that order?

18   A.    No.

19   Q.    Is it your testimony that this company -- that

20   the hiring of this company qualifies as an

21   assessment center pursuant to the order in the

22   Hammock case?

23                    MR. MORGAN:  Object to the form.

17

1    A.    No.

2    Q.    Is it true that this company, CWH, was hired to

3          administer a written test that anyone applying

4          for the battalion chief promotion had to take?

5          Is that correct?

6    A.    They developed a neutral job-related process for

7          us to use in making a promotion decision.

8    Q.    Other than administering the written test that

9          was taken by all the battalion chief applicants,

10         what else did they do to participate in the

11         battalion chief promotion process?

12   A.    They recommended and developed a series of

13         exercises to help determine who was the best

14         candidate for the promotion.

15   Q.    Was that provided to the City in some written

16         form?

17   A.    The exercises?

18   Q.    Yes, sir.

19   A.    Yes.

20   Q.    Do you know if the City of Auburn still has that

21         document that details the exercises?

22   A.    In one form, yes.

23   Q.    What do you mean in one form?

18

1    A.    Well, the orientation manual is one form.

2    Q.    What other form do y'all have it in writing?

3    A.    There was a report -- Well, I think the

4          Candidate Feedback Reports provided some

5          information about it.  There was a final report

6          about the overall process that provided details

7          about it.

8    Q.    Is the orientation manual that you just

9          testified about -- Is Plaintiff's Exhibit Number

10         2 a copy of that orientation manual?

11                    (Plaintiff's Exhibit 2 marked for

12                        identification.)

13   A.    It appears to be at least part of it.

14   Q.    Part of it?  What else --

15   A.    I can't tell.

16   Q.    Your testimony is Plaintiff's Exhibit 2 is part

17         of the orientation manual submitted by CWH; is

18         that correct?

19   A.    It appears to be.

20   Q.    Does the City of Auburn to your knowledge still

21         have the actual test that was administered to

22         the battalion chief applicants?

23   A.    We don't.

19

1    Q.    What happened to that test?

2    A.    The test was returned to CWH.

3    Q.    You said earlier that you spoke with an

4          individual about hiring CWH.  Tell me what

5          happened that participated your seeing the need

6          to hire a company such as CWH to get involved in

7          the battalion chief promotion.

8    A.    The settlement agreement in 1991 called for a

9          process utilizing outside assessors and a

10         consultant.  Kathleen Robinson was the person

11         that did that for us.  She retired.

12   Q.    Robinson?

13   A.    Yes.

14   Q.    And she's the one who you consulted with in

15         hiring CWH, correct?

16   A.    I asked her if she was available to do this

17         work, and she said she was retiring and

18         recommended CWH to me.

19   Q.    Had the City of Auburn to your knowledge used a

20         company like CWH to perform some type of written

21         test or assessment center prior to the battalion

22         chief promotion in May of 2006?

23   A.    Like CWH?

20

Q.   Well, let me rephrase the question.

      Had the City of Auburn used an outside assessment center for any promotion within the fire division since the 1991 settlement order?

A.   Yes.

Q.   And what promotions did it use an assessment center for?

A.   I believe there was a 1994 captains promotion and a 1996 lieutenant and captains promotion.

Q.   If you can, describe the assessment center that was used for those two promotions.

A.   To my knowledge it involved a conglomeration of exercises -- job-related exercises.

Q.   And it was formulated by whom?

A.   Kathleen Robinson.

Q.   And I guess what I'm asking you to do for my education is define what you believe an outside assessment center to be.

A.   An assessment center -- An outside assessment center would consist of a conglomeration of devices used -- job-related devices used to determine who the best candidates were for a promotion.

21

1    Q.    And by outside assessment center, does that mean

2          someone or some company has to implement those

3          processes that is not employed or has any

4          connection with the City of Auburn?

5    A.    I think that's a fair statement.

6    Q.    And you said that Kathleen Robinson was in

7          charge of that for the City of Auburn for a

8          period of time, correct?

9    A.    Correct.

10   Q.    Was she employed by the City of Auburn?

11   A.    No.  She was contracted by the City of Auburn.

12   Q.    What was Kathleen Robinson's job to your

13         knowledge?

14   A.    Professionally?

15   Q.    Yeah.

16   A.    I recall she was involved in testing services at

17         either Cobb County or DeKalb County in the

18         Atlanta metro area.

19   Q.    So she lives in the Atlanta metro area or did

20         live in the Atlanta Metro ...

21   A.    I assume that's where she lived.

22   Q.    Do you know who actually made the decision to

23         hire Kathleen Robinson to implement the outside

1     assessment center?

2  A.    The lawyers involved in the original litigation.

3  Q.    The original Clinton Hammock litigation?

4  A.    Correct.

5  Q.    Do you know if she still lives in the Atlanta

6     metro area?

7  A.    I don't know.

8  Q.    Does she have a company name to your knowledge?

9  A.    I don't know.

10  Q.    You don't know if there's some -- if she's

11     incorporated under some other name?

12  A.    I haven't had any further contact with her.

13  Q.    It's your testimony that she developed the

14     outside assessment center for the 1994 captains

15     promotion and the 1996 lieutenant promotion; is

16     that correct?

17  A.    That's my understanding.

18  Q.    Is it also your understanding that pursuant to

19     either of those promotions or pursuant to

20     neither of those promotions there was a written

21     test given to the applicants with a cutoff

22     score; is that correct?

23  A.    I don't recall there was a written test.

23

1   Q.   You don't recall if there was a written test?

2   A.   Right.

3   Q.   Are you saying there may have been and you don't

4        recall?

5   A.   I don't -- I was not directly involved in that

6        process.

7   Q.   With regard to the battalion chief promotion in

8        May of 2006, who at the City of Auburn decided

9        that there was going to be a written test with a

10       cutoff score as a factor in the promotion?

11  A.   It was a collective decision made by me, the

12       public safety director, the deputy fire chief,

13       and CWH.

14  Q.   And at that time the deputy fire chief was Lee

15       Lamar?

16  A.   Correct.  And the fire chief.

17  Q.   Who was Langley?

18  A.   Right.

19            And CWH.

20  Q.   And CWH.

21            So for the battalion chief promotion, is it

22       your testimony that you, the public safety

23       director, the deputy fire chief, the chief got

24

1    together and decided that there needed to be an

2    outside assessment center for this promotion,

3    and you contacted Kathleen Robinson?  She had

4    retired and told you you needed to contact CWH?

5    Is that the chronology of how it occurred?

6  A.    Yes.

7  Q.    And then the individuals I just named, along

8        with you, got with CWH, and that group made the

9        decision that a test with a cutoff score was

10       going to be given; is that correct?

11  A.    That's correct.

12  Q.    Were you personally involved in meetings with

13        CWH, Langley, Lamar, the safety director where

14        y'all discussed with CWH that a test needed to

15        be given with a cutoff score?

16  A.    Yes.

17  Q.    Is it your testimony that the City of Auburn had

18        not made that decision before it contracted with

19        CWH about the test or the cutoff score?

20  A.    Could you repeat the question?

21  Q.    Yeah.

22        Did you, the public safety director, Lamar,

23        and Langley make the decision that there needed

25

1       to be a test with a cutoff score given prior to

2       the time y'all contracted with CWH?

3   A.  No.

4   Q.  Do you recall the individual's name that y'all

5       were dealing with at CWH?

6   A.  Primarily Michael Blair.

7   Q.  Do you independently recall as you sit here

8       today meetings with those individuals and

9       Mr. Blair where the decision was made that a

10      test was going to be given for the battalion

11      chief promotion with a cutoff score?

12  A.  Yes.

13  Q.  Do you recall who actually first recommended

14      that that test be given?

15  A.  The CWH process incorporates a testing option.

16      Through our discussions it was determined that

17      giving a test was a good way to evaluate the

18      subject matter expertise of the candidates in

19      the area of fire prevention.

20  Q.  Did Mr. Blair, the CWH representative, recommend

21      that a test be given or did he say that that was

22      a necessary part of CWH's involvement in this

23      process?

1       MR. HANCOCK:  Object to the form.

2  A. As I said, the CWH process incorporated an

3    option to have a test.

4  Q. It wasn't a requirement; it was an option; is

5    that correct?

6  A. It was an option, correct.

7  Q. And was it at the City's discretion -- Was it at

8    the City's discretion to give or not give the

9    test with a cutoff score?

10  A. Yes.

11       MR. MORGAN:  Object to the form.

12  Q. It was?

13    Do you recall whether or not Lee Lamar

14    suggested that a cutoff score of 70 is something

15    that he would prefer during those meetings?

16  A. Our discussions included the use of a cutoff

17    score of 70 percent.

18  Q. Do you recall specifically who suggested the

19    cutoff score of 70?

20  A. Who first voiced that, I don't know.

21  Q. You don't recall if it was Lee Lamar?

22  A. I know Lee Lamar stated that 70 percent was the

23    common cutoff score used in the fire service.

27

1    If people went to the fire college and they took

2    a test, there was a 70 percent cutoff.  I

3    understand at the National Fire Academy, some of

4    the courses there have a 70 percent cutoff.  Our

5    practice in other testing procedures in the City

6    of Auburn had been to use a 70 percent cutoff.

7    We saw it as something consistent and also in

8    keeping with tradition in the fire service.

9  Q.  Am I correct in saying that the City of Auburn

10    representatives during these meetings were the

11    individuals who suggested the 70 cutoff score

12    rather than the CWH representative?

13         MR. MORGAN:  Object to the form.

14  A.  I don't know if CWH said you can use a cutoff

15    score or if we said we want to use a cutoff

16    score.  It was --

17  Q.  You don't recall?

18  A.  No, I don't.

19  Q.  Are you aware that CWH pursuant to administering

20    this test required that there be a cutoff score?

21  A.  No.  I think that was our choice.

22  Q.  That was your choice?  The City of Auburn's

23    choice?

28

1    A.    It was our, as you stated, discretion.

2    Q.    During those meetings about the test, am I

3          correct that the City of Auburn made the

4          decision to implement that test as the first

5          factor in the battalion chief promotion with a

6          cutoff score, meaning that if you did not meet

7          the cutoff score, you could not progress further

8          in the battalion chief promotion process?

9    A.    Would you repeat the question?

10   Q.    Yeah.

11         Is it true that the -- Isn't it true that

12         the City of Auburn made the decision that the

13         test with a cutoff score was the initial factor

14         in whether an applicant proceeded through the

15         rest of the process?

16   A.    Again, this was a decision made collectively in

17         consultation with CWH.  Had the City said we

18         don't want to use a cutoff score, I don't think

19         CWH would have argued with us.

20   Q.    CWH didn't care one way or the other whether or

21         not the City used a cutoff score or whether the

22         test was a deciding factor if someone got to

23         progress through the process, did they?

29

```
 1                      MR. MORGAN:  Object to the form.

 2    A.    I'm not sure I'd go that far.

 3    Q.    Well, CWH was hired as a consulting firm to

 4          administer a test; is that correct?

 5    A.    They were designed to --

 6                      MR. MORGAN:  Object to the form.

 7    A.    -- hired to design and provide consulting

 8          services to the City so that we had a fair

 9          promotional process.

10    Q.    And if the City had decided that the test would

11          be administered by CWH and that there would not

12          be a cutoff score and that the test would simply

13          be part of a cumulative process for the

14          battalion chief promotion, CWH to your knowledge

15          wouldn't have objected to that; is that correct?

16                      MR. MORGAN:  Object to the form.

17    A.    I think they would have allowed us to do that.

18    Q.    They would have allowed you to do that?

19    A.    (Witness nods head positively.)

20    Q.    You've got to answer out loud.

21                They would have allowed you to do that,

22          correct?

23    A.    Yes.
```

30

1    Q.   My point is:  The City of Auburn had the

2           discretion as to how the test and the cutoff

3           score would be implemented into the promotional

4           process.  Is that a fair statement?

5    A.   Yes.

6    Q.   CWH didn't make that decision, did they?

7                 MR. MORGAN:  He's answered that about

8                      five times.

9    Q.   CWH didn't make that decision, did they?

10              MR. MORGAN:  Object to the form.

11   A.   It was a collective decision, but ultimately it

12          was the City's discretion to --

13   Q.   Well, if the City had the ultimate discretion,

14          then CWH didn't have any discretion to decide

15          how that test would play a part in the

16          promotional process, did they?

17             MR. MORGAN:  Object to the form.

18   A.   We certainly listened carefully to their advice.

19   Q.   They could make recommendations but they could

20          not make decisions; is that correct?

21   A.   Correct.

22   Q.   Do you recall -- I may have asked this

23          question.  I simply can't remember.

1          Do you recall if CWH recommended that the

2      test be the deciding factor -- the test with a

3      cutoff score be the deciding factor as to

4      whether or not an applicant proceeded through

5      the battalion chief promotional process?

6   A.   Again, this was a collective decision made in

7      discussion with CWH.

8   Q.   And if CWH is going to say that Lee Lamar

9      suggested the 70 cutoff score, you don't have

10     anything to dispute that, do you?

11  A.   No.

12  Q.   Tell me why you and the public safety director

13     and Lee Lamar and Langley decided that CWH

14     needed to be hired in order to conduct the

15     outside assessment center if the City of Auburn

16     at that time in May of 2006 -- Well, the test

17     was given before then.  Let's just say between

18     February and May of 2006.  Let me start over.

19         Why did you and the public safety director,

20     Lee Lamar, and Langley decide during that time

21     period from February through May of 2006 that an

22     outside assessment center needed to take place

23     pursuant to the battalion chief promotion if the

32

1    City was under the impression that the 1991

2    order had expired?

3       MR. MORGAN: Object to the form.

4  Q.  When I speak of the 1991 order -- Let's go ahead

5    and mark it and we'll talk about it in detail in

6    a little while.

7     But you're familiar with the Clinton Hammock

8    order approving the settlement agreement,

9    correct?

10  A.  I am.

11      (Plaintiff's Exhibit 3 marked for

12       identification.)

13  Q.  And that's the document that required the City

14    of Auburn to conduct an outside assessment

15    center back then for any captain promotion or

16    any lieutenant promotion, correct?

17  A.  Correct.

18  Q.  Tell me, then, if the City believed that that

19    order had either expired or that the court no

20    longer had jurisdiction over the City of

21    Auburn's promotional practices, why did you and

22    these other gentlemen feel that an assessment

23    center was necessary for this promotion?

33

1        MR. MORGAN:  Object to the form.

2    A.   I think -- I won't speculate.  We had

3         considered the -- if the order approving

4         settlement was still in effect with counsel

5         narrowly construed to the issue of the matter of

6         reclassifying team leaders to lieutenant.  We

7         came to a point where we needed to make a

8         promotion to fill some vacant positions at the

9         battalion chief level.  We felt that the best

10        course of action -- since we had not gone

11        through a process as we had with the team leader

12        to lieutenant reclassification, the best course

13        of action was to follow what was stipulated in

14        the assessment center or -- I'm sorry -- in the

15        settlement agreement from 1991.

16   Q.   Have you read the order approving settlement

17        agreement marked as Plaintiff's Exhibit 3?

18   A.   I have.

19   Q.   Have you read it in preparation for this

20        deposition?

21   A.   I have.

22   Q.   Do you know of anywhere in that order where it

23        states that a written test with a cutoff score

34

1   is required to be a part of the assessment

2   center?

3 A. It does not specifically say that.

4 Q. Again, I'm not sure I followed you when you were

5   talking about the lieutenant or the team leader

6   reclassification to lieutenant.  I think you

7   said that during that process --

8     Well, tell me what you said.  I don't want

9   to mischaracterize your testimony.  Tell me

10   again why an assessment center -- why the court

11   order was not followed pursuant to the team

12   leader to lieutenant reclassification.

13     MR. MORGAN:  Object to the form.

14 Q. You'll agree with me that the order approving

15   settlement agreement was not complied with

16   pursuant to the February 1, 2006

17   reclassification of team leaders to lieutenants;

18   is that correct?

19     MR. MORGAN:  Object to the form.

20 Q. Will you agree with me on that?

21 A. I would agree that we did some research with

22   legal counsel, and it was determined that the

23   settlement agreement was no longer in force.

1    And at that point, based on a petition from team

2    leaders, based on the interest of stimulating

3    morale in the department, based on

4    considerations of the cost of conducting

5    assessment centers, we determined that changing

6    the job title of equal -- of a position that

7    had -- that was equal to lieutenant was an

8    appropriate thing to do.

9  Q.  So are you testifying that a firefighter or a

10     City of Auburn Fire Division employee that

11     moved -- prior to February 1 of 2006, before

12     that time, a firefighter that moved from team

13     leader to lieutenant was not considered to be a

14     promotion?

15 A.  It was not a promotion.

16 Q.  It was not a promotion?

17 A.  No.

18 Q.  Is that correct?

19 A.  Correct.

20 Q.  When Lieutenant Stevens went from team leader to

21     lieutenant in 1996, was that not a promotion?

22          MR. MORGAN:  Object to the form.

23 A.  No.

36

1   Q.   It was not?

2        You've already testified that during that

3        process, an outside assessment center was used,

4        correct?

5   A.   It was.

6             (Plaintiff's Exhibit 4 marked for

7                  identification.)

8   Q.   I'll show what you I've marked as Plaintiff's

9        Exhibit Number 4.

10            MR. MORGAN:  Was he a team leader?

11            MR. HORSLEY:  Well, hold on.

12  Q.   When was the team leader position started at the

13       City of Auburn Fire Division?

14  A.   I think it was started sometime in 1989 or 1990.

15  Q.   In 1996 when Gerald Stephens was promoted to

16       lieutenant --

17        I'm going to show you what's marked as

18       Plaintiff's Exhibit Number 4.  Have you ever

19       seen that letter?

20  A.   I've seen a copy of this.

21  Q.   Is it your understanding that he was promoted

22       from the team leader position or from the

23       firefighter position to lieutenant?

1    A.    I understand he was a firefighter.

2    Q.    Why did he not have to be promoted to team

3          leader before being promoted to lieutenant back

4          in 1996?

5                    MR. MORGAN:   Object to the form.

6    A.    I'm sorry.  Repeat the question.

7    Q.    Yes.

8              Why was he not required to be promoted to

9          team leader before being promoted to lieutenant

10         back in 1996?

11   A.    To my knowledge he didn't apply for team leader.

12   Q.    Well, my question is:  You're saying that team

13         leader and lieutenant were the exact same

14         position before February 1 of 2006, correct?

15   A.    Correct.

16   Q.    Then why do they have different names?

17   A.    One was -- One evolved out of the court-ordered

18         settlement and one evolved out of traditional

19         rank structure in the fire service.

20   Q.    Which one evolved out of the court-ordered

21         settlement?

22   A.    Team leader.

23   Q.    And is there a pay differential between -- Was

38

| | | |
|---|---|---|
| 1 | | there a pay differential between the job of team |
| 2 | | leader and lieutenant before February 1 of 2006? |
| 3 | A. | No. |
| 4 | Q. | None? |
| 5 | A. | None. |
| 6 | Q. | All team leaders and all lieutenants made the |
| 7 | | exact same wage.  Is that your testimony? |
| 8 | A. | Yes.  They were paid in the same pay grade. |
| 9 | Q. | What about bars?  Do firemen at the City of |
| 10 | | Auburn have pins that they wear that have a |
| 11 | | certain number of bars on them? |
| 12 | A. | I'm aware that there's some insignia that they |
| 13 | | wear. |
| 14 | Q. | Is the insignia that the team leaders wore |
| 15 | | before February 1 of '06 the same as the |
| 16 | | lieutenants wore prior to that time? |
| 17 | A. | I don't know. |
| 18 | Q. | You don't know? |
| 19 | A. | (Witness nods head negatively.) |
| 20 | Q. | Do you know why all these team leaders wanted to |
| 21 | | be reclassified as lieutenants if the job was |
| 22 | | the same and they were making the same money? |
| 23 | A. | I think they stipulated that in their petition. |

39

1    Q.    What do you recall that stipulation to be?

2    A.    I believe they said that team leader is not a

3          recognized title in the fire service.  When they

4          went to other training, they had to explain what

5          a team leader was.  When they went to other --

6          to assist other fire agencies, they had to

7          explain what their training was.  They preferred

8          to be called lieutenants because that was a

9          recognized, more traditional job title for a

10         company officer in the fire service.

11   Q.    So from their standpoint -- you would agree with

12         me from a convenience standpoint, it was an

13         actual promotion from team leader to lieutenant?

14   A.    I'm sorry?

15   Q.    From a convenience to the team leaders, it was a

16         promotion to go from team leader to lieutenant;

17         is that correct?

18               MR. MORGAN:  Object to the form.

19   A.    No.

20   Q.    And you don't know if the insignia had more bars

21         as a lieutenant than a team leader?

22   A.    I don't.

23   Q.    In February 1 of 2006, who were the lieutenants

1      in the Auburn Fire Division to your knowledge?

2  A.   Gerald Stephens.

3  Q.   He's the only one, correct?

4  A.   Yes.

5  Q.   He's an Afro-American, correct?

6  A.   He is.

7  Q.   Are you aware -- How long had he been the only

8      lieutenant in the Auburn Fire Division to your

9      knowledge?

10 A.   I don't know.

11 Q.   And he was appointed or promoted to lieutenant

12     back in 1996, correct?

13 A.   Correct.

14 Q.   Did you ever hear or have you heard of

15     dissatisfaction among the team leaders at that

16     time prior to February 1 of '06 that Gerald

17     Stephens was the only lieutenant in the

18     department?

19 A.   Can you repeat the question?

20 Q.   Yeah.

21         Did you ever hear or have you ever heard of

22     dissatisfaction or discontent among the team

23     leaders at that time prior to February 1 of '06

41

| | | |
|---|---|---|
| 1 | | that Gerald Stephens was the only lieutenant in |
| 2 | | the Auburn Fire Division? |
| 3 | A. | Not that I recall. |
| 4 | Q. | Have you ever heard of that? |
| 5 | A. | Not that I recall. |
| 6 | Q. | Is it your testimony that Gerald Stephens was |
| 7 | | not a higher ranking employee of the City of |
| 8 | | Auburn Fire Division prior to February 1 of '06 |
| 9 | | than the team leaders? |
| 10 | A. | I'm sorry.  Would you repeat that? |
| 11 | Q. | Is it your testimony that Gerald Stephens was |
| 12 | | not a higher ranking Auburn Fire Division |
| 13 | | employee prior to February 1 of '06 than were |
| 14 | | the team leaders? |
| 15 | A. | That is my testimony. |
| 16 | | MR. MORGAN:  Object to the form. |
| 17 | Q. | He was not a higher ranking employee? |
| 18 | A. | He was not. |
| 19 | Q. | I don't want to get into privileged information |
| 20 | | between you and attorneys.  You said that you |
| 21 | | consulted with legal counsel prior to the time |
| 22 | | that you reclassified the team leaders to |
| 23 | | lieutenants and decided that the court order had |

42

| 1 | | expired or that it was no longer in force; is |
|---|---|---|
| 2 | | that correct? |
| 3 | A. | Correct. |
| 4 | Q. | Who was your legal counsel at that time? |
| 5 | A. | The city attorney. |
| 6 | Q. | And was that Arnold Umbach? |
| 7 | A. | It is. |
| 8 | Q. | Anyone else that you or the City consulted with |
| 9 | | in reaching the conclusion that the 1991 order |
| 10 | | had expired or was no longer in force? |
| 11 | A. | Not directly.  I don't know if Arnold had -- |
| 12 | Q. | Yeah.  What I'm saying is:  The City came to |
| 13 | | that conclusion based on discussions with legal |
| 14 | | counsel, Arnold Umbach, and that's the only way |
| 15 | | the City came to that conclusion.  Is that a |
| 16 | | correct statement? |
| 17 | A. | That's correct. |
| 18 | Q. | And, again, I don't want to know what Arnold |
| 19 | | Umbach told you or anyone else, but do you have |
| 20 | | knowledge as to why Arnold Umbach told the City |
| 21 | | that the 1991 settlement agreement was no longer |
| 22 | | in force? |
| 23 | A. | I do know what he told me. |

43

1     MR. HORSLEY:  Can I ask him that?

2     MR. MORGAN:  Yeah.

3 Q. What did he tell you?

4 A. He told us that -- he told me that --

5     MR. MORGAN:  Let me say this.

6      We're --

7     MR. HORSLEY:  You're not waiving any

8      privilege.  You're not waiving any

9      privilege.

10     MR. MORGAN:  Okay.

11 A. He told me that in the absence of a specific

12   termination date, all contracts have -- they

13   come to an end based on changing conditions,

14   changing situations, that he had learned that

15   the court did not retain jurisdiction of this

16   settlement and that basically this was a

17   contractual matter between the City and the

18   plaintiffs.

19 Q. Did he tell you when the court no longer

20   retained jurisdiction over this?

21 A. A point in time?

22 Q. Yeah.

23 A. No.

44

1   Q.   Was it your understanding that after the court

2        signed off on the order that they essentially

3        lost jurisdiction over what was contained within

4        the order?  Is that your understanding?

5                MR. MORGAN:  Object to the form.

6   A.   That's the information I received.

7   Q.   So the order was essentially ineffective the day

8        after it was signed?  Is that your testimony?

9                MR. MORGAN:  Object to the form.

10  A.   No.

11  Q.   Well, what was your understanding of when that

12       order became ineffective or when the court lost

13       jurisdiction over the contents of that order?

