**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **EDDIE OGLETREE, an individual,** * | |
| **GERALD STEPHENS, an individual,** * | |
| * | |
| **Plaintiffs,** * | |
| * | |
| **vs.** * | **CASE NO.: 3:07-cv-867-WKW** |
| * | |
| **CITY OF AUBURN, et al.,** * | |
| * | |
| **Defendants.** * | |
| **vs.** * | |
| * | |
| **CWH RESEARCH, INC.,** * | |
| * | |
| **Third-Party Defendant.** * | |

**CITY OF AUBURN'S OPPOSITION BRIEF**

COMES NOW Defendant/Third-Party Plaintiff the City of Auburn ("the City") in the above-styled cause and hereby submits its opposition to CWH Research, Inc.'s ("CWH") Motion for Summary Judgment.

**I.
SUMMARY OF ARGUMENT**

CWH provided no deposition or affidavit testimony from any individual from CWH to support its Motion for Summary Judgment. In fact, many of the alleged facts presented are not supported by any evidence, but are simply argument. Any statements made by CWH counsel, without proper citation to evidentiary materials, are due to be stricken.[1] The Southern District recently noted:

---

[1] See i.e. the first paragraph on p. 8 of CWH's Brief, and CWH counsel's summary of facts 1-8 on pages 11 and 12 of the CWH Brief. The "introduction" is also not supported facts.

> [U]nsupported representations of counsel do not constitute
> evidence that may be considered on summary judgment . *See,
> e.g.,Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 (1st
> Cir.1993) ("Factual assertions by counsel in motion papers,
> memoranda, briefs, or other such 'self-serving' documents, are
> generally insufficient to establish the existence of a genuine
> issue of material fact at summary judgment."); *Bowden ex rel.
> Bowden v. Wal-Mart Stores, Inc.*, 124 F.Supp.2d 1228, 1236
> (M.D.Ala.2000) ("opinions, allegations, and conclusory
> statements of counsel do not substitute for evidence").

*Williams v. Saxon Mortg. Co.*, 2008 WL 45739 *4, n.9 (S.D. Ala.). There is also a failure to comply with this Court's January 8, 2008 Order regarding citation to evidence in motion for summary judgment briefs. Accordingly, summary judgment is due to be denied and CWH's motion otherwise stricken.

In the alternative, the City states as follows: To accept CWH's argument regarding its indemnification responsibility pursuant to the contract it executed with the City, one would have to find that the City did nothing more than purchase a written test from CWH. The evidence is undisputed that CWH's services for the City was much more vast in scope. CWH was a nationally recognized company that was retained for the purpose of developing a valid, job-related and neutral promotional process for the 2006 Battalion Chief promotion. The overwhelming evidence in this case is that CWH worked collectively with certain individuals with the City to determine the promotional process for Battalion Chief in 2006. The City has been sued over that promotional process on the basis that it was racially discriminatory. The contract between CWH and the City calls for CWH to contribute to or indemnify the City if the City is found liable for any acts "in any way related" to the negligence or wrongdoing of CWH. To that end, if the City is found liable for discrimination, such would be based on the promotional process specifically developed

2

with CWH's expertise counsel.  That is why CWH was hired.  At the very least, a question

of fact exists as to whether CWH must contribute to or indemnify the City in the event

Plaintiffs recover against the City for race discrimination.

## II.
## FACTS[2]

### A.    Background

1.    The City contracted with CWH in December 2005 for CWH to develop

a promotional process for the Battalion Chief positions in 2006.  (See Exhibit "A" Letter of

Agreement between the City of Auburn and CWH).

2.    It is undisputed that the contract entered between CWH and the City

states:

> CWH shall perform services for the Client in the categories
> listed below (collectively, the "Services").  These categories,
> and some, but not necessarily all, of the major services to be
> performed for the **Fire Battalion Chief** position as follows:
>
>    a)    Job Analysis Review
>       (1)    Job analysis review includes conducting interviews to
>              develop test instruments and to provide a content valid
>              process.
>
>    b)    Written Test Development
>       (1)    Developing and validating a semi-customized written
>              exam composed of 70 to 80 traditional job knowledge
>              written items and 20 to 30 situational judgment items.
>              Includes recommendations as to the format of the
>              questions and answers, the number of questions to be
>              included and the study sources.  Includes up to 30
>              custom test items designed specifically for the client.
>       (2)    Provide master copy of the exam, the delivery of the
>              exam and answer sheets, scoring of the exam, and
>              handling appeals.

---

[2] Where pertinent, absence of facts or evidence are noted.

c) Test Scoring
   (1) Score tests.
   (2) Conduct relevant statistical analysis.
   (3) Consult with the Client regarding the format and structure of the final eligibility lists.
   (4) Provide results in written format within two weeks after completion of the exams.
   (5) Handle test challenges or concerns.

d) Assessment Center
   (1) Develop one set of exercises for each position, selecting three of the following for each position: In-basket, Oral Resume, Oral Presentation, Written Exercise, Role-Play or Emergency/Tactical Scenario.
   (2) Provide candidate orientations, conduct rater training, conduct training for Client staff as required or needed.
   (3) Provide assessor training.
   (4) Administer process to up to 12 candidates (one day of testing).
   (5) Score.

e) Feedback
   (1) Provide written feedback letters to candidates.
   (2) Provide process summary to Client.

f) Validity.  CWH shall conduct a content validation process for the test(s).   This validation will meet and adhere to the following standards and guidelines:
   (1) Federal EEOC Uniform Guidelines on Employment Selection Procedure.
   (2) Principals for the Validation and use of Personnel Selection Procedures.
   (3) Standards and Ethical Considerations for Assessment Center Operations.
   (4) Standards for Education and Psychological Tests.


In addition, CWH shall defend, indemnify, and hold client, its officials, representatives, agents, servants and employees free and harmless from and against any claims, demands or actions brought by third parties **which are related in any way** or are associated with the negligence, tortuous acts, or other unlawful conduct of CWH or its respective agents, officers and employees in the performance of this agreement.

(Id.)(Emphasis added).

3.    Plaintiffs Eddie Ogletree and Gerald Stephens were two of the applicants for the Battalion Chief promotions in 2006. (See *Complaint*). Both are African-Americans. (Id.). Both failed to receive one of the Battalion Chief Promotions and sued the City for race discrimination. (Id.). One of the allegations made was a disparate impact claim based on the allegation that the "employment procedures and/or testing mechanisms" operated as a "built-in headwind" for minority groups. (See *Complaint* at ¶48). No where in the *Complaint* do Plaintiffs limit their allegations to there being a cut-off score for the written test.[3]

4.    Based on the disparate impact claim, the City filed a *Third-Party Complaint* setting out the indemnification contract language and stating that if it was held liable for race discrimination based on the promotion process, which CWH developed for the City, then CWH was due under the contract to indemnify the City. (See *Third-Party Complaint*). The City also brought a common law cause of action for indemnification. (Id.).

5.    Steve Reeves explained the decision to hire CWH as follows:

CWH Management Solutions is a nationally recognized firm with notable clients. We were impressed when we learned that its entry level fire fighter test was recommended by the U.S. Department of Justice due to its low adverse impact and excellent validity, that it was endorsed by the International Association of Fire Chiefs, and that it had earned the highest professional award in the field of industrial organizational psychology. We were also impressed by the methodology CWH proposed to develop and administer a valid, job related, neutral selection process. After we made the decision to

---

[3] It is true that Plaintiffs testified that their *Complaint* is about a written test being given more so than the content of the test. However, Plaintiffs make allegations about some of the test content in their depositions.

engage CWH, I worked with that firm to create and execute a contract. An agreement was reached and CWH was retained for the purpose of developing a valid, job related and neutral promotional process for the 2006 City of Auburn Battalion Chief Promotion.

\*\*\*

Among the services provided by CWH was the option to use a written test as a component of the assessment center. We decided to use a written test as part of the process ... .

\*\*\*

We collectively determined to implement a cut-off score of 70 in order for an applicant to move forward in the promotional process because this is the cut-off score commonly used in the fire service, including the Alabama Fire College and National Fire Academy, it was consistent with the cut-off score the City has used in past selection processes, and because we felt it was important to ensure that those who are promoted to this critical life and community safety position know well the body of knowledge necessary to do the job of Battalion Chief.

(See Exhibit "B" Affidavit of Steve Reeves at ¶¶5, 7, 8).

B.     **CWH's Involvement**

1.     Although CWH attempts to limit the scope of its services, it is undisputed that they were completely and fully involved in developing the test instruments and to provide a content valid process. (Id.). CWH attempts to summarize these responsibilities, but an actual reading of the contract provides a more accurate picture. (See Exhibit "A").

2.     Steve Reeves testified:

Q:     Is it true that this company, CWH, was hired to administer a written test that anyone applying for the Battalion Chief promotion had to take? Is that correct?

A:    They developed a neutral-job related process for us to use in making a promotion decision.

Q:    Other than administering the written test that was taken by all the Battalion Chief applicants, what else did they do to participate in the Battalion Chief promotion process?

A:    They recommended and developed a series of exercises to help determine who was the best candidate for the promotion.

(See Exhibit "C" Deposition of Steve Reeves p. 17 at lines 2-14).

Reeves further stated:

Q:    And you'll agree with me that that was the first step in the process.  And if you did not pass that test, you were not allowed to progress in the process regardless of seniority, regardless of work experience, regardless of time and grade, correct?

*OBJECTION*

Q:    Is that correct?

*OBJECTION*

A:    It is correct.

Q:    That process - - who developed that process to your knowledge?

A:    The overall process?

Q:    Uh huh. (Positive response).  The process ya'll used for that specific promotion.

A:    **That process was developed by CWH** in consultation with the City of Auburn, the employees that you have listed there.

\*\*\*

7

Q:   So my question is: Has it been scientifically validated by the City that that process does not have a disparate impact on Afro-Americans, that the test be given first, if you don't meet the cut-off, you don't progress and then nothing else is considered?

*OBJECTION*

A:   We were relying on our consultant to advise us in that regard.

Q:   And who was that?

A:   CWH.

(Reeves Depo. p. 93 at line 20 to p. 94 at line 14, p. 98 at lines 2-12) (emphasis added).

3.    Reeves made clear that CWH was not hired to simply administer a test but to "design and provide consulting services to the City so that we had a fair promotional process."  (Reeves Depo. p. 29 at lines 3-9).

**C.    The Cut-off Score**

1.    Reeves clarified that implementation of a cut-off score was a collective decision with CWH:

Q:   With regard to the Battalion Chief promotion in May 2006, who at the City of Auburn decided that there was going to be a written test with a cut-off score as a factor in the promotion?

A:   It was a collective decision made by me, the Public Safety Director, the Deputy Fire Chief, and CWH.

(Reeves Depo. p. 23 at lines 7-13).

2.    Reeves reiterates this fact:

Q:   And then the individuals I just named, along with you, got with CWH, and that group made the decision that a

test with a cut-off score was going to be given: Is that correct?

