**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **EDDIE OGLETREE, an individual;** | ) | |
| **GERALD STEPHENS, an individual** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO:** |
| | ) | **3:07-cv-867-WKW** |
| **CITY OF AUBURN**, a municipality in The | ) | |
| State of Alabama; **LARRY LANGLEY**, an | ) | **JURY TRIAL DEMANDED** |
| individual; **LEE LAMAR**, an individual; | ) | |
| **BILL HAM, Jr.**, an individual; **STEVEN** | ) | |
| **A.REEVES**, an individual; **BILL JAMES**, | ) | |
| an individual; **CHARLES M. DUGGAN**, | ) | |
| an individual; and **CORTEZ LAWRENCE**, | ) | |
| an individual; | ) | |
| | ) | |
| **Defendants,** | ) | |

---

**PLAINTIFFS' BRIEF IN RESPONSE TO THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

**RICHARD F. HORSLEY
KING, HORSLEY & LYONS, LLC
1 Metroplex, Suite 280
Birmingham, Alabama 35209**

# TABLE OF CONTENTS

I.      STATEMENT OF THE CASE........................................................................................1

II.     SUMMARY JUDGMENT STANDARD......................................................................2

III.    STATEMENT OF THE FACTS TO BE CONSTRUED IN FAVOR OF THE
        PLAINTIFFS'.............................................................................................................2

IV.     TESTIMONY.............................................................................................................11
        A.      Gerald Stephens..............................................................................................11
        B.      Eddie Ogletree................................................................................................16
        C.      Stephen Reeves...............................................................................................22
        D.      Lee Lamar.......................................................................................................28
        E.      Larry Langley..................................................................................................31
        F.      William James.................................................................................................33

V.      LEGAL ARGUMENT................................................................................................34
        A.      Title VII Claims/Circumstantial Evidence....................................................36
        B.      Title VII Claims/Disparate Impact.................................................................44
        C.      Violation of the 1991 Hammock Order...........................................................49
        D.      Title VII Claims/Direct Evidence of Discrimination....................................52
        E.      § 1983 Claims/Individual Defendants/Retaliation.........................................53
        F.      Statute of Limitations.....................................................................................54

VI.     CONCLUSION...........................................................................................................55

## TABLE OF AUTHORITIES

**CASES AND STATUTES**                                                    **PAGE**

Anderson v. Liberty Lobby Inc., 477 U.S. 242 1986........................................................................2

McDonnell Douglas Corp., v. Green 411 U.S. 792................................................................. 36

Mayfield v. Patterson Pump Co., 101 F 3d 1371 (11th Cir. 1996)..................................................36

Benson v. Tocco Inc., 1134 3d 1203 (11th Cir. 1997)................................................................36

Standard v. The A.B.E.L. Services Inc., 161 F. 3d 1318 (11th Cir. 1998)...................................38

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)...........................................................39

Hurlbert v. St. Mary's Health Care Sys. Inc., 439 F. 3d 1286, 1299 (11th Cir. 2006)...................41

Ross v. Rhodes Inc., 146 F. 3d 1286, 1291 (1998)...........................................................................43

Denney v. City of Albany, 247 F. 3d 1172, 1181 (11th Cir. 2001)..................................................44

Smith v. City of Mobile, Et. 17 (S.D. Ala. 9-4-07)...........................................................................44

29 C.P.R. § 1607.4 (d)........................................................................................................................44

Teamsters v. United States, 431 U.S. 324, 339-40, 97 S.C.t. 1843, 52 L. Ed. 2d 396 (1977).......44

42 U.S.C. § 2000 e-2 (k) (1) (A) (I).................................................................................................45

Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S. Ct. 2362, 45 L. E. d 2d 280 (1975)....45

Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656, 657, 109 S. Ct. 2115, 104 L. Ed. 2d

733 (1989)..........................................................................................................................................46

Isabel v. City of Memphis, 404 F. 3d 404,413 (6th Cir. 2005)........................................................48

Lee v. Conecuh Cy. Bd. of Ed., 634 F 2d 959, 962 (5th Cir. 1981)................................................50

Cit. Concerned About Children v. School Bd., 111 F 3d 1285 (11th Cir. 1999)............................50

Smith v. City of Mobile, (S.D. Ala. 9-4-07)................................................................................. 52

Merritt v. Dillard Paper Co., 120 F 3d 1181, 1189-90 (11th Circuit 1997)...................................52

E.E.O.C. v. Alton Packing Corp., 901 F 2d 920, 924 (11th Cir. 1990)..........................................52

Gold Smith v. City of Atmore, 966 F 2d 1155, 1163 (11th Cir. 1993)..........................................54

Combs v. Plantation Patters, 106 F 3d 1519, 1528 (11th Cir. 1997)..............................................54

Jones v. Dillards Inc., 368 F 3d 1278, 1281(11th Cir. 2004)..........................................................55

Cocke v. Merrill Lynch & Co., 817 F 2d 1559 (11th Cir. 1987)....................................................55

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EDDIE OGLETREE, an individual;** | ) | |
| **GERALD STEPHENS, an individual** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO:** |
| | ) | **3:07-cv-867-WKW** |
| **CITY OF AUBURN**, a municipality in The | ) | |
| State of Alabama; **LARRY LANGLEY**, an | ) | **JURY TRIAL DEMANDED** |
| individual; **LEE LAMAR**, an individual; | ) | |
| **BILL HAM, Jr.**, an individual; **STEVEN** | ) | |
| **A.REEVES**, an individual; **BILL JAMES**, | ) | |
| an individual; **CHARLES M. DUGGAN**, | ) | |
| an individual; and **CORTEZ LAWRENCE**, | ) | |
| an individual; | ) | |
| | ) | |
| **Defendants,** | ) | |

**PLAINTIFFS' BRIEF IN RESPONSE TO THE DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

**COME NOW** the Plaintiffs, in the above styled cause of action and submit this

Memorandum Brief and evidence in support of their response to the Defendants's Motion for

Summary Judgment.

**I. STATEMENT OF THE CASE**

The Plaintiffs, Gerald Stephens and Eddie Ogletree, in 2006, were Lieutenants with the

City of Auburn Fire Division.  This lawsuit alleges that both men were denied a promotion to

Battalion Chief within the Department in May 2006.  The lawsuit contains claims of race

discrimination pursuant to Title VII, including a disparate impact claim, and §1983 and

retaliation.  Plaintiffs sued individuals Larry Langley, Lee Lamar, Bill Hamm, Stephen Reeves,

Bill James, Charles Duggan and Cortez Lawrence.  Cortez Lawrence has since been dismissed, and the Plaintiffs hereby consent to the Summary Judgment Motion as it relates to Bill Hamm Jr.

Plaintiffs filed a second and third amended Complaint leading to claims for intentional race discrimination, retaliation and disparate impact.  The City of Auburn filed a third party Complaint against CWH Research Inc., the company who administered the cut off score test which is at the center of this lawsuit.

The Defendant, The City of Auburn, and the individual Defendants have filed a Motion for Summary Judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary Judgment is appropriate when the City of Auburn shows (1) that there is no genuine issue as to any material fact; and (2) that the City of Auburn is entitled to judgment as a matter of law.  FRCP 56 ( c) is not resolving factual disputes but rather is attempting to determine whether the Plaintiffs' proof, if believed at trial, could support a finding for that party.  Accordingly, this Court must accept all of the Plaintiffs properly supported assertions as true and give the Plaintiffs the benefit of all reasonable inferences from those assertions.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986).

## III. STATEMENT OF FACTS TO BE CONSTRUED
## IN FAVOR OF THE PLAINTIFFS

_____These factual allegations are supported in the cited deposition testimony and documentary evidence that follows.

The City of Auburn Fire Department has a long history of alleged racial discrimination in its hiring and promotional practices.  In 1991, the City of Auburn settled a racial discrimination

claim filed by multiple firefighters concerning the City's promotional practices.  (Hammock v. City of Auburn CV 87-680-E).  As a result of that settlement, Judge Robert E. Varner, in the United States District Court for the Middle District of Alabama, Eastern Division, signed an Order which, among other things, directed the City of Auburn to implement terms and conditions related to hiring and promotional practices with regard to minorities.  (See Ex A Sec. 12)  While the City of Auburn initially attempted to comply with that Order, its compliance was relatively short lived, and as of today, the City takes the position that the Order is no longer in effect, and the City is not bound by its terms and conditions.  (Reeves Depo Pg. 20 at 6-9) The City of Auburn did not seek to comply with the 1991 Order pursuant to the Battalion Chief promotion in 2006, which is the subject of this race discrimination lawsuit.  (Reeves Depo Pg. 32 at 4-17; Lamar Depo Pg. 17 at 11-19; James Depo Pg. 9 at 1-14)

The Hammock Order specifically states, in Section 12, that the City of Auburn must implement and use an assessment center for the promotion of Lieutenants and Captains within the fire division.  The Order further states that all promotions subject to the assessment center shall be made by promoting the candidate rated number 1 by the assessment center for each such promotion.  Therefore, as of the 1991 Order, all Lieutenants and Captains promotions within the City of Auburn were supposed to be made pursuant to an assessment center.  The Order specifically states that the assessment center shall control the Lieutenants and Captains promotions and makes no mention of requiring applicants to pass a written test in order to proceed to the assessment center.  (See Ex A Sec. 12)

Gerald Stephens, hired by the City in 1994, was promoted, through an assessment center, to the position of Lieutenant in 1996.  There have been no Lieutenant promotions through an

3

assessment center since Lieutenant Stephens was promoted in 1996.  Stephens was the only

Lieutenant in the Auburn Fire Division until February 1, 2006.  (Stephens Depo Pg. 20 at 22-23;

Pg. 21 at 1-6; Pg. 43 at 12-21; Pg. 48 at 20-23; Pg. 49 at 5-7; Reeves Depo Pg. 39 at 23; Pg. 40 at

1-6)

      Eddie Ogletree began his employment with the Auburn Fire Division in 1984.  In 1996,

he became a Team Leader , and at the time the events made the subject of this lawsuit arose,

Ogletree was a Lieutenant.  (Ogletree Depo Pg. 20 at 21-22; Pg. 10 at 1-16) At least in the last 28

years, the City of Auburn Fire Department has never promoted a black firefighter past the rank of

Lieutenant.  (Lamar Depo Pg. 37 at 11-19) During those years, the ranks above Lieutenant

included Captain, Battalion Chief, Deputy Chief and Chief. (Langley Depo Pg. 9 at 6-23; Pg. 10

at 1-23)

      Since the 1991 Order, there have been approximately 5 black firefighters hired by

the City of Auburn, while approximately 48 white firefighters were hired in that same period of

time.  The student firefighter program has only produced 1 current black firefighter with the City

of Auburn, Gerald Stephens.  (Lamar Depo Pg. 35 at 6-19; Pg. 36 at 6-15; Reeves Depo Pg. 105

at 9-18) This program is a program designed to hire and train Auburn University students to

become full-time firefighters.  (Reeves Depo Pg. 107 at 1-8) Currently, and at the time of the

Battalion Chief promotion made the subject of this lawsuit, the City of Auburn has only 3 black

firefighters, including the 2 Plaintiffs in this lawsuit, and Chris Turner, who has also sued the

City of Auburn in a companion case, filed in the Middle District.  (Ogletree Depo Pg. 171 at 8-

23; Ex Y Pg. 1)

      Since the 1991 Order, numerous white firefighters were promoted through various means

4

without any consistency or compliance with a career development plan. Some of these promotions utilized interviews, some used situational testing and some occurred simply by appointment without any structured process. (Ogletree Depo Pg. 128 at 1-8; Pg. 51 at 1-11; Pg. 52 at 15-19; Pg. 54 at 7-22; Stephens Depo Pg. 143 at 5-10; Reeves Depo Pg. 49 at 15-23; Pg. 50 at 20-23) Again, during this period of time, no black firefighter was promoted past the rank of Lieutenant, and Gerald Stephens was the only Lieutenant within the department from February 1996 until February 1, 2006. (Stephens Depo Pg. 20 at 22-23; Pg. 21 at 1-6; Pg. 43 at 12-21; Pg. 48 at 20-23; Pg. 49 at 5-7; Reeves Depo Pg. 39 at 23; Pg. 40 at 1-6) African Americans have applied for jobs with the Auburn Fire Department during this same period of time, but were not hired. (Ogletree Depo Pg. 55 at 5-21)

