## UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

OFFICE OF THE CLERK

POST OFFICE BOX 711

MONTGOMERY, ALABAMA 36101-0711

DEBRA P. HACKETT, CLERK

TELEPHONE (334) 954-3600

September 3, 2008

## NOTICE OF CORRECTION

**From:   Clerk's Office**

**Case Style:   Ogletree et al v. City of Auburn et al**

**Case Number:   3:07cv00867-WKW**

**This Notice of Correction was filed in the referenced case this date to attach the corrected main PDF document previously attached and to attach the PDF documents of seven previously omitted exhibits.**

**The correct PDF documents are attached to this notice for your review.   Reference is made to document # 80   filed on    September 02, 2008.**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **EDDIE OGLETREE, an individual;** | ) | |
| **GERALD STEPHENS, an individual** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO:** |
| | ) | **3:07-cv-867-WKW** |
| **CITY OF AUBURN**, a municipality in The | ) | |
| State of Alabama; **LARRY LANGLEY**, an | ) | **JURY TRIAL DEMANDED** |
| individual; **LEE LAMAR**, an individual; | ) | |
| **BILL HAM, Jr.**, an individual; **STEVEN** | ) | |
| **A.REEVES**, an individual; **BILL JAMES**, | ) | |
| an individual; **CHARLES M. DUGGAN**, | ) | |
| an individual; and **CORTEZ LAWRENCE**, | ) | |
| an individual; | ) | |
| | ) | |
| **Defendants,** | ) | |

## PLAINTIFFS' RESPONSE TO THE DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Plaintiffs, through counsel, and respond to the Defendants' Motion for

Summary Judgment and state that, pursuant to FRCP 56, there are genuine issues of material fact

for submission to a jury, and judgment as a matter of law is improper.  In support of this

response, the Plaintiffs submit their response Brief contemporaneously with the following

submissions of evidence:

1.      All Pleadings to date;

2.      Ex A-1991 Hammock Order;

3.      Ex B-CWH Research Inc. Letter of Agreement;

4.      Ex C-CWH Research Inc. Auburn Fire Division Orientation Manual;

5.      Ex D-Battalion Chief Memo dated February 17, 2006;

6.     Ex E- Battalion Chief Memo dated February 23, 2006;

7.     Ex F- Gerald Stephens Lieutenant Promotion Letter;

8.     Ex G- CWH Research Inc./City of Auburn E-mails;

9.     Ex H-Modification of Lieutenant Promotional Process signed by Gerald Stephens;

10.    Ex I-Modification of Lieutenant Promotional Process signed by Chris Turner;

11.    Ex J-City of Auburn Personnel Policies § 2.07 and § 2.09;

12.    Ex K-Eddie Ogletree EEOC Charge of Discrimination;

13.    Ex L-Gerald Stephens EEOC Charge of Discrimination;

14.    Ex M- EEOC Determination regarding Eddie Ogletree;

15.    Ex N-EEOC Determination regarding Gerald Stephens;

16.    Ex O-City of Auburn Interrogatory responses;

17.    Ex P-Grievance Letter dated May 12, 2006;

18.    Ex Q-Lee Lamar Letter dated April 28, 2006;

19.    Ex R-April 14, 2006 Letters to Ogletree and Stephens regarding the denial of the

Battalion Chief Promotion;

20.    Ex S-Affidavit of Gerald Stephens with attachments;

21.    Ex T-Affidavit of Eddie Ogletree with attachments;

22.    Ex U-Affidavit of Christopher Turner;

23.    Ex V-Affidavit of Horace Clanton;

24.    Ex W-Affidavit of William Felton;

25.    Ex X-Grievance Letter dated May 24, 2006;

26.    Ex Y-Christopher Turner lawsuit;

27.    Ex Z-Affidavit of CWH Research Inc.;

28.    Ex AA-Larry Langley Letter;

29.    Deposition Testimony of Eddie Ogletree;

30.    Deposition Testimony of Gerald Stephens;

31.    Deposition Testimony of Stephen Reeves;

32.    Deposition Testimony of Lee Lamar;

33.    Deposition Testimony of Larry Langley;

34.    Deposition Testimony of William James;

**WHEREFORE**, Plaintiffs respectfully request the denial of the Defendants Motion for

Summary Judgment.


**/s/ Richard F. Horsley**
**Richard F. Horsley (HOR023)**
**Attorney for Plaintiffs:**
**Gerald Stephens & Eddie Ogletree**

**OF COUNSEL:**
**KING, HORSLEY & LYONS, LLC**
**1 Metroplex, Suite 280**
**Birmingham, Alabama 35209**
**Telephone: (205) 871-1310**
**Facsimile: (205) 871-1370**
**E-mail:  rfhala@cs.com**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using electronic filing which will send notification of such filing on this the 2nd day of September, 2008.


/s/ Richard F. Horsley
**Richard F. Horsley**


**Randall Morgan, Esquire**
**Hill, Hill, Carter, Franco, Cole & Black PC**
**425 South Perry Street**
**Montgomery, Alabama 36104**
**Telephone: (334) 834-7600**
**Facsimile: (334) 262-4389**
**E-mail: morgan@hillhillcarter.com**

# EXHIBIT AA

To. Judge Robert Varner

I object to the Settlement Dudley Perry has
agree to in the T.K.T.A. & the Dudley Perry Action at the
meeting was uncall for. Mr. Perry said
he would settle this case hisself & we
had no say so in the matter. Mr. Perry has
told us we would be Grandfather concerning
schooling & Physical fitting, but the agreement
he had was not like that. Mr. Perry has
done nothing to stop the harassment from
city Officals. we were not allow to
sit in on negotiactions, but Alan Ledbetter
was allow to set in on his. I disagree with
the promotion of Jessie Strickland & Bill Felton
to Lieutenant's wd Alson disagree with the way
Leon leader was made Lieutenant, That was not
the understanding I had when they started the
Student Program. I have had no say in
the concerning this Prospal & Therefore I must
Object to the Prospal.

Your Respecting
Larry Langley

RECEIVED
THOMAS C. CALER
U.S. DISTRIC COURT
MIDDLE DISTRICT OF A
CLERK

FILED
JAN 17 1990
CLERK
U.S. DIST. COURT
MIDDLE DIST. OF AL
DEPUTY CLERK, BY CO

# DEPOSITION TESTIMONY OF
# EDDIE OGLETREE

# DEPOSITION OF EDDIE OGLETREE

## June 6, 2008

## Pages 1 through 192

# PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF ALABAMA
3                    EASTERN DIVISION
4
5    EDDIE OGLETREE, an individual,
     GERALD STEPHENS, an
6    individual,
7         Plaintiffs,
8    Vs.              CIVIL ACTION NO.
                      3:07-CV-867-WKW
9
     CITY OF AUBURN, a municipality
10   in the State of Alabama, LARRY
     LANGLEY, and individual, LEE LAMAR,
11   an individual, BILL HAM, JR., an
     individual, STEVEN A. REEVES, an
12   individual, BILL JAMES, an
     individual, CHARLES M. DUGGAN, an
13   individual, and CORTEZ LAWRENCE,
     an individual,
14
          Defendants.
15
                 * * * * * * * * * * *
16
          DEPOSITION OF EDDIE OGLETREE, taken pursuant to
17
     stipulation and agreement before Pamela A. Wilbanks,
18
     Certified Court Reporter, ACCR# 391, Registered
19
     Professional Reporter and Commissioner for the State of
20
     Alabama at Large, in the Law Offices of Hill, Hill,
21
     Carter, Franco, Cole & Black, 425 South Perry Street,
22
     Montgomery, Alabama, on Friday, June 6, 2008, commencing
23
```

**Page 2**

```
1                    APPEARANCES
2    FOR THE PLAINTIFFS:
3    Mr. Richard F. Horsley
     KING, HORSLEY & LYONS
4    Attorneys at Law
     1 Metroplex Drive
5    Suite 280
     Birmingham, AL 35209
6
     FOR THE DEFENDANTS:
7
     Mr. Randall Morgan
8    HILL, HILL, CARTER, FRANCO, COLE & BLACK
     Attorneys at Law
9    425 South Perry Street
     Montgomery, Alabama
10
     FOR CWH:
11
     Mr. William K. Hancock
12   ADAMS & REESE
     Attorneys at Law
13   Suite 1100
     2100 Third Avenue North
14   Birmingham, AL 35203
15   ALSO PRESENT:
16   Mr. Steven Reeves
     Mr. Lee Lamar
17   Mr. Gerald Stephens
18
              * * * * * * * * * * * *
19        EXAMINATION INDEX
20   BY MR. MORGAN . . . . . . . . . . .  4
     BY MR. HANCOCK . . . . . . . . . . 185
21   BY MR. MORGAN . . . . . . . . . . 186
     BY MR. HANCOCK . . . . . . . . . . 187
22   BY MR. MORGAN . . . . . . . . . . 188
23
```

**Page 3**

```
1         EXAMINATION INDEX OF MR. STEPHENS
2    BY MR. HANCOCK . . . . . . . . . . 188
     BY MR. MORGAN . . . . . . . . . . 189
3
4         DEFENDANT'S EXHIBIT INDEX
5    14   City of Auburn Employment Application      78
6    15   4/4/05 letter to Mr. Ogletree from Steve  103
          Reeves concerning the Candidate Feedback
7         Report
8    16   4/14/06 letter to Mr. Ogletree from       103
          Stephanie King
9
10   17   4/21/06 letter to Chief Lamar from Clanton, 108
          Hodge, Ogletree and Stephens
11
12
13
14               STIPULATION
15        It is hereby stipulated and agreed by and
16   between counsel representing the parties that the
17   deposition of EDDIE OGLETREE is taken pursuant to
18   Federal Rules of Civil Procedure and that said
19   deposition may be taken before Pamela A. Wilbanks,
20   Registered Professional Reporter and Commissioner for
21   the State of Alabama at Large, without the formality of
22   a commission, that objections to questions other than
23   objections as to the form of the question need not be
```

**Page 4**

```
1    such time as the said deposition may be offered in
2    evidence or used for any other purpose by either party
3    provided for by the Statute.
4         It is further stipulated and agreed by and
5    between counsel representing the parties in this case
6    that the filing of said deposition is hereby waived and
7    may be introduced at the trial of this case or used in
8    any other manner by either party hereto provided for by
9    the Statute regardless of the waiving of the filing of
10   the same.
11        It is further stipulated and agreed by and
12   between the parties hereto and the witness that the
13   signature of the witness to this deposition is hereby
14   waived.
15
16             * * * * * * * * * * * *
17                  EDDIE OGLETREE
18        The witness, after having first been duly sworn
19   to speak the truth, the whole truth and nothing but the
20   truth testified as follows:
21                  EXAMINATION
22   BY MR. MORGAN:
23        Q.  State your name, please.
```

Page 5

1    A.  Eddie Ogletree.
2            MR. HANCOCK:  Before we get started, I
3        think we've got a stipulation from
4        the plaintiffs that I'd like to
5        put on the record.
6        MR. HORSLEY:  The plaintiffs in this
7        case will stipulate that at this
8        point in the litigation, we do not
9        have a claim and are not claiming
10       that the test in and of itself at
11       issue is a discriminatory test.
12       We are not waiving the right to
13       claim that in the future, but at
14       this point in the litigation we
15       have not even seen the test so I
16       don't think that we can claim that
17       statistically the test is a
18       discriminatory test at this point
19       since we have not even seen it.
20       But we are not waiving the right
21       to claim that in the future of
22       this litigation.
23       MR. HANCOCK:  As I understand it, the

Page 6

1        disparate impact claim that you're
2        bringing in the City's --
3        MR. HORSLEY:  The disparate impact
4        claim that we have made in the
5        case and that we made from the
6        outset is that the City's
7        implementation of a test has a
8        disparate impact on the
9        plaintiffs, not that the test in
10       and of itself is a discriminatory
11       test and causes -- or that the
12       test in and of itself is a
13       disparate impact test.
14       MR. HANCOCK:  And the policy -- the
15       City's policy with regard to who
16       is allowed to take the test; is
17       that correct?
18       MR. HORSLEY:  Correct.
19       MR. MORGAN:  Wait a minute.  Both of
20       y'all are stipulating to a lot.
21          Are you dropping your
22       disparate impact claim?
23       MR. HORSLEY:  No, we are not.

Page 7

1        Absolutely not.
2        MR. MORGAN:  What is the disparate
3        impact claim if you're not
4        claiming it's the results from the
5        test?
6        MR. HORSLEY:  It is the results of the
7        test.
8        MR. MORGAN:  You're claiming --
9        MR. HORSLEY:  I'm not dropping any
10       claim.  We never made a claim in
11       this lawsuit against this company;
12       y'all did.
13       MR. MORGAN:  Well, I know that.  But
14       you claim that the written test --
15       and if I'm wrong, correct me --
16       that the written test, that the
17       procedure had a disparate impact
18       on blacks.
19       MR. HORSLEY:  Yes, we're claiming
20       that.
21       MR. HANCOCK:  As I read the complaint,
22       it's not the test.  It's the
23       procedure of who takes the test.

Page 8

1        It's the policy of utilizing a
2        test.
3        MR. HORSLEY:  It's the policy of
4        implementing the test in order to
5        give people this promotion.
6        That's what we've been claiming
7        all long.
8        MR. HANCOCK:  But not the test
9        itself?
10       MR. HORSLEY:  We don't have any
11       evidence at this point in the
12       litigation --
13       MR. MORGAN:  Wait a minute.  Are you
14       saying the test does not have a
15       disparate impact?
16       MR. HORSLEY:  No, I'm not saying
17       that.
18       MR. HANCOCK:  He's saying he doesn't
19       know.
20       MR. MORGAN:  Huh?
21       MR. HORSLEY:  No.  We're saying it
22       does have a disparate impact.
23       MR. MORGAN:  The written test?

Page 9

| | |
|---|---|
| 1 | MR. HORSLEY: The fact that the City |
| 2 | made these people take the test. |
| 3 | MR. MORGAN: I can see the claim where |
| 4 | you say the written test shouldn't |
| 5 | have been required. I don't have |
| 6 | any problem with that. |
| 7 | MR. HORSLEY: Right. |
| 8 | MR. MORGAN: I understand that. But |
| 9 | then you have a disparate impact |
| 10 | claim. Are you -- |
| 11 | MR. HORSLEY: Let's go off the record. |
| 12 | (Brief off-the-record discussion.) |
| 13 | MR. HORSLEY: After a meeting with |
| 14 | Randall and Will about the |
| 15 | previous stipulation for today's |
| 16 | deposition, we are not going to |
| 17 | stipulate to anything on the |
| 18 | record pursuant to the disparate |
| 19 | impact claim which we stated |
| 20 | earlier. So for today there's no |
| 21 | stipulation on the record about |
| 22 | the disparate impact claim or the |
| 23 | test. |

Page 10

| | |
|---|---|
| 1 | Q. State your name, please. |
| 2 | A. Eddie Ogletree. |
| 3 | Q. And, Mr. Ogletree, you're employed as a |
| 4 | lieutenant with the City of Auburn Fire |
| 5 | Department? |
| 6 | A. Yes. As of February 1st, 2006 when they changed |
| 7 | the title from team leader. |
| 8 | Q. And before that you were a team leader? |
| 9 | A. Yes. |
| 10 | Q. And when did you become a team leader? |
| 11 | A. June 1st of 1996, I believe, somewhere around |
| 12 | there. |
| 13 | Q. And what procedure did you go through to be |
| 14 | eligible to be a team leader in 1996? |
| 15 | A. They called it -- I guess it was like a |
| 16 | structured interview. |
| 17 | Q. Is that the first time that you had applied for |
| 18 | team leader in '96? |
| 19 | A. I had applied one time before, but they took the |
| 20 | job off the board. And I had applied for a |
| 21 | lieutenant's position about a year or two before |
| 22 | that, and they cancelled the job. |
| 23 | Q. You applied for lieutenant before '96? |

Page 11

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And that was also cancelled? |
| 3 | A. Uh-huh (positive response). |
| 4 | Q. So you never went through -- |
| 5 | A. Never went through any process. |
| 6 | Q. Do you remember what the process would have been |
| 7 | for lieutenant in '94? |
| 8 | A. It would have been -- More or less it would have |
| 9 | been a structured interview type of thing. |
| 10 | Q. Did you sit on any of the structured interviews |
| 11 | or assessment -- |
| 12 | A. I did. |
| 13 | Q. Which ones did you sit on? |
| 14 | A. I probably have sat on about four to five from a |
| 15 | period of, like, the year of '97 or '98 till |
| 16 | about maybe 2001, somewhere along in there. |
| 17 | Q. Would that have been for team leader? |
| 18 | A. That would have been for team leader. |
| 19 | Q. And did Chris Turner apply for team leader |
| 20 | during those -- |
| 21 | A. I believe he did one time. |
| 22 | Q. Do you remember how you graded him? |
| 23 | A. He was above average. I graded him above |

Page 12

| | |
|---|---|
| 1 | average. |
| 2 | Q. Do you remember who got promoted that time? |
| 3 | A. I couldn't recall. I couldn't recall. It's |
| 4 | been several guys. I do know that one of them |
| 5 | might have been Hartsfield, which is a battalion |
| 6 | chief now. I believe he might have been one of |
| 7 | them that got promoted. I think it might have |
| 8 | been him. |
| 9 | Q. Rodney Hartsfield? |
| 10 | A. Yes. |
| 11 | Q. Is he a good officer? |
| 12 | A. Rodney? |
| 13 | Q. Yeah. |
| 14 | A. He's no better than I would be or -- He's a good |
| 15 | officer, but all officers there are pretty good. |
| 16 | Q. Did you participate in petitioning the City to |
| 17 | change the rank from team leader to lieutenant? |
| 18 | A. Yes. |
| 19 | Can I elaborate? |
| 20 | Q. Yeah. |
| 21 | A. When they came around to me -- |
| 22 | Q. Now, who is "they"? |
| 23 | A. Joey Darby. I was approached by Joey Darby |

Page 13

1    first about it before I seen any paperwork.  And
2    he had said that they was going -- they was
3    thinking about petitioning to change the team
4    leader title to lieutenant and say he had
5    chalked to chief about it, which would have been
6    Chief Langley at the time.  And he approached me
7    again, and he showed me the paperwork.  And when
8    I read through the paperwork, it was my
9    understanding that they was going to petition
10   the court, and that's the only reason I signed,
11   because I figured if they go back through the
12   court system, then everything would be legal and
13   it would take enough time where everybody would
14   be satisfied, because I was approached by then
15   by Chief Garrett, and he had already said that
16   they know that certain people were going to
17   complain about it.  Just because -- I signed
18   that paper, but I didn't think -- I thought it
19   was going to court.
20   Q.  Well, what about Chief Garrett knew that certain
21   people were going to complain?  Who --
22   A.  Chief Garrett had stated that Chris Turner and
23   Lieutenant Stephens and Walter Allen -- the

Page 14

1    chief already knew they weren't going to agree
2    with it.
3    Q.  Well, did that influence your decision to sign
4    it, the fact that they weren't going to agree
5    with it?
6    A.  The one thing on there that I signed for was to
7    court.  They stated they were going to petition
8    the court, because, you know -- Another thing
9    about that:  Those guys that were pushing that
10   petition, they had a real problem with answering
11   to Lieutenant Stephens over there.  And my only
12   conclusions with that was because Lieutenant
13   Stephens was black, and he was the highest
14   ranking officer in the fire department at that
15   time.  And they had a real problem when he was
16   giving them orders.  I have heard them complain,
17   go over his head, say they think they was equal
18   rank to him.  And the policy plainly states that
19   team leaders has no say-so over regular
20   firefighters or officers.
21   Q.  Who are the officers that complained about
22   Lieutenant Stephens -- taking orders from
23   Lieutenant Stephens?

Page 15

1    A.  Joey Darby.
2    Q.  Okay.
3    A.  Matt Joy.
4    Q.  Matt who?
5    A.  Matt Joy.
6    Q.  J-O-Y?
7    A.  J-O-R-D-A-N.
8    Q.  Jordan.  Okay.
9    A.  I know they complained directly.
10   Q.  Complained directly to who?
11   A.  Chief Garrett.
12   Q.  What other team leaders did you hear complain
13   about taking orders from Lieutenant Stephens?
14   A.  I just -- I knew it was a problem.  Most all --
15   It's probably about eight to nine of them.
16   Q.  Give me their names.
17   A.  Jason Brown.  Let's see who else it would be.
18   Clay Carson, John Benefield, Joe Lovvorn, I
19   remember those guys directly.
20   Q.  Who did they complain to about --
21   A.  Their immediate supervisor, because at the time
22   they were giving Lieutenant Stephens a hard
23   time.

Page 16

1    Q.  These six people were giving Lieutenant Stephens
2    a hard time?
3    A.  They just didn't think that their rank and his
4    rank -- They thought their rank and his rank was
5    the same.
6    Q.  I want to be clear on what their complaint was.
7    If they thought the rank was the same, that's
8    one thing.  But what you said was that they were
9    complaining because Lieutenant Stephens was
10   black.  Now, did you hear any of these people
11   say, I don't want to take orders from Lieutenant
12   Stephens because he's black?
13   A.  No, I didn't hear them say it.
14   Q.  Did you hear anybody say --
15   A.  But --
16   Q.  -- anything like that?
17          MR. HORSLEY:  Just answer his
18          question.
19   Q.  Wait a minute.
20          Did you hear anybody say anything like that,
21          that I don't want to take orders from Lieutenant
22   Stephens because he's black?  Who do you accuse
23   of those people that you named of complaining

Page 17

1    about taking orders from Lieutenant Stephens
2    because he's black?
3  A.  No one.
4  Q.  Their complaint was they thought their rank as a
5    team leader was equal to his rank as a
6    lieutenant, true?
7  A.  Yes, that's true.
8  Q.  Did you feel like your rank as a team leader was
9    equal to the lieutenant rank?
10  A.  No.
11  Q.  Well, since the promotion or the change from
12    team leader to lieutenant did not go through the
13    court --
14      You know that, don't you?
15  A.  Yes.  I know it because it come back too quick.
16  Q.  Did you refuse to accept that rank change since
17    it didn't go through the court?
18  A.  I didn't refuse.  I just took -- They gave me
19    the bars, and I just put them on and kept doing
20    the same thing I've been doing.
21  Q.  Did you complain to anybody or make any comment
22    to anybody when you became a lieutenant that you
23    thought it needed to go through the court?

Page 18

1  A.  I talked to Lieutenant Stephens.
2  Q.  Anybody else?
3  A.  No.
4  Q.  Steve Reeves or any of these people that you've
5    sued?
6  A.  No.
7  Q.  Did you say anything to them about -- complain
8    about being changed from a team leader to a
9    lieutenant?
10  A.  No.
11      Can I say something else on that?
12  Q.  Say whatever you want.
13  A.  I been there long enough to know that
14    complaining don't do no good.  When somebody
15    make a decision, you know -- If I'm going to do
16    something, I'm going to do it formally.  That's
17    why we're here now.  But complaining, you just
18    make your day bad.
19      MR. MORGAN:  Well, I'm going to move
20        to exclude that.
21  Q.  Well, who brought you the petition that you
22    signed, Joey Darby?
23  A.  Joey Darby.

Page 19

1  Q.  And did you tell Mr. Darby that you were only
2    signing it because it was going through the
3    court?
4  A.  Yes.  They say they was going to petition the
5    court, and I say I'll sign it.
6  Q.  Did you tell them you wouldn't sign it if they
7    weren't going to petition the court?
8  A.  No.  That was my understanding when it came to
9    me, that it was going to the court system.
10  Q.  Is it your position in this lawsuit that you
11    should not be a lieutenant?
12      MR. HORSLEY:  Object to the form.
13  A.  No.  Because other people that got promoted over
14    the years were doing less.
15  Q.  I'm not asking about other people.  I'm asking
16    about Eddie Ogletree.
17  A.  No.
18  Q.  Is it your position because they didn't petition
19    the court that you should not be a lieutenant?
20  A.  No.
21  Q.  Your position is you should be a lieutenant?
22  A.  Yes.
23  Q.  Is it your position that because you were a team

Page 20

1    leader and the change to lieutenant did not go
2    to the court that you should not be eligible for
3    promotion to battalion chief?
4  A.  No.  Because team leaders were eligible for
5    promotion.
6  Q.  Well, do you have any problem with team leaders
7    being eligible for promotion to battalion chief?
8  A.  No.
9  Q.  You don't have any complaint about that, do you?
10  A.  No, I didn't have a complaint about that.
11  Q.  Do you have a complaint about people who had not
12    yet achieved the rank of team leader being
13    eligible to apply for the battalion chief
14    promotion?
15  A.  Yes, I do.
16  Q.  What's your problem with that?
17  A.  When I came there, it was five years before you
18    could even put in for anything above -- You
19    could be a firefighter from your first five
20    years.
21  Q.  You came in 1984?
22  A.  Yes.
23  Q.  So you had to wait five years for a promotion?

Deposition of Eddie Ogletree

June 6. 2008

Page 21

1   A.   Exactly.  You had certain things you had to
2        learn, basic things you had to learn for those
3        first five years:  streets and numbers, your
4        hydrant flow, learn how to do pumping on the
5        truck and -- before you even got -- You was on
6        the ladder truck, but you learned that first.
7        Then you learned to run a front run pumper.  So
8        by the time you learn all that, you didn't have
9        time to just come in the door and apply yourself
10       to be something else because they held you to
11       it.
12   Q.  Well, who just came in the door and was eligible
13       to apply for battalion chief?
14   A.  We had several firefighters -- We had
15       firefighters in there, and we had several guys
16       that had been promoted within the first two
17       years of being a regular firefighter.
18   Q.  Were they team leaders?
19   A.  Yes.
20   Q.  And we've already established you don't have any
21       complaint about --
22   A.  I've got a complaint about time in service.
23   Q.  Seniority?

Page 22

1   A.   Uh-huh (positive response).
2            MR. HORSLEY:  You need to say yes, not
3        uh-huh (positive response).
4   A.   Yes.
5   Q.   Before I get to that, what firefighters who were
6        not team leaders or lieutenants sat for the exam
7        on the battalion chief promotion?
8   A.   Chris Turner was a firefighter.
9            MR. HORSLEY:  In 2006?  Was that your
10       question?
11   Q.  Isn't that the one you're complaining about, the
12       battalion chief promotion in 2006?
13   A.  Yes.
14   Q.  You're not complaining about any other
15       promotions, are you?
16   A.  Other than when they changed the title.  I told
17       you I didn't agree --
18   Q.  You don't want to be a lieutenant?  You want the
19       City to make you a team leader again?
20   A.  Other than when they changed the title and it
21       didn't go to the courts.
22           MR. HORSLEY:  Object to the form.
23       It's argumentative.

Page 23

1   Q.   And that's team leader to lieutenant.  You
2        consider that a promotion?
3   A.   Yes.
4   Q.   And you don't want -- you think that's unfair to
5        you to make you a lieutenant?
6            MR. HORSLEY:  Object to the form.
7   A.   And the battalion chief promotions of 2005 --
8        2004.
9   Q.   Did you apply for those?
10  A.   No.  Didn't nobody get a chance to apply.
11  Q.   Is that when the captains became battalion
12       chiefs?
13  A.   Yes.  Battalion chief was a promotion.
14  Q.   Did you file an EEOC claim over that in 2004?
15  A.   No, I didn't file a EEOC claim.
16  Q.   Did you file a lawsuit over that?
17  A.   No, I didn't.
18  Q.   So Chris Turner is the only person who was not
19       ranked at least -- who was not ranked as a
20       lieutenant?
21  A.   Yes.
22  Q.   So you think he should not have been allowed to
23       sit for the battalion chief promotion?

Page 24

1   A.   I think so, but ...
2   Q.   Now, how did his sitting for battalion chief
3        adversely affect your promotion possibilities?
4   A.   I didn't have a problem with him sitting per
5        se. I'm talking about all the people that was
6        in there that had less time than I had.
7   Q.   Well, that's everybody that was there, wasn't
8        it?
9   A.   That's the way they've been promoting.
10  Q.   I mean, everybody that sat for the exam had less
11       time --
12  A.   Except for two other guys.
13  Q.   All right.  Who had been there longer than you?
14  A.   Horace Clanton and Robbie Hodge.
15  Q.   And he's white?
16  A.   Both of them are white.
17  Q.   So your position is those two whites should have
18       been promoted to battalion chief?
19           MR. HORSLEY:  Object to the form.
20  A.   No.  I said I have a problem with who sat
21       there.  That doesn't have nothing to do with
22       being promoted, who just you was competing
23       against.

Page 25

1  Q.  Let's go back to my other question about Chris
2      Turner.
3          Did Chris Turner sitting for the battalion
4      chief exam adversely affect your chances to be
5      promoted?
6  A.  No.
7  Q.  And Chris Turner is a black male?
8  A.  Yes.
9  Q.  And you're a black male?
10 A.  Yes.
11 Q.  And Gerald Stephens is a black male?
12 A.  Yes.
13 Q.  Well, who that sat for the exam do you think
14     didn't have enough seniority to sit for it?
15 A.  Joe Lovvorn, Rod Hartsfield, Matt Jordan, Clay
16     Carson, Jason Brown. Let me see who else was in
17     there. There's probably one or two -- probably
18     one or two more. I can't remember exactly
19     everybody.
20 Q.  Let me show you the list because I want to make
21     sure I get all of them. Here's the ones that
22     were in the orientation. Who else do you think
23     didn't have enough time to sit?

Page 26

1  A.  John Lankford. And that's it. Well, Jason
2      didn't take it.
3  Q.  Who didn't take it?
4  A.  Jason Rawls (phonetic), he didn't take it.
5  Q.  Joe Lovvorn, Rodney Hartsfield, Matt Jordan,
6      Clay Carson, Jason Brown, and John Lankford --
7  A.  Yes.
8  Q.  -- you think didn't have enough time in grade to
9      take the exam?
10 A.  Yes.
11 Q.  How long had Joe Lovvorn been with the fire
12     department at that time?
13 A.  Well, they count student time now, but probably
14     about five or six years.
15 Q.  And how about Rodney Hartsfield? How long had
16     he been there?
17 A.  Probably about seven.
18 Q.  And Matt Jordan? How long --
19 A.  Probably about five or six. That's not exact,
20     but that's counting that date of hire probably,
21     not their student firefighter date of hire.
22 Q.  So this is a regular firefighter --
23 A.  Yeah, regular firefighter.

Page 27

1  Q.  So how would you have fashioned the exam for
2      battalion chief? What would you have made the
3      requirements be?
4          MR. HORSLEY: Object to the form.
5  A.  Just like --
6  Q.  We can establish first: You're not a testing
7      expert, are you?
8  A.  No, I'm not.
9  Q.  You don't purport yourself --
10 A.  Don't purport.
11 Q.  Well, given that, what would you have made the
12     requirements to be?
13         MR. HORSLEY: Object to the form.
14 A.  No cutoff score. More hands-on type
15     activities. Seniority, time in grade.
16 Q.  Is there --
17 A.  We didn't get any points for any of that. We
18     got cut off. That's where my problem is.
19 Q.  Is there a difference in seniority and time in
20     grade?
21 A.  Yes. Because you have some people that have
22     been -- Like Lieutenant Stephens there, he's the
23     longest ranking lieutenant in the fire

Page 28

1      department. He doesn't have as much time in
2      grade as I have, but he's the highest -- longest
3      ranking lieutenant. So he's been in a
4      lieutenant position now for twelve years.
5          THE WITNESS: Right?
6          (No response.)
7  Q.  Well, which do you consider that to be,
8      seniority or time in grade?
9  A.  Time in grade.
10 Q.  And seniority is just how long you've been with
11     the department?
12 A.  Yes.
13 Q.  Well, from, say, 2000 on, were there any
14     differences in what you did as a team leader
15     than what Gerald Stephens did as a lieutenant?
16 A.  2000? I couldn't really say because -- I'm
17     trying to think about the manpower and who I was
18     really supervising at the time. For me I was
19     doing what I was -- I was at Station 3, and I
20     rarely had a full-time man, which it state the
21     team leader can't supervisor a regular full-time
22     firefighter. I always just about had student
23     firefighters at my station. There was some that

Page 29

1     was different throughout the City.
2  Q.  Were your responsibilities and duties any --
3  A.  Did --
4  Q.  Let me finish my question.
5        -- any different from Gerald Stephens after
6     2000?
7  A.  Yes.
8  Q.  What were the differences?
9  A.  I was supervising more students than I was
10    career.  I wasn't supervising any career until
11    here probably the last three or four years when
12    they put a full-time man regular out at my
13    station.
14 Q.  When did you start supervising a career?
15 A.  Probably about 2004 or '5, somewhere around
16    there.
17 Q.  Well, at that point was there any difference in
18    what you were doing from Lieutenant Stephens?
19 A.  No.
20 Q.  The entire time that you were a team leader that
21    he was a lieutenant, was there any difference in
22    what the two of y'all did?
23 A.  Yes.

Page 30

1  Q.  What was the differences?
2  A.  He could supervise regular full-time
3     firefighters and I couldn't.
4  Q.  That's the only difference?
5  A.  Yes, that's the difference.
6  Q.  Well, do you have any problem -- feel any
7     deficiency in supervising full-time regular --
8  A.  No.
9  Q.  I mean, are they any more difficult or less
10    difficult to supervisor than student
11    firefighters?
12 A.  No.
13 Q.  Supervision at that rank is supervision, isn't
14    it?
15 A.  Yes.
16 Q.  I mean, do student firefighters do less or more
17    than the regular firefighters?
18 A.  They probably present more of a challenge than a
19    regular firefighter.
20 Q.  So if you can supervisor a student firefighter,
21    you can probably supervise a regular
22    firefighter, can't you?
23 A.  Yes.

Page 31

1  Q.  Have you ever filed an EEOC charge against the
2     City?
3  A.  No.  This is my first one.
4  Q.  Had you filed a grievance against the City?
5  A.  No.  This is my first one.
6  Q.  Where do you currently live?
7  A.  At 106 Pioneer Drive, LaGrange, Georgia 30240.
8  Q.  And who do you live there with?
9  A.  My wife.
10 Q.  And what is her name?
11 A.  Marzilla.  That's M-A-R-Z-I-L-L-A.
12 Q.  And is that your only wife?
13 A.  Yes.
14 Q.  Don't have any ex's?
15 A.  No.
16 Q.  Do you have any relatives by blood or marriage
17    that live in Lee County?
18 A.  Yes.
19 Q.  Who are they?
20 A.  My mother.
21 Q.  And what's her name?
22 A.  Emma, E-M-M-A, Ogletree.
23 Q.  And where does Emma live?

Page 32

1  A.  She stays out in Loachapoka.
2  Q.  Is she employed?
3  A.  She retired.
4  Q.  Where did she retire from?
5  A.  University.  Auburn University.
6  Q.  What did she do at Auburn?
7  A.  She was housekeeping.  She worked in
8     housekeeping.
9  Q.  Any other relatives in Lee County?
10 A.  Yes.
11 Q.  All right.
12 A.  Catherine Calloway.
13 Q.  Who is she?
14 A.  My sister.
15 Q.  Where does she live?
16 A.  In Loachapoka.
17 Q.  Who is she married to?
18 A.  Earnest Calloway.
19 Q.  What's her employment?
20 A.  She does home care.
21 Q.  And what's his employment?
22 A.  He's retired.
23 Q.  From where?

Page 33

1   A.   Southern Stone.
2   Q.   Do they have any children over the age of, say,
3        18, that live in Lee County or --
4   A.   A daughter.
5   Q.   What's her daughter's name?
6   A.   Earnestine.
7   Q.   Calloway?
8   A.   Yes.
9   Q.   And how old is she?
10   A.   About 34 or 35, somewhere along there.
11   Q.   And where does she live?
12   A.   She stays in Loachapoka also.
13   Q.   Where is she employed?
14   A.   She works at Wal-Mart in Tallassee, Alabama.
15   Q.   Any other relatives in Lee County?
16   A.   Yes. Marjorie Dowdell.
17   Q.   Who is she?
18   A.   My sister.
19   Q.   Where does she live?
20   A.   In Loachapoka.
21   Q.   Who is she married to?
22   A.   Arthur Dowdell.
23   Q.   What does Marjorie do?

Page 34

1   A.   She works for Loachapoka High School.
2   Q.   What does Arthur do?
3   A.   He cooks at the athletic Sewell Hall for
4        athletes at Auburn University.
5   Q.   Do they have any children over 18?
6   A.   Yes.
7   Q.   What are their names?
8   A.   Arthur Dowdell, Jr.
9   Q.   How old is he?
10   A.   He's about 37.
11   Q.   And what does he do?
12   A.   He works at Bruno's, I think, down here in
13        Montgomery.
14   Q.   Any other children they have over 18?
15   A.   Yes. Kim. Well, she doesn't live -- you can
16        strike her. She's out in Colorado.
17        Faye.
18   Q.   Where does she live?
19   A.   She stays in Loachapoka.
20   Q.   How old is he?
21   A.   She's probably 20.
22   Q.   What does she do?
23   A.   She goes to Southern Union.

Page 35

1   Q.   Any other relatives in Lee County?
2   A.   Not in Lee. Well, yeah. I've got some first
3        cousins.
4   Q.   I'll send an interrogatory on that.
5        Do you have any relatives in Chambers
6        County?
7   A.   By marriage.
8   Q.   Who are they? Is that where your wife is from?
9   A.   Yes.
10   Q.   What is her maiden name?
11   A.   Barrow, B-A-R-R-O-W.
12   Q.   Are her parents still alive?
13   A.   Yes.
14   Q.   Do they live in Chambers County?
15   A.   Yes.
16   Q.   Has she got brothers and sisters in Chambers
17        County?
18   A.   Yes.
19   Q.   What are her parents' names?
20   A.   Walter and Velma Barrow.
21   Q.   Are they employed?
22   A.   Retired.
23   Q.   Walter, what did he retire from?

Page 36

1   A.   He had his own business. He runs an auto
2        mechanic shop.
3   Q.   And Velma?
4   A.   Yeah. She retired from Piggly Wiggly.
5   Q.   Has your wife got brothers and sisters in
6        Chambers County?
7   A.   Yeah.
8   Q.   How many?
9   A.   She got two brothers and one sister.
10   Q.   Just give me the brothers' names?
11   A.   Walter, Jr. and Keith.
12   Q.   And then the sister?
13   A.   Velma.
14   Q.   What's her last name?
15   A.   I'm trying to think of her husband's name.
16        Canada, C-A-N-A-D-A.
17   Q.   Have you got any relatives in Macon County?
18   A.   Yes, sir. A brother.
19   Q.   What's his name?
20   A.   Alfred.
21   Q.   Ogletree?
22   A.   Yes.
23   Q.   And where is he employed?

Page 37

1   A.  Rubber Plant, Mitchell.
2   Q.  Is he married?
3   A.  Yes.
4   Q.  And what's her name?
5   A.  Gail.
6   Q.  What's her maiden name?
7   A.  Kendall.
8   Q.  Where is she employed?
9   A.  She works for a guy that runs a private
10      company.  I don't know exactly what she does.
11  Q.  Do they have any children over the age of 18
12      that live --
13  A.  Yes.
14  Q.  How many?
15  A.  One.
16  Q.  What's his or her name?
17  A.  Her name.  Let me see what her name -- Ashley.
18  Q.  How old is Ashley?
19  A.  She's 19, I believe.
20  Q.  And she goes to school?
21  A.  Yes.  She will be going to West Georgia College
22      in the fall.  She just finished up in Pensacola.
23  Q.  Do you have any relatives by blood or marriage

Page 38

1       in Randolph County?
2   A.  No.
3   Q.  Do you have any relatives by blood or marriage
4       in Russell County?
5   A.  No.
6   Q.  Do you have any relatives by blood or marriage
7       in Tallapoosa County?
8   A.  No.
9   Q.  Are you a member or have you been a member of a
10      church or any civic, social, political clubs,
11      organizations in Lee County?
12  A.  Yes.  I belong to a fraternity, but I'm
13      inactive.
14  Q.  What fraternity?
15  A.  Phi Beta Sigma.
16  Q.  Is that a social fraternity?
17  A.  Uh-huh (positive response).
18  Q.  Yes?
19  A.  Yes.
20  Q.  Have you ever lived in Lee County?
21  A.  Yes.
22  Q.  When did you live there?
23  A.  Probably -- It's been about 20 years.

Page 39

1   Q.  Have you been in Georgia for 20 years?
2   A.  No.  I've been -- Yeah, close to it.  Close to
3       it.
4   Q.  Were you a member or did you attend a church
5       when you were in Lee County?
6   A.  Cluster (phonetic).  I still got a church down
7       in Cluster, a Baptist church.
8   Q.  Are you a member of a church or any clubs or
9       civic organizations in any of the following
10      counties:  Chambers?
11  A.  No.
12  Q.  Macon?
13  A.  No.
14  Q.  Randolph?
15  A.  No.
16  Q.  Russell?
17  A.  No.
18  Q.  Tallapoosa?
19  A.  No.
20  Q.  Other than this lawsuit, have you been a
21      plaintiff in any other lawsuits?
22  A.  No.
23  Q.  Have you ever been sued for anything?

Page 40

1   A.  No.
2   Q.  Have you ever given a deposition before?
3   A.  No.  Never given a deposition.
4   Q.  Have you ever been arrested for anything?
5   A.  Yes.  I missed a court date.
6   Q.  When was that?
7   A.  It was about 25 years ago.
8   Q.  Have you ever been convicted of anything?
9   A.  No.
10  Q.  Have you ever made any other discrimination
11      claims against anybody?
12  A.  No.
13  Q.  You've been with the City since 1984?
14  A.  Yes.
15  Q.  And you've been a regular firefighter the whole
16      time?
17  A.  Yes.  When I was hired, they didn't have the
18      student program.
19  Q.  You never were --
20          What did you do before that?  What year were
21      you born?
22  A.  1959.
23  Q.  Are you a veteran?

Page 41

1   A.  No.
2   Q.  What did you do before you joined the Auburn
3        Fire Department?
4   A.  I worked with Allen McCord.  He used to work at
5        the fire department.  He retired now.  I
6        attended school.  I attended Southern Union a
7        couple of years, and I attended the University
8        of North Alabama a couple of semesters.  And I
9        came down to Auburn and attended there for about
10       a year.
11  Q.  You went to Southern --
12  A.  Southern Union.
13  Q.  Where is it located?
14  A.  It was in Wadley, Alabama.  Still in Wadley,
15       Alabama.  They got a campus in Opelika now.
16  Q.  But you went to the Whatley campus?
17  A.  Uh-huh (positive response).
18  Q.  Yes?
19           MR. HORSLEY:  It's Wadley,
20           W-A-D-L-E-Y.
21  Q.  And then you went where in north Alabama?
22  A.  University of North Alabama.
23  Q.  Did you graduate from there?

Page 42

1   A.  No.
2   Q.  What was your course of study?
3   A.  Sociology and psychology.
4   Q.  How long did you go?
5   A.  I got about three years in.  I came back to
6        Auburn and did a year.  So I got about three,
7        three-and-a-half years in.
8   Q.  So you were a senior?
9   A.  Yeah.  I was close to being a senior.
10  Q.  Where did you graduate from high school?
11  A.  Loachapoka.
12  Q.  What year?
13  A.  1977.
14  Q.  And then you say you attended Auburn University?
15  A.  I attended Southern Union first.  Yeah, I
16       attended Auburn University.
17  Q.  When you came back from north Alabama, where did
18       you go?
19  A.  Auburn University.
20  Q.  How long were you at Auburn?
21  A.  A year.
22  Q.  What years were you there?
23  A.  '80, '81, I believe.

Page 43

1   Q.  Did you get a degree?
2   A.  No.
3   Q.  What was your course of study at Auburn?
4   A.  Same:  Social and psychology.
5   Q.  How close were you to graduating?
6   A.  I probably got about 60 to 80 hours to go.
7   Q.  Six to eight?
8   A.  Sixty to eighty.  No, not six to eight.
9   Q.  You applied for -- You said you were promoted to
10       team leader in June of '96?
11  A.  Yes.
12  Q.  From June of '96 up until, what, February of
13       '06, did you apply for a promotion to any other
14       ranks in the Auburn Fire Department?
15  A.  No.
16  Q.  I think before you were promoted to team leader,
17       Gerald Stephens had been promoted to lieutenant;
18       is that correct?
19  A.  Yes.  He was promoted in May -- April of '96,
20       and I was promoted in June of '96.
21  Q.  Did you apply for the promotion to lieutenant?
22  A.  No, I did not.
23  Q.  Why not?

Page 44

1   A.  I had -- I think at the time I had already put
2        in for the team leader.  But they had -- they
3        did the lieutenants assessment before they
4        did ...
5   Q.  But you would have been eligible to have applied
6        for lieutenant?
7   A.  Yes, I would have.
8   Q.  And then I think sometime -- I'm not sure what
9        year -- sometime around '96 there was a captains
10       promotion.
11  A.  Yes.  I don't know if it was '96.  It was
12       somewhere around there because it was -- the
13       other four black guys that were working there at
14       the time, they were involved in litigation
15       against the City.  And they promoted Gerald and
16       they promoted me right after that settlement.
17  Q.  Who were the other four?
18  A.  There was Lieutenant Jessie Strickland,
19       Lieutenant Bill Felton, Lieutenant Dexter Card,
20       and Chris Turner -- Firefighter Chris Turner.
21       And they were involved in litigation about the
22       captains promotion.
23  Q.  About the captains promotion?

Page 45

1   A.  Yes.
2   Q.  Do you remember what that litigation was about?
3   A.  Basically the same thing:  About blacks being
4       looked over for promotion.
5   Q.  And do you know how that litigation resolved?
6   A.  It was settled with them.
7   Q.  With them what?
8   A.  I don't know exact settlement.  All I know is
9       Jessie and Bill and Dexter went home, and they
10      settled it with them.
11  Q.  Have you talked to Jessie Strickland about the
12      terms of the settlement or anything that he
13      received in the settlement?
14  A.  Not about the terms.
15  Q.  Did he tell you anything he received in the
16      settlement?
17  A.  No.
18  Q.  How about Bill Felton?
19  A.  No.
20  Q.  Did you talk to him about the terms of the
21      settlement?
22  A.  No.  I haven't even talked to him period.
23  Q.  Did he tell you anything he may have received in

Page 46

1       the settlement?
2   A.  No.
3   Q.  How about Dexter Card?  Did you talk to him
4       about the settlement?
5   A.  No.  Haven't talked or seen him since he left.
6   Q.  You don't know what he may have received as part
7       of the settlement?
8   A.  No.
9   Q.  And Chris Turner, did you talk to him as
10      part of -- what his part --
11  A.  No.  He hadn't told us.
12  Q.  Do you know anything he may have received with
13      any settlement with the City?
14  A.  No.
15  Q.  Well, whenever the captains -- last captains
16      promotion was, sometime around '96, did you sit
17      for that promotion?
18  A.  No, I didn't.
19  Q.  Well --
20  A.  I wouldn't have been able to sit for that
21      promotion because at that time, unless you was
22      the right person, I guess -- Chief Langley went
23      from firefighter to captain, but it used to be

Page 47

1       you had to hold one rank before you could move
2       up to the next rank and the next rank.
3   Q.  Well --
4   A.  They would have laughed me out of there.
5   Q.  Why would they have laughed you out?
6   A.  They wouldn't have let me sit for it because I
7       was a firefighter.  I hadn't been promoted to
8       anything yet.
9   Q.  Well, was the last captains promotion open for
10      firefighters to sit?
11  A.  No.
12  Q.  You had to be a lieutenant?
13  A.  Yes.
14  Q.  When was the promotion to captain that you're
15      talking about Captain Langley, when he went from
16      firefighter?  Was it before the last one?
17  A.  Yes, it was before the last one.
18  Q.  Well, was that part of a settlement --
19  A.  No.
20  Q.  -- that anybody could sit for it?
21  A.  I don't know how it happened, but it happened.
22  Q.  Well, did you sit for the one that Langley sat
23      for?

Page 48

1   A.  He didn't sit for any.  They just come got him
2       and made him captain.
3   Q.  Before the February of '06 battalion chief exam,
4       there were no other captain exams that you
5       remember other than the one that was sometime
6       around '96?
7   A.  Yes.
8   Q.  Is that correct what I said?
9   A.  That's correct.
10  Q.  And then there was a long period of time when
11      there was no lieutenant exams given?
12  A.  Yes.  They just started -- They didn't promote
13      any more lieutenants after '96.  Gerald was the
14      last one.  It was two left.  It was Gerald and
15      Andrew Terry Langley.  He was there.  He was
16      ahead of Gerald.  He was a senior lieutenant at
17      the time, and he retired and then Gerald became
18      a senior lieutenant.
19  Q.  Well --
20  A.  They started promoting team leaders.
21  Q.  And is it your testimony that the last
22      lieutenant exam, the one that Gerald sat for,
23      that there was both a seniority and a time in

Page 49

1    grade requirement?
2    A. I'm going to elaborate on that. When that
3    litigation was going on -- I'm not saying Gerald
4    is not qualified, but he was black first.
5    That's why they promoted him, because they had
6    been exposed about how they were treating us
7    down there and how they were promoting us. I'm
8    talking about minorities, African-Americans.
9    And then they went right on -- In the complaint
10    they complained about it not being any black
11    team leaders. They went right on and promoted
12    me after they promoted Gerald, and we have --
13    and they hadn't promoted a minority since -- an
14    African-American since then.
15    Q. Well, are you saying you were promoted to team
16    leader because you were black?
17    A. I didn't say I wasn't qualified, but yes.
18    Q. And Gerald was promoted to lieutenant because he
19    was black?
20    A. Yes.
21    Q. Well, has there ever been another
22    African-American or black who sat for team
23    leader other than Chris Turner?

Page 50

1    A. No. There's no -- It's never been over seven or
2    eight that worked there at one time, and it's
3    not been over three worked there in the last --
4    full-time firefighters where they could have sat
5    for anything in the last twelve years. Chief
6    Langley had made it known to me that he was
7    intending to hire some minorities. He said, I
8    know I need to hire some blacks; I know I need
9    to hire some blacks. When the opportunity
10    presented itself with two qualified guys --
11    that's Jeremy Patterson and William Thompkins --
12    he didn't hire them. And they were from the
13    student program.
14    Q. Okay. I'm going to get to those in a minute,
15    but let me ask you this, Mr. Ogletree.
16    Since the court order that you've told me
17    about with Dexter and Jessie and Bill, has any
18    test or any promotion procedure at the fire
19    department required seniority or time in grade
20    since the settlement of those claims that they
21    made?
22    A. Let me see. I guess that battalion chief
23    promotion did because I guess that's how they

Page 51

1    got it: Dean Garrett, Johnny Lawrence, Danny
2    Leverette, and the late Jimmy Brown, because --
3    All I know is Chief Garrett was my boss, he
4    went up the hill one day with two bars on and he
5    came back with three and said, call me chief
6    now. And to me that's a promotion, because they
7    take the same thing and turn around and tried to
8    test me for it when they gave it to them.
9    Q. And that was when?
10    A. That was in 2005, I believe. Yeah, about 2004
11    or 2005. I'm not sure on that date.
12    Q. And when that occurred, there were no more
13    captains, were there?
14    A. No.
15    Q. And I think I've asked you this, but just for
16    the record, you didn't file an EEOC claim or
17    lawsuit over that?
18    A. No. That's kind of part of this.
19    Q. Well, what is that part of this?
20    A. Because of the inconsistency. Test today,
21    interview tomorrow, somebody get gave a
22    promotion the next day.
23    Q. Somebody what?

Page 52

1    A. Get gave a promotion the next week. And
2    coincidentally ain't nothing happened for
3    African-Americans down there. And I know I'm
4    qualified, and I do my job.
5    Q. Well, is there anybody that you know that sat
6    for the battalion chief promotion in '06 that
7    didn't think he was qualified?
8    MR. HORSLEY: Object to the form.
9    A. Yeah, I can't say. I can't ...
10    Q. Is there anybody that sat for that promotion in
11    February of '06 that didn't think he did his
12    job?
13    MR. HORSLEY: Object to the form.
14    A. I don't know that either.
15    Q. Do you agree with me that there has to be some
16    procedure in place to decide who gets promoted?
17    A. That's the key word: Some procedure.
18    Q. You agree with me, right?
19    A. Some procedure, yes.
20    Q. And do you agree with me that that procedure is
21    a responsibility of the City of Auburn?
22    A. I don't know if I would agree with that.
23    Q. Who should make the decision as to the

|  | Page 53 |
|---|---|
| 1 | procedure? |
| 2 | A.  Probably I would think that the men should have |
| 3 | a lot of input because we do the jobs every day. |
| 4 | Q.  So the folks that are -- the firefighters -- |
| 5 | A.  Yes. |
| 6 | Q.  -- should decide what the procedure is for |
| 7 | promotion? |
| 8 | A.  Collectively, and send some up and -- I know |
| 9 | they would have the final say, but they should |
| 10 | have more input than they do. |
| 11 | Q.  Do you know of any fire department where the men |
| 12 | have the say-so as to who gets promoted? |
| 13 | A.  I can't answer that. |
| 14 | Q.  Well -- |
| 15 | A.  I do know one thing, though:  The way they |
| 16 | tested us was unfair and discriminatory. |
| 17 | Q.  Because you didn't -- |
| 18 | A.  No.  I talked to Mr. Lamar about it before.  I |
| 19 | was concerned about the test before he gave it, |
| 20 | if he recall, and he say don't worry about it; |
| 21 | you'll pass.  Chief Garrett had said they had |
| 22 | went through it and seen some of the questions |
| 23 | and had helped with the test.  I was concerned |

|  | Page 54 |
|---|---|
| 1 | because they were battalion chiefs, and they |
| 2 | didn't take the test.  And I had been seeing too |
| 3 | much of this over the years.  I'm not a |
| 4 | complainer, but when something is wrong, it's |
| 5 | wrong. |
| 6 | Q.  You've seen too much of what over the years? |
| 7 | A.  Discrepancies in promotional procedures.  People |
| 8 | getting jobs that are not even being posted. |
| 9 | People go in and sit and interview and get a |
| 10 | job. |
| 11 | Q.  What promotions have there been when it wasn't |
| 12 | posted? |
| 13 | A.  Training chief in 2005.  That's when Lieutenant |
| 14 | Stephens filed that grievance. |
| 15 | Q.  Did you file a grievance? |
| 16 | A.  No. |
| 17 | Q.  Any other promotions that weren't, in your |
| 18 | opinion, posted? |
| 19 | A.  The battalion chief for Chief Garrett -- Chief |
| 20 | Leverette. |
| 21 | Q.  When the captains became battalion chiefs? |
| 22 | A.  It's a promotion to me. |
| 23 | Q.  Well, did you consider the team leader to |

|  | Page 55 |
|---|---|
| 1 | lieutenant to be a promotion? |
| 2 | A.  Yes, I did. |
| 3 | Q.  Was that posted? |
| 4 | A.  No.  It was petitioned, but it wasn't posted. |
| 5 | Q.  Who is Jeremy Patterson and William Thompkins? |
| 6 | You said they were -- |
| 7 | A.  They were in the student program.  They had been |
| 8 | the only two African-Americans besides one there, |
| 9 | and his name was Owny (phonetic), and he had |
| 10 | disciplinary problems.  I think he had gotten |
| 11 | into some trouble so he got fired. |
| 12 | Q.  When was Jeremy Patterson there? |
| 13 | A.  I want to say between 2003 and 2006 I believe |
| 14 | they were there, both of them. |
| 15 | Q.  And when was William Thompkins there? |
| 16 | A.  About the same time. |
| 17 | Q.  And why wasn't Patterson hired? |
| 18 | A.  I have no idea.  I wasn't privy to that |
| 19 | information.  I knew he did apply for a job. |
| 20 | Q.  Did he talk to you about why he wasn't hired? |
| 21 | A.  He thought it was because he was black. |
| 22 | Q.  Did he file a complaint or lawsuit or anything? |
| 23 | A.  No.  He went on and got his engineering degree |

|  | Page 56 |
|---|---|
| 1 | and is working now.  William Thompkins thought |
| 2 | the same thing. |
| 3 | Q.  Thought he was black? |
| 4 | A.  Because he was black.  These guys were under my |
| 5 | immediate supervision for one time.  They |
| 6 | confided a lot in me, you know. |
| 7 | Q.  Have there been any white student firefighters |
| 8 | that weren't hired? |
| 9 | A.  I'm not concerned about that.  I -- |
| 10 | Q.  I'm asking you that because it's really easy to |
| 11 | say I didn't get hired because I'm black.  You |
| 12 | can't say -- You tell me:  Are there any white |
| 13 | firefighter students that didn't get hired? |
| 14 | A.  Yes. |
| 15 | Q.  Did they not get hired because they were white? |
| 16 |     MR. HORSLEY:  Object to the form. |
| 17 | A.  I don't know, but I know the ratio of the hiring |
| 18 | to minorities to the white students is |
| 19 | overwhelming.  It's about 95, 96 to one. |
| 20 | Q.  But you got hired? |
| 21 | A.  And I was told that I'm hiring you because |
| 22 | you're black. |
| 23 | Q.  Who told you that? |

Page 57

1    A.  Chief Ellis Mitchell.  Before the federal
2         government tells me to hire some more blacks,
3         I'm hiring you.  He was proactive about the
4         situation.
5    Q.  Have you talked to Thompkins or Patterson --
6    A.  I haven't talked to Patterson.  I communicate
7         with Thompkins.  All of us are frat brothers --
8         fraternity brothers, but I just talk to him
9         about his job.  He calls me from time to time.
10   Q.  Where is he working now?
11   A.  He's in the Atlanta area.
12   Q.  Have you talked to Chief Langley about why
13        either one wasn't hired?
14   A.  No.  Chief Langley -- The only thing Chief
15        Langley used to tell me was I know I need to
16        hire some blacks, and we didn't have much
17        conversation.
18   Q.  When did you first learn about the battalion
19        chief promotion?
20   A.  They sent a letter out.  You have it, the same
21        letter you showed Gerald.
22   Q.  First of all, I'm going to show you what was
23        marked as Defendant's Exhibit Number 1 to

Page 58

1         Gerald's deposition.  That's the posted notice,
2         and it was posted, I think, February 16, 2006.
3              Did you see that when it went up?
4    A.  Yes, I did.
5    Q.  Did you see it about February 16?
6    A.  Somewhere around there.
7    Q.  Within a day or two?
8    A.  Uh-huh (positive response).
9    Q.  Yes?
10   A.  Yes, sir.
11   Q.  So you knew at that time there would be a
12        promotion procedure?
13   A.  Yes.
14   Q.  And Gerald said something about e-mails.  Do you
15        get e-mails?
16   A.  Yes.  We can read the City -- That's how we
17        communicate.
18   Q.  So did this come out -- this Number 1, did this
19        come out on an e-mail?
20   A.  I don't know if it came out on e-mail.  It
21        probably did, but I got mine from the chief.
22   Q.  The chief handed you one?
23   A.  Yeah, I got it.

Page 59

1    Q.  Which chief?
2    A.  Chief Langley.
3    Q.  Did you have any conversation with him when he
4         gave it to you?
5    A.  I might have -- I probably spoke to him.  I know
6         I spoke to him about the test I just said, you
7         know, because they was talking about giving a
8         test then because Chief Garrett had talked to me
9         about they were going over questions, and that
10        was my immediate supervisor.
11   Q.  So even before you got Defendant's Exhibit
12        Number 1, the notice, you had talked to Chief
13        Garrett --
14   A.  And he had said they had been working on a test
15        for battalion chief.
16   Q.  Did you ask him what was the test about or how
17        was it or what was he --
18   A.  He just said they threw out some questions.
19        They looked at some questions and determined
20        some questions that were good for the test and
21        all that.  And he made the statement to me that
22        he didn't think it was fair to us older guys
23        because it give the younger guys fresh out of

Page 60

1         college a better chance.
2    Q.  Dean Garrett told you that he did not think it
3         was fair to the older guys?
4    A.  Yeah.  He said he discussed this with Chief
5         Langley.
6    Q.  Well, what was there about it that he didn't
7         think was fair?
8    A.  Just the fact that they were testing us on that
9         type of material for the job, I guess.  That's
10        what I took it to mean.  And that you had guys
11        that were working on their master's degrees
12        where I hadn't picked up a book and studied like
13        that for years, that they probably were going to
14        have an advantage going in where I had to pick
15        up a book and start studying from that point of
16        getting the books and material and going
17        forward.
18   Q.  Well, he didn't say he didn't think it was going
19        to be fair to blacks.  He said he didn't think
20        it was going to be fair to the older guys?
21   A.  He said he didn't think it would be fair to the
22        older guys.
23   Q.  Who else was taking it that would be considered

Page 61

1    an older guy?
2    A.  I guess he was talking about myself, Horace
3        Clanton, Robbie Hodge, Gerald Stephens.
4    Q.  And Clanton and Hodge are white males?
5    A.  Yes.
6    Q.  Any other conversations you had with Dean
7        Garrett about the test other --
8    A.  I was concerned that he had seen some of the
9        questions.  I didn't say it to him, but I was
10       like, I thought they were going to order the
11       test from somebody.
12   Q.  Well, do you know for a fact whether he saw
13       questions that were actually --
14   A.  That was him telling me.  I can't verify that.
15   Q.  And you didn't tell him you were concerned that
16       he saw the questions?
17   A.  I didn't say it to him.  No, I didn't.
18   Q.  What else did y'all actually discuss other than
19       you said he told you he had looked at some of
20       the questions, and he didn't think it was going
21       to be fair to the older guys?
22   A.  That was about it.
23   Q.  And then Chief Langley gives you Defendant's

Page 62

1        Exhibit Number 1?
2    A.  Yes.
3    Q.  And did you have any conversation with him about
4        the procedure at that point?
5    A.  No, I didn't.
6    Q.  I assume you received this memo, Defendant's
7        Exhibit Number 2, which is dated February 17
8        that tells you who can be eligible and that a
9        written exam will be part of the assessment
10       process.  Did you receive that?
11   A.  Yes.
12   Q.  And was that e-mailed to you or posted?
13   A.  I think I got mine e-mailed.
14   Q.  Does it come e-mail to your house?
15   A.  Everybody got e-mail, and they just click -- all
16       the officers, and they just click on the
17       computer.
18   Q.  So you would have probably received that
19       February 17 --
20   A.  Yeah.  If I was on duty.
21   Q.  If you weren't on duty, the next time --
22   A.  The next day, yeah.
23   Q.  At that point did you make any complaints to

Page 63

1    anybody about the written test?
2    A.  No.  It was about 30 days later when I went to
3        pick up my books, 30-something days later.  I
4        just mentioned it to Chief Lamar there that -- I
5        said, a test, you know.  It just kind of like --
6        You know, it bothered me.
7    Q.  Well, I'm going to get to that.  But as a result
8        of this February 17, 2006 Defendant's Exhibit
9        Number 2, did you make any complaints to anybody
10       about having to take a written test?
11   A.  No.  We talked -- It was two or three of us
12       talked among ourselves, the other older guys:
13       Horace Clanton, Robbie Hodge.
14   Q.  And y'all didn't want to take a written test?
15   A.  We just didn't think it was right.
16   Q.  Y'all probably wanted it to be seniority, didn't
17       you?
18   A.  Not just necessarily seniority, but if you're
19       going to give a written test, let it count for a
20       certain percentage and let you move on to the
21       next phase.  My particular thing is that cutoff
22       score that the City imposed.
23   Q.  Do you think it's too high or too low?

Page 64

1    A.  That's the first time they ever gave a test with
2        a cutoff score.
3    Q.  How do you know the City imposed that?
4    A.  I got paperwork that says it imposed it.
5    Q.  What do you think the cutoff score should have
6        been?
7            MR. HORSLEY:  Object to the form.
8    A.  I have no idea.  That's something they had to
9        have experts determine.
10   Q.  Well, do you know whether or not the City had
11       any expert to determine the cutoff score?
12   A.  Thirty days.
13   Q.  What?
14   A.  No.  I don't believe they did.
15   Q.  Why don't you believe that?
16   A.  Because it plainly states in our grievance
17       hearing that the City chose to impose a 70,
18       which is the cutoff score.
19   Q.  Do you know Mr. Hancock here down at the end of
20       the table?
21   A.  Yes, I do.
22   Q.  Have you had any conversations with Mr. Hancock
23       about the cutoff score?

Page 65

1   A.  No, I haven't.
2   Q.  Have you had any conversations with Mr. Hancock
3       about who came up with the 70 percent figure?
4   A.  No.
5   Q.  Have you had any conversations with him about
6       who imposed the cutoff?
7   A.  No.
8   Q.  Let me show you Defendant's Exhibit Number 3,
9       which is a memo dated February 23, 2006 that
10      opened it up to others that were not
11      non-probationary lieutenants.
12  A.  Yes.  That's about the time.
13  Q.  And you would have received that on or about
14      February 23, 2006?
15  A.  Yes.
16  Q.  And did you make any complaints to anybody about
17      that?
18  A.  No.  It kind of struck me that -- Probationary
19      lieutenants, that kind of struck me, because the
20      City policy states that probationary employees
21      in the fire department can't be eligible for a
22      promotion within a year.
23  Q.  Back up.

Page 66

1       The City policy says what?
2   A.  That -- In the fire and the police department,
3       that if you work for them and you go from one
4       rank to the next, you can't be eligible for a
5       promotion until after you complete that -- you
6       have to do a year in that promotion step to be
7       able to apply for the next promotion.  Now, the
8       fire department policy I guess states another
9       thing, but the City policy states what I just
10      told you.
11  Q.  So according to the City policy, in order to
12      apply for promotion, as you understand it, to
13      battalion chief, you would have had to have been
14      in what position for a year?
15  A.  Lieutenant's position for a year.
16  Q.  Were you in the lieutenant's position for a
17      year?
18  A.  No.  That's why I was satisfied with the team
19      leader.  I was eligible as team leader.
20  Q.  Well, was there anybody -- a team leader or
21      lieutenant that had not been there for a year?
22  A.  All of us had been there for a year, but we went
23      from team leader to lieutenant.

Page 67

1   Q.  That's my question.  Are you saying only people
2       who had been lieutenants for a year should have
3       been eligible for battalion chief?
4   A.  It's not me saying it.  That's City policy.
5   Q.  And you agree with the City policy is what
6       you're saying?
7           MR. HORSLEY:  Object to the form.
8   A.  I work for the City.  I just work --
9   Q.  Here's where I'm confused.  Are you saying you
10      should or should have not been eligible?
11  A.  If those guys were eligible, I should have been.
12  Q.  I'm not asking about those guys.
13  A.  Yeah, I was eligible.
14  Q.  Why were you eligible?
15  A.  I wasn't eligible according to the City policy.
16  Q.  You were not?
17  A.  But I was eligible according to this memo from
18      Chief Langley.
19  Q.  All right.  You were not eligible to apply for
20      battalion chief per City policy?
21  A.  Yeah.
22  Q.  And why is that, because you had not been a
23      lieutenant for a year?

Page 68

1   A.  City policy states if you work for the fire
2       department or police department and you go from
3       one position to the next that you can't be
4       eligible for a promotion to within a year's
5       period.
6   Q.  So, then, the only two people that would have
7       been eligible for promotion to battalion chief
8       would have been Gerald Stephens and Chris
9       Turner?  Is that your position?
10  A.  Yes.
11          MR. HORSLEY:  Is this a decent time
12      for a break?
13          MR. MORGAN:  Sure.
14          (Brief recess.)
15  Q.  (Continuing by Mr. Morgan)  Let me show you
16      Defendant's Exhibit Number 4, which I think is
17      the sign-in sheet for the orientation.  Did you
18      attend the orientation?
19  A.  Yes, I did.
20  Q.  Who was present?
21  A.  It was all of these guys except -- I think just
22      about everybody was present that signed off on
23      here.

Deposition of Eddie Ogletree

June 6, 2008

Page 69

1    MR. HANCOCK: Randall, let me
2        interrupt. The exhibits you're
3        referring to, are those the
4        exhibits to Mr. Stephens'
5        deposition?
6    MR. MORGAN: They are.
7    MR. HANCOCK: Are you going to attach
8        those to this or do you want to
9        have one set?
10   MR. MORGAN: My intention was to just
11       keep the same numbers going.
12   MR. HANCOCK: I just --
13   MR. MORGAN: I don't see any need to
14       renumber and put extra exhibits in
15       there.
16   MR. HANCOCK: Okay.
17   MR. HORSLEY: I agree.
18   Q.  Who was there --
19   A.  Dennis might have not been there, because he
20       didn't take the test.
21   Q.  Who was there to explain what was going on or
22       what was going to happen?
23   A.  I don't remember the guy's name, but he got up

Page 70

1        on stage. And I believe Mr. Reeves was there
2        and Chief Lamar was there.
3    Q.  The guy that got up on stage --
4    A.  He was a representative from CWH.
5            (Off-the-record discussion.)
6    Q.  How long did the orientation session last?
7    A.  I want to say about an hour. You could give or
8        take.
9    Q.  And what do you remember Steve Reeves saying?
10   A.  I believe he just passed out some things for us,
11       and they got our signature. Took up our
12       signature. And the guy from CWH kind of took
13       the show and started explaining the different
14       parts of the test and thing.
15   Q.  And then what do you remember Lee Lamar saying
16       or doing?
17   A.  I can't remember if he did anything or said
18       anything.
19   Q.  And the guy from CWH I guess explained the
20       assessment process?
21   A.  Yeah, that's what he did.
22   Q.  And did he explain the written test?
23   A.  Yes. He went through some parts of it and how

Page 71

1        it worked, you know. That's all I remember him
2        doing.
3    Q.  Did he tell you there would be a cutoff score?
4    A.  Not to my knowledge.
5    Q.  When did you learn there would be a cutoff
6        score?
7    A.  I think Mr. Lamar told me that it would be --
8        you would have to make a 70. I'm not sure when
9        it was.
10   Q.  Was it before or after this orientation?
11   A.  I don't know if it was before or after. I can't
12       really recall.
13   Q.  Well, did the guy that was from CWH --
14       I assume you don't remember his name?
15   A.  No, I don't.
16   Q.  -- did he indicate to you that certain people
17       would not be allowed to go to the second part of
18       the procedure?
19   A.  Not to my knowledge.
20   Q.  What do you remember him telling you about the
21       written test?
22   A.  He just explained the different components and
23       how they go about making the test. He told us

Page 72

1        about the company. I kind of -- it kind of -- I
2        mentioned it to one of the guys when we left.
3        It looked like to me he was up there touting his
4        own successes more than really trying to fill us
5        in on anything.
6    Q.  Well, did he tell you what procedure had been
7        used to come up with the written test?
8    A.  He might have. I can't say if he did or didn't.
9    Q.  And did he tell you what the next part of the
10       test was after the written part?
11   A.  No, he didn't. Chief Lamar and them had said it
12       was the assessment part. I knew it was an
13       assessment part because everybody that's
14       there -- every guy promoted was familiar with
15       in-baskets because we did that in the structured
16       interviews. It was more like hands-on,
17       job-related stuff that you did every day.
18   Q.  So let me be clear. Was it your understanding
19       that you would take a written test --
20   A.  Yeah.
21   Q.  -- and then --
22   A.  Assessment.
23   Q.  But your testimony is that you didn't understand

Page 73

1    that not everybody would get to go to the
2    assessment part?
3    A.  I didn't know when I learned of the 70.  I can't
4        say --
5    Q.  It could have been before or it could have been
6        after?
7    A.  That's right.
8    Q.  You certainly knew it by the time you took the
9        test?
10   A.  Yeah, I knew it by the time I took it.
11   Q.  Defendant's Exhibit Number 5, it says Auburn
12       Fire Division Orientation Manual, Promotional
13       Written Test, and Assessment Center.
14           I assume you were given that at the
15       orientation session?
16   A.  Yes.
17   Q.  And who handed that out?
18   A.  I couldn't say who handed it out, but I do have
19       it.
20   Q.  And did the person from CWH go over this with
21       you?
22   A.  Yeah.  He went over -- this is what -- He went
23       over brief parts of it.  He just touched on each

Page 74

1    part of it.
2    Q.  Did he go over it page by page?
3    A.  I believe he had a slide show up there, and he
4        was punching it.  And he was going to certain
5        topics and going through -- he touched on the
6        whole book.
7    Q.  For instance, I just happened to turn to
8        strategies for taking the test.  Would he have a
9        slide up that would say strategies for taking
10       the test and have these things --
11   A.  He had some of them.  I don't know -- I can't
12       recall exactly what he did show us, but I know
13       he gave me this packet because I have it.  And
14       we went through, and he touched on different
15       topics.
16   Q.  And that book is something you were able to take
17       home with you?
18   A.  Yes.
19   Q.  Did you make any complaints that day to CWH,
20       Steve, or Lee Lamar about the procedure?
21   A.  Not the day of -- Talking about of orientation?
22   Q.  Yeah.  March 3 --
23   A.  No, I didn't.

Page 75

1    Q.  -- 2006.
2    A.  Like I said, I mentioned -- the only thing I
3        mentioned was I was concerned about it to
4        Mr. Lamar the day I signed for those books.
5    Q.  And that's going to be after this actually,
6        March 3.
7    A.  Okay.  It was after.
8    Q.  But the day when you had -- when there was the
9        orientation and you had the guy that was there
10       that was explaining the test and the assessment
11       center, Steve and Lee Lamar, you didn't make any
12       objection --
13   A.  No.
14   Q.  -- at that point about any of the process, did
15       you?
16   A.  No.
17   Q.  Now, here is a document dated -- Defendant's
18       Exhibit 6 dated March 3, 2006.  I assume you
19       remember receiving that document.
20   A.  Yes.
21   Q.  Is that another one that came out via e-mail?
22   A.  It probably did, but I know I got a copy of
23       this.  I can't say if it came --

Page 76

1    Q.  On or about March 3, 2006?
2    A.  Yes.
3    Q.  And in here it clearly states that -- I say it
4        does.  Does this tell you about a cutoff score?
5    A.  Yeah.  Minimum score of 70 must be achieved.  So
6        if I got this, I learned about it around about
7        this time.
8    Q.  You don't remember if you knew about it before,
9        but you knew about it for certain by March 3,
10       2006?
11   A.  Yeah, thereabouts.  Because if I wasn't on duty,
12       I didn't get it that day but the next day.
13   Q.  So within --
14   A.  One or two days either way.
15   Q.  So we know for certain you knew about it by
16       then?
17   A.  Yes, sir.
18   Q.  And whether you knew about it before, you just
19       can't remember?
20   A.  I don't know.
21   Q.  When you received this March 3 memo from Lee
22       Lamar, did you complain to anybody at that time
23       about the cutoff score?

Page 77

1    A.  If he gave it to me, that's the day I spoke to
2        him.  That would be around about the day I spoke
3        to him about I was concerned about taking the
4        test with the score -- the cutoff score.
5    Q.  Let's see.  This is March 3, 2006 when you
6        picked up your stuff.  This is Defendant's
7        Exhibit 7.  And then Defendant's Exhibit 8 I
8        think is where you actually signed on March 3,
9        2006 that that's when you got your stuff.
10   A.  That would have been the day I spoke with him
11       (indicating).
12   Q.  What did you say to Mr. --
13   A.  I just kind of said, a test; I don't know.  He
14       said, well, you're a smart guy; you'll pass it.
15       And I said, well, I just don't know.  And I just
16       kind of walked out and left with the books.
17   Q.  Did you say anything more definitive to him
18       than, a test; I don't know?
19   A.  I didn't say anything other than that.  He just
20       kind of acknowledged it, and I kind of
21       acknowledged it and turned around and walked
22       out.
23   Q.  So the only thing you said to him was, a test; I

Page 78

1        don't know?
2    A.  Yeah.
3    Q.  That's when you signed that you received the
4        book, and that's the day that Lee would have
5        handed you that piece of paper telling you about
6        the test?
7    A.  Yes.
8    Q.  And you said, a test; I don't know?
9    A.  Yes.
10            (Defendant's Exhibit 14 marked for
11               identification.)
12   Q.  Let me show you Defendant's Exhibit 14.  Is this
13       your application for the battalion chief
14       promotion?
15   A.  Yes.
16   Q.  I think the test was given April 10 of 2006.
17   A.  Somewhere thereabouts.
18   Q.  Tell me what you did to study for the test.
19       What did you do?
20   A.  I believe it was three or four different books.
21       I went through and read the chapters, and I
22       really put some time in.  I studied.  My wife
23       was kind of worried about me I was studying so

Page 79

1        hard at the dining room table.  You know, I seen
2        a lot of material, went over a lot of material.
3        And as I was studying, I was like, you know, a
4        lot of this stuff is for -- to me, it seemed
5        like it was for bigger departments.  And it
6        really strayed away from what we really do
7        actually day-to-day operations with all the --
8    Q.  Wait.  When you were studying, you were doing
9        what, now?
10   A.  I said I did a lot of reading, and my wife got a
11       little worried about it because I was trying to
12       study so hard and make sure I did as well as I
13       could on the test.
14   Q.  But you thought something was getting away?
15   A.  The material that we was reading, chief officers
16       and stuff, a lot of that to me seemed like it
17       was for maybe a department the size of
18       Montgomery where it had district chiefs.  You
19       know, you had a bigger rank structure.
20   Q.  Well, are these the books that you had that the
21       City gave you:  IFSTA Chief Officer?
22   A.  Yes.
23   Q.  You read that book?

Page 80

1    A.  Yeah.  I read chapters.  I didn't read all of
2        it.  I read most of it.
3    Q.  You didn't read it all, but you read most of it?
4    A.  Yes.
5    Q.  And you decided that that book didn't apply to
6        the City of Auburn?
7    A.  I didn't decide.  I said --
8            MR. HORSLEY:  Object to the form.
9    A.  I didn't decide.  I just said to myself that
10       some of this stuff looked like it was a bit much
11       for the department a size of Auburn.  That
12       didn't stop me from trying to read and
13       comprehend it.
14   Q.  What was there in the IFSTA Chief Officer book
15       that you thought was a bit much for the City of
16       Auburn?
17   A.  A lot of that was pertaining to more of a
18       district chief.
19   Q.  What's the difference in a district chief and a
20       battalion chief?
21   A.  A district chief runs an entire quadrant of a
22       city.
23   Q.  And what does a battalion chief do?

Deposition of Eddie Ogletree                                                June 6, 2008

Page 81

1   A.  Battalion chief just oversees about three to
2       four stations.  We don't have but five stations,
3       and that's what he does.  But, you know, it was
4       a lot more responsibility.
5   Q.  For who?
6   A.  A district chief has a lot more responsibility.
7   Q.  So you thought the IFSTA Chief Officer referred
8       more to a larger city and district chiefs?
9   A.  Yeah, I did.  I'm not an expert, but that's what
10      I thought.
11  Q.  Did you complain to anybody about that before
12      the written test?
13  A.  No.  I just read.  I just studied my material.
14  Q.  And did you read the Effective Supervisory
15      Practices?
16  A.  Yes.
17  Q.  Now, had you had that book before?
18  A.  Yes.
19  Q.  Where all had you had that before?
20  A.  That was a class that the City puts on and
21      requires the employees to go to that's in
22      supervisory positions.
23  Q.  You had already had that?

Page 82

1   A.  Yes.
2   Q.  And then that was another book that you were
3       given to review?
4   A.  Yes.
5   Q.  Because questions were going to come from it on
6       this test?
7   A.  Yes.
8   Q.  Was there anything about that book that you
9       didn't think applied to the battalion chief
10      promotion?
11  A.  No.  That was kind of good.
12  Q.  And did you read that whole book or just parts
13      of it?
14  A.  Parts of it because I took that class, and I was
15      pretty familiar with it.
16  Q.  And then you had the Fire Officers Handbook of
17      Tactics?
18  A.  Yeah.
19  Q.  Did you read that book?
20  A.  Yes.  I read some parts of it.
21  Q.  Had you been exposed to that book before?
22  A.  No.  Not that book per se but some tactics and
23      firefighting books.

Page 83

1   Q.  And you read parts of it?
2   A.  Yes.
3   Q.  How did you decide what parts you were going to
4       read?
5   A.  I just — You know, everybody got strong and
6       weak areas in stuff they do, and I looked at
7       things that I wasn't quite sure of.  Some things
8       I knew.  Some things I wasn't quite sure of, and
9       I read those.  I spent a little more time --
10      when I say — I spent more time on some things
11      than others.
12  Q.  So if you thought you knew it, you didn't spend
13      as much time on it?
14  A.  Yes.
15  Q.  And you had had some exposure, maybe not to this
16      book, but to the tactics books?
17  A.  Yes.
18  Q.  As you reviewed this Fire Officers' Handbook of
19      Tactics, was there anything in this book you
20      didn't think applied to the City of Auburn?
21  A.  No.
22  Q.  You thought that book was applicable to what
23      went on at Auburn?

Page 84

1   A.  Yes.  Because you got -- any different structure
2       fire going to be different.  So that was more
3       telling you about attacks and plans.
4   Q.  And that's pretty uniform?
5   A.  Pretty uniform.
6   Q.  And then the fourth book was Structural
7       Firefighting?
8   A.  Yeah.  That's another one that's pretty true to
9       form too.
10  Q.  That's a uniform book?
11  A.  Yeah.
12  Q.  Were you exposed to that book before at the City
13      of Auburn?
14  A.  Not -- I've took some classes -- You know, you
15      got a little building construction and stuff and
16      components of different classes I took over the
17      years.  It was made up of that.
18  Q.  And you thought that book was applicable to what
19      went on at the City of Auburn?
20  A.  Yeah.
21  Q.  Did you form any study groups with anybody?
22  A.  No.  I just studied at home.
23  Q.  Did you study anything other than the -- I

Deposition of Eddie Ogletree

June 6, 2008

Page 85

1    assume that's the four books that were given to
2    you by the City for this?
3    A.   Yes.
4    Q.   Did you study anything other than those four
5    books in preparation for the exam?
6    A.   No, I did not.
7    Q.   Because you understood the questions were going
8    to come from those books?
9    A.   Yes.  That's what I understood.
10   Q.   Y'all were told that in the orientation, were
11   you not?
12   A.   I don't remember him saying it just like you
13   said it, but we just assumed that those books
14   were going to cover the test.
15   Q.   So you reviewed those books, read some of them.
16   You studied at home.  Anything else you did in
17   preparation for the test?
18   A.   No.  Other than all the years of going to the
19   fire college and going to the National Fire
20   Academy for advanced training.  Other than
21   that ...
22   Q.   Your experience?
23   A.   Yes.

Page 86

1    Q.   You said you went to the fire college and where
2    else?
3    A.   I went -- Yeah, the fire college.  I went to the
4    National Fire Academy at Emmitsburg, Maryland.
5    Q.   How many times have you been to the fire
6    college?
7    A.   Several.  I've been up there about three or four
8    times, but a lot of classes now are taught in
9    the field so we don't really have to go up
10   there.  But they are certified through the fire
11   college so we get a lot of that in regional
12   training.
13   Q.   Do they give tests when you complete those
14   courses at the fire college?
15   A.   Yes.  After a week or two weeks of going over.
16   Q.   You get a written test?
17   A.   Yes.
18   Q.   Does the written test have a passing score?
19   A.   Yes.
20   Q.   And what's the passing score on those written
21   tests?
22   A.   It's a 70.
23   Q.   And how about at the National Fire Academy in

Page 87

1    Maryland?  Do they give written tests there?
2    A.   No.
3    Q.   Do they give you any kind of test?
4    A.   You have homework, and they go over with you --
5    they are more of making sure you learn it than
6    test your abilities after you come -- the
7    classes I took.  I don't know in the executive
8    fire officer classes what they do, but they give
9    you projects.
10   Q.   So they don't test what they've taught you?
11   A.   No.  I haven't took one up there.
12   Q.   Do you get any certification or anything from
13   them?
14   A.   Yes.
15   Q.   So then the test, I guess, is April 10 of 2006?
16   A.   Somewhere thereabouts.
17   Q.   Do you remember what time it started?
18   A.   I couldn't say.  I want to say about nine in the
19   morning.
20   Q.   And who was there to sort of be the proctor to
21   oversee the test, give it out?
22   A.   I want to say it was people from the human
23   resources department.  I don't know if it was

Page 88

1    Mr. Reeves -- I can't recall -- or Stephanie
2    King.  It was people from the human resource
3    department, though, that passed out ...
4    Q.   Was there anybody there from CWH?
5    A.   I can't recall.
6    Q.   Do you remember how long you had to take the
7    test?
8    A.   I believe it was three hours.
9    Q.   And this --
10   A.   I don't know for sure, but I believe it was
11   three hours.
12   Q.   And this was strictly a written test?
13   A.   Strictly a written test.
14   Q.   And you knew at that time you had to have a
15   70 --
16   A.   Yes.
17   Q.   -- to go forward?
18   A.   When we sat down there, we knew.
19   Q.   Do you remember how long it took you to take the
20   test?
21   A.   About two hours and thirty minutes, somewhere
22   thereabouts.
23   Q.   Who was the first one finished?

Page 89

1    A.  I couldn't say.
2    Q.  Were you the second one to finish?
3    A.  No.
4    Q.  And when you completed the test that day with
5        the human resources people there, did you make
6        any complaints to anybody at that time about the
7        written test?
8    A.  Not to anybody that was in authority.  Some of
9        the guys talked when we left about we thought it
10       was vague.
11   Q.  But nobody -- you didn't complain to any of the
12       people that you've sued --
13   A.  No.
14   Q.  -- in this lawsuit --
15   A.  No.
16   Q.  -- or anybody with human resources?
17   A.  No.
18   Q.  Did you ever complain to anybody that you've
19       sued or with human resources before you learned
20       you had not passed the test?
21   A.  No.
22   Q.  Did anybody that you talked to think they had
23       done well?

Page 90

1    A.  Like I said, everybody thought it was kind of
2        vague and not real poignant.  If you answered
3        something right, sometime you might not knew
4        it.  But it was different from the test that you
5        take at the fire college.  It was just
6        different.
7    Q.  Well, how was it different?
8    A.  It was the same format, I mean, multiple choice,
9        but it was just different.
10   Q.  Well, did you think the questions were related
11       to what a battalion chief would do in the Auburn
12       Fire Department?
13       MR. HORSLEY:  Object to the form.
14   A.  No.
15   Q.  Well, did you know what a battalion chief did in
16       the Auburn Fire Department?
17   A.  Yes.
18   Q.  How did you know that?
19   A.  I do it.
20   Q.  You do the same thing as a battalion chief?
21   A.  Yes.  I was acting battalion chief a couple of
22       weeks ago for a week.
23   Q.  Before this test did you know what a battalion

Page 91

1    chief did?
2    A.  Yes, I did.
3    Q.  And did you serve as an acting battalion chief
4        before this test?
5    A.  Yes.  When Chief Garrett was out, I would have
6        to go to headquarters and run the shift.
7    Q.  Tell me what a battalion chief does
8    A.  This is layman's terms -- layman terms.
9        Responsible for getting out all the
10       communications that day, making sure the
11       training gets done on shift, making sure that if
12       any trucks are down and something that we can
13       fix, that we get it took care of.  They are in
14       charge of responding to all fires and
15       emergency-type situations and taking control of
16       the scene and dispersing their manpower and
17       other resources in the City we may need.
18       They're just really the overseer.  They take
19       care of everything, you know.
20   Q.  Do they have supervisory responsibilities?
21   A.  Yes, they do.  They are the top of the food
22       chain besides the administrative part.
23   Q.  And you did not think that the questions on the

Page 92

1    test related to what a battalion chief did in
2    Auburn, Alabama?
3    A.  It wasn't all of them.  It was some of them.
4    Q.  Well, what percent of the test did you think did
5        not relate to what you do in Auburn?
6        MR. HORSLEY:  Object to the form.
7    A.  Not expert, but about 35 to 40 percent.
8    Q.  The 35 or 40 percent that you did not think
9        related to what a battalion chief did in the
10       City of Auburn, did those questions relate to
11       supervision of employees?
12       MR. HORSLEY:  Object to the form.
13   A.  I wouldn't say all of them.
14   Q.  But some percent of those would relate to
15       supervision?
16   A.  Yeah.  Yes.
17   Q.  Well, what kind of questions were there that you
18       didn't think related to what a battalion chief
19       did or to supervision?  What were the other kind
20       of questions on there that you didn't think
21       related to one of those two subjects?
22       MR. HORSLEY:  Object to the form.
23   A.  Probably some of the structural firefighting

Deposition of Eddie Ogletree

June 6, 2008

Page 93

1   questions, because we have very little -- we're
2   not Boston or New York. We have very little --
3   We have a few high-rise. We don't have those
4   type high-rise. We don't have those type of
5   warehouses, stuff like that. It was some on
6   there -- I don't remember exactly what questions
7   it were, but it was a lot of them on there.
8  Q.  There were questions on there about high-rises
9   and warehouses?
10  A.  It was just how you attack those, as I
11   remember. How you structurally fight fire on
12   those. It would be -- In other words, it would
13   be larger scale operations than we would be used
14   to.
15  Q.  And you knew from your conversation with Dean
16   Garrett, I guess, that the battalion chiefs had
17   looked at some of the questions or areas to be
18   questioned?
19  A.  That's what he told me.
20  Q.  Any other areas of the test that you didn't
21   think applied to Auburn or supervision other
22   than the ones that related to high-rises or
23   warehouses?

Page 94

1         MR. HORSLEY: Object to the form.
2  A.  No.
3  Q.  And what was the problem with the warehouses?
4   Don't they have warehouses in Auburn?
5  A.  Yeah. But I'm saying -- you're talking about
6   warehouses that cover two or three city blocks.
7   It seemed to be questions on there about -- we
8   didn't -- Some of those questions seemed to me
9   to call for more apparatus than we were ever
10   going to have or more manpower.
11  Q.  Any other complaints you had about the written
12   test that day?
13  A.  That day?
14  Q.  I mean --
15  A.  I just didn't think it was fair.
16  Q.  But you didn't express that to anybody other --
17  A.  Of authority. Nobody of authority.
18  Q.  And all the people that talked about it said
19   they thought it was vague?
20  A.  Yes.
21  Q.  What did you mean by vague?
22  A.  Just, you know -- It just didn't kind of fit
23   Auburn. It just didn't fit what we was used to

Page 95

1   doing.
2  Q.  Who all thought it was vague?
3  A.  The same older officers I talked to.
4  Q.  The older officers?
5  A.  Yeah. Lieutenant Clanton, Lieutenant Hodge, we
6   spoke about it.
7  Q.  Clanton, Hodge, and you. Y'all thought it was
8   vague?
9  A.  Yes.
10  Q.  Did you challenge any of the test questions?
11  A.  I think Joey did. Chief Darby did that. I
12   think he was the one that -- I know some
13   questions were being challenged, and later on I
14   come to find out I believe he was the one doing
15   it.
16  Q.  Did you challenge any questions?
17  A.  No, I did not.
18  Q.  Before filing the grievance, did you ever
19   complain to anybody that you've sued in this
20   lawsuit --
21  A.  Yes.
22  Q.  -- about the written test --
23  A.  Yes.

Page 96

1  Q.  -- being unfair?
2  A.  Yes.
3  Q.  And to whom did you complain?
4  A.  The day I was talking to Chief Langley and Chief
5   Lamar walked in, and I told him to come on in
6   too. I don't know if he was paying me much
7   attention, but I was complaining to chief that
8   day.
9  Q.  What day?
10  A.  It was after we took the test. It was about a
11   couple of days after we took the test. And
12   I just told them I didn't think the process was
13   fair.
14  Q.  Well, did you tell them what was unfair about
15   the process?
16  A.  Yes. People that got promoted to battalion
17   chief before me and didn't take a test.
18  Q.  Well, did you ever tell anybody you thought it
19   discriminated against you because you were
20   black?
21  A.  Yes, I did. All the black guys, we didn't have
22   a chance to be promoted. Obviously it
23   discriminated against us because we was black.

24 (Pages 93 to 96)

Page 97

1  Q.  Did you explain --
2  A.  Every time it comes time for -- at that
3      department for a black guy to move up on
4      experience and seniority, the rules change.  You
5      can go back to when Lieutenant Felton and
6      Lieutenant Strickland had to file that lawsuit.
7      It was about the same thing:  Being promoted
8      from lieutenant up to a higher rank.
9  Q.  When is the first time that you complained to
10     any of the people that you've sued in this
11     lawsuit that you thought that test discriminated
12     against you because you were black?
13 A.  I said it was unfair at the time.
14 Q.  I know you said unfair.  I mean specifically
15     complained that this test discriminates against
16     me because I'm black.  When is the first time
17     you told anybody you sued that?
18         MR. HORSLEY:  Your question was this
19         test discriminates against me, not
20         the whole promotional process?
21         MR. MORGAN:  Anything.  I don't care
22         what you call it.
23         MR. HORSLEY:  Don't answer --

Page 98

1          MR. MORGAN:  Well, I want to make
2          sure --
3          MR. HORSLEY:  I don't want him to
4          answer anything.
5  Q.  Anytime you complained about the test, the
6      procedure, or anything discriminating against
7      you because you were black.
8  A.  We was talking about the process, and we talked
9      amongst ourselves before we filed the grievance
10     that -- Me and Lieutenant Stephens talked among
11     ourselves about the situation and from our
12     perspective.  There were three blacks down
13     there.  Every time -- I'm looking at four white
14     guys that just got promoted to battalion chief
15     and retired.  Me and him looking at one another
16     like, now, you're a senior man; I'm a senior
17     man; the only thing we got in common is that and
18     we're black so it look like we just don't get a
19     shake; they are doing this on purpose.
20 Q.  And did Horace Clanton and Robbie Hodge think
21     they were being discriminated against?
22         MR. HORSLEY:  Object to the form.
23 A.  I have no idea.  I didn't talk to them about --

Page 99

1      They was worried more about the time in grade
2      policy and the inconsistencies.
3  Q.  Weren't they senior men?
4  A.  Yeah.  They were more concerned about the
5      inconsistencies that we stated in the letter,
6      that some people can take a test to move up and
7      some people get gave their jobs, and some people
8      just walk up there one day and come back and
9      they are your boss.
10 Q.  Well, did they think that they were -- that test
11     was unfair?
12         MR. HORSLEY:  Object to the form.
13 A.  I have no idea.  You'll have to ask them that.
14 Q.  Well, you did ask them, didn't you?  Didn't
15     y'all meet and sign the letter together and go
16     through the procedure?
17 A.  They didn't like the process no more than we did.
18 Q.  Well, of the people that you've sued in this
19     lawsuit -- While I'm thinking about it, what's
20     the basis of Cortez Lawrence being sued?  Did he
21     have anything to do with this battalion chief
22     promotion?
23 A.  He didn't have anything to do with the battalion

Page 100

1      chief promotion.
2  Q.  He wasn't there?  Been gone for years, hadn't
3      he?
4  A.  The only thing he got to do with this is they
5      are still using his policies and procedures,
6      which definitely discriminates against
7      African-Americans being hired at that fire
8      department.
9  Q.  What policy and procedures --
10 A.  Student firefighter program.
11 Q.  You think -- The student firefighter program,
12     that's Cortez Lawrence's policy and procedure --
13 A.  It's his program.
14 Q.  -- program?
15     And you say it discriminates against blacks
16     being hired?
17 A.  Yes.
18 Q.  And that procedure has been in effect how long?
19 A.  For about 13, 14 years.
20 Q.  And you know Gerald Stephens went through that
21     procedure?
22 A.  Yes.  It's a couple of blacks have been -- two,
23     three, four.  But if you look at the ratio and

Page 101

1    the numbers, it has a definite effect.
2    Q.  Well, is it not true that you never challenged
3         that procedure when it was first implemented?
4    A.  They had it in the lawsuit -- the old lawsuit.
5         It's in the old lawsuit.
6    Q.  Did you ever --
7    A.  I didn't challenge it.
8    Q.  Did you challenge it in the 1990s at all?  Did
9         you ever make a complaint or file a lawsuit
10        about the --
11   A.  No, I did not.
12   Q.  So the only thing with Cortez Lawrence is that
13        the City is still using his procedures or
14        policies on the student firefighter program?
15   A.  Yes.
16   Q.  And that's in hiring?
17   A.  Yes.
18   Q.  And he's been gone for at least, what, seven or
19        eight years?
20   A.  Yes.
21   Q.  He had nothing to do with the battalion chief?
22   A.  No, he did not.  Not to my knowledge.
23   Q.  So going back to my question:  When is the first

Page 102

1    time that you complained to somebody that you've
2    sued that you thought that this test or
3    procedure, the process, discriminated against
4    you on the basis of your race?
5    A.  I know we filed -- We didn't put -- state that
6    particularly in the first couple of letters, but
7    it was stated about blacks being promoted and
8    hired in the last letter that we sent out, I
9    think.  It should be in one of your --
10   Q.  The last letters --
11   A.  It's one of the letters in the grievance process
12   we sent back and forth, back and forth.  And it
13   was stated in the letter that if they would
14   carefully check in their records, no
15   African-American firefighter has been promoted
16   or hired in the past twelve years.
17   Q.  That's in one of the letters in the grievance
18   process?
19   A.  Yes, it is.  So it went to everybody.  It went
20   to the people that was our immediate
21   supervisors.
22   Q.  Let me show you what I marked as Defendant's
23   Exhibit 15, which is obviously an incorrect

Page 103

1    date.
2         (Defendant's Exhibit 15 marked for
3          identification.)
4    Q.  But did you receive that from --
5    A.  Yes, I did.
6    Q.  -- from somebody?
7    A.  I received one, but it wasn't April 4.  I don't
8    know --
9    Q.  Yeah.  It's a different date.
10   A.  It's a different date.
11   Q.  In fact, you probably received this one first.
12   Defendant's Exhibit 16, do you remember
13   receiving that, which is the -- telling you
14   about that you hadn't scored --
15   A.  Yes.
16   Q.  -- 70?
17        (Defendant's Exhibit 16 marked for
18         identification.)
19   Q.  And then you received 15 probably after this but
20   at some point, which is a candidate feedback
21   report regarding the written test.  And it says
22   if you have any questions, please contact me
23   directly.

Page 104

1         Did you contact Steve Reeves after you
2    received the candidate feedback report?
3    A.  If my memory serve me correct, we briefly went
4    over this with -- I'm trying -- I don't know if
5    it was Mr. Reeves -- and tried to explain some
6    of this to us.  But everybody left there was
7    like still -- we went in and didn't know
8    nothing, and we left and didn't know nothing.
9    Q.  Let's talk about that meeting.  Who was that --
10   A.  I know they tried to explain -- somebody tried
11   to explain this to us because -- when they were
12   sent back after the challenge.  I can't say it
13   was Mr. Reeves.  It might have been, since
14   that's part of his duties in his capacity of
15   HR.  But somebody did go over this with us.
16   Q.  Went over your candidate feedback?
17   A.  Yes.
18   Q.  Did they go over it just with you --
19   A.  No.
20   Q.  -- or with everybody?
21   A.  Yes.
22   Q.  Blacks and whites?
23   A.  Yes.

Page 105

1  Q.  And where was that meeting held?
2  A.  It had to be at the fire department.
3  Q.  And do you remember what was said at the
4      meeting?
5  A.  It was just explaining the breakdown, I guess,
6      of these.  I don't remember specifically what
7      was said.  Just the scoring breakdown.
8  Q.  Did you make any specific complaints at that
9      time about the written test?
10 A.  No, I did not.
11 Q.  And when did you learn that Joey Darby had
12     challenged some of the questions?
13 A.  Some people were complaining.  I can't call
14     their names.  I just remember they were
15     complaining, and somebody said Joey had
16     challenged.  And then we had a waiting period
17     till CWH figured out which ones they were going
18     to throw out.  And they came back and said they
19     threw out, I believe they said, seven.
20 Q.  CWH threw out seven questions?
21 A.  Yes.  We don't know if we got those seven right
22     or -- They were not going to count seven of
23     them.  And by virtue of those seven being

Page 106

1      throwed out, that put Joey had an even 70.
2  Q.  Put him at an even 70?
3  A.  Yes.
4  Q.  What had been his score before?
5  A.  I have no idea.  I know he didn't pass, but
6      that -- when they threw the questions out, that
7      put him at a even 70.
8  Q.  Who threw the questions out?
9  A.  Somebody from CWH.
10 Q.  Well, you're not saying CWH threw those
11     questions out --
12 A.  No, I haven't --
13 Q.  Let me finish my question.
14         You're not saying CWH threw those questions
15     out so that a white male could reach a passing
16     score, are you?
17 A.  I have no idea what CWH did.  I just know they
18     threw out seven questions that had been
19     complained about.
20 Q.  And did it increase your score as well?
21 A.  Not to my knowledge.
22 Q.  Did it decrease your score?
23 A.  Not to my knowledge.

Page 107

1  Q.  You don't know one way or the other?
2  A.  I don't know one way or the other.
3  Q.  How did y'all find out that it had increased
4      Joey's score?
5  A.  We know he hadn't passed.
6  Q.  Did he get one of these candidate feedback
7      letters that said he didn't pass?
8  A.  I hadn't talked to him, but everybody knew he
9      didn't pass so obviously he got a candidate
10     feedback letter.
11 Q.  And you knew he hadn't passed because everybody
12     knew?
13 A.  Yeah.  It wasn't just I knowed it.  People knew
14     it.
15 Q.  Did he ever say, hey, I didn't pass and I'm
16     challenging this question?
17 A.  No.  He was challenging the questions.
18 Q.  And CWH looked at the test questions and --
19 A.  And deemed them, I guess, unfit to be in there,
20     and they threw seven of them out.
21 Q.  How many questions were there all together?
22 A.  One hundred.
23 Q.  The meeting with Steve or somebody from HR to go

Page 108

1      over the candidate feedback, was that somebody
2      from the City or was that somebody from WCH
3      there?
4  A.  I believe it was the City official.
5  Q.  Did you file your grievance before or after
6      that?
7  A.  I can't recall.  It might have been filed
8      before, but I can't say.
9  Q.  Let me show you Defendant's Exhibit 17.
10         (Defendant's Exhibit 17 marked for
11         identification.)
12 Q.  Is that the grievance that you filed?
13 A.  Yes.
14 Q.  When were you supposed to challenge the
15     questions?
16 A.  I think you had maybe -- After the test, I
17     believe.  I can't say exactly the time frame.
18 Q.  How did you learn you could challenge questions?
19 A.  I think that was went over in orientation.  It
20     might have been went over in orientation.
21 Q.  And your recollection is you had some time
22     period after the test to challenge questions?
23 A.  Maybe a couple of days.

Page 109

1    Q.   But a day or two or some period?
2    A.   Yes.  That's my recollection, now.  Somebody
3         else might remember something different.
4    Q.   And that was something discussed, I guess, by
5         the CWH person in orientation?
6    A.   Yeah.
7    Q.   And is it your understanding that Joey Darby is
8         the only one that challenged any questions?
9    A.   Yes, that's my understanding.  I don't know if
10        anybody else did or didn't, but it's my
11        understanding that he --
12   Q.   We know you did not.
13   A.   No, I did not.
14   Q.   And these older firefighters that were making
15        complaints about the test being vague, they
16        didn't challenge any questions?
17   A.   No, they did not.  Not to my knowledge they
18        didn't.
19   Q.   We can agree, I guess, that Defendant's Exhibit
20        17 does not make any reference to your race as a
21        factor, does it?
22   A.   No, it doesn't.  Not the first letter.
23   Q.   But you say there's another letter in the

Page 110

1         grievance process that does make reference to --
2    A.   Yes.  It was on down the chain.  It was probably
3         the fourth or fifth letter.
4    Q.   Now, there are four specific complaints about
5         the test --
6    A.   Yes.
7    Q.   -- on this Defendant's Exhibit Number 17.  I'm
8         going to ask you which ones -- Look at the four
9         of them.  Were all four of those complaints that
10        you had or which ones were your complaints?
11             MR. HORSLEY:  Just for clarity, these
12             are not all four complaints about
13             the test.  These are complaints
14             about the whole procedure.
15   A.   Yes.  That's what I was going to say.  This is
16        more in line with the policies and procedures of
17        the Auburn Fire Department.  That written
18        exam -- When we say written exam, my thinking
19        was, why we have to take a written examine with
20        a cutoff score.  That was my concern when we met
21        to write this letter:  Why take a written exam
22        when people getting promoted and tested in other
23        ways down here and get promoted.

Page 111

1         No time in grade policy was a concern of
2    mine also because I had come there -- when they
3    hired me, you had to learn one job before you
4    came in and -- because you might have been a
5    little better in a book here and or book there,
6    you could just come in from being -- Some people
7    hadn't even been off probation got promoted, and
8    you have to show them how to get around the
9    street there.  But they are sitting in the
10   officer's seat.  They are lieutenants.  So I had
11   a concern about that.
12        No accumulative point system, that goes back
13   to the written exam.  You're grading a man on
14   one thing and one thing only.  You get that
15   cutoff score.  You don't -- And then you turn
16   around and he does the job, and nobody holler,
17   well, you didn't make 70; get out the Jeep.
18        Inconsistency on past promotional process,
19   if you think about everything I just said, that
20   sums that up because everybody that been
21   promoted down there has been promoted in a
22   different way in the last twelve years.
23   Q.   So I want to be clear on the written exam.  Did

Page 112

1         you have a complaint about the written exam or
2         just the fact that --
3    A.   The way it was administered.
4    Q.   What was it about the way it was administered?
5    A.   70 cutoff score.
6    Q.   You didn't think there should be a cutoff score?
7    A.   No.
8    Q.   If there hadn't been a cutoff score, would it
9         have been okay with you to use a written exam?
10   A.   Yes.  If it hadn't been a cutoff score.  I think
11        you should be tested on certain things, and then
12        if you're not that good at maybe a written exam,
13        you can go in and show, okay, I know this
14        hands-on.  You give me a hands-on exercise or
15        you give me a in-basket; you give me something
16        that I actually do when I'm out there doing it,
17        and you can see how well I do it.
18   Q.   So if there hadn't been a 70 cutoff score on
19        this exam, the use of this exam would have been
20        okay with you?
21   A.   As long as I got a chance to go forward in the
22        process.
23   Q.   Does that mean yes?

Page 113

1   A.  Yes.
2   Q.  And the no time in grade is that you didn't have
3       to be a --
4   A.  You could skip rank now.  You could jump -- go
5       from firefighter to being the chief, and then
6       you get up there with that power and say I got
7       to take a test when I just watched you go from
8       firefighter to chief.
9   Q.  And is it --
10  A.  That goes down to inconsistency too.
11  Q.  Is it your testimony this is the first test
12      where there was no time in grade requirement?
13          MR. HORSLEY:  Test?
14  Q.  First procedure.
15  A.  For captain or battalion chief, yes.
16  Q.  So for captain or battalion chief, this is the
17      first promotion process where you didn't have a
18      time in grade requirement?
19  A.  Yes.  With eight years of service, you wouldn't
20      have even been considered.
21  Q.  With how many?
22  A.  Eight years of service, you wouldn't even be
23      considered fifteen years ago.

Page 114

1   Q.  How many years of service do you think you
2       should have had before you could be considered?
3           MR. HORSLEY:  Object to the form.
4   A.  At least ten to fifteen.
5   Q.  And then no accumulative point system, I'm not
6       clear on that one.  Tell me what that one is.
7   A.  Say somebody took the test and made a 69 on it,
8       and they move to the next phase of testing, of
9       an in-basket or they done a great job on
10      doing -- say it was something that Chief Lamar
11      wants us to do, an assignment, and we did that
12      so we made -- Say he made a 75 on that where
13      somebody on the test might have made a 71 and
14      then didn't do so good on that.  You took all
15      those scores when you got to the end of the
16      thing and add it up and come out with a average
17      and then made your promotions.
18  Q.  That's basically the same thing about the
19      written test, not having a cutoff score, isn't
20      it?
21  A.  Basically.
22  Q.  You think you should have --
23  A.  You accumulate points.  You get points for not

Page 115

1   getting wrote up, coming to work on time,
2   wearing your uniform with pride.  We do
3   merit-based raises.  We get merit-based raises.
4   And if I'm supervising a career firefighter and
5   I don't fill his evaluation out just like my
6   chief want me to -- It's very important that we
7   do that and keep a track of his performance.
8   Now, you got -- you ought to be able -- if
9   that's so important, you ought to be able to
10  incorporate that into your promotional
11  procedures also.
12  Q.  You're saying the promotional procedures should
13      have included more than the test --
14  A.  Exactly.
15  Q.  -- and the assessment center?
16  A.  Exactly.
17  Q.  What else should have been -- Let me finish.
18          What else should have been involved in the
19      promotional procedure besides the written test
20      and the assessment center?
21          MR. HORSLEY:  Object to the form.
22  A.  Your yearly appraisals, the years that you've
23      been there.  That's about it.

Page 116

1   Q.  So you should have a written test, you should
2       have the assessment center, but then you should
3       also --
4   A.  But some of this stuff should come before
5       there.  Like I said, your appraisals, if they
6       are so important, the way we have to fill them
7       out, they should be looked at before you be
8       allowed to put in for a promotion.
9   Q.  So what you would do to eliminate people rather
10      than a written test is looking at the yearly
11      appraisals?
12  A.  Yeah.  Because if he's not coming to work
13      wearing his uniform right, if I had to reprimand
14      him for being late and then all the sudden he's
15      eligible for battalion chief, obviously he got a
16      problem with coming to work on time, but yet
17      still he's going to be battalion chief because
18      he can pass a test?
19  Q.  Are those written appraisals --
20  A.  Performance appraisals.
21  Q.  Is that where your supervising officer goes
22      through and fills out things and says this is
23      what Eddie -- he's a 3 on this or a 4 on that or

Page 117

```
1    a 5 on that?
2    A.  Yeah.  But you also -- that's how they move you
3         from -- get your raises.  You also get your
4         raises based on that.  You have to meet a
5         certain standard.
6    Q.  And you think that that should be used to
7         determine who is eligible for promotions?
8    A.  I didn't say the determining factor, but used.
9         That should have a little weight.
10   Q.  Should it eliminate people?  because you said
11        you ought to look at that first.
12            MR. HORSLEY:  Object to the form.
13   A.  I don't believe it should totally -- I don't
14        believe in elimination.  If you're -- Me, let me
15        speak for me personally.  To be discriminated
16        against -- I don't like that word "elimination"
17        because people can find ways to keep you out of
18        stuff.  There's smart people in this world.
19        They can find ways and don't make it look like
20        it, but you can discriminate against.  I'm
21        speaking for my side.  I've done experienced
22        it.  And so I don't believe in that word
23        "elimination".  But you should take all of it
```

Page 118

```
1         into consideration.  Let's look at it that way.
2    Q.  Here's the reason I asked that.  Earlier you
3         said that you should look at the performance
4         appraisal to determine who should be able to
5         take --
6    A.  I made a mistake.
7    Q.  Are you backing off that?
8    A.  I'm backing off that.  But have all of it add up
9         to something and don't cut nobody.  Just don't
10        cut nothing.  Just get a score.  That way you
11        could do it this way.  If that person didn't
12        wear his uniform, he could see why maybe he
13        didn't get -- he could go through the process,
14        but he could see where he fell 5 points short
15        for not wearing his uniform.  He'll be more
16        motivated to the next time to keep his shirttail
17        tucked in, wear his collar brass the right way,
18        make sure the truck gets checked off, because,
19        let's face it.  We live in a world where you can
20        only do so much talking to people when you're a
21        supervisor.
22   Q.  Would you count that equal with the written test
23        of the assessment center, the performance
```

Page 119

```
1    appraisal?
2            MR. HORSLEY:  Object to the form.
3    A.  I can't make a statement because I'm not a
4         expert.  I just thought it should be included in
5         my opinion.
6    Q.  You think the seniority --
7    A.  Yes, I think it should be included.  I ain't say
8         give them a hundred points.  I say give them
9         some points.  A lot of departments do, for being
10        on the job, for being there and being -- You can
11        look at the appraisal and look at how long
12        they've been on the job and say, well, if this
13        person is doing this at this level, then you can
14        score -- give them a numerical score on it.
15   Q.  So a person who may have better performance
16        appraisals and score higher on a written test
17        and do better on an assessment center should be
18        penalized because they haven't been hired before
19        somebody else?
20            MR. HORSLEY:  Object to the form.
21            That's not what he said.
22   A.  No, that's not what I'm saying.
23   Q.  Tell me what you're saying.  I want to be sure I
```

Page 120

```
1         understand.
2            MR. HORSLEY:  Object to the form.
3            He's answered the question, but go
4         ahead and answer it again.
5    Q.  I want to be sure I understand.  I didn't
6         understand.  Exactly what is it about the
7         seniority?  What --
8    A.  We have always got points when I was hired for
9         seniority.
10   Q.  And seniority means from your hiring date
11        forward?
12   A.  That's right.  From your hiring date forward.
13        You can be there -- But, see, when you came in
14        the door -- you don't even come in the door
15        pushing to be at the front of the line.  Now we
16        got a culture of where, I don't have to know
17        this.  You got people -- If I was driving a
18        truck for one of those guys right now, I would
19        have to show them how to get around town.
20   Q.  Who is one of those guys?
21   A.  Some of the battalion chiefs.
22   Q.  I'm going to get to that in just a minute.
23            You should get points under a procedure you
```

Page 121

1 would have for being hired longer than somebody
2 else?
3 A. I think so.
4 Q. Who among these battalion chiefs had poorer
5 yearly appraisals than you did?
6 A. I have no way of knowing that. That's personal
7 information. I'm not -- When I say that, I'm
8 not accusing them of anything. I'm saying I
9 think that's the way the promotional process
10 should have been.
11 Q. Do you know whether or not any of the people
12 that were promoted had bad performance
13 appraisals?
14 A. I know because of seniority and no time in grade
15 policy and inconsistent past promotional
16 procedures that that benefited those guys.
17 Q. My question, though, is: On the performance
18 appraisals that you think --
19 A. No, I don't.
20 Q. -- that you think should be a part of it, do you
21 know whether or not --
22 A. I would have no way of knowing.
23 Q. How are your performance appraisals?

Page 122

1 A. Every one I seen is good.
2 Q. And what battalion chiefs are there there don't
3 know how to get around the city?
4 A. I'm saying that's not a big priority now, and a
5 lot of people come up through the ranks and
6 really don't know their streets and numbers.
7 When I came I had to learn that and go before
8 people and show them that I knew that in order
9 to move to the next step.
10 Q. Well, what battalion chiefs don't know their
11 streets and numbers?
12 A. Most of them. I would say every one of them.
13 They are learning them. They are getting
14 on-the-job training, but that wasn't required of
15 them when they first came in like it was
16 required of me.
17 Q. You mean when they were first hired?
18 A. I know it wasn't. They didn't enforce it like
19 they did against me. They would have put it in
20 my appraisal and fired me.
21 Q. Well, is it your testimony that the people that
22 were promoted to battalion chief don't know
23 their streets and numbers? Is that what you're

Page 123

1 testifying to?
2 A. They don't know them like the people -- their
3 predecessors had to know them. I'll put it that
4 way.
5 Q. And specifically which -- All battalion chiefs?
6 A. Yes.
7 Q. None of the battalion chiefs know their streets
8 and numbers?
9         MR. HORSLEY: Object to the form.
10         That's not what he said.
11 Q. Like you would have?
12 A. Like their predecessors were required to.
13 Q. How did they test the predecessors to see if
14 they knew them?
15 A. Now we have people moving so fast that you
16 didn't get -- We moved fast because that's the
17 way they done got the system set up. But you
18 used to you come in -- You're 19 fresh coming in
19 now from college, 19, student firefighter, and
20 driving the front end pumper, that's a lot of
21 responsibility. Driving a truck in to lay a
22 line to a house fire and you're 19 years old
23 with a $300,000 piece of apparatus at your

Page 124

1 control, that's unheard of in most places.
2 Q. Are you saying those people aren't competent to
3 do it?
4 A. That's a lot of responsibility. You need time
5 to learn.
6 Q. Didn't y'all's fire rating just increase?
7 A. I have no way of knowing. That's Chief Lamar.
8 Q. And I'm not trying to argue with you. I want to
9 be sure I understand what you're saying.
10     A student firefighter in your opinion is not
11 qualified to operate a piece of apparatus? Is
12 that what you're saying?
13         MR. HORSLEY: That's not what he
14         said.
15 A. I'm not an expert. Let me sum it up this way.
16 The standards I were hired under are lacking
17 now. That's what I am saying.
18 Q. And how are they lacking?
19         MR. HORSLEY: Object to the form.
20         Asked and answered.
21 A. That's all I can say. Standards --
22 Q. Well, you've told me about the streets and
23 numbers. How else are they lacking?

Page 125

1   A.  I could sit here all day and go through things
2       that are different now about what happens down
3       there. The training, it's good, but people are
4       not -- you've got people that are just sliding
5       through the cracks. They are looking forward to
6       being promoted instead of learning one job
7       before they can get -- before they can move to
8       the next because they done took away all the
9       standards, all the policies.
10          When I came in -- And this is exactly what
11      I'm saying. When I came in, I was told learn
12      your streets and numbers, your hydrant
13      locations, and you've got a certain time to
14      learn them and the hydrant locations, and then
15      we're going to teach you how to tilt the back of
16      the ladder truck and we're going to teach you
17      how to drive a pumper, you won't be eligible
18      for a promotion to lieutenant for at least five
19      years.
20          Now they come in, and they entertain the
21      thought of a promotion as soon as they come off
22      probation, or some will sneak in on probation.
23      They let them come in on probation to sit in to

Page 126

1       get promoted. That's what I'm saying right
2       there in a nutshell.
3   Q.  Is it your opinion that the procedures and
4       promotion policies and hiring policies under
5       Ellis Mitchell are better and more fair than
6       they are today?
7           MR. HORSLEY: Object to the form.
8   A.  In my opinion -- Like I say, I'm not an expert.
9       I know he had his problems, but -- Yes, he had
10      some problems, some serious problems, because he
11      told me what he told me when he hired me. But
12      at least when he hired me and told me that, I
13      could accept the fact he was trying to do
14      something about it.
15  Q.  So you think his hiring and promotion procedures
16      are better than what they are now?
17          MR. HORSLEY: Object to the form.
18  A.  I think he required more of you.
19  Q.  He required more of you?
20  A.  Yeah. Than just --
21  Q.  Who was promoted from probationary status?
22  A.  Rodney Hartsfield.
23  Q.  He was --

Page 127

1   A.  Team leader. He promoted from firefighter to
2       team leader.
3   Q.  And he was still --
4   A.  On probation per City policy.
5   Q.  Where is that City policy that says you have to
6       have one year in grade?
7   A.  Firemen and policeman -- It's in the City
8       personnel policies book.
9   Q.  Do you have that City personnel book that has
10      that in there?
11  A.  I don't have it handy.
12  Q.  But there's a City policy in the personnel book
13      that says police and fire have to be in a
14      position one year before they can --
15  A.  Yes. I just read it last week. I went online
16      and read it last week.
17  Q.  I think the last thing on -- what's that letter
18      number -- Defendant's Exhibit 17, inconsistency
19      of past promotional procedures, what's your
20      complaint? Was that one of your complaints?
21  A.  Yes.
22  Q.  What was your complaint?
23  A.  Just what I got through spelling out. If Chief

Page 128

1       Lamar can get promoted one way, Chief Lankford
2       can get promoted another way, Fire Chief Langley
3       got promoted from firefighter to captain by
4       somebody coming and getting him and telling him
5       he captain and then he moves to the chief
6       position and never took a written test, it's
7       definitely discriminatory when you require that
8       of me.
9   Q.  Well, it would be -- would it be discriminatory
10      if you required it of anybody, black or white?
11          MR. HORSLEY: Object to the form.
12  A.  I've got to worry about me right now.
13  Q.  I'm asking you. Is it any less discriminatory
14      toward you as a black than it would be as a
15      white?
16          MR. HORSLEY: Object to the form.
17  A.  Well, it's excluding us blacks. I'll put it --
18  Q.  Well, does it exclude the other whites?
19  A.  Other whites are being promoted at a record
20      rate.
21  Q.  Mr. Ogletree, does it exclude people who don't
22      get promoted like Horace Clanton? Is he
23      discriminated against?

32 (Pages 125 to 128)

Deposition of Eddie Ogletree                                                                    June 6, 2008

Page 129

1        MR. HORSLEY: Object to the form.
2    A.  I have no idea.
3    Q.  You don't know if he's discriminated against?
4    A.  I have no idea.  That would be something he
5        would have to tell you.  I know how I feel.
6    Q.  So the procedure only discriminates against
7        blacks, not against whites that don't get
8        promoted.  That's your testimony?
9        MR. HORSLEY: Object to the form.
10   A.  That's my testimony.
11   Q.  You asked that the four written exams be
12       reviewed.  Information was received that
13       questions were excluded.  Is that the challenges
14       that were made by Joey Darby?
15   A.  Yes.  I guess that's what that were referring
16       to.
17   Q.  And very concerned which questions were removed
18       and verify that everyone participated in the
19       exam was equally graded.
20       Do you have any --
21   A.  I have no way of knowing.
22   Q.  -- evidence or testimony or hearsay or opinions
23       now that anybody was not graded fairly?

Page 130

1    A.  I have no way of knowing that.  We don't even
2        know what questions were threw out.  We have no
3        way -- We know it helped Joey, but we don't know
4        did somebody get all seven right and they still
5        were thrown out and they didn't get credit for
6        it.  We have no way of knowing.
7    Q.  You don't know whether it helped you or not?
8    A.  That's right.
9        MR. HANCOCK: Are we close to a
10           break?
11       MR. MORGAN: Sure.
12       (Brief recess.)
13   Q.  (Continuing by Mr. Morgan)  Mr. Ogletree, do you
14       recall sometime in the late 1980s that there was
15       a lawsuit against the City dealing with the
16       Auburn Fire Department and Ellis Mitchell as its
17       fire chief?
18   A.  Yes.
19   Q.  After that lawsuit was settled, did the City
20       ever give any streets and numbers exam?
21   A.  They didn't never really give an exam.  They
22       just called you in and sat you down, and you
23       would answer to your supervisor really.  It

Page 131

1        wasn't nothing that was like what they are
2        giving you today and say you've got a 70.  They
3        just made sure you knew it.  I didn't take it as
4        being an exam.  They just kind of called you in
5        and gave you a map and said fill it in.  Or you
6        sat there before somebody, and they would ask
7        you Cox Street, and then you would have to give
8        all streets and the numbers on them.
9    Q.  Since the settlement of that lawsuit against the
10       City and Ellis Mitchell, have applicants for
11       promotion ever been given any points for
12       seniority?
13   A.  Not to my -- I wouldn't have privy to that
14       information.
15   Q.  Well --
16   A.  I wouldn't know.  Not to my knowledge.  I should
17       say that.
18   Q.  Well, did you receive any points for seniority
19       the time that you competed for team leader?  Did
20       anybody get seniority points on that occasion?
21   A.  The only thing I could say, everybody in there
22       had been there at least four or five years and
23       had -- the people that went out were with me and

Page 132

1        we didn't get any points.  It was more or less
2        just me talking to you, you talking to me, and
3        we -- Somebody is giving you a set of questions,
4        and you answer them and they would give you a
5        score between one and six.
6    Q.  But nobody got seniority points?
7    A.  Not to my knowledge.
8    Q.  And going back to the petition from team leader
9        to lieutenant, I know you said you signed the
10       petition with the understanding that it would be
11       taken to the court.
12   A.  Yes.
13   Q.  Weren't you apprised later that the City
14       determined that the court did not retain
15       jurisdiction and that that name change could be
16       made without going back through the court?
17   A.  I believe I seen something to that on the
18       letterhead, something to that effect.  But in my
19       position and what I've seen over the years, I
20       don't take -- I take it to mean -- anything I
21       see dealing with the courts and the City of
22       Auburn, I take it to believe that they are
23       going -- They'll write anything down and give it

Page 133

1    to you just to keep you from asking any further
2    questions. That's what I believe.
3    Q.  Well, I'm not sure what that answer means, but
4        let me ask you this.
5            Didn't you get a letter or memorandum from
6        the City advising that the City determined that
7        they did not have to go back to the court, and
8        you signed a second thing agreeing to the name
9        change from team leader to lieutenant?
10   A.  No, I don't remember signing a second thing.
11   Q.  You only signed the petition?
12   A.  I know I signed the petition. I don't remember
13       signing anything else.
14   Q.  You don't remember signing a second thing after
15       you found that out?
16   A.  No, I don't remember that. I don't remember
17       having to sign anything else.
18   Q.  Well, if you had been presented with something
19       that said that the City had determined that they
20       could do it, in essence, without going back
21       through the court, would you have signed it?
22           MR. HORSLEY: Object to the form.
23   A.  With that language on there, I probably would

Page 134

1        have.
2    Q.  And then I think we've covered the initial thing
3        of the grievance procedure. Y'all proceeded on
4        through the grievance procedure?
5    A.  Yes, sir.
6    Q.  And actually had a hearing?
7    A.  Yes.
8    Q.  But your testimony was at some point along at
9        that process, y'all brought up about the race.
10   A.  It was the last letter addressed to Mr. Charlie
11       Duggan.
12   Q.  By the way, do you know what section of the
13       personnel rules that is that says you've got to
14       be time in grade?
15   A.  No, it doesn't -- I didn't see anything. I said
16       it's about probation. That's in the promotions
17       part of it.
18   Q.  Do you know what section of the personnel --
19   A.  It will be a section that says promotions, and
20       it will be under it.
21   Q.  And it says you have to be --
22   A.  If you're a firefighter or a police officer, you
23       have to be on probation for one year before

Page 135

1        being eligible to move to the next rank.
2    Q.  And I assume you have a copy of the letter that
3        you can make available that went to Charles
4        Duggan --
5    A.  Yes.
6    Q.  -- about the race?
7            Who showed up for the hearing? Who was
8        still on board as complaining about the
9        procedure?
10   A.  Myself, Lieutenant Stephens, and Lieutenant
11       Horace Clanton.
12   Q.  And y'all had a hearing in the -- before Judge
13       Bailey?
14   A.  Before Judge Bailey, yes, sir.
15   Q.  And what happened after the hearing?
16   A.  Well, basically Judge Bailey sided with the
17       City. They sent us about -- It was about maybe
18       two weeks later they sent us a packet where they
19       reaffirmed the decision not to promote us.
20       Later we got a letter from Mr. Duggan
21       reaffirming Judge Bailey's decision not to
22       promote us.
23   Q.  And Mr. Clanton did not file a lawsuit?

Page 136

1    A.  No, he did not.
2    Q.  Is there anything different about Mr. Clanton's
3        position on the promotion process and the way he
4        was treated than your position and the way you
5        were treated?
6    A.  There's one big difference. Mr. Clanton is not
7        black.
8    Q.  That's the only difference, isn't it?
9    A.  Yes.
10   Q.  Sir?
11   A.  That's it.
12   Q.  Were you privy to a conversation where
13       Mr. Clanton was told he did not have a suit
14       because he was not black?
15   A.  I don't know if I was privy to that or not. I
16       don't remember anything like that.
17   Q.  I'm going to ask you about these guys that were
18       promoted, and I want you to tell me -- I'm going
19       to ask you about Rodney Hartsfield. Is it your
20       opinion that Mr. Hartsfield is or is not
21       qualified to be a battalion chief?
22           MR. HORSLEY: Object to the form.
23   A.  I can't make that -- I'm not a expert. All I

Page 137

1   know is I am qualified and experienced and have
2   more qualifications and more experience than
3   Chief Hartsfield.
4   Q.  Tell me how your qualifications are better and
5       how your experience is better than Chief
6       Hartsfield.
7   A.  I feel this way:  If they could give Chief
8       Garrett, Chief Lawrence, and Chief Leverette
9       those promotions based on -- obviously it was
10      based on their experience -- they could have
11      promoted me based on my experience and
12      qualifications.
13  Q.  My question, though, is as to Mr. Hartsfield.
14      What is it about you that makes you more
15      qualified than Mr. Hartsfield?
16          MR. HORSLEY:  Object to the form.
17  A.  My years of service.
18  Q.  Anything else?
19  A.  No.
20  Q.  I'm sorry?
21  A.  No.
22  Q.  What is there about your experience that makes
23      you more qualified than Mr. Hartsfield?

Page 138

1   A.  This goes to the core of it.
2   Q.  Goes to what?
3   A.  This goes to the core of all of it with that.
4       Firefighting is not like going out here and
5       learning something, you know, across the street
6       at the bank or something -- learning how to be a
7       teller.  Any different structure you pull up on,
8       it could be different.  It could seem like it's
9       burning in the front room when it might be
10      burning on the bottom floor.  And until you see
11      enough of that -- You gain more understanding
12      with the more that you see, and that's why your
13      years of service is so important.
14  Q.  So, once again, going back, your experience --
15      you're more experienced than Mr. Hartsfield
16      because of your years of service?
17  A.  That's right.
18  Q.  Anything else?
19  A.  That's it.
20  Q.  What about, is it, Joe --
21  A.  Joe Lovvorn.  Same answer.
22  Q.  Same answer as to why you think you're better
23      qualified to be a battalion chief is because of

Page 139

1   your years in service?
2   A.  Yes, sir.
3   Q.  Same answer?
4   A.  Same answer.
5   Q.  And as for Matt Jordan --
6   A.  Same answer.
7   Q.  -- same answer?  You think you're better
8       qualified to be a battalion chief because of
9       your years in service?
10  A.  Yes, sir.
11  Q.  And Joey Darby?
12  A.  Same answer.
13  Q.  You think you're more qualified to be a
14      battalion chief because of your years in service
15      than Mr. Darby?
16  A.  Yes, sir.
17  Q.  I'm going to run through some of these witnesses
18      that y'all have listed, and I'm going to try to
19      do this quickly.  These are people that you and
20      your attorney disclosed as having some
21      information about your case, and two of them are
22      William Thompkins and Jeremy Patterson.
23  A.  Yes, sir.

Page 140

1   Q.  First of all, what is it that they know about
2       your case; you're not being promoted to
3       battalion chief?
4   A.  Basically I don't think they know anything about
5       my case.  They just know that we didn't get
6       promoted.
7   Q.  Do you know why they were listed as possible
8       witnesses or have some information on this case?
9   A.  I think it's relevant how they were treated down
10      there when trying to get a job at Auburn Fire
11      Department.
12          MR. HORSLEY:  I'm going to object to
13          that because I've drafted the
14          letter --
15      MR. MORGAN:  I understand that.
16      MR. HORSLEY:  -- as to -- Every person
17          whose name appears anywhere is on
18          that list so he's not going to
19          have any idea why some of them are
20          on there.
21  A.  That's my opinion.  I think they are relevant
22      because the way they put in for jobs down there
23      when the chief was telling me he knew he need to

Page 141

1   hire some blacks, and I think that have some
2   relevance to ...
3   Q.  To your knowledge they know nothing about your
4       case?
5   A.  Exactly, to my knowledge.
6   Q.  But they were not hired, and they are black?
7   A.  That's right.
8   Q.  And Chris Turner.  What is it that Chris
9       Turner -- what do you think he knows about all
10      this?
11  A.  Only thing I can say is Chris has been subjected
12      to tests every time he gets ready to be
13      promoted, and he's not being promoted.
14  Q.  Test.  Now, has he ever had a written test
15      before?
16  A.  Yes.
17  Q.  Was that for the last team leader?
18  A.  I don't know.  I just know he was sitting there
19      with the battalion chiefs.
20  Q.  Oh, he took the battalion chiefs with y'all?
21  A.  Yes, sir.
22  Q.  But you don't think he should have been able to
23      take the battalion chiefs, do you?

Page 142

1           MR. HORSLEY:  Object to the form.
2   A.  I know that by City policy, he was the only one
3       other than Gerald Stephens qualified to be -- By
4       the policy of non-probationary employees, they
5       were the only two qualified to be sitting in
6       there if we went by the City policy.
7   Q.  But he was not a lieutenant?
8   A.  No.  And I don't think he should have been in
9       there.
10  Q.  You don't think he should have ever taken the
11      test, do you?
12  A.  That's right.
13          MR. HORSLEY:  Object to the form.
14  Q.  Marzilla Ogletree, that's your wife?
15  A.  Yes.
16  Q.  What does she know about this case or do you
17      know anything that she would have -- any
18      information she would have about this?
19  A.  Probably worried about me.
20  Q.  Delner Franklin Thomas with the EEOC, do you
21      know who he is?
22  A.  No, I don't.
23  Q.  Douglas Watson, the former City manager, do you

Page 143

1   know what he had to do with the battalion chief
2   situation?
3   A.  He wasn't there when -- The ones that got
4       promoted, it was Mr. Watkins that was there at
5       that time, when Chief Garrett and them were
6       promoted.
7   Q.  Do you know of any anything that Doug Watson has
8       to do with either changing captains to battalion
9       chief or the battalion chief procedure that you
10      took?
11  A.  Not that I know of.
12  Q.  And Horace Clanton, he was -- wasn't he one of
13      those that --
14  A.  He was on the grievance with us.
15  Q.  And Rodney Hartsfield was promoted?
16  A.  Promoted.
17  Q.  Anything else you know he might know about this
18      other than being promoted?
19  A.  No.
20  Q.  Does he know anything about your complaints?
21  A.  No.
22  Q.  Have you ever discussed them with him?
23  A.  No.  He's my immediate supervisor right now.  I

Page 144

1   don't ...
2   Q.  Do y'all have any problems with each other?
3   A.  No.  I get along with Rodney fine.
4   Q.  Is he a good supervisor?
5           MR. HORSLEY:  Object to the form.
6   A.  I don't have any problem with him.
7   Q.  Matthew Jordan, do you know anything he knows
8       specifically about your claims?
9   A.  No.  He was just promoted.
10  Q.  Joe Lovvorn, do you know anything he knows about
11      your claims?
12  A.  No.
13  Q.  Jason Brown, who is that?  The name sounds
14      familiar.
15  A.  He works on my shift with me.
16  Q.  Is he black or white?
17  A.  White.
18  Q.  Is there anything he knows about your promotion?
19  A.  No.
20  Q.  Have you discussed this lawsuit with him?
21  A.  No.
22  Q.  Has he ever told you he thought you should have
23      been promoted?

36 (Pages 141 to 144)

Page 145

1  A.  Yes.
2  Q.  What did he tell you?
3  A.  They thought seniority and people that been
4      there should have been promoted just like the
5      people that had been there before like Chief
6      Garrett and Chief Lawrence.
7  Q.  And how long has Jason Brown been there?
8  A.  Probably eight years -- eight or nine years.
9      Probably eight years.
10 Q.  Did he sit for the promotion to battalion chief?
11 A.  Yeah, I believe he did.  Yes, I believe he did.
12     I believe his name on that list.
13 Q.  Paden Payton, do you know him?
14 A.  No.  He worked there, but I don't know him.
15 Q.  Joey Darby?
16 A.  He's the guy who promoted that challenged --
17 Q.  That challenged the questions.
18     Terry Walker?
19 A.  Ex-training officer.
20 Q.  When did he leave?
21 A.  Last year sometime.  It might have been this
22     year, but he hadn't left over six months ago.
23 Q.  Did he have to go through a promotion to be a

Page 146

1      training officer?
2  A.  Yes, sir.  Interview.
3  Q.  Did you apply for training officer?
4  A.  No, I didn't.  But Lieutenant Stephens did.
5  Q.  But you did not?
6  A.  I did not.
7  Q.  Was he a good training officer?
8  A.  He was all right.
9  Q.  Anything you know about -- that he knows about
10     the battalion chief promotion that you know of
11     or your complaints in this lawsuit?
12 A.  He just spoke to me one day.  I don't know if he
13     would recall this.  He just spoke to me one day
14     and said he wouldn't have did it that way.
15 Q.  Not did what that way?
16 A.  The procedure -- the promotional procedure for
17     battalion chief.
18 Q.  Did he tell you how he would have done it?
19 A.  No.  He just said, I told them I wouldn't did it
20     that way.  I knew what he was talking about and
21     he knew I knew what he was talking about, and
22     that was it.
23 Q.  Ronnie Blankenship?

Page 147

1  A.  Ex-fire chief.
2  Q.  When did he leave?
3  A.  Was it 2000?  He been gone -- Chief was chief
4      for about twelve years, Chief Langley, so he
5      been gone 12 or 13 years.
6  Q.  Do you know what he knows about this case?
7  A.  I have no idea.
8  Q.  Do you know any information he has about any of
9      the promotion procedures or discrimination or
10     anything?
11 A.  He probably would have some information because
12     his name was named when Lieutenant Strickland
13     and Lieutenant Card and all them were filing
14     their lawsuit.
15 Q.  Stephanie King?
16 A.  Human resource specialist, generalist.
17 Q.  Do you remember anything she did in this
18     situation?
19 A.  She just came in and I think maybe spoke -- She
20     might have spoke to us.  I don't know.
21 Q.  Joe Bailey, he heard the grievance?
22 A.  He heard the grievance.
23 Q.  Anything else?

Page 148

1  A.  No.
2  Q.  Michael Thee, who is he?
3  A.  That's one of the student firefighters.
4  Q.  Is he still a student firefighter?
5  A.  Yes, he is.
6  Q.  And did he apply for battalion chief?
7  A.  No, he did not.
8  Q.  Anything else that -- Anything he would know
9      about your case?
10 A.  I haven't --
11 Q.  Have you discussed it with him?
12 A.  I have not.
13 Q.  Casey McLeod?
14 A.  Firefighter.
15 Q.  Black or white?
16 A.  White.
17 Q.  Have you discussed your case with him?
18 A.  No, I haven't.
19 Q.  Do you know anything he would know about the
20     promotion procedure?
21 A.  No.
22 Q.  Did he apply?
23 A.  No, he didn't.

Page 149

1  Q.  Dean Garrett?
2  A.  That's Chief Garrett I've been mentioning.
3  Q.  Have you had any conversations with him?  You
4      told me --
5  A.  Yeah.  I told you he mentioned that he had seen
6      the test questions.  He mentioned that he didn't
7      think it was fair to the older guys.  He
8      mentioned a couple of things to me.
9  Q.  What else did he mention besides that?
10 A.  That was about the gist of it.  I can't --
11 Q.  He had seen the test questions, and he --
12 A.  He say he helped with them, and they had threw
13     some of them out already and that he didn't --
14     that they had helped with forming the test.
15 Q.  And he didn't think it was fair to the older
16     guys?
17 A.  Yes.
18 Q.  Any other conversations you had with him?
19 A.  No.
20 Q.  Did you have any conversations with him after
21     you took the test about the test and what you
22     thought about it?
23 A.  I just mentioned to him I didn't think it was

Page 150

1      right and that we were going to file a
2      grievance.
3  Q.  What did he say?
4  A.  He didn't say nothing.  He had retired and he
5      came by so -- He didn't say anything.
6  Q.  Then you've got a couple of folks listed with
7      the Auburn News:  Amy Weaver and Lindsey Field.
8  A.  I have no idea --
9  Q.  Have you ever talked to them?
10 A.  No.
11 Q.  Jimmy Lee Brown?
12 A.  He's deceased.
13 Q.  What rank did he have when he was --
14 A.  Battalion chief.
15 Q.  Did he just die recently?
16 A.  Yes.  He died this year.
17 Q.  Have you ever had any conversation with him
18     about the test or discrimination?
19 A.  Yes, I did.  He mentioned to me -- He had
20     mentioned to me something about discrimination,
21     and he had mentioned that he didn't think -- he
22     didn't think they were treating us right.  He
23     mentioned that to me a couple of years ago.

Page 151

1  Q.  Now, who is "us"?
2  A.  African-Americans who worked there.
3  Q.  Anything else he said other than he didn't think
4      they were treating "us" fair?
5  A.  No.
6  Q.  What was the substance of the conversation y'all
7      were having?
8  A.  We just was talking.  Just -- He come out.  He
9      was my battalion chief at the time, and he just
10     say he just work here.  And I said, well, I just
11     work here too.  And he just mentioned that -- I
12     told him that I didn't think it was right how
13     they promote people and do things.  And he just
14     mentioned he didn't think he had been treated --
15     He especially mentioned how they were doing
16     Chris, by him not being promoted and they trying
17     to make him pass a test to be promoted when they
18     know he can do the job.
19 Q.  Well, did you ever specifically mention race or
20     was it just that you didn't like the way they --
21 A.  He reminded me I was a minority.  So, yeah, it
22     was race.
23 Q.  Do you know why they changed the procedure to

Page 152

1      require a written test for team leader?
2  A.  I have no idea.
3  Q.  You don't have any idea about that?
4  A.  I have no idea.
5  Q.  You didn't hear anything about Chris Turner's
6      last lawsuit and why they changed that
7      procedure?
8  A.  No, I did not.
9  Q.  Did you know they changed that procedure because
10     of him?
11 A.  No, I did not.  I didn't know anything about it.
12 Q.  And Wendall Willis?
13 A.  He used to work there.  He's retired.
14 Q.  How long has he been gone?
15 A.  Maybe over ten, eleven years I believe.
16 Q.  James -- Did you ever have any conversation with
17     Wendall Willis about promotions or race or
18     discrimination?
19 A.  No, I didn't.
20 Q.  James Lyle.
21 A.  He's another --
22 Q.  Been gone a long time?
23 A.  Yeah.

Page 153

1   Q.  Have you had any conversation with him about any
2      of this?
3   A.  No.
4   Q.  Tommy James?
5   A.  He's gone.  He's retired.
6   Q.  Have you had any conversation with him about
7      race —
8   A.  No.
9   Q.  — or promotions or anything?
10   A.  No.
11   Q.  Kenneth Lee Smith?
12   A.  No, I haven't had any conversation with him.  He
13      retired too.
14   Q.  How long has he been gone, a while?
15   A.  Yeah.  All them guys been gone a while.
16   Q.  You haven't had any discussion with him about
17      race discrimination or promotion —
18   A.  No.
19   Q.  Ron Jones?
20   A.  Ronnie Jones?
21   Q.  Who is he?
22   A.  He was a captain there.
23   Q.  Has he been gone a while?

Page 154

1   A.  Yeah.  About five years.
2   Q.  Did you have any conversation with him about
3      discrimination or the test or anything?
4   A.  No, I didn't.
5   Q.  Dexter Card, have you had any conversation with
6      him?
7   A.  No, I haven't.
8   Q.  I think you told me earlier you haven't —
9   A.  I haven't even seen him.
10   Q.  Since he left?
11   A.  Since he left.
12   Q.  How about William Felton?
13   A.  No.
14   Q.  No conversation with him?
15   A.  No.
16   Q.  Have you talked to him about this lawsuit or
17      anything?
18   A.  No.
19   Q.  Thomas Scott?  Have you discussed anything with
20      him about this case or does he know anything
21      about this case?
22   A.  No.
23   Q.  Steve Heart, who is he?

Page 155

1   A.  He was gone before I started working there.
2   Q.  Before you started working there?
3   A.  Yeah.
4   Q.  You haven't had any conversations with him, have
5      you?
6   A.  No.
7   Q.  Larry Stanley?
8   A.  Another one.  He was gone before I started
9      working there.
10   Q.  Have you had any conversations with him?
11   A.  No.
12   Q.  Gary Jones?
13   A.  No.  He's gone too.
14   Q.  Have you had any conversation with him?
15   A.  No.
16   Q.  Jan Dempsey?
17   A.  Ex-mayor, no.
18   Q.  Have you had any conversation with her about
19      anything to do with this discrimination or
20      hiring —
21   A.  I don't know if she was the mayor when they
22      filed that last lawsuit.  But, no, I haven't
23      talked to her anything about it.

Page 156

1   Q.  Ron Tahita?
2   A.  I think he was an OHR director.
3   Q.  And he's been gone a while, hasn't he?
4   A.  Yes.
5   Q.  Have you ever had any conversations with him —
6   A.  No.
7   Q.  — about race or promotions or anything?
8   A.  No.
9   Q.  And Ellis Mitchell?
10   A.  I mentioned him.  I haven't had any
11      conversations with him.
12   Q.  When did you mention him?
13   A.  I mentioned him earlier when you told me —
14   Q.  He's been gone from the City a long —
15   A.  He's been gone a long time.
16   Q.  Does he still live in the city?
17   A.  He lives in Loachapoka, I believe.
18   Q.  Have you had any conversation with him about
19      this lawsuit or your complaints or race
20      discrimination?
21   A.  No, I haven't.
22   Q.  Let me ask you about some of the allegations in
23      your complaint.  In paragraph 23 you complain

Page 157

1    that the test -- I think we've been over this --
2    the City allowed non-probationary and
3    probationary lieutenants, including entry-level
4    firefighters, to apply for battalion chief
5    promotion.  That's one of your complaints?
6    A.  Yes.
7    Q.  And the only non-probationary non-lieutenant was
8    Chris Turner?
9    A.  Yes, sir.
10   Q.  Were there any probationary lieutenants that
11   were allowed to apply for the battalion chief
12   position?
13   A.  My position is that it was all of us guys that
14   had just got promoted from team leader to
15   lieutenant.
16   Q.  So that included you?
17   A.  That included me.
18   Q.  And number 24 is that you -- the City changed
19   its policy and required a written test.
20         And you complained about a written test
21   being -- Well, if I remember, you complained
22   about the cutoff score?
23   A.  The cutoff score.

Page 158

1    Q.  You're okay with the written test?
2    A.  I'm okay with some form of a written test, but
3    if that's all you're getting judged on, I'm not
4    okay with it.
5    Q.  And you say that coincidentally that policy
6    change occurred when two African-American
7    lieutenants and one entry-level --
8         What's coincidental about that?
9         MR. HORSLEY:  Object to the form.
10   A.  Well, all I know is before then, they were not
11   using a test with a cutoff score -- a written
12   test with a cutoff score.  And we seem to have a
13   bit of a edge at that particular time, and then
14   the policy changed when the three
15   African-Americans became -- well, two of them
16   were eligible.
17   Q.  And then you've got in there, of course, the
18   seniority was discarded.  I want to be clear on
19   this.  Can you name any promotional procedure
20   since the settlement of the Clinton Hammock
21   lawsuit in which seniority was given any credit?
22   A.  I'll put it this way.  Every battalion chief I
23   ever worked for had at least 15 years -- or

Page 159

1    captain had at least 15 years' experience or
2    more.  So whether they put it in writing or not,
3    it was given weight.
4    Q.  So before they became a captain or battalion
5    chief, they had at least 15 years' experience?
6    A.  Yeah.  The guys I worked for had at least 15
7    years' experience.
8    Q.  Let's go back to my question on the promotion
9    procedure.  Do you know of any promotion
10   procedure --
11   A.  No.
12   Q.  -- since the settlement of the Clinton Hammock
13   lawsuit in which credit was given for seniority?
14   A.  Chief Lawrence, Chief Garrett, Chief Brown, and
15   Chief Leverette.
16   Q.  And that's the name change?
17   A.  That's a promotion to me.
18   Q.  Did their duties change any?
19   A.  No.  When somebody tell me they are the chief
20   and I work for them, it changed.
21   Q.  Well, you worked for him when he was a captain.
22   A.  Yeah.  And he come down and made sure I knew he
23   was the chief.

Page 160

1    Q.  Whether he called himself the chief or captain,
2    did your relationship change any?
3    A.  Not my relationship, no.
4    Q.  Did his duties change any?
5    A.  I have no idea.
6    Q.  Well, did you know -- you told me before you
7    knew what a battalion chief did and you knew
8    what a captain did.  Did the duties change
9    between a captain and --
10   A.  Not to my knowledge.
11   Q.  Did he get any more pay?
12   A.  I wouldn't have that information.
13   Q.  And you didn't make any complaint with anybody
14   when the name change occurred, did you?
15   A.  No, I did not.
16   Q.  Let's see.  Then you've got 25.  The denial of
17   your promotion to battalion chief was racially
18   based.
19         Tell me why you claim that you were not
20   promoted based on your race.
21         MR. HORSLEY:  As much as its been
22   answered numerous times, I object
23   to the form.  But go ahead.

Page 161

1   A. All I know is three African-Americans were
2     eligible to be hired -- promoted to battalion
3     chief, and all the promotions went to four white
4     guys -- four Caucasian males.
5   Q. Is that the only basis, evidence, hearsay,
6     documents? Anything else that you have that
7     supports your allegation that you were denied
8     promotion because of your race?
9         MR. HORSLEY: Same objection. You can
10         answer.
11   A. No.
12   Q. Just that you and two other blacks were not
13     promoted and four whites were?
14         MR. HORSLEY: Same objection.
15   Q. True?
16   A. Exactly.
17   Q. In number 26 you say that Caucasian or white
18     applicants for battalion chief were given
19     preferential treatment regarding the application
20     process, test aids, and test grades.
21        What Caucasians were given preferential
22     treatment?
23   A. All I know is Chief Garrett told me he had seen

Page 162

1     the questions. And if he had seen some of the
2     questions, I don't know what happened. I don't
3     know what -- I can't say what happened. I
4     don't -- But I just know somebody -- he say he
5     had seen those questions.
6   Q. Well, so what? He wasn't an applicant, was he?
7   A. I have --
8         MR. HORSLEY: Object.
9   Q. Was he an applicant for battalion chief?
10   A. No, he was not.
11   Q. This specifically says that Caucasian applicants
12     were given preferential treatment regarding
13     application process, test aids, and test
14     grades.
15        What Caucasian applicants were given
16     preferential treatment?
17   A. I have no idea.
18   Q. Can you name a single one?
19   A. No, I cannot.
20   Q. Do you know of any?
21   A. No, I don't.
22   Q. Do you know any white applicants that received
23     preferential treatment in the application

Page 163

1     process?
2   A. No, I don't. I don't know.
3   Q. What do you mean by application process?
4         MR. HORSLEY: Object to the form. He
5         didn't write it.
6         MR. MORGAN: Well, I understand, but
7         it's my only chance to ask him. I
8         understand. I'm sorry.
9   Q. What do you mean by application process?
10         MR. HORSLEY: Object to the form.
11   A. I didn't write it. I have no idea.
12   Q. Do you know of any white applicant that received
13     more test aids than you did from the City or
14     any --
15   A. I wouldn't be privy to that. If it happened, I
16     wouldn't be privy to that.
17   Q. The answer to my question is: You don't know of
18     any, do you?
19   A. I don't.
20   Q. Do you know of any white applicants that were
21     given preferential treatment on their test
22     grades?
23   A. Obviously Chief Garrett and them were. They

Page 164

1     didn't take a test.
2   Q. That's not the question now, Mr. Ogletree.
3     Let's stay focused on the battalion chief
4     promotion that was given in April of 2006.
5   A. I was talking about the other one. I don't
6     know.
7   Q. Do you know of any white applicants that got
8     preference on their test grades?
9   A. I don't know.
10   Q. Look at number 27. You make a reference to the
11     City violating and continuing to violate a
12     federal court order requiring them to alter
13     hiring and promotion policies and procedures to
14     provide equitable treatment to
15     African-Americans.
16        What court order are you referring to?
17         MR. HORSLEY: Object to the form.
18   A. I don't know.
19   Q. Well, what is it that you say the City is doing
20     wrong that they violate a federal court order?
21         MR. HORSLEY: Object to the form.
22   Q. Do you know?
23   A. I'd say giving the test to weed out

Page 165

1　　　African-American applicants. They are running
2　　　the student firefighter program and not getting
3　　　any African-Americans to apply and therefore be
4　　　hired full-time.
5　　Q.　I'm sorry. I missed the first one. Something
6　　　about test.
7　　A.　Yeah. They decided to change the policies and
8　　　give a test and weed out African-American
9　　　applicants from being promoted.
10　Q.　And then they do the student firefighter
11　　　program, and blacks don't get hired, or
12　　　African-Americans?
13　A.　Exactly.
14　Q.　Do you know what advertising the City does for
15　　　the student firefighter program?
16　A.　I know some of it. I know they recently tried
17　　　to improve on some of it, I guess, when they
18　　　started going around to more schools. But they
19　　　had quit going anywhere for a long time.
20　Q.　When did they quit going anywhere?
21　A.　Because I went and talked to some -- to a church
22　　　at one time about twelve years ago and -- talked
23　　　to an African-American church and talked to some

Page 166

1　　　people trying to get some people to come in.
2　　Q.　At the request of the City?
3　　A.　At the request of -- It was at the request of my
4　　　training chief. I guess he had got orders from
5　　　somebody. I don't know who it was.
6　　Q.　And so you went to a black church and tried to
7　　　recruit people to apply for the student
8　　　firefighter program?
9　　A.　But they stopped. And I know they stopped --
10　Q.　Let's go back to that.
11　A.　Yes, I did.
12　Q.　And how many people from that black church
13　　　applied?
14　A.　I have no idea.
15　Q.　Do you know of any?
16　A.　All I know is we put on a seminar.
17　Q.　And did they do that in other black churches?
18　A.　That's the one I went to.
19　Q.　You don't know what else they did?
20　A.　I don't know what else they did.
21　Q.　Why do you say you know they've quit that?
22　A.　I just know they hadn't did it in a while.
23　Q.　But you know they did it about twelve years ago?

Page 167

1　　A.　Yeah. Twelve or thirteen.
2　　Q.　Because you went out there?
3　　A.　Because I went out there, and I could speak for
4　　　that.
5　　Q.　You don't know how many folks that led to apply,
6　　　do you?
7　　A.　Exactly. I don't know. I wouldn't have
8　　　privilege to that information.
9　　Q.　Do you know if Gerald Stephens ever went to any
10　　　churches?
11　A.　No, I don't.
12　Q.　Do you know of anything else the City has done
13　　　in the last twelve or thirteen years to try to
14　　　get more applicants from the minority blacks?
15　A.　No, I don't.
16　Q.　How is the City violating, in your opinion, a
17　　　court order on promotion process?
18　　　　　MR. HORSLEY: Object to the form.
19　A.　All I know is I got promoted in 1996, in June.
20　　　Lieutenant Stephens were promoted in April.
21　　　He's applied for several jobs and didn't get
22　　　them. I've applied for one. I was looking at
23　　　him struggle through the process, and I was,

Page 168

1　　　like, they still not going to promote us. And
2　　　then I looked back at Chris Turner, and he get
3　　　beat side the head every day when he goes in and
4　　　take those tests, whatever they give him in
5　　　there, and he has to supervise guys and they
6　　　come in and outrank him in a year. And that's
7　　　what I know. And we are the only three blacks
8　　　there. That's what I knew are those facts.
9　　Q.　And you sat on -- Are they structured interviews
10　　　for Chris Turner, for team leader?
11　A.　I know the one I sat in on was a structured
12　　　interview.
13　Q.　Do y'all get together and talk about the
14　　　applicants after that and make sure everybody is
15　　　consistent or talk about the grading?
16　A.　They did. Sometime they would.
17　Q.　Well, did you?
18　A.　Yeah. I did that time.
19　Q.　Well, did you think the people were unfair in
20　　　their evaluations of Chris Turner or the other
21　　　applicants when you did it?
22　　　　　MR. HORSLEY: Object to the form.
23　A.　At that point I didn't think about it. I didn't

Page 169

1　think about it. I was in there and I gave him a
2　score, and I scored him pretty well. That's all
3　I was concerned with.
4　Q. Now, you've got a complaint in here for
5　retaliation. It says you engaged in
6　statutorily-protected expressions such as EEOC
7　charges and grievances.
8　　My understanding is you had never filed an
9　EEOC charge or grievance before this.
10　A. No.
11　Q. Is there any other statutorily-protected
12　expressions that you think you engaged in that
13　resulted in you being denied a promotion?
14　　MR. HORSLEY: Object to the form.
15　A. I didn't engage in it directly, but I think I
16　suffered for that 1996 lawsuit of Lieutenant
17　Strickland, Lieutenant Card, and Lieutenant Bill
18　Felton, and Chris Turner.
19　Q. How do you suffer for that?
20　A. I think that they just made up their mind they
21　didn't want any blacks working there anymore,
22　that if they get rid of us, they'll be fine, and
23　that they wasn't going to promote us, and they

Page 170

1　wasn't going to hire anymore to make sure no
2　more ever worked there if they could get away
3　with it.
4　Q. But you didn't participate in that lawsuit?
5　A. No. I didn't participate in it, but I'm just as
6　black as they were.
7　Q. Did they ask you to participate in it?
8　A. No. I make my own mind up. This is serious
9　business.
10　Q. But in terms of you actually participating in
11　any statutorily-protected expression, you can't
12　name any of that, can you?
13　　MR. HORSLEY: Object to the form.
14　A. No, sir.
15　Q. And then we have here that the employment
16　practices of the City -- of the defendants --
17　I'm going get to the defendants in a minute.
18　　What does this mean to you, built-in
19　headwind?
20　　MR. HORSLEY: Object to the form.
21　A. It means something that's put there that really
22　don't carry any weight, but it stops a
23　particular group from advancing. That's exactly

Page 171

1　what it means to me.
2　Q. And I know you didn't draft this, but I just
3　want you to explain to me what you understand
4　your suit is about the disparate impact.
5　　MR. HORSLEY: Object to the form.
6　A. I didn't write it.
7　Q. I understand.
8　A. But in layman terms, the way they select people
9　through the student firefighter program. Like I
10　said, the last black person that was hired was
11　twelve years ago. The way they promote us --
12　There's three of us down there. Chris has been
13　there 20-something years and still making
14　firefighters pay, but he can do the job and
15　everybody is confident in his abilities to do
16　his job. Everybody got weaknesses.
17　　I can't get promoted. I've been there
18　working on 25 years now, and they come up with
19　different rules and sets. And I know it's
20　affecting us. I can't worry about who else it's
21　affecting. It's affecting us three
22　African-Americans that work there and the
23　ones -- the potential of keeping ones from ever

Page 172

1　working there.
2　Q. Have you had any conversations with Larry
3　Langley about this promotion procedure or race
4　discrimination?
5　A. Two things he said to me was he know he need to
6　hire some blacks.
7　Q. Now, what year did he say that?
8　A. He said that right before we had that battalion
9　chiefs exam in 2005. He mentioned that to me.
10　Q. Anything else he said --
11　A. After the test I had talked with him about I
12　didn't think it was fair the way they did the
13　procedure.
14　Q. And what did he say?
15　A. I didn't have nothing to do with it. That's
16　exactly what he said: I didn't have nothing to
17　do with it.
18　Q. Any other conversations you've had with him
19　about this lawsuit or your complaints --
20　A. No, sir.
21　Q. -- for promotion, hiring, race discrimination or
22　anything?
23　A. No, sir.

Page 173

1  Q.  Any conversations you've had with Lee Lamar
2      about your complaints, this lawsuit, promotion,
3      hiring, race discrimination?
4  A.  Other than when I made that little gesture about
5      my reservations about the test.
6  Q.  The ones you already told me about?
7  A.  Yes.
8  Q.  Anything else you talked to Lee about?
9  A.  No, sir.
10 Q.  Any conversations you had with Mayor Ham about
11     your complaints, promotions, hiring, race
12     discrimination?
13 A.  No, sir.
14 Q.  This lawsuit?
15 A.  No, sir.
16 Q.  Have you ever spoken to Mayor Ham about
17     anything?
18 A.  No, sir.
19 Q.  Steve Reeves.  Any conversations you've had with
20     Steve Reeves about the procedure, the test, race
21     discrimination, hiring, promotion, complaints,
22     this lawsuit?
23 A.  No, sir, I haven't spoken to Mr. Reeves.

Page 174

1  Q.  Bill James.  Any conversations you've had with
2      him about this lawsuit, your complaints, race
3      discrimination, promotion, hiring, procedures,
4      tests?
5  A.  No, sir.
6  Q.  Any conversations with Bill James?
7  A.  No, sir.
8  Q.  Charles Duggan.  Any conversations with Charles
9      Duggan --
10 A.  Other than that correspondence, that letter that
11     we sent.
12 Q.  Written correspondence?
13 A.  Yes.
14 Q.  Any verbal communication?
15 A.  (Witness nods head negatively.)
16 Q.  Ever spoken to him about anything?
17 A.  Other than just --
18 Q.  Hey, how are you?
19 A.  Yeah.
20 Q.  You never talked to Charles Duggan about your
21     complaints, this lawsuit, policies, procedures,
22     hiring, promotion, race discrimination or
23     anything?

Page 175

1  A.  No.  No, sir.  He just took over that job
2      probably a year and a half ago.
3  Q.  Did you ever have any with his predecessor,
4      David Watkins?
5  A.  No, sir.
6  Q.  Did you ever have any with Doug Watkins?
7  A.  No, sir.
8  Q.  Did you ever have any conversation with Cortez
9      Lawrence complaining about race discrimination
10     or promotions or hiring?
11 A.  No, sir.
12 Q.  If you would, just summarize for me what your
13     complaints are, why you filed this lawsuit.
14         MR. HORSLEY:  Object to the form.
15 A.  I got the way the City conducts its policy and
16     procedures as far as using that test and that
17     that disparate impact claim, because you can
18     look around at the numbers and you can tell it's
19     having an impact.
20 Q.  And I guess the gist of all that is that you're
21     complaining that you've been denied a promotion
22     because of your race?
23 A.  Yes, sir.

Page 176

1  Q.  As a result of --
2  A.  Of the policy of giving that test with that
3      cutoff score.
4  Q.  And the disparate impact?
5  A.  Yes.
6  Q.  Tell me what you understand, if anything, that
7      Larry Langley had to do with the two things that
8      you just told me about.
9  A.  He didn't hire -- He was telling me he know he
10     need to hire some blacks.  And he was a
11     decision-maker so I figured if he was telling
12     me, he could go out and make something
13     happened.  And he upheld the fact to give us
14     this promotional procedure.
15 Q.  Anything else you think Larry Langley did to
16     discriminate against you on the basis of your
17     race?
18 A.  No.  Those two.
19 Q.  What do you think Lee Lamar did to discriminate
20     against you on the basis of your race?
21 A.  He was part of the decision-making process to do
22     it this way, to promote this way.
23 Q.  The procedure that was in place?

Page 177

1   A.  Exactly.
2   Q.  Written test and the assessment center?
3   A.  Exactly.
4   Q.  Anything specifically you know that Lee did?
5   A.  No.
6   Q.  What is it that Mayor Ham did that you think --
7   A.  His decision --
8   Q.  Let me get my question out.
9       What is it that Mayor Ham did in your
10      opinion that discriminated against you on the
11      basis of your race?
12  A.  I'm sorry about cutting you off.
13      He's a decision-maker, and he upheld that
14      decision when we filed the grievance.
15  Q.  Upheld the grievance?
16  A.  Upheld the decision not to promote us after we
17      filed a grievance.  I guess he in the chain.
18  Q.  Well, do you know of anything in particular he
19      did in regard to the test or the promotion
20      procedure?
21  A.  No, not anything particular.
22  Q.  Other than being mayor, do you know of any
23      involvement he had in this?

Page 178

1   A.  No, sir.
2   Q.  And Steve Reeves.  What is it that you think
3       Steve Reeves has done to discriminate against
4       you on the basis of race?
5   A.  He upheld the decision.  He was part of the
6       chain that made the decision to promote this
7       way.
8   Q.  To implement the procedure you're complaining
9       about?
10  A.  Yes, sir.
11  Q.  Anything else that Steve Reeves did?
12  A.  Not that I can think of.
13  Q.  I don't want to keep beating this up.  Let's say
14      that's true.  Let's say Steve Reeves had some
15      input.  Do you say he did that knowing it was
16      going to affect blacks?
17          MR. HORSLEY:  Object to the form.
18  A.  I have no idea.  I know it did affect blacks.  I
19      can't say what they were thinking before.
20  Q.  I understand that, but you sued him claiming he
21      racially discriminated against you --
22  A.  That's the way it end up.
23  Q.  Other than approving the policy, if he did,

Page 179

1   other than whatever input he had in the
2   promotion procedure, you say he intentionally
3   did that to discriminate against you on the
4   basis of your race?
5       MR. HORSLEY:  Object to the form.
6   A.  I can't say he intentionally did anything.
7   Q.  Well, let's go through it, and I'll get that
8       question next.
9       Bill James.  What do you say Bill James did
10      to discriminate against you on the basis of your
11      race?
12  A.  He upheld the decision to promote this way --
13      use the procedure to promote.
14  Q.  And Charles Duggan, what do you say --
15  A.  He had the final say, and he upheld the decision
16      not to promote us.
17  Q.  Let's say you're correct, that all these six
18      folks -- Langley, Lamar, Ham, Reeves, James, and
19      Duggan -- all had a hand in agreeing to the
20      procedure that was being used.  Do you have any
21      evidence, any facts, any hearsay, any documents,
22      anything that would lend weight to a claim that
23      those people did it with the purpose of racially

Page 180

1   discriminating against you and Lieutenant
2   Stephens?
3       MR. HORSLEY:  Object to the form.
4   A.  Everything I have, sir, my lawyer has, documents
5       and otherwise.  So I wouldn't -- I'm not a legal
6       mind.  That's why we hired him.
7   Q.  But do you know of anything?
8   A.  No, I don't.
9   Q.  Do you know of any reason that Larry Langley
10      would discriminate against you on the basis of
11      your race?
12  A.  I don't have any evidence, and I don't know
13      anything.
14  Q.  In summary, is it fair to say that you don't
15      have any evidence that any of these individuals
16      discriminated against you?  Your complaint is
17      that the procedure was in place, and you didn't
18      get promoted as a result of the procedure in
19      place?
20          MR. HORSLEY:  Object to the form.
21  A.  Yes, sir.
22  Q.  You don't know of anything that Lee did or Steve
23      did or Bill Ham or James or anybody did to keep

Deposition of Eddie Ogletree                                                June 6, 2008

Page 181

1    you from being promoted because of your race?
2                MR. HORSLEY: Object to the form.
3    A.  I don't have -- No, sir.
4                MR. MORGAN:  I've got one little
5          area.  If we can take about a
6          five-minute break, I may be about
7          through.
8                MR. HORSLEY:  Okay.
9                (Brief recess.)
10   Q.  (Continuing by Mr. Morgan) Tell me what damages
11        you claim in this lawsuit.  How do you claim
12        you've been damaged and what do you seek for
13        relief?
14               MR. HORSLEY:  Object to the form.
15   A.  I think it's punitive.
16   Q.  Punitive?
17   A.  I think it's punitive damages on there.
18   Q.  Well --
19   A.  And compensatory.
20   Q.  Tell me what compensatory damages you claim
21        you've been denied or that you're entitled to.
22               MR. HORSLEY:  Object to the form.
23   A.  That's the raise that go along with being

Page 182

1        promoted, the raise in your retirement benefits.
2    Q.  Any other money damages?
3    A.  I wouldn't know any right now when it comes to
4        that.  I know that's immediate right there.
5        That's immediate effect.
6    Q.  Do you make any claim for mental anguish or
7        emotional distress?
8    A.  Like I said before, my wife worry about me
9        because I'm usually a pretty happy-go-lucky
10       guy.  And it's been weighing on me a little bit.
11   Q.  What do you mean by weighing in on you?
12   A.  You know, I'm thinking about it all the time.
13       I'm bothering her, you know.  I don't take
14       lightly what's going on here and everything, and
15       it's just -- You know, to think that you done
16       put as many years as I have at a place and to be
17       denied a promotion, it just bothers you.  It
18       bothers you.
19   Q.  Well, have you been to see any doctors about
20       being bothered?
21   A.  No.  I got doctors I see, but not lately.
22   Q.  What doctors do you see?
23   A.  Well, I got a chronic stomach problem anyway,

Page 183

1    and so I ...
2    Q.  How long have you had that?
3    A.  Years.
4    Q.  Who do you see for that?
5    A.  Dr. Boyer.
6    Q.  Do you have what I call a family doctor or
7        primary care physician?
8    A.  Yes.
9    Q.  Who is that?
10   A.  I'm trying to call his name.  He got a foreign
11       name.  I missed my last appointment so -- I
12       can't think of his name right off, but I got a
13       family doctor I see.
14   Q.  Have you seen any psychiatrists or
15       psychologists --
16   A.  No, sir.
17   Q.  -- or mental health specialists for this
18       weighing on your mind?
19   A.  No, sir.
20   Q.  Received any medications or prescriptions for
21       sleeping or nerves or being anxious or anything?
22   A.  No, sir.  I take blood pressure medication,
23       but --

Page 184

1    Q.  You already did that before?
2    A.  Yes, sir.
3    Q.  Have you complained to Boyer or this
4        foreign-named doctor or any other doctor about
5        anxiety, nervousness, complaints about this
6        lawsuit or anything?
7    A.  No, sir.
8    Q.  Complaints about any of your employment with the
9        City or promotion?
10   A.  I just --
11   Q.  Any complaints or seen any medical providers,
12       psychological or anybody?
13   A.  No, I haven't complained to any.
14   Q.  Any other compensatory damages other than the
15       raise, increase in retirement benefits, and the
16       mental anguish and emotional distress?
17   A.  No.
18   Q.  And you said punitive damages.  Is there
19       anything that you know of that these six
20       individuals that you've sued -- let me just
21       rephrase it -- that any of these individuals
22       you've sued has done wrong that you think would
23       entitle you to punitive damages from them?

Page 185

1          MR. HORSLEY:  Object to the form.
2   A.  No.
3   Q.  I think we've been through this before.  You
4       don't know of anything they did to intentionally
5       discriminate against you because of your race?
6   A.  No.  That's right.  I don't know.
7   Q.  Have we covered all your damages?
8   A.  I think that's it.
9          MR. MORGAN:  That's it.
10         EXAMINATION
11  BY MR. HANCOCK:
12  Q.  Mr. Ogletree, I want to make sure I fully
13      understand your disparate impact claim.  My
14      understanding is you're not claiming that the
15      test -- the CWH test itself had a negative
16      impact on black employees at the Auburn Fire
17      Department, are you?
18  A.  Not the test itself.
19  Q.  It's the policy that utilizes the test as part
20      of it, but it was the policy that didn't take
21      into consideration years of service, that didn't
22      allow all applicants to go through all phases of
23      the process, including the practical side, the

Page 186

1       assessment, the in-basket and that sort of
2       thing, and result in a total score of looking at
3       all components of the process; is that correct?
4   A.  Yes, sir.
5          MR. HANCOCK:  No further questions.
6          MR. MORGAN:  Is that it?
7          MR. HANCOCK:  Richard, do you mind if
8          I ask Mr. Stephens those same
9          questions?
10         MR. HORSLEY:  That's fine.
11         (Off-the-record discussion.)
12         EXAMINATION CONTINUING OF MR. OGLETREE
13  BY MR. MORGAN:
14  Q.  You don't have a complaint about the test and
15      the way it was graded or the way the scores came
16      out.  You just complained that you weren't
17      allowed to go through the whole process?
18         MR. HORSLEY:  Object to the form.
19  A.  Yes, sir.
20         MR. HORSLEY:  I'm objecting to the
21         form because he has already
22         testified about problems that he
23         did have with the test itself and

Page 187

1       that's --
2   Q.  Well, you thought -- do you think the test
3       fairly tested what a battalion chief did at the
4       City of Auburn, the written test?
5          MR. HORSLEY:  Object to the form.
6   A.  I answered it -- I told -- It's back in my
7       testimony that I didn't think some components of
8       it we used at the City of Auburn.
9          MR. MORGAN:  Okay.
10         EXAMINATION
11  BY MR. HANCOCK:
12  Q.  But you're not claiming in this lawsuit that the
13      vagueness of the test is what caused the adverse
14      impact.  It's the City's policy of not taking
15      into consideration other factors and allowing
16      the applicants to go through the entire process?
17         MR. MORGAN:  Object to the form of
18         that question.
19         MR. HANCOCK:  I'm just asking what his
20         claim is in this lawsuit.
21  A.  Yes, sir.
22         EXAMINATION
23  BY MR. MORGAN:

Page 188

1   Q.  So just to be clear, your only complaint with
2       the test; that is, whether it tested stuff you
3       were supposed to do, disparate impact -- your
4       only complaint with the test is the 70 cutoff
5       score; otherwise, you're happy with the test?
6          MR. HORSLEY:  Object to the form.
7   A.  Yes, sir.
8       ADDITIONAL EXAMINATION OF MR. STEPHENS
9   BY MR. HANCOCK:
10  Q.  Mr. Stephens, you've heard the questions that
11      Mr. Morgan and I have asked Mr. Ogletree.  Do
12      you agree -- Is your testimony and your position
13      in this lawsuit and the claims you bring the
14      same that Mr. Ogletree has just testified to?
15  A.  Yes, sir --
16         MR. MORGAN:  Object to the form.
17  A.  -- it is the same.
18  Q.  You don't have a complaint about the test
19      itself; it's the City's policy of not using
20      additional factors in the ultimate decision as
21      to who would be promoted to battalion chief; is
22      that correct?
23         MR. MORGAN:  Object to the form.

Page 189

```
1    A.  Yes, sir.
2              MR. HANCOCK:  Nothing else.
3              EXAMINATION
4    BY MR. MORGAN:
5    Q.  Just to be clear, you do not make any claim in
6        this lawsuit that the test itself, the written
7        test, has a disparate impact; is that true?
8              MR. HORSLEY:  Object to the form.
9              That's a legal question.
10   Q.  Well, do you claim or don't claim that the
11       written test has a disparate impact?
12             MR. HORSLEY:  Object to the form.
13   Q.  Do you know one way or the other?
14   A.  I don't know one way or the other, Mr. Morgan.
15   Q.  Do you claim in this lawsuit -- Wait a minute.
16       Let me rephrase.
17         Do you agree that the test -- the written
18       test is job related and tests those factors that
19       are important for a battalion chief with the
20       City of Auburn Fire Department?
21             MR. HORSLEY:  Object to the form.  You
22             can answer.
23   A.  Again, Mr. Morgan, I'm not a expert.  Your
```

Page 190

```
1    question, related to the field of fire
2    profession, but I don't necessarily think it
3    applies to the way we do things in Auburn.
4              MR. MORGAN:  I don't have anything
5              else.
6              (Deposition concluded at approximately
7              1:05 p.m.)
8              * * * * * * * * * * * *
9              FURTHER DEPONENT SAITH NOT
10             * * * * * * * * * * * *
11
12             REPORTER'S CERTIFICATE
13   STATE OF ALABAMA:
     MONTGOMERY COUNTY:
14
         I, Pamela A. Wilbanks, CCR, Registered
15
     Professional Reporter, and Commissioner for the State of
16
     Alabama at Large, do hereby certify that I reported the
17
     deposition of:
18
         EDDIE OGLETREE
19
     who was first duly sworn by me to speak the truth, the
20
     whole truth and nothing but the truth, in the matter of:
21
         EDDIE OGLETREE, an individual,
22
         GERALD STEPHENS, an
23
```

Page 191

```
1              Plaintiffs,
2              Vs.
3              CITY OF AUBURN, a municipality
4              in the State of Alabama, LARRY
5              LANGLEY, and individual, LEE LAMAR,
6              an individual, BILL HAM, JR., an
7              individual, STEVEN A. REEVES, an
8              individual, BILL JAMES, an
9              individual, CHARLES M. DUGGAN, an
10             individual, and CORTEZ LAWRENCE,
11             an individual,
12             Defendants.
13             In The U.S. District Court
14             For the Middle District of Alabama
15             Eastern Division
16             3:07-CV-867-WKW
17   on Friday, June 6, 2008.
18         The foregoing 190 computer printed pages
19   contain a true and correct transcript of the examination
20   of said witness by counsel for the parties set out
21   herein.  The reading and signing of same is hereby
22   waived.
23         I further certify that I am neither of kin nor
```

Page 192

```
1    of counsel to the parties to said cause nor in any
2    manner interested in the results thereof.
3         This 17 day of June 2008.
4
5
6
7
8
9
10
11         _____
           Pamela A. Wilbanks, ACCR #334
12         Expiration Date:  9-30-2008
           Registered Professional Reporter
13         and Commissioner for the State
           of Alabama at Large
14
15
16
17
18
19
20
21
22
23
```

# DEPOSITION TESTIMONY OF
# GERALD STEPHENS

# DEPOSITION OF GERALD STEPHENS

## May 30, 2008

## Pages 1 through 251

## PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net



Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3               EASTERN DIVISION
 4
 5   EDDIE OGLETREE, an individual,
     GERALD STEPHENS, an
 6   individual,
 7        Plaintiffs,
 8   Vs.            CIVIL ACTION NO.
                    3:07-CV-867-WKW
 9
     CITY OF AUBURN, a municipality
10   in The State of Alabama, LARRY
     LANGLEY, and individual, LEE LAMAR,
11   an individual, BILL HAM, JR., an
     individual, STEVEN A. REEVES, an
12   individual, BILL JAMES, an
     individual, CHARLES M. DUGGAN, an
13   individual, and CORTEZ LAWRENCE,
     an individual,
14
15        Defendants.
16   * * * * * * * * * * * * *
17   DEPOSITION OF GERALD STEPHENS, taken pursuant
18   to stipulation and agreement before Pamela A. Wilbanks,
19   Certified Court Reporter, ACCR# 391, Registered
20   Professional Reporter and Commissioner for the State of
21   Alabama at Large, in the Law Offices of Hill, Hill,
22   Carter, Franco, Cole & Black, 425 South Perry Street,
23   Montgomery, Alabama, on Friday, May 30, 2008, commencing
```

Page 2

```
 1              APPEARANCES
 2   FOR THE PLAINTIFFS:
 3   Mr. Richard F. Horsley
     KING, HORSLEY & LYONS
 4   Attorneys at Law
     1 Metroplex Drive
 5   Suite 280
     Birmingham, AL  35209
 6
     FOR THE DEFENDANTS:
 7
     Mr. Randall Morgan
 8   HILL, HILL, CARTER, FRANCO, COLE & BLACK
     Attorneys at Law
 9   425 South Perry Street
     Montgomery, Alabama
10
     FOR CWH:
11
     Mr. William K. Hancock
12   ADAMS & REESE
     Attorneys at Law
13   Suite 1100
     2100 Third Avenue North
14   Birmingham, AL  35203
15   ALSO PRESENT:
16   Mr. Eddie Ogletree
     Mr. Steven Reeves
17   Mr. Lee Lamar
18
     * * * * * * * * * * * * *
19
          EXAMINATION INDEX
20
     BY MR. MORGAN . . . . . . . . . .   5
21   BY MR. HORSLEY . . . . . . . . . .  237
     BY MR. MORGAN . . . . . . . . . .   242
22
23   * * * * * * * * * * * * *
```

Page 3

```
 1            DEFENDANTS' EXHIBIT INDEX
 2    1   Copy of posting for the position of      78
          Battalion Chief
 3
      2   Copy of memo sent by e-mail dated 2/17/06  78
 4        to all personnel from Mr. Lamar concerning
          the Battalion Chiefs Assessment
 5
      3   Copy of memo sent by e-mail dated 2/23/06  80
 6        to all career personnel from Chief Langley
          concerning the Battalion Chiefs Assessment
 7
      4   Sign-in sheet for the Battalion Chief      83
 8        Assessment Orientation dated 2/28/06
 9    5   Copy of Auburn Fire Division Orientation   87
          Manual
10
      6   Copy of 3/3/06 letter to the Battalion    100
11        Chief candidates from Mr. Lamar
12    7   Auburn Fire Division Battalion Chief      100
          Reading List Check-out Sheet, 3/3/06
13
      8   Auburn Fire Division Battalion Chief      100
14        Reading List Check-out Sheet, 3/3/06
15    9   Mr. Stephens' application for the        104
          promotion to Battalion Chief
16
     10   Copy of 4/4/05 letter to Mr. Stephens from  125
17        Steve Reeves
18   11   Copy of 4/14/06 letter to Mr. Stephens from  127
          Stephanie King
19
     12   Copy of 4/21/06 letter to Mr. Chief Lamar  128
20        from Mr. Clanton, Mr. Hodge, Mr. Ogletree
          and Mr. Stephens
21
22   13   Copy of the Charge of Discrimination       188
23
```

Page 4

```
 1                STIPULATION
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of GERALD STEPHENS is taken pursuant to the
 5   Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Pamela A. Wilbanks,
 7   Registered Professional Reporter and Commissioner for
 8   the State of Alabama at Large, without the formality of
 9   a commission, that objections to questions other than
10   objections as to the form of the question need not be
11   made at this time but may be reserved for a ruling at
12   such time as the said deposition may be offered in
13   evidence or used for any other purpose by either party
14   provided for by the Statute.
15        It is further stipulated and agreed by and
16   between counsel representing the parties in this case
17   that the filing of said deposition is hereby waived and
18   may be introduced at the trial of this case or used in
19   any other manner by either party hereto provided for by
20   the Statute regardless of the waiving of the filing of
21   the same.
22        It is further stipulated and agreed by and
23   between the parties hereto and the witness that the
```

Page 5

1 signature of the witness to this deposition is hereby
2 waived.
3
4 . . . . . . . . . . . . . . .
5
     GERALD STEPHENS
6
     The witness, after having first been duly sworn
7
to speak the truth, the whole truth and nothing but the
8
truth testified as follows:
9
     EXAMINATION
10
BY MR. MORGAN:
11
Q.   State your name, please.
12
A.   My name is Gerald Stephens.
13
Q.   And Mr. Stephens, where do you live?
14
A.   I live in Auburn, Alabama.
15
Q.   What is your address?
16
A.   My address is 828 Cahaba Drive, Auburn, Alabama
17
     36830.
18
Q.   And who do you live with there?
19
A.   I live with my wife and my son.
20
Q.   What is your wife's name?
21
A.   My wife name is Richetta, R-I-C-H-E-T-T-A.
22
Q.   And your son's name?
23

Page 6

1  Q.   Richetta, where does she work?
2  A.   Richetta works with Media General, which is a
3       company that oversees the Opelika-Auburn News of
4       Opelika.
5  Q.   And how old is your son Jameson?
6  A.   My son Jameson is four years old.
7  Q.   Do you have any ex-wives?
8  A.   No, sir, I don't.
9  Q.   Got any other children?
10 A.   Yes, sir, I do.
11 Q.   And their names and ages?
12 A.   I have one daughter.  She's 17 years old.  Her
13      name is Tarnesha, T-A-R-N-E-S-H-A.
14 Q.   And where does she live?
15 A.   She also lives in Auburn.
16 Q.   Does she attend high school there?
17 A.   Yes, sir, she does.
18 Q.   Which high school?
19 A.   Auburn High School.
20 Q.   Who is her mother?
21 A.   Her mother name is Tasha Smith.
22 Q.   Where does Tasha live?
23 A.   She also lives in Auburn.

Page 7

1  Q.   Where does she work?
2  A.   Last I recall she works at Lambert Child Care of
3       Auburn.
4  Q.   This case is in federal court, and I guess
5       probably the easiest thing would be to send some
6       interrogatories.  But I'm going to ask you if
7       you've got any relatives in any of these
8       counties.
9           Do you have any relatives by blood or
10      marriage in Lee County?
11 A.   Yes, sir, I do.
12 Q.   How about Chambers County?
13 A.   No, sir.
14 Q.   Macon County?
15 A.   No, sir.
16 Q.   Randolph County?
17 A.   No, sir.
18 Q.   Russell County?
19 A.   No, sir.
20 Q.   Tallapoosa County?
21 A.   No, sir.
22 Q.   How many relatives do you have in Lee County?
23 A.   Several.

Page 8

1  Q.   Let me just send an interrogatory.
2           Are your parents still living?
3  A.   My mother is.  My father is deceased.
4  Q.   Where does your mother work, if she does?
5  A.   My mother is retired.
6  Q.   From where?
7  A.   She was in child care.  She worked in several
8       different places.  The last place she worked was
9       First Baptist Church.
10 Q.   And what is her name?
11 A.   Dorothy Stephens.
12 Q.   And your father's name?
13 A.   James.
14 Q.   And where was his last employment?
15 A.   Post Office of Auburn, Alabama.  U.S. Postal
16      Service.
17 Q.   Do you have any brothers?
18 A.   I do.
19 Q.   That live in Lee County?
20 A.   Yes, sir.
21 Q.   How many?
22 A.   I have two brothers -- three brothers -- I'm
23      sorry -- that live in Lee County.

Page 9

| | |
|---|---|
| 1 | Q. Just give me their names. |
| 2 | A. Terry Byrd. B-Y-R-D, last name. Russell Byrd |
| 3 | and Clemmon Byrd. |
| 4 | Q. Where does Terry work? |
| 5 | A. He's disabled at this time. He doesn't work |
| 6 | anymore. |
| 7 | Q. Russell? |
| 8 | A. He's disabled as well. |
| 9 | Q. And Clemmon? |
| 10 | A. Clemmon is a police officer of the City of |
| 11 | Auburn, police division. |
| 12 | Q. And are they married? |
| 13 | A. Clemmon is. |
| 14 | Q. What's his wife's name? |
| 15 | A. Allison. |
| 16 | Q. Where does she work? |
| 17 | A. I think she works with Mental Health of Lee |
| 18 | County, if I'm not mistaken. |
| 19 | Q. What's her maiden name? |
| 20 | A. I'm not really sure about that, Mr. Morgan. |
| 21 | Q. Got any sisters? |
| 22 | A. I do. |
| 23 | Q. How many sisters? |

Page 10

| | |
|---|---|
| 1 | A. One sister. |
| 2 | Q. And her name is ... |
| 3 | A. Cassandra Stephens Pitts. |
| 4 | Q. Where does she work? |
| 5 | A. She works in Montgomery. |
| 6 | Q. What does she do over here? |
| 7 | A. She works with the IRS Department of the State. |
| 8 | Q. And her husband's name, if she has one? |
| 9 | A. She's divorced, but her ex-husband name is |
| 10 | Robert Pitts. |
| 11 | Q. And where does he live and work? |
| 12 | A. He works in Opelika. He lives in Auburn. |
| 13 | Q. What does he do in Opelika? |
| 14 | A. He works at the UniRoyal Plant. |
| 15 | Q. Are you a member or do you regularly attend a |
| 16 | church? |
| 17 | A. Yes, sir, I do. |
| 18 | Q. What is that church? |
| 19 | A. My church home is Ebeneezer Baptist Church of |
| 20 | Auburn. |
| 21 | Q. Do you attend another church? |
| 22 | A. Mr. Morgan, I attend several churches in the |
| 23 | City of Auburn. I attend my wife's church, |

Page 11

| | |
|---|---|
| 1 | which is St. Luke CME, also of Auburn. |
| 2 | Q. Okay. |
| 3 | A. I attend Auburn United Methodist Church, which |
| 4 | is also of Auburn. And I also attend Greater |
| 5 | Peace Baptist Church, which is in Opelika, |
| 6 | Alabama. |
| 7 | Q. But you are officially a member of Ebeneezer? |
| 8 | A. Yes, sir. |
| 9 | Q. And I assume you attend St. Luke's because your |
| 10 | wife goes there? |
| 11 | A. Yes, sir. Wife and son. |
| 12 | Q. What about these other two: Auburn United |
| 13 | Methodist and Greater Peace? |
| 14 | A. Those are just neighboring churches in the |
| 15 | community that I'm affiliated with the people |
| 16 | that go there and the ministers. So I attend |
| 17 | them on a regular basis. |
| 18 | Q. Do you hold any position in any of these |
| 19 | churches? |
| 20 | A. No, sir. |
| 21 | Q. Deacon or anything like that? |
| 22 | A. No, sir. |
| 23 | Q. Are you a member of any clubs, civic, social -- |

Page 12

| | |
|---|---|
| 1 | A. I am a member -- I'm sorry. |
| 2 | Q. -- political organizations in Lee County or any |
| 3 | of these other counties? |
| 4 | A. I am a member of an organization by the name of |
| 5 | People of Action for Community Enrichment. The |
| 6 | icon on that is PACE, and it is of Lee County. |
| 7 | Q. What kind of group is that? What do they do? |
| 8 | A. It's a social communication where we implement |
| 9 | youth development and educational skills. We |
| 10 | oversee our organization, which is a reading |
| 11 | club, to induce basically educational skills for |
| 12 | growing youth. |
| 13 | Q. Is that a mixed race group? |
| 14 | A. Yes, sir, it is. |
| 15 | Q. Where is it located? Does it have an address? |
| 16 | A. We meet monthly in Opelika. We don't have a |
| 17 | general area where we consider to be a part of. |
| 18 | Q. Are there any other Auburn firefighters that are |
| 19 | members of that club? |
| 20 | A. No, sir, not that I'm aware of. |
| 21 | Q. Are you a member of the NAACP? |
| 22 | A. No, sir. |
| 23 | Q. Have we covered all your clubs, civic, political |

Page 13

1    organizations?
2    A.  (Witness nods head positively.)
3    Q.  Any others?
4    A.  Not that I'm aware of at this time, sir.
5    Q.  Or any that you've been a member of, say, within
6        the last five years that you're no longer a
7        member of?
8    A.  I am a part of a Masonic organization, if that
9        would apply to it or whatever.
10   Q.  Okay.  Where is it located?
11   A.  Auburn.
12   Q.  What's the name of it?
13   A.  Milton W. Howze, H-O-W-Z-E.  Lodge Number 408.
14   Q.  And what does that organization do?
15   A.  Community involvement as far as -- Basically
16       what we do is just help out in the community,
17       help local businesses, fundraisers, anything
18       that pretty much enhances the community.
19   Q.  Have you, other than this lawsuit, been a
20       plaintiff, sued anyone else, other than this
21       lawsuit?
22   A.  No, sir, not that I can recall.
23   Q.  Have you ever been sued by anybody?

Page 14

1    A.  No, sir.
2    Q.  Ever been in bankruptcy?
3    A.  No, sir.
4    Q.  Have you ever had any judgments against you for
5        anything?
6    A.  In reference to -- Just in particular?
7    Q.  Anything.  Loans, collections --
8    A.  No, sir.
9    Q.  -- cases?  Anything?
10   A.  No, sir.
11   Q.  Have you ever been arrested?
12   A.  In my early years, yes, sir.
13   Q.  What for?
14   A.  I had a driving violation, 16 years old.
15   Q.  Like a speeding ticket?
16   A.  DUI.
17   Q.  Anything else?
18   A.  Other than speeding tickets.  From that point
19       on, no, sir.
20   Q.  And any convictions?  Were you convicted of the
21       DUI?
22   A.  Yes, sir, I was.
23   Q.  Any other convictions other than that?

Page 15

1    A.  No, sir.
2    Q.  Tell me about your educational background.
3        You're a high school graduate?
4    A.  Yes, sir.
5    Q.  Where did you graduate from?
6    A.  Auburn High School.
7    Q.  What year?
8    A.  1990.
9    Q.  Have you attended college or junior colleges?
10   A.  Yes, sir.
11   Q.  Where have you been?
12   A.  Auburn University.
13   Q.  What year did you start?
14   A.  1990.
15   Q.  And did you complete it?
16   A.  No, sir.  1992.  I did two years at Auburn
17       University.
18   Q.  What was your course of study?
19   A.  Business.
20   Q.  And what was the reason why you did not complete
21       it?
22   A.  I had a child at the time, and I needed to work.
23   Q.  Did you have any academic problems?

Page 16

1    A.  No, sir.
2    Q.  Any other formal education?
3    A.  Yes, sir.  I attended several junior colleges:
4        Southern Union, Chattahoochee Valley State
5        Community College, Shelton State Community
6        College, Alabama State Fire College.
7    Q.  Is that at Shelton State or is that separate?
8    A.  Yes, sir.  That's through Shelton State in
9        Tuscaloosa.
10   Q.  In terms of Southern Union, did you receive a
11       diploma, certificate or anything from that or
12       were you attending courses related to your fire
13       work?
14   A.  Courses related to my fire work.
15   Q.  And how about Chattahoochee Valley?  Same thing?
16   A.  Courses related to my fire work.
17   Q.  Shelton State?
18   A.  Yes, sir.  Courses related to my fire work.
19   Q.  And the Alabama Fire College, is that something
20       that all firefighters attend or do you have to
21       be selected to attend the Alabama Fire College?
22       How does that work at Auburn?
23   A.  As far as I've been working there, it was an

Deposition of Gerald Stephens                                                                May 30, 2008

Page 17

1 opportunity for firefighters to go and to better
2 enhance themselves as far as the fire
3 professional field and career.
4 Q. Do you have to attend the Alabama Fire College
5 as an employee of Auburn Fire Department?
6 A. Yes, sir, I do.
7 Q. So all firefighters, once they are hired and
8 become, I guess, non-probationary, they have to
9 attend the fire college?
10 A. Yes, sir. In order to be employed with the
11 Auburn Fire Division, to my understanding you
12 must undergo several weeks of training which
13 comes from the State Fire College through
14 certifications and all that.
15 Q. Now, are there state-required minimum standards
16 for firefighters before you can be hired?
17 A. Before?
18 Q. Yes. Or as part of your hiring process.
19 A. Not before, no. And I'm only speaking from my
20 experience. When I was hired I underwent
21 educational and physical training through the
22 State Fire College at that point. It was not
23 prior to.

Page 18

1 Q. Okay. In order to be certified in the state of
2 Alabama as a firefighter, do you have to
3 complete certain things?
4 A. Yes, sir.
5 Q. And what do those include?
6 A. I had to complete Firefighter I certification.
7 Q. And where did you do that?
8 A. The training was conducted in Lee County at the
9 Opelika training grounds through my employer.
10 Q. Are you a veteran?
11 A. No, sir.
12 Q. No time in the military?
13 A. No, sir.
14 Q. When were you first employed with the City of
15 Auburn?
16 A. I was first employed in 1991.
17 Q. Now, were you a student firefighter?
18 A. Yes, sir, I was.
19 Q. And tell me what you had to do to be a student
20 firefighter.
21 A. Of course, I had to submit an application. And
22 once selected I had to undergo several weeks of
23 training, what they consider to be a rookie

Page 19

1 school.
2 Q. Who would be your supervisor when you were a
3 student firefighter?
4 A. My immediate supervisor was a team leader.
5 Q. Do you remember who?
6 A. If I'm thinking correctly, my first team leader
7 was by the name of Ronald Blankenship.
8 Q. And how long did you remain a student
9 firefighter?
10 A. Three years.
11 Q. That would have been up till about '94?
12 A. Yes, sir.
13 Q. And then you became a ...
14 A. Career firefighter, yes, sir.
15 Q. If you left Auburn in -- the university in '92,
16 how did you remain a student firefighter up
17 through '94?
18 A. I went to Auburn University for two years, and
19 then after that I started taking courses through
20 the junior colleges.
21 Q. Academic courses or fire-related courses?
22 A. Both.
23 Q. What junior colleges did you take academic

Page 20

1 courses in?
2 A. Southern Union and Chattahoochee Valley.
3 Q. Did you receive a certificate or diploma or
4 complete the coursework academically at either
5 Southern Union or Chattahoochee?
6 A. I have my grades and records to show that I
7 attended those, but certification-wise, not
8 during that period of time.
9 Q. What I'm asking is -- Usually, I guess, if you
10 go two years, you get some sort of certificate
11 at the end: I've completed this course of study
12 at a junior college. Did you ever achieve that
13 from either Southern Union or Chattahoochee?
14 A. No, sir.
15 Q. But that allowed you to stay on as a student
16 firefighter?
17 A. Yes, sir.
18 Q. What did you do to become a regular firefighter?
19 A. I submitted an application.
20 Q. And I assume you were hired?
21 A. Yes, sir.
22 Q. According to my notes, I've got that you were
23 hired January 17, 1994. Is that about right?

Page 21

1  A. That was my first day on shift. I was
2     actually — According to my state retirement
3     records and all that, I officially started
4     January 1st.
5  Q. Of '94?
6  A. Yes, sir.
7  Q. Speaking of retirement, do you get time credited
8     on your retirement for the period when you were
9     a student firefighter?
10 A. I didn't ever get any, no, sir.
11 Q. Do they do that now?
12 A. Yes, sir.
13 Q. So did they go back and pick up your three
14    years?
15 A. Well, I was given an opportunity to do that, but
16    I didn't.
17 Q. You would have had to have pay in, I guess?
18 A. Yes, sir.
19 Q. We talked about training, going to the Alabama
20    Fire College and the Firefighter I training you
21    received in Lee County. Did you have to undergo
22    any additional training to be a career
23    firefighter from what you had already received

Page 22

1     as a student firefighter?
2  A. Yes, sir. I underwent a lot of training that
3     was basically voluntary that I chose to pursue
4     on my own.
5  Q. Let me back up.
6        As a requirement -- I assume when you were
7     hired as a student firefighter, you had to have
8     fire training just like anybody else.
9  A. Yes, sir.
10 Q. Did you have to have any additional required
11    training when you made the transition from
12    student to career?
13 A. Yes, sir. I had to -- Within a year I had to
14    pass a course or certification of Firefighter
15    II. And I can't remember how many years later,
16    but I was required to pass an apparatus operator
17    certification.
18 Q. And I assume you did all that without any
19    problem?
20 A. Yes, sir. No problems.
21 Q. Other than the fire department or fire division
22    with City of Auburn, have you had -- between
23    high school and becoming a career -- what I call

Page 23

1     a career firefighter in '94, did you have any
2     other employments?
3  A. Yes, sir.
4  Q. Where else were you employed?
5  A. I had several. I worked with Lamar Lawn Care,
6     and that's of Auburn. I worked at JJ Raceway,
7     which is a convenience store/gas station, and
8     that's of Auburn. I worked at Wal-Mart
9     Supercenter, and that was in Opelika, Alabama.
10    I'm trying to think. Two years ago I started my
11    own business as a lawn care and landscaping
12    service business, and I've been doing that for
13    two years. I think I touched them all. I
14    think.
15 Q. Now, I'm aware of two EEOC charges which you
16    filed.
17 A. Yes, sir.
18 Q. The one about the battalion chief and promotion,
19    and then one several years earlier that I think
20    had to do with the Horace Clanton assignment.
21       Have you filed any other EEOC charges other
22    than those two? Not just the City of Auburn but
23    anybody. Any other, other than those two EEOC

Page 24

1     charges?
2  A. No, sir, I haven't. Other than the two you've
3     spoken of.
4  Q. And in the grievances, I'm aware that you filed
5     a grievance after the battalion chief promotion
6     procedure. Have you filed any other grievances
7     with the City of Auburn?
8  A. I have initiated grievances, but I've never
9     completed them. Well, I didn't complete those
10    that were initiated. After going through the
11    procedures that are in place with the City, it
12    was handled through the process.
13 Q. Let me get a list of those. The battalion
14    chief -- The grievance related to the battalion
15    chief promotion, you completed that process?
16 A. Yes, sir.
17 Q. What grievances have you filed that you
18    didn't -- Let me back up. I want to be clear.
19       That's the only grievance procedure that
20    you've completed?
21 A. It was two grievance procedures I completed.
22    One was in 2005 where I went -- where I
23    underwent all the procedures of the City and

Page 25

| | |
|---|---|
| 1 | actually had a hearing. And that was in 2005 |
| 2 | where I was pretty much on my -- alone on that |
| 3 | grievance and pursued all procedures in |
| 4 | reference to. |
| 5 | Q. What was the 2005 one about? |
| 6 | A. That one was about -- That was when Mr. Horace |
| 7 | Clanton was assigned as acting battalion chief |
| 8 | in the presence of our official battalion chief |
| 9 | who had health issues at the time. |
| 10 | Q. You actually had a hearing on it? |
| 11 | A. Yes, sir. |
| 12 | Q. Who was the hearing officer? |
| 13 | A. The city Judge, Judge Joe Bailey. |
| 14 | Q. Just briefly, what was the outcome of his -- |
| 15 | A. That I can recall, basically they stated that |
| 16 | they didn't find anything in reference to me |
| 17 | having a grievance or any grounds in reference |
| 18 | to my complaint that I was applying on the City. |
| 19 | Q. Were you the only person involved in that |
| 20 | grievance? |
| 21 | A. Yes, sir. |
| 22 | Q. And is that the same incident or scenario that |
| 23 | led to the EEOC charge? |

Page 26

| | |
|---|---|
| 1 | A. The first one. |
| 2 | Q. Yes, sir. |
| 3 | A. Yes, sir. |
| 4 | Q. And did you receive a right to sue letter on |
| 5 | that first EEOC charge involving Mr. Clanton? |
| 6 | A. From the attorney firm that I had at that time, |
| 7 | yes, I did receive one. |
| 8 | Q. You had a law firm representing you at that |
| 9 | time? |
| 10 | A. I had a law firm I was consulting with, yes. |
| 11 | Q. Who were they? |
| 12 | A. Brooks Law Firm of Birmingham, Alabama. |
| 13 | Q. But my understanding is you did not file a |
| 14 | lawsuit as a result of that EEOC complaint; is |
| 15 | that true? |
| 16 | A. No, sir. |
| 17 | Q. No, sir, you -- |
| 18 | A. No, I didn't. |
| 19 | Q. It's true you did not file a complaint? |
| 20 | A. I filed a complaint and went all the way through |
| 21 | the hearing and to the point where I got the |
| 22 | right to sue letter, but after -- |
| 23 | MR. HORSLEY: He's talking about a |

Page 27

| | |
|---|---|
| 1 | lawsuit. |
| 2 | Q. You didn't file a lawsuit as a result of that? |
| 3 | A. No, sir. |
| 4 | Q. So you didn't file a lawsuit as a result of |
| 5 | either that EEOC charge or grievance? |
| 6 | A. No, sir. |
| 7 | Q. Tell me what other grievances that you filed |
| 8 | with the City that you didn't complete the |
| 9 | process. |
| 10 | A. Past and present? |
| 11 | Q. Yeah. All of them. |
| 12 | A. All of them. Okay. |
| 13 | Q. Well, let me back up. I want all of them, but |
| 14 | if you have any present ones that are still |
| 15 | pending, I'm going to put them in a different |
| 16 | category. |
| 17 | A. Okay. |
| 18 | Q. Do you have any grievances that are still |
| 19 | pending? |
| 20 | A. No, sir. |
| 21 | Q. So all -- |
| 22 | A. Present day, no, sir. |
| 23 | Q. So all the grievances that you're about to tell |

Page 28

| | |
|---|---|
| 1 | me about you filed but did not complete the |
| 2 | process? |
| 3 | A. I didn't go through the whole process where a |
| 4 | hearing was involved. |
| 5 | Q. Okay. Tell me about those grievances. And if |
| 6 | you can, start at your earliest one that you can |
| 7 | remember. |
| 8 | A. If I'm thinking correctly, the first one I ever |
| 9 | filed was in 2001, and that was filed on my |
| 10 | immediate supervisor, Melvin Dean Garrett. |
| 11 | Q. Just tell me what was the nature of the |
| 12 | grievance. |
| 13 | A. Basically I was being labeled as a problem from |
| 14 | my immediate supervisor and coworkers, and I |
| 15 | thought I was being treated unfairly. So I |
| 16 | underwent the grievance procedures of the City. |
| 17 | Q. And how was that resolved? |
| 18 | A. Basically it was resolved when we got to the |
| 19 | acting fire chief at the time, Mr. Larry |
| 20 | Langley. |
| 21 | Q. And how did Mr. Langley resolve it? |
| 22 | A. Basically the problem was confronted at hand, |
| 23 | and to make a long story short, we left the room |

Page 29

1  with an understanding that the problem wouldn't
2  happen again.
3  Q.  And did that work out to your satisfaction?
4  A.  For a little bit of time it did, yes, sir.
5  Q.  What was there about being labeled a problem
6      that you considered being unfair treatment?
7  A.  Well, there was a lot of things going on on
8      shift whereas it was presented to me that people
9      had problems working for me, working with me,
10     or, better yet, just saying overall that I
11     wanted things done my way, of that nature,
12     whereas I was doing basically what I was told or
13     advised to do through my immediate supervisor,
14     who was Captain Garrett at the time.
15 Q.  Now, you were a lieutenant then?
16 A.  Yes, sir.
17 Q.  And you would have reported to Captain Garrett?
18 A.  Yes, sir.  That's my immediate supervisor.
19 Q.  What location was this?
20 A.  This happened at Station 1.
21 Q.  And I want to be clear.  Would the captain have
22     been the highest ranking officer at Station 1 at
23     that time?

Page 30

1  A.  Captain Garrett was the shift commander for that
2      shift.  And if I'm thinking correctly, that
3      was -- I want to say it was A shift, but
4      don't -- I don't actually recall the actual
5      shift.  But he was the shift commander.
6  Q.  And would y'all have both been on the same shift
7      at the same time?
8  A.  Yes, sir.  Same station.
9  Q.  When is the next grievance that you recall?
10 A.  The next one was on -- was when I changed
11     shifts.  I went through a shift change and
12     received another immediate supervisor by the
13     name of Danny Leverette.
14 Q.  Just generally what was the nature of that
15     complaint?
16 A.  It was basically a problem from the previous
17     grievance I filed where it carried over, and the
18     same things pretty much started happening again.
19 Q.  You were labeled a problem?
20 A.  Yes, sir.
21 Q.  How was that resolved?
22 A.  Same procedures.  Underwent the procedures and
23     got to Mr. Langley's office again, and I

Page 31

1  requested that it stop.  And we left his office
2  with the understanding that it would.
3  Q.  And did it work out?
4  A.  For a little -- short period of time, yes.
5  Q.  And when is your next grievance?
6  A.  I'm trying to get them in order here.  I
7      initiated a grievance -- I don't recall the
8      date.  I initiated a grievance in reference to
9      my evaluation.  And basically that was about the
10     fact that my evaluation was due at a certain
11     time, and it wasn't according to the rules in
12     place.
13 Q.  Wasn't timely completed?
14 A.  No, sir, it wasn't timely.
15 Q.  And who was the person that was supposed to
16     evaluate you?
17 A.  I don't recall that, Mr. Morgan.  I'm sorry.
18 Q.  How was that --
19 A.  I received my evaluation.  It was late but I
20     received it.
21 Q.  Did you have to go any further than just
22     initiating a grievance?  Did you meet with Larry
23     Langley or --

Page 32

1  A.  No, sir.  I pretty much presented it to my
2      immediate supervisor.  What he did, I don't
3      know, but I received my evaluation immediately.
4  Q.  Any other grievances you filed?
5  A.  I've had to do that twice.  I had to file a
6      grievance twice on that, evaluation purposes.
7  Q.  Okay.
8  A.  For the same reasons.
9  Q.  And I assume it was the same result on each one
10     of them?
11 A.  Yes, sir.
12 Q.  You talked to your superior officer, and the
13     next thing is you get your evaluation?
14 A.  Yes, sir.
15 Q.  Any other grievances?
16 A.  If I'm thinking correctly, the next one was when
17     I was assigned to Station 5.  I'm sorry.  I'm
18     sorry.  Back up.
19     I started a grievance about an incident that
20     happened on the fire scene over a fire call that
21     involved Mr. Larry Langley.  And my immediate
22     supervisor at that time was the late Jimmy
23     Brown, who is deceased at this time.

Page 33

1    Q.   What rank was Langley at the time?
2    A.   Langley was acting fire chief.
3    Q.   Just briefly tell me what happened.
4    A.   Basically what happened on that incident was we
5         was on an actual working structure fire, fire
6         call, that day.  Captain Brown at the time was
7         not working.  The acting supervisor was Dennis
8         Carlisles.  And during the process of working
9         that structure fire, Mr. Langley arrived on the
10        scene.  And from what I saw, he was in the way.
11        He didn't have on his proper equipment, and we
12        was trying to work.  And basically I asked him
13        to remove himself from what we considered to be
14        the hot zone of the fire scene.  And the remark
15        he gave me back was something I probably
16        shouldn't say.
17   Q.   You can say it.  We've probably all heard
18        something similar.
19   A.   Well, to the best of my knowledge, he told me,
20        I'm the damn fire chief; I do what I want to do;
21        you just get to work.  Not in those exact
22        words.
23            So at that point I asked -- I went to the

Page 34

1         immediate supervisor, Mr. Carlisles, and asked
2         him could he remove him from the fire scene so
3         we could do our work.  And the response
4         Mr. Carlisles gave me at that time was, I told
5         him, and he basically told me he was the fire
6         chief and he do what he want to do.
7             So we worked through that and put the fire
8         out.  And after the fire when we returned to the
9         station, it was a called meeting for the
10        personnel on shift who actually fought the
11        fire.  And in this meeting, again Mr. Langley
12        became very irate with me in front of everybody
13        who was present.  And at that point I considered
14        things to be totally out of hand so I sat down,
15        and I just didn't say anything else until
16        everybody left.  And when everybody did leave,
17        to make a long story short, I told him that I
18        would not accept that type of behavior and I
19        just wasn't going to tolerate it.
20            So therefore I wrote a letter to my
21        immediate supervisor, who -- when he came back
22        to work.  Explained it to him, what happened.
23        And his response basically was, this is

Page 35

1         something that always happens at the fire scene;
2         you should be used to this by now; deal with
3         it.  And being that I got that response, I
4         decided not to do anything at that point but to
5         just have that documented and in my presence.
6    Q.   Any other grievances?
7    A.   I think the next one was when I was assigned to
8         Station 5, the new station that was recently
9         built or the last station that was recently
10        built, the fire station that was built in
11        Auburn.
12   Q.   Tell me about that one.
13   A.   This particular grievance involved an incident
14        where a young man was -- I'm trying to think of
15        a good word.  He was violated and he chose to
16        pursue it.
17   Q.   Who is this?
18   A.   His name was Paden Payton.
19   Q.   Pagan?
20   A.   Paden Payton.
21   Q.   P-A-D-E-N?
22   A.   Payton Paden.  I'm sorry.  P-A-Y-T-O-N
23        P-A-D-E-N.

Page 36

1    Q.   How was he violated?
2    A.   It was one of those situations where you're new
3         on the shift, and this is our way of initiating
4         you in sort of speaking, something that happens
5         or has happened at the fire station.  But this
6         particular time when it happened, he felt
7         violated and he came to me.
8    Q.   Can you tell me what it was that was done to him
9         or that he relayed to you?
10   A.   From what I was told and from what I observed
11        when it was presented to me, he was severely wet
12        down with water and covered with food product,
13        duck-taped, et cetera, et cetera, to the point
14        where -- He told me in the beginning it was
15        against his will.  Like I say, Mr. Morgan, I
16        didn't see it.  It was brought to me after the
17        fact.  And when I asked him what did he want me
18        to do about it in reference to, he said he
19        wanted me to do something.  So the only thing I
20        knew to do was to follow the procedures that
21        were in place for the City.
22   Q.   Is he a white male?
23   A.   He is a white male.

Page 37

1  Q.  Did you file a grievance on his behalf or did he
2     file his own grievance?
3  A.  Well, that's leading to -- everything that was
4     done was through me as his immediate
5     supervisor. I guess I should just tell you all
6     in detail leading to the point where I did what
7     I did. Would that be okay?
8  Q.  Sure.
9  A.  I presented in writing what I was told by him
10    and my guys on my shift to my immediate
11    supervisor. From that point I think it went to
12    the Public Safety Department, whereas the deputy
13    fire chief, acting fire chief, training chief,
14    all those superior officers got involved to
15    investigate. And to make a long story short, I
16    convinced Mr. Paden to the point that we can try
17    to resolve this in-house if we possibly can. Of
18    course, he can do anything he want. That was
19    his choice. But as his immediate supervisor and
20    on the behalf of the division, I was trying to
21    resolve this in-house and in a progressive
22    manner as much as possible. And it was.
23       Mr. Paden's request was to remain under my

Page 38

1    immediate supervision until he regained his
2    confidence. And he did stay with me; that is,
3    until I was told to report to another station.
4    And when I was told to report to another
5    station, I didn't understand why. And, of
6    course, when I told Payton that I was advised to
7    move to another station, he resigned. And his
8    reason for resigning was that he asked to remain
9    under my immediate supervision until he regained
10    his confidence. Being that we were moving me
11    and I wasn't there to be over him, he didn't
12    feel confident anymore to even work there and he
13    resigned.
14  Q.  What station was that?
15  A.  Station 5.
16  Q.  Is that something that's called hazing?
17  A.  Yes, sir, that's exactly what it is.
18  Q.  Did he participate in any hazing himself?
19  A.  According to the investigation from what I was
20    told, they say he did. According to Mr. Paden,
21    he say he didn't.
22  Q.  Have you ever participated in any hazing?
23  A.  No, sir.

Page 39

1  Q.  Not even as a young firefighter?
2  A.  No, sir.
3  Q.  What's your next grievance that you started but
4    didn't complete?
5  A.  Well, I think the last grievance I started and
6    didn't complete was in reference to the incident
7    with Mr. Paden whereas I questioned why I was
8    being moved from Station 5. And it was with
9    Mr. Lamar, who at the time was the deputy chief.
10  Q.  You went from 5 to where?
11  A.  I went from 5 to Station 4.
12  Q.  And did you file a grievance and it went up
13    to --
14  A.  I initiated a grievance, and it stopped at
15    Mr. Lamar.
16  Q.  And how was it resolved?
17  A.  Basically it was decided between him and my
18    immediate supervisor, who was Matthew Jordan.
19    What happened was that when I initiated a
20    grievance, the response was that Chief Jordan
21    was going administratively working Monday
22    through Friday and that a new shift commander
23    was stepping in by the name of Joey Darby. And,

Page 40

1    of course, that took place, but I was still
2    given an opportunity to move back to Station 5
3    by Mr. Lamar. And after conversing with my
4    immediate supervisor -- present immediate
5    supervisor, Mr. Darby, Chief Darby, and through
6    agreement with him as my immediate supervisor, I
7    chose to remain at Station 4 and just work
8    things out from that point.
9  Q.  Which station was Jordan the shift commander, 4
10    or 5?
11  A.  Chief Jordan was working administrative duties
12    as a battalion chief. He was working in the
13    public safety building. He was working Monday
14    through Friday schedule. He was not assigned --
15    Prior to him becoming shift commander, he was
16    not assigned to a station.
17  Q.  Here's why I'm confused. You were at Station 5
18    and transferred to Station 4.
19  A.  Yes, sir.
20  Q.  Did you have any problems with the shift
21    commander at Station 5?
22  A.  No, sir.
23  Q.  Did you want to leave Station 5?

Page 41

1    A.  No, sir.
2    Q.  When you arrived at Station 4, did you have any
3         problems with the shift commander?
4    A.  No, sir.
5    Q.  You just didn't want to go from 5 to 4?
6    A.  Basically I was asked to go to Station 5 when it
7         opened by Mr. Langley.  And I had put in a
8         request to go to Station 5 when it was being
9         built that I explained to my immediate
10        supervisor.  So my problem was here I am being
11        requested to go and asking to go, and a month
12        and a half later or right at almost two months
13        I'm being asked to leave.  And I wanted to know
14        why.
15   Q.  And did you ask somebody why?
16   A.  I asked Chief Jordan why.
17   Q.  What did he say?
18   A.  The response he gave me was:  You're closer to
19        home and you don't have to travel so far to get
20        to work.  And my response to him was:  For 14
21        years I've never been late for work regardless
22        of where the station was and how far I had to
23        travel.

Page 42

1    Q.  But now that you're at -- Are you still at 4?
2    A.  I'm still at 4.
3    Q.  And once you got to 4 and you filed your
4         grievance, they gave you an opportunity to go
5         back to 5 and you elected to stay at 4?
6    A.  Yes, sir.  After speaking with my present
7         supervisor.
8    Q.  Is there some significance in Darby becoming the
9         shift commander --
10   A.  That was not my call.  That was somebody else's.
11   Q.  I mean is there some significance in him being
12        shift commander that influenced you to stay at
13        4?
14   A.  Yes, sir.
15   Q.  And what was that?
16   A.  Basically Chief Darby was coming on fresh.  He
17        hadn't made this decision with me.  And after
18        talking with him and letting him know what I
19        thought about the move in general, we just came
20        to a conclusion where we worked it out where I
21        would stay at 4 and the other guy would remain
22        at 5 who actually replaced me when I left.
23   Q.  And do you agree with me that it is up to the

Page 43

1         chief or his administrative assistant to
2         determine where firefighters should be assigned?
3    A.  It's not my decision, Mr. Morgan.  As far as I
4         know, it is everyone above me -- that's
5         battalion chief and up -- who make those
6         decisions.
7    Q.  And do you agree with me they are the ones that
8         should make those decisions?
9    A.  They are in position to make those decisions so
10        therefore, I guess, it's their duty to make
11        those decisions when the time come.
12   Q.  Now, you applied for promotion to lieutenant in
13        '96?
14   A.  Yes, sir.
15   Q.  And you were promoted?
16   A.  Yes, sir.
17   Q.  What was the procedure for lieutenant?
18   A.  At that time?
19   Q.  Yes, sir.
20   A.  At that time I underwent an assessment center.
21   Q.  Explain that to me.
22   A.  An assessment center consists of a panel of
23        assessors, non-affiliated with Auburn Fire

Page 44

1         Division or the City of Auburn in general.
2         Basically what you have is a panel of officers,
3         lieutenant or higher, who would sit through a
4         scenario or different scenarios throughout the
5         entire procedures.  I think the procedures at
6         that time lasted a week.  And basically what I
7         had to do was undergo these scenarios to the
8         point where they would take the information
9         received and grade me appropriately or
10        accordingly.  Didn't take a written test.  Had
11        to be eligible to apply for the position
12        basically was the only requirement.  And at that
13        time, I was eligible to apply; therefore, I did.
14   Q.  Do you remember what the eligibility
15        requirements were?
16   A.  No, sir, I don't recall.  But at the time I know
17        I had several certifications:  Firefighter I and
18        II, Instructor I and II, Fire Officer I and II,
19        hazmat technician, apparatus operator, pumper
20        certification.  Fire Inspector I, I think I had.
21   Q.  What I was asking actually is:  Were there any
22        time in grade requirements?  Did you have to be
23        a permanent firefighter?

Page 45

1   A.  l was never -- Well, you had to be a career
2       firefighter to apply.
3   Q.  Okay.
4   A.  But I was not given any pertinent time in
5       reference to applying for this position.
6   Q.  So if I became a career firefighter on April
7       1st, I could have taken the promotion procedure
8       for lieutenant on April 5?
9   A.  One thing I was told is that I couldn't apply if
10      I was on probation.
11   Q.  Okay.
12   A.  And I wasn't on probation when I applied.  Let
13      me confirm that.
14   Q.  How long is your probationary period?
15   A.  My probationary period when I became career --
16      well, when I became a student was one year.  My
17      probationary period when I became a career
18      firefighter was one year, and my probationary
19      period when I became a lieutenant was one year.
20   Q.  So you had to at least have one year of service
21      as a career firefighter to apply for lieutenant
22      when you applied?
23   A.  In reference to me, yes, sir.

Page 46

1   Q.  What were the ranks in the fire department in
2      '96 when you applied for lieutenant?
3   A.  Okay.  Chain of command in '96 was student
4      firefighter, career firefighter, team leader,
5      lieutenant, captain, deputy chief and fire
6      chief.  And that's from -- leads to your
7      superior.
8   Q.  And what was your understanding as to the
9      evolution of team leaders?  What were they to do
10      as you understood it and what did they do?
11   A.  Team leaders supervise student firefighters.
12      They were created contingent to the student
13      firefighter program whereas fire lieutenants was
14      part of the career ladder itself.  Student
15      firefighters and team leaders was a temporary
16      full-time position whereas lieutenant and up
17      were career positions:  salaries, benefits, the
18      whole nine.
19   Q.  And where did you get that understanding?
20   A.  I got it in writing from the requirements.  The
21      understanding, whatever, came through the City
22      of Auburn rules and regulations, et cetera.
23   Q.  Team leader would be a career firefighter?

Page 47

1   A.  A team leader would be a career -- The way it
2      worked was you had to be a career firefighter to
3      apply for team leader.  You couldn't apply for a
4      team leader position that I'm aware of as a
5      student firefighter.  You couldn't do it.
6   Q.  Student firefighters can't do anything but be
7      student firefighters.
8   A.  That's it.
9          MR. HORSLEY:  We're still talking
10      1996, right?
11   A.  Yes.
12   Q.  Yes.  I'm just trying to --
13   A.  Yes, sir.
14   Q.  -- get the promotion procedures as we go
15      forward.
16   A.  Understand, Mr. Morgan, I've never been a team
17      leader.
18   Q.  I understand.
19   A.  But from what I understand, you become career.
20      And if the position became available, these guys
21      applied, or the career firefighters who was
22      eligible or wanted to apply applied.
23   Q.  Are you familiar with the promotion process that

Page 48

1      was used for team leaders?
2   A.  All I can tell you, Mr. Morgan, was it was a
3      structured interview.
4   Q.  Did you ever participate in the structured
5      interview?
6   A.  I never went through a structured interview for
7      a team leader, but I have on occasion sat in as
8      an interview board.
9   Q.  You were on the interview board.  How many
10      interview boards did you have -- were you on?
11   A.  Several, Mr. Morgan.  Estimated four times, I
12      guess.  It was several times.
13   Q.  In your opinion has the role of a team leader
14      changed from what you just described in '96 up
15      until, what year was it, '06, I guess, that they
16      became lieutenants?
17   A.  Yes, sir.
18   Q.  Did the role of team leaders change during that
19      period of time?
20   A.  For the record, Mr. Morgan, I was the last
21      lieutenant promoted in the Auburn Fire
22      Division.  Anything after my promotion was team
23      leaders.

Page 49

1   Q.  How many lieutenants were there when you were
2      promoted?
3   A.  Three, maybe four.
4   Q.  You were the last lieutenant?
5   A.  I was the last lieutenant to be promoted in the
6      Auburn Fire Division through an assessment
7      center.
8   Q.  So then the team leaders that came after you,
9      did you assume the responsibilities of a
10     lieutenant?
11   A.  Through the powers that be, they were allowed to
12     conduct themselves on my level or on a level of
13     a fire lieutenant.
14   Q.  So their role, at least in your viewpoint,
15     expanded from just being supervisors for student
16     firefighters to assuming the responsibilities of
17     a lieutenant?
18   A.  They was assuming the responsibilities for
19     career firefighters.
20   Q.  Say the last year that there were team
21     leaders -- '04, '05, whatever year that may
22     be -- in your opinion was there any difference
23     in what you as a lieutenant did as opposed to

Page 50

1     what a team leader did?
2   A.  No, sir.  Basically from 1996 and up, they were
3     acting as station officers, which that's what I
4     am.  I'm a station officer.  I just had a
5     different title as they.  And I underwent a
6     different procedure as far as being promoted.
7     Other than that they stepped in as a station
8     officer and conducted themselves as a station
9     officer to their ability.
10   Q.  Once you were promoted to lieutenant, I assume
11     you had a new assignment at that point.
12   A.  As far as responsibilities, duties, stations and
13     all that?
14   Q.  Yes.
15   A.  Yes, sir.  I had a very wide range of
16     responsibilities and duties as a station
17     officer, fire lieutenant.
18   Q.  Did you apply for any more promotions between
19     lieutenant in '96 and the battalion chief
20     promotion in '06?
21   A.  Yes, sir.
22   Q.  What other promotions did you apply for?
23   A.  I applied for training chief -- the training

Page 51

1     officer position.  Excuse me.  I applied for the
2     deputy fire chief position.
3   Q.  When was the last captain's promotion?
4   A.  If I'm not mistaken, the last one was when I was
5     promoted.  When they did an assessment center
6     for me in '96, it was an assessment center for
7     lieutenants and captains.
8   Q.  So you never applied and went through an
9     assessment center for the position of captain;
10     is that correct?
11   A.  No, sir.
12   Q.  No, sir, it's not correct or --
13   A.  I didn't apply for the captain --
14   Q.  What I said is correct?  You never applied and
15     went through an assessment center for captain,
16     true?
17   A.  No, sir.
18         MR. HORSLEY:  That is true?
19   Q.  Wait a minute.
20   A.  That is true.  A captain position never came
21     available during my era.
22   Q.  So you did the lieutenant assessment in '96 at
23     the same time that they did the captain

Page 52

1     assessment?
2   A.  Yes, sir.
3   Q.  What procedure was used for training officer?
4   A.  I underwent what I consider to be a structured
5     interview.
6   Q.  Let me back up on the captain's assessment
7     center.
8         Other than the assessment center, do you
9     know of any other requirements at that time for
10     the captain's promotion?
11   A.  I'm not aware of that, sir.
12   Q.  Did you pay any attention one way or the other
13     what the captains had to do or were you just
14     interested in being a lieutenant at that time?
15   A.  I just -- It was totally separate.  If you
16     applied for lieutenant, you went to the
17     lieutenant.  If you applied for captain, you
18     went to captain.
19   Q.  The training officer was a structured interview,
20     and when was that promotion procedure?
21   A.  I don't recall the actual year or date.
22   Q.  Has it been, say, within the last five years?
23   A.  Yes, sir, it was within the last five.

Page 53

1    Q.  And who was promoted?
2    A.  A gentleman by the name of Terry Walker.
3    Q.  Is he still the training officer?
4    A.  No, sir.  He's retired.
5    Q.  Who took his place?
6    A.  A gentleman by the name of John Lankford.
7    Q.  Did you apply for training officer when
8         Lankford --
9    A.  No, sir, I did not.
10   Q.  So you applied for training officer one time,
11        and that was when Terry Walker received it?
12   A.  Yes, sir.
13   Q.  And that was a structured interview?
14   A.  Pretty much, sir, yes.
15   Q.  And you sat on, you told me, the structured
16        interview panels for team leaders?
17   A.  Yes, sir.
18   Q.  Was that a similar-type interview?  I'm sure the
19        questions were different, but people from
20        in-house, firefighters and others --
21   A.  The difference between team leaders and the
22        training officer was the team leader wasn't
23        intense like the training officer was.  The team

Page 54

1         leader basically was a panel of questions that
2         was presented to the candidate.  When I went
3         through training officer, I went through seven
4         different scenarios.  I had to make, I think it
5         was, a three-minute presentation.  I had to go
6         through what they call, I think it was, an
7         in-basket situation where you prioritize your
8         responsibilities for the day.  It's all on
9         paper.  And then you undergo an actual interview
10        where you sit down and they ask you questions,
11        you know.  Basically that was it.
12   Q.  Do you remember who was on your panel or the
13        panel?
14   A.  Dean Garrett, Danny Leverette, Lee Lamar, Larry
15        Langley.  I can't remember who else.
16   Q.  So these were all fire division people?
17   A.  Yes.  They was city employees, whether it was
18        human resources down through the fire division.
19   Q.  And Terry Walker, did you think that he was a
20        good hire?
21   A.  At the present time, Mr. Morgan, I didn't know
22        anything about Terry Walker so I can't say if he
23        was good or bad.  I don't know.

Page 55

1    Q.  And when did you apply for the deputy fire chief
2         position?
3    A.  Again, I don't actually remember the year and
4         date, but it was within the five years.
5    Q.  And who was promoted to that position?
6    A.  Lee Lamar.  Mr. Lee Lamar.
7    Q.  What was the procedure used at that time?
8    A.  Basically I submitted an application, and I went
9         to a structured interview at City Hall.
10   Q.  And the panel, was it all firefighters or fire
11        division or were there other people on the
12        panel?
13   A.  It was other people on the panel outside of the
14        fire division, yes.
15   Q.  So you had an application and a structured
16        interview?
17   A.  Yes, sir.
18   Q.  Any other component of that promotion procedure?
19   A.  No, sir.
20   Q.  And Mr. Lamar was promoted?
21   A.  Yes, sir.
22   Q.  Have we covered all the promotions that you've
23        actually applied for -- lieutenant, training

Page 56

1         officer, and deputy fire chief --
2    A.  Yes.
3    Q.  -- before the battalion chief?
4    A.  Yes, sir.
5    Q.  And then you sat on some of the interview panels
6         with the team leader position?
7    A.  Yes, sir.
8             MR. MORGAN:  Can we take a quick
9         break?
10            MR. HORSLEY:  Yeah.
11            (Brief recess was taken.)
12   Q.  (Continuing by Mr. Morgan)  Did you have any
13        involvement or input into the last team leader
14        promotion procedure where a written test was
15        used?
16   A.  No, sir.
17   Q.  Did you know anything about the requirements for
18        that last team leader promotion procedure?
19   A.  No, sir.  The only thing I knew, Mr. Morgan, was
20        basically information that was presented the day
21        of that was going to be questioned to the
22        candidates.  That's all I know.  And I was asked
23        to be on the board.

Page 57

1  Q. And so you were on the structured interview
2     board or panel for the last team leader
3     promotion?
4  A. I don't know if it was the last one, but I do
5     know I've sat in on several.
6  Q. Did you ever hear any complaints or comments
7     about a written test being a component of the
8     team leader promotion procedure?
9  A. I don't recall a written test ever being a
10    component of the promotion procedure for a team
11    leader.
12  Q. And then at some point there was a petition
13    presented to the City for team leaders to become
14    lieutenants.
15  A. Yes, sir.
16  Q. You're familiar with that?
17  A. Yes, sir.
18  Q. And you did not join in that petition?
19  A. I wasn't given the opportunity to join,
20    Mr. Morgan.
21  Q. How did that come about?
22  A. The first I heard or seen anything in reference
23    to a petition for team leaders and the title

Page 58

1    change was December of 2005.
2  Q. And what did you see or hear at that time?
3  A. Basically me and two other of my insubordinates
4    (sic) were called to a meeting in the public
5    safety building. And basically this meeting was
6    in reference to whether we was for or opposed to
7    the title change from team leader to
8    lieutenants.
9  Q. Who were the other two?
10  A. Mr. Christopher Turner and Mr. Walter Allen.
11  Q. Is it your testimony that's the first time that
12    you learned the City was considering or had been
13    petitioned to change from team leader to
14    lieutenant?
15  A. From my understanding, Mr. Morgan, is basically
16    this all rendered from when the captains had a
17    title change to battalion chiefs. So therefore
18    the team leaders took it upon themselves to
19    pursue a title change as well. I had heard
20    rumors, but I didn't have any definite, you
21    know, idea or information in reference to they
22    were doing that until that day.
23  Q. But you had heard rumors that the team leaders

Page 59

1    were making an effort to change it to
2    lieutenant?
3  A. In the fire house, Mr. Morgan, you hear all kind
4    of rumors. I just don't believe them until I
5    see them.
6  Q. So the first actual confirmation that you had
7    that that was under consideration was when you,
8    Chris Turner, and Walter Allen were called to a
9    meeting in December of '05?
10  A. Yes, sir.
11  Q. And who was that meeting with?
12  A. It was my immediate supervisor, Dean Garrett,
13    Mr. Steve Reeves, Mr. Bill James, Mr. Lamar,
14    and, of course, Mr. Turner, and Mr. Allen. I
15    think that's everybody.
16  Q. And what was the discussion?
17  A. Basically the discussion was -- the floor was
18    pretty much open to the point in reference to
19    what we thought about it. And me, myself, I
20    requested to see everything in reference to, the
21    proposal and the reason why we were there and
22    all. And I was presented with the paperwork
23    that included thirteen signatures of team

Page 60

1    leaders. All the team leaders in the
2    department, their signature was on this
3    paperwork. And it was provided to me by the --
4    I guess the public safety director, Mr. James,
5    gave the okay for me to receive that, and it was
6    given to me by Mr. Reeves.
7  Q. You received it at that meeting?
8  A. Yes, sir.
9  Q. Let me back up a minute.
10     Were you the last lieutenant when this
11    meeting was called?
12  A. In 1996 I was the last lieutenant to be
13    promoted.
14  Q. I understand that, but were you the last actual
15    lieutenant rank --
16  A. Yes, sir.
17  Q. -- in December of '05?
18  A. The only one, yes, sir.
19  Q. Now, were Chris Turner and Walter Allen the only
20    two career firefighters that were not team
21    leaders?
22  A. I'm not sure about that, Mr. Morgan. All I know
23    is they were career firefighters.

Page 61

1  Q.  And Chris Turner is a black male?
2  A.  Yes, sir.
3  Q.  And Walter Allen is a white male?
4  A.  Yes, sir.
5  Q.  So you received the paperwork which showed that
6      all thirteen of the team leaders --
7          Which included Eddie Ogletree, true?
8  A.  Yes, sir.
9  Q.  -- had petitioned for team leaders to become
10     lieutenants?
11 A.  Yes, sir.  And understand, Mr. Morgan, that was
12     the first time I had seen actual paperwork in
13     reference to a petition being presented for team
14     leaders getting a title change.  That was the
15     first time.  And I confirmed that in the
16     meeting.  I was like, this is the first time
17     I've seen this; can I take time to read it.  And
18     I read it, and I asked for copies of it.
19 Q.  Do you know why you and Chris and Walter Allen
20     were called to that meeting?
21 A.  No, sir.  I don't know the actual reason, but I
22     know I did speak with Mr. Langley with my
23     immediate supervisor present prior to that

Page 62

1      meeting.  Mr. Langley.
2  Q.  Was he in this meeting?
3  A.  Yes, sir, he was.  If I'm thinking correctly, he
4      was.
5  Q.  So Langley, Lamar, James, Reeves, and Garrett
6      were in the meeting with you two?
7  A.  Yes, sir.
8  Q.  But then you said you spoke to Mr. Langley.  Did
9      you speak to him outside of this meeting?
10 A.  I had to sign a form.  I had to sign a form
11     saying I was in favor of or against the title
12     change.  And at that time, I submitted some
13     paperwork to Mr. Langley.
14 Q.  Let me back up.  I'm a little confused.
15         The form that you received whether you were
16     in favor or not in favor, did you receive that
17     before this meeting with these other people?
18 A.  I received it from Mr. Langley in his office
19     before that meeting.
20 Q.  That same day or a different day?
21 A.  I don't think it was the same day, no, sir.
22 Q.  So you had had an opportunity, then, before that
23     to put in whether or not you thought it was a

Page 63

1      good idea or bad idea?
2  A.  Yes, sir.  I had a choice to make in reference
3      to -- I was asked to fill out that paperwork and
4      enclose it in an envelope to be submitted to
5      human resources.
6  Q.  And did you do that?
7  A.  Yes, sir.
8  Q.  And that was all done before this meeting that
9      you're telling me about?
10 A.  Yes, sir.  Now, understand, now, this paperwork
11     I was given to sign off on was different from
12     the paper I received at the meeting.
13 Q.  Well, how was it different?
14 A.  Well, basically the letter I received from
15     Mr. Langley in the presence of Chief Garrett at
16     the time was saying was I for or against.
17 Q.  Right.  A vote.
18 A.  When I actually got in the meeting, I was, like,
19     can somebody provide me with some information in
20     reference to what's going on because this is new
21     to me, and I want to know, you know, what does
22     it involve.  And that's when I received the
23     paperwork stating everything that had been done

Page 64

1      to include the thirteen signatures.
2  Q.  So when Mr. Langley handed you this form where
3      you could vote "yes" or "no" on the name change,
4      you didn't understand what was going on?
5  A.  No, sir, I didn't.  Directly speaking, no, I
6      didn't know.
7  Q.  And Mr. Langley didn't explain it to you?
8  A.  He explained it to me, but, I mean, it's one of
9      those situations where I don't believe
10     everything I hear regardless of who it comes
11     from until I see it.  But I know the paperwork
12     that I saw and I signed, which was not in favor
13     of the title change.  And my main reason for
14     that, Mr. Morgan, was because I didn't know
15     nothing about it.  I was never given an
16     opportunity to -- in the beginning to sign with
17     the other thirteen signatures to say I was for
18     or against.
19 Q.  Well, looking back now, if you had been given
20     the information, would your vote have been
21     different?
22         MR. HORSLEY:  Object to the form.  You
23         can answer.

Page 65

1   A.  No, sir.  I still would have been against it.
2   Q.  But when Mr. Langley handed you this sheet of
3       paper, the form which you could vote, he didn't
4       explain to you why or that the City had been
5       petitioned by the team leaders?  He didn't
6       explain any of that to you?
7   A.  I don't recall exactly what he said,
8       Mr. Morgan.  But, like I said earlier, he gave
9       me the paper.  I read it.  I presented to him my
10      paperwork I had.  And he said no, and so I
11      marked the appropriate place indicating that I
12      was not in favor of it.  I folded the letter up
13      and put it in an envelope, sealed it, and gave
14      it to Mr. Langley.
15  Q.  What paperwork did you give Mr. Langley?
16  A.  I typed a letter myself on my behalf, the only
17      lieutenant in the division, and presented to
18      him basically asking for -- in complainance
19      (sic) to whatever the team leaders were doing.
20  Q.  Now, do you still have copies of that paperwork?
21  A.  Yes, sir, I do.
22  Q.  Well, I'm not trying to get into any privileged
23      conversations, but do you know if that paperwork

Page 66

1       was produced as part of your disclosures?
2           MR. MORGAN:  I can get with you later
3           on that.
4   A.  Mr. Horsley has it.  He has a copy of it.
5   Q.  Let me backtrack one minute.
6           When you applied for lieutenant, they had a
7       captain's promotion at the same time?
8   A.  Yes, sir.
9   Q.  Was there any time in grade requirements for the
10      captain promotion or could anybody apply for the
11      captain promotion?
12  A.  Again, sir, I don't know if there was any -- if
13      any of that applied.  I'm not sure.
14  Q.  You don't know whether or not you had to be a
15      lieutenant to apply for captain or whether just
16      a firefighter could apply for captain?
17  A.  The way it's supposed to work is that you follow
18      the chain of command as far as promotions.
19  Q.  So you gave Chief Langley -- I guess he was
20      chief at that time -- some paperwork dealing
21      with your complaints about team leaders?
22  A.  I presented to him a form that I had typed, and
23      I asked him to, you know, sign it, him and Chief

Page 67

1       Garrett both to sign it, if he was in agreement
2       of it.  And he told me no, and he would not
3       sign.  So did Chief Garrett, which Chief Garrett
4       was acting as a witness.
5   Q.  What was your paperwork, just the gist of it?
6   A.  Basically it was just, you know, from -- I guess
7       it was drawn upon and presented to him based
8       upon what I had heard.  And being that I was
9       called to his office to sign this form in
10      reference to, then therefore I presented to him
11      what I would like to have if this is the case.
12  Q.  And what is it that you would like to have?
13  A.  I wanted a title change.
14  Q.  So you knew then even before you went to see
15      Chief Langley that there were discussions about
16      a title change?
17  A.  I had heard rumors about a title change.  When I
18      was called to his office, of course, Chief
19      Garrett was with me.  That's when it was
20      confirmed through me that, yes, there was
21      something going on with the title change.
22  Q.  And did you take Garrett with you?
23  A.  Yes, sir.

Page 68

1   Q.  And so you wanted your own title changed?
2   A.  Yes, sir.  Just like everybody else, I wanted
3       one.
4   Q.  And what title change did you want?
5   A.  I wanted captain.
6   Q.  Well, now, at that time were there still captain
7       positions or had the captains been renamed
8       battalion chiefs?
9   A.  The captains had been renamed battalion chiefs.
10  Q.  So if the team leaders became lieutenants, you
11      wanted a title change from lieutenant to
12      captain?
13  A.  Yes, sir.
14  Q.  So then you and Chris Turner and Walter Allen
15      meet with these people that you've told me
16      about:  Dean, Steve, Lee, and Larry.  What did
17      y'all talk about in that meeting?
18  A.  Basically what was presented at the meeting was
19      basically what has been going on as far as the
20      paperwork that had been submitted, those who was
21      in favor of, the review of whatever rules and
22      regulations that was in place involving the
23      division and the -- fire division and the City,

Deposition of Gerald Stephens                                           May 30, 2008

Page 69

| | |
|---|---|
| 1 | and basically where they were and what they was |
| 2 | going to do or what they was, you know, planning |
| 3 | to do. |
| 4 | Q.  What was it they were planning to do? |
| 5 | A.  They was planning to go forward with the title |
| 6 | change from team leaders to lieutenants. |
| 7 | Q.  And what was your response or reaction? |
| 8 | A.  Well, I tried to remain as calm and professional |
| 9 | as I possibly could.  Nevertheless, things got a |
| 10 | little out of order with Mr. Turner and |
| 11 | Mr. Allen.  So at that point I kind of thought |
| 12 | things was out of hand.  So therefore I just |
| 13 | renamed calm until I could actually speak on my |
| 14 | behalf in reference to what I thought. |
| 15 | Q.  And how did it get out of hand with Turner and |
| 16 | Allen? |
| 17 | A.  Apparently their reaction to it was their |
| 18 | reaction.  They reacted to it.  They got up. |
| 19 | They seemed to get a little irate about it and |
| 20 | all that and -- Something I would have never |
| 21 | done. |
| 22 | Q.  Do you remember any specific comments that |
| 23 | Turner or Allen made? |

Page 71

| | |
|---|---|
| 1 | Fire Division and he needed to look into it. |
| 2 | Q.  What was that problem? |
| 3 | A.  Basically there was some things taking place |
| 4 | down there that I deemed unfair, that I deemed |
| 5 | inconsistent, that basically needed some |
| 6 | attention, needed to be looked into and |
| 7 | corrected before it got any worse. |
| 8 | Q.  And tell me what they are. |
| 9 | A.  Well, I mean -- |
| 10 | Q.  Did you give him some specifics or -- |
| 11 | A.  No, sir.  I didn't tell him anything specific |
| 12 | because at that time I thought -- it was several |
| 13 | things going on, and that's just me thinking |
| 14 | that.  I'm speaking for myself. |
| 15 | Q.  Well, did you tell Bill James what things were |
| 16 | going on that you thought were unfair or |
| 17 | inconsistent or needed attention? |
| 18 | A.  I was not specific with that, Mr. Morgan. |
| 19 | Q.  And what was Mr. James' response to your saying |
| 20 | that things were unfair or inconsistent? |
| 21 | A.  Mr. James was very, very considerate.  He was |
| 22 | very polite and very professional, and he say he |
| 23 | want everything to be right for everybody, not |

Page 70

| | |
|---|---|
| 1 | A.  I recall a comment made by Turner when he was |
| 2 | asking for a title change as well. |
| 3 | Q.  What did he want to be? |
| 4 | A.  I don't know.  I don't know what he wanted to |
| 5 | be, being he was a firefighter.  I don't know. |
| 6 | Q.  Do you remember him making the statement that he |
| 7 | didn't have any opposition to team leaders being |
| 8 | lieutenants as long as he became a lieutenant? |
| 9 | A.  I don't recall that, Mr. Morgan.  I'm sorry. |
| 10 | Q.  Did you eventually make some verbal response to |
| 11 | what you had heard? |
| 12 | A.  Yes, sir, I did. |
| 13 | Q.  And what did you say? |
| 14 | A.  Basically what I did, Mr. Morgan, is when |
| 15 | everything calmed down to a certain point, I |
| 16 | asked to speak to Mr. James in private.  He |
| 17 | accepted my request. |
| 18 | Q.  What did y'all talk about? |
| 19 | A.  Basically I told Mr. James -- I thanked him for |
| 20 | calling me in and letting me know what was |
| 21 | officially going on and working with me to bring |
| 22 | me up to par.  But at the same time, I told |
| 23 | Mr. James that there was a problem at the Auburn |

Page 72

| | |
|---|---|
| 1 | in those words.  But, again, I specifically |
| 2 | directed to him that there was a problem at the |
| 3 | Auburn Fire Division and he needed to look into |
| 4 | it. |
| 5 | Q.  Anything else that you recall saying to |
| 6 | Mr. James in y'all's private meeting? |
| 7 | A.  No, sir.  It was just very brief and very to the |
| 8 | point. |
| 9 | Q.  Anything else you recall saying in the meeting |
| 10 | with everyone other than asking to speak |
| 11 | privately with Mr. James? |
| 12 | A.  I can't think of nothing else at this time, |
| 13 | Mr. Morgan. |
| 14 | Q.  Turner and Allen, you testified they became |
| 15 | irate and I think in your opinion probably acted |
| 16 | unprofessional? |
| 17 | A.  Yes, sir. |
| 18 | Q.  Did they leave before you asked to speak to Bill |
| 19 | James or did -- |
| 20 | A.  I don't know exactly when they left, but at that |
| 21 | point when everything appeared to have calmed |
| 22 | down, I asked to speak to Mr. James in private. |
| 23 | And, you know, as far as how they departed and |

Page 73

1     how they left, I really don't know.
2  Q. Did you come back into the main meeting or did
3     you leave —
4  A. No, sir, I didn't leave. Me and Mr. James did
5     not leave. Everybody else left, and me and
6     Mr. James stayed.
7  Q. So they were gone and just the two of y'all?
8  A. Yes, sir.
9  Q. And then the name change was eventually approved
10    from team leader to lieutenant?
11 A. Yes, sir, it was approved.
12 Q. Are there any people or team leaders who in your
13    opinion are not qualified to serve as
14    lieutenants?
15 A. I'm not in that position to say if they are
16    qualified or not, Mr. Morgan. All I know is
17    they applied and they were promoted.
18 Q. Now, let's backtrack a minute.
19 A. Yes, sir.
20 Q. My understanding is, I guess from your testimony
21    so I want to be clear on this, there had earlier
22    been a name change from captain to battalion
23    chief.

Page 74

1  A. That's when it all started, yes, sir.
2  Q. When did that occur?
3  A. I'm not sure on the date, Mr. Morgan, but I know
4     it happened — I think it happened within the
5     past five years. But, understand, that's when
6     the whole title change thing came about. You
7     had all the captains made a proposal to the city
8     manager at the time. And to make a long story
9     short, it happened. So from that point, it just
10    went on.
11 Q. Did you have any conversations with anybody that
12    would have been involved in that process? And
13    I'm assuming that's going to be the city
14    manager, from what you've testified, the
15    captains, deputy chief, and chief. Did you have
16    any conversations with any of those people about
17    the name change from captain to battalion chief?
18 A. No, sir.
19 Q. Did you have any conversations with any of these
20    people that you've sued in this lawsuit: Larry
21    Langley, Lee Lamar, Bill Ham, Jr., Steven
22    Reeves, Bill James, Charles Duggan, and Cortez
23    Lawrence? Did you have any conversations with

Page 75

1     any of them —
2  A. No, sir.
3  Q. — about the name change from —
4  A. Other than the meeting that I had with Mr. Allen
5     and Mr. Turner, that's the only time I conversed
6     with Mr. Reeves. That was in reference to team
7     leader to a lieutenant. But nothing about — I
8     didn't have no dealings, didn't know how they
9     was doing it or what they were doing in
10    reference to captain to battalion chief.
11 Q. Was Cortez Lawrence still employed with the City
12    when the name change occurred?
13 A. To my knowledge, no.
14 Q. He left —
15 A. Years ago.
16 Q. — years ago, didn't he?
17 A. Yes, sir.
18 Q. Do you know why he's been sued?
19 A. I have no idea.
20        MR. HORSLEY: Off the record.
21        (Brief off-the-record discussion.)
22 Q. How was it announced, official announcement,
23    that from this day forward captains will now be

Page 76

1     battalion chiefs? How would that be announced?
2  A. If I'm thinking correctly, Mr. Morgan, it came
3     from a memorandum or a letter directed to the
4     division. And, of course, when it occurred,
5     word of mouth.
6  Q. And at that point captains were then referred to
7     as battalion chiefs?
8  A. Yes, sir.
9  Q. Did you make any formal complaint either through
10    the grievance procedure or EEOC protesting the
11    change from captain to battalion chief?
12 A. No, sir.
13 Q. Did you make any verbal complaints to Langley or
14    Lamar or Ham or Reeves or Bill James or Charles
15    Duggan?
16 A. No, sir.
17 Q. And from your observations, did the battalion
18    chiefs continue to operate similar to what the
19    captains had done before?
20 A. Basically the only thing that changed was the
21    title. The responsibilities and all that went
22    hand in hand.
23 Q. When did you learn there would be a promotion

**Page 77**

1     procedure or process to battalion chief?
2   A.  I received it through a memorandum or a letter
3      directed to the division.
4   Q.  And did you receive it the same day or within a
5      day or two of the memorandum being published?
6   A.  Basically, if I'm thinking correctly, it was
7      posted.  I think it was done in two places:  At
8      the stations and through e-mail -- City e-mail.
9   Q.  The City has an e-mail?  They send out things on
10     e-mail?
11  A.  Yes, sir.
12  Q.  As an employee do you receive those e-mails on
13     duty or can you receive them off duty?
14  A.  The information -- I don't know what procedures
15     they use to send the information, but they send
16     them as far as I know randomly.  It could come
17     on a day when I'm at work.  It could come on a
18     day when I'm off work.
19  Q.  Do you have a home computer?
20  A.  Yes, sir, I do.
21  Q.  Can you check the City of Auburn Web site --
22  A.  Yes, sir.
23  Q.  -- for these e-mails from home?

**Page 78**

1   A.  Yes, sir.
2       (Defendant's Exhibits 1 and 2 marked
3        for identification.)
4   Q.  Let me show you what I'm marking as Defendant's
5      Exhibit Number 1.  Let me show you 1 and 2.
6      Does Defendant's Exhibit Number 1 appear to be
7      the posting for the position of battalion chief?
8   A.  It appears to be, yes, sir.
9   Q.  Is that what would have been posted in, you
10     said, two places:  the stations and -- Where was
11     the other place it would have been posted?
12  A.  E-mail.
13       Exhibit 1 was posted at the station.
14  Q.  And I think it's dated February 16.
15  A.  Yes, sir.  2006.
16  Q.  And would it be fair to say that you would have
17     observed that either February 16 or within a day
18     or two of that day?
19  A.  Within that week, yes, sir, I would have
20     observed it.
21  Q.  And in addition to it being posted at stations,
22     that job notice is also sent out by e-mail?
23  A.  Well, you haven't gotten to Exhibit 2 yet, but

**Page 79**

1     this one here, I think I saw it on e-mail.
2   Q.  I'm going to get to Number 2.
3   A.  But this one I saw in the station only.
4   Q.  Is Number 1 also sent by e-mail?
5   A.  I haven't seen nothing like this sent on e-mail.
6   Q.  But it's posted in the station?
7   A.  Yes, sir.
8   Q.  All right.  And then Defendant's Exhibit Number
9     2 is the one that you received by e-mail?
10  A.  If I'm thinking correctly, sir, I did get a copy
11     of this on e-mail.
12  Q.  And that's the memorandum I think you were
13     testifying about earlier?
14  A.  Yes, sir.
15  Q.  And it says you must be a current
16     non-probationary lieutenant.  It talks about an
17     orientation session, and it says a written exam
18     will be a component of the assessment process.
19     Reading materials have been obtained.
20       That's all in the e-mail that was sent on
21     Exhibit 2, true?
22  A.  Yes, sir.
23  Q.  When you received that e-mail, did you register

**Page 80**

1     any objection at that time to -- Let me back up.
2       I assume you would have received that
3     e-mail -- Is that memo also posted or is it just
4     sent by e-mail?
5   A.  I recall seeing one on the board just like this
6     one around the station, but it could easily be
7     somebody got a copy of the e-mail and put it up
8     there.  I don't know.
9   Q.  Is it fair to say you would have received that
10     e-mail or observed that memo either February 17
11     or within a day or two thereafter?
12  A.  Give or take within a week, yes, sir.
13  Q.  And did you make any complaints at that time to
14     anybody about the written exam being a component
15     of the assessment process?
16  A.  No, sir.
17       (Defendant's Exhibit 3 marked for
18        identification.)
19  Q.  And let me show you what's going to be marked as
20     Defendant's Exhibit Number 3, which is another
21     memo dated February 23, which discovered that
22     non-probationary firefighters and probationary
23     lieutenants were eligible and reaffirmed when

Page 81

1   the orientation was going to be. And that's
2   dated February 23. I assume that you either saw
3   or received that --
4   A.   Yes, sir, I did.
5   Q.   -- February 23rd or within a day or two of that?
6   A.   Yes, sir.
7   Q.   Did you register any complaint for
8       non-probationary firefighters or probationary
9       lieutenants being eligible to apply for the
10      battalion chief vacancy?
11  A.   When I read this, I was kind of puzzled due to
12      the fact that why are probationary employees
13      allowed to apply for this position, you know. I
14      was somewhat familiar of the first memo. But
15      when I received this one, it really puzzled me.
16      But, no, sir, I did not make a complaint. I
17      didn't say nothing. I just followed the
18      procedures in place.
19  Q.   You didn't have any conversations with anyone
20      about there being a written test component nor
21      probationary -- non-probationary firefighters
22      and probationary lieutenants being eligible. Is
23      that a fair statement?

Page 82

1   A.   Yes, sir, that's a fair statement.
2   Q.   And, now, I understand that at least in this
3       lawsuit you've made some complaint about there
4       being no non-probationary firefighters and
5       probationary lieutenants being eligible. Were
6       any non-probationary firefighters promoted to
7       battalion chief as a result of this process?
8   A.   As a result of this process, no, sir.
9   Q.   Were any probationary lieutenants promoted to
10      battalion chief as a result of this process?
11  A.   The only thing I can recall, Mr. Morgan, is I
12      recall an incident where a probationary
13      firefighter was promoted to team leader, and I
14      also recall an incident where a firefighter was
15      promoted to captain and then eventually promoted
16      to acting fire chief.
17  Q.   Well, my question is: In terms of the
18      complaints about the battalion chief promotion
19      procedure in 2006, isn't it true that no
20      non-probationary firefighters were promoted to
21      battalion chief in 2006?
22  A.   Yes, sir.
23  Q.   And were any probationary lieutenants promoted

Page 83

1   to battalion chief?
2   A.   No, sir.
3            (Defendant's Exhibit 4 marked for
4            identification.)
5   Q.   Let me show you what I'm going to mark as
6       Defendant's Exhibit Number 4. Do you recognize
7       that as the sign-in sheet for the battalion
8       chief assessment orientation, which was February
9       28, 2006?
10  A.   Yes, sir. This is the sheet.
11  Q.   And is that your signature?
12  A.   Yes, sir, that's my signature.
13  Q.   And you attended that orientation?
14  A.   Yes, sir, I did.
15  Q.   How long was that orientation?
16  A.   If I'm thinking correctly, it was two to three
17      hours.
18  Q.   Who conducted the orientation?
19  A.   It was several people there -- a couple of
20      people there, Mr. Morgan. You had two
21      representatives from human resources:
22      Ms. Stephanie King, Mr. Reeves. You had a
23      representative from the company who I guess

Page 84

1   provided the test for the division, CWH, I
2   suppose. He was there. Chief Lamar was there,
3   and I think vaguely Larry Langley was there.
4   Q.   You're not as certain on him, but you think he
5       was?
6   A.   I think I recall seeing him there for a short
7       period of time. Mr. Lamar pretty much handled
8       everything.
9   Q.   Any other non-applicants you recall being there
10      other than Stephanie King, Steve, the
11      representative from CWH, Lee Lamar, or Larry
12      Langley?
13  A.   No, sir, I don't recall anybody else.
14  Q.   The representative from CWH, was that a male or
15      female?
16  A.   It was a white male.
17  Q.   Look on that list and tell me who on that list
18      was a non-probationary firefighter.
19  A.   According to this list, nobody on here that I'm
20      aware of was a non-probationary firefighter.
21  Q.   Well, was everyone on that list a team leader
22      with the exception of Chris Turner?
23  A.   Chris Turner was a career firefighter.

Deposition of Gerald Stephens                                                                                        May 30, 2008

Page 85

1    Q.   And he was not a team leader or a lieutenant?
2    A.   No, sir.
3    Q.   Is he the only one on that list?
4    A.   Yes, sir.
5         MR. HORSLEY:  When you say team
6         leader, you're referring to team
7         leaders that have now been changed
8         to lieutenant?
9         MR. MORGAN:  Right.
10   Q.   My point is:  The only person on the list who
11        was not a lieutenant via assessment center or
12        team leader was Chris Turner, true?
13   A.   I'm not sure about Carson.  He may have been.
14        He may have not.  I'm not really sure.  But I
15        know Chris Turner was a firefighter.
16   Q.   And he's a black male?
17   A.   Yes, sir.
18   Q.   And the record will show this.  I'm not --
19   A.   Yes, sir.  I understand.
20   Q.   This isn't any test that you're going to pass or
21        fail, but do you recognize the names of anybody
22        else on the list other than Chris Turner that
23        was a career firefighter that was not a team

Page 86

1         leader or hadn't been either a team leader or
2         lieutenant?  You said possibly Clay Carson?
3    A.   Yes, sir.  I think Carson was a firefighter and
4         recently became a lieutenant, but I'm not clear
5         on him.  For the record, I know Chris Turner was
6         a firefighter.
7    Q.   There's no question Chris Turner was?
8    A.   No question.
9    Q.   And who on the list would have been a
10        probationary lieutenant --
11   A.   No one.
12   Q.   -- at the time?
13   A.   If it was anybody, it was Carson.
14   Q.   And did Clay Carson score -- he's a white male,
15        is he not?
16   A.   Yes, sir.
17   Q.   Did he score high enough on the written test to
18        go to the assessment portion of the battalion
19        chief --
20   A.   That I recall, Clay Carson did not take the
21        test.
22   Q.   Did not take the test.  Okay.
23   A.   He wasn't there when I took it.

Page 87

1    Q.   So we can take him out of the equation.
2    A.   If you choose to, yes, sir.
3    Q.   So the only career non-probationary firefighter
4         who took the battalion chief written test who
5         was not a lieutenant was Chris Turner, a black
6         male?
7    A.   I know Chris Turner took the test.
8    Q.   Did you keep notes of the orientation session?
9    A.   I don't recall taking any notes.  We were
10        provided study material in reference to the test
11        at some particular time or another.  But, no,
12        sir, I don't recall any notes I took during
13        orientation.
14            (Defendant's Exhibit 5 marked for
15             identification.)
16   Q.   I'm going to mark this as Number 5.  Did you
17        receive this document at the orientation?
18   A.   It looks familiar, Mr. Morgan.  Yes, sir.
19   Q.   And that is an Auburn Fire Division Orientation
20        Manual.  That's the title of it, true?
21   A.   Yes, sir.
22   Q.   And you did receive that at the orientation
23        session?

Page 88

1    A.   I think so.
2    Q.   And did the people that you've testified were
3         there -- Stephanie King, Steve Reeves, Lee and
4         the WCA's representative -- did they go over
5         that document with you?
6    A.   A lot of things was discussed that day,
7         Mr. Morgan.  I can't specifically remember what
8         was went over and what was discussed.  But it
9         was a lot of information involved, and
10        everything that I think was presented was
11        touched upon as far as orientation, yes, sir.
12   Q.   The bottom line is:  It was explained to the
13        applicants the testing process?
14   A.   Yes, sir.  It was told to us basically how it
15        would be implemented and worked and I guess
16        scored and applied to whatever was going on.
17   Q.   And the percentages as to people taking the
18        written test, who would be eligible to proceed
19        on to the assessment program part of it?
20   A.   Basically the understanding I had when I was
21        there was if you passed the written test, you
22        proceed.
23   Q.   If you didn't pass the written test --

22 (Pages 85 to 88)

Deposition of Gerald Stephens

May 30, 2008

Page 89

1   A.  If you didn't pass, you didn't proceed.
2   Q.  You talked about a reading material or study
3       material list. Did you receive a list -- I know
4       you got some books. I'm going to get to that in
5       a minute. Was there an actual list that was
6       given out or was the list discussed or was it in
7       that manual?
8   A.  The only thing I remember was that I was
9       notified to come to the public safety building
10      to Mr. Lamar's office and receive your study
11      material.
12  Q.  But you were made aware in the orientation
13      session that study materials would be provided?
14  A.  Yes, sir.
15  Q.  The person from CWH, do you recall anything that
16      he said about the test, how the test was
17      devised, the purpose of the test?
18  A.  I don't recall that, sir.
19  Q.  Did you make any complaint at the orientation
20      session, which I think was February 28, 2006 --
21      did you make any complaint at the orientation
22      session about a written test?
23  A.  No, sir.

Page 90

1   Q.  The people that were conducting the orientation,
2       did they ask people -- the participants if they
3       wanted to -- needed to ask questions or
4       anything?
5   A.  That I recall, I think it was a time available
6       for questioning throughout the whole --
7       throughout the hours we were there, but I can't
8       recall any specifics at this time. I know I
9       can't.
10  Q.  Did you ask any questions?
11  A.  No, sir, I didn't.
12  Q.  Did Mr. Ogletree ask any questions?
13  A.  I'm not aware of that, sir, if he did or not.
14  Q.  How about Chris Turner?
15  A.  I'm not aware of that either, sir.
16  Q.  Did anybody complain about a written test being
17      part of the promotion procedure at the
18      orientation?
19  A.  I'm not aware of anybody complaining,
20      Mr. Morgan.
21  Q.  And I know this was, what, two years ago and a
22      three-hour session, but just as best you can
23      remember, tell me what you recall Stephanie

Page 91

1       King's role being at that session.
2   A.  The first person I saw when I came to
3       orientation that I guess had something to do
4       with presenting the material was Ms. King. She
5       was actually setting up the projectile and all
6       that in the room I guess preparing everything
7       for presentation.
8   Q.  Did you have any conversation with Stephanie?
9   A.  Other than hello; how are you doing; good to see
10      you, no, sir.
11  Q.  Do you remember anything that she said or
12      contributed to the orientation session other
13      than setting up the equipment?
14  A.  From what I experienced and saw, it looked as if
15      Ms. King or Mr. Reeves was working together to
16      do whatever they had to do as far as human
17      resources. But vaguely do I recall Ms. King
18      saying anything in reference to. She was
19      present with Mr. Reeves.
20  Q.  What about Steve Reeves? What do you recall his
21      role being?
22  A.  Mr. Reeves made a brief presentation in
23      reference to welcoming everybody in so many

Page 92

1       words, and then he turned things over to the
2       representative from CWH.
3   Q.  Do you recall Steve Reeves explaining any of the
4       testing procedures or what would be -- which the
5       applicants would go through?
6   A.  I don't remember, sir. I'm sorry. I don't
7       recall that.
8   Q.  Do you remember Steve Reeves saying anything
9       about how the procedure was developed?
10  A.  I don't remember, sir. I'm sorry.
11  Q.  Do you remember Steve Reeves saying anything
12      about how it was determined that there would be
13      a written test and then you would go from the
14      written test if you passed to the remainder of
15      it, the assessment part? Do you remember any of
16      that from Mr. Reeves?
17  A.  The only person I recall saying that or
18      explaining in detail how it would work was the
19      representative for CWH. But I don't recall -- I
20      can't remember if he did or not -- did say that,
21      Mr. Morgan. I don't remember.
22  Q.  "He" being Steve Reeves?
23  A.  Yes.

Page 93

1   Q.  What about Larry Langley?  What was his role or
2      what did he contribute to the --
3   A.  That I remember, Mr. Langley walked in the room
4      before we even got started and left, and I never
5      saw him again.
6   Q.  And Lee Lamar, what do you recall his input or
7      participation being?
8   A.  Mr. Lamar was there, that I recall, for the
9      entire time of the orientation.  And I vaguely
10     remember him having some input, if he was
11     questioned about it, in reference to the
12     division itself and all that.  That's basically
13     all I remember on that.
14   Q.  Do you remember Lee saying anything specifically
15     about how the test was developed?
16   A.  No, sir.
17   Q.  Do you remember Lee saying anything specifically
18     about how the components were derived and
19     processed, came about?
20   A.  I don't remember that, sir.
21   Q.  Tell me what you recall the CWH representative
22     saying about the test.
23   A.  Basically he was saying that the questions was

Page 94

1      drawn from whatever procedures they have, and
2      they had been representing several cities or
3      municipalities around the nation, you know.
4      Just told us a little bit about the company
5      within itself, and he started going over the
6      material.  I think he had a slide presentation,
7      and we just gradually worked through the whole
8      orientation process of that evening.
9   Q.  What do you recall the slide presentation being
10     about?
11   A.  I think it was in reference to the study
12     material we had, the things to study or
13     something of that nature.  But I can't
14     specifically remember what is was pertaining to.
15   Q.  Do you remember if the CWH representative
16     explained to the participants that questions
17     would be drawn from these study materials?
18   A.  It's a great chance he could have said that, but
19     I just don't remember at this time, Mr. Morgan.
20     I'm sorry.
21   Q.  What was your understanding as to the purpose of
22     the study materials?
23   A.  My understanding of the study material was it

Page 95

1      was given because -- supposedly it was in
2      reference to the test that was being given.
3      That's the understanding I had.
4   Q.  The study materials would help you on the test?
5   A.  Supposedly help us on the test.
6   Q.  Now, anything else specific that you recall from
7     the CWH representative?
8   A.  No, sir, I don't.  I don't recall anything.
9   Q.  Did the representative from CWH go over any
10     sample questions with you and the other
11     participants at that orientation?
12   A.  I don't remember Mr. Morgan.  We went over so
13     much within those hours, I just don't remember.
14   Q.  What was your understanding from the orientation
15     session and what you were being told as to how
16     the questions were developed?  What was your
17     understanding as to why the questions that you
18     were going to be asked were going to be those
19     questions?
20   A.  I don't have any idea on how they drew up their
21     questions.  I don't have a clue.
22   Q.  The reading materials that were discussed, did
23     they all relate to fire duties?

Page 96

1   A.  They were actually -- If I remember correctly,
2     they were essentials of some sort in the field
3     of firefighting.
4   Q.  Were any of them related more to supervision
5     than firefighting, or were they all -- as you
6     heard it, did they all appear to be related to
7     what you would be doing as an officer?
8        MR. HORSLEY:  The study materials?
9        MR. MORGAN:  Yeah.
10   A.  From what I looked at and what was presented to
11     me, Mr. Morgan, the material was of an advanced
12     level.  And what I consider to be an advanced
13     level is a management position within the fire
14     division.
15   Q.  And the battalion chief is an advanced level, is
16     it not?
17   A.  Yes, sir.
18   Q.  That's what --
19   A.  Superior, advanced, you know.  Yes, sir.
20   Q.  That's the next rank below the deputy chief?
21   A.  Yes, sir.  In the Auburn Fire Division.
22   Q.  Well, the discussion from the CWH representative
23     as to the test and what would be included and

Page 97

1    what was expected, did it appear to be related
2    to what a person would do as a supervisory
3    officer in the Auburn Fire Department?
4  A.  Now, that was a question.  I mean, we have ways
5    we do things in Auburn, and people have ways
6    they do things in Montgomery.  But the
7    essentials itself I guess was the appropriate or
8    the common way or the popular way, however they
9    put it, that they think something should
10    happen.  I mean, it didn't directly apply to the
11    way we do things in Auburn, but it was
12    officially essential in reference to, you know,
13    advanced positions of that nature.
14  Q.  The discussion in your opinion was that these
15    were essential functions of that rank, but it
16    may not be the way we do it in Auburn?
17  A.  Yes, sir.
18  Q.  And did you register any complaint with the WCH
19    representative about those type questions being
20    asked on the test?
21  A.  No, sir.
22  Q.  Did anybody?
23  A.  I'm not aware of that, sir.  If somebody did,

Page 98

1    I'm not aware of it.
2  Q.  Do you know what input into the written test any
3    officers with the City of Auburn Fire Division
4    had?
5  A.  There were rumors that the battalion chiefs at
6    the time played a role in some part of it, but I
7    don't know.  I'm not aware if they did.  I'm not
8    aware what part they played.
9  Q.  Let's assume that the battalion chiefs at Auburn
10    played a role in the written test that was
11    developed for the position of battalion chief.
12    Would you agree with me that that would be a
13    good thing?
14        MR. HORSLEY:  Object to the form.  You
15        can answer if you know how.
16  A.  I think just like with team leaders,
17    lieutenants, the whole nine, I think battalion
18    chiefs should play a role in the overall
19    promotionary procedure.  Now, the test, I'm not
20    sure about that.
21  Q.  Not sure about what, whether they did or not?
22  A.  I'm not sure if they played a role in the
23    questions that was on the test.  I'm not sure of

Page 99

1    that.
2  Q.  And I understand that you've testified to that.
3    My question is:  Assume they did.  Would you
4    agree with me that battalion chiefs playing a
5    role in helping develop the written test, if
6    that occurred, would be a good thing?
7        MR. HORSLEY:  Object to the form.  You
8        can answer.
9  A.  That would be a good resource, yes, sir.
10  Q.  Was there anything that the representative from
11    CWH said at the orientation session that day
12    that would be included on the test, whether it
13    was a written test or the assessment part of it,
14    that you thought didn't have anything to do with
15    fire work?
16  A.  I don't recall anything, Mr. Morgan.  I mean, he
17    was presenting information that was available
18    that I guess was being directed to the
19    candidates, which was me and all the others that
20    was present.
21  Q.  Are you aware of any orientation sessions other
22    than this one?
23  A.  This is the only one I can recall.

Page 100

1  Q.  Do you know of any special meetings or
2    orientation sessions that white applicants had
3    with these people that were there, including the
4    CWH representative, that you were not a part of?
5  A.  To my knowledge, no, sir, I don't know anything
6    about that.
7  Q.  As far as you know, everybody attended the same
8    orientation session.  You have no evidence
9    otherwise?
10  A.  No evidence otherwise.
11  Q.  And as far as you know, that was the only
12    orientation session that was given, true?
13  A.  That's all I know, yes, sir.
14        MR. HORSLEY:  Is this a decent time
15        for a break?
16        MR. MORGAN:  Yeah.
17        (Lunch recess.)
18        (Defendant's Exhibits 6, 7 and 8
19        marked for identification.)
20  Q.  (Continuing by Mr. Morgan)  Let me show you what
21    I'm marking as three exhibits, 6, 7, and 8.  Do
22    you recall receiving Exhibit 6, which is a memo,
23    letter, to the candidates outlining the dates

Page 101

1    and guidelines for the exam?  Do you recall
2    receiving that?
3    A.  Yes, sir, I do.
4    Q.  Would you have received that on or about March
5    3, 2006?
6    A.  Yes, sir, on or about.
7    Q.  And the next two exhibits, 7 and 8, both of them
8    say they are the battalion chief reading list
9    check-out sheet, and they have your signature on
10   both of these.  Signature on one and initials --
11   yeah -- Signatures and initials on both.
12   A.  Yes, sir.
13   Q.  And those are both dated March 3, 2006, true?
14   A.  Yes, sir, they are.
15   Q.  When you signed these 7 and 8, would you have
16   received -- by that time would you already have
17   received Defendant's Exhibit Number 6, which is
18   the letter outlining the dates and guidelines?
19   A.  Yes, sir.
20   Q.  Now, the one that I guess that's Exhibit 7 has
21   your signature, and then it has some initials
22   and then it has a number, number 14.  I guess
23   that's a book number that you received?

Page 102

1    A.  I don't remember specifically what it applies
2    to.  But, yes, it has the number 14.
3    Q.  And to the left of that are initials.  Do you
4    know whose initials those are?
5    A.  On Exhibit Number 7 or which one are we on right
6    now?
7    Q.  Yeah.  Look to the right of where you signed.
8    A.  Right here?
9    Q.  Yeah.  In fact, let's look -- look at your
10   signature.  It's got Gerald Stephens, 3/7/06, at
11   something.
12   A.  Yes, sir.  On the day I signed this form, it was
13   March 7, 2006 at 0850 hours, at 8:50 a.m., that
14   morning.
15   Q.  You signed it on March 7 rather than March 6?
16   A.  Yes, sir.
17   Q.  I'm sorry.  March 3.
18       Why did you sign it on March 7?
19   A.  It had to be when I was on duty that day.  That
20   would be the only reason.
21   Q.  And then continuing on, it's got, looks like,
22   ZZZ.  It looks like numbers to me.  Are those
23   your initials?

Page 103

1    A.  No, sir.  Those are not mine.
2    Q.  And how about the number 14?  Is that your
3    handwriting or is that someone else's
4    handwriting?
5    A.  That's somebody else's handwriting.
6    Q.  But that's your signature?
7    A.  Yes, sir.
8    Q.  And Defendant's Exhibit Number 8, books, it's
9    got the number of books, number 14.  Is that
10   your signature?
11   A.  Yes, sir.  Those are my initials.
12   Q.  And is the number 14 yours as well or did
13   somebody else write that in?
14   A.  Somebody else wrote 14.
15   Q.  And do you remember if you signed Defendant's
16   Exhibit 8 on March 3rd or did you sign it on
17   March 7th?
18   A.  I'm going to guess and say I signed it on the
19   7th.
20   Q.  The same day would be your best guess?
21   A.  Yes, sir.
22   Q.  Do you remember what you received as book number
23   14?

Page 104

1    A.  I received a couple of books when I would
2    receive my material.  I can't remember which
3    ones they were and the titles of them, but I do
4    recall them being some sort of essential or
5    another in reference to firefighting.
6    Q.  Essential?
7    A.  Yes, sir.
8        (Defendant's Exhibit 9 marked for
9        identification.)
10   Q.  Let me show you what I'm going to mark as
11   Defendant's Exhibit Number 9.  I apologize.  Is
12   that your application for the promotion to
13   battalion chief?
14   A.  Yes, sir.  That's it.
15   Q.  And what day did you fill that out or sign it?
16   A.  I signed it on February 20, 2006, on a Monday.
17   Q.  Now, between the orientation session, which was
18   February 28 of '06, and your signing for the
19   books on March 7, 2006, do you recall anything
20   during that period of time that occurred in
21   relation to the battalion chief promotion?
22   A.  I don't recall anything, Mr. Morgan.
23   Q.  Did you discuss with any of the people who had

Page 105

1  been involved in the orientation -- Lee, Steve,
2  Stephanie, the CWH representative, or Chief
3  Langley -- did you have any discussions with
4  them up until the time you received your books
5  on March 7?  Anything about the procedure or the
6  test or any conversations with any of those
7  people?
8  A.  No, sir, I don't recall.
9  Q.  How about the folks that you've sued in this
10  case -- other people that you've sued:  Bill
11  Ham, Bill James, Charles Duggan?  Did you have
12  any conversations with any of them --
13  A.  No, sir.
14  Q.  -- up until March 7 about the test or how it
15  would be administered?  Anything to do with the
16  test?
17  A.  No, sir.
18  Q.  Do you recall where you were when you received
19  the -- signed the form and received the books?
20  A.  As I stated, Mr. Morgan, I think I was on duty
21  that day.
22  Q.  Did somebody bring you the books and the form?
23  A.  No, sir.  I had to go to the public safety

Page 106

1  office to Chief Lamar's office.
2  Q.  And was Chief Lamar there?
3  A.  Yes, sir.
4  Q.  Did you have any conversations with him when you
5  signed about the test or books?
6  A.  No, sir.
7  Q.  Just said I'm here and signed it?
8  A.  Yes, sir.
9  Q.  So you had the letter from, I guess, Lee Lamar
10  telling you that the written test was going to
11  be on a certain day.  I think it was April 10 or
12  whatever is in the letter.
13  A.  Yes, sir.
14  Q.  And you had the books that you had received from
15  the City, and you had your orientation booklet.
16  Y'all got to keep these orientation booklets,
17  didn't you, Defendant's Exhibit 5?
18  A.  I don't think we got to keep these.  I'm not
19  real sure on that.
20  Q.  But you are sure you got to keep the books or at
21  least --
22  A.  Oh, yes.  Most definitely, sir.
23  Q.  Is there anything of any significance that

Page 107

1  occurred in relation to the promotion procedure
2  from the time you received your books on March 7
3  up until the time you start taking the written
4  test, which I think is April 10?
5  A.  Can you repeat the first part?  It slipped my
6  mind.  I'm sorry.
7  Q.  You received the books on March 7 at Deputy --
8  at that time -- Lee Lamar's office, and I think
9  the test began April 10.  Anything of any
10  significance between that time period that
11  relates to the promotion procedure?  Did
12  anything occur during that time period?
13  A.  Not that I can recall, sir.
14  Q.  Did you have any conversations with Lee or Larry
15  Langley or Steve Reeves or Stephanie up until
16  you start taking the written test on April 10?
17  A.  No, sir.
18  Q.  Other than what may have occurred at the
19  orientation?
20  A.  No, sir.
21  Q.  And you never had any conversations up to that
22  time with the mayor or Charles Duggan or Steve
23  Reeves?

Page 108

1  A.  No, sir.
2  Q.  The mayor, Bill James, and Charles Duggan, you
3  didn't have any conversations with them up to
4  April 10 about the test in any fashion, true?
5  A.  No, sir.  True.
6  Q.  Tell me what you did to study and prepare for
7  the test.
8  A.  Being the time I had to study all that
9  material -- First of all, I reviewed all the
10  material that was available.  And I took it upon
11  myself to just study areas where I thought to be
12  important.  Like I say, we didn't have that much
13  time or I don't think we had enough time to
14  actually study all the material that was
15  available.  So I took it upon myself to apply
16  myself to areas where I thought I needed to
17  study and work on to prepare or be ready for
18  this test.  And that was just the way I was
19  thinking about it, Mr. Morgan.
20  Q.  Did you have study groups?  Firefighters get
21  together and have study groups?
22  A.  I did not.
23  Q.  You did not?

Deposition of Gerald Stephens                                              May 30, 2008

Page 109

1   A.  No, sir.
2   Q.  How many study books did you have?
3   A.  I can't remember the exact number, but three to
4       four books.
5   Q.  Did you have to turn those back in?
6   A.  Yes, sir.
7   Q.  Did you make any complaint to anybody before you
8       sat down for the written test that you didn't
9       have enough time to study?
10  A.  Anybody as in ...
11  Q.  Lee Lamar.
12  A.  The one person that I did talk about in the
13      study time and all that, he's in this room
14      now and that's Mr. Ogletree.
15  Q.  You had those conversations with Mr. Ogletree?
16  A.  Yes, sir.  I told him just what I thought about
17      the time span and the material that was
18      available to study, and I told him what I
19      thought about it.
20  Q.  Well, I'm going to get to that.  Let me go
21      through my little list.
22          You didn't have any conversations with Larry
23      Langley complaining about the time you had to

Page 110

1       study, did you?
2   A.  Larry Langley, no.
3   Q.  No conversations with Lee Lamar about the period
4       of time for study, did you?
5   A.  Mr. Lamar, no.
6   Q.  No conversations with Bill Ham about the period
7       of time you had to study?
8   A.  Mayor Ham, no.
9   Q.  No conversation with Steve Reeves about the
10      period of time you had to study?
11  A.  Mr. Reeves, no.
12  Q.  No conversations with Bill James about the
13      period of time you had to study?
14  A.  Mr. James, no.
15  Q.  No conversations with Charles Duggan about the
16      time you had to -- period of time you had to
17      study?
18  A.  Charles Duggan, no.
19  Q.  And none with Stephanie King?
20  A.  Ms. King, no.
21  Q.  And none with any representative of CWH?
22  A.  No representatives, no.
23  Q.  And so you and I will be together on this, I'm

Page 111

1       not asking you questions about Cortez Lawrence
2       because I'm understanding from your answers he
3       didn't have anything to do with this.  Is that a
4       fair statement?
5   A.  To my knowledge he don't.  I don't know nothing
6       about that.
7   Q.  What conversations did you have with Eddie
8       Ogletree about the time span?
9   A.  Basically I notified him and just asked him, you
10      know, basically his opinion on the material that
11      was presented and the time we had on it.  And I
12      just basically told him that I don't see where I
13      think I would be able to cover all this, you
14      know, in the time we had available.  It was a
15      lot of material.  It was a lot to read.  Plus,
16      you know, the other information that I chose to
17      pursue and study that I thought would be liable
18      (sic) for the test, I studied that as well,
19      stuff like SOP books, personnel policies, City
20      personnel policies -- I'm sorry -- in
21      conjunction with the material that was given for
22      the actual test.
23  Q.  So in addition to the books that you were told

Page 112

1       were the recommended reading for the test, you
2       studied the fire department SOPs and you studied
3       the personnel policies?
4   A.  Yes, sir.
5   Q.  Now, did anybody recommend or suggest that you
6       study the SOPs for the battalion chief test?
7   A.  Nobody recommended it to me, sir.
8   Q.  Did anybody recommend or suggest that you study
9       the personnel policies for this battalion chief
10      test?
11  A.  No, sir.  Nobody recommended it to me.
12  Q.  Any other sources that you studied or reviewed
13      for the battalion chief test, now, that weren't
14      on the recommended reading list, the books you
15      were given by the City, other than the SOPs and
16      personnel policies?
17  A.  No, sir.  Those are the only outside two
18      resources I studied in conjunction with what was
19      given to me.
20  Q.  And other than the fact that you received your
21      reading material on March 7 rather than March 3,
22      did any of the other firefighters or candidates
23      for this promotion have any additional period of

Page 113

1   time to study than you did?
2   A.  I'm not aware of that, sir.
3   Q.  As far as we can tell from the documentation
4       that I've presented to you today, everybody
5       would have received the reading material on or
6       about March 3; is that true?
7   A.  Yes, sir, on or about.
8   Q.  So the length of time would have been the same
9       for black applicants, white applicants,
10      lieutenant applicants, team leader lieutenant
11      applicants, firefighter applicants?  Everybody
12      would have had the same time period.  Is that a
13      fair statement?
14  A.  Give or take one or two days depending on how
15      the shift ran.  Yes, sir, that's a true
16      statement.
17  Q.  You make a reference in your complaint to test
18      aids.  What did you consider to be the test aids
19      for the battalion chief promotion process?
20  A.  Could you be a little bit more specific about
21      this?
22  Q.  I'll show you what I'm talking about.
23  A.  Okay.

Page 114

1   Q.  Paragraph 18.  You have on here -- I've
2       highlighted it.  Caucasian applicants for the
3       position were given preferential treatment
4       regarding the application process, test aids,
5       and test grades.
6           Do you see that in your complaint?
7   A.  Yes, sir.
8   Q.  What are the test aids that you're referring
9       to?  What did you consider to be the test aids
10      for this promotion?
11  A.  I can't recall that, Mr. Morgan.
12  Q.  Well, let me ask this.  You testified about an
13      orientation.
14  A.  Yes, sir.
15  Q.  And you testified about receiving the books.
16  A.  Yes, sir.
17  Q.  Do you have knowledge of any white applicants
18      for this position with battalion chief that
19      received anything else that would help them on
20      this test other than attending the orientation
21      and reviewing the books that everyone was
22      given?  Anything else that you know of that
23      white applicants received that you didn't

Page 115

1   receive?
2   A.  I'm not aware, Mr. Morgan.  I haven't been
3       introduced with that.
4   Q.  Do you know any white applicant who was given
5       preferential treatment in the application
6       process?
7   A.  I don't recall that, Mr. Morgan.  It don't ring
8       a bell.
9   Q.  Do you know any white applicant who was given
10      preferential treatment in terms of test aids?
11  A.  Never presented to me, Mr. Morgan.  I'm not
12      aware of that.
13  Q.  I assume that you continued your regular shift
14      work -- shift hours during the process when you
15      were studying for the battalion chief promotion
16      procedure.
17  A.  Yes, sir.
18  Q.  Did you take any time off to study?
19  A.  That I recall, none, sir.  If it was any, it
20      would have been how our Kelly days fall or
21      something like that.  But I don't recall taking
22      off any significant shift during that process.
23  Q.  Did you apply for any or request any leave time

Page 116

1   that you were denied during that period of time?
2   A.  I don't recall anything of that nature, sir.
3   Q.  Did you have your lawn service going on at that
4       time?
5   A.  No, sir.
6   Q.  When did you say you started the lawn service?
7   A.  May of 2006.
8   Q.  Did you do any preparatory work for that?
9   A.  Basically I waited until everything was over
10      with the battalion chief promotion before I even
11      thought about starting a business.  So no, sir,
12      I didn't do anything.
13  Q.  How is that business set up?  Is it a d/b/a or a
14      corporation?
15  A.  D/b/a.
16  Q.  And who does your books?
17  A.  My wife.  She has accounting resources
18      knowledge, stuff like that.
19  Q.  And do you have -- I guess for tax purposes you
20      keep your records on purchasing equipment --
21  A.  Yes, sir.
22  Q.  -- advertising, if you do any advertising --
23  A.  Yes, sir.

Page 117

1   Q.  -- and all that?
2   A.  Yes, sir.
3   Q.  So if I needed to request that information, you
4       would have that from the beginning of the time
5       when you started your business?
6   A.  Yes, sir.
7   Q.  Is that a fair statement?
8   A.  Yes, sir.
9   Q.  I always get confused with firefighters and
10      their shifts.  In March of '06, where were you
11      assigned?
12  A.  I was on A shift.  Chief Brown was my immediate
13      supervisor.
14  Q.  What station?
15  A.  Station 3, if I remember correctly.
16  Q.  And what are the hours or days that A shift
17      works in a week?
18  A.  Well, each shift works a 24-hour shift.  So we
19      work from 0700 to 07 the following morning for a
20      total of 24.  Then we're off for 48 hours
21      whereas overall we work one day and be off two
22      days.
23  Q.  And you maintained that same shift during the

Page 118

1       time that you would have been preparing for the
2       test?
3   A.  Yes, sir.
4   Q.  Work one day and off two days?
5   A.  Yes, sir.
6   Q.  Anything that you did to prepare for the test
7       other than review the SOPs, personnel policies,
8       and those portions of the study books which you
9       thought were going to be important?  Anything
10      else that you did in preparation for the test?
11  A.  That's about all I did, sir.
12  Q.  Did you read completely any of the study aid
13      books?
14  A.  Like I said earlier, Mr. Morgan, I reviewed the
15      material that was given to me.  In the areas
16      where I felt strong on, I didn't spend as much
17      time as on the areas that I felt weak on.  So it
18      was give and take throughout the study guides --
19      study information.
20  Q.  So is it fair to say, then, the answer to my
21      question is:  You didn't read the whole book.
22      You read the parts you thought were going to
23      help you with your strengths taking the test?

Page 119

1   A.  Yes, sir.  I concentrated heavily on the area
2       where I thought I was weak in.
3   Q.  What day of the week was the test given?  Do you
4       recall?
5   A.  No.  I don't recall what day it was, sir.
6   Q.  And didn't we decide, or at least I decided, it
7       was April 10?
8   A.  Yes, sir.  April 10.
9   Q.  And do you remember what time it started?
10  A.  It was stated that it started at 8:30, but I
11      don't know if it started on time, a little bit
12      before or a little bit after.  I'm not sure on
13      that.  I don't recall.
14  Q.  Was there a sign-in sheet?
15  A.  Yes, sir, I do recall a sign-in sheet.
16  Q.  And would you -- I say you.  I mean all the
17      applicants.  Were you given a booklet to take?
18      How was the written test?  What was the written
19      test?
20  A.  If I'm remembering correctly, through the whole
21      process we came in and signed in.  And, of
22      course, all the tables and chairs were set up
23      and spaced evenly from each candidate.  And

Page 120

1       sometime or another a booklet was presented -- a
2       sealed booklet -- that we had to open at the
3       time we started the actual test.
4   Q.  How did you identify -- Did you write in the
5       test booklet or was there a separate answer
6       sheet?
7   A.  I don't recall exactly what it was, but I think
8       we wrote in the test booklet.  But I don't
9       recall.  I just can't remember.
10  Q.  Did you put your name on your test booklet or a
11      number?  How was that to identify --
12  A.  There was a number, and somewhere you did have
13      to put your name.
14  Q.  And how long was the test?
15  A.  We was allowed so many hours to take the test.
16      If I'm thinking correctly, it was three hours.
17      And it took me approximately two, two hours and
18      fifteen minutes, two hours and a half to take
19      it.  I wasn't the last person in the room when I
20      left.  I'll put it like that.  So I didn't take
21      up the whole three hours.
22  Q.  Who was present to monitor or proctor the test?
23      Who was there to hand it out and make sure --

Page 121

1    A.  I think I recall Mr. Lamar being there.  I
2         vaguely saw Mr. Langley there.  I can't remember
3         who else may have been there, Mr. Morgan.  I'm
4         sorry.
5    Q.  Do you remember if Steve Reeves was there?
6    A.  I don't remember.
7    Q.  How about Stephanie?
8    A.  I don't remember.
9    Q.  Do you remember any representative from CWH?
10   A.  I don't recall anybody from CWH.
11   Q.  From the time of the orientation on February 28
12        up until the time you start taking the test on
13        April 10, did you have any further conversations
14        or participate in any further discussions with
15        anybody from CWH about the test?
16   A.  No.
17   Q.  During this three-hour test, were you allowed to
18        take breaks if you needed to?
19   A.  I don't remember.  All I do remember is I didn't
20        take one.  I didn't take a break.
21   Q.  How many questions were there?
22   A.  I don't remember, sir.
23   Q.  Was it a multiple choice, fill-in-the-blank?

Page 122

1         How were the questions and answers?
2    A.  If I remember correctly, it was multiple
3         choice.
4    Q.  Were they divided up into any divisions or areas
5         such as supervision, fire scene, or was it just
6         a straight series of questions?
7    A.  That I recall, it was a straight series of
8         questions.
9    Q.  And did the questions appear to be related to
10        fire work?
11   A.  They appeared to be related to the field of fire
12        profession, yes.
13   Q.  Were there questions on there that appeared to
14        be related to supervisory roles?
15   A.  I recall there being some questions, yes, sir.
16   Q.  Did you think that the questions related to what
17        a battalion chief would do in the city of
18        Auburn?
19             MR. HORSLEY:  Object to the form.  You
20             can answer.
21   A.  I don't think -- I think several of the
22        questions on that test had nothing to do with
23        Auburn and the way we do things at Auburn.  To

Page 123

1         me those questions were something in reference
2         to a larger municipality bigger than us.
3    Q.  Do you remember the specific questions?
4    A.  No, sir, I don't.
5    Q.  How many questions were there like that that you
6         thought related to a larger municipality?
7    A.  It was the majority of the questions of the
8         test.  I don't recall the exact number or how
9         many apply to that, but I know it was several
10        questions on there that I just didn't think
11        pertained to the way we do things in Auburn, to
12        the rules we go by, regulations.
13   Q.  What exactly is your familiarity with the
14        responsibilities and duties of the battalion
15        chief?
16   A.  Being that I filled the role in the absence of a
17        battalion chief, I'm very familiar with the
18        things they do.
19   Q.  What does a battalion chief do differently from
20        what a lieutenant does?
21   A.  Basically in a nutshell, the battalion chief is
22        responsible for the entire shift and also
23        responsible for the operations of the City in

Page 124

1         reference to life, safety, and fire protection
2         during that shift.
3    Q.  Did you make any complaints to anyone during the
4         testing process --
5    A.  No, sir, I did not.
6    Q.  -- that you didn't think the test was related to
7         what went on at Auburn?
8    A.  No, sir, I did not.
9    Q.  After the test was completed, usually folks talk
10        about the test, what they thought about it.  Do
11        you remember anybody making any comments in any
12        kind of meetings like that that they thought the
13        test did not address what a battalion chief did
14        at the City of Auburn?
15   A.  Nobody spoke to me about anything of the test
16        afterwards, Mr. Morgan, and nor did I speak to
17        anybody about it.
18   Q.  How did you think you had done on the test?
19   A.  I didn't know what to think to be honest with
20        you, Mr. Morgan.
21   Q.  Although you can't remember specific questions,
22        was there some general area of the test that you
23        thought didn't relate to what went on at Auburn

Page 125

1    that you could give me some examples so I could
2    kind of understand what you're talking about?
3    A.   I can't remember specifically, Mr. Morgan.  If I
4        had to guess, it had to be something on the
5        guidelines of --
6            MR. HORSLEY:  Don't guess.  Just tell
7            him what you remember.
8    A.   I don't remember.  I just don't remember.
9    Q.   Who was the first person to finish the test?  Do
10       you remember?
11   A.   If I recall, it was Christopher Turner.
12       Mr. Turner.
13   Q.   And there were still people in there when you
14       completed it?
15   A.   Yes, sir, there was still people in there.
16           (Defendant's Exhibit 10 marked for
17           identification.)
18   Q.   Let me show you what I'm marking as Defendant's
19       Exhibit 10.  This is a letter to you dated April
20       4, a feedback letter, feedback report.  Do you
21       remember receiving that?
22   A.   Yes, sir.
23   Q.   Did you make a request for this report or did

Page 126

1    this report just come to you without you having
2    requested it?
3    A.   If I recall I requested this.
4    Q.   Did you do that in writing or --
5    A.   I did it in writing.
6    Q.   What did the -- I may have it, but I can't find
7        it.
8        In what way did you request it, just that
9        you would like an opportunity to look at it
10       or --
11   A.   That I recall, this was done during the
12       grievance procedure that we initiated, me and
13       three other guys.  Three other guys initiated a
14       grievance after the results of the test, if I'm
15       thinking correctly.
16           MR. HORSLEY:  Off the record.
17           (Brief off-the-record discussion.)
18           MR. HORSLEY:  For the record, this
19           letter is dated April 4, 2005,
20           which would appear to be before
21           the test was given.
22           MR. MORGAN:  Let me take one second.
23           (Brief recess.)

Page 127

1            (Defendant's Exhibit 11 marked for
2            identification.)
3    Q.   (Continuing by Mr. Morgan)  I have a letter,
4        which I will show you, Defendant's Exhibit
5        Number 11, and it is an official notification
6        that you didn't make 70 or whatever the magic
7        number was on the written test.  And then I've
8        given you Defendant's Exhibit Number 10, which
9        is the feedback report.  Okay?
10   A.   Yes, sir.
11   Q.   And I didn't pick up on it, but as Richard
12       pointed out, the year is incorrect on the Number
13       10.  It should be 2006.
14   A.   Yes, sir.
15   Q.   My question to you is --
16           MR. HORSLEY:  Just for the record, the
17           date is wrong, too, because it
18           predates the test.
19           MR. MORGAN:  What is the date?
20           MR. HORSLEY:  April 4.
21           MR. MORGAN:  The whole date is wrong?
22           MR. HORSLEY:  The whole thing --
23           THE WITNESS:  Everything is improper.

Page 128

1    Q.   Which did you receive first, 10 or 11?
2    A.   I received 11 first.  I did.
3    Q.   And that's dated April --
4    A.   14th, 2006.
5    Q.   And that's the one telling you that you did
6        not -- Let me show you one other document.
7            (Defendant's Exhibit 12 marked for
8            identification.)
9    Q.   Now, that is a document which appears to be the
10       grievance complaining about the test, true?
11   A.   Yes, sir.
12   Q.   And it's dated April 21, 2006?
13   A.   Yes, sir.
14   Q.   Using that as a frame of reference, did you
15       receive the report -- feedback report before or
16       after you filed the grievance?
17   A.   Now, for starters, Exhibit 11, that's the first
18       thing I received after the test.
19   Q.   And let me ask you this.  Did that come to you
20       in the mail or was it hand-delivered?
21   A.   I recall it coming in the mail, Mr. Morgan.
22   Q.   All right.
23   A.   And as far as this feedback, the only thing that

Page 129

1    I have received, Mr. Morgan, as far as feedback
2    is when I requested it. That's the only thing I
3    can recall me receiving, any feedback, because
4    nothing was made to me directly, but people
5    complained about the test, one person in
6    particular, whereas some questions were thrown
7    out during the testing period.
8    Q.   Who is the one --
9    A.   Joey Darby.
10        And through the rumor mill, I understand
11   that's how he managed to make the cut to go
12   through the remaining of the promotion
13   procedures.
14   Q.   Because questions were thrown out?
15   A.   That was deemed -- That shouldn't have been
16   there of some sort. It was presented to
17   whomever was in power to make that decision.
18   And I do recall Joey Darby being one of those to
19   pursue that.
20   Q.   Do you recall there being any others?
21   A.   I don't. I don't recall anyone else.
22   Q.   Well, I'm not saying this is true, but assume
23   what you said is true, that questions were

Page 130

1    thrown out for Joey Darby. Would those
2    questions have been thrown out for everybody or
3    just for Joey Darby?
4    A.   The whole process.
5    Q.   That question for everybody was thrown out?
6    A.   It was removed, null and void, pointblank.
7    Q.   So if you missed those same questions that Joey
8    Darby missed and that question was thrown out,
9    then that helped your score?
10   A.   Apparently so. It did.
11   Q.   Do you recall if you requested that feedback in
12   writing or just asked somebody verbally to send
13   the feedback report?
14   A.   As I stated earlier, Mr. Morgan, it was done in
15   writing. And right here on Exhibit 12, it will
16   show where we asked that four written exams be
17   reviewed. And what I received was this
18   feedback.
19   Q.   So you're thinking that your written request for
20   that was in Exhibit 12, the grievance thing?
21   A.   Yes, sir.
22   Q.   So when that grievance is filed -- My
23   understanding is Exhibit 12 is the first step in

Page 131

1    the grievance procedure.
2    A.   It appears that this is, yes, sir.
3    Q.   You, of course, had been informed that you did
4    not pass by that time?
5    A.   Yes, sir. The first thing I received was my
6    letter of response saying what I made on the
7    test. That's the first thing I received.
8    Q.   And is it your testimony that when you filed
9    that grievance that you had heard rumors that
10   Joey Darby had test questions thrown out?
11   A.   Well, Joey Darby didn't have them thrown out.
12   He questioned those -- I guess he pursued those
13   questions because we was -- they mentioned
14   somewhere -- I'm trying to remember -- if a
15   question was on the test that didn't appear to
16   be in reference to -- I can't remember how they
17   worded it, but I know there was some questions
18   on that test challenged.
19   Q.   Well, did you challenge any test -- any --
20   A.   Any questions? No, sir, I didn't.
21   Q.   But from what I understand your testimony to be,
22   the rumor was that Joey Darby challenged some
23   questions?

Page 132

1    A.   Yes, sir. If I'm thinking correctly, yes, sir.
2    Q.   And the rumor was that some of the questions
3    that Joey Darby challenged were thrown out. Is
4    that what the rumor was?
5    A.   Yes, sir, if I'm thinking correctly.
6    Q.   And you don't know whether or not the questions
7    he challenged affected your grade or not. Is
8    that a fair statement?
9    A.   I don't know which questions it was that he
10   challenged, and therefore I don't know if it
11   will help me or hurt me or whatever.
12   Q.   Is it your understanding that the feedback
13   report was only prepared or presented to the
14   four people who signed the grievance as opposed
15   to everyone who took the test receiving a
16   feedback report?
17   A.   Like I said earlier, Mr. Morgan, I didn't
18   receive -- the first thing I received was the
19   letter that I received showing my score. After
20   that me and the other guys filed a grievance,
21   and then after that I received the feedback
22   report based on the request that I made.
23   Q.   That's what my question is. Is it your

Page 133

1  understanding that you received the feedback
2  report because you requested it when you filed
3  for the grievance?
4  A. Yes.
5  Q. Do you have an understanding as to whether, for
6  instance, Rodney Hartsfield received a feedback
7  report? Do you know one way or the other
8  whether he did?
9  A. I don't know if he did or not, sir.
10 Q. The only thing you can say that you think is
11    that because you complained and requested it,
12    you received it, and you don't know whether
13    other people received it as a matter of course
14    or not?
15 A. Just like right here on Exhibit 10, this was
16    addressed to me, and I know what I asked for.
17 Q. Have you ever discussed it with Joey Darby about
18    test questions being thrown out or what he
19    objected to or anything?
20 A. No, sir, I didn't.
21 Q. Have you heard of any other applicants that
22    complained about the test questions other than
23    Joey Darby?

Page 134

1  A. Like I say, it was just word of mouth, rumor
2     mill, and I'm not sure on that. I don't recall.
3  Q. The only name you recall is Joey Darby?
4  A. That's the only name I recall hearing in
5     reference to.
6  Q. What's the date of the letter that told you you
7     didn't -- April 14?
8  A. Uh-huh (positive response).
9  Q. And the grievance was filed April 21.
10    In between receiving the letter, Defendant's
11    Exhibit Number 11, telling you that you were
12    not — hadn't made high enough on the written
13    and filing this grievance, Defendant's Exhibit
14    12 on April 21, did you have any conversations
15    with Lee Lamar or Larry Langley about the test?
16 A. I didn't, sir.
17 Q. Did you have any conversations with Steve Reeves
18    or Bill James?
19 A. No, sir, I did not.
20 Q. Have any conversations with the mayor or the
21    city manager about it?
22 A. No, sir, I did not.
23 Q. How about WCH? Did you have any conversations

Page 135

1  with CWH?
2  A. No, sir, I did not.
3  Q. And then you and three others filed a grievance
4     to Lee Lamar, and you asked that four written
5     exams be reviewed. I assume that's the four of
6     you, your written exams?
7  A. Yes, sir.
8  Q. Now, Horace Clanton is a white male?
9  A. Yes, sir.
10 Q. And Robbie Hodge is a white male?
11 A. Yes, sir.
12 Q. Eddie Ogletree is a black male?
13 A. Yes, sir.
14 Q. And Gerald Stephens is a black male?
15 A. Yes, sir.
16 Q. And the four of y'all filed this grievance
17    together?
18 A. We initiated that grievance together.
19 Q. And when you actually had the hearing, though,
20    how many of you went forward with the hearing?
21 A. It was three of us.
22 Q. Who did not go forward?
23 A. Robbie Hodge.

Page 136

1  Q. In this letter y'all say about exercising your
2     rights for a grievance on a promotion procedure,
3     which includes the following: The written exam.
4        What was your complaint about the written
5     exam at that point?
6  A. In reference to this grievance as a group,
7     everybody had their specific complaint. And the
8     only thing I can tell you about that is the last
9     one, inconsistency of past promotional
10    procedures. That was my main complaint.
11 Q. So did you have a complaint yourself about the
12    written exam as part of this grievance
13    procedure?
14        MR. HORSLEY: What was that question
15        again? I'm sorry.
16        MR. MORGAN: He said --
17 Q. As I understand what you said, the four of y'all
18    may have each had your own separate complaints,
19    true?
20 A. Pretty much so, yes, sir.
21 Q. The one that you were most complaining about was
22    the inconsistency of past promotional
23    procedures?

Page 137

1  A.  Yes, sir.
2  Q.  My question is:  As part of the grievance
3      procedure, was one of your complaints or did you
4      have a complaint about the written exam?
5  A.  The thing about inconsistency of past
6      promotional procedures, it involves the written
7      exam because for the simple fact there have
8      never been one.  That's my main thing.  That's
9      part of my inconsistency, because when I took --
10     if I can explain --
11          MR. HORSLEY:  Yeah.
12 A.  When I took my promotional assessment in '96,
13     there was no written test.  Anything after that
14     that I recall within a ten-year time span, there
15     was no written test.
16 Q.  Let me ask the question this way.  I'm going to
17     get to the inconsistency and let you explain
18     that in detail, but I want to go through these
19     other three.
20          What I'm hearing you say -- you tell me if
21     I'm wrong -- is that your complaint about the
22     written exam is that it was a requirement.
23 A.  Basically the written exam was part of the

Page 138

1      procedure, yes.
2  Q.  You didn't make any specific complaints about
3      the exam per se but just the fact that it was
4      now a part of the promotion procedure?
5  A.  Yes, sir.
6  Q.  And did you have as part of your complaint the
7      no time in grade policy?  Was that something
8      that concerned you?
9  A.  Not directly, sir.
10 Q.  And then the -- I don't even understand this
11     one -- no accumulative point system, was that
12     one of your concerns?
13 A.  That was a minor concern because --
14 Q.  What is that?
15 A.  Basically accumulative points is something
16     that's implemented into the overall assessment
17     whereas if --
18 Q.  Back up.
19 A.  Let's say, for example, if you had four years of
20     service, you get two points for that.  If you
21     had a degree, you get eight points for that, you
22     know.  To the point -- The point I'm trying to
23     get at is:  At the end of the testing, all your

Page 139

1      points are added up, and that's how you get a
2      result, like I got on my result from when I was
3      promoted stating how I ranked and here was my
4      score.
5  Q.  So you thought there should be some accumulative
6      point system into the system, either seniority
7      or education or something?
8  A.  Yes, sir.  I think it should have been one --
9      some type of point system, yes, sir.  Whether
10     there was or not, I don't know, because I didn't
11     make it past the written test portion for
12     battalion chief.
13 Q.  Well, tell me how you would have fashioned the
14     test for battalion chief.
15          MR. HORSLEY:  Object to the form.  You
16          can answer.
17 A.  I'm not an expert on test making, Mr. Morgan, so
18     I can't really say what I would do and what I
19     would do would be the correct thing to do.  But
20     I just -- I just -- I'm not an expert in that
21     field.  I just don't know.
22 Q.  And then your number four complaint -- I think
23     this is the one that you said most concerned

Page 140

1      you -- was the inconsistency of past promotional
2      procedures.
3  A.  Yes, sir.
4  Q.  Elaborate and tell me exactly what it is that
5      concerned you about that one.
6  A.  The thing that concerned me was that, of course,
7      I went through an assessment center.  Some
8      people promoted and, whether it was lieutenant
9      or team leader, went through structured
10     interviews.  Some people were appointed.  And
11     some people were just, in my terms, vaguely
12     given a job.
13 Q.  Just what, now?
14 A.  Vaguely given the job and told them that you are
15     in this position.  And when I say that, the job
16     position wasn't posted.
17 Q.  So --
18 A.  So that's what I mean by inconsistency.
19 Q.  I guess what I'm understanding you to say -- and
20     once again, you correct me -- is that people had
21     achieved a rank in different ways.
22 A.  Yes, sir.
23 Q.  Who was appointed as opposed to going through

Page 141

1    the structured interview with the team leader or
2    the assessment as lieutenant?  Who was appointed
3    to a position that sat for the battalion chief
4    promotion?
5  A.  I do recall Rodney Hartsfield, who is a
6    battalion chief now, being promoted when he was
7    on probation as a career firefighter.  I don't
8    have any specifics on the date or nothing like
9    that.
10  Q.  Promoted to what?
11  A.  He was promoted to a team leader.
12  Q.  While he was a probationary career firefighter?
13  A.  Yes.
14  Q.  Well, I don't know either.  I mean, the
15    documents will say whatever they say, but was
16    there always -- other than Rodney Hartsfield's
17    promotion, was there always a requirement for
18    promotion to team leader that you had to be a
19    non-probationary career firefighter?
20  A.  Like I say, Mr. Morgan, I was not a team leader,
21    but I know there was requirements for me when I
22    applied for lieutenant.
23  Q.  So you don't know whether or not the

Page 142

1    non-probationary versus probationary was ever a
2    requirement for team leader?
3  A.  Well, I mean, it was practiced, but whether or
4    not it was a direct requirement, I can't tell
5    you.  Like I say, I was never a team leader.
6  Q.  And then the last category was people who were
7    vaguely given the jobs that were not posted.
8    Who sat for the battalion chief position that
9    was vaguely given a job that was not posted?
10  A.  Well, nobody sat for the position of battalion
11    chief.  Basically he had something to do with
12    presenting in the -- the testing orientation or
13    whatever.  And what I'm speaking about in
14    particular is that when they first implemented
15    back the training officer position, it was never
16    posted.  I never saw anything in reference to.
17    And the first time I heard about it was when my
18    immediate supervisor told me, who is the late
19    Jimmy Brown.  He told me that the person who had
20    stepped in and started acting as the training
21    officer was the training officer.
22  Q.  Lee Lamar?
23  A.  Yes, sir.

Page 143

1  Q.  Anybody else who you think in the fire
2    department received a promotion where they were
3    vaguely given a job that was not posted other
4    than Lee Lamar?
5  A.  Well, vaguely given a job, I don't know, but I
6    recall another incidence where a promotion took
7    place.  They went from firefighter to captain
8    whereas they skipped other rank.
9  Q.  And that's Larry Langley?
10  A.  And that's Larry Langley.
11  Q.  Once again, do you know whether or not on that
12    promotion there was a requirement for a time in
13    grade or that you had to be a lieutenant?
14  A.  The only thing I know is what I applied for,
15    Mr. Morgan, and that was lieutenant.
16  Q.  And that would have been the captain promotion
17    that occurred in 1996, true?
18  A.  No, sir.  It was in -- In 1996 I think
19    Mr. Langley was on his way to being acting fire
20    chief.
21  Q.  So Langley was promoted to captain even before
22    '96?
23  A.  Yes, sir.

Page 144

1  Q.  Do you remember what year he was promoted to
2    captain?
3  A.  I don't remember off the top of my head,
4    Mr. Morgan.
5  Q.  But your best recollection is it was sometime
6    before '96?
7  A.  It was before '96.
8  Q.  All right.  Now, you're going to have to help me
9    here.  You've taken your written test.  You've
10    told me about the procedure, what went on during
11    that written test.  And then I guess a couple of
12    days later -- within a week I guess -- you get
13    notice that you didn't score high enough to
14    proceed.  And then by April 21 you filed your
15    grievance along with these other firefighters.
16    I guess they were all lieutenants at that point.
17  A.  Yes, sir.  We were all lieutenants.
18  Q.  And then you go through the grievance
19    procedure.  I've seen the paperwork where you go
20    up -- the four of you go up the steps on the
21    grievance procedure.
22  A.  Yes, sir.
23  Q.  Is there anything else going on at that time in

Page 145

1   terms of complaints about the test,
2   conversations with people, anything that's not
3   documented in the grievance procedures?
4   A.  I don't recall of anything.  I will say that I
5   did converse with the guys that was on the
6   grievance.  Once we came together and decided to
7   file a grievance, we discussed a lot of things.
8   And it was with those guys that are on that
9   paper right there.
10  Q.  What do you recall Horace Clanton's specific
11  complaints being about the test or the
12  procedure?
13  A.  Can I see that?
14  Q.  Yeah, sure.
15  A.  I can't remember, Mr. Morgan.  I'm sorry.  The
16  only thing that I can consider to be my direct
17  complaint was the inconsistency part in
18  compliance (sic) with everything else.  I mean,
19  it was all of us conversing together.  And we
20  had our concerns, and all of it came together
21  and we presented this together.
22  Q.  I just want to be sure I have this documented.
23  Do you remember -- what was the other -- Not

Page 146

1   Eddie, but who was the other one?
2   A.  Mr. Robert Hodge.
3   Q.  Do you remember any specific complaints that he
4   had?
5   A.  No, sir, I don't.  I don't recall.
6   Q.  Do you remember any specific complaints that
7   Eddie Ogletree had?
8   A.  Of the three that's available, no, sir.  I don't
9   recall.
10  Q.  I think this is Exhibit 10, the feedback
11  report.  When is your recollection that you
12  received that, after you filed the grievance?
13  A.  Like I say, the only time I recall receiving
14  this that is addressed to me is when I pretty
15  much asked for a review.  In reference to
16  everybody else, I don't know.  I'm just speaking
17  as far as what I received that was addressed to
18  me, because I think of the three of us -- of the
19  four of us who did it, each one was addressed to
20  each individual, I think.  But I'm not clear on
21  it.  It's been so far along.  But I can vouch
22  for this one that's addressed to me.
23  Q.  Look at the second page of this document, and

Page 147

1   it's got down there reading source.
2   A.  Okay.
3   Q.  It's got four books -- I assume they are
4   books -- listed:  IFSTA Chief Officer, Effective
5   Supervisory Practices, Fire Officers' Handbook
6   of Tactics, and Structural Firefighting.
7   Do you see those?
8   A.  Yes, sir.
9   Q.  Are those the four books that the City furnished
10  you to review to prepare for the battalion chief
11  exam?
12  A.  I think they are, sir.
13  Q.  And look at the next page on that.  It says:
14  Scoring Changes Based on Item Analysis.  Do you
15  see that?
16  A.  Yes, sir.
17  Q.  And it's got -- The first sentence says:  At the
18  time of the written test, all candidates were
19  given the opportunity to appeal any item on the
20  test they felt was inaccurate and unfair.
21  And my understanding is that you did not
22  appeal any of the test questions, true?
23  A.  No, sir, I didn't appeal any.

Page 148

1   Q.  And then the second paragraph says:  There were
2   a total of seven items appealed, and the scoring
3   key was adjusted for two of these items.
4   Did you ever ask anyone at the City what
5   that referred to or what that meant?
6   A.  I didn't, sir.  No.
7   Q.  And so I can be clear, the rumor is that if test
8   grades or scores had not been changed -- Let me
9   start over.
10  The rumor is if test question answers had
11  not been changed that Joey Darby would not have
12  scored high enough to have proceeded to the
13  assessment part?
14  A.  Yes, sir.
15  Q.  But you don't know how that change affected your
16  individual score, do you?
17  A.  Not directly, sir, no.
18  Q.  Tell me just generally what went on during the
19  grievance appeal process.
20  A.  Basically what happened was after -- I was
21  notified after the time I received the letter
22  stating what I made on the test and I couldn't
23  proceed.  I was contacted by Mr. Clanton.  He

Page 149

1   asked me what I thought, and I told him that I'm
2   concerned enough to file a grievance; what about
3   you. And he say he felt the same way, and he
4   had talked to Mr. Hodge and Mr. Ogletree.
5       So we met and we initiated the first letter
6   based upon the conversations we had and based on
7   everything that we presented on this first
8   letter. And we decided to present it to --
9   Being that we was a station officer and middle
10  management, we decided to present it to
11  Mr. Lamar, who was deputy chief, because we each
12  worked on -- well, some of us worked on
13  different shifts. If I'm not mistaken, me and
14  Mr. Clanton was on the same shift, and Eddie
15  and -- Mr. Hodge and Mr. Ogletree was on the
16  same shift. So we had different supervisor --
17  immediate supervisors. So we addressed it to
18  Mr. Lamar.
19  Q.  And I guess from there it goes to --
20  A.  Yes, sir. Just procedures that go through the
21  chain of command.
22  Q.  And eventually you have a hearing?
23  A.  Yes, sir. When we reach the city manager, it's

Page 150

1   his decision to grant us a hearing of his
2   choice, you know, as far as the hearing
3   officer. And it's set up, and that's when we go
4   into the hearing procedure part of the
5   grievance.
6   Q.  And that was before Judge Bailey came in?
7   A.  No. That was when Judge Bailey came. He was
8   the hearing officer.
9   Q.  He was the hearing officer. That's what I
10  asked. Okay.
11      And Hodge decided not to go forward with the
12  hearing?
13  A.  Yes, sir. During the process of when we
14  addressed Chief Lamar and, if I'm remember
15  correctly, when addressed -- when we was
16  preparing to address Mr. James, public safety
17  director, he told myself and Mr. Clanton that he
18  did not want to pursue any further. And, of
19  course, we respected that and told him we
20  appreciated what he had done. And Mr. Clanton
21  and myself and Mr. Ogletree, we're still
22  proceeding.
23  Q.  Clanton, is that the officer that had been the

Page 151

1   subject of your earlier EEOC complaint --
2   A.  Yes, sir.
3   Q.  -- that he took a temporary position as
4   something?
5   A.  Yes, sir. He was appointed as acting A shift
6   officer in place of the late Chief Brown.
7   That's when he had undergone -- initially found
8   out and undergone his health issues at the time
9   and was not capable of work. So our shift was
10  without an immediate supervisor when this
11  happened, but I was the acting. I was filling
12  that role prior to him being appointed because I
13  was the one who broke the news to every other
14  officer on the shift, the situation with Chief
15  Brown.
16  Q.  But my question is: That's the person you were
17  complaining about that got to be the temporary,
18  I guess, captain or battalion chief and you
19  thought it should have been you?
20  A.  Yes, sir. That was my main complaint to
21  Mr. Langley who made the appointment: Why
22  Mr. Clanton when I wasn't given an opportunity.
23  Q.  Did you have an attorney representing you at the

Page 152

1   hearing?
2   A.  No, sir. Well, let's back up. Which one, the
3   one in 2005 or 2006?
4   Q.  The one dealing with the battalion chief.
5   A.  Me, Mr. Ogletree, and Mr. Clanton? No, sir, we
6   didn't have a lawyer at that time.
7   Q.  Was there an attorney on the other side for the
8   City or was it just --
9   A.  No, sir. We just came into the hearing as we
10  were.
11  Q.  Who was the City's spokesperson?
12  A.  The City spokesperson?
13  Q.  Who was the one that defended the City's
14  position?
15  A.  Basically Judge Bailey. I mean, that's who we
16  talked to.
17  Q.  Lee Lamar wasn't there?
18  A.  Mr. Lamar was there and Mr. Reeves was there,
19  but, you know, we -- our conversation pretty
20  much was through Mr. Bailey.
21  Q.  Well, I understand that. Was there somebody
22  from the City who then had a conversation with
23  Mr. Bailey as to what the City's position was?

Page 153

1   A.  I guess there was between those other people
2       that were present, yes, sir.
3   Q.  Anybody you remember being there besides Lee and
4       Steve Reeves?
5   A.  I can't remember if Mr. Langley was there or
6       not, but I do know Mr. Lamar and Mr. Reeves was
7       there.
8   Q.  And Judge Bailey --
9   A.  And Judge Bailey, of course.  He was the hearing
10      officer.
11  Q.  He ruled against y'all?
12  A.  Yes, sir.
13  Q.  Did you have any witnesses or was it just the
14      three of you?
15  A.  It was just us three.
16  Q.  Do you know Rodney Hartsfield?
17  A.  I do.
18  Q.  Have you ever worked with him?
19  A.  I do.
20  Q.  Is he --
21  A.  I have.
22  Q.  Is he a good officer?
23  A.  I can't say if he's good or not, but the times I

Page 154

1       worked with Rodney Hartsfield, he was an
2       insubordinate (sic) to me.  I mean, he worked
3       under my leadership.
4   Q.  He wasn't insubordinate.  He was subordinate.
5   A.  He was subordinate, yes, sir.  He was either a
6       student firefighter, career firefighter, or a
7       team leader.  As far as him being a battalion
8       chief, I don't recall working for him ever since
9       he's been in that position.  I may have worked
10      overtime a couple of hours till they can get
11      somebody in at shift change, but not a 24-hour
12      shift.  No, sir.
13  Q.  Do you have an opinion as to whether or not he
14      is qualified or not qualified to be a battalion
15      chief?
16          MR. HORSLEY:  Object to the form.  You
17      can answer.
18  A.  I don't have an opinion on that, Mr. Morgan.
19  Q.  And Joe Lovvorn, have you worked with him?
20  A.  Yes, sir.  Same as I have with Rodney
21      Hartsfield.
22  Q.  Was he a good, competent officer when you worked
23      with him?

Page 155

1   A.  I mean --
2   Q.  Have any complaints about him?
3   A.  I never worked under his leadership as a
4       battalion chief.  It was always the same
5       description as was for Rodney Hartsfield.
6   Q.  Do you have any opinion as to whether he is or
7       is not qualified to be a battalion chief?
8          MR. HORSLEY:  Object to the form.
9   A.  I don't have an opinion, sir.
10  Q.  And Matt Jordan --
11  A.  Yes, sir.
12          MR. HORSLEY:  Same objection.
13  Q.  Have you ever worked for Matt Jordan?
14          MR. HORSLEY:  I'm sorry.  I thought he
15          was asking the same question.
16  A.  I have worked for Chief Jordan.  He was -- When
17      he was promoted, he was my -- he was put on my
18      shift, or our shift, as my immediate supervisor.
19  Q.  And do you have an opinion on whether or not he
20      is or is not qualified to be a battalion chief?
21          MR. HORSLEY:  Object to the form.  You
22          can answer.
23  A.  I don't have an opinion whether he's qualified

Page 156

1       or not, but I do know I had some problems with
2       him in reference to the grievance that I
3       initiated.  And that goes back to when I was at
4       Station 5.
5   Q.  You told me about that grievance?
6   A.  Yes, sir.
7   Q.  I don't know that he's one of the people that
8       y'all referred to, but I think Joey Darby has
9       been promoted to battalion chief as well now.
10  A.  Joey Darby was promoted to battalion chief to
11      replace Chief Brown when he retired.
12  Q.  Do you have an opinion of whether or not Joey
13      Darby is qualified or not qualified to be a
14      battalion chief?
15          MR. HORSLEY:  Object to the form.  You
16          can answer.
17  A.  I don't have an opinion on that, sir.
18  Q.  Do you have an opinion on whether or not you are
19      more qualified than Rodney Hartsfield to be a
20      battalion chief?
21          MR. HORSLEY:  Object to the form.  You
22          can answer.
23  A.  I do have an opinion on that.

Page 157

1  Q.  What is that opinion?
2  A.  Considering that I was an officer when he
3      started working there, I taught him in rookie
4      school, and, I mean, I trained him through the
5      training procedures that took place or
6      whatever. All these guys who are battalion
7      chiefs now, they came in after me.
8  Q.  I want to be sure I get all your answers so
9      let's kind of take our time on this.
10  A.  Yes, sir.
11  Q.  What I'm understanding you to say about Rodney
12      Hartsfield as to why you think you're more
13      qualified is that you were an officer when he
14      was hired and you participated in his training,
15      right?
16  A.  (Witness nods head positively.)
17  Q.  Any other reasons why you think you're more
18      qualified than Rodney Hartsfield?
19           MR. HORSLEY: Object to the form.
20  A.  More years of experience level. I have more
21      years of experience. Spent more time on the
22      job. Has played a significant role or did play
23      a significant role in the growth of the

Page 158

1      department, you know, during the era when they
2      was actually coming in and being hired. I just
3      think I have more experience than any of those
4      guys at the Auburn Fire Division.
5          And one other thing: I mentioned it later
6      on. During their absence, you know, I filled
7      that position. And I filled that position
8      before they even became, you know, battalion
9      chiefs. I filled the position in the absence of
10      a battalion chief.
11  Q.  If a battalion chief —
12  A.  And I still do it.
13  Q.  — is not there, you as a lieutenant, step up —
14  A.  Yes, sir.
15  Q.  — to that position?
16  A.  Yes, sir. Based upon seniority.
17           MR. HORSLEY: And you said you had
18          done that before the battalion
19          chief promotion?
20           THE WITNESS: Before and after.
21  Q.  You're talking about with other people who were
22      battalion chiefs?
23  A.  Yes, sir. I've filled in several times for

Page 159

1      Chief Brown.
2  Q.  Do you know whether or not Rodney Hartsfield
3      ever filled in —
4  A.  I don't know. Me and him was not on the same
5      shift.
6  Q.  Do you know whether or not as a team leader
7      Rodney Hartsfield had stepped up and filled in
8      as a lieutenant?
9  A.  I'm not sure on that, Mr. Morgan.
10  Q.  Have we covered everything about Rodney
11      Hartsfield as to why you think you're more
12      qualified?
13  A.  I think we touched the basis of it, sir, the
14      most important part.
15  Q.  And Joe Lovvorn, do you think you're more
16      qualified than Joe Lovvorn to be a battalion
17      chief?
18           MR. HORSLEY: Object to the form.
19  Q.  What are the reasons?
20  A.  Pretty much the same reasons that I mentioned
21      with Rodney Hartsfield.
22  Q.  Been there longer?
23  A.  Yes, sir.

Page 160

1  Q.  And Matt Jordan. Do you think you're more
2      qualified than Matt Jordan?
3           MR. HORSLEY: Object to the form.
4  Q.  What are the reasons?
5  A.  Same reasons. Understand, Mr. Morgan, all these
6      guys came in right along the same era, one or
7      two years, give or take. And when they came in,
8      I was a officer already.
9  Q.  And then Joey Darby. You think you're more
10      qualified than Joey Darby —
11  A.  Yes, sir.
12  Q.  — to be a battalion chief?
13           MR. HORSLEY: Object to the form.
14  A.  Yes, sir.
15  Q.  Same reasons?
16  A.  Yes, sir.
17  Q.  Any different reasons for any of them other than
18      what you've already expressed?
19  A.  Not at this time, sir.
20  Q.  There's a reference in this lawsuit — Well, let
21      me get to that.
22           MR. MORGAN: Let's take a quick break.
23          (Brief recess.)

Page 161

1   Q.  (Continuing by Mr. Morgan)  Look at these four
2       books that were the reading source.
3       Specifically I'm going to ask you about all of
4       them, but specifically the supervisory --
5       Effective Supervisory Practices.  Hadn't you
6       read that book earlier in some of your training
7       courses for some of the certifications that you
8       had received along the way in your career?
9   A.  Yes, sir.  I recall having a lot to do
10      resourcefully with this particular text, yes,
11      sir.
12  Q.  How about the other three texts on there?  Had
13      you read or been exposed to any of them before
14      the battalion chief promotion procedure?
15  A.  If it was any other, it had to be Structural
16      Firefighting.  That's throughout your whole
17      career pretty much.
18  Q.  So a lot of this -- at least the material in
19      those two books would not have been new material
20      to you but really have been a review of stuff
21      that you had learned along the way?
22  A.  Yes, sir.  I can agree with that.
23  Q.  Let me ask some specifics about your complaint.

Page 162

1       In Count I --
2           (Brief pause.)
3   Q.  Look at paragraph 15, if you would, first
4       sentence.  It says:  Prior to February 2007,
5       only nine probationary lieutenants were allowed
6       to apply for the position of battalion chief.
7           Actually, isn't it true that there actually
8       had never been a promotion for battalion chief
9       before this?  Isn't that true?
10  A.  No.
11          MR. HORSLEY:  And, for the record,
12              that date is wrong too.  It should
13              be 2006.  I'm sorry about that.
14              That was my fault.
15  A.  The first incident involving battalion chiefs
16      was a change from captain to battalion chief.
17      That was the title change coordinated and worked
18      through the person in position to make that
19      decision.
20  Q.  So this is actually the first promotion to
21      battalion chief?
22  A.  Yes, sir.
23  Q.  The prior promotion had been to captain in '96?

Page 163

1   A.  Yes, sir.
2   Q.  And I think you testified, but I want to be
3       clear.  You don't remember whether or not
4       non-probationary people were allowed to apply
5       for captain in '96 because you weren't concerned
6       with that.  You were concerned with your own
7       promotion procedure.
8   A.  Yes, sir.  For the record, there were two people
9       applying for captain in '96 when I was applying
10      for lieutenant, and it was Mr. Lamar and
11      Mr. Johnny Lawrence.  Those were the two
12      candidates for captains in 1996.
13  Q.  And were either of them promoted?
14  A.  Chief Lawrence -- Mr. Lawrence was promoted to
15      captain.
16  Q.  Had he been a lieutenant?
17  A.  He was a team leader.
18  Q.  So then prior to February 2006, this is not
19      correct.  Only non-probationary -- Unless you're
20      counting team leaders as being lieutenants in
21      '96.  As a team leader, he was allowed to apply
22      for promotion to captain?
23  A.  Yes, sir, he was.

Page 164

1   Q.  And was promoted?
2   A.  Yes, sir.
3   Q.  And then you've got in February of '06, the City
4       changed its policy to allow non-probationary and
5       probationary firefighters to apply for battalion
6       chief.
7           And I think cutting through all that, what
8       we've established is the only person who was not
9       a team leader, lieutenant, or lieutenant (sic)
10      who sat for the written test for battalion chief
11      was Chris Turner, a black male?
12  A.  Chris Turner.  Give or take Clay Carson.
13  Q.  And I think you said he didn't take the test.
14  A.  No, sir, he did not.
15  Q.  The only one that took the test was Chris?
16  A.  Yes, sir.  Mr. Turner.
17  Q.  Black male.  All right.
18          Look at number 16, the next page.  It says:
19      During the time the City changed the policy to
20      require applicants for battalion chief to pass a
21      written test.
22          Obviously there was a written test.  What's
23      the problem with the written test?

Page 165

1          MR. HORSLEY: Object to the form. Go
2     ahead.
3  A.  My problem with that is that there have never
4     been a written test, Mr. Morgan. It was
5     always -- It was either assessment center or a
6     structured interview. And regardless which one
7     it was, there was not a written test for a
8     promotion to that rank.
9  Q.  Well, say that's true. Say that's true. Why
10    does that make it wrong to change the procedure
11    to include a written test?
12         MR. HORSLEY: Object to the form.
13 Q.  I know you don't like the fact that you didn't
14    do well on the written test. But aside from
15    that, looking at the big picture, what's wrong
16    with the City including a written test as part
17    of the promotion procedure?
18         MR. HORSLEY: Object to the form. Go
19    ahead.
20 A.  I'm not in the position to say whether it's
21    right or wrong with the City implementing
22    anything. I can only speak from the point that
23    through my 17 years of being there or up to the

Page 166

1     point where I became an officer and on up until
2     the time of this first battalion chief
3     promotion, there was never a written test. What
4     is right or wrong for the City to do, I'm not at
5     any liberty or at any power to justify that.
6  Q.  And that makes me want to back up a minute.
7        You took the assessment center or
8     participated in that for lieutenant.
9  A.  Yes, sir.
10 Q.  You sat on what you've called structured
11    interviews for team leader.
12 A.  Yes, sir.
13 Q.  What's the difference between the two? What was
14    different as an assessment as opposed to the
15    structured interview?
16 A.  I consider assessment center very thorough where
17    it covers all broadness of the position. I
18    mean, from exercises in reference to medical
19    calls, pumping, driving, having good
20    conversational skills with the public, in
21    general. That's an assessment center. A
22    structured interview for a team leader, you come
23    in a room and you sit down and okay, we have a

Page 167

1     series of questions we want to ask you. Please
2     respond to the best of your ability. Let us
3     know when you're done, and that's it.
4  Q.  Does assessment center involve more than just
5     questions and answers?
6  A.  It could, depending on what type of promotion it
7     is. The ones where I conducted myself as an
8     assessor in a neighboring department, yes, it
9     did. But in Auburn all the scenarios in 1996
10    was inside a building, and it was just different
11    scenarios dealing with different broad areas
12    that you're going to be exposed to as an
13    officer.
14 Q.  The assessment center that you participated in
15    for lieutenant, was that a question-and-answer
16    system?
17 A.  A portion of it was, yes, sir.
18 Q.  Was there more than just questions and answers?
19 A.  Yes, sir. We had role plays. We had an
20    in-basket scenario. We had scenarios where we
21    were actually videotaped. I can't remember if
22    we did an interview or not. I'm not sure.
23 Q.  Look at the second sentence of paragraph 16. It

Page 168

1     says: Coincidentally the policy changes
2     occurred when two African-American lieutenants
3     and one entry-level African-American
4     firefighter --
5        I assume that's Chris Turner.
6  A.  Yes.
7  Q.  -- became eligible for the position.
8        What's coincidental about that?
9          MR. HORSLEY: Object to the form. You
10    can answer.
11 A.  Coincidentally, you know, we applied for the
12    positions. We became eligible and we applied.
13    And all of a sudden, you know, things changed.
14    Things changed to the point where, you know, we
15    had to take a test. Why not stick to the way
16    we've been doing things?
17 Q.  Do you have any evidence that that change
18    occurred to exclude African-Americans from being
19    promoted to battalion chief?
20         MR. HORSLEY: Object to the form.
21 A.  I don't know if it was applied or not, sir. I
22    don't know. But I know this. It just
23    coincidentally happened that way to the point

Page 169

1    where it hasn't happened in the past.
2  Q.  And the last sentence of that paragraph says:
3    Seniority within the division was discarded as a
4    criteria for promotion to the battalion chief
5    position.
6      Do you recall one way or the other whether
7    or not in '96 for the last captain's promotion
8    seniority was a requirement?
9  A.  I don't know if it was a requirement, but it was
10    heavily considered.
11  Q.  And that's based on what?
12  A.  Based on time in grade, based on the number of
13    years of experience, on the years you was --
14  Q.  My question is:  Why do you say that was a
15    requirement for captain in '96?  Do you recall
16    seniority being a requirement for captain?
17  A.  I don't recall that.  I don't know, sir.
18  Q.  Look at paragraph 17.  It says you were denied
19    promotion to battalion chief in April 2006 and a
20    temporary assignment in January of 2005.
21      The 2005, is that the one where you filed
22    the grievance and the EEOC charge dealing with
23    Horace Clanton?

Page 170

1  A.  Yes, sir.
2  Q.  And if I recall, no lawsuit was filed as a
3    result of that?
4  A.  No, sir.
5  Q.  And then you said the denial of the promotion
6    was racially based.
7      What facts do you have that you're not being
8    promoted to battalion chief was because of --
9    was racially based?
10      MR. HORSLEY:  Object to the form.
11  A.  I can't think of no other reason why.  I mean,
12    I've done everything that the Auburn Fire
13    Division asked me to do up until this point.  I
14    was actually running the position prior to him
15    making that decision, and it had been practiced
16    and exercised prior to this incident that the
17    available lieutenants fill these positions.
18      Prior to the opportunity coming to me,
19    Mr. Langley's brother, who was a lieutenant of
20    the department, every time they needed a
21    position to take place, he was given the
22    opportunity.  And he had more seniority than
23    me.  And basically at one point, Mr. Langley

Page 171

1    told me -- Mr. Larry Langley told me that he has
2    more seniority than you; he's a lieutenant.  So
3    I'm just following suit.
4  Q.  Wait.  Now, he was a lieutenant?
5  A.  Terry Langley was a lieutenant.  Terry Langley
6    is Larry Langley's brother.
7  Q.  And what positions was he given that you weren't
8    given?
9  A.  In the absence of a captain or battalion chief,
10    he would fill that role and it was based on
11    seniority.
12  Q.  I thought you testified that you had also filled
13    that role as captain or battalion chief.
14  A.  When he left I did.  When he retired in February
15    of 2004, I was the only lieutenant left, and I
16    started filling those positions when asked to do
17    so.  Lieutenant Langley, Terry Langley, would do
18    it consecutively.  He would get the assignment,
19    and it would be his until told to do something
20    else.  I would do it randomly when guys take off
21    and -- When they take off, I'll step in.
22  Q.  Well, assume all that is true.  Why is it that
23    you say -- How do you consider that to be

Page 172

1    evidence of racial discrimination in your not
2    being promoted to battalion chief?
3  A.  What other reason would it be?  I mean, I've
4    done -- I'm qualified.  I'm certified.  I'm
5    capable of doing the job.  They make me do it
6    anyway.  So what other reason would it not be?
7    That's the conclusion I was led to, and that's
8    what I think.
9  Q.  Well, do you have any specific what you would
10    consider evidence other than that's what you
11    think?
12      MR. HORSLEY:  Object to the form.  You
13    can answer.
14  A.  Well, the only evidence I have, Mr. Morgan, is
15    the day that the announcement was made and
16    Mr. Clanton was asked to act as the A shift
17    shift commander.
18  Q.  That was back in '05?
19  A.  Yes, sir.
20  Q.  Well, let's talk about February of '06 when you
21    applied for battalion chief and then you didn't
22    score high enough on the written test.  What
23    evidence do you have that you were denied

Page 173

1    promotion on that occasion because of your race?
2          MR. HORSLEY: Object to the form. You
3    can answer.
4    A.  I don't recall anything at this time,
5    Mr. Morgan.
6    Q.  Look at paragraph 18. I think we've been
7    through this. You're not aware of any Caucasian
8    applicants for battalion chief in February of
9    '06 that were given preferential treatment in
10   the application process, test aids, or test
11   grades, correct?
12   A.  Yes, sir.
13   Q.  And in paragraph 19, it said: The City
14   continues to violate a federal court order
15   requiring them to alter hiring and promotion
16   practices.
17         First of all, you were hired in '94 as a
18   black male, true?
19   A.  Yes, sir.
20   Q.  And you had been hired earlier than that, I
21   guess, in '91 as a student firefighter?
22   A.  Yes, sir.
23   Q.  What federal court order are you referring to

Page 174

1    and how is the City of Auburn violating it as it
2    relates to promotion practices?
3    A.  When I was hired in 1994, I was informed -- my
4    immediate supervisor when I went career was Dean
5    Garrett. No. My shift commander was Dean
6    Garrett. My immediate supervisor was a black
7    male by the name of Jessie Strickland. And at
8    the time, I didn't know anything about previous
9    lawsuits or whatever. But it was at that time
10   when they informed me that I was hired because I
11   was black, and that was in the previous lawsuit.
12   Q.  Who told you that?
13   A.  This came from the officers when I went on shift
14   as a career --
15   Q.  Jessie Strickland?
16   A.  It was Dean Garrett and Jessie Strickland
17   present.
18   Q.  Told you you were hired because you were black?
19   A.  Yeah. Basically in a nutshell, that's what it
20   was. And it was all contingent upon the lawsuit
21   that they had where they was made to hire three
22   African-Americans, three blacks.
23   Q.  You don't believe that, do you?

Page 175

1    A.  Oh, most definitely. I think I was hired
2    because I was the man for the job. It has
3    nothing to do with color.
4    Q.  That's right.
5          Well, the court order that you're referring
6    to is one that occurred before you were hired as
7    a student firefighter as you understand it?
8    A.  I guess it was, Mr. Morgan. I don't -- well --
9    Q.  Have you ever read the court order?
10   A.  No, sir. I don't know nothing about it.
11   Q.  Well, is it fair to say that you really don't
12   know -- can't give me any examples about how is
13   it you claim that the City is violating the
14   court order as to promotion policies?
15         MR. HORSLEY: Object to the form. You
16   can answer.
17   A.  All I know is that from previous lawsuits, there
18   were stipulations set, guidelines set. And the
19   City was to follow it in reference to the Auburn
20   Fire Division.
21   Q.  And you got that understanding from Dean Garrett
22   and Jessie Strickland?
23   A.  That's the first confirmation I got from it when

Page 176

1    I became career.
2    Q.  Was from those two people?
3    A.  They were my immediate and shift supervisor.
4    Q.  And they are the same two people that told you
5    you were hired because you were black?
6    A.  They pretty much told me.
7    Q.  And you don't believe that?
8    A.  No, sir.
9    Q.  Look at Count II, Retaliation. I think it's
10   page 6. You've got here that the Plaintiffs
11   have engaged in statutorily protected
12   expressions, such as filing EEOC -- well, Equal
13   Opportunity charges and grievances against the
14   City.
15         What do consider to be statutorily protected
16   expressions?
17         MR. HORSLEY: Object to the form.
18   A.  I guess -- Well, I don't want to guess about
19   it. I want to be direct with it.
20         MR. HORSLEY: If you don't know, don't
21   try and answer.
22   A.  I don't know, Mr. Morgan.
23   Q.  Let me ask you, then. Do you claim in this

Page 177

1　lawsuit that you were denied promotion to
2　battalion chief in retaliation for having filed
3　an earlier EEOC charge and grievances against
4　the City?
5　A.　To my understanding, the reason why I didn't get
6　the opportunity to pursue the battalion chief
7　position is because I didn't pass the written
8　test. I don't understand to this day why it was
9　implemented as part as when in the past it never
10　has happened.
11　Q.　You don't have any evidence that the reason you
12　weren't promoted is in retaliation for having
13　filed an EEOC charge or grievance, do you?
14　　　　THE WITNESS: Can I talk to my
15　　　　attorney for a minute?
16　　　　MR. HORSLEY: All I can tell you is if
17　　　　you don't know the answer to the
18　　　　question, that needs to be your
19　　　　answer.
20　A.　I don't know the answer to that question,
21　Mr. Morgan.
22　Q.　Your understanding is you didn't get promoted
23　because you didn't score high enough on the

Page 178

1　written test, true?
2　　　　MR. HORSLEY: Object to the form.
3　　　　THE WITNESS: Can I answer?
4　　　　MR. HORSLEY: You can answer.
5　A.　True.
6　Q.　And as far as you know, the same written test
7　was given to everyone, blacks and whites?
8　A.　As far as I know, sir, everyone that was present
9　got the same test.
10　Q.　And you don't have any evidence or suspect that
11　the City sat around with anybody and said, hey,
12　let's make this test so that Gerald Stephens
13　can't pass it because we're mad at him for
14　filing an EEOC charge? You don't have any
15　evidence to that effect, do you?
16　　　　MR. HORSLEY: Object to the form.
17　　　　THE WITNESS: Can I answer?
18　　　　MR. HORSLEY: Yeah.
19　A.　No, sir, I don't have any evidence of that.
20　Q.　In paragraph 31, you make reference to protected
21　expressions. Do you see that?
22　A.　Yes.
23　Q.　Do you include anything in protected expressions

Page 179

1　other than what you refer to in paragraph 30
2　being the EEOC charge and the grievances? Is
3　there anything else that you consider to be
4　protected expressions, if you consider them to
5　be, other than the EEOC charge and the
6　grievances, if you know one way or the other?
7　A.　I don't know one way or the other, sir.
8　Q.　Look at Count III. And the first question is --
9　In paragraph 34 in quotes, is the phrase
10　"built-in headwind for minority groups and
11　unrelated to measuring job capability".
12　　　What is a built-in headwind? What do you
13　understand that to be?
14　　　　MR. HORSLEY: Object to the form. He
15　　　　didn't draft the complaint.
16　　　　MR. MORGAN: I understand.
17　A.　I don't know, sir, at this point.
18　Q.　Outside of this lawsuit and excluding any
19　conversations with your attorney, have you ever
20　heard of the phrase "built-in headwind" before?
21　A.　I don't recall ever hearing anything of that
22　nature, sir.
23　Q.　What is your understanding as to your claim that

Page 180

1　the promotion practice had a disparate impact?
2　In your terms, what does that mean?
3　　　　MR. HORSLEY: Object to the form. You
4　　　　can answer.
5　A.　All I know, Mr. Morgan, is that as an employee
6　of the Auburn Fire Division being hired in 1994,
7　there have only been one person hired with the
8　division, African-American, as a career
9　firefighter, and that was a guy by the name of
10　Roderick Torbert.
11　Q.　Who?
12　A.　Roderick Torbert. And other than myself being
13　promoted in 1996, the only other person I know
14　that was promoted is Mr. Ogletree. Since then
15　no African-Americans have been promoted or
16　hired, and I know that there are
17　African-Americans out there who have applied and
18　who are qualified for those positions. I don't
19　know them directly. I don't know them
20　specifically, but I know some who have applied
21　for a promotion and for career firefighter
22　positions, and it's never happened.
23　Q.　Let me kind of break that down because I want to

45 (Pages 177 to 180)

Page 181

1    be clear on it.
2        Is your complaint about a disparate impact
3    related to the hiring or non-hiring of blacks,
4    or is it related to the promotion or
5    non-promotion of blacks?
6        MR. HORSLEY: Object to the form.
7    A.  Both. I'm concerned about both of those issues,
8    Mr. Morgan.
9    Q.  So you think that the City's hiring practices
10   have a disparate impact on blacks?
11   A.  Yes, sir.
12   Q.  Tell me what you mean by a disparate impact on
13   blacks.
14       MR. HORSLEY: Object to the form. Go
15   ahead.
16   A.  They haven't hired any, Mr. Morgan, or promoted
17   any, since 1996.
18   Q.  And what do you mean by a disparate impact
19   against blacks on promotions?
20       MR. HORSLEY: Same objection. Go
21   ahead.
22   A.  They haven't promoted any.
23   Q.  In your opinion, just the fact that none have

Page 182

1    been hired is evidence of the disparate impact?
2    A.  They have not hired or promoted qualified
3    African-Americans since 1996.
4    Q.  And that's the basis of your disparate impact
5    claim?
6    A.  Yes.
7    Q.  How did you rate Chris Turner on the team leader
8    interviews?
9    A.  I never sat on the interview with -- on the
10   board of an interview for Chris Turner. I've
11   never sat --
12   Q.  For team leader you never sat on one that he
13   applied for?
14   A.  No, sir, I never did.
15   Q.  Was it your experience that the team leader
16   interviews that -- panels that you sat on always
17   included at least one and usually two blacks?
18   A.  One if not two, yes, sir.
19   Q.  Well, let's focus in on the promotion to
20   battalion chief which you applied for and did
21   not receive. What is there about that procedure
22   to battalion chief that you think had a
23   disparate impact on blacks?

Page 183

1        MR. HORSLEY: Object to the form. You
2    can answer.
3    A.  When the four captains received their battalion
4    chief rank, it was done by a title change. No
5    test. No procedures. No structured interview.
6    No assessment center. I mean, nothing was set
7    in stone other than a title change until after
8    the fact when they decided to go this route
9    right here.
10   Q.  This route meaning the test?
11   A.  The test -- The written test and the cutoff
12   score and everything else that went along with
13   it that I didn't experience.
14   Q.  Well, let's go back to the four captains.
15   A.  Okay.
16   Q.  Did anything occur in terms of their employment
17   other than they were renamed battalion chief
18   from captain?
19   A.  No, sir.
20   Q.  Did their duties and responsibilities remain the
21   same?
22   A.  The only thing I say had something to do with
23   that is the actual growth of the city. I mean,

Page 184

1    the city is steadily growing. Responsibilities
2    are steadily increasing. Our job
3    responsibilities are, you know, growing more
4    than they have been in the past. And I guess --
5    Well, I won't guess about it.
6        Just the growth of the city, and they
7    thought maybe they needed a title change for
8    some reason or another, and they pursued it.
9    Q.  Do you claim that the title change alone from
10   captain to battalion chief -- do you make a
11   claim that had some sort of racial
12   discrimination or racially discriminatory effect
13   toward blacks, changing the name from captain to
14   battalion chief?
15       MR. HORSLEY: Object to the form.
16   A.  I don't know what the reason was, Mr. Morgan. I
17   don't know the reason for pursuing it, the
18   reason for wanting to change it. I don't have a
19   clue.
20   Q.  My question is: Do you consider that to be
21   somehow racially discriminatory, to change the
22   title from captain to battalion chief?
23       MR. HORSLEY: Object to the form. I

Page 185

1        think he's already answered the
2        question.
3   A.  No, sir, I don't.
4   Q.  Now, in terms of the actual battalion chief
5        promotion procedure that you were involved in,
6        what is there about it that you think had a
7        disparate impact on blacks?
8            MR. HORSLEY:  Object to the form.  You
9        can answer.
10  A.  Can you ask me that again, please, sir?
11  Q.  In terms of the battalion chief promotion
12       process in which you participated, what is it
13       about it that you think had a disparate impact
14       on blacks?
15           MR. HORSLEY:  Object to the form.
16  A.  The written test.
17  Q.  What is there about the written test that you
18       think had a disparate impact?
19           MR. HORSLEY:  Same objection.  Go
20       ahead.
21  A.  As stated before, Mr. Morgan, on previous
22       incidents, the written test has never been an
23       option in the promotion -- a written test with a

Page 186

1        cutoff score has never been part of the
2        promotion procedure within the division.
3   Q.  And I don't want to keep on with this, but I
4        want to be clear.  Is it your position that just
5        by giving a written test that the effect of that
6        was to have a disparate impact on blacks?
7            MR. HORSLEY:  Object to the form.  You
8        can answer.
9   A.  I don't recall that at this time, Mr. Morgan.
10  Q.  What I probably should have done is ask this
11       question first.
12           What does disparate impact mean to you?
13       What do the terms "disparate impact" mean to
14       you?
15  A.  Basically it means to me that -- Let me see if I
16       can come up with a specific --
17           MR. HORSLEY:  That's a legal question.
18  A.  No, sir.
19           MR. HORSLEY:  It's a legal term, and I
20       don't want you answering questions
21       like that.
22  A.  No, sir.  I don't have any comment at this time.
23  Q.  I'm not asking a legal definition.  I'm just

Page 187

1        asking what do you think it means.
2            MR. HORSLEY:  I don't want you trying
3        to think up an answer.
4            MR. MORGAN:  No.  Don't sit here and
5        just answer it.
6   Q.  Do you know what disparate impact means one way
7        or the other?
8   A.  No, sir.  I don't have any comment at this time.
9   Q.  Before they became battalion chiefs, were those
10       people that held that position captains or were
11       they shift commanders?
12  A.  The title that I understand is shift
13       commander/captain or shift commander/battalion
14       chief.  Captains or battalion chief are
15       commanders like lieutenants are station
16       officers.
17  Q.  So captains had become shift commanders which
18       had become battalion chiefs?
19  A.  Captains are shift commanders and the title was
20       changed to battalion chief.
21  Q.  All of which was just, as you understand it, a
22       name change?
23  A.  Title change.

Page 188

1   Q.  In the big picture, what do the battalion chiefs
2        do?
3   A.  They are shift commanders.  They oversee all
4        operations per shift, including the firefighters
5        that work under them in reference to the safety
6        of the city, the whole -- Everything in
7        reference to.
8   Q.  And there are four of them?
9   A.  Yes, sir, it is.
10  Q.  And does each one have a different area of
11       responsibility?
12  A.  Each one of them carry out the same
13       responsibilities.  The responsibilities apply to
14       each battalion chief, other than the one who is
15       assigned to administrative duties.
16           (Defendant's Exhibit 13 marked for
17           identification.)
18  Q.  Let me show you Defendant's Exhibit 13 and ask
19       you if you recognize this as the charge of
20       discrimination when you submitted to the EEOC.
21           Is that your charge of discrimination?
22  A.  Yes, sir.
23           (Off-the-record discussion followed by

Deposition of Gerald Stephens                                                                                          May 30, 2008

Page 189

1          a brief recess.)
2    Q.   (Continuing by Mr. Morgan)  Let me ask you about
3          some of these folks on the witness list and
4          specifically what they know about your case.
5              William Thompkins, who is he and what does
6          he know about your case?
7    A.   William Thompkins used to be employed with the
8          student firefighter program.  Of course, he's a
9          black male.  And Mr. Thompkins was terminated on
10         a first offense of an incident that occurred
11         between him and another temporary full-time
12         employee, who is a PSO, Public Safety Officer.
13         Why he was terminated on a first offense, I
14         don't know, but he shouldn't have never been
15         terminated.
16   Q.   And he's a black male?
17   A.   Yes, sir, he is.
18   Q.   When was he terminated?
19   A.   I don't remember, Mr. Morgan.
20   Q.   Well, does he know anything about you not being
21         promoted to battalion chief?
22   A.   I don't know exactly what he knows, but he could
23         have been told something of that nature.  I

Page 190

1          don't know for sure.
2    Q.   Was he still employed with the City when you
3          applied for battalion chief?
4    A.   I don't recall he was, sir.
5    Q.   Have you had any conversations with him about
6          race discrimination?
7    A.   I haven't seen Thompkins in a long time.
8    Q.   Anything else that you have him listed for other
9          than the fact that he was terminated on a first
10         offense and you don't think he should have been
11         terminated on a first offense?
12   A.   No, sir.
13   Q.   And do you know what that offense was?
14   A.   I really don't know.  I don't know why they
15         decided to do that.
16   Q.   Was he a firefighter?
17   A.   He was a student firefighter.
18   Q.   Well, let me ask you this.  I'm not being
19         disrespectful, but what business would it be of
20         yours as to why he was terminated?
21   A.   Because I've seen other things happen with other
22         student firefighters who were white, and they
23         had multiple times to correct the problem, do

Page 191

1          better, whatever.  There were times when they've
2          done things that, yes, they should have been
3          fired on the first offense because it involved
4          the police department.  Police were notified.
5          They were involved.  They committed an act that
6          I deem to be very serious.  And if I was their
7          immediate supervisor, I would have recommended
8          that they be terminated.
9    Q.   And can you give me names of any of them?
10   A.   Michael Garrett Thee; a young man by the name of
11         Hale -- last name Hale, H-A-L-E; a young man by
12         the name of Graham -- last name Graham,
13         G-R-A-H-A-M.  That's just a few that come off
14         the top of my head.
15   Q.   Who is Jeremy Patterson?
16   A.   He also is a black male, student firefighter
17         program, or was.
18   Q.   And was he there when you applied for promotion
19         to battalion chief?
20   A.   No, sir, he wasn't.
21   Q.   To your knowledge does he know anything about
22         your case?
23   A.   I have talked to Mr. Patterson.

Page 192

1    Q.   And what has he told you?
2    A.   Basically he understand who the battalion chiefs
3          were who were promoted, and he asked me on
4          occasions how did that happen and what took
5          place.
6    Q.   Well, does he have any evidence or give you any
7          information or facts that you were not promoted
8          because of your race?
9    A.   I don't recall that.  I don't know.
10   Q.   Did he voluntarily leave the student firefighter
11         program?
12   A.   He graduated from Auburn University and obtained
13         another job, and -- I think he resigned and took
14         on a new job and left the program.
15   Q.   So he stayed in the program.  What is the up
16         side to being in the student firefighter
17         program?  They pay for your college education?
18   A.   They do --
19   Q.   Room and board?
20   A.   They provide them a place to live.  They have
21         tuition reimbursement.  Now they allow them to
22         pay into the retirement program.
23   Q.   And then you have Chris Turner.  What does Chris

Page 193

1     Turner know about your complaint?
2  A.  Chris Turner, of course, him and I went through
3     recruiting school together in '91 and have
4     pretty much worked our entire career together,
5     you know, per shift assignments.
6  Q.  Well, do you know of any specific information he
7     has about you not being promoted?
8  A.  Well, Chris Turner I think has been overlooked
9     several times on promotion himself; therefore,
10    he's witnessed other incidents to occur.  What
11    his reasons are, I don't recall.  But as I
12    stated, Chris Turner and I have pretty much
13    worked our career together.
14 Q.  I guess I'm pronouncing this right.  Marzella
15    Ogletree?
16         MR. OGLETREE:  That's my wife.
17 Q.  His wife.  Do you know her?
18 A.  I've seen her before, but I don't know her, no,
19    sir.
20 Q.  And then your wife.  What does your wife know
21    about your complaints or your lawsuit?
22 A.  Basically what I've told her and shared with her
23    from what I received from my attorney.

Page 194

1  Q.  She doesn't have any firsthand knowledge of what
2     goes on at the fire department, does she?
3  A.  She don't work there, no, sir.
4  Q.  Then you have Adelner Franklin Thomas, district
5     director, EEOC.  What does -- I guess that's a
6     male.  What does he know or she know?
7  A.  I don't have -- I don't know of anything of
8     that, Mr. Morgan.
9  Q.  You've got Doug Watkins, former city manager.
10 A.  Yes, sir.
11 Q.  What does he know about your battalion chief
12    promotion?
13 A.  I don't know if he knows anything, Mr. Morgan,
14    but --
15 Q.  He wasn't there at that time, was he?
16 A.  He was the one who implemented or helped
17    implement the title change promotion, whatever
18    you want to call it, from captain to battalion
19    chief.
20 Q.  Do you know specifically what he did in that
21    regard?
22 A.  I don't know specifically what he did.
23 Q.  Do you know of anything else that he's done in

Page 195

1     terms of the battalion chief position other than
2     his involvement in the title and name change?
3  A.  I don't know of anything.
4  Q.  And he was not present when you were -- went
5     through the process?
6  A.  No, sir.
7  Q.  And you've got Horace Clanton.  He's one of
8     those that signed the grievance with you?
9  A.  Yes, sir.
10 Q.  In terms of racial discrimination, do you know
11    of any information or knowledge that Mr. Clanton
12    has about you and racial discrimination?
13 A.  I don't know of anything, sir.
14 Q.  Rodney Hartsfield?
15 A.  I don't know of anything.
16 Q.  And he was promoted to battalion chief.
17         And then you've got Michael -- Matthew
18    Jordan.  Do you know of anything he knows about
19    you being racially discriminated against?
20 A.  I don't know if he knows anything, sir.
21 Q.  Joseph Lovvorn, do you know anything he knows
22    about your case, this lawsuit?
23 A.  No, sir, I don't know if he knows anything.

Page 196

1  Q.  Jason Brown, who is Jason Brown?
2  A.  Jason Brown is a station officer, one of those
3     that -- one of the thirteen signatures on the
4     paperwork that allowed them to -- allowed them
5     the title change or promotion, whatever you want
6     to call it, to lieutenant.
7  Q.  Is he a white male?
8  A.  He is a white male.
9  Q.  What, if anything, does he know about your
10    complaints in this lawsuit?
11 A.  I don't know if he knows anything, Mr. Morgan.
12 Q.  Did he sit for the promotion to battalion chief?
13 A.  He did, sir.
14 Q.  Did he make it to the top five?
15 A.  I don't know, sir, if he did or not.
16 Q.  Was he promoted to battalion chief?
17 A.  No, sir, he was not.
18 Q.  And then you've got Paden Payton.  Is he the one
19    you told me about earlier with the hazing
20    incident?
21 A.  Yes, sir.
22 Q.  And when did he leave the City?
23 A.  I can't remember the date right off, sir, but it

Page 197

1    was within the last two years.
2    Q.  Was he still employed with the City when you
3        went through the promotion procedure process for
4        battalion chief?
5    A.  Yes, sir, he was.
6    Q.  Has he told you any information or knowledge he
7        has about your lawsuit or your claims of racial
8        discrimination?
9    A.  No, sir.
10   Q.  Then you've got the Auburn city council
11       members.  Have you discussed your case with any
12       members of the Auburn city council?
13   A.  No, sir.
14   Q.  Do you know anything that the Auburn city
15       council members know about your claim of racial
16       discrimination?
17   A.  No, sir.
18   Q.  Joey Darby, do you know anything he knows about
19       your case or why he's listed as a witness?
20   A.  I don't know anything that he knows.
21   Q.  Then you have Terry Walker.  Who is Terry
22       Walker?
23   A.  He is the former training officer -- training

Page 198

1    chief who recently retired.
2    Q.  Do you know anything that he knows about your
3        case?
4    A.  No, sir.
5    Q.  Do you know why he's listed as a witness?
6    A.  Don't have a clue.
7    Q.  Ronnie Blankenship, who is he?
8    A.  He was my first actual supervisor when I became
9        a student.  And to make a long story short, he
10       was the fire chief up until '96-'97 --
11       1996-1997.  He went from team leader to fire
12       chief, and then from fire chief he went on and
13       retired and went elsewhere.
14   Q.  He left the City in '96 or '97?
15   A.  Yes, sir.
16   Q.  Do you know anything that he knows about your
17       claims of racial discrimination?
18   A.  I don't know if -- I don't know what he knows,
19       Mr. Morgan.
20   Q.  But he hasn't been employed with the City since
21       '97 thereabouts?
22   A.  '96-'97, within that range.
23   Q.  And Stephanie King, you've told me your

Page 199

1    observations of her involvement in this
2    process.  Anything that she knows or any other
3    reason she would be listed as a witness other
4    than her role in the assessment -- I mean, the
5    orientation process?
6    A.  No, sir.  I don't know of anything.
7    Q.  Have you ever had any conversations with her and
8        complained about racial discrimination?
9    A.  No, sir.
10   Q.  Ever complained about the test to her?
11   A.  No, sir.
12   Q.  And you've got Joe Bailey, and I know you said
13       he was the hearing officer.
14   A.  Yes, sir.
15   Q.  To your knowledge does he know anything else
16       other than what he heard as the hearing officer?
17   A.  I don't know what else he have heard or knows or
18       anything, Mr. Morgan.
19   Q.  Have you ever discussed your case with him?
20   A.  No, sir.
21   Q.  Michael Thee.  Who is Michael Thee?
22   A.  Mr. Thee is a student firefighter of the Auburn
23       Fire Division.

Page 200

1    Q.  And is he still a firefighter?
2    A.  Yes, sir.
3    Q.  Still a student firefighter?
4    A.  Yes, sir.  To my knowledge he is.
5    Q.  What, if anything, does he know about your case?
6    A.  I don't know if he knows anything, Mr. Morgan.
7    Q.  Has he received any favorable treatment in your
8        opinion?
9    A.  I think he has.
10   Q.  What kind of favorable --
11   A.  Being that he was involved in the incident at
12       work, which according to the rules and the
13       personnel procedures of the City, what he did
14       was considered a major offense and he should
15       have been dismissed.
16   Q.  What was that major offense?
17   A.  He went in and changed documents, provided false
18       documents in a calendar that belonged to me
19       while I was on duty because he was running late
20       and had been late for work several consecutive
21       times and knew he was in trouble.  And he knew
22       what was going to happen to you if it continued
23       because I made sure I let him know each time

Page 201

1  that it occurred what was going to happen.
2  Q.  And did you report that, that he changed
3      documents?
4  A.  I documented and reported to my immediate
5      supervisor, and it did go up the chain.
6  Q.  What happened to him?
7  A.  If I'm thinking correctly, he received a
8      suspension for, I think it was, four shifts but
9      was allowed to return back to work, and he still
10     works there.
11 Q.  Has he applied for any promotions?
12 A.  I don't know if he applied for any promotions or
13     not, Mr. Morgan.
14 Q.  Then you've got Casey McCloud -- McLeod?
15 A.  McLeod.
16 Q.  Who is that?
17 A.  Casey McLeod also was a student firefighter, but
18     presently he is now a fire career firefighter.
19 Q.  White male?
20 A.  White male.
21 Q.  And does he know anything about your case?
22 A.  I don't know if he knows anything or not,
23     Mr. Morgan.

Page 202

1  Q.  Have you discussed it with him?
2  A.  No, sir, I have not.
3  Q.  Did he apply for any promotions?
4  A.  I don't know if he have or not, sir.
5  Q.  Any problems that you're aware of with him?
6  A.  Presently, no, sir.
7  Q.  Well, in the past?
8  A.  Well, there have been some incidents where he
9      also was late for work, an incident where he had
10     an unexcused absence that pretty much was said
11     or told to me through my immediate supervisor at
12     the time, which was Johnny Lawrence, that we're
13     not going to worry about this; it never happened
14     as far as I'm concerned.
15 Q.  Did you complain to anybody about that above
16     your supervisor?
17 A.  I complained to Chief Lawrence directly and told
18     him that I didn't think it was right.
19 Q.  To Chief Lawrence?
20 A.  Yes, sir.  Johnny Lawrence.  That was my
21     immediate supervisor at the time.
22 Q.  Did you complain to anybody above your immediate
23     supervisor?

Page 203

1  A.  Well, I talked to Mr. Langley about it, too.
2      Larry Langley.
3  Q.  And what did he say?
4  A.  I also talked to -- Well, let me back up.
5      Johnny Lawrence was filling in for my supervisor
6      at the time who was Danny Leverette.  So I spoke
7      to Johnny Lawrence and I talked to Danny
8      Leverette and I also talked to Larry Langley.
9  Q.  But you're not aware of anything he knows about
10     you not being promoted?
11 A.  I don't know if he knows anything.
12 Q.  How about Dean Garrett?  Does he know anything
13     about you not being promoted?
14 A.  I don't know if he knows anything or not, sir.
15 Q.  Was he still with the City when you applied for
16     the battalion chief?
17 A.  I think he had retired.
18 Q.  Have you ever discussed with him any complaints
19     you have about racial discrimination?
20 A.  No, sir.
21 Q.  Amy Weaver, it says she's -- I don't know what
22     it says she is, but she takes care of the
23     Auburn-Opelika News.  Have you ever talked to an

Page 204

1      Amy Weaver?
2  A.  No, sir.
3  Q.  Do you know who she is?
4  A.  No, sir.
5  Q.  Lindsey Field, do you know who that is?
6  A.  No, sir.
7  Q.  Clinton Hammond, do you know who he is?
8  A.  Yes, sir.
9  Q.  Does he know anything about your claims of
10     racial discrimination?
11 A.  Mr. Hammond is deceased.  I don't know what he
12     knew when he was living.
13 Q.  Do you remember what year he died?
14 A.  I don't remember the exact year, but -- Maybe
15     eight, nine years ago maybe.
16 Q.  Jimmy Lee Brown, who is that?
17 A.  He was the battalion chief of the Auburn Fire
18     Division, the one who had the health issues
19     that --
20 Q.  Hammock?
21 A.  No.
22 Q.  Horace Clanton?
23 A.  Horace Clanton, yes, sir, was assigned to fill

Page 205

1     his position in his absence.
2   Q.  Was Mr. Brown still a battalion chief when you
3     applied for the promotion to battalion chief?
4   A.  Was he? I don't recall if he was or not,
5     Mr. Morgan. It was right during the time -- I
6     think he was maybe on sick leave or something of
7     that nature. Let me see. Yes, sir, he was
8     still employed there.
9   Q.  Have you had any conversations with him about
10     racial discrimination or your claims?
11   A.  No, sir.
12   Q.  Who is Wendall Willis?
13   A.  He was a guy that I used to work with years
14     ago. He was a career firefighter. He doesn't
15     work there anymore. It's been a long time since
16     he worked there.
17   Q.  Do you know anything that he knows about your
18     case?
19   A.  No, sir.
20   Q.  Have you talked to him about it?
21   A.  No, sir.
22   Q.  James Lyle?
23   A.  Yes, I know him.

Page 206

1   Q.  Who is he?
2   A.  Also a career firefighter years ago.
3   Q.  Has he gone a long time?
4   A.  Yes, sir.
5   Q.  Have you discussed your lawsuit with him?
6   A.  No, sir.
7   Q.  Have you talked to him about it or seen him
8     recently?
9   A.  No, sir.
10   Q.  Tommy James?
11   A.  Yes, sir, I know him.
12   Q.  Who is Tommy James?
13   A.  Tommy James is a retired team leader from the
14     Auburn Fire Division.
15   Q.  Was he retired when you applied for the
16     battalion chief?
17   A.  Yes, sir.
18   Q.  Do you know anything that he knows about your
19     case?
20   A.  No, sir.
21   Q.  Have you discussed your case with him?
22   A.  No, sir.
23   Q.  Kenneth Lee Smith?

Page 207

1   A.  Used to be a lieutenant in the fire division but
2     was demoted to firefighter approximately a
3     couple of months before he actually retired.
4   Q.  How long has he been retired?
5   A.  Over ten years.
6   Q.  White male?
7   A.  White male.
8   Q.  Do you know anything he knows about your case?
9   A.  No, sir.
10   Q.  Have you discussed your case with him?
11   A.  No, sir.
12   Q.  Ron Jones?
13   A.  Ronnie Jones?
14   Q.  Yeah.
15   A.  Ronald Jones? He is a retired shift commander,
16     captain, at the time.
17   Q.  Was he still with the City when you applied for
18     battalion chief?
19   A.  No, sir.
20   Q.  Do you know anything he knows about your case?
21   A.  I don't know if he knows anything, sir.
22   Q.  Have you discussed it with him?
23   A.  No, sir.

Page 208

1   Q.  Dexter Card. Do you know Dexter Card?
2   A.  Lieutenant Dexter Card, yes, sir.
3   Q.  Does he know anything about your case?
4   A.  I don't know what he knows, sir.
5   Q.  Have you discussed your lawsuit with him?
6   A.  No, sir.
7   Q.  And he wasn't there when you took the test?
8   A.  No, sir.
9   Q.  William Felton?
10   A.  Yes, sir. Retired lieutenant.
11   Q.  Has he been gone a long time?
12   A.  Yes, sir.
13   Q.  Have you discussed your lawsuit with him?
14   A.  No, sir.
15   Q.  Thomas Scott?
16   A.  Yes, sir. Retired -- Well, actually, he was
17     terminated. Terminated career firefighter.
18   Q.  What did he do?
19   A.  I have no idea. Happened years ago.
20   Q.  Have you discussed your case with him?
21   A.  I haven't seen him, no, sir.
22   Q.  Steve Heart, who is he? H-E-A-R-T, Steve
23     Heart? Name doesn't sound familiar?

Page 209

1    A.  Don't ring a bell with me.
2    Q.  Larry Stanley, does that name sound familiar?
3    A.  Don't ring a bell with me, sir.
4    Q.  Gary Jones?
5    A.  Yes, sir, I know him.
6    Q.  Who is that?
7    A.  Gary Jones is actually the brother to Ronnie
8        Jones.  Never had an opportunity to work with
9        him.  Haven't seen him.
10   Q.  Does he know anything about your case?
11   A.  I don't know if he knows anything or not.
12   Q.  Have you discussed it with him?
13   A.  No, sir.
14   Q.  Was he gone when you took the promotion?
15   A.  Yes, sir.
16   Q.  Jan Dempsey?
17   A.  Former mayor of the City of Auburn.
18   Q.  Have you discussed your complaints with her?
19   A.  No, sir.
20   Q.  Have you discussed this lawsuit with her?
21   A.  No, sir.
22   Q.  Ron Tahita, do you know who he is?
23   A.  That names sound familiar, but I don't know who

Page 210

1    he is.
2    Q.  Do you know who Ellis Mitchell is?
3    A.  Yes, sir, I do.
4    Q.  Had any conversation with Ellis Mitchell about
5        this lawsuit?
6    A.  No, sir.
7    Q.  There were a number of documents that were
8        disclosed, and I'm not going to go through all
9        of them, but let me ask this.  Toward the end of
10       these documents are a lot of paperwork dealing
11       with various employees, it looks like, with the
12       fire department:  Michael Thee, Harvard
13       Graham --
14           What does this paperwork have to do with
15       your lawsuit?
16   A.  Basically those papers are progressive
17       disciplinary procedures that were implemented on
18       them for improperly doing something in reference
19       to the Auburn Fire Division.  Could vary from
20       being late for work or doing something they
21       don't supposed to do.
22   Q.  And Dave Bradley?
23   A.  Yes, sir.  I recall him being late for work one

Page 211

1        time.
2    Q.  Walter Peacock?
3    A.  Uh-huh (positive response).
4    Q.  Katie Hartsill?
5    A.  Hartsill.
6    Q.  Casey McLeod.
7            Other than being paperwork on people that
8        looks like most of them were late, does it have
9        some significance to your not being promoted to
10       battalion chief?
11   A.  No.  Those are just documentation as an officer
12       that I must do when these people don't comply to
13       the rules of the division.
14   Q.  Just documentation showing that you disciplined
15       people when you thought they needed to be
16       disciplined?
17   A.  According to the personnel policies of the City
18       of Auburn, whenever they violate any of their
19       rules, it is my job to document and submit it to
20       the immediate supervisor for any other action to
21       be taken, if necessary.  All I can do is make a
22       request in reference to what I think should
23       happen.

Page 212

1    Q.  Scott Chinowith?
2    A.  Yes, sir.
3    Q.  Other than documenting that these people didn't
4        do something that you thought they should do --
5        Cusak, Dennis Ballard, Kanaxi Sufom (phonetic),
6        Austin Bales -- do they have any bearing on you
7        not being promoted?
8    A.  No, sir.  But when we talked about
9        Mr. Thompkins --
10   Q.  About who?
11   A.  William Thompkins.  You remember you mentioned
12       that name to me at the beginning?  What I think
13       should have happened to Thompkins is basically
14       what happened to all these other guys you just
15       looked through, if anything.  I mean, he didn't
16       do anything directly or violated any rules or
17       regulations within the personnel policies.  And
18       what happened to all those people just saw
19       should have happened to him.  I think he should
20       have never been terminated.
21   Q.  Before I get to my main question, let me be
22       clear.  Those documents don't have anything to
23       do with you not being promoted, though, true?

Deposition of Gerald Stephens    May 30, 2008

Page 213

1    A.  No, sir.
2    Q.  No, sir meaning I'm correct?
3    A.  You're correct.
4    Q.  And whatever happened to Mr. Thompkins you don't
5        know for an actual fact, do you?
6    A.  I didn't make that decision.  I don't know.
7    Q.  But whatever happened to Mr. Thompkins, he
8        didn't file a lawsuit, did he?
9    A.  Not that I'm aware.  I don't know if he filed
10       one or not, sir.
11   Q.  But you're not familiar or know what he actually
12       did or didn't do, do you?
13   A.  I don't know what he did, sir.
14   Q.  Now, let me ask you about the folks I represent
15       and what it is that you think these people have
16       done to constitutes racial discrimination and
17       why you have sued them.
18           The first one is Larry Langley.
19           MR. HORSLEY:  I'm going to do a
20           blanket objection to all these
21           questions because I think they ask
22           for legal conclusions.  But go
23           ahead and answer them.

Page 214

1    A.  Larry Langley -- Ask your question.
2    Q.  What is it that Larry Langley has done that you
3        think is racially discriminatory or retaliation
4        and caused you to sue him in this lawsuit?
5    A.  Mr. Langley have not allowed me to -- Let me
6        back up.
7           I feel like -- I think Mr. Langley has been
8        unfair to me as a fire lieutenant and the
9        responsibilities I have and the position I
10       should fill as a fire lieutenant in the absence
11       of or in reference to whatever the job may be.
12       I don't think he's been honest with me about
13       several things throughout my career.  I think
14       he's been misleading to a point where when
15       things do occur, I'm not aware of it.  I have to
16       go through -- go through my immediate supervisor
17       asking questions in reference to find out what's
18       going on.  Overall I just think he's been very
19       unfair to me as specifications of my rank, which
20       is fire lieutenant.
21   Q.  Is there anything that you claim that Larry
22       Langley did that prevented you from being
23       promoted to battalion chief?

Page 215

1    A.  Yes, sir.
2    Q.  What?
3    A.  Larry Langley sent me a memo -- I'm sorry.  He
4        didn't send me a memo.  He responded to an
5        e-mail I sent to him in reference to the posting
6        of the training officer position that Lee Lamar
7        filled.  And in his memo, he stated that, if I
8        can remember correctly, somehow or another he
9        lost it in his computer and that it was posted
10       and it was posted for some period of time and it
11       was for team leaders only.  And at the time I
12       was a lieutenant.
13   Q.  And that was for training officer?
14   A.  That was for training officer.
15   Q.  Is there anything that Larry Langley did that
16       you think prevented you from being promoted to
17       battalion chief because of your race?
18   A.  I also recall an incident.  If I'm thinking
19       correctly, it was during the time I filed my
20       grievance in 2005.  Mr. Langley came to my house
21       and delivered a letter from Mr. James, which I
22       had addressed to him.  And during that
23       deliverance, we conversed, and he told me in a

Page 216

1        nutshell that if I underwent or continued my
2        grievance that a red flag would be up against my
3        name and people of the City would think that I'm
4        not willing to comply with what they are doing
5        and that basically I would have a hard time, you
6        know, progressing working there whatsoever.
7    Q.  Well, assume all that is true.  Is there
8        anything that you know of that he did that kept
9        you from being promoted to battalion chief in
10       February or March or April of '06?
11   A.  I think he had something to do with allowing
12       non-probationary personnel to be eligible to
13       apply for that position, therefore making it
14       more challenging for me to possibly attempt to
15       obtain that position.
16   Q.  Well, first of all, in terms of that test, it
17       didn't matter how many people applied.  I mean,
18       you were graded on what you made, right?
19           MR. HORSLEY:  Object to the form.
20   Q.  True?  It didn't matter if a thousand people
21       applied.  You had to make 70?
22   A.  That was the rule.
23   Q.  So it didn't matter how many folks were in that

Page 217

1  room.  You either were going to make 70 or not
2  make 70, right?
3  A.  Right.
4  Q.  And the best I can tell, the only person who
5  took that test that was a non-probationary
6  career officer was Chris Turner, another black
7  male.  Are you complaining that Chris Turner
8  should not have been allowed to take that test?
9  A.  I can't say -- I don't -- I'm not in a position
10  to say what he can or can't take.  But Chris
11  Turner was allowed to take the test.
12  Q.  And he didn't make it, did he?
13  A.  No, sir, he did not.
14  Q.  And that didn't influence your grade one bit,
15  did it?
16  A.  Not that I'm aware of, it didn't.
17  Q.  So can you agree with me that whether or not
18  Larry Langley did or didn't allow
19  non-probationary permanent employees to take the
20  test doesn't affect your score one bit?
21  A.  I'm not aware of it did or not, sir.
22  Q.  So you can't think of any reason or anything
23  that Larry Langley did to keep you from being

Page 218

1  promoted to battalion chief in April of '06, can
2  you?
3  A.  I can't recall anything at this time, sir.
4  Q.  And what is it that Mr. Langley said or did that
5  you think was not honest or misleading?
6  A.  Basically when he said that the training officer
7  position was posted.
8  Q.  And what is it that you think he did or didn't
9  do that was unfair to your position as a fire
10  lieutenant?
11  A.  In the absence of a shift commander, captain, or
12  battalion chief, I wasn't given the opportunity
13  to fill those positions.
14  Q.  Is that the Horace Clanton deal?
15  A.  That's part of it, yes, sir.
16  Q.  What else besides Horace Clanton?
17  A.  There were several other times when things
18  got -- things came about whereas when I applied
19  for it, he wanted to -- he did whatever he
20  deemed necessary to -- that made me think he was
21  trying to prevent me from being a part of it.
22  Q.  Did any of those incidences occur after you
23  complained about Horace Clanton?

Page 219

1  A.  No, sir.
2  Q.  And what about Lee Lamar?  What is it that Lee
3  Lamar did in your opinion that kept you from
4  being promoted because of your race or in
5  retaliation?
6  A.  I don't recall.  I'm not aware of anything at
7  this time, sir.
8  Q.  And Bill Ham, Jr., what is it that he did that
9  kept you from being promoted because of your
10  race or in retaliation?
11  A.  I'm not aware of anything at this time, sir.
12  Q.  Have you ever spoken to Bill Ham, Jr. about any
13  of this?
14  A.  No, sir.
15  Q.  And what is it that Steve Reeves did to keep you
16  from being promoted because of your race or in
17  retaliation?
18  A.  I don't know what role he could have played in
19  any of this, but being he works in the human
20  resource department, he had to play some role in
21  it.  He was present during all the orientation
22  and the testing procedures.
23  Q.  Anything else other than the fact that he's in

Page 220

1  HR?
2  A.  I'm not aware of anything, sir.
3  Q.  And you're not aware of any specifics that he
4  did, are you?
5  A.  No, sir.
6  Q.  And then Bill James, what is it that you say
7  Bill James did to keep you from being promoted
8  because of your race or in retaliation?
9  A.  Other than the point of me speaking with him
10  directly telling him there was a problem at the
11  Auburn Fire Division, I'm not aware of what he
12  knows or done or -- I don't know.
13  Q.  And my understanding is that when you spoke with
14  him privately, you never said, hey, I'm being
15  discriminated against in promotions because of
16  my race, did you?
17  A.  I don't recall making that statement, sir.
18  Q.  And your conference with him was before you took
19  the battalion chief test, wasn't it?
20  A.  Yes, sir.  It was before they actually
21  implemented the title change or the promotion
22  for team leader to lieutenant.
23  Q.  And Charles M. Duggan, the city manager, have

Page 221

1    you ever spoken to the city manager about any
2    complaints you have about race discrimination or
3    retaliation?
4    A. No, sir.
5    Q. Do you know of anything that Charles M. Duggan
6       did to keep you from being promoted because of
7       your race or in retaliation?
8    A. No, sir, I'm not aware of anything he knows.
9    Q. And then you've sued the City of Auburn. What
10      is it you say the City of Auburn did to keep you
11      from being promoted because of your race or in
12      retaliation?
13   A. Being that the City of Auburn is responsible for
14      everything that has taken place throughout the
15      history of the department, why no blacks or
16      African-Americans have been hired or promoted
17      since me or since Mr. Ogletree, I don't
18      understand that. I'm very concerned about
19      that. What's the reason for it? I just don't
20      understand it.
21   Q. Which occurred first? Were you promoted to
22      lieutenant before or after Mr. Ogletree became a
23      team leader?

Page 222

1    A. Approximately one month before he became a team
2       leader.
3    Q. You were promoted to lieutenant?
4    A. Yes, sir.
5    Q. And he would have gone through the structured
6       interview that you've talked about to become a
7       team leader as far as you know?
8    A. As far as I know, he went through a structured
9       interview. How was it? Was it identical to
10      previous times? I don't know.
11   Q. Any other reason that you've sued the City of
12      Auburn other than you just don't understand
13      about the hiring and the promotion?
14          MR. HORSLEY: Object to the form. You
15          can answer.
16   A. I'm not aware of anything at this time.
17   Q. Let me ask you about your damages, how you claim
18      you've been damaged. Do you know what I'm
19      talking about?
20   A. Yes, sir.
21   Q. I assume we can just get through this quick. I
22      assume that one way you claim you've been
23      damaged is the difference in salary that you

Page 223

1    would have received as a battalion chief
2    compared to what you're making now.
3    A. Yes, sir.
4    Q. I assume that --
5    A. To the conclusion of my retirement, whenever I
6       retire.
7    Q. The difference in salary and ever how that
8       impacts retirement benefits and whatever?
9    A. Yes, sir.
10   Q. Then you've got a claim in here for emotional --
11      I thought you did. I thought I had written in
12      here emotional distress.
13          (Brief off-the-record discussion.)
14   Q. Are you claiming emotional distress or mental
15      anguish?
16   A. Yes, sir.
17   Q. Have you seen any professional mental health
18      counselors, doctors, psychiatrists, or
19      psychologists for any mental anguish or
20      emotional distress which you claim as a result
21      of not being promoted?
22   A. No, sir.
23   Q. Had you ever seen a mental health specialist --

Page 224

1    A. No, sir.
2    Q. -- before this or a psychiatrist or a
3       psychologist?
4    A. No, sir.
5    Q. What is your claim for mental anguish and
6       emotional distress? What is it that you claim?
7    A. I've been -- For years, Mr. Morgan, I've been
8       labeled as a problem by my immediate
9       supervisors, and basically it has traveled from
10      one shift to another to one shift commander to
11      another to eventually up the chain to the point
12      where when it actually got to the point of a
13      hearing, it was pretty much all over the
14      division, which, you know, challenged my skill
15      as a leader amongst my men, just my overall
16      character as a firefighter, officer, an
17      employee, the whole nine, and being that it has
18      been challenging at times for me to successfully
19      and progressively manage my people and to
20      conduct myself safely and to do my job in a
21      manner in which I'm supposed to do it. I always
22      felt like I was being watched. Any mistakes I
23      make or anything that may happen that falls

Page 225

1  under my responsibility, you know, I actually
2  think if it happens that it will be held against
3  me severely.
4  Q.  And how long have you had those feelings?
5  A.  Ever since I was promoted to lieutenant in
6  1996.  Back then a lot of people didn't think I
7  deserved it.  They thought I was promoted
8  because I was black.  They thought things that I
9  never thought people that I trust and work with
10  in the profession that I do would actually
11  think.  I applied for the position, I was
12  eligible for the position, and I got the
13  position, not because of my skin color but
14  because I thought I was the best person for the
15  job.
16  Q.  Well, do you claim you suffered any additional
17  mental anguish or emotional distress as a result
18  of not being promoted to the battalion chief or
19  is it just something that's been going on since
20  '96?
21  A.  That's adding to the problem overall.  I mean,
22  here I am the only lieutenant in the fire
23  division, and then here comes title changes

Page 227

1  Auburn Fire Division.
2  Q.  And is that because of this battalion chief
3  promotion?
4  A.  Because of everything that I've dealt with,
5  Mr. Morgan, to include the battalion chief
6  promotion.
7  Q.  But you haven't seen any professionals?
8  A.  No, sir, I have not seen any professionals.
9  Q.  Do they have some counseling program that's
10  available to the employees of the City of
11  Auburn?
12  A.  I'm quite sure they have some type of program,
13  yes.
14  Q.  Have you done anything in that regard?
15  A.  No, sir, I have not done anything yet.
16  Q.  And I know you've told me this, and I
17  apologize.  I'm really not trying to belabor
18  this.  Who is it that you say was appointed, Lee
19  Lamar?  Who was appointed to a position?
20  A.  Apparently Lee Lamar was because I don't recall
21  him going through an interview.  I don't recall
22  the position being posted.  The deputy chief
23  position, which he got, it was a structured

Page 226

1  which pretty much put people on the level that
2  I'm on.  Now I've got to -- Where I had no one
3  to compete with, now I've got to compete with
4  thirteen other people for a position that I
5  didn't even have to compete with anyone with.
6  Why couldn't I have been appointed like some of
7  these other people that have been appointed
8  through the years?  Why couldn't I have
9  undergone a structured interview?  Why I got to
10  go take a test and make a cutoff score to be
11  eligible for a position when at that particular
12  time or at a particular time, I was the only
13  fire lieutenant in the whole fire division?  So
14  that concerns me severely.
15  Q.  Well, how does this mental anguish or emotional
16  distress manifest itself?  How does it affect
17  you?  Are you not able to do your job?
18  A.  Doing my job is very challenging.  Rarely do I
19  sleep at night when I'm on shift because I don't
20  know what could happen.  I've got people that
21  live in the stations.  I've got people that have
22  access to the stations.  I'm just at a point now
23  where there's not too many people I trust at the

Page 228

1  interview.  But according to the paperwork or
2  the information that was forwarded to me, he was
3  appointed as deputy chief.
4  Q.  Well, did he have a structured interview as
5  part of -- to be deputy chief?
6  A.  Yes, sir.  There was a structured interview that
7  I also attended.
8  Q.  And you applied for that position?
9  A.  Yes, sir.
10  Q.  So you know there was some process by which he
11  was selected?
12  A.  For the deputy chief, it was.
13  Q.  But you're saying for training officer?
14  A.  Training officer ...
15  Q.  And how long ago was that?
16  A.  I don't remember the date.  2003 or 2004, one of
17  those.
18  Q.  Anybody else that you claim was appointed other
19  than Lee Lamar, training officer?
20  A.  Terry Walker, he was appointed.
21  Q.  And what was he appointed to?
22  A.  Training chief.  Training officer.
23  Q.  Do you want to be training officer?  Would you

Page 229

1   have given up your position as lieutenant to
2   be --
3   A.  I applied for the position, but today I can't --
4       I can't say what I would do without talking with
5       my attorney and discussing it further.
6   Q.  When did you apply for the position of training
7       officer?
8   A.  I don't remember the date, Mr. Morgan.
9   Q.  Who got it?
10  A.  Terry Walker got it.
11  Q.  So when Terry Walker was appointed, there was a
12      process in which you participated?
13  A.  Yes, sir.
14  Q.  And he was selected?
15  A.  And understand, Mr. Morgan, there was no test.
16      There was no written test.  When John Lankford
17      got the training officer position, there was no
18      test.
19  Q.  Are you complaining there should have been a
20      test or shouldn't have been a test?
21  A.  I was made to take a test for battalion chief.
22  Q.  Well, so was everybody else that was promoted in
23      April of '06, weren't they?

Page 230

1   A.  But nobody between --
2   Q.  Didn't everybody that applied for battalion
3       chief in February and March of '06 have to take
4       a written test?
5   A.  Yes, sir.
6   Q.  So Terry Walker and Lee Lamar.  Anybody else you
7       claim was appointed?
8   A.  John Lankford.
9   Q.  And what was he appointed to?
10  A.  Training officer.
11  Q.  Was that before or after Lee Lamar?
12  A.  That was after Lee Lamar.
13  Q.  Did you apply before then?
14  A.  No, sir.
15  Q.  Did anybody apply for it then?
16  A.  I'm not aware of who applied for it.
17  Q.  Lee Lamar, John Lankford, and Terry Walker.
18      Anyone else that was appointed?
19  A.  I look -- Overall I look at the title changes as
20      a promotion.
21  Q.  The title changes?
22  A.  Yes, sir.  From captain to battalion chief, from
23      team leader to lieutenants, I look at that as a

Page 231

1   promotion.
2   Q.  You think that's a promotion?
3   A.  Yes, sir.
4   Q.  But you know that's not true?
5           MR. HORSLEY:  Object to the form.
6   A.  Well, the thing is is that when -- captains,
7       prior to them going to battalion chief, they
8       had, I think it was, two bugles as far as their
9       brass.  They went to three.  Team leaders had
10      collar insignia, and they went to bugles.  I
11      wear bugles, and I know what I had to do to get
12      my bugles.
13  Q.  So you're saying Eddie Ogletree should not be a
14      lieutenant?
15          MR. HORSLEY:  Object to the form.
16  A.  I'm not saying --
17  Q.  I'm asking you.  Are you saying Eddie Ogletree
18      should not be a lieutenant?
19          MR. HORSLEY:  Object to the form.
20  Q.  It's a simple question.
21          MR. HORSLEY:  You can answer.
22  A.  As far as I'm concerned, Eddie Ogletree and all
23      other thirteen people who signed that paper

Page 232

1   should be team leaders.
2   Q.  Should not be a lieutenant?
3   A.  No, sir.
4   Q.  And should not have been eligible to apply for
5       battalion chief?
6           MR. HORSLEY:  Object to the form.
7   A.  No, sir.
8   Q.  I mean, that's your position?  They should not
9       have been eligible to apply for battalion chief;
10      is that true?
11          MR. HORSLEY:  Object to the form.  You
12          can answer.
13  A.  Yes, that's true.
14  Q.  I want to try to get a grasp on this mental
15      anguish, emotional distress.  I know you haven't
16      seen any professionals.  Specifically as to not
17      being promoted to battalion chief, how has that
18      affected you?
19  A.  Can you be more specific on that question,
20      please, sir?
21  Q.  I wish I could.  I mean, do you not want to go
22      to work?  You can't sleep?  What is it?
23  A.  I'm very displeased at work, very.

Page 233

1  Q. But you've not discussed -- How about your
2      family doctor? Did you discuss it with your
3      family doctor?
4  A. No, sir.
5  Q. Who is your family doctor?
6  A. Dr. Kevin L. Jackson. That's my medical doctor.
7  Q. And where is he located?
8  A. Auburn, Alabama.
9  Q. You've got a loss wage claim based on the
10     difference in the positions. You have a claim
11     for mental anguish and emotional distress. Any
12     other way you claim you've been damaged by not
13     being promoted to battalion chief because of
14     your race or in retaliation?
15 A. Directly speaking, the opportunity to advance.
16     I've always had a goal to be somewhere within
17     the Auburn --
18         MR. HORSLEY: He's just asking you if
19             there's any other category of
20             damages that you're claiming other
21             than wages and mental anguish and
22             emotional distress. That's what
23             he's asking.

Page 234

1  A. I can't think of nothing else at this time, sir.
2  Q. Loss wages and emotional distress.
3         And then this opportunity to advance, what
4      do you mean by that?
5  A. Career advancement, move up, be promoted.
6  Q. Can't move up because you didn't get that
7      promotion. Okay.
8         Any other damages you claim? I want -- I'm
9      not -- I want to know anything that you claim as
10     a damage. I've got your wages, I've got your
11     emotional distress, and I've got your
12     opportunity to advance. Are there any other
13     damages that you claim in this lawsuit?
14         MR. HORSLEY: You're not asking
15             punitives obviously?
16         MR. MORGAN: I'm not talking about
17             punitives.
18 A. I think that pretty much touches bases.
19 Q. I am going to ask you this one question about
20     punitives.
21        Do you claim that any of these people that
22     you've sued -- Larry Langley, Lee Lamar, Bill
23     Ham, Steven Reeves, Bill James, Charles

Page 235

1      Duggan -- do you think they deliberately and
2      intentionally kept you from being promoted?
3         MR. HORSLEY: Object to the form.
4  A. I don't have any comment about that right this
5      time, Mr. Morgan.
6         MR. MORGAN: Give me two minutes, and
7             I may be through.
8         (Brief recess was taken.)
9  Q. (Continuing by Mr. Morgan) Mr. Stephens, are
10     you familiar with the City's educational
11     assistance plan -- do you know what that is --
12     or program?
13 A. I'm somewhat familiar with it. It's been a long
14     time since I seen that, sir.
15 Q. Have you taken advantage of that opportunity to
16     complete your college education or school?
17 A. I have. In my career I have taken advantage of
18     it.
19 Q. Tell me what you've done in terms of educational
20     assistance.
21 A. I have taken classes -- Everything pretty much
22     in my latter years I took was in reference to my
23     career with the Auburn Fire Division. And I

Page 236

1      took an EMT course. I can't remember when it
2      was, but it was right during the time when the
3      local colleges and junior colleges were
4      implementing the change from quarterly to
5      semesters. Took the EMT course. Made the
6      grade. Submitted all the paperwork. Told my
7      immediate supervisors in reference to tuition
8      reimbursement and all that. Met all
9      requirements but never was reimbursed.
10        During those times when I took those -- that
11     course -- it was approximately nine weeks or a
12     quarter long -- I had to get people to work for
13     me. I think somewhere in the education program
14     of the City, it states they allow you to take
15     time off to take these courses as long as you
16     make them up. I work a 24-hour shift. I work a
17     little bit different than other people in the
18     City; therefore, I couldn't necessarily do
19     that. But I was allowed to swap or get people
20     to cover for me so I could attend these courses
21     or whatever courses that I decided to take.
22        MR. MORGAN: That's all I've got,
23             Richard.

Page 237

1          MR. HORSLEY: I've got a few.
2              EXAMINATION
3    BY MR. HORSLEY:
4    Q.  Gerald, either in layman's terms or in legal
5         terms, do you truly understand the meaning of
6         the term "disparate impact"?
7    A.  No, sir.
8    Q.  You got a lot of questions about disparate
9         impact and what you're claiming in the lawsuit
10        as it relates to disparate impact.  My question
11        is:  Do you have an understanding as to what you
12        are ultimately claiming in this lawsuit,
13        claiming happened to you?
14   A.  Yes, sir, I kind of understand.
15   Q.  What are you claiming happened to you in this
16        lawsuit?
17   A.  I'm claiming that basically because I'm a black
18        man employed with the City, I was discriminated
19        against.
20   Q.  Are you claiming that with regard to the 2006
21        battalion chief promotion?
22   A.  Yes, sir.  That's a part of it.
23   Q.  You were also asked a lot of questions about

Page 238

1         evidence, and I think evidence is probably a
2         legal term also.  Can you give us examples of
3         how you were denied that promotion or
4         discriminated against because of your race by
5         the City of Auburn?
6              MR. MORGAN:  Object to the form.
7    Q.  You can answer.
8    A.  There was a lot of implementations that took
9         place during the time when I was eligible for
10        several positions, and it was something that was
11        not practiced through those years.  They gave a
12        test, which, you know, for whatever reason they
13        he gave it, they did it.
14   Q.  The test we've talked about for the battalion
15        chief promotion?
16   A.  Yes.
17   Q.  What else?
18   A.  They made temporary assignments, and I think
19        they never considered me for those assignments.
20        They haven't promoted any blacks of the ones
21        that was available that works there.
22   Q.  What are your thoughts about the seniority and
23        experience level of the people that were

Page 239

1         promoted in front of you as it relates to racial
2         discrimination?
3              MR. MORGAN:  Object to the form.
4    Q.  Go ahead.
5    A.  I think I was more qualified than these guys
6         were.  I had more seniority.  I was more
7         experienced.  I just directly speaking think I
8         was more qualified.
9    Q.  Why do you think -- Again, from a layman's
10        standpoint, why do you believe the City
11        implemented the test for this promotion?
12             MR. MORGAN:  Object to the form.
13   Q.  You can answer.
14   A.  Basically because I'm black and I was applying
15        for the position.
16   Q.  Were other blacks applying for the position
17        also?
18   A.  Other blacks were applying for the position as
19        well.
20   Q.  Y'all spoke some about damages, and Randall
21        asked you questions about mental anguish and
22        emotional distress related to the denial of the
23        promotion.  Again, what is the reason you are

Page 240

1         ultimately claiming you were denied that
2         promotion?
3              MR. MORGAN:  Object to the form.
4    A.  Basically because I'm black.
5    Q.  How does that affect you from an emotional
6         standpoint?
7              MR. MORGAN:  Object to the form.
8    A.  Can I answer?
9    Q.  Yes, you can answer.
10   A.  Being judged because I'm a black man, that
11        really bothers me a whole lot because I have
12        applied myself.  I've done everything that I can
13        possibly do or everything they've asked me to do
14        to obtain this position and have held it -- any
15        position that I've applied and received and held
16        it as long as of today.  There are just things
17        that happened to me that I think didn't happen
18        to other people; therefore, it leads me to think
19        that, along with other things that take place.
20   Q.  How does that make you feel?
21             MR. MORGAN:  Object to the form.
22   A.  It basically just makes me feel like, you know,
23        people don't trust me or whatever the case may

Page 241

1  be and that they are going to give me a hard
2  time at work and just make it very challenging
3  for me when I'm working there.
4  Q.  He asked you about the individual defendants and
5  what evidence you have that they had acted
6  deliberately and intentionally.  Who do you
7  understand made the decisions to implement a
8  test for the battalion chief promotion?
9        MR. MORGAN:  Object to the form.
10 Q.  Go ahead.
11 A.  All the persons that are named on the
12 paperwork.  Now, I think they played a major
13 role of some part or another in reference to
14 what took place.
15 Q.  Who made the decisions to make the title changes
16 from team leader to lieutenant?
17 A.  As far as I'm concerned, those names that was
18 mentioned on the paperwork.
19 Q.  As far as you know, who made the decision to
20 make the title change from captain to battalion
21 chief?
22 A.  As far as I'm concerned, those people again
23 whose name is on the paperwork.

Page 242

1        MR. HORSLEY:  That's all I have.
2        EXAMINATION
3  BY MR. MORGAN:
4  Q.  Mr. Stephens, was there anything on the test you
5  took, the booklet, that you turned in to be
6  graded that identified you as a black male?
7  A.  Identified me as a black male?
8  Q.  Anything that would tell the person that was
9  grading that paper, hey, this is a black male.
10 A.  I'm not aware if anything was.
11 Q.  You didn't put Gerald Stephens, black male, did
12 you?
13 A.  No, sir.
14 Q.  You didn't put Gerald Stephens,
15 African-American, did you?
16 A.  No, sir.
17 Q.  You just put your name or your -- ever what that
18 identification --
19 A.  Yes, sir.
20 Q.  So whoever graded your paper didn't know what
21 your race was, did they?
22 A.  I'm not aware if they knew anything or not,
23 Mr. Morgan.

Page 243

1  Q.  This temporary assignment, I want to be clear
2  because I thought we had been through all this.
3  The last temporary assignment about which you
4  complained you didn't get was the one involving
5  Horace Clanton that you filed an EEOC charge
6  about, wasn't it?
7  A.  Yes, sir.
8  Q.  And your thoughts on seniority and experience,
9  that's why you think you're more qualified than
10 the people who became battalion chiefs, true?
11 A.  Yes, sir.  To include time on the job, time in
12 grade, all that.
13 Q.  Seniority.
14 A.  Yes, sir.
15 Q.  So you think promotions should be based on
16 seniority?
17 A.  Yes, sir.
18 Q.  Not qualifications, not who can do the best job,
19 simply I've been sitting in this job for the
20 longest of anybody else; therefore, I need to be
21 promoted?
22       MR. HORSLEY:  Object to the form.
23       That's not --

Page 244

1  Q.  Is that your position?
2        MR. HORSLEY:  Mischaracterization of
3        testimony.
4  A.  I think seniority is a main part in the job I do
5  and the job that the other firefighters do,
6  which leads to the length of time on the job,
7  knowing the job, being experienced doing the
8  job.  I don't think it should be based upon
9  whether you pass or fail a test.
10 Q.  You don't?  You don't think --
11 A.  A written test.  No, sir, I don't.
12 Q.  You don't think a test that's designed to test
13 your qualifications, your skill, knowledge of
14 the job is more important than just having been
15 on the payroll longer than somebody else?
16       MR. HORSLEY:  Object to the form.
17 Q.  That's your testimony?
18       MR. HORSLEY:  Object to the form.
19       That's not his testimony.
20 A.  I don't necessarily look at it as being on the
21 payroll, Mr. Morgan.  I look at it as basically
22 being on the job, learning the job, doing the
23 job, training those who, you know, just may turn

Page 245

1    around and be your supervisors one day, you
2    know.  It takes time to be in that position
3    that -- you know, what was being tested for, and
4    I don't think a cutoff score of no nature should
5    be involved.  That's just what I think.
6    Q.  So you think that it's just strictly seniority
7        is all that --
8                MR. HORSLEY:  Object to the form.
9            That's not what he said.
10               MR. MORGAN:  That's exactly what he's
11           saying.
12               MR. HORSLEY:  That's exactly not what
13           he's saying.  He just said --
14               MR. MORGAN:  Well, I'm going to ask
15           him this.
16   Q.  Do you think strictly seniority is what you
17       should go by?
18   A.  No, sir.
19   Q.  Then what other qualifications are there?
20   A.  Seniority, experience, time on the job.
21   Q.  Experience.  How do you define experience?
22   A.  How long you've been working there.
23   Q.  Seniority?

Page 246

1    A.  Yes.  It falls under that category, yes, sir.
2    Q.  Time in the grade.  Time on the job.  That's
3        seniority?
4    A.  Knowledge of the job, yes, sir.  Training.
5    Q.  Back up.
6            Knowledge of the job?
7    A.  Yes, sir.
8    Q.  How do you test knowledge of the job?
9    A.  I'm not in a position to justify how they go
10       about testing that.
11   Q.  Do you agree that before someone should be
12       promoted that you should test their knowledge of
13       the job?
14               MR. HORSLEY:  Object to the form.  Go
15           ahead.
16   Q.  Shouldn't you test --
17   A.  I agree that testing procedures should be
18       consistent whether a written test is involved or
19       not.
20   Q.  That's not my question.  My question is:  Before
21       a person is promoted, should knowledge of the
22       job be tested?
23               MR. HORSLEY:  Object to the form.

Page 247

1    A.  I don't have any comments at this time.
2    Q.  You don't have a comment on whether or not you
3        ought to test somebody's knowledge of the job?
4    A.  Well, you know, apparently not.
5    Q.  But you do have a comment that based on
6        seniority you ought to be promoted?
7    A.  Yes, sir.
8    Q.  Would you have been promoted to lieutenant if
9        the City had used seniority as the guide stick
10       back in 1996?  Did you have the most seniority
11       of anybody that applied to be a lieutenant or
12       was eligible to be a lieutenant in 1996?
13   A.  Not in 1996.
14   Q.  You wouldn't have been promoted.
15   A.  Not in 1996.
16   Q.  And do you have -- I don't care if you want to
17       call it, evidence, hearsay, knowledge --
18       anything that you say that supports your
19       contention that the City implemented a written
20       test to discriminate against black applicants on
21       the basis of their race?  Anything?  Anybody
22       ever said anything, any hearsay, anything you've
23       seen, any documents, anything that would support

Page 248

1    that contention?
2                MR. HORSLEY:  Asked and answered, but
3            go ahead and answer it again.
4    A.  Over a time span of ten years, I have not seen a
5        black man or woman or African-American hired or
6        promoted.
7    Q.  Under any procedure?  Under any procedure?  Is
8        that your testimony?
9    A.  Under any procedure what?
10   Q.  Whether it was a written test or not written
11       test?
12   A.  No, I haven't.
13   Q.  Well, then, what is there?  What facts, what
14       evidence, hearsay, anything, would make you say
15       the City implemented a written test to
16       discriminate against you on the basis of your
17       race?
18               MR. HORSLEY:  Asked and answered.  Go
19           ahead.
20   A.  Basically nobody never been hired or promoted.
21       That's it.
22   Q.  That's it?
23   A.  Yes, sir.

Page 249

```
1      MR. MORGAN:  That's it.
2      (Deposition concluded at
3          approximately 4:00 p.m.)
4      * * * * * * * * * * * *
5      FURTHER DEPONENT SAITH NOT
6      * * * * * * * * * * * *
7
8      REPORTER'S CERTIFICATE
9  STATE OF ALABAMA:
10  MONTGOMERY COUNTY:
11      I, Pamela A. Wilbanks, CCR, Registered
12  Professional Reporter, and Commissioner for the State
13  of Alabama at Large, do hereby certify that I reported
14  the deposition of:
15      GERALD STEPHENS
16  who was first duly sworn by me to speak the truth, the
17  whole truth and nothing but the truth, in the matter
18  of:
19      EDDIE OGLETREE, an individual,
20      GERALD STEPHENS, an
21  individual,
22      Plaintiffs,
23      Vs.
```

Page 251

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Pamela A. Wilbanks, ACCR #334
Expiration Date:  9-30-2008
Registered Professional Reporter
and Commissioner for the State
of Alabama at Large

Page 250

```
1      In The State of Alabama, LARRY
2  LANGLEY, and individual, LEE LAMAR,
3  an individual, BILL HAM, JR., an
4  individual, STEVEN A. REEVES, an
5  individual, BILL JAMES, an
6  individual, CHARLES M. DUGGAN, an
7  individual, and CORTEZ LAWRENCE,
8  an individual,
9      Defendants.
10      In The U.S. District Court
11      For the Middle District of Alabama
12      Eastern Division
13      3:07-CV-867-WKW
14  on Friday, May 30, 2008.
15      The foregoing 249 computer printed pages
16  contain a true and correct transcript of the
17  examination of said witness by counsel for the parties
18  set out herein.  The reading and signing of same is
19  hereby waived.
20      I further certify that I am neither of kin nor
21  of counsel to the parties to said cause nor in any
22  manner interested in the results thereof.
23      This 13th day of June 2008.
```

# DEPOSITION TESTIMONY OF
# STEPHEN REEVES

ORIGINAL

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4

5  EDDIE OGLETREE, an individual,
   GERALD STEPHENS, an
6  individual,

7          Plaintiffs,

8  Vs.                              CIVIL ACTION NO.
                                    3:07-CV-867-WKW
9

10 CITY OF AUBURN, a municipality
   in the State of Alabama, LARRY
   LANGLEY, an individual, LEE LAMAR,
11 an individual, BILL HAM, JR., an
   individual, STEVEN A. REEVES, an
12 individual, BILL JAMES, an
   individual, CHARLES M. DUGGAN, an
13 individual, and CORTEZ LAWRENCE,
   an individual,

14

          Defendants
15
                    * * * * * * * * * * *
16

17         **DEPOSITION OF STEVEN A. REEVES**, taken pursuant

18  to stipulation and agreement before Pamela A. Wilbanks,

19  Certified Court Reporter, ACCR# 391, Registered

20  Professional Reporter and Commissioner for the State of

21  Alabama at Large, in the Conference Room of Auburn City

22  Hall, 144 Tichenor, Auburn, Alabama, on Wednesday, July

23  30, 2008, commencing at approximately 9:15 a.m.

2

1

2                                   **APPEARANCES**

3

4   **FOR THE PLAINTIFF:**

5   Mr. Richard F. Horsley
    KING, HORSLEY & LYONS
6   Attorneys at Law
    1 Metroplex Drive
7   Suite 280
    Birmingham, AL  35209
8
    **FOR THE DEFENDANT:**
9
    Mr. Randall Morgan
10  HILL, HILL, CARTER, FRANCO, COLE & BLACK
    Attorneys at Law
11  425 South Perry Street
    Montgomery, Alabama
12
    **FOR CWH:**
13
    Mr. William K. Hancock
14  ADAMS & REESE
    Attorneys at Law
15  Suite 1100
    2100 Third Avenue North
16  Birmingham, AL  35203

17  **ALSO PRESENT:**

18  Mr. D'Arcy Wernette
    Mr. Bill James
19  Mr. Larry Langley
    Mr. Lee Lamar
20  Mr. Eddie Ogletree
    Mr. Gerald Stephens
21

22

23

3

EXAMINATION INDEX

BY MR. HORSLEY  . . . . . . . . . . . .    5
BY MR. HANCOCK  . . . . . . . . . . . .  115
BY MR. HORSLEY  . . . . . . . . . . . .  123

\* \* \* \* \* \* \* \* \* \* \* \*

PLAINTIFFS' EXHIBIT INDEX

1    Letter of agreement between the City of
     Auburn and CWH Research, Inc.                     14

2    Copy of Orientation Manual
                                                       18

3    Order Approving Settlement Agreement
                                                       32

4    4/4/96 letter to Gerald Stephens from
     Ronnie Blankenship concerning his promotion       36
     to lieutenant

5    Series of e-mails
                                                       65

6    City of Auburn Pay Table Beginning October
     1, 2005                                           110

7    Proposed Modification of the Fire
     Lieutenant Promotional Process signed by          58
     Chris Turner

8    Proposed Modification of the Fire
     Lieutenant Promotional Process signed by          58
     Gerald Stephens

9    City of Auburn Personnel Policies
                                                       78

10   Notice of Right to Sue letter to Mr.
     Ogletree and determination                       111

11   Notice of Right to Sue letter to Mr.
     Stephens and determination                       111

12   Defendant Steven Reeves' Responses to
     Plaintiffs' First Set of Interrogatories         113

4

1    **STIPULATION**

2         It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of **STEVEN A. REEVES** is taken pursuant to the

5    Alabama Rules of Civil Procedure and that said

6    deposition may be taken before Pamela A. Wilbanks,

7    Registered Professional Reporter and Commissioner for

8    the State of Alabama at Large, without the formality of

9    a commission, that objections to questions other than

10   objections as to the form of the question need not be

11   made at this time but may be reserved for a ruling at

12   such time as the said deposition may be offered in

13   evidence or used for any other purpose by either party

14   provided for by the Statute.

15        It is further stipulated and agreed by and

16   between counsel representing the parties in this case

17   that the filing of said deposition is hereby waived and

18   may be introduced at the trial of this case or used in

19   any other manner by either party hereto provided for by

20   the Statute regardless of the waiving of the filing of

21   the same.

22        It is further stipulated and agreed by and

23   between the parties hereto and the witness that the

5

1  signature of the witness to this deposition is hereby

2  not waived.

3              * * * * * * * * * * * *

4                  **STEVEN A. REEVES**

5        The witness, after having first been duly sworn

6  to speak the truth, the whole truth and nothing but the

7  truth testified as follows:

8                   **EXAMINATION**

9  BY MR. HORSLEY:

10   Q.    Please tell us your full name.

11   A.    Steven Anderson Reeves.

12   Q.    Mr. Reeves, my name is Richard Horsley.  We've

13         met a couple of times before.  I'm going to ask

14         you some questions today related to the lawsuit

15         that's been filed by Mr. Ogletree and

16         Mr. Stephens.

17              If you don't understand what I'm asking you,

18         please ask me to repeat the question or rephrase

19         it so that you understand it.  Once you answer a

20         question, I'm going to assume that you

21         understood it and that you're giving the answer

22         you intended to give.  Okay?

23   A.    Okay.

6

1    Q.    Where do you currently reside?

2    A.    1071 Terrace Acres Drive, Auburn.

3    Q.    And where are you currently employed?

4    A.    City of Auburn.

5    Q.    In what capacity?

6    A.    I'm the human resources director.

7    Q.    And how long have you been the human resources

8          director with the City of Auburn?

9    A.    Since 1994 -- 1993.

10   Q.    1993?

11   A.    Yes, sir.

12   Q.    Before '93 where were you employed?

13   A.    City of Auburn.

14   Q.    In what capacity?

15   A.    Risk manager.

16   Q.    Risk manager?

17         How long did you hold that job?

18   A.    Six years.

19   Q.    And before that where were you employed?

20   A.    Auburn University.

21   Q.    And in what capacity?

22   A.    Faculty member.

23   Q.    What type of faculty member?

7

1    A.    I was a research associate.

2    Q.    How long did you hold that job?

3    A.    About nine months.

4    Q.    Before that where were you employed?

5    A.    Auburn University.

6    Q.    In what capacity?

7    A.    Graduate student.

8    Q.    Before that you were a student --

9    A.    Yes.

10   Q.    -- at Auburn?

11         So the jobs you have held since you

12   graduated from Auburn University would be with

13   Auburn University and with the City of Auburn

14   and that's it, correct?

15   A.    Correct.

16   Q.    Do you have relatives -- I'm assuming you do

17   have relatives that live in Lee County.

18   A.    I do.

19   Q.    Is it a lot or is it just a few?

20   A.    A few.

21   Q.    Can you tell me who they are?

22   A.    Starting with immediate family, my wife Jane,

23   two children.

8

1    Q.    They are not over 18 years of age, are they?

2    A.    One is 18.

3    Q.    What is his or her name?

4    A.    Danielle.

5    Q.    Who else?

6    A.    Sister-in-law, Susan McChesney.  Sister-in-law,

7    Ann May.

8    Q.    What are their husbands' names?

9    A.    Susan is not married and Ann is widowed.

10    Q.    Who else?

11    A.    Do you want Ann's children?

12    Q.    Not unless they are over 18.

13    A.    Okay.  Rem May.  Remmington May.

14    Q.    Is that it?

15    A.    I think so.

16    Q.    Do you have any relatives in Russell, Chambers,

17    Montgomery, Lowndes, or Macon County?

18    A.    No.

19    Q.    Other than that I'm not going -- I'm going to

20    try to get straight into the issues in this case

21    because we don't have a lot of time.  We're

22    going to take four depositions today so I'm

23    going to jump straight into the issues.

9

1          Tell me generally what your job duties are

2     as the human resources director for the City of

3     Auburn.

4   A.   Generally I coordinate compensation and

5     benefits, employee relations, risk management

6     and safety, employee training and development.

7   Q.   Do you participate in any way in the promotion

8     practices of the City of Auburn?

9   A.   Yes.

10  Q.   In what capacity?

11  A.   I serve as a resource.  I will do research as

12    necessary.

13  Q.   Do you actually participate in decision-making

14    with regard to promotions with City of Auburn

15    employees?

16  A.   Only within my department.

17  Q.   You don't participate in the decisions to

18    promote or not promote City of Auburn

19    firefighters; is that correct?

20  A.   I have not.

21  Q.   You have not ever?

22  A.   I have not.

23  Q.   Are you in charge of implementing policies and

10

1          procedures with regard to the promotional

2          practices of the City of Auburn?

3     A.   Yes.

4     Q.   Is anybody else in charge of that or is that

5          your sole -- or are you the only person that is,

6          in fact, in charge of that?

7     A.   Each department head is charged with complying

8          with the personnel policies as they pertain to

9          promotions.

10    Q.   But you as the human resources director are in

11         charge of enforcing the promotional policies and

12         procedures throughout the City of Auburn.  Is

13         that a fair statement?

14              MR. MORGAN:  Object to the form.

15    A.   No.

16    Q.   So it's just within your department; is that

17         correct?

18    A.   I make recommendations regarding promotions

19         within my department.

20    Q.   Let's say from February until June of 2006, who

21         would have been in charge of promotions at the

22         City of Auburn Fire Division?

23    A.   The city manager.

11

1  Q.  And what was his name?  What is his name?

2  A.  Can you give me the dates again?

3  Q.  Yeah.  From February of '06 until June of '06.

4  A.  Well, from February 10 or February 11, '06 -- I

5      think I've got this date right.  From February

6      11, '06, it would have been the current city

7      manager.

8  Q.  Who is ...

9  A.  Charles M. Duggan, Jr.

10                  MR. HORSLEY:  Off the record for a

11             minute.

12             (Brief off-the-record discussion.)

13  Q.  Charles Duggan was the city manager from

14      February 11 of '06 until when?

15  A.  He's currently the city manager.

16  Q.  So he would have been the city manager in May of

17      '06, correct?

18  A.  Correct.

19  Q.  And you just testified that he was -- he would

20      have been the person in charge of promotions at

21      the City of Auburn Fire Division; is that

22      correct?

23                  MR. MORGAN:  Object to the form.

12

1    A.    Ultimately, yes.

2    Q.    When you say ultimately, I'm assuming that there

3          are other individuals that would have also been

4          involved in the promotion of firefighters within

5          the City of Auburn Fire Division; is that

6          correct?

7    A.    Correct.

8    Q.    And, again, concentrating on the time from

9          February of '06 through June of '06, who at the

10         City of Auburn Fire Division would have been in

11         the decision-making process to promote

12         firefighters?

13   A.    Bill James.

14   Q.    And he is the public safety director; is that

15         correct?

16   A.    That's correct.

17   Q.    Still?

18   A.    Still.

19   Q.    Who else?

20   A.    Lee Lamar.

21   Q.    What's Mr. Lamar's position?

22   A.    Currently he's the fire chief.

23   Q.    In May of '06, what was his position with the

13

1          City of Auburn?

2    A.    Deputy fire chief.

3    Q.    Who was the fire chief at that time?

4    A.    Larry Langley.

5    Q.    Bill James, Lee Lamar.  Who else would have been

6          involved in the decision to promote firefighters

7          at the City of Auburn?

8    A.    I believe that's all.

9    Q.    That's it?

10         And I may be wrong about this, but would

11         Bill James and Larry Langley recommend

12         firefighters for promotion and then Charles

13         Duggan would have the ultimate say in whether or

14         not those people were actually promoted?

15   A.    Correct.

16   Q.    Do you know back in May of 2006 whether or not

17         Mr. Duggan had to approve every promotion or, if

18         there was a dispute about a promotion, he would

19         have the ultimate say?

20   A.    He has to approve.

21   Q.    He has to approve every promotion; is that

22         correct?

23   A.    Every promotion, yes.

14

1   Q.   Tell me what, if any, participation you had in

2        the battalion chief promotion that occurred in

3        May of 2006.

4   A.   I helped identify the firm that would guide us

5        through that process.  I helped put together a

6        contract to employ that firm.  I participated in

7        the discussions about the process.  I helped

8        facilitate the interactions between the firm and

9        the City.

10          (Plaintiff's Exhibit 1 marked for

11             identification.)

12   Q.   What I'm going to mark as Plaintiff's Exhibit

13        Number 1 is a letter of agreement that appears

14        to be between the City of Auburn and the CWH

15        Research, Inc.  Is that the agreement or the

16        contract that you spoke about just a moment ago

17        between the research company and the City of

18        Auburn?

19   A.   This appears to be the agreement.

20   Q.   And how did you go about finding this company?

21   A.   This company was recommended to me by a lady

22        named Kathleen Robinson.

23   Q.   Who is she?

15

1    A.    Kathleen Robinson was the individual who

2          formerly did promotion processes for the ranks

3          of lieutenant and captain for the City of

4          Auburn.

5    Q.    What was your understanding of what this company

6          was supposed to do with regard to the battalion

7          chief promotion in May of 2006?

8    A.    They were to develop a job-related neutral

9          selection process for us to use to make

10         promotions to the rank of battalion chief.

11   Q.    Had the City of Auburn ever done any contract

12         work with this firm before?

13   A.    No.

14   Q.    You're not testifying that this company, CWH, is

15         an outside assessment center, are you?

16   A.    I ...

17   Q.    Do you know what an assessment center is?

18   A.    I know what an assessment center is.

19   Q.    This company is not an assessment center, are

20         they?

21                MR. MORGAN:  Object to the form.

22   A.    An assessment center is not a brick-and-mortar

23         structure.

16

```
 1   Q.    Right.

 2              Well, are you familiar with the 1991

 3         settlement order in the McCormick case?

 4                        MR. MORGAN:  Object to the form.  In

 5                    the what case?

 6                        MR. HORSLEY:  I got the name wrong.

 7                    Hammock case.

 8                        MR. MORGAN:  Object to the form.

 9   A.    Yes.

10   Q.    You're familiar with the order approving a

11        settlement agreement that requires an assessment

12        center for certain promotions within the Auburn

13        City Fire Division?

14   A.    I am.

15   Q.    Is it your testimony that Plaintiff's Exhibit

16        Number 1 qualifies as an assessment center

17        pursuant to that order?

18   A.    No.

19   Q.    Is it your testimony that this company -- that

20        the hiring of this company qualifies as an

21        assessment center pursuant to the order in the

22        Hammock case?

23                        MR. MORGAN:  Object to the form.
```

17

1   A.   No.

2   Q.   Is it true that this company, CWH, was hired to

3         administer a written test that anyone applying

4         for the battalion chief promotion had to take?

5         Is that correct?

6   A.   They developed a neutral job-related process for

7         us to use in making a promotion decision.

8   Q.   Other than administering the written test that

9         was taken by all the battalion chief applicants,

10        what else did they do to participate in the

11        battalion chief promotion process?

12   A.   They recommended and developed a series of

13        exercises to help determine who was the best

14        candidate for the promotion.

15   Q.   Was that provided to the City in some written

16        form?

17   A.   The exercises?

18   Q.   Yes, sir.

19   A.   Yes.

20   Q.   Do you know if the City of Auburn still has that

21        document that details the exercises?

22   A.   In one form, yes.

23   Q.   What do you mean in one form?

18

1    A.    Well, the orientation manual is one form.

2    Q.    What other form do y'all have it in writing?

3    A.    There was a report -- Well, I think the

4          Candidate Feedback Reports provided some

5          information about it.  There was a final report

6          about the overall process that provided details

7          about it.

8    Q.    Is the orientation manual that you just

9          testified about -- Is Plaintiff's Exhibit Number

10         2 a copy of that orientation manual?

11                   (Plaintiff's Exhibit 2 marked for

12                        identification.)

13   A.    It appears to be at least part of it.

14   Q.    Part of it?  What else --

15   A.    I can't tell.

16   Q.    Your testimony is Plaintiff's Exhibit 2 is part

17         of the orientation manual submitted by CWH; is

18         that correct?

19   A.    It appears to be.

20   Q.    Does the City of Auburn to your knowledge still

21         have the actual test that was administered to

22         the battalion chief applicants?

23   A.    We don't.

19

1    Q.    What happened to that test?

2    A.    The test was returned to CWH.

3    Q.    You said earlier that you spoke with an

4          individual about hiring CWH.  Tell me what

5          happened that participated your seeing the need

6          to hire a company such as CWH to get involved in

7          the battalion chief promotion.

8    A.    The settlement agreement in 1991 called for a

9          process utilizing outside assessors and a

10        consultant.  Kathleen Robinson was the person

11        that did that for us.  She retired.

12    Q.    Robinson?

13    A.    Yes.

14    Q.    And she's the one who you consulted with in

15        hiring CWH, correct?

16    A.    I asked her if she was available to do this

17        work, and she said she was retiring and

18        recommended CWH to me.

19    Q.    Had the City of Auburn to your knowledge used a

20        company like CWH to perform some type of written

21        test or assessment center prior to the battalion

22        chief promotion in May of 2006?

23    A.    Like CWH?

20

1    Q.    Well, let me rephrase the question.

2          Had the City of Auburn used an outside

3    assessment center for any promotion within the

4    fire division since the 1991 settlement order?

5    A.    Yes.

6    Q.    And what promotions did it use an assessment

7    center for?

8    A.    I believe there was a 1994 captains promotion

9    and a 1996 lieutenant and captains promotion.

10   Q.    If you can, describe the assessment center that

11   was used for those two promotions.

12   A.    To my knowledge it involved a conglomeration of

13   exercises -- job-related exercises.

14   Q.    And it was formulated by whom?

15   A.    Kathleen Robinson.

16   Q.    And I guess what I'm asking you to do for my

17   education is define what you believe an outside

18   assessment center to be.

19   A.    An assessment center -- An outside assessment

20   center would consist of a conglomeration of

21   devices used -- job-related devices used to

22   determine who the best candidates were for a

23   promotion.

21

1    Q.    And by outside assessment center, does that mean

2          someone or some company has to implement those

3          processes that is not employed or has any

4          connection with the City of Auburn?

5    A.    I think that's a fair statement.

6    Q.    And you said that Kathleen Robinson was in

7          charge of that for the City of Auburn for a

8          period of time, correct?

9    A.    Correct.

10   Q.    Was she employed by the City of Auburn?

11   A.    No.  She was contracted by the City of Auburn.

12   Q.    What was Kathleen Robinson's job to your

13         knowledge?

14   A.    Professionally?

15   Q.    Yeah.

16   A.    I recall she was involved in testing services at

17         either Cobb County or DeKalb County in the

18         Atlanta metro area.

19   Q.    So she lives in the Atlanta metro area or did

20         live in the Atlanta Metro ...

21   A.    I assume that's where she lived.

22   Q.    Do you know who actually made the decision to

23         hire Kathleen Robinson to implement the outside

22

1        assessment center?

2   A.   The lawyers involved in the original litigation.

3   Q.   The original Clinton Hammock litigation?

4   A.   Correct.

5   Q.   Do you know if she still lives in the Atlanta

6        metro area?

7   A.   I don't know.

8   Q.   Does she have a company name to your knowledge?

9   A.   I don't know.

10  Q.   You don't know if there's some -- if she's

11       incorporated under some other name?

12  A.   I haven't had any further contact with her.

13  Q.   It's your testimony that she developed the

14       outside assessment center for the 1994 captains

15       promotion and the 1996 lieutenant promotion; is

16       that correct?

17  A.   That's my understanding.

18  Q.   Is it also your understanding that pursuant to

19       either of those promotions or pursuant to

20       neither of those promotions there was a written

21       test given to the applicants with a cutoff

22       score; is that correct?

23  A.   I don't recall there was a written test.

23

1    Q.    You don't recall if there was a written test?

2    A.    Right.

3    Q.    Are you saying there may have been and you don't

4          recall?

5    A.    I don't -- I was not directly involved in that

6          process.

7    Q.    With regard to the battalion chief promotion in

8          May of 2006, who at the City of Auburn decided

9          that there was going to be a written test with a

10         cutoff score as a factor in the promotion?

11   A.    It was a collective decision made by me, the

12         public safety director, the deputy fire chief,

13         and CWH.

14   Q.    And at that time the deputy fire chief was Lee

15         Lamar?

16   A.    Correct.  And the fire chief.

17   Q.    Who was Langley?

18   A.    Right.

19               And CWH.

20   Q.    And CWH.

21               So for the battalion chief promotion, is it

22         your testimony that you, the public safety

23         director, the deputy fire chief, the chief got

24

1    together and decided that there needed to be an

2    outside assessment center for this promotion,

3    and you contacted Kathleen Robinson?  She had

4    retired and told you you needed to contact CWH?

5    Is that the chronology of how it occurred?

6  A.    Yes.

7  Q.    And then the individuals I just named, along

8    with you, got with CWH, and that group made the

9    decision that a test with a cutoff score was

10    going to be given; is that correct?

11  A.    That's correct.

12  Q.    Were you personally involved in meetings with

13    CWH, Langley, Lamar, the safety director where

14    y'all discussed with CWH that a test needed to

15    be given with a cutoff score?

16  A.    Yes.

17  Q.    Is it your testimony that the City of Auburn had

18    not made that decision before it contracted with

19    CWH about the test or the cutoff score?

20  A.    Could you repeat the question?

21  Q.    Yeah.

22       Did you, the public safety director, Lamar,

23    and Langley make the decision that there needed

1     to be a test with a cutoff score given prior to

2     the time y'all contracted with CWH?

3  A.   No.

4  Q.   Do you recall the individual's name that y'all

5     were dealing with at CWH?

6  A.   Primarily Michael Blair.

7  Q.   Do you independently recall as you sit here

8     today meetings with those individuals and

9     Mr. Blair where the decision was made that a

10    test was going to be given for the battalion

11    chief promotion with a cutoff score?

12  A.   Yes.

13  Q.   Do you recall who actually first recommended

14    that that test be given?

15  A.   The CWH process incorporates a testing option.

16    Through our discussions it was determined that

17    giving a test was a good way to evaluate the

18    subject matter expertise of the candidates in

19    the area of fire prevention.

20  Q.   Did Mr. Blair, the CWH representative, recommend

21    that a test be given or did he say that that was

22    a necessary part of CWH's involvement in this

23    process?

26

1              MR. HANCOCK:  Object to the form.

2    A.   As I said, the CWH process incorporated an

3         option to have a test.

4    Q.   It wasn't a requirement; it was an option; is

5         that correct?

6    A.   It was an option, correct.

7    Q.   And was it at the City's discretion -- Was it at

8         the City's discretion to give or not give the

9         test with a cutoff score?

10   A.   Yes.

11             MR. MORGAN:  Object to the form.

12   Q.   It was?

13        Do you recall whether or not Lee Lamar

14        suggested that a cutoff score of 70 is something

15        that he would prefer during those meetings?

16   A.   Our discussions included the use of a cutoff

17        score of 70 percent.

18   Q.   Do you recall specifically who suggested the

19        cutoff score of 70?

20   A.   Who first voiced that, I don't know.

21   Q.   You don't recall if it was Lee Lamar?

22   A.   I know Lee Lamar stated that 70 percent was the

23        common cutoff score used in the fire service.

27

1    If people went to the fire college and they took

2    a test, there was a 70 percent cutoff.  I

3    understand at the National Fire Academy, some of

4    the courses there have a 70 percent cutoff.  Our

5    practice in other testing procedures in the City

6    of Auburn had been to use a 70 percent cutoff.

7    We saw it as something consistent and also in

8    keeping with tradition in the fire service.

9  Q.  Am I correct in saying that the City of Auburn

10   representatives during these meetings were the

11   individuals who suggested the 70 cutoff score

12   rather than the CWH representative?

13        MR. MORGAN:  Object to the form.

14  A.  I don't know if CWH said you can use a cutoff

15   score or if we said we want to use a cutoff

16   score.  It was --

17  Q.  You don't recall?

18  A.  No, I don't.

19  Q.  Are you aware that CWH pursuant to administering

20   this test required that there be a cutoff score?

21  A.  No.  I think that was our choice.

22  Q.  That was your choice?  The City of Auburn's

23   choice?

28

1   A.   It was our, as you stated, discretion.

2   Q.   During those meetings about the test, am I

3        correct that the City of Auburn made the

4        decision to implement that test as the first

5        factor in the battalion chief promotion with a

6        cutoff score, meaning that if you did not meet

7        the cutoff score, you could not progress further

8        in the battalion chief promotion process?

9   A.   Would you repeat the question?

10  Q.   Yeah.

11       Is it true that the -- Isn't it true that

12       the City of Auburn made the decision that the

13       test with a cutoff score was the initial factor

14       in whether an applicant proceeded through the

15       rest of the process?

16  A.   Again, this was a decision made collectively in

17       consultation with CWH.  Had the City said we

18       don't want to use a cutoff score, I don't think

19       CWH would have argued with us.

20  Q.   CWH didn't care one way or the other whether or

21       not the City used a cutoff score or whether the

22       test was a deciding factor if someone got to

23       progress through the process, did they?

1                    MR. MORGAN:  Object to the form.

2    A.    I'm not sure I'd go that far.

3    Q.    Well, CWH was hired as a consulting firm to

4          administer a test; is that correct?

5    A.    They were designed to --

6                    MR. MORGAN:  Object to the form.

7    A.    -- hired to design and provide consulting

8          services to the City so that we had a fair

9          promotional process.

10   Q.    And if the City had decided that the test would

11         be administered by CWH and that there would not

12         be a cutoff score and that the test would simply

13         be part of a cumulative process for the

14         battalion chief promotion, CWH to your knowledge

15         wouldn't have objected to that; is that correct?

16                   MR. MORGAN:  Object to the form.

17   A.    I think they would have allowed us to do that.

18   Q.    They would have allowed you to do that?

19   A.    (Witness nods head positively.)

20   Q.    You've got to answer out loud.

21              They would have allowed you to do that,

22         correct?

23   A.    Yes.

30

1    Q.    My point is:  The City of Auburn had the

2          discretion as to how the test and the cutoff

3          score would be implemented into the promotional

4          process.  Is that a fair statement?

5    A.    Yes.

6    Q.    CWH didn't make that decision, did they?

7                    MR. MORGAN:  He's answered that about

8                    five times.

9    Q.    CWH didn't make that decision, did they?

10                   MR. MORGAN:  Object to the form.

11   A.    It was a collective decision, but ultimately it

12         was the City's discretion to --

13   Q.    Well, if the City had the ultimate discretion,

14         then CWH didn't have any discretion to decide

15         how that test would play a part in the

16         promotional process, did they?

17                   MR. MORGAN:  Object to the form.

18   A.    We certainly listened carefully to their advice.

19   Q.    They could make recommendations but they could

20         not make decisions; is that correct?

21   A.    Correct.

22   Q.    Do you recall -- I may have asked this

23         question.  I simply can't remember.

1          Do you recall if CWH recommended that the

2     test be the deciding factor -- the test with a

3     cutoff score be the deciding factor as to

4     whether or not an applicant proceeded through

5     the battalion chief promotional process?

6     A.   Again, this was a collective decision made in

7     discussion with CWH.

8     Q.   And if CWH is going to say that Lee Lamar

9     suggested the 70 cutoff score, you don't have

10     anything to dispute that, do you?

11     A.   No.

12     Q.   Tell me why you and the public safety director

13     and Lee Lamar and Langley decided that CWH

14     needed to be hired in order to conduct the

15     outside assessment center if the City of Auburn

16     at that time in May of 2006 -- Well, the test

17     was given before then.  Let's just say between

18     February and May of 2006.  Let me start over.

19          Why did you and the public safety director,

20     Lee Lamar, and Langley decide during that time

21     period from February through May of 2006 that an

22     outside assessment center needed to take place

23     pursuant to the battalion chief promotion if the

32

1    City was under the impression that the 1991

2    order had expired?

3            MR. MORGAN:   Object to the form.

4    Q.   When I speak of the 1991 order -- Let's go ahead

5    and mark it and we'll talk about it in detail in

6    a little while.

7        But you're familiar with the Clinton Hammock

8    order approving the settlement agreement,

9    correct?

10   A.   I am.

11            (Plaintiff's Exhibit 3 marked for

12                identification.)

13   Q.   And that's the document that required the City

14   of Auburn to conduct an outside assessment

15   center back then for any captain promotion or

16   any lieutenant promotion, correct?

17   A.   Correct.

18   Q.   Tell me, then, if the City believed that that

19   order had either expired or that the court no

20   longer had jurisdiction over the City of

21   Auburn's promotional practices, why did you and

22   these other gentlemen feel that an assessment

23   center was necessary for this promotion?

33

1          MR. MORGAN:  Object to the form.

2    A.    I think -- I won't speculate.  We had

3          considered the -- if the order approving

4          settlement was still in effect with counsel

5          narrowly construed to the issue of the matter of

6          reclassifying team leaders to lieutenant.  We

7          came to a point where we needed to make a

8          promotion to fill some vacant positions at the

9          battalion chief level.  We felt that the best

10         course of action -- since we had not gone

11         through a process as we had with the team leader

12         to lieutenant reclassification, the best course

13         of action was to follow what was stipulated in

14         the assessment center or -- I'm sorry -- in the

15         settlement agreement from 1991.

16   Q.    Have you read the order approving settlement

17         agreement marked as Plaintiff's Exhibit 3?

18   A.    I have.

19   Q.    Have you read it in preparation for this

20         deposition?

21   A.    I have.

22   Q.    Do you know of anywhere in that order where it

23         states that a written test with a cutoff score

34

1       is required to be a part of the assessment

2       center?

3   A.  It does not specifically say that.

4   Q.  Again, I'm not sure I followed you when you were

5       talking about the lieutenant or the team leader

6       reclassification to lieutenant.  I think you

7       said that during that process --

8           Well, tell me what you said.  I don't want

9       to mischaracterize your testimony.  Tell me

10      again why an assessment center -- why the court

11      order was not followed pursuant to the team

12      leader to lieutenant reclassification.

13          MR. MORGAN:  Object to the form.

14  Q.  You'll agree with me that the order approving

15      settlement agreement was not complied with

16      pursuant to the February 1, 2006

17      reclassification of team leaders to lieutenants;

18      is that correct?

19          MR. MORGAN:  Object to the form.

20  Q.  Will you agree with me on that?

21  A.  I would agree that we did some research with

22      legal counsel, and it was determined that the

23      settlement agreement was no longer in force.

35

 1      And at that point, based on a petition from team

 2      leaders, based on the interest of stimulating

 3      morale in the department, based on

 4      considerations of the cost of conducting

 5      assessment centers, we determined that changing

 6      the job title of equal -- of a position that

 7      had -- that was equal to lieutenant was an

 8      appropriate thing to do.

 9  Q.  So are you testifying that a firefighter or a

10      City of Auburn Fire Division employee that

11      moved -- prior to February 1 of 2006, before

12      that time, a firefighter that moved from team

13      leader to lieutenant was not considered to be a

14      promotion?

15  A.  It was not a promotion.

16  Q.  It was not a promotion?

17  A.  No.

18  Q.  Is that correct?

19  A.  Correct.

20  Q.  When Lieutenant Stevens went from team leader to

21      lieutenant in 1996, was that not a promotion?

22          MR. MORGAN:  Object to the form.

23  A.  No.

36

1   Q.   It was not?

2        You've already testified that during that

3        process, an outside assessment center was used,

4        correct?

5   A.   It was.

6                (Plaintiff's Exhibit 4 marked for

7                    identification.)

8   Q.   I'll show what you I've marked as Plaintiff's

9        Exhibit Number 4.

10               MR. MORGAN:  Was he a team leader?

11               MR. HORSLEY:  Well, hold on.

12  Q.   When was the team leader position started at the

13       City of Auburn Fire Division?

14  A.   I think it was started sometime in 1989 or 1990.

15  Q.   In 1996 when Gerald Stephens was promoted to

16       lieutenant --

17       I'm going to show you what's marked as

18       Plaintiff's Exhibit Number 4.  Have you ever

19       seen that letter?

20  A.   I've seen a copy of this.

21  Q.   Is it your understanding that he was promoted

22       from the team leader position or from the

23       firefighter position to lieutenant?

1    A.    I understand he was a firefighter.

2    Q.    Why did he not have to be promoted to team

3          leader before being promoted to lieutenant back

4          in 1996?

5                    MR. MORGAN:   Object to the form.

6    A.    I'm sorry.  Repeat the question.

7    Q.    Yes.

8               Why was he not required to be promoted to

9          team leader before being promoted to lieutenant

10         back in 1996?

11   A.    To my knowledge he didn't apply for team leader.

12   Q.    Well, my question is:  You're saying that team

13         leader and lieutenant were the exact same

14         position before February 1 of 2006, correct?

15   A.    Correct.

16   Q.    Then why do they have different names?

17   A.    One was -- One evolved out of the court-ordered

18         settlement and one evolved out of traditional

19         rank structure in the fire service.

20   Q.    Which one evolved out of the court-ordered

21         settlement?

22   A.    Team leader.

23   Q.    And is there a pay differential between -- Was

38

1        there a pay differential between the job of team

2        leader and lieutenant before February 1 of 2006?

3  A.  No.

4  Q.  None?

5  A.  None.

6  Q.  All team leaders and all lieutenants made the

7        exact same wage.  Is that your testimony?

8  A.  Yes.  They were paid in the same pay grade.

9  Q.  What about bars?  Do firemen at the City of

10       Auburn have pins that they wear that have a

11       certain number of bars on them?

12 A.  I'm aware that there's some insignia that they

13       wear.

14 Q.  Is the insignia that the team leaders wore

15       before February 1 of '06 the same as the

16       lieutenants wore prior to that time?

17 A.  I don't know.

18 Q.  You don't know?

19 A.  (Witness nods head negatively.)

20 Q.  Do you know why all these team leaders wanted to

21       be reclassified as lieutenants if the job was

22       the same and they were making the same money?

23 A.  I think they stipulated that in their petition.

39

| 1 | Q. | What do you recall that stipulation to be? |
|---|---|---|

1   Q.   What do you recall that stipulation to be?

2   A.   I believe they said that team leader is not a

3        recognized title in the fire service.  When they

4        went to other training, they had to explain what

5        a team leader was.  When they went to other --

6        to assist other fire agencies, they had to

7        explain what their training was.  They preferred

8        to be called lieutenants because that was a

9        recognized, more traditional job title for a

10       company officer in the fire service.

11   Q.   So from their standpoint -- you would agree with

12       me from a convenience standpoint, it was an

13       actual promotion from team leader to lieutenant?

14   A.   I'm sorry?

15   Q.   From a convenience to the team leaders, it was a

16       promotion to go from team leader to lieutenant;

17       is that correct?

18              MR. MORGAN:  Object to the form.

19   A.   No.

20   Q.   And you don't know if the insignia had more bars

21       as a lieutenant than a team leader?

22   A.   I don't.

23   Q.   In February 1 of 2006, who were the lieutenants

40

1          in the Auburn Fire Division to your knowledge?

2     A.   Gerald Stephens.

3     Q.   He's the only one, correct?

4     A.   Yes.

5     Q.   He's an Afro-American, correct?

6     A.   He is.

7     Q.   Are you aware -- How long had he been the only

8          lieutenant in the Auburn Fire Division to your

9          knowledge?

10    A.   I don't know.

11    Q.   And he was appointed or promoted to lieutenant

12         back in 1996, correct?

13    A.   Correct.

14    Q.   Did you ever hear or have you heard of

15         dissatisfaction among the team leaders at that

16         time prior to February 1 of '06 that Gerald

17         Stephens was the only lieutenant in the

18         department?

19    A.   Can you repeat the question?

20    Q.   Yeah.

21              Did you ever hear or have you ever heard of

22         dissatisfaction or discontent among the team

23         leaders at that time prior to February 1 of '06

41

1      that Gerald Stephens was the only lieutenant in

2      the Auburn Fire Division?

3   A.  Not that I recall.

4   Q.  Have you ever heard of that?

5   A.  Not that I recall.

6   Q.  Is it your testimony that Gerald Stephens was

7      not a higher ranking employee of the City of

8      Auburn Fire Division prior to February 1 of '06

9      than the team leaders?

10  A.  I'm sorry.  Would you repeat that?

11  Q.  Is it your testimony that Gerald Stephens was

12      not a higher ranking Auburn Fire Division

13      employee prior to February 1 of '06 than were

14      the team leaders?

15  A.  That is my testimony.

16          MR. MORGAN:  Object to the form.

17  Q.  He was not a higher ranking employee?

18  A.  He was not.

19  Q.  I don't want to get into privileged information

20      between you and attorneys.  You said that you

21      consulted with legal counsel prior to the time

22      that you reclassified the team leaders to

23      lieutenants and decided that the court order had

42

1      expired or that it was no longer in force; is

2      that correct?

3   A.   Correct.

4   Q.   Who was your legal counsel at that time?

5   A.   The city attorney.

6   Q.   And was that Arnold Umbach?

7   A.   It is.

8   Q.   Anyone else that you or the City consulted with

9      in reaching the conclusion that the 1991 order

10      had expired or was no longer in force?

11  A.   Not directly.  I don't know if Arnold had --

12  Q.   Yeah.  What I'm saying is:  The City came to

13      that conclusion based on discussions with legal

14      counsel, Arnold Umbach, and that's the only way

15      the City came to that conclusion.  Is that a

16      correct statement?

17  A.   That's correct.

18  Q.   And, again, I don't want to know what Arnold

19      Umbach told you or anyone else, but do you have

20      knowledge as to why Arnold Umbach told the City

21      that the 1991 settlement agreement was no longer

22      in force?

23  A.   I do know what he told me.

43

| | |
|---|---|
| 1 | MR. HORSLEY:  Can I ask him that? |
| 2 | MR. MORGAN:  Yeah. |
| 3 | Q. What did he tell you? |
| 4 | A. He told us that -- he told me that -- |
| 5 | MR. MORGAN:  Let me say this. |
| 6 | We're -- |
| 7 | MR. HORSLEY:  You're not waiving any |
| 8 | privilege.  You're not waiving any |
| 9 | privilege. |
| 10 | MR. MORGAN:  Okay. |
| 11 | A. He told me that in the absence of a specific |
| 12 | termination date, all contracts have -- they |
| 13 | come to an end based on changing conditions, |
| 14 | changing situations, that he had learned that |
| 15 | the court did not retain jurisdiction of this |
| 16 | settlement and that basically this was a |
| 17 | contractual matter between the City and the |
| 18 | plaintiffs. |
| 19 | Q. Did he tell you when the court no longer |
| 20 | retained jurisdiction over this? |
| 21 | A. A point in time? |
| 22 | Q. Yeah. |
| 23 | A. No. |

44

1    Q.    Was it your understanding that after the court

2          signed off on the order that they essentially

3          lost jurisdiction over what was contained within

4          the order?  Is that your understanding?

5                  MR. MORGAN:  Object to the form.

6    A.    That's the information I received.

7    Q.    So the order was essentially ineffective the day

8          after it was signed?  Is that your testimony?

9                  MR. MORGAN:  Object to the form.

10   A.    No.

11   Q.    Well, what was your understanding of when that

12         order became ineffective or when the court lost

13         jurisdiction over the contents of that order?

14                 MR. MORGAN:  Object to the form.

15   A.    It's not something I really contemplated until

16         you just asked me this question.

17   Q.    You don't know -- don't have any knowledge over

18         a time -- a date and time when the court lost

19         jurisdiction over the 1991 order?  Is that your

20         testimony?

21                 MR. MORGAN:  Object to the form.

22   A.    Based on what I was told by the city attorney,

23         presumably they did not retain jurisdiction

45

1          after the settlement.

2    Q.    And that was my question a moment ago.  Your

3          belief today and upon discussing it with Arnold

4          Umbach was that essentially the United States

5          District Court for the Middle District of

6          Alabama Eastern Division lost jurisdiction over

7          the order that it entered in 1991 essentially

8          the day after it signed the order; is that

9          correct?

10             MR. MORGAN:  Object to the form.

11   Q.    I think that's what you said.

12   A.    Not being a lawyer, that's the way it appears.

13             MR. MORGAN:  Are you at a stopping

14                point?

15             MR. HORSLEY:  Yeah.  We can take a

16                break.  That's fine.

17             (Brief recess.)

18   Q.    (Continuing by Mr. Horsley)  I want to go back

19          for a moment to the distinction between the team

20          leader and lieutenant position prior to February

21          1 of 2006.  That's when that change became

22          effective, correct, when all the team leaders

23          became lieutenants?

46

1   A.   February 1.

2   Q.   February 1 of 2006?

3   A.   That's correct.

4   Q.   Isn't it true that prior to that time, the team

5        leader position was a temporary position?  It

6        was a full-time job but a temporary position; is

7        that correct?

8   A.   My recollection is that it started as a

9        temporary position and at some point since 1989

10       it became an assignment that didn't go away.

11  Q.   And weren't the team leaders in some respects

12       required to oversee the student firefighters?

13  A.   They did oversee student firefighters.

14  Q.   Was that a part of their job duties?

15  A.   A part of their job duties was to provide

16       front-line supervision -- first-line supervision

17       over fire suppression personnel.

18  Q.   Student firefighters?

19  A.   Student firefighters included, yeah.

20  Q.   Was that also a job task of the lieutenants

21       prior to February 1 of 2006?

22  A.   I believe lieutenants did oversee student

23       firefighters.  I don't -- That's my belief.

47

1   Q.   But wasn't the team leader position specifically

2        created in order to oversee the student

3        firefighters?

4   A.   I believe it was.

5   Q.   Was the lieutenant position ever specifically

6        created in order to oversee student

7        firefighters?

8   A.   The lieutenant position existed prior to the

9        creation of student firefighters.

10   Q.   It has never been the primary job task of a

11       lieutenant to oversee student firefighters; is

12       that correct?

13              MR. MORGAN:  Object to the form.

14   A.   Would you repeat that?

15   Q.   It has never been a primary job duty of a

16       lieutenant with the Auburn Fire Division to

17       oversee the student firefighters; is that

18       correct?

19              MR. MORGAN:  Object to the form.

20   A.   I can't agree with that.

21   Q.   You cannot agree with that?

22   A.   No.

23   Q.   Will you agree with me that the primary task of

48

1        a team leader was to oversee the student

2        firefighters?

3  A.    At one time.

4  Q.    When?

5  A.    The late '80s, early '90s.

6  Q.    So it's your testimony that in 2005, the team

7        leaders were no longer required to oversee the

8        student firefighters?

9  A.    I think they oversaw student firefighters and

10       also career firefighters.

11  Q.    And it's your testimony that their job duties

12       directly related to student firefighters were

13       exactly the same as the lieutenants' job duties

14       related to student firefighters; is that

15       correct?

16  A.    The job descriptions were identical.

17  Q.    With respect to student firefighters?

18  A.    With respect to supervising personnel.

19  Q.    Is your testimony that with respect to the

20       supervision of student firefighters, the job

21       duties of team leader and lieutenant were

22       exactly the same prior to February 1 of '06?

23           MR. MORGAN:  Object to the form.

49

1    A.    That's my belief.

2    Q.    The City decided through discussions with its

3          attorney that the outside assessment center was

4          no longer required because the 1991 court order

5          was no longer effective with regard to the team

6          leader reclassification to lieutenants in

7          February 1 of '06.  We've established that.

8                    MR. MORGAN:  Object to the form.

9    Q.    And it sounds to me like you were concerned

10         about that or the City was concerned about that

11         and actually consulted with its attorney before

12         it made that decision to reclassify team leaders

13         to lieutenants.  Is that a fair statement?

14   A.    Correct.

15   Q.    Why, then, were the battalion chief promotions

16         at the end of 2005 performed without an outside

17         assessment center?

18                   MR. MORGAN:  Do what?

19   A.    They were.

20   Q.    The battalion chief promotions in 2005 were?

21                   MR. MORGAN:  Object to the form.

22   A.    There wasn't a battalion chief promotion in

23         2005.

50

1    Q.    When was the last battalion chief promotion
2          before May of '06?
3    A.    1996.  But back then it was called captain or
4          shift commander.
5    Q.    Were Dean Garrett, Johnny Lawrence, Jimmy Brown,
6          and Danny Leverette not promoted to battalion
7          chief in 2004 or 2005 to your knowledge?
8    A.    They were not.
9    Q.    What is your understanding of their job status
10         in 2004 and '05?
11   A.    At some point during that period of time, their
12         job title changed.
13   Q.    From captain to battalion chief?
14   A.    From shift commander to battalion chief.
15   Q.    And it's your testimony that's not a promotion?
16   A.    That's correct.
17   Q.    Are you testifying that it's similar to or just
18         like the reclassification of team leaders to
19         lieutenants, that shift commanders became
20         battalion chiefs?
21   A.    Their job title was changed.
22   Q.    All shift commanders' job titles were changed to
23         battalion chiefs?

51

1    A.    Correct.

2    Q.    And when did that happen?

3    A.    I think it was in 2004.

4    Q.    Why did that occur?

5    A.    The captains/shift commanders had been asking

6          that their job titles be changed to battalion

7          chief for quite some time.  They met with the

8          former city manager and requested that their job

9          titles be changed.  I understand that it was a

10         desire that they had because it was a job title

11         more in keeping with the fire service, that when

12         they went to training or conferences, they

13         wanted to introduce themselves as battalion

14         chief.  They made their petition to the city

15         manager, and he agreed to change their job

16         title.  There was no change in job description.

17         There was no change in compensation whatsoever.

18   Q.    Were those individuals that I just named all

19         white men?

20   A.    Yes.

21   Q.    And, again, that change was made at their

22         request, for lack of a better word, convenience

23         to them; is that correct?

52

1                    MR. MORGAN:  Object to the form.

2    A.    I don't know about convenience, but to satisfy

3          what they wanted to be called.

4    Q.    But it's your testimony that was not a

5          promotion?

6    A.    It was not.

7    Q.    Again, the insignia -- are you familiar with the

8          insignia that the shift commanders wore back

9          then?

10   A.    Not until just recently.

11   Q.    Was that insignia the same as what a battalion

12         chief wore?

13                   MR. MORGAN:  Which one?

14                   MR. HORSLEY:  The shift commander.

15   A.    I have heard there was a change in the jewelry

16         that they put on their collars.

17   Q.    Once they became battalion chiefs, they wore a

18         different insignia; is that correct?  Once the

19         shift commanders became battalion chiefs, the

20         individuals we just named; is that correct?

21   A.    I heard something about there was a bugle added

22         to their collar.

23   Q.    Do you know whether or not the insignia that the

1    shift commanders wore included two bars and the

2    ones that the battalion chiefs wore included

3    three bars?

4    A.    I don't know that.

5    Q.    You don't know?

6    A.    (Witness nods head negatively.)

7    Q.    Do you have any reason to dispute that if that's

8    what --

9              MR. MORGAN:   Object to the form.

10   A.    It is what it is.

11   Q.    But you don't know?

12   A.    I don't know.

13   Q.    Once again, the reclassification or retitlement

14   of -- the reclassification of the shift

15   commanders to battalion chiefs was done without

16   an outside assessment center, correct?

17             MR. MORGAN:   Object to the form.

18   A.    Correct.

19   Q.    There were no tests given to those individuals,

20   correct?

21   A.    There was no promotion.

22   Q.    I understand.   That's not my question.

23   A.    There was no test.

54

| | | |
|---|---|---|
| 1 | Q. | There were no tests given to those individuals, |
| 2 | | correct? |
| 3 | A. | Correct. |

4          MR. MORGAN:  Wait a minute.  There was

5               a test when they were promoted to

6               captain or shift commander so

7               object to the form of that.

8          MR. HORSLEY:  I was asking about the

9               reclassification.  He said it was

10              not a promotion.  I was asking

11              about the reclassification from

12              shift commander to battalion

13              chief.

14         MR. MORGAN:  When they were renamed

15              from shift commander to battalion

16              chief, was there a promotion given

17              to rename them?  Is that the

18              question?

19         MR. HORSLEY:  No.  My question is:

20              Was there a test given?

21         MR. MORGAN:  When they are renamed?

22         MR. HORSLEY:  Whatever we're calling

23              it.  When they are reclassified.

55

1    Q.    When they became battalion chiefs, they did not

2          have to take a test, correct?

3                    MR. MORGAN:  Object to the form.

4    A.    When their job title was changed from shift

5          commander to battalion chief, there was not a

6          test given.

7    Q.    They were not required to undergo an outside

8          assessment center pursuant to that change,

9          correct?

10   A.    It was not necessary.

11   Q.    When did the position of captain change to the

12         position of battalion chief?

13   A.    The position of captain changed to shift

14         commander.

15   Q.    When was that?

16   A.    Mid-'90s.  I don't know.

17   Q.    Why was that change made?

18   A.    I don't know that either.

19   Q.    You don't have any information about why the

20         position of captain was changed to shift

21         commander?

22   A.    I don't.

23   Q.    The order that we've been --

56

1    A.   Let me clarify that.

2    Q.   Okay.

3    A.   You asked do I have any information?

4    Q.   Uh-huh (positive response).

5    A.   I don't recall what -- who made that decision;

6         why it was done.

7    Q.   You'll agree with me that that change from

8         captain to shift commander occurred subsequent

9         to Plaintiff's Exhibit 3, which is the Hammock

10        order approving the settlement agreement,

11        correct?

12   A.   Correct.

13   Q.   Are you aware that that order specifically --

14        whether it was effective or not effective, that

15        order specifically requires that any promotion

16        to captain requires an outside assessment

17        center?  You're aware of that, right?

18             MR. MORGAN:  Object to the form.

19   A.   Yes.

20   Q.   So it's your testimony that for some reason

21        subsequent to this order, the position of

22        captain was renamed shift commander, correct?

23   A.   Correct.

57

1    Q.    And you don't know why; is that correct?

2    A.    Right.

3    Q.    It's also your testimony that subsequent to this

4          order marked as Exhibit 3 that there was a

5          reclassification in 2004 or '05 from shift

6          commander to captain -- excuse me -- from

7          captain to shift commander and that the captain

8          position no longer existed, correct?

9                MR. MORGAN:   Object to the form.

10   A.    What date did you say?

11   Q.    I think we established it was either -- I think

12         you said '04.  It was in 2004.

13   A.    I said in '04.  I believe in '04 the job title

14         changed from shift commander to battalion chief.

15   Q.    When did it change from -- I'm sorry.  That's my

16         fault.  It was in the mid-'90s that it changed

17         from captain to shift commander?

18   A.    I think so.

19   Q.    Subsequent to the 1991 order, correct?

20   A.    Correct.

21   Q.    Subsequent to that order which specifically

22         addresses the outside assessment for captain

23         promotions, the captain position was essentially

58

1         eliminated by the department, correct?

2                     MR. MORGAN:  Object to the form.

3    A.    No.

4    Q.    The title of captain was eliminated by the

5          department, correct?

6                     MR. MORGAN:  Object to the form.

7    A.    Correct.

8    Q.    You agree with that, the title of captain was

9          eliminated subsequent to the order?

10   A.    It was changed to shift commander.

11                    (Plaintiff's Exhibits 7 & 8 marked for

12                        identification.)

13   Q.    I'll show you what I've marked as Plaintiff's

14         Exhibits 5 and 6.

15                    MR. MORGAN:  Richard, we've gone on

16                        about this, but the change in name

17                        from team leader to lieutenant is

18                        not an issue in this case, and I

19                        don't know why we're spending so

20                        much time on it.  I mean, that's

21                        not a claim in this lawsuit.

22                    MR. HORSLEY:  I think I'm entitled to

23                        ask questions about the history of

59

| | | |
|---|---|---|
| 1 | | the department and the changes |
| 2 | | they've made and the motivations |
| 3 | | behind them. |
| 4 | Q. | Have you ever seen Plaintiff's Exhibits 5 and 6? |
| 5 | | (Off-the-record discussion.) |
| 6 | | MR. HORSLEY:  I'm marking these as 7 |
| 7 | | and 8.  Seven is the Proposed |
| 8 | | Modification of Fire Lieutenant |
| 9 | | Promotional process signed by |
| 10 | | Christopher Turner, and 8 is the |
| 11 | | same thing signed by Gerald |
| 12 | | Stephens. |
| 13 | Q. | Have you seen those two documents? |
| 14 | A. | I have. |
| 15 | Q. | And do you recall who made the decision to issue |
| 16 | | these documents to the City of Auburn |
| 17 | | firefighters? |
| 18 | A. | Ultimately it would have been the city manager. |
| 19 | Q. | Who was ... |
| 20 | A. | David Watkins. |
| 21 | Q. | And you'll agree with me that in both of these |
| 22 | | documents -- both of these documents are |
| 23 | | addressing the reclassification of team leaders |

60

1   to lieutenants; is that correct?

2 A. That's correct.

3 Q. Do you know why these memos or documents were

4   given to Gerald Stephens and Christopher Turner?

5 A. They were given to all affected members of the

6   fire division.  They were given to them because

7   we wanted their input.  We wanted to offer full

8   disclosure.  And because the city attorney said

9   this essentially was a contractual matter

10   between the plaintiffs and the City, we felt

11   this was a good way to go about getting the

12   input regarding their preference as to this

13   particular matter.

14 Q. The preference to the particular matter of

15   reclassifying team leaders to lieutenants?

16 A. Changing their job title from team leader to

17   lieutenant, reclassifying, yes.

18 Q. And Eddie Ogletree would have been one of those

19   individuals, correct?

20 A. Eddie Ogletree was a team leader who supported

21   that decision.

22 Q. Well, he signed the document agreeing to it,

23   correct?

61

1              MR. MORGAN:  Object to the form.

2    Q.    Do you have --

3              MR. MORGAN:  We have that.  We have

4                   the one that he signed.  The

5                   second he claimed he didn't sign,

6                   yeah, we've got it.

7    A.    He stated:  I agree with the proposal.

8    Q.    And did you witness Mr. Ogletree sign that

9          document?

10   A.    No.

11   Q.    Do you know if the first page was attached to it

12         when he signed it?

13   A.    No.

14   Q.    Even though you had certain members of the fire

15         department that disagreed with the

16         reclassification, the City did it anyway,

17         correct?

18   A.    After we met with those individuals to

19         understand their concerns.

20   Q.    And in both 7 and 8, it states that the

21         court-approved assessment center process

22         submitted for fire lieutenant will be considered

23         to have expired, correct?

62

1    A.    Correct.

2    Q.    That's in paragraph 1 at the bottom of the first

3          page; is that correct?

4    A.    That's correct.

5    Q.    If it was your position and the City's position

6          at that time that, number one, the settlement

7          order was no longer in effect and that this was

8          not a promotion -- it was simply a

9          reclassification -- why are you addressing the

10         outside assessment center required by the order

11         in these two documents?

12               MR. MORGAN:  Object to the form.

13   Q.    I mean, if it's not an issue because it's not a

14         promotion and the order is not in force anyway,

15         why do you have to send out this document for

16         people to sign that specifically addresses the

17         assessment center and the fact that you consider

18         it to have expired?

19               MR. MORGAN:  Object to the form.

20   A.    Because --

21               MR. MORGAN:  The document speaks for

22                    itself.

23   Q.    Go ahead.

63

1   A.   Because the city attorney said this was

2        essentially a contractual matter between the

3        plaintiffs and the City, and we were trying to

4        provide full disclosure as to what the

5        implications of this proposal meant before we

6        moved forward.

7   Q.   But your earlier testimony made it very clear

8        this was not a promotion, correct?

9   A.   Correct.

10   Q.   Then why are you required to send out documents

11        asking for the approval when this is not a

12        promotion?  It's simply a reclassification.

13                MR. MORGAN:  Object to the form.

14                Asked and answered.

15   Q.   Is there a reason why you felt you needed to

16        send out these documents if this was not a

17        promotion?

18   A.   We were concerned that if we didn't take this

19        step, understand their preferences, then it

20        would potentially invalidate moving them from

21        team leader to lieutenant.

22   Q.   And even though some people disagreed with it,

23        y'all went ahead and reclassified them, correct?

64

1    A.    After we met with them to understand what their

2          concerns were.

3    Q.    If February 1 of 2006 the City had decided the

4          order was no longer in effect and outside

5          assessment centers were not required, why was an

6          outside assessment center used or why was it

7          allegedly used for the battalion chief promotion

8          in May of 2006?

9                MR. MORGAN:  Object to the form.

10   A.    In regard to the --

11   Q.    Well, let me ask you this.  Is it your position

12         that an outside assessment center that complies

13         with the court order of 1991 was, in fact,

14         utilized for the 2006 battalion chief promotion?

15               MR. MORGAN:  Object to the form.

16   A.    Yes.

17   Q.    Why did the City feel it necessary to use the

18         outside assessment center for the battalion

19         chief promotion in 2006 if it was the City's

20         position that the order was no longer in effect?

21               MR. MORGAN:  Object to the form.

22   A.    As I've indicated previously, this matter

23         regarding the team leaders being changed in job

65

```
 1          title to lieutenant was very narrowly focused on

 2          in regard to the settlement agreement.  We did

 3          not address the issue of assessment center

 4          processes or the process for promotion to

 5          battalion chief or captain or shift commander,

 6          whatever you want to call it, in this effort or

 7          in this initiative presented to us by the team

 8          leaders.

 9      Q.  Are you familiar with somebody named Stephanie

10          King?

11      A.  I am.

12      Q.  Who is she?

13      A.  She is our senior HR generalist.

14      Q.  Still?

15      A.  She is.

16                    (Plaintiff's Exhibit 5 marked for

17                       identification.)

18      Q.  Let me show you what I've marked as Plaintiff's

19          Exhibit 5.  This has just been provided to me

20          today.  It's a series of e-mails, some of which

21          you sent, some of which you received, some

22          Mr. Lamar sent, received.  Take a look at those,

23          and I'm going to ask you a couple of questions
```

66

1          about them.

2                    MR. MORGAN:  Where did you get this

3                    document?

4                    MR. HORSLEY:  From Will Hancock.

5                    MR. HANCOCK:  That's what I sent you,

6                    Randall.  Those are the e-mails

7                    you requested I think after

8                    Mr. Turner's deposition.  I sent

9                    them the following week.

10   Q.   Have you seen that exhibit before?

11   A.   I have.

12   Q.   The only question I'm going to ask you is:  Does

13        it appear to be an accurate reflection of

14        e-mails that were sent between the City of

15        Auburn employees and CWH representatives about

16        the battalion chief promotion test and

17        assessment center?

18                    MR. MORGAN:  Object to the form.

19   A.   No.

20   Q.   It does not?  How is it not e-mails sent --

21   A.   Well, chronologically I'm puzzled by how I got

22        this e-mail at 1:51.  I responded at 2:55.  Lee

23        Lamar responded at 2:07.  I don't understand how

67

```
 1           that happens, how he responded after me or --
 2           before me, but it chronologically appears that
 3           he responded after me.
 4      Q.   So you say there's a contradiction in two of the
 5           times when e-mails were apparently sent; is that
 6           correct?
 7      A.   I don't understand why that is.  There's a
 8           question in my mind about that.
 9      Q.   Do you agree with me that these e-mails were
10           sent?  Have you seen these e-mails?
11      A.   I believe -- Well, I saw them after Mr. Hancock
12           provided them.
13      Q.   Do you dispute that these e-mails exist?
14      A.   No.
15      Q.   Do you agree that the e-mails that have your
16           name on them as being sent by you were sent by
17           you?
18      A.   Yes.
19      Q.   Did you receive the e-mails that indicate that
20           you received them on this document?
21      A.   I believe I did.
22      Q.   Do you believe that Lee Lamar sent the e-mails
23           that his name is on?
```

68

1   A.   This document would suggest that.

2   Q.   The battalion chief promotion that we're talking

3        about and that actually occurred in May of 2006,

4        that was a promotion, correct, from -- for

5        anyone that applied for it; is that correct?

6   A.   Correct.

7   Q.   Or for anyone who actually received the job,

8        that was a promotion, correct?

9   A.   Correct.

10  Q.   It was a promotion in rank and pay; is that

11       correct?

12  A.   Correct.

13  Q.   And you'll agree with me that Mr. Stephens and

14       Mr. Ogletree and Mr. Turner did not receive that

15       promotion, correct?

16  A.   Correct.

17  Q.   And you'll agree with me that those are each

18       Afro-Americans, correct?

19  A.   Correct.

20  Q.   And you'll agree with me those are the only

21       Afro-Americans that applied for the battalion

22       chief promotion at that time, correct?

23  A.   Correct.

69

```
1    Q.   You'll agree with me that the only people who

2         did receive that promotion were white men,

3         correct?

4    A.   Correct.

5    Q.   You'll agree with me that the only people who

6         made it past the testing phase of that promotion

7         were white men, correct?

8                    MR. MORGAN:   Object to the form.

9    A.   Correct.

10   Q.   The testing phase meaning the test that was

11        taken with the 70 cutoff score, correct?

12   A.   The written test.

13   Q.   Yes.  The only people that made it past that

14        point were white, correct?

15   A.   Correct.

16   Q.   Are you familiar with Mr. Stephens' and

17        Mr. Ogletree's job history with the City of

18        Auburn?

19   A.   Yes.

20   Q.   You're familiar with the jobs they've held and

21        their work performance.  Is that a fair

22        statement?

23   A.   Yes.
```

70

1   Q.   Other than their not passing the written test,

2        are you aware of anything about their employment

3        history with the City of Auburn that would have

4        kept them from being promoted to battalion

5        chief?

6                   MR. MORGAN:  Object to the form.

7   A.   They had the same opportunity that everyone else

8        did.

9   Q.   Right.  My question though, is:  There's not

10       something that you're aware of that would have

11       precluded them from that promotion but for not

12       passing that test; is that correct?

13                  MR. MORGAN:  Object to the form.  Go

14                       ahead.

15  A.   Correct.  They were eligible, just like everyone

16       else.

17  Q.   But for not passing that test, is it your

18       testimony that they were qualified to receive

19       that promotion?

20                  MR. MORGAN:  Object to the form.

21  A.   That is not my testimony.

22  Q.   Based on their time in grade, based upon their

23       seniority, based upon your knowledge of their

1  work ethic and yearly evaluations, do you have

2  an opinion one way or the other about whether

3  they were qualified to be battalion chiefs?

4          MR. MORGAN:  Object to the form.

5  A.  First, time in grade and seniority were not

6      considered.

7  Q.  Why is that?

8  A.  How do you consider that?

9  Q.  I don't know.

10 A.  Exactly.

11 Q.  I mean, I guess you consider it by how long

12     somebody has been there and how long they've

13     been in a certain position.  You're saying that

14     was not a qualification obviously for the

15     battalion chief job?  Is that what you're

16     saying?

17 A.  Correct.

18 Q.  My question, though, was:  Other than them not

19     passing the test, based upon their work history

20     with the City of Auburn, were they qualified for

21     that promotion?

22          MR. MORGAN:  Object to the form.

23               Asked and answered.

72

```
1    A.    They were eligible.

2    Q.    They were not disqualified for that promotion?

3    A.    Correct.

4    Q.    Who ultimately received those promotions to

5          battalion chief?  I'll try to help you.  I think

6          it was Joe Lovvorn, Rod Hartsfield, Matt Jordan,

7          and Joey Darby.

8    A.    That's correct.

9    Q.    Is that correct?

10   A.    Yes.

11   Q.    Those were all white males, correct?

12   A.    Correct.

13   Q.    Would you disagree with me that at the time of

14         his promotion to battalion chief, Joe Lovvorn

15         had been with the Auburn Fire Division for

16         approximately five to six years?

17   A.    I don't know exactly.

18   Q.    Do you have any reason to disagree with that?

19              MR. MORGAN:  Well, the record speaks

20                   for itself.

21   Q.    Do you have any reason to disagree with that?

22              MR. MORGAN:  Object to the form.

23   A.    Does that include his time as a student
```

73

1       firefighter?

2   Q.   No.

3   A.   I think --

4   Q.   He's been full-time employed with the City of

5       Auburn five to six years to your knowledge?

6   A.   As a regular firefighter?

7   Q.   Yes.

8   A.   I don't have any reason to disbelieve that

9       that's true.

10          MR. MORGAN:  Object to the form on

11              that question.

12   Q.   Do you believe that Rod Hartsfield had been with

13       the Auburn Fire Department for approximately

14       seven years at the time he was promoted to

15       battalion chief?

16          MR. MORGAN:  Object to the form.

17   A.   As a regular employee?

18   Q.   Yes, sir.

19   A.   I have no reason to disbelieve that's not true.

20   Q.   Matt Jordan, five to six years with the Auburn

21       Fire Division; is that --

22          MR. MORGAN:  Object to the form.

23   A.   Same stipulation.

74

1    Q.    And the same question with Joey Darby.

2                MR. MORGAN:  Object to the form.

3    A.    Same stipulation.

4    Q.    Do you agree with me that Mr. Stephens and

5        Mr. Ogletree both had more years of service with

6        the Auburn Fire Department than any of the

7        individuals that were promoted to battalion

8        chief?

9    A.    I believe that's true.

10    Q.    Do you agree with me that both Mr. Stephens and

11        Mr. Ogletree had more experience with the Auburn

12        Fire Department than did the individuals that

13        received the battalion chief promotion?

14                MR. MORGAN:  Object to the form.

15    A.    They had worked -- To the extent that they had

16        been employed longer, ostensibly they had worked

17        more shifts than these others.

18    Q.    So they had more experience?

19                MR. MORGAN:  Object to the form.

20    Q.    Is that correct?

21                MR. MORGAN:  What do you mean by

22                    experience?

23                MR. HORSLEY:  Experience as Auburn

75

1          firefighters working for the

2          Auburn Fire Department.

3                MR. MORGAN:  Are you talking about

4                seniority?

5                MR. HORSLEY:  No.  Seniority is just a

6                number of years.  I'm talking

7                about experience going out and

8                working for the City of Auburn.

9    Q.    Did they have more experience than the people

10         that were promoted to battalion chief?

11               MR. MORGAN:  Object to the form.

12   A.    They had more experience as employees of the

13         City of Auburn to the extent that they had been

14         employed longer.

15   Q.    What jobs with the City of Auburn did the

16         individuals that were promoted to battalion

17         chief hold immediately before they were

18         promoted?

19   A.    I think they were all lieutenants.

20   Q.    Lieutenants?

21   A.    (Witness nods head positively.)

22   Q.    Were they in the group that was reclassified

23         from team leaders to lieutenants, the ones that

76

1      were promoted?

2              MR. MORGAN:   Promoted to battalion

3                  chief?

4              MR. HORSLEY:  Yes.

5  A.   They were in that group.

6  Q.   Each of the individuals that were promoted to

7      battalion chief in May of '06 were in the same

8      group of individuals that were reclassified from

9      team leader to lieutenant in February 1 of '06,

10     correct?

11 A.   Correct.

12 Q.   So how long had they been lieutenants at the

13     time that they were promoted to battalion

14     chiefs?

15 A.   They had held the job title of lieutenant from

16     February 1, 2006.

17 Q.   So --

18 A.   They had been company officers, as I understand

19     that term in the fire service, for significantly

20     longer than that.

21 Q.   So they had been lieutenants for four months

22     approximately; is that correct?

23 A.   Correct.

77

| | | |
|---|---|---|
| 1 | Q. | Since they had not been lieutenants for twelve |
| 2 | | months, would they have not been probationary |
| 3 | | lieutenants at the time that they were promoted |
| 4 | | to battalion chiefs? |
| 5 | A. | No. |
| 6 | Q. | They were not? |
| 7 | A. | They were not probationary. |
| 8 | Q. | Why not? |
| 9 | A. | Because we made a title change from team leader |
| 10 | | to lieutenant.  They had already satisfied any |
| 11 | | probationary requirements. |
| 12 | Q. | So it's your testimony that even though they had |
| 13 | | only been lieutenants for approximately four |
| 14 | | months, they were nonprobationary lieutenants |
| 15 | | and entitled to be promoted to battalion chiefs, |
| 16 | | correct? |
| 17 | A. | Correct.  For the sake of argument, even if they |
| 18 | | had been probationary, they would have been |
| 19 | | eligible. |
| 20 | Q. | Doesn't that conflict with the City of Auburn |
| 21 | | personnel policies? |
| 22 | A. | Not that I'm aware of. |
| 23 | Q. | Are you familiar with those policies? |

78

```
 1    A.    I am.

 2    Q.    You are?  Are you familiar with Section 2.07 of

 3          the City of Auburn personnel policies from

 4          1999?  I've marked the whole document as

 5          Plaintiff's Exhibit Number 9.

 6                    (Plaintiff's Exhibit 9 marked for

 7                       identification.)

 8                    MR. MORGAN:  Is that what was in

 9                       effect in 2006?

10                    MR. HORSLEY:  I don't know.

11    Q.    Was it?

12    A.    No.

13    Q.    What was in effect?

14    A.    The personnel policies of 2005 as amended.

15    Q.    Okay.  Look at Section 2.07 of that section and

16          read it, if you will.

17    A.    In the document, the City of Auburn personnel

18          policies of 1999 labeled such, Section 2.07,

19          probation, states:  The probationary period --

20             Did you want me to read this out loud?

21    Q.    No.  Just read it to yourself, and I'm going to

22          ask you a question about it.

23    A.    (Witness complies.)
```

79

1    Q.    Was that section still in effect with the

2          amended personnel policies of '05 to your

3          knowledge?

4    A.    To my knowledge it was.

5    Q.    Does that section not require that a fire

6          department employee be employed at a certain job

7          for twelve months before being entitled to a

8          promotion?

9    A.    When an employee --

10                   MR. MORGAN:  Object to the form.  Go

11                        ahead.

12   A.    When an employee is promoted -- When an employee

13         is hired or promoted into a new job, they serve

14         a probationary period.

15   Q.    Of twelve months?

16   A.    Of twelve months.

17   Q.    And they can't be promoted while they are in

18         that probationary period, is that correct,

19         according to the city personnel policies?

20   A.    No, that is not correct.

21   Q.    That's not correct?

22   A.    No.

23   Q.    2.7 does not say that?

80

1    A.    2.07?

2    Q.    Yes, sir.

3    A.    It does not say you can't be promoted during the

4          probationary period.

5                    MR. MORGAN:  I didn't see it either.

6                    Show it.

7    Q.    I'm sorry.  Section 2.09 regarding promotions

8          refers back to Section 2.07.  Does that section

9          not say an employee is not entitled to a

10         promotion until he has served a twelve-month

11         probationary period?

12                   MR. MORGAN:  Object to the form.

13   A.    No.

14   Q.    It refers to a step increase in pay, correct?

15   A.    Correct.

16   Q.    Does it not state that an increase in pay

17         requires an employee to serve a probationary

18         period of twelve months?

19                   MR. MORGAN:  Object to the form.

20   A.    A step increase -- I'm sorry.  Repeat the

21         question.

22   Q.    Does that not mean -- Section 2.09 which refers

23         back to 2.07, does that not mean an employee has

81

1          to serve a twelve-month probationary period

2          before he can receive a step increase in pay?

3    A.    In that job, correct.

4    Q.    So it's your testimony that there's no

5          requirement through the City of Auburn personnel

6          policies that an employee serve a twelve-month

7          probationary period before they can be promoted?

8    A.    If a firefighter wanted to apply for a higher

9          level job within the organization during their

10         probationary period as a firefighter, they could

11         certainly do so.  And if selected they would be

12         promoted to that position.

13   Q.    And it's your testimony that would not

14         contradict or conflict in any way with the

15         personnel policies marked as Plaintiff's Exhibit

16         9; is that correct?

17   A.    It would not.

18   Q.    I think I asked this earlier, but I forgot what

19         your answer was.  Is it your testimony that the

20         individuals that were promoted to battalion

21         chief in May of '06 were, in fact, probationary

22         lieutenants?

23              MR. MORGAN:  Object to the form.

82

1   A.   That was not my testimony.

2            MR. HORSELY:  That's why I asked it

3               again because I couldn't remember

4               what his answer was.

5   Q.   What was your testimony?

6   A.   My testimony was that they were not

7        probationary.  They had received -- I'm sorry.

8            Repeat which question --

9   Q.   Yeah.  Were they non --

10  A.   Which job?

11  Q.   Is it your testimony that those individuals that

12       received the battalion chief promotion were

13       probationary or nonprobationary lieutenants at

14       the time of the promotion to battalion chief?

15  A.   They were nonprobationary lieutenants when they

16       were promoted.

17  Q.   And, again, they had only been lieutenants for

18       approximately four months, correct?

19            MR. MORGAN:  Object to the form.

20  A.   They had held the job title of lieutenant for --

21       since February 1, 2006.

22  Q.   Are you familiar with how many Afro-Americans

23       or -- Let's say minorities.

83

1           Are you familiar with how many minorities

2       the City of Auburn Fire Department has hired

3       since the year 2004?

4   A.  Off the top of my head, no.

5   Q.  Are you aware that they've hired any?

6   A.  I believe that they have hired student

7       firefighters that were minorities.

8   Q.  Student firefighters?

9   A.  Yes.

10  Q.  Are you aware of any full-time firemen that the

11      City has hired since 2000, minority firemen?

12  A.  Not to my knowledge.

13  Q.  And, again, I may be taxing your memory -- and

14      it's fine if you don't know the answer to this

15      question -- but since 1991, since the order was

16      entered, are you aware of how many minorities

17      the City of Auburn has hired as full-time

18      firemen?

19  A.  As regular --

20  Q.  Yes, sir.

21  A.  -- firemen?

22          No.

23  Q.  You don't know?

84

1    A.    No.

2    Q.    Do you have any knowledge or information that it

3          would be more than two?

4                MR. MORGAN:   Object to the form.

5    A.    I don't know if there have been more than two

6          regular minority firefighters hired since 2000

7          or ...

8    Q.    Since 1991.

9    A.    1991.  Sorry.

10   Q.    Do you know if there's been more than four

11         minority firefighters hired since 1991?

12                MR. MORGAN:   Object to the form.

13   A.    No.

14   Q.    And how many minority firefighters are employed

15         with the City right now?  Let's say regular

16         firefighters first, full-time firemen.

17   A.    Three.

18   Q.    And that's Chris Turner, Gerald Stephens, and

19         Eddie Ogletree, correct?

20   A.    Correct.

21   Q.    And how many student firefighters are there,

22         minority student firefighters?

23   A.    Right now?

85

| | | |
|---|---|---|
| 1 | Q. | Uh-huh (positive response). |
| 2 | | MR. MORGAN:  How many? |
| 3 | | MR. HORSLEY:  He said "right now".  He |
| 4 | | hasn't answered yet. |
| 5 | A. | I think it's one or two. |
| 6 | Q. | Did Chief Langley or Lamar, either one of those |
| 7 | | gentlemen, ever make the statement to you that |
| 8 | | the City of Auburn needed to hire more minority |
| 9 | | firefighters? |
| 10 | A. | Yes. |
| 11 | Q. | Let's start with Langley first.  When has he |
| 12 | | made that statement to you? |
| 13 | A. | I can't tell you a specific time, but it's been |
| 14 | | a matter of concern for quite a while that we |
| 15 | | have not been able to attract and hire |
| 16 | | minorities into the fire division. |
| 17 | Q. | And Lamar has said that to you as well? |
| 18 | A. | Yes. |
| 19 | Q. | It's your position that the City wants to hire |
| 20 | | more minorities, but there's been no interest |
| 21 | | from minorities to be firefighters with the City |
| 22 | | of Auburn? |
| 23 | A. | That's not my testimony. |

86

1   Q.   What is your testimony?

2   A.   We have not -- For one reason or another, either

3        through not getting applications or not being

4        ranked as number one in the selection process or

5        for people -- Well, I've already said lack of

6        applications.

7             It's for those two reasons we've not been

8        able to develop a strong minority presence in

9        the fire division.

10  Q.   Are you familiar with two student firefighters

11       by the name of Jeremy Patterson and William

12       Thompkins?

13  A.   I know them.  I know their names.  I don't know

14       them.

15  Q.   Did they apply for full-time employment with the

16       City of Auburn Fire Department?

17  A.   I don't think they did.

18  Q.   So you don't know one way or the other whether

19       or not they applied with the City of Auburn for

20       full-time employment?

21  A.   One of them did not.

22  Q.   Which one?

23  A.   I want to say it was Thompkins.

87

1                And what was the other?

2    Q.    Jeremy Patterson.

3    A.    I don't think Jeremy Patterson applied.

4    Q.    But Thompkins did?

5    A.    I don't recall that he did.

6    Q.    If he did, you'll agree with me he was not

7          hired, correct?

8                MR. MORGAN:   Object to the form.

9    A.    Correct.

10   Q.    Leading up to the battalion chief promotion in

11         May of 2006 when you and Langley and Lamar and

12         the public safety director were discussing that

13         promotion, do you recall any discussion about

14         whether or not the test would make it more

15         difficult for minorities to be promoted to

16         battalion chief?

17   A.    No.

18   Q.    That was not discussed, is that correct, at

19         least when you were present?

20   A.    Not that I recall.

21   Q.    Do you recall any discussion among those

22         individuals and you about whether or not the

23         test would make it more difficult for the older

88

1     members of the fire department to be promoted to

2     battalion chief?

3  A.   I think there was some discussion that the way

4     the test was structured, which incorporated

5     situational judgment questions, that that would

6     help employees that had been with the

7     organization longer to exercise that knowledge

8     that they had gained based on experience and

9     familiarity with the policies, that that would

10    give -- that that would help them in the testing

11    process.

12  Q.   So your testimony is that y'all had some

13    discussions about how the test would actually

14    help the older members of the fire department;

15    is that correct?

16  A.   Actually, I think that was something that CWH

17    told us.

18  Q.   Well, my question was:  Do you recall any

19    discussions between you and those gentlemen

20    about whether or not the test requirement would

21    make it more difficult for the older members of

22    the department to receive that promotion?

23         MR. MORGAN:  Object to the form.

89

```
 1    A.    No.

 2    Q.    You don't recall?

 3    A.    No.

 4    Q.    Do you recall the education levels of the four

 5          individuals that received the battalion chief

 6          promotion?

 7    A.    I think I do.

 8    Q.    Can you tell me?

 9    A.    I think they've all got college degrees.

10    Q.    Are you aware of whether Mr. Ogletree and

11          Mr. Stephens had college degrees at the time

12          they applied for battalion chief promotion?

13    A.    I don't think that they had completed their

14          college education.

15    Q.    Had they been out of school -- formal school for

16          a much longer period than the individuals that

17          were promoted to battalion chief to your

18          knowledge?

19    A.    To my knowledge, yes.

20    Q.    Do you agree with me that someone who is closer

21          to being out of school than further away from

22          being out of school might be a better test

23          taker?
```

90

1                    MR. MORGAN:  Object to the form.

2    Q.    Standard test taker?

3                    MR. MORGAN:  Object to the form.

4    A.    That would seem plausible.

5    Q.    Will you agree with me that the individuals who

6          had been out of school for a lesser period of

7          time than the older individuals had an advantage

8          in taking the cutoff test for the battalion

9          chief promotion?

10                   MR. MORGAN:  Object to the form.

11   A.    No.

12   Q.    You would not agree with that?

13   A.    No.

14   Q.    Would you agree with me that someone with a

15         college education would have an advantage over

16         someone without a college education in taking

17         the cutoff score test for battalion chief

18         promotion?

19                   MR. MORGAN:  Object to the form.

20   A.    Not based on a cutoff score.

21   Q.    Well, just the test, then.

22   A.    I think that they would --

23                   MR. MORGAN:  Object to the form.

91

1    A.      -- it's logical that somebody that has more

2            formal education is going to do better on a

3            test.  And all of our employees have abundant

4            opportunities to pursue education through the

5            tuition reimbursement program, in particular,

6            through courses that we send them to for

7            training.

8                    MR. MORGAN:  Can we take another quick

9                 break?

10                   MR. HORSLEY:  Yeah.

11                   (Brief recess.)

12   Q.      (Continuing by Mr. Horsley)  We've talked about

13           the order of approving settlement agreement,

14           Plaintiff's Exhibit 3, and you've read it.  Will

15           you agree with me that at least for a period of

16           time, however long that was, the City did use

17           this settlement agreement pursuant to its

18           policies and procedures with regard to hiring

19           minorities?

20                   MR. MORGAN:  Object to the form.

21   Q.      Is that correct?

22   A.      Yes.  To any hiring.

23   Q.      To any hiring.

92

1            So this document was something that the City

2      had and looked at and used, correct?

3            MR. MORGAN:  Object to the form.

4   A.   For the promotions --

5            MR. MORGAN:  Is there a special

6                 provision in there on hiring?

7            MR. HORSLEY:  He said it.

8   A.   In regard to the promotion processes for

9      lieutenant and captain.

10           MR. MORGAN:  Object to the form.

11  Q.   Will you agree with me that the promotional

12     process for battalion chief in May of '06

13     consisted of the following:  It consisted of a

14     cutoff test and then the exercises that were

15     implemented by CWH, and that was essentially it;

16     is that correct?

17           MR. MORGAN:  Why do we keep using May

18                of '06?  Didn't they take this

19                written test in April?

20  Q.   Didn't the promotion occur in May?  If I've used

21     May incorrectly, I stand corrected.

22  A.   I don't remember the exact date.

23  Q.   We're talking about the battalion chief

1    promotion in '06.  Okay?

2  A.    Okay.

3  Q.    The process, you'll agree with me, did not

4        include the consideration of seniority, correct?

5  A.    Correct.

6  Q.    It didn't include the consideration of time in

7        grade, correct?

8  A.    Correct.

9  Q.    It didn't include the consideration of work

10        experience, correct?

11            MR. MORGAN:  Object to the form.

12  A.    Not directly.

13  Q.    It included essentially a cutoff test that was

14        the first thing you had to do in order to be

15        considered to be promoted to battalion chief,

16        correct?

17            MR. MORGAN:  Object to the form.

18  A.    It utilized a job-related test with a cutoff

19        score to advance further in the process.

20  Q.    And you'll agree with me that that was the first

21        step in the process.  And if you did not pass

22        that test, you were not allowed to progress in

23        the process regardless of seniority, regardless

94

1          of work experience, regardless of time in grade,

2          correct?

3                    MR. MORGAN:   Object to the form.

4     Q.   Is that correct?

5                    MR. MORGAN:   Object to the form.

6     A.   It is correct.

7     Q.   That process -- Who developed that process to

8          your knowledge?

9     A.   The overall process?

10    Q.   Uh-huh (positive response).   The process y'all

11         used for that specific promotion.

12    A.   That process was developed by CWH in

13         consultation with the City of Auburn, the

14         employees that you've listed there.

15    Q.   Do you know if that process itself, the entire

16         process, for the promotion has ever been

17         scientifically validated to not have a disparate

18         or negative impact on Afro-Americans?

19                   MR. MORGAN:   Object to the form.

20    A.   That particular process could not --

21                   MR. MORGAN:   Go ahead.  I object to

22                   the form.  You go ahead.

23    A.   That particular process could not have been

95

1      scientifically validated because it had not been

2      done.  However, it used the EEOC uniform

3      guidelines and other professional standards of

4      test development such that there was assurance

5      that it had content -- that it was content

6      validated.

7   Q.  You're talking about the test itself.

8   A.  I'm talking about the test itself.

9   Q.  We're not exactly on the same page.  I'm talking

10     about the entire process for the promotion of

11     battalion chief.  The test was a component of

12     that.  You'll agree with me, correct?

13  A.  Correct.

14  Q.  And the test may have been scientifically

15     validated by CWH, correct?

16  A.  Correct.

17  Q.  What I'm asking you is:  Did the City of Auburn

18     take the entire process with the test as a

19     component of that process and have it

20     scientifically validated not to have a disparate

21     impact on Afro-Americans?

22          MR. MORGAN:  Object to the form.

23  A.  Let me try to answer that in this way.  CWH

1    represents in their literature that their

2    process results in valid job-related

3    selections.  That particular process could not

4    have been after the fact -- Well, any analysis

5    of it in terms of adverse impact would occur

6    after the fact so it could not have been done

7    before the fact.  But following professional

8    standards of test development and CWH's

9    representation that the exercises are a neutral

10   job-related method of making selections, I would

11   say that it was scientifically validated.

12 Q.  Just so we're clear, you understand what I'm

13   saying when I say disparate impact; is that

14   correct?

15 A.  I do.

16 Q.  But you've already testified that the City made

17   the ultimate decision about having the test as

18   the first factor of the process and the cutoff

19   score, correct?

20                 MR. MORGAN:  Wait a minute.  Here's

21                 the problem.  You've asked him the

22                 question about the entire process,

23                 and then when he answered it, you

97

```
 1              corrected him and asked him, no,

 2              you're looking at the entire

 3              process.  He's now answered the

 4              question about the entire process,

 5              but now you're going back as if

 6              somehow the written test is

 7              supposed to be treated differently

 8              in terms of the validation.

 9          MR. HORSLEY:  Randall, just let me ask

10              my question.  I didn't tell you to

11              ask you my guys questions in a

12              certain way.

13          MR. MORGAN:  I know that, but, I

14              mean --

15          MR. HORSELY:  Come on.

16          MR. MORGAN:  Object to the form.

17  Q.   My question is:  Didn't you already testify that

18       the City made the decision about the cutoff

19       score on the test and that the test would be the

20       first step in the process and that you could not

21       go past the first step if you failed the test?

22       Did the City make that decision?

23          MR. MORGAN:  Object to the form.
```

98

1    A.    Yes.

2    Q.    So my question is:  Has it been scientifically

3          validated by the City that that process does not

4          have a disparate impact on Afro-Americans, that

5          the test be given first, if you don't meet the

6          cutoff, you don't progress and then nothing else

7          is considered?

8                    MR. MORGAN:  Object to the form.

9    A.    We were relying on our consultant to advise us

10         in that regard.

11   Q.    And who was that?

12   A.    CWH.

13   Q.    Is it your testimony that CWH informed you that

14         if the test were done first without a cutoff

15         score, you could not progress past the test if

16         you failed, that that had been scientifically

17         validated not to have a disparate impact on

18         Afro-Americans?

19                   MR. MORGAN:  Object to the form.

20   Q.    Your testimony is that's what CWH told the City

21         of Auburn?

22                   MR. MORGAN:  Object to the form.

23   A.    I'm sorry.  Repeat the question.

99

1   Q.   I think you just testified that your consultant

2        CWH advised the City of Auburn that if you

3        conducted the test as the first factor in the

4        process with a cutoff score and that you could

5        not progress past the test if you failed it had

6        been scientifically validated to not have a

7        disparate impact on black applicants?

8              MR. MORGAN:  Object to the form.

9   Q.   Did they tell you that?

10             MR. MORGAN:  Object to the form.

11   A.   They told us that the process that they use

12        using subject matter experts to develop the

13        written test was a neutral job-related,

14        content-validated approach recognized in

15        professional standards as the appropriate way to

16        develop a test which is neutral.

17   Q.   But they didn't tell you that using the test as

18        the first factor with a cutoff score was neutral

19        or did not have a disparate impact on

20        Afro-Americans, did they?

21             MR. MORGAN:  Object to the form.

22   A.   They did not tell us that the test would have

23        adverse impact.

100

1    Q.   Would not -- What I'm asking you is:  Did they

2          tell you the test would not have -- the whole

3          process of using the test first with a cutoff

4          score would not have an adverse or a disparate

5          impact on Afro-Americans?  Did they tell you

6          that?

7                MR. MORGAN:  Object to the form.

8    A.   They did not tell us that it would have adverse

9          impact.

10   Q.   You're not hearing my question.  Did they tell

11         you it would not have an adverse impact?

12               MR. MORGAN:  Object to the form.

13   A.   I guess you're using a double negative in here.

14   Q.   Well, let me repeat it just so we're clear.

15         Did CWH advise the City that if you used the

16         test as the first factor in the promotional

17         process with a cutoff score beyond which you

18         could not go if you failed, that that process

19         would not have a disparate impact on

20         Afro-American applicants?

21               MR. MORGAN:  Object to the form.

22   A.   They did not tell us that using the test as a

23         cutoff would not have adverse impact because it

101

1    was designed as a neutral test.

2 Q. That's all my question was, and you just

3    answered it.  They did not tell you that,

4    correct?

5      MR. MORGAN:  Object to the form.

6 Q. You answered yes.

7 A. Why would they?

8 Q. And you'll agree with me that the promotional

9    process that the City of Auburn used with the

10    test as a component of that process caused the

11    only black applicants not to receive the

12    promotion, correct?

13      MR. MORGAN:  Object to the form.

14 A. They and four others.  Four whites did not

15    advance beyond that level.

16 Q. And how many white applicants were there for

17    that battalion chief promotion to your

18    knowledge?

19 A. Nine.

20 Q. Nine?

21 A. No.  I'm sorry.  There were nine that sat for

22    it.  I think there were eleven that applied.

23 Q. Is it your testimony that four white applicants

102

1            did not pass the test?

2    A.     That is my testimony.

3    Q.     And seven white applicants passed the test; is

4           that correct?

5    A.     Five.

6    Q.     Five passed the test?

7    A.     (Witness nods head positively.)

8    Q.     So there were nine white applicants total.  I

9           thought you said eleven.

10   A.     There were eleven white applicants.  There were

11          two white applicants that opted out before the

12          test.

13   Q.     Okay.  So nine whites took the test.  Four of

14          them failed it, correct?

15   A.     Correct.

16   Q.     And you'll agree with me that three

17          Afro-Americans took the test and failed it,

18          correct?

19   A.     Correct.

20   Q.     The only three applicants for battalion chief --

21          The only three Afro-American battalion chief

22          applicants did not make it through the process

23          that the City developed for the battalion chief

103

1    promotion, correct?

2                        MR. MORGAN:  Object to the form.  The

3                        City didn't develop it.  Object to

4                        the form.  I'm sorry.

5    A.   They did not make it through the test.

6    Q.   They didn't make it through the process,

7         correct?

8    A.   Correct.

9    Q.   Are you aware that the only black firemen hired

10        by the City of Auburn Fire Department since 1991

11        are Chris Turner, Gerald Stephens, Kevin Harper,

12        and Rod Torbert?

13                        MR. MORGAN:  Object to the form.

14   A.   I'm aware that two of them were:  Chris and

15        Gerald.

16   Q.   Do you have any information at your disposal

17        that would indicate more Afro-Americans than

18        those I just named have been hired by the fire

19        department?

20   A.   Probably.

21   Q.   You do?

22   A.   Yeah.

23   Q.   Can you tell me who they are or are you saying

104

```
 1            you could get that information?
 2      A.    I'm sure we've got that information.
 3      Q.    And you believe that more have been hired by the
 4            City of Auburn Fire Department?
 5      A.    Including in the student firefighter program,
 6            yes.
 7      Q.    But not including the student firefighter
 8            program.
 9      A.    I don't know about those last two.
10      Q.    Do you know how many white firemen have been
11            hired by the City of Auburn since 1991?
12      A.    No.
13      Q.    Do you have an estimate?
14      A.    Regular or student?
15      Q.    Regular.
16      A.    This is a very rough estimate.  Probably 20.
17      Q.    Could the City provide records to us of that
18            number?
19      A.    We can try.
20                  MR. MORGAN:  Well, let me -- you can
21                      submit a request and we can
22                      respond to it.
23      Q.    You said a rough estimate would be 20, correct?
```

1   A.   A very rough estimate.

2   Q.   Could be more?  Could be less?

3   A.   Yes.

4   Q.   You're referring to the student firefighters,

5       and I guess your indication is there have been a

6       number of Afro-Americans hired into the student

7       firefighter program, correct?

8   A.   Correct.

9   Q.   Are you aware of one Afro-American student

10      firefighter that's been hired by the City of

11      Auburn as a full-time firefighter since 1991?

12              MR. MORGAN:  Object to the form.

13   A.   I think one.

14   Q.   Who?

15   A.   If I'm not mistaken, Gerald was a student

16      firefighter.

17   Q.   Gerald Stephens?

18   A.   Yes.

19   Q.   Other than Mr. Stephens, who has been hired to

20      your knowledge out of the student firefighter

21      program?

22   A.   I couldn't say.

23   Q.   What does the student firefighter program do in

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | order to attract minority applicants in the City            |
| 2  |    | of Auburn?                                                   |
| 3  | A. | Thank you for asking that question.                          |
| 4  | Q. | Uh-huh (positive response).                                  |
| 5  | A. | The City of Auburn is very aggressive in its                |
| 6  |    | recruitment process.  We cast a very wide net                |
| 7  |    | such that anybody that wants to know of a job                |
| 8  |    | with the City of Auburn can easily find out                  |
| 9  |    | about that.  Specifically in terms of recruiting             |
| 10 |    | minorities to the student firefighter program,               |
| 11 |    | we recruit through the State Employment Office,              |
| 12 |    | through the City's Web site, through four or                 |
| 13 |    | five traditionally black colleges, through a                 |
| 14 |    | dozen or so black churches, through -- At one                |
| 15 |    | time we sent literature to every high school in              |
| 16 |    | the state informing them about the student                   |
| 17 |    | program.  More recently we've sent literature --             |
| 18 |    | contacted every high school within a 50 to 60                |
| 19 |    | mile range.  We have participated in career days             |
| 20 |    | at those high schools.  Much of this has been an             |
| 21 |    | effort to reach out to minorities and let them               |
| 22 |    | know of our programs so that we can get them                 |
| 23 |    | into the student program.  And ultimately                    |

 1          because our student program does act as a feeder

 2          into our career program because of the education

 3          and the experience that the student firefighters

 4          have, they become -- they are very competitive

 5          with outside applicants for career firefighter

 6          positions and so we try to get them into the

 7          student program so they'll be successful when

 8          they apply for the career positions.  So we cast

 9          a very wide net, and we've been very aggressive

10          with that.

11    Q.    And, again, other than Gerald Stephens, you're

12          not aware of any student fire -- minority

13          student firefighter hired full-time by the City

14          of Auburn since 1990, correct?

15    A.    That's correct.

16    Q.    Do you know who drafted Plaintiff's Exhibits 7

17          and 8, who authored those exhibits?

18    A.    Yes.

19    Q.    Who?

20    A.    Me.  It was also reviewed by -- After I drafted

21          them, it was reviewed by the city attorney, and

22          I suspect that public safety employees were also

23          involved in that review.  But I drafted it.

108

1   Q.   Do you agree with me that if the battalion chief

2        test with a cutoff score had not been used --

3        specifically with a cutoff score had not been

4        used as a part of the battalion chief promotion

5        that Gerald Stephens and Eddie Ogletree would

6        have had a better opportunity to receive the

7        battalion chief promotion?

8              MR. MORGAN:  Object to the form.

9   A.   I don't know that.

10  Q.   Are you aware or have you been told by any chief

11       or any other employee with the City of Auburn

12       that there were other factors in that

13       promotional process that they thought would have

14       hindered Mr. Ogletree or Mr. Stephens pursuant

15       to that promotion?

16             MR. MORGAN:  Object to the form.

17  A.   No.

18  Q.   And just so I'm clear -- and I'm going to take a

19       little break, and I may be through -- your

20       position and the City of Auburn's position back

21       in February of '06 and until today is that the

22       1991 order in the Hammock case is no longer in

23       effect and was not in effect back in 2006,

109

1    correct?

2                    MR. MORGAN:   Object to the form.   Go

3                         ahead.

4    A.   I would say that's true in regard to utilization

5         of the selection procedure for lieutenant.

6    Q.   What about captain?

7                    MR. MORGAN:   Object to the form.

8    Q.   Let me ask you this.   Isn't it true that the

9         title change from captain to shift commander --

10             Is that right?

11   A.   Yes.

12   Q.   -- relieved the City of any requirements

13        pursuant to this order with regard to the

14        captain promotion?

15                   MR. MORGAN:   Object to the form.

16   A.   I don't think the City looked at it that way.

17   Q.   Well --

18   A.   I think the City saw that as just a title

19        change, and they were still abiding by this

20        agreement.

21   Q.   Still abiding by this agreement when?   At what

22        time?

23   A.   When shift commander became a job title used in

110

1        the fire division.

2    Q.    And that was in the early to mid-'90s, correct?

3    A.    Somewhere in there.

4                    MR. HORSLEY:  Let's take a little

5                        break.

6                    (Brief recess.)

7                    MR. HORSLEY:  On the record we need to

8                        state we are missing Exhibit 6.

9                        There was no document marked as

10                       Exhibit 6.

11   Q.    I'm going to get you to identify several

12       things.

13                   (Brief off-the-record discussion.)

14                   MR. HORSLEY:  I will mark what I'm

15                       about to offer as Exhibit 6.

16                   (Plaintiff's Exhibit 6 marked for

17                       identification.)

18   Q.    This is a document that was produced to us in

19       the initial disclosures in this case.  Can you

20       simply identify that for me?

21                   (Brief off-the-record discussion.)

22   Q.    Can you identify it for me?

23   A.    This is entitled City of Auburn Pay Table

111

1      Beginning October 1, 2005.

2    Q.    And --

3    A.    And at the bottom it says:  Pay table FY 2006.

4    Q.    Is that -- What does that mean?

5    A.    That means that that was the pay table for the

6          classified employees of the City of Auburn in

7          effect for fiscal year 2006, which began October

8          1, 2005.

9                      (Plaintiff's Exhibits 10 & 11 marked

10                          for identification.)

11   Q.    Let me show you what I've marked as Plaintiff's

12         Exhibits 10 and 11, which are Notice of Right to

13         Sue letters and determinations issued by the

14         U.S. Equal Employment Opportunity Commission

15         which I believe were both sent to the City of

16         Auburn.  And I'll just ask you if you've ever

17         seen both of those documents.

18                   MR. MORGAN:  I see what they are, but

19                      are you representing that the

20                      determination went with the right

21                      to sue letter?

22                   MR. HORSLEY:  I believe it did.

23                   MR. MORGAN:  I'm going to object to

1              the form.
2                        MR. HORSLEY:  This is how I have the
3                        documents in my file.  I may be
4                        wrong.
5                        MR. MORGAN:  All right.  I'm going to
6                        object to the form.
7                        MR. HORSLEY:  That's fine.
8    Q.    Have you seen all these documents previously?
9    A.    I think so.
10   Q.    My question is:  Before the determinations were
11         sent to the City of Auburn, did you participate
12         in the City of Auburn's response to the EEOC
13         claims made by Stephens and Ogletree?
14   A.    I did.
15   Q.    And did you do that with Mr. Umbach?
16   A.    I did.
17   Q.    Did anybody else with the City to your knowledge
18         participate in the City's response to those
19         charges?
20   A.    Yeah.  I believe others at this table
21         participated in that and others that are not at
22         this table, including CWH.
23   Q.    Who actually drafted the responses?

113

1    A.    I think it was -- it came out of our city

2          attorney's office.  I don't know who drafted it.

3    Q.    Around Umbach?

4    A.    It came from his office.

5                    (Plaintiff's Exhibit 12 marked for

6                        identification.)

7    Q.    What I have marked as 12 are your response to

8          our interrogatories.

9                    MR. HORSELY:  And, Randall, you may

10                       have sent them to me and I haven't

11                       seen them in my mass of

12                       documents.  But I don't think I

13                       have a signed copy yet.

14                   MR. MORGAN:  Okay.  I'll check on

15                       that.

16                   MR. HORSLEY:  If you've already sent

17                       them, just tell me and I'll try to

18                       find them.  But I assume nothing

19                       has changed.

20   Q.    Can you identify Plaintiff's Exhibit 12?

21                    (Brief off-the-record discussion.)

22   A.    You asked me to identify this document:  Stephen

23          A. Reeves' Responses to Plaintiff's First Set of

114

1        Interrogatories.

2   Q.   Is that an accurate copy of your responses to my

3        interrogatories as best you can tell?

4   A.   As best I can tell.

5   Q.   Have you ever read those before today?

6   A.   I think I did.

7   Q.   Do you recall signing them and getting your

8        signature notarized?  It's not on that document,

9        but do you know if you've done that yet?

10  A.   I don't recall notary -- What I do recall is

11       that the City developed responses.  That's what

12       stands out in my mind more so than this

13       document.

14  Q.   But those are your individual responses.  At

15       some point you're going to have to sign

16       responses, and what I'm trying to get at is:

17       Are those going to be the responses that you

18       sign or is there going to be something that's

19       changed or different before you sign them or do

20       you know?

21  A.   I don't know, but I have no reason to believe

22       that I would make any changes.

23  Q.   As far as you know, these are your responses to

115

1          the interrogatories that -- these are going to

2          be your sworn responses to my interrogatories?

3     A.   As far as I know.

4     Q.   Are you aware that Lieutenant Stephens requested

5          of Langley to have his lieutenant's title

6          changed to that of captain at some point?

7     A.   I'm not aware of that.

8     Q.   So you're not aware that that request was

9          denied?

10    A.   I've never heard that.

11                    MR. HORSLEY:  That's all I have.

12                    Thank you.

13                    MR. HANCOCK:  I've got just a couple

14                    of questions.  I'll go ahead and

15                    knock them out.

16                         **EXAMINATION**

17   BY MR. HANCOCK:

18    Q.   Mr. Reeves, the City of Auburn does not contend

19         that CWH's batching test had a disparate impact

20         on test takers, does it?

21    A.   Not being a statistician, I don't think you can

22         establish disparate impact with such a small

23         population.

116

1    Q.    I'm not asking about the statistical

2          significance of the pool of test takers.  I'm

3          asking whether Auburn takes the position that

4          the test itself had a disparate impact on those

5          who took the test.

6    A.    We take the position that it didn't.

7    Q.    Do you recall that CWH recommended that no

8          cutoff score be applied, that the City not use a

9          cutoff score of any number?

10   A.    I don't recall -- There was a lot of discussion

11         about cutoff score.  In fact, in the literature

12         from CWH, it says some tests use a cutoff

13         score.  We discussed that quite extensively with

14         CWH.  We partnered with them through this

15         process, and there was a lot of back-and-forth

16         discussion.  And ultimately the decision was we

17         would use a cutoff score as part of the

18         process -- the overall process.

19   Q.    I understand that was the City's ultimate

20         decision.  My question is:  Do you recall that

21         CWH recommended that a cutoff score not be

22         used?  Let me ask it maybe a different way.

23               Do you recall that CWH recommended that all

1      applicants be allowed to proceed through the

2      assessment center notwithstanding their test

3      score?

4   A.  At one time they actually recommended that only

5      the top twelve finishers go through.

6   Q.  That ultimately was not the City's decision,

7      though, right?

8   A.  No.  Ultimately the City's decision was that

9      anybody that passed the 70 percent threshold

10     would move forward in the process.

11  Q.  And it was the City's decision not to allow

12     those who didn't score 70 or higher on the test

13     to proceed to the assessment center; is that

14     correct?

15  A.  As I've said before, that was the decision made

16     collectively with CWH as our consultant.

17  Q.  CWH was the consultant, but it had no decisional

18     authority in the decision, did it?

19          MR. MORGAN:  Object to the form.

20  A.  Ultimately, if you want to say who had the final

21     authority on a cutoff score, it would have been

22     the City of Auburn.

23  Q.  CWH couldn't make any decision at all.  All it

118

1        could do is offer advice; is that correct?

2                MR. MORGAN:  Object to the form.

3  A.   Correct.

4  Q.   If CWH were to take the position that it

5       recommended that all applicants be allowed to

6       proceed to the assessment center regardless of

7       score and that the test score be but one

8       component of the ultimate decision, would you

9       dispute that contention?

10              MR. MORGAN:  Object to the form.

11  A.   Yes.

12  Q.   Why?

13  A.   Part of the discussion included CWH, Michael

14      Blair, expressing the opinion that somebody that

15      did poorly on the test would find the assessment

16      center process demoralizing or humiliating.

17  Q.   I'm not sure that answers my question, though.

18  A.   Would you ask the question again, please?

19              MR. HANCOCK:  Would you read it back

20            to him, please?

21           (The immediately preceding question

22            was read back by the court

23            reporter.)

1   A.   I can only say that there was a lot of

2        back-and-forth discussion, and I don't know if

3        they actually said that we should not have a

4        cutoff score and that everyone should

5        participate.

6   Q.   So Auburn's position is that there was

7        discussion back and forth, but it couldn't

8        dispute the assertion by CWH that CWH

9        recommended that all applicants be allowed to

10       proceed through the assessment center

11       notwithstanding their test score?

12            MR. MORGAN:  Object to the form of the

13               question.

14  A.   My position is that we partnered with CWH to

15       guide us through a process, and we listened very

16       carefully to their recommendations.  There was a

17       lot of discussion about whether or not to use a

18       cutoff score.  And ultimately, in conjunction

19       with CWH, a cutoff score was determined.

20       Whether or not CWH advised us flat-out not to

21       use a cutoff score, I don't recall that.

22  Q.   You don't recall one way or the other?

23  A.   I don't recall that they flat-out said don't use

120

1        a cutoff score.

2   Q.   Do you remember them urging the City not to use

3        a cutoff score?

4               MR. MORGAN:  Object to the form.

5   Q.   Pardon me.  Do you recall that CWH recommended

6        that Auburn not use a cutoff score?

7   A.   I don't recall that.  Again, there was a lot of

8        conversation back and forth, and we talked about

9        letting the score stand as it was and being a

10       part of the final score as it was -- ultimately

11       the test was a part of the final score at the

12       end of the process or to -- or not to have a

13       cutoff score.  I just -- There was a lot of

14       discussion about that, and ultimately we decided

15       that in the tradition of the fire service and in

16       being consistent with other testing processes

17       that the City had done that the cutoff score was

18       an appropriate thing for us to use on the

19       written test.

20   Q.   It was Lee Lamar who first suggested a 70 cutoff

21       score, wasn't it?

22   A.   I can't say he was the first one to say that.

23       Again, that's something in the CWH literature.

1    Q.    Well, CWH never recommended that the City use a

2          cutoff score of 70, did it?

3    A.    Actually, in the assessment -- in the exercises

4          portion of the whole process, they did.

5    Q.    I'm talking about the test.

6    A.    I don't know that they said one way or the

7          other.  I mean, I couldn't say that they said 70

8          percent.

9    Q.    Is it Auburn's position that CWH ever recommend

10         that a cutoff score be used with regard to the

11         test -- the written test?

12                   MR. MORGAN:  Object to the form.

13   A.    They told us that some clients use a cutoff

14         score and some clients don't.  I'm sorry I'm not

15         answering the question.

16   Q.    Right.  Because in point of fact, CWH never

17         recommended that the City of Auburn use a cutoff

18         score.

19                   MR. MORGAN:  Object to the form.

20                   Asked and answered.

21   A.    I don't think they -- Through those discussions

22         they didn't say it was wrong to do so.

23   Q.    But they never said it was right and appropriate

1      to.  They said some clients use a cutoff and

2      others don't?

3                    MR. MORGAN:  Object to the form.

4   A.  And what would we take from that?

5   Q.  Well, ultimately it was the City of Auburn and

6      not CWH that decided to use a cutoff score; is

7      that correct?

8   A.  Yes.

9   Q.  And it was the City of Auburn and not CWH that

10     decided that the cutoff score would be 70; is

11     that correct?

12                   MR. MORGAN:  Object to the form.

13  A.  Yes.

14  Q.  And it's the City's position that the

15     utilization of the written test with a cutoff

16     score of 70 did not have an adverse impact on

17     applicants or test takers; is that correct?

18  A.  Correct.

19                   MR. HANCOCK:  I don't have anything

20                        else.

21                   MR. HORSLEY:  One other question.

22                        **EXAMINATION**

23  BY MR. HORSLEY:

1    Q.    The battalion chief promotion in 2006 was the

2          first time the City had ever implemented a test

3          with a cutoff score for a promotion; is that

4          correct?

5                    MR. MORGAN:  Object to the form.

6    A.    Not correct.

7    Q.    When was it done before?

8    A.    It was used for team leader in 2005.

9    Q.    Team leader in 2005.

10         And who was the company that implemented or

11         did the test?

12   A.    We utilized a test that was developed by the

13         International Public Management Association.

14   Q.    And that was for promotions to team leader?

15   A.    To company officer, parenthesis, lieutenant, or

16         maybe it's the other way around.  It's the

17         company officer level position.

18   Q.    And that was in 2005?

19   A.    That's correct.

20   Q.    And it's your testimony that the City used a

21         test with a cutoff score as their first factor

22         in that promotional process; if you didn't meet

23         the cutoff score, you did not go forward?

1   A.   That's my recollection.

2   Q.   And who to your knowledge applied for that

3        promotion?

4   A.   I don't remember.  I think I want to say David

5        Hines was the one that was promoted from that

6        process, but I don't remember who all applied

7        for it.

8   Q.   Do you recall what African-Americans, if any,

9        applied for that promotion?

10  A.   I think Chris Turner applied for that.

11  Q.   Did he take the test?

12  A.   I think he did.

13  Q.   Did he pass it?

14  A.   He did not.

15  Q.   What was the cutoff score on that test?

16  A.   I recall that it was 70 percent.

17  Q.   Who decided to have a test with a cutoff score

18       of 70 on that occasion?

19  A.   I don't know.  Maybe I should say I don't

20       recall.

21  Q.   Was the battalion chief promotion the first time

22       that the City had ever implemented a test with a

23       cutoff score for any position -- for promotion

125

1        to any position above team leader?

2                 MR. MORGAN:  Object to the form.

3  A.  Are you asking if we had ever used a test with a

4      cutoff score for the battalion level job?

5  Q.  Yes.

6  A.  No.

7  Q.  Okay.

8  A.  Not to my knowledge.

9  Q.  Is it Chief Lamar now?

10  A.  Yes.

11  Q.  Was Chief Lamar required to take a test with a

12      cutoff score in order to be promoted to chief?

13  A.  No.

14  Q.  Was that a position that people could apply for?

15  A.  The city manager made an appointment to the

16      unclassified service.  The fire chief, the

17      police chief, the department heads are in the

18      unclassified service.  They are not covered by

19      the personnel policies of the City of Auburn.

20      They serve strictly at the will of the city

21      manager.  He was appointed to that position.

22  Q.  What about -- What was his job before he was

23      deputy chief?

1    A.    Before he was deputy chief, he was team leader.

2    Q.    He was a team leader?

3    A.    I'm sorry.  He was the training officer.

4    Q.    Training officer.  And he was promoted from

5          training officer to deputy chief; is that

6          correct?

7    A.    Correct.

8    Q.    Did that promotion require an assessment center?

9    A.    No, not that I recall.

10   Q.    Was he required to take any type of test?

11   A.    I think there were interviews.

12   Q.    Do you recall who else interviewed for that

13         position?

14   A.    I don't.

15   Q.    Will you agree with me that Chief Lamar was

16         promoted to chief based on experience and

17         seniority?

18               MR. MORGAN:  Object to the form.

19   A.    No.

20   Q.    You would not?

21   A.    No.

22   Q.    What were the circumstances of that promotion?

23               MR. MORGAN:  Object to the form.

127

1   A.   It wasn't my decision.

2   Q.   Do you know why he was promoted to that

3       position?

4   A.   I assume because he was doing a good job as

5       acting chief.

6   Q.   His experience and his job history with the City

7       of Auburn allowed for him to get that

8       promotion.  Would you agree with that?

9             MR. MORGAN:  Object to the form.

10            He's asked and answered.

11  A.   The skill set -- From an HR perspective, the

12      skill set that Lee Lamar brought to the table

13      combined with education and his experience as a

14      fire officer enabled him to succeed as the

15      acting chief.  And I would presume -- I'm not

16      speaking for my city manager, but I'm assuming

17      my city manager took that into consideration

18      when he made the appointment.

19            MR. HORSLEY:  That's all.  Thank

20         you.

21       (Deposition concluded at

22         approximately 12:30 p.m.)

23       * * * * * * * * * * *

1        FURTHER DEPONENT SAITH NOT

2        * * * * * * * * * * * *

3        REPORTER'S CERTIFICATE

4   STATE OF ALABAMA:

5   MONTGOMERY COUNTY:

6        I, Pamela A. Wilbanks, CCR, Registered

7   Professional Reporter, and Commissioner for the State

8   of Alabama at Large, do hereby certify that I reported

9   the deposition of:

10        STEVEN A. REEVES

11   who was first duly sworn by me to speak the truth, the

12   whole truth and nothing but the truth, in the matter

13   of:

14        EDDIE OGLETREE, an individual,

15        GERALD STEPHENS, an

16        individual,

17        Plaintiffs,

18        Vs.

19        CITY OF AUBURN, a municipality

20        in the State of Alabama, LARRY

21        LANGLEY, and individual, LEE LAMAR,

22        an individual, BILL HAM, JR., an

23        individual, STEVEN A. REEVES, an

129

1          individual, BILL JAMES, an

2          individual, CHARLES M. DUGGAN, an

3          individual, and CORTEZ LAWRENCE,

4          an individual,

5          Defendants.

6          In The U.S. District Court

7          For the Middle District of Alabama

8          Eastern Division

9          3:07-CV-867-WKW

10  on Wednesday, July 30, 2008.

11          The foregoing 128 computer printed pages

12  contain a true and correct transcript of the

13  examination of said witness by counsel for the parties

14  set out herein.  The reading and signing of same is

15  hereby not waived.

16          I further certify that I am neither of kin nor

17  of counsel to the parties to said cause nor in any

18  manner interested in the results thereof.

19          This 5th day of August 2008.

20

21

22

23

130

ORIGINAL

1

2

3

4

5          *Pamela A. Wilbanks (M.M.C.)*
           Pamela A. Wilbanks, ACCR #334
6          Expiration Date:  9-30-2008
           Registered Professional Reporter
7          and Commissioner for the State
           of Alabama at Large

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# DEPOSITION TESTIMONY OF
# LEE LAMAR

ORIGINAL 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  EASTERN DIVISION

4   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
5   individual,

6          Plaintiffs,

7   Vs.                              CIVIL ACTION NO.
                                     3:07-CV-867-WKW
8
    CITY OF AUBURN, a municipality
9   in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
10  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
11  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
12  individual, and CORTEZ LAWRENCE,
    an individual,
13
           Defendants.
14
                  * * * * * * * * * * *
15

16          **DEPOSITION OF LEE Y. LAMAR, JR.**, taken pursuant

17  to stipulation and agreement before Pamela A. Wilbanks,

18  Certified Court Reporter, ACCR# 391, Registered

19  Professional Reporter and Commissioner for the State of

20  Alabama at Large, in the Conference Room of Auburn City

21  Hall, 144 Tichenor Avenue, Auburn, Alabama, on

22  Wednesday, July 30, 2008, commencing at approximately

23  2:50 p.m.

2

1

2                              **APPEARANCES**

3

4  **FOR THE PLAINTIFF:**

5  Mr. Richard F. Horsley
   KING, HORSLEY & LYONS
6  Attorneys at Law
   1 Metroplex Drive
7  Suite 280
   Birmingham, AL  35209
8
   **FOR THE DEFENDANT:**
9
   Mr. Randall Morgan
10 HILL, HILL, CARTER, FRANCO, COLE & BLACK
   Attorneys at Law
11 425 South Perry Street
   Montgomery, Alabama
12
   **ALSO PRESENT:**
13
   Mr. D'Arcy Wernette
14 Mr. Steven Reeves
   Mr. Larry Langley
15 Mr. Bill James
   Mr. Eddie Ogletree
16 Mr. Gerald Stephens

17
                    * * * * * * * * * * * *
18
                    EXAMINATION INDEX
19
       BY MR. HORSLEY . . . . . . . . . . .    4
20     BY MR. MORGAN . . . . . . . . . . .    38
       BY MR. HORSLEY . . . . . . . . . . .   42
21
                    * * * * * * * * * * * *
22

23

3

1

2                       <u>PLAINTIFF'S EXHIBIT INDEX</u>

3    19    4/28/06 letter to Horace Clanton from Lee       31
4          Lamar in response to Mr. Clanton's
           grievance

5    20    4/28/06 letter to Gerald Stephens from Lee      33
6          Lamar in response to Mr. Clanton's
           grievance

7    21    Two memos regarding the battalion chief         33
8          promotion dated 2/17/06 and 2/23/06

9    22    Chief Langley's answers to interrogatories      41

     23    Lee Lamar's answers to interrogatories          41
10

11

12                       **STIPULATION**

13          It is hereby stipulated and agreed by and

14   between counsel representing the parties that the

15   deposition of **LEE Y. LAMAR, JR.** is taken pursuant to

16   the Alabama Rules of Civil Procedure and that said

17   deposition may be taken before Pamela A. Wilbanks,

18   Registered Professional Reporter and Commissioner for

19   the State of Alabama at Large, without the formality of

20   a commission, that objections to questions other than

21   objections as to the form of the question need not be

22   made at this time but may be reserved for a ruling at

23   such time as the said deposition may be offered in

4

1  evidence or used for any other purpose by either party

2  provided for by the Statute.

3        It is further stipulated and agreed by and

4  between counsel representing the parties in this case

5  that the filing of said deposition is hereby waived and

6  may be introduced at the trial of this case or used in

7  any other manner by either party hereto provided for by

8  the Statute regardless of the waiving of the filing of

9  the same.

10        It is further stipulated and agreed by and

11  between the parties hereto and the witness that the

12  signature of the witness to this deposition is hereby

13  not waived.

14                  * * * * * * * * * * *

15                  **LEE Y. LAMAR, JR.**

16        The witness, after having first been duly

17  sworn to speak the truth, the whole truth and nothing

18  but the truth testified as follows:

19                  **EXAMINATION**

20  BY MR. HORSLEY:

21   Q.    Please tell us your full name.

22   A.    Lee Young Lamar, Jr.

23   Q.    We've met before.  I'm going to ask you

5

```
 1            questions just like everybody else.  If you want
 2            me to rephrase it or repeat it, tell me.
 3            Otherwise I'll assume you understood and gave
 4            the answer you intended to give.  Okay?
 5     A.     Yes, sir.
 6     Q.     Where do you currently reside?
 7     A.     566 Lee Road 93, Waverly, Alabama 36879.
 8     Q.     And where are you currently employed?
 9     A.     City of Auburn.
10     Q.     And you're the City of Auburn fire chief; is
11            that correct?
12     A.     Deputy public safety director fire operations or
13            fire chief.
14     Q.     And that means fire chief?
15     A.     Yes, sir.
16     Q.     If I call you fire chief, we'll assume -- that
17            means all those titles you just gave us.
18                 And how long have you been the fire chief?
19     A.     I was named acting December 1, 2007 and then was
20            made permanent July 1, 2008.
21     Q.     And what were you on December 1 of '07?
22     A.     Acting.
23     Q.     And then you became permanent?
```

6

```
 1   A.    Yes, sir.

 2   Q.    What process did you go through to go from

 3         acting fire chief to permanent fire chief?

 4   A.    No specific process.  Mr. James and I discussed

 5         it, and then I was -- had an appointment with

 6         Charles Duggan, the city manager.  We discussed

 7         it, and then he offered the position to me.

 8   Q.    Was that a promotion?

 9   A.    Yes, sir.  From deputy chief.

10   Q.    And you didn't have to take a test, correct?

11   A.    No, sir.  Not for that.

12   Q.    Other than your meeting with Mr. Duggan, did you

13         have to give any interviews?

14   A.    I had to prepare some papers.  They requested

15         some papers be written.

16   Q.    Did you have to go to an assessment center?

17   A.    No, sir.

18   Q.    What job did you -- That's when you went from

19         acting to permanent?

20   A.    Yes, sir.

21   Q.    Before you were acting fire chief, what was your

22         position?

23   A.    Deputy fire chief.
```

7

Q.   And what year or when did you go from being
     deputy fire chief to acting fire chief?
A.   2007.
Q.   And that's when Chief Langley retired?
A.   Yes, sir.
Q.   Tell us what process you had to go through in
     order to become acting fire chief.
A.   I don't recall the specific process.  Before
     Chief Langley retired, Mr. James met with me and
     explained or offered me the opportunity to take
     over as acting.
Q.   Once again, you didn't have to undergo any test,
     correct?
A.   No, sir.
Q.   No formal interviews, correct?
A.   Not that I recall, sir.
Q.   And you didn't have to go to an assessment
     center, correct?
A.   No, sir.
Q.   And before you were deputy chief, what was your
     position?
A.   Before deputy chief?
Q.   Yeah.

8

1    A.    I --

2    Q.    Isn't that what we were just talking about to

3          get to deputy chief?

4    A.    Well, acting -- from chief to acting -- working

5          backwards, from chief to acting.  Before acting

6          I was deputy fire chief.  Before that I was the

7          training officer for the division.

8    Q.    I thought I had asked you that, but I guess I

9          was a step ahead of myself.

10              What process did you go through to become

11          the deputy chief?

12   A.    Interview process.

13   Q.    Who did you interview with?

14   A.    I believe Wendy Hassett, Bill James, Larry

15          Langley, and Steve Reeves were on the interview

16          board that all of the candidates sat before.

17   Q.    Is deputy chief the same thing as training

18          chief?

19   A.    No, sir.  They are different jobs.

20   Q.    Did you hold the job of training chief?

21   A.    I was training officer, yes, sir.

22   Q.    That was before deputy chief?

23   A.    Yes, sir.

9

1    Q.    So you interviewed with those people you just

2           mentioned to become deputy chief.  What else did

3           you have to do?

4    A.    It was a competitive interview.  That was all we

5           did.  We submitted resumes and applications, and

6           then they interviewed us and made a selection

7           based on our interview scores.

8    Q.    Did you have to undergo an assessment center?

9    A.    No, sir.

10    Q.    Did you have to take a written test?

11    A.    No, sir.

12    Q.    Who else applied for deputy chief when you did?

13    A.    Within the department -- There were both people

14           from inside and outside the department.  From

15           within the department, I believe Rod Hartsfield,

16           I believe Gerald Stephens, Joey Darby.  I'm not

17           sure who else within the department.  And then

18           there were several people from outside that I

19           would not -- I didn't know.  We weren't privy to

20           those names.

21    Q.    How does that work?  Did they come from some

22           other fire department?

23    A.    Yes, sir.

10

1    Q.    It wasn't just people -- It wasn't just
2          civilians.  Okay.
3              Do you have any information today about
4          Gerald Stephens' interviews for that job?
5    A.    No, sir.  That would be privileged.
6    Q.    Was the job of deputy chief actually a posted
7          job position?
8    A.    Yes, sir.
9    Q.    Who ultimately made the decision to promote you
10         to deputy chief?
11   A.    If -- I don't know for sure.  I would imagine if
12         it's like many things, a recommendation by the
13         board was sent to the city manager, and he would
14         have made the appointment.
15   Q.    And was anybody else promoted to deputy chief at
16         the same time?
17   A.    No, sir.
18   Q.    There's only one deputy chief --
19   A.    There's only --
20   Q.    -- in that department?
21   A.    -- one vacancy.  Sorry.
22   Q.    And before deputy chief, what was your position?
23   A.    Training officer for the division.

11

1    Q.    Training officer?

2    A.    Yes.

3    Q.    And that's different than training chief?

4    A.    The actual job title is training officer on the

5          job description.

6    Q.    So is there such a thing as training chief?

7    A.    People refer to it as that because it's at the

8          same level as the battalion.

9    Q.    So when I said training chief a minute ago, that

10         would be the same thing as training officer; is

11         that correct?

12   A.    Yes, sir.

13   Q.    And how long were you a training officer?

14   A.    I believe it was -- March of 2001 would have

15         been when I moved over from the line to that

16         position.

17   Q.    What do you mean the line?

18   A.    In fire service you have line and staff.  Line

19         personnel are those who work shift and respond

20         to calls directly on a daily basis.  Staff are

21         those who work in administration.  And I moved

22         off the line to take that position.

23   Q.    What was your job title before you became

12

1    training chief?

2  A.   Team leader.

3  Q.   And what process did you go through to be

4       promoted from team leader to training officer?

5  A.   I believe it was posted.  I stated that I was

6       interested in it, and I don't think anybody else

7       did because there was no pay incentive.  And it

8       was just an opportunity to move over and try to

9       work with training.  I think I was the only

10      person who applied at that time.

11 Q.   Is it your testimony under oath that that job

12      was posted for people within the department to

13      apply for, correct?

14 A.   To the best of my recollection.

15 Q.   And did you have to take a test to get that

16      promotion?

17 A.   No.

18            MR. MORGAN:  Object to the form as a

19                promotion.

20 Q.   Did you have to undergo an assessment for that

21      promotion?

22            MR. MORGAN:  Object to the form of

23                the question.

13

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Did you have to interview for that? |
| 3 | | MR. MORGAN:  Object to the form. |
| 4 | A. | No. |
| 5 | Q. | All you did was put your name and you were |
| 6 | | selected -- put in your name and you were |
| 7 | | selected, correct? |
| 8 | A. | Yes, sir.  It was not a promotion. |
| 9 | Q. | Was there a certain reason why you wanted it, if |
| 10 | | it was not a promotion, but nobody else wanted |
| 11 | | it? |
| 12 | A. | I had worked for quite a while with training new |
| 13 | | recruits and was very interested in it.  And my |
| 14 | | wife and I discussed it as an opportunity to |
| 15 | | improve my skills.  And so we viewed it -- Even |
| 16 | | though I would not be working part-time anywhere |
| 17 | | because I would be coming off line, it was an |
| 18 | | opportunity that I needed to take and see if I |
| 19 | | could make it work and try to develop my skills. |
| 20 | Q. | And then before that you said you were a team |
| 21 | | leader, correct? |
| 22 | A. | Yes, sir. |
| 23 | Q. | And how long were you a team leader? |

14

```
 1    A.    From March of 1994 until approximately March
 2          2001.
 3    Q.    And what process did you go through to become --
 4          Well, what were you before you were a team
 5          leader?
 6    A.    A firefighter.
 7    Q.    What process did you go through to be promoted
 8          from firefighter to team leader?
 9    A.    Internal structured interview.
10    Q.    Internal structured interview?
11    A.    Yes, sir.
12    Q.    Did you have to take a test?
13    A.    No.  We had -- there were -- I think we did --
14          There was a interview phase, and then we also
15          had to do paperwork, prove capability of doing
16          paperwork, and I believe there was a hot seat
17          exercise.
18    Q.    What year was it you were promoted to team
19          leader?
20    A.    1994.
21    Q.    Didn't have to undergo an assessment center,
22          correct?
23    A.    Not an assessment center, no, sir.
```

15

```
 1   Q.   Didn't have to take a test, correct?

 2   A.   No, sir.

 3   Q.   Do you recall who was promoted with you to team

 4        leader in 1994?

 5   A.   About a month after I was -- a month or two

 6        months after I was, Terry Smith was promoted.

 7   Q.   So at the time you were promoted, you were the

 8        only one.  And then about a month later Terry

 9        Smith was promoted?

10   A.   Yes, sir.  There was a list, I believe, that had

11        been formed.  And as positions came open, people

12        were promoted up.

13   Q.   Is Terry Smith still with the department?

14   A.   No, sir.  He retired.

15   Q.   Was he white or black?

16   A.   He's white.

17   Q.   And then was firefighter your first position

18        with the City of Auburn --

19   A.   Yes, sir.

20   Q.   -- Fire Department?

21             Where were you employed before the City of

22        Auburn Fire Department?

23   A.   Let's see.  In 1978 and '79 I was going to
```

16

1                school at Auburn University and was working

2                part-time at Tyson's Grocery.  I worked on the

3                family farm some in Macon County and any other

4                odd jobs at the time.

5        Q.      Just so it's clear on the record, what was your

6                position with the fire department from February

7                2006 through May of 2006?

8        A.      Would have been the deputy chief.

9        Q.      Did you participate in the decision-making

10               process concerning the battalion chief

11               promotion?

12       A.      Yes, sir.  Collectively there were a group of us

13               who made decisions on that.

14       Q.      Why did there need to be a battalion chief

15               promotion in 2006?

16       A.      We had several battalion chiefs who were

17               retiring and several more who had the time in

18               service to retire so we wanted to go ahead and

19               get that accomplished.

20       Q.      During the initial meetings about that promotion

21               before CWH was hired, do you recall discussions

22               that y'all had as a group about what the process

23               would entail for the promotion of battalion

17

1      chief?

2   A.    I think there were probably some general

3         discussions about what we should include.

4   Q.    What do you remember about those discussions?

5   A.    That what we were looking for or what components

6         of an assessment center would best measure the

7         candidates in the process.  We may have

8         discussed role plays or in-baskets or written

9         exams or hot seat exercises, tactical exercise,

10        any number of things.

11  Q.    Was it a concern of yours that the City of

12        Auburn Fire Department comply with the 1991

13        settlement order marked as Plaintiff's Exhibit 3

14        pursuant to the battalion chief promotion in

15        2006?

16              MR. MORGAN:  Object to the form.

17  A.    Not greatly, sir, no.

18  Q.    It was not a concern of the City's, correct?

19  A.    Not a concern of mine.

20              MR. MORGAN:  Object to the form.

21  Q.    Not a concern of yours that you comply with the

22        order, correct?

23  A.    What we viewed -- That was a decision that would

18

```
 1        have been made above my grade at the time.  My
 2        concern was that we identify the best way to
 3        find a candidate -- the best candidates.
 4   Q.   And the order itself was not a concern of yours
 5        personally?
 6   A.   Not mine personally, no, sir.
 7   Q.   And in these meetings and in deciding how y'all
 8        were going to make the battalion chief
 9        promotions, did you ever sit down and read that
10        order and say, okay, well, we've got to comply
11        with this part and this part?
12   A.   I don't believe I did, no, sir.
13   Q.   Did you know at the time whether or not the City
14        of Auburn was required to comply with that order
15        for the battalion chief promotion in 2006?
16                  MR. MORGAN:  Object to the form.
17   A.   I did not know, no, sir.
18   Q.   You did not know?
19   A.   No.
20   Q.   Whose decision was it to use an assessment
21        center as a part of this promotion process to
22        battalion chief?
23   A.   I think that goes back to the collective
```

19

1   discussions that we had, that that would be one
2   of the best methodologies to determine who was
3   the most highly qualified candidates.
4   Q.   Is that something that's commonly done in fire
5        departments to your knowledge, that in order to
6        determine promotions, outside assessments are
7        done?
8   A.   Assessment centers --
9   Q.   Assessment centers.
10  A.   -- or assessment processes are becoming more and
11       more common in fire service organizations.  It's
12       an expensive process, but it's -- typically what
13       they find is that the best candidates rise to
14       the top because you're measuring against
15       multiple different areas and multiple criteria.
16  Q.   And you understand that you can conduct an
17       assessment center or pay somebody to conduct an
18       assessment center without having a written test
19       as a component of the process, correct?
20  A.   A written test does not have to be a component,
21       but it can be.
22  Q.   It doesn't have to be, though.
23  A.   Doesn't have to be.

20

```
 1   Q.   If a written test is to be a component of a
 2        promotional process, it is not required that
 3        there be a cutoff score; is that correct?
 4   A.   That's left up to the individual agency is
 5        typically what's done I would think, if they
 6        want to impose one or not.
 7   Q.   Well, who imposed a cutoff score for the written
 8        test that we've been talking about today for the
 9        battalion chief promotion in 2006?
10   A.   Again, the group that's been discussed several
11        times today:  Steve Reeves, Bill James, Larry
12        Langley, myself, and CWH's personnel when they
13        arrived at that part.  We all discussed it, and
14        that was the option.
15   Q.   That was the option --
16   A.   That was the option that was chosen.
17   Q.   But you'll agree with me that the City of Auburn
18        Fire Department had ultimate discretion as to
19        whether or not there would be, number one, a
20        test, correct?
21             MR. MORGAN:  Object to the form.
22   A.   Yes, sir.
23   Q.   And number two, y'all had ultimate discretion as
```

21

```
 1          to whether or not that test would contain a
 2          cutoff score, correct?
 3                    MR. MORGAN:  Object to the form.
 4    A.    Yes, sir.  As advised by CWH, our consultant.
 5    Q.    But y'all have the ultimate decision-making
 6          power?
 7                    MR. MORGAN:  Object to the form.
 8    A.    Yes, sir.
 9    Q.    And you heard Mr. Hancock's questions earlier
10          today to Mr. Reeves, I guess, where he suggested
11          that CWH attempted to persuade or encourage the
12          City of Auburn not to use a cutoff score.  Did
13          you hear those questions?
14    A.    I heard those questions.
15    Q.    Do you recall that?
16    A.    No, sir.
17    Q.    Can you testify one way or the other about what
18          you remember CWH advising you and the City of
19          Auburn about a cutoff score?
20    A.    What I recall was that if you chose to use one
21          that it needed to be that way throughout the
22          assessment on all components.
23    Q.    That cutoff scores would be used on every
```

22

1    component?

2  A.    Yes, sir.

3  Q.    Did the City of Auburn use cutoff scores on all

4        components of the battalion chief promotion

5        process in 2006?

6  A.    Yes, sir.  I believe so.

7  Q.    And if CWH says that it encouraged you and the

8        City of Auburn not to use a cutoff score, you're

9        testifying that's incorrect?

10             MR. MORGAN:  Object to the form.

11 A.    Can you repeat that?

12 Q.    Yeah.

13        If CWH is going to say in this case that

14        they tried to encourage you and the City of

15        Auburn not to use a cutoff score for that test,

16        you're going to testify that that's incorrect;

17        is that correct?

18             MR. MORGAN:  Object to the form.

19 A.    I'm not trying to be difficult.  It's that when

20        you through that last "that's correct" --

21 Q.    Forget that last correct.  Let me ask it a

22        different way.

23        Are you going to testify that CWH did not

23

```
 1            recommend to you and the City of Auburn that you
 2            not use a cutoff score?
 3                    MR. MORGAN:  Object to the form.
 4     A.     I don't recall them specifically saying that,
 5            no, sir.
 6     Q.     You don't recall?  Is that your testimony?
 7     A.     Yes, sir.
 8                    MR. MORGAN:  Wait.  Object to the
 9                        form of that question.
10     Q.     Let's ask it again.
11                You don't recall whether CWH encouraged you
12            and the City not to use a cutoff score?
13                    MR. MORGAN:  Object to the form.
14     A.     No, they did not encourage us not to use it.  I
15            don't recall that they did.
16     Q.     And that's my question.  You don't recall or
17            they did not do it?
18     A.     I don't recall that they did -- that they did
19            not encourage us to use a cutoff.
20     Q.     You don't --
21                    MR. MORGAN:  His question -- You're
22                        asking if they do not recall, and
23                        what he's saying is I don't recall
```

24

1           them doing that.

2                    MR. HORSLEY:  And that's why I want

3                    to be clear about it.

4                    MR. MORGAN:  He doesn't recall is

5                    what you're asking him.

6                    MR. HORSLEY:  Exactly.  But I'm

7                    making sure --

8    Q.   You're not saying that it didn't happen.  You're

9         saying you don't recall whether it happened or

10        not?

11                   MR. MORGAN:  Object to the form.  Go

12                   ahead.

13   Q.   We're going to get it straight before we move

14        on.

15           I'm going to ask you two questions.  The

16        first one:  Do you remember whether CWH

17        attempted to encourage the City of Auburn not to

18        use a cutoff score?

19                   MR. MORGAN:  Object to the form.

20   A.   I do not remember them encouraging us not to use

21        a cutoff.

22   Q.   And the second question is:  The answer you just

23        gave me is, I don't remember; is that correct?

25

1                     MR. MORGAN:    Object to the form.

2     A.    That's correct.

3     Q.    Was it you, in fact, that suggested the cutoff

4           score of 70 to other members of the group with

5           the City of Auburn and CWH?

6     A.    I may have, yes, sir.

7     Q.    And why did you suggest 70 as a cutoff score, if

8           you did?

9     A.    As we were having the discussion with CWH and

10          the rest of the group, it was agreed that that

11          was a state certification standard, that you

12          could not obtain a certification without scoring

13          a minimum of 70 on an exam, that that was a

14          standard in the three to five classes that the

15          National Fire Academy has tests in.  That was

16          also an educational standard, that anything

17          below a 70 was not a transferable grade -- i.e,

18          a "D" in most schools -- and therefore would not

19          meet an educational standard as well.

20              So those three items were the argument-- my

21          side of an argument -- not argument but

22          discussion points -- in that saying that if you

23          could not obtain a 70, you really hadn't

26

1    achieved anything.

2  Q.   So --

3  A.   That was transferable.

4  Q.   So it sounds to me like you did suggest 70 as

5       the cutoff score.

6  A.   I'm sure in the discussion with everybody else,

7       yeah, we -- Again, I may have suggested it, but

8       I had thought about it.

9  Q.   Was it your perception that the people at CWH

10       didn't know all that stuff you just told me

11       about the 70 cutoff score?

12  A.   No, sir.  I believe they knew.

13  Q.   Were they suggesting a different cutoff score?

14  A.   Not that I recall.

15  Q.   Was there some reason why you were having to

16       explain all the reasons why 70 should be a

17       cutoff score to the people at CWH that you feel

18       like already knew all the things you were

19       telling them?

20  A.   Well, I think it was part of the discussion as a

21       group:  What would be your -- What would be your

22       points to make that decision on.

23  Q.   I think you've already testified to this, but

27

1        it's your testimony that you decided in

2        conjunction with the other members of the group

3        with the City of Auburn along with CWH that a

4        test that included a cutoff score should be used

5        in advance of the assessment center, correct?

6                MR. MORGAN:  Object to the form.

7    A.   Yes, sir.

8    Q.   You couldn't get to the assessment center

9        without passing the test, correct?

10               MR. MORGAN:  Object to the form.

11   Q.   Is that correct?

12   A.   That's correct.

13   Q.   I guess you heard my questions to Chief Langley

14       a minute ago or maybe -- I don't remember who it

15       was.  But you'll agree with me that the test and

16       the assessment center are two separate entities;

17       is that correct?

18               MR. MORGAN:  Object to the form.

19   A.   No, sir, I don't agree with you.

20   Q.   You don't agree with that.

21        So you disagree with -- I'm not going to

22       read it again.  You disagree with the definition

23       of assessment center provided by CWH in the

28

1       Auburn Fire Division Orientation Manual?

2             MR. MORGAN:  Object to the form.

3   A.  May I read it, sir?

4   Q.  Sure.  It's under, What Is an Assessment Center.

5   A.  I agree with portions of this, but I don't agree

6       with the entire definition they are using.

7   Q.  So you disagree with the entire definition of

8       assessment center provided by CWH, which is the

9       company y'all contracted with in order to

10      conduct the assessment center; is that correct?

11            MR. MORGAN:  Object to the form.

12  A.  Not with the entire definition, no, sir.

13  Q.  So it's your testimony that a test -- that this

14      test for the battalion chief was part of an

15      assessment center?  Is that what you're saying?

16  A.  Yes, sir.

17  Q.  Isn't the point of an assessment center that

18      somebody neutral --

19            (Brief interruption.)

20  Q.  Isn't the main objective behind an outside

21      assessment center that the assessment center is

22      conducted by someone neutral that has no

23      connection with the fire department?

29

1              MR. MORGAN:   Object to the form.

2    A.    Can you repeat that?

3    Q.    Yeah.

4          Isn't an outside assessment center -- isn't

5    the objective of that to have assessors from

6    outside the department come in neutral and make

7    objective decisions about the applicants, people

8    who are not associated with the City fire

9    department?

10             MR. MORGAN:   Object to the form.

11   Q.    Otherwise why don't you do your own assessment?

12   A.    Well, again, I'm not a specialist in developing

13   an assessment center.  The objective will be to

14   hire consultants to assist you in identifying

15   the things that would best measure candidates.

16   And it could be -- If I may, for example,

17   Birmingham, Jefferson County, is internal.  It's

18   part of their personnel board.  We don't have

19   that resource here so we would have to find that

20   resource from somebody.  And so we would hire a

21   consultant to come in and help us establish an

22   assessment process.  Not necessarily an

23   assessment center but an assessment process.

30

1    Q.    So it's not your understanding that an outside

2          assessment center is supposed to be neutral or

3          not associated in any way with the City of

4          Auburn?

5                    MR. MORGAN:  I object to the form.

6    A.    Can you repeat it one more time, sir?  I'm

7          sorry.

8    Q.    I was trying to confirm what you just said, that

9          it's not your understanding that the assessment

10         center used for the battalion chief promotion

11         was supposed to be a neutral third-party

12         assessment center.

13                   MR. MORGAN:  Object to the form.

14   A.    That's correct.  We hired an agency to come in

15         and help us establish an assessment process.

16   Q.    And, in fact, it wasn't neutral because you

17         actually made decisions about how that process

18         would work, correct?

19                   MR. MORGAN:  Object to the form.

20   A.    We consulted with our consultant.

21   Q.    Right.

22   A.    And then -- Yes, we made some decisions.

23   Q.    And you made the ultimate decision about whether

31

```
 1        the test would be given and whether there would

 2        be a cutoff score, correct?

 3   A.   We collectively, and CWH agreed to that.

 4                    (Plaintiff's Exhibit 19 marked for

 5                     identification.)

 6   Q.   What we've marked as Exhibit 19 is a letter

 7        dated April 28, 2006 from you to Horace

 8        Clanton.  First of all, if you could, identify

 9        that as your letter.

10   A.   Yes, sir.  This appears to be the letter that I

11        wrote in response to, I believe, his grievance.

12   Q.   Did you write the exact same letter -- I don't

13        think I could find it this morning, but did you

14        write the exact same letter to Gerald Stephens

15        and Eddie Ogletree to the best of your memory?

16   A.   Yes, sir.  It should have been the same letter.

17   Q.   The part that is highlighted in this letter, if

18        you would read that, please.

19   A.   A concern CWH had was that some of the

20        candidates would not be prepared for the job of

21        battalion chief based on their experience and

22        rank.

23   Q.   Can you explain that sentence to us?
```

32

1 A. As far as -- What that's referencing was that

2   when we opened this up, which we were -- again,

3   our job descriptions didn't stop from

4   happening -- when we opened that up, CWH was

5   concerned those who were in ranks below would

6   not be as qualified, would not have the rank and

7   the experience or the time serving in a rank to

8   be competitive.

9 Q. So CWH was concerned about time in grade

10   criteria for the battalion chief promotion?

11      MR. MORGAN:  Object to the form.

12 A. I don't know that it was necessarily time in

13   grade.  I think they were looking at experience

14   in position, yes, sir.

15 Q. And that's an important part of being promoted

16   to battalion chief, is it not?

17      MR. MORGAN:  Object to the form.

18 A. I believe so.

19 Q. And how did you know they were concerned about

20   that?

21 A. Obviously it was part of the discussion at some

22   point.

23 Q. They were concerned that the people who were

33

1          going to apply for the job of battalion chief

2          were not qualified; is that correct?

3                    MR. MORGAN:  Object to the form.

4      A.   I couldn't speak about their concern about

5          qualification.  I think it was about experience

6          or rank, time in rank.  I hesitate to speak for

7          what CWH's concern was specifically.

8      Q.   Just for clarification, I just found the exact

9          same letter you sent to Lieutenant Stephens.

10         I've marked it as Exhibit 20.

11              Is that what that is, the exact same letter

12         you sent to Lieutenant Stephens?

13                    (Plaintiff's Exhibit 20 marked for

14                      identification.)

15     A.   Yes, sir.  They appear to be the same.

16                    (Plaintiff's Exhibit 21 marked for

17                      identification.)

18     Q.   I'm going to mark this as one exhibit.  It's

19         21.  It will be two memos, the first one dated

20         February 17, '06 and then February 23, '06

21         regarding the battalion chief promotion.

22              Is the first page of that document a memo

23         that you issued?

34

1   A.   Yes, sir.  It looks like it.

2   Q.   And then what precipitated the second memo, if

3        you know, issued by Chief Langley?

4   A.   The application of Chris Turner for the

5        battalion chief's position.

6   Q.   And was it then after the second memo went out

7        that CWH became concerned about the

8        qualifications of those who were going to apply

9        for battalion chief?

10  A.   I don't know if it was before or after, sir.

11  Q.   Well, they wouldn't have known before February

12       23 that probationary and nonprobationary

13       firefighters and probationary lieutenants were

14       eligible for the battalion chief promotion,

15       would they?

16  A.   I don't know when they would have obtained these

17       or when they would have stated that concern.  I

18       can't speak for when they stated that concern.

19  Q.   You'll agree with me that as of the date of your

20       memo, February 17, the only eligible applicants

21       were current nonprobationary lieutenants,

22       correct?

23  A.   Yes, sir.

35

1   Q.   And then that changed?

2   A.   Yes, sir.

3   Q.   How many years have you been with the City of

4        Auburn Fire Department?

5   A.   Part-time and full-time since 1980.  So 28.

6   Q.   Do you have an estimate since 1991 of how many

7        black firemen the City of Auburn has hired as

8        full-time employees?

9   A.   As full-time?

10  Q.   Yes, sir.

11  A.   Probably between four and seven.  Not specific.

12  Q.   Between four and seven?

13  A.   Yeah.

14                 (Brief off-the-record discussion.)

15  Q.   Can you name those four -- However many it was,

16       four or seven, can you name them?

17  A.   In 1991 beginning with Thomas Scott, Chris

18       Turner, Matthew Holland, Gerald Stephens, Kevin

19       Harper.  That's who I remember right now.

20  Q.   And they were hired at different times?

21  A.   Yes, sir.

22  Q.   Between 1991 and now; is that correct?

23  A.   Yes, sir.  Most of them in the '90s I would

36

```
 1        suspect.
 2   Q.   And some of those were hired as a direct result
 3        of the lawsuit settlement, correct?
 4   A.   Of one of the settlements.  I believe Chris
 5        Turner and Thomas Scott.
 6   Q.   Also during that period of time, can you
 7        estimate how many white full-time firemen had
 8        been hired by the City of Auburn?
 9   A.   From 1991 to the present?
10   Q.   Uh-huh (positive response).
11   A.   I'm really not sure how many.
12   Q.   Would you agree with me if I suggested three per
13        year since that time?
14   A.   That may be right.  Again, we could look at the
15        date of hire records and be more specific.
16   Q.   Are you aware of any black student firefighter
17        since 1991 who has been hired full-time by the
18        City of Auburn Fire Department?
19   A.   Lieutenant Gerald Stephens and Kevin Harper both
20        came from the program.  There may have been
21        somebody else.  I'm not sure.
22   Q.   What happened to Mr. Harper?
23   A.   I think he resigned or was dismissed.  I don't
```

37

1      know specifically what happened to him.

2  Q.  Do you recall when?

3  A.  No, sir.

4  Q.  During your entire time with the City of Auburn

5      Fire Department, has there ever been a black

6      fireman that achieved a rank beyond battalion

7      chief?

8  A.  No, sir.

9           MR. HORSLEY:  Give me just a minute.

10          (Brief recess.)

11 Q.  (Continuing by Mr. Horsley)  Earlier I said

12     since you've been with the Auburn Fire

13     Department has any black ever achieved the rank

14     beyond battalion chief.

15      Now my question is:  Has any black fireman

16     achieved any rank beyond lieutenant since the

17     time you've been with the Auburn Fire

18     Department?

19 A.  No, sir.  I don't believe so.

20 Q.  You stated earlier that when you went from team

21     leader to training officer that that was a

22     lateral transfer, correct?

23 A.  Yes, sir.

38

1    Q.    And that there was no pay increase or rank

2          increase as a result of that; is that correct?

3    A.    That's right.

4    Q.    Is it not true that shortly after you became the

5          training officer, you went from a pay grade of

6          18 to 20?

7    A.    In 2004 as a process of reclassification by

8          Condrey & Associates, it was identified I was

9          doing the same job as the police training

10         officer and therefore the job should pay

11         commensurate and be rank commensurate.

12   Q.    How much longer after you became training

13         officer was it that you moved from an 18 to a 20

14         pay scale?

15   A.    Three to three-and-a-half years.

16              MR. HORSLEY:  That's all.

17              MR. MORGAN:  I've got a couple of

18              questions.

19                    **EXAMINATION**

20   BY MR. MORGAN:

21   Q.    What is it you don't remember?  You don't

22         remember any conversation or you don't remember

23         CWH telling you not to use a cutoff score?

39

|   |    |                                                              |
|---|----|--------------------------------------------------------------|
| 1 |    | MR. HORSLEY:  Object to the leading.                         |
| 2 | A. | I don't remember CWH ever telling us not to use             |
| 3 |    | a cutoff.                                                     |
| 4 | Q. | Now, let me show you Plaintiff's Exhibit 19, the            |
| 5 |    | concern of CWH about some candidates not being              |
| 6 |    | prepared for battalion chief based on experience            |
| 7 |    | and rank.                                                     |
| 8 |    | Did that concern come up after the                           |
| 9 |    | eligibility was opened up to everybody?                      |
| 10| A. | I believe so, yes, sir.                                       |
| 11|    | MR. HORSLEY:  Object to the form.                            |
| 12| Q. | That concern had to do with firefighters being              |
| 13|    | eligible to apply for battalion chief?                       |
| 14| A. | Yes, sir.                                                     |
| 15| Q. | Were any of the people who were promoted to                 |
| 16|    | battalion chief firefighter -- rank of                       |
| 17|    | firefighter?                                                 |
| 18| A. | No, sir.                                                      |
| 19| Q. | And Lovvorn, Jordan, Hartsfield, and Darby, had             |
| 20|    | they all been student firefighters?                          |
| 21| A. | Yes, sir.                                                     |
| 22| Q. | Are student firefighters certified to be                     |
| 23|    | firefighters?                                                 |

40

1    A.   Yes, sir.

2    Q.   But that time doesn't count towards their

3          seniority once they become career firefighters?

4                MR. HORSLEY:  Object to the form.

5    Q.   Does it or does it not?

6    A.   We haven't counted it towards -- We don't count

7          seniority typically for any reason.  We don't

8          use it for promotions or anything.

9    Q.   But as a student firefighter, those people are

10         certified and do they do everything that a

11         career firefighter does?

12             MR. MORGAN:  Object to the form.

13   A.   For the most part, yes, sir.

14   Q.   How long has Lovvorn been a certified

15        firefighter working with the City of Auburn

16        either as a student firefighter or a career

17        firefighter?

18   A.   Probably ten or more years.

19   Q.   And how about Jordan?

20           MR. HORSLEY:  Objection.

21   A.   Twelve years.

22   Q.   How about Hartsfield?

23           MR. HORSLEY:  Object to the form.

41

A.     Approximately ten years.

Q.     And how about Darby?

A.     Thirteen to fourteen years.  Twelve to fourteen

       years.  I'm sorry.

Q.     In your opinion were they in any way lacking in

       experience or job knowledge to be a battalion

       chief?

              MR. HORSLEY:  Object to the form.

A.     No, sir.  They showed themselves to be the best

       candidates.

              MR. MORGAN:  That's all I've got.

              MR. HORSLEY:  I forgot to mark

                  Langley's answers to

                  interrogatories and Lamar's.

              (Plaintiff's Exhibits 22 & 23 marked

                  for identification.)

              MR. HORSLEY:  What I have marked as

                  22 are Chief Langley's answers to

                  interrogatories.  And these are

                  going to remain the same once --

                  or the signed copy is going to be

                  the same as Exhibit 22, correct,

                  Randall?

42

1          MR. MORGAN:  Supposed to be.

2          MR. HORSLEY:  Now, 23 are Lee Lamar's

3              responses to my interrogatories.

4                      **EXAMINATION**

5  **BY MR. HORSLEY:**

6    Q.    Have you seen those?  Have you signed those?

7    A.    Yes, sir.

8    Q.    And those are your sworn answers to my

9          interrogatories, correct?

10   A.    Yes, sir.

11          MR. HORSLEY:  That's all.

12          (Deposition concluded at

13              approximately 3:45 p.m.)

14          *  *  *  *  *  *  *  *  *  *  *

15          FURTHER DEPONENT SAITH NOT

16          *  *  *  *  *  *  *  *  *  *  *

17

18          REPORTER'S CERTIFICATE

19  STATE OF ALABAMA:

20  MONTGOMERY COUNTY:

21          I, Pamela A. Wilbanks, CCR, Registered

22  Professional Reporter, and Commissioner for the State

23  of Alabama at Large, do hereby certify that I reported

    the deposition of:

43

1                    LEE Y. LAMAR, JR.

2  who was first duly sworn by me to speak the truth, the

3  whole truth and nothing but the truth, in the matter

4  of:

5                 EDDIE OGLETREE, an individual,

6                 GERALD STEPHENS, an

7                 individual,

8                 Plaintiffs,

9                 Vs.

10                CITY OF AUBURN, a municipality

11                in the State of Alabama, LARRY

12                LANGLEY, an individual, LEE LAMAR,

13                an individual, BILL HAM, JR., an

14                individual, STEVEN A. REEVES, an

15                individual, BILL JAMES, an

16                individual, CHARLES M. DUGGAN, an

17                individual, and CORTEZ LAWRENCE,

18                an individual,

19                Defendants.

20                In The U.S. District Court

21                For the Middle District of Alabama

22                Eastern Division

23                3:07-CV-867-WKW

44

ORIGINAL

1  on Wednesday, July 30, 2008.

2       The foregoing 43 computer printed pages

3  contain a true and correct transcript of the

4  examination of said witness by counsel for the parties

5  set out herein.  The reading and signing of same is

6  hereby waived.

7       I further certify that I am neither of kin nor

8  of counsel to the parties to said cause nor in any

9  manner interested in the results thereof.

10       This 5th day of August 2008.

11

12

13

14

15

16

17

18       *Pamela A. Wilbanks (Th. M.C.)*

19       Pamela A. Wilbanks, ACCR #334
         Expiration Date:  9-30-2008
20       Registered Professional Reporter
         and Commissioner for the State
21       of Alabama at Large

22

23

# DEPOSITION TESTIMONY OF
# LARRY LANGLEY

ORIGINAL

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  EASTERN DIVISION

4   EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
5   individual,

6          Plaintiffs,

7   Vs.                              CIVIL ACTION NO.
                                     3:07-CV-867-WKW
8
    CITY OF AUBURN, a municipality
9   in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
10  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
11  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
12  individual, and CORTEZ LAWRENCE,
    an individual,

13         Defendants.

14              * * * * * * * * * *

15

16         DEPOSITION OF LARRY M. LANGLEY, taken pursuant

17  to stipulation and agreement before Pamela A. Wilbanks,

18  Certified Court Reporter, ACCR# 391, Registered

19  Professional Reporter and Commissioner for the State of

20  Alabama at Large, in the Conference Room of Auburn City

21  Hall, 144 Tichenor Avenue, Auburn, Alabama, on

22  Wednesday, July 30, 2008, commencing at approximately

23  2:20 p.m.

2

1                        **APPEARANCES**

2   **FOR THE PLAINTIFF:**

3   Mr. Richard F. Horsley
    KING, HORSLEY & LYONS
4   Attorneys at Law
    1 Metroplex Drive
5   Suite 280
    Birmingham, AL  35209
6
    **FOR THE DEFENDANT:**
7
    Mr. Randall Morgan
8   HILL, HILL, CARTER, FRANCO, COLE & BLACK
    Attorneys at Law
9   425 South Perry Street
    Montgomery, Alabama
10
    **ALSO PRESENT:**
11
    Mr. D'Arcy Wernette
12  Mr. Steven Reeves
    Mr. Bill James
13  Mr. Lee Lamar
    Mr. Eddie Ogletree
14  Mr. Gerald Stephens

15
                  * * * * * * * * * * * *
16
                  <u>EXAMINATION INDEX</u>
17
        BY MR. HORSLEY . . . . . . . . . . . .    4
18      BY MR. MORGAN . . . . . . . . . . . .   27

19                * * * * * * * * * * * *
                  <u>PLAINTIFFS' EXHIBIT INDEX</u>
20
    17   5/4/06 grievance letter to Mr. Langley from    21
21        Mr. Clanton, Mr. Hodge, Mr. Ogletree and
          Mr. Stephens
22
    18   Mr. Langley's letter to Mr. Stephens in       21
23        response to PX-17

3

**STIPULATION**

1

2            It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of **LARRY M. LANGLEY** is taken pursuant to the

5    Alabama Rules of Civil Procedure and that said

6    deposition may be taken before Pamela A. Wilbanks,

7    Registered Professional Reporter and Commissioner for

8    the State of Alabama at Large, without the formality of

9    a commission, that objections to questions other than

10   objections as to the form of the question need not be

11   made at this time but may be reserved for a ruling at

12   such time as the said deposition may be offered in

13   evidence or used for any other purpose by either party

14   provided for by the Statute.

15            It is further stipulated and agreed by and

16   between counsel representing the parties in this case

17   that the filing of said deposition is hereby waived and

18   may be introduced at the trial of this case or used in

19   any other manner by either party hereto provided for by

20   the Statute regardless of the waiving of the filing of

21   the same.

22            It is further stipulated and agreed by and

23   between the parties hereto and the witness that the

4

1    signature of the witness to this deposition is hereby

2    not waived.

3                    * * * * * * * * * * *

4                    **LARRY M. LANGLEY**

5           The witness, after having first been duly

6    sworn to speak the truth, the whole truth and nothing

7    but the truth testified as follows:

8                    **EXAMINATION**

9    **BY MR. HORSLEY:**

10   Q.   Please tell us your full name.

11   A.   Larry Michael Langley.

12   Q.   My name is Richard Horsley.  The same thing.

13        I'm going to ask you questions.  And if you

14        don't understand, tell me to repeat.  I'm going

15        to assume you understood and gave the answer you

16        intended to give once you answer.  Okay?

17   A.   Okay.

18   Q.   Where do you currently reside?

19   A.   81 Lee Road 374, Valley, Alabama 36854.

20   Q.   And you're retired from the Auburn Fire

21        Department; is that correct?

22   A.   Right.

23   Q.   When did you retire?

5

```
 1    A.    November 30, 2007.

 2    Q.    2007?

 3    A.    Uh-huh (positive response).

 4                MR. MORGAN:  Yes.  You need to make

 5                    an audible answer.

 6    Q.    Yeah.  I'm sorry.

 7                MR. MORGAN:  You need to say "yes" or

 8                    "no".  Don't say "uh-huh".

 9    Q.    Say "yes" or "no" rather than "uh-huh" or

10          "huh-uh" because she can't take that down.

11                So you retired in November 2007?

12    A.    Yes.

13    Q.    And what was the reason for your retirement?

14    A.    I had 30 years in with the City.

15    Q.    Just ready to retire?

16    A.    Ready to retire.

17    Q.    How long were you the fire chief for the City of

18          Auburn?

19    A.    Acting chief and deputy of public safety

20          director a little over ten years.

21    Q.    Deputy public safety director, tell me what that

22          is.

23    A.    Our public safety director -- in I think it was
```

6

1          '02 or '03 -- changed our title from police

2          chief and fire chief and the building code

3          official and communications director to deputy

4          public safety director over police operations or

5          fire operations.  It was just a name change.

6    Q.    So if I call it fire chief, it's the same thing?

7    A.    Same thing.

8    Q.    You were the fire chief for about ten years?

9    A.    Yeah.

10   Q.    And what job did you hold immediately before you

11         became the fire chief?

12   A.    I was a battalion chief or shift commander.

13   Q.    What year were you promoted to fire chief?

14   A.    July of '97.

15   Q.    And before that you were a shift commander, and

16         then are you saying that position was changed to

17         battalion chief?

18   A.    Later in 2005 -- '04.  Whenever we're talking

19         about, it was changed.  I just said battalion

20         chief because it's --

21   Q.    But you were already the chief at the time that

22         it was changed to battalion chief?

23   A.    Right.

7

| | | |
|---|---|---|
| 1 | Q. | So before you were chief, you actually were a |
| 2 | | shift commander? |
| 3 | A. | Yeah. |
| 4 | Q. | And for how long were you a shift commander? |
| 5 | A. | About a year and a half. |
| 6 | Q. | What process did you go through to be promoted |
| 7 | | to chief from shift commander? |
| 8 | A. | I didn't go through a process.  The current |
| 9 | | chief resigned and went to Phenix City. |
| 10 | Q. | What was his name? |
| 11 | A. | Ronnie Blankenship.  And I was asked by the |
| 12 | | current public safety director at that time if I |
| 13 | | would run the fire department until, you know, |
| 14 | | they went through a process.  And they never |
| 15 | | went through a process.  I just kept the job the |
| 16 | | whole time. |
| 17 | Q. | You weren't required to interview, correct? |
| 18 | A. | No. |
| 19 | Q. | You weren't required to take any test, correct? |
| 20 | A. | No. |
| 21 | Q. | You weren't required to go through an assessment |
| 22 | | center, correct? |
| 23 | A. | No. |

8

1    Q.    We've talked a little bit today about the job

2          classification or changes from shift commander

3          to battalion chief and from team leader to

4          lieutenant.  I'm assuming as a fire chief,

5          you're familiar with the insignia that the

6          firemen wear on their uniforms; is that correct?

7    A.    Right.

8    Q.    What's the difference between the insignia that

9          a shift commander and a battalion chief wore?

10   A.    The shift commander at that time -- Well, we was

11         captain/shift commanders, and it was two bars.

12         That's standard in the industry, two bars.  Two

13         bugles.

14   Q.    And then when --

15   A.    And then when the name changed to battalion

16         chief, the recognized insignia for that is the

17         three bugles.

18   Q.    Would three bugles as opposed to two bugles not

19         signify a promotion in rank within the

20         department?

21                    MR. MORGAN:  Object to the form.

22   A.    Not in this department, no.

23   Q.    Are you saying that it would in some

9

| 1 | | departments, but -- |
|---|---|---|
| 2 | A. | Some departments may.  But if they had the |
| 3 | | captain position still open and then the |
| 4 | | assistant chief, battalion chiefs, you would |
| 5 | | have different insignias on the collar for that. |
| 6 | Q. | What did you wear as a chief? |
| 7 | A. | Five bugles. |
| 8 | Q. | Did anybody in the department have more than |
| 9 | | five bugles? |
| 10 | A. | No. |
| 11 | Q. | Would that signify that you were the highest |
| 12 | | level employee at the fire department -- |
| 13 | A. | Right. |
| 14 | Q. | -- the fact that you had five bugles? |
| 15 | A. | Right. |
| 16 | Q. | And a lieutenant has how many bugles? |
| 17 | A. | One bugle. |
| 18 | Q. | And when the team leaders -- Well, what did a |
| 19 | | team leader have when that position existed? |
| 20 | A. | The team leaders wore a gold collar brass.  I |
| 21 | | think it had AFD wrote on it. |
| 22 | Q. | They had no bugles, correct? |
| 23 | A. | They had no bugles. |

10

1    Q.    And when they were reclassified as lieutenants,

2          they would then wear insignia with one bugle?

3    A.    Right.

4    Q.    And you said earlier, I think, battalion chief

5          has three bugles; is that correct?

6    A.    Correct.

7    Q.    Would battalion chief be the second highest

8          level employee within the fire division?

9    A.    Deputy chief.

10   Q.    I'm sorry.

11              What does a deputy chief wear?

12   A.    Four bugles.

13   Q.    So it goes lieutenant, one bugle; battalion

14         chief -- Wait a minute.  Who has two bugles?

15   A.    Captains.

16   Q.    And then battalion chief, three bugles?

17   A.    Right.

18   Q.    Deputy chief, four bugles; and -- is that

19         correct?

20   A.    Correct.

21   Q.    And chief, five bugles, correct?

22   A.    Correct.

23   Q.    And is it your testimony that the number of

11

1    bugles on the insignia does not indicate rank

2    within the department?

3                MR. MORGAN:   Object to the form.

4    A.   In certain departments it does.

5    Q.   But in the Auburn Fire Department, it does not?

6    A.   We don't have -- The captain position they

7         recognized as a battalion chief so they went to

8         three bugles.

9    Q.   But wouldn't you agree with me that the higher

10        ranking employee you are, the more bugles you

11        get on your insignia within the Auburn

12        Department?

13   A.   The way we structure it now, yes.

14   Q.   The way you structure it now, yes?

15   A.   Uh-huh (positive response).

16   Q.   What about the way it was structured in 2006?

17   A.   The way we were structured then, the team leader

18        had the AFD.  And we had two lieutenants, and

19        one retired and that left Gerald.

20   Q.   But you'll agree with me in 2006, the higher

21        rank that you achieved would give you more

22        bugles, is that correct, on your insignia; is

23        that correct?

12

1                MR. MORGAN:  Object to the form.

2    A.   The higher the name would recognize the -- The

3         name of the position recognized the amount of

4         bugles.

5    Q.   And the more bugles on an insignia would signify

6         the higher position, correct?

7                MR. MORGAN:  Object to the form.

8    A.   With the deputy chief having four and the fire

9         chief having five, yes.

10   Q.   Right.  That's logical, correct?

11               MR. MORGAN:  Object to the form.

12   A.   Uh-huh (positive response).

13   Q.   Now, you said you served for a year and a half

14        as the shift commander?

15   A.   Right.

16   Q.   And what job did you hold before shift

17        commander?

18   A.   Staff captain, rotating shift commander.

19   Q.   Staff captain, is that the same thing as a

20        captain or -- Well, what's the difference in a

21        staff captain?

22   A.   I worked eight to five in administration.  And

23        when one of the -- The rotating part, when one

13

1       of the shift commanders at that time would take

2       off, I would work in their position on their

3       shift.

4    Q.   So going from that to shift commander was a

5       promotion for you, correct?

6    A.   Huh-uh (negative response). I didn't -- It was

7       just a name change. It was no change in pay or

8       nothing.

9    Q.   And how did you get that position?

10   A.   The staff captain?

11   Q.   No. You're saying you were a staff captain and

12      a rotating shift commander?

13   A.   I filled in for the rotating shift commanders

14      when they was on vacation or out sick.

15   Q.   And then you were changed to full-time shift

16      commander, correct?

17   A.   When one of the shift commanders retired, I

18      moved to that position.

19   Q.   But in order to do that, you didn't have to take

20      a test, correct?

21   A.   No.

22   Q.   You didn't have to go through an assessment

23      center?

14

```
 1   A.   No.  It was just a lateral move.

 2   Q.   You didn't have to do an interview, correct?

 3   A.   No.

 4   Q.   Did the bugles on your insignia change when you

 5        moved to shift commander?

 6   A.   No.  I still had two.

 7   Q.   How long were you the rotating shift commander

 8        and staff captain?

 9   A.   I was promoted to staff captain in '94 --

10        January of '94.

11   Q.   From what position?

12   A.   Firefighter.

13   Q.   And what process did you go through to get

14        promoted --

15   A.   I went through an assessment center.

16   Q.   You went through an assessment center.

17             Do you remember what company administered

18        the assessment center?

19   A.   Kathleen Robinson administered that one.

20   Q.   And do you remember the components of that

21        assessment center?

22   A.   We had a hot seat, a role play, a in-basket, and

23        something else.  I don't remember what it was.
```

15

| | | |
|---|---|---|
| 1 | Q. | Did you have to take a written test with a |
| 2 | | cutoff score? |
| 3 | A. | No. |
| 4 | Q. | And how many people received that promotion |
| 5 | | along with you? |
| 6 | A. | Myself and Jimmy Brown. |
| 7 | Q. | Jimmy Brown? |
| 8 | A. | Me and him was promoted at the same time. |
| 9 | Q. | Is he a white guy or black guy? |
| 10 | A. | He was a white guy. |
| 11 | Q. | Is he still with the department? |
| 12 | A. | He's deceased. |
| 13 | Q. | You heard me talking earlier about the |
| 14 | | assessment center.  Is it your understanding -- |
| 15 | | The assessment center that you went through did |
| 16 | | not include a test with a cutoff score, correct? |
| 17 | A. | Correct. |
| 18 | Q. | And there was no test with a cutoff score that |
| 19 | | was a prerequisite to your assessment center; is |
| 20 | | that correct? |
| 21 | A. | That's correct. |
| 22 | Q. | And then before firefighter, that was your first |
| 23 | | job with the City of Auburn? |

16

1   A.   No.  I worked for Ampex Corporation.

2   Q.   But that was your first job with the City of

3        Auburn was --

4   A.   Right.

5   Q.   -- firefighter?

6        You heard me ask questions earlier, I

7        assume, about the meetings that were held prior

8        to the 2006 battalion chief promotion between

9        you and Lee Lamar and Mr. Reeves and Mr. James.

10       Do you specifically recall those meetings and

11       what was discussed in those meetings?

12  A.   Somewhat of them.  I wasn't in all of them.

13       Sometimes I was out of town when they had a

14       meeting.

15  Q.   Do you recall any discussions in those meetings

16       about implementing a test with a cutoff score as

17       a prerequisite for that job?

18  A.   Yes.

19  Q.   Whose decision was it?

20  A.   I don't remember.  I don't really remember how

21       that come about.  The only thing I know is

22       during the conversations and everything between

23       all of us, it come up.

17

```
1   Q.   You can't testify about who with the City had

2        the idea or made the decision to have a test

3        with a cutoff score; is that correct?

4   A.   No.

5   Q.   Do you recall if that decision was made before

6        the City contracted with CWH?

7   A.   No.  It was made along with CWH.

8   Q.   Do you recall whether or not Lee Lamar was the

9        individual that suggested the number of 70 as

10       the test score cutoff?

11  A.   Don't -- I can't testify to that, no.

12  Q.   Does that seem familiar to you that he did or --

13  A.   Well, 70 was discussed because it's a state

14       standard to the fire college and National Fire

15       Academy, and I remember the 70 score being

16       discussed.

17  Q.   Was there any discussion about using a test

18       without a cutoff score and just using it as a

19       part of the whole process?

20  A.   I really don't remember if it was or not.

21  Q.   Looking back on it, do you have any opinions

22       about whether or not that would have been a

23       better idea?
```

18

1                 MR. MORGAN:  Object to the form of

2                 that question.

3  A.   No.  I think the process went good.

4  Q.   As a fire chief, did you feel like the people

5       that should be promoted to battalion chief

6       should have had significant experience with the

7       Auburn Fire Department?

8                 MR. MORGAN:  Object to the form.

9  A.   Again, it's what you're talking about on

10      experience.  Knowledge and stuff of fire

11      techniques, fire tactics -- I think they should

12      have had the knowledge.  But experience, I don't

13      know exactly what you mean by that.

14  Q.   Well, knowledge, then.  Do you feel like that

15      the people that are promoted to battalion chief,

16      that it was more important that they have the

17      knowledge about firefighting or whether or not

18      they could pass the test?

19                 MR. MORGAN:  Object to the form of

20                 the question.

21  A.   If they had the knowledge of firefighting, they

22      should have passed the test.

23  Q.   Did you review the test yourself?

19

```
 1   A.   No.  The only thing that I reviewed was -- CWH
 2        brought in a pack of questions.  It was 150 or
 3        175 questions and about 60 situational judgment
 4        questions.  And there was about nine or ten of
 5        us -- the battalion chiefs, HRM, Bill James,
 6        Deputy Chief Lamar, and myself -- and we
 7        reviewed the questions and turned back to CWH
 8        what we thought was consistent with the way the
 9        City of Auburn operated.  Did I see the final
10        test?  No.
11   Q.   You've never taken that test, correct?
12   A.   No.
13   Q.   Did you participate in any way in the decision
14        to allow probationary lieutenants,
15        nonprobationary and probationary firefighters to
16        apply for the battalion chief position in 2006?
17   A.   Participate?  What --
18   Q.   Were you a part of that decision?
19   A.   Yes.  We recognized that by the City policies
20        that they was eligible to apply for it.
21   Q.   Had those people I just identified ever been
22        allowed to apply for battalion chief promotions
23        before?
```

20

1   A.   Which people?

2   Q.   Probationary lieutenants --

3   A.   Yes.

4   Q.   -- non and probationary firefighters before

5        2006?

6   A.   Before 2006, yes.

7   Q.   When were they allowed?

8   A.   They was allowed to on team leader promotions,

9        on just about every promotion we done.  If they

10       was still on probation, they could apply.

11  Q.   I guess what I'm asking, though, is:  Was there

12       ever a captain or a battalion chief promotion

13       before 2006 where probationary lieutenants and

14       probationary and nonprobationary firefighters

15       were allowed to apply?

16  A.   The last captain/lieutenant promotion we done

17       was in 1996, and I was a shift commander at that

18       time.

19  Q.   Is it true that in -- February 1 of 2006 when

20       the team leaders were reclassified as

21       lieutenants that Lieutenant Stephens was

22       actually the only lieutenant in the department

23       at that time?

21

1   A.    Yes.  Yes.

2   Q.    Do you recall any discontent or dissatisfaction

3         among white team leaders that lieutenant

4         Stephens was the only lieutenant in the

5         department?

6   A.    No.

7                      (Plaintiff's Exhibits 17 & 18 marked

8                         for identification.)

9   Q.    I'll show you what I've marked as Plaintiff's

10        Exhibits 17 and 18.  It's the same letters we

11        looked at before.  Have you ever seen that

12        before?  Have you seen that before?

13  A.    Yes.

14  Q.    In response to that, is Exhibit 18 what you

15        sent?

16  A.    Yes.

17  Q.    And in the third paragraph it says:  Under our

18        current city policies and job -- and, again,

19        this letter is dated -- well, it's not dated.

20        Yeah, it is.  May 8 of 2006.

21            In the third paragraph it says:  Under our

22        current City policies and job descriptions,

23        there is no time in grade policy and no

22

1    cumulative point system.  Because of our current

2    advancement criteria, any nonprobationary

3    employee may participate in the assessment.  The

4    fire division is currently reviewing a Career

5    Development Plan that addresses these criteria.

6         So when you wrote this letter, the City of

7    Auburn was then reviewing a Career Development

8    Plan that addressed the criteria of time in

9    grade and a cumulative point system, correct?

10                    MR. MORGAN:  Object to the form.

11   A.   Yes.  We was working on one.

12   Q.   And that would be a Career Development Plan

13        meaning that people could be promoted within the

14        department based on time in grade and a

15        cumulative point system; is that correct?

16                    MR. MORGAN:  Object to the form.

17   A.   Yes.

18   Q.   Why was the City reviewing that?

19                    MR. MORGAN:  Object to the form.

20   A.   We didn't have a current Career Development Plan

21        that was really in place, and we was trying to

22        develop one to set out guidelines for the

23        firefighters where a career firefighter hired in

23

1       would know what he had to do to advance.

2  Q.    For that Career Development Plan, you would

3       consider a cumulative point system and time in

4       grade as requirements to promote, correct?

5              MR. MORGAN:  Object to the form.

6  A.    Before?

7  Q.    No.  As a part of this Career Development Plan

8       that y'all were looking into, you would consider

9       time in grade and a cumulative point system for

10      promotions; is that correct?

11            MR. MORGAN:  Object to the form.

12  A.    Yes.  Once we got it there.  But it wasn't in

13      place at that time.

14  Q.    Right.  Well, has it ever gotten in place?

15  A.    It hadn't been put in place when I retired in

16      November.

17  Q.    Do you agree that those are important criteria

18      for promotions, time in grade and a cumulative

19      point system?

20            MR. MORGAN:  Object to the form.

21  A.    Some of it, yes.

22  Q.    Would those criteria have benefited Mr. Ogletree

23      and Mr. Stephens in your opinion in their

24

1           application for battalion chief?

2                          MR. MORGAN:  Object to the form.

3    A.     That's according to what points was assigned to

4           it.  We never had got down to that point.

5    Q.     Just because I don't know, what would be an

6           example of things considered in a cumulative

7           point system?  How would you accumulate points?

8    A.     The amount of certifications you might have or

9           college degrees, time in grade and stuff like

10          that.

11   Q.     What does time in grade mean?

12   A.     How long you've worked in that, you know, grade,

13          that position.

14                         MR. HORSLEY:  Let's take a minute.

15                         (Brief recess.)

16   Q.     (Continuing by Mr. Horsley)  Are you familiar

17          with Plaintiff's Exhibit 3, which is the 1991

18          settlement order that we've talked about today?

19   A.     I'm familiar with it.  I haven't looked at it in

20          over eight or nine -- It's been a long time

21          since I looked it.

22   Q.     Eight or nine years?

23   A.     No.

25

1   Q.   I thought you said --

2   A.   Eight or nine months, ever how long it's been

3        since I left, or it might have been longer than

4        that.

5   Q.   Do you know whether or not during the battalion

6        chief promotions in 2006 that the City of Auburn

7        was required to comply with that order?

8               MR. MORGAN:  Object to the form.

9               Also calls for a legal opinion.

10  A.   Repeat that.

11  Q.   Yeah.  During the battalion chief promotions in

12       2006, do you know if the City of Auburn Fire

13       Department was required to comply with that

14       order?

15  A.   By the process we was going through, I thought

16       we was complying with that form.

17  Q.   But the question was:  Did you think y'all were

18       required to comply with it?

19              MR. MORGAN:  Object to the form.

20  A.   Was we required?  I never questioned it because

21       the process I thought we was doing was meeting

22       this criteria.

23  Q.   Did you review that order before y'all

26

1     implemented the process for the battalion chief

2     promotion that you recall?

3   A.   I don't remember if I did or not.

4   Q.   But you've heard earlier discussions about

5     whether or not the order was still in force in

6     2006.  Did you know one way or the other whether

7     or not that order was still in force?

8   A.   Really I don't know.

9   Q.   Am I correct in saying that the

10    reclassification -- that the City did not

11    consult this order before you reclassified the

12    team leaders to lieutenants in February of '06,

13    correct?

14           MR. MORGAN:  Object to the form.

15  A.   February?

16  Q.   When the team leaders were reclassified to

17    lieutenants in February of 1 of 2006, do you

18    recall whether or not the City consulted this

19    order to see if that was proper or not?

20           MR. MORGAN:  Object to the form.

21  A.   Yes.  Steve Reeves and the city attorney, you

22    know, they read it, and that's when they come

23    back with their judgment that we could make a

27

1     name change.

2  Q.   Do you recall whether or not the City consulted

3     this order before the captain was reclassified

4     or renamed as battalion chief?

5         MR. MORGAN:  Object to the form.

6  A.   That I don't know.  That was handled by the city

7     manager, David Watkins, at that time.

8  Q.   Do you know whether or not the Plaintiff's

9     Exhibit 3 was consulted by the City before it

10    reclassified the shift commander position to

11    battalion chief?

12        MR. MORGAN:  Object to the form.

13  A.  Again, that was done by -- that decision was

14    made by the city manager, David Watkins.  I

15    don't know if he did or not.

16        MR. HORSLEY:  That's all.  Thank you.

17        MR. MORGAN:  I've got one or two

18          questions.

19           **EXAMINATION**

20 BY MR. MORGAN:

21  Q.   The lieutenant/team leader reclassification, at

22    that time you testified lieutenant had a bar and

23    the team leaders had what, something --

28

1    A.    AFD insignia on the collar.

2    Q.    Did they do the same job?

3    A.    The job description was identical.

4    Q.    Did they get the same pay?

5    A.    Same pay.

6    Q.    Was the lieutenant over a team leader?

7    A.    No.

8    Q.    Was that a promotion from team leader to

9          lieutenant?

10   A.    No.  It was a name change only.

11   Q.    You were asked about people being eligible to

12         apply for the battalion chief promotion and the

13         City opening it up for everybody.

14   A.    Right.

15   Q.    When you applied for captain in 1993 --

16   A.    Yes.

17   Q.    -- you were what rank?

18   A.    Firefighter.

19   Q.    Even though you were not a lieutenant, you were

20         eligible to have applied for captain?

21   A.    Right.

22   Q.    And Eddie Ogletree as a firefighter in 1993

23         could have applied for captain as well, couldn't

29

1          he?

2    A.    Right.

3                    MR. MORGAN:  No further questions.

4                    MR. HORSLEY:  Thank you.

5                    (Deposition concluded at

6                     approximately 2:40 p.m.)

7               * * * * * * * * * * *

8            FURTHER DEPONENT SAITH NOT

9               * * * * * * * * * * *

10

11               REPORTER'S CERTIFICATE

STATE OF ALABAMA:

12

MONTGOMERY COUNTY:

13

          I, Pamela A. Wilbanks, CCR, Registered

14

Professional Reporter, and Commissioner for the State

15

of Alabama at Large, do hereby certify that I reported

16

the deposition of:

17

               LARRY M. LANGLEY

18

who was first duly sworn by me to speak the truth, the

19

whole truth and nothing but the truth, in the matter

20

of:

21

               EDDIE OGLETREE, an individual,

22

               GERALD STEPHENS, an

23

               individual,

30

1        Plaintiffs,

2        Vs.

3        CITY OF AUBURN, a municipality

4        in the State of Alabama, LARRY

5        LANGLEY, an individual, LEE LAMAR,

6        an individual, BILL HAM, JR., an

7        individual, STEVEN A. REEVES, an

8        individual, BILL JAMES, an

9        individual, CHARLES M. DUGGAN, an

10       individual, and CORTEZ LAWRENCE,

11       an individual,

12       Defendants.

13       In The U.S. District Court

14       For the Middle District of Alabama

15       Eastern Division

16       3:07-CV-867-WKW

17  on Wednesday, July 30, 2008.

18       The foregoing 29 computer printed pages

19  contain a true and correct transcript of the

20  examination of said witness by counsel for the parties

21  set out herein.  The reading and signing of same is

22  hereby not waived.

23       I further certify that I am neither of kin nor

ORIGINAL

31

1   of counsel to the parties to said cause nor in any

2   manner interested in the results thereof.

3           This 5th day of August 2008.

4

5

6

7

8

9

10

11      _Pamela A. Wilbanks (K.M.C.)_

12      Pamela A. Wilbanks, ACCR #334
        Expiration Date:  9-30-2008

13      Registered Professional Reporter
        and Commissioner for the State

14      of Alabama at Large

15

16

17

18

19

20

21

22

23

# DEPOSITION TESTIMONY OF
# WILLIAM JAMES

COPY

1

1         IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3             EASTERN DIVISION

4  EDDIE OGLETREE, an individual,
    GERALD STEPHENS, an
5  individual,

6       Plaintiffs,

7  Vs.                CIVIL ACTION NO.
                        3:07-CV-867-WKW
8

    CITY OF AUBURN, a municipality
9  in the State of Alabama, LARRY
    LANGLEY, an individual, LEE LAMAR,
10  an individual, BILL HAM, JR., an
    individual, STEVEN A. REEVES, an
11  individual, BILL JAMES, an
    individual, CHARLES M. DUGGAN, an
12  individual, and CORTEZ LAWRENCE,
    an individual,
13

       Defendants.
14

            * * * * * * * * * *
15

16       **DEPOSITION OF WILLIAM HOWARD JAMES**, taken

17  pursuant to stipulation and agreement before Pamela A.

18  Wilbanks, Certified Court Reporter, ACCR# 391,

19  Registered Professional Reporter and Commissioner for

20  the State of Alabama at Large, in the Conference Room

21  of Auburn City Hall, 144 Tichenor Avenue, Auburn,

22  Alabama, on Wednesday, July 30, 2008, commencing at

23  approximately 1:20 p.m.

2

1

2                                  **APPEARANCES**

3

4   **FOR THE PLAINTIFF:**

5   Mr. Richard F. Horsley
    KING, HORSLEY & LYONS
6   Attorneys at Law
    1 Metroplex Drive
7   Suite 280
    Birmingham, AL  35209
8
    **FOR THE DEFENDANT:**
9
    Mr. Randall Morgan
10  HILL, HILL, CARTER, FRANCO, COLE & BLACK
    Attorneys at Law
11  425 South Perry Street
    Montgomery, Alabama
12
    **ALSO PRESENT:**
13
    Mr. D'Arcy Wernette
14  Mr. Steven Reeves
    Mr. Larry Langley
15  Mr. Lee Lamar
    Mr. Eddie Ogletree
16  Mr. Gerald Stephens

17              * * * * * * * * * * * *

18              EXAMINATION INDEX

19      BY MR. HORSLEY . . . . . . . . . . .      4

20              * * * * * * * * * * * *

21

22

23

3

**STIPULATION**

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of **WILLIAM HOWARD JAMES** is taken pursuant to the Alabama Rules of Civil Procedure and that said deposition may be taken before Pamela A. Wilbanks, Registered Professional Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission, that objections to questions other than objections as to the form of the question need not be made at this time but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used for any other purpose by either party provided for by the Statute.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of said deposition is hereby waived and may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute regardless of the waiving of the filing of the same.

It is further stipulated and agreed by and between the parties hereto and the witness that the

4

1  signature of the witness to this deposition is hereby

2  not waived.

3              * * * * * * * * * * *

4                **WILLIAM HOWARD JAMES**

5        The witness, after having first been duly

6  sworn to speak the truth, the whole truth and nothing

7  but the truth testified as follows:

8                    **EXAMINATION**

9  **BY MR. HORSLEY:**

10   Q.    Please tell us your full name.

11   A.    William Howard James.

12   Q.    And do you go by Bill James?

13   A.    Yes.

14   Q.    My name is Richard Horsley.  I'm going to ask

15         you some questions.  Just like with Mr. Reeves,

16         if you don't understand something or want me to

17         rephrase it, just tell me and I will do so.

18         Once you answer a question, I'm going to assume

19         you understood it and are giving the answer you

20         intended to give.  Okay?

21   A.    Okay.

22   Q.    Where do you currently reside?

23   A.    8371 Lee Road 188, Waverly.

5

1    Q.    What's the ZIP Code out there?

2    A.    36879.

3    Q.    Where are you currently employed?

4    A.    City of Auburn.

5    Q.    In what capacity with the City?

6    A.    Public safety director.

7    Q.    How long have you held that job?

8    A.    October of 2004.

9    Q.    Generally tell me what you do as a public safety

10         director for the City of Auburn.

11   A.    Provide administrative direction for the

12         divisions in public safety, budgets, contract,

13         personnel.

14   Q.    What was your job immediately before that?

15   A.    I was a building official with the City of

16         Auburn.

17   Q.    The building official?

18   A.    Uh-huh (positive response).

19   Q.    How long did you hold that job?

20   A.    Fifteen years, sixteen years.

21   Q.    Where were you immediately before that?

22   A.    I worked with the economic development

23         department for a year --

6

| | | |
|---|---|---|
| 1 | Q. | City of Auburn? |
| 2 | A. | -- with the City of Auburn prior to that. |
| 3 | Q. | Before that where were you employed? |
| 4 | A. | I worked for Castle and Algernon Blair, a |
| 5 | | contracting company out of Montgomery. |
| 6 | Q. | What kind of contracting? |
| 7 | A. | They did building contracting. |
| 8 | Q. | Do you recall where you worked before that? |
| 9 | A. | Self-employed in Tennessee. |
| 10 | Q. | What did you do in Tennessee? |
| 11 | A. | Built a few houses. |
| 12 | Q. | Did you have a company name or ... |
| 13 | A. | Worked with my brother-in-law. |
| 14 | Q. | Was there a name of the company? |
| 15 | A. | Blue Ridge Construction or Blue -- Blue Ridge |
| 16 | | maybe. |
| 17 | Q. | Do you have relatives that reside in Lee County? |
| 18 | A. | Yes. |
| 19 | Q. | Can you tell me who they are, or if it's a lot |
| 20 | | of them -- |
| 21 | A. | I've got in-laws and three brothers and sisters |
| 22 | | and such. |
| 23 | Q. | Just provide a list of your -- what I want -- I |

7

1      don't want to spend a bunch of time going

2      through them, but what I need to know is

3      relatives in Lee County, Macon County, Lowndes

4      County, Russell County, Montgomery County.  I

5      think that's it.

6    A.   Okay.

7    Q.   Macon.  Did I say Macon?

8         Randall knows which counties they are.

9    A.   Okay.

10   Q.   You said that your job -- one of the elements of

11       your job was dealing with personnel; is that

12       correct?

13   A.   Yes, sir.

14   Q.   What aspects of personnel decisions are you

15       involved in?

16   A.   Review personnel actions, whether it be

17       performance appraisals, corrective actions,

18       things of that nature.

19   Q.   Did you participate in any way in the battalion

20       chief promotions back in 2006?

21   A.   I did.

22   Q.   What participation did you have in those

23       promotions?

8

1   A.   I was -- participated with the others that have

2        been mentioned here today discussing what we

3        were going to do for the promotion process.

4   Q.   And I think you were a part of the group that

5        Mr. Reeves named that decided how that promotion

6        would take place; is that correct?

7   A.   Yes.  I had input, yes.

8   Q.   And do you agree with him that that group of

9        people decided to hire CWH to conduct the cutoff

10       test?

11  A.   Yes.  Well, to hire CWH, yes.

12  Q.   And the people that he named, were those the

13       people that you remember being involved in that

14       decision?

15  A.   In the hiring of the company?

16  Q.   Yes.

17  A.   Yes.

18  Q.   He also spoke about decisions or meetings that

19       were had after CWH was hired.  What I want to

20       know is:  Do you recall being in those meetings

21       when discussions were held with CWH about the

22       cutoff test and the assessment center?

23                 MR. MORGAN:  Object to the form.

9

1    A.    Yes.

2    Q.    Is it your memory that the City of Auburn was

3          attempting to comply with the 1991 court order

4          that we've talked about earlier during that

5          promotion or was that not a consideration?

6    A.    I don't recall that personally being a

7          consideration.

8    Q.    You don't recall specifically the order being

9          something the City felt like it had to comply

10         with pursuant to those promotions?

11                    MR. MORGAN:  Object to the form.

12   A.    Right.

13   Q.    Is that right?

14   A.    Yes.

15   Q.    And are you familiar with that order?  Have you

16         read it?

17   A.    Not recently, but I have read it.

18   Q.    Can you tell me why the City did not believe at

19         that time that it was -- that it had to comply

20         with the 1991 order?

21                    MR. MORGAN:  Object to the form.

22   A.    I'm not sure I understand the question.  In

23         reference to what?

10

```
 1   Q.    You said you didn't feel like the 1991 order was
 2         a consideration in y'all's decision-making
 3         process for the battalion chief promotion in
 4         2006.
 5                    MR. MORGAN:  Object to the form.
 6   Q.    Is that correct?
 7   A.    Whether we had to do an assessment center?
 8   Q.    Whether you had to comply with the order.
 9                    MR. MORGAN:  Object to the form.
10   A.    I guess -- I'm sorry.  I don't understand.
11   Q.    Let me ask it again.
12             When y'all were talking about the promotion
13         to battalion chief and decided how that
14         promotion was going to take place, when y'all
15         were having these meetings, before and when you
16         joined up with CWH, what I want to know is:  Is
17         it your memory that the City felt as though it
18         was obligated to comply with the 1991 order
19         pursuant to those promotions?
20                    MR. MORGAN:  Object to the form.
21   A.    Whether it was obligated to follow that?
22   Q.    Uh-huh (positive response).
23   A.    No.
```

11

Q.    The City did not believe it was, correct?

           MR. MORGAN:  Object to the form.

A.    That we had to comply with the order?

Q.    The City did not believe it had to comply with
      the order?

           MR. MORGAN:  Object to the form.

A.    No, I don't want to say that.  No.

Q.    We're not connecting.

      Are you saying that it's your memory the
      City did not believe it had to comply with the
      1991 order pursuant to the 2006 battalion chief
      promotions?

           MR. MORGAN:  Object to the form.

A.    I'm sorry.

Q.    That's okay.

      Did you or did you not have to comply with
      the order?

           MR. MORGAN:  I'm going to object to
              the form.

A.    I don't think that was the only reason we went
      to an assessment center was because the order
      said that you had to use an assessment center
      for a promotional process.

12

| | | |
|---|---|---|
| 1 | Q. | You're saying y'all weren't doing an assessment |
| 2 | | center because the order said you had to do it? |
| 3 | | MR. MORGAN:  Object to the form. |
| 4 | A. | Not in my understanding. |
| 5 | Q. | Again, was it your understanding that the City |
| 6 | | had to comply with the 1991 order for the |
| 7 | | battalion chief promotion in 2006? |
| 8 | | MR. MORGAN:  Object to the form. |
| 9 | A. | I'm not sure what the position was from the |
| 10 | | City's standpoint of whether we had to comply |
| 11 | | with the '91 order. |
| 12 | Q. | You don't know one way or the other; is that |
| 13 | | correct? |
| 14 | A. | Yes.  I don't have that knowledge. |
| 15 | Q. | Did you ever have any meetings about the 1991 |
| 16 | | order and whether or not it was still in force |
| 17 | | with the city attorney, Arnold Umbach? |
| 18 | A. | No.  I don't recall having any meetings with |
| 19 | | Attorney Umbach. |
| 20 | Q. | Do you recall the 1991 order being the subject |
| 21 | | of any discussions that y'all had when you were |
| 22 | | deciding about the battalion chief promotion |
| 23 | | maybe from Steve Reeves? |

13

1  A.   There may have been some discussion about there

2       is this order and it has -- I believe in

3       captains -- assessment centers.  There may have

4       been some discussions on that, yes.

5  Q.   From your standpoint am I correct in saying that

6       the City did not attempt to comply with the 1991

7       order pursuant to the battalion chief promotions

8       in 2006?

9            MR. MORGAN:  Object to the form.

10 A.   I wouldn't say we attempted to not comply, no.

11 Q.   You wouldn't say you -- Say that again.  I

12      wasn't sure what your answer was, if you don't

13      mind.

14      Did the City attempt to comply with the

15      1991 order for the 2006 battalion chief

16      promotions?

17           MR. MORGAN:  Object to the form.

18 A.   Yeah.  Yes, we attempted to comply with it.

19 Q.   You did?  And how did you do that?

20 A.   If you assume that we had to do an assessment

21      center for this promotion, then I guess we

22      complied with the order.

23 Q.   In Section 12 of the order, which we've marked

14

1        as Plaintiff's Exhibit 3 -- I'll show it to

2        you -- if you would read the section for me,

3        Section 12.  I've highlighted it.  I apologize

4        for that.

5    A.   (Witness complies.)

6    Q.   Section 12, which is the section that deals with

7        the assessment center and promotions, did you

8        see anywhere in that section any reference to a

9        test with a cutoff score?

10               MR. MORGAN:  Object to the form.

11   A.   No, sir.

12   Q.   Is it your understanding that this order

13       requires an assessment center or an assessment

14       center that has a test with a cutoff score?

15             MR. MORGAN:  Object to the form.

16   A.   Well, I think I have an understanding of what an

17       assessment center is.

18   Q.   Okay.

19   A.   And --

20   Q.   You'll agree with me that Section 12 does not --

21            MR. MORGAN:  Let him answer the

22               question.

23   Q.   I'm sorry.

15

1   A.   I think I have an understanding of what an

2        assessment center is, and there are various

3        components in an assessment center.

4   Q.   You'll agree with me that this document does not

5        reference in any way a cutoff score either as a

6        prerequisite or as a component of the assessment

7        center that's been approved by this court; is

8        that correct?

9             MR. MORGAN:  Object to the form.

10  A.   That's right.

11  Q.   In fact, an assessment center and a test with a

12       cutoff score or any tests are two separate

13       entities; is that correct?

14            MR. MORGAN:  Object to the form.

15  A.   I don't know that I would agree with that.

16  Q.   You would not agree with that?

17            What we've marked earlier as Plaintiff's

18       Exhibit 2, which is the Auburn Fire Division

19       Orientation Manual, Promotional Written Test and

20       Assessment Center Process, have you seen this

21       document?

22  A.   Yes.

23  Q.   Have you looked at it and read it and understand

16

1      it?

2  A.    I remember looking at this document back when we

3      started the process.

4  Q.    Will you agree with me that as described in that

5      document, the test and the assessment center are

6      two completely separate things?

7          MR. MORGAN:  Object to the form.

8  A.    I would have to read back through here and see

9      how it's spelled out in this document here.

10  Q.    There's a section on page 9 that describes an

11      assessment center.

12  A.    Okay.

13  Q.    And if you don't mind, I'll read it into the

14      record and ask if that's what you understand an

15      assessment center to be.

16      An assessment center is an integrated

17      system of simulations designed to elicit

18      behavior similar to that required for success in

19      a target job.  More simply, it is a series of

20      activities that are similar to those performed

21      in a given job.  Each activity mirrors a

22      different aspect of the job.  Performance in

23      these activities is observed by assessors who

17

1      are trained to be fair and objective.  The panel

2      of objective assessors will be selected from

3      departments similar to yours based upon their

4      expertise and knowledge regarding the target

5      job.  The assessors will observe you performing

6      a series of exercises in order to evaluate

7      several job performance dimensions deemed

8      important to performing successfully on the

9      job.  Assessors compare candidates' performance

10     to predetermined performance guidelines to

11     ascertain who will perform effectively on the

12     job.

13          Is that consistent with your understanding

14     of what an assessment center is?

15               MR. MORGAN:  Object to the form.

16  A.   I would say no.

17  Q.   That's not consistent with your understanding?

18  A.   Not my personal understanding of an assessment

19     center, no.

20  Q.   How is your personal understanding different

21     than what I just read to you?

22  A.   I think it included those components right

23     there, but also a part of that would be an

18

1          examination.

2     Q.   You understand that the examination is part of

3          the assessment center; is that correct?

4     A.   Yes.

5     Q.   And where did you gain that information?

6     A.   That's just my personal belief.  I don't know

7          that I've read or -- I can't point to a specific

8          document that says this is why I believe that.

9          I just believe that an assessment center would

10         be evaluating a wide ...

11    Q.   If you assume that what I just read you is

12         correct and that that is a correct description

13         of an assessment center, you would agree with me

14         that a written test is not a part of it,

15         correct?

16              MR. MORGAN:  Object to the form.

17    A.   Based on that definition.

18    Q.   Based on that definition your answer is "yes"?

19              MR. MORGAN:  Object to the form.

20    A.   Yes.

21    Q.   And, in fact, the test with the cutoff score

22         that was given to the battalion chief applicants

23         in 2006 was a prerequisite before you could

19

1          actually go to the assessment center; is that

2          correct?

3                    MR. MORGAN:  Object to the form.

4     A.   Yes.  You had to pass the test before you went

5          to the next step in the process, yes.

6     Q.   According to the document that y'all used for

7          the assessment center, the assessment center as

8          I just read to you which was implemented by the

9          City of Auburn doesn't include a test, does it?

10                   MR. MORGAN:  Object to the form of

11                      that question.

12    Q.   What I just read to you --

13    A.   Out of that definition, it did not say anything

14         about a test.

15                   MR. MORGAN:  Object to the form.

16    Q.   Well, this is the company y'all were using to do

17         the assessment center, correct?

18    A.   Right.

19    Q.   Is there any reason why you would disagree with

20         the company y'all had hired to do the assessment

21         center?

22    A.   No.  But the test was a part of the process.

23    Q.   The test was a prerequisite --

20

1    A.    The assessment process.

2    Q.    You'll agree with me if you didn't pass the

3          test, you didn't go to the assessment center,

4          did you?

5                    MR. MORGAN:  Object to the form.

6                    Asked --

7    A.    You didn't move further along the process, that

8          is correct.

9    Q.    The document speaks for itself, and I'll submit

10         that the document clearly shows the test and the

11         assessment center are two separate entities.

12         Okay?

13                   MR. MORGAN:  If that's a question, I

14                      object to the form.

15   Q.    Was the assessment -- I think you testified

16         earlier that in doing an assessment center or

17         attempting to do an assessment center for the

18         battalion chief promotion in 2006 that you felt

19         like the City was trying to comply with the 1991

20         court order; is that correct?

21   A.    Yes.

22   Q.    Do you know whether or not the 2006 assessment

23         center used for the battalion chief promotion

21

1        had been approved by the United States District

2        Court for the Middle District of Alabama Eastern

3        Division?

4  A.   I have no knowledge of that.

5  Q.   You don't know one way or the other?

6  A.   Right.  Correct.

7  Q.   Will you agree with me that in the paragraph we

8        just read in Section 12 it says that the City at

9        that time submitted to the court an assessment

10       center which shall be approved by the court?  Do

11       you agree with that?

12            MR. MORGAN:  Object to the form.

13  A.   That's what it says.  I wasn't here at that

14        time.

15  Q.   And you don't know one way or the other if this

16        assessment center for the 2006 BC promotion was

17        approved by the court or not, correct?

18  A.   No, sir.

19  Q.   Are you familiar with Kathleen Robinson?

20  A.   No, I'm not.

21  Q.   Will you agree with me, Mr. James, that if, in

22        fact, the City required a cutoff test before you

23        could go to the assessment center that that

22

1        would violate the 1991 order that we just read?

2               MR. MORGAN:  Object to the form.

3  A.    Would I agree that it would violate it?

4  Q.    That it would violate it.

5               MR. MORGAN:  First of all, that's a

6                    legal question.  But if you've got

7                    an opinion --

8  A.    My opinion is no.

9  Q.    In your opinion it would not violate the order?

10  A.    Correct.

11  Q.    And why is that your opinion?

12              MR. MORGAN:  Object to the form.

13  A.    Because it doesn't say anything about not having

14      a test.

15  Q.    Your testimony is that because the order doesn't

16      mention a test, then it doesn't violate the --

17      giving a test doesn't violate the order?

18             MR. MORGAN:  Object to the form.

19  A.    Correct.  Based on my -- what my opinion is of

20      an assessment center.

21  Q.    Did you hear testimony earlier from Mr. Reeves

22      about the number of black firefighters hired --

23      firemen hired since the 1991 order?

23

1    A.    Yes, sir.

2    Q.    And you've been there all that time, maybe not

3          in the same position --

4    A.    Correct.

5    Q.    -- but did you hear when I said that -- when I

6          named four black firefighters that were hired

7          since that time?

8    A.    I heard you mention that, yes.

9    Q.    Do you know of any other black firemen that were

10         hired since that time by the City of Auburn Fire

11         Department?

12   A.    No, sir.

13   Q.    You heard Mr. Reeves give a rough estimate that

14         20 white people had been hired or white firemen

15         had been hired since 1991.  Do you agree with

16         that estimate?

17   A.    To be honest, I couldn't say if that was ten

18         over or ten -- I don't know.  I don't have a

19         feel for whether that's even close.

20                    (Plaintiff's Exhibit 13 marked for

21                         identification.)

22   Q.    I'll show you what I've marked as Plaintiff's

23         Exhibit 13.  These are unsigned answers to

24

1          interrogatories that I submitted to the City and

2          your attorney.  I'm going to show them to you

3          and just ask if you've ever seen them before.

4                          MR. MORGAN:  Richard, I have the

5                          signed responses.  And I will send

6                          those to you, and I will show him

7                          his signed responses --

8                    MR. HORSLEY:  Okay.

9                    MR. MORGAN:  -- if that's okay.

10                   MR. HORSLEY:  That's fine.

11                   MR. MORGAN:  We can make a copy of it

12                          if you want to.

13                   MR. HORSLEY:  It doesn't matter.  As

14                          long as they are the same, it

15                          doesn't matter.

16                   MR. MORGAN:  I don't think we made

17                          any changes.

18                   MR. HORSLEY:  If you'll send me the

19                          signed copies, I don't care if

20                          those are not attached to the

21                          deposition.

22                   MR. MORGAN:  The unsigned responses I

23                          sent you have not been changed.  I

25

```
1              have the signed ones, and I'll
2              send them to you.
3              MR. HORSLEY:  So for the record, the
4              interrogatory responses we're
5              attaching as exhibits to this
6              deposition are exactly the same as
7              the interrogatory responses that
8              have been signed under oath by
9              each individual --
10             MR. MORGAN:  That's my understanding.
11  Q.   Do you recall signing your answers to
12       interrogatories?
13  A.   Yes, sir.
14  Q.   And this is an accurate copy of your answers; is
15       that correct?
16  A.   Yes, sir.
17  Q.   And these answers are correct and answers given
18       to the best of your knowledge, correct?
19  A.   Yes, sir.
20             (Plaintiff's Exhibit 14 marked for
21              identification.)
22  Q.   I'll show you what I've marked -- Let me do this
23       first.  Just so I can go ahead and get these
```

26

 1      attached, these are the City of Auburn's

 2      responses to my interrogatories marked as

 3      Plaintiff's Exhibit 14.  Have you seen those?

 4                  MR. MORGAN:  I'll make the same

 5                  representation to you.

 6                  MR. HORSLEY:  Who is going to sign or

 7                  who signed those?

 8                  MR. MORGAN:  I don't know who signed

 9                  for the City.

10                  (Off-the-record discussion.)

11                  MR. MORGAN:  The city manager, yeah.

12                  MR. HORSLEY:  Who is that?

13                  MR. MORGAN:  Charles Duggan.

14                  MR. HORSLEY:  So Plaintiff's Exhibit

15                  14 is the City's responses, and

16                  those were signed without change

17                  by Charles Duggan, the city

18                  manager, correct?

19                  (Plaintiff's Exhibit 15 marked for

20                  identification.)

21  Q.    What I've marked as Plaintiff's Exhibit 15 is a

22      letter sent to you back on May 12, 2006 from

23      Horace Clanton, Eddie Ogletree, and Gerald

27

1          Stephens, and I'll ask you if you've ever seen

2          that document.

3     A.   Yes, sir.

4     Q.   You have seen this?

5     A.   Yes.

6     Q.   You received it?

7               Had you had any discussions with

8          Mr. Ogletree or Mr. Stephens about this

9          grievance before they sent you this letter?

10    A.   I don't recall having any discussions, no.

11    Q.   As a result of this letter, do you recall having

12         a meeting with Mr. Stephens and Mr. Ogletree?

13    A.   No, I don't recall having a meeting.

14    Q.   Have you ever had a face-to-face meeting with

15         these gentlemen specifically related to their

16         complaints in Plaintiff's Exhibit 15?

17    A.   Not that I recall.

18                    (Plaintiff's Exhibit 16 marked for

19                        identification.)

20    Q.   What I'll mark as Plaintiff's Exhibit 16 is a

21         letter that I believe you sent to Lieutenant

22         Stephens.  If you could, identify that for me.

23    A.   Yes, I recall this.

28

1   Q.   Was that letter sent to Lieutenant Stephens in

2          response to Plaintiff's Exhibit 15?

3   A.   Let me see it again.

4               (Brief off-the-record discussion.)

5   A.   Yeah.  It appears to be what I would have

6          responded to.

7   Q.   Did you send the exact same letter to your

8          knowledge to Eddie Ogletree?

9   A.   Yeah.  My recollection I would have, yes.

10   Q.   In your second to last sentence in the second

11         paragraph, you state that an accumulative system

12         is being evaluated in the overall scope of the

13         promotional process.  They hope to have this

14         completed by the end of this fiscal year.

15        What did you mean by those two sentences?

16   A.   A Career Development Plan that the fire division

17         is working on.

18   Q.   Did you mean by that that the Auburn Fire

19         Department was looking into an accumulative

20         system for promotions?

21   A.   Yes.

22   Q.   Meaning --

23   A.   As part of the Career Development Plan for each

29

```
 1           rank.
 2     Q.    I'm sorry.  What?
 3     A.    Promotion for each rank, for each position.
 4     Q.    And what specifically do you mean when you say
 5           accumulative?
 6     A.    Well, the Career Development Plan, as I
 7           understand it, each position would have certain
 8           requirements in that position, certain
 9           certifications, educational requirements.  And
10           then to go to the next -- or be eligible for a
11           promotion to a higher rank, that you would meet
12           those qualifications.
13     Q.    Does a cutoff test also -- is that also included
14           in those qualifications?
15     A.    The document I recall does not mention a cutoff
16           test.
17     Q.    So were you saying in this letter that the City
18           was looking into promoting people based on
19           something different than tests with cutoff
20           scores?
21                 MR. MORGAN:  Object to the form.
22     A.    Well, as I recall this, it was the Career
23           Development Plan, CDP, that the fire division
```

30

1       was working on.

2    Q.   Do you recall during the meetings with CHW -- if

3       I say that wrong -- CWH -- do you recall who

4       during those meetings was promoting a score of

5       70 as being the cutoff score?

6    A.   I don't recall any specific person promoting

7       that other than it was discussed among everybody

8       that was in the room about a cutoff score.

9    Q.   And you can't testify if anyone with the City of

10      Auburn was the first person to suggest that

11      there be a 70 cutoff score?

12   A.   I couldn't identify a person, no.

13   Q.   Are you familiar through your job with the City

14      of Auburn with the work history of Mr. Stephens

15      and Mr. Ogletree?  It's okay if you're not.  I'm

16      just asking.

17   A.   Detailed parts of it, not specifically, other

18      than I did -- since my position as the director

19      looking at performance appraisals.

20   Q.   To your knowledge did they have satisfactory

21      performance appraisals?

22   A.   As I recall they do, yes.

23   Q.   Are you aware of anything in their work history

31

1     with the City of Auburn that would have

2     disqualified them for the promotion to battalion

3     chief?

4            MR. MORGAN:  Object to the form.

5  A.    No.

6  Q.    You talked about the promotional process a

7     moment ago, and you'll agree with me that the

8     test with a cutoff score was a component of the

9     process to be promoted to battalion chief in

10    2006; is that correct?

11  A.   Correct.

12  Q.   And what other components of that process

13    existed to your knowledge for the promotion?

14  A.   They had the thing they called the hot seat.

15    They had a situational scenario.  It seems there

16    was another component, but I can't remember what

17    it was.  It seems like there were three

18    components.

19  Q.   Is it your understanding that an applicant's

20    performance in the situational part of the

21    process, that their performance was largely

22    based on their experience as firefighters?

23           MR. MORGAN:  Object to the form.

32

```
 1   A.   To be honest I don't know that I could answer

 2        that.  I'm not sure.  I'm not a firefighter so

 3        I'm not sure.

 4   Q.   You'll agree with me that all three

 5        African-Americans that applied for battalion

 6        chief failed to make it past the first step of

 7        the requirements; is that correct?

 8   A.   That's true.

 9   Q.   And that being -- the first step was a test with

10        a cutoff score of 70, correct?

11   A.   That's true.

12   Q.   Will you also agree with me that the three

13        African-Americans that failed to make it past

14        the first step of the promotion process had been

15        with the City of Auburn Fire Department for more

16        years than the four individuals that were

17        actually promoted to battalion chief?

18   A.   To my recollection I'd say that's correct.

19   Q.   Would you agree that since they had been there a

20        number of years more than the individuals who

21        were actually promoted to battalion chief that

22        they had more actual on-the-job experience than

23        those individuals?
```

33

1           MR. MORGAN:  Object to the form.

2    A.    I could agree that they had been a firefighter

3          longer.  I'm not sure how you define experience.

4    Q.    I'm not going to offer this exhibit during your

5          deposition, but have you seen the two memos that

6          were sent out back to back in advance of the

7          promotion where one said that only

8          nonprobationary lieutenants could apply and then

9          several days later a second one that said

10         everybody can apply:  nonprobationary,

11         probationary, and probationary, nonprobationary

12         firefighters could apply also?  Did you see

13         those two memos?

14   A.    Yes.

15   Q.    Were you involved in the decision to allow

16         nonprobationary lieutenants and probationary and

17         nonprobationary --

18              Were you involved in the decision to allow

19         probationary lieutenants and nonprobationary and

20         probationary firefighters to apply for the

21         battalion chief position?

22   A.    Yes.  I made -- Yes.

23   Q.    Was that a group decision or did you make that

34

1        decision yourself?

2   A.   I did not see anything in our policy or job

3        description that would have excluded the

4        individuals other than lieutenants, and I made

5        that point and then the second memo was sent

6        out.

7   Q.   So you saw the first memo.  And for some reason

8        that triggered you to go --

9   A.   No.  Actually, the first memo went out as I

10       recall.  And then, if I'm not mistaken, I

11       believe we got an application from Mr. Turner.

12       When I got that or when I heard that, I looked

13       and did not find anything that would preclude

14       him from applying for the job.

15   Q.   So it's your testimony that as a result of

16       his -- Mr. Turner's application, you went and

17       looked at the policies and determined that there

18       was nothing that would preclude him from

19       applying for the battalion chief position,

20       correct?

21   A.   As I recall, yes.

22   Q.   And so based upon that, you decided to allow

23       probationary lieutenants, probationary and

35

1        nonprobationary firefighters all to apply for

2        that position; is that correct?

3   A.   Yes, sir.

4   Q.   Is it your position that the lieutenants who had

5        been reclassified in February of '06 were

6        probationary or nonprobationary lieutenants at

7        the time of the battalion chief promotion?

8   A.   Non.

9   Q.   Why is that?

10  A.   Because they weren't promoted.

11  Q.   Mr. Reeves wasn't real familiar with the

12       insignia that different ranking firemen wear.

13       Are you familiar with those insignia?

14  A.   I am not.

15  Q.   Do you recall a meeting with Lieutenant Stephens

16       sometime in 2005 which would have been before

17       the reclassification of team leaders to

18       lieutenant?

19  A.   A meeting before that?

20  Q.   Uh-huh (positive response).

21  A.   I don't recall that we had a meeting before

22       that.

23  Q.   You don't recall the meeting you had with

36

```
 1          Mr. Stephens where he told you that there was a
 2          problem --
 3     A.   I believe we may have met after that meeting --
 4          at some point after that meeting.
 5     Q.   At some point after the reclassification?
 6     A.   No.  After a meeting that we had with the three
 7          individuals that did not agree with the
 8          reclassification.
 9     Q.   You're saying you and Mr. Stephens had a meeting
10          after that meeting?
11     A.   As I recall it was after that meeting.
12     Q.   Can you tell us approximately when this meeting
13          occurred?
14     A.   It may have been the same day.  It could have
15          been the next day.  I think it was shortly after
16          that.
17     Q.   Tell me what you recall was said during that
18          meeting.  It's just you and Mr. Stephens?
19     A.   I believe we went to my office.  To be quite
20          honest, I don't recall any details about the
21          meeting.  I don't recall anything -- I can only
22          assume that there wasn't anything earth
23          shattering, but I don't recall what we said or
```

37

1      what he said.

2    Q.    It's your testimony you don't recall

3          specifically what was said during that meeting?

4    A.    No.  I recall -- I believe we met in my office,

5          but I don't recall any specifics about it, no.

6                    MR. HORSLEY:  Let's take a few

7                    minutes.

8                    (Brief recess.)

9                    (Deposition concluded at

10                   approximately 2:10 p.m.)

11               *  *  *  *  *  *  *  *  *  *  *

12               FURTHER DEPONENT SAITH NOT

13               *  *  *  *  *  *  *  *  *  *  *

14

15               REPORTER'S CERTIFICATE

     STATE OF ALABAMA:

16

     MONTGOMERY COUNTY:

17

          I, Pamela A. Wilbanks, CCR, Registered

18

     Professional Reporter, and Commissioner for the State

19

     of Alabama at Large, do hereby certify that I reported

20

     the deposition of:

21

                    WILLIAM HOWARD JAMES

22

     who was first duly sworn by me to speak the truth, the

23

     whole truth and nothing but the truth, in the matter

1  of:

2   EDDIE OGLETREE, an individual,

3   GERALD STEPHENS, an

4   individual,

5   Plaintiffs,

6   Vs.

7   CITY OF AUBURN, a municipality

8   in the State of Alabama, LARRY

9   LANGLEY, an individual, LEE LAMAR,

10   an individual, BILL HAM, JR., an

11   individual, STEVEN A. REEVES, an

12   individual, BILL JAMES, an

13   individual, CHARLES M. DUGGAN, an

14   individual, and CORTEZ LAWRENCE,

15   an individual,

16   Defendants.

17   In The U.S. District Court

18   For the Middle District of Alabama

19   Eastern Division

20   3:07-CV-867-WKW

21 on Wednesday, July 30, 2008.

22   The foregoing 37 computer printed pages

23 contain a true and correct transcript of the

39

COPY

1  examination of said witness by counsel for the parties

2  set out herein.  The reading and signing of same is

3  hereby not waived.

4         I further certify that I am neither of kin nor

5  of counsel to the parties to said cause nor in any

6  manner interested in the results thereof.

7         This 5th day of August 2008.

8

9

10

11

12

13

14

15  /s/

16  Pamela A. Wilbanks, ACCR #334
    Expiration Date:  9-30-2008

17  Registered Professional Reporter
    and Commissioner for the State

18  of Alabama at Large

19

20

21

22

23