IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

EDDIE OGLETREE, *et al.*,                )
                                         )
            Plaintiffs,                  )
                                         )
       v.                                )       CASE NO. 3:07-CV-867-WKW[WO]
                                         )
CITY OF AUBURN, *et al.*,                )
                                         )
            Defendants.                  )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Before the court is Defendants' Motion for Summary Judgment (Doc. # 76), which is accompanied by an evidentiary submission and a brief (Doc. # 77). Defendants move for summary judgment on Plaintiffs' claims alleging discriminatory failure to promote on the basis of race, disparate impact on the basis of race, and retaliation, in violation of the Equal Protection Clause to the Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 ("§ 1983"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"). Opposing the motion, Plaintiffs filed a Brief in Response (Doc. # 82), and an evidentiary submission (Doc. # 83). Defendants filed a Reply (Doc. # 88), and Plaintiffs filed a surreply (Doc. # 98). After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendants' Motion for Summary Judgment is due to be granted.

## II.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  The parties do not contest personal jurisdiction or venue, and the court finds that there are allegations sufficient to support both

## III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Rule 56(e)(2).  To avoid summary judgment, the non-moving party "must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party."  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).

## IV.  FACTS

In 2006, Plaintiffs, who at the time were lieutenants in the City of Auburn's Fire Division, applied for a battalion chief promotion.  Neither was promoted, but four Caucasian firefighters were.  Defendants say Plaintiffs were not promoted because they failed the written examination, not because they are African-American.  Plaintiffs, however, say that reason is a coverup for race discrimination and retaliation and that the minimum score for passing the written examination created a disparate impact on African-Americans. Defendants move for summary judgment on all claims.  The facts material to the resolution of the summary judgment motion are set out below.  Those facts are portrayed in the light most favorable to Plaintiffs.

### A.     Parties

There are two Plaintiffs: Eddie Ogletree ("Ogletree") and Gerald Stephens ("Stephens").  They are African-American employees of the City of Auburn's Fire Division. Mr. Ogletree began his employment with the Fire Division in 1984.  (Ogletree Dep. 20 (Ex. A to Doc. # 76).)  In June 1996, he became a team leader; in February 2006, he was

promoted to lieutenant.  (Ogletree Dep. 10, 20.)  Mr. Stephens began working for the Fire Division in January 1994.  (Stephens Dep. 20, 22 (Unnumbered Ex. to Doc. # 80).)  In 1996, he was promoted to lieutenant.  (Stephens Dep. 43-44.)  Having been denied battalion chief promotions in 2006, Plaintiffs remain lieutenants.

There are seven Defendants.  The City of Auburn ("City") is a municipality organized under the laws of the State of Alabama.  Larry Langley ("Langley") served as the fire chief for the City from 1997 until he retired in November 2007.  (Langley Dep. 4-6 (Ex. H to Doc. # 76).)  In December 2007, Lee Lamar ("Lamar") became the acting fire chief, an appointment which was made permanent in July 2008.  (Lamar Dep. 5 (Ex. I to Doc. # 76).)

Steven A. Reeves ("Reeves") has been employed with the City as its human resources director since 1993.  (Reeves Aff. ¶ 2 (Ex. F to Doc. # 76).)  As part of his job responsibilities, he took part in the decision regarding the process to be used to promote firefighters to battalion chief in 2006.  (Reeves Aff. ¶ 3.)  Bill Ham Jr. ("Ham") has been the City's mayor since 1998.  (Ham Aff. ¶ 2 (Ex. C to Doc. # 76).)  Mr. Ham has no hiring, promoting or firing authority for the City.  (Ham Aff. ¶ 4.)  Since October 2004, Bill James ("James") has served as the City's public safety director.  (James Dep. 5 (Ex. F to Doc. # 76).)

Charles M. Duggan Jr. ("Duggan") became acting city manager in February 2006.  (Duggan Aff. ¶ 2 (Ex. D to Doc. # 76).)  Mr. Duggan has hiring and firing authority.

4

(Duggan Aff. ¶ 3.)  When the battalion chief promotions were made in 2006, he approved the recommendations made to him as a result of the promotional process.[1]  (Duggan Aff. ¶ 4.)

There is one third-party defendant in this lawsuit: CWH Research, Inc. ("CWH"). (Third-Party Compl. (Doc. # 56).)  CWH developed the written examination that Plaintiffs failed.  Defendants, as third-party plaintiffs, seek indemnification from CWH in the event that they are held liable on the claims brought against them by Plaintiffs.[2]  (Third-Party Compl. 1-4 (Doc. # 56).)

**B.   <u>Fire Division</u>**

*1.   Hierarchy*

In 1996, in ascending order of rank, the City's Fire Division consisted of student firefighters, career firefighters, team leaders, lieutenants, captains, a deputy chief and a fire chief. (Stephens Dep. 46.)  After 1996, career firefighters were promoted to team leader, not lieutenant.  Mr. Stephens was the last employee promoted to lieutenant.  (Stephens Dep. 48.)

In 1996, there were promotions to both captain and lieutenant.  (Stephens Dep. 51.) At this time, Mr. Stephens was promoted to lieutenant on the basis of an assessment center, which consisted of a panel of assessors, unaffiliated with the City or the Fire Division, who

---

[1] Cortez Lawrence also was named as a defendant, but Plaintiffs since have "stipulate[d]" to his dismissal (Doc. # 68).

[2] Also pending in this lawsuit is CWH's Motion for Summary Judgment on the claims brought against it by Defendants (Doc. # 74).  That motion is addressed in a separate Order.

put him through scenarios applicable to real-life firefighting.  Mr. Stephens did not take a written test.  (Stephens Dep. 43-44, 45 & 51.)

In November 2004, the captains petitioned the city manager to have their title changed to "battalion chiefs," and the change was made.  (Lamar Aff. ¶ 6 (Ex. K to Doc. # 76); Reeves Aff. ¶ 18; Reeves Dep. 49-51 & 57 (Unnumbered Ex. to Doc. # 80).)  The title change did not result in any change "to the [team leaders'] job description or the rate of pay." (Reeves Aff. ¶ 18; *see also* Lamar Aff. ¶ 6; Reeves Dep. 52-53, 57.)

In February 2006, the team leaders petitioned the City to be reclassified as "lieutenants."  (Lamar Aff. ¶ 7; Stephens Dep. 57.)  The City agreed.  (Lamar Aff. ¶ 7.) There was no difference in pay or any material change in job responsibilities.  (Lamar Aff. ¶ 7; Stephens Dep. 57; Langley Dep. 28; Ogletree Dep. 17, 29-30; *see generally* Summ. J. Br. 15-16.)  However, the insignia on a lieutenant's uniform included one bugle, while the insignia on a team leader's uniform had no bugles.  (Summ. J. Resp. 6; Reeves Dep. 52-53.) Mr. Stephens, the only lieutenant at the time, opposed the re-titling, but Mr. Ogletree signed the petition requesting the change.  (Stephens Dep. 60, 64-65; Reeves Dep. 39-40; Ogletree Dep. 13, 18-19.)  The reclassification of team leaders to lieutenants resulted in team leaders, including Mr. Ogletree, receiving the rank of lieutenant (Ogletree Dep. 10, 20); the other team leaders who were reclassified as lieutenants were Caucasian (Summ. J. Resp. 6).  The four Caucasian firefighters who, instead of Plaintiffs, subsequently were promoted to

battalion chief in 2006 were among the team leaders whose titles were changed to lieutenant in February 2006.  (Reeves Dep. 45-46, 76; *see also* Summ. J. Br. 16.)

### 2.       *1991 Hammock Court-Approved Settlement Agreement*

In 1991, the City of Auburn settled a class action lawsuit filed on behalf of the City's Fire Division employees, alleging a pattern and practice of racial discrimination, and the court approved the Settlement Agreement.  *See Hammock v. City of Auburn, Ala.,* No. 87-680-E (M.D. Ala. Feb. 15, 1991).  Section 12 of that agreement provides that promotions for the positions of captains and lieutenants must be accomplished through an assessment center.  Section 12, titled "ASSESSMENT CENTER" provides in full:

> The City has submitted to this Court an Assessment Center which shall be approved by the Court and implemented by the City for use in the promotion of Lieutenants and Captains with the Fire Division.  Notwithstanding any language to the contrary contained in the City of Auburn Assessment Center Candidate Orientation Manual, all promotions subject to Assessment Center involvement shall be made by promoting the candidate rated Number 1 by the Assessment Center for each such promotion.

(*Hammock* Court-Approved Settlement Agreement ¶ 12 (Ex. A to Doc. # 80).)