14               MR. MORGAN:  Object to the form.

15  A.   It's not something I really contemplated until

16       you just asked me this question.

17  Q.   You don't know -- don't have any knowledge over

18       a time -- a date and time when the court lost

19       jurisdiction over the 1991 order?  Is that your

20       testimony?

21               MR. MORGAN:  Object to the form.

22  A.   Based on what I was told by the city attorney,

23       presumably they did not retain jurisdiction

45

1          after the settlement.

2   Q.     And that was my question a moment ago.  Your

3          belief today and upon discussing it with Arnold

4          Umbach was that essentially the United States

5          District Court for the Middle District of

6          Alabama Eastern Division lost jurisdiction over

7          the order that it entered in 1991 essentially

8          the day after it signed the order; is that

9          correct?

10                  MR. MORGAN:  Object to the form.

11  Q.     I think that's what you said.

12  A.     Not being a lawyer, that's the way it appears.

13                  MR. MORGAN:  Are you at a stopping

14                      point?

15                  MR. HORSLEY:  Yeah.  We can take a

16                      break.  That's fine.

17                  (Brief recess.)

18  Q.     (Continuing by Mr. Horsley)  I want to go back

19          for a moment to the distinction between the team

20          leader and lieutenant position prior to February

21          1 of 2006.  That's when that change became

22          effective, correct, when all the team leaders

23          became lieutenants?

1    A.    February 1.

2    Q.    February 1 of 2006?

3    A.    That's correct.

4    Q.    Isn't it true that prior to that time, the team

5          leader position was a temporary position?  It

6          was a full-time job but a temporary position; is

7          that correct?

8    A.    My recollection is that it started as a

9          temporary position and at some point since 1989

10         it became an assignment that didn't go away.

11   Q.    And weren't the team leaders in some respects

12         required to oversee the student firefighters?

13   A.    They did oversee student firefighters.

14   Q.    Was that a part of their job duties?

15   A.    A part of their job duties was to provide

16         front-line supervision -- first-line supervision

17         over fire suppression personnel.

18   Q.    Student firefighters?

19   A.    Student firefighters included, yeah.

20   Q.    Was that also a job task of the lieutenants

21         prior to February 1 of 2006?

22   A.    I believe lieutenants did oversee student

23         firefighters.  I don't -- That's my belief.

1    Q.   But wasn't the team leader position specifically

2         created in order to oversee the student

3         firefighters?

4    A.   I believe it was.

5    Q.   Was the lieutenant position ever specifically

6         created in order to oversee student

7         firefighters?

8    A.   The lieutenant position existed prior to the

9         creation of student firefighters.

10   Q.   It has never been the primary job task of a

11        lieutenant to oversee student firefighters; is

12        that correct?

13                  MR. MORGAN:   Object to the form.

14   A.   Would you repeat that?

15   Q.   It has never been a primary job duty of a

16        lieutenant with the Auburn Fire Division to

17        oversee the student firefighters; is that

18        correct?

19                  MR. MORGAN:   Object to the form.

20   A.   I can't agree with that.

21   Q.   You cannot agree with that?

22   A.   No.

23   Q.   Will you agree with me that the primary task of

48

1      a team leader was to oversee the student

2      firefighters?

3    A.   At one time.

4    Q.   When?

5    A.   The late '80s, early '90s.

6    Q.   So it's your testimony that in 2005, the team

7      leaders were no longer required to oversee the

8      student firefighters?

9    A.   I think they oversaw student firefighters and

10     also career firefighters.

11   Q.   And it's your testimony that their job duties

12     directly related to student firefighters were

13     exactly the same as the lieutenants' job duties

14     related to student firefighters; is that

15     correct?

16   A.   The job descriptions were identical.

17   Q.   With respect to student firefighters?

18   A.   With respect to supervising personnel.

19   Q.   Is your testimony that with respect to the

20     supervision of student firefighters, the job

21     duties of team leader and lieutenant were

22     exactly the same prior to February 1 of '06?

23                MR. MORGAN:  Object to the form.

49

1    A.    That's my belief.

2    Q.    The City decided through discussions with its

3          attorney that the outside assessment center was

4          no longer required because the 1991 court order

5          was no longer effective with regard to the team

6          leader reclassification to lieutenants in

7          February 1 of '06.  We've established that.

8                   MR. MORGAN:  Object to the form.

9    Q.    And it sounds to me like you were concerned

10         about that or the City was concerned about that

11         and actually consulted with its attorney before

12         it made that decision to reclassify team leaders

13         to lieutenants.  Is that a fair statement?

14   A.    Correct.

15   Q.    Why, then, were the battalion chief promotions

16         at the end of 2005 performed without an outside

17         assessment center?

18                  MR. MORGAN:  Do what?

19   A.    They were.

20   Q.    The battalion chief promotions in 2005 were?

21                  MR. MORGAN:  Object to the form.

22   A.    There wasn't a battalion chief promotion in

23         2005.

50

1    Q.   When was the last battalion chief promotion

2          before May of '06?

3    A.   1996.  But back then it was called captain or

4          shift commander.

5    Q.   Were Dean Garrett, Johnny Lawrence, Jimmy Brown,

6          and Danny Leverette not promoted to battalion

7          chief in 2004 or 2005 to your knowledge?

8    A.   They were not.

9    Q.   What is your understanding of their job status

10         in 2004 and '05?

11    A.   At some point during that period of time, their

12         job title changed.

13    Q.   From captain to battalion chief?

14    A.   From shift commander to battalion chief.

15    Q.   And it's your testimony that's not a promotion?

16    A.   That's correct.

17    Q.   Are you testifying that it's similar to or just

18         like the reclassification of team leaders to

19         lieutenants, that shift commanders became

20         battalion chiefs?

21    A.   Their job title was changed.

22    Q.   All shift commanders' job titles were changed to

23         battalion chiefs?

1   A.   Correct.

2   Q.   And when did that happen?

3   A.   I think it was in 2004.

4   Q.   Why did that occur?

5   A.   The captains/shift commanders had been asking

6        that their job titles be changed to battalion

7        chief for quite some time.  They met with the

8        former city manager and requested that their job

9        titles be changed.  I understand that it was a

10       desire that they had because it was a job title

11       more in keeping with the fire service, that when

12       they went to training or conferences, they

13       wanted to introduce themselves as battalion

14       chief.  They made their petition to the city

15       manager, and he agreed to change their job

16       title.  There was no change in job description.

17       There was no change in compensation whatsoever.

18  Q.   Were those individuals that I just named all

19       white men?

20  A.   Yes.

21  Q.   And, again, that change was made at their

22       request, for lack of a better word, convenience

23       to them; is that correct?

52

1                    MR. MORGAN:  Object to the form.

2   A.   I don't know about convenience, but to satisfy

3        what they wanted to be called.

4   Q.   But it's your testimony that was not a

5        promotion?

6   A.   It was not.

7   Q.   Again, the insignia -- are you familiar with the

8        insignia that the shift commanders wore back

9        then?

10  A.   Not until just recently.

11  Q.   Was that insignia the same as what a battalion

12       chief wore?

13                   MR. MORGAN:  Which one?

14                   MR. HORSLEY:  The shift commander.

15  A.   I have heard there was a change in the jewelry

16       that they put on their collars.

17  Q.   Once they became battalion chiefs, they wore a

18       different insignia; is that correct?  Once the

19       shift commanders became battalion chiefs, the

20       individuals we just named; is that correct?

21  A.   I heard something about there was a bugle added

22       to their collar.

23  Q.   Do you know whether or not the insignia that the

53

1          shift commanders wore included two bars and the

2          ones that the battalion chiefs wore included

3          three bars?

4   A.   I don't know that.

5   Q.   You don't know?

6   A.   (Witness nods head negatively.)

7   Q.   Do you have any reason to dispute that if that's

8          what --

9               MR. MORGAN:  Object to the form.

10  A.   It is what it is.

11  Q.   But you don't know?

12  A.   I don't know.

13  Q.   Once again, the reclassification or retitlement

14         of -- the reclassification of the shift

15         commanders to battalion chiefs was done without

16         an outside assessment center, correct?

17            MR. MORGAN:  Object to the form.

18  A.   Correct.

19  Q.   There were no tests given to those individuals,

20         correct?

21  A.   There was no promotion.

22  Q.   I understand.  That's not my question.

23  A.   There was no test.

54

Q.     There were no tests given to those individuals,
       correct?

A.     Correct.

            MR. MORGAN:  Wait a minute.  There was

                a test when they were promoted to

                captain or shift commander so

                object to the form of that.

            MR. HORSLEY:  I was asking about the

                reclassification.  He said it was

                not a promotion.  I was asking

                about the reclassification from

                shift commander to battalion

                chief.

            MR. MORGAN:  When they were renamed

                from shift commander to battalion

                chief, was there a promotion given

                to rename them?  Is that the

                question?

            MR. HORSLEY:  No.  My question is:

                Was there a test given?

            MR. MORGAN:  When they are renamed?

            MR. HORSLEY:  Whatever we're calling

                it.  When they are reclassified.

55

| | | |
|---|---|---|
| 1 | Q. | When they became battalion chiefs, they did not |
| 2 | | have to take a test, correct? |
| 3 | | MR. MORGAN:  Object to the form. |
| 4 | A. | When their job title was changed from shift |
| 5 | | commander to battalion chief, there was not a |
| 6 | | test given. |
| 7 | Q. | They were not required to undergo an outside |
| 8 | | assessment center pursuant to that change, |
| 9 | | correct? |
| 10 | A. | It was not necessary. |
| 11 | Q. | When did the position of captain change to the |
| 12 | | position of battalion chief? |
| 13 | A. | The position of captain changed to shift |
| 14 | | commander. |
| 15 | Q. | When was that? |
| 16 | A. | Mid-'90s.  I don't know. |
| 17 | Q. | Why was that change made? |
| 18 | A. | I don't know that either. |
| 19 | Q. | You don't have any information about why the |
| 20 | | position of captain was changed to shift |
| 21 | | commander? |
| 22 | A. | I don't. |
| 23 | Q. | The order that we've been -- |

56

1   A.   Let me clarify that.

2   Q.   Okay.

3   A.   You asked do I have any information?

4   Q.   Uh-huh (positive response).

5   A.   I don't recall what -- who made that decision;

6        why it was done.

7   Q.   You'll agree with me that that change from

8        captain to shift commander occurred subsequent

9        to Plaintiff's Exhibit 3, which is the Hammock

10       order approving the settlement agreement,

11       correct?

12  A.   Correct.

13  Q.   Are you aware that that order specifically --

14       whether it was effective or not effective, that

15       order specifically requires that any promotion

16       to captain requires an outside assessment

17       center?  You're aware of that, right?

18            MR. MORGAN:  Object to the form.

19  A.   Yes.

20  Q.   So it's your testimony that for some reason

21       subsequent to this order, the position of

22       captain was renamed shift commander, correct?

23  A.   Correct.

57

1    Q.   And you don't know why; is that correct?

2    A.   Right.

3    Q.   It's also your testimony that subsequent to this

4         order marked as Exhibit 3 that there was a

5         reclassification in 2004 or '05 from shift

6         commander to captain -- excuse me -- from

7         captain to shift commander and that the captain

8         position no longer existed, correct?

9              MR. MORGAN:  Object to the form.

10   A.   What date did you say?

11   Q.   I think we established it was either -- I think

12        you said '04.  It was in 2004.

13   A.   I said in '04.  I believe in '04 the job title

14        changed from shift commander to battalion chief.

15   Q.   When did it change from -- I'm sorry.  That's my

16        fault.  It was in the mid-'90s that it changed

17        from captain to shift commander?

18   A.   I think so.

19   Q.   Subsequent to the 1991 order, correct?

20   A.   Correct.

21   Q.   Subsequent to that order which specifically

22        addresses the outside assessment for captain

23        promotions, the captain position was essentially

58

1       eliminated by the department, correct?

2                       MR. MORGAN:   Object to the form.

3    A.   No.

4    Q.   The title of captain was eliminated by the

5         department, correct?

6                       MR. MORGAN:   Object to the form.

7    A.   Correct.

8    Q.   You agree with that, the title of captain was

9         eliminated subsequent to the order?

10   A.   It was changed to shift commander.

11                      (Plaintiff's Exhibits 7 & 8 marked for

12                          identification.)

13   Q.   I'll show you what I've marked as Plaintiff's

14        Exhibits 5 and 6.

15                      MR. MORGAN:   Richard, we've gone on

16                          about this, but the change in name

17                          from team leader to lieutenant is

18                          not an issue in this case, and I

19                          don't know why we're spending so

20                          much time on it.  I mean, that's

21                          not a claim in this lawsuit.

22                      MR. HORSLEY:   I think I'm entitled to

23                          ask questions about the history of

59

```
 1              the department and the changes
 2              they've made and the motivations
 3              behind them.
 4    Q.   Have you ever seen Plaintiff's Exhibits 5 and 6?
 5              (Off-the-record discussion.)
 6              MR. HORSLEY:  I'm marking these as 7
 7              and 8.  Seven is the Proposed
 8              Modification of Fire Lieutenant
 9              Promotional process signed by
10              Christopher Turner, and 8 is the
11              same thing signed by Gerald
12              Stephens.
13    Q.   Have you seen those two documents?
14    A.   I have.
15    Q.   And do you recall who made the decision to issue
16         these documents to the City of Auburn
17         firefighters?
18    A.   Ultimately it would have been the city manager.
19    Q.   Who was ...
20    A.   David Watkins.
21    Q.   And you'll agree with me that in both of these
22         documents -- both of these documents are
23         addressing the reclassification of team leaders
```

60

1        to lieutenants; is that correct?

2  A.    That's correct.

3  Q.    Do you know why these memos or documents were

4        given to Gerald Stephens and Christopher Turner?

5  A.    They were given to all affected members of the

6        fire division.  They were given to them because

7        we wanted their input.  We wanted to offer full

8        disclosure.  And because the city attorney said

9        this essentially was a contractual matter

10       between the plaintiffs and the City, we felt

11       this was a good way to go about getting the

12       input regarding their preference as to this

13       particular matter.

14  Q.    The preference to the particular matter of

15       reclassifying team leaders to lieutenants?

16  A.    Changing their job title from team leader to

17       lieutenant, reclassifying, yes.

18  Q.    And Eddie Ogletree would have been one of those

19       individuals, correct?

20  A.    Eddie Ogletree was a team leader who supported

21       that decision.

22  Q.    Well, he signed the document agreeing to it,

23       correct?

61

1              MR. MORGAN:  Object to the form.

2    Q.    Do you have --

3              MR. MORGAN:  We have that.  We have

4                   the one that he signed.  The

5                   second he claimed he didn't sign,

6                   yeah, we've got it.

7    A.    He stated:  I agree with the proposal.

8    Q.    And did you witness Mr. Ogletree sign that

9          document?

10   A.    No.

11   Q.    Do you know if the first page was attached to it

12         when he signed it?

13   A.    No.

14   Q.    Even though you had certain members of the fire

15         department that disagreed with the

16         reclassification, the City did it anyway,

17         correct?

18   A.    After we met with those individuals to

19         understand their concerns.

20   Q.    And in both 7 and 8, it states that the

21         court-approved assessment center process

22         submitted for fire lieutenant will be considered

23         to have expired, correct?

1    A.    Correct.

2    Q.    That's in paragraph 1 at the bottom of the first

3          page; is that correct?

4    A.    That's correct.

5    Q.    If it was your position and the City's position

6          at that time that, number one, the settlement

7          order was no longer in effect and that this was

8          not a promotion -- it was simply a

9          reclassification -- why are you addressing the

10         outside assessment center required by the order

11         in these two documents?

12               MR. MORGAN:  Object to the form.

13   Q.    I mean, if it's not an issue because it's not a

14         promotion and the order is not in force anyway,

15         why do you have to send out this document for

16         people to sign that specifically addresses the

17         assessment center and the fact that you consider

18         it to have expired?

19               MR. MORGAN:  Object to the form.

20   A.    Because --

21               MR. MORGAN:  The document speaks for

22                  itself.

23   Q.    Go ahead.

63

1    A.    Because the city attorney said this was

2          essentially a contractual matter between the

3          plaintiffs and the City, and we were trying to

4          provide full disclosure as to what the

5          implications of this proposal meant before we

6          moved forward.

7    Q.    But your earlier testimony made it very clear

8          this was not a promotion, correct?

9    A.    Correct.

10   Q.    Then why are you required to send out documents

11         asking for the approval when this is not a

12         promotion?  It's simply a reclassification.

13               MR. MORGAN:  Object to the form.

14               Asked and answered.

15   Q.    Is there a reason why you felt you needed to

16         send out these documents if this was not a

17         promotion?

18   A.    We were concerned that if we didn't take this

19         step, understand their preferences, then it

20         would potentially invalidate moving them from

21         team leader to lieutenant.

22   Q.    And even though some people disagreed with it,

23         y'all went ahead and reclassified them, correct?

64

1    A.   After we met with them to understand what their

2         concerns were.

3    Q.   If February 1 of 2006 the City had decided the

4         order was no longer in effect and outside

5         assessment centers were not required, why was an

6         outside assessment center used or why was it

7         allegedly used for the battalion chief promotion

8         in May of 2006?

9              MR. MORGAN:  Object to the form.

10   A.   In regard to the --

11   Q.   Well, let me ask you this.  Is it your position

12        that an outside assessment center that complies

13        with the court order of 1991 was, in fact,

14        utilized for the 2006 battalion chief promotion?

15             MR. MORGAN:  Object to the form.

16   A.   Yes.

17   Q.   Why did the City feel it necessary to use the

18        outside assessment center for the battalion

19        chief promotion in 2006 if it was the City's

20        position that the order was no longer in effect?

21             MR. MORGAN:  Object to the form.

22   A.   As I've indicated previously, this matter

23        regarding the team leaders being changed in job

65

1    title to lieutenant was very narrowly focused on

2    in regard to the settlement agreement.  We did

3    not address the issue of assessment center

4    processes or the process for promotion to

5    battalion chief or captain or shift commander,

6    whatever you want to call it, in this effort or

7    in this initiative presented to us by the team

8    leaders.

9  Q.  Are you familiar with somebody named Stephanie

10      King?

11 A.  I am.

12 Q.  Who is she?

13 A.  She is our senior HR generalist.

14 Q.  Still?

15 A.  She is.

16              (Plaintiff's Exhibit 5 marked for

17                 identification.)

18 Q.  Let me show you what I've marked as Plaintiff's

19      Exhibit 5.  This has just been provided to me

20      today.  It's a series of e-mails, some of which

21      you sent, some of which you received, some

22      Mr. Lamar sent, received.  Take a look at those,

23      and I'm going to ask you a couple of questions

66

```
1         about them.
2                      MR. MORGAN:  Where did you get this
3                      document?
4                      MR. HORSLEY:  From Will Hancock.
5                      MR. HANCOCK:  That's what I sent you,
6                      Randall.  Those are the e-mails
7                      you requested I think after
8                      Mr. Turner's deposition.  I sent
9                      them the following week.
10    Q.   Have you seen that exhibit before?
11    A.   I have.
12    Q.   The only question I'm going to ask you is:  Does
13         it appear to be an accurate reflection of
14         e-mails that were sent between the City of
15         Auburn employees and CWH representatives about
16         the battalion chief promotion test and
17         assessment center?
18                      MR. MORGAN:  Object to the form.
19    A.   No.
20    Q.   It does not?  How is it not e-mails sent --
21    A.   Well, chronologically I'm puzzled by how I got
22         this e-mail at 1:51.  I responded at 2:55.  Lee
23         Lamar responded at 2:07.  I don't understand how
```

67

1      that happens, how he responded after me or --

2      before me, but it chronologically appears that

3      he responded after me.

4  Q.  So you say there's a contradiction in two of the

5      times when e-mails were apparently sent; is that

6      correct?

7  A.  I don't understand why that is.  There's a

8      question in my mind about that.

9  Q.  Do you agree with me that these e-mails were

10      sent?  Have you seen these e-mails?

11  A.  I believe -- Well, I saw them after Mr. Hancock

12      provided them.

13  Q.  Do you dispute that these e-mails exist?

14  A.  No.

15  Q.  Do you agree that the e-mails that have your

16      name on them as being sent by you were sent by

17      you?

18  A.  Yes.

19  Q.  Did you receive the e-mails that indicate that

20      you received them on this document?

21  A.  I believe I did.

22  Q.  Do you believe that Lee Lamar sent the e-mails

23      that his name is on?

68

1    A.    This document would suggest that.

2    Q.    The battalion chief promotion that we're talking

3          about and that actually occurred in May of 2006,

4          that was a promotion, correct, from -- for

5          anyone that applied for it; is that correct?

6    A.    Correct.

7    Q.    Or for anyone who actually received the job,

8          that was a promotion, correct?

9    A.    Correct.

10    Q.    It was a promotion in rank and pay; is that

11         correct?

12    A.    Correct.

13    Q.    And you'll agree with me that Mr. Stephens and

14         Mr. Ogletree and Mr. Turner did not receive that

15         promotion, correct?

16    A.    Correct.

17    Q.    And you'll agree with me that those are each

18         Afro-Americans, correct?

19    A.    Correct.

20    Q.    And you'll agree with me those are the only

21         Afro-Americans that applied for the battalion

22         chief promotion at that time, correct?

23    A.    Correct.

69

1    Q.    You'll agree with me that the only people who

2          did receive that promotion were white men,

3          correct?

4    A.    Correct.

5    Q.    You'll agree with me that the only people who

6          made it past the testing phase of that promotion

7          were white men, correct?

8                    MR. MORGAN:    Object to the form.

9    A.    Correct.

10   Q.    The testing phase meaning the test that was

11         taken with the 70 cutoff score, correct?

12   A.    The written test.

13   Q.    Yes.    The only people that made it past that

14         point were white, correct?

15   A.    Correct.

16   Q.    Are you familiar with Mr. Stephens' and

17         Mr. Ogletree's job history with the City of

18         Auburn?

19   A.    Yes.

20   Q.    You're familiar with the jobs they've held and

21         their work performance.    Is that a fair

22         statement?

23   A.    Yes.

70

1    Q.   Other than their not passing the written test,

2         are you aware of anything about their employment

3         history with the City of Auburn that would have

4         kept them from being promoted to battalion

5         chief?

6                MR. MORGAN:  Object to the form.

7    A.   They had the same opportunity that everyone else

8         did.

9    Q.   Right.  My question though, is:  There's not

10        something that you're aware of that would have

11        precluded them from that promotion but for not

12        passing that test; is that correct?

13                MR. MORGAN:  Object to the form.  Go

14                    ahead.

15    A.   Correct.  They were eligible, just like everyone

16         else.

17    Q.   But for not passing that test, is it your

18         testimony that they were qualified to receive

19         that promotion?

20                MR. MORGAN:  Object to the form.

21    A.   That is not my testimony.

22    Q.   Based on their time in grade, based upon their

23         seniority, based upon your knowledge of their

71

1        work ethic and yearly evaluations, do you have

2        an opinion one way or the other about whether

3        they were qualified to be battalion chiefs?

4                    MR. MORGAN:  Object to the form.

5    A.    First, time in grade and seniority were not

6        considered.

7    Q.    Why is that?

8    A.    How do you consider that?

9    Q.    I don't know.

10   A.    Exactly.

11   Q.    I mean, I guess you consider it by how long

12       somebody has been there and how long they've

13       been in a certain position.  You're saying that

14       was not a qualification obviously for the

15       battalion chief job?  Is that what you're

16       saying?

17   A.    Correct.

18   Q.    My question, though, was:  Other than them not

19       passing the test, based upon their work history

20       with the City of Auburn, were they qualified for

21       that promotion?

22                    MR. MORGAN:  Object to the form.

23                    Asked and answered.

72

1    A.    They were eligible.

2    Q.    They were not disqualified for that promotion?

3    A.    Correct.

4    Q.    Who ultimately received those promotions to

5          battalion chief?  I'll try to help you.  I think

6          it was Joe Lovvorn, Rod Hartsfield, Matt Jordan,

7          and Joey Darby.

8    A.    That's correct.

9    Q.    Is that correct?

10   A.    Yes.

11   Q.    Those were all white males, correct?

12   A.    Correct.

13   Q.    Would you disagree with me that at the time of

14         his promotion to battalion chief, Joe Lovvorn

15         had been with the Auburn Fire Division for

16         approximately five to six years?

17   A.    I don't know exactly.

18   Q.    Do you have any reason to disagree with that?

19               MR. MORGAN:  Well, the record speaks

20                    for itself.

21   Q.    Do you have any reason to disagree with that?

22               MR. MORGAN:  Object to the form.

23   A.    Does that include his time as a student

73

1    firefighter?

2    Q.    No.

3    A.    I think --

4    Q.    He's been full-time employed with the City of

5          Auburn five to six years to your knowledge?

6    A.    As a regular firefighter?

7    Q.    Yes.

8    A.    I don't have any reason to disbelieve that

9          that's true.

10             MR. MORGAN:    Object to the form on

11                    that question.

12   Q.    Do you believe that Rod Hartsfield had been with

13         the Auburn Fire Department for approximately

14         seven years at the time he was promoted to

15         battalion chief?

16             MR. MORGAN:    Object to the form.

17   A.    As a regular employee?

18   Q.    Yes, sir.

19   A.    I have no reason to disbelieve that's not true.

20   Q.    Matt Jordan, five to six years with the Auburn

21         Fire Division; is that --

22             MR. MORGAN:    Object to the form.

23   A.    Same stipulation.

74

Q.    And the same question with Joey Darby.

          MR. MORGAN:    Object to the form.