A:    That's correct.

Q:    Were you personally involved in meetings with CWH, Langley, Lamar and the Safety Director where ya'll discussed with CWH that a test needs to be given with a cut-off score?

A:    Yes.

Q:    Is it your testimony that the City of Auburn had not made that decision before it contracted with CWH about the test or the cut-off score?

A:    Could you repeat the question?

Q:    Yeah.

Q:    Did you, the Public Safety Director, Lamar, and Langley make the decision that there needed to be a test with a cut-off score given prior to the time ya'll contracted with CWH?

A:    No.

Q:    Do you recall the individual's name that ya'll were dealing with at CWH?

A:    Primarily Michael Blair.

Q:    Do you independently recall as you sit here today meetings with those individuals and Mr. Blair where the decision was made that a test was going to be given for the Battalion Chief promotion with a cut-off score?

A:    Yes.

* * *

Q:    Is it true that the - - isn't it true that the City of Auburn made the decision that the test with a cut-off score was the initial factor in whether an applicant proceeded through the rest of the process?

> A:  Again, this was a decision made collectively in consultation with CWH. ...

(Reeves Depo. p. 24 at line 7 to p. 25 at line 12, p. 28 at lines 11-17; see also p. 118 at lines 6-16).

> 3.  Again, Reeves' testimony was consistent on this point:

> A.  My position is that we partnered with CWH to guide us through a process, and we listened very carefully to their recommendations.  There was a lot of discussion about whether or not to use a cut-off score.  And ultimately, in conjunction with CWH, a cut-off score was determined.

(Reeves Depo. p. 119 at lines 14-19; see also p. 120 at lines 7-19).  In fact, CWH told the City that some clients use a cut-off score with their written test.  (Reeves Depo. p. 121 at lines 9-15).  CWH never disclosed that it was wrong to use a cut-off score or that such would be problematic for the City.  (Reeves Depo. p. 121 at lines 21-22).

> 4.  Chief Lamar confirmed Reeves' testimony regarding use of a written test and cut-off score, explaining that a cut-off score was imposed after discussions between himself, Reeves, James, Langley and CWH personnel.  (See Exhibit "D" Deposition of Lee Y. Lamar p. 20 at lines 1-14).  Lamar further explained that the City ultimately had the discretion to determine what would be done, but that those decisions were based on discussions from the City's consultant, CWH.  (Lamar Depo. p. 20 at line 23 to p. 21 at line 4).  When asked what CWH said about the cut-off score, Lamar explained that CWH said if you use a cut-off score on the written exam, a cut-off score should be used in all components of the promotional process.  (Lamar Depo. p. 21 at line 17 to p. 22 at line 2).  In short, Lamar confirmed that the decision to use the test with a cut-

off score was collectively made with the group from the City and CWH.  (Lamar Depo. p.

26 at line 23 to p. 27 at line 7).

     5.     Former Chief Larry Langley further confirmed that using a cut-off score

for the written test was a decision made with CWH's consultation:

> Q:     Do you recall any discussions in those meetings about implementing a task with a cut-off score as a prerequisite for that job?
>
> A:     Yes.
>
> Q:     Whose decision was it?
>
> A:     I don't remember.  I don't really remember how that come about.  The only thing I know is during the conversations and everything between all of us, it come up.
>
> Q;     You can't testify about who with the City had the idea or made the decision to have a test with a written cut-off score; is that correct?
>
> A:     No.
>
> Q:     Do you recall if that decision was made before the City contracted with CWH?
>
> A:     No. It was made along with CWH.

(See Exhibit "E" Deposition of Larry Langley at p. 16 at line 15 to p. 17 at line 7).

     6.     Public Safety Director Bill James has the same recollection regarding

the cut-off score:

> Q:     Do you recall during the meetings with CWH - - if I say that wrong - - CWH - - do you recall who during those meetings was promoting a score of 70 as being the cut-off score?

> A:  I don't recall any specific person promoting that other than it was discussed among everybody that was in the room about a cut-off score.

(See Exhibit "F" Deposition of William James p. 30 at lines 2-8).

7.  Most telling, CWH provides absolutely no evidence to contradict the City's undisputed evidence that CWH played a role in deciding there would be a cut-off score on the written exam to proceed in the promotional process.

### D.   Consideration of Seniority

1.  CWH argues in its brief that Plaintiffs are complaining that not considering seniority caused a disparate impact.  CWH then argues - - with no facts - - that it had nothing to do with whether to consider seniority.  However, Reeves dispels any notion that not considering seniority was "unrelated" to CWH's consultation: "The Fire Division had not given points for seniority in past promotional processes and CWH had expressed some caution in regard to awarding points for seniority and/or education." (Reeves Aff. at ¶9).  In fact, Reeves recalls CWH employee Michael Blair opining that if an applicant did poorly on the test, he would find the remaining process humiliating.  (Reeves Depo. p. 118 at lines 4-16).[4]

2.  CWH presents no evidence by deposition or affidavit to contradict the fact that it was a part of determining that seniority should not be considered in the promotional process.

---

[4] After reading his deposition, Steve Reeves has in good faith clarified to undersigned counsel that the word used by Michael Blair, he believes, was actually "humbling."

**III.**
**ARGUMENT AND CONCLUSIONS OF LAW**

Summary judgment is not appropriate unless there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Indemnity agreements between private parties are valid where "the parties knowingly, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify the other, including indemnity against the indemnitee's own wrongs, if expressed in clear and unequivocal language." *Royal Insurance Co. of America v. Whitaker Contracting Corp.*, 242 F.3d 1035, 1041 (11th Cir. 2001)(<u>citing</u> *Industrial Tile, Inc. v. Stewart*, 388 So.2d 171, 176 (Ala. 1980)).[5] CWH does not argue that it did not contract for indemnification with the City and presents no argument regarding common law indemnification. CWH does not argue that the contract agreement was unclear or qualified. CWH does not argue that the indemnity agreement is not enforceable for any reason. Rather, CWH, based on no evidence or testimony from it, attempts to limit its responsibility of indemnification to only the contents of the written exam to argue that the City has not been sued for anything that has any relation to the services provided by CWH. This argument is nonsensical. There is absolutely no basis whatsoever upon which to take this position pursuant to the undisputed facts or precedential case authority. Apparently this reality is why no testimony from CWH or case authority was submitted to support CWH's position. Construing all the facts in a light most favorable to the City, summary judgment is due to be denied as a matter of law.

---

[5] The contract executed (Exhibit "A") dictates that Alabama law controls any issue in the contract.

## A.    CWH was hired to develop the entire promotional process

It is undisputed that CWH executed a contract with the City that plainly and unequivocally states it will indemnify the City for claims, demands or actions brought by third parties which are **related in any way** or associated to the negligence or unlawful conduct of CWH.   (Agreement).   CWH was hired to develop a neutral job-related promotional process.   (Reeves Aff. at ¶9).   They worked collectively with the City to determine what factors would be considered in the promotional process.   (Id.; Reeves Depo. p. 17 at lines 2-14,  p. 24 at line 7 to p. 25 at line 12, p. 28 at lines 11-17, p. 93 at line 20 to p. 94 at line 14, p. 98 at lines 2-12, p. 118 at lines 6-16). They developed the written test and the further assessment center.  (Id.).  They were involved in determining that seniority or education level would not be a factor.  (Id.).  There is no question that CWH was a part of the entire process that has been challenged by Plaintiffs.  Developing the entire promotional process in a fair manner is precisely the reason CWH was hired.

Certainly, the lawsuit by Plaintiffs Ogletree and Stephens is "related in any way" to the acts of CWH which, if proven discriminatory, would be at the very least negligent. While the City believes no question of fact exists as to Plaintiffs' disparate impact (and to that end adopts its presentation of facts and law in its motion for summary judgment brief), if the Court disagrees, certainly any such questions of fact in turn relate specifically to whether CWH's actions were negligent or wrong.  As such, summary judgment is due to be denied at this stage.

CWH's argument that they are not due to indemnify the City because CWH had no decisional authority is disingenuous.  Under that theory, CWH would never be liable to a municipality for its development of a promotional process.  It is undisputed that the City

contracted with CWH for the very purpose of providing expert advice in regards to an appropriate selection and promotional process. The fact that the City ultimately had to sign off on the process in no way undermines CWH's responsibility to the City. It is undisputed that the City relied on CWH's counsel and expertise (Reeves Depo. p. 98 at lines 2-12).

### B.    CWH assisted in determining there would be a cut-off score

CWH attempts to argue that the Plaintiffs complain, not about the substance or content of the exam, but only about the written cut-off score, and, that they were not a part of the decision to implement a cut-off score. This argument fails for three reasons: First, it is not necessarily true, based on the face of Plaintiffs' *Complaint*, that Plaintiffs' allegations are limited just to the implementation of a cut-off score as opposed to use of a test. While it is not exactly clear whether Plaintiffs complain about the contents of the written exam, they certainly complain about *use* of a written test. Stephens alleges that the only reason a test was given was because black applicants were applying. (See Exhibit "G" Deposition of Gerald Stephens p. 239 at lines 9-19). He also says that while he is not complaining about the actual content of the test *per se*, he is complaining that there was a written test given as part of the promotional process. (Stephens Depo. p. 136 at line 1 to p. 140 at line 22). Ogletree believes that the test was given to weed out black applicants. (See Exhibit "H" Deposition of Eddie Ogletree p. 164 at line 10 to p. 165 at line 9). The facts are undisputed that CWH was part of the decision to have a written exam. In fact, CWH does not argue otherwise.

Second, if a cut-off score is Plaintiffs' only basis for the disparate impact claim, the undisputed evidence is that utilization of a cut-off score was a collective decision between CWH and the City. (Reeves Depo. p. 23 at lines 7-13, 24 at line 7 to p. 25 at line 12, p.

28 at lines 11-17, p. 118 at lines 6-16, p. 119 at lines 14-19, p. 120 at lines 7-19; Lamar Depo. p. 20 at lines 1-14, p. 20 at line 23 to p. 21 at line 4, p. 21 at line 17 to p. 22 at line 2, p. 26 at line 23 to p. 27 at line 7; Langley Depo. p. 16 at line 15 to p. 17 at line 7; James Depo. p. 30 at lines 2-8).  CWH provides absolutely no evidence to the contrary, rather, argues that the City had the ultimate authority to decide.  Even so, there can be no question that the decision was at the very least "related" to CWH's expertise and consultation.

Third, again, assuming for the sake of argument that Plaintiffs do not question the contents of the written exam in regards to their disparate claim, CWH is still liable for indemnification since it is undisputed that CWH played a part in determining the entire promotional process regarding what critical factors would be considered in making up the full assessment center.  It is undisputed that at no time did CWH ever advise that it was wrong to have a cut-off score to proceed for the written exam.  (Reeves Depo. p. 121 at lines 21-22).  There is certainly no evidence that CWH walked out on the process because having a written cut-off score was going to have an adverse impact on the promotional process.  This undisputed fact is critical because there is no question before the Court that the City was relying on CWH to provide a neutral, fair job-related promotional process that was in compliance with all EEOC guidelines and National Fire Division standards.