In the mid 1990's, for reasons the City of Auburn Human Resources Director does not know, the position of Captain, as referenced in the 1991 settlement Order, was changed to Shift Commander. In 2005, the City of Auburn changed the rank of Captain/Shift Commander to Battalion Chief. As a result, multiple white firefighters became Battalion Chiefs. (Reeves Depo Pg. 49 at 15-23; Pg. 50 at 22-23; Pg. 51 at 5-20; Pg. 55 at 13-22; Pg. 56 at 7-23)Although the City claims this was not a promotion, it is a rank increase according to the insignia that the firefighters wear on their uniforms (Captain/Shift Commander 2 bugles-Battalion Chief 3 bugles). (Reeves Depo Pg. 50 at 5-16; Langley Depo Pg. 8 at 8-17) The City made this rank change without any testing, assessment centers or interviews. On February 1, 2006, only 4 months prior to the subject Battalion Chief promotion, all of the Team Leaders received a rank change to Lieutenant. Again, Gerald Stephens, a black male, was the only Lieutenant within the department at that time. Although the City claims this was not a promotion or a rank increase, it

5

is undisputed that Lieutenants have 1 bugle on their insignia and Team Leaders have no bugles on their insignia.  This rank change occurred without any testing, assessment center or interviews.  (Reeves Depo Pg. 34 at 4- 23; Pg. 35 at 1-16; Pg. 39 at 7-10, 23; Pg. 40 at 1-6) Although Eddie Ogletree, a Plaintiff herein, was in the group of Team Leaders who became Lieutenants, he understood that the change in rank was subject to Court approval.  The other 11 Team Leaders who became Lieutenants were white. (Ogletree Depo Pg. 13 at 2-14; Pg. 14 at 6-23; Pg. 15 at 1-19)

Curiously, this rank change occurred about the same time that three to six Battalion Chiefs were coming up for retirement, and Lieutenant is the rank below Battalion Chief.  Unless the City of Auburn were to allow rank skipping, which it ultimately did, only non probationary Lieutenants would have been eligible for the Battalion Chief promotion.  (Lamar Depo Pg. 16 at 14-19; Ex E; Ex J Sec. 2.07 and 2.09; Lamar Depo Pg. 34 at 19-23) The Battalion Chief promotion at issue in this case was posted in February 2006.  Initially, the City stated the only eligible applicants were non probationary lieutenants.  However, approximately 1 week later, the City changed the eligibility requirements to include non probationary firefighters and probationary Lieutenants.  (See Ex D; Ex E; Ex J Sec. 2.07 and 2.09) According to the City, they made the change in requirements because Chris Turner, a black male, who has also sued the City of Auburn, expressed interest in applying for the position.  He was a non probationary firefighter at the time, and the City claims that they determined that he was also eligible so they opened up the application process to all non probationary firefighters and probationary Lieutenants. (Lamar Depo Pg. 34 at 2-5; Ex E) Interestingly, the City now claims that each of the Team Leaders who were changed to Lieutenants on February 1, 2006 were

automatically non probationary Lieutenants due to their service as Team Leaders and the fact that

they did not consider the change to be a promotion.  However, the second Memo, which shows

the new eligibility requirements, specifically states that probationary Lieutenants were eligible,

despite the City's position that the new Lieutenants were non probationary.  (Reeves Depo Pg. 82

at 6-21; Ex C; Ex E) Then, the obvious question is, why are probationary Lieutenants eligible for

the Battalion Chief position if there were no probationary Lieutenants as of February 2006?

Technically, since a probationary employee is within the first 12 months of his position, each of

the new Lieutenants were in fact probationary Lieutenants since they had only been in that

position for a couple of weeks at the time the job was posted and would have held that rank for

only 4 months at the time the actual promotions were made.  (Reeves Depo Pg. 82 at 11-21;

Exhibit J Sec. 2.07 and Sec. 2.09)  Again, the obvious question is why did the City of Auburn

specifically state that probationary Lieutenants were eligible for the Battalion Chief promotion if

it now takes the position that there were no probationary Lieutenants at that time?

Leading up to the Battaltion Chief promotion, the City, including the individual

Defendants in this case, decided that they would implement a cut off score test as the first step in

the promotional process.  Obviously, this meant that anyone who did not pass the test was

immediately out of the promotional process and could not receive a promotion.  (Reeves Depo

Pg. 9 at 1-11; Pg. 10 at 20-23; Pg. 11 at 1-22; Pg. 12 at 8-23; Pg. 13 at 2-8; Pg. 23 at 21-23; Pg.

24 at 1-16; Pg. 69 at 1-15)The City claims that CWH Research, also a cross claim Defendant in

this case, was hired to administer the test and an assessment center for the promotion.  The City

claims that it made the decision to implement the cut off score test based upon advice and

recommendations from CWH Research Inc.  However, the evidence in this case is emphatic that

CWH Research Inc. recommended against implementing a cut off score test as a part of the promotional process. (Reeves Depo Pg. 14 at 1-9; Pg. 15 at 14; Ex B Pg. 2; Reeves Depo Pg. 23 at 7-13; Pg. 116 at 7-23; Pg. 119 at 6-11; Pg. 122 at 5-18; Ex C Pg. 2 and 9; Ex Z)

In fact, CWH Research Inc. takes the position that the current Fire Chief, Lee Lamar, suggested the cut off score for the exam and refused to follow their recommendations regarding the cut off score. (See Ex Z; Ex G 1-4; Reeves Depo Pg. 119 at 6-23; Pg. 120 at 2-21; Pg. 121 at 1-18) The 1991 Hammock Order clearly mandates that all Captains and Lieutenants promotions require an assessment center. At the time of this Battalion Chief promotion, the City had eliminated the rank of Captain, and while the City HR director doesn't know it why it was changed, the most plausible reason that the rank was eliminated was in order to circumvent the requirements of the 1991 Order. (See Ex A Sec. 12; Reeves Depo Pg. 55 at 11-18) And, at the time of this promotion, the City takes the position that the Order was no longer in effect and that they were not required to comply with the Order. Incredibly, the City's Human Resources Director testified that it is his understanding that the Hammock Court lost jurisdiction over the City's hiring practices the day after the Order was signed. (Reeves Depo Pg. 45 at 2-12) The City clearly violated the Order by requiring a cut off score test in advance of an assessment center for a promotion to a position that was re-classified from the Captains/Shift Commander position. There is an abundance of evidence in this case that the City has continuously violated the 1991 Hammock Order since it was signed. (Ogletree Depo Pg. 23 at 7-12; Pg. 51 at 1-11; Pg. 52 at 15-19; Pg. 54 at 7-22; Pg. 128 at 1-8; Reeves Depo Pg. 82 at 4-17; Pg. 34 at 14-18, 21-23; Pg. 35 at 9-15; Ex U)

In an attempt to explain its non compliance with the Order, beside the fact that the City

8

did not feel it was required to comply, the City says that the cut off score test was actually a part

of the assessment center referenced in the 1991 Order. (Lamar Depo Pg. 27 at 8-20; Pg. 28

at 13-16) Despite the fact that an assessment center is supposed to be an "outside" assessment

center administered by a neutral third party, the City admits that it played an active role in the

development of this promotional process and made the ultimate decision, against the

recommendation of CWH, to implement a cut off score test. (Lamar Depo Pg. 19 at 16-23; Pg.

20 at 7-14; Pg. 21 at 1-8; Pg. 30 at 8-22) CWH, through its contractual documents and an

Affidavit submitted in this case, clearly shows that the assessment center and the cut off score

test are completely separate entities. In this case, you could not get to the assessment center

unless you first passed the cut off score test. An assessment center is a reality based series of

exercises related to firefighting. The test is simply a written test which the City required that the

applicant pass before moving on to the assessment center. (See Ex B Pg. 1 and 2; Ex C Pg. 2 and

9; Reeves Depo Pg. 20 at 10-13; Ex Z) This is a clear violation of the 1991 Order, and the

City appears to be trying to circumvent the Order by now arguing that the cut off score test is a

part of the assessment center. (James Depo Pg. 15 at 11-15; Pg. 16 at 10-23; Pg. 17 at 1-19)

While the City of Auburn had utilized various inconsistent methods for promotions and

reclassifications within the Department since the 1991 Order, all of the sudden, when the only 3

African Americans within the Department wished to apply for the Battalion Chief promotion, the

City implements a cut off score test in advance of an assessment center. (Stephens Depo

Pg. 165 at 3-8; Pg. 168 at 11-16; Pg. 169 at 2-13; Ogletree Depo Pg. 97 at 2-8; Pg. 158 at 1-16)

Furthermore, the promotional process failed to consider work experience, seniority, time-in-

grade, yearly appraisals or any other work and service factors of the applicants. (Ogletree Depo

Pg. 1-10; 117 at 1-23) Nine white applicants took the cut off score exam, and the only three

African American firemen in the division took the exam.  Four of the white applicants failed to

pass the cut off score exam and all 3 African Americans, including Ogletree and Stephens, failed

to pass the exam.  Ogletree, Stephens and Chris Turner, the 3 African Americans, did not

proceed through the promotional process and did not receive the Battalion Chief promotion.

(Reeves Depo Pg. 68 at 7-23; Pg. 69 at 1-15; Pg. 102 at 10-23; Pg. 103 at 1-8) Stephens and

Ogletree both had more years of service, more time-in-grade and arguably more experience than

the 4 individuals promoted to Battalion Chief.  Each of the white individuals promoted to

Battalion Chief were among the Team Leaders who were allowed to change to the rank of

lieutenant only four months previous to the Battalion Chief promotion.  (Reeves Depo Pg. 74 at

4-9; Pg. 76 at 6-23; Ogletree Depo Pg. 122 at 2-16)

    Stephens and Ogletree were informed that they had not passed the exam and could not

proceed through the promotional process on April 14, 2006.  Although they filed grievances and

exhausted the grievance process in July 2006, Ogletree and Stephens filed charges with the Equal

Employment Opportunity Commission within 180 days of receiving notification that they could

not proceed through the promotional process.  (See Ex R; Ex K; Ex L; Ex P; Ex X) The Equal

Employment Opportunity Commission subsequently issued the determination letters finding that

the evidence substantiated Ogletree and Stephens' claims of race discrimination.  (See Ex

M; Ex N)

    There is direct evidence that Lee Lamar, the current Fire Chief, and Larry Langley, the

Chief during the 2006 Battalion Chief promotion, and Defendants in this case, have used racial

slurs in the past.  Larry Langley verbally represented to Gerald Stephens and Chris Turner (the

10

Plaintiff in a companion case of discrimination) that their allegations in a grievance and an

EEOC charge would cause them problems in the future.  These comments were made to both

men prior to the 2006 Battalion Chief promotion.  (See Ex W; Ex U; Ex S) Horace Clanton, a

white Firefighter, was told by then Chief Langley, while filling in as Battalion Chief, to make

sure to come to work everyday so that Gerald Stephens would not be in charge.  The other

firemen would not want to work for him.  (See Exhibit V)

## IV. TESTIMONY

### A.    Gerald Stephens

1.    Gerald Stephens began working for the Auburn Fire Department on

January 17, 1994.  Within the first year after he was hired, Stephens completed the Fire Fighter II

certification course, and subsequently, he completed an apparatus operator certification.

(Stephens Depo Pg. 20 at 22-23; Pg. 21 at 1-6; Pg. 22 at 13-20)

2.    Stephens, prior to the events made the subject of this lawsuit, did file an

EEOC Complaint against the City of Auburn.  (Stephens Depo Pg. 23 at 15-20)

3.    In 1996, Stephens applied for and received a promotion to the position of

lieutenant.  For the promotion, he completed an assessment center and had 1 year of service as a

career firefighter, which was required.  (Stephens Depo Pg. 43 at 12-21; Pg. 45 at 1-19) The

assessment center consisted of a panel of assessors, unaffiliated with the Auburn Fire Department

or the City of Auburn, who put Stephens through scenarios applicable to real life firefighting.