Mr. Reeves describes an assessment center as a conglomeration of job-related devices used to determine who the best candidates are for a promotion.  (Reeves Dep. 20.)  An assessment center means that some individual or company not employed or affiliated with the City had to implement the processes for the promotion.  (Reeves Dep. 21.)  After the *Hammock* Settlement Agreement was approved, an outside consultant was hired to establish

the assessment center used for promotions occurring in 1994 and 1996.  (Reeves Dep. 21-22.)

**C.**   **2006 Battalion Chief Promotions**

In 2006, a notice was posted for promotional openings for the battalion chief position. (Lamar Dep. 16.)  This was the first promotion process for the position since 1996.  From February through June, 2006, Mr. Reeves (human resources director), Mr. James (public safety director), Mr. Langley (fire chief), and Mr. Lamar (deputy fire chief) were involved in the promotion of firefighters within the Fire Division.  (Reeves Dep. 12-13; Reeves Aff. ¶ 4.)  Mr. Duggan (city manager) gave final approval of the promotions.  (Reeves Dep. 13.)

Mr. Reeves, Mr. James, Mr. Langley and Mr. Lamar made the decision to hire CWH to develop the procedure for the battalion chief promotions.  (Reeves Aff. ¶ 4; Lamar Dep. 17-19, 23-24.)  Mr. Reeves worked with CWH to create and execute a contract for CWH to develop a process for the battalion chief promotions.  (Reeves Aff. ¶ 5; Reeves Dep. 14, 17; *see also* Ex. L (Letter of Agreement between City of Auburn and CWH).)  Pursuant to the terms of the Letter of Agreement, CWH agreed to provide a job analysis review; to provide a validated, semi-customized written test; to handle scoring the test; to administer an assessment center including its development, training and scoring; to provide a feedback letter to candidates and process summary to the City; and to conduct a content validation process for the test.  (Letter of Agreement.)

The written test was developed by CWH.  Each firefighter applying for the battalion chief position had to pass the written test before proceeding any further in the promotional

process.  The minimum score to pass the test was 70.  Mr. Reeves says that the decision to use a cutoff score on the written examination was "a collective decision made by [him], the public safety director [Mr. James], the deputy fire chief [Mr. Lamar], and CWH," and that the City had discretion to implement a cutoff score for the test.  (Reeves Dep. 23 (brackets added); *see also* Reeves Dep. 28 (testifying that "[h]ad the City said [it] d[i]dn't want to use a cutoff score, I don't think CWH would have argued with us"); Lamar Dep. 20 (confirming that the City, not CWH, had the "ultimate discretion as to whether or not [the] test would contain a cut-off score").)  Mr. Reeves explained that a score of 70 "is the cut off score commonly used in the fire service, including the Alabama Fire College and the National Fire Academy[;] it was consistent with the cut off score the City ha[d] used in past selection processes, and . . . it was important to ensure that those who were promoted to this critical life and community safety position kn[e]w well the body of knowledge necessary to do the job of [b]attalion [c]hief."  (Reeves Aff. ¶ 8.)  Chris Hornick ("Hornick"), CWH's president, however, says that CWH was not involved in the collective decision to implement a cutoff score:  "The City of Auburn elected[,] against CWH's advice[,] to impose a test score cut-off of 70 as a precondition to advancing to the assessment center.  CWH recommended that the City allow all applicants to proceed to the assessment score regardless of test score."

(Hornick Decl. 1 (brackets added).)   Mr. Hornick, however, does not say why CWH recommended against a cutoff score of 70.[3]

As to the firefighters eligible to apply for the battalion chief positions, Mr. James determined that all non-probationary firefighters, probationary lieutenants, and non-probationary lieutenants would be allowed to apply.  (Reeves Aff. ¶ 11; Langley Dep. 19; James Dep. 33-34; Lamar Dep. 34.)  Nine Caucasian firefighters and three African-American firefighters took the written examination on April 10, 2006.  (Ogletree Dep. 78; Reeves Aff. ¶¶ 12-13.)  Of those twelve, seven firefighters did not attain a passing score of 70 and, thus, were not eligible for promotion.  (Reeves Aff. ¶ 13.)  The three African-American applicants, who were Mr. Ogletree, Mr. Stephens and a non-probationary firefighter, did not make the cutoff score.  (Reeves Aff. ¶ 3; Reeves Dep. 102-03.)  Five of those who passed completed the assessment center, and four were promoted.  (Reeves Aff. ¶¶ 13-15.)  The four individuals promoted had been employed with the City for ten years or more.  (Lamar Dep. 40-41; Reeves Aff. ¶ 15.)

Mr. Ogletree and Mr. Stephens complain that they had more years of service, more time-in-grade and "arguably more experience" than the four individuals promoted to the position of battalion chief.  (Summ. J. Resp. 10; *see also* Ogletree Dep. 1-10, 117, 138; Stephens Dep. 153, 154, 157, 158; Summ. J. Resp. 9, 14-15.)  As to experience, Mr. Ogletree

---

[3] Defendants contend that Mr. Hornick's affidavit should be stricken.  (Mot. Strike at 3 (Doc. # 86); *see also* Order (denying motion to strike, but providing that "only evidence that is admissible on its face or can be reduced to admissible form" would be considered on summary judgment) (Doc. # 89).)  Accepting as true Mr. Hornick's conclusion, however, does not sway the outcome, as discussed *infra*.

says, for example, that he was required to learn the City's "streets and numbers" (Ogletree

Dep. 21), and that "most" battalion chiefs "don't know their streets and numbers," but instead

learn them during "on-the-job training" (Ogletree Dep. 122).  Mr. Ogletree believes that

some of the Caucasians who sat for the written examination and were promoted "did not have

enough seniority or time-in-grade to qualify for the [b]attalion [c]hief promotion." (Summ.

J. Resp. 18; Ogletree Dep. 25-26; *see also* Summ. J. Resp. 22 ("Seniority is the number of

years that a firefighter has been with the department[,] and time-in-grade is the amount of

time spent at [the employee's] current rank.").)  Mr. Stephens "feels as though he is more

qualified for the [b]attalion [c]hief job than" the Caucasian individuals who were promoted.

(Summ. J. Resp. 15 (citing Stephens Dep. 160).)  Mr. Stephens can "think of no other

reason" other than race discrimination as to why he was not promoted to battalion chief.

(Stephens Dep. 170; Summ. J. Resp. 15.)

## D.    The Complaint and EEOC Charges

The operative complaint is the Third Amended Complaint; it contains three counts.

In Counts One and Two, Plaintiffs allege that they were discriminated against on the basis

of their race and retaliated against when they were not promoted to battalion chiefs in 2006.

(Third Am. Compl. ¶¶ 13-31 (Doc. # 65).)  In Count Three, Plaintiffs allege that Defendants'

"employment procedures and/or testing mechanisms" pertaining to the 2006 battalion chief

promotions created a disparate impact on African-American firefighters.  (Third Am. Compl.

¶¶ 32-34.)  As relief, Plaintiffs seek declaratory and injunctive relief, punitive damages,

11

"compensatory damages, back pay, front pay, loss of retirement benefits and pension, [and] loss of promotion." (Third Am. Compl. 6 (brackets added); *see also* Third Am. Compl. 7 & 8.)

Plaintiffs bring their claims pursuant to the Equal Protection Clause of the Fourteenth Amendment, as enforced by § 1983, and Title VII. (Third Am. Compl. ¶ 12.) Each Plaintiff received a letter dated April 14, 2006, that he had not passed the written examination. (*See, e.g.*, Ex. R to Doc. # 80 (letters notifying Ogletree and Stephens that they were "ineligible to participate in the assessment center" because they "did not pass the written test").) Within 180 days of that notification, they filed charges with the Equal Employment Opportunity Commission ("EEOC"). (*See* Exs. K, L, P & X to Doc. # 80.) They received right-to-sue letters dated July 18, 2007, from the EEOC, and filed suit within the required ninety days. (Third Am. Compl. ¶ 12; *see* Exs. E & F to Doc. # 2.)

**E.   Retaliation**

As stated, Count Two is a claim for retaliation. The factual basis for Mr. Stephens's retaliation claim is that in January 2005, Mr. Stephens submitted a grievance to the City's Fire Division, complaining of discriminatory promotional practices. (Stephens Aff. 1 (Ex. S to Doc. # 80).) Mr. Langley, who at the time was the fire chief, told Mr. Stephens that, if he "continued with this discrimination grievance there would be a 'red flag' next to [his] name with the City of Auburn.'" (Stephens Aff. 1.) Mr. Stephens says that Mr. Langley's statement is "evidence that [Mr.] Langley's attitude about the grievance was related to the

denial of the promotion in 2006." (Summ. J. Resp. 54.) The City, in turn, attributes the denial of the promotion solely to Mr. Stephens's failure to score at least 70 on the written examination. (Summ. J. Br. 53; Summ. J. Reply 25.) As discussed *infra*, Mr. Ogletree has abandoned his retaliation claim.