A.    Same stipulation.

Q.    Do you agree with me that Mr. Stephens and

      Mr. Ogletree both had more years of service with

      the Auburn Fire Department than any of the

      individuals that were promoted to battalion

      chief?

A.    I believe that's true.

Q.    Do you agree with me that both Mr. Stephens and

      Mr. Ogletree had more experience with the Auburn

      Fire Department than did the individuals that

      received the battalion chief promotion?

          MR. MORGAN:    Object to the form.

A.    They had worked -- To the extent that they had

      been employed longer, ostensibly they had worked

      more shifts than these others.

Q.    So they had more experience?

          MR. MORGAN:    Object to the form.

Q.    Is that correct?

          MR. MORGAN:    What do you mean by

              experience?

          MR. HORSLEY:    Experience as Auburn

75

```
 1                         firefighters working for the

 2                         Auburn Fire Department.

 3              MR. MORGAN:  Are you talking about

 4                         seniority?

 5              MR. HORSLEY:  No.  Seniority is just a

 6                         number of years.  I'm talking

 7                         about experience going out and

 8                         working for the City of Auburn.

 9       Q.    Did they have more experience than the people

10             that were promoted to battalion chief?

11                         MR. MORGAN:  Object to the form.

12       A.    They had more experience as employees of the

13             City of Auburn to the extent that they had been

14             employed longer.

15       Q.    What jobs with the City of Auburn did the

16             individuals that were promoted to battalion

17             chief hold immediately before they were

18             promoted?

19       A.    I think they were all lieutenants.

20       Q.    Lieutenants?

21       A.    (Witness nods head positively.)

22       Q.    Were they in the group that was reclassified

23             from team leaders to lieutenants, the ones that
```

76

```
 1          were promoted?
 2                      MR. MORGAN:   Promoted to battalion
 3                      chief?
 4                      MR. HORSLEY:   Yes.
 5     A.   They were in that group.
 6     Q.   Each of the individuals that were promoted to
 7          battalion chief in May of '06 were in the same
 8          group of individuals that were reclassified from
 9          team leader to lieutenant in February 1 of '06,
10          correct?
11     A.   Correct.
12     Q.   So how long had they been lieutenants at the
13          time that they were promoted to battalion
14          chiefs?
15     A.   They had held the job title of lieutenant from
16          February 1, 2006.
17     Q.   So --
18     A.   They had been company officers, as I understand
19          that term in the fire service, for significantly
20          longer than that.
21     Q.   So they had been lieutenants for four months
22          approximately; is that correct?
23     A.   Correct.
```

77

1   Q.   Since they had not been lieutenants for twelve

2        months, would they have not been probationary

3        lieutenants at the time that they were promoted

4        to battalion chiefs?

5   A.   No.

6   Q.   They were not?

7   A.   They were not probationary.

8   Q.   Why not?

9   A.   Because we made a title change from team leader

10       to lieutenant.  They had already satisfied any

11       probationary requirements.

12   Q.   So it's your testimony that even though they had

13       only been lieutenants for approximately four

14       months, they were nonprobationary lieutenants

15       and entitled to be promoted to battalion chiefs,

16       correct?

17   A.   Correct.  For the sake of argument, even if they

18       had been probationary, they would have been

19       eligible.

20   Q.   Doesn't that conflict with the City of Auburn

21       personnel policies?

22   A.   Not that I'm aware of.

23   Q.   Are you familiar with those policies?

78

1    A.    I am.

2    Q.    You are?  Are you familiar with Section 2.07 of

3          the City of Auburn personnel policies from

4          1999?  I've marked the whole document as

5          Plaintiff's Exhibit Number 9.

6                    (Plaintiff's Exhibit 9 marked for

7                    identification.)

8                    MR. MORGAN:  Is that what was in

9                    effect in 2006?

10                   MR. HORSLEY:  I don't know.

11   Q.    Was it?

12   A.    No.

13   Q.    What was in effect?

14   A.    The personnel policies of 2005 as amended.

15   Q.    Okay.  Look at Section 2.07 of that section and

16         read it, if you will.

17   A.    In the document, the City of Auburn personnel

18         policies of 1999 labeled such, Section 2.07,

19         probation, states:  The probationary period --

20             Did you want me to read this out loud?

21   Q.    No.  Just read it to yourself, and I'm going to

22         ask you a question about it.

23   A.    (Witness complies.)

79

1    Q.   Was that section still in effect with the

2         amended personnel policies of '05 to your

3         knowledge?

4    A.   To my knowledge it was.

5    Q.   Does that section not require that a fire

6         department employee be employed at a certain job

7         for twelve months before being entitled to a

8         promotion?

9    A.   When an employee --

10                  MR. MORGAN:   Object to the form.   Go

11                       ahead.

12   A.   When an employee is promoted -- When an employee

13        is hired or promoted into a new job, they serve

14        a probationary period.

15   Q.   Of twelve months?

16   A.   Of twelve months.

17   Q.   And they can't be promoted while they are in

18        that probationary period, is that correct,

19        according to the city personnel policies?

20   A.   No, that is not correct.

21   Q.   That's not correct?

22   A.   No.

23   Q.   2.7 does not say that?

80

1   A.   2.07?

2   Q.   Yes, sir.

3   A.   It does not say you can't be promoted during the

4        probationary period.

5                 MR. MORGAN:  I didn't see it either.

6                 Show it.

7   Q.   I'm sorry.  Section 2.09 regarding promotions

8        refers back to Section 2.07.  Does that section

9        not say an employee is not entitled to a

10       promotion until he has served a twelve-month

11       probationary period?

12                MR. MORGAN:  Object to the form.

13  A.   No.

14  Q.   It refers to a step increase in pay, correct?

15  A.   Correct.

16  Q.   Does it not state that an increase in pay

17       requires an employee to serve a probationary

18       period of twelve months?

19                MR. MORGAN:  Object to the form.

20  A.   A step increase -- I'm sorry.  Repeat the

21       question.

22  Q.   Does that not mean -- Section 2.09 which refers

23       back to 2.07, does that not mean an employee has

81

1     to serve a twelve-month probationary period

2     before he can receive a step increase in pay?

3  A.  In that job, correct.

4  Q.  So it's your testimony that there's no

5     requirement through the City of Auburn personnel

6     policies that an employee serve a twelve-month

7     probationary period before they can be promoted?

8  A.  If a firefighter wanted to apply for a higher

9     level job within the organization during their

10    probationary period as a firefighter, they could

11    certainly do so.  And if selected they would be

12    promoted to that position.

13 Q.  And it's your testimony that would not

14    contradict or conflict in any way with the

15    personnel policies marked as Plaintiff's Exhibit

16    9; is that correct?

17 A.  It would not.

18 Q.  I think I asked this earlier, but I forgot what

19    your answer was.  Is it your testimony that the

20    individuals that were promoted to battalion

21    chief in May of '06 were, in fact, probationary

22    lieutenants?

23         MR. MORGAN:  Object to the form.

82

```
1    A.   That was not my testimony.
2                    MR. HORSELY:  That's why I asked it
3                         again because I couldn't remember
4                         what his answer was.
5    Q.   What was your testimony?
6    A.   My testimony was that they were not
7         probationary.  They had received -- I'm sorry.
8              Repeat which question --
9    Q.   Yeah.  Were they non --
10   A.   Which job?
11   Q.   Is it your testimony that those individuals that
12        received the battalion chief promotion were
13        probationary or nonprobationary lieutenants at
14        the time of the promotion to battalion chief?
15   A.   They were nonprobationary lieutenants when they
16        were promoted.
17   Q.   And, again, they had only been lieutenants for
18        approximately four months, correct?
19                   MR. MORGAN:  Object to the form.
20   A.   They had held the job title of lieutenant for --
21        since February 1, 2006.
22   Q.   Are you familiar with how many Afro-Americans
23        or -- Let's say minorities.
```

1          Are you familiar with how many minorities

2     the City of Auburn Fire Department has hired

3     since the year 2004?

4   A.   Off the top of my head, no.

5   Q.   Are you aware that they've hired any?

6   A.   I believe that they have hired student

7     firefighters that were minorities.

8   Q.   Student firefighters?

9   A.   Yes.

10  Q.   Are you aware of any full-time firemen that the

11    City has hired since 2000, minority firemen?

12  A.   Not to my knowledge.

13  Q.   And, again, I may be taxing your memory -- and

14    it's fine if you don't know the answer to this

15    question -- but since 1991, since the order was

16    entered, are you aware of how many minorities

17    the City of Auburn has hired as full-time

18    firemen?

19  A.   As regular --

20  Q.   Yes, sir.

21  A.   -- firemen?

22       No.

23  Q.   You don't know?

84

1    A.    No.

2    Q.    Do you have any knowledge or information that it

3          would be more than two?

4                MR. MORGAN:   Object to the form.

5    A.    I don't know if there have been more than two

6          regular minority firefighters hired since 2000

7          or ...

8    Q.    Since 1991.

9    A.    1991.  Sorry.

10   Q.    Do you know if there's been more than four

11         minority firefighters hired since 1991?

12               MR. MORGAN:   Object to the form.

13   A.    No.

14   Q.    And how many minority firefighters are employed

15         with the City right now?  Let's say regular

16         firefighters first, full-time firemen.

17   A.    Three.

18   Q.    And that's Chris Turner, Gerald Stephens, and

19         Eddie Ogletree, correct?

20   A.    Correct.

21   Q.    And how many student firefighters are there,

22         minority student firefighters?

23   A.    Right now?

85

1   Q.   Uh-huh (positive response).

2             MR. MORGAN:  How many?

3             MR. HORSLEY:  He said "right now".  He

4                  hasn't answered yet.

5   A.   I think it's one or two.

6   Q.   Did Chief Langley or Lamar, either one of those

7        gentlemen, ever make the statement to you that

8        the City of Auburn needed to hire more minority

9        firefighters?

10  A.   Yes.

11  Q.   Let's start with Langley first.  When has he

12       made that statement to you?

13  A.   I can't tell you a specific time, but it's been

14       a matter of concern for quite a while that we

15       have not been able to attract and hire

16       minorities into the fire division.

17  Q.   And Lamar has said that to you as well?

18  A.   Yes.

19  Q.   It's your position that the City wants to hire

20       more minorities, but there's been no interest

21       from minorities to be firefighters with the City

22       of Auburn?

23  A.   That's not my testimony.

1   Q.   What is your testimony?

2   A.   We have not -- For one reason or another, either

3        through not getting applications or not being

4        ranked as number one in the selection process or

5        for people -- Well, I've already said lack of

6        applications.

7             It's for those two reasons we've not been

8        able to develop a strong minority presence in

9        the fire division.

10  Q.   Are you familiar with two student firefighters

11       by the name of Jeremy Patterson and William

12       Thompkins?

13  A.   I know them.  I know their names.  I don't know

14       them.

15  Q.   Did they apply for full-time employment with the

16       City of Auburn Fire Department?

17  A.   I don't think they did.

18  Q.   So you don't know one way or the other whether

19       or not they applied with the City of Auburn for

20       full-time employment?

21  A.   One of them did not.

22  Q.   Which one?

23  A.   I want to say it was Thompkins.

87

```
 1              And what was the other?

 2    Q.    Jeremy Patterson.

 3    A.    I don't think Jeremy Patterson applied.

 4    Q.    But Thompkins did?

 5    A.    I don't recall that he did.

 6    Q.    If he did, you'll agree with me he was not

 7          hired, correct?

 8              MR. MORGAN:   Object to the form.

 9    A.    Correct.

10    Q.    Leading up to the battalion chief promotion in

11          May of 2006 when you and Langley and Lamar and

12          the public safety director were discussing that

13          promotion, do you recall any discussion about

14          whether or not the test would make it more

15          difficult for minorities to be promoted to

16          battalion chief?

17    A.    No.

18    Q.    That was not discussed, is that correct, at

19          least when you were present?

20    A.    Not that I recall.

21    Q.    Do you recall any discussion among those

22          individuals and you about whether or not the

23          test would make it more difficult for the older
```

88

1          members of the fire department to be promoted to

2          battalion chief?

3     A.   I think there was some discussion that the way

4          the test was structured, which incorporated

5          situational judgment questions, that that would

6          help employees that had been with the

7          organization longer to exercise that knowledge

8          that they had gained based on experience and

9          familiarity with the policies, that that would

10         give -- that that would help them in the testing

11         process.

12    Q.   So your testimony is that y'all had some

13         discussions about how the test would actually

14         help the older members of the fire department;

15         is that correct?

16    A.   Actually, I think that was something that CWH

17         told us.

18    Q.   Well, my question was:  Do you recall any

19         discussions between you and those gentlemen

20         about whether or not the test requirement would

21         make it more difficult for the older members of

22         the department to receive that promotion?

23              MR. MORGAN:  Object to the form.

89

1    A.    No.

2    Q.    You don't recall?

3    A.    No.

4    Q.    Do you recall the education levels of the four

5          individuals that received the battalion chief

6          promotion?

7    A.    I think I do.

8    Q.    Can you tell me?

9    A.    I think they've all got college degrees.

10   Q.    Are you aware of whether Mr. Ogletree and

11         Mr. Stephens had college degrees at the time

12         they applied for battalion chief promotion?

13   A.    I don't think that they had completed their

14         college education.

15   Q.    Had they been out of school -- formal school for

16         a much longer period than the individuals that

17         were promoted to battalion chief to your

18         knowledge?

19   A.    To my knowledge, yes.

20   Q.    Do you agree with me that someone who is closer

21         to being out of school than further away from

22         being out of school might be a better test

23         taker?

90

1              MR. MORGAN:  Object to the form.

2   Q.   Standard test taker?

3              MR. MORGAN:  Object to the form.

4   A.   That would seem plausible.

5   Q.   Will you agree with me that the individuals who

6        had been out of school for a lesser period of

7        time than the older individuals had an advantage

8        in taking the cutoff test for the battalion

9        chief promotion?

10             MR. MORGAN:  Object to the form.

11  A.   No.

12  Q.   You would not agree with that?

13  A.   No.

14  Q.   Would you agree with me that someone with a

15       college education would have an advantage over

16       someone without a college education in taking

17       the cutoff score test for battalion chief

18       promotion?

19             MR. MORGAN:  Object to the form.

20  A.   Not based on a cutoff score.

21  Q.   Well, just the test, then.

22  A.   I think that they would --

23             MR. MORGAN:  Object to the form.

91

```
1   A.      -- it's logical that somebody that has more
2           formal education is going to do better on a
3           test.  And all of our employees have abundant
4           opportunities to pursue education through the
5           tuition reimbursement program, in particular,
6           through courses that we send them to for
7           training.
8                   MR. MORGAN:  Can we take another quick
9                       break?
10                  MR. HORSLEY:  Yeah.
11                  (Brief recess.)
12  Q.      (Continuing by Mr. Horsley)  We've talked about
13          the order of approving settlement agreement,
14          Plaintiff's Exhibit 3, and you've read it.  Will
15          you agree with me that at least for a period of
16          time, however long that was, the City did use
17          this settlement agreement pursuant to its
18          policies and procedures with regard to hiring
19          minorities?
20                  MR. MORGAN:  Object to the form.
21  Q.      Is that correct?
22  A.      Yes.  To any hiring.
23  Q.      To any hiring.
```

92

1          So this document was something that the City

2      had and looked at and used, correct?

3              MR. MORGAN:  Object to the form.

4   A.   For the promotions --

5              MR. MORGAN:  Is there a special

6                  provision in there on hiring?

7              MR. HORSLEY:  He said it.

8   A.   In regard to the promotion processes for

9      lieutenant and captain.

10              MR. MORGAN:  Object to the form.

11  Q.   Will you agree with me that the promotional

12      process for battalion chief in May of '06

13      consisted of the following:  It consisted of a

14      cutoff test and then the exercises that were

15      implemented by CWH, and that was essentially it;

16      is that correct?

17              MR. MORGAN:  Why do we keep using May

18                  of '06?  Didn't they take this

19                  written test in April?

20  Q.   Didn't the promotion occur in May?  If I've used

21      May incorrectly, I stand corrected.

22  A.   I don't remember the exact date.

23  Q.   We're talking about the battalion chief

93

```
1              promotion in '06.  Okay?
2     A.       Okay.
3     Q.       The process, you'll agree with me, did not
4              include the consideration of seniority, correct?
5     A.       Correct.
6     Q.       It didn't include the consideration of time in
7              grade, correct?
8     A.       Correct.
9     Q.       It didn't include the consideration of work
10             experience, correct?
11                  MR. MORGAN:  Object to the form.
12    A.       Not directly.
13    Q.       It included essentially a cutoff test that was
14             the first thing you had to do in order to be
15             considered to be promoted to battalion chief,
16             correct?
17                  MR. MORGAN:  Object to the form.
18    A.       It utilized a job-related test with a cutoff
19             score to advance further in the process.
20    Q.       And you'll agree with me that that was the first
21             step in the process.  And if you did not pass
22             that test, you were not allowed to progress in
23             the process regardless of seniority, regardless
```

94

```
 1          of work experience, regardless of time in grade,

 2          correct?

 3                    MR. MORGAN:  Object to the form.

 4     Q.   Is that correct?

 5                    MR. MORGAN:  Object to the form.

 6     A.   It is correct.

 7     Q.   That process -- Who developed that process to

 8          your knowledge?

 9     A.   The overall process?

10     Q.   Uh-huh (positive response).  The process y'all

11          used for that specific promotion.

12     A.   That process was developed by CWH in

13          consultation with the City of Auburn, the

14          employees that you've listed there.

15     Q.   Do you know if that process itself, the entire

16          process, for the promotion has ever been

17          scientifically validated to not have a disparate

18          or negative impact on Afro-Americans?

19                    MR. MORGAN:  Object to the form.

20     A.   That particular process could not --

21                    MR. MORGAN:  Go ahead.  I object to

22                    the form.  You go ahead.

23     A.   That particular process could not have been
```

95

1      scientifically validated because it had not been

2      done.  However, it used the EEOC uniform

3      guidelines and other professional standards of

4      test development such that there was assurance

5      that it had content -- that it was content

6      validated.

7   Q.  You're talking about the test itself.

8   A.  I'm talking about the test itself.

9   Q.  We're not exactly on the same page.  I'm talking

10      about the entire process for the promotion of

11      battalion chief.  The test was a component of

12      that.  You'll agree with me, correct?

13  A.  Correct.

14  Q.  And the test may have been scientifically

15      validated by CWH, correct?

16  A.  Correct.

17  Q.  What I'm asking you is:  Did the City of Auburn

18      take the entire process with the test as a

19      component of that process and have it

20      scientifically validated not to have a disparate

21      impact on Afro-Americans?

22          MR. MORGAN:  Object to the form.

23  A.  Let me try to answer that in this way.  CWH

96

```
 1        represents in their literature that their

 2        process results in valid job-related

 3        selections.  That particular process could not

 4        have been after the fact -- Well, any analysis

 5        of it in terms of adverse impact would occur

 6        after the fact so it could not have been done

 7        before the fact.  But following professional

 8        standards of test development and CWH's

 9        representation that the exercises are a neutral

10        job-related method of making selections, I would

11        say that it was scientifically validated.

12   Q.   Just so we're clear, you understand what I'm

13        saying when I say disparate impact; is that

14        correct?

15   A.   I do.

16   Q.   But you've already testified that the City made

17        the ultimate decision about having the test as

18        the first factor of the process and the cutoff

19        score, correct?

20                 MR. MORGAN:  Wait a minute.  Here's

21                 the problem.  You've asked him the

22                 question about the entire process,

23                 and then when he answered it, you
```

1        corrected him and asked him, no,

2        you're looking at the entire

3        process.  He's now answered the

4        question about the entire process,

5        but now you're going back as if

6        somehow the written test is

7        supposed to be treated differently

8        in terms of the validation.

9            MR. HORSLEY:  Randall, just let me ask

10           my question.  I didn't tell you to

11           ask you my guys questions in a

12           certain way.

13           MR. MORGAN:  I know that, but, I

14           mean --

15           MR. HORSELY:  Come on.

16           MR. MORGAN:  Object to the form.

17   Q.   My question is:  Didn't you already testify that

18        the City made the decision about the cutoff

19        score on the test and that the test would be the

20        first step in the process and that you could not

21        go past the first step if you failed the test?

22        Did the City make that decision?

23           MR. MORGAN:  Object to the form.

98

1    A.    Yes.

2    Q.    So my question is:  Has it been scientifically

3          validated by the City that that process does not

4          have a disparate impact on Afro-Americans, that

5          the test be given first, if you don't meet the

6          cutoff, you don't progress and then nothing else

7          is considered?

8                 MR. MORGAN:  Object to the form.

9    A.    We were relying on our consultant to advise us

10         in that regard.

11    Q.    And who was that?

12    A.    CWH.

13    Q.    Is it your testimony that CWH informed you that

14         if the test were done first without a cutoff

15         score, you could not progress past the test if

16         you failed, that that had been scientifically

17         validated not to have a disparate impact on

18         Afro-Americans?

19                 MR. MORGAN:  Object to the form.

20    Q.    Your testimony is that's what CWH told the City

21         of Auburn?

22                 MR. MORGAN:  Object to the form.

23    A.    I'm sorry.  Repeat the question.

99

1   Q.   I think you just testified that your consultant

2        CWH advised the City of Auburn that if you

3        conducted the test as the first factor in the

4        process with a cutoff score and that you could

5        not progress past the test if you failed it had

6        been scientifically validated to not have a

7        disparate impact on black applicants?

8               MR. MORGAN:  Object to the form.

9   Q.   Did they tell you that?

10              MR. MORGAN:  Object to the form.

11  A.   They told us that the process that they use

12       using subject matter experts to develop the

13       written test was a neutral job-related,

14       content-validated approach recognized in

15       professional standards as the appropriate way to

16       develop a test which is neutral.

17  Q.   But they didn't tell you that using the test as

18       the first factor with a cutoff score was neutral

19       or did not have a disparate impact on

20       Afro-Americans, did they?

21              MR. MORGAN:  Object to the form.

22  A.   They did not tell us that the test would have

23       adverse impact.

100

1    Q.    Would not -- What I'm asking you is:  Did they

2          tell you the test would not have -- the whole

3          process of using the test first with a cutoff

4          score would not have an adverse or a disparate

5          impact on Afro-Americans?  Did they tell you

6          that?

7                 MR. MORGAN:  Object to the form.

8    A.    They did not tell us that it would have adverse

9          impact.

10   Q.    You're not hearing my question.  Did they tell

11         you it would not have an adverse impact?

12                MR. MORGAN:  Object to the form.

13   A.    I guess you're using a double negative in here.

14   Q.    Well, let me repeat it just so we're clear.

15               Did CWH advise the City that if you used the

16         test as the first factor in the promotional

17         process with a cutoff score beyond which you

18         could not go if you failed, that that process

19         would not have a disparate impact on

20         Afro-American applicants?

21                MR. MORGAN:  Object to the form.

22   A.    They did not tell us that using the test as a

23         cutoff would not have adverse impact because it

101

1        was designed as a neutral test.

2  Q.    That's all my question was, and you just

3        answered it.  They did not tell you that,

4        correct?

5            MR. MORGAN:  Object to the form.

6  Q.    You answered yes.

7  A.    Why would they?

8  Q.    And you'll agree with me that the promotional

9        process that the City of Auburn used with the

10       test as a component of that process caused the

11       only black applicants not to receive the

12       promotion, correct?

13           MR. MORGAN:  Object to the form.

14  A.    They and four others.  Four whites did not

15       advance beyond that level.

16  Q.    And how many white applicants were there for

17       that battalion chief promotion to your

18       knowledge?

19  A.    Nine.

20  Q.    Nine?

21  A.    No.  I'm sorry.  There were nine that sat for

22       it.  I think there were eleven that applied.

23  Q.    Is it your testimony that four white applicants

102

```
1           did not pass the test?

2    A.     That is my testimony.

3    Q.     And seven white applicants passed the test; is

4           that correct?

5    A.     Five.

6    Q.     Five passed the test?

7    A.     (Witness nods head positively.)

8    Q.     So there were nine white applicants total.  I

9           thought you said eleven.

10   A.     There were eleven white applicants.  There were

11          two white applicants that opted out before the

12          test.

13   Q.     Okay.  So nine whites took the test.  Four of

14          them failed it, correct?

15   A.     Correct.

16   Q.     And you'll agree with me that three

17          Afro-Americans took the test and failed it,

18          correct?

19   A.     Correct.

20   Q.     The only three applicants for battalion chief --

21          The only three Afro-American battalion chief

22          applicants did not make it through the process

23          that the City developed for the battalion chief
```

1    promotion, correct?

2                    MR. MORGAN:  Object to the form.  The

3                        City didn't develop it.  Object to

4                        the form.  I'm sorry.

5    A.   They did not make it through the test.

6    Q.   They didn't make it through the process,

7         correct?

8    A.   Correct.

9    Q.   Are you aware that the only black firemen hired

10        by the City of Auburn Fire Department since 1991

11        are Chris Turner, Gerald Stephens, Kevin Harper,

12        and Rod Torbert?

13                   MR. MORGAN:  Object to the form.

14   A.   I'm aware that two of them were:  Chris and

15        Gerald.

16   Q.   Do you have any information at your disposal

17        that would indicate more Afro-Americans than

18        those I just named have been hired by the fire

19        department?