## C.    CWH Advocated Against Considering Seniority

CWH also argues in its brief that the failure to consider seniority is one aspect of Plaintiffs' *Complaint*, yet CWH had nothing to do with the decision.  However, CWH provides no evidence to support this fact.  To the contrary,  the City provides the testimony

of Steve Reeves which undisputedly demonstrates that CWH was very much a part of the decision to not consider seniority. (Reeves Aff. at ¶9; Reeves Depo. p. 118 at lines 4-6).

### D.    Indemnification Sufficiently Pled

To the extent CWH attempts to argue there was insufficient pleading of indemnification, such position is without merit. The City pled the contractual language regarding negligent and tortuous acts in the *Third-Party Complaint* and further pled that pursuant to that contract, CWH had to contribute to or indemnify the City pursuant to the contract terms if the City was held liable. Any argument that the City failed to claim the facts necessary to maintain an indemnification claim is completely unfounded and certainly not supported by any legal precedent presented by CWH.

WHEREFORE PREMISES HAVING BEEN CONSIDERED, CWH's summary judgment is due to be denied in that at the least a question of fact exists as to whether indemnification is due the City by CWH.

Respectfully submitted this the 2nd day of September, 2008.

*|S| Randall Morgan*

Randall Morgan [8350-R70R]
Elizabeth Brannen Carter [3272-C-38-E]
Counsel for Defendant/Third-Party Plaintiff
City of Auburn

OF COUNSEL:

**HILL, HILL, CARTER, FRANCO
    COLE & BLACK, P.C.**
Post Office Box 116
Montgomery, Alabama  36101-0116
(334) 834-7600 phone
(334) 263-5969 fax
Rmorgan@HillHillCarter.com
Ecarter@HillHillCarter.com

17

## CERTIFICATE OF SERVICE

I Hereby Certify that I have this date served a true and correct copy of the foregoing *City of Auburn's Opposition Brief* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, using the CM/ECF system which will send notification of such filing to: Richard F. Horsley, Esquire (rfhala@cs.com), this the 2nd day of September, 2008.

/S/ Randall Morgan

Of Counsel

# EXHIBIT "A"

**Letter of Agreement Between
the City of Auburn and CWH**



## LETTER OF AGREEMENT

THIS AGREEMENT is made this 21st day of December, 2005 between the City of Auburn, Alabama (hereinafter called "the Client") and CWH Research, Inc., (hereinafter called "CWH") a Colorado Corporation, whose business address is 9085 E. Mineral Circle, Suite 350, Englewood, CO 80112.

1) The Contract. This document is a complete agreement.

2) Definitions. When used in this Agreement, the following words and phrases shall have the indicated meanings:

   a) candidate - an individual who appears at the testing site and begins the written test.

   b) written test - a written measuring instrument and accompanying answer sheets, which may or may not be combined with other instruments into a single battery.

   c) qualified administrator – an individual who has had previous experience in written test administration, has been apprised of the confidential nature of the tests, the importance of fair and impartial testing, and the importance of maintaining strict test security. Further, this individual shall have read the CWH general instructions for written test administrations, and shall have been approved by CWH.

   d) written test session - the period from commencement of the first test in a CWH promotional test battery to the last test in that battery, occurring on the testing date (s) agreed upon by CWH and client.

   e) assessment center - exercises or simulations designed to measure candidates' knowledge, skills, and abilities, as well as the scoring of those candidates' performance on each of the exercises and simulations.

   f) assessor - an individual who has been trained in the use of assessment centers and the evaluation of candidates' performances in assessment centers. Further, the assessor or assessors shall have been apprised of the confidential nature of the assessment center exercises, the importance of fair and impartial evaluations, and the importance of maintaining strict security over all elements of the assessment center.

   g) assessment center test session - the period from commencement of the first set of assessment center exercises to the last exercise and final evaluation of candidates, occurring on the testing date (s) agreed upon by CWH and the Client.

   h) oral board – series of structured interview questions designed to measure candidates' knowledge, skills, and abilities, as well as the scoring of those candidates' performance on each of the questions.

   i) oral board test session – the period from commencement of the first oral board question to the last question and final evaluation of candidates, occurring on the testing date (s) agreed upon by CWH and the Client.

3) Services to be Performed by CWH. CWH is an independent contractor and is not an agent, servant, employee or partner of the Client, and nothing contained herein shall be deemed or construed by the parties hereto or by any third party as creating a relationship of principal and agent or partnership or joint venture between the parties. CWH shall perform services for the Client in the categories listed below (collectively, the "Services"). These categories, and some, but not necessarily all, of the major services to be performed for the Fire Battalion Chief position as follows:

   a) Job Analysis Review
      (1) Job analysis review includes conducting interviews to develop test instruments and to provide a content valid process.

# CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

b) Written Test Development
   (1) Developing and validating a semi-customized written exam composed of 70 to 80 traditional job knowledge written items and 20 to 30 situational judgment items. Includes recommendations as to the format of the questions and answers, the number of questions to be included and the study sources. Includes up to 30 custom test items designed specifically for the client.
   (2) Provide master copy of the exam, the delivery of the exam and answer sheets, scoring of the exam, and handling appeals.

c) Test Scoring
   (1) Score tests.
   (2) Conduct relevant statistical analysis.
   (3) Consult with the Client regarding the format and structure of the final eligibility lists.
   (4) Provide results in written format within two weeks after completion of the exams.
   (5) Handle test challenges or concerns.

d) Assessment Center
   (1) Develop one set of exercises for each position, selecting three of the following for each position: In-basket, Oral Resume, Oral Presentation, Written Exercise, Role-Play or Emergency / Tactical Scenario.
   (2) Provide candidate orientations, conduct rater training, conduct training for Client staff as required or needed.
   (3) Provide assessor training.
   (4) Administer process to up to 12 candidates (one day of testing).
   (5) Score.

e) Feedback
   (1) Provide written feedback letters to candidates.
   (2) Provide process summary to Client.

f) Validity. CWH shall conduct a content validation process for the test(s). This validation will meet and adhere to the following standards and guidelines:

   (1) Federal EEOC Uniform Guidelines on Employment Selection Procedures.
   (2) Principals for the Validation and use of Personnel Selection Procedures.
   (3) Standards and Ethical Considerations for Assessment Center Operations.
   (4) Standards for Education and Psychological Tests.

# CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

4) <u>Payment for Services</u>. In consideration of the Services of CWH, the Client shall pay CWH the total sum shown below for services. Travel expenses will be billed at additional cost.

Breakdown for services is as follows:

| Service | Cost |
|---|---|
| Job Analysis Review | Included |
| Semi-Customized Written Test | |
| Technical Job Knowledge Component | $2,500.00 |
| Situational Judgment Component | $4,500.00 |
| Assessment Center | $10,000.00 |
| | |
| TOTAL (excluding options and expenses) | $17,000.00 |
| | |
| | |
| OPTIONS: | |
| Written Feedback Letters ($125 per candidate – assumes 10 candidates) | $1,250.00 |
| Additional days of assessment center administration | $800 per day |
| "Hot Seat" exercise | Not included |
| CWH obtaining assessors | Not included |

Payment to be made as follows (excludes options and expenses):

| | |
|---|---|
| 25% upon initiation of contract | $4,250.00 |
| 25% upon completion of SME test development meeting | $4,250.00 |
| 25% upon completion of written test | $4,250.00 |
| 25% upon completion of assessment center | $4,250.00 |

Options will be billed with the final invoice following completion of the assessment center.

All travel and additional expenses will be billed at cost as incurred or at the below standard rates. These expenses will include the following categories and rates:

| | |
|---|---|
| Airfare | Economy class, with first class upgrades paid for by CWH mileage points. Cost varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Hotel charges | Mid priced hotel, such as Marriot, Hilton, etc. We use government rates and discounts when possible. Cost varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Per Diem | $45 per day, or $15 per meal. |
| Mileage to/from airport and to/from client site | $0.42 cents per mile, plus applicable tolls. |
| Rental car | Mid size car. Varies by area – every attempt will be made to minimize cost. Billed at cost. |
| Shipping | US Postal service or FED EX is generally used, depending upon requirements. 2 day shipping is generally used, unless overnight is required. |

# CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO  80112
303-617-3433

This price includes the complete and satisfactory performance of the Services specified in this Agreement.  Optional components may be selected by client for additional charges noted.

If any additional work is required beyond what this contract states, Dr. Hornick will provide his assistance at the rate of $250 per hour.  Any additional work provided by other personnel in CWH will be charged at the rate of $175 per hour for Managing Consultants, $125 per hour for Consultants, and $50 per hour for clerical.

Expert Testimony.  CWH shall provide expert testimony concerning any aspect of its work related to this contract and/or the resultant defense of all related products.  This testimony and any necessary preparation will be performed at the hourly rate mentioned above, plus any travel or other related expenses which are incurred.

5) Client Responsibilities.  In addition to paying CWH for services according to the preceding paragraph, the Client shall have the following responsibilities:

a)   The Client shall provide for the written test and assessment center appropriate testing site(s) and materials, including rooms and furniture conducive to the taking of tests.  In addition, all necessary supplies needed by candidates, assessors, and proctors during the written test and assessment center shall also be provided by Client.

b)   The Client shall make arrangements for qualified written test and assessment center administrators and proctors.  The qualified administrators must be approved by CWH.

c)   The Client shall make all notifications to those people who are eligible to take the test.  These notifications include, by way of explanation, but not by way of limitation: testing dates, testing times, and testing places.  Further, Client shall make all reasonable attempts to provide for notifications, testing opportunities, and similar concerns to all candidates in a fair and impartial manner.

d)   The Client shall supply sufficient numbers of assessors and role players to conduct the assessment centers, based on criteria established by CWH.  Should these assessors or role players require payment for their time or expenses, the Client agrees to assume full responsibility for these costs.

e)   CWH will retain the copyrights to all materials developed in the performance of this contract.  CWH will, however, grant the Client a non-exclusive, royalty free license to use the selection procedures that will be developed for the duration of this contract.  Client shall not reveal the contents of the tests to anyone without the written consent of CWH.  The Client assumes full responsibility and liability for any violation of this provision by its employees and/or agents to the extent such employees and/or agents were acting within the scope of their employment and or agency.

f)   Client shall return all testing materials provided by CWH, to CWH.

6) Provisions of the Contract.  The following provisions are made a part of this contract:

a)   Non-Discrimination.  CWH certifies and represents that, during the performance of this Contract, Contractor and any other parties with whom it may subcontract shall adhere to equal opportunity employment practices to assure that applicants and employees are treated equally and are not discriminated against because of their race, religious creed, color, national origin, ancestry, handicap, sex or age.  Contractor further certifies that it will not maintain any segregated facilities.

b)   Applicable Law.  Parties to this contract shall conform with all existing and applicable city ordinances, resolutions, state laws, federal laws, and all existing and applicable rules and regulations.  This contract should be construed in accordance with the laws of the State of Alabama.  If a dispute arises involving this agreement, and the parties are not able to amicably resolve such dispute, then the parties agree that all claims shall be brought in a Court of Competent jurisdiction located in Alabama.

# CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

c) Interest of the Client. No elected official or any officer or employee of the Client shall have a financial interest, direct or indirect, in this contract.

d) Interest of CWH. CWH covenants that they presently have no interest and shall not acquire any interest, direct or indirect, which would conflict with the performance of services required to be performed under this contract; they further covenant that in the performance of this contract, no person having any such conflict of interest shall be employed.

e) Maintenance of Records. All appropriate records related to the aforementioned projects will be maintained by CWH for the required statute of limitations.

f) Modification. This contract contains the entire Agreement of the parties. No representations were made or relied upon by either party other than those that are expressly set forth herein. No agent, employee or other representative of either party is empowered to alter any of the terms hereof unless mutually consented to in writing and signed by an authorized officer of the respective parties.

g) Assignment. CWH may not assign its rights under this Agreement without the express prior written consent of the Client, and such successor in interest may not assign its rights under this Agreement without the express prior written consent of the Client. The Client has the right to continue with the assignee or cancel the Agreement with a pro-rata refund.

h) Termination: The Client may terminate this Agreement upon 30 days written notice without cause. Upon delivery of said notice to CWH, CWH shall cease performing any work pursuant to this agreement and shall be entitled to retain that portion of the fee for services performed through and including the 30 days notice period prior to termination.

i) Insurance: CWH will be required to provide certificates of insurance showing that it carries, or has in force, automobile liability insurance, general liability insurance, professional liability insurance and workers' compensation insurance. Limits of liability for automobile liability insurance shall be, at a minimum, $1,000,000.00 combined single limit. Limits of liability for general liability insurance shall be, at a minimum, $1,000,000.00 per occurrence, $1,000,000.00 personal and advertising injury, $1,000,000.00 general aggregate and $1,000,000.00 products/completed operations aggregate. General liability insurance will include coverage for contractually assumed liability. Limits of liability for professional liability shall be, at a minimum, $1,000,000.00 per occurrence or claim and $3,000,000.00 aggregate. If professional liability coverage is on a claims-made basis, CWH will maintain coverage in force for a period of two (2) years following completion of the work specified in the agreement. Workers' compensation insurance shall provide statutory workers' compensation coverage and employers' liability coverage with limits of, at a minimum, $500,000.00 each accident, $500,000.00 disease- each employee and $500,000.00 accident, $500,000.00 disease – policy limit.

The certificate of insurance shall provide the Client with thirty (30) days written notice of cancellation of any of the coverages named in said certificate.

The Client will be named as additional insured under the CWH's general liability insurance and automobile insurance policies.

CWH shall require certificates of insurance from subcontractors. Subcontractors will carry limits of insurance equal to or greater than those carried by the CWH. These certificates shall evidence waivers of subrogation in favor of CWH and the Client and shall be made available to the Client upon request.

j) Indemnification. Each party shall generally be responsible for its own acts and will be responsible for all damages, costs, fees, and expenses, including attorney's fees and costs, which arise out of the performance of

## CWH Research, Inc.

9085 E. Mineral Circle, Suite 350, Englewood, CO 80112
303-617-3433

this agreement and which are due to that party's own negligence, carelessness, unskillfulness, and other unlawful conduct and/or the negligence, carelessness or unskillfulness or other unlawful conduct of its respective officers, agents and/or employees acting in their official capacities. Provided; however, Client shall defend, indemnify and hold CWH, its officers, agents and employees free and harmless from and against any claims, demands, actions, damages, expenses, fees, liabilities and/or attorney's fees arising out of, by virtue of, or associated with the negligence, tortuous acts or other unlawful conduct of Client or its respective agents, officers and employees in the performance of this agreement. Provided however, that Client does not waive its defense of sovereign immunity or any other immunity or privilege afforded by law; nor does client waive official immunity available to any officer, employee, or agent acting by or on behalf of Client. In addition, CWH shall defend, indemnify, and hold Client, its officials, representatives, agents, servants and employees free and harmless from and against any claims, demands or actions brought by third parties which are related in any way or are associated with the negligence, tortuous acts or other unlawful conduct of CWH or its respective agents, officers and employees in the performance of this agreement.

### AUTHORIZED REPRESENTATIVE

In further consideration of the mutual covenants herein contained, the parties hereto expressly agree that for purposes of notice, including legal service of process, during the term of this contract and for the period of any applicable statute of limitations thereafter, the following named individuals shall be the authorized representatives of the parties:

(i)    CLIENT:

Steven A. Reeves

Human Resources Director

130 Tichenor Avenue

Auburn, AL 36830

By: _____

Name:    David F. Watkins

Title:    City Manager

(ii)    CWH Research, Inc.
Kathryn A. Fox, M.A.
9085 E. Mineral Circle
Suite 350
Englewood, Colorado 80112

Kathryn A. Fox, Vice-President

EXECUTED this 21st day of December, 2005.

# EXHIBIT "B"

## Affidavit of Steve Reeves

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

EDDIE OGLETREE, an individual,　　　*
GERALD STEPHENS, an individual,　　*
　　　　　　　　　　　　　　　　　　　　　*
　　　Plaintiffs,　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　　　*　　　CASE NO.: 3:07-cv-867-WKW
vs.　　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　　　*
CITY OF AUBURN, et al.,　　　　　　*
　　　　　　　　　　　　　　　　　　　　　*
　　　Defendants.　　　　　　　　　　*

## AFFIDAVIT OF STEVEN A. REEVES

Before me, the undersigned authority in and for said county and state personally appeared Steven A. Reeves who being known to me and being first duly sworn, deposes and says under oath as follows:

　　　1.　　　My name is Steven A. Reeves. I am an adult over the age of nineteen and I have personal knowledge of the following information.

　　　2.　　　I am employed with the City of Auburn and have been the Human Resources Director since 1993.

　　　3.　　　As part of my job responsibilities, I took part in a decision regarding the promotional process to be used to promote four individuals to Fire Division Battalion Chief in 2006.

　　　4.　　　Public Safety Director Bill James, Fire Division Chief Larry Langley, Deputy Chief Lee Lamar and I determined that an outside assessment center process was needed. I had contacted Kathleen Robinson, the consultant that the parties agreed to use to conduct assessment center promotional processes in the 1991 settlement, but she was retiring. Ms. Robinson recommended CWH Management Solutions to me.

　　　5.　　　CWH Management Solutions is a nationally recognized firm with notable clients. We were impressed when we learned that its entry level fire fighter test was recommended by

the U.S. Department of Justice due to its low adverse impact and excellent validity, that it was endorsed by the International Association of Fire Chiefs, and that it had earned the highest professional award in the field of industrial/organizational psychology. We were also impressed by the methodology CWH proposed to develop and administer a valid, job-related, neutral selection process. After we made the decision to engage CWH, I worked with that firm to create and execute a contract. An agreement was reached and CWH was retained for the purpose of developing a valid, job-related and neutral promotional process for the 2006 City of Auburn Battalion Chief promotion.

6.   James, Langley, Lamar and I met with CWH representatives and collectively determined that there would be a written test utilized as part of the assessment center and that any applicant not scoring a 70 or above on the written test could not proceed in the promotional process for Battalion Chief.

7.   I am aware that there is some question about who made the decision to have a written test as a component of the assessment center and to use a cut off score. Among the services provided by CWH was the option to use a written test as a component of the assessment center. We decided to use a written test as part of the process because we felt it was important that candidates demonstrate their level of subject matter expertise to help identify the most qualified candidates for promotion, and because the assessment of subject matter knowledge through written testing is common in the fire service. For these reasons, the Fire Division had used written tests in other promotional processes, as well.

8.   We collectively determined to implement a cut off score of 70 in order for an applicant to move forward in the promotional process because this is the cut off score commonly used in the fire service, including the Alabama Fire College and the National Fire Academy, it was consistent with the cut off score the City has used in past selection processes, and because we felt it was important to ensure that those who were promoted to this critical life

and community safety position know well the body of knowledge necessary to do the job of Battalion Chief.

9.   I am aware that the Plaintiffs have also called into question the fact that seniority was not a criteria considered during this promotion. The Fire Division had not given points for seniority in past promotional processes and CWH had expressed some caution in regard to awarding points for seniority and/or education. However, even if points had been awarded for seniority and/or education as part of the overall promotion process, it would not have had an impact on the outcome of the test for the plaintiffs and four white applicants who also did not pass the test.

10.   In mid-February 2006, a vacancy announcement was posted to invite applications for Battalion Chief. At the end of February 2006, an in-depth three-hour candidate orientation meeting was held to introduce the candidates to the CWH representatives and to explain the entire promotion process and how the various components would be developed and validated. During this meeting, in which applicant attendance was mandatory, it was announced that a written test would be administered as part of the promotional process and that a 70 percent cut off score would be utilized. Each candidate was given a detailed orientation manual reviewing, among other aspects, the types of questions that would be on the test and how to prepare for the test. To help candidates review and prepare for the test, four job-related text books were identified and on or about March 3, 2006, at least six weeks before the test, each candidate was given a copy of each book. All of the technical job knowledge questions were developed by CWH and came from these four books.  In consultation with subject matter experts, CWH also developed situational judgment questions that were consistent with the Fire Division's standard operating procedures and required the application of knowledge and skills to specific, job-related situations appropriate to the Fire Division and the rank of Battalion Chief.

11.   After the Battalion Chief positions were announced, Chris Turner, a black male, applied for the job. Because he was a Fire Fighter and not a Lieutenant, the Public Safety

Director investigated whether anyone within the Fire Division was eligible to apply for the position. Because the City's Personnel Policies and the Battalion Chief job description did not preclude a Fire Fighter from applying, because past promotion processes for Battalion Chief (aka Captain and Shift Commander at various times) had allowed non-probationary Fire Fighters and probationary and non-probationary Lieutenants to seek promotion to Battalion Chief, and because the Fire Division's career development plan was out-of-date and being revised at that time, it was determined that non-probationary Fire Fighters were eligible for the job as were probationary and non-probationary Lieutenants. The documentation we released on this matter to the Fire Division employees is attached hereto as Exhibit "1".

12.    There were initially fifteen applicants but three individuals, all white males, never took the written test because they decided not to pursue the promotion.

13.    Twelve applicants took the written exam: nine white employees and three black employees. Five individuals scored a 70 or above and continued in the promotional process of job-related exercises. Four of the white applicants and all three black applicants failed to score a 70. We were very surprised and disappointed by the low number of applicants that passed the test. Four individuals were promoted to Battalion Chief at the end of that process.

14.    The application process was the same for each candidate. Identical test aid materials were distributed to each applicant. The written test was graded by CWH. There were no differences in the promotional process for any applicant.

15.    All four individuals receiving the promotion had ten or more years of fire fighter experience and college degrees.