Stephens did not take a written test.  (Stephens Depo Pg. 43 at 22-23; Pg. 44 at 1-12) Stephens

was the last lieutenant promoted, through an assessment center, at the Auburn Fire Department.

Subsequently, team leaders became lieutenants.  (Stephens Depo Pg. 48 at 20-23; Pg. 49 at 4-17)

11

4.      Stephens subsequently applied for the deputy fire chief position but did not receive the promotion.  Pursuant to the deputy fire chief position, Stephens underwent a structured interview.  (Stephens Depo Pg. 51 at 1-2; Pg. 52 at 3-5)

5.      Stephens applied for deputy fire chief within the last 5 years, and Lee Lamar, the current chief, was promoted to that position.  Pursuant to that position, Stephens submitted an application and underwent a structured interview at City Hall.  The interview was conducted by a panel of individuals un-associated with the Auburn Fire division.  (Stephens Depo Pg. 55 at 1-14)

6.      Stephens does not recall a written test ever being required for the team leader promotion.  (Stephens Depo Pg. 57 at 6-11)

7.      Around December of 2005, Stephens learned that the team leaders at the Auburn Fire Division had petitioned for a title change to lieutenant.  Stephens learned of this in a meeting with Dean Garrett, Steve Reeves, Bill James, Lee Lamar, Chris Turner and Walter Allen.  At that meeting, Stephens received a Petition signed by 13 team leaders.  (Stephens Depo Pg. 58 at 1-10; Pg. 59 at 11-23; Pg. 60 at 1-8)

8.      At that time, Stephens was the only lieutenant in the Auburn Fire Division, a higher rank than team leader.  (Stephens Depo Pg 60 at 9-16)

9.      Stephens was provided with a ballot to vote "yes" or "no" for the change in rank, and he voted "no".  However, the change still occurred.  (Stephens Depo Pg. 63 at 2-7, 18-23; Pg. 64 at 1-4; Pg. 65 at 7-14)

10.     Stephens learned through a memorandum directed to the division that there would be a battalion chief promotion.  Previously, the position of Battalion Chief was

Captain; however, the rank was changed.  (Stephens Depo Pg. 73 at 20-23; Pg. 76 at 2-8, 23; Pg. 77 at 1-3)

11.     The Battalion Chief promotion was also posted in the division on February 16, 2006.  (Stephens Depo Pg. 78 at 9-15)

12.     The Battalion Chief promotion memo stated that current non probationary lieutenants were eligible and stated that a written exam would be a component of the assessment process.  (Stephens Depo Pg. 79 at 12-19)

13.     The second memo, dated February 23, 2006, stated that non probationary firefighters and probationary lieutenants were eligible for the Battalion Chief promotion. (Stephens Depo Pg. 80 at 19-23; Pg. 81 at 1-4).

14.     Stephens attended an orientation for the Battalion Chief promotion and was informed that if an applicant did not pass a written test, then that applicant was not eligible to proceed through the remainder of the process.  (Stephens Depo Pg. 88 at 17-22)

15.     The materials that Stephens was provided to study for the exam were for an advanced management level position with a fire division.  The Battalion Chief position at the Auburn Fire Division was 1 rank below deputy fire chief.  (Stephens Depo Pg. 96 at 10-21)

16.     In advance of the test, Stephens studied as much as he could in the time he had.  He concentrated in areas that needed most of his attention.  (Stephens Depo Pg. 108 at 18)

17.     The test itself contained some questions that seemed to reference a larger municipality than the City of Auburn.  (Stephens Depo Pg. 122 at 21-23; Pg. 123 at 1-3)

18.     A couple of days after the exam, Stephens received a feedback report and a letter indicating that he did not achieve the 70 cut off score on the exam.  (Stephens Depo Pg.

13

125 at 18-22; Pg. 127 at 3-10)

19.    Stephens feels that the Battalion Chief promotional process was unfair and inconsistent with past promotional procedures.  The written exam with a cut off score was a new part of the process and there was no accumulative point system or overall assessment taken into consideration.  (Stephens Depo Pg. 137 at 5-15; Pg. 138 at 19-23; Pg. 139 at 1-12)

20.    Stephens states that inconsistent promotional procedures included some firemen promoted through structured interviews, some firemen appointed to new jobs and some people were just given a job.  Stephens states that Rodney Hartsfield was promoted to team leader while he was a probationary career firefighter.  Lee Lamar was appointed as the training officer without any promotional process.  (Stephens Depo Pg. 140 at 1-12; Pg. 141 at 5-13; Pg. 142 at 6-23)

21.    In certain instances, firefighters were allowed to skip ranks.  Larry Langley was promoted from firefighter to Captain.  (Stephens Depo Pg. 143 at 5-10)

22.    Rodney Hartfield, 1 of the white men promoted to Battalion Chief, worked under Stephens as a student firefighter, career firefighter and team leader.  This is also true of Joe Lovvorn.  Subsequent to this promotion, Joey Darby, 1 of the Battalion Chief applicants, was promoted to Battalion Chief to replace Chief Brown when he retired.  Stephens trained Rodney Hartsfield in Rookie School and has more years of experience than Hartsfield, has spent more time on the job and believes he has more experience than any of the individuals promoted to Battalion Chief.  Also, he works as a Battalion Chief on a fill in basis.  (Stephens Depo Pg. 154 at 1-12, 18-21; Pg. 156 at 10-11, 18-23; Pg. 157 at 1-7, 20-23; Pg. 158 at 1-4)

23.    When Joe Lovvorn, Matt Jordan and Joey Darby, 3 of the white firemen

14

promoted to Battalion Chief, began their careers at the Auburn Fire Department, Stephens was already an officer.  For the reasons already expressed, Stephens feels as though he is more qualified for the Battalion Chief job than these individuals.  (Stephens Depo Pg. 160 at 5-16)

24.     Stephens states there has never been a written test requirement for a promotion to this rank.  Stephens states that, coincidentally, when 3 African Americans applied for the Battalion Chief position, the City of Auburn implemented a written test.  He also says that seniority within a division was discarded as a criteria for the promotion to Battalion Chief and that, in 1996, when he was promoted to lieutenant, seniority and time-in-grade was heavily considered.  (Stephens Depo Pg. 165 at 3-8; Pg. 168 at 11-16; Pg. 169 at 2-13)

25.     Stephens can think of no reason, other than race, why he was not promoted to Battalion Chief.  (Stephens Depo Pg. 170 at 11-17)

26.     Since 1994, when Stephens was hired, only 1 other African American has been hired as a career firefighter at the City of Auburn Fire Department.  Other than Stephens, the only other African American promoted since 1996 is Eddie Ogletree.  Since 1996, no other African Americans have been promoted or even hired, even though African Americans have applied for promotions and jobs as career firefighter.  (Stephens Depo Pg. 180 at 5-22)

27.     Prior to the present Battalion Chief promotion, 4 white Captains received rank of Battalion Chief without a test, procedure, structured interview or assessment center.  It was simply done by a title change.   (Stephens Depo Pg. 183 at 3-13)

28.     Stephens states that Lee Lamar, who is now Fire Chief, was actually appointed to Training Officer in 2003 or 2004.  He also says that Terrie Walker was also appointed as Training Officer.  (Stephens Depo Pg. 227 at 16-23; Pg. 228 at 15-22)

15

B.    **Eddie Ogletree**

1.    Eddie Ogletree began his employment with the Auburn Fire Division in 1984.  In June of 1996, Ogletree became a team leader.  He participated in a structured interview in order to become a team leader.  On February 1, 2006, Ogletree became a lieutenant when the City of Auburn Fire Division changed the title from team leader to lieutenant.  (Ogletree Depo Pg. 20 at 21-22; Pg. 10 at 1-16)

2.    Ogletree signed the paperwork for the February 1, 2006 title change from team leader to lieutenant.  However, he understood and believed that the fire division was going to petition the Court to authorize the title change. [1] (Ogletree Depo Pg. 13 at 2-14)

3.    Prior to the title change from team leader to lieutenant, Ogletree was aware that other white team leaders in the division were dissatisfied that Gerald Stephens (also a Plaintiff in this case and an African American) was the only lieutenant within the division at that time.  Ogletree heard other white team leaders complain to the division fire chief that they had a real problem with lieutenant Stephens giving them orders.  Ogletree heard these individuals complain that they believed they were equal rank with lieutenant Stephens.  Ogletree identified the complaining team leaders as Joey Darby, Matt Jordan, Jason Brown, Clay Carsen, John Benefield and Joe Lovvorn.  Each of these team leaders where Caucasian.  And, these men were the individuals responsible for promoting the petition for the title change from team leader to lieutenant.  Again, lieutenant Stephens is an African American and was the only lieutenant in the division at that time.  (Ogletree Depo Pg. 14 at 6-23; Pg. 15 at 1-19)

---

[1] The Court referenced herein is the United District Court for the Middle District of Alabama Eastern Division Hammock Order approving settlement agreement.

4.    Ogletree ultimately signed the paperwork for the title change because he believed that they were petitioning the Court to authorize the change, and he said that to Joey Darby when presented with the paperwork.  (Ogletree Depo Pg. 19 at 1-5)

5.    Ogletree states that prior to the title change from team leader to lieutenant, team leaders and lieutenants did have different responsibilities with regard to supervision. Ogletree states that team leaders supervise more student firefighters than career firefighters and lieutenants could supervise regular full time firefighters whereas team leaders could not. (Ogletree Depo -2-23; 30 at 1-5)

6.    During the year 2005, then Chief Langley stated to Ogletree that the Auburn Fire Division needed to hire more blacks.  (Ogletree Depo Pg. 172 at 5-9)

7.    Between 2003 and 2006, 2 black men, Jeremy Patterson and William Thompkins, participated in the student firefighter program and applied for permanent positions with the fire department but were not hired.  Ogletree believes that the ratio of hiring blacks to whites in the student firefighter program is about 95 or 96 to 1.  Back when Ogletree was hired, then Chief Ellis Mitchell told him that he was being hired because he was black.  Chief Mitchell specifically said "before the Federal Government tells me to hire some more blacks, I'm hiring you".  (Ogletree Depo Pg. 55 at 5-21; Pg. 56 at 17-23; Pg. 57 at 1-3)

8.    When Ogletree first came to the division, firefighters had to work for 5 years before being eligible for a promotion.  He states that he had to learn things such as streets and numbers, hydrant flow, and pumping on the truck.  He had to learn how to run the ladder truck and how to run a front run pumper.  He states that it takes time to learn these skills. (Ogletree Depo Pg. 20 at 21-23; Pg. 21 at 1-11)

17

9.      Later, Ogletree says that other firefighters were promoted within the first 2 years of being a regular firefighter.  (Ogletree Depo Pg. 21 at 14-17)

10.      In approximately 2004 or 2005, division captains were re-titled Battalion Chiefs.  Ogletree believed that was actually a promotion; however, he, nor anyone else was allowed to apply. [2] (Ogletree Depo Pg. 23 at 7-12)

11.      Eddie Ogletree applied for the Battalion Chief promotion in 2006 and sat for the examination.  Other than Horace Clanton and Robbie Hodge, Ogletree had more experience than anyone sitting for the exam.  Ogletree believes that Joe Lovvorn, Rod Hartsfield, Matt Jordan, Clay Carson, Jason Brown and John Lankford, all white males applying for Battalion Chief, did not have enough seniority or time-in-grade to qualify for the Battalion Chief promotion.  (Ogletree Depo Pg. 25 at 13-19; Pg. 26 at 5-10)

12.      Ogletree believes that the Battalion Chief promotion should have taken into consideration time-in-grade and seniority and there should have been no cut off score on the exam.  Seniority is the number of years that a firefighter has been with the department and time-in-grade is the amount of time spent at your current rank.  At the time of Battalion Chief promotion Ogletree states that lieutenant Stephens was the highest and longest ranking lieutenant in the department.  (Ogletree Depo Pg. 27 at 11-15, 21-23; Pg. 28 at 1-12)

13.      In 2004 or 2005, Chief Garrett was promoted to Chief without going through the same application process required of Ogletree.  He states there is no standard promotion procedure at the Auburn Fire Department and that fire fighters in the past have

---

[2] The 1991 Hammock Order specifically details promotion procedures to be used for captains and lieutenants.  As of February 1, 2006, the position of Captain no longer existed within the Auburn Fire Division.

received promotions that were not posted.  The job of training Chief in 2005 was given but not posted.  The promotion of Chief Garrett and Chief Leverett were not posted.  (Ogletree Depo Pg. 51 at 1-11; Pg. 52 at 15-19; Pg. 54 at 7-22).