## V.  DISCUSSION

### A.    <u>Individual Liability: Title VII and § 1983</u>

#### *1.    Bill Ham*

Plaintiffs "consent to the [s]ummary [j]udgment [m]otion as it relates to [Mayor] Bill Ham[] Jr." (Summ. J. Resp. 2.) Defendants' motion for summary judgment as to the claims asserted against Mr. Ham, therefore, is due to be granted.

#### *2.    Title VII*

The Individual Defendants are sued only in their personal capacities. It is not clear from the Third Amended Complaint whether the individual Defendants are sued under Title VII, or only under § 1983, but both Plaintiffs and Defendants brief the Title VII claims as if they are against the City only. (Summ. J. Br. 38; Summ. J. Resp. 36.) The court will adopt the same approach, given that personal liability cannot attach to individuals under Title VII. *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act."); *accord Albra v. Advan, Inc.*, 490 F.3d 826, 830 (11th Cir. 2007).

### 3.      § 1983: Qualified Immunity

In their opening brief, the individual Defendants argue that they are entitled to qualified immunity on the § 1983 equal protection claims against them in their individual capacities.  (Summ. J. Br. 30-35.)  Plaintiffs do not mention the defense in their response, instead focusing only on the merits.  In their reply, Defendants argue that Plaintiffs' failure to address their qualified immunity arguments constitutes abandonment of those claims to which the defense is asserted.

To receive qualified immunity, "an official must first establish that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *McCullough v. Antolini*, ___ F.3d ___, 2009 WL 469327, at *4 (11th Cir. 2009) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).  Once a defendant establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is "inappropriate." *Id.*  To meet his burden, the plaintiff must demonstrate, first, that the summary judgment facts "make out a violation of a constitutional right," and, second, that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194 (2001)).

To the extent that the individual Defendants were involved in the decisions affecting Plaintiffs' employment,[4] it is clear from the summary judgment evidence – and Plaintiffs

---

[4] As to certain Defendants, including City Manager Duggan, Defendants contend that they had no involvement.  (Summ. J. Br. 34.)

plead their claims on the precondition (*see* Third Am. Compl. ¶¶ 5-11) – that the individual Defendants were acting within their discretionary authority as city officials when they made the employment decisions at issue.  *See Holloman ex. rel. Holloman v. Harland*, 370 F.3d 1252, 1304 (11th Cir. 2004) (The appropriate inquiry on the question of discretionary authority is not whether a defendant had "authority to commit the allegedly illegal act," but whether the acts complained of were part of the defendant's job-related duties).  This element is undisputed.

Plaintiffs, however, have not made any attempt to demonstrate that qualified immunity is "inappropriate."  *McCullough*, ___ F.3d at ___, 2009 WL 469327, at *4; (*see* Summ. J. Resp. 53.)  As the burden is on Plaintiffs to show that the individual Defendants are not entitled to the defense, the court finds that Plaintiffs have failed to defeat Defendants' properly-supported motion seeking summary judgment on the ground of qualified immunity. Summary judgment, therefore, is due to be entered in the individual Defendants' favor on the § 1983 equal protection claims on the basis of qualified immunity.[5]  The claim proceeds, for the time being, against the City.

---

[5] The analysis on the merits of the § 1983 claims applies equally to the individual Defendants and provides an alternative basis for granting summary judgment in the individual Defendants' favor on the § 1983 claims.

**B.**     **The City:  Title VII and § 1983 Claims Alleging Disparate Treatment and Retaliation**

Title VII makes it unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ."  42 U.S.C. § 2000e-2(a)(l).  Title VII also forbids employers from discriminating against an employee who has (1) "opposed any practice made an unlawful employment practice [by Title VII]"; or (2) "made a charge, testified, assisted, or participated in any matter in any investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *accord Crawford v. Metro. Gov't of Nashville & Davidson County*, 129 S. Ct. 846, 849 (2009).

As the parties acknowledge, Plaintiffs' Title VII race discrimination and § 1983 equal protection claims are premised on the same evidence.  (Summ. J. Br. 38; Summ. J. Resp. 53.) The same is true for Plaintiffs' Title VII and § 1983 retaliation claims.  "Title VII and section 1983 claims have the same elements where the claims are based on the same set of facts." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 n.5 (11th Cir. 2008); *accord Underwood v. Perry County Comm'n*, 431 F.3d 788, 793 (11th Cir. 2005).  Plaintiffs' Title VII claims, thus, need not be discussed separately from the § 1983 claims,[6] and, the analysis is governed

---

[6] No contrary argument has been advanced by either party.

by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[7]

Under *McDonnell Douglas*, the establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated or retaliated against the employee. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). In turn, this "presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case." *Id.* at 506-07. If the employer produces competent evidence of a legitimate, nondiscriminatory reason for the adverse employment action, meaning that "the proffered reason is one that might motivate a reasonable employer," the burden shifts to the employee to "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). At this juncture, an employee "must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reason[] given by the employer w[as] not its true reason[], but w[as] a pretext for discrimination." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (brackets added). "The focused inquiry in the last step requires the plaintiff to demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Rioux*, 520 F.3d at 1275 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519,

---

[7] When a plaintiff presents "discrimination by direct evidence, application of *McDonnell Douglas* is inappropriate." *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990). As explained later in this opinion, the racial slurs are not direct evidence of discrimination. Plaintiffs do not contend that there is any other direct evidence in this case.

1538 (11th Cir. 1997)). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). "The result of this three step dance is that the burden [of persuasion] is always on plaintiff to show that defendant's action is discriminatory." *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir. 2005) (per curiam) (brackets added).

For the reasons set out below, Plaintiffs have failed to present evidence that creates a genuine issue of material fact that the City's use of a cutoff score on the written examination is a pretext for racial discrimination or retaliation. As a result, Plaintiffs' discriminatory failure-to-promote claims and Mr. Stephens's retaliation claim cannot survive Defendants' summary judgment motion.

### 1.    *Failure to Promote*

Initially, it is useful to clarify what is not at issue. To quote Plaintiffs, this lawsuit "is not an attack on the validity of the [written] test itself." (Summ. J. Resp. 35.) In other words, "Plaintiffs do not maintain that the test itself was discriminatory." (Summ. J. Resp. 35.) Rather, Plaintiffs contend that the use of a cutoff score on the written test "as the first step in the promotional process, without the consideration of experience, seniority, time-in-grade, [knowledge of] streets and numbers and the [*Hammock*] Court[-]ordered assessment center," caused Plaintiffs to be ineligible for "continu[ing] in the promotional process and the

18

promotion itself." (Summ. J. Resp. 34 (brackets added).)  While Plaintiffs admit that four Caucasian applicants also were excluded from the promotion by failing the test, they say that "it is undisputed that the African[-]Americans [who] failed the exam have longer tenure with the City['s] Fire Division than the candidates who passed the exam." (Summ. J. Resp. 34.)

The *prima facie* elements of a discriminatory failure-to-promote claim are set out in *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344 (11th Cir. 2007):

> In order to establish a prima facie case on the basis of a failure to promote, Plaintiff must demonstrate that: (i) she belonged to a protected class; (ii) she was qualified for and applied for a position; (iii) despite qualifications, she was rejected; and (iv) the position was filled with an individual outside the protected class.

*Id.* at 1348 n.2.

The City challenges the second element dealing with qualifications.  The City says, without citation to authority, that it is "somewhat unclear" in this circuit what is required for a plaintiff to sustain his *prima facie* burden on the qualifications element. (Summ. J. Br. 40.) It contends that Plaintiffs' inability to score at least 70 on the written test should end the inquiry. (Summ. J. Br. 41.)  Plaintiffs, however, argue that the City is "attempt[ing] to use the very discriminatory conduct about which [they] complain as an instrument to argue that [they] do not meet the qualification requirement[.]" (Summ. J. Resp. 38.)  Plaintiffs argue that, "but for the cut off score exam, [they] were qualified for the Battalion Chief position." (Summ. J. Br. 37.)

*Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997),[8] a Title VII case involving an allegedly racially discriminatory termination, contains a warning against using the employer's rationale for the adverse action to prevent an employee from proving a *prima facie* case of discrimination:  Where the issue of the plaintiff's "*job performance is intertwined with the issue of whether his termination was pretextual,* [*his*] *job performance will not be examined until a later stage of the McDonnell Douglas analysis.*"  *Id.* at 1562 n.3 (brackets added). Taking the same approach as in, but not citing, *Holifield*, the Eleventh Circuit in *Sledge v. Goodyear Dunlop Tires North America, Ltd.,* 275 F.3d 1014 (11th Cir. 2001), held that the plaintiff's inability to pass a prescribed written test did not render him unqualified for the promotion.  *See id.* at 1019.  The *Sledge* court analyzed the defendant's reason for denying the plaintiff a promotion – *i.e.*, that he did not pass the required written examination – at the pretext stage, *see id.* at 1015 n.1 & 1019-20, rather than at the *prima facie* case stage, as urged by the employer, *id.* at 1018-19; *see also Scarborough v. Mineta,* No. 3:03cv328, 2006 WL 931859, at *6 (N.D. Fla. April 10, 2006) ("Because [plaintiff] was terminated from training based on evaluations which [plaintiff] contends were *themselves* unlawfully discriminatory, it would be inappropriate to treat the evaluations as positively establishing that [he] was unqualified for the position."); *Gunn v. Whizz Temp. Agency*, No. 90-C-4235, 1992 WL 209284, at *3  (N.D. Ill. Aug. 18, 1992) ("Although defendant contends plaintiff was not qualified for the position because she did not pass the tests, the significance of

---

[8] In *Holifield*, the Eleventh Circuit affirmed the judgment of the district court "for the reasons stated in its dispositive order" and attached that order as an Appendix.  115 F.3d at 1556-57.

plaintiff's alleged failure of the tests will be addressed during the discussion of whether [defendant's] articulated reason for not hiring plaintiff was pretextual.").

Here, the reason the City contends Plaintiffs were not qualified for the promotion is the same reason as its nondiscriminatory reason for not promoting Plaintiffs – *i.e.*, that Plaintiffs "failed to score a 70 on the written test." (Summ. J. Br. 41.)  Consequently, heeding *Holifield*'s caution and consonant with *Sledge*, the court will not require Plaintiffs to demonstrate qualifications at the *prima facie* case stage, but will address qualifications at the next two stages of the *McDonnell Douglas* analysis.  No other challenge to the *prima facie* case having been made by the City, the court finds that Plaintiffs' failure-to-promote claim properly advances to the next *McDonnell Douglas* stage.

The City has introduced admissible evidence that the reason for not promoting either Plaintiff is because he did not score at least 70 on the written test.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).  That reason is "clear and reasonably specific," *id.* at 258, and if "taken as true, would permit the conclusion that there was a

nondiscriminatory reason for the adverse action," *St. Mary's Honor Ctr.*, 509 U.S. at 511.[9]

The presumption created by the *prima facie* case, therefore, is rebutted, and the issue turns

on whether Plaintiffs have offered sufficient proof to raise a genuine issue of material fact

that the City's stated reason for not promoting them – *i.e.*, that they failed to score 70 on the

written examination – is pretext.  Plaintiffs say it is for several reasons.[10]  (Summ. J. Resp.

40-44.)

---

[9] In another section of their brief, Plaintiffs cite *Lee v. Conecuh County Board of Education*, 634 F.2d 959 (5th Cir. 1981), and argue that the City's "past history of racial discrimination" requires the City to prove its nondiscriminatory reason by "'clear and convincing'" evidence.  (Summ. J. Resp. 50 (citing *Lee*, 634 F.2d at 963); *but see* Summ. J. Surreply 2 (qualifying "that there is a long history of 'alleged' racial discrimination").)  Because Plaintiffs' argument is undeveloped, it will not be considered. This opinion, therefore, does not present the time or place to explore whether *Lee*'s holding applies outside of "the distinctive context of claims alleging discrimination, whether in employment or other areas, *by a school district with a history of unlawful segregation*."  *Castaneda v. Pickard*, 648 F.2d 989, 994 n.2 (5th Cir. 1981) (emphasis added).  There is, however, authority suggesting that it does not apply outside that context.  *See Harris v. Birmingham Bd. of Educ.*, 712 F.2d 1377, 1383 (11th Cir. 1983) (applying *Lee*'s "clear and convincing" standard in class action against school board operating under a desegregation order; "[i]mplicit in [*Lee*'s] holding[] is that proof of an immediate past history of racial discrimination may be established by showing the existence of various desegregation orders"); *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 n.5 (11th Cir. 1982) (noting that where the discrimination lawsuit "arises out of a school desegregation order the nature of defendant's rebuttal burden may be greater" (citing *Lee*, 634 F.2d at 963)).  Nor is it necessary to examine whether the alleged past history of racial discrimination, ostensibly arising from the *Hammock* litigation that was settled in 1991, was "immediate," as required under *Lee*, 634 F.2d at 963.  It is notable, however, that in *Lee*, as well as in *Harris*, the plaintiffs also introduced probative statistical evidence of recent discrimination. *See Lee*, 634 F.2d at 964; *Harris*, 712 F.2d at 1380-81.  As will become clear, such evidence is missing in this case.

[10] Plaintiffs begin their discussion of pretext by listing multiple contentions in rapid-fire, single-sentence form.  (Summ. J. Resp. 40-41.)  They do not provide any elaboration, do not support these contentions with citations to the record, and do not refer back, with appropriate citations, to other sections of their brief.  While it "is not the court's function to weed through the summary judgment submissions in search of evidence to support [Plaintiffs'] position," *Foster v. Mid State Land & Timber Co, Inc.*, No. 2:06cv405, 2007 WL 3287345, at *11 (M.D. Ala. Nov. 5, 2007) (brackets added); (*see also* Uniform Scheduling Order § 2 (Doc. # 35)), the court nonetheless has attempted to connect the dots between Plaintiffs' contentions and the record citations set forth in other parts of their brief.  As discussed, however, Plaintiffs' contentions fail to create a genuine of issue of material fact as to pretext.

### a.    Alleged Connection Between Tenure and Test Taking

Plaintiffs argue that the City knew that, "because of their tenure" – Mr. Ogletree having been employed with the Fire Division since 1984 (Ogletree Dep. 20) and Mr. Stephens since 1994 (Stephens Dep. 20, 22) – they would have more "trouble" than the Caucasian applicants attaining a score of 70 on the written examination.  (Summ. J. Resp. 41.)  In another part of their brief (Summ. J. Resp. 34-35), Plaintiffs cite an unsigned and unsworn letter from CWH's president to the EEOC, in which CWH says that "[t]he tenure (time since date of hire) of candidates who passed the test was 8 years," but that the "average tenure of candidates who failed the test was 16 years."  (CWH EEOC Resp. (Ex. F to Doc. # 76).)  "Research studies exist in the professional literature that suggest that older, more tenured workers perform more poorly as a group on standardized tests than younger workers."  (CWH EEOC Resp.)  Plaintiffs do not cite any exception to the hearsay rule that would allow consideration on summary judgment of an unsigned, unsworn letter to the EEOC summarizing conclusions from unnamed studies by unnamed authors.

That flaw aside for the moment, Plaintiffs also do not provide any specifics as to the tenure of the Caucasian applicants, instead choosing to rely on a conclusory statement in their brief, with no citation to the record (Summ. J. Resp. 34), and a lone statement from Mr. Reeves that, "to the extent . . . [Plaintiffs] had been employed longer [than those promoted], ostensibly they had worked more shifts than these others" (Summ. J. Resp. 10 (citing Reeves Dep. 74)).  Even assuming, however, that there was specific evidence that Plaintiffs' tenure

with the Fire Division exceeded that of the Caucasian test takers, Plaintiffs' argument is weakened by the fact that four arguably less-tenured Caucasian applicants also failed the written test.   But, more important on this record, it simply is impossible to infer any connection between Plaintiffs' seniority with the Fire Division and an intent to discriminate on the basis of race.   Rather, Plaintiffs' contentions are based upon pure speculation, and "[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (internal quotation marks and citation omitted).   In short, Plaintiffs cannot establish pretext on such a sketchy argument.

### b.   Content Validity of the Test

Plaintiffs argue that the City's reason for the non-promotions is pretextual "because the City has not and cannot prove the content validity of the test[.]"  (Summ. J. Resp. 41.) This argument, however, loses all vitality – and candidly is perplexing – in light of Plaintiffs' express statement that they are not "attack[ing] the validity of the test itself."  (Summ. J. Resp. 35.)  It also lacks merit at the pretext stage because Plaintiffs, not the City, bear the burden of persuasion on pretext.  *Chapman*, 229 F.3d at 1030.  Relatedly, to the extent that Plaintiffs argue that the written test was "not scientifically validated not to adversely affect African Americans" (Summ. J. Resp. 41), the argument fails for the same reasons.