20   A.   Probably.

21   Q.   You do?

22   A.   Yeah.

23   Q.   Can you tell me who they are or are you saying

1     you could get that information?

2  A.   I'm sure we've got that information.

3  Q.   And you believe that more have been hired by the

4     City of Auburn Fire Department?

5  A.   Including in the student firefighter program,

6     yes.

7  Q.   But not including the student firefighter

8     program.

9  A.   I don't know about those last two.

10  Q.   Do you know how many white firemen have been

11     hired by the City of Auburn since 1991?

12  A.   No.

13  Q.   Do you have an estimate?

14  A.   Regular or student?

15  Q.   Regular.

16  A.   This is a very rough estimate.  Probably 20.

17  Q.   Could the City provide records to us of that

18     number?

19  A.   We can try.

20             MR. MORGAN:  Well, let me -- you can

21                 submit a request and we can

22                 respond to it.

23  Q.   You said a rough estimate would be 20, correct?

1    A.    A very rough estimate.

2    Q.    Could be more?  Could be less?

3    A.    Yes.

4    Q.    You're referring to the student firefighters,

5          and I guess your indication is there have been a

6          number of Afro-Americans hired into the student

7          firefighter program, correct?

8    A.    Correct.

9    Q.    Are you aware of one Afro-American student

10         firefighter that's been hired by the City of

11         Auburn as a full-time firefighter since 1991?

12                    MR. MORGAN:  Object to the form.

13   A.    I think one.

14   Q.    Who?

15   A.    If I'm not mistaken, Gerald was a student

16         firefighter.

17   Q.    Gerald Stephens?

18   A.    Yes.

19   Q.    Other than Mr. Stephens, who has been hired to

20         your knowledge out of the student firefighter

21         program?

22   A.    I couldn't say.

23   Q.    What does the student firefighter program do in

| | | |
|---|---|---|
| 1 | | order to attract minority applicants in the City |
| 2 | | of Auburn? |
| 3 | A. | Thank you for asking that question. |
| 4 | Q. | Uh-huh (positive response). |
| 5 | A. | The City of Auburn is very aggressive in its |
| 6 | | recruitment process.  We cast a very wide net |
| 7 | | such that anybody that wants to know of a job |
| 8 | | with the City of Auburn can easily find out |
| 9 | | about that.  Specifically in terms of recruiting |
| 10 | | minorities to the student firefighter program, |
| 11 | | we recruit through the State Employment Office, |
| 12 | | through the City's Web site, through four or |
| 13 | | five traditionally black colleges, through a |
| 14 | | dozen or so black churches, through -- At one |
| 15 | | time we sent literature to every high school in |
| 16 | | the state informing them about the student |
| 17 | | program.  More recently we've sent literature -- |
| 18 | | contacted every high school within a 50 to 60 |
| 19 | | mile range.  We have participated in career days |
| 20 | | at those high schools.  Much of this has been an |
| 21 | | effort to reach out to minorities and let them |
| 22 | | know of our programs so that we can get them |
| 23 | | into the student program.  And ultimately |

1    because our student program does act as a feeder

2    into our career program because of the education

3    and the experience that the student firefighters

4    have, they become -- they are very competitive

5    with outside applicants for career firefighter

6    positions and so we try to get them into the

7    student program so they'll be successful when

8    they apply for the career positions.  So we cast

9    a very wide net, and we've been very aggressive

10   with that.

11  Q.   And, again, other than Gerald Stephens, you're

12       not aware of any student fire -- minority

13       student firefighter hired full-time by the City

14       of Auburn since 1990, correct?

15  A.   That's correct.

16  Q.   Do you know who drafted Plaintiff's Exhibits 7

17       and 8, who authored those exhibits?

18  A.   Yes.

19  Q.   Who?

20  A.   Me.  It was also reviewed by -- After I drafted

21       them, it was reviewed by the city attorney, and

22       I suspect that public safety employees were also

23       involved in that review.  But I drafted it.

108

1    Q.    Do you agree with me that if the battalion chief

2          test with a cutoff score had not been used --

3          specifically with a cutoff score had not been

4          used as a part of the battalion chief promotion

5          that Gerald Stephens and Eddie Ogletree would

6          have had a better opportunity to receive the

7          battalion chief promotion?

8                    MR. MORGAN:  Object to the form.

9    A.    I don't know that.

10   Q.    Are you aware or have you been told by any chief

11         or any other employee with the City of Auburn

12         that there were other factors in that

13         promotional process that they thought would have

14         hindered Mr. Ogletree or Mr. Stephens pursuant

15         to that promotion?

16                   MR. MORGAN:  Object to the form.

17   A.    No.

18   Q.    And just so I'm clear -- and I'm going to take a

19         little break, and I may be through -- your

20         position and the City of Auburn's position back

21         in February of '06 and until today is that the

22         1991 order in the Hammock case is no longer in

23         effect and was not in effect back in 2006,

1    correct?

2                    MR. MORGAN:  Object to the form.  Go

3                        ahead.

4    A.    I would say that's true in regard to utilization

5          of the selection procedure for lieutenant.

6    Q.    What about captain?

7                    MR. MORGAN:  Object to the form.

8    Q.    Let me ask you this.  Isn't it true that the

9          title change from captain to shift commander --

10             Is that right?

11   A.    Yes.

12   Q.    -- relieved the City of any requirements

13         pursuant to this order with regard to the

14         captain promotion?

15                   MR. MORGAN:  Object to the form.

16   A.    I don't think the City looked at it that way.

17   Q.    Well --

18   A.    I think the City saw that as just a title

19         change, and they were still abiding by this

20         agreement.

21   Q.    Still abiding by this agreement when?  At what

22         time?

23   A.    When shift commander became a job title used in

110

1       the fire division.

2   Q.  And that was in the early to mid-'90s, correct?

3   A.  Somewhere in there.

4                   MR. HORSLEY:  Let's take a little

5                       break.

6                   (Brief recess.)

7                   MR. HORSLEY:  On the record we need to

8                       state we are missing Exhibit 6.

9                       There was no document marked as

10                      Exhibit 6.

11  Q.  I'm going to get you to identify several

12      things.

13                  (Brief off-the-record discussion.)

14                  MR. HORSLEY:  I will mark what I'm

15                      about to offer as Exhibit 6.

16                  (Plaintiff's Exhibit 6 marked for

17                      identification.)

18  Q.  This is a document that was produced to us in

19      the initial disclosures in this case.  Can you

20      simply identify that for me?

21                  (Brief off-the-record discussion.)

22  Q.  Can you identify it for me?

23  A.  This is entitled City of Auburn Pay Table

111

1        Beginning October 1, 2005.

2   Q.   And --

3   A.   And at the bottom it says:  Pay table FY 2006.

4   Q.   Is that -- What does that mean?

5   A.   That means that that was the pay table for the

6        classified employees of the City of Auburn in

7        effect for fiscal year 2006, which began October

8        1, 2005.

9                 (Plaintiff's Exhibits 10 & 11 marked

10                     for identification.)

11  Q.   Let me show you what I've marked as Plaintiff's

12       Exhibits 10 and 11, which are Notice of Right to

13       Sue letters and determinations issued by the

14       U.S. Equal Employment Opportunity Commission

15       which I believe were both sent to the City of

16       Auburn.  And I'll just ask you if you've ever

17       seen both of those documents.

18             MR. MORGAN:  I see what they are, but

19                 are you representing that the

20                 determination went with the right

21                 to sue letter?

22             MR. HORSLEY:  I believe it did.

23             MR. MORGAN:  I'm going to object to

112

1               the form.

2                         MR. HORSLEY:  This is how I have the

3                         documents in my file.  I may be

4                         wrong.

5                         MR. MORGAN:  All right.  I'm going to

6                         object to the form.

7                         MR. HORSLEY:  That's fine.

8    Q.   Have you seen all these documents previously?

9    A.   I think so.

10   Q.   My question is:  Before the determinations were

11        sent to the City of Auburn, did you participate

12        in the City of Auburn's response to the EEOC

13        claims made by Stephens and Ogletree?

14   A.   I did.

15   Q.   And did you do that with Mr. Umbach?

16   A.   I did.

17   Q.   Did anybody else with the City to your knowledge

18        participate in the City's response to those

19        charges?

20   A.   Yeah.  I believe others at this table

21        participated in that and others that are not at

22        this table, including CWH.

23   Q.   Who actually drafted the responses?

```
 1    A.    I think it was -- it came out of our city

 2          attorney's office.  I don't know who drafted it.

 3    Q.    Around Umbach?

 4    A.    It came from his office.

 5                    (Plaintiff's Exhibit 12 marked for

 6                       identification.)

 7    Q.    What I have marked as 12 are your response to

 8          our interrogatories.

 9                    MR. HORSELY:  And, Randall, you may

10                       have sent them to me and I haven't

11                       seen them in my mass of

12                       documents.  But I don't think I

13                       have a signed copy yet.

14                    MR. MORGAN:  Okay.  I'll check on

15                       that.

16                    MR. HORSLEY:  If you've already sent

17                       them, just tell me and I'll try to

18                       find them.  But I assume nothing

19                       has changed.

20    Q.    Can you identify Plaintiff's Exhibit 12?

21                    (Brief off-the-record discussion.)

22    A.    You asked me to identify this document:  Stephen

23          A. Reeves' Responses to Plaintiff's First Set of
```

114

```
 1          Interrogatories.
 2     Q.   Is that an accurate copy of your responses to my
 3          interrogatories as best you can tell?
 4     A.   As best I can tell.
 5     Q.   Have you ever read those before today?
 6     A.   I think I did.
 7     Q.   Do you recall signing them and getting your
 8          signature notarized?  It's not on that document,
 9          but do you know if you've done that yet?
10     A.   I don't recall notary -- What I do recall is
11          that the City developed responses.  That's what
12          stands out in my mind more so than this
13          document.
14     Q.   But those are your individual responses.  At
15          some point you're going to have to sign
16          responses, and what I'm trying to get at is:
17          Are those going to be the responses that you
18          sign or is there going to be something that's
19          changed or different before you sign them or do
20          you know?
21     A.   I don't know, but I have no reason to believe
22          that I would make any changes.
23     Q.   As far as you know, these are your responses to
```

115

1          the interrogatories that -- these are going to

2          be your sworn responses to my interrogatories?

3  A.    As far as I know.

4  Q.    Are you aware that Lieutenant Stephens requested

5          of Langley to have his lieutenant's title

6          changed to that of captain at some point?

7  A.    I'm not aware of that.

8  Q.    So you're not aware that that request was

9          denied?

10  A.    I've never heard that.

11             MR. HORSLEY:  That's all I have.

12             Thank you.

13             MR. HANCOCK:  I've got just a couple

14             of questions.  I'll go ahead and

15             knock them out.

16              **EXAMINATION**

17 BY MR. HANCOCK:

18  Q.    Mr. Reeves, the City of Auburn does not contend

19          that CWH's batching test had a disparate impact

20          on test takers, does it?

21  A.    Not being a statistician, I don't think you can

22          establish disparate impact with such a small

23          population.

116

1   Q.   I'm not asking about the statistical

2       significance of the pool of test takers.  I'm

3       asking whether Auburn takes the position that

4       the test itself had a disparate impact on those

5       who took the test.

6   A.   We take the position that it didn't.

7   Q.   Do you recall that CWH recommended that no

8       cutoff score be applied, that the City not use a

9       cutoff score of any number?

10  A.   I don't recall -- There was a lot of discussion

11      about cutoff score.  In fact, in the literature

12      from CWH, it says some tests use a cutoff

13      score.  We discussed that quite extensively with

14      CWH.  We partnered with them through this

15      process, and there was a lot of back-and-forth

16      discussion.  And ultimately the decision was we

17      would use a cutoff score as part of the

18      process -- the overall process.

19  Q.   I understand that was the City's ultimate

20      decision.  My question is:  Do you recall that

21      CWH recommended that a cutoff score not be

22      used?  Let me ask it maybe a different way.

23         Do you recall that CWH recommended that all

117

1          applicants be allowed to proceed through the

2          assessment center notwithstanding their test

3          score?

4     A.   At one time they actually recommended that only

5          the top twelve finishers go through.

6     Q.   That ultimately was not the City's decision,

7          though, right?

8     A.   No.  Ultimately the City's decision was that

9          anybody that passed the 70 percent threshold

10         would move forward in the process.

11    Q.   And it was the City's decision not to allow

12         those who didn't score 70 or higher on the test

13         to proceed to the assessment center; is that

14         correct?

15    A.   As I've said before, that was the decision made

16         collectively with CWH as our consultant.

17    Q.   CWH was the consultant, but it had no decisional

18         authority in the decision, did it?

19              MR. MORGAN:  Object to the form.

20    A.   Ultimately, if you want to say who had the final

21         authority on a cutoff score, it would have been

22         the City of Auburn.

23    Q.   CWH couldn't make any decision at all.  All it

118

1   could do is offer advice; is that correct?

2      MR. MORGAN:  Object to the form.

3 A. Correct.

4 Q. If CWH were to take the position that it

5   recommended that all applicants be allowed to

6   proceed to the assessment center regardless of

7   score and that the test score be but one

8   component of the ultimate decision, would you

9   dispute that contention?

10      MR. MORGAN:  Object to the form.

11 A. Yes.

12 Q. Why?

13 A. Part of the discussion included CWH, Michael

14   Blair, expressing the opinion that somebody that

15   did poorly on the test would find the assessment

16   center process demoralizing or humiliating.

17 Q. I'm not sure that answers my question, though.

18 A. Would you ask the question again, please?

19      MR. HANCOCK:  Would you read it back

20       to him, please?

21      (The immediately preceding question

22       was read back by the court

23       reporter.)

119

1    A.    I can only say that there was a lot of
2          back-and-forth discussion, and I don't know if
3          they actually said that we should not have a
4          cutoff score and that everyone should
5          participate.
6    Q.    So Auburn's position is that there was
7          discussion back and forth, but it couldn't
8          dispute the assertion by CWH that CWH
9          recommended that all applicants be allowed to
10         proceed through the assessment center
11         notwithstanding their test score?
12                   MR. MORGAN:    Object to the form of the
13                       question.
14   A.    My position is that we partnered with CWH to
15         guide us through a process, and we listened very
16         carefully to their recommendations.  There was a
17         lot of discussion about whether or not to use a
18         cutoff score.  And ultimately, in conjunction
19         with CWH, a cutoff score was determined.
20         Whether or not CWH advised us flat-out not to
21         use a cutoff score, I don't recall that.
22   Q.    You don't recall one way or the other?
23   A.    I don't recall that they flat-out said don't use

120

1          a cutoff score.

2     Q.    Do you remember them urging the City not to use

3          a cutoff score?

4                    MR. MORGAN:   Object to the form.

5     Q.    Pardon me.  Do you recall that CWH recommended

6          that Auburn not use a cutoff score?

7     A.    I don't recall that.  Again, there was a lot of

8          conversation back and forth, and we talked about

9          letting the score stand as it was and being a

10         part of the final score as it was -- ultimately

11         the test was a part of the final score at the

12         end of the process or to -- or not to have a

13         cutoff score.  I just -- There was a lot of

14         discussion about that, and ultimately we decided

15         that in the tradition of the fire service and in

16         being consistent with other testing processes

17         that the City had done that the cutoff score was

18         an appropriate thing for us to use on the

19         written test.

20    Q.    It was Lee Lamar who first suggested a 70 cutoff

21         score, wasn't it?

22    A.    I can't say he was the first one to say that.

23         Again, that's something in the CWH literature.

1   Q.   Well, CWH never recommended that the City use a

2         cutoff score of 70, did it?

3   A.   Actually, in the assessment -- in the exercises

4         portion of the whole process, they did.

5   Q.   I'm talking about the test.

6   A.   I don't know that they said one way or the

7         other.  I mean, I couldn't say that they said 70

8         percent.

9   Q.   Is it Auburn's position that CWH ever recommend

10        that a cutoff score be used with regard to the

11        test -- the written test?

12               MR. MORGAN:  Object to the form.

13   A.   They told us that some clients use a cutoff

14         score and some clients don't.  I'm sorry I'm not

15         answering the question.

16   Q.   Right.  Because in point of fact, CWH never

17        recommended that the City of Auburn use a cutoff

18        score.

19               MR. MORGAN:  Object to the form.

20               Asked and answered.

21   A.   I don't think they -- Through those discussions

22         they didn't say it was wrong to do so.

23   Q.   But they never said it was right and appropriate

1        to.  They said some clients use a cutoff and

2        others don't?

3               MR. MORGAN:  Object to the form.

4  A.   And what would we take from that?

5  Q.   Well, ultimately it was the City of Auburn and

6        not CWH that decided to use a cutoff score; is

7        that correct?

8  A.   Yes.

9  Q.   And it was the City of Auburn and not CWH that

10       decided that the cutoff score would be 70; is

11       that correct?

12              MR. MORGAN:  Object to the form.

13  A.   Yes.

14  Q.   And it's the City's position that the

15       utilization of the written test with a cutoff

16       score of 70 did not have an adverse impact on

17       applicants or test takers; is that correct?

18  A.   Correct.

19             MR. HANCOCK:  I don't have anything

20             else.

21             MR. HORSLEY:  One other question.

22                   **EXAMINATION**

23 BY MR. HORSLEY:

123

Q.    The battalion chief promotion in 2006 was the
      first time the City had ever implemented a test
      with a cutoff score for a promotion; is that
      correct?

            MR. MORGAN:  Object to the form.

A.    Not correct.

Q.    When was it done before?

A.    It was used for team leader in 2005.

Q.    Team leader in 2005.

            And who was the company that implemented or
      did the test?

A.    We utilized a test that was developed by the
      International Public Management Association.

Q.    And that was for promotions to team leader?

A.    To company officer, parenthesis, lieutenant, or
      maybe it's the other way around.  It's the
      company officer level position.

Q.    And that was in 2005?

A.    That's correct.

Q.    And it's your testimony that the City used a
      test with a cutoff score as their first factor
      in that promotional process; if you didn't meet
      the cutoff score, you did not go forward?

124

```
 1   A.    That's my recollection.

 2   Q.    And who to your knowledge applied for that

 3         promotion?

 4   A.    I don't remember.  I think I want to say David

 5         Hines was the one that was promoted from that

 6         process, but I don't remember who all applied

 7         for it.

 8   Q.    Do you recall what African-Americans, if any,

 9         applied for that promotion?

10   A.    I think Chris Turner applied for that.

11   Q.    Did he take the test?

12   A.    I think he did.

13   Q.    Did he pass it?

14   A.    He did not.

15   Q.    What was the cutoff score on that test?

16   A.    I recall that it was 70 percent.

17   Q.    Who decided to have a test with a cutoff score

18         of 70 on that occasion?

19   A.    I don't know.  Maybe I should say I don't

20         recall.

21   Q.    Was the battalion chief promotion the first time

22         that the City had ever implemented a test with a

23         cutoff score for any position -- for promotion
```

1       to any position above team leader?

2                MR. MORGAN:  Object to the form.

3  A.  Are you asking if we had ever used a test with a

4      cutoff score for the battalion level job?

5  Q.  Yes.

6  A.  No.

7  Q.  Okay.

8  A.  Not to my knowledge.

9  Q.  Is it Chief Lamar now?

10  A.  Yes.

11  Q.  Was Chief Lamar required to take a test with a

12      cutoff score in order to be promoted to chief?

13  A.  No.

14  Q.  Was that a position that people could apply for?

15  A.  The city manager made an appointment to the

16      unclassified service.  The fire chief, the

17      police chief, the department heads are in the

18      unclassified service.  They are not covered by

19      the personnel policies of the City of Auburn.

20      They serve strictly at the will of the city

21      manager.  He was appointed to that position.

22  Q.  What about -- What was his job before he was

23      deputy chief?

1    A.    Before he was deputy chief, he was team leader.

2    Q.    He was a team leader?

3    A.    I'm sorry.  He was the training officer.

4    Q.    Training officer.  And he was promoted from

5          training officer to deputy chief; is that

6          correct?

7    A.    Correct.

8    Q.    Did that promotion require an assessment center?

9    A.    No, not that I recall.

10   Q.    Was he required to take any type of test?

11   A.    I think there were interviews.

12   Q.    Do you recall who else interviewed for that

13         position?

14   A.    I don't.

15   Q.    Will you agree with me that Chief Lamar was

16         promoted to chief based on experience and

17         seniority?

18                MR. MORGAN:  Object to the form.

19   A.    No.

20   Q.    You would not?

21   A.    No.

22   Q.    What were the circumstances of that promotion?

23                MR. MORGAN:  Object to the form.

127

1    A.    It wasn't my decision.

2    Q.    Do you know why he was promoted to that

3          position?

4    A.    I assume because he was doing a good job as

5          acting chief.

6    Q.    His experience and his job history with the City

7          of Auburn allowed for him to get that

8          promotion.  Would you agree with that?

9                MR. MORGAN:  Object to the form.

10               He's asked and answered.

11   A.    The skill set -- From an HR perspective, the

12         skill set that Lee Lamar brought to the table

13         combined with education and his experience as a

14         fire officer enabled him to succeed as the

15         acting chief.  And I would presume -- I'm not

16         speaking for my city manager, but I'm assuming

17         my city manager took that into consideration

18         when he made the appointment.

19               MR. HORSLEY:  That's all.  Thank

20               you.

21               (Deposition concluded at

22               approximately 12:30 p.m.)

23               * * * * * * * * * * * *

1          FURTHER DEPONENT SAITH NOT

2          * * * * * * * * * * * *

3              REPORTER'S CERTIFICATE

4  STATE OF ALABAMA:

5  MONTGOMERY COUNTY:

6          I, Pamela A. Wilbanks, CCR, Registered

7  Professional Reporter, and Commissioner for the State

8  of Alabama at Large, do hereby certify that I reported

9  the deposition of:

10             STEVEN A. REEVES

11 who was first duly sworn by me to speak the truth, the

12 whole truth and nothing but the truth, in the matter

13 of:

14             EDDIE OGLETREE, an individual,

15             GERALD STEPHENS, an

16             individual,

17             Plaintiffs,

18             Vs.

19             CITY OF AUBURN, a municipality

20             in the State of Alabama, LARRY

21             LANGLEY, and individual, LEE LAMAR,

22             an individual, BILL HAM, JR., an

23             individual, STEVEN A. REEVES, an

1          individual, BILL JAMES, an

2          individual, CHARLES M. DUGGAN, an

3          individual, and CORTEZ LAWRENCE,

4          an individual,

5          Defendants.

6          In The U.S. District Court

7          For the Middle District of Alabama

8          Eastern Division

9          3:07-CV-867-WKW

10 on Wednesday, July 30, 2008.

11          The foregoing 128 computer printed pages

12 contain a true and correct transcript of the

13 examination of said witness by counsel for the parties

14 set out herein.  The reading and signing of same is

15 hereby not waived.

16          I further certify that I am neither of kin nor

17 of counsel to the parties to said cause nor in any

18 manner interested in the results thereof.

19          This 5th day of August 2008.

20

21

22

23

130

ORIGINAL

1

2

3

4

5

*Pamela A. Wilbanks (M. M. C.)*

Pamela A. Wilbanks, ACCR #334

6    Expiration Date:  9-30-2008
Registered Professional Reporter

7    and Commissioner for the State
of Alabama at Large

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# DEPOSITION TESTIMONY OF
# LEE LAMAR

ORIGINAL 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
5   individual,

6          Plaintiffs,

7   Vs.                              CIVIL ACTION NO.
                                     3:07-CV-867-WKW
8
    CITY OF AUBURN, a municipality
9   in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
10  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
11  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
12  individual, and CORTEZ LAWRENCE,
    an individual,
13
           Defendants.
14
                    * * * * * * * * * * *
15

16          **DEPOSITION OF LEE Y. LAMAR, JR.**, taken pursuant

17  to stipulation and agreement before Pamela A. Wilbanks,

18  Certified Court Reporter, ACCR# 391, Registered

19  Professional Reporter and Commissioner for the State of

20  Alabama at Large, in the Conference Room of Auburn City

21  Hall, 144 Tichenor Avenue, Auburn, Alabama, on

22  Wednesday, July 30, 2008, commencing at approximately

23  2:50 p.m.