16.    CWH responded in writing when the EEOC made the determination that the written test had an adverse impact on black applicants. A CWH expert, Chris Hornick, President of the company, opined that the process did not create a disparate impact for black applicants and that an applicant pool of twelve individuals did not establish statistical significance such that an illegal disparate impact could be presented. That communication from

CWH is attached hereto as Exhibit "2" and incorporated as set out in full herein. Hornick stated: "CWH would like to emphasize that no statistical analysis of adverse impact can be performed with a sample of 12 candidates, including only 3 minority candidates." Hornick's correspondence provides a detailed analysis of why seven individuals failed and confirms that no disparate impact of black applicants could be indicated. Hornick points to educational experience, time lapse since formal education (and therefore test taking), allowed study time before the test, and CWH being new to the City, as factors that caused the fail rate - - all unrelated to race.

17.    When there was a need for a temporary working out of class assignment to fill in for an absent Battalion Chief in January 2005, it was determined that Horace Clanton, a white male, would fill the position because the assignment duration was too short and to allow each eligible officer to rotate into the assignment would prove to be operationally disruptive. As such, we simply chose Horace Clanton because he had seniority by several years at the company officer level. Under the circumstances, it was the fairest way to address the temporary need. Working out of class is a temporary assignment and is not considered a promotion.

18.    In November 2004, Shift Commanders asked the former City Manager to change their job title to Battalion Chief, and he granted their request. There were no changes made to the job description or the rate of pay. Changing the job title was not a promotion.

Further affiant saith not.

Dated this the 7th of August 2008.

_Steven A. Reeves_
Steven A. Reeves

STATE OF ALABAMA          )

COUNTY OF LEE             )

    Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **Steve Reeves** who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

_Kimberly M. Coleman_
NOTARY PUBLIC

My Commission Expires: _5-16-2012_

(SEAL)

# Memo

To: All Career Personnel

From: Chief Larry Langley



Date: February 23, 2006

Ref: Battalion Chief Assessment

On February 17, 2006 a memo was sent to all personnel on the Battalion Chiefs vacancy explaining that only non-probationary Lieutenants were eligible to apply for the position. After reviewing the current job descriptions and minimum qualifications, it was discovered that non-probationary Firefighters and the probationary Lieutenant are eligible to apply for the Battalion Chiefs Vacancy. I know this is short notice but any of the eligible applicants mention above if interested need to apply by February 28, 2006 at 3:00 PM. Orientation is on February 28, at 6:00 PM in the large conference at the Public Safety Building. This session will include an explanation of the process and practical information to assist candidates.



Ogletree-¶ Disclosures

00050



To:     Glenn Todd
From:   Chris W. Hornick, Ph.D., President, CWH Research, Inc.
Date:   3/5/07
Re:     EEOC Case–Stephens, Ogletree v. Auburn


Dear Mr. Todd,

This letter is a response to the EEOC correspondence dated February 27, 2007 regarding the EEOC
Cases of Stephens and Ogletree v. Auburn. CWH offers the following evidence, explanation and
analysis to adamantly and vigorously reject the preliminary conclusion of the EEOC that the
selection process discriminates on the basis of race.

*The EEOC correspondence stated that "...the validation study determined that the written test
adversely impacted Black applicants."*

1.  The CWH written summary report stated that the written test demonstrated adverse impact
    against Blacks because no Blacks passed the test at the pre-determined cut score of 70%. CWH
    is committed to the elimination of disparate impact based on race and gender in testing
    processes. Because of this, we provide detailed information in our reports regarding the results
    of the testing process. In our discussion of the written test results, we provided information to
    the client regarding ways to evaluate the testing process. While it was a concern that no Black
    candidates passed the test, the information provided about the adverse impact in the written test
    must be interpreted in a correct and appropriate context.
2.  CWH would like to emphasize that **no** statistical analysis of adverse impact can be performed
    with a sample of 12 candidates, including only 3 minority candidates. Thus, there is **no** evidence
    of statistically significant or meaningful adverse impact. There is **no** evidence that the testing
    process itself discriminated illegally or inappropriately against Blacks or any group of
    candidates. However, further qualitative analysis of the process may shed light on other
    potential factors related to the performance of Blacks **and** the low scoring Whites in the testing
    process.
3.  The CWH report (p. 8 and 9) examined differences in performance of Whites and Blacks on the
    written test. Although there were differences in the mean score and pass rates of Whites and
    Blacks, these differences cannot be evaluated in terms of statistical differences due to the very
    small sample sizes. Thus it is essentially impossible to draw meaningful statistical conclusions,
    based on a sample of 12. CWH noted that Blacks did not perform as well as a group as Whites
    on the test. However, CWH did not intend to suggest that the testing process discriminated
    unfairly, inappropriately, or illegally. In fact, there are many other factors that should be
    considered in putting the results in context:
    a.  One Black candidate with the lowest written test score was only at the rank of Firefighter
        at the time of testing, and may not have had the minimum necessary experience and
        training as an officer to compete for Battalion Chief. All other candidates were at the
        rank of Lieutenant. The City of Auburn allowing participation by firefighters in the
        testing process serves to increase potential diversity and provide learning opportunities

9085 E. Mineral Circle Suite 350,  Englewood, CO 80112   VOICE: 303-617-3433   FAX: 303-617-3433
FILENAME \p P:\2006 Projects\Auburn Fire\Auburn letter re ai.doc

EXHIBIT
2



for these individuals. In our professional opinion, in most departments nationally, individuals at the firefighter rank would most likely fail a Battalion Chief test, as these ranks are extremely different in terms of duties, experience, and responsibility. Thus, this candidate could reasonably be excluded from any adverse impact considerations or analysis.

b.  The tenure (time since date of hire) of candidates is a possible factor in test performance. In fact, the average tenure of candidates who passed the test was 8 years. The average tenure of candidates who failed the test was 16 years. It is highly probable that this difference in tenure had much more relevance in the testing process than race.

c.  The education levels and recency of formal education of candidates was most likely another significant factor in test performance. As indicated above, candidates who passed the test have been hired more recently, and may have higher levels of education and more recent experience in the educational system, including more recent test taking experience.

d.  Research in the field of I/O psychology supports the above observations that tenure and time since formal education impact test performance. Research studies exist in the professional literature that suggest that older, more tenured workers perform more poorly as a group on standardized tests (such as reading comprehension or other cognitive ability tests) than younger workers.

4.  As CWH noted in the report (p.9), the majority of candidates performed poorly on the written test. Only 5 out of 12 passed the test at the pre-determined passing score of 70, while 7 out of 12 failed the test. This is an overall pass rate of less than half (42%). In fact, it is highly probable that the poor performance of candidates (White and Black) on the written test had to do with factors unrelated to the testing process itself. CWH noted several variables in our report that could have caused lower than expected test scores on the test:

a.  10 years since the last Battalion Chief test in the Auburn Fire Division meant that many candidates may not have been familiar with or comfortable with the testing process in general and the test reading material in particular.

b.  Using CWH Research as a consultant for the first time meant that candidates were not familiar with the CWH process and our written tests.

c.  The preparation time frame permitted only a 6 week study period. Departments nationally usually allow 90 days to 6 months study time for this type of test.

5.  In addition, tenure and education appear to have a strong correlation with test performance, as discussed above.

6.  In this small sample of candidates, more Whites (4) failed the test than Blacks (3). Thus, no conclusion may be drawn that the test had a more negative impact on Blacks than Whites. In fact, the above noted factors would have the same potential impact on all candidates.

7.  Little or no meaning can be placed on an evaluation of this small sample. The 4/5ths rule **cannot** be met in this situation unless all minority candidates (all 3 Black candidates) were to have passed the test. For example, with a sample size of only 3 Black candidates, the only possible pass ratios for Black candidates are 0% ( 0 Black candidates pass), 33% (1 Black candidate passes), 67% (2 Black candidates pass) and 100% (all 3 Black candidates pass). Even if a different cut score had been established prior to the test administration, such as 60%, only 2 out of 3 Black candidates would have passed (pass ratio of 67%) and 8 out of 9 White candidates would have passed (pass rate of 89%). This would still result in an adverse impact ratio of 75%,



slightly below the 80% guideline. Thus, there is no possible cut score that would not result in some adverse impact because of the exceptionally small sample sizes.

8. The EEOC guideline regarding the 4/5th ratio and other professionally accepted methods of evaluating adverse impact were never intended to be used to evaluate small samples where the performance of 1 or 2 candidates could dramatically affect the test results and the evaluation of the process as a whole.

*The EEOC correspondence stated:  "No evidence has been submitted to indicate that Auburn sought to employ any alternative selection criteria, despite its knowledge of the racial impact of the test."*

The testing process developed by CWH exceeded all national professional guidelines and standards recommended by the American Psychological Association (APA) and the Society of Industrial-Organizational Psychology (SIOP).  CWH is a national leader in creating testing processes that maintain high validity and increase diversity.  CWH has won the highest lifetime award from SIOP (the M. Scott Myers Award in 1999) for its entry level testing processes, and CWH has pioneered the use of Situational Judgment tests that emphasize experience over "book-learning." In fact, the testing process also incorporated many Best Practices methods recommended by the EEOC and the Department of Labor to reduce adverse impact, such as use of a compensatory model.  In addition, the testing process had the following features:

1. The written test measured job related knowledge, skills, and abilities and was **validated** in accordance with professional standards to demonstrate content validity.
2. It used a compensatory model to measure more skills and abilities earlier in the process.  A traditional model used by most departments nationally includes only a technical job knowledge test based on reading material as an initial hurdle in the promotional process.  The CWH test for Auburn incorporated a Situational Judgment component with a Technical Job Knowledge component.  Research in I/O Psychology and CWH data from other departments demonstrate that using a Situational Judgment test greatly minimizes differences in performance based on race.  This was also the case with the written test in question, with the result that the differences in scores between Blacks and Whites was substantially smaller on the Situational Judgment items than on the Technical Job Knowledge items.
3. CWH maintains a database of test results nationally and can demonstrate very positive results with minimum or substantially lower adverse impact from clients where sample sizes include significant numbers of minorities.
4. Therefore, the City had actually investigated options, and selected CWH based on a track record of successfully providing tests with no or very low adverse impact based on race or gender.
5. Finally, knowledge of the actual test results occurred after the test administration.  There was no expectation of a racial impact in the test prior to the test administration.  The results cited by the EEOC from the report were only available after the written test had been administered, using a predetermined passing score of 70%.  Thus, it is inappropriate to state that the City did not seek alternative testing procedures with less adverse impact prior to the test administration.



In conclusion, the City of Auburn took responsible measures to ensure a fair, valid testing process that would provide equal opportunity for all test takers. Many factors potentially contributed to lower test performance by both Blacks and Whites on the written test. There is not sufficient evidence to conclude that the test unfairly or illegally discriminated against the small sample of Blacks on the basis of their race.