14.    Chief Garrett stated to Ogletree that he did not believe the cut off score test was fair to the older guys because it gives the younger guys fresh out of college a better chance.  He told Ogletree that he discussed that with Chief Langley. [3]

15.    Probationary lieutenants were allowed to apply for the Battalion Chief promotion.  However, Ogletree states that the City of Auburn personnel policy states that probationary employees in the fire and police department cant be eligible for a promotion within the first 12 months.  (Ogletree Depo Pg. 65 at 18-22; Pg. 66 at 1-14 and City Personnel Policies)

16.    Based on the City Personnel Policies, the only 2 people that would have been eligible for the promotion to Battalion Chief were Gerald Stephens and Chris Turner, both African Americans.  (Ogletree Depo Pg. 68 at 1-10)

17.    Ogletree and some of the other men who sat for the exam thought that the test was "vague".  Ogletree did not believe that some questions related to the Battalion Chief job with the City of Auburn.  He felt that 35% to 40% of the test was not specific to an Auburn Fire Department Battalion Chief.  There were questions related to high rise buildings, which the City of Auburn does not have.  (Ogletree Depo Pg. 90 at 4-10; Pg. 92 at 4-7; Pg. 93 at 1-14)

18.    Ogletree knows what a Battalion Chief does with the City of Auburn Fire Department because he has served as the acting Battalion Chief when Battalion Chief Garrett was not there.  (Ogletree Depo Pg. 90 at 15-19; Pg. 91 at 3-6)

---

[3] Three of the five oldest firefighters to sit for the exam were African Americans.

19

19.    Ogletree states that any time an African American is in a position to be promoted to a rank higher than lieutenant, the rules change in order to exclude blacks.  (Ogletree Depo Pg. 97 at 2-8)

20.    During the grievance process, Ogletree stated in a letter that no African American fire fighters had been promoted or hired in the last 12 years.  (Ogletree Depo Pg. 102 at 11-16)

21.    Ogletree is concerned that he is required to take a written test with a cut off score for promotion when others in the department were not.  The City of Auburn did not consider time-in-grade or seniority and did not use an accumulative point system for the Battalion Chief promotion; rather, they used a cut off score before advancement.  He states that there is inconsistency in the promotional process by having written test for some promotions but not for others.  He also states that firefighters were allowed to skip ranks for the Battalion Chief promotion whereas in the past this did not happen.  He states that time-in-grade was a consideration for the Battalion Chief (Captain) job in the past.  He also states that yearly appraisals were not taken into consideration for Battalion Chief promotion.  (Ogletree Depo Pg. 110-117 at 1-23)

22.    Most of the current Battalion Chiefs do not know their city streets and numbers.  They are learning them on the job.  Ogletree was forced to learn his streets and numbers before he could move to the next step.  (Ogletree Depo Pg. 122 at 2-16)

23.    Ogletree states that Rodney Hartsfield was promoted to team leader from fire fighter while still on probation.  (Ogletree Depo Pg. 126 at 22-23; Pg. 127 at 1-4)

24.    Chief Lamar gets promoted one way, Chief Langford gets promoted a

20

different way, Fire Chief Langley gets promoted from fire fighter to Captain and then moves to the position of Fire Chief without ever taking a written test.  However, Ogletree is required to take a test for the Battalion Chief promotion.  (Ogletree Depo Pg. 128 at 1-8)

25.    Ogletree testified that he is more qualified for the Battalion Chief position than Hartsfield, Lovvorn, Jordan and Darby.  (Ogletree Depo Pg. 137 at 1-12; Pg. 138 at 20-21; Pg. 139 at 5-16)

26.    Ogletree states that the cut off score was implemented as a result of 3 African Americans applying for the Battalion Chief Promotion.  (Ogletree Depo Pg. 158 at 1-16)

27.    Chief Lawrence, Chief Garrett, Chief Brown and Chief Leverett were promoted to Battalion Chief based on their seniority.  (Ogletree Depo Pg. 159 at 12-20)

28.    Three African American men were eligible for the Battalion Chief promotion and all 4 promotions went to Caucasian males.  (Ogletree Depo Pg. 161 at 1-4)

29.    Ogletree states that the City of Auburn is violating a Federal Court Order implementing a test in order to "weed out" African American applicants.  They are also running a student fire fighter program and not getting any African Americans to apply and therefore hired full time.  (Ogletree Depo Pg. 164 at 22-23; Pg. 165 at 1- 13)

30.    The last black firefighter hired by the City of Auburn was 12 years ago and there are only 3 African Americans, including the 2 Plaintiffs, presently working for the City of Auburn Fire Department.  (Ogletree Depo Pg. 171 at 8-23)

31.    Ogletree believes that the City's policy that utilizes the test, with a cut off score, as part of the process, but did not take into consideration years of service and allow all applicants to go through all phases of the process, including the practical side, the assessment

21

center, the "in basket" and result in a total score looking at all the components of the process had a negative impact on African Americans applying for the Battalion Chief promotion. (Ogletree Depo Pg. 185 at 12-23; Pg. 186 at 1-4)

C.    Steven A. Reeves

1.    Steven Reeves is the Human Resources director for the City of Auburn and has held that position with the City of Auburn since 1993. Prior to that, he was the risk manager for the City of Auburn for 6 years. (Reeves Depo Pg. 5 at 11; Pg. 6 at 4-18)

2.    As the risk manager, Reeves does participate in the promotion practices of the City of Auburn. He serves as a resource. From February until June of 2006, the City Manager Charles Duggan, Public Safety Director Bill James, then Deputy Fire Chief Lee Lamar and then Fire Chief Larry Langley were involved in the decision making process to promote fire fighters at the City of Auburn Fire Division. (Reeves Depo Pg. 9 at 1-11; Pg. 10 at 20-23; Pg. 11 at 1-22; Pg. 12 at 8-23; Pg. 13 at 2-8).

3.    Pursuant to the May 2006 Battalion Chief promotion, Reeves participated in hiring CWH Research Inc and participated in discussions about the promotional process. CWH Research Inc was hired to develop a job related neutral selection process for the Battalion Chief promotion. (Reeves Depo Pg. 14 at 1-9; Pg. 15 at 5-10)

4.    The City of Auburn used an assessment center for the 1994 Captains promotion and the 1996 Lieutenant and Captains promotions. Reeves understands an assessment center to involve a conglomeration of job related exercises. Reeves understands that an outside assessment center means someone or some company that implements the promotional process is not employed with nor has any connection with the City of Auburn. (Reeves Depo Pg. 20 at 6-

22

13; Pg. 21 at 1-5)

5.      Reeves does not recall if a written test was utilized as a part of those prior promotions.  (Reeves Depo Pg . 22 at 18-23)

6.      Prior to the Battalion Chief promotion, Reeves, the Public Safety Director, the Deputy Fire Chief, the Chief and CWH collectively decided that a test with a cut off score for the Battalion Chief promotion. [4]  Reeves says he was personally involved in these meetings where the city representatives discussed with CWH that a test needed to be given with a cut off score.  (Reeves Depo Pg. 23 at 21-23; Pg. 24 at 1-16)

7.      CWH representative did not recommend that a test be given; rather, the test was an option incorporated into its promotional process.  It was at the city's discretion whether or not to include a test and whether or not to use a cut off score.  (Reeves Depo Pg. 25 at 15-23; Pg. 26 at 2-10)

8.      Reeves says he does not recall, during these meetings, who suggested using a cut off score.  (Reeves Depo Pg. 27 at 14-18)

9.      The City of Auburn had the ultimate discretion about whether or not to use a test, with a cut off score, as the defining factor for continuation through the promotional process. [5] (Reeves Depo Pg. 29 at 10-23)

10.     Reeves has nothing to dispute the position of CWH that Lee Lamar suggested the cut off score.  (Reeves Depo Pg. 31 at 8-11)

---

[4] Despite Reeves testimony, CWH Research Inc. denies participating in the cut off score collective agreement.  CWH Research Inc. recommended against using a cut off score.

[5] See Exhibit Z and G.

23

11.    The City of Auburn determined that the <u>Hammock v. City of Auburn</u>, CV-87-680-E Order Approving Settlement Agreement for 1991 was no longer in force at the time of the 2006 Battalion Chief promotion.  He agrees that the Order requires the City to conduct an outside assessment center for any Captain or Lieutenant promotion .  (Reeves Depo Pg. 32 at 4-17; Pg. 34 at 21-23)

12.    Reeves states that the reclassification of Team Leaders to Lieutenants and Captains to Battalion Chiefs were not promotions; therefore, the City was not required to comply with the Order, even if it were in effect.  (Reeves Depo Pg. 34 at 14-18; Pg. 35 at 9-15)

13.    The Team Leader position, which was changed to Lieutenant, evolved out of the 1991 Court Ordered settlement.  Therefore, the position created by the Settlement Agreement no longer exists.  (Reeves Depo Pg. 37 at 12-22)

14.    Reeves knows that as of February 1, 2006, when all team leaders were reclassified as Lieutenants, Gerald Stephens was the only lieutenant in the Auburn Fire Division, and the reclassification occurred because the Team Leaders preferred to be called Lieutenants because that was a recognized, more traditional job title.  (Reeves Depo Pg. 39 at 7-10, 23; Pg. 40 at 1-6)

15.    Based upon legal advice, the City of Auburn believed that the 1991 Court Order was a contract without a termination date.  And, the Court did not retain jurisdiction of the settlement which was a contractual matter between the City and the Plaintiffs.   Reeves understanding was that the United District Court for the Middle District of Alabama, Eastern Division, lost jurisdiction over the 1991 settlement after the Order was signed by the Judge.  He believed that this Court did not retain jurisdiction over this case after the Settlement Agreement

24

was finalized.  (Reeves Depo Pg. 43 at 11-23; Pg. 44 at 1-6, 22-23; Pg. 45 at 1-12)

16.    The City had decided, as of February 1, 2006, that the 1991 Court Order was no longer in effect and outside assessment centers were no longer required for promotions. At that time, team leaders were reclassified to the rank of lieutenant.  (Reeves Depo Pg. 49 at 2-14)

17.    In 2004, the Captains/Shift Commanders asked for their title to be reclassified as Battalion Chief.  The  Captains/Shift Commanders who were reclassified as Battalion Chiefs were all white, and Reeves maintains it was not a promotion.  There was no assessment center administered pursuant to this reclassification.  (Reeves Depo Pg. 49 at 15-23; Pg. 50 at 22-23; Pg. 51 at 5-20)

18.    Reeves heard that the insignia the firemen wear on their uniforms changed after the reclassification and that a bugle was added to their collars.  The Captains/Shift Commander were made Battalion Chiefs without an assessment center or a test.  (Reeves Depo Pg. 52 at 15-22; Pg. 53 at 13-23)

19.    The position of Captain, as referenced in the 1991 Order, was changed to Shift Commander in the mid 1990's.  Reeves does not know why.  Reeves is aware that the Order requires an outside assessment center for any promotions to Captain.  He agrees that, subsequent to this Order, for some unknown reason, the position of Captain was renamed Shift Commander.  (Reeves Depo Pg. 55 at 13-22; Pg. 56 at 7-23).