24

### c.       Violation of the *Hammock* Order

Two of Plaintiffs' arguments focus on accusations that the City's use of a written examination with a cutoff score violates the *Hammock* Order that approved the Settlement Agreement resolving that litigation.[11]  *See Hammock v. City of Auburn, Ala.*, No. 87-680-E (M.D. Ala. Feb. 15, 2009).   (Summ. J. Resp. 49-51.)   Citing § 12 of the *Hammock* Settlement Agreement, they argue that it requires that "all Captains [later redesignated battalion chiefs by the City] and Lieutenants promotions shall be accomplished through an assessment center," but that "there is nothing in the Order that authorizes the City to screen which applicants go to the assessment center by use of a cut off score." (Summ. J. Resp. 49 (brackets added).)  Plaintiffs, thus, argue that the cutoff score on the written examination is a filter by which to eliminate applicants from proceeding to the assessment center, while the City takes the position that "a written test option was part of the assessment center offered by CWH – not a separate matter" (Summ. J. Br. 43).  The City, in essence, argues that "[t]here was no intent to avoid a promotional process[,]" as that is what the City specifically sought to do – establish a promotional process through consultation with CWH.  (Summ. J. Reply 16.)  Alternatively, the City construes the *Hammock* Order as not disallowing an "objective measure of job knowledge" in the form of a written examination.  (Summ. J. Br. 43.)  The City also asserts that, even assuming that "there was some technical violation (which the City adamantly denies), such is not evidence of race discrimination unless there

---

[11] Plaintiffs do not in this case seek to state an independent cause of action for alleged violations of the Order.  Nor do they bring a claim alleging breach of the *Hammock* Settlement Agreement.

is evidence that the City violated the order with the intent to discriminate against black applicants."  (Summ. J. Reply 15; *see also* Summ. J. Br. 43.)

Here, Plaintiffs cite solid authority for the proposition that parties subject to a consent decree are legally bound to adhere to its terms and that a failure to do so puts the infringing party at risk of being held in contempt of court.  (Summ. J. Resp. 51.)  The Third Amended Complaint, however, does not state an independent cause of action for alleged violations of the *Hammock* Order, *see supra* note 11.  Assuming without deciding that the court-approved *Hammock* Settlement Agreement is the legal equivalent of a consent decree, the issue is not whether the City should be held in contempt of court for alleged violations of the *Hammock* Order concerning the promotional procedures the City implemented to fill the battalion chief positions in 2006.  Rather, as to a violation's relevance to this lawsuit and Plaintiffs' claims, the issue is whether any violation of the *Hammock* Order during the promotional process, if such evidence exists, is sufficient to raise a jury question as to pretext.  As to this issue, Plaintiffs cite no authority.  *But cf. Kobrin v. Univ. of Minn.*, 121 F.3d 408, 413 & 414-15 (8th Cir. 1997) (rejecting the plaintiff's argument that the university's breach of a provision of a consent decree that required the university to "recalculate . . . faculty gender statistics" proved that the proffered reason for not hiring the plaintiff was a pretext for unlawful sex discrimination; holding that, "even if the University had recalculated the . . . faculty gender statistics, [the plaintiff] would not have been hired"); *NLRB v. Local 483 & Local 11, Int'l Ass'n. of Bridge, Structural & Ornamental Ironworkers, AFL-CIO*, 672 F.2d 1159, 1164 (3d

Cir. 1982) ("A failure to comply with the consent decree does not necessarily constitute a violation of the [National Labor Relations] Act," prohibiting "unfair labor practices[.]").

Here, Plaintiffs appear to argue that a deviation by the City from the *Hammock* Order in the process implemented to fill the battalion chief positions in 2006 creates a jury issue on the issue of pretext because it illustrates the "differences in treatment" by the City between African-American and Caucasian fire fighters. (Summ. J. Resp. 49.) But, that rationale is not persuasive.

All twelve applicants for the battalion chief job – African-Americans and Caucasians alike – were required to take the written examination. (Ogletree Dep. 78; Reeves Aff. ¶¶ 12-13.) All received the same study materials. (*See generally* Summ. J. Br. 12-13; Reeves Aff. ¶ 14 (attesting that "[t]he application process was the same for each candidate[;] [i]dentical test aid materials were distributed to each applicant"); Reeves Aff. ¶ 10.) All applicants who failed to score at least 70 on the written examination – those applicants being four Caucasians and three African-Americans – were precluded from proceeding in the promotional process and were not promoted. The evidence establishes that the African-American and Caucasian applicants for the battalion chief positions were treated equally, not differently. On these facts, even assuming that the City's decision to implement a cutoff score on the written examination for the battalion chief promotions violated the *Hammock* Order, Plaintiffs have failed to provide evidence of any link between that alleged violation

and an alleged discriminatory intent by the City in requiring that all applicants for the battalion chief position score 70 on the written examination.

Plaintiffs also complain that there are other incidents of the City's violations of the *Hammock* Order illustrating differential treatment between Caucasian and African-American firefighters.  In particular, Plaintiffs complain that, shortly before the battalion chief positions opened up, twelve team leaders "received a rank increase to [l]ieutenant without undergoing an assessment center pursuant to the [*Hammock*] Order."  (Summ. J. Resp. 49.)  On this factual record, however, it is too long an evidentiary leap from that event to an inference of a racially discriminatory intent by the City when it denied Plaintiffs a promotion because they failed to score 70 on the written examination.  *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) ("[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.").  For one thing, it is undisputed that Mr. Ogletree was one of the team leaders reclassified to the rank of lieutenant; it is difficult to conceive how a decision that Mr. Ogletree claims was beneficial to him later can be said to signify a discriminatory motive in the City's decision to deny him a promotion to battalion chief.  (*See, e.g.*, Summ. J. Resp. 49; Ogletree Dep. 10, 20.)  For another thing, Plaintiffs have presented insufficient facts and arguments, and no authority, that establishes that the title change from team leader to lieutenant – which undisputedly did not result in a change in pay, but did result in a change

28

in the uniform insignia[12] (Lamar Aff. ¶ 7; Stephens Dep. 57; Langley Dep. 28) – was a "promotion" governed by § 12 of the *Hammock* Settlement Agreement. *See Perryman v. West*, 949 F. Supp. 815, 819 (M.D. Ala. 1996) (Job action must affect "a term or condition of employment and [the job action] is not adverse merely because the employee dislikes it or disagrees with it.") (brackets added).  The court is not under an obligation, and declines to undertake one, to develop Plaintiffs' argument and scour the record for supporting evidence, should there be any. *Cf. Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008) (Title VII employee's "perfunctory and undeveloped" argument was waived.); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (There "is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").

To the extent that the alleged violation of the *Hammock* Order concerning the title change would be relevant to the issue of whether the City discriminated against Plaintiffs based on their race in requiring them and all other applicants – African-American and Caucasian alike – to score 70 on the written examination, Plaintiffs simply have not met their burden of presenting evidence from which it can be inferred that a violation of the *Hammock* Order occurred.  Even if they had, there is no evidence from which discriminatory intent can

---

[12] Plaintiffs believe, but cite no authority in support of that belief, that the title change effectuated a promotion because the insignia on a lieutenant's uniform included one bugle, but the insignia on a team leader's uniform had no bugles.  (Summ. J. Resp. 6; *see also* Summ. J. Resp. 5 ("Although the City claims this was not a promotion, it is a rank increase according to the insignia that the firefighters wear on their uniform."); Reeves Dep. 52-53.)

be inferred.  Accordingly, the court finds that any evidence of alleged noncompliance with the *Hammock* Order is not probative of racial discrimination in this case.

### d.    Qualifications

Plaintiffs argue that they have demonstrated pretext by putting forth evidence showing that they had more years of service and more time-in-grade than the four individuals promoted to the position of battalion chief.  At the same time, they fault the City for not taking into account an employee's years of service and time-in-grade.  (Ogletree Dep. 138; Stephens Dep. 153; Summ. J. Resp. 10, 37.)  The City does not dispute that, in the promotional process for battalion chief, there was no consideration for seniority or time-in-grade.  (Summ. J. Br. 6 (citing Reeves Dep. 71 & 93).)  The City contends, however, that Plaintiffs fail to present any evidence that its decision not to consider either factor is somehow related to race.  (Summ. J. Br. 42.)

In *Abel v. Dubberly*, 210 F.3d 1334 (11th Cir. 2000), cited by the City, the Eleventh Circuit reiterated that an "'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Id.* at 1339 n.5 (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)).  This is because a federal court should not and cannot "sit as a super-personnel department that reexamines an entity's business decisions."  *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).  Against that backdrop, however, it is not impossible "to show pretext by asserting superior qualifications[.]"  *Tippie*

*v. Spacelabs Med., Inc.*, 180 F. App'x. 51, 55 (11th Cir. 2006); *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (per curiam) ("[Q]ualifications evidence may suffice, at least in some circumstances, to show pretext[,]" but the "'disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" (citation omitted)).  In general, however, qualifications must be adjudged based upon the employer's selected job criteria, as "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer."  *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000) (quoting *Combs*, 106 F.3d at 1528); *see also Chapman*, 229 F.3d at 1030 (A plaintiff is not permitted to "substitute his business judgment for that of the employer.").