                                                                        2

 1

 2                            **APPEARANCES**

 3

 4   **FOR THE PLAINTIFF:**

 5   Mr. Richard F. Horsley
     KING, HORSLEY & LYONS
 6   Attorneys at Law
     1 Metroplex Drive
 7   Suite 280
     Birmingham, AL   35209
 8
     **FOR THE DEFENDANT:**
 9
     Mr. Randall Morgan
10   HILL, HILL, CARTER, FRANCO, COLE & BLACK
     Attorneys at Law
11   425 South Perry Street
     Montgomery, Alabama
12
     **ALSO PRESENT:**
13
     Mr. D'Arcy Wernette
14   Mr. Steven Reeves
     Mr. Larry Langley
15   Mr. Bill James
     Mr. Eddie Ogletree
16   Mr. Gerald Stephens

17                    * * * * * * * * * * * *

18
                        EXAMINATION INDEX
19
        BY MR. HORSLEY . . . . . . . . . . .    4
20      BY MR. MORGAN . . . . . . . . . . .    38
        BY MR. HORSLEY . . . . . . . . . . .   42
21
                    * * * * * * * * * * * *
22

23

3

1

2                    PLAINTIFF'S EXHIBIT INDEX

3    19    4/28/06 letter to Horace Clanton from Lee        31
            Lamar in response to Mr. Clanton's
4           grievance

5    20    4/28/06 letter to Gerald Stephens from Lee       33
            Lamar in response to Mr. Clanton's
6           grievance

7    21    Two memos regarding the battalion chief          33
            promotion dated 2/17/06 and 2/23/06
8
     22    Chief Langley's answers to interrogatories       41
9
     23    Lee Lamar's answers to interrogatories           41
10

11

12
                           **STIPULATION**
13
          It is hereby stipulated and agreed by and
14
between counsel representing the parties that the
15
deposition of **LEE Y. LAMAR, JR.** is taken pursuant to
16
the Alabama Rules of Civil Procedure and that said
17
deposition may be taken before Pamela A. Wilbanks,
18
Registered Professional Reporter and Commissioner for
19
the State of Alabama at Large, without the formality of
20
a commission, that objections to questions other than
21
objections as to the form of the question need not be
22
made at this time but may be reserved for a ruling at
23
such time as the said deposition may be offered in

4

1  evidence or used for any other purpose by either party

2  provided for by the Statute.

3          It is further stipulated and agreed by and

4  between counsel representing the parties in this case

5  that the filing of said deposition is hereby waived and

6  may be introduced at the trial of this case or used in

7  any other manner by either party hereto provided for by

8  the Statute regardless of the waiving of the filing of

9  the same.

10          It is further stipulated and agreed by and

11  between the parties hereto and the witness that the

12  signature of the witness to this deposition is hereby

13  not waived.

14              * * * * * * * * * * *

15                  **LEE Y. LAMAR, JR.**

16          The witness, after having first been duly

17  sworn to speak the truth, the whole truth and nothing

18  but the truth testified as follows:

19                  **EXAMINATION**

20  **BY MR. HORSLEY:**

21   Q.    Please tell us your full name.

22   A.    Lee Young Lamar, Jr.

23   Q.    We've met before.  I'm going to ask you

5

| 1 | | questions just like everybody else. If you want |
| 2 | | me to rephrase it or repeat it, tell me. |
| 3 | | Otherwise I'll assume you understood and gave |
| 4 | | the answer you intended to give. Okay? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Where do you currently reside? |
| 7 | A. | 566 Lee Road 93, Waverly, Alabama 36879. |
| 8 | Q. | And where are you currently employed? |
| 9 | A. | City of Auburn. |
| 10 | Q. | And you're the City of Auburn fire chief; is |
| 11 | | that correct? |
| 12 | A. | Deputy public safety director fire operations or |
| 13 | | fire chief. |
| 14 | Q. | And that means fire chief? |
| 15 | A. | Yes, sir. |
| 16 | Q. | If I call you fire chief, we'll assume -- that |
| 17 | | means all those titles you just gave us. |
| 18 | | And how long have you been the fire chief? |
| 19 | A. | I was named acting December 1, 2007 and then was |
| 20 | | made permanent July 1, 2008. |
| 21 | Q. | And what were you on December 1 of '07? |
| 22 | A. | Acting. |
| 23 | Q. | And then you became permanent? |

6

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | What process did you go through to go from |
| 3 | | acting fire chief to permanent fire chief? |
| 4 | A. | No specific process.  Mr. James and I discussed |
| 5 | | it, and then I was -- had an appointment with |
| 6 | | Charles Duggan, the city manager.  We discussed |
| 7 | | it, and then he offered the position to me. |
| 8 | Q. | Was that a promotion? |
| 9 | A. | Yes, sir.  From deputy chief. |
| 10 | Q. | And you didn't have to take a test, correct? |
| 11 | A. | No, sir.  Not for that. |
| 12 | Q. | Other than your meeting with Mr. Duggan, did you |
| 13 | | have to give any interviews? |
| 14 | A. | I had to prepare some papers.  They requested |
| 15 | | some papers be written. |
| 16 | Q. | Did you have to go to an assessment center? |
| 17 | A. | No, sir. |
| 18 | Q. | What job did you -- That's when you went from |
| 19 | | acting to permanent? |
| 20 | A. | Yes, sir. |
| 21 | Q. | Before you were acting fire chief, what was your |
| 22 | | position? |
| 23 | A. | Deputy fire chief. |

7

| | | |
|---|---|---|
| 1 | Q. | And what year or when did you go from being |
| 2 | | deputy fire chief to acting fire chief? |
| 3 | A. | 2007. |
| 4 | Q. | And that's when Chief Langley retired? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Tell us what process you had to go through in |
| 7 | | order to become acting fire chief. |
| 8 | A. | I don't recall the specific process.  Before |
| 9 | | Chief Langley retired, Mr. James met with me and |
| 10 | | explained or offered me the opportunity to take |
| 11 | | over as acting. |
| 12 | Q. | Once again, you didn't have to undergo any test, |
| 13 | | correct? |
| 14 | A. | No, sir. |
| 15 | Q. | No formal interviews, correct? |
| 16 | A. | Not that I recall, sir. |
| 17 | Q. | And you didn't have to go to an assessment |
| 18 | | center, correct? |
| 19 | A. | No, sir. |
| 20 | Q. | And before you were deputy chief, what was your |
| 21 | | position? |
| 22 | A. | Before deputy chief? |
| 23 | Q. | Yeah. |

8

```
 1    A.    I --

 2    Q.    Isn't that what we were just talking about to

 3          get to deputy chief?

 4    A.    Well, acting -- from chief to acting -- working

 5          backwards, from chief to acting.  Before acting

 6          I was deputy fire chief.  Before that I was the

 7          training officer for the division.

 8    Q.    I thought I had asked you that, but I guess I

 9          was a step ahead of myself.

10                What process did you go through to become

11          the deputy chief?

12    A.    Interview process.

13    Q.    Who did you interview with?

14    A.    I believe Wendy Hassett, Bill James, Larry

15          Langley, and Steve Reeves were on the interview

16          board that all of the candidates sat before.

17    Q.    Is deputy chief the same thing as training

18          chief?

19    A.    No, sir.  They are different jobs.

20    Q.    Did you hold the job of training chief?

21    A.    I was training officer, yes, sir.

22    Q.    That was before deputy chief?

23    A.    Yes, sir.
```

9

1   Q.   So you interviewed with those people you just

2         mentioned to become deputy chief.  What else did

3         you have to do?

4   A.   It was a competitive interview.  That was all we

5         did.  We submitted resumes and applications, and

6         then they interviewed us and made a selection

7         based on our interview scores.

8   Q.   Did you have to undergo an assessment center?

9   A.   No, sir.

10   Q.   Did you have to take a written test?

11   A.   No, sir.

12   Q.   Who else applied for deputy chief when you did?

13   A.   Within the department -- There were both people

14         from inside and outside the department.  From

15         within the department, I believe Rod Hartsfield,

16         I believe Gerald Stephens, Joey Darby.  I'm not

17         sure who else within the department.  And then

18         there were several people from outside that I

19         would not -- I didn't know.  We weren't privy to

20         those names.

21   Q.   How does that work?  Did they come from some

22         other fire department?

23   A.   Yes, sir.

10

```
 1    Q.    It wasn't just people -- It wasn't just
 2          civilians.  Okay.
 3                Do you have any information today about
 4          Gerald Stephens' interviews for that job?
 5    A.    No, sir.  That would be privileged.
 6    Q.    Was the job of deputy chief actually a posted
 7          job position?
 8    A.    Yes, sir.
 9    Q.    Who ultimately made the decision to promote you
10          to deputy chief?
11    A.    If -- I don't know for sure.  I would imagine if
12          it's like many things, a recommendation by the
13          board was sent to the city manager, and he would
14          have made the appointment.
15    Q.    And was anybody else promoted to deputy chief at
16          the same time?
17    A.    No, sir.
18    Q.    There's only one deputy chief --
19    A.    There's only --
20    Q.    -- in that department?
21    A.    -- one vacancy.  Sorry.
22    Q.    And before deputy chief, what was your position?
23    A.    Training officer for the division.
```

11

```
1    Q.    Training officer?

2    A.    Yes.

3    Q.    And that's different than training chief?

4    A.    The actual job title is training officer on the

5          job description.

6    Q.    So is there such a thing as training chief?

7    A.    People refer to it as that because it's at the

8          same level as the battalion.

9    Q.    So when I said training chief a minute ago, that

10         would be the same thing as training officer; is

11         that correct?

12   A.    Yes, sir.

13   Q.    And how long were you a training officer?

14   A.    I believe it was -- March of 2001 would have

15         been when I moved over from the line to that

16         position.

17   Q.    What do you mean the line?

18   A.    In fire service you have line and staff.  Line

19         personnel are those who work shift and respond

20         to calls directly on a daily basis.  Staff are

21         those who work in administration.  And I moved

22         off the line to take that position.

23   Q.    What was your job title before you became
```

12

1      training chief?

2   A.  Team leader.

3   Q.  And what process did you go through to be

4       promoted from team leader to training officer?

5   A.  I believe it was posted.  I stated that I was

6       interested in it, and I don't think anybody else

7       did because there was no pay incentive.  And it

8       was just an opportunity to move over and try to

9       work with training.  I think I was the only

10      person who applied at that time.

11  Q.  Is it your testimony under oath that that job

12      was posted for people within the department to

13      apply for, correct?

14  A.  To the best of my recollection.

15  Q.  And did you have to take a test to get that

16      promotion?

17  A.  No.

18              MR. MORGAN:  Object to the form as a

19          promotion.

20  Q.  Did you have to undergo an assessment for that

21      promotion?

22              MR. MORGAN:  Object to the form of

23          the question.

13

```
1    A.    No.

2    Q.    Did you have to interview for that?

3                MR. MORGAN:  Object to the form.

4    A.    No.

5    Q.    All you did was put your name and you were

6          selected -- put in your name and you were

7          selected, correct?

8    A.    Yes, sir.  It was not a promotion.

9    Q.    Was there a certain reason why you wanted it, if

10         it was not a promotion, but nobody else wanted

11         it?

12   A.    I had worked for quite a while with training new

13         recruits and was very interested in it.  And my

14         wife and I discussed it as an opportunity to

15         improve my skills.  And so we viewed it -- Even

16         though I would not be working part-time anywhere

17         because I would be coming off line, it was an

18         opportunity that I needed to take and see if I

19         could make it work and try to develop my skills.

20   Q.    And then before that you said you were a team

21         leader, correct?

22   A.    Yes, sir.

23   Q.    And how long were you a team leader?
```

14

1    A.   From March of 1994 until approximately March

2         2001.

3    Q.   And what process did you go through to become --

4         Well, what were you before you were a team

5         leader?

6    A.   A firefighter.

7    Q.   What process did you go through to be promoted

8         from firefighter to team leader?

9    A.   Internal structured interview.

10   Q.   Internal structured interview?

11   A.   Yes, sir.

12   Q.   Did you have to take a test?

13   A.   No.  We had -- there were -- I think we did --

14        There was a interview phase, and then we also

15        had to do paperwork, prove capability of doing

16        paperwork, and I believe there was a hot seat

17        exercise.

18   Q.   What year was it you were promoted to team

19        leader?

20   A.   1994.

21   Q.   Didn't have to undergo an assessment center,

22        correct?

23   A.   Not an assessment center, no, sir.

15

1   Q.   Didn't have to take a test, correct?

2   A.   No, sir.

3   Q.   Do you recall who was promoted with you to team

4        leader in 1994?

5   A.   About a month after I was -- a month or two

6        months after I was, Terry Smith was promoted.

7   Q.   So at the time you were promoted, you were the

8        only one.  And then about a month later Terry

9        Smith was promoted?

10  A.   Yes, sir.  There was a list, I believe, that had

11       been formed.  And as positions came open, people

12       were promoted up.

13  Q.   Is Terry Smith still with the department?

14  A.   No, sir.  He retired.

15  Q.   Was he white or black?

16  A.   He's white.

17  Q.   And then was firefighter your first position

18       with the City of Auburn --

19  A.   Yes, sir.

20  Q.   -- Fire Department?

21            Where were you employed before the City of

22       Auburn Fire Department?

23  A.   Let's see.  In 1978 and '79 I was going to

16

1          school at Auburn University and was working

2          part-time at Tyson's Grocery.  I worked on the

3          family farm some in Macon County and any other

4          odd jobs at the time.

5     Q.   Just so it's clear on the record, what was your

6          position with the fire department from February

7          2006 through May of 2006?

8     A.   Would have been the deputy chief.

9     Q.   Did you participate in the decision-making

10         process concerning the battalion chief

11         promotion?

12    A.   Yes, sir.  Collectively there were a group of us

13         who made decisions on that.

14    Q.   Why did there need to be a battalion chief

15         promotion in 2006?

16    A.   We had several battalion chiefs who were

17         retiring and several more who had the time in

18         service to retire so we wanted to go ahead and

19         get that accomplished.

20    Q.   During the initial meetings about that promotion

21         before CWH was hired, do you recall discussions

22         that y'all had as a group about what the process

23         would entail for the promotion of battalion

17

1        chief?

2 A.    I think there were probably some general

3        discussions about what we should include.

4 Q.    What do you remember about those discussions?

5 A.    That what we were looking for or what components

6        of an assessment center would best measure the

7        candidates in the process.  We may have

8        discussed role plays or in-baskets or written

9        exams or hot seat exercises, tactical exercise,

10       any number of things.

11 Q.    Was it a concern of yours that the City of

12       Auburn Fire Department comply with the 1991

13       settlement order marked as Plaintiff's Exhibit 3

14       pursuant to the battalion chief promotion in

15       2006?

16              MR. MORGAN:  Object to the form.

17 A.    Not greatly, sir, no.

18 Q.    It was not a concern of the City's, correct?

19 A.    Not a concern of mine.

20              MR. MORGAN:  Object to the form.

21 Q.    Not a concern of yours that you comply with the

22       order, correct?

23 A.    What we viewed -- That was a decision that would

18

```
 1         have been made above my grade at the time.  My

 2         concern was that we identify the best way to

 3         find a candidate -- the best candidates.

 4    Q.   And the order itself was not a concern of yours

 5         personally?

 6    A.   Not mine personally, no, sir.

 7    Q.   And in these meetings and in deciding how y'all

 8         were going to make the battalion chief

 9         promotions, did you ever sit down and read that

10         order and say, okay, well, we've got to comply

11         with this part and this part?

12    A.   I don't believe I did, no, sir.

13    Q.   Did you know at the time whether or not the City

14         of Auburn was required to comply with that order

15         for the battalion chief promotion in 2006?

16              MR. MORGAN:  Object to the form.

17    A.   I did not know, no, sir.

18    Q.   You did not know?

19    A.   No.

20    Q.   Whose decision was it to use an assessment

21         center as a part of this promotion process to

22         battalion chief?

23    A.   I think that goes back to the collective
```

19

```
 1         discussions that we had, that that would be one
 2         of the best methodologies to determine who was
 3         the most highly qualified candidates.
 4    Q.   Is that something that's commonly done in fire
 5         departments to your knowledge, that in order to
 6         determine promotions, outside assessments are
 7         done?
 8    A.   Assessment centers --
 9    Q.   Assessment centers.
10    A.   -- or assessment processes are becoming more and
11         more common in fire service organizations.  It's
12         an expensive process, but it's -- typically what
13         they find is that the best candidates rise to
14         the top because you're measuring against
15         multiple different areas and multiple criteria.
16    Q.   And you understand that you can conduct an
17         assessment center or pay somebody to conduct an
18         assessment center without having a written test
19         as a component of the process, correct?
20    A.   A written test does not have to be a component,
21         but it can be.
22    Q.   It doesn't have to be, though.
23    A.   Doesn't have to be.
```

20

```
 1   Q.   If a written test is to be a component of a

 2        promotional process, it is not required that

 3        there be a cutoff score; is that correct?

 4   A.   That's left up to the individual agency is

 5        typically what's done I would think, if they

 6        want to impose one or not.

 7   Q.   Well, who imposed a cutoff score for the written

 8        test that we've been talking about today for the

 9        battalion chief promotion in 2006?

10   A.   Again, the group that's been discussed several

11        times today:  Steve Reeves, Bill James, Larry

12        Langley, myself, and CWH's personnel when they

13        arrived at that part.  We all discussed it, and

14        that was the option.

15   Q.   That was the option --

16   A.   That was the option that was chosen.

17   Q.   But you'll agree with me that the City of Auburn

18        Fire Department had ultimate discretion as to

19        whether or not there would be, number one, a

20        test, correct?

21                 MR. MORGAN:  Object to the form.

22   A.   Yes, sir.

23   Q.   And number two, y'all had ultimate discretion as
```

21

```
 1            to whether or not that test would contain a

 2            cutoff score, correct?

 3                      MR. MORGAN:  Object to the form.

 4    A.      Yes, sir.  As advised by CWH, our consultant.

 5    Q.      But y'all have the ultimate decision-making

 6            power?

 7                      MR. MORGAN:  Object to the form.

 8    A.      Yes, sir.

 9    Q.      And you heard Mr. Hancock's questions earlier

10            today to Mr. Reeves, I guess, where he suggested

11            that CWH attempted to persuade or encourage the

12            City of Auburn not to use a cutoff score.  Did

13            you hear those questions?

14    A.      I heard those questions.

15    Q.      Do you recall that?

16    A.      No, sir.

17    Q.      Can you testify one way or the other about what

18            you remember CWH advising you and the City of

19            Auburn about a cutoff score?

20    A.      What I recall was that if you chose to use one

21            that it needed to be that way throughout the

22            assessment on all components.

23    Q.      That cutoff scores would be used on every
```

22

1          component?

2     A.   Yes, sir.

3     Q.   Did the City of Auburn use cutoff scores on all

4          components of the battalion chief promotion

5          process in 2006?

6     A.   Yes, sir.  I believe so.

7     Q.   And if CWH says that it encouraged you and the

8          City of Auburn not to use a cutoff score, you're

9          testifying that's incorrect?

10              MR. MORGAN:  Object to the form.

11    A.   Can you repeat that?

12    Q.   Yeah.

13         If CWH is going to say in this case that

14         they tried to encourage you and the City of

15         Auburn not to use a cutoff score for that test,

16         you're going to testify that that's incorrect;

17         is that correct?

18              MR. MORGAN:  Object to the form.

19    A.   I'm not trying to be difficult.  It's that when

20         you through that last "that's correct" --

21    Q.   Forget that last correct.  Let me ask it a

22         different way.

23              Are you going to testify that CWH did not

23

```
 1          recommend to you and the City of Auburn that you

 2          not use a cutoff score?

 3                    MR. MORGAN:  Object to the form.

 4    A.    I don't recall them specifically saying that,

 5          no, sir.

 6    Q.    You don't recall?  Is that your testimony?

 7    A.    Yes, sir.

 8                    MR. MORGAN:  Wait.  Object to the

 9                      form of that question.

10    Q.    Let's ask it again.

11              You don't recall whether CWH encouraged you

12          and the City not to use a cutoff score?

13                    MR. MORGAN:  Object to the form.

14    A.    No, they did not encourage us not to use it.  I

15          don't recall that they did.

16    Q.    And that's my question.  You don't recall or

17          they did not do it?

18    A.    I don't recall that they did -- that they did

19          not encourage us to use a cutoff.

20    Q.    You don't --

21                    MR. MORGAN:  His question -- You're

22                      asking if they do not recall, and

23                      what he's saying is I don't recall
```

24

them doing that.

   MR. HORSLEY: And that's why I want
   to be clear about it.

   MR. MORGAN: He doesn't recall is
   what you're asking him.

   MR. HORSLEY: Exactly. But I'm
   making sure --

Q. You're not saying that it didn't happen. You're
  saying you don't recall whether it happened or
  not?

   MR. MORGAN: Object to the form. Go
   ahead.

Q. We're going to get it straight before we move
  on.

   I'm going to ask you two questions. The
  first one: Do you remember whether CWH
  attempted to encourage the City of Auburn not to
  use a cutoff score?

   MR. MORGAN: Object to the form.

A. I do not remember them encouraging us not to use
  a cutoff.

Q. And the second question is: The answer you just
  gave me is, I don't remember; is that correct?

25

1              MR. MORGAN:   Object to the form.

2    A.   That's correct.

3    Q.   Was it you, in fact, that suggested the cutoff

4         score of 70 to other members of the group with

5         the City of Auburn and CWH?

6    A.   I may have, yes, sir.

7    Q.   And why did you suggest 70 as a cutoff score, if

8         you did?

9    A.   As we were having the discussion with CWH and

10        the rest of the group, it was agreed that that

11        was a state certification standard, that you

12        could not obtain a certification without scoring

13        a minimum of 70 on an exam, that that was a

14        standard in the three to five classes that the

15        National Fire Academy has tests in.  That was

16        also an educational standard, that anything

17        below a 70 was not a transferable grade -- i.e,

18        a "D" in most schools -- and therefore would not

19        meet an educational standard as well.

20             So those three items were the argument-- my

21        side of an argument -- not argument but

22        discussion points -- in that saying that if you

23        could not obtain a 70, you really hadn't

26

```
 1          achieved anything.
 2   Q.    So --
 3   A.    That was transferable.
 4   Q.    So it sounds to me like you did suggest 70 as
 5          the cutoff score.
 6   A.    I'm sure in the discussion with everybody else,
 7          yeah, we -- Again, I may have suggested it, but
 8          I had thought about it.
 9   Q.    Was it your perception that the people at CWH
10          didn't know all that stuff you just told me
11          about the 70 cutoff score?
12   A.    No, sir.  I believe they knew.
13   Q.    Were they suggesting a different cutoff score?
14   A.    Not that I recall.
15   Q.    Was there some reason why you were having to
16          explain all the reasons why 70 should be a
17          cutoff score to the people at CWH that you feel
18          like already knew all the things you were
19          telling them?
20   A.    Well, I think it was part of the discussion as a
21          group:  What would be your -- What would be your
22          points to make that decision on.
23   Q.    I think you've already testified to this, but
```

27

1          it's your testimony that you decided in

2          conjunction with the other members of the group

3          with the City of Auburn along with CWH that a

4          test that included a cutoff score should be used

5          in advance of the assessment center, correct?

6                    MR. MORGAN:  Object to the form.

7     A.   Yes, sir.

8     Q.   You couldn't get to the assessment center

9          without passing the test, correct?

10                   MR. MORGAN:  Object to the form.

11    Q.   Is that correct?

12    A.   That's correct.

13    Q.   I guess you heard my questions to Chief Langley

14         a minute ago or maybe -- I don't remember who it

15         was.  But you'll agree with me that the test and

16         the assessment center are two separate entities;

17         is that correct?

18                   MR. MORGAN:  Object to the form.

19    A.   No, sir, I don't agree with you.

20    Q.   You don't agree with that.

21         So you disagree with -- I'm not going to

22         read it again.  You disagree with the definition

23         of assessment center provided by CWH in the

28

1           Auburn Fire Division Orientation Manual?

2                   MR. MORGAN:  Object to the form.

3    A.    May I read it, sir?

4    Q.    Sure.  It's under, What Is an Assessment Center.

5    A.    I agree with portions of this, but I don't agree

6          with the entire definition they are using.

7    Q.    So you disagree with the entire definition of

8          assessment center provided by CWH, which is the

9          company y'all contracted with in order to

10         conduct the assessment center; is that correct?

11                  MR. MORGAN:  Object to the form.

12   A.    Not with the entire definition, no, sir.

13   Q.    So it's your testimony that a test -- that this

14         test for the battalion chief was part of an

15         assessment center?  Is that what you're saying?

16   A.    Yes, sir.

17   Q.    Isn't the point of an assessment center that

18         somebody neutral --

19                  (Brief interruption.)

20   Q.    Isn't the main objective behind an outside

21         assessment center that the assessment center is

22         conducted by someone neutral that has no

23         connection with the fire department?

29

```
1                    MR. MORGAN:  Object to the form.
2    A.   Can you repeat that?
3    Q.   Yeah.
4              Isn't an outside assessment center -- isn't
5         the objective of that to have assessors from
6         outside the department come in neutral and make
7         objective decisions about the applicants, people
8         who are not associated with the City fire
9         department?
10                   MR. MORGAN:  Object to the form.
11   Q.   Otherwise why don't you do your own assessment?
12   A.   Well, again, I'm not a specialist in developing
13        an assessment center.  The objective will be to
14        hire consultants to assist you in identifying
15        the things that would best measure candidates.
16        And it could be -- If I may, for example,
17        Birmingham, Jefferson County, is internal.  It's
18        part of their personnel board.  We don't have
19        that resource here so we would have to find that
20        resource from somebody.  And so we would hire a
21        consultant to come in and help us establish an
22        assessment process.  Not necessarily an
23        assessment center but an assessment process.
```

1    Q.    So it's not your understanding that an outside

2           assessment center is supposed to be neutral or

3           not associated in any way with the City of

4           Auburn?

5                 MR. MORGAN:  I object to the form.

6    A.    Can you repeat it one more time, sir?  I'm

7           sorry.

8    Q.    I was trying to confirm what you just said, that

9           it's not your understanding that the assessment

10         center used for the battalion chief promotion

11         was supposed to be a neutral third-party

12         assessment center.

13              MR. MORGAN:  Object to the form.

14    A.    That's correct.  We hired an agency to come in

15         and help us establish an assessment process.