Sincerely,


Chris W. Hornick, Ph.D.
President

9085 E. Mineral Circle Suite 350,    Englewood, CO  80112    VOICE: 303-617-3433   FAX: 303-617-3433
FILENAME \p P:\2006 Projects\Auburn Fire\Auburn letter re ai.doc

# EXHIBIT "C"

**Deposition of Steve Reeves**



1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


EDDIE OGLETREE, an individual,
GERALD STEPHENS, an
individual,

      Plaintiffs,

Vs.                                         CIVIL ACTION NO.
                                            3:07-CV-867-WKW

CITY OF AUBURN, a municipality
in the State of Alabama, LARRY
LANGLEY, an individual, LEE LAMAR,
an individual, BILL HAM, JR., an
individual, STEVEN A. REEVES, an
individual, BILL JAMES, an
individual, CHARLES M. DUGGAN, an
individual, and CORTEZ LAWRENCE,
an individual,

      Defendants

        * * * * * * * * * *


     **DEPOSITION OF STEVEN A. REEVES**, taken pursuant

to stipulation and agreement before Pamela A. Wilbanks,

Certified Court Reporter, ACCR# 391, Registered

Professional Reporter and Commissioner for the State of

Alabama at Large, in the Conference Room of Auburn City

Hall, 144 Tichenor, Auburn, Alabama, on Wednesday, July

30, 2008, commencing at approximately 9:15 a.m.

17

1   A.   No.

2   Q.   Is it true that this company, CWH, was hired to

3        administer a written test that anyone applying

4        for the battalion chief promotion had to take?

5        Is that correct?

6   A.   They developed a neutral job-related process for

7        us to use in making a promotion decision.

8   Q.   Other than administering the written test that

9        was taken by all the battalion chief applicants,

10       what else did they do to participate in the

11       battalion chief promotion process?

12  A.   They recommended and developed a series of

13       exercises to help determine who was the best

14       candidate for the promotion.

15  Q.   Was that provided to the City in some written

16       form?

17  A.   The exercises?

18  Q.   Yes, sir.

19  A.   Yes.

20  Q.   Do you know if the City of Auburn still has that

21       document that details the exercises?

22  A.   In one form, yes.

23  Q.   What do you mean in one form?

23

1   Q.   You don't recall if there was a written test?

2   A.   Right.

3   Q.   Are you saying there may have been and you don't

4        recall?

5   A.   I don't -- I was not directly involved in that

6        process.

7   Q.   With regard to the battalion chief promotion in

8        May of 2006, who at the City of Auburn decided

9        that there was going to be a written test with a

10       cutoff score as a factor in the promotion?

11  A.   It was a collective decision made by me, the

12       public safety director, the deputy fire chief,

13       and CWH.

14  Q.   And at that time the deputy fire chief was Lee

15       Lamar?

16  A.   Correct.  And the fire chief.

17  Q.   Who was Langley?

18  A.   Right.

19       And CWH.

20  Q.   And CWH.

21       So for the battalion chief promotion, is it

22       your testimony that you, the public safety

23       director, the deputy fire chief, the chief got

24

1    together and decided that there needed to be an

2    outside assessment center for this promotion,

3    and you contacted Kathleen Robinson?  She had

4    retired and told you you needed to contact CWH?

5    Is that the chronology of how it occurred?

6    A.   Yes.

7    Q.   And then the individuals I just named, along

8    with you, got with CWH, and that group made the

9    decision that a test with a cutoff score was

10   going to be given; is that correct?

11   A.   That's correct.

12   Q.   Were you personally involved in meetings with

13   CWH, Langley, Lamar, the safety director where

14   y'all discussed with CWH that a test needed to

15   be given with a cutoff score?

16   A.   Yes.

17   Q.   Is it your testimony that the City of Auburn had

18   not made that decision before it contracted with

19   CWH about the test or the cutoff score?

20   A.   Could you repeat the question?

21   Q.   Yeah.

22        Did you, the public safety director, Lamar,

23   and Langley make the decision that there needed

25

1     to be a test with a cutoff score given prior to

2     the time y'all contracted with CWH?

3  A.   No.

4  Q.   Do you recall the individual's name that y'all

5     were dealing with at CWH?

6  A.   Primarily Michael Blair.

7  Q.   Do you independently recall as you sit here

8     today meetings with those individuals and

9     Mr. Blair where the decision was made that a

10    test was going to be given for the battalion

11    chief promotion with a cutoff score?

12  A.   Yes.

13  Q.   Do you recall who actually first recommended

14    that that test be given?

15  A.   The CWH process incorporates a testing option.

16    Through our discussions it was determined that

17    giving a test was a good way to evaluate the

18    subject matter expertise of the candidates in

19    the area of fire prevention.

20  Q.   Did Mr. Blair, the CWH representative, recommend

21    that a test be given or did he say that that was

22    a necessary part of CWH's involvement in this

23    process?

28

1   A.   It was our, as you stated, discretion.

2   Q.   During those meetings about the test, am I

3        correct that the City of Auburn made the

4        decision to implement that test as the first

5        factor in the battalion chief promotion with a

6        cutoff score, meaning that if you did not meet

7        the cutoff score, you could not progress further

8        in the battalion chief promotion process?

9   A.   Would you repeat the question?

10  Q.   Yeah.

11          Is it true that the -- Isn't it true that

12       the City of Auburn made the decision that the

13       test with a cutoff score was the initial factor

14       in whether an applicant proceeded through the

15       rest of the process?

16  A.   Again, this was a decision made collectively in

17       consultation with CWH.  Had the City said we

18       don't want to use a cutoff score, I don't think

19       CWH would have argued with us.

20  Q.   CWH didn't care one way or the other whether or

21       not the City used a cutoff score or whether the

22       test was a deciding factor if someone got to

23       progress through the process, did they?

29

1                MR. MORGAN:  Object to the form.

2    A.   I'm not sure I'd go that far.

3    Q.   Well, CWH was hired as a consulting firm to

4         administer a test; is that correct?

5    A.   They were designed to --

6                MR. MORGAN:  Object to the form.

7    A.   -- hired to design and provide consulting

8         services to the City so that we had a fair

9         promotional process.

10   Q.   And if the City had decided that the test would

11        be administered by CWH and that there would not

12        be a cutoff score and that the test would simply

13        be part of a cumulative process for the

14        battalion chief promotion, CWH to your knowledge

15        wouldn't have objected to that; is that correct?

16                MR. MORGAN:  Object to the form.

17   A.   I think they would have allowed us to do that.

18   Q.   They would have allowed you to do that?

19   A.   (Witness nods head positively.)

20   Q.   You've got to answer out loud.

21        They would have allowed you to do that,

22        correct?

23   A.   Yes.

1    promotion in '06.  Okay?

2   A.   Okay.

3   Q.   The process, you'll agree with me, did not

4        include the consideration of seniority, correct?

5   A.   Correct.

6   Q.   It didn't include the consideration of time in

7        grade, correct?

8   A.   Correct.

9   Q.   It didn't include the consideration of work

10       experience, correct?

11             MR. MORGAN:  Object to the form.

12  A.   Not directly.

13  Q.   It included essentially a cutoff test that was

14       the first thing you had to do in order to be

15       considered to be promoted to battalion chief,

16       correct?

17             MR. MORGAN:  Object to the form.

18  A.   It utilized a job-related test with a cutoff

19       score to advance further in the process.

20  Q.   And you'll agree with me that that was the first

21       step in the process.  And if you did not pass

22       that test, you were not allowed to progress in

23       the process regardless of seniority, regardless

94

1       of work experience, regardless of time in grade,

2       correct?

3                       MR. MORGAN:  Object to the form.

4  Q.    Is that correct?

5                       MR. MORGAN:  Object to the form.

6  A.    It is correct.

7  Q.    That process -- Who developed that process to

8       your knowledge?

9  A.    The overall process?

10 Q.    Uh-huh (positive response).  The process y'all

11      used for that specific promotion.

12 A.    That process was developed by CWH in

13      consultation with the City of Auburn, the

14      employees that you've listed there.

15 Q.    Do you know if that process itself, the entire

16      process, for the promotion has ever been

17      scientifically validated to not have a disparate

18      or negative impact on Afro-Americans?

19                      MR. MORGAN:  Object to the form.

20 A.    That particular process could not --

21                      MR. MORGAN:  Go ahead.  I object to

22                      the form.  You go ahead.

23 A.    That particular process could not have been

98

1    A.    Yes.

2    Q.    So my question is:  Has it been scientifically

3          validated by the City that that process does not

4          have a disparate impact on Afro-Americans, that

5          the test be given first, if you don't meet the

6          cutoff, you don't progress and then nothing else

7          is considered?

8                MR. MORGAN:  Object to the form.

9    A.    We were relying on our consultant to advise us

10         in that regard.

11   Q.    And who was that?

12   A.    CWH.

13   Q.    Is it your testimony that CWH informed you that

14         if the test were done first without a cutoff

15         score, you could not progress past the test if

16         you failed, that that had been scientifically

17         validated not to have a disparate impact on

18         Afro-Americans?

19               MR. MORGAN:  Object to the form.

20   Q.    Your testimony is that's what CWH told the City

21         of Auburn?

22               MR. MORGAN:  Object to the form.

23   A.    I'm sorry.  Repeat the question.

118

could do is offer advice; is that correct?

        MR. MORGAN:  Object to the form.

A.    Correct.

Q.    If CWH were to take the position that it
recommended that all applicants be allowed to
proceed to the assessment center regardless of
score and that the test score be but one
component of the ultimate decision, would you
dispute that contention?

        MR. MORGAN:  Object to the form.

A.    Yes.

Q.    Why?

A.    Part of the discussion included CWH, Michael
Blair, expressing the opinion that somebody that
did poorly on the test would find the assessment
center process demoralizing or humiliating.

Q.    I'm not sure that answers my question, though.

A.    Would you ask the question again, please?

        MR. HANCOCK:  Would you read it back
           to him, please?

         (The immediately preceding question
           was read back by the court
           reporter.)

119

1    A.    I can only say that there was a lot of

2          back-and-forth discussion, and I don't know if

3          they actually said that we should not have a

4          cutoff score and that everyone should

5          participate.

6    Q.    So Auburn's position is that there was

7          discussion back and forth, but it couldn't

8          dispute the assertion by CWH that CWH

9          recommended that all applicants be allowed to

10         proceed through the assessment center

11         notwithstanding their test score?

12                   MR. MORGAN:  Object to the form of the

13                        question.

14   A.    My position is that we partnered with CWH to

15         guide us through a process, and we listened very

16         carefully to their recommendations.  There was a

17         lot of discussion about whether or not to use a

18         cutoff score.  And ultimately, in conjunction

19         with CWH, a cutoff score was determined.

20         Whether or not CWH advised us flat-out not to

21         use a cutoff score, I don't recall that.

22   Q.    You don't recall one way or the other?

23   A.    I don't recall that they flat-out said don't use

120

1   a cutoff score.

2   Q.   Do you remember them urging the City not to use

3        a cutoff score?