20.    Although Gerald Stephens and Chris Turner, another black firefighter, disagreed in writing to the reclassification of Team Leaders to Lieutenants, the City affected the reclassification anyway.  In those documents, the City specifically states that the Court approved

assessment center in a process has expired. Despite its position that the change was not a promotion, the city, in writing, informed everyone that the assessment center requirement of the 1991 Order had expired. (Reeves Depo Pg. 61 at 14-17, 20-23; Pg. 62 at 5-23; Pg. 63 at 1-21)

21.     Reeves agrees that he authored and received the e-mails to and from CWH Research Inc which were marked as Exhibits to his deposition. He also agrees that Lee Lamar sent the e-mails which have his name on them. (Reeves Depo Pg. 67 at 9-23; Pg. 68 at 1)

22.     The Battalion Chief promotion at issue in this case is a promotion in rank and pay. Reeves agrees that the 3 African Americans who applied, including Stephens and Ogletree, did not receive the promotion. He also agrees that those are the only African Americans who applied for the promotion. The only people who did receive the promotion were white men. He agrees that the only people who made it past the cut off test were white men. (Reeves Depo Pg. 68 at 7-23; Pg. 69 at 1-15)

23.     Other than not passing the cut off score exam, the 3 African Americans who applied for the Battalion Chief position were not otherwise disqualified to obtain that promotion. (Reeves Depo Pg. 71 at 18-23; Pg. 72 at 1-3)

24.     Four white males were the only ones that received the Battalion Chief promotion. (Reeves Depo Pg. 72 at 4-12)

25.     Stephens and Ogletree both had more years of service with the Auburn Fire Department than any of the individuals that were promoted to Battalion Chief in 2006. Each of the white males that was promoted to Battalion Chief were in the same group of individuals that were reclassified from Team Leader to Lieutenant in 2005, which became effective February 1, 2006. Consequently, each of the individuals promoted to Battalion Chief had only held the

rank of Lieutenant since February 1, 2006, 4 months prior to their Battalion Chief promotion. (Reeves Depo Pg. 74 at 4-9; Pg. 76 at 6-23)

26.    Reeves maintains that since it was a title change, the Lieutenants who were promoted to Battalion Chief were not probationary Lieutenants.  (Reeves Depo Pg. 77 at 1-11)

27.    Reeves is not aware that the City of Auburn Fire Department has hired any minorities since the year 2000.  Reeves does not know if the City of Auburn Fire Department has hired more than 2 minority fire fighters since 1991.  There are 3 black fire fighters employed with the City of Auburn Fire Department at this time, Gerald Stephens, Eddie Ogletree and Chris Turner.  (Reeves Depo Pg. 83 at 10-22; Pg. 84 at 2-17)

28.    Stephens and Ogletree had not attended a formal school for a much longer period than the individuals that were promoted to the Battalion Chief position.  Reeves said it was "plausible" that someone closer to being out of school would be a better test taker than someone farther away from being out of school.  He also agrees that someone with a college education would probably have an advantage in taking an exam over someone without a college education.  (Reeves Depo Pg. 89 at 15-23; Pg. 90 at 1-4, 14-22)

29.    The Battalion Chief promotion in 2006 did not include the consideration of seniority, time-in-grade or work experience.  The process utilized a test with a cut off score to advance further in the process.  Reeves states this process was developed by CWH in consultation with the City of Auburn.[6]  Rather, CWH maintains that it recommended against the cut off score exam.  That promotional process was never scientifically validated not to have a

---

[6] As has already been established, CWH emphatically denies that it recommended or agreed to the cut off score exam.

disparate impact on black applicants.  (Reeves Depo Pg. 93 at 3-19; Pg. 94 at 9-14; Pg. 95 at 9-23; 96 at 1-23; 97 at 1-23; Pg. 98 at 1-23; Pg. 99 at 1-23; Pg. 100 at 1-23; Pg. 101 at 1-7)

30.     Nine white applicants took the cut off score exam and 4 failed to pass it. All 3 African Americans that took the cut off score exam failed to pass it.  The only 3 African American Battalion Chief applicants did not make it through the first step of the process that the City of Auburn developed for the Battalion Chief promotion.  (Reeves Depo Pg. 102 at 10-23; Pg. 103 at 1-8)

31.     Gerald Stephens is the only African American student firefighter hired by the City of Auburn Fire Department since 1991.  The 2006 Battalion Chief promotional process was never scientifically validated not to have a negative impact on the black applicants.  (Reeves Depo Pg. 95 at 1-23; Pg. 100 at 22-33)

32.     Reeves drafted Exhibits 7 and 8 to his deposition indicating that the 1991 Court Order had expired.  Reeves agrees that the City of Auburn's position during the 2006 Battalion Chief promotion was that the 1991 Order was no longer in effect regarding the utilization of the selection procedure for Lieutenants and Captains.  (Reeves Depo Pg. 107 at 16-21; Pg. 108 at 18-23; Pg. 109 at 1-11; Ex H; Ex I)

33.     Reeves participated in the City of Auburn's response to Stephens and Ogletree's EEOC charges.  He has seen the Charges and the City's response.  (Reeves Depo Pg. 111 at 11-17; Pg. 112 at 8-22)

**D.     Lee Lamar**

1.     Lee Lamar is currently the Deputy Public Safety Director of Fire Operations for the City of Auburn.  This is the equivalent of Fire Chief.  Lamar was the acting

Fire Chief as of December 1, 2007 and became permanent July 1, 2008.  Chief Lamar did not

have to go through a promotion process in order to go from acting to permanent Fire Chief.  This

was a promotion from Deputy Chief.  Lamar did not take a test or go to an assessment center.

(Lamar Depo Pg. 5 at 8-23; Page 6 at 1-17)

2.      Prior to this promotion, Lamar was promoted from Deputy Fire Chief to

acting Fire Chief without undergoing any test or assessment center.  Prior to that, Lamar was

promoted from Training Officer to Deputy Chief.  He did not have to take a test or undergo an

assessment center for that promotion.  (Lamar Depo Pg. 8 at 8-23; Pg. 9 at 8-11)

3.      Prior to Training Officer, Lamar was a Team Leader.  He believes the

training officer promotion was a posted job and he was the only one who applied.  He did not

have to take a test or undergo an assessment center.  Lamar does not believe this was a

promotion.  (Lamar Depo Pg. 12 at 3-23; Pg. 13 at 1-8)

4.      Prior to Team Leader, Lamar was a Firefighter.  He underwent an internal

structured interview in order to become a team leader.  He was not required to take the test or

undergo an assessment center.  (Lamar Depo Pg. 14 at 3-23)

5.      During the 2006 Battalion Chief promotional process, Lamar was the

Deputy Chief.  He did participate in the decision making process concerning the Battalion Chief

promotion.  Lamar states that he, along with the other decision makers, were looking for what

components of an assessment center would best measure the candidates in the

process.  He was not concerned about complying with the 1991 <u>Hammock</u> Settlement Order

during this promotional process.  (Lamar Depo. Pg. 16 at 5-13; Pg. 17 at 5-17)

6..      Lamar states that he did not read the Settlement Order during the Battalion

29

Chief promotional process and did not even know whether the City was required to comply with that Order.  (Lamar Depo Pg. 18 at 7-19)

7.      Lamar agrees that a written exam is not required to be a component of the promotional process.  He also understands that cut off scores are not required for written exams. He states that the cut off score decision was made by a group of decision makers along with CWH personnel. [7]  Lamar agrees that the City of Auburn had the ultimate discretion about whether to impose a cut off score.  (Lamar Depo Pg. 19 at 16-23; Pg. 20 at 7-14; Pg. 21 at 1-8)

8.      Lamar states that he does not recall CWH trying to persuade the group not to use a cut off score.  (Lamar Depo Pg. 21 at 9-16)

9.      Lamar admits that he may have suggested a 70 cut off score.  Lamar agress that the Battalion Chief applicants could not undergo the assessment center without first passing the written exam.  He does not agree that the cut off test and the assessment center are two separate entities. [8]  (Lamar Depo Pg. 25 at 3-6; Pg. 27 at 8-20)

10.     Lamar's testimony that the cut off test is part of the assessment center is simply wrong.  (See CWH Affidavit, CWH Letter Agreement and CWH Auburn Fire Division Orientation Manual)

11.     Lamar testifies that the assessment center used for the Battalion Chief promotion in 2006, whether the test was a component or not, was not an "outside" neutral

---

[7]  Again, CWH denies that it recommended an exam cut off score.  CWH recommended against an exam cut off score.

[8]  CWH Research Inc. establishes that the cut off test and the assessment center are completely separate entities.  You could not get to the assessment center without first passing the cut off score imposed by the City.

assessment center because City representatives made decisions about how the process would take place. (Lamar Depo Pg. 30 at 8-22)

        12.     Lamar confirms that letters written to Stephens and Ogletree by him stated that CWH was concerned that some of the candidates were not prepared for the Battalion Chief job because of their experience and rank. He agrees that CWH was concerned about certain candidates experience in their positions. He agrees that experience is an important part of being promoted to Battalion Chief. (Lamar Depo Pg. 31 at 6-22; Pg. 32 at 9-18; Pg. 33 at 8-15)

        13.     Lamar believes between 4 and 7 black full time firefighters have been hired by the City of Auburn since 1991. He can only remember the names of 5. (Lamar Depo Pg. 35 at 6-19)

        14.     Lamar agrees that the City may have hired 3 white firemen per a year since 1991. (Lamar Depo Pg. 36 at 6-15)

        15.     During Lamar's 28 years with the City of Auburn Fire Department, no black firefighter has ever achieved a rank beyond Lieutenant. (Lamar Depo Pg. 37 at 11-19)

    **E.**    **Larry Langley**

        1.     Larry Langley is the retired City of Auburn Fire Chief. He retired November 20, 2007. He was the acting Chief and Deputy of Public Safety Director for more than 10 years. (Langley Depo Pg. 4 at 11, 20-22; Pg. 5 at 1, 17-20)

        2.     Prior to becoming Chief, Langley was a Shift Commander. He did not have to go through a promotional process to become Fire Chief. He did not undergo an interview, take a test or attend an assessment center. (Langley Depo Pg. 7 at 6-9, 17-23)

        3.     In 2005, the Position of Captain changed to Battalion Chief. Langley

31

admits that a Captain wears two bugles on his uniform and the Battalion Chief has three bugles.

Langley states that the Chief wears the insignia of five bugles which signifies the highest level

employee at the Fire Department.  A Lieutenant wears one bugle and Team Leaders wore gold

collar brass with no bugles.  When the Team Leaders were reclassified as Lieutenants, they began

wearing one bugle insignia.  The Deputy Chief wears four bugles.  Lieutenants wear one bugle,

Captains wear two bugles, Battalion Chiefs wear three bugles, the Deputy Chief four bugles and

the Chief five bugles.  Despite this, Langley does not agree that the bugles on the insignia

indicate rank within the department.  (Langley Depo Pg. 8 at 8-23; Pg. 9 at 6-23; Pg. 10 at 1-23;

Pg. 11 at 1-4)

       4.     In 1994, Langley was promoted from Firefighter to Staff Captain.  He

underwent an assessment center that included hot seat, role play and "in basket" and was not

required to take a test with a cut off score.  (Langley Depo Pg. 14 at 9-23; Pg. 15 at 1-3)

       5.     Langley participated in the group discussions about the Battalion Chief

promotional process.  Langley says that he cannot remember specifically who suggested an exam

with a cut off score as a prerequisite to the assessment center.  (Langley Depo Pg. 16 at 6-21; Pg.