The salient question is not whether, on the basis of seniority and time-in-grade, Plaintiffs were so much more qualified for a battalion chief promotion than those promoted that the City could not have chosen those selected for the promotion over Plaintiffs.  That is because the City did not consider either seniority or time-in-grade as to any applicant when making the promotion decisions.  (Reeves Aff. ¶ 11.)  Plaintiffs do not get to pick and choose the City's criteria for awarding promotions, and to the extent that they ask this court to do so for the City, Plaintiffs essentially are asking for a federal court review of the City's personnel decisions.

Plaintiffs must instead offer evidence that the City's decision to give preliminary weight to the written examination's cutoff score, and no weight to seniority or time-in-grade, was for a racially discriminatory reason. Plaintiffs have presented no evidence that raises an inference that the criterion adopted by the City is discriminatory. The City's decision not to consider seniority or time-in-grade is not inconsistent with its past practices. Mr. Reeves attests that "[t]he Fire Division had not given points for seniority in past promotional processes," and that "CWH had expressed some caution in regard to awarding points for seniority and/or education."[13]   (Reeves Aff. ¶ 11.)  Plaintiffs' subjective beliefs that they were more qualified than the Caucasian applicants who were promoted (*see, e.g.*, Summ. J. Resp. 15, 18; Ogletree Dep. 25-26) are unavailing. *See, e.g., Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 58 (11th Cir. 2005) (A Title VII plaintiff cannot establish pretext by "present[ing] only his own unsubstantiated opinion that he was qualified for the position.").

### e.   Statistics

Plaintiffs suggest that the Fire Division's hiring and promotional practices reveal statistical disparities in the ratio of African-American and Caucasian firefighters and that these disparities are evidence of pretext.  (*See* Summ. J. Resp. 4-5.)  Namely, Plaintiffs submit evidence for the purpose of demonstrating an estimate as to the marked disparity

---

[13] Plaintiffs complain that some promotions within the Fire Division "utilized interviews," others "situational testing" and others "appointment[s]."  (Summ. J. Resp. 4-5.)  Plaintiffs, however, have not demonstrated the relevance or materiality of these processes to the complained-of battalion chief promotions.  These processes pertained to other ranks, as well as to ranks not governed by the *Hammock* Order.

between the number of African-American and Caucasian firefighters hired by the City since 1991.  (Summ. J. Resp. 4 (citing Lamar Dep. 35-36 & Reeves Dep. 105, 107); Summ. J. Resp. 5 (citing Ogletree Dep. 55).)

Plaintiffs are correct that, in individual disparate treatment cases, "statistics *may* be relevant to establish that an employer's articulated reason for an employment action is pretextual."  *Burney v. Rheem Mfg. Co.*, 196 F.R.D. 659, 667 (M.D. Ala. 2000) (emphasis added) (citing *McDonnell Douglas*, 411 U.S. at 804-05).  To be statistically meaningful on the issue of pretext, however, there must be a way to discern whether the disparities in hiring "are the result of legitimate or racially-discriminatory variables."  *Blackledge v. Ala. Dep't of Mental Health & Mental Retardation*, No. 2:06cv321, 2007 WL 3124452, at *20 (M.D. Ala. Oct. 25, 2007); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004) ("Statistics without any analytical foundation are virtually meaningless.") (internal quotation marks and citation omitted); *accord Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir. 1991).

In *Wilson*, for example, analyzing an individual disparate treatment claim alleging discriminatory failure to promote, the Eleventh Circuit rejected the plaintiff's proposed statistical evidence that, during a specified period of time, only two females had been selected to fill forty-four open positions for vice president.  376 F.3d at 1088.  "This statistical evidence is not even probative of pretext because [the plaintiff] has not provided

any other relevant information, including the number of women who expressed interest in vice president positions."  *Id.* at 1089.

Here, Plaintiffs contend that, since 1991, the City has hired forty-eight Caucasian firefighters, but only five African-American firefighters, that the student firefighter program has resulted in the hiring of only one African-American (who happens to be Mr. Stephens), and that there presently are only three African-American firefighters in the City's Fire Division.  (Summ. J. Resp. 4.)  Similar to *Wilson*, however, there is an absence of evidence as to the total number of applicants who applied for firefighter positions with the City's Fire Division and the percentage of African-Americans in that hiring pool.  The portions of the record upon which Plaintiffs rely to show a racial hiring disparity either do not mention at all the number and race of the applicants who applied for the various positions (*see* Lamar Dep. 35-36), or are conclusory and/or based upon inadmissible hearsay (*see* Reeves Dep. 105-07; Ogletree Dep. 55).  *See also Macuba v. Deboer*, 193 F.3d 1316, 1325 (11th Cir. 1999) (To be admissible on summary judgment, evidence "would [have to] be admissible at trial under an exception to the hearsay rule."); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) ("[C]onclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment.").  Hence, there is not an adequate statistical foundation from which to infer that the disparity between the number of African-Americans and Caucasians employed as firefighters with the City either is or is not probative

of racial discrimination.  Because the statistics are devoid of any analytical value, this evidence has no probative value on the issue of pretext.

### f.    Racial Slurs

Plaintiffs argue that they have presented evidence of racial animosity on the part of two of the decision-makers, Mr. Langley and Mr. Lamar, and that discrimination can be inferred from that animus.  (Summ. J. Resp. 43.)  Specifically, they rely on an affidavit from a former City firefighter, William Felton ("Mr. Felton"), who was employed in the Fire Division from 1974 to 1999.  (Felton Aff. (Ex. W to Doc. # 80).)  Mr. Felton attests that Mr. Langley and Mr. Lamar "regularly" used the "N-word" when referring to African-American firefighters.[14]  (Felton Aff. 1.)

It is true that the "[d]isparate treatment analysis requires that none of the participants in the decision-making process be influenced by racial bias." *Jones v. Gerwens*, 874 F.2d 1534, 1541 n.13 (11th Cir. 1989).  Moreover, a decision-maker's race-based derogatory remarks can be used to support an inference that an employment decision was motivated by an impermissible racial bias.  In *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286 (11th Cir. 1998), a Title VII race discrimination case cited by Plaintiffs, the employee offered evidence that, approximately four years prior to his termination, a supervisor involved in his

---

[14] Plaintiffs also rely on an affidavit submitted by one of their colleagues as evidence of racial animosity on the part of Mr. Langley.  (*See* Horace Clanton Aff. 3 (Ex. V to Doc. # 80); Summ. J. Resp. 11, 52.)  It cannot be inferred, in the context presented, that Mr. Langley's statement that other firefighters did not want to work for Mr. Stephens is a statement about race.  No reason is given or suggested as to why Mr. Langley said that other firefighters did not want to work for Mr. Stephens.  It could be for a reason wholly unrelated to race.  There simply is not a sufficient foundation to determine whether the statement is or is not probative of racial animosity on the part of Mr. Langley.

termination, said, "'I never seen as many blacks in this building except in a Tarzan movie.'" *Id.* at 1291. The Eleventh Circuit explained, "Although we have repeatedly held that such comments are not *direct* evidence of discrimination because they are either too remote in time or too attenuated because they were not directed at the plaintiff, . . . we have not held that such comments can never constitute *circumstantial* evidence of discrimination." *Id.*; *see also Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (holding that, when there is other evidence of pretext, a supervisor's racially-biased remark which is not directly related to the employment decision "can contribute to a circumstantial case for pretext").