16    Q.    And, in fact, it wasn't neutral because you

17         actually made decisions about how that process

18         would work, correct?

19              MR. MORGAN:  Object to the form.

20    A.    We consulted with our consultant.

21    Q.    Right.

22    A.    And then -- Yes, we made some decisions.

23    Q.    And you made the ultimate decision about whether

31

```
 1        the test would be given and whether there would

 2        be a cutoff score, correct?

 3   A.   We collectively, and CWH agreed to that.

 4                   (Plaintiff's Exhibit 19 marked for

 5                    identification.)

 6   Q.   What we've marked as Exhibit 19 is a letter

 7        dated April 28, 2006 from you to Horace

 8        Clanton.  First of all, if you could, identify

 9        that as your letter.

10   A.   Yes, sir.  This appears to be the letter that I

11        wrote in response to, I believe, his grievance.

12   Q.   Did you write the exact same letter -- I don't

13        think I could find it this morning, but did you

14        write the exact same letter to Gerald Stephens

15        and Eddie Ogletree to the best of your memory?

16   A.   Yes, sir.  It should have been the same letter.

17   Q.   The part that is highlighted in this letter, if

18        you would read that, please.

19   A.   A concern CWH had was that some of the

20        candidates would not be prepared for the job of

21        battalion chief based on their experience and

22        rank.

23   Q.   Can you explain that sentence to us?
```

32

1    A.    As far as -- What that's referencing was that

2          when we opened this up, which we were -- again,

3          our job descriptions didn't stop from

4          happening -- when we opened that up, CWH was

5          concerned those who were in ranks below would

6          not be as qualified, would not have the rank and

7          the experience or the time serving in a rank to

8          be competitive.

9    Q.    So CWH was concerned about time in grade

10         criteria for the battalion chief promotion?

11               MR. MORGAN:  Object to the form.

12   A.    I don't know that it was necessarily time in

13         grade.  I think they were looking at experience

14         in position, yes, sir.

15   Q.    And that's an important part of being promoted

16         to battalion chief, is it not?

17               MR. MORGAN:  Object to the form.

18   A.    I believe so.

19   Q.    And how did you know they were concerned about

20         that?

21   A.    Obviously it was part of the discussion at some

22         point.

23   Q.    They were concerned that the people who were

33

```
 1           going to apply for the job of battalion chief

 2           were not qualified; is that correct?

 3                   MR. MORGAN:  Object to the form.

 4      A.   I couldn't speak about their concern about

 5           qualification.  I think it was about experience

 6           or rank, time in rank.  I hesitate to speak for

 7           what CWH's concern was specifically.

 8      Q.   Just for clarification, I just found the exact

 9           same letter you sent to Lieutenant Stephens.

10           I've marked it as Exhibit 20.

11                Is that what that is, the exact same letter

12           you sent to Lieutenant Stephens?

13                   (Plaintiff's Exhibit 20 marked for

14                       identification.)

15      A.   Yes, sir.  They appear to be the same.

16                   (Plaintiff's Exhibit 21 marked for

17                       identification.)

18      Q.   I'm going to mark this as one exhibit.  It's

19           21.  It will be two memos, the first one dated

20           February 17, '06 and then February 23, '06

21           regarding the battalion chief promotion.

22                Is the first page of that document a memo

23           that you issued?
```

34

1   A.   Yes, sir.  It looks like it.

2   Q.   And then what precipitated the second memo, if

3        you know, issued by Chief Langley?

4   A.   The application of Chris Turner for the

5        battalion chief's position.

6   Q.   And was it then after the second memo went out

7        that CWH became concerned about the

8        qualifications of those who were going to apply

9        for battalion chief?

10   A.   I don't know if it was before or after, sir.

11   Q.   Well, they wouldn't have known before February

12        23 that probationary and nonprobationary

13        firefighters and probationary lieutenants were

14        eligible for the battalion chief promotion,

15        would they?

16   A.   I don't know when they would have obtained these

17        or when they would have stated that concern.  I

18        can't speak for when they stated that concern.

19   Q.   You'll agree with me that as of the date of your

20        memo, February 17, the only eligible applicants

21        were current nonprobationary lieutenants,

22        correct?

23   A.   Yes, sir.

35

1   Q.   And then that changed?

2   A.   Yes, sir.

3   Q.   How many years have you been with the City of

4       Auburn Fire Department?

5   A.   Part-time and full-time since 1980.  So 28.

6   Q.   Do you have an estimate since 1991 of how many

7       black firemen the City of Auburn has hired as

8       full-time employees?

9   A.   As full-time?

10   Q.   Yes, sir.

11   A.   Probably between four and seven.  Not specific.

12   Q.   Between four and seven?

13   A.   Yeah.

14           (Brief off-the-record discussion.)

15   Q.   Can you name those four -- However many it was,

16       four or seven, can you name them?

17   A.   In 1991 beginning with Thomas Scott, Chris

18       Turner, Matthew Holland, Gerald Stephens, Kevin

19       Harper.  That's who I remember right now.

20   Q.   And they were hired at different times?

21   A.   Yes, sir.

22   Q.   Between 1991 and now; is that correct?

23   A.   Yes, sir.  Most of them in the '90s I would

36

1       suspect.

2   Q.  And some of those were hired as a direct result

3       of the lawsuit settlement, correct?

4   A.  Of one of the settlements.  I believe Chris

5       Turner and Thomas Scott.

6   Q.  Also during that period of time, can you

7       estimate how many white full-time firemen had

8       been hired by the City of Auburn?

9   A.  From 1991 to the present?

10  Q.  Uh-huh (positive response).

11  A.  I'm really not sure how many.

12  Q.  Would you agree with me if I suggested three per

13      year since that time?

14  A.  That may be right.  Again, we could look at the

15      date of hire records and be more specific.

16  Q.  Are you aware of any black student firefighter

17      since 1991 who has been hired full-time by the

18      City of Auburn Fire Department?

19  A.  Lieutenant Gerald Stephens and Kevin Harper both

20      came from the program.  There may have been

21      somebody else.  I'm not sure.

22  Q.  What happened to Mr. Harper?

23  A.  I think he resigned or was dismissed.  I don't

37

1        know specifically what happened to him.

2    Q.   Do you recall when?

3    A.   No, sir.

4    Q.   During your entire time with the City of Auburn

5        Fire Department, has there ever been a black

6        fireman that achieved a rank beyond battalion

7        chief?

8    A.   No, sir.

9             MR. HORSLEY:  Give me just a minute.

10            (Brief recess.)

11   Q.   (Continuing by Mr. Horsley)  Earlier I said

12       since you've been with the Auburn Fire

13       Department has any black ever achieved the rank

14       beyond battalion chief.

15         Now my question is:  Has any black fireman

16       achieved any rank beyond lieutenant since the

17       time you've been with the Auburn Fire

18       Department?

19   A.   No, sir.  I don't believe so.

20   Q.   You stated earlier that when you went from team

21       leader to training officer that that was a

22       lateral transfer, correct?

23   A.   Yes, sir.

38

1    Q.    And that there was no pay increase or rank

2          increase as a result of that; is that correct?

3    A.    That's right.

4    Q.    Is it not true that shortly after you became the

5          training officer, you went from a pay grade of

6          18 to 20?

7    A.    In 2004 as a process of reclassification by

8          Condrey & Associates, it was identified I was

9          doing the same job as the police training

10         officer and therefore the job should pay

11         commensurate and be rank commensurate.

12   Q.    How much longer after you became training

13         officer was it that you moved from an 18 to a 20

14         pay scale?

15   A.    Three to three-and-a-half years.

16               MR. HORSLEY:  That's all.

17               MR. MORGAN:  I've got a couple of

18               questions.

19                    **EXAMINATION**

20   BY MR. MORGAN:

21   Q.    What is it you don't remember?  You don't

22         remember any conversation or you don't remember

23         CWH telling you not to use a cutoff score?

39

1           MR. HORSLEY:  Object to the leading.

2    A.    I don't remember CWH ever telling us not to use

3          a cutoff.

4    Q.    Now, let me show you Plaintiff's Exhibit 19, the

5          concern of CWH about some candidates not being

6          prepared for battalion chief based on experience

7          and rank.

8               Did that concern come up after the

9          eligibility was opened up to everybody?

10   A.    I believe so, yes, sir.

11          MR. HORSLEY:  Object to the form.

12   Q.    That concern had to do with firefighters being

13         eligible to apply for battalion chief?

14   A.    Yes, sir.

15   Q.    Were any of the people who were promoted to

16         battalion chief firefighter -- rank of

17         firefighter?

18   A.    No, sir.

19   Q.    And Lovvorn, Jordan, Hartsfield, and Darby, had

20         they all been student firefighters?

21   A.    Yes, sir.

22   Q.    Are student firefighters certified to be

23         firefighters?

40

1    A.    Yes, sir.

2    Q.    But that time doesn't count towards their

3          seniority once they become career firefighters?

4                    MR. HORSLEY:  Object to the form.

5    Q.    Does it or does it not?

6    A.    We haven't counted it towards -- We don't count

7          seniority typically for any reason.  We don't

8          use it for promotions or anything.

9    Q.    But as a student firefighter, those people are

10         certified and do they do everything that a

11         career firefighter does?

12                   MR. MORGAN:  Object to the form.

13   A.    For the most part, yes, sir.

14   Q.    How long has Lovvorn been a certified

15         firefighter working with the City of Auburn

16         either as a student firefighter or a career

17         firefighter?

18   A.    Probably ten or more years.

19   Q.    And how about Jordan?

20                   MR. HORSLEY:  Objection.

21   A.    Twelve years.

22   Q.    How about Hartsfield?

23                   MR. HORSLEY:  Object to the form.

41

```
 1    A.    Approximately ten years.

 2    Q.    And how about Darby?

 3    A.    Thirteen to fourteen years.  Twelve to fourteen

 4          years.  I'm sorry.

 5    Q.    In your opinion were they in any way lacking in

 6          experience or job knowledge to be a battalion

 7          chief?

 8                    MR. HORSLEY:  Object to the form.

 9    A.    No, sir.  They showed themselves to be the best

10          candidates.

11                    MR. MORGAN:  That's all I've got.

12                    MR. HORSLEY:  I forgot to mark

13                    Langley's answers to

14                    interrogatories and Lamar's.

15                 (Plaintiff's Exhibits 22 & 23 marked

16                    for identification.)

17                    MR. HORSLEY:  What I have marked as

18                    22 are Chief Langley's answers to

19                    interrogatories.  And these are

20                    going to remain the same once --

21                    or the signed copy is going to be

22                    the same as Exhibit 22, correct,

23                    Randall?
```

42

1              MR. MORGAN:  Supposed to be.

2              MR. HORSLEY:  Now, 23 are Lee Lamar's

3         responses to my interrogatories.

4                    **EXAMINATION**

5    **BY MR. HORSLEY:**

6    Q.    Have you seen those?  Have you signed those?

7    A.    Yes, sir.

8    Q.    And those are your sworn answers to my

9         interrogatories, correct?

10   A.    Yes, sir.

11             MR. HORSLEY:  That's all.

12             (Deposition concluded at

13              approximately 3:45 p.m.)

14         *  *  *  *  *  *  *  *  *  *  *

15         FURTHER DEPONENT SAITH NOT

16         *  *  *  *  *  *  *  *  *  *  *

17

18             REPORTER'S CERTIFICATE

     STATE OF ALABAMA:

19
     MONTGOMERY COUNTY:

20
          I, Pamela A. Wilbanks, CCR, Registered

21
     Professional Reporter, and Commissioner for the State

22
     of Alabama at Large, do hereby certify that I reported

23
     the deposition of:

43

1                    LEE Y. LAMAR, JR.

2   who was first duly sworn by me to speak the truth, the

3   whole truth and nothing but the truth, in the matter

4   of:

5                    EDDIE OGLETREE, an individual,

6                    GERALD STEPHENS, an

7                    individual,

8                    Plaintiffs,

9                    Vs.

10                   CITY OF AUBURN, a municipality

11                   in the State of Alabama, LARRY

12                   LANGLEY, an individual, LEE LAMAR,

13                   an individual, BILL HAM, JR., an

14                   individual, STEVEN A. REEVES, an

15                   individual, BILL JAMES, an

16                   individual, CHARLES M. DUGGAN, an

17                   individual, and CORTEZ LAWRENCE,

18                   an individual,

19                   Defendants.

20                   In The U.S. District Court

21                   For the Middle District of Alabama

22                   Eastern Division

23                   3:07-CV-867-WKW

44

1  on Wednesday, July 30, 2008.

2       The foregoing 43 computer printed pages

3  contain a true and correct transcript of the

4  examination of said witness by counsel for the parties

5  set out herein.  The reading and signing of same is

6  hereby waived.

7       I further certify that I am neither of kin nor

8  of counsel to the parties to said cause nor in any

9  manner interested in the results thereof.

10       This 5th day of August 2008.

11

12

13

14

15

16

17

18       *Pamela A. Wilbanks (Th. M.C.)*

19       Pamela A. Wilbanks, ACCR #334
         Expiration Date:  9-30-2008

20       Registered Professional Reporter
         and Commissioner for the State

21       of Alabama at Large

22

23

# DEPOSITION TESTIMONY OF
# LARRY LANGLEY

ORIGINAL                                                    1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                     EASTERN DIVISION

4  EDDIE OGLETREE, an individual,
   GERALD STEPHENS, an
5  individual,

6          Plaintiffs,

7  Vs.                              CIVIL ACTION NO.
                                    3:07-CV-867-WKW
8
   CITY OF AUBURN, a municipality
9  in the State of Alabama, LARRY
   LANGLEY, an individual, LEE LAMAR,
10 an individual, BILL HAM, JR., an
   individual, STEVEN A. REEVES, an
11 individual, BILL JAMES, an
   individual, CHARLES M. DUGGAN, an
12 individual, and CORTEZ LAWRENCE,
   an individual,

13
          Defendants.

14                * * * * * * * * * *

15

16          DEPOSITION OF LARRY M. LANGLEY, taken pursuant

17 to stipulation and agreement before Pamela A. Wilbanks,

18 Certified Court Reporter, ACCR# 391, Registered

19 Professional Reporter and Commissioner for the State of

20 Alabama at Large, in the Conference Room of Auburn City

21 Hall, 144 Tichenor Avenue, Auburn, Alabama, on

22 Wednesday, July 30, 2008, commencing at approximately

23 2:20 p.m.

2

1                              **APPEARANCES**

2 **FOR THE PLAINTIFF:**

3 Mr. Richard F. Horsley
    KING, HORSLEY & LYONS
4 Attorneys at Law
    1 Metroplex Drive
5 Suite 280
    Birmingham, AL  35209
6
    **FOR THE DEFENDANT:**
7
    Mr. Randall Morgan
8 HILL, HILL, CARTER, FRANCO, COLE & BLACK
    Attorneys at Law
9 425 South Perry Street
    Montgomery, Alabama
10
    **ALSO PRESENT:**
11
    Mr. D'Arcy Wernette
12 Mr. Steven Reeves
    Mr. Bill James
13 Mr. Lee Lamar
    Mr. Eddie Ogletree
14 Mr. Gerald Stephens

15                * * * * * * * * * * * *

16                EXAMINATION INDEX

17
      BY MR. HORSLEY . . . . . . . . . . . . .   4
18      BY MR. MORGAN . . . . . . . . . . . .   27

19              * * * * * * * * * * * *
          PLAINTIFFS' EXHIBIT INDEX
20
   17    5/4/06 grievance letter to Mr. Langley from   21
21         Mr. Clanton, Mr. Hodge, Mr. Ogletree and
          Mr. Stephens
22
   18    Mr. Langley's letter to Mr. Stephens in     21
23         response to PX-17

3

1                              **STIPULATION**

2            It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of **LARRY M. LANGLEY** is taken pursuant to the

5    Alabama Rules of Civil Procedure and that said

6    deposition may be taken before Pamela A. Wilbanks,

7    Registered Professional Reporter and Commissioner for

8    the State of Alabama at Large, without the formality of

9    a commission, that objections to questions other than

10   objections as to the form of the question need not be

11   made at this time but may be reserved for a ruling at

12   such time as the said deposition may be offered in

13   evidence or used for any other purpose by either party

14   provided for by the Statute.

15           It is further stipulated and agreed by and

16   between counsel representing the parties in this case

17   that the filing of said deposition is hereby waived and

18   may be introduced at the trial of this case or used in

19   any other manner by either party hereto provided for by

20   the Statute regardless of the waiving of the filing of

21   the same.

22           It is further stipulated and agreed by and

23   between the parties hereto and the witness that the

4

1  signature of the witness to this deposition is hereby

2  not waived.

3                  * * * * * * * * * * *

4                    **LARRY M. LANGLEY**

5        The witness, after having first been duly

6  sworn to speak the truth, the whole truth and nothing

7  but the truth testified as follows:

8                     **EXAMINATION**

9  BY MR. HORSLEY:

10   Q.   Please tell us your full name.

11   A.   Larry Michael Langley.

12   Q.   My name is Richard Horsley.  The same thing.

13        I'm going to ask you questions.  And if you

14        don't understand, tell me to repeat.  I'm going

15        to assume you understood and gave the answer you

16        intended to give once you answer.  Okay?

17   A.   Okay.

18   Q.   Where do you currently reside?

19   A.   81 Lee Road 374, Valley, Alabama 36854.

20   Q.   And you're retired from the Auburn Fire

21        Department; is that correct?

22   A.   Right.

23   Q.   When did you retire?

5

```
 1    A.    November 30, 2007.

 2    Q.    2007?

 3    A.    Uh-huh (positive response).

 4              MR. MORGAN:  Yes.  You need to make

 5                 an audible answer.

 6    Q.    Yeah.  I'm sorry.

 7              MR. MORGAN:  You need to say "yes" or

 8                 "no".  Don't say "uh-huh".

 9    Q.    Say "yes" or "no" rather than "uh-huh" or

10          "huh-uh" because she can't take that down.

11              So you retired in November 2007?

12    A.    Yes.

13    Q.    And what was the reason for your retirement?

14    A.    I had 30 years in with the City.

15    Q.    Just ready to retire?

16    A.    Ready to retire.

17    Q.    How long were you the fire chief for the City of

18          Auburn?

19    A.    Acting chief and deputy of public safety

20          director a little over ten years.

21    Q.    Deputy public safety director, tell me what that

22          is.

23    A.    Our public safety director -- in I think it was
```

6

1          '02 or '03 -- changed our title from police
2          chief and fire chief and the building code
3          official and communications director to deputy
4          public safety director over police operations or
5          fire operations.  It was just a name change.
6     Q.   So if I call it fire chief, it's the same thing?
7     A.   Same thing.
8     Q.   You were the fire chief for about ten years?
9     A.   Yeah.
10    Q.   And what job did you hold immediately before you
11         became the fire chief?
12    A.   I was a battalion chief or shift commander.
13    Q.   What year were you promoted to fire chief?
14    A.   July of '97.
15    Q.   And before that you were a shift commander, and
16         then are you saying that position was changed to
17         battalion chief?
18    A.   Later in 2005 -- '04.  Whenever we're talking
19         about, it was changed.  I just said battalion
20         chief because it's --
21    Q.   But you were already the chief at the time that
22         it was changed to battalion chief?
23    A.   Right.

7

| | | |
|---|---|---|
| 1 | Q. | So before you were chief, you actually were a |
| 2 | | shift commander? |
| 3 | A. | Yeah. |
| 4 | Q. | And for how long were you a shift commander? |
| 5 | A. | About a year and a half. |
| 6 | Q. | What process did you go through to be promoted |
| 7 | | to chief from shift commander? |
| 8 | A. | I didn't go through a process.  The current |
| 9 | | chief resigned and went to Phenix City. |
| 10 | Q. | What was his name? |
| 11 | A. | Ronnie Blankenship.  And I was asked by the |
| 12 | | current public safety director at that time if I |
| 13 | | would run the fire department until, you know, |
| 14 | | they went through a process.  And they never |
| 15 | | went through a process.  I just kept the job the |
| 16 | | whole time. |
| 17 | Q. | You weren't required to interview, correct? |
| 18 | A. | No. |
| 19 | Q. | You weren't required to take any test, correct? |
| 20 | A. | No. |
| 21 | Q. | You weren't required to go through an assessment |
| 22 | | center, correct? |
| 23 | A. | No. |

8

1    Q.    We've talked a little bit today about the job

2          classification or changes from shift commander

3          to battalion chief and from team leader to

4          lieutenant.  I'm assuming as a fire chief,

5          you're familiar with the insignia that the

6          firemen wear on their uniforms; is that correct?

7    A.    Right.

8    Q.    What's the difference between the insignia that

9          a shift commander and a battalion chief wore?

10   A.    The shift commander at that time -- Well, we was

11         captain/shift commanders, and it was two bars.

12         That's standard in the industry, two bars.  Two

13         bugles.

14   Q.    And then when --

15   A.    And then when the name changed to battalion

16         chief, the recognized insignia for that is the

17         three bugles.

18   Q.    Would three bugles as opposed to two bugles not

19         signify a promotion in rank within the

20         department?

21                    MR. MORGAN:  Object to the form.

22   A.    Not in this department, no.

23   Q.    Are you saying that it would in some

9

1          departments, but --

2    A.    Some departments may.  But if they had the

3          captain position still open and then the

4          assistant chief, battalion chiefs, you would

5          have different insignias on the collar for that.

6    Q.    What did you wear as a chief?

7    A.    Five bugles.

8    Q.    Did anybody in the department have more than

9          five bugles?

10   A.    No.

11   Q.    Would that signify that you were the highest

12         level employee at the fire department --

13   A.    Right.

14   Q.    -- the fact that you had five bugles?

15   A.    Right.

16   Q.    And a lieutenant has how many bugles?

17   A.    One bugle.

18   Q.    And when the team leaders -- Well, what did a

19         team leader have when that position existed?

20   A.    The team leaders wore a gold collar brass.  I

21         think it had AFD wrote on it.

22   Q.    They had no bugles, correct?

23   A.    They had no bugles.

10

1    Q.    And when they were reclassified as lieutenants,
2          they would then wear insignia with one bugle?
3    A.    Right.
4    Q.    And you said earlier, I think, battalion chief
5          has three bugles; is that correct?
6    A.    Correct.
7    Q.    Would battalion chief be the second highest
8          level employee within the fire division?
9    A.    Deputy chief.
10   Q.    I'm sorry.
11             What does a deputy chief wear?
12   A.    Four bugles.
13   Q.    So it goes lieutenant, one bugle; battalion
14         chief -- Wait a minute.  Who has two bugles?
15   A.    Captains.
16   Q.    And then battalion chief, three bugles?
17   A.    Right.
18   Q.    Deputy chief, four bugles; and -- is that
19         correct?
20   A.    Correct.
21   Q.    And chief, five bugles, correct?
22   A.    Correct.
23   Q.    And is it your testimony that the number of

11

1          bugles on the insignia does not indicate rank

2          within the department?

3                    MR. MORGAN:  Object to the form.

4     A.   In certain departments it does.

5     Q.   But in the Auburn Fire Department, it does not?

6     A.   We don't have -- The captain position they

7          recognized as a battalion chief so they went to

8          three bugles.

9     Q.   But wouldn't you agree with me that the higher

10         ranking employee you are, the more bugles you

11         get on your insignia within the Auburn

12         Department?

13    A.   The way we structure it now, yes.

14    Q.   The way you structure it now, yes?

15    A.   Uh-huh (positive response).

16    Q.   What about the way it was structured in 2006?

17    A.   The way we were structured then, the team leader

18         had the AFD.  And we had two lieutenants, and

19         one retired and that left Gerald.

20    Q.   But you'll agree with me in 2006, the higher

21         rank that you achieved would give you more

22         bugles, is that correct, on your insignia; is

23         that correct?

12

```
 1              MR. MORGAN:  Object to the form.
 2   A.   The higher the name would recognize the -- The
 3        name of the position recognized the amount of
 4        bugles.
 5   Q.   And the more bugles on an insignia would signify
 6        the higher position, correct?
 7              MR. MORGAN:  Object to the form.
 8   A.   With the deputy chief having four and the fire
 9        chief having five, yes.
10   Q.   Right.  That's logical, correct?
11              MR. MORGAN:  Object to the form.
12   A.   Uh-huh (positive response).
13   Q.   Now, you said you served for a year and a half
14        as the shift commander?
15   A.   Right.
16   Q.   And what job did you hold before shift
17        commander?
18   A.   Staff captain, rotating shift commander.
19   Q.   Staff captain, is that the same thing as a
20        captain or -- Well, what's the difference in a
21        staff captain?
22   A.   I worked eight to five in administration.  And
23        when one of the -- The rotating part, when one
```

13

1        of the shift commanders at that time would take

2        off, I would work in their position on their

3        shift.

4   Q.   So going from that to shift commander was a

5        promotion for you, correct?

6   A.   Huh-uh (negative response).  I didn't -- It was

7        just a name change.  It was no change in pay or

8        nothing.

9   Q.   And how did you get that position?

10   A.   The staff captain?

11   Q.   No.  You're saying you were a staff captain and

12        a rotating shift commander?

13   A.   I filled in for the rotating shift commanders

14        when they was on vacation or out sick.

15   Q.   And then you were changed to full-time shift

16        commander, correct?

17   A.   When one of the shift commanders retired, I

18        moved to that position.

19   Q.   But in order to do that, you didn't have to take

20        a test, correct?

21   A.   No.

22   Q.   You didn't have to go through an assessment

23        center?