4            MR. MORGAN:   Object to the form.

5   Q.   Pardon me.   Do you recall that CWH recommended

6        that Auburn not use a cutoff score?

7   A.   I don't recall that.   Again, there was a lot of

8        conversation back and forth, and we talked about

9        letting the score stand as it was and being a

10       part of the final score as it was -- ultimately

11       the test was a part of the final score at the

12       end of the process or to -- or not to have a

13       cutoff score.   I just -- There was a lot of

14       discussion about that, and ultimately we decided

15       that in the tradition of the fire service and in

16       being consistent with other testing processes

17       that the City had done that the cutoff score was

18       an appropriate thing for us to use on the

19       written test.

20  Q.   It was Lee Lamar who first suggested a 70 cutoff

21       score, wasn't it?

22  A.   I can't say he was the first one to say that.

23       Again, that's something in the CWH literature.

121

1    Q.    Well, CWH never recommended that the City use a

2          cutoff score of 70, did it?

3    A.    Actually, in the assessment -- in the exercises

4          portion of the whole process, they did.

5    Q.    I'm talking about the test.

6    A.    I don't know that they said one way or the

7          other.  I mean, I couldn't say that they said 70

8          percent.

9    Q.    Is it Auburn's position that CWH ever recommend

10         that a cutoff score be used with regard to the

11         test -- the written test?

12                MR. MORGAN:  Object to the form.

13    A.    They told us that some clients use a cutoff

14          score and some clients don't.  I'm sorry I'm not

15          answering the question.

16    Q.    Right.  Because in point of fact, CWH never

17          recommended that the City of Auburn use a cutoff

18          score.

19                MR. MORGAN:  Object to the form.

20                  Asked and answered.

21    A.    I don't think they -- Through those discussions

22          they didn't say it was wrong to do so.

23    Q.    But they never said it was right and appropriate

# EXHIBIT "D"

**Deposition of Lee Y. Lamar**

COPY

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  EASTERN DIVISION

4   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
5   individual,

6            Plaintiffs,

                              CIVIL ACTION NO.
7   Vs.                       3:07-CV-867-WKW

8
    CITY OF AUBURN, a municipality
9   in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
10  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
11  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
12  individual, and CORTEZ LAWRENCE,
    an individual,

13
             Defendants.

14               * * * * * * * * * * *

15

16        **DEPOSITION OF LEE Y. LAMAR, JR.,** taken pursuant

17  to stipulation and agreement before Pamela A. Wilbanks,

18  Certified Court Reporter, ACCR# 391, Registered

19  Professional Reporter and Commissioner for the State of

20  Alabama at Large, in the Conference Room of Auburn City

21  Hall, 144 Tichenor Avenue, Auburn, Alabama, on

22  Wednesday, July 30, 2008, commencing at approximately

23  2:50 p.m.

20

1    Q.    If a written test is to be a component of a
2          promotional process, it is not required that
3          there be a cutoff score; is that correct?
4    A.    That's left up to the individual agency is
5          typically what's done I would think, if they
6          want to impose one or not.
7    Q.    Well, who imposed a cutoff score for the written
8          test that we've been talking about today for the
9          battalion chief promotion in 2006?
10   A.    Again, the group that's been discussed several
11         times today:  Steve Reeves, Bill James, Larry
12         Langley, myself, and CWH's personnel when they
13         arrived at that part.  We all discussed it, and
14         that was the option.
15   Q.    That was the option --
16   A.    That was the option that was chosen.
17   Q.    But you'll agree with me that the City of Auburn
18         Fire Department had ultimate discretion as to
19         whether or not there would be, number one, a
20         test, correct?
21                    MR. MORGAN:  Object to the form.
22   A.    Yes, sir.
23   Q.    And number two, y'all had ultimate discretion as

21

1   to whether or not that test would contain a

2   cutoff score, correct?

3           MR. MORGAN:  Object to the form.

4   A.  Yes, sir.  As advised by CWH, our consultant.

5   Q.  But y'all have the ultimate decision-making

6   power?

7           MR. MORGAN:  Object to the form.

8   A.  Yes, sir.

9   Q.  And you heard Mr. Hancock's questions earlier

10  today to Mr. Reeves, I guess, where he suggested

11  that CWH attempted to persuade or encourage the

12  City of Auburn not to use a cutoff score.  Did

13  you hear those questions?

14  A.  I heard those questions.

15  Q.  Do you recall that?

16  A.  No, sir.

17  Q.  Can you testify one way or the other about what

18  you remember CWH advising you and the City of

19  Auburn about a cutoff score?

20  A.  What I recall was that if you chose to use one

21  that it needed to be that way throughout the

22  assessment on all components.

23  Q.  That cutoff scores would be used on every

22

1    component?

2    A.    Yes, sir.

3    Q.    Did the City of Auburn use cutoff scores on all

4          components of the battalion chief promotion

5          process in 2006?

6    A.    Yes, sir.  I believe so.

7    Q.    And if CWH says that it encouraged you and the

8          City of Auburn not to use a cutoff score, you're

9          testifying that's incorrect?

10                   MR. MORGAN:  Object to the form.

11   A.    Can you repeat that?

12   Q.    Yeah.

13          If CWH is going to say in this case that

14         they tried to encourage you and the City of

15         Auburn not to use a cutoff score for that test,

16         you're going to testify that that's incorrect;

17         is that correct?

18                   MR. MORGAN:  Object to the form.

19   A.    I'm not trying to be difficult.  It's that when

20         you through that last "that's correct" --

21   Q.    Forget that last correct.  Let me ask it a

22         different way.

23          Are you going to testify that CWH did not

23

1    recommend to you and the City of Auburn that you

2    not use a cutoff score?

3              MR. MORGAN:  Object to the form.

4   A.   I don't recall them specifically saying that,

5    no, sir.

6   Q.   You don't recall?  Is that your testimony?

7   A.   Yes, sir.

8              MR. MORGAN:  Wait.  Object to the

9                 form of that question.

10   Q.   Let's ask it again.

11    You don't recall whether CWH encouraged you

12    and the City not to use a cutoff score?

13             MR. MORGAN:  Object to the form.

14   A.   No, they did not encourage us not to use it.  I

15    don't recall that they did.

16   Q.   And that's my question.  You don't recall or

17    they did not do it?

18   A.   I don't recall that they did -- that they did

19    not encourage us to use a cutoff.

20   Q.   You don't --

21             MR. MORGAN:  His question -- You're

22               asking if they do not recall, and

23               what he's saying is I don't recall

26

1       achieved anything.

2  Q.  So --

3  A.  That was transferable.

4  Q.  So it sounds to me like you did suggest 70 as

5       the cutoff score.

6  A.  I'm sure in the discussion with everybody else,

7       yeah, we -- Again, I may have suggested it, but

8       I had thought about it.

9  Q.  Was it your perception that the people at CWH

10      didn't know all that stuff you just told me

11      about the 70 cutoff score?

12  A.  No, sir.  I believe they knew.

13  Q.  Were they suggesting a different cutoff score?

14  A.  Not that I recall.

15  Q.  Was there some reason why you were having to

16      explain all the reasons why 70 should be a

17      cutoff score to the people at CWH that you feel

18      like already knew all the things you were

19      telling them?

20  A.  Well, I think it was part of the discussion as a

21      group:  What would be your -- What would be your

22      points to make that decision on.

23  Q.  I think you've already testified to this, but

27

1    it's your testimony that you decided in

2    conjunction with the other members of the group

3    with the City of Auburn along with CWH that a

4    test that included a cutoff score should be used

5    in advance of the assessment center, correct?

6                MR. MORGAN:  Object to the form.

7    A.   Yes, sir.

8    Q.   You couldn't get to the assessment center

9    without passing the test, correct?

10                MR. MORGAN:  Object to the form.

11   Q.   Is that correct?

12   A.   That's correct.

13   Q.   I guess you heard my questions to Chief Langley

14   a minute ago or maybe -- I don't remember who it

15   was.  But you'll agree with me that the test and

16   the assessment center are two separate entities;

17   is that correct?

18                MR. MORGAN:  Object to the form.

19   A.   No, sir, I don't agree with you.

20   Q.   You don't agree with that.

21        So you disagree with -- I'm not going to

22   read it again.  You disagree with the definition

23   of assessment center provided by CWH in the

# EXHIBIT "E"

**Deposition of Larry Langley**

COPY

1

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3               EASTERN DIVISION

4  EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
5  individual,

6        Plaintiffs,

7  Vs.                    CIVIL ACTION NO.
                            3:07-CV-867-WKW
8
    CITY OF AUBURN, a municipality
9  in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
10  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
11  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
12  individual, and CORTEZ LAWRENCE,
    an individual,
13
        Defendants.
14
             * * * * * * * * * *
15

16        DEPOSITION OF LARRY M. LANGLEY, taken pursuant

17  to stipulation and agreement before Pamela A. Wilbanks,

18  Certified Court Reporter, ACCR# 391, Registered

19  Professional Reporter and Commissioner for the State of

20  Alabama at Large, in the Conference Room of Auburn City

21  Hall, 144 Tichenor Avenue, Auburn, Alabama, on

22  Wednesday, July 30, 2008, commencing at approximately

23  2:20 p.m.

16

1 A. No. I worked for Ampex Corporation.

2 Q. But that was your first job with the City of

3   Auburn was --

4 A. Right.

5 Q. -- firefighter?

6    You heard me ask questions earlier, I

7   assume, about the meetings that were held prior

8   to the 2006 battalion chief promotion between

9   you and Lee Lamar and Mr. Reeves and Mr. James.

10   Do you specifically recall those meetings and

11   what was discussed in those meetings?

12 A. Somewhat of them. I wasn't in all of them.

13   Sometimes I was out of town when they had a

14   meeting.

15 Q. Do you recall any discussions in those meetings

16   about implementing a test with a cutoff score as

17   a prerequisite for that job?

18 A. Yes.

19 Q. Whose decision was it?

20 A. I don't remember. I don't really remember how

21   that come about. The only thing I know is

22   during the conversations and everything between

23   all of us, it come up.

1   Q.   You can't testify about who with the City had

2         the idea or made the decision to have a test

3         with a cutoff score; is that correct?

4   A.   No.

5   Q.   Do you recall if that decision was made before

6         the City contracted with CWH?

7   A.   No.  It was made along with CWH.

8   Q.   Do you recall whether or not Lee Lamar was the

9         individual that suggested the number of 70 as

10         the test score cutoff?

11   A.   Don't -- I can't testify to that, no.

12   Q.   Does that seem familiar to you that he did or --

13   A.   Well, 70 was discussed because it's a state

14         standard to the fire college and National Fire

15         Academy, and I remember the 70 score being

16         discussed.

17   Q.   Was there any discussion about using a test

18         without a cutoff score and just using it as a

19         part of the whole process?

20   A.   I really don't remember if it was or not.

21   Q.   Looking back on it, do you have any opinions

22         about whether or not that would have been a

23         better idea?