17 at 1-4)

       6.     Langley states that as of May 2006, the City was working on a career

development plan that included promotional criteria of time-in-grade and an accumulative point

system.  This was a plan where people would be promoted within the department based on time-

in-grade and accumulative point system.  Langley agrees, at that time, the City did not have a

current career development plan in place.  That career development plan was not in place at the

time of his retirement.  He agrees that time-n-grade and accumulative point systems are

important criteria for promotions.  (Langley Depo Pg. 21 at 17-23; Pg. 22 at 1-23; Pg. 23 at 1-21)

**F.    William James**

1.    William James has been the Public Safety Director for the City of Auburn since October 2004.  James was part of the group of Auburn officials that decided the Battalion Chief promotion would take place.  (James Depo Pg. 5 at 3-8; Pg. 7 at 19-23; Pg. 8 at 1-7)

2.    James does not recall the 1991 Court Order being a consideration in the promotion.  James agrees that the 1991 Order, Section 12, requires an assessment center for certain promotions and has no reference to a cut off score test.  (James Depo Pg. 9 at 2-7; Pg. 14 at 1-11)

3.    James does not agree that an assessment center and a test with a cut off score are two separate entities.  James' understanding of an assessment center is different than the assessment center described in the Auburn Fire Division Orientation Manual.  (James Depo Pg. 15 at 11-15; Pg. 16 at 10-23; Pg. 17 at 1-19)

4.    James believes that the examination is part of the assessment center but agrees that based on the definition in the Auburn Fire Division Orientation Manual, the written test is not a part of the assessment center.  (James Depo Pg. 18 at 2-4, 11-20)

5.    James states that the City of Auburn Fire Department was looking into an accumulative point system for promotions pursuant to a career development plan.  He states that the career development plan would have certain requirements for each position, including certifications and educational requirements before you could be eligible for a promotion to a higher rank.  The plan that he recalls does not mention a cut off score tests.  (James Depo Pg. 28 at 10-23; Pg. 29 at 4-12)

33

6.     James is aware that Stephens and Ogletree have satisfactory performance appraisals and there is nothing in their work history that would have disqualified them for the 2006 promotion to Battalion Chief.  (James Depo Pg. 30 at 13-22; Pg. 31 at 1-5)

7.     James agrees that all 3 African Americans that applied for Battalion Chief in 2006 failed to make it past the first step.  James also agrees that each of the 3 African Americans that failed to make it past the first step of the promotional process had been employed with the City of Auburn Fire Department for more years than the four individuals that were actually promoted to Battalion Chief.  (James Depo Pg. 32 at 4-8, 12-18)

## V.  LEGAL ARGUMENT

Eddie Ogletree and Gerald Stephens maintain that the City of Auburn framed the promotional process for the 2006 Battalion Chief promotion in a manner that made it more difficult for certain applicants to receive that promotion.  The implementation of the cut off score test as the first step in the promotional process, without the consideration of experience, seniority, time-and-grade, streets and numbers and the Court ordered assessment center, clearly resulted in the exclusion of all three African American applicants from continuation in the promotional process and the promotion itself.  While it is true that white applicants were also excluded from the promotion by failing the test, it is undisputed that the African Americans that failed the exam have longer tenure with the City of Auburn Fire Department than the candidates who passed the exam.  As stated in the Defendants own exhibits submitted with the Motion for Summary Judgment:

> The tenure (time since date of hire) of candidates is a possible factor in test performance.  In fact, the average tenure of candidates who passed the test was eight years.  The average tenure of candidates who failed the test was sixteen years.  It is

34

highly probable that this difference in tenure had much more relevance in the testing process than race. The education levels and recency of formal education of candidates was most likely another significant factor in test performance. As indicated above, candidates who passed the test had been hired more recently and may have higher levels of education and more recent experience in the educational system, including more recent test taking experience. Research in the field of I/O psychology supports the above observations that tenure and time since formal education impact test performance. Research studies exist in the professional literature that suggest that older, more tenured workers perform more poorly as a group on standardized tests than younger workers. (See Defendants Ex F Pg. 9)

Certainly, the individuals responsible for implementing the cut off test were aware of the information stated in the Defendants' Exhibit. These individuals met with the author of that Exhibit prior to the promotion and received advice and recommendations from that company. Steve Reeves has testified in this case that it is "plausible" that a longer tenured employee would perform more poorly on a test than a shorter tenured employee. So, the City of Auburn implemented a cut off score test as the first step in the promotional process with knowledge that the three African American applicants would most likely perform more poorly than the more recently hired white applicants.

The Plaintiffs, at the outset, want this honorable Court to understand that this response Brief is not an attack on the validity of the test itself. Although the City has not produced the test questions and cannot carry its burden of proving the content validity of those questions, again, the Plaintiffs do not maintain that the test itself was discriminatory. The Plaintiffs maintain that the entire promotional process was discriminatory because the process utilized a cut off score test as the initial factor for the promotion with knowledge that the three African American applicants would have difficulty passing that exam. Furthermore, the City failed to consider any other factors associated with the African Americans' experience as firefighters and violated the 1991 Court Order requiring that the City make this promotion through an assessment center. The City

35

claims that the test was part of the assessment center; however, that position is completely

inconsistent with the evidence submitted herewith and completely dispelled by the company that

administered the exam.

Although the City will argue that any negative impact that the promotional process had on

the African American applicants was unintentional, intent is not a requirement pursuant to the

Plaintiffs' disparate impact claims.  In the end, the City, at its discretion and against the advice of

the company that administered the test and assessment center, and with knowledge that the black

applicants were in the group of applicants that would most likely have difficulty passing the

exam, chose to use the cut off score test as a pre-condition to the assessment center.

A.    Title VII Claims/Circumstantial Evidence

While the Plaintiffs will provide direct evidence of discrimination later in this

Brief, the evidence of Title VII discrimination is largely circumstantial.

In the absence of direct evidence of discrimination, this Court should apply the

burden shifting analysis.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) The

Plaintiffs here are first required to make a Prima Facia case, then the burden shifts to the City of

Auburn to produce legitimate, non discriminatory reasons for the adverse employment action,

and the burden shifts back to the Plaintiffs to establish that these reasons are pretextual.

Mayfield v. Patterson Pump Co., 101 F. 3d 1371, 1375 (11th Cir. 1996) The Plaintiffs establish a

Prima Facia case of the discriminatory denial of the promotion by showing that they are members

of a protected group, that they were not promoted, that they were qualified for the promotion and

that the position was filled by Caucasian applicants.  Benson v. Tocco, Inc., 113 F. 3d 1203,

1207-08 (11th Cir. 1997)

The Plaintiffs here easily establish a Prima Facia case. The Plaintiffs are African Americans and did not receive the 2006 Battalion Chief promotion. There is a mountain of evidence cited in the factual and testimony sections of this Brief to support that both Plaintiffs were qualified for the Battalion Chief promotion. Steve Reeves, the Human Resources Director for the City, testified that but for the cut off score exam, the Plaintiffs were qualified for the Battalion Chief position. Those Plaintiffs are used as "fill in" Battalion Chiefs in the absence of other Battalion Chiefs, and Ogletree's yearly appraisal stated that he performed the "fill in" Battalion Chief job with distinction. Both Plaintiffs had more years of experience with the City of Auburn Fire Department than the individuals promoted, and Ogletree testified that the promoted Battalion Chiefs were learning their streets and numbers on the job. Horace Clanton, a long time co-worker with the Plaintiffs, and a lieutenant, stated in his Affidavit that both Plaintiffs were qualified for the Battalion Chief promotion. To satisfy the last prong, it is undisputed that he four individuals who ultimately received the Battalion Chief promotion were Caucasian.

In its Summary Judgment Motion, the Defendant states the Plaintiffs cannot move their Prima Facia case because they cannot prove they were qualified for the promotion because they failed the test. Moreover, the Defendant incorrectly indicates that the Plaintiffs must establish "discriminatory intent" in order to show their Prima Facia case. That is simply an incorrect statement of law. (Def Brief Pg. 40 at 14-15) Then, the Defendant states that "it is undisputed that there was an assessment center which utilized a written exam given to all applicants" (Def Brief Pg. 40 at 23; Pg. 41 at 1) The Plaintiffs have shown, throughout this response, time and

again, that the cut off score test and the assessment center are completely separate entities and

that the test was a prerequisite for participation in the assessment center.  It is borderline comical

that the City continues to refer to the test and the assessment center as the same thing when the

company who administered both clearly indicates that they are different.  Since the Defendant

has absolutely no evidence that the Plaintiffs were not qualified for the Battalion Chief

promotion, it argues that the cut off test was a qualification which they failed and thus they are

not qualified.  However, the cut off score test, as the City is well aware, is the seminal issue in

this case and its administration as a part of the promotional process is part of the discriminatory

conduct about which the Plaintiffs complain.  The City attempts to use the very discriminatory

conduct about which the Plaintiffs complain as an instrument to argue that the Plaintiffs do not

meet the qualification requirements of the Prima Facia case.  The argument is simply without

merit, and the Plaintiffs easily satisfy their Prima Facia case requirement, and the burden now

shifts back to the City to produce legitimate, non discriminatory reasons for the adverse

employment action.  Standard v.  The A.B.E.L. Services Inc., 161 F. 3d 1318 (11th Cir. 1998)

Again, in its Brief, the Defendant falls back on the written test as a legitimate, non discriminatory

reason not to promote the Plaintiffs and, once again, the City references the test and the

assessment center as one in the same when it is clear that they are clearly separate animals.  (Def

Brief Pg. 41 at 10-14) The Defendant cites only the cut off sore test as the legitimate non

discriminatory reason for the adverse employment action, then immediately begins its argument

that the reason is not pretextual.  (Def Brief Pg. 41 at 10-15)

       Thus, once again, the City attempts to use the discriminatory conduct about which the

Plaintiffs complain as its defense that the promotional process was legitimate and non

discriminatory.  The City, on the same page, seems to indicate that there is some argument about why the assessment center was developed.  Either the City does not want to understand the Plaintiffs' claims or does not understand the Plaintiffs' claims, but in either case, there is no Complaint by the Plaintiffs about the assessment center.  Conversely, the Plaintiffs complain that they were never allowed to proceed to the assessment center because of the cut off score test. The assessment center is a requirement of the 1991 Order, and the City chose to dismantle the assessment center as a factor for the promotion of all applicants by implementing the cut off score test.

The City fails to produce its burden of showing a legitimate non discriminatory reason for the employment action.  The City is required to "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action" St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) The City uses the failure of the cut off score tests as its legitimate non discriminatory reason for the employment action; however, the City fails to offer any evidence about why it chose to implement the cut off score test as a prerequisite to the assessment center.  The City fails to offer any evidence about why it chose to disregard the advice of the test administrator not to use a cut off score.  The City offers no evidence concerning why it chose to use the cut off score test rather than making the test, without a cut off score, a component of the promotional process.  The City fails to offer any evidence about why it decided not to consider time-and-grade, seniority, experience, knowledge of streets and numbers, yearly appraisals and other work related factors as criteria for the promotion when the City claims that those factors would be included in its uncompleted career development plan.  The City fails to

39

offer any evidence about why it changed eligibility requirements to allow probationary Lieutenants to apply for the promotion when its initial posting for the promotion indicated that probationary Lieutenants were not eligible.  The Defendant fails to offer any evidence about why white Captains/Shift Commanders received the rank of Battalion Chief without undergoing any tests, assessments, interviews or exercises, and the 2006 Battalion Chief applicants, that included three African Americans, were required to take a cut off score test.  The City has not offered any evidence whatsoever of why it chose to disregard the 1991 Order which requires an assessment center for this promotion.  Consequently, the City relies completely on the failure of the cut off score test as its legitimate non discriminatory reason for the adverse employment action with regard to the Plaintiffs.  The City simply ignores all of the other numerous problems with this promotional process, as above referenced.  As such, the City completely fails to meet its obligation pursuant to the McDonnell Douglas shifting burden, and the Defendants' Motion for Summary Judgment fails at this very point.  Now, the Plaintiffs are not required to prove that the City's "legitimate non discriminatory" reasons are pretextual.

Even though the Defendant has not met its burden, there is an abundance of evidence that the reason stated by the City is pretextual.  Again, the only stated reason by the City is that Plaintiffs failed the cut off score test, and there is no other reason offered as the legitimate non discriminatory reason.  Technically, the Plaintiffs are only required to prove that the one reason stated by the Defendants is in fact pretextual; however, the Plaintiffs also reference clear evidence that constitutes pretext.