Contrary to Plaintiffs' argument (Summ. J. Resp. 52), however, the evidence is not direct evidence. Mr. Felton left the Fire Division in 1999 (Felton Aff. 1), some six or seven years prior to the 2006 promotion denials at issue in this case. The racially-derogatory remarks, as reported by Mr. Felton, thus, were not made close in time to the promotions at issue, and whether the remarks were made directly to Plaintiffs is not established by Mr. Felton's affidavit. (Felton Aff. 1.) The evidence can constitute circumstantial evidence of pretext, but absent any other evidence that implementing a cutoff score on the written test was a coverup for discrimination, the past racial slurs, although certainly not condoned, cannot on this record serve to create a jury issue on pretext.

g.     **Comparison with *Sledge***

As a final point, Plaintiffs' failure to raise a genuine issue of material fact as to pretext further is illuminated when the facts are compared to those of another case where the

36

Eleventh Circuit found that the employee sustained his summary judgment burden on his Title VII claims alleging racial discrimination in promotions.  In *Sledge*, the two applicants – the African-American plaintiff and another Caucasian employee – both failed the allegedly required written test for a mechanic promotion, yet the Caucasian employee was promoted instead of the plaintiff.  *See* 275 F.3d at 1018.  There also was evidence that, as to other promotions granted to Caucasian applicants, the plaintiff either was denied an interview or was not permitted to sit for the written test, with no articulated reason given by the employer for the refusals.  *Id.* at 1019-20.  In another instance in *Sledge*, a Caucasian employee who was promoted was permitted to skip certain portions of the written test, but the plaintiff was required to take the entire written test and had to do so at the end of his twelve-hour shift, *id.* at 1017 & 1020; the plaintiff failed the test, but if he had been permitted to skip the component of the test that the Caucasian employee was excused from taking, the plaintiff would have received a passing score, *id.* at 1017.  Viewing those facts in the light most favorable to the plaintiff, the Eleventh Circuit held that the employer's stated reason for denying the plaintiff the promotions at issue – *i.e.*, that the plaintiff did not pass the written test – was a pretext for racial discrimination.  *Id.* at 1020.

Here, contrary to *Sledge*, there is no evidence that any Caucasian applicant failed the written examination, but nonetheless was promoted.  There also is no evidence that any Caucasian applicant who failed the written examination was permitted to continue in the promotional process.  Nor is there any evidence that any Caucasian applicant was not

37

required to take the entire test under the identical testing conditions as Plaintiffs.  Plaintiffs also have not submitted any evidence that they were denied training or study materials that were provided to the Caucasian test takers.  (*See generally* Summ. J. Br. 12-13 (discussing evidence pertaining to Plaintiffs' preparations for test); Reeves Aff. ¶ 14 (attesting that "[t]he application process was the same for each candidate[;] [i]dentical test aid materials were distributed to each applicant"); Reeves Aff. ¶ 10.)

      **h.**    **Summary of Pretext**

Having considered carefully the arguments for and against a finding of pretext, the court finds that Plaintiffs have not met their ultimate burden of persuasion by raising an inference that the City's proffered reason for not promoting them – *i.e.*, that they did not score 70 on the written examination – is racially discriminatory.  They have not shown "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[] for its action that a reasonable factfinder could find [it] unworthy of credence.'"  *Rioux*, 520 F.3d at 1275 (quoting *Combs*, 106 F.3d at 1538).  In short, the failure-to-promote claims fail for lack of proof of pretext sufficient to raise a genuine issue of material fact for trial.

      *2.*    *Retaliation*

      **a.**    **Mr. Ogletree**

Mr. Ogletree did not respond to Defendants' properly-supported motion for summary judgment on his retaliation claim (*see, e.g.,* Summ. J. Br. 24-25, 51-53 (arguing that Mr.

Ogletree has never engaged in protected activity and therefore cannot maintain a retaliation claim")); therefore, he has abandoned it, *see Resolution Trust Corp.*, 43 F.3d at 599 ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

### b.   Mr. Stephens

Mr. Stephens says that he was denied the promotion to battalion chief because in January 2005, he submitted a grievance to the City's Fire Division, complaining of discriminatory promotional practices. (Stephens Aff. 1.)  The parties apply the *McDonnell Douglas* framework to Mr. Stephens's retaliation claim. (*See* Summ. J. Br. 51-52; Summ. J. Resp. 53-54.)  Under that framework, a *prima facie* case of retaliation requires proof "that (1) [the plaintiff] engaged in statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity." *Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1028 (11th Cir. 2008) (internal quotation marks and citation omitted).  In this circuit, the causal relation element is defined "so that 'a plaintiff merely has to prove that the protected activity and the . . . [adverse] action are not completely unrelated.'" *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)).

In its opening summary judgment brief, the City does not dispute that Mr. Stephens engaged in a protected activity or that the promotion denial was an adverse employment action. (*See* Summ. J. Br. 52.)  It, however, argues that Mr. Stephens fails to prove any

"causal connection" between those two events (Summ. J. Br. 52-53; *see also* Summ. J. Br. 24-25), but Mr. Stephens says that he has (Summ. J. Resp. 53-54).  Namely, Mr. Stephens points to his declaration, in which he explains that Mr. Langley told him that, if he "continued with this discrimination grievance there would be a 'red flag' next to [his] name with the City of Auburn.'"  (Stephens Aff. 1.)  He says that Mr. Langley's comment "is evidence that [Mr.] Langley's attitude about the grievance was related to the denial of the promotion in 2006."  (Summ. J. Resp. 54.)  The City does not dispute that Mr. Langley was involved in the decision-making concerning the promotional process that resulted in Mr. Stephens not getting promoted.  (Summ. J. Reply 25 (Mr. Langley was "one of many participants in the promotion process development.").)  It, however, contends that, even if Mr. Langley's "red flag" comment is true, "there is absolutely no causal connection between the statements and the denial of the 2006 Battalion Chief promotion" (Summ. J. Reply 25), given that Mr. Stephens failed the written examination, and that Mr. Stephens has not demonstrated, and cannot demonstrate, that the content of the written examination "could effectuate retaliation" (Summ. J. Reply 25).  The City argues, in essence, that the failure of Mr. Stephens to score at least 70 on the written test is an intervening cause that severs any retaliatory causal connection between Mr. Langley's "red flag" statement and his failure to obtain the promotion.  *Cf. Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 521 (11th Cir. 2007) (rejecting retaliation claim where an "intervening act of misconduct . . . severed

the causal connection (if any) between [plaintiff's] initial complaint of discrimination and [defendant's] decision to terminate her employment" (brackets added)).

Because the City again relies on the written examination both as the means to defeat Mr. Stephens's *prima facie* case and as its legitimate nondiscriminatory reason, it is appropriate to defer a decision as to the validity of that reliance until the pretext stage of the *McDonnell Douglas* analysis. Deferral, however, does not in the end save Mr. Stephens's claim. Mr. Stephens relies upon the same evidence and inferences of pretext he submitted in regard to his discriminatory failure-to-promote claim. (Summ. J. Resp. 54 ("[F]or all reasons previously stated, the cut off score test reason is in fact pretextual[.]").) For the same reasons discussed in the context of that claim, *supra*, Mr. Stephens fails to raise a genuine issue of material fact as to whether his failure to pass the written examination is a pretext for unlawful retaliation. Just as Mr. Stephens has presented no evidence that the cutoff score on the written test was racially discriminatory, he also has presented no evidence that the cutoff score was rigged for retaliation. And, to reiterate, Plaintiffs do not contend in this lawsuit that the examination itself was anything other than a race-neutral, objective, non-retaliatory and professional examination. (Summ. J. Resp. 35 (This lawsuit "is not an attack on the validity of the [written] test itself.").) Accordingly, summary judgment is due to be granted in Defendants' favor as to Mr. Stephens's Title VII/§ 1983 retaliation claim against the City.

C.    **Title VII:  Disparate Impact**

Plaintiffs also bring a disparate impact claim.  (Third Am. Compl. ¶¶ 32-34 (Count

Three).)  Unlawful racial discrimination in violation of Title VII may be proved not only

under a disparate treatment theory, as discussed above, but also under a disparate impact

theory.[15]  *See EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000).  Claims

brought under the disparate treatment theory require "proof of discriminatory intent"; claims

brought under the disparate impact theory "do not."  *Id.*  A "disparate impact theory prohibits

neutral employment practices which, while non-discriminatory on their face, visit an adverse,

disproportionate impact on a statutorily-protected group."[16]  *Id.* at 1274; *see also Nash v.*

*Consol. City of Jacksonville*, 905 F.2d 355, 356-57 n.2 (11th Cir. 1990) (Title VII "proscribes

---

[15] The parties have not addressed whether a disparate impact theory can prove a violation of the Equal Protection Clause.  *Cf. Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610, 1626 (2008) (The Fourteenth Amendment's Equal Protection Clause "does not regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class*.") (Scalia, J., concurring in judgment).  The analysis here proceeds only under Title VII, but the same analysis also would support summary judgment in favor of the City as to the § 1983 equal protection claim.

[16] The relevant statutory provision is 42 U.S.C. § 2000e-2(k)(1)(A).  It provides:

Burden of proof in disparate impact cases

(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if–

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

42 U.S.C. § 2000e-2(k)(1)(A).

'not only overt discrimination but also practices that are fair in form, but discriminatory in operation.'" (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).  "The doctrine seeks the removal of employment obstacles, not required by business necessity, which create 'built-in headwinds' and freeze out protected groups from job opportunities and advancement."  *Joe's Stone Crab*, 220 F.3d at 1274 (citation omitted).