14

1   A.   No.  It was just a lateral move.

2   Q.   You didn't have to do an interview, correct?

3   A.   No.

4   Q.   Did the bugles on your insignia change when you

5       moved to shift commander?

6   A.   No.  I still had two.

7   Q.   How long were you the rotating shift commander

8       and staff captain?

9   A.   I was promoted to staff captain in '94 --

10      January of '94.

11   Q.   From what position?

12   A.   Firefighter.

13   Q.   And what process did you go through to get

14      promoted --

15   A.   I went through an assessment center.

16   Q.   You went through an assessment center.

17          Do you remember what company administered

18      the assessment center?

19   A.   Kathleen Robinson administered that one.

20   Q.   And do you remember the components of that

21      assessment center?

22   A.   We had a hot seat, a role play, a in-basket, and

23      something else.  I don't remember what it was.

15

| | | |
|---|---|---|
| 1 | Q. | Did you have to take a written test with a |
| 2 | | cutoff score? |
| 3 | A. | No. |
| 4 | Q. | And how many people received that promotion |
| 5 | | along with you? |
| 6 | A. | Myself and Jimmy Brown. |
| 7 | Q. | Jimmy Brown? |
| 8 | A. | Me and him was promoted at the same time. |
| 9 | Q. | Is he a white guy or black guy? |
| 10 | A. | He was a white guy. |
| 11 | Q. | Is he still with the department? |
| 12 | A. | He's deceased. |
| 13 | Q. | You heard me talking earlier about the |
| 14 | | assessment center.  Is it your understanding -- |
| 15 | | The assessment center that you went through did |
| 16 | | not include a test with a cutoff score, correct? |
| 17 | A. | Correct. |
| 18 | Q. | And there was no test with a cutoff score that |
| 19 | | was a prerequisite to your assessment center; is |
| 20 | | that correct? |
| 21 | A. | That's correct. |
| 22 | Q. | And then before firefighter, that was your first |
| 23 | | job with the City of Auburn? |

16

| | | |
|---|---|---|
| 1 | A. | No.  I worked for Ampex Corporation. |
| 2 | Q. | But that was your first job with the City of |
| 3 | | Auburn was -- |
| 4 | A. | Right. |
| 5 | Q. | -- firefighter? |
| 6 | | You heard me ask questions earlier, I |
| 7 | | assume, about the meetings that were held prior |
| 8 | | to the 2006 battalion chief promotion between |
| 9 | | you and Lee Lamar and Mr. Reeves and Mr. James. |
| 10 | | Do you specifically recall those meetings and |
| 11 | | what was discussed in those meetings? |
| 12 | A. | Somewhat of them.  I wasn't in all of them. |
| 13 | | Sometimes I was out of town when they had a |
| 14 | | meeting. |
| 15 | Q. | Do you recall any discussions in those meetings |
| 16 | | about implementing a test with a cutoff score as |
| 17 | | a prerequisite for that job? |
| 18 | A. | Yes. |
| 19 | Q. | Whose decision was it? |
| 20 | A. | I don't remember.  I don't really remember how |
| 21 | | that come about.  The only thing I know is |
| 22 | | during the conversations and everything between |
| 23 | | all of us, it come up. |

17

```
 1   Q.   You can't testify about who with the City had
 2        the idea or made the decision to have a test
 3        with a cutoff score; is that correct?
 4   A.   No.
 5   Q.   Do you recall if that decision was made before
 6        the City contracted with CWH?
 7   A.   No.  It was made along with CWH.
 8   Q.   Do you recall whether or not Lee Lamar was the
 9        individual that suggested the number of 70 as
10        the test score cutoff?
11   A.   Don't -- I can't testify to that, no.
12   Q.   Does that seem familiar to you that he did or --
13   A.   Well, 70 was discussed because it's a state
14        standard to the fire college and National Fire
15        Academy, and I remember the 70 score being
16        discussed.
17   Q.   Was there any discussion about using a test
18        without a cutoff score and just using it as a
19        part of the whole process?
20   A.   I really don't remember if it was or not.
21   Q.   Looking back on it, do you have any opinions
22        about whether or not that would have been a
23        better idea?
```

18

1      MR. MORGAN:  Object to the form of

2           that question.

3   A.   No.  I think the process went good.

4   Q.   As a fire chief, did you feel like the people

5        that should be promoted to battalion chief

6        should have had significant experience with the

7        Auburn Fire Department?

8      MR. MORGAN:  Object to the form.

9   A.   Again, it's what you're talking about on

10       experience.  Knowledge and stuff of fire

11       techniques, fire tactics -- I think they should

12       have had the knowledge.  But experience, I don't

13       know exactly what you mean by that.

14  Q.   Well, knowledge, then.  Do you feel like that

15       the people that are promoted to battalion chief,

16       that it was more important that they have the

17       knowledge about firefighting or whether or not

18       they could pass the test?

19      MR. MORGAN:  Object to the form of

20           the question.

21  A.   If they had the knowledge of firefighting, they

22       should have passed the test.

23  Q.   Did you review the test yourself?

19

1   A.   No.  The only thing that I reviewed was -- CWH

2        brought in a pack of questions.  It was 150 or

3        175 questions and about 60 situational judgment

4        questions.  And there was about nine or ten of

5        us -- the battalion chiefs, HRM, Bill James,

6        Deputy Chief Lamar, and myself -- and we

7        reviewed the questions and turned back to CWH

8        what we thought was consistent with the way the

9        City of Auburn operated.  Did I see the final

10       test?  No.

11  Q.   You've never taken that test, correct?

12  A.   No.

13  Q.   Did you participate in any way in the decision

14       to allow probationary lieutenants,

15       nonprobationary and probationary firefighters to

16       apply for the battalion chief position in 2006?

17  A.   Participate?  What --

18  Q.   Were you a part of that decision?

19  A.   Yes.  We recognized that by the City policies

20       that they was eligible to apply for it.

21  Q.   Had those people I just identified ever been

22       allowed to apply for battalion chief promotions

23       before?

20

| | | |
|---|---|---|
| 1 | A. | Which people? |
| 2 | Q. | Probationary lieutenants -- |
| 3 | A. | Yes. |
| 4 | Q. | -- non and probationary firefighters before |
| 5 | | 2006? |
| 6 | A. | Before 2006, yes. |
| 7 | Q. | When were they allowed? |
| 8 | A. | They was allowed to on team leader promotions, |
| 9 | | on just about every promotion we done.  If they |
| 10 | | was still on probation, they could apply. |
| 11 | Q. | I guess what I'm asking, though, is:  Was there |
| 12 | | ever a captain or a battalion chief promotion |
| 13 | | before 2006 where probationary lieutenants and |
| 14 | | probationary and nonprobationary firefighters |
| 15 | | were allowed to apply? |
| 16 | A. | The last captain/lieutenant promotion we done |
| 17 | | was in 1996, and I was a shift commander at that |
| 18 | | time. |
| 19 | Q. | Is it true that in -- February 1 of 2006 when |
| 20 | | the team leaders were reclassified as |
| 21 | | lieutenants that Lieutenant Stephens was |
| 22 | | actually the only lieutenant in the department |
| 23 | | at that time? |

21

1    A.    Yes.  Yes.

2    Q.    Do you recall any discontent or dissatisfaction

3          among white team leaders that lieutenant

4          Stephens was the only lieutenant in the

5          department?

6    A.    No.

7                    (Plaintiff's Exhibits 17 & 18 marked

8                        for identification.)

9    Q.    I'll show you what I've marked as Plaintiff's

10         Exhibits 17 and 18.  It's the same letters we

11         looked at before.  Have you ever seen that

12         before?  Have you seen that before?

13   A.    Yes.

14   Q.    In response to that, is Exhibit 18 what you

15         sent?

16   A.    Yes.

17   Q.    And in the third paragraph it says:  Under our

18         current city policies and job -- and, again,

19         this letter is dated -- well, it's not dated.

20         Yeah, it is.  May 8 of 2006.

21             In the third paragraph it says:  Under our

22         current City policies and job descriptions,

23         there is no time in grade policy and no

22

1    cumulative point system.  Because of our current

2    advancement criteria, any nonprobationary

3    employee may participate in the assessment.  The

4    fire division is currently reviewing a Career

5    Development Plan that addresses these criteria.

6        So when you wrote this letter, the City of

7    Auburn was then reviewing a Career Development

8    Plan that addressed the criteria of time in

9    grade and a cumulative point system, correct?

10           MR. MORGAN:  Object to the form.

11   A.   Yes.  We was working on one.

12   Q.   And that would be a Career Development Plan

13       meaning that people could be promoted within the

14       department based on time in grade and a

15       cumulative point system; is that correct?

16           MR. MORGAN:  Object to the form.

17   A.   Yes.

18   Q.   Why was the City reviewing that?

19           MR. MORGAN:  Object to the form.

20   A.   We didn't have a current Career Development Plan

21       that was really in place, and we was trying to

22       develop one to set out guidelines for the

23       firefighters where a career firefighter hired in

23

1        would know what he had to do to advance.

2   Q.   For that Career Development Plan, you would

3        consider a cumulative point system and time in

4        grade as requirements to promote, correct?

5              MR. MORGAN:  Object to the form.

6   A.   Before?

7   Q.   No.  As a part of this Career Development Plan

8        that y'all were looking into, you would consider

9        time in grade and a cumulative point system for

10       promotions; is that correct?

11            MR. MORGAN:  Object to the form.

12  A.   Yes.  Once we got it there.  But it wasn't in

13       place at that time.

14  Q.   Right.  Well, has it ever gotten in place?

15  A.   It hadn't been put in place when I retired in

16       November.

17  Q.   Do you agree that those are important criteria

18       for promotions, time in grade and a cumulative

19       point system?

20            MR. MORGAN:  Object to the form.

21  A.   Some of it, yes.

22  Q.   Would those criteria have benefited Mr. Ogletree

23       and Mr. Stephens in your opinion in their

24

1       application for battalion chief?

2                   MR. MORGAN:  Object to the form.

3    A.    That's according to what points was assigned to

4          it.  We never had got down to that point.

5    Q.    Just because I don't know, what would be an

6          example of things considered in a cumulative

7          point system?  How would you accumulate points?

8    A.    The amount of certifications you might have or

9          college degrees, time in grade and stuff like

10         that.

11   Q.    What does time in grade mean?

12   A.    How long you've worked in that, you know, grade,

13         that position.

14                  MR. HORSLEY:  Let's take a minute.

15                  (Brief recess.)

16   Q.    (Continuing by Mr. Horsley)  Are you familiar

17         with Plaintiff's Exhibit 3, which is the 1991

18         settlement order that we've talked about today?

19   A.    I'm familiar with it.  I haven't looked at it in

20         over eight or nine -- It's been a long time

21         since I looked it.

22   Q.    Eight or nine years?

23   A.    No.

25

1    Q.    I thought you said --

2    A.    Eight or nine months, ever how long it's been

3          since I left, or it might have been longer than

4          that.

5    Q.    Do you know whether or not during the battalion

6          chief promotions in 2006 that the City of Auburn

7          was required to comply with that order?

8                    MR. MORGAN:  Object to the form.

9                    Also calls for a legal opinion.

10   A.    Repeat that.

11   Q.    Yeah.  During the battalion chief promotions in

12         2006, do you know if the City of Auburn Fire

13         Department was required to comply with that

14         order?

15   A.    By the process we was going through, I thought

16         we was complying with that form.

17   Q.    But the question was:  Did you think y'all were

18         required to comply with it?

19                   MR. MORGAN:  Object to the form.

20   A.    Was we required?  I never questioned it because

21         the process I thought we was doing was meeting

22         this criteria.

23   Q.    Did you review that order before y'all

26

1      implemented the process for the battalion chief

2      promotion that you recall?

3   A.  I don't remember if I did or not.

4   Q.  But you've heard earlier discussions about

5      whether or not the order was still in force in

6      2006.  Did you know one way or the other whether

7      or not that order was still in force?

8   A.  Really I don't know.

9   Q.  Am I correct in saying that the

10     reclassification -- that the City did not

11     consult this order before you reclassified the

12     team leaders to lieutenants in February of '06,

13     correct?

14          MR. MORGAN:  Object to the form.

15  A.  February?

16  Q.  When the team leaders were reclassified to

17     lieutenants in February of 1 of 2006, do you

18     recall whether or not the City consulted this

19     order to see if that was proper or not?

20          MR. MORGAN:  Object to the form.

21  A.  Yes.  Steve Reeves and the city attorney, you

22     know, they read it, and that's when they come

23     back with their judgment that we could make a

27

1     name change.

2  Q.  Do you recall whether or not the City consulted

3     this order before the captain was reclassified

4     or renamed as battalion chief?

5          MR. MORGAN:  Object to the form.

6  A.  That I don't know.  That was handled by the city

7     manager, David Watkins, at that time.

8  Q.  Do you know whether or not the Plaintiff's

9     Exhibit 3 was consulted by the City before it

10    reclassified the shift commander position to

11    battalion chief?

12         MR. MORGAN:  Object to the form.

13  A.  Again, that was done by -- that decision was

14    made by the city manager, David Watkins.  I

15    don't know if he did or not.

16         MR. HORSLEY:  That's all.  Thank you.

17         MR. MORGAN:  I've got one or two

18            questions.

19             **EXAMINATION**

20 BY MR. MORGAN:

21  Q.  The lieutenant/team leader reclassification, at

22    that time you testified lieutenant had a bar and

23    the team leaders had what, something --

28

1    A.    AFD insignia on the collar.

2    Q.    Did they do the same job?

3    A.    The job description was identical.

4    Q.    Did they get the same pay?

5    A.    Same pay.

6    Q.    Was the lieutenant over a team leader?

7    A.    No.

8    Q.    Was that a promotion from team leader to

9           lieutenant?

10    A.    No.  It was a name change only.

11    Q.    You were asked about people being eligible to

12           apply for the battalion chief promotion and the

13           City opening it up for everybody.

14    A.    Right.

15    Q.    When you applied for captain in 1993 --

16    A.    Yes.

17    Q.    -- you were what rank?

18    A.    Firefighter.

19    Q.    Even though you were not a lieutenant, you were

20           eligible to have applied for captain?

21    A.    Right.

22    Q.    And Eddie Ogletree as a firefighter in 1993

23           could have applied for captain as well, couldn't

29

1    he?

2    A.    Right.

3                   MR. MORGAN:   No further questions.

4                   MR. HORSLEY:   Thank you.

5                   (Deposition concluded at

6                     approximately 2:40 p.m.)

7              *  *  *  *  *  *  *  *  *  *  *

8              FURTHER DEPONENT SAITH NOT

9              *  *  *  *  *  *  *  *  *  *  *

10                   REPORTER'S CERTIFICATE

11   STATE OF ALABAMA:

12   MONTGOMERY COUNTY:

13        I, Pamela A. Wilbanks, CCR, Registered

14   Professional Reporter, and Commissioner for the State

15   of Alabama at Large, do hereby certify that I reported

16   the deposition of:

17                   LARRY M. LANGLEY

18   who was first duly sworn by me to speak the truth, the

19   whole truth and nothing but the truth, in the matter

20   of:

21                   EDDIE OGLETREE, an individual,

22                   GERALD STEPHENS, an

23                     individual,

30

1                    Plaintiffs,

2                    Vs.

3                    CITY OF AUBURN, a municipality

4                    in the State of Alabama, LARRY

5                    LANGLEY, an individual, LEE LAMAR,

6                    an individual, BILL HAM, JR., an

7                    individual, STEVEN A. REEVES, an

8                    individual, BILL JAMES, an

9                    individual, CHARLES M. DUGGAN, an

10                   individual, and CORTEZ LAWRENCE,

11                   an individual,

12                   Defendants.

13                   In The U.S. District Court

14                   For the Middle District of Alabama

15                   Eastern Division

16                   3:07-CV-867-WKW

17    on Wednesday, July 30, 2008.

18            The foregoing 29 computer printed pages

19    contain a true and correct transcript of the

20    examination of said witness by counsel for the parties

21    set out herein.  The reading and signing of same is

22    hereby not waived.

23            I further certify that I am neither of kin nor

ORIGINAL

31

1   of counsel to the parties to said cause nor in any

2   manner interested in the results thereof.

3          This 5th day of August 2008.

4

5

6

7

8

9

10

11          *Pamela A. Wilbanks (R.M.C.)*

12          Pamela A. Wilbanks, ACCR #334
            Expiration Date:  9-30-2008

13          Registered Professional Reporter
            and Commissioner for the State

14          of Alabama at Large

15

16

17

18

19

20

21

22

23

# DEPOSITION TESTIMONY OF
# WILLIAM JAMES

1

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      EASTERN DIVISION

4    EDDIE OGLETREE, an individual,
     GERALD STEPHENS, an
5    individual,

6          Plaintiffs,

7    Vs.                          CIVIL ACTION NO.
                                  3:07-CV-867-WKW
8

9    CITY OF AUBURN, a municipality
     in the State of Alabama, LARRY
     LANGLEY, an individual, LEE LAMAR,
10   an individual, BILL HAM, JR., an
     individual, STEVEN A. REEVES, an
11   individual, BILL JAMES, an
     individual, CHARLES M. DUGGAN, an
12   individual, and CORTEZ LAWRENCE,
     an individual,

13
           Defendants.
14
                   * * * * * * * * * *
15

16        **DEPOSITION OF WILLIAM HOWARD JAMES**, taken

17   pursuant to stipulation and agreement before Pamela A.

18   Wilbanks, Certified Court Reporter, ACCR# 391,

19   Registered Professional Reporter and Commissioner for

20   the State of Alabama at Large, in the Conference Room

21   of Auburn City Hall, 144 Tichenor Avenue, Auburn,

22   Alabama, on Wednesday, July 30, 2008, commencing at

23   approximately 1:20 p.m.

2

1

2                                  **APPEARANCES**

3

4  **FOR THE PLAINTIFF:**

5  Mr. Richard F. Horsley
   KING, HORSLEY & LYONS
6  Attorneys at Law
   1 Metroplex Drive
7  Suite 280
   Birmingham, AL  35209
8
   **FOR THE DEFENDANT:**
9
   Mr. Randall Morgan
10 HILL, HILL, CARTER, FRANCO, COLE & BLACK
   Attorneys at Law
11 425 South Perry Street
   Montgomery, Alabama
12
   **ALSO PRESENT:**
13
   Mr. D'Arcy Wernette
14 Mr. Steven Reeves
   Mr. Larry Langley
15 Mr. Lee Lamar
   Mr. Eddie Ogletree
16 Mr. Gerald Stephens

17            *  *  *  *  *  *  *  *  *  *  *  *

18              EXAMINATION INDEX

19    BY MR. HORSLEY . . . . . . . . . . . .    4

20            *  *  *  *  *  *  *  *  *  *  *  *

21

22

23

3

**STIPULATION**

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of **WILLIAM HOWARD JAMES** is taken pursuant to the Alabama Rules of Civil Procedure and that said deposition may be taken before Pamela A. Wilbanks, Registered Professional Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission, that objections to questions other than objections as to the form of the question need not be made at this time but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used for any other purpose by either party provided for by the Statute.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of said deposition is hereby waived and may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute regardless of the waiving of the filing of the same.

It is further stipulated and agreed by and between the parties hereto and the witness that the

4

1  signature of the witness to this deposition is hereby

2  not waived.

3              * * * * * * * * * * *

4                 **WILLIAM HOWARD JAMES**

5         The witness, after having first been duly

6  sworn to speak the truth, the whole truth and nothing

7  but the truth testified as follows:

8                    **EXAMINATION**

9  BY MR. HORSLEY:

10   Q.    Please tell us your full name.

11   A.    William Howard James.

12   Q.    And do you go by Bill James?

13   A.    Yes.

14   Q.    My name is Richard Horsley.  I'm going to ask

15         you some questions.  Just like with Mr. Reeves,

16         if you don't understand something or want me to

17         rephrase it, just tell me and I will do so.

18         Once you answer a question, I'm going to assume

19         you understood it and are giving the answer you

20         intended to give.  Okay?

21   A.    Okay.

22   Q.    Where do you currently reside?

23   A.    8371 Lee Road 188, Waverly.

5

| | | |
|---|---|---|
| 1 | Q. | What's the ZIP Code out there? |
| 2 | A. | 36879. |
| 3 | Q. | Where are you currently employed? |
| 4 | A. | City of Auburn. |
| 5 | Q. | In what capacity with the City? |
| 6 | A. | Public safety director. |
| 7 | Q. | How long have you held that job? |
| 8 | A. | October of 2004. |
| 9 | Q. | Generally tell me what you do as a public safety |
| 10 | | director for the City of Auburn. |
| 11 | A. | Provide administrative direction for the |
| 12 | | divisions in public safety, budgets, contract, |
| 13 | | personnel. |
| 14 | Q. | What was your job immediately before that? |
| 15 | A. | I was a building official with the City of |
| 16 | | Auburn. |
| 17 | Q. | The building official? |
| 18 | A. | Uh-huh (positive response). |
| 19 | Q. | How long did you hold that job? |
| 20 | A. | Fifteen years, sixteen years. |
| 21 | Q. | Where were you immediately before that? |
| 22 | A. | I worked with the economic development |
| 23 | | department for a year -- |

6

1    Q.    City of Auburn?

2    A.    -- with the City of Auburn prior to that.

3    Q.    Before that where were you employed?

4    A.    I worked for Castle and Algernon Blair, a

5          contracting company out of Montgomery.

6    Q.    What kind of contracting?

7    A.    They did building contracting.

8    Q.    Do you recall where you worked before that?

9    A.    Self-employed in Tennessee.

10   Q.    What did you do in Tennessee?

11   A.    Built a few houses.

12   Q.    Did you have a company name or ...

13   A.    Worked with my brother-in-law.

14   Q.    Was there a name of the company?

15   A.    Blue Ridge Construction or Blue -- Blue Ridge

16         maybe.

17   Q.    Do you have relatives that reside in Lee County?

18   A.    Yes.

19   Q.    Can you tell me who they are, or if it's a lot

20         of them --

21   A.    I've got in-laws and three brothers and sisters

22         and such.

23   Q.    Just provide a list of your -- what I want -- I

1          don't want to spend a bunch of time going

2          through them, but what I need to know is

3          relatives in Lee County, Macon County, Lowndes

4          County, Russell County, Montgomery County.  I

5          think that's it.

6   A.   Okay.

7   Q.   Macon.  Did I say Macon?

8          Randall knows which counties they are.

9   A.   Okay.

10   Q.   You said that your job -- one of the elements of

11          your job was dealing with personnel; is that

12          correct?

13   A.   Yes, sir.

14   Q.   What aspects of personnel decisions are you

15          involved in?

16   A.   Review personnel actions, whether it be

17          performance appraisals, corrective actions,

18          things of that nature.

19   Q.   Did you participate in any way in the battalion

20          chief promotions back in 2006?

21   A.   I did.

22   Q.   What participation did you have in those

23          promotions?

8

```
 1   A.    I was -- participated with the others that have

 2         been mentioned here today discussing what we

 3         were going to do for the promotion process.

 4   Q.    And I think you were a part of the group that

 5         Mr. Reeves named that decided how that promotion

 6         would take place; is that correct?

 7   A.    Yes.  I had input, yes.

 8   Q.    And do you agree with him that that group of

 9         people decided to hire CWH to conduct the cutoff

10         test?

11   A.    Yes.  Well, to hire CWH, yes.

12   Q.    And the people that he named, were those the

13         people that you remember being involved in that

14         decision?

15   A.    In the hiring of the company?

16   Q.    Yes.

17   A.    Yes.

18   Q.    He also spoke about decisions or meetings that

19         were had after CWH was hired.  What I want to

20         know is:  Do you recall being in those meetings

21         when discussions were held with CWH about the

22         cutoff test and the assessment center?

23               MR. MORGAN:  Object to the form.
```

9

1    A.    Yes.

2    Q.    Is it your memory that the City of Auburn was

3          attempting to comply with the 1991 court order

4          that we've talked about earlier during that

5          promotion or was that not a consideration?

6    A.    I don't recall that personally being a

7          consideration.

8    Q.    You don't recall specifically the order being

9          something the City felt like it had to comply

10         with pursuant to those promotions?

11                   MR. MORGAN:   Object to the form.

12   A.    Right.

13   Q.    Is that right?

14   A.    Yes.

15   Q.    And are you familiar with that order?  Have you

16         read it?

17   A.    Not recently, but I have read it.

18   Q.    Can you tell me why the City did not believe at

19         that time that it was -- that it had to comply

20         with the 1991 order?

21                   MR. MORGAN:   Object to the form.

22   A.    I'm not sure I understand the question.  In

23         reference to what?

10

Q.   You said you didn't feel like the 1991 order was
     a consideration in y'all's decision-making
     process for the battalion chief promotion in
     2006.

          MR. MORGAN:  Object to the form.

Q.   Is that correct?

A.   Whether we had to do an assessment center?

Q.   Whether you had to comply with the order.

          MR. MORGAN:  Object to the form.

A.   I guess -- I'm sorry.  I don't understand.

Q.   Let me ask it again.

     When y'all were talking about the promotion
     to battalion chief and decided how that
     promotion was going to take place, when y'all
     were having these meetings, before and when you
     joined up with CWH, what I want to know is:  Is
     it your memory that the City felt as though it
     was obligated to comply with the 1991 order
     pursuant to those promotions?