# EXHIBIT "F"

## Deposition of William James

COPY                                                    1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
5   individual,

6          Plaintiffs,

7   Vs.                              CIVIL ACTION NO.
                                     3:07-CV-867-WKW
8
    CITY OF AUBURN, a municipality
9   in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
10  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
11  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
12  individual, and CORTEZ LAWRENCE,
    an individual,
13
           Defendants.
14
                    * * * * * * * * * *
15

16          **DEPOSITION OF WILLIAM HOWARD JAMES**, taken

17  pursuant to stipulation and agreement before Pamela A.

18  Wilbanks, Certified Court Reporter, ACCR# 391,

19  Registered Professional Reporter and Commissioner for

20  the State of Alabama at Large, in the Conference Room

21  of Auburn City Hall, 144 Tichenor Avenue, Auburn,

22  Alabama, on Wednesday, July 30, 2008, commencing at

23  approximately 1:20 p.m.

30

1       was working on.

2   Q.   Do you recall during the meetings with CHW -- if

3       I say that wrong -- CWH -- do you recall who

4       during those meetings was promoting a score of

5       70 as being the cutoff score?

6   A.   I don't recall any specific person promoting

7       that other than it was discussed among everybody

8       that was in the room about a cutoff score.

9   Q.   And you can't testify if anyone with the City of

10      Auburn was the first person to suggest that

11      there be a 70 cutoff score?

12  A.   I couldn't identify a person, no.

13  Q.   Are you familiar through your job with the City

14      of Auburn with the work history of Mr. Stephens

15      and Mr. Ogletree?  It's okay if you're not.  I'm

16      just asking.

17  A.   Detailed parts of it, not specifically, other

18      than I did -- since my position as the director

19      looking at performance appraisals.

20  Q.   To your knowledge did they have satisfactory

21      performance appraisals?

22  A.   As I recall they do, yes.

23  Q.   Are you aware of anything in their work history

# EXHIBIT "G"

## Deposition of Gerald Stephens

COPY

1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                        EASTERN DIVISION

4

5   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
6   individual,

7           Plaintiffs,

8   Vs.                                    CIVIL ACTION NO.
                                           3:07-CV-867-WKW
9
    CITY OF AUBURN, a municipality
10  in The State of Alabama, LARRY
    LANGLEY, and individual, LEE LAMAR,
11  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
12  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
13  individual, and CORTEZ LAWRENCE,
    an individual,
14
           Defendants.
15
                * * * * * * * * * * * *
16
          **DEPOSITION OF GERALD STEPHENS**, taken pursuant
17
    to stipulation and agreement before Pamela A. Wilbanks,
18
    Certified Court Reporter, ACCR# 391, Registered
19
    Professional Reporter and Commissioner for the State of
20
    Alabama at Large, in the Law Offices of Hill, Hill,
21
    Carter, Franco, Cole & Black, 425 South Perry Street,
22
    Montgomery, Alabama, on Friday, May 30, 2008, commencing
23
    at approximately 10:00 a.m.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1    Q.    In this letter y'all say about exercising your

2          rights for a grievance on a promotion procedure,

3          which includes the following:  The written exam.

4                What was your complaint about the written

5          exam at that point?

6    A.    In reference to this grievance as a group,

7          everybody had their specific complaint.  And the

8          only thing I can tell you about that is the last

9          one, inconsistency of past promotional

10         procedures.  That was my main complaint.

11   Q.    So did you have a complaint yourself about the

12         written exam as part of this grievance

13         procedure?

14                    MR. HORSLEY:  What was that question

15                again?  I'm sorry.

16                    MR. MORGAN:  He said --

17   Q.    As I understand what you said, the four of y'all

18         may have each had your own separate complaints,

19         true?

20   A.    Pretty much so, yes, sir.

21   Q.    The one that you were most complaining about was

22         the inconsistency of past promotional

23         procedures?

1    A.    Yes, sir.

2    Q.    My question is:  As part of the grievance

3          procedure, was one of your complaints or did you

4          have a complaint about the written exam?

5    A.    The thing about inconsistency of past

6          promotional procedures, it involves the written

7          exam because for the simple fact there have

8          never been one.  That's my main thing.  That's

9          part of my inconsistency, because when I took --

10         if I can explain --

11               MR. HORSLEY:  Yeah.

12   A.    When I took my promotional assessment in '96,

13         there was no written test.  Anything after that

14         that I recall within a ten-year time span, there

15         was no written test.

16   Q.    Let me ask the question this way.  I'm going to

17         get to the inconsistency and let you explain

18         that in detail, but I want to go through these

19         other three.

20               What I'm hearing you say -- you tell me if

21         I'm wrong -- is that your complaint about the

22         written exam is that it was a requirement.

23   A.    Basically the written exam was part of the

1       procedure, yes.

2   Q.  You didn't make any specific complaints about

3       the exam per se but just the fact that it was

4       now a part of the promotion procedure?

5   A.  Yes, sir.

6   Q.  And did you have as part of your complaint the

7       no time in grade policy?  Was that something

8       that concerned you?

9   A.  Not directly, sir.

10  Q.  And then the -- I don't even understand this

11      one -- no accumulative point system, was that

12      one of your concerns?

13  A.  That was a minor concern because --

14  Q.  What is that?

15  A.  Basically accumulative points is something

16      that's implemented into the overall assessment

17      whereas if --

18  Q.  Back up.

19  A.  Let's say, for example, if you had four years of

20      service, you get two points for that.  If you

21      had a degree, you get eight points for that, you

22      know.  To the point -- The point I'm trying to

23      get at is:  At the end of the testing, all your

139

1    points are added up, and that's how you get a

2    result, like I got on my result from when I was

3    promoted stating how I ranked and here was my

4    score.

5  Q.  So you thought there should be some accumulative

6    point system into the system, either seniority

7    or education or something?

8  A.  Yes, sir.  I think it should have been one --

9    some type of point system, yes, sir.  Whether

10   there was or not, I don't know, because I didn't

11   make it past the written test portion for

12   battalion chief.

13 Q.  Well, tell me how you would have fashioned the

14   test for battalion chief.

15        MR. HORSLEY:  Object to the form.  You

16        can answer.

17 A.  I'm not an expert on test making, Mr. Morgan, so

18   I can't really say what I would do and what I

19   would do would be the correct thing to do.  But

20   I just -- I just -- I'm not an expert in that

21   field.  I just don't know.

22 Q.  And then your number four complaint -- I think

23   this is the one that you said most concerned

140

1        you -- was the inconsistency of past promotional

2        procedures.

3    A.  Yes, sir.

4    Q.  Elaborate and tell me exactly what it is that

5        concerned you about that one.

6    A.  The thing that concerned me was that, of course,

7        I went through an assessment center.  Some

8        people promoted and, whether it was lieutenant

9        or team leader, went through structured

10       interviews.  Some people was appointed.  And

11       some people were just, in my terms, vaguely

12       given a job.

13   Q.  Just what, now?

14   A.  Vaguely given the job and told them that you are

15       in this position.  And when I say that, the job

16       position wasn't posted.

17   Q.  So --

18   A.  So that's what I mean by inconsistency.

19   Q.  I guess what I'm understanding you to say -- and

20       once again, you correct me -- is that people had

21       achieved a rank in different ways.

22   A.  Yes, sir.

23   Q.  Who was appointed as opposed to going through

239

1    promoted in front of you as it relates to racial

2    discrimination?

3                    MR. MORGAN:  Object to the form.

4    Q.  Go ahead.

5    A.  I think I was more qualified than these guys

6        were.  I had more seniority.  I was more

7        experienced.  I just directly speaking think I

8        was more qualified.

9    Q.  Why do you think -- Again, from a layman's

10       standpoint, why do you believe the City

11       implemented the test for this promotion?

12                   MR. MORGAN:  Object to the form.

13   Q.  You can answer.

14   A.  Basically because I'm black and I was applying

15       for the position.

16   Q.  Were other blacks applying for the position

17       also?

18   A.  Other blacks were applying for the position as

19       well.

20   Q.  Y'all spoke some about damages, and Randall

21       asked you questions about mental anguish and

22       emotional distress related to the denial of the

23       promotion.  Again, what is the reason you are

# EXHIBIT "H"

## Deposition of Eddie Ogletree

COPY

1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                   EASTERN DIVISION

4

5   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
6   individual,

7          Plaintiffs,

8   Vs.                              CIVIL ACTION NO.
                                     3:07-CV-867-WKW
9
    CITY OF AUBURN, a municipality
10  in the State of Alabama, LARRY
    LANGLEY, and individual, LEE LAMAR,
11  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
12  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
13  individual, and CORTEZ LAWRENCE,
    an individual,
14
           Defendants.
15
              * * * * * * * * * * * *
16
           **DEPOSITION OF EDDIE OGLETREE**, taken pursuant to

17  stipulation and agreement before Pamela A. Wilbanks,

18  Certified Court Reporter, ACCR# 391, Registered

19  Professional Reporter and Commissioner for the State of

20  Alabama at Large, in the Law Offices of Hill, Hill,

21  Carter, Franco, Cole & Black, 425 South Perry Street,

22  Montgomery, Alabama, on Friday, June 6, 2008, commencing

23  at approximately 9:00 a.m.

164

```
 1            didn't take a test.

 2   Q.   That's not the question now, Mr. Ogletree.

 3        Let's stay focused on the battalion chief

 4        promotion that was given in April of 2006.

 5   A.   I was talking about the other one.  I don't

 6        know.

 7   Q.   Do you know of any white applicants that got

 8        preference on their test grades?

 9   A.   I don't know.

10   Q.   Look at number 27.  You make a reference to the

11        City violating and continuing to violate a

12        federal court order requiring them to alter

13        hiring and promotion policies and procedures to

14        provide equitable treatment to

15        African-Americans.

16            What court order are you referring to?

17                MR. HORSLEY:  Object to the form.

18   A.   I don't know.

19   Q.   Well, what is it that you say the City is doing

20        wrong that they violate a federal court order?

21                MR. HORSLEY:  Object to the form.

22   Q.   Do you know?

23   A.   I'd say giving the test to weed out
```

1       African-American applicants.  They are running

2       the student firefighter program and not getting

3       any African-Americans to apply and therefore be

4       hired full-time.

5  Q.   I'm sorry.  I missed the first one.  Something

6       about test.

7  A.   Yeah.  They decided to change the policies and

8       give a test and weed out African-American

9       applicants from being promoted.

10  Q.  And then they do the student firefighter

11      program, and blacks don't get hired, or

12      African-Americans?

13  A.  Exactly.

14  Q.  Do you know what advertising the City does for

15      the student firefighter program?

16  A.  I know some of it.  I know they recently tried

17      to improve on some of it, I guess, when they

18      started going around to more schools.  But they

19      had quit going anywhere for a long time.

20  Q.  When did they quit going anywhere?

21  A.  Because I went and talked to some -- to a church

22      at one time about twelve years ago and -- talked

23      to an African-American church and talked to some