Considering the cut off score test as the legitimate reason for not promoting the Plaintiffs, once again, the use of the cut off score test by the City is itself a major factor in the promotional

40

process that the Plaintiffs claim was discriminatory.  Since the Plaintiffs have made it clear that they consider the cut off score test to be a discriminatory factor in the promotional process, the Defendant cannot use that factor as its legitimate non discriminatory reason.  That reason is pretextual because the City used a cut off score test when it was not required or even advised to do so.  That reason is pretextual because the City did not allow all applicants to proceed to the assessment center as is required by the 1991 Order.  That reason is pretextual because the City used a cut off score test when it knew that the African American applicants would have trouble passing that test because of their tenure.  That reason is pretextual because the City, rather than the testing company, made the decision to use the cut off score.  That reason is pretextual because the City used the cut off score without considering any other work related factors associated with the Plaintiffs' employment.  That reason is pretextual because the City has not and cannot prove the content validity of the test because it has not produced the test. (the City states that the test did have content validity, but that statement is based totally on CWH's response to the EEOC) That reason is pretextual because the City now feigns compliance with the 1991 Order by stating that the cut off score test and the assessment center are the same thing. That reason is pretextual because the entire promotional process that the City used was never scientifically validated not to adversely affect African Americans.  Each of these examples of pretext entirely disables the City's "legitimate and non discriminatory" reason, and again, the Summary Judgment Motion is due to be denied at this point pursuant to the Title VII promotion claims.

There is also other evidence that the City's reasons are pretextual.  An employer's deviation from its standard promotional procedures may serve as evidence of pretext.  Hurlbert v.

41

St. Mary's Health Care Sys. Inc., 439 F. 3d 1286, 1299 (11th Cir. 2006)  Clearly, the City

deviated from some standard promotional procedures, and it deviated from the required

promotional procedures of the 1991 Order.  In 2005, the year before this Battalion Chief

promotion, four white Captains/Shift Commanders received the rank of Battalion Chief without

any application or promotional process.  Although the City claims that it was not a promotion, it

is undisputed that the Battalion Chief rank is higher than Captain/Shift Commander and their

uniform insignia indicates that it is a higher rank.  On February 1, 2006, just four months prior to

this Battalion Chief promotion, approximately eleven team leaders received the rank of lieutenant

without any application or promotional process.  The Defendant claims this also was not a

promotion although the rank of Lieutenant is undeniably higher than the rank of Team Leader

and the uniform insignia also indicates that it is a higher rank.  No written cut off score tests were

required for either of these rank changes.  Chief Lamar has never been required to take a cut off

test in order to receive a promotion.  Former Chief Langley has never been required to take a cut

off score test in order to receive a promotion.  The last Lieutenant promotion prior to February 1,

2006, in 1996, required an assessment center with no cut off score exam.  When the only

three African Americans within the department are eligible for the Battalion Chief promotion, at

a time when no African American has ever achieved a rank beyond Lieutenant, the City

implements a cut off score test for the promotion.  Then, the City changed the eligibility

requirements for the promotion within one week to include probationary Lieutenants, when only

weeks before, ten white Team Leaders received the rank of Lieutenant.  These deviations from

standard procedures are clearly evidence of pretext.

 Prior comments made by decision makers can be deemed proof of pretext, even where

42

those prior comments were not made in the context of this particular promotion.  Ross v. Rhodes Inc., 146 F. 3d 1286, 1291 (1998) According to the testimony in this case, former Chief Larry Langley was a decision maker during this promotion.  According to Affidavits submitted by the Plaintiff, Gerald Stephens, and a Plaintiff in the companion case, Chris Turner, Larry Langley verbally represented that Gerald Stephens discrimination related grievance would be a red flag with the City of Auburn, which he perceived to mean would affect him in future promotions.  Langley verbally represented to Chris Turner that an EEOC charge that he had filed would cause him trouble getting promoted.  According to the testimony in this case, current Fire Chief Lee Lamar was also a decision maker during this promotional process.  William Felton, a former Auburn Firefighter, submitted an Affidavit as evidence in this case that both Lee Lamar and Larry Langley used the N word on a regular basis at the station, and that Langley referred to black Firefighters as N word.  According to an Affidavit submitted herein by Horace Clanton, a current white Lieutenant at the Auburn Fire Department, while serving as a fill in Battalion Chief, he was told by then Chief Larry Langley to make sure to come to work every day so that Gerald Stephens would not be in charge because the others would not want to work for him. Larry Langley also sent Judge Robert Varner a letter protesting the 1991 Settlement, prior to the issuance of the 1991 Order, stating that he disagreed with the promotion of black Firefighters Jessie Strickland and Bill Felton to Lieutenant.  (See Ex AA) These Affidavits and the letter from Langley clearly indicate that Langley and Lamar, two of the decision makers during the 2006 Battalion Chief promotion, regularly used the N word and Langley referred to black Firefighters as the N word.  Chief Lamar admits that he made the ultimate decision to use the (70) seventy cut off score.  Langley's letter clearly indicates that he disagreed with the 1991 settlement and did

43

not want two black Firefighters promoted to Lieutenant. Both Lamar and Langley indicated to Gerald Stephens and Chris Turner that filing an EEOC charge and a grievance would hurt them in the future with the City of Auburn. Allegations of prior racial discrimination by the City can also serve as persuasive evidence of intent to discriminate. Denney v. City of Albany, 247 F. 3d 1172, 1181 (11th Cir. 2001) Consequently, because there is other evidence that exist as to pretext, even one prior case has evidentiary value. Smith v. City of Mobile, Et. 17 (S.D. Ala. 9-4-07) Once again, the City has not met its burden, but even if it had, there is substantial evidence of pretext. Since there are unquestionable issues of fact with regard to the Title VII promotion burden shifting analysis, the City's Motion for Summary Judgment should be denied.

### B.    Title VII/Disparate Impact

During the 2006 Battalion Chief Promotion, all three African Americans who applied for the job failed the cut off score written exam, and five of the nine white applicants passed the exam. This result, although the pool of applicants is relatively small, does seem to indicate a violation of the "four-fifths rule". It states as follows:

> A selection rate for any race, sex, or ethnic group which is less than four-fifths (or 80%) of the rate for the group with the highest rate will generally be regarded by the Federal Enforcement Agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal Enforcement Agencies as evidence of adverse impact. 29 C.P.R. § 1607.4 (d)

Obviously, the passing rate of African Americans for the Battalion Chief promotion (0%) is less than four-fifths of the passing rate of the Caucasian applicants (55%). The four-fifths rule should be determined on a case by case approach, with the recognition that statistics come in various forms and their relevance depends on the circumstances of each case. Teamsters v.

44

United States, 431 U.S. 324, 339-40, 97 S.Ct. 1843, 52 L. Ed. 2d 396 (1977) Discrimination

occurs when an employer "uses a particular employment practice that causes a disparate impact

on the basis of race, color, religion, sex or national origin and fails to demonstrate that the

challenged practice is job related for the position in question and consistent with business

necessity".  42 U.S.C. § 2000 e-2 (k) (1) (A) (I).  When this occurs, as it has in the present case,

the Supreme Court uses a three part burden shifting test to determine whether an unlawful

disparate impact exist in a particular case.  Albemarle Paper Co. v. Moody, 422 U.S. 405, 425,

95 S. Ct. 2362, 45 L. E. d 2d 280 (1975).  First, the Plaintiffs here must establish a Prima Facia

case of discrimination.  They accomplish this 1.  By establishing that an adverse impact has

occurred; 2.  Then the employer must show that the protocol in question has a "business

justification"; 3.  The Plaintiffs must then show that other tests or selection protocols would

serve the employer's interest without creating the undesirable discriminatory effect.  Albemarle,

422 U.F. at 425, 432.

　　　The Defendant takes the position that since the pool of Battalion Chief applicants was so

small, the Plaintiffs cannot meet their Prima Facia obligation because proving disparate impact

requires statistical analysis.  There are certainly cases that the Defendant has cited which indicate

that statistical analysis is impossible if the pool of applicants is too small.  However, again, the

Supreme Court has made it clear that this is a case by case evaluation and the usefulness of

statistics depends on the surrounding circumstances.  Teamsters, 431 U.S. at 339-40.  Therefore,

the statistical analysis related to the 2006 Auburn Battalion Chief promotion should be analyzed

according to the surrounding circumstances.  The surrounding circumstances are that the City of

Auburn is not a large city that would have large numbers of applicants for any promotion.  And,

45

at the City of Auburn Fire Department, there were only twelve applicants for this position and

0% of the three African Americans taking the exam passed the exam.  Fifty five percent of the

Caucasian applicants passed the exam.  Consequently, based on the particular circumstances

surrounding this promotion, the Plaintiffs have met the first prong of the Prima Facia case by

establishing that the cut off score test negatively affected the African American applicants more

so than the Caucasian applicants.  Thus, an adverse impact occurred.

The burden then shifts to the City to demonstrate a "business justification for the

employment practice".  Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656, 657, 109 S. Ct.

2115, 104 L. Ed. 2d 733 (1989) The Plaintiffs here challenge the entire promotional process as

having a disparate impact on the three African Americans who applied for the Battalion Chief

position.  The cut off score test was the first component of that process beyond which you could

not proceed if you did not pass the test.  It has been established that the City knew that the three

African Americans taking the exam had more tenure with the City and were further removed

from college than the individuals who passed the exam and got the promotion.  The City argues

that there is no better way to measure an applicant's job knowledge than implementing a written

test, and that is the business justification for the promotion process.  However, as the City is fully

aware, a written test that is a component of the promotion process may be justified from a

business standpoint.  However, the City has not offered any evidence that the cut off score exam,

which precludes progression in the promotional process for those that do not pass, is justified

from any business standpoint.  The City has offered no evidence or explanation as to why a cut

off score exam is necessary for this promotional process.  In fact, all of the evidence in the case

indicates that the cut off score test is not only unnecessary, but the company who devised the

exam recommended against using a cut off score.  The City has certainly offered no business

necessity reasons for refusing the advice of the expert test administrator.  In fact, Lee Lamar, who

has made past racial remarks according to other Firefighters, made the decision to use the cut off

score despite the recommendation of CWH Research Inc.  The City has offered no explanation or

evidence about why it was a business necessity to disallow applicants who failed the cut off score

exam to proceed to the assessment center, as required by the 1991 Order.  The City has offered

no explanation or evidence about why it was a business necessity not to make the written exam a

component of the promotional process along with work related factors and the assessment center.

The City has offered no explanation or evidence about why it was a business necessity to refused

the advice of its expert test administrator regarding the cut off score.  The City has offered no

explanation or evidence about why it was a business necessity to use a written test as a

component of the promotional process when is not required, but optional.  The City has offered

no explanation or evidence about why it was a business necessity to allow probationary

Lieutenants to apply for the Battalion Chief promotion.  The City has offered no explanation or

evidence about why it was a business necessity to change the Captains/Shift Commanders to the

higher rank of Battalion Chief without any test, evaluations or interviews, then require the 2006

Battalion Chief applicants to take a written cut off score test.  Another consideration that the

City's reasons are pretextual is that, at the very least, there has been no African American

promoted past the rank of Lieutenant in the last (28) twenty-eight years.  Since the 1991 Order,

only five African Americans have been hired as career Firefighters, and currently there are only

three African Americans within the entire Fire Department. Consequently, the City has simply

offered nothing to prove that the entire promotional process, as it was performed, was a business

47

necessity.  Consequently, the Defendants' Motion for Summary Judgment should be denied at this point based upon this issue.  However, if the Court were to find that the Defendant had satisfied this prong of the test, the Plaintiffs are now required to show that other tests or selection protocols would have served the employers interest without creating the undesirable discriminatory effect.

Proving this is relatively simple.  The City of Auburn could have implemented the written test as a component of the Battalion Chief promotion, with the test score simply as a component of the overall qualifications for the promotion.  This is an alternative procedure that could have been used which, due to the Plaintiffs' experience and qualifications, would have provided them a much better opportunity to receive the promotion.  Using an accumulative point system that took into account time-and-grade, seniority, experience, knowledge of streets and numbers and yearly appraisals, along with a written test with no cut off score, and an assessment center, would have served the City's exact same purposes for the promotion and would have given the black applicants a much higher opportunity to achieve the promotion.  The reason for this is because the black applicants, although they may have scored below (70) seventy on the exam, would have rated higher than the applicants who received the promotion in the areas of time-and-grade and seniority.  Although the City claims in its Brief that these should not be factors to consider for this promotion, Larry Langley testified that the City was in the process of drafting a career development plan that included consideration of time-and-grade and accumulative point system. The City could have followed the 1991 Order, as it was supposed to do, and simply made the promotions pursuant to an assessment center.  These selection protocols would serve the City's interest in this promotion without blocking all three African American applicants because of a

48

single test score.  In Isabel v. City of Memphis, 404 F. 3d 404,413 (6th Cir. 2005), the Court

referenced testimony by a private consultant and industrial psychologist, Dr. Mark Jones, who

developed the City of Memphis written tests for police department promotions.  The Court cites

testimony that he did not want to use a cut off score and saw no value in implementing one; he

explained that the only reason that he used one was because the Union forced him to do so.

Since the City cannot articulate a true business necessity for implementing a cut off score

exam and since there are several alternative protocols that could have been used for this

promotion, the Defendants' Motion for Summary Judgment pursuant to this issue is due to be

denied.

### C.    Violation of the 1991 Hammock Order

The 1991 Hammock Order states in Section 12 that all Captains and Lieutenants

promotions shall be accomplished through an assessment center.  There is nothing in the Order to

indicate that this requirement will expire after a certain period of time, and there is nothing in the

Order that authorizes the City to screen which applicants go to the assessment center by use of a

cut off score test.  Since the 1991 Order, only one African American has been promoted to the

rank of Lieutenant .  During that time, the ranks above Lieutenant were Captain/Shift

Commander, Battalion Chief, Deputy Chief and Chief.  Although no African Americans, other

than Stephens, was promoted past Lieutenant, eleven white Firefighters, along with Ogletree,

received a rank increase to Lieutenant without undergoing an assessment center pursuant to the

Order. [9]  In the year before the Battalion Chief promotion, four white Captains/Shift

---

[9] As stated previously, Ogltree believed that this rank increase was going to be approved
by the Court.

49

Commanders received a rank increase to Battalion Chief without undergoing an assessment center pursuant to the Order.  As stated in the factual section of this Brief, there have been other promotions, reassignments and rank increases for white Firefighters without testing, interviews or assessment centers.

The McDonnell Douglas Prima Facia showing is not necessarily a factual finding of discrimination.  However, it is proof of actions taken by the employer from which the inference of discriminatory treatment arises because experience has shown that in the absence of any other explanation, it is more likely than not that those actions were based on impermissible considerations.  Lee v. Conecuh Cy. Bd. of Ed., 634 F 2d 959, 962 (5th Cir. 1981) Proving discriminatory motive is critical; however, in some situations it may be inferred from the mere fact of differences in treatment.  Lee 634 F 2d at 962.  In that case, the Conecuh County school system was operating under Federal injunction to end a regime of segregation, and the Plaintiff filed a discrimination lawsuit.  The Court in Cohecuh stated that "proof of an immediate past history of racial discrimination alone can be sufficient to shift to the local board of education the burden of justifying its employment decisions by clear and convincing evidence" Id at 963. Based on that decision, the differences in treatment between white Firefighters and black Firefighters, since the 1991 Order, may create an inference of discriminatory motive with regard to the Battalion Chief promotions.  And, since there is no question that the City has a past history of racial discrimination, the burden is on the City to justify its employment decisions.  The only justification offered by the City for the Battalion Chief promotion is that three African American Firefighters failed the cut off score test.  They offer nothing else.

In Cit. Concerned About Children v. School Bd., 111 F 3d 1285 (11th Cir. 1999), the

50

parties entered into a consent decree in order to rectify past discriminatory practices with regard to segregation in schools and busing. That Court addressed consent decrees with regard to the rectification of racial inequalities as follows:

> Whether compliance with a consent decree of this sort is a compelling interest-answers itself yes, for two reasons, first, consent decrees are a kind of Court order. Parties **must** obey them. Therefore, like Court Orders, a violation is punishable by contempt... Avoiding contempt in respecting the Court that entered the consent decree suffice to make obedience a compelling interest... This consent decree rest on a foundation- redressing of past discriminatory wrongs-that the Supreme Court has explicitly recognized as a compelling interest by itself when two elements are present... When the compelling interest is compliance with a Court Order, that means that the governmental entity must face a likelihood of contempt under the Order if it abandons the racial policy. Cit. Concerned About Chidren, 111 F 3d at 1292-1293.

The Human Resources Director for the City of Auburn testified in this case that the City did not attempt to comply with the 1991 Hammock Order pursuant to the 2006 Battalion Chief promotion. The Chief at that time stated he did not attempt to comply with the 1991 Order pursuant to that promotion. The current Chief stated that he did not attempt to comply with that Order at the time of the promotion. The Director of Public Safety testified that he did not attempt to comply with that Order pursuant to the 2006 Battalion Chief promotion. In fact, the Human Resources Director testified that he felt that the Order essentially expired the day after it was signed. Consequently, it is quite obvious here that the City of Auburn and the decision makers during the Battalion Chief promotional process intentionally disregarded and violated the 1991 Order. There is also significant evidence that the City and the decision makers have repeatedly violated that Order since it was entered.

51

D.    Title VII/Direct Evidence of Discrimination

Plaintiffs have already shown that prior comments made by decision makers can be used in order to prove pretext in the McDonnell Douglas shifting burden analysis.  Smith v. City of Mobile, (S.D. Ala. 9-4-07) Use of racial slurs also constitutes direct evidence of discriminatory intent.  Merritt v. Dillard Paper Co., 120 F 3d 1181, 1189-90 (11th Circuit 1997) Racial slurs uttered by the person in charge of making employee evaluation and rehiring suggestions constitutes direct evidence of discrimination.  Evidence of racial slurs by men responsible for making promotional decisions constitutes direct evidence of discriminatory motive requires the burden to shift to the Defendant to prove by preponderance of evidence that the Plaintiffs would have not been promoted absent the discriminatory motive.  E.E.O.C. v. Alton Packing Corp., 901 F 2d 920, 924 (11th Cir. 1990)

According to Affidavits submitted in this case, both Larry Langley, the Fire Chief at the time of these promotions, and Lee Lamar, the current Chief, have made regular racial slurs in the past.  It is undisputed that Lee Lamar made the ultimate decision to implement the cut off score test, even though there had never been a cut off score test for the Battalion Chief promotion.  Also, according to Affidavits submitted in this case, Larry Langley told both Chris Turner and Gerald Stephens that their discrimination related grievances and EEOC charges would hurt them with the City of Auburn in the future.  The Affidavit submitted by Horace Clanton indicates that Chief Langley told him to come to work every day so that Gerald Stephens would not be in charge because "others" would not want to work for him.  It is undisputed that Langley and Lamar were among the decision makers during the Battalion Chief promotion in 2006.  The Affidavit testimony provides evidence that both of these men used racial slurs, that Langley

52

tacitly threatened retaliation by the City for EEOC charges and grievances and that Lamar did not want Stephens to be "in charge". This creates direct evidence of discrimination. Therefore, since there is a genuine issue of material fact with regard to all of the Plaintiffs' Title VII claims, the Motion for Summary Judgment is due to be denied.

    E.    §1983 Claims/Individual Defendants/Retaliation

    With regard to the Plaintiffs' claims made pursuant to §1983, this Court's analysis shall be the same for the Plaintiffs' claims under Title VII. Lee v. Conecuh Cy. Bd. of Ed., 634 F 2d 959, 961 (5th Cir. 1981). Thus, the Plaintiff reasserts all legal arguments herein pursuant to the §1983 claim.

    With regard to the individual Defendants, each of them were involved in the decision making process for the 2006 Battalion Chief promotion. Ultimately, this group of Defendants decided, against the recommendation of CWH Research Inc., to implement a cut off score test as the prerequisite for the assessment center. It is established that Lee Lamar, the current Chief, first suggested the cut off score and the City made the ultimate decision. Also, the Human Resources Director for the City of Auburn, and each of the other decision makers, testified that they did not attempt to comply with the 1991 Hammock Order pursuant to the promotion. Last, there is sworn testimony that Lee Lamar and Larry Langley have used racial slurs on a regular basis which is evidence of pretext and direct evidence of discrimination. For those reasons, and all previous legal arguments stated herein, there are genuine issues of material fact related to the individual Defendant's liability, and the Summary Judgment should be denied as to each of them.

    Concerning retaliation, the Plaintiffs must prove that they were engaged in statutorily protected activity, suffered adverse employment action and a casual connection between the

53

adverse employment action and the protective activity. <u>Gold Smith v. City of Atmore</u>, 966 F 2d

1155, 1163 (11th Cir. 1993) Once the Plaintiffs establish the Prima Facia case of retaliation, the

City has the burden of providing non retaliatory reasons for the action. Then, Plaintiffs are

required to prove that the explanation is a pretext. <u>Combs v. Plantation Patters</u>, 106 F 3d 1519,

1528 (11th Cir. 1997)

      By Affidavit testimony, it is apparent that Gerald Stephens filed a grievance related to

race discrimination. As a result of that grievance, he was told by then Chief Larry Langley that

the grievance would be a red flag with the City of Auburn. Subsequently, Stephens was denied

the promotion to Battalion Chief. He received Langley's comment to mean that he would have

trouble receiving promotions in the future as a result of his grievance, and he in fact did not

receive the promotion in 2006. Consequently, there is evidence that Langley's attitude about the

grievance was related to the denial of the promotion in 2006. The only reason that the City has

offered for the denial of the promotion was the failure of the cut off score test, which the

Plaintiffs have already addressed in this Brief as discriminatory. Therefore, for all reasons

previously stated, the cut off score test reason is in fact pretextual, and the Defendants' Motion

for Summary Judgment pursuant to the retaliation claim is due to be denied.

      **F.**    **Statute of Limitations**

      With regard to the City's argument that any act that occurred prior to March 9, 2006 is

barred by the statute of limitations based upon the EEOC (180) one hundred-eighty day deadline,

the Plaintiffs were denied the promotion in April 2006. And, they followed the grievance

procedures prescribed by the City of Auburn until July 2006. However, as of the date that the job

was posted, and as of the date that the Plaintiffs took the cut off score exam, they were without

54

sufficient knowledge to file a EEOC Charge of discrimination because they had not yet been denied the promotion.  With regard to anything that occurred prior to the denial of the promotion, the Plaintiffs are entitled to "equitable tolling" of the deadline pursuant to Federal law.  Jones v. Dillards Inc., 368 F 3d 1278, 1281(11th Cir. 2004) The EEOC charge limitations period is tolled "until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his/her rights".  Cocke v. Merrill Lynch & Co., 817 F 2d 1559 (11th Cir. 1987)  Until the Plaintiffs were denied the promotion, and arguably until the grievance procedures were completed, the Plaintiffs did not have sufficient knowledge to understand that they were not going to be promoted.  Consequently, any complaints that the Plaintiffs have prior to March 9, 2006 are equitably tolled.

## VI.  CONCLUSION

Based upon the foregoing facts, testimony and legal argument, it is clear that there are issues, material fact, and the Defendants Summary Judgment Motion is due to be denied.

Respectfully submitted,

/s/ Richard F. Horsley
**Richard F. Horsley    HOR023**
**Attorney for Plaintiff**

**OF COUNSEL:**
**KING, HORSLEY & LYONS**
**1 Metroplex Drive, Suite 280**
**Birmingham, Alabama 35209**
**(205) 871-1310**

## CERTIFICATE OF SERVICE

_____I hereby certify that I have served a copy of the above and foregoing on all counsel of records listed below by placing a copy of same in the United States Mail, first class, postage pre-paid on this the 2nd day of September, 2008.

**Randall Morgan, Esquire**
**Hill, Hill, Carter, Franco, Cole & Black PC**
**425 South Perry Street**
**Montgomery, Alabama 36104**


                              **/s/ Richard F. Horsley**
                              **OF COUNSEL**