The framework for proving unlawful discrimination based upon a disparate impact theory is "well settled."  *Id.*  In a disparate impact race discrimination case, a plaintiff initially "must make out a prima facie case 'that [a] facially neutral employment practice has a significantly discriminatory impact.'"  *Id.* (citation omitted).  To establish a *prima facie* case, a plaintiff must show that "(1) there is a significant statistical disparity among members of different racial groups; (2) there is a specific, facially-neutral employment policy or practice; and (3) there is a causal nexus between the specific policy or practice and the statistical disparity."  *Cooper v. S. Co.*, 390 F.3d 695, 724 (11th Cir. 2004); *accord Joe's Stone Crab*, 220 F.3d at 1274.  As recognized in *Joe's Stone Crab*, this circuit "adopt[s] a flexible approach for determining whether a particular statistical deviation is 'significant' for disparate impact analysis in light of all the facts and circumstances."  220 F.3d at 1275 n.12 (citation omitted).  Even under a flexible approach, however, the deviation cannot rest solely on "'bottom line' statistical imbalances in an employer's workforce."  *Id.* at 1276 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 992 (1988)).  The statistical deviation also may be unreliable if it is based upon "small or incomplete data sets[.]"  *Watson*, 487

43

U.S. at 996-97; *see also Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) (affirming district court's dismissal of disparate impact claim because "[a] sample involving 6 female applicants in a pool of 38 applicants is likely too small to produce statistically significant results"). Moreover, a plaintiff must offer "'statistical evidence of a kind and degree sufficient to show that *the practice in question* has *caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Joe's Stone Crab*, 220 F.3d at 1274-75 (quoting *Watson*, 487 U.S. at 994).

If the plaintiff establishes a *prima facie* case, the "burden of production then shifts to the defendant to establish that the challenged employment practice serves a legitimate, non-discriminatory business objective." *Id.* at 1275. "However, even if the defendant satisfies this burden, a plaintiff may still prevail by proving that an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well." *Id.*

The City contends that Plaintiffs have not established a *prima facie* case of disparate impact. Initially, according to the City, it is unclear "what facially neutral employment practice is in question." (Summ. J. Reply 20.) The City, however, presumes for its analysis that the facially-neutral employment practice was the City's practice of disqualifying for promotion applicants for battalion chief who failed to meet the cutoff score of 70 on the written examination. (Summ. J. Br. 47); (*see also* Summ. J. Reply 20 ("It is insufficient to assert that every aspect of the promotional process caused Black applicants to not be promoted.").) The court will presume the same, as Plaintiffs' disparate impact discussion

44

focuses upon the failure of the three African-American applicants to pass the written examination for battalion chief. (*See* Summ. J. Resp. 44.)  In this regard, the evidence is that twelve individuals – nine Caucasians and three African-Americans – took the written examination, but that seven individuals – four Caucasians and three African-Americans – did not score at least 70 and, resultantly, were ineligible for the battalion chief promotion. (Reeves Aff. ¶ 13.)

The City argues, however, that "[a]n applicant pool of twelve individuals cannot establish statistical significance." (Summ. J. Br. 47.)  Plaintiffs disagree, stating that, for purposes of their *prima facie* case, they can demonstrate that the written examination's cutoff criterion had a disparate impact upon African-Americans based upon the "four-fifths rule," as set out in the EEOC's Uniform Guidelines on Employee Selection Procedures. (Summ. J. Resp. 44.)

The four-fifths, or 80 percent, rule provides:

A selection rate for any race . . . which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

29 C.F.R. § 1607.4(D).  Thus, according to the four-fifths rule, if 20 percent of African-American applicants are hired, but 40 percent of Caucasian applicants are hired, the ratio is 20/40, or 50 percent, meaning that the selection rate for African-American applicants is 50

percent of the selection rate for Caucasian applicants.  The 50 percent selection rate is less than 80 percent and, consequently, violates the four-fifths rule.

Plaintiffs point out that "the passing rate of African Americans for the Battalion Chief promotion (0%) is less than four-fifths of the passing rate of the Caucasian applicants (55%)."  (Summ. J. Resp. 44.)  According to Plaintiffs, "[t]his result, although the pool of applicants is relatively small, does seem to indicate a violation of the 'four-fifths rule.'" (Summ. J. Resp. 44.)  Framed that way, application of the four-fifths rule to the racial composition of the pass rate on the written examination of the twelve battalion chief applicants yields the results stated by Plaintiffs.  But, as to the "data" upon which they rely, Plaintiffs have not cited any cases that have permitted an employee to satisfy his *prima facie* disparate impact case based solely upon application of the four-fifths rule to a statistical pool as small as twelve.  There, however, is authority, including the rule itself, that supports the opposite conclusion.

To begin with, in *Watson*, the Supreme Court noted that the four-fifths rule "has been criticized on technical grounds" and that the rule "has not provided more than a rule of thumb for the courts."  487 U.S. at 995 n.3.  In *Price v. City of Chicago*, which cited *Watson*, the district court found that a sample size of twenty-two was "too small" for purposes of applying the four-fifths rule.  *See* No. 99cv7864, 2000 WL 1468318, at *4 n.2 (N.D. Ill. Aug. 29, 2000) (noting also that the four-fifths rule is "not the law – it is a guideline or rule of

thumb used by the EEOC in considering selection procedures" (citing *Watson*, 487 U.S. at 995 n.3)), *aff'd*, 251 F.3d 656 (7th Cir. 2001).

The text of the rule itself recognizes the rule's limited utility when the statistics are based upon "small numbers." 29 C.F.R. § 1607.4(D). Notably, in their brief, Plaintiffs omit this portion of the rule that provides: "Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant." 29 C.F.R. § 1607.4(D). Where the "numbers . . . are too small to be reliable," the rule provides that "evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact." *Id.* Based upon the foregoing text, one district court concluded that, at least where the sample size is relatively small (189 in that case), "the 4/5ths Rule is recognized as a rule of thumb to be used in conjunction with standard deviation or other statistical evidence." *Jones v. Pepsi-Cola Metro. Bottling Co.*, 871 F. Supp. 305, 311 (E.D. Mich. 1994).

Based upon the foregoing authority, Plaintiffs' reliance solely upon the four-fifths rule as establishing "a significant statistical disparity," *Cooper*, 390 F.3d at 724, is unavailing. The sample size is twelve, less than the sample size of twenty-two found insufficient in *Price*, and much less than *Jones*'s inadequate 189-sample pool. Standing alone, the sample size simply is too small to render the disparity reliable as a statistical indicator of disparate

impact.  Plaintiffs have not offered any other statistical analysis or evidence or attempted to broaden the statistical analysis beyond the promotion in question, as recommended in the rule's text.  Nor have they, as pointed out by the City, presented any evidence from a "statistical expert."  (Summ. J. Reply 20.)  Plaintiffs also have not explained the statistical relevance, if any, of the fact that four of the nine Caucasians who took the written examination also failed to attain a passing score, meaning that 44 percent of the Caucasian test takers failed.

Because Plaintiffs have failed to demonstrate a statistically meaningful disparity, it logically follows that they cannot establish a causal nexus between the facially neutral employment practice of requiring battalion chief applicants to score 70 on the written examination and the statistical disparity.  Plaintiffs have not presented evidence of a *prima facie* case, thus, entitling the City to summary judgment on their unlawful discrimination claim premised upon a disparate impact theory.

## VI.  CONCLUSION

Summary judgment is due to be entered in favor of the individual Defendants on the § 1983 equal protection claims either on the basis of consent (Mr. Ham) or on the basis of qualified immunity (all other individual Defendants).  To the extent that Plaintiffs seek to bring Title VII claims against the individual Defendants, those claims are not viable based upon the authority of *Busby.  See* 931 F.2d at 772 ("The relief granted under Title VII is

against the employer, not individual employees whose actions would constitute a violation of the Act.").

As to the City, Plaintiffs' Title VII race discrimination and § 1983 equal protection claims, to which the same analysis applies, fail because Plaintiffs have presented no evidence to create a genuine issue of material fact regarding pretext. Plaintiffs' Title VII/§ 1983 retaliation claim against Mr. Stephens fails for the same reason, and Mr. Ogletree has abandoned his Title VII/§ 1983 retaliation claim. Finally, Plaintiffs' attempt to prove Title VII unlawful race discrimination under a disparate impact theory based solely upon application of the four-fifths rule is unsuccessful given the small sample size.[17]

## VII. ORDER

Based on the foregoing, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. # 76) is GRANTED.

A final judgment will be entered separately.

DONE this 31st day of March, 2009.

/s/   W.  Keith Watkins

UNITED STATES DISTRICT JUDGE

---

[17] As to arguments raised by the parties, but not addressed in this opinion, the arguments either lack merit, or are not necessary to the conclusion.