          MR. MORGAN:  Object to the form.

A.   Whether it was obligated to follow that?

Q.   Uh-huh (positive response).

A.   No.

11

1    Q.    The City did not believe it was, correct?

2              MR. MORGAN:  Object to the form.

3    A.    That we had to comply with the order?

4    Q.    The City did not believe it had to comply with

5          the order?

6              MR. MORGAN:  Object to the form.

7    A.    No, I don't want to say that.  No.

8    Q.    We're not connecting.

9              Are you saying that it's your memory the

10         City did not believe it had to comply with the

11         1991 order pursuant to the 2006 battalion chief

12         promotions?

13             MR. MORGAN:  Object to the form.

14   A.    I'm sorry.

15   Q.    That's okay.

16             Did you or did you not have to comply with

17         the order?

18             MR. MORGAN:  I'm going to object to

19                 the form.

20   A.    I don't think that was the only reason we went

21         to an assessment center was because the order

22         said that you had to use an assessment center

23         for a promotional process.

12

1    Q.    You're saying y'all weren't doing an assessment

2          center because the order said you had to do it?

3                  MR. MORGAN:  Object to the form.

4    A.    Not in my understanding.

5    Q.    Again, was it your understanding that the City

6          had to comply with the 1991 order for the

7          battalion chief promotion in 2006?

8                  MR. MORGAN:  Object to the form.

9    A.    I'm not sure what the position was from the

10          City's standpoint of whether we had to comply

11          with the '91 order.

12    Q.    You don't know one way or the other; is that

13          correct?

14    A.    Yes.  I don't have that knowledge.

15    Q.    Did you ever have any meetings about the 1991

16          order and whether or not it was still in force

17          with the city attorney, Arnold Umbach?

18    A.    No.  I don't recall having any meetings with

19          Attorney Umbach.

20    Q.    Do you recall the 1991 order being the subject

21          of any discussions that y'all had when you were

22          deciding about the battalion chief promotion

23          maybe from Steve Reeves?

13

1    A.    There may have been some discussion about there

2          is this order and it has -- I believe in

3          captains -- assessment centers.  There may have

4          been some discussions on that, yes.

5    Q.    From your standpoint am I correct in saying that

6          the City did not attempt to comply with the 1991

7          order pursuant to the battalion chief promotions

8          in 2006?

9                MR. MORGAN:  Object to the form.

10   A.    I wouldn't say we attempted to not comply, no.

11   Q.    You wouldn't say you -- Say that again.  I

12         wasn't sure what your answer was, if you don't

13         mind.

14         Did the City attempt to comply with the

15         1991 order for the 2006 battalion chief

16         promotions?

17               MR. MORGAN:  Object to the form.

18   A.    Yeah.  Yes, we attempted to comply with it.

19   Q.    You did?  And how did you do that?

20   A.    If you assume that we had to do an assessment

21         center for this promotion, then I guess we

22         complied with the order.

23   Q.    In Section 12 of the order, which we've marked

14

1        as Plaintiff's Exhibit 3 -- I'll show it to

2        you -- if you would read the section for me,

3        Section 12.  I've highlighted it.  I apologize

4        for that.

5   A.   (Witness complies.)

6   Q.   Section 12, which is the section that deals with

7        the assessment center and promotions, did you

8        see anywhere in that section any reference to a

9        test with a cutoff score?

10                  MR. MORGAN:  Object to the form.

11  A.   No, sir.

12  Q.   Is it your understanding that this order

13       requires an assessment center or an assessment

14       center that has a test with a cutoff score?

15                  MR. MORGAN:  Object to the form.

16  A.   Well, I think I have an understanding of what an

17       assessment center is.

18  Q.   Okay.

19  A.   And --

20  Q.   You'll agree with me that Section 12 does not --

21                  MR. MORGAN:  Let him answer the

22                     question.

23  Q.   I'm sorry.

15

1    A.    I think I have an understanding of what an

2          assessment center is, and there are various

3          components in an assessment center.

4    Q.    You'll agree with me that this document does not

5          reference in any way a cutoff score either as a

6          prerequisite or as a component of the assessment

7          center that's been approved by this court; is

8          that correct?

9                MR. MORGAN:  Object to the form.

10   A.    That's right.

11   Q.    In fact, an assessment center and a test with a

12         cutoff score or any tests are two separate

13         entities; is that correct?

14               MR. MORGAN:  Object to the form.

15   A.    I don't know that I would agree with that.

16   Q.    You would not agree with that?

17               What we've marked earlier as Plaintiff's

18         Exhibit 2, which is the Auburn Fire Division

19         Orientation Manual, Promotional Written Test and

20         Assessment Center Process, have you seen this

21         document?

22   A.    Yes.

23   Q.    Have you looked at it and read it and understand

16

1          it?

2    A.    I remember looking at this document back when we

3          started the process.

4    Q.    Will you agree with me that as described in that

5          document, the test and the assessment center are

6          two completely separate things?

7                    MR. MORGAN:  Object to the form.

8    A.    I would have to read back through here and see

9          how it's spelled out in this document here.

10   Q.    There's a section on page 9 that describes an

11         assessment center.

12   A.    Okay.

13   Q.    And if you don't mind, I'll read it into the

14         record and ask if that's what you understand an

15         assessment center to be.

16              An assessment center is an integrated

17         system of simulations designed to elicit

18         behavior similar to that required for success in

19         a target job.  More simply, it is a series of

20         activities that are similar to those performed

21         in a given job.  Each activity mirrors a

22         different aspect of the job.  Performance in

23         these activities is observed by assessors who

1      are trained to be fair and objective.  The panel

2      of objective assessors will be selected from

3      departments similar to yours based upon their

4      expertise and knowledge regarding the target

5      job.  The assessors will observe you performing

6      a series of exercises in order to evaluate

7      several job performance dimensions deemed

8      important to performing successfully on the

9      job.  Assessors compare candidates' performance

10     to predetermined performance guidelines to

11     ascertain who will perform effectively on the

12     job.

13          Is that consistent with your understanding

14     of what an assessment center is?

15               MR. MORGAN:  Object to the form.

16  A.  I would say no.

17  Q.  That's not consistent with your understanding?

18  A.  Not my personal understanding of an assessment

19     center, no.

20  Q.  How is your personal understanding different

21     than what I just read to you?

22  A.  I think it included those components right

23     there, but also a part of that would be an

18

1       examination.

2   Q.   You understand that the examination is part of

3        the assessment center; is that correct?

4   A.   Yes.

5   Q.   And where did you gain that information?

6   A.   That's just my personal belief.  I don't know

7        that I've read or -- I can't point to a specific

8        document that says this is why I believe that.

9        I just believe that an assessment center would

10       be evaluating a wide ...

11  Q.   If you assume that what I just read you is

12       correct and that that is a correct description

13       of an assessment center, you would agree with me

14       that a written test is not a part of it,

15       correct?

16              MR. MORGAN:  Object to the form.

17  A.   Based on that definition.

18  Q.   Based on that definition your answer is "yes"?

19              MR. MORGAN:  Object to the form.

20  A.   Yes.

21  Q.   And, in fact, the test with the cutoff score

22       that was given to the battalion chief applicants

23       in 2006 was a prerequisite before you could

19

1     actually go to the assessment center; is that

2     correct?

3               MR. MORGAN:  Object to the form.

4     A.   Yes.  You had to pass the test before you went

5          to the next step in the process, yes.

6     Q.   According to the document that y'all used for

7          the assessment center, the assessment center as

8          I just read to you which was implemented by the

9          City of Auburn doesn't include a test, does it?

10              MR. MORGAN:  Object to the form of

11                   that question.

12    Q.   What I just read to you --

13    A.   Out of that definition, it did not say anything

14         about a test.

15              MR. MORGAN:  Object to the form.

16    Q.   Well, this is the company y'all were using to do

17         the assessment center, correct?

18    A.   Right.

19    Q.   Is there any reason why you would disagree with

20         the company y'all had hired to do the assessment

21         center?

22    A.   No.  But the test was a part of the process.

23    Q.   The test was a prerequisite --

20

1   A.   The assessment process.

2   Q.   You'll agree with me if you didn't pass the

3        test, you didn't go to the assessment center,

4        did you?

5             MR. MORGAN:  Object to the form.

6                  Asked --

7   A.   You didn't move further along the process, that

8        is correct.

9   Q.   The document speaks for itself, and I'll submit

10       that the document clearly shows the test and the

11       assessment center are two separate entities.

12       Okay?

13            MR. MORGAN:  If that's a question, I

14                 object to the form.

15  Q.   Was the assessment -- I think you testified

16       earlier that in doing an assessment center or

17       attempting to do an assessment center for the

18       battalion chief promotion in 2006 that you felt

19       like the City was trying to comply with the 1991

20       court order; is that correct?

21  A.   Yes.

22  Q.   Do you know whether or not the 2006 assessment

23       center used for the battalion chief promotion

21

```
 1            had been approved by the United States District

 2            Court for the Middle District of Alabama Eastern

 3            Division?

 4     A.     I have no knowledge of that.

 5     Q.     You don't know one way or the other?

 6     A.     Right.  Correct.

 7     Q.     Will you agree with me that in the paragraph we

 8            just read in Section 12 it says that the City at

 9            that time submitted to the court an assessment

10            center which shall be approved by the court?  Do

11            you agree with that?

12                    MR. MORGAN:  Object to the form.

13     A.     That's what it says.  I wasn't here at that

14            time.

15     Q.     And you don't know one way or the other if this

16            assessment center for the 2006 BC promotion was

17            approved by the court or not, correct?

18     A.     No, sir.

19     Q.     Are you familiar with Kathleen Robinson?

20     A.     No, I'm not.

21     Q.     Will you agree with me, Mr. James, that if, in

22            fact, the City required a cutoff test before you

23            could go to the assessment center that that
```

22

1          would violate the 1991 order that we just read?

2                    MR. MORGAN:  Object to the form.

3     A.   Would I agree that it would violate it?

4     Q.   That it would violate it.

5                    MR. MORGAN:  First of all, that's a

6                    legal question.  But if you've got

7                    an opinion --

8     A.   My opinion is no.

9     Q.   In your opinion it would not violate the order?

10    A.   Correct.

11    Q.   And why is that your opinion?

12                   MR. MORGAN:  Object to the form.

13    A.   Because it doesn't say anything about not having

14         a test.

15    Q.   Your testimony is that because the order doesn't

16         mention a test, then it doesn't violate the --

17         giving a test doesn't violate the order?

18                   MR. MORGAN:  Object to the form.

19    A.   Correct.  Based on my -- what my opinion is of

20         an assessment center.

21    Q.   Did you hear testimony earlier from Mr. Reeves

22         about the number of black firefighters hired --

23         firemen hired since the 1991 order?

23

1    A.    Yes, sir.

2    Q.    And you've been there all that time, maybe not

3          in the same position --

4    A.    Correct.

5    Q.    -- but did you hear when I said that -- when I

6          named four black firefighters that were hired

7          since that time?

8    A.    I heard you mention that, yes.

9    Q.    Do you know of any other black firemen that were

10         hired since that time by the City of Auburn Fire

11         Department?

12   A.    No, sir.

13   Q.    You heard Mr. Reeves give a rough estimate that

14         20 white people had been hired or white firemen

15         had been hired since 1991.  Do you agree with

16         that estimate?

17   A.    To be honest, I couldn't say if that was ten

18         over or ten -- I don't know.  I don't have a

19         feel for whether that's even close.

20                    (Plaintiff's Exhibit 13 marked for

21                        identification.)

22   Q.    I'll show you what I've marked as Plaintiff's

23         Exhibit 13.  These are unsigned answers to

24

1          interrogatories that I submitted to the City and

2          your attorney.  I'm going to show them to you

3          and just ask if you've ever seen them before.

4                         MR. MORGAN:  Richard, I have the

5                              signed responses.  And I will send

6                              those to you, and I will show him

7                              his signed responses --

8                         MR. HORSLEY:  Okay.

9                         MR. MORGAN:  -- if that's okay.

10                        MR. HORSLEY:  That's fine.

11                        MR. MORGAN:  We can make a copy of it

12                             if you want to.

13                        MR. HORSLEY:  It doesn't matter.  As

14                             long as they are the same, it

15                             doesn't matter.

16                        MR. MORGAN:  I don't think we made

17                             any changes.

18                        MR. HORSLEY:  If you'll send me the

19                             signed copies, I don't care if

20                             those are not attached to the

21                             deposition.

22                        MR. MORGAN:  The unsigned responses I

23                             sent you have not been changed.  I

25

1          have the signed ones, and I'll

2          send them to you.

3               MR. HORSLEY:  So for the record, the

4               interrogatory responses we're

5               attaching as exhibits to this

6               deposition are exactly the same as

7               the interrogatory responses that

8               have been signed under oath by

9               each individual --

10               MR. MORGAN:  That's my understanding.

11   Q.   Do you recall signing your answers to

12        interrogatories?

13   A.   Yes, sir.

14   Q.   And this is an accurate copy of your answers; is

15        that correct?

16   A.   Yes, sir.

17   Q.   And these answers are correct and answers given

18        to the best of your knowledge, correct?

19   A.   Yes, sir.

20               (Plaintiff's Exhibit 14 marked for

21                identification.)

22   Q.   I'll show you what I've marked -- Let me do this

23        first.  Just so I can go ahead and get these

26

1          attached, these are the City of Auburn's

2          responses to my interrogatories marked as

3          Plaintiff's Exhibit 14.  Have you seen those?

4                    MR. MORGAN:  I'll make the same

5                    representation to you.

6                    MR. HORSLEY:  Who is going to sign or

7                    who signed those?

8                    MR. MORGAN:  I don't know who signed

9                    for the City.

10                   (Off-the-record discussion.)

11                   MR. MORGAN:  The city manager, yeah.

12                   MR. HORSLEY:  Who is that?

13                   MR. MORGAN:  Charles Duggan.

14                   MR. HORSLEY:  So Plaintiff's Exhibit

15                   14 is the City's responses, and

16                   those were signed without change

17                   by Charles Duggan, the city

18                   manager, correct?

19                   (Plaintiff's Exhibit 15 marked for

20                   identification.)

21    Q.    What I've marked as Plaintiff's Exhibit 15 is a

22          letter sent to you back on May 12, 2006 from

23          Horace Clanton, Eddie Ogletree, and Gerald

27

1          Stephens, and I'll ask you if you've ever seen

2          that document.

3     A.   Yes, sir.

4     Q.   You have seen this?

5     A.   Yes.

6     Q.   You received it?

7               Had you had any discussions with

8          Mr. Ogletree or Mr. Stephens about this

9          grievance before they sent you this letter?

10    A.   I don't recall having any discussions, no.

11    Q.   As a result of this letter, do you recall having

12         a meeting with Mr. Stephens and Mr. Ogletree?

13    A.   No, I don't recall having a meeting.

14    Q.   Have you ever had a face-to-face meeting with

15         these gentlemen specifically related to their

16         complaints in Plaintiff's Exhibit 15?

17    A.   Not that I recall.

18                    (Plaintiff's Exhibit 16 marked for

19                       identification.)

20    Q.   What I'll mark as Plaintiff's Exhibit 16 is a

21         letter that I believe you sent to Lieutenant

22         Stephens.  If you could, identify that for me.

23    A.   Yes, I recall this.

28

1   Q.   Was that letter sent to Lieutenant Stephens in

2        response to Plaintiff's Exhibit 15?

3   A.   Let me see it again.

4            (Brief off-the-record discussion.)

5   A.   Yeah.  It appears to be what I would have

6        responded to.

7   Q.   Did you send the exact same letter to your

8        knowledge to Eddie Ogletree?

9   A.   Yeah.  My recollection I would have, yes.

10   Q.   In your second to last sentence in the second

11        paragraph, you state that an accumulative system

12        is being evaluated in the overall scope of the

13        promotional process.  They hope to have this

14        completed by the end of this fiscal year.

15        What did you mean by those two sentences?

16   A.   A Career Development Plan that the fire division

17        is working on.

18   Q.   Did you mean by that that the Auburn Fire

19        Department was looking into an accumulative

20        system for promotions?

21   A.   Yes.

22   Q.   Meaning --

23   A.   As part of the Career Development Plan for each

29

```
 1            rank.

 2       Q.   I'm sorry.  What?

 3       A.   Promotion for each rank, for each position.

 4       Q.   And what specifically do you mean when you say

 5            accumulative?

 6       A.   Well, the Career Development Plan, as I

 7            understand it, each position would have certain

 8            requirements in that position, certain

 9            certifications, educational requirements.  And

10            then to go to the next -- or be eligible for a

11            promotion to a higher rank, that you would meet

12            those qualifications.

13       Q.   Does a cutoff test also -- is that also included

14            in those qualifications?

15       A.   The document I recall does not mention a cutoff

16            test.

17       Q.   So were you saying in this letter that the City

18            was looking into promoting people based on

19            something different than tests with cutoff

20            scores?

21                 MR. MORGAN:  Object to the form.

22       A.   Well, as I recall this, it was the Career

23            Development Plan, CDP, that the fire division
```

30

1   was working on.

2 Q. Do you recall during the meetings with CHW -- if

3   I say that wrong -- CWH -- do you recall who

4   during those meetings was promoting a score of

5   70 as being the cutoff score?

6 A. I don't recall any specific person promoting

7   that other than it was discussed among everybody

8   that was in the room about a cutoff score.

9 Q. And you can't testify if anyone with the City of

10   Auburn was the first person to suggest that

11   there be a 70 cutoff score?

12 A. I couldn't identify a person, no.

13 Q. Are you familiar through your job with the City

14   of Auburn with the work history of Mr. Stephens

15   and Mr. Ogletree?  It's okay if you're not.  I'm

16   just asking.

17 A. Detailed parts of it, not specifically, other

18   than I did -- since my position as the director

19   looking at performance appraisals.

20 Q. To your knowledge did they have satisfactory

21   performance appraisals?

22 A. As I recall they do, yes.

23 Q. Are you aware of anything in their work history

1    with the City of Auburn that would have

2    disqualified them for the promotion to battalion

3    chief?

4            MR. MORGAN:  Object to the form.

5    A.   No.

6    Q.   You talked about the promotional process a

7    moment ago, and you'll agree with me that the

8    test with a cutoff score was a component of the

9    process to be promoted to battalion chief in

10   2006; is that correct?

11   A.   Correct.

12   Q.   And what other components of that process

13   existed to your knowledge for the promotion?

14   A.   They had the thing they called the hot seat.

15   They had a situational scenario.  It seems there

16   was another component, but I can't remember what

17   it was.  It seems like there were three

18   components.

19   Q.   Is it your understanding that an applicant's

20   performance in the situational part of the

21   process, that their performance was largely

22   based on their experience as firefighters?

23           MR. MORGAN:  Object to the form.

32

1    A.    To be honest I don't know that I could answer

2          that.  I'm not sure.  I'm not a firefighter so

3          I'm not sure.

4    Q.    You'll agree with me that all three

5          African-Americans that applied for battalion

6          chief failed to make it past the first step of

7          the requirements; is that correct?

8    A.    That's true.

9    Q.    And that being -- the first step was a test with

10         a cutoff score of 70, correct?

11   A.    That's true.

12   Q.    Will you also agree with me that the three

13         African-Americans that failed to make it past

14         the first step of the promotion process had been

15         with the City of Auburn Fire Department for more

16         years than the four individuals that were

17         actually promoted to battalion chief?

18   A.    To my recollection I'd say that's correct.

19   Q.    Would you agree that since they had been there a

20         number of years more than the individuals who

21         were actually promoted to battalion chief that

22         they had more actual on-the-job experience than

23         those individuals?

33

1              MR. MORGAN:  Object to the form.

2    A.    I could agree that they had been a firefighter

3          longer.  I'm not sure how you define experience.

4    Q.    I'm not going to offer this exhibit during your

5          deposition, but have you seen the two memos that

6          were sent out back to back in advance of the

7          promotion where one said that only

8          nonprobationary lieutenants could apply and then

9          several days later a second one that said

10         everybody can apply:  nonprobationary,

11         probationary, and probationary, nonprobationary

12         firefighters could apply also?  Did you see

13         those two memos?

14   A.    Yes.

15   Q.    Were you involved in the decision to allow

16         nonprobationary lieutenants and probationary and

17         nonprobationary --

18              Were you involved in the decision to allow

19         probationary lieutenants and nonprobationary and

20         probationary firefighters to apply for the

21         battalion chief position?

22   A.    Yes.  I made -- Yes.

23   Q.    Was that a group decision or did you make that

34

1       decision yourself?

2   A.  I did not see anything in our policy or job

3       description that would have excluded the

4       individuals other than lieutenants, and I made

5       that point and then the second memo was sent

6       out.

7   Q.  So you saw the first memo.  And for some reason

8       that triggered you to go --

9   A.  No.  Actually, the first memo went out as I

10      recall.  And then, if I'm not mistaken, I

11      believe we got an application from Mr. Turner.

12      When I got that or when I heard that, I looked

13      and did not find anything that would preclude

14      him from applying for the job.

15  Q.  So it's your testimony that as a result of

16      his -- Mr. Turner's application, you went and

17      looked at the policies and determined that there

18      was nothing that would preclude him from

19      applying for the battalion chief position,

20      correct?

21  A.  As I recall, yes.

22  Q.  And so based upon that, you decided to allow

23      probationary lieutenants, probationary and

35

1          nonprobationary firefighters all to apply for

2          that position; is that correct?

3    A.    Yes, sir.

4    Q.    Is it your position that the lieutenants who had

5          been reclassified in February of '06 were

6          probationary or nonprobationary lieutenants at

7          the time of the battalion chief promotion?

8    A.    Non.

9    Q.    Why is that?

10   A.    Because they weren't promoted.

11   Q.    Mr. Reeves wasn't real familiar with the

12         insignia that different ranking firemen wear.

13         Are you familiar with those insignia?

14   A.    I am not.

15   Q.    Do you recall a meeting with Lieutenant Stephens

16         sometime in 2005 which would have been before

17         the reclassification of team leaders to

18         lieutenant?

19   A.    A meeting before that?

20   Q.    Uh-huh (positive response).

21   A.    I don't recall that we had a meeting before

22         that.

23   Q.    You don't recall the meeting you had with

36

1         Mr. Stephens where he told you that there was a

2         problem --

3    A.   I believe we may have met after that meeting --

4         at some point after that meeting.

5    Q.   At some point after the reclassification?

6    A.   No.  After a meeting that we had with the three

7         individuals that did not agree with the

8         reclassification.

9    Q.   You're saying you and Mr. Stephens had a meeting

10        after that meeting?

11   A.   As I recall it was after that meeting.

12   Q.   Can you tell us approximately when this meeting

13        occurred?

14   A.   It may have been the same day.  It could have

15        been the next day.  I think it was shortly after

16        that.

17   Q.   Tell me what you recall was said during that

18        meeting.  It's just you and Mr. Stephens?

19   A.   I believe we went to my office.  To be quite

20        honest, I don't recall any details about the

21        meeting.  I don't recall anything -- I can only

22        assume that there wasn't anything earth

23        shattering, but I don't recall what we said or

37

1       what he said.

2   Q.    It's your testimony you don't recall

3         specifically what was said during that meeting?

4   A.    No.  I recall -- I believe we met in my office,

5         but I don't recall any specifics about it, no.

6                       MR. HORSLEY:  Let's take a few

7                   minutes.

8                   (Brief recess.)

9                   (Deposition concluded at

10                  approximately 2:10 p.m.)

11              * * * * * * * * * * *

12              FURTHER DEPONENT SAITH NOT

13              * * * * * * * * * * *

14

15              REPORTER'S CERTIFICATE

    STATE OF ALABAMA:
16
    MONTGOMERY COUNTY:
17
            I, Pamela A. Wilbanks, CCR, Registered
18
    Professional Reporter, and Commissioner for the State
19
    of Alabama at Large, do hereby certify that I reported
20
    the deposition of:
21
                    WILLIAM HOWARD JAMES
22
    who was first duly sworn by me to speak the truth, the
23
    whole truth and nothing but the truth, in the matter

38

1  of:

2                    EDDIE OGLETREE, an individual,

3                    GERALD STEPHENS, an

4                    individual,

5                    Plaintiffs,

6                    Vs.

7                    CITY OF AUBURN, a municipality

8                    in the State of Alabama, LARRY

9                    LANGLEY, an individual, LEE LAMAR,

10                   an individual, BILL HAM, JR., an

11                   individual, STEVEN A. REEVES, an

12                   individual, BILL JAMES, an

13                   individual, CHARLES M. DUGGAN, an

14                   individual, and CORTEZ LAWRENCE,

15                   an individual,

16                   Defendants.

17                   In The U.S. District Court

18                   For the Middle District of Alabama

19                   Eastern Division

20                   3:07-CV-867-WKW

21  on Wednesday, July 30, 2008.

22          The foregoing 37 computer printed pages

23  contain a true and correct transcript of the

39

1   examination of said witness by counsel for the parties

2   set out herein.   The reading and signing of same is

3   hereby not waived.

4            I further certify that I am neither of kin nor

5   of counsel to the parties to said cause nor in any

6   manner interested in the results thereof.

7            This 5th day of August 2008.

8

9

10

11

12

13

14

15                          /S/

16   Pamela A. Wilbanks, ACCR #334
     Expiration Date:  9-30-2008
17   Registered Professional Reporter
     and Commissioner for the State
18   of Alabama at Large

19

20

21

